Fc3iwavc ag                    CONFERENCE

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  THE WAVE STUDIO, LLC,

4               Plaintiff,

5          v.                          13 Civ. 9239 CS

6  GENERAL  HOTEL MANAGEMENT,
   LTD., et al.,
7
               Defendants.
8
   ------------------------------x
9
                              White Plains, N.Y.
10                            December 3, 2015
                              11:25 a.m.
11
   Before:
12
                    HON. CATHY SEIBEL,
13
                              District Judge
14
                      APPEARANCES
15 HIARING SMITH
        Attorney for Plaintiff
16 VIJAY K. TOKE

17 CHIESA SHAHINIAN & GIANTOMASI
        Attorney for Defendant General Hotel Management
18 ABIGAIL REMORE
   HOWARD J. SCHWARTZ
19
   CLAUSEN MILLER
20      Attorney for Defendant VFM, etal.,
   MATTHEW JAMES VANDUSEN
21
   BAXTER & SHAPIRO
22      Attorney for Defendant Delta
   SIM R. SHAPIRO
23
   GOLDBERG SEGALLA
24      Attorney for Defendant Setai
   DANIEL BARRIE MOAR
25

Fc3iwavc ag                    CONFERENCE

 1          THE COURTROOM DEPUTY:  Wave Studio v. General Hotel

 2   Management.

 3          THE COURT:  Good morning everyone.  Let's see, for

 4   plaintiff, Mr. Toke.

 5          MR. TOKE:  Yes.  Good morning, your Honor.

 6          THE COURT:  For defendant, Mr. Schwartz, Ms Remore and

 7   Mr. Van Dusen.  You can all have a seat.

 8          I've got Mr. Schwartz's November 19th letter regarding

 9   the motion that defendant would like to make and I have

10   Mr. Toke's November 30th letter regarding the motion plaintiff

11   would like to make, and why defendant's motion isn't going to

12   succeed in plaintiff's view.

13          Let me just ask a procedural question.  You mentioned,

14   Mr. Toke, in your letter that you want to proffer an expert on

15   Singapore law.  When you folks were before Judge Davison that

16   was just on fact discovery, did you talk about expert

17   discovery?

18          MR. SCHWARTZ:  No, your Honor.  As I understand it,

19   for purposes of this motion, we wouldn't be submitting

20   necessarily expert reports but just, not just, but from

21   defendant's perspective an affidavit from a very sophisticated

22   gentleman from Singapore for your Honor's consideration.  So as

23   I understand the law and certainly this aspect of the case with

24   respect to foreign law, your Honor has the ability to make the

25   exclusive determination on foreign law and you can consider

Fc3iwavc ag                    CONFERENCE

1    affidavits from foreign experts but they're not necessarily

2    expert reports at this time.

3            THE COURT:  You're on the same page?

4            MR. TOKE:  We're on the same page, your Honor.

5            THE COURT:  So we don't need to set a schedule for

6    expert discovery, you're not asking to depose each other's

7    foreign law experts.

8            MR. TOKE:  No, your Honor.  We just raised the issue

9    in order to have that discussion and counsel discussed it and I

10   think we're in agreement that there need not be any expert

11   discovery.  But I think there should be some disclosure at some

12   point  But that's it.

13           MR. SCHWARTZ:  We have disclosed today who our expert

14   is going to be and plaintiff knew it because we met at his

15   office for depositions and as I understand it plaintiff does

16   not yet have an expert.

17           MR. TOKE:  We don't have an expert retained yet but we

18   are speaking to experts on the topic.

19           THE COURT:  I so look forward to that.  Let me just

20   ask some questions raised by the letters just to see if we can

21   sharpen the issues a little bit.  Obviously I'm going to need

22   briefing on these complex issues.  I guess I'll start with

23   Mr. Schwartz's letter.  The whole premise, as I understand it,

24   of your argument that Singapore law applies here is that the

25   most significant relationship test determines whose law

Fc3iwavc ag                    CONFERENCE

1    applies.  But isn't the plaintiff correct that that only

2    applies to unregistered works?

3          MR. SCHWARTZ:  Not at all.  In fact, they're quite

4    incorrect.  The case that they rely -- the theory that they

5    relied on is expressly rejected by Itar in footnote 5 which I

6    have here.  Plaintiff is relying on a Virginia district court

7    case which says that there was a distinction between registered

8    and unregistered, and the district court in Virginia relied on

9    the district court opinion in Itar which was overruled by the

10   Second Circuit.  So here's footnote number 5 in Itar from the

11   Second Circuit.  It says:  To the extent that this decision

12   applies to U.S. work-for-hire doctrine simply because

13   copyrights certificates had been issued by the United States

14   Copyright Office it relied on an unpersuasive ground.  Issuance

15   of the certificate is not a determination concerning

16   applicability of a work-for-hire or a resolution of any issue

17   concerning ownership, and then there's a citation.  And no case

18   from the Southern District following Itar has followed that, if

19   I may say, rogue interpretation from Virginia.

20          So I would say it's absolutely clear from footnote 5

21   that their contention is incorrect.  And we've also then, the

22   Second Circuit in Itar relied heavily on Patry and we followed

23   up on Patry's own discussion of Itar and it also makes no

24   mention whatsoever of this registered versus unregistered

25   distinction.  So it's not correct that the Virginia case is

Fc3iwavc ag                    CONFERENCE

1   wrong.  It relied on the district court opinion which was

2   overruled and the district court did not mention footnote 5.

3           THE COURT:  Mr. Toke, you don't want me to be a rogue,

4   do you?

5           MR. TOKE:  In this instance being a rogue may not be a

6   bad idea.  But we disagree with that interpretation of footnote

7   5.  In fact, the district court in Virginia was simply

8   recognizing that the Second Circuit didn't overrule the grant

9   of summary judgment for those individuals that did have

10  certificates of copyright registration.  So we believe that the

11  case we cited was actually appropriate.  But in any event,

12  obviously this is an issue that needs to be litigated and is

13  certainly appropriate for the motions.

14          One thing I wanted to clarify, your Honor, with our

15  letter, and I apologize if it wasn't clear, because it wasn't

16  to opposing counsel, plaintiff is not suggesting that we must

17  file a summary judgment motion.  In fact, we'd prefer if the

18  main issue of copyright ownership, whether it be be owned by

19  Wave or the hotels as GHM is now contending, could be decided

20  on one motion rather than having cross-motions.  It becomes a

21  lot more cumbersome.  But we simply raise the issue if that's

22  how the Court would prefer it.

23          THE COURT:  I would never presume to give strategic

24  advice.  But it seems if the defendants move for summary

25  judgment all I can do is grant it or deny it.  If I deny it,

Fc3iwavc ag                    CONFERENCE

1    then the only way you can win is at a trial unless you've also

2    moved.  All I can say is even if I think you're right I can't

3    grant you summary judgment unless you make a motion.  Obviously

4    you shouldn't make a motion unless you think you're entitled to

5    win on the undisputed facts, in which case I could grant

6    summary judgment if I agree.  If you think you would win at

7    trial but wouldn't win on summary judgment you shouldn't make

8    the motion.

9            MR. TOKE:  That's why we want to raise the issue.  We

10    think that if GHM is filing a motion for summary judgment as to

11    copyright ownership, claiming that the hotels own the

12    copyrights to these photographs but in fact Singapore law, even

13    if Singapore law does apply, plaintiff will take the position

14    in its opposition that under Singapore law the copyright

15    ownership is waived.

16            THE COURT:  I could find there are disputed facts and

17    then we'd have to have a trial.  I think the most I can do on

18    the defendant's motion is find they have failed to carry their

19    burden that on the undisputed facts they're entitled to

20    judgment.  Even if I believe that on the undisputed facts

21    you're entitled to judgment on that issue, I don't know if I

22    can grant summary judgment without you having filed a motion

23    but you can file -- I mean, it doesn't in my mind have to be a

24    motion that comes with an affidavit and a brief that duplicates

25    your opposition.  It can be one brief that makes the same

Fc3iwavc ag                    CONFERENCE

1    argument or that incorporates the argument.  But I leave it up

2    to you.

3         MR. TOKE:  Okay, your Honor, which is precisely why we

4    raised that issue in our letter because we wanted to know what

5    the Court's position on that is.

6         THE COURT:  I guess my position is I don't have a

7    position; you do what you want.  I also want to ask you,

8    Mr. Schwartz, to just tell me a little bit more about your

9    argument that the plaintiff can't prove that it is the rightful

10   owner of all of the allegedly infringed photographs based on

11   fatal errors in the chains of title.  And I have two questions.

12   One is -- and I understand that this is an argument that only

13   need to reach if U.S. law applies, but it sounds like it

14   does -- if U.S. law applies, you're not arguing that plaintiff

15   can't prove that it's the rightful owner of all the works, just

16   some of them, is that correct?

17        MR. SCHWARTZ:  That issue wouldn't as much be

18   ownership as much as the propriety of the registration which I

19   guess in a certain way is ownership.  Let me give you just one

20   example of one of the issues.  There's four Wave entities, just

21   hold that in the back of your mind.  Over the course of time,

22   way before this litigation started, various entities -- we'll

23   start with the most simple one, sole proprietorship of the

24   individual plaintiff.  She claims she owned some photographs.

25   She then assigned those photographs to another company.  This

Fc3iwavc ag                    CONFERENCE

1   is way before the litigation.  So that entity had no more

2   photographs.  That entity two days later then dissolved in

3   Singapore and then they filed all the proper papers for

4   whatever reason they may have, which I assume from the

5   testimony had something to don't with some amnesty provisions

6   in Singapore.

7           THE COURT:  But entity B now owns whatever rights

8   entity A had.

9           MR. SCHWARTZ:  Just bear with me on this image.  It's

10  like on Fifth Avenue with the shell games.

11          THE COURT:  Those shell games haven't been out for

12  decades.

13          MR. SCHWARTZ:  Showing my age.

14          THE COURT:  Unfortunately, I know what you're talking

15  about.

16          MR. SCHWARTZ:  The same thing happened with the second

17  company.  She transferred those rights and some additional

18  rights to another company and dissolved the second company.

19  Transferred it to a third company, the same thing happened.  So

20  during the first deposition I went through this at great

21  length, I believe showing that there was some pretty serious

22  flaws in the registrations.  The registrations, for example, in

23  the Copyright Office were registered by companies that had been

24  extinguished and no longer in existence, registering copyrights

25  which by their own documents they didn't have.  So there was a

Fc3iwavc ag                    CONFERENCE

1    continuation of the deposition, we couldn't complete it all in

2    the first day.  So the deposition on the second day was I

3    believe September 5 -- September 9th.  And September 4th -- a

4    week before, on September 14th, the plaintiff signed a

5    document, I'm going to read you one paragraph from it which was

6    given to us the day before the deposition.  This is really an

7    ineffective rewriting of history, something along the lines of

8    which I'm sure your Honor has never seen, I've never seen

9    anything like this.  This is a *nunc pro tunc*, meaning forget

10   what history actually happened.  Let just read you, for

11   example, one paragraph from this declaration of the plaintiff

12   individual, from Ms Lee.  It says a purported assignment, this

13   is her own document, she's referring to a purported assignment,

14   meaning her own assignment, a purported assignment of copyright

15   from Wave S, the individual, to Wave Design PTE Ltd. was

16   entered into and made effective as of February 15, 2007.  Okay.

17   On information and belief, we don't know what that means, this

18   assignment was made in error and is void *ab initio*.  In other

19   words, in a document that she signed on September 4, 2015

20   during the course of this litigation and handed to me the day

21   before her continued deposition, she said forget what I really

22   did, forget the thing that I really filed in the copyright

23   registration, it's null and void, it's void *ab initio* and was

24   made in error.

25           So this is a somewhat longwinded answer to your

Fc3iwavc ag                    CONFERENCE

1   Honor's question about what the heck happened.  It depends on

2   what day you want to ask what happened.  In 2007 this happened.

3   But they say in 2005 the this didn't really happen because I'm

4   changing it.

5           THE COURT:  When you asked plaintiff's principal what

6   makes her think this assignment in 2007 was in error, did you

7   get an answer?

8           MR. SCHWARTZ:  I got a lot of gobbledygook in my view.

9   Essentially she said that I made a mistake because I didn't

10  realize that by force of law when I dissolved the companies I

11  would have gotten all of the rights anyway, which may or may

12  not be true, but it doesn't change the fact that she

13  transferred the ownership of this company to another company,

14  which was legitimate, and you incorrectly filed your

15  registration.  You can't pretend that that didn't happen and

16  try to say oh, never mind, which is exactly what she's saying.

17          So there are huge problems.  And mind you, your Honor,

18  and I hate to give you a headache this morning, that's all

19  governed by Singapore law.  The effect of those assignments,

20  the effect of declaring something null and void by itself

21  without explaining the reason for the mistake, that's all

22  Singaporean contract law, not U.S. law.  This is a mess.  And

23  it's not a mess that the defendants have created, it's a mess

24  that the plaintiff has created.

25          THE COURT:  It also presents I guess some chicken and

Fc3iwavc ag                    CONFERENCE

1    egg problems in that do I decide first the effectiveness of

2    these transfers and whether we have the right plaintiff in this

3    lawsuit, or do I come at it from the other end and figure out

4    which law applies.  I don't know.  Complicated.

5            MR. SCHWARTZ:  I'm going to go from a regular headache

6    to an Excedrin headache because there is a question of whether

7    or not if the Copyright Office knew that the entity that was

8    claiming to be the registrant into longer existed and didn't in

9    fact own the rights to the copyright, whether the Copyright

10   Office would have accepted that.  And there is specific

11   provision in the CFR for a referral, if your Honor so chooses,

12   to send that to the Copyright Office for the Copyright Office

13   to give guidance on whether or not they would have accepted

14   that as a registration.  Because you know generally the

15   Copyright Office just stamps something as filed, they don't do

16   an investigation.  Then, to go to a double Excedrin headache,

17   just simply regarding basic contract principles, and I'm

18   stepping ahead from the question that your Honor had originally

19   asked, but there is a contract that the plaintiff relies upon,

20   in other words the document that she sent to the hotel with a

21   copy to GHM that they're relying on as the production estimate

22   that has at the bottom the claimed reservation of rights.

23   That's a contract between Wave, Singaporean company, and the

24   individual hotels, which are entities existing under the laws

25   of Oman, Viet Nam, Indonesia, Malaysia and a whole bunch of

Fc3iwavc ag                    CONFERENCE

1    countries only one of which is the United States from one

2    hotel.  So an interpretation of those contracts is governed by

3    even different foreign law.  The contracts between GHM and the

4    hotels themselves which we've produced to plaintiff and which

5    answer a question of whether or not the general manager -- the

6    question raised by the plaintiff is whether the general manager

7    of the hotel was really an employee of GHM or of the hotel

8    itself.  The contracts say that the general manager is an

9    employee of the hotel.  Each one of those contracts is by its

10   terms governed by the law of the location of the hotel.  Again,

11   one contract is the government of Oman, one is with the

12   government of Viet Nam and numerous other contracts throughout

13   Southeast Asia frankly, with the exception of one hotel in the

14   United States at the time.  I'm not minimizing those questions.

15   I'm saying that those questions exist in this case.  And we

16   intend to raise those questions ultimately in one way to say

17   that this Court shouldn't even be deciding this, that these are

18   *forum non conveniens*  issues, and for whatever reason the

19   plaintiff has not sued any of these hotels.  It seems pretty

20   obvious they're necessary parties.  They're not in this

21   litigation.  Except for one hotel.  I should say the except for

22   one hotel, the Miami hotel.

23        I'm only giving you a little bit of a description of

24   what's going to happen here and I'm not trying to exaggerate

25   and I'm not picking out metaphysical angels on the head of a

Fc3iwavc ag                    CONFERENCE

1    pin.  These are real, first level questions.

2              THE COURT:  Okay.

3              MR. TOKE:  If I might respond to some of these, your

4    Honor.  I think GHM has defeated its own motion for summary

5    judgment before it's even been filled with all these factual

6    issues that they're claiming seem to exist.  With regard to the

7    chain of title, Mr. Schwartz did actually get a straightforward

8    answer and not gobbledygook.  What the principal of Wave

9    indicated, those purported assignments were actually prepared

10   much later inadvertently because the principal of Wave was not

11   a lawyer and was simply trying to make it clear what existed,

12   which is true.  All of these companies had the same principal.

13   All the photographs were created by these various entities, all

14   owned by the same person.

15             THE COURT:  What does that mean, created

16   inadvertently?  Nobody creates an assignment inadvertently.

17             MR. TOKE:  In the sense that it was actually created

18   in 2011, not 2007 or 2008, they were actually --

19             THE COURT:  Nobody does that by mistake.  What was the

20   reason for writing it in 2011 and backdating it?

21             MR. TOKE:  Because it was supposed to be a *nunc pro*

22   *tunc*, now for then, but inadvertent because it was unnecessary.

23   And what plaintiff realized later, actually after the first

24   deposition was oh well, actually these assignments should not

25   have been done.  They're not correct.  Because the chain of

Fc3iwavc ag                    CONFERENCE

1    title was final just as it was.  And so the document that was

2    filed with the Copyright Office that was produced to the

3    defendant was meant to clarify all of that ownership chain of

4    title to make it clear and to clean up that chain of title.

5    This is a very common thing to do.

6            THE COURT:  If you choose to do business in a

7    corporate form, for all the good reasons that people choose to

8    do business in a corporate form, that comes with certain

9    burdens, one of which is it doesn't matter if the owners are

10   the same, they're separate entities.

11           MR. TOKE:  Correct, your Honor.  Yes, of course.  And

12   what this document does is it simply clarifies and cleans up

13   that chain of title.  It's a very common practice within

14   copyright and other intellectual property areas to make sure

15   that if there are any inadvertent errors in the chain of title

16   because these corporate entities have the same principal they

17   can actually --

18           THE COURT:  Isn't inadvertent error like the name of

19   the company was Cathy Seibel, Inc. and you spelled it S-I-E

20   instead of S-E-I?  That's a mistake.  What happened here sounds

21   like it was intentional, even if it was misguided.  Am I

22   allowed to just ignore it?

23           MR. TOKE:  Well, it's not ignoring it, your Honor.

24   There has been an actual clean-up of all of that later by the

25   principal of these companies.

Fc3iwavc ag                    CONFERENCE

1          THE COURT:  And that's allowed?

2          MR. TOKE:  Absolutely.  Why not?  Any contract that

3   has been entered into can then be amended later.  That's very

4   common practice.

5          THE COURT:  Yes and no.  If I make a deal with Joe

6   Smith to paint my house and Joe Smith wants to assign that

7   contract to Jane Doe, he can't do it unless I say okay.  And if

8   in the meantime -- that's a bad analogy, but basically if the

9   owner sells the product and then the new owner, company A

10  doesn't have any rights in this photograph anymore and company

11  A doesn't even exist anymore yet company A registers the

12  copyright when it's owned by company D, let's just say, company

13  A and company D are allowed to say after the fact it's all

14  right, we're cool and the registration that was void when it

15  was made is then retroactively made valid?  It may be that that

16  sort of thing is allowed.

17         MR. TOKE:  In fact yes, because under the copyright

18  rules what Mr. Schwartz is talking about is that the incorrect

19  entity as the owner was placed on some of the copyright

20  registrations and that was simply corrected, which is again

21  commonplace in Copyright Office practice.  This is a very

22  different situation where you have a contract between two

23  separate third parties.  We're talking about a number of

24  companies, successive companies, that are all owned by the same

25  individual.  There's some overlap in some of their operation,

Fc3iwavc ag                    CONFERENCE

1    but generally speaking, when one ended the other one picked up.

2                THE COURT:  Right.  This is clearly a technicality.  I

3    forget the principal's name but the photographer is the

4    principal of all these companies.  So this is a technicality.

5    Sometimes technicalities matter.  I guess you'll both show me

6    whether or not there is authority for fixing mistakes like

7    this.

8                MR. TOKE:  Absolutely.

9                THE COURT:  If we ever get to the implied license

10   issue, it sure sounds like there are going to be fact issues.

11               MR. SCHWARTZ:  It seems to me we don't even need to go

12   that far.  So let's say plaintiff's theory seems to be that she

13   had some agreement at some level with the hotel that the hotels

14   could use the photographs in the brochures but not on the

15   Internet.  I think that seems to be her theory.  That, under

16   very clear Second Circuit guidelines, is a contract action.  In

17   other words, it's not something concerning the copyright and

18   therefore not under federal question jurisdiction, but it's a

19   question of the scope of the license, whether there was a

20   license, there wasn't a license, the license applied to

21   brochures, it didn't apply to brochures.  That is a contract

22   issue, diversity jurisdiction, and there is no diversity

23   jurisdiction because these defendants are domiciled and

24   registered in New York.  Plaintiff is a New York corporation.

25   And for contract jurisdiction, for diversity jurisdiction,

Fc3iwavc ag                    CONFERENCE

1    there is none, so you wouldn't have to go any further than

2    that.

3            THE COURT:  I have jurisdiction because it's a

4    copyright claim.  Don't the others tag along?

5            MR. SCHWARTZ:  No, because under her theory, they pled

6    this as a copyright case but it's not really a copyright case.

7    It's a case concerning the scope of the license or the

8    agreement that she had with the hotels.  So while she may have

9    pled it as a copyright case, the law is very clear in the

10   Second Circuit that regardless of nomenclature that you put on

11   it, if it's not of and concerning really the copyright but is

12   really a scope of the license, that's a contract case.

13           THE COURT:  I do have to say it's tempting to find no

14   jurisdiction or to decide that some court in Singapore should

15   decide this.

16           MR. SCHWARTZ:  That's correct.  And I just say I'm

17   very happy to rely on a brief which would show that the law, as

18   I see it, is pretty clear that the distinction between a claim

19   under a copyright violation as opposed to a claim that's really

20   a contract claim, in other words, here there's no doubt that

21   these entities, some entities on the plaintiff's side hired a

22   photographer to take photographs and were paid.  So there's no

23   question that that occurred.  The question then under their

24   theory is, did we have the right to use the photographs that

25   were paid for and that she took, the photographer, whether or

Fc3iwavc ag                    CONFERENCE

1    not we had the right to use them in the way that we did, that

2    is to say on the Internet.  So it's not a case of a person

3    unconnected to the plaintiff violating the plaintiff's rights.

4    This is a question of the scope of what plaintiff agreed the

5    defendants could do.  That's a contract case.

6            THE COURT:  If the contract said you can do A and B

7    and you do C, then you've infringed the copyright, but it

8    really turns on whether the contract said you could do C or

9    not.

10           MR. SCHWARTZ:  It's a contract case, not a copyright

11   violation.

12           MR. TOKE:  Your Honor, if I might respond briefly to

13   that.  In terms of diversity jurisdiction, even if Mr. Schwartz

14   were correct, I think this actually came up before with

15   MasterCard, although the LLC is in New York, the residence or

16   its principal place, it would be based on the residence of the

17   principal of the LLC, who is, of course, in Malaysia.

18           THE COURT:  I know you have to look to the domicile of

19   the principals, but do you disregard where the LLC exists?

20           MR. TOKE:  Well, if we're looking to determine where

21   the LLC is actually domiciled, then yes.

22           THE COURT:  I just don't remember.  I know for a

23   corporation it's your principal place of business.

24           MR. SCHWARTZ:  And correct me if I'm wrong because I

25   didn't know that that came up in the MasterCard case, which is

Fc3iwavc ag                    CONFERENCE

1    shrouded in secrecy as far as I am concerned, I think the term

2    is aliens under the jurisdiction law, foreign citizens are

3    deemed citizens of every district if I'm correct, if I remember

4    that correctly.

5              THE COURT:  This is all fascinating.

6              MR. TOKE:  In any event, your Honor, we of course

7    disagree that this is a contract case.  This is a copyright

8    case because there is rampant infringement of plaintiff's works

9    all over the Internet and there are a number of defendants

10   where we don't know where they got the photographs and GHM

11   doesn't know where they got the photographs.  They may have

12   been ripped off from somewhere.  It's definitely a copyright

13   case.  There may be some implications which I think this Court

14   exercise its supplemental jurisdiction on, in terms of any

15   implied license with GHM.  Again, with regard to GHM, GHM is

16   now claiming that the contracts entered into were not with GHM

17   but were in fact with the hotels.  So GHM's implied license

18   theory isn't a contract issue because they were a manager of

19   hotels.  And so it's not, it isn't a contract issue with GHM.

20   Nonetheless, again, all of these issues I think are well within

21   the Court's jurisdiction because it is and properly is a

22   copyright case.

23             THE COURT:  Let's go off the record a second.

24             (Discussion off the record)

25             MR. SCHWARTZ:  We have suggested for your Honor's

Fc3iwavc ag                    CONFERENCE

1   approval that the defendant move by January 29th.

2          MR. TOKE:  I thought it was February 14th, your Honor.

3          MR. SCHWARTZ:  February 14th is fine for me.

4          THE COURT:  February 15th is a Monday.

5          MR. SCHWARTZ:  Make it the Friday before.

6          THE COURT:  2/12/16.

7          MR. SCHWARTZ:  30 days for the answering papers would

8   make it March 12th more or less.

9          THE COURT:  That's a Saturday.  Make it Monday the

10  14th for the opposition.

11         MR. SCHWARTZ:  And then reply would be April 14th.

12         THE COURT:  Two weeks for the reply.  Make it April

13  1st.  And if there's going to be a cross-motion then the

14  cross-motion can be made with the opposition and the reply on

15  the cross motion would be April 15th.

16         MS REMORE:  For the opposition on the cross-motion?

17         THE COURT:  Ideally defendants will move, plaintiff

18  will oppose and cross-move together, then you will reply on

19  your motion and oppose on their motion.  If it's going to be

20  that, do you want more than two weeks?

21         MR. SCHWARTZ:  Yes, please.

22         THE COURT:  Why don't we make that April 14th and then

23  reply on the cross-motion April 28th.  Now the question is,

24  what I'd like you to do is talk to your clients about a private

25  mediation and let them know how strongly I think this should

Fc3iwavc ag                    CONFERENCE

1    happen, and then if that means you want to adjust the schedule

2    then send me a letter.

3              MR. SCHWARTZ:  Also there are two other final

4    administrative details.  We requested a larger than average --

5              THE COURT:  All right.  I almost never think it's

6    necessary but in this case, you want 40 pages for your opening

7    brief and 20 for your reply?

8              MR. SCHWARTZ:  Yes.  I believe in being very short.

9    We would try not to go to 40 pages.

10              THE COURT:  You get brownie points if you don't take

11    all 40.  And 20 for reply.

12              MR. SCHWARTZ:  One other --

13              MR. TOKE:  For opposition?  40 for moving and

14    opposition papers and 20 for reply.

15              THE COURT:  Right.

16              MR. SCHWARTZ:  One other thing so we're clear.  If

17    we're going to the private mediation which seems like a

18    sensible idea, I hate to make a precondition, can we agree here

19    this is to discuss a global settlement?

20              MR. TOKE:  Yes.

21              MS REMORE:  So we need all the defendants then.

22              MR. SCHWARTZ:  We can try to work that out.

23              THE COURT:  It might make sense to have some

24    representative handful of them.  I would leave that to the

25    mediator.  Obviously GHM, it's sort of a choke point for almost

Fc3iwavc ag                    CONFERENCE

1    all of them and could lead that discussion.

2            Let me talk to you about bundling the motion papers.

3    What I mean by bundling -- you're both nodding.  You know what

4    I mean.  I don't require bundling but I think it is a grand

5    idea.

6            MR. SCHWARTZ:  It is a grand idea.  You get one

7    package of everything.

8            THE COURT:  You serve each other on the dates you set

9    but you don't file anything electronically until everything is

10   complete and it's in one package which gives me the ability, if

11   either side runs into a jam and needs extra time, to be

12   generous with you without having to worry about my six-month

13   list.

14           MR. SCHWARTZ:  I always thought that judges were

15   waiting for me to file their papers and were going to read them

16   the moment I filed them.

17           THE COURT:  I hope it's not a disappointment that that

18   doesn't happen.  Sometimes a lawyer will fax in a letter at two

19   o'clock and call at three on o'clock:  What's the answer to my

20   request?  Like I was just hanging out with nothing to do.

21           Anything more we should do now?

22           MR. TOKE:  Does the Court want to set a date for us to

23   complete the mediation?

24           THE COURT:  Let's say this:  Tell your clients that

25   they need to answer yea or nay within two weeks.

Fc3iwavc ag                        CONFERENCE

1              MR. TOKE:  Yea or nay whether we're going to do one?

2              THE COURT:  Yes.  I think in this case it's more to

3       get the right mediator than to get somebody who is available

4       now.  I'm happy to push off the motion schedule if you can't

5       get it done in time, and if you come up with the right person

6       but they're not available in December, I think it's worth the

7       wait if you have somebody who knows this world.  So I won't put

8       a date buy which the mediation has to be completed.  I'll

9       postpone the briefing schedule if necessary.

10             MR. TOKE:  Very good, your Honor.

11             THE COURT:  Thank you.

12             (Proceedings adjourned; 12:25 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25