```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------x
      THE WAVE STUDIO, LLC,
 3
                      Plaintiff,
 4
 5            v.                          13 Civ. 9239(CS)
 6                                        CONFERENCE
 7    GENERAL HOTEL MANAGEMENT, LTD., et al.,
 8                      Defendants.
      ------------------------------------------x
 9
10                                        United States Courthouse
                                          White Plains, N.Y.
11                                        November 2, 2015
12
13    Before:  THE HONORABLE PAUL E. DAVISON, Magistrate Judge
14
15                          APPEARANCES
16    COBALT, LLP
           Attorneys for Plaintiff
17    VIJAY K. TOKE
18
19    BAXTER, SMITH & SHAPIRO, P.C.
           Attorneys for Defendants
20    SIM R. SHAPIRO
21
22    CHIESA, SHAHINIAN & GIANTOMASI, P.C.
           Attorneys for Defendant
23    HOWARD J. SCHWARTZ
24
25    *Proceeding recorded via digital recording device.
```

1          THE DEPUTY CLERK:  In the matter of Wave Studio

2     against General Hotel Management, et al.

3          Would the plaintiff please stand and note your

4     appearance for the record.

5          MR. TOKE:  Absolutely.

6          Vijay Toke of Cobalt, LLP for the plaintiff the Wave

7     Studio, LLC, your Honor.

8          THE COURT:  Good afternoon, Mr. Toke.

9          MR. TOKE:  Good afternoon.

10         THE DEPUTY CLERK:  Defense counsel.

11         MR. SCHWARTZ:  Howard J. Schwartz for General Hotel

12    Management.

13         THE COURT:  Mr. Schwartz.

14         MR. SHAPIRO:  Good morning, your Honor.  Sim Shapiro

15    from the law firm of Baxter, Smith & Shapiro on behalf of the

16    defendant Delta, which is one of the stayed defendants.

17         THE COURT:  Welcome, Mr. Shapiro.

18         And I note that there are numerous other defendants

19    who have been stayed at this stage of the litigation and are

20    not appearing, and there's certainly no reason why they should

21    be.

22         All right.  We're assembled to address some discovery

23    related issues raised by plaintiff's counsel.

24         Mr. Toke, it's your application, so you have the

25    floor.

1          MR. TOKE:  Thank you, your Honor.

2          As noted in our papers, your Honor, plaintiff asks for

3   several types of relief here from the Court regarding the

4   production of documents as well as the deposition of GHM.

5          With regard to documents, there were initial document

6   requests that were served by Wave's prior counsel in the late

7   summer or fall of 2014.  GHM responded to that discovery with a

8   porosity of documents of about 1200 pages.

9          THE COURT:  That sounds like a lot of documents to me.

10         MR. TOKE:  1200 pages total, your Honor, for 120-some

11  different requests about work that occurred over a ten-year

12  period with 20 different hotels.  It's actually a shockingly

13  small number of documents for the volume and size of this case

14  as well as the level and extent of the infringement.

15  Nonetheless, we can point to numerous documents that have been

16  dribbled out here and there that are clearly relevant that were

17  never produced.

18         As the Court may recall or may not know, in the fall

19  of 2014, there was a problem with previous counsel for Wave.

20  There was a conflict with one of the stayed defendants.

21  Actually, they were sued in California, MasterCard.  And then

22  there was some discussion about prior counsel being

23  disqualified altogether.  That process took a number of months,

24  at which point our firm took over.  And as soon as we took

25  over, we took the mantle on meet-and-confer efforts with regard

1    to discovery.  So we've been discussing these documents with

2    opposing counsel since April and May of this year.

3         These documents should have been produced in the

4    beginning.  They're clearly relevant.  They have to do with the

5    hotels at issue here and the marketing that happened.  They're

6    clearly within the ambit of the language of the document

7    requests and weren't produced.  Nonetheless, we met and

8    conferred and talked about it and, finally, they were produced

9    just a few days before we were all to fly to Singapore.  They

10   were produced in --

11        THE COURT:  Okay, just so -- you're referring to these

12   documents.  Just so the record is clear, you're now talking

13   about management service contracts and licensing agreements

14   with respect to different hotels.

15        MR. TOKE:  I'm speaking about management services

16   contracts, your Honor.  Those management services contracts did

17   refer to license agreements, which, to date, have not been

18   produced.  We put them into a new set of requests for

19   production because, while they should have been produced over a

20   year ago, they -- we put a name to them so there was no way for

21   GHM to evade that request.

22        So, in any event, the management services agreements

23   were produced just a few days before we were all to fly to

24   Singapore.  They were done -- they were produced in redacted

25   form as well as designated attorneys' eyes only.  And the only

1    basis that GHM gave for redactions was not privilege, but

2    relevance.

3            Relevance is not an appropriate basis for them to be

4    redacting portions of these documents, to say these are

5    relevant and these were not to this case.  They're responsive

6    to the discovery and it's for plaintiff to determine whether or

7    not the documents are useful.  To redact solely on relevance is

8    inappropriate.

9            Moreover, even in the deposition of GHM, it was clear

10    that certain provisions that were, in fact, redacted were

11    directly relevant to the issues in the case.  Now, whether they

12    are probative, whether they have any important information that

13    bears on the ultimate issues is not the inquiry here; it is

14    whether or not plaintiff should be able to see those documents,

15    review them and ask questions about them.  And that was --

16            THE COURT:  Plaintiff's counsel.

17            MR. TOKE:  Pardon me?

18            THE COURT:  Plaintiff's counsel.

19            MR. TOKE:  Plaintiff's counsel, correct, your Honor.

20            And in fact, that did not happen because we didn't get

21    them until just days before.  They were in highly redacted

22    form.  When we met and conferred before the deposition, GHM's

23    counsel said they're just not relevant, we don't see how

24    they're relevant, and we responded exactly with the argument we

25    just provided to the Court and were told take it up with the

2015b2wavecf

```
 1   Judge, so that's what we've done.  The license agreements,
 2   which are also referenced in some of the management services
 3   agreements, were not.  These deal specifically with
 4   intellectual property.  We have no idea --
 5             THE COURT:  Let me just cut you off --
 6             MR. TOKE:  Sure.
 7             THE COURT:  -- because I read defendants' responsive
 8   letter to indicate that the license agreements are going to be
 9   produced.
10             MR. TOKE:  They are, that's correct.
11             THE COURT:  Right.
12             MR. TOKE:  Now.  Except that we've already flown to
13   Singapore.  We've already taken the deposition of GHM.  We
14   reserved our rights to ask for more time, as we have in our
15   papers, because we were there to take this deposition, and
16   these documents which were clearly responsive to discovery
17   served over a year ago were never produced.  And now they're
18   telling us we're going to produce it.  They're going to produce
19   the unredacted version of the management services agreements.
20   But we are back here in the United States, not in Singapore.
21   This was dilatory on GHM's behalf by over a year.
22             THE COURT:  Did predecessor counsel object
23   contemporaneously to what they were given or not given a year
24   ago?
25             MR. TOKE:  Not that I'm aware of, your Honor, but as
```

1    soon as we took over the case in April, we did and we began

2    those discussions.  Now we're talking, okay, even if they're

3    not a year dilatory, they are six months dilatory.  It's still

4    a matter of time for documents that are clearly within their

5    records, clearly important because they are the basis for their

6    business.  These couldn't have been difficult to find or

7    produce and, yet, it took six months for them to do that and,

8    on top of it, producing them in redacted form so that we

9    couldn't use them.  I mean, as the Court may have noted in the

10   papers that we submitted, you can see how redacted they are.

11   There are headings and most of the documents are not even

12   readable as a result of the redactions.

13            So that's the document portion of it, your Honor.

14   There's also the ESI portion.  We've produced documents,

15   e-mails, from GHM that GHM did not produce that were clearly

16   responsive to the --

17            THE COURT:  When were those communications?

18            MR. TOKE:  They were in -- I don't recall.  They were

19   all over the span of the time that --

20            THE COURT:  But years and years ago?

21            MR. TOKE:  Yes, that's correct, your Honor.

22            THE COURT:  What's your basis for believing -- in

23   other words, it is entirely possible that your client retained

24   items that defendants did not retain, so my question is what's

25   your basis for believing that they've been improperly withheld

1    which would require some basis for believing that they had been

2    retained or were on hand somehow at defendants' premises?

3                 MR. TOKE:  Sure.  Well, because defendant did produce

4    a number of random e-mails throughout that same period of time.

5    Why those e-mails were -- because it wasn't just for one year,

6    it was several years of e-mails that have been produced, so why

7    those e-mails were retained, but other e-mails weren't, we

8    don't know.  And so we're simply asking for a certification so

9    that we know what was actually done to conduct the search

10   because, without knowing what was done to conduct the search,

11   there's no way for us to fairly evaluate whether or not they've

12   done a diligent search and whether or not there are other

13   documents that they have that they simply haven't looked for

14   and could.  That's what we're asking for.

15                Obviously, what they have is a black box.  We don't

16   know.  But what we do know is we have produced a number of

17   documents that were responsive.  They haven't produced those

18   same documents that were generated by them.  And we are simply

19   looking for an assurance or understanding or and understanding

20   of what was done to conduct the search so that we can fairly

21   evaluate whether or not there needs to be a greater search or

22   whether or not it is what it is, that's what they have.  And

23   that's fine.  But the fact that really critical e-mails that we

24   have that they generated were not produced is important.

25                In addition, with regard to the electronically stored

information, we have met and conferred with regard to terms and

asked for them to conduct a search.  We don't know what the

result of that is other than they produced some documents on

September 9th which included a couple more e-mails and that's

about it.  But the fact that they then supplemented with more

e-mails again suggests that they didn't -- we don't know what

the search was and that it may not have been completely

thorough.

        That's the documentary portion, I think, your Honor.

We can certainly talk about --

        THE COURT:  Did you make any effort to explore this

scope of search issue when you were over there in Singapore?

        MR. TOKE:  Not when we were in Singapore, your Honor,

no, no, because they had already produced the documents.  We

were trying to take the deposition.  We had limited time.

        THE COURT:  So that was not one of the (30)(b)(6)

topics that you inquired about?

        MR. TOKE:  What was not?

        THE COURT:  The methodology or, you know, question

that would or topic that would embrace the adequacy of the

search for documents.

        MR. TOKE:  No, it was not, your Honor, it was not,

your Honor.

        THE COURT:  All right.  I interrupted you.

        MR. TOKE:  No, that was just the documentary portion

1    of our requests here.  We can talk about the deposition, as

2    well, if that makes sense or if the Court would like to break

3    it up.

4              THE COURT:  Why don't you go ahead and --

5              MR. TOKE:  Address that as well?

6              THE COURT:  -- address that issue.

7              MR. TOKE:  Sure.

8              Well, with regard to the deposition and wanting more

9    time to do that, first, with regard to the documents that

10   haven't been produced, obviously plaintiff should have the

11   opportunity to depose GHM with regard to those documents in an

12   unredacted form as well as the documents that were not produced

13   before, like the licensing agreements, which, as we noted in

14   one of our exhibits, there was an e-mail, your Honor.  I think

15   it is -- I believe it is -- I apologize, your Honor.  I'm

16   trying to -- it is one of the e-mails that discusses the

17   ownership -- yes, it's Exhibit J to our --

18             THE COURT:  Okay, let me catch up with you.

19             MR. TOKE:  Sure.

20             THE COURT:  Exhibit J.  All right --

21             MR. TOKE:  If you'll flip to --

22             THE COURT:  An e-mail from a Mr. OEI?

23             MR. TOKE:  Yes, Kendall Oei, who is the director of

24   GHM.  This is written in June of 2006, June 28th of 2006.

25             If you'll flip to the second page, your Honor, at the

1  bottom.  This is in the thread.  It's an e-mail from June 30th,
2  2006 from Mr. Oei to a Mr. Richard Hong, who is I believe a
3  representative of a property that used to be represented by
4  GHM, stating, "In most of our hotel brochures, the photos used
5  are not the property of the owner" -- that's the hotel, or the
6  property -- "but are the property of GHM/Waves," Waves being
7  our client.  "Thus, they're covered by the GHM license
8  agreement and technically cannot be used whether in existing
9  brochures or in new brochures."
10          This is important because it suggests that the
11  licensing agreements have some bearing on this issue.
12          THE COURT:  Right.
13          Now, when did you receive this e-mail chain that we're
14  talking about, Exhibit J?
15          MR. TOKE:  This was produced by Wave back a year ago,
16  your Honor.
17          THE COURT:  This was produced by Wave?
18          MR. TOKE:  This was actually produced by Wave.
19          THE COURT:  This is a Wave document?
20          MR. TOKE:  Well, it's a Wave document because --
21          THE COURT:  A document that Wave had in its
22  possession.
23          MR. TOKE:  Correct.  But it was generated by GHM.
24          So this e-mail was not produced by GHM and, again,
25  it's indicative of, one, this is sort of a central e-mail.  It

1    talks about the ownership of copyrights to the photographs.  It

2    mentions licensing agreements that were not produced and that

3    were referenced in the management services agreements produced

4    just days before the Singapore deposition.  All of these

5    together indicate that we may not have gotten all the

6    documents, and we have not had the opportunity to fairly depose

7    GHM as a result.

8             THE COURT:  Well, when prior to the trip to Singapore

9    did plaintiffs request the licensing agreement that was

10   referenced in that e-mail that we just talked about?

11            MR. TOKE:  We were under the impression that we were

12   going to get all of the agreements that were relevant and

13   related to the management services agreements when we asked for

14   them in April or May.  We hadn't seen the agreements, so we

15   didn't know exactly to call them by name, but they're related

16   to the management services agreements.  They're incorporated by

17   reference.  So as far as we're concerned, April or May and,

18   yet, they were not produced.  They still have not been

19   produced.  And so when we took the deposition of GHM, we had no

20   benefit of that.  We looked at this --

21            THE COURT:  When you got on the airplane to Singapore,

22   you knew you didn't have licensing agreements.

23            MR. TOKE:  Well, your Honor, I was -- they were -- we

24   received the documents on Wednesday, the 16th.  I had already

25   advised Mr. Schwartz that I was going to be out of town already

```
 1    and leaving for Singapore.  In order to get the documents
 2    copied and actually sent to Singapore in time for the
 3    deposition, they had to leave by Thursday.  So I was actually
 4    reviewing the documents as I was en route.  There was no way to
 5    actually know because of the time changes.  And so the first
 6    time I was actually able to even have the meet and confer with
 7    Mr. Schwartz was the morning of the deposition.  I suppose it's
 8    possible I could have done it Monday in Singapore, but I was
 9    still reviewing documents with the client and so it took some
10    time to prepare it and be able to do it before the deposition.
11         So that's the first part with regard to the
12    deposition, because we weren't able to depose them meaningfully
13    based on documents that have not been produced.
14         Second, as we discussed in our papers, Ms. Chng was
15    not knowledgeable about half of the topics on the list.
16         THE COURT:  What do you mean -- and this is -- I'm
17    practically paraphrasing the colloquy that appears on the
18    transcript excerpt that I was provided with, but what do you
19    mean by knowledgeable?
20         MR. TOKE:  Well, she didn't have any knowledge about
21    these issues, personal knowledge certainly, but -- and so she
22    said that she would not be able to testify on any of those
23    topics and that Mr. Ohletz, the third-party witness, would have
24    been the person to talk to.  And when asked about topics that
25    she said he was knowledgeable about, she didn't respond.  She
```

| | |
|---|---|
| 1 | would say Mr. Ohletz is the person you need to talk to, not |
| 2 | that -- |
| 3 | THE COURT:  Are you talking about the transcript |
| 4 | excerpt that you gave me or some other portion of the |
| 5 | deposition that I don't have? |
| 6 | MR. TOKE:  You have them, your Honor.  You have them, |
| 7 | your Honor.  Where we went through the (30)(b)(6) topics, she |
| 8 | said which ones she had knowledge about and which she didn't of |
| 9 | which half of them she did not, and that Mr. Ohletz -- |
| 10 | THE COURT:  Well, but I read that as her indication |
| 11 | that she did not have personal knowledge of some of these |
| 12 | topics because she didn't work at the company at the time that |
| 13 | some of these events happened. |
| 14 | MR. TOKE:  Sure.  She also, however, hadn't read any |
| 15 | documents to prepare for the deposition and wouldn't answer |
| 16 | questions about those topics when I asked about them.  For |
| 17 | example -- |
| 18 | THE COURT:  In some other portion of the deposition -- |
| 19 | MR. TOKE:  Yes, which are there. |
| 20 | THE COURT:  -- which you haven't provided me. |
| 21 | MR. TOKE:  No, which have been provided, your Honor, I |
| 22 | believe.  In fact --but I believe -- yes, they have been |
| 23 | produced, your Honor.  If the Court will indulge me for a |
| 24 | moment. |
| 25 | (Pause) |

 1              MR. TOKE:  Page 11, lines 7 to 9 I asked her about a
 2     topic that she had said that Mr. Ohletz would testify on, and
 3     she admitted --
 4              THE COURT:  I'm sorry.
 5              MR. TOKE:  Oh, pardon me.
 6              THE COURT:  We must be looking at different
 7     transcripts.
 8              MR. TOKE:  We are looking at -- pardon me, your Honor.
 9     I apologize.  This would actually be -- let me find it.
10          (Pause)
11              MR. TOKE:  There was a portion -- I apologize, your
12     Honor.  It actually -- I apologize, your Honor.  It may
13     actually be in a different exhibit.  I believe we have produced
14     it to the Court, but let me double -- I will double check in a
15     moment, when Mr. Schwartz is speaking.
16              But in any event, yes, the testimony was basically
17     that I asked her a question about a topic that she had said
18     that she had knowledge of, but deferred to Mr. Ohletz,
19     nonetheless, as well as a topic that she said she did not have
20     knowledge on and said Mr. Ohletz was the person you should be
21     talking to.  Again, it was not just that she didn't have
22     personal knowledge, but she couldn't speak to the issues at
23     all.
24              So I will double check, your Honor, with regard to
25     the --

2015b2wavecf

1      THE COURT:  I will tell you we went over this pretty

2   carefully and I didn't find that, so I would appreciate it if

3   you have something specific --

4      MR. TOKE:  Of course, your Honor.

5      THE COURT:  -- to tell me what it is.

6      MR. TOKE:  Sure.

7      THE COURT:  Because we carefully go over what counsel

8   submits to us --

9      MR. TOKE:  Of course.

10      THE COURT:  -- and we can't be mind readers.

11      MR. TOKE:  Absolutely, your Honor.

12      Nonetheless, that's the second basis for getting some

13   more time with GHM, the first basis being we haven't had a

14   meaningful ability to ask them about documents that were not

15   produced.

16      THE COURT:  You know, I think defendants are going to

17   stand up and say that they gave you what they gave you, and I

18   guess that's the management service contracts in their redacted

19   form, immediately or almost immediately upon the entry of a

20   confidentiality order which had been the subject of some

21   discussion in connection with this.

22      MR. TOKE:  Sure.  And that's true, your Honor.

23   However, these documents should have been able to have been

24   produced far before that.  We didn't know about the -- we

25   discovered that GHM wouldn't produce it unless there was a

2015b2wavecf

1    discovery order sometime in August.  We discussed the discovery

2    order.  Moreover, we didn't know it was going to come in

3    redacted form.  It would be one thing if they said, all right,

4    we produced them on the 9th of -- pardon me -- the 16th of

5    September, just a few days before the deposition, but here they

6    are.  They're designated attorneys' eyes only, but here they

7    are in full form.  That's not what happened.  We got them in

8    completely redacted form so that, even despite that, they were

9    useless documents because we couldn't read provisions that even

10   Ms. Chng testified were relevant and important for the

11   proceeding and this matter.  So that's why that's important.

12           The license agreements were never produced, and they

13   still haven't been produced, and they're clearly central

14   because they're referenced in the management services

15   agreement, they're referenced in Mr. Oei's e-mail and they're

16   key documents that go to the very heart of this case's issue --

17   the threshold issue of who owns these photographs; rather, the

18   copyrights to the photographs.  So without being able to take

19   testimony on that very central and singular issue that's before

20   the Court today, we didn't have the ability to meaningfully

21   depose GHM.  And these are documents, once again, that were

22   asked for a year ago and hadn't been produced.  We've asked for

23   them since April, but we didn't find out until August that they

24   needed a -- they wouldn't be produced unless there was a

25   confidentiality order in place.  We greed on August 31st as to

1    the form of that discovery order.  It wasn't submitted to the

2    Court for ten days after that.

3            There's certainly been delay here and the timing of it

4    certainly made it very difficult for plaintiff to have a

5    meaningful deposition on key central documents that they've

6    been asking for for six months.  So that's our position.

7            THE COURT:  Does that exhaust your list of grievances

8    today?

9            MR. TOKE:  Yes.

10           THE COURT:  All right.

11           Mr. Schwartz.

12           MR. SCHWARTZ:  Good morning, your Honor.  Or good

13    afternoon, your Honor.

14           So we're told that GHM trademark license agreements

15    are very central and completely important to this case, so I'll

16    just tell you just briefly what they are.  The agreements, 15

17    or 20 years ago, were between GHM and the hotels and they

18    related only -- only -- to the hotel's use of General Hotel

19    Management's trademarks.  But if he wants them, I'm happy to

20    give them to him.

21           THE COURT:  So you're going to produce them.  It's off

22    my desk if you're going to produce them.

23           When can you produce those?

24           MR. SCHWARTZ:  I had intended to produce them when

25    they were due, but --

2015b2wavecf

1            THE COURT:  Let's expedite that.

2            MR. SCHWARTZ:  I can produce them within a week.

3            THE COURT:  Okay.

4            MR. SCHWARTZ:  A week from today.

5            THE COURT:  Okay.

6            MR. SCHWARTZ:  With the financial terms deleted, you

7    know, how much money they have to pay us for that.  I think

8    that is proprietary information.  It's not relevant to the case

9    in any fashion.

10            THE COURT:  All right.

11            MR. SCHWARTZ:  And then on the next issue of the

12   management agreements, so the portions that we redacted, I said

13   in the transcript, at page 45, not just that they were, in some

14   cases, not relevant, but that they were proprietary, and that's

15   why I left in the captions.  So that the portions that are

16   deleted -- the -- yes, the --

17            THE COURT:  I mean, we looked over this.  Obviously,

18   we can't tell, either, what's in the redacted portions, but I

19   will tell you that the one that jumped out to me was the

20   miscellaneous section, which it's a little bit hard for me to

21   know how the plaintiff could satisfy himself that that's not

22   relevant with such a generic heading on it.

23            MR. SCHWARTZ:  I did not realize that that was one

24   that he considered important.  I'll check on it.

25            THE COURT:  I don't know if he considers it important

1    or not, but I just looked at it and said that's not very

2    helpful.

3             MR. SCHWARTZ:  Give me two seconds.

4             THE COURT:  Sure.

5             MR. SCHWARTZ:  After I finish this, I'll look at it

6    and maybe I'll say, okay, if he wants --

7             THE COURT:  Okay, well, go ahead, because I am

8    somewhat mystified by the approach that GHM has taken to this,

9    the sort of double-barreled, number one, designating them

10    attorneys' eyes only, which I assume is designed to make sure

11    that the plaintiff herself, who counsel have indicated you

12    don't trust for various reasons, doesn't get her hands on this

13    information, but that being the case, to then severely redact

14    these documents, I was puzzled by that because usually these

15    types of extreme confidentiality designations are used to make

16    it possible to divulge things that might otherwise put the

17    producer at some kind of competitive or other disadvantage.

18             MR. SCHWARTZ:  So the discussion about that is

19    sensitive, and while we have no distrust of Mr. Toke, I have no

20    reason to distrust Mr. Toke, there is more than the usual

21    antipathy between the plaintiff and the defendant.

22             As we put in the footnote, in this --

23             THE COURT:  No, I understand you've got reasons to

24    question plaintiff's motives, but that's really -- I take that

25    as a given.

1          MR. SCHWARTZ:  Yes.  And it's more than just the

2     usual, but this is a person who, in our view, has a very

3     specific and clear motive to hurt our client, and given that

4     high level of distrust and given that we can see no possible

5     relationship between the portions that we redacted, although

6     I'll look at the miscellaneous and possibly give it to him, and

7     I said I would give him three agreements at the paragraph that

8     are labeled advertising.  They're not really advertising, but I

9     viewed them again.  I have them here today.  I can give them to

10    Mr. Toke.  They related in large portion to reservation systems

11    that GHM would use and advance the company's -- the hotel's

12    reservation systems.  So they're not really related in any

13    fashion at all to any issue in the underlying case.  And I'll

14    give them to Mr. Toke.  I have them here with me today.  I can

15    read them into the record if we designate the record

16    confidential.  I have no particular problem.

17          THE COURT:  Let's not do that.

18          MR. SCHWARTZ:  Okay, okay.  And I appreciate that.

19    But I'm trying to say that the information that we redacted

20    really in no conceivable --

21          THE COURT:  You're telling me it's irrelevant, but I

22    take a somewhat less nuanced view of this, and contracts and

23    things like that are ordinarily the types of documents which

24    have to be read in their totality in order for them to be

25    analyzed and evaluated.  And you've got this attorneys' eyes

1    only designation which plaintiff is not really challenging at

2    this point, so why shouldn't I simply order you to produce

3    these unredacted and authorize you to -- you know, if there are

4    specific financial numbers or some specific term or value in

5    there that has some sort of competitive significance, I would

6    not be surprised to see financial terms redacted.  And again, I

7    think that's what you've indicated you're going to do with

8    respect to the licensing agreements.  But when I see these big

9    block redactions, I mean, it looks to me like the kind of thing

10   that I would expect to see coming out of the CIA or something.

11   Is there some other reason why you're seeking all this

12   redaction?

13           MR. SCHWARTZ:  No.  But then the question then becomes

14   what are we going to do with that.  So let's say that -- let's

15   say that I'm correct that a neutral -- a judge reviewing the

16   unredacted version would say, well, you know, these are all --

17   there's no conceivable way that there should be any discussion

18   about those issues.

19           THE COURT:  Ninety-five percent -- my perception is

20   that ninety-five percent of the information that gets exchanged

21   in civil litigation is irrelevant to the issues at hand, so

22   there's nothing --

23           MR. SCHWARTZ:  It's ninety-nine percent in my view.

24           THE COURT:  Well, it may be even higher, but -- a

25   hundred percent in some cases -- but that's not really an

1    answer.  And ordinarily, you know, we have open-file discovery

2    and it's up to the adversary to seek to separate the chaff from

3    the grain and make what use he can make with material that the

4    producing party thinks is irrelevant.

5          So I'm giving you an opportunity to tell me some other

6    reason why I shouldn't simply order you to turn that over,

7    especially since it's going to be AEO.

8          MR. SCHWARTZ:  All right.  Then I agree to turn over

9    the management agreements attorneys' eyes only.  And I will

10   redact financial terms, things that I believe are clearly

11   related to financial terms or anything else, because I don't

12   remember off the top of my head any other significantly

13   proprietary information, because --

14         THE COURT:  All right.  And if you're going to do

15   that, rather than sort of engendering another dispute, you

16   ought to provide some accompanying explanation to counsel as to

17   what is being redacted, what type of information is being

18   redacted, because, otherwise, the redaction itself becomes sort

19   of catnip for further inquiry.

20         MR. SCHWARTZ:  Well, that was my problem.

21         All right.  As I understand it, then, I'll turn over

22   the unredacted versions of the management agreements except for

23   portions that are relating clearly to financial terms or

24   anything else that the client feels is proprietary.  And if I

25   do that, I will identify the reason why and what information is

2015b2wavecf

1    contained, sort of like a privileged log, the same way we --

2              THE COURT:  Well, that's right.  And then, you know,

3    if plaintiff wants to challenge that, then, you know, I suppose

4    I'll end up reviewing it in camera or something.

5              MR. SCHWARTZ:  Well, that's actually in the terms of

6    the confidentiality order.

7              THE COURT:  Right.

8              MR. SCHWARTZ:  It says that.

9              THE COURT:  Well, but the confidentiality order

10   doesn't say redact, right?  The confidentiality order provides

11   a procedure for challenging confidentiality designations.  But

12   it seems to me that when you have that type of a robust

13   confidentiality --

14             MR. SCHWARTZ:  Production.

15             THE COURT:  -- protection in place, then that's a

16   reason not to redact, not to, you know -- the

17   belt-and-suspenders aspect of your position -- and again, I

18   understand your client doesn't like the plaintiff, and I'm sure

19   it's mutual, but that's kind of the rough and tumble of

20   litigation.

21             MR. SCHWARTZ:  And without meaning to make your

22   life -- your Honor's life more difficult, I --

23             THE COURT:  You probably could not possibly make my

24   life any more difficult.

25             MR. SCHWARTZ:  I would say I would hand you an

1    unredacted -- I would send you an unredacted version, and then

2    you could determine which sections --

3              THE COURT:  I don't want to do that.  I want you to do

4    what you just said you were going to do --

5              MR. SCHWARTZ:  Okay.

6              THE COURT:  -- which is unredact, eliminate any

7    redactions based on "relevance," and if there are financial

8    terms or other "proprietary" information, you will accompany

9    any remaining redactions with something in the nature of a

10   privileged advising plaintiff of the nature of the information

11   that has been redacted.

12             MR. TOKE:  If I might, your Honor, with regard to that

13   procedure, one of the problems with the proprietary designation

14   is, again, there's no real basis when we have an attorneys'

15   eyes only designation.  Now, plaintiff certainly reserves the

16   right to challenge that designation at a later date if that is

17   necessary, but, at this point, we're not.  But, for example,

18   the very provision that was highly relevant to the matter,

19   which we've submitted that testimony from Ms. Chng that says,

20   yes, this provision is exactly what was the basis for all of

21   this marketing collateral that was generated, she called

22   proprietary and it was redacted.  And so I'm concerned that

23   GHM --

24             THE COURT:  Mr. Schwartz, I am going to assume that

25   you know what Mr. Toke is talking about, and if your client's

2015b2wavecf

1    representative designated a portion of these agreements as

2    material to the issues in this litigation, I think, at the end

3    of the day, the Court would be hard-pressed to sanction

4    withholding that information from plaintiff's counsel, so let's

5    be so advised.

6            MR. SCHWARTZ:  All right.

7            So if I could just continue, so the description of

8    Ms. Chng's deposition is not exactly what she said.  Even the

9    last statement, that she said it was the most important

10   thing --

11           THE COURT:  You know, I don't want to go any farther

12   out on this limb today.

13           MR. SCHWARTZ:  Right, right.

14           THE COURT:  You're going to reproduce these agreements

15   in what I assume will be dramatically less redacted form.

16   You're going to tell plaintiff what it is you're redacting.

17   And then if there's any remaining issue, counsel will let me

18   know what it is.

19           MR. SCHWARTZ:  Correct.  Redacted and still

20   maintaining the attorneys' eyes only issue.  That's my only

21   reservation.

22           THE COURT:  Yes.

23           MR. SCHWARTZ:  So, yes, we will do that.  And then --

24   so we have the license -- the trademark license -- the GHM

25   trademark license agreements I'll produce within a week.

2015b2wavecf

1    Management agreements unredacted mostly, with the exception we

2    just described, also by next Monday.

3              And then the other issue was this what I refer to as

4    this fake discovery certification.  Do you need me to discuss

5    this?

6              THE COURT:  Well, why don't you speak to --

7              MR. SCHWARTZ:  I'll respond to it.

8              THE COURT:  -- this issue that the plaintiff

9    apparently has copies of e-mails that were generated by your

10   client that your client doesn't have.

11             MR. SCHWARTZ:  No, no.  She was copied on it.  That's

12   why she has it.

13             THE COURT:  I understand that, I understand that.

14             MR. SCHWARTZ:  We have no -- we don't have that

15   anymore.  She saved it.  Good for her.  God bless her.  We have

16   no particular problem with that.  We don't have any of those.

17   We don't have any of those e-mails, period.  Whatever.

18   Whatever, meaning not in a disparaging way, but we don't have

19   any of these -- we don't have any of those e-mails whatever,

20   whatever year.  These go back to the year 2000.  I think the

21   e-mail from Mr. Oei was 2006, if my memory serves me correctly.

22   And so we don't have them.  We just don't have them.  We

23   didn't -- we didn't have them when this litigation was started.

24   Obviously, the litigation hold letter was sent.

25             To show the kind of cooperation that we did try to

1    undergo when Mr. Toke came in, he was complaining.  He said

2    ESI, ESI, it's all ESI, and we said, well, you know, they don't

3    have the same -- GHM doesn't have the same setup that Apple

4    does, for example, and so tell me what you want.  Give me some

5    more terms.  He gave me some more terms.  We used those terms.

6    We said -- the terms were obvious, you know.  Her name.  I

7    think Mr. Yang's name.  You know, whatever names he wanted we

8    ran again.  No such e-mails exist.  I told him that.  There was

9    one on his list I think we didn't even know what it was.  I

10   think the name was Ekwis.  We didn't even know what that was.

11   So -- and so he served a second set of interrogatories or

12   document demands.  We responded and said, yes, we did what we

13   were supposed to do.  The client did what it was supposed to

14   do.  We don't have anymore.

15         And he says only 1200 documents.  It doesn't make a

16   difference.  You know, if he produced 350,000 pages, what they

17   are is screen shots of photographs that are on the internet,

18   350,000 pages, in many cases, of the same photograph.  Well,

19   God bless him.  That's what he did.

20         The underlying transactions -- when I mean

21   transactions, the underlying interplay between GHM and his

22   client -- was between Mr. Ohletz and Junior Li.  And that's

23   what Mr. Ohletz testified about.  He's the only one that spoke

24   to her on a consistent basis.  He went to the photo shoots he

25   estimated 90 percent of the time.  There was no e-mails back

```
 1    and forth.  There was no document that he knew of, other than
 2    the management agreements, that he knew of that existed, that
 3    pertained to this.  So this is not a
 4    document-intensive-circumstance case.  I mean, there are no
 5    documents that pertain to this.
 6              THE COURT:  Well, in any event, what I need you to do
 7    is assure this Court that your client has undertaken a diligent
 8    search of its books and records and produced what remains in
 9    the company's files concerning the issues identified by
10    plaintiff's counsel.
11              MR. SCHWARTZ:  I can say that here in court today.  So
12    when my firm came in -- first of all, the first law firm that
13    was involved in this case is a law firm known to us and my
14    firm.  Highly reputable.  We have no issues with them at all.
15    They sent a litigation hold on all the documents.  They
16    followed up on the first go-round of the documents.  Then we
17    came into the case.  We followed up again on the second thing.
18    And then when Mr. Toke served the follow-up set of -- second
19    set of interrogatories and document demands and all that, we
20    specifically went over very clearly with the client, the
21    lawyers in my firm and I personally talking with Ms. Chng, who
22    is the only person we ever dealt with there.  She said she
23    ran -- she did the whole thing again and said whatever she had,
24    she had.  And when we went to Singapore -- when I went to
25    Singapore, I asked her again.  And I find Ms. Chng to be
```

1    completely reliable, a very sophisticated person.  There is no

2    document that anybody knows was -- is or was being withheld or

3    is or was spoliated in any fashion.  We just don't have the

4    e-mails that plaintiff had.  And God bless if she has them.

5    Good for her.

6         Mind you, the e-mails aren't particularly relevant to

7    the case other than the e-mails that she has with her

8    production estimates, you know, the UCC-type documents, the

9    production estimates and the invoices.  And she has them and we

10   don't.  Well, that's okay, because it wasn't -- we didn't pay

11   the invoices.  The hotels paid the invoices.  And we didn't

12   particularly have -- we don't particularly have a lot of books

13   and records having to do with her.  That's it.  We don't have

14   any.  And there's no written agreement alleged between her and

15   GHM.  There's no reason for us to have any information about

16   her copyright filings, which were some of the questions that --

17   on his list of information that she's supposed to know about.

18   Miss Li's activities in New York.  Well, Monica Chng didn't

19   know anything about those things and she just didn't.

20        So the information that he's looking for relative and

21   relevant to this case can be obtained only essentially through

22   two people, Ms. Chng and Mr. Ohletz.  Mr. Ohletz no longer

23   works for us.  He lives in Bangkok.  Through my efforts, not

24   through plaintiff's efforts --

25        THE COURT:  No, I know.  He was deposed.  And I

2015b2wavecf

1    crawled out of bed to --

2             MR. SCHWARTZ:  Exactly.

3             THE COURT:  -- even up the --

4             MR. SCHWARTZ:  And to be very -- I don't want to

5    polish the apple here, but to be very deferential to your Honor

6    and to make sure there was no further problem with this, I

7    initially said, well, I would take three hours and he got one

8    hour because it's my witness and I flipped it.  So I could have

9    one hour about and Mr. Toke took three hours.  I didn't block

10    him.  There was no objection.

11             THE COURT:  Look, this is water under the dam.  I

12    ruled on this.  The deposition is over already.

13             MR. SCHWARTZ:  No, but I think here today he is not

14    complaining that there was any information that he wanted that

15    he couldn't get, except for the license -- the GHM trademark

16    license agreement, which is going to say we licensed the

17    trademark to the hotel.

18             THE COURT:  All right.  You're going to produce that,

19    and then I'll wait for the next wave of issues.

20             MR. SCHWARTZ:  No pun intended.  Wave the issue.

21             So what I'm trying to say is the rest of this is just

22    litigation rhetoric.  And appreciate that no plaintiff ever

23    thinks he has enough documents or, frankly, defendants ever

24    think they have enough documents, but this case is where it is.

25    This is what the evidence is going to be in this case.

| 1 | THE COURT:  I want to finish.  You can have a seat for |
| 2 | a second. |
| 3 | MR. TOKE:  All right. |
| 4 | THE COURT:  You make me nervous when you're standing |
| 5 | up and not talking, so -- |
| 6 | MR. TOKE:  Oh, I apologize.  I'll sit. |
| 7 | THE COURT:  Yes. |
| 8 | All right.  That leads us to the issues relating to |
| 9 | plaintiff's allegation that the (30)(b)(6) witness was |
| 10 | inadequately prepared or inadequately testified. |
| 11 | MR. SCHWARTZ:  She was.  Obviously, she was prepared. |
| 12 | And Mr. Toke says that Ms. Chng testified that she didn't |
| 13 | review any documents before the deposition, that's a completely |
| 14 | true statement.  He's confusing that, preparing for the |
| 15 | deposition, with having knowledge about the case and about the |
| 16 | underlying documents.  She testified for the whole day.  And |
| 17 | you'll note that there's no real specific allegation that I can |
| 18 | tell that she didn't testify about anything that a (30)(b)(6) |
| 19 | witness should testify.  What started out was, if you read the |
| 20 | transcript, you'll see Mr. Toke said -- |
| 21 | THE COURT:  Well, I've read about a dozen pages which |
| 22 | I've been given. |
| 23 | MR. SCHWARTZ:  Right. |
| 24 | THE COURT:  Both sides are referring to this |
| 25 | deposition, which I did not attend and can only read that which |

1    is put before me.  But go ahead.

2              MR. SCHWARTZ:  And what I'm suggesting to your Honor

3    is that those first 15 or 25 pages are the basis for this

4    motion because, perhaps inadvertently or perhaps just maybe a

5    litigation tactic, he asked in a very conclusory way do you

6    know anything about or do you have any personal knowledge about

7    item number 15 on this list and she would say I have knowledge

8    or she would say no, it's better to ask Mr. Ohletz, which she

9    quit clearly knew was going to be there the next day.  And then

10   Mr. Toke deposed her all day long.  And so she answered all the

11   questions about things that she knew about, and if she

12   believed -- because, mind you, she wasn't there at the time

13   that --

14             THE COURT:  Right.  Well, the whole problem is that

15   plaintiff is entitled to demand that defendants produce a

16   witness who is reasonably prepared to give binding testimony on

17   behalf of the corporate defendant with respect to the

18   designated issues.  So whether plaintiff got answers to his

19   questions from Mr. Ohletz is not really the point here.  The

20   point is whether the (30)(b)(6) designee was able to testify on

21   behalf of the company with respect to these subjects.

22             MR. SCHWARTZ:  Well, yes, she certainly was able to

23   testify on behalf of the subjects.  But it doesn't have to be

24   only one (30)(b)(6) witness.  You can have more than one

25   (30)(b)(6) witness if there are different people in a company

1    who have different knowledge.  That has never been a problem as

2    far as I'm concerned, as far as I can see in general

3    litigation.  So Ms. Chng was clearly prepared.  She knew about

4    all of the agreements.  She did not know about the actual

5    interplay between Ohletz and Junior Li and she said, well, it's

6    better to ask Ohletz.  And the next day, he asked Ohletz

7    whatever --

8              THE COURT:  Well, let me follow up on something that I

9    believe you said.  And I have notes about this.  I think this

10    was actually when we had that telephone conference on September

11    22nd with counsel in Singapore in the midst of all of this.  I

12    think at that time you indicated that you thought that your

13    client would be willing to adopt Ohletz' answers as binding on

14    GHM.

15              MR. SCHWARTZ:  If that's the question before the

16    Court, I can -- I assume the answer to that question would be

17    yes.  I didn't specifically review that with the client before

18    today.  I can give you an answer.  Probably take two or three

19    days with the time difference.  How about this?  By next

20    Friday, when I produce all the other documents, I will give you

21    an answer.  I suspect that the answer will be yes, that

22    Mr. Ohletz' answers can be --

23              THE COURT:  Because that's the -- you know, the

24    purpose of Rule (30)(b)(6), or at least one of the purposes of

25    it was to eliminate the practice that apparently was previously

1    prevalent of what was called bandying, which is the company

2    produces a witness and then says, oh, I don't know, you have to

3    ask somebody else and it turns into a wild goose chase.  Now,

4    this is not that because I think everyone agrees that

5    Mr. Ohletz is the person -- actually, the flesh and blood

6    living and breathing person that had interactions with Ms. Li,

7    so I'm not accusing -- I'm not suggesting there's some improper

8    motivation there.  Obviously, he's going to be knowledgeable

9    about events in which he personally participated.  But if the

10   company is willing to adopt his testimony as binding on the

11   company, that would, it seems to me, extinguish this issue.

12        MR. SCHWARTZ:  I'll give you answer to that certainly

13   no later than next Monday, I think I said, so a week from

14   today.  I have no particular issue with that, no issue with

15   that at all.

16        THE COURT:  All right.

17        Mr. Toke, is there anything else you wanted to tell

18   me?

19        MR. TOKE:  No, your Honor, only that, with regard to

20   the requests, that we would be able to depose GHM for the

21   purposes of any additional documents that are produced.

22        THE COURT:  You're getting some additional documents.

23   I will entertain an application after you've received those

24   documents and you can identify for me anything in there that

25   you think warrants a further deposition, but, subject to some

1    significant revelation in those documents, I'm denying that

2    application at this time.

3            Defendants will produce the license agreements, which

4    we've discussed.  They will produce the management agreements

5    in substantially unredacted form, as discussed.  I am satisfied

6    that defendants have satisfied their discovery obligations.

7            Obviously, Mr. Schwartz, defendants, have a continuing

8    duty to disclose.  And if Mr. Toke alerts to defendants to some

9    other material that might be relevant or should be searched,

10   you need to do that.

11           But to the extent that plaintiff is seeking some other

12   agreement or certification, that application is denied.

13           All right.  Discovery is presently scheduled to

14   conclude on November 20th.  Is that correct?

15           MR. TOKE:  Correct, your Honor.

16           THE COURT:  Does anybody anticipate that's going to be

17   a problem?

18           MR. TOKE:  Well, your Honor, if we --

19           THE COURT:  Depends on what you get and what's in

20   there.

21           MR. TOKE:  Depends on what we get and what's in there.

22           THE COURT:  All right.  Well, why don't we phone

23   conference this case like around November 20th, Frank.

24           THE DEPUTY CLERK:  Sure.

25           THE COURT:  Mr. Shapiro, I assume you're here as an

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

 1    interested observer and not as an active participant.

 2          MR. SHAPIRO:  I have nothing to add, your Honor.

 3          THE COURT:  Okay.  Didn't want to ignore somebody

 4    who's sitting here.

 5          THE DEPUTY CLERK:  We can do the 20th at 10 a.m.

 6          THE COURT:  The 20th at 10 a.m.

 7          MR. TOKE:  Your Honor, that is 7 a.m. Pacific time.

 8          THE COURT:  Oh.  We'll do it later.

 9          MR. TOKE:  I get to the office usually by 7:30, but

10    that's --

11          THE COURT:  Well, what time would be convenient for

12    you, Mr. Toke?

13          MR. TOKE:  If we could say 11:30 Eastern, would that

14    be possible?

15          THE COURT:  Frank.

16          MR. TOKE:  We can do 11:30.

17          THE COURT:  Okay.  Done.

18          Thank you all.  We stand in recess.

19          MR. SCHWARTZ:  Thank you.

20

21                              - - - -

22

23

24

25


                    CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                             (914)390-4103