HOWARD J. SCHWARTZ
CHIESA SHAHINIAN & GIANTOMASI PC
One Boland Drive
West Orange, NJ 07052
Telephone: 973-325-1500
Attorneys for Defendant
General Hotel Management Ltd.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE WAVE STUDIO, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL HOTEL MANAGEMENT LTD. *et al.,*<br><br>Defendants. | Case No.:  13-cv-09239 (CS) (PED)<br><br>**DECLARATION OF DR. STANLEY LAI, SC IN SUPPORT OF DEFENDANT GENERAL HOTEL MANAGEMENT'S MOTION FOR SUMMARY JUDGMENT** |

I, **DR. STANLEY LAI TZE CHANG, SC**, declare as follows:

1.      I am a lawyer and an academic.  After graduating from the University of Leicester with an LLB (Hons) degree in 1992, I was called to the Bar of England and Wales, Lincoln's Inn in 1993 and obtained an LLM from the University of Cambridge in 1994.  I was called to the Singapore Bar in 1995 before commencing my PhD research in the field of technology law and computer software copyright to become the first Singapore-born lawyer to be conferred a PhD in Law from the University of Cambridge. In January 2010, I was appointed Senior Counsel.

2.      I am a partner of Allen & Gledhill LLP ("**A&G**") and the Head of the Intellectual Property ("**IP**") practice at A&G.  I specialise in all forms of IP litigation and information technology disputes, and am also a commercial litigator. I also maintain a strong advisory practice for IP management and strategy, serving a broad spectrum of

clients. I am recommended as a Leading Individual in Chambers Asia-Pacific, The Legal 500 Asia Pacific and other leading legal publications.

3.     I am currently the Chairman of the Intellectual Property Office of Singapore. I am also a member of the Singapore International Arbitration Centre IP Panel and Singapore Copyright Tribunal, and a director of Singapore Technologies Engineering Ltd (listed on the Singapore Stock Exchange). I have published extensively on IP and information technology law, including the book entitled "The Copyright Protection of Computer Software in the United Kingdom", and an article entitled "Publisher reigned in on racing data copyright claim".

4.     I am currently an Adjunct Associate Professor of the National University of Singapore, Faculty of Law. I also serve as a Principal Mediator of the Singapore Mediation Centre. A copy of my Curriculum Vitae is annexed hereto as **Exhibit 1**.

5.     I have been retained as an expert witness by Defendant General Hotel Management to provide my opinion concerning issues of Singapore law, in particular the following issues:

(i)     The position under the Singapore Copyright Act (Cap. 63) (the "**Act**") on the ownership of copyright in commissioned photographs

(ii)     Whether the copyright in the Photographs that were taken by Lee Kar Yin and/or Masano Kawana (sub-contractor) belongs to the respective business entity that issued the relevant production estimate (referred to as the "**respective Wave entities**") by reason of the language in the production estimates:

> "*We will proceed on the basis that this estimate is wholly acceptable unless advised to the contrary in writing before the work is undertaken*"

2

> *"We reserve the intellectual property copyright to all designs / soft copies / material / photographs / projects undertaken."*

(iii)    Whether the Declaration of Lee Kar Yin and *Nunc Pro Tunc* Copyright Assignments to The Wave Studio LLC dated 4 September 2015 would be valid under Singapore law and whether the said document would be valid under Singapore law to "correct" the errors in the chain of title after the fact.

6.    The salient facts that are relevant to my analysis as set forth in Paragraph 5, above, are:

(i)    The photographs that are the subject matter of the dispute in the Suit were claimed to have been first published between 2001 to 2007.  (Declaration of Abigail J. Remore, dated February 12, 2016 ("Remore Decl.") at Ex A. ("Compl.") at ¶¶ 73, 77.)

(ii)    44% of "final" production estimates produced in the Suit that include charges for photo shoots were signed and 56% are unsigned. (Remore Decl. ¶ 10.)

(iii)    The production estimates contain the following language, in fine print, at the bottom of the page:

> *"We will proceed on the basis that this estimate is wholly acceptable unless advised to the contrary in writing before the work is undertaken."*

> *"We reserve the intellectual property copyright to all designs / soft copies / material / photographs / projects undertaken."*

(General Hotel Management, Ltd.'s Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("GHM's 56.1 St.") ¶ 25.)

(iv)    The production estimates were addressed to the general manager of the individual hotel, not to GHM.  (GHM's 56.1 St. ¶24.)

3

(v)   Production estimates include daily fees for photography, photo art direction and supervision, as well as photo digital touch up and provision of multiple sets of master CDs to GHM/Hotels.

(vi)   Ralf Ohletz (who used to be the Vice President of GHM) testified that if Lee Kar Yin ("**Lee**") (pleaded in the First Amended Complaint as one of the members of the Plaintiff) had indicated to him that she believed she owned the photographs, GHM would not have done any more business with her.  (GHM's 56.1 St. ¶32.)

(vii)   No one is aware of a "master" agreement between GHM/hotels managed by GHM and the respective Wave entities that relates to ownership in photographs, nor has one been produced in discovery in this proceeding.  (GHM's 56.1 St. ¶23.)

(viii) In the majority of cases, photography was estimated and invoiced separately from design, production and printing of marketing collateral.

(ix)   Based upon the documents that have been provided to GHM in the Suit, it appears that Lee was paid at least US$250,000.00 for photo shoots, and at least US$75,000.00 for additional design services and printing and colour separation supervision services.  (Remore Decl. ¶ 11.)

(x)    In some cases, a representative of GHM or the hotels would give Lee a list of which portions of the hotels they wanted to be photographed.  (Remore Decl. at Exs. H, I, J, K.)

(xi)   Ralf Ohletz testified that he was present at the majority (maybe 90%) of the photo shoots.  (Remore Decl. at Ex. E at 15:9-16.)

(xii)  Lee paid Masano Kawana, out of the proceeds of her payments from GHM/hotel, to be the photographer on the majority of these photoshoots.

4

7.    Ralf Ohletz testified that the photographer did the setup and took the pictures, Lee just supervised.  Lee testified that Masano was merely the "cameraman" who pushed the button when she told him to.  (Remore Decl. at Ex. E at 17:13-15; 23:11-13; Remore Decl. at Ex. C at 177:25-179:6).

8.    In the Suit, the Plaintiff has asserted ownership of copyright over photographs that are the subject of the following copyright registrations registered with the United States Copyright Office, and has alleged infringement of copyright in the same:[1]

| Registration Number | Title of Work |
|---|---|
| VAu 1-055-458 | The Wave Design Pte. Ltd. Unpublished photographs 2005 (C) setai429 — setai803 |
| VAu 1-055-459 | The Wave Design Pte. Ltd. Unpublished photographs 2005 (D) setai960 — setai 1179 |
| VAu 1-057-927 | The Wave Pte. Unpublished setai 182 |
| VAu 1-060-180 | The Wave Design Pte. Ltd. unpublished setai0183; 0184 |
| VAu 1-060-182 | Wave-s unpublished setai959 |
| VA 1-432-324 | Wave-s Photographs 2001 |
| VA 1-432-325 | Wave-s Photographs 2002 |
| VA 1-432-326 | The Wave Design Pte. Ltd. Photographs 2007(A) |
| VA 1-432-327 | The Wave Design Pte. Ltd. Photographs 2007 (B) |
| VA 1-432-328 | Wave-s Photographs 2003 |
| VA 1-432-329 | Wave-s Photographs 2004 |
| VA 1-432-330 | The Wave Design Pte. Ltd. Photographs 2006 |
| VA 1-432-331 | The Wave Pte. Ltd. Photographs 2005 (A) |

---

[1] Paragraphs 72, 73, 75 and 77 of the First Amended Complaint.

| VA 1-432-332 | The Wave Design Pte. Ltd. Photographs 2005 |
| VA 1-432-336 | Wave-s Photographs 2002 (B) |
| VA 1-758-524 | Wave-s Photographs 2004 (B) |
| VA 1-765-854 | The Wave Design Pte. Ltd. published legian 121 |

(collectively referred to as the "**Photographs**").

The Photographs are photographs of the hotels managed by GHM on behalf of the relevant owners of the hotels.

9.     My opinion is premised on the factual matrix of the Suit as described above.

10.     In preparing this brief opinion, I have reviewed the following documents that have been made available to me:

(i)    First Amended Complaint

(ii)    Amended  Answer  and  Affirmative  Defenses  of  General  Hotel Management Ltd

(iii)    Transcript of the deposition of Lee Kar Yin on 21 May 2015 and Exhibits 1 to 15 and the transcript of the continued deposition of Lee Kar Yin on 9 September 2015 (collectively, "**Lee's Deposition**")

(iv)    Transcript of the deposition of Ralf Ohletz Graf on 23 September 2015 ("**Ohletz's Deposition**") and Exhibits 45 to 61

(v)    Declaration of Lee Kar Yin and *Nunc Pro Tunc* Copyright Assignments to The Wave Studio LLC dated 4 September 2015

(vi)    Email dated 2 November 2001 at 17:29 from See Soo Eng to Junior Lee on subject "Fw: American Express Promotion"

6

(vii) Email dated 15 September 2005 at 8:33:07 from Larry Van Ooyen to "jlee" on subject "carcosa images"

(viii) Email dated 8 October 2005 at 2:41:18am from Devyani Singh to "jlee" on subject "RE: Seta Photographs"

(ix)  Email dated 13 March 2006 at 4:27:41pm from See Soo Eng to Junior Lee with copy to Eleanor Hardy on subject "The Chedi, Chiang Mai – Update photo shoot"

(x)   Email dated 28 April 2006 at 4:48pm from Alvin Fong to See Soo Eng and "jr lee" on subject "RE: The Chedi Phuket A4 Flyer"

(xi)  Email dated 16 May 2006 at 12:43pm See Soo Eng to Junior Lee with copy to Eleanor Hardy on subject "Fw: Update photo shoot"

(xii) Email dated 17 May 2006 at 12:40pm from See Soo Eng to Junior Lee with copy to Eleanor Hardy on subject "Re: Update photo shoot" in reply to email dated 16 May 2006 at 3:08pm from Junior Lee to See Soo Eng with copy to Eleanor Hardy on subject "Re: Update photo shoot"

(xiii) Email dated 20 September 2006 at 4:58:27pm from K Oei to "KarYin Lee with copy to Hans Jenni on subject "Ultimate Spa"

(xiv) Email dated 6 October 2006 at 10:08pm from Astrid Djuansjah to "jlee" with copy to "General Manager; Director of Marketing; Sales Administrator" on subject "Re: The Beach House Images"

(xv)  Email dated 18 November 2006 at 1:11pm from See Soo Eng to Eleanor Hardy with copy to Junior Lee on subject "List of Areas for The Chedi, Chiang Mai Photo Shoot"

(xvi) Email dated 27 September 2007 at 1:49:40pm from "jlee" to ghmadmin@singnet.com.sg on subject "Re: Interior Design magazine – photography credit for the Chedi Muscat"

**Issue (i) - The position under the Singapore Copyright Act (Cap. 63) (the "Act") on the ownership of copyright of commissioned photographs**

11.     Under Singapore law, as a general proposition, the author/creator of a work is the first copyright owner. Section 30(2) of the Act provides that "*Subject to this section, the author of a literary, dramatic, musical or artistic work shall be entitled to any copyright subsisting in the work by virtue of this Part.*" "Author" is defined in Section 7(1) of the Act only in relation to photographs and means "the person who took the photograph". However, the Act does provide for exceptions to the rule in Section 30(2). For photographs that are taken pursuant to a commissioning agreement, this rule is displaced by the operation of Section 30(5) of the Act, which provides that:

> *Subject to subsection (4), where —*
> *(a) a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving by the other person; and*
> *(b) the work is made in pursuance of the agreement,*
> *the first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.*

12.     In the present case, we are dealing with photographs, which as a category of works, fall within Section 30(5) of the Act. The effect of Section 30(5) of the Act is that the commissioning party, and not the photographer, is the first owner of copyright in the photographs. In *Wang Choong Li v Wong Wan Chin* [2015] 4 SLR 41 (enclosed at

**Exhibit 2**), the Singapore High Court found that the respondent who had engaged a photographer to take pre-wedding photographs for the respondent and her husband were the owners of copyright in the photographs by reason of Section 30(5). The Judge found that even though the word "commission" was not used in discussions between the respondent and the photographer when the photographer was engaged, it was clear from looking at all the facts and circumstances that the photographer was commissioned by the respondent and by operation of Section 30(5), the copyright in the photographs belonged to the respondent as the commissioning party.

13.    Accordingly, where a photograph is created by the photographer pursuant to an agreement for the taking of the photograph for valuable consideration, the commissioning party is the first owner of copyright in the photographs. As observed by the Singapore High Court in *Wang Choong Li v Wong Wan Chin*, there is no necessity that words like "commission" must be used for the court to find that a commissioning arrangement was present. Rather, "*what matters is the legal characterisation that may be attributed when all the facts and circumstances are looked at*" (*Wang Choong Li v Wong Wan Chin* at [26]).

14.    The effect of Section 30(5) to displace the general rule under the law of copyright in Singapore (and many other countries) that the author is the first owner of copyright such that the commissioning party, and not the photographer, is the first owner of copyright in photographs has been stated in leading textbook authorities. These authorities would be accepted by the Singapore Courts as being leading authorities which would carry high persuasive value. In *The Modern Law of Copyright and* Designs (Third Edition) (enclosed at **Exhibit 3**), the authors state at [21.41] that for a commissioning to

9

"*oust the normal rule that the author is the first owner of the copyright the commission must pre-date the making of the work commissioned*".

15. The fact that a sub-contractor, Masano Kawana was engaged by Lee (as the contractor), took some of the Photographs in contention between the parties in the Suit, does not detract from the effect that the commissioning party is the owner of copyright by reason of Section 30(5) of the Act. At [21.42] of *The Modern Law of Copyright and* Designs (Third Edition) (Exhibit 3), the authors state that "*where part of the process for the making of the finished article has been sub-contracted out, it appears that it is the person who commissioned the making of the finished article, and not the immediate person who commissioned the making of the copyright work, who is entitled to the copyright.*" The authors of *Copinger and Skone James on Copyright* (Fourteenth Edition) (enclosed at **Exhibit 4**) state at [5-33(d)] that "*if a person ordered a work to be made by another, who then subcontracted the necessary labour, the person ordering the work would in the normal case have been entitled to the copyright in the work. This is on the basis that the person ordering the work commissioned all necessary articles to be made even though unaware of the need for them.*" In my view, this would equally apply to the present situation in the Suit where GHM (acting on behalf of the hotels) engaged the respective Wave entity effectively owned by Lee to take the Photographs of the hotels and Lee then contracted with Masano to take the Photographs for the Wave entity. As the hotels (through GHM) were the parties who commissioned the end-product (the Photographs), they are entitled to the copyright in the Photographs. The fact that Lee was not the actual author of the Photographs but she sub-contracted/engaged Masano to take the Photographs does not of itself negate the operation of Section 30(5).

16.     Accordingly, the arrangement where GHM engaged the respective Wave entities for, *inter alia,* photography of various hotels that GHM was managing on behalf of the hotels would be treated as commissioning arrangements to which Section 30(5) would apply under Singapore law.  Consequently, by operation of Section 30(5) of the Act, the first owner of the copyright in the Photographs would be the commissioning party, which I understand to be the hotel at all material times (GHM was acting as the agent of the hotel) and not the photographer (whether Masano Kawana or Lee).

**Issue (ii) – Whether the language in the production estimates vested copyright ownership in the respective business entity that issued the relevant production estimate**

17.     The rule in Section 30(5) which vests first ownership of copyright in commissioned photographs in the commissioning party may be excluded or modified by agreement.  Section 30(3) provides that *"The operation of subsection (4), (5) or (6) in relation to copyright in a particular work may be excluded or modified by agreement."*

18.     The question in the present case is whether the following language used in the production estimate would operate to exclude the operation of Section 30(5) and vest copyright ownership of the Photographs in the respective business entity rather than the commissioning party:

> *"We will proceed on the basis that this estimate is wholly acceptable unless advised to the contrary in writing before the work is undertaken"*

> *"We reserve the intellectual property copyright to all designs / soft copies / material / photographs / projects undertaken."*

19.     In my view, the language in the production estimate would not be sufficient under Singapore law to operate as an exclusion of Section 30(3) of the Act.

20.     The language used merely states "*We reserve the intellectual property copyright to all designs / soft copies / material / photographs / projects undertaken*" and is essentially a broad catch-all provision that is used generically.  In my view, this clause would not suffice to exclude the operation of Section 30(5) of the Act and would not have effect to vest the copyright in the photographs in the respective Wave entities.  Under Singapore law, the standard of proof in civil proceedings is proof on a balance of probabilities.  If the dispute were litigated in Singapore, the plaintiff would have to prove on a balance of probabilities that the language was in fact part of the agreed terms between the hotels and the respective Wave entities (please see discussion at paragraphs 25 to 27 below on oral agreements).  First, by reason of Section 30(5), the first owner of copyright is the commissioning party and not the Wave business entity (see paragraphs 11 to 16 above).  In this respect, the Wave business entity has no intellectual property rights to reserve in the first place.  Secondly, the language used is neither clear nor specific in identifying the subject matter over which copyright was purportedly asserted.  Instead a carte blanche reference to "*all designs / soft copies / material / photographs / projects undertaken*" is used.  In order for a commissioning agreement to exclude or modify the operation of Section 30(5), the agreement should identify clearly the works in which copyright is to vest in the Wave business entity and to state in no uncertain terms that the copyright in the photographs belong to the Wave business entity.  The exclusion or the modification of the operation of Section 30(5) which vests the first ownership of copyright in the commissioning party is a serious derogation of rights of the commissioning party.  Consequently, any agreement that purports to exclude or modify the operation of Section 30(5) must be sufficiently precise in identifying the works in

which copyright is to vest in the author as opposed to the commissioning party before it is found to be effective. Such specificity is missing in the language used in the production estimate.

21.    There is presently no Singapore case where the issue to be determined was whether language used in a production estimate (which I understand from reading Lee's Deposition and Ohletz's Deposition was intended to act as a quotation) would be sufficient to amount to an agreement excluding the operation of Section 30(5) of the Act. As Justice Aedit Abdullah observed in *Wang Choong Li v Wong Wan Chin* at [21] (Exhibit 2), "*Section 30(5) of the Act has not attracted much judicial attention in Singapore*". Nonetheless, there have been cases in other Commonwealth jurisdictions concerning contracts purporting to exclude or modify provisions that are *in pari materia* with Section 30(5) which would carry highly persuasive (though not binding) value in the Singapore Courts.

22.    In *Christopher Bede Studio Limited v United Portraits Limited* [1958] NZLR 250 (enclosed at **Exhibit 5**), the plaintiff company was in the business of shooting photographs and it sued the defendant for reproducing photographs the plaintiff had taken for the defendant. The plaintiff alleged it owned copyright in the photographs. The plaintiff company required each customer to sign a special form of contract which contained the following clause on copyright:

> *In consideration of your supplying me with proofs of at least 80% of the photographs taken by your photographer, which proofs shall be BLACK AND WHITE FADELESS PRINTS INSTEAD OF RED DAYLIGHT PROOFS, I agree that the copyright in all photographs taken or supplied by you shall be owned by you. I understand that the term copyright means that only you have the right to print, copy or reproduce in any shape, form or colour, any of the photographs taken or supplied to me by you.*

23.     The New Zealand Supreme Court found that this clause was effective to exclude the operation of Section 8(1)(a) of the Copyright Act 1913[2] which would otherwise made the orderer of the photograph the first owner of the copyright.  On page 256 of the decision, the Supreme Court held that *"Clause 7 of the appointment contract relates to the subject-matter of the contract —namely, the photographs—and cannot be said to be accepted by the orderer in the belief that it relates to an entirely different transaction from what is expressed therein."* The clause in question in that case was clear in identifying the work in which copyright was asserted and in stating that in consideration of the photographer supplying a percentage of proofs, the customer agreed that the copyright in the photographs would vest in the photographer.  I consider that in order for an agreement to be effective in excluding the operation of Section 30(5), more specificity and clarity in language used is required, as seen in Clause 7 in *Christopher Bede Studio Limited v United Portraits Limited*.  In contrast, the broad and general language used in the production estimate on which the Plaintiff is seeking to rely on lack such clarity.  Although the New Zealand case is not binding authority on the Singapore Courts, it would be considered highly persuasive.

24.     There is another basis upon which I am of the opinion that the language used in the production estimates (*"We reserve the intellectual property copyright to all*

---

[2] Section 8(1)(a) provides that *"Subject to the provisions of this Act the author of a work shall be the first owner of the copyright therein: Provided that:*

*Where in the case of an engraving, photograph, or portrait, the plate of other original was ordered by some other person, and was made for valuable consideration in pursuance of that order, then, in the absence of any agreement to the contrary, the persons by whom such plate or other original was ordered shall be the first owner of the copyright."*

*designs / soft copies / material / photographs / projects undertaken*") would not be upheld under Singapore law as vesting copyright in the respective Wave entities. Under Singapore law, one of the rules of construction of contracts is the *contra preferentem* rule where a clause is to be construed against the party who is seeking to enforce it. This rule is applied when the contractual clause in question is vague and ambiguous. In my opinion, the clause on which Lee is relying to assert copyright ownership over the photographs is vague because it does not refer to specific works (as set out in [77] of the Amended Complaint). Accordingly, it must be construed against her in accordance with the *contra preferentem* rule. As earlier stated in paragraph 20 above, an agreement to exclude or modify the operation of Section 30(5) is a serious derogation of rights of the commissioning party. In this case, the clause that the copyright in the photographs vest in the respective Wave entities should be construed against the plaintiff and bearing in mind the large amounts paid by the hotels to the respective Wave entities, it is unlikely that the hotels agreed that the copyright in the photographs would vest in the respective Wave entities. The clause would not be upheld on an application of the *contra preferentem* rule of construction of contract.

25. I also note from the salient facts as I understand them and Ohletz's Deposition[3] that there was no master agreement or other written document setting out terms and conditions for the commissioning arrangement between the Wave entities and GHM (acting on behalf of the hotels). In these circumstances, the commissioning agreements were in essence oral agreements between the parties who had developed a

---

[3] Remore Decl. at Ex. E at 32:4-11.

pattern of conduct.[4] Oral commissioning agreements are valid and enforceable under Singapore law, although Section 6 of the Civil Law Act (Cap. 43) provides that "*No action shall be brought against ... (e) any person upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person lawfully authorised by him.*" From the facts of the present case, it is my understanding that the agreement was performed by the respective Wave entity within one year and accordingly, Section 6 of the Civil Law Act would not be of concern in this present case. The terms governing the oral agreement between the parties would generally have to be inferred by the conduct between the parties and where proven, any implied terms common in the industry. In this regard, I note that it was not the usual practice for all of the production estimates to be signed and less than half (only 45%) of the production estimates produced in this matter were signed. This is a factor that would mitigate against a finding under Singapore law that the language used in the production estimates as set out in Paragraph 10, above, were in fact part of the terms by which all parties believed formed part of the commissioning agreement. It is noteworthy that in Ohletz's Deposition, he testified that all dealings with Lee (as representative of the Wave entities) never proceeded on the basis that the hotels were not the copyright owners, nor did they proceed on the basis that use of the Photographs by the hotels was subject to a licence from the Wave entities or Lee. He testified that she never once asserted ownership over the copyright over the

---

[4] *See* Remore Decl. at Ex. E. at 32:12-19.

Photographs and if she had done that, he would have stopped working with her.[5] He also testified that the usual practice in the industry was for the hotels to own copyright in the photographs since multiple reproductions for various purposes would be required, and no hotel would pay large sums of money for photographs in which they did not own copyright and the right to reproduce as they required.[6]

26.    In determining the terms of an oral agreement between the parties under Singapore law, it would be relevant to consider the intention of both parties through the pattern of conduct between the parties. From Ohletz's Deposition, it appears that GHM and the hotels operated on the basis that the copyright in the photographs belonged at all material times to the hotels. In Lee's Deposition, Lee states that GHM knew that she was asserting copyright over the photographs. Unless there is clear evidence that it was in fact the intention of both parties that Section 30(5) would be excluded and the copyright in the photographs would not be owned by the hotels, my view is that under Singapore law, it would be, at a minimum, questionable, if not improper, to infer a term or otherwise conclude that the respective Wave business entity owned the copyright in the photographs. The emails dated 27 September 2007 at 1:49:40pm from "jlee" to ghmadmin@singnet.com.sg on subject "Re: Interior Design magazine – photography credit for the Chedi Muscat"[7] fortifies my view that the conduct of the parties show that the hotels never agreed that the respective Wave business entity owned the copyright in the photographs. From the contents of the email, Lee was aware that GHM had sent a

---

[5] Remore Decl. at Ex. E at 32:20-25; 33:1-6; 93:4.

[6] Remore Decl. at Ex. E. at 33:16-21; 80:24-25; 81:1-6; 111:20-25; 112:1-3.

[7] Remore Decl. at Ex. G.

photograph of The Chedi Muscat to Interior Design Magazine since GHM had asked her what the photography credit should be. In her email, she did not raise any objections to GHM sending a photograph of The Chedi Muscat without first seeking her consent, nor did she request for any payment of licence fees, nor did she demand "copyright acknowledgement." The failure on Lee's part to raise any objections shows that she understood that the copyright in the photographs belonged to the hotels.

27.     If the matter was adjudicated in Singapore, account would likely be taken of the industry norms in determining the precise terms of the oral agreement. Bearing in mind that it would be unusual for a hotel to pay substantial fees for photographs if the hotels would not own the copyright and have the right to make further use of the photographs, it would be tenuous to infer or otherwise conclude under Singapore law, in the absence of compelling evidence, that the parties had indeed agreed orally that the copyright in the Photographs would vest in the respective Wave entity and not the hotels.

28.     For reasons stated above, I am of the opinion that the language used in the production estimate is not sufficient to and does not operate to exclude or modify the operation of Section 30(5) of the Act. From the pattern of conduct between the parties and bearing in mind industry norms and practices that would likely be considered under a Singapore law analysis, particularly in the context of an oral agreement, it is also unlikely that an inference would be found under Singapore law that parties had agreed that the hotels would not own the copyright in the Photographs and instead the respective Wave entity would be the owner of copyright in the Photographs.

**Issue (iii) – Whether the Declaration of Lee Kar Yin and *Nunc Pro Tunc* Copyright Assignments to The Wave Studio LLC dated 4 September 2015 (the "Declaration and Assignment") would be valid under Singapore law and whether the said**

**document would be valid under Singapore law to "correct" the errors in the chain of title after the fact.**

29.    I have reviewed the following assignment agreements and documents which are annexed as Exhibits to Lee's Deposition:

(i)    Assignment of Copyright agreement between Wave-S to The Wave Design Pte. Ltd. dated 15 February 2007 (Exhibit 8 of Lee's Deposition)

(ii)    Assignment of Copyright agreement between The Wave Pte. Ltd. and The Wave Studio Pte. Ltd. dated 28 July 2008 (Exhibit 3 of Lee's Deposition)

(iii)    Copyright Assignment between The Wave Pte. Ltd. and The Wave Studio, LLC dated 11 November 2011(Exhibit 4 of Lee's Deposition)

(iv)    Certificate of Acknowledgment of Execution of an Instrument (issued by Embassy of the United States of America in Singapore) with copy of Assignment of Copyright agreement between The Wave Pte. Ltd. and The Wave Studio Pte. Ltd. but with the dates 28 July 2008 cancelled and the date "15 October 2012" stamped (Exhibit 5 of Lee's Deposition)

(v)    Declaration recorded with US Copyright Office dated 7 January 2013 (Exhibit 7 of Lee's Deposition)

30.    I have also reviewed the Declaration and Assignment in which Lee declares at paragraphs 19, 20, 21 and 22 that the following assignments were made in error and are void *ab initio*:

(i)    Assignment of Copyright agreement between Wave-S to The Wave Design Pte. Ltd. dated 15 February 2007 (Exhibit 8 of Lee's Deposition)

(ii)    Assignment of Copyright agreement between The Wave Pte. Ltd. and The Wave Studio Pte. Ltd. dated 28 July 2008 (Exhibit 3 of Lee's Deposition)

(iii)  Copyright Assignment between The Wave Pte. Ltd. and The Wave Studio, LLC dated 11 November 2011(Exhibit 4 of Lee's Deposition)

(iv)  Copyright assignment between Wave-S to The Wave Studio LLC dated 11 November 2011

31.    For the reasons explained above, I am of the opinion that the copyright in the Photographs belong to the hotels.  Consequently, there is no copyright that the respective Wave entities could legally assign.  As such, the assignments listed out under paragraphs 29 and 30 are ineffective under Singapore law.  Nevertheless, for completeness, I make some observations on the declarations made by Lee on the assignments apropos the Declaration and Assignment and set out my opinion on whether the Declaration and Assignment would be valid under Singapore law, and whether the said document would be valid under Singapore law to "correct" the errors in the chain of title after the fact.

32.    From my review of paragraphs 2 to 12 of the Declaration and Assignment and comparing the assignments listed at (i) and (ii) at paragraph 30 above,[8] it is apparent that there is discrepancy and contradiction in the assignments of the copyright.  On one hand, Lee declared that upon the dissolution of Wave-S on 21 February 2007, all the copyright was automatically transferred to Lee by operation of Singapore law.  This would be correct since Wave-S was a sole-proprietorship under Lee and all of Wave-S's assets are legally Lee's, except that there was already an assignment between Wave-S and The Wave Design Pte. Ltd. on 15 February 2007.  At the same time, Lee also declared that on 1 August 2008, the Board of Directors of The Wave Design Pte. Ltd.

---

[8] Remore Decl. at Exs. 18-23.

resolved to dissolve The Wave Design Pte. Ltd. and assign the copyright to Lee. However, The Wave Pte. Ltd. and The Wave Studio Pte. Ltd. entered into a copyright assignment dated 28 July 2008. Lee seeks to rectify these discrepancies through the Declaration and Assignment.

33.    At the outset, it would be helpful to set out the requirements under Singapore law for the assignment of copyright. Section 194(2) of the Act provides that "*No assignment of copyright (whether total or partial) shall have effect unless it is in writing signed by or on behalf of the assignor.*" The full provision of Section 194 is set out below:

> **194.**—*(1) Subject to this section, copyright shall be transmissible by assignment, by testamentary disposition, or by operation of law as personal or movable property.*
> *(2) An assignment of copyright may be limited in any of the following ways, or in any combination of 2 or more of those ways:*
> *(a) so as to apply to one or more, but not all, of the classes of acts which by virtue of this Act the owner of the copyright has the exclusive right to do (including any one or more classes of acts not separately designated in this Act as being restricted by the copyright, but falling within any of the classes of acts so designated);*
> *(b) so as to apply to any one or more, but not all, of the countries in relation to which the owner of the copyright has by virtue of this Act that exclusive right;*
> *(c) so as to apply to part, but not the whole, of the period for which the copyright is to subsist,*
> *and references in this Act to a partial assignment are references to an assignment so limited.*
> *(3) No assignment of copyright (whether total or partial) shall have effect unless it is in writing signed by or on behalf of the assignor.*
> *(4) Subject to subsection (4A), a licence granted in respect of any copyright by the person who, in relation to the matters to which the licence relates, is the owner of the copyright shall be binding upon every successor in title to his interest in the copyright, except a purchaser in good faith for valuable consideration and without notice (actual or constructive) of the licence or a person deriving title from such a purchaser.*

> (4A) A licence granted to the Government or any statutory board on
> or after 1st July 2004[*] in respect of any copyright by the person
> who, in relation to the matters to which the licence relates, is the
> owner of the copyright shall be binding upon every successor in title
> to his interest in the copyright.
> (5) References in this Act, in relation to any copyright, to the doing
> of anything with, or (as the case may be) without, the licence of the
> owner of the copyright shall be construed accordingly.
> (6) In this section, "statutory board" means any body corporate
> established by or under any written law to perform or discharge a
> public function.

34.    Section 194(2) identifies 2 requirements for an effective assignment of copyright under Singapore law. First, the assignment must be in writing. Secondly, the assignment must be signed by or on behalf of the assignor. Where the assignor is a body corporate, the signatory must have authority to bind the body corporate. Any assignment that does not comply with these 2 requirements under Section 194(2) would be ineffective. Nonetheless, if an assignor and assignee intended to assign the copyright but failed to comply with Section 194(2), the law would recognise the existence of an equitable assignment[9] and if parties subsequently entered into a written assignment in compliance with Section 194(2), that would be sufficient for the assignee to become the legal owner of the assigned copyright. In this regard, retrospective assignments (or *nunc pro tunc* assignments) would be upheld under Singapore law provided that the assignments do in fact accurately reflect the parties' genuine intentions for the assignments to have been effected at that relevant time. A situation where a retrospective assignment would be upheld would be one where an equitable assignment exists between the parties and the retrospective assignment was subsequently entered into to satisfy the legal requirements under Section 194(2).

---

[9] *The Law of Copyright in Singapore* (Second Edition), George Wei at [12.33]

22

35.     The Declaration and Assignments seeks to declare certain past assignments void and to effect what Lee declares to be the correct assignment.  In my opinion, the Declaration and Assignment would not be valid and would not be effective under Singapore law to "correct" the errors in the chain of title after the fact.  The reasons are as follows.

36.     Although paragraphs 19 to 22 of the Declaration and Assignment state that the assignments were made in error, the document omits to explain what kind of "error" Lee is relying on as the basis for the unilateral declaration that the assignments are void *ab initio*.  Under Singapore law, an assignment would only be found to be void ab initio if (i) there is a common mistake which renders a contract void *ab initio* at common law: *Associated Japanese Bank (International) Ltd v Credit du Nord SA* [1989] 1 WLR 255 endorsed by the Singapore High Court in the Singapore High Court in *Ho Seng Lee Construction Pte Ltd v Nian Chuan Construction Pte Ltd* [2001] 3 SLR(R) 184 and *Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd* [2003] 1 QB 679 followed in *Wong Lai Keen v Allgreen Properties Ltd* [2009] 1 SLR(R) 148[10] or (ii) there is a unilateral mistake on one party's party and the other non-mistaken party had actual knowledge that the other party was operating under a mistake: *Chwee Kin Keong and others v Digilandmall.com Pte Ltd* [2005] 1 SLR(R) 502.

---

[10] By Section 3 of the Application of English Law Act (Cap. 7A), the common law of England (including the principles and rules of equity), so far as it was part of the law of Singapore immediately before 12th November 1993 continues to be part of the law of Singapore.

37.     The courts are generally reluctant to declare an agreement void *ab initio* at common law because of the general principle that the law places as its paramount policy concern that of upholding contracts.[11]

Common mistake at law

38.     The courts in Singapore have held that the doctrine of common mistake only applies to those which lie at the root of the contract.[12]  Two preconditions must be satisfied.  First, the contract must not have allocated the risk or one or both parties.  Second, the mistake is not attributable to the fault of either party.  Assuming the preconditions are satisfied, the requirements are that (i) the mistake was shared by both parties and relate to facts or law before the contract was concluded; and (ii) the mistake that rendered the subject matter of the contract fundamentally different from what the parties contracted on as constituting basis of their contract.  A mere statement by Lee that the assignments were effected in error would not, in my opinion, be sufficient for the doctrine of common mistake under Singapore law to apply resulting in the assignments being void *ab initio*.

Common mistake in equity

39.     Contracts may be voidable under equity (from *Solle v Butcher* [1950] 1 KB 671 and *Grist v Bailey* [1967] Ch 532) if the common mistake is not sufficiently fundamental to the subject matter of the contract to warrant relief under common law.  The precondition is that the party seeking relief should not be at fault.  However, it

---

[11] *Associated Japanese Bank (International) Ltd v Credit du Nord SA* applied by the Singapore High Court in *Ho Seng Lee Construction Pte Ltd v Nian Chuan Construction Pte Ltd* [2001] 3 SLR(R) 184.

[12] *Adani Wilmar Ltd v Cooperative Centrale Raiffeisen-Boerenleenbank BA* [2002] 2 SLR(R) at [52].

must be shown that the parties operated under a common mistake that was serious for the court to exercise equitable jurisdiction to set aside the contract, with regard to any rights acquired by innocent third parties.

Unilateral mistake

40.    Under the doctrine of unilateral mistake in Singapore, the first requirement for the application of the doctrine is that the unilateral mistake must relate to the terms of the contract.    The second requirement is that the unilateral mistake must be "fundamental".    Finally, the non-mistake party must have actual knowledge of the unilateral mistake at common law.

41.    Based on the documents that I have reviewed, there is nothing to suggest that the parties (namely the respective Wave Entities) were genuinely operating under a common mistake or that there was a unilateral mistake by either the assignor or the assignee and actual knowledge by the non-mistaken party so as to render the assignments void *ab initio*.    Further, bearing in mind the paramount policy of the law to uphold contracts, I am of the view that the Declaration and Assignment would not be valid and effective under Singapore law.

**Conclusion**

42.    In conclusion, I briefly set out the position under Singapore law on the 3 issues:

(i)    Photographs that were commissioned by the hotels through GHM (as agent) are owned by the commissioning party as the first owner of the copyright and not the photographer by operation of Section 30(5) of the Act.

(ii)    The language used in the production estimate does not exclude nor modify the operation of Section 30(5) in the commissioning agreement between GHM (acting on behalf of the hotels) and the respective Wave business entities.  Further, it is also unlikely that a finding of an inference would be made under Singapore law that it was a term of the oral agreement between the parties (since there was no master agreement) that the copyright in the Photographs would vest in the respective Wave entity and not the hotels.

(iii)    The Declaration and Assignment unilaterally declares that the previous assignments entered into between the respective Wave Entities were entered in error and void *ab initio*.  Under Singapore law, the Declaration and Assignment would not be valid under Singapore law and would not be effective to "correct" the errors in the chain of title after the fact.

*[SIGNATURE PAGE FOLLOWS]*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 12, 2016
at Singapore

By: _____
DR. STANLEY LAI TZE CHANG, SC

27

# Exhibit 1



| | | |
|---|---|---|
| <u>Surname</u>, First name | : | Dr Stanley <u>Lai</u> Tze Chang, SC |
| Address | : | Allen & Gledhill LLP |
| | | One Marina Boulevard, #28-00 Singapore 018989 |
| Tel | : | 6890-7883 |
| Fax | : | 6302-3302 |
| Email | : | <u>stanley.lai@allenandgledhill.com</u> |
| Nationality/Date of Birth | : | Singaporean / 24/2/1968 |

## Educational/Professional Memberships

| <u>Organization:</u> | <u>Qualification:</u> | <u>Date Obtained:</u> |
|---|---|---|
| University of Leicester (UK) | (LLB (Hons) Upper Second Class) | 1989-92 |
| (Lincoln's Inn) | Barrister at Law | 1992-1993 |
| University of Cambridge (UK) | LLM | 1993-94 |
| Supreme Court of Singapore | Advocate & Solicitor | 1995 |
| University of Cambridge (UK) | PhD in Law | 1995-1998 |
| Singapore Academy of Law/Supreme Court of Singapore | Senior Counsel | January 2010 |

| Other Appointments | | Date of Appointment |
|---|---|---|
| Panel of Principal Mediators, Singapore Mediation Centre | Principal Mediator | 1 June 2012 |
| Singapore Domain Name Dispute Resolution Policy (SDRP) Panel | Member | 1 April 2013 |
| Intellectual Property Office of Singapore | Chairman | 1 April 2013 |
| Singapore Copyright Tribunal | Member | 15 May 2012 |
| IP Academy | Chairman, Advisory Panel | 1 April 2013 |
| Neutral Evaluator Panel | Member | 2 May 2012 |
| Copyright Tribunal | Member | 15 May 2012 |
| SMU School of Law Advisory Board | Member | 1 April 2013 |
| SIAC Panel of Intellectual Property Arbitrators | Member | 24 January 2014 |
| Asian Domain Name Dispute Resolution Centre | Panelist | 25 July 2014 |

**Current Position**

Messrs Allen & Gledhill LLP :     Head of Intellectual Property Practice (2006 to present)

**Professional Experience**

| Dates | Law Firm or other organisation and address | Particulars |
|---|---|---|
| 1994-1995 | Messrs Wong Yoong Tan & Molly Lim/Wong Partnership, Singapore | Pupillage (Corporate Law) |

| | | |
|---|---|---|
| October 1995 to June 1996 | University of Leicester, United Kingdom | Part-time tutor, Contract Law |
| October 1996 to December 1996 | University of Leicester, United Kingdom | Part-time tutor, Intellectual Property Law (LLM) |
| 1999-2001 | Messrs Lee & Lee, Singapore | Legal Associate/Partner (July 2000) (Intellectual Property, General Litigation) |
| July 2000- 2012 | National University of Singapore Faculty of Law | Teaching Principles of Intellectual Property Law B LL4053 (Appointment: Adjunct Associate Professor) |
| 2001-present | Messrs Allen & Gledhill LLP | Partner |
| August 2007 - 2015 | National University of Singapore Faculty of Engineering | Teaching IP Law for Engineers and Scientists MT 5005 Adjunct Associate Professor) |
| 2013-2015 | National University of Singapore Faculty of Law | Teaching IP and Competition Law LL4075/LL5075/LL6075 Adjunct Associate Professor) |
| 2016 | National University of Singapore Faculty of Law | Foundations of IP Law LL4070V / LL5070V / LC5070V / LL6070V (Current Appointment: Adjunct Associate Professor) |

3

**Arbitration Experience**

Experience as arbitration counsel.

Currently acting as counsel in an ad-hoc arbitration concerning an information technology dispute.

Separately advising in a technology dispute involving PRC parties.

**List of Recent Reported Decisions (Lead Counsel)**

- *Global Tobacco Manufacturers (International) Sdn Bhd v Jamal Abdulnaser Mahmoud Al Mahamid* [2015] SGCA 51

- *Jamal Abdulnaser Mahmoud Al Mahamid v Global Tobacco Manufacturers (International) Sdn Bhd* [2015] SGHC 42

- *I-Admin (Singapore) Pte Ltd v Hong Ying Ting and others* [2015] SGHC 153

- *Main-Line Corporate Holdings Ltd v DBS Bank Ltd* [2012] 4 SLR 147

- *Martek Biosciences Corp v Cargill International Trading Pte Ltd* [2012] 2 SLR 482

- *Martek Biosciences Corp v Cargill International Trading Pte Ltd* [2011] 4 SLR 429

- *Martek Biosciences Corp v Cargill International Trading Pte Ltd* [2011] 1 SLR 1287

- *Martek Biosciences Corp v Cargill International Trading Pte Ltd* [2010] 3 SLR 927

- *Cargill International Trading Pte Ltd v Martek Biosciences Corporation* [2009] SGIPOS 16

- *Cargill International Trading Pte Ltd v Martek Biosciences Corporation* [2009] SGIPOS 12

- *Asia Pacific Publishing Pte Ltd v Pioneers & Leaders (Publishers) Pte Ltd* [2011] 4 SLR 381

- *Pioneers & Leaders (Publishers) Pte Ltd v Asia Pacific Publishing Pte Ltd* [2010] 4 SLR 744

- *Mühlbauer AG v Manufacturing Integration Technology Ltd* [2010] 2 SLR 724

- *Ozone Community Corp v Advance Magazine Publishers Inc* [2010] 2 SLR 459

- *Mobil Petroleum Co, Inc v Hyundai Mobis* [2010] 1 SLR 512

- *Inphosoft Pte Ltd v Ho Jin Kiat and another (Foo Guowei Derek, non-party)* [2009] SGHC 152

- *Mobil Petroleum Co, Inc v Hyundai Mobis* [2008] 4 SLR(R) 427

- *Hyundai Mobis v Mobil Petroleum Company, Inc* [2007] SGIPOS 12

- *Future Enterprises Pte Ltd v McDonald's Corp* [2007] 2 SLR(R) 845

4

**Publications**

**Articles & Case Notes**

*The Law of Reckless Manslaughter - Swept by the Tide of Change?* (1994) 58 Journal of Criminal Law 303

*Biotechnology and the Singapore Patents Act 1994* IP Asia, July/August 1995 (No.6) at 2

The Singapore Patents Act 1994: Wither Biotechnology and Patent Law? (1995) Singapore Academy of Law Journal (7 S.Ac.L.J. Part II) 396

*IP and the Pharmaceutical Industry - A Supplement to Managing Intellectual Property at 40-41*

*Unauthorised Use and Section 1 Computer Misuse Act 1990* Journal of Financial Crime, May 1996 at 359

*The Erosion of Goodwill* (1996) 146 New Law Journal 974 (cited in Carty, Passing Off at the Crossroads" [1996] 11 EIPR 629 at 632 n.21)

*Recent Developments in Copyright Protection and Software Reverse engineering in Singapore - A Triumph for the Ultra-protectionists?* [1997] 19 European Intellectual Property Review 525

*Database Protection in the United Kingdom: The New Deal and its Effects on Software Protection* [1998] 1 European Intellectual Property Review 32

*The Impact of the Recent WIPO Copyright Treaty and Other Initiatives on Software Copyright in the United Kingdom* [1998] 1 Intellectual Property Quarterly 35

Case Note on *Redrow Homes Ltd v Bett Bros plc – Additional damages for breach of copyright* [1998] 19 Company Lawyer 221; [1999] Journal of Financial Crime

*Recent Developments in Copyright and Database Protection in a Digital Environment* [1999] 7(1) International Journal of Law and Information Technology 73

*Opinion: Digital Copyright and Watermarking* European Intellectual Property Review (Issue 4, 1999)

*Substantive Issues of Copyright Protection in a Networked Environment* (1999) 8(2) Information & Communications Technology Law 127

*Liability of Network Service Provider under Copyright Law*: Impact of the Copyright (Amendment) Act 1999. *Asia Business Law Review*, Issue No. 27, January 2000 at 65.

"Patenting the Life Sciences" Law Gazette, November 2000(3)

"Napstering in Singapore" Law Gazette, February 2001(1)

"Intellectual Property Licensing", *Articles on Singapore Law* (13, 2005) www.singaporelaw.sg

"The Copyright Scourge of P2P Networks: Civil Copyright Liability of the P2P Provider" Inter Se, Singapore academy of Law, March-April 2006 (2)

"Cyber -Copyright: Trends and Perspectives" Law Gazette, April 2008

"Take care of IP rights during downturn" *The Business Times, Friday, 20 February 2009*

"Securitise your IP rights in Asia" (an article published in *Managing Intellectual Property April 2009*, 30-32)

"Publisher reigned in on racing data copyright claim" (WIPO magazine, February 2012)

*"The Future of Inventive Step in Patent Law* (2012) 24 SAcLJ 599 (Special Issue on Intellectual Property)

## Contributions to Books

*Tracing of Assets in the Commonwealth – Singapore* Chapter in *International Tracing of Assets* (Michael Ashe QC, Barry Rider eds) Volume 1,Q4/1-21 (1997)

*Copyright Issues of Watermarking,* chapter in the *Handbook of Information Hiding: Steganography and Watermarking* (Artech House Inc, Mass, 2000)

Contribution to *International Perspectives on Intellectual Property* (Volume 8, 2001) – "The Role of Computer Software Copyright in New Media" at page 75

*The Potential Developments in the Areas Relating to the Protection of Intellectual Property Rights in the New Millennium* in 'The Singapore Conference': Leading the Law and Lawyers into the New Millennium@2020 (Butterworths, 2000) at page 129 et sq

*"Developments in Intellectual Property Law"* in Developments in Singapore Law 1996 and 2000 (Sweet & Maxwell Asia, 2001) at page 1

*"Anti-circumvention and its challenges to the Law of Copyright"* in 'The Impact of the Regulatory Framework on E-Commerce in Singapore' (Symposium Publications, October 2002)

*"Development in Patent Law over the Past Five Years (2006-2010)"* in Developments in Singapore Law between 2006 and 2010 (Singapore Academy of Law Conference, 2011) at page 374 et seq

Contribution to the Singapore section of the *"Encyclopedia of International Commercial Litigation"* (Kluwer Law International, 2009)

Contribution to Singapore section of the *"The International Comparative Legal Guide to Product Liability 2011"* (Global Legal Group, 2011) at page 291

Contribution to Singapore section of the *"The International Comparative Legal Guide to Product Liability 2012"* (Global Legal Group, 2012) at page 254

Contribution to Singapore section of the *"The International Comparative Legal Guide to Product Liability 2013"* (Global Legal Group, 2013) at page 253

Contribution to Singapore section of the *"The International Comparative Legal Guide to Product Liability 2014"* (Global Legal Group, 2014) at page 238

Contribution to Singapore section of the *"The International Comparative Legal Guide to Product Liability 2015"* (Global Legal Group, 2015)

**Authored Works**

*The Copyright Protection of Computer Software in the United Kingdom* (Hart Publishing, 2000)

The "Intellectual Property" Volume (Volume D) of Singapore Precedents and Forms, published by LexisNexis (2005)

**Languages**

Written:        English

Spoken:        English, Chinese (Mandarin, Cantonese)

# Exhibit 2

# Wang Choong Li
v
# Wong Wan Chin

## [2015] SGHC 128

High Court — District Court Appeal No 27 of 2014
Aedit Abdullah JC
16 February; 12 May 2015

*Copyright — Ownership — Whether appellant or respondent had commissioned photographer for taking of respondent's pre-wedding photographs — Whether respondent had granted appellant licence for use of pre-wedding photographs*

*Copyright — Ownership — Whether appellant who engaged photographer for taking of respondent's wedding photographs pursuant to contract for provision of wedding services owned copyright to those photographs*

*Copyright — Infringement — Co-owners of copyright — Whether one co-owner of copyright could commence infringement proceedings without joining other co-owner*

**Facts**

The respondent, a celebrity in Hong Kong, had engaged a wedding boutique run by the appellant for the provision of wedding services which included photography and video-taping services on the day of her wedding. Prior to the wedding, the respondent had a pre-wedding photo-shoot conducted by a photographer who was a friend of the respondent ("the first photographer"). The wedding day photographs were taken by another photographer engaged by the appellant's boutique ("the second photographer"). The respondent subsequently discovered that the appellant had been using both her pre-wedding and wedding photographs and commenced copyright infringement proceedings.

The trial judge below allowed her claims and ordered the appellant to pay statutory damages. The trial judge also granted an injunction to restrain the appellant from infringing the respondent's copyright. The appellant appealed against the trial judge's decision on the basis that: (a) the trial judge had erred in finding that it was the respondent who owned the copyright in both sets of photographs; (b) the trial judge had erred in finding that there was no licence agreement for the appellant to use the pre-wedding photographs; (c) in any event, it was the respondent's husband who owned the copyright to the pre-wedding photographs; and (d) the injunction ordered by the trial judge should be discharged.

**Held, allowing the appeal in part:**

(1)    Under s 30(5) of the Copyright Act (Cap 63, 2006 Rev Ed) ("the Act"), a person who commissioned another to take a photograph was entitled to the copyright in such photograph. The trial judge accepted the evidence pointing to the respondent commissioning the first photographer and there was nothing to

suggest that the trial judge was in error. It followed that the respondent owned the copyright in the pre-wedding photographs: at [21] to [31].

(2)      It could at best be said that the copyright in the pre-wedding photographs was jointly held by the respondent and her husband. A co-owner of land might be able to sue to prevent interference with the rights of the co-owners by a stranger and there was nothing in the Act which militated against the application of this principle. Thus, as against a stranger or third party, the respondent, as the co-owner of the copyright, had to be able to sue without having to join her husband: at [32] to [34].

(3)      On the evidence, it was highly doubtful whether the parties had entered into a contract for the respondent to give the appellant a licence to make use of the pre-wedding photographs. The supposed licence agreement was alleged to be found in a form that was concerned with the collection of gowns. However, the agreement itself was lacking in details and the alleged price paid for the licence was also not very high. The terms to effect the grant of a licence were also inserted by writing. There was thus, on a balance of probabilities, no licence agreement reached between the parties and the parole evidence rule could not apply. The collection form was simply an acknowledgement and evidence of receipt or collection of the gowns pursuant to the original contract for the provision of wedding services, without the handwritten words having any effect: at [40] to [54].

(4)      As for the wedding photographs, the point that consideration ultimately came from the respondent could not determine the issue as to whether the respondent had commissioned the second photographer: at [60].

(5)      There were no terms in the agreement between the parties that provided for the appellant to act for the respondent or for the respondent to be entitled to give instructions to the second photographer. Further, the respondent had engaged the appellant to provide photography and this had to mean that there was no intention for the respondent to enter into a contract with the photographer. In the absence of any evidence of an actual commission of the second photographer by the respondent, the copyright in the wedding photographs did not reside with the respondent: at [61] to [64].

(6)      Since the copyright in the wedding photographs did not reside in the respondent, and in the light of the fact that there was little danger of the appellant's future use of the both the pre-wedding and wedding photographs, the court's discretion should be exercised in the appellant's favour and the injunction accordingly discharged: at [71].

[Observation: The respondent argued that celebrities had a heightened need for protection of the use of their image and privacy. As a matter of principle, a person claiming to be a celebrity was not entitled to any special treatment under copyright law. Neither was there any special protection of privacy of such a person: at [72].]

**Case(s) referred to**

*Lauri v Renad* [1892] 3 Ch 402 (folld)
*Mail Newspapers plc v Express Newspapers plc* [1987] FSR 90 (refd)
*Pollard v Photographic Co* (1888) 40 Ch D 345 (refd)

Powell v Head (1879) 12 Ch D 686 (refd)
Zurich Insurance (Singapore) Pte Ltd v B-Gold Interior Design & Construction
    Pte Ltd [2008] 3 SLR(R) 1029; [2008] 3 SLR 1029 (refd)

**Legislation referred to**
    Copyright Act (Cap 63, 2006 Rev Ed) s 30(5) (consd);
        ss 30(1), 30(3)
    Evidence Act (Cap 97, 1997 Rev Ed) ss 93, 94 (consd)

Mohamed Nawaz Kamil (Tito Isaac & Co LLP) for the appellant;
Bhaskaran Shamkumar (APAC Law Corporation) for the respondent.

12 May 2015                                Judgment reserved.

**Aedit Abdullah JC:**

**Introduction**

1       This appeal has at its centre the issue of the ownership of copyright in photographs taken of the bride and groom, both before and on the wedding day. Such issues may be far from the minds of most couples marrying, but as in many instances, the law intrudes when least expected.

2       The appellant ("the Appellant"), who ran a business providing wedding services, appealed against the decision of the trial judge awarding the respondent ("the Respondent"), her client, damages and an injunction for breach of copyright in pre-wedding and wedding photographs of the Respondent.

3       Having heard the arguments of the parties, and having considered the evidence, I dismiss most of the appeal, save that I find that the copyright in the wedding photographs was not shown to be vested in the Respondent. The amount of damages awarded by the trial judge is therefore reduced. Additionally, I discharge the injunction against the further use of the photographs by the Appellant as there is little risk of her using the Respondent's pre-wedding photographs in future.

**Background**

4       The Respondent, who is a singer and actress, decided in 2009 to get married to her fiancé, Derek Baram ("Baram"). The couple chose 29 December 2009 as the date of their wedding. As part of the preparations for the event, the Respondent made inquiries at the wedding boutique run by the Appellant. On 2 September 2009, the Respondent engaged the Appellant to provide rental of custom made gowns and suits, flower arrangements, photography and video-taping service on her wedding day. On 2 October 2009, after visiting the Appellant's premises, the Respondent and Baram decided that they would buy suits for the latter, and not rent

them from the Appellant. They did so because they were of the view that the suits were not satisfactorily tailor-made to fit Baram.

5      On 18 October 2009, when the Respondent collected six gowns for a pre-wedding photo-shoot in London, she signed a form ("the Collection Form"). That form, aside from listing the gowns she collected, also stated:

> Sponsor for Photoshoot Rental FOC Dry cleaning charge in return for CD photos as sample book.

The circumstances of the signing of the Collection Form as well as the effect of the words stated therein were disputed by the parties.

6      At the end of October 2009, the Respondent had a photo-shoot in London. She used gowns supplied by the Appellant. Photographs from this shoot ("the pre-wedding photographs"), which were taken by Ivy Lam ("the first photographer"), were handed over by the Respondent to the Appellant in a DVD. The circumstances in which these photographs were handed over were disputed. The Respondent claimed that the photographs were only for the Appellant's personal viewing. The Appellant alleged that the photographs were given pursuant to an agreement entered between the two of them, allowing the Appellant to use these photographs in marketing her business.

7      As it was, on the day of the wedding, photographs ("the wedding day photographs") were taken of the event by a freelance photographer ("the second photographer").

8      Subsequently, the Respondent discovered the use by the Appellant of both sets of photographs. The Respondent came to know that there was a coffee table book publicly displayed at the Appellant's business containing the wedding day photographs. The pre-wedding photographs were also used by the Appellant at wedding exhibitions.

9      The Appellant asserted that she was entitled to use the photographs. In respect of the London photo-shoot, the Appellant had been prevailed upon by the Respondent to sponsor the latter's photo-shoot in London, *ie*, in exchange for the use of the photographs. As for the actual wedding day photographs, the Appellant argued that the copyright had not been vested in the Respondent. It should be noted that these photographs were not in fact used for marketing by the Appellant.

## The decision of the trial judge

10     The trial judge found in favour of the Respondent. The Respondent had indeed commissioned the pre-wedding photographs. While it was disputed by the Appellant, the trial judge found that there was sufficient evidence to conclude that the Respondent had arranged and finalised the engagement of the first photographer. In any event, there was at least a joint commissioning by both the Respondent and Baram. It was sufficient for

one of one of several co-owners to proceed against the infringer of copyright.

11    As to the allegation of an agreement contained in the Collection Form, the trial judge found that there was no agreement between the parties. The sponsorship deal as alleged by the Appellant was inherently improbable in light of the status of the Respondent as a celebrity in Hong Kong and the value of the rental. Furthermore, the fact that the agreement was captured in a collection form, in the form of a few words, pointed against the Respondent knowingly entering into the alleged agreement. There was evidence that the Appellant intended to benefit from the Respondent's status as a celebrity. On the facts of the case, it was likely that the gowns were provided as compensation for the three men's suits which were not taken up by the Respondent.

12    The wedding day photographs were found by the judge to have been commissioned by the Respondent, though the Appellant had engaged the actual photographer. The copyright was vested in the Respondent under s 30(5) of the Copyright Act (Cap 63, 2006 Rev Ed) ("the Act") as well.

13    The judge ordered statutory damages of a total of $44,500 for the infringement of the Respondent's copyright in the photographs. Firstly, in respect of the pre-wedding photographs, the trial judge considered that statutory damages of $1,500 for each item infringed was appropriate in light of the various considerations in the case. There were 29 infringements of the pre-wedding photographs, giving a sub-total of $43,500. As for the infringement in respect of the wedding day photographs, as there was no real exploitation, the trial judge awarded a sum of $1,000. These two figures thus added up to $44,500.

14    The trial judge additionally granted an injunction to restrain the Appellant's infringement of the Respondent's copyright.

**The Appellant's case on appeal**

15    In the appeal, the Appellant argued that the Respondent had not shown that she owned the copyright in the photographs. Her evidence was inconsistent. The Appellant further argued that, in any event, the evidence from the first photographer showed that she had assigned the copyright to the Respondent. Any such purported assignment was not in compliance with s 194 of the Act. Additionally, on the facts, there is no basis to conclude that the photographer was commissioned by the Respondent. In any event, a binding agreement was formed through the contract contained in the Collection Form, under which the Respondent gave a licence to the Appellant to use these photographs. The trial judge had erred in finding that the contract was against the inherent probabilities. As for the copyright in the wedding day photographs, this was not held by the Respondent either. The Appellant was not acting as an agent of the Respondent in

engaging the second photographer. Neither was the second photographer an employee of the Appellant – he was an independent contractor. The injunction should also be discharged.

**The Respondent's case on appeal**

16    The Respondent contended that the evidence was clear that she commissioned the photographs taken at the pre-wedding photo shoot. As for the photographs taken on the wedding day, the Appellant acted as the Respondent's agent in engaging the photographer. The Respondent thus commissioned these photographs as well. There was also no agreement in the Collection Form for the Respondent to grant the Appellant a licence for the use of the photographs. The injunction should remain.

**My decision**

17    I am satisfied that the Respondent had the copyright in the pre-wedding photographs and that there was no agreement licensing the use of these photographs to the Appellant. I dismiss the appeal as regards this part of the trial judge's decision. However, I find that the copyright in the photographs on the wedding day did not vest in the Respondent. She thus had no standing to proceed against the Appellant for infringement of the copyright in these photographs. I also find that the injunction awarded by the trial judge against the Appellant should be discharged as there is little or no risk at this time of the Appellant's continued use of the pre-wedding photographs.

18    I note that no arguments were made on appeal on whether the Appellant's acts constituted an infringement of copyright under the law, and no issue was also taken with the quantification of the damages made by the trial judge.

19    The decision thus turned on the following issues:

(a)    the ownership of copyright in the pre-wedding photographs;

(b)    whether a contract to licence the pre-wedding photographs was formed; and

(c)    the ownership of copyright in the wedding day photographs.

*Ownership of copyright in the pre-wedding photographs*

20    The question here is whether the Respondent had commissioned the pre-wedding photographs. I am satisfied that the Respondent has made out her case, as was accepted by the trial judge, that these photographs were indeed commissioned by her by the operation of s 30(5) of the Act. At the very least, as the trial judge found, the photographs were commissioned by both the Respondent and Baram. If so it was sufficient for one of them, *ie*, the Respondent, to pursue an action for an infringement of copyright.

*The law on commissioning*

21    The present appeal did not engage issues regarding the law on the commissioning of works, which is clear. Section 30(5) of the Act has not attracted much judicial attention in Singapore. That section reads, as relevant:

> … where —
>
> (a)    a person makes, for valuable consideration, an agreement with another person for the taking of a photograph … by the other person; and
>
> (b)    the work is made in pursuance of the agreement,
>
> the first mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.

Thus, under s 30(5), a person who commissions another to take a photograph is entitled to the copyright in such photograph. Otherwise, by virtue of s 30(1), copyright is normally vested in the author of the work. An exception also arises under s 30(3), which provides that the operation of s 30(5) can be excluded or modified by agreement.

22    In this case, therefore, the question is whether the facts do establish that the first photographer was commissioned by the Respondent.

*Findings of facts in relation to the pre-wedding day photographs*

23    The trial judge found that the photographs were in fact commissioned by the Respondent. I found nothing to cause me to disturb his findings. The trial judge accepted the evidence of the first photographer that she had spoken to and reached an agreement with the Respondent, as well as her explanation with respect to Baram's role in arranging the trip to London for her. The trial judge found that Baram had taken the lead in the arrangements and payment as he was familiar with London. I saw nothing that called for these findings to be disturbed.

24    The Appellant contended that the evidence pointed against this. There were three main factual contentions made by the Appellant:

> (a)    the first photographer transferred the copyright in the pre-wedding photographs to the Respondent;
>
> (b)    the pre-wedding photographs were in fact commissioned by Baram, not the Respondent; and
>
> (c)    the Respondent was inconsistent as to what had transpired in respect of the pre-wedding photographs.

(1)    Alleged transfer of copyright by the first photographer

25    The Appellant argued that the evidence of the first photographer was that she had given the copyright to the Respondent. This, the Appellant said, showed that what was intended was an assignment of copyright by the maker of the works. The Appellant argued that there was no proper assignment as required by law.

26    However, this makes too much of the words used by the first photographer, a lay person. While the language used by the witnesses was indeed not precise, the distinctions between the terms "giving", "assigning" and "being commissioned" may not be apparent or live in the mind of a layperson, even someone who is actively involved in creating works on a daily basis. What matters is the legal characterisation that may be attributed when all the facts and circumstances are looked at. The first photographer did say when questioned by counsel for the Appellant that she gave full copyright to the Respondent. However, it is clear from the context that when this occurred, this was part of a general discussion between the first photographer and the Respondent. "Giving" the copyright in this context did not signify an actual assignment, but rather that it was not disputed that the copyright would reside in the Respondent from the very beginning. The first photographer was clear that the copyright was with the Respondent.

27    Additionally, the Appellant contended that the testimony from the Respondent showed that she did not regard herself as having commissioned the first photographer. It is true that there is no direct statement by the Respondent that she "commissioned" the first photographer. Had there been such a statement, this issue would not have been a live one. Again, in the context of discussions between laypersons, it is not surprising that there is no such statement. The testimony of the Respondent did show that she regarded herself as being the one who engaged the first photographer, and that shows on the facts that it was the Respondent who commissioned the first photographer.

(2)    Alleged commission by Baram

28    The Appellant also attempted to show that because Baram had paid for the flights and accommodation of the first photographer, he was the one who had commissioned the first photographer As noted by the trial judge, the first photographer gave evidence that she had been the Respondent's friend for a number of years, and the Respondent was responsible for most of the wedding arrangements. Taken as a whole, it is more probable than not that the Respondent was the one who commissioned the first photographer. Again, as found by the trial judge, Baram would not have made the arrangements he did but for the fact that the Respondent had commissioned the first photographer. I accept this conclusion reached by the trial judge.

29    The Appellant attacked the credibility of Baram, particularly his being called late in the day to give evidence orally at trial. However, while this would not have been the best way for the evidence to be introduced, I do not think it affected Baram's credit or credibility.

(3)    Alleged inconsistencies in the evidence

30    The Appellant has made much of supposed inconsistencies in the evidence, particularly of the Respondent. Some of these alleged inconsistencies related to the dealings with the first photographer. As noted above, I did not find however that any of these inconsistencies could be taken to be anything more than an expression of the understanding of a lay person of what the legal arrangements were. What the court has to determine ultimately is what legal character and legal impact should follow from what these parties did regardless of how they may describe it.

31    The trial judge having accepted that the evidence pointed to the Respondent commissioning the pre-wedding photographs, and there being nothing before me to conclude that the trial judge was in error, I decline to disturb his findings. It follows then that the Respondent had commissioned the first photographer to take the pre-wedding photographs, and therefore she was entitled to the copyright under s 30(5) of the Act.

*Ability of one of several co-owners to sue for infringement*

32    The trial judge found that even if copyright was jointly held by the Respondent and Baram, either of them singly may sue for infringement, citing George Wei, *The Law of Copyright in Singapore* (SNP Editions, 2nd Ed, 2000) at p 388 n 66. That passage discussed *Mail Newspapers plc v Express Newspapers plc* [1987] FSR 90 and referred specifically to an observation of Millet J (as he then was) in the case (at 93–94). The relevant paragraph of Millet J's judgment reads:

> It is settled law that one joint owner cannot grant an exclusive licence without the consent of the other owner or owners. Even if it were possible for one co-owner to grant a licence without the consent of the others, such a licence could not possibly be an exclusive licence, since he would not be able, without the consent of the others, to exclude the others or their licensees. Accordingly, it is self-evident that an exclusive licence can be granted only by all co-owners. A single co-owner can, of course, sue to restrain infringement
> …

That last sentence is the basis of the footnote. The relevant authorities were not cited by Millet J, but it is likely that one of the cases he had in mind was probably *Lauri v Renad* [1892] 3 Ch 402

33    In that case, Kekewich J adopted the reasoning of counsel for the plaintiff in that case, that one co-owner may be able to sue to prevent interference with the rights of the co-owners by a stranger. This position was not doubted on appeal in that case. The analogy accepted by

Kekewich J was founded on an action for trespass by tenants-in-common of land. In the earlier decision of *Powell v Head* (1879) 12 Ch D 686, Jessel MR stated that a part-owner could not lend or deal with the entirety of the copyright without the authority of the other part-owners. Kekewich J noted that such a proposition went against the ability of one co-owner to maintain an action on his own, but was in the end persuaded by the analogy put to him, and did not think that the plaintiff's action should be defeated on that ground.

34    While the English cases were concerned with English legislation, the issue of who had standing to sue was decided on general principles of property law and these principles are applicable in the local context and under the Act. I see nothing in the Act which militates against the adoption of the same position in Singapore. As against a stranger or third party, any of the co-owners of copyright must be able to sue without having to join the other co-owners.

35    In any event, the other co-owner, Baram, was a witness for the Respondent. Given his support for the Respondent's position, the only thing lacking in the present case was the formal joinder of Baram. It is highly doubtful, I think, that in these circumstances the failure to join Baram in the proceedings should prove fatal to the Respondent's claim.

### *The existence of a contract to licence the use of the photographs*

36    The next issue that was raised was that the Appellant had been given a licence to make use of the pre-wedding photographs. This contract was supposed to have been captured in the Collection Form. The Collection Form contained the following handwritten note:

> Sponsor for Photoshoot Rental FOC Dry cleaning charge in return for CD photos as sample book.

37    The Appellant argued that the Collection Form captured an agreement that the Appellant was sponsoring the pre-wedding photo-shoot in London, giving free rental of gowns, but with dry-cleaning charges applying, for which the Appellant would receive a compact disc of photographs which could be used by the Appellant as marketing samples for her boutique business. It was said that the Appellant did receive a DVD containing photographs from the Respondent.

38    The Respondent argued that it was not believable that the Respondent would have given a sponsorship agreement on a form contract meant to record the collection of the gowns. It was contended that the Respondent was experienced, knowing how endorsement contracts were drafted, and would not grant a licence without the involvement of her agent. There was no such agreement, and the words were added without the Respondent's knowledge. The Respondent had not noticed the added words when she took her copy of the form. Even the allegation of the agreement between the

parties which was captured in the Collection Form was made only at trial and was an afterthought. Furthermore, it was the intention of the Respondent to keep her wedding private. The evidence from another wedding boutique showed that an equivalent package would not be worth anywhere as much as the $10,000 claimed by the Appellant. There was no certainty in the terms added, indicating there was no agreement between the parties. In any event, even if there was a contract, the term had to be read against the Appellant, and could not be interpreted as allowing the use for marketing. The DVD was given only to allow the Appellant to view the photographs for her own use. And even if there was an agreement, it had been terminated by the Respondent.

39    I am satisfied that no contract was in fact formed.

*Formation of the contract*

40    It is highly doubtful that the contract as alleged by the Appellant was in fact formed. All that the Collection Form had covered was the collection of the gown, and it was nothing more than a documentary record of the collection of the gowns and related matters. The contract governing the relationship between the parties was what was agreed to previously between them, entered into on or about the 2 September 2009. This contract was evidenced by an invoice listing out a contract price of $5,288 for the package, which included, amongst other things, the rental of various dresses and suits, and photography services for the wedding day.

41    The supposed licence agreement was alleged to be found in a form that was concerned with the collection of gowns. As noted by the trial judge, to have a sponsorship agreement contained in such a document goes against the probabilities. Even if the agreement was entered into between laypersons without the involvement of lawyers, it would have been expected that there would be more details, including the limits of the use of the photographs, either in time or in terms of circulation or media. Sponsorship without any demarcation of the benefit of making use of the Respondent's image would not be likely at all. Given that the arrangements were also entered into because of the Respondent's status as a celebrity, which the Appellant accepted, it would have been expected that the arrangements would have more detailed. The perfunctory nature of the sponsorship agreement suggests strongly that it was not a true agreement between the parties.

42    There were a number of other points that militated against the agreement being formed. As noted by the trial judge, the alleged bargain or price for the supposed sponsorship deal was not very high. The cost of the gowns that were traded for the use of the photographs was only about $10,000. The Respondent made the point that the rental of six dresses would not on the evidence be worth anything close to $10,000. Evidence was given of another boutique's package for six dresses which amounted to

only $1,888, and that included rental of men's clothing, and other services. The Appellant contended in the oral hearing of the appeal that the $10,000 claimed was for a ten-day rental. Even so, the figure does seem high on balance. In return for this service, the Appellant was to have unqualified use of the photographs without a time limit. The Appellant argued that this went to questioning the sufficiency of the consideration given. That is not so. The point of the trial judge's analysis of the facts was not whether valid consideration was given. It was to deal with a different point – whether the evidence showed on the balance of probabilities that there was an agreement between the parties.

43     The Appellant also argued that the fact that the Respondent gave to the Appellant a DVD with the pre-wedding photoshoot photographs supported the existence of the agreement. As noted by the Respondent's counsel in arguments, the Respondent gave evidence that the DVD was provided by her to allow the Appellant to view the use of the wedding gowns. I accept the evidence of the Respondent in this regard. The giving of a single DVD without more does not positively show that such an act was pursuant to an agreement. The explanation proffered by the Respondent that she felt obliged to do so because she had rented the Appellant's gowns was plausible and likely.

44     As also noted by the trial judge, the terms were inserted as handwriting, and in a part of the document concerned with administrative details. Given the title of the document, and the absence of any evidence that the Respondent's attention had been specifically drawn to the handwritten portions at the time, I am of the view that there was, on the balance of probabilities, no agreement reached between the Appellant and Respondent of the nature alleged by the Appellant. The Appellant argued that it was highly improbable for her to sneak in terms. That to my mind was more probable than the Respondent agreeing to such terms.

45     There was also a question of who actually signed another document, another collection form dated 28 December 2009. In that form, an extra gown, beyond the gowns stipulated in the invoice, was collected by the Respondents' sisters. This was material in the mind of the trial judge as it showed that there was a substitution of one additional gown for the men's suits. There was also expert testimony that the signature on that December collection form was not that of any of the Respondent's sisters. The expert evidence instead showed that it was more likely than not that the documents was instead signed by the Appellant. This was particularly disturbing. Given all of this, the trial judge was justified in finding that the evidence showed there were doubts as to the credibility of the Appellant. I accept that these reasons point to concerns about the credibility of the Appellant in this area, and would further support the conclusion that her evidence should not be accepted on the point of the supposed Collection Form licence.

46    The trial judge also rejected the evidence of an ex-employee of the Appellant who had testified that the Respondent requested sponsorship. For the reasons stated by the trail judge in his judgement, I accept that there were a number of inconsistences in her evidence, and that there were difficulties with her demeanour. I thus do not find anything that would lead me to disturb the trial judge's findings in this area.

47    The trial judge found that the evidence of the Respondent was to be preferred. I saw nothing to disturb his conclusions as to whose evidence should be accepted.

*Parole evidence*

48    The parole evidence rule is only relevant when there is a contract in existence. In view of my agreement with the finding of the trial judge that there was in fact no contract for sponsorship, the application of ss 93 and 94 of the Evidence Act (Cap 97, 1997 Rev Ed) does not arise.

49    Section 93 provides:

> When the terms of a contract ... have been reduced by or by consent of the parties to the form of a document ... no evidence shall be given in proof of the terms of such a contract ... except the document itself, or secondary evidence of its contents in cases in which secondary evidence is admissible under the provisions of this Act.

Section 93 thus limits proof in respect of a contract in writing to the document itself or permitted secondary evidence. But it requires that the contract has been reduced to writing by the parties or with their consent.

50    Section 94 provides:

> When the terms of any such contract ... have been proved according to section 93, no evidence of any oral agreement or statement shall be admitted as between the parties to any such instrument ... for the purpose of contradicting, varying, adding to, or subtracting from its terms ...

Section 94 excludes evidence of any oral agreement or statement if a written contract falls within the ambit of s 93.

51    Both sections are predicated on the existence of a contract. All the cases considering the application of ss 93 and 94, such as *Zurich Insurance (Singapore) Pte Ltd v B-Gold Interior Design & Construction Pte Ltd* [2008] 3 SLR(R) 1029 are concerned with the interpretation of contracts between the parties, and not with the actual formation and existence of such contracts.

52    In the present appeal, the position of the Appellant is that that Collection Form with the words in handwriting formed a binding agreement – six gowns would be taken for free by the Respondent in return for which the photographs in the CD would be available for use by the Appellant as samples for her business. It was not the argument of the

Appellant that the license to make use of the pre-wedding photographs had been agreed upon *ab initio* in the contract which was entered into originally for the Appellant to provide wedding boutique services to the Respondent. There were thus, on the Appellant's case, at least two agreements – one on 2 September 2009 for the initial engagement of the Appellant and one contained in the Collection Form.

53    In my view, no contract had arisen under the Collection Form, and the Collection Form was simply an acknowledgement and evidence of receipt or collection of the gowns pursuant to that original contract, without the handwritten words having any effect

54    I note that the trial judge had considered various matters surrounding the Collection Form contract on the basis that he could look at the surrounding circumstances as the contract was *incomplete* on its face. The trial judge found that the supposed terms were brief, and many details were left unsaid, and did not capture even what the Appellant argued were to be part of the terms governing their relationship. These various matters to my mind are actually relevant in terms of the *existence* of this Collection Form contract, and would have been better analysed on that basis.

55    What had happened in the circumstances was what the Respondent had testified – that six gowns were provided to the Respondent for her use in London as compensation for the three men's suits not being ready.

56    Again, I did not think there were sufficient grounds to disturb the findings of fact made by the trial judge.

*Non est factum*

57    The Appellant referred to the fact that *non est factum* was not in fact pleaded. However, to my mind, *non est factum* was not the applicable doctrine or plea. The Respondent did not deny her signature, and did not deny the operation of the Collection Form in so far as it operated as a collection form. What was in issue, and what she denied, were the handwritten portions. The very inclusion of the handwritten portions was in doubt, throwing in issue when it could have been added. This could have been after the Respondent had signed. In these circumstances, as there is doubt about the effect of the signature, and what that signature bound the Respondent to, the *non est factum* doctrine does not come into play. Accordingly, I do not find that any of the usual authorities for the doctrine are relevant here.

**Ownership of copyright in the actual day photographs**

58    The trial judge found that the photographer for the actual day was commissioned by the Respondent through the Appellant. What was said at [40] of the Grounds of Decision was:

In relation to the Actual Day Photographs, it is clear that the Plaintiff had commissioned and paid for the Actual Day Photographs. The actual day photograph service was part of the Wedding Package, covered by the $5,288 package price paid by the Plaintiff. The fact that the Plaintiff engaged the Defendant for such services, and the Defendant in turn engaged DW2 to take the Actual Day Photographs, does not change the result. The fact remains that consideration for the photography work is ultimately attributable to, and paid for by, the Plaintiff. The Plaintiff therefore owns the copyright to the Actual Day Photographs under Section 30(5) of the Act.

59    Conceptually, the approach appears to have been that the Appellant commissioned the second photographer on behalf of the Respondent, ie, the Appellant acted as the agent for the Respondent. This was the characterisation of the trial judge's reasoning adopted by the Appellant.

60    I find that agency is not borne out on the facts or by the law. The point that consideration ultimately came from the Respondent cannot determine the outcome – back-to-back contracts are common in many contexts. It does not follow that in such situations that the intermediate contracts can be disregarded, and that privity is established between the parties at the two ends of the chain of transactions.

61    Privity can be so established if the intermediary was an agent. This requires that the erstwhile agent act not for herself, but for the benefit of the supposed principal. Certainly, as argued by the Respondent, there may be undisclosed agency, but such absence of disclosure of the fact of agency only affects the third party. As between the principal and agent, there should be consent on both sides for the latter to act for the former: see *Chitty on Contracts – Volume II: Specific Contracts* (H G Beale gen ed) (Sweet & Maxwell, 31st Ed, 2012) at para 31-006.

62    There is nothing in the evidence adduced at the trial that would establish this on the balance of probabilities. The issue appears to have received little attention in testimony and in the arguments below. On appeal, there was little examination and elucidation of this issue in the arguments. There was nothing in terms of any agreement between the Appellant and the Respondent for the Appellant to act for the latter. There was nothing to show that there was a direct contractual relationship between the Respondent and the second photographer. There was nothing in any documentation, nor was there any testimony to this effect. There was nothing in terms of the instructions that the Respondent would have been expected to give to the second photographer before the event as to the scope of the work required, terms of payment, or requirements as to the precise services or equipment that would be deployed. Certainly, it is conceivable that the second photographer would have taken on board on the wedding day the requirements and requests of the bride, the parents, the maids of honour, and just very possibly, the groom. But that is a different matter from being in a direct contractual relationship with any of them. In this

context, any supposition that the Appellant may have thought that he was an employee of the Respondent is irrelevant.

63    Furthermore as noted by the Appellant, the Respondent engaged the Appellant to provide photography. This must mean there was no intention for the Respondent to enter into a contract with the photographer. Finding that agency arose between the Respondent and the Appellant in respect of the dealing with the second photographer is highly artificial. I accept the arguments of the Appellant that an agency was not in the contemplation of either the Appellant or the Respondent.

64    In the absence of any evidence of an actual commission of the second photographer by the Respondent, the copyright in those photographs reside either with the maker, *ie*, the photographer, or with the Appellant. It is not, however, necessary for me to decide the matter in this appeal. It suffices that I find that the copyright does not reside with the Respondent.

65    I would also emphasise that the position as to the existence of agency will vary with the facts. The conclusion here is based on the evidence adduced in this case only.

### Control of the use of the actual day photographs

66    An alternative argument, which was not actually put forward by the Respondent, nor pleaded, would have been for an equitable assignment. However, I find that this too is not made out, even had it been permitted to be argued.

67    If the concern was with whether the Appellant could use the photographs as she pleased, however she may have obtained them, the solution could lie in the implication of terms in the contracts between the Respondent and the Appellant, and the Appellant and the Photographer respectively, that exploiting the photographs for other purposes would be prohibited. This, however, was not pleaded, though I note that one of the authorities cited by the Respondent in the context of commissioning under s 30(5) of the Act – *Pollard v Photographic Company* (1888) 40 Ch D 345 – would actually be relevant in the context of implication of terms.

68    In any event, the issue does not arise as the Appellant did not commercially exploit these photographs, as found by the trial judge.

### Damages awarded

69    The damages awarded needs to be reduced by an amount of $1,000. This was the amount awarded by the trial judge for the use of the wedding day photographs. There was as found by the trial judge little or no exploitation of these photographs. Since I find that copyright of these photographs did not reside in the Respondent, the Respondent is not

entitled to damages for any alleged exploitation of the photographs by the Appellant.

### Injunction

70    It was argued that the injunction should be discharged.

71    My finding that the copyright in the wedding photographs was not vested in the Respondent means that there was no basis for the injunction on that ground. Additionally, the Appellant stated in arguments that there was no danger of any further use of the Respondent's photographs in any event. I have also referred above to the possibility that there may be an implied term in the contact between the Appellant and Respondent. That issue is left to another forum to determine whether there is such a term in the present case; it would be a factor that the Appellant would have to take into account if she were to consider using the Respondent's photographs in future. Overall, I am satisfied that there is little danger of the Appellant's future use of the photographs. In the exercise of my discretion, I accordingly discharge the injunction in respect of both the pre-wedding and wedding photographs.

### Miscellaneous issues

72    The Respondent argued that celebrities have a heightened need for protection of the use of their image and privacy. No authority was cited for this proposition. As a matter of principle, a person claiming to be a celebrity is not entitled to any special treatment under copyright law. Neither is there any special protection of privacy of such a person.

73    In the trial below, there were also matters touching on possible estoppel against the Appellant in respect of the allegations of the use of photographs, and some other matters going to her credibility, as well as matters arising out of the Respondent's non-disclosure. I did not think these matters were significant in the appeal and they did not affect the outcome.

74    I should also note, and this was raised in passing by Counsel for the Appellant, that at least some of the words that supposedly captured the licence agreement should be excluded. The way the handwritten note appeared in the Collection Form was as follows:

Sponsor for Photoshoot Rental FOC            Dry cleaning charge
in return for CD photos as sample book.

There was a bit of space between "FOC" and "Dry Cleaning charge". It may be that the phrase "Dry Cleaning Charge" was a separate entry. The

Appellant could not really assist on this in her testimony. If so, the licence agreement would have been contained in the following words

> Sponsor for Photoshoot Rental FOC in return for CD photos as sample book.

Be that as it may, this would not have affected the reasoning and outcome.

## Costs

75    I will hear the parties on the costs of the appeal.

Reported by Liu Zhao Xiang Daniel.

# Exhibit 3

# The Modern Law of Copyright and Designs

Third Edition

## Volume 1

## Chapters 1–30

**The Honourable Sir Hugh Laddie**
One of Her Majesty's Justices
of the High Court of Justice

**Peter Prescott**, BSc, MSc
One of Her Majesty's Counsel
of Lincoln's Inn, Barrister

**Mary Vitoria**, PhD, LLB
One of Her Majesty's Counsel
of Lincoln's Inn, Barrister

**Adrian Speck**, MA (Cantab)
Barrister of Gray's Inn

**Lindsay Lane**, MA (Cantab), LLM (EUI, Florence)
Barrister of Middle Temple

**Butterworths**
London, Edinburgh, Dublin
2000

will be regarded as having commissioned the making of the engraving and be entitled to the copyright in it, provided that he paid or agreed to pay for the making of it as well as of the finished goods.[5]

1 *James Arnold & Co Ltd v Miafern Ltd* [1980] RPC 397.
2 *Martin v Polyplas Manufacturers Ltd* [1969] NZLR 1046 (plastic coins); *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985] RPC 127, NZCA (plastic flying discs known as 'Frisbees'); and *Plix Products Ltd v Frank M Winstone (Merchants) Ltd* (1983–85) 3 IPR 390, NZ, HC.
3 See *Wham-O Manufacturing Co* and *Plix Products Ltd*, above.
4 For the meaning of 'engraving' and a discussion of these cases, see paras 4.22 ff.
5 See *James Arnold & Co*, n 1 above. But, for a contrary view, see *Cope Allman (Marrickville) Ltd v Farrow* (1984) 3 IPR 567, Sup Ct of New South Wales.

## Sound recordings

**21.40**    A 'sound recording' is defined by the 1956 Act as the aggregate of sounds embodied in, and capable of being reproduced by means of, a record of any description, other than a soundtrack associated with a cinematograph film.[1]

1 1956 Act, s 12(9). See also *Presentaciones Musicales SA v Secunda* [1995] EMLR 118, where the production of an album from mixing master tapes pursuant to an agreement whereby the mixer was reimbursed his expenses and given an exclusive sales agency was held to be pursuant to a commission so that the sound recording copyright in the album belonged to the commissioner.

## Commission

**21.41**    To 'commission' is defined in the *Oxford English Dictionary* as: 'to empower, to entrust with an office or duty; to give a commission or order to or for'. To oust the normal rule that the author is the first owner of the copyright the commission must pre-date the making of the work commissioned.[1] The commission must presumably be placed with the person who would otherwise be the copyright owner. This is not necessarily the author. For example, the making of a portrait could be carried out by an employee of a company with whom the commission had been placed.[2] Provided that the terms are sufficiently clear the copyright may vest in the commissioner by virtue of an implied contract to pay for the work, for example where it was produced at his request in circumstances where it can only be assumed that it would be ultimately paid for.[3] Where the terms are not sufficiently clear or the person making the request is under no obligation to accept, or pay for, the work, the court will be unwilling to reverse the normal rule.[4]

> **Illustration**    (1) In *Leah v Two Worlds Publishing Co*[5] it was held that the father had not ordered[6] the sketch of his son because the terms on which the sketch was drawn were that he need not accept or pay for it if he did not consider that it resembled his son.
>
> (2) In *Sasha Ltd v G Stoenesco*[7] the claimant, a photographer, had invited actresses to pose for photographs at no cost to themselves. He later sent them proofs and they could, if they wished, order copies. His purpose was to gain publicity for himself by displaying the photograph or by reproducing them in glossy magazines. It was held that it was doubtful whether the sitters were under an obligation to pay for the sitting and that this was nothing more than a request from a photographer to a model to allow him to take pictures.[8]

**21.41**  *First ownership*

(3) In *Plix Products Ltd v Frank M Winstone (Merchants) Ltd,*[9] the claimant, the leading manufacturer of packaging for kiwi fruit, had been requested by a leading exporter to design and develop a new size of pocket pack. There was no obligation on the exporter's part to pay for the design in any event nor for the many drawings and patterns which were made before the final design was adopted. The High Court of New Zealand regarded it as doubtful that there was a 'commissioning' of the drawings, moulds and dies such as to make the exporter the copyright owner.

It was suggested in *Wood v Sandow*[10] that a useful test of whether the work was commissioned is whether the photographer or artist can sue the person who placed the commission if he refused to take the work produced or to pay for the work involved.[11] In this connection it has been held that the contract was not one for the sale of a chattel to be manufactured and delivered within the meaning of the Sale of Goods Act 1893[12] but was one for the exercise of the artist's labour and skill where it was only ancillary to the contract that some materials also pass.[13]

1  See *Hartnett v Pinkett* (1953) 103 L Jo 204 and *Plix Products Ltd v Frank M Winstone (Merchants) Ltd* [1986] FSR 63, H Ct, New Zealand.

2  *Global Upholstery Co Ltd v Galaxy Office Furniture Ltd* (1976) 29 CPR (2d) 145.

3  *PS Johnson & Associates Ltd v Bucko Enterprises Ltd* [1975] 1 NZLR 311.

4  In *Apple Corps Ltd v Adam Cooper* [1993] FSR 286, it was held that the photographs taken by a professional photographer of the Beatles for the cover of their album 'Sergeant Pepper's Lonely Hearts Club Band' had not been commissioned. The arrangements for the session had been largely made on a 'friend of a friend' basis and the judge commented that an intention that someone would pay and an expectation of being paid was too indefinite to amount to a commission.

5  [1951] Ch 393. See para 21.36.

6  'Ordered' was the word used in the corresponding section of the 1911 Act.

7  (1929) 45 TLR 350.

8  See also *Ellis v Horace Marshall & Son* (1895) 64 LJQB 757; *Luniere v Robertson-Cole Distributing Co* [1917–23] MCC 431.

9  [1986] FSR 63. Note that under the New Zealand Copyright Act 1962, s 9(3), the copyright in commissioned drawings belongs to the commissioner.

10  [1911–16] MCC 142.

11  Subject to the work being satisfactorily carried out. See *Cole v Henry Graves & Co Ltd* [1905–1910] MCC 275. This test was also suggested in *Hartnett v Pinkett*, n 1, above.

12  See now Sale of Goods Act 1979.

13  *Robinson v Graves* [1935] WN 57, CA; *Art Direction Ltd v USP Needham (NZ) Ltd* [1977] 2 NZLR 12.

**21.42**  Where a person commissions the making of finished goods and the method by which such goods are made involves the making of copyright works, which are covered by the commissioning provisions, it appears that he may be regarded as having commissioned the copyright work so as to own the copyright therein if he is under an obligation to pay or has paid for the copyright work itself, irrespective of what his obligations are in relation to payment for the finished products and irrespective of whether he knew that the process involved the making of the copyright works in question.[1] Under the Copyright Acts 1911 and 1956 this situation is most likely to arise where one of the process steps involves the making of an engraving, such as a mould or die,[2] from which a finished product is then made. Where part of the process for the making of the finished article has been sub-contracted out, it appears that it is the person who commissioned the making of the finished article, and not the immediate person who commissioned the making of the copyright work, who is entitled to the copyright.[3]

1  *Sasha Ltd v Stoenesco* (1929) 45 TLR 350; *James Arnold & Co Ltd v Miafern Ltd* [1980] RPC 397; *Plix Products Ltd v Frank M Winstone (Merchants) Ltd* [1986] FSR 63, H Ct, New Zealand. For a contrary view, see *Cope Allman (Marrickville) Ltd v Farrow* (1984) 3 IPR 567, Sup Ct of New South Wales.

2 See para 21.39.

3 See *James Arnold & Co*, above, although the question was said to be of some difficulty.

**21.43**  It has been held that the copyright in the commissioned work belongs to the commissioner so soon as any part of it has been carried out so that the commissioner is in a position to dismiss the original artist and to commission someone else to complete the work, subject to any claim arising out of the breach of contract.

> **Illustration**   In *Art Direction Ltd v USP Needham (NZ) Ltd*[1] the claimants were commissioned by USP to produce a so-called 'fun map' of the cities of Auckland and Christchurch. Part way throught the project the claimants were asked to cease work and were paid for what they done so far. Because of a series of misunderstandings they were not asked to resume the work which instead was given to another company to complete. Under the New Zealand Copyright Act 1962[2] the copyright in commissioned drawings belongs to the commissioner and it was held that the copyright belonged to USP. The court held that clear wording of the Act supported the proposition that provided there is an agreement to pay, the copyright vests in the person commissioning and there was no reason why the words should not apply to incomplete as well as to complete works.[3]

1 [1977] 2 NZLR 12.

2 Section 9(3).

3 *Sed quaere*: it is a condition precedent to the vesting of the copyright in the commissioner that 'the work is made'. This may well refer only to the commissioned work, not to an incomplete part of it.

## Commissioned works made before commencement of the 1956 Act

**21.44**  The ownership of copyright in commissioned photographs, portraits and engravings made in pursuance of a contract which pre-dates the commencement of the 1956 Act (1 June 1957 for British works) is governed by the provisions of the 1911 Act in respect of such works.[1] Under these provisions where, in the case of an engraving, photograph or portrait, the plate or other original was ordered by some other person and was made for valuable consideration in pursuance of that order then, in the absence of any agreement to the contrary, the person by whom such plate or other original was ordered is the first owner of the copyright. The definition of 'engraving' in the 1911 Act is the same as in the 1956 Act, but that of 'photograph' is slightly different; it includes any photolithograph and any work produced by a process akin to photography.[2] It therefore covers photographs which are part of a cinematograph film and the first ownership of the copyright in such films is governed by these rules relating to all pre-1957 photographs.[3] The 1911 Act provisions are very similar to those of the 1956 Act except (a) that the consideration has only to be valuable consideration,[4] and (b) in the reference to the plate or original being ordered.

> **Illustration**   In *Con Planck Ltd v Kolynos Inc*,[5] CP produced an advertising sketch on a speculative basis for K. K suggested alterations to the sketch and placed an order for about 10,000 copies of the altered sketch. The copies were reproduced by lithography. It was held that although CP was the author of the altered sketch, K owned the copyright as the sketch was an engraving

**21.44**  *First ownership*

within the meaning of the Act. They were thus entitled to obtain reproductions from another company.

This decision must be wrong. K undoubtedly owned the copyright in the lithographic plate from which the copies were made but they can hardly be said to have owned the copyright in the original sketch from which the plate was made, although they may well have had an irrevocable licence or been the owners in equity.[6]

> **Illustration**    (2)  In *Toronto Carton Co v Manchester McGregor Ltd*[7] it was held that the copyright in a sketch made by a firm of advertising agents pursuant to an order placed by the claimants, who did not pay for it or order prints to be made from it, did not belong to the claimants. It was held that as no engraving had resulted from the sketch being made, the claimants' assertion to be owners of the copyright could only relate to that in the sketch and had nothing to do with 'the case of an engraving, photograph or portrait'; hence the provisions of the section relating to commissioned works did not apply.

1 CDPA 1988, Sch 1, para 11(1); 1911 Act, s 5(1) proviso (a).
2 1911 Act, s 35.
3 CDPA 1988, Sch 1, para 7(1), (3).
4 See eg *Ellis v Horace Marshall & Son* (1895) 64 LJ QB 757; *Wood v Sandow* [1911–16] MCC 142.
5 [1925] 2 KB 804.
6 See paras 21.69 ff.
7 [1935] 2 DLR 94. Section 12(1) of the Copyright Act RSC 1927 c 32 was in similar terms to the 1911 Act.

**21.45**  For pre-1 July 1912 works the provisions of the pre-1912 legislation apply.[1] Under the Fine Arts Copyright Act 1862, s 1, where any painting or drawing or the negative of any photograph was made or executed for on behalf of any other person for a good or a valuable consideration, that person was entitled to the copyright unless the copyright was expressly reserved to the author in writing signed by the person for whom the work was made.[2] Note that the section applied to all paintings and drawings capable of being copyright and not merely to portraits.

1 CDPA 1988, Sch 1, para 11(1).
2 For the meaning of 'a good and valuable consideration' see *Ellis v Horace Marshall & Son* (1895) 64 LJQB 757; *Stackemann v Paton* [1905–10] MCC 38; *Melville v Mirror of Life Co* [1895] 2 Ch 531. For the meaning of 'for and on behalf of' see *Melville v Mirror of Life Co*, above.

## Agreements to the contrary

**21.46**  All the cases where the copyright legislation gives the copyright to someone other than the author, viz commissioned work, contributions by journalist-employees for works made before 1 August 1989 and works by employees made in the course of their employment, are subject to any agreement to the contrary. The agreement must be such that, notwithstanding the existence of a contract of employment or a commissioning contract, the title to the copyright shall not vest in the employer or the commissioner and it must be legally effective.[2] For example, an agreement that what is in reality a contract of employment shall be treated as a contract for services, is not legally effective and will not be regarded as an agreement to the contrary for the purposes of vesting the copyright in the employee and not the employer.[3]

1 CDPA 1988, s 11(1) for post-1989 works; ibid, Sch 1, para 11(1) and 1956 Act, s 4(5) for works made between 1 June 1957 and 1 August 1989 and ibid, Sch 1, para 11(1) and 1911 Act, s 5(1), proviso for works made between 1 July 1912 and 1 June 1957.

2 *Robin Ray v Classic FM* [1998] FSR 622 at 639.
3 Ibid.

**21.47**   There are no formalities specified for such agreements and they may be made orally or in writing, but to be enforceable should be supported by consideration or else be under seal. Clearly the agreement must precede the making of the work as otherwise the copyright will vest in accordance with the provisions of the Act and an assignment in writing will then be required to transfer ownership. Provided the agreement itself is clear in its effect there is no need for a specific reference to the particular section being excluded.

> **Illustration**   (1)  In *Christopher Bede Studios Ltd v United Portraits Ltd*[1] CB Studios carried on business as 'at home' photographers. Having taken the photographs and supplied proofs to the customers, CB Studios found that a rival company was soliciting the customers and supplying enlargements on more favourable terms. They introduced, therefore, the following term into their contract with their customers:
>
> 'Copyright: In consideration of your supplying me with proofs of at least 80 per cent of the photographs taken by your photographer, which proofs shall be black and white fadeless prints instead of red daylight proofs, I agree that the copyright in all photographs taken or supplied by you shall be owned by you. I understand that the term copyright means that only you have the right to print, copy or reproduce in any shape, form, or colour, any of the photographs taken or supplied to me by you.'
>
> It was held that this clause was not an assignment or transfer of an existing copyright but an agreement for valuable consideration whereby the person who commissioned the photograph agreed that CB Studios should be the first owner of the copyright. They were thus able to sue successfully their business rivals for infringement of copyright.

1 [1958] NZLR 250. See also *Noah v Shuba* [1991] FSR 14.

# 5   Pre-1912 works

## Engravings

**21.48**   For pre-1 July 1912 works the copyright owner was either the actual engraver or else a person who invented the actual design and who caused or procured another to produce it in the form of an engraving, etching, mezzotint, or chiaroscuro.[1]

> **Illustration**   In *Stannard v Harrison*,[2] C made an engraving of a bird's eye view of the fortifications of Paris at the time of the Franco-Prussian war. S, who could not draw, invented the subject of the design, he prescribed the proportions and the contents and communicated information from various sources to C to enable C to make an accurate plan. It was held that S was the copyright owner as he had invented the design and procured C to design and draw what he had invented.

# Exhibit 4

# COPINGER AND SKONE JAMES

## on

# COPYRIGHT

### FOURTEENTH EDITION

### BY

**KEVIN GARNETT, M.A.**
*One of Her Majesty's Counsel*

**JONATHAN RAYNER JAMES, M.A., LL.B.**
*One of Her Majesty's Counsel*

**GILLIAN DAVIES, Ph.D.**
*Barrister*

LONDON
Sweet & Maxwell
1999

*The Chain of Title*

**5–32**    (c) *What amounts to a commissioning?* In general the word "commission" means "order".[22] This means more than "request" or "encourage".[23] While well-known personalities will often agree to their photograph being taken, even in a studio, without any commission by them being made, this is less likely to happen in the case of people in the ordinary walk of life, since in the latter case the photographer is unlikely to take the risk of no prints being ordered.[24] Of course, if there was either payment or an agreement to pay, it will normally be easy to conclude that a work was commissioned but it does not necessarily follow that this was so. The commissioning must obviously have taken place before the work is made.[25]

**5–33**    (d) *Work subcontracted.* If a person ordered a work to be made by another, who then subcontracted the necessary labour, the person ordering the work would in the normal case have been entitled to the copyright in the work. This is on the basis that the person ordering the work commissioned all necessary articles to be made even though unaware of the need for them.[26] This principle assumes, however, that the subcontracted work was itself subject to the commissioning provisions of the Act.[27] The position would be different if, for example, the subcontractor had reserved the copyright.[28]

(e) *Was there an agreement to pay?*[29] While a commissioning does not necessarily imply an obligation to pay, it will often do so. Indeed, the usual meaning of "commission" involves both the ordering of work to be done and the coming under an obligation to pay for that work, irrespective of whether any product of that work is purchased.[30] Everything, however, will depend on the circumstances as to whether any agreement was made at all and, if so, whether it included a provision for payment. In the case of a portrait photograph, for example, the question would be whether, if the sitter declined to buy any copies of the photograph, the photographer would have been entitled to sue the sitter for work and labour done in the making of the copyright work.[31] In the ordinary case where a professional photographer, painter or engraver is commissioned,

---

[22] *Plix Products Ltd v. Frank M. Winstone (Merchants)* [1986] F.S.R. 63.
[23] *ibid.*
[24] *Sasha Ltd v. Stoenesco* (1929) 45 T.L.R. 350.
[25] *Plix Products Ltd v. Frank M. Winstone (Merchants)*, above; *Apple Corps Ltd v. Cooper* [1993] F.S.R. 286.
[26] *James Arnold and Co. Ltd v. Miafern Ltd* [1980] R.P.C. 397.
[27] See the reservation in *Apple Corps Ltd v. Cooper* above, at 297.
[28] See s.4(5).
[29] Note that the 1988 Act, when dealing with commissions in relation to the moral right of privacy in relation to photographs and films, refers only to commissioning, without the further requirement of an agreement to pay (s.85(1)). The provision dealing with the design right, however, refers to a "commission for money or money's worth" (s.263(1)).
[30] *Plix Products Ltd v. Frank M. Winstone (Merchants)* [1986] F.S.R. 63.
[31] *Sasha Ltd v. Stoenesco* (1929) 45 T.L.R.; *Hartnett v. Pinkett* (1953) 103 L.J. 204 (Cty Ct).

*The First Owner of Copyright*

the court will readily imply that the commissioner is to pay for the work.[32] But a professional photographer may often be willing to attend occasions such as a wedding or the taking of a school photograph without any agreement for payment but simply in the expectation that people will order prints from him. In such a case he will have retained the copyright. As already noted, in the case of well-known personalities, a photographer may also be willing to take photographs without any commission or assurance of payment.[33] An agreement to pay of course requires a consensus so that where the commissioner had an intention to pay, perhaps only if requested, but this was not known to the maker of the work, this will not suffice. Neither will expectation of payment by the maker if the commissioner had not agreed to pay.[34]

(f) *What the payment must have been for.* The payment or agreement to pay must have been for the making of the copyright work, not the physical embodiment of the work itself. The payment is the *quid pro quo* for the copyright.[35] In the context of a photograph, for example, the fact that prints or even the negative were paid for will not therefore have been sufficient although clearly the cost of the work of taking the photograph may in fact be built into the price of making copies.[36] Again, in the context of an engraving, payment for a run of the finished product with a built-in or separate charge for the costs of tooling will not necessarily be payment for the making of the work.[37] Such cases will turn on the nice question of precisely what the payment was to be for.

5–34

(g) *Money or money's worth.* Under the earlier Acts the issue was whether "valuable" or "good" consideration had been given. These cases are considered below but it is suggested that they are not of great assistance when considering the provisions of the 1956 Act. "Money's worth" refers to the case where the price or consideration for the making of the work was something other than money, for example services to be rendered or property other than money.[38] Whether the giving of access to private premises or a famous personality would amount to payment in money's worth would depend on the precise circumstances although usually it would not. In any event it is likely to be rare that such access will have been provided by way of payment for the making of the photographs.[39]

---

[32] *Boucas v. Cooke* [1903] 2 K.B. 227, analysed in *Apple Corps Ltd v. Cooper*, above, citing the example of a sitter approaching the photographer without any prior invitation.
[33] *Sasha Ltd v. Stoenesco* (1929) 45 T.L.R. 350.
[34] *Apple Corps Ltd v. Cooper*, above.
[35] *ibid.*
[36] *Sasha Ltd v. Stoenesco*, above.
[37] *Plix Products Ltd v. Frank M. Winstone (Merchants)*, above.
[38] See *Secretan v. Hart* [1969] 1 W.L.R. 1599.
[39] The cases under the earlier Acts in which such questions arose are considered below.

*The Chain of Title*

(h) *When must the agreement to pay or payment have been made?* Since the vesting of the copyright in the commissioner took place, if at all, when the work was first made, all the elements referred to in the section must have been present at this moment. It follows that either the payment or the agreement to pay must have been made before this time.[40] Payment made after the event without obligation will not therefore of itself have operated to vest the copyright in the commissioner.[41] In such circumstances the copyright will only have been transferred to the commissioner if it was part of a separate transaction by which the legal title was validly assigned.[42] Alternatively in such a case, the commissioner may thereby have acquired an equitable title if the payment was part of an agreement which included, expressly or impliedly, the acquisition of the copyright.[43]

**5–35**   **Commissioned artistic works under the 1911 Act.** The provisions of the 1911 Act apply to determine questions of first ownership of copyright in works made between July 1, 1912, and June 1, 1957.[44] The 1911 Act provided[45] that where, in the case of an engraving,[46] photograph[47] or portrait,[48] the plate[49] or other original was ordered by some other person than the author, and was made for valuable consideration in pursuance of that order, then, in the absence of any agreement to the contrary, the person by whom such plate or other original was ordered should be the first owner of the copyright. The 1911 and 1956 Acts, although expressed in different words seem generally to have been to the same effect, although it is possible that "money or money's worth" in the 1956 Act had a narrower meaning than "valuable consideration", which is considered below. The above discussion as to what amounted to a "commissioning" under the 1956 Act is relevant in considering what amounted to an "ordering" under the 1911 Act.[50]

---

[40] *Apple Corps Ltd v. Cooper*, above.
[41] *Leah v. Two Worlds Publishing Co. Ltd* [1951] Ch. 393, where the agreement to pay for a portrait was only made after it had been seen.
[42] As to assignments of copyright, see paras 5–72 *et seq.*
[43] As to equitable titles, see para. 5–169.
[44] See para. 5–03. The 1911 Act also applied to works made after June 1, 1957 but which were commissioned by a contract made before that date (see para. 5–30, n. 6).
[45] s.5(1)(a).
[46] Defined to include etchings, lithographs, wood-cuts, prints and other similar works, not being photographs: s.35(1). This is identical to the 1956 Act definition.
[47] Defined to include a photo-lithograph and any work produced by any process analogous to photography: s.35(1). This is similar to the 1956 definition, except that the 1956 Act excluded any photograph forming part of a cinematograph film. Under the 1911 Act, films were not protected as such but the individual frames were protected as photographs.
[48] As to the meaning of this, see the discussion of the 1956 Act provisions.
[49] Defined to include any stereotype or other plate, stone, block, mould, matrix, transfer, or negative used or intended to be used for printing or reproducing copies of any work: s.35(1).
[50] See, for example, *Boucas v. Cooke* [1903] 2 K.B. 227 and *Sasha Ltd v. Stoenesco* (1929) 45 T.L.R. 350, referred to above in the discussion of the 1956 Act provisions.

*The First Owner of Copyright*

**Valuable consideration.** This expression was also used in the 1862 Act, considered below, which in addition used the expression "good" consideration. Valuable consideration usually consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other.[51] It clearly includes money or money's worth, but excludes a consideration which is illusory or merely nominal. Some of the cases on this point are not easy to reconcile:

5–36

   (a) Where a plaintiff was in business of taking and selling photographs of well-known sporting celebrities and requested and was allowed to take a photograph of one such person, on terms that the photographer be allowed to print and sell copies, the celebrity was held thereby to have given good and valuable consideration.[52]

   (b) Where a celebrity agreed to a request by a photographer to sit for her photograph, without any charge being made by the photographer, this did not amount to good or valuable consideration.[53]

   (c) Where a firm of photographers took photographs of school premises and pupils with the permission of the principals, it being clearly understood that no one was compelled to buy any prints, the photographers reasonably speculating that they would in fact make sales to pupils and others, it was held that the proprietors had given "good", although apparently not "valuable", consideration by permitting the photographers to have access to private premises and showing them around.[54]

**The 1911 Act: "Other original".** The meaning of this expression is unclear. It seems that it was not just the copyright in the engraving, photograph or portrait which the commissioner acquired. Thus, a sketch produced with the intention of its being reproduced in a newspaper was held to be within the section on the basis that it was the "original" of the

5–37

---

[51] *Fleming v. New Zealand Bank* [1900] A.C. 577.
[52] *Melville v. Mirror of Life Co.* [1895] 2 Ch. 531. The claim that the copyright was vested in the celebrity failed, however, on the wording of the 1862 Act in that the photograph had not been made or executed "for or on his behalf". See below.
[53] *Ellis v. Marshall (H.) & Son* (1895) 64 L.J.Q.B. 757. Again, the claim also failed because the photographs were not taken "for or on her behalf". *Melville v. Mirror of Life Co.*, above, was decided 15 days earlier and not cited.
[54] *Stackemann v. Paton* [1906] 1 Ch. 774. *Melville v. Mirror of Life Co.* was apparently not cited. *Ellis v. Marshall (H.) & Son* was distinguished on the basis that Judge there had found that the only consideration given by the celebrity was that he had taken the trouble to walk up to the photographer's room and sit in his chair, and this was neither good nor valuable. (It is suggested that even if the decision that the proprietors had given good consideration was correct, the case was wrongly decided since the photographs had not been made "for or on behalf of" the proprietors—see, again, the wording of the 1862 Act, below. Farwell J. seems to have been much influenced by the conclusion that the proprietors would not conceivably have allowed a photographer to publish photographs of the inside of a girls' school (including that of the French governess in her bedroom), a factor which, it is suggested, was irrelevant on this point.)

*The Chain of Title*

newspaper illustration.[55] A sketch which, had it been accepted, was intended by its maker for use as the original of an engraving would not be an "original" if it was never in fact accepted or so used.[56]

**5–38    Pre-1911 Act commissioned artistic works.** There was a similar provision in the Fine Arts Copyright Act 1862[57] to the effect that, where a painting, drawing or the negative of any photograph should be "made or executed for or on behalf of any person for a good or a valuable consideration" the copyright should belong to "the person for or on whose behalf the same shall be so made or executed."[58] Under this Act it was necessary, if the commissioned author wished to retain the copyright, for him to do so in writing. The differences between the 1911 Act and the 1862 Act were that: (1) under the 1911 Act writing was not required if the artist desired to retain his copyright—the proviso only said "in the absence of any agreement to the contrary"; (2) the 1862 Act referred to a work "made" for another, whereas the 1911 Act spoke of a plate or original "ordered" by some other person; (3) as already noted, the 1862 Act used the expression "a good or a valuable consideration," whereas the 1911 Act only had the words "valuable consideration"; (4) the 1862 Act referred to any painting or drawing, not just a portrait.

**5–39    Limits as to commissioning.** It has already been pointed out that the provisions of the Copyright Acts relating to commissioned works are limited in scope. Generally, it was only commissioned engravings and photographs that vested in the commissioner, together with commissioned portraits, by whatever means produced. This was capable of producing unexpected severances of copyright in the case of commercial art. Consider, for example, the case of an advertiser who placed an order for an advertisement. He would have been the owner of the final engraving or photograph comprising the advertisement, having commissioned it. But the advertisement probably started life as a sketch or drawing, unaffected by this subsection,[59] so that there will have been an outstanding copyright in the sketch or drawing which will not have vested in the advertiser as a result of the commission and which might have

---

[55] *Nicol v. Barranger* [1917–23] Mac.C.C. 219. Although it is not clear from the report, it seems that an engraving was made from the sketch so that it could be reproduced in the newspaper, so that the sketch was the "original" of the engraving (see the specific reference to "engravings" in the quotation of s.5(1)(a) at p. 226). In *Con Planck Ltd v. Kolynos Inc.* [1925] 2 K.B. 804 a sketch which was intended to be reproduced by lithographic process for advertisement purposes was held itself to be a "lithograph". *Sed quaere.*

[56] *Toronto Carton Co. v. Manchester McGregor Ltd* [1935] 2 D.L.R. 94, decided under the similar provisions of the Canadian Act. It seems, although this was not decided, that the sketches were also not made for valuable consideration in pursuance of any order, having been made in the hope only that they would be accepted and paid for.

[57] 25 & 26 Vict. c. 68.

[58] As to this provision, see above and *Petty v. Taylor* [1897] 1 Ch. 465; *Boucas v. Cooke* [1903] 2 K.B. 227.

[59] Although see the discussion of the expression "other original" in the 1911 Act, above.

# Exhibit 5

# THE NEW ZEALAND
# LAW REPORTS
## (INCORPORATING THE GAZETTE LAW REPORTS)

CASES DETERMINED BY THE

# JUDICIAL COMMITTEE OF THE PRIVY COUNCIL,
# COURT OF APPEAL, SUPREME COURT,
# WORKERS' COMPENSATION COURT,
# COURT OF ARBITRATION,
# LAND VALUATION COURT.

AND

# COURTS-MARTIAL APPEAL COURT

———————

Editor :
**J. P. KAVANAGH**
A Barrister of the Supreme Court of New Zealand.

# 1958

𝔑𝔢𝔴 𝔃𝔢𝔞𝔩𝔞𝔫𝔡 :

Published for, and under the Superintendence and Control of,
THE NEW ZEALAND COUNCIL OF LAW REPORTING

BY

BUTTERWORTH & CO. (AUSTRALIA), LIMITED,
(Incorporated in Great Britain)
49 BALLANCE STREET, WELLINGTON, N.Z.

250            COURT OF APPEAL.            [1958]

thus permitted the application of s. 166 (z).    If the land had been
*outside a mining district*, s. 166 (y) would have applied and the grant
would, it appears to me, have required Ministerial consent.

In the result, I am of opinion that over land outside a mining district
in favour of land outside a mining district, the Commissioner of Crown      5
Lands and not the Warden has jurisdiction to grant a mining privilege
in respect of water.    If, contrary to this conclusion, the Warden has
concurrent jurisdiction with the Commissioner of Crown Lands, his
powers are restricted to granting mining privileges in respect of water
for purposes connected with mining only.    I would therefore answer      10
Question (a) in the negative, and on this basis Question (b) does not
require determination.    The parties are agreed that there should be
no order as to costs.

*Question* (a) *answered* :  *No.*

Solicitors for the applicant : *Broderick and Parcell* (Cromwell).

Solicitors for the Crown : *Crown-Law Office* (Wellington).

---

[IN THE SUPREME COURT].

# CHRISTOPHER BEDE STUDIOS LIMITED  *v.*
# UNITED PORTRAITS LIMITED.

Supreme Court.   Auckland.   1957.   September 11, 12, 20.   T. A.
Gresson J.

*Copyright—Photographs—Agreement between Customer and Photographer, for Valuable
Consideration, that Copyright on all Photographs taken is owned by Photographer
—Agreement effective to make Photographer First Owner of Copyright in Such
Photographs—Injunction against Infringement thereof—Defence of Non est
factum rejected—Copyright Act 1913, ss. 8 (1) (a), 27.*

The plaintiff company, in business as " at home " photographers, required
each customer to sign a special form of contract which contained details as
to name, address, date, and particulars of the appointment and fees payable.
It contained the following paragraph :

*Copyright* :  In consideration of your supplying me with proofs of
at least 80% of the photographs taken by your photographer, which proofs
shall be *black and white fadeless prints instead of red daylight proofs*, I agree
that the copyright in all photographs taken or supplied by you shall be
owned by you.    I understand that the term copyright means that only
you have the right to print, copy or reproduce in any shape, form, or
colour, any of the photographs taken or supplied to me by you.

The contract was signed by each customer, who acknowledged that he
had received a duplicate of it.

In an action against the defendant company claiming an injunction
restraining it from reproducing in any form whatever, without the consent
of the plaintiff company, photographs taken by the plaintiff company in which
it owned copyright,

*Held*, granting the injunction sought,  1. That cl. 7 of the appointment
contract was not a transfer or assignment of an existing copyright, but it
was an agreement for valuable consideration whereby the person who ordered
the photograph agreed that the plaintiff company, as the holder of the negative,
should be the first owner of the copyright in all photographs taken by it, thus
excluding the operation of s. 8 (1) (a) of the Copyright Act 1913, which would
otherwise make the person ordering the photograph the first owner of the
copyright.

2. That the defence of *non est factum* failed, as there was no element of
fraud, machination, or misrepresentation, and cl. 7 of the contract related

to the subject-matter of the contract (the photographs) and could not be said to be accepted by the customer in the belief that it related to a different transaction from what was expressed therein.

3. That, by virtue of cl. 7 of the appointment contract, the plaintiff company became the first owner of the copyright of the photographs in all cases where the contract had been effectually signed by the customer and the company's representative.

ACTION claiming an injunction restraining the defendant company, its servants and agents from reproducing in any form whatsoever, without the consent of the plaintiff company, photographs taken by it in which it owned the copyright.

5    The facts sufficiently appear from the judgment.

*Hamer,* for the plaintiff company.

*Mackay,* for the defendant company.

*Cur. adv. vult.*

T. A. GRESSON J.    In 1948, Christopher Bede Studios Ltd. embarked
10   on an extensive venture in "at home" photography to the accompaniment of widespread press and radio advertisement.    The procedure was to advertise that a representative of the company would be in a particular district on a certain date and salesmen would then canvass homes for orders for photographs.    Proofs of the portraits would be
15   sent out in due course, and, under the compulsion of matrimonial or parental pride, the customer could usually be relied upon to order several black and white enlargements or, in many cases, an expensively-framed coloured portrait.    The company made a loss on the original appointment at which the photograph was taken, but this was swiftly over-
20   taken provided the anticipated order for enlargements followed.

The plaintiff company then discovered that rival portrait companies, equally anxious to exploit this lucrative field, were waiting until the proofs were delivered and then sending out their salesmen to persuade persons who had originally been customers of Christopher Bede Studios
25   Ltd. to let them make the necessary portraits or enlargements, to the consternation and financial detriment of the plaintiff company, which had taken the original photograph and held the negative.    The plaintiff company tried to combat this competition by issuing warning advertisements in the following terms :

30                           WARNING
It has come to our notice that other Photographic Firms have been calling on our Clients and claiming that (1) they are either associated with

---

COPYRIGHT ACT, 1913—Section 8 (1). Subject to the provisions of this Act the author of a work shall be the first owner of the copyright therein :

Provided that—

(a) Where, in the case of an engraving, photograph, or portrait, the plate or other original was ordered by some other person, and was made for valuable consideration in pursuance of that order, then, in the absence of any agreement to the contrary, the person by whom such plate or other original was ordered shall be the first owner of the copyright.

Section 27.    The term for which copyright shall subsist in photographs shall be fifty years from the making of the original negative from which the photograph was directly or indirectly derived ; and the person who was the owner of such negative at the time when such negative was made shall be deemed to be the author of the work, and, where such owner is a body corporate, the body corporate shall be deemed for the purposes of this Act to reside in New Zealand if it has established a place of business in New Zealand.

Christopher Bede Studios Ltd., or (2) that they can produce perfect Coloured Portraits from our proofs or photographs without the original negatives.

1. We wish to advise you that there is only one Christopher Bede Studios Ltd., and that every authorised representative carries a special identification card, and Order Books printed with our special signature. All our samples are also identifiable. Each has the name "Christopher Bede" embossed on the surface of the photograph.

2. We also advise you that no matter how skilled the photographer, it is impossible to secure perfect enlargements without the Original Negative from which prints are made.

3. Because our Studio has the original negatives of the photographs recently taken in your home, we are the only firm that can give you perfect enlargements or colour portraits from these, therefore :

LET ONLY CHRISTOPHER BEDE ENLARGE AND COLOUR CHRISTOPHER BEDE PHOTOGRAPHS.

These warnings failed to achieve their purpose and in 1951 the plaintiff company sought what its governing director, Mr Doherty, described as "the best legal opinion on the situation". The company was advised to obtain the copyright to its photographs and a special form of contract was introduced. This contained the usual details as to name, address, and date, and particulars of the appointment and fees payable, followed by the words :

"To Christopher Bede Studios Ltd.

1. *Request :* Please instruct your photographer to take photographs :
   (a) At my home (which is situated at the address written above in this contract), or
   (b) At your Studios (cross one out)
   on the date, day and time as written in the appointment memo-square on the top of this contract.

2. *Appointment Fee :* I agree to pay in advance, your appointment fee of £1.10.0d., which entitles me to have six photographs taken by your photographer. I understand that the appointment fee is only to cover your expenses in arranging the appointment and taking the photographs.

3. *Overtime Fee :* I understand that the appointment fee will be increased by 2-6d. if my appointment is to be photographed before 8.50 a.m., or after 5 p.m. on a weekday, or at any time on a Saturday or Public Holiday.

4. *Extras :* If I decide to have more than six photographs taken by your photographer I shall pay you 5/- extra for each photograph over six.

5. *Group Photographs :* I understand that a nominal fee of 5/- must be paid in advance for group photographs of five or more figures.

6. *Proofs :* You agree to supply me with proofs for at least 80% of the photographs taken by your photographer, and I understand that instead of red daylight proofs which do fade, you will be supplying black and white prints which will be fadeless and will be mine to keep as a permanent record.

7. *Copyright :* In consideration of your supplying me with proofs of at least 80% of the photographs taken by your photographer, which proofs shall be BLACK AND WHITE FADELESS PRINTS INSTEAD OF RED DAYLIGHT PROOFS, I agree that the copyright in all photographs taken or supplied by you shall be owned by you. I understand that the term copyright means that only you have the right to print, copy or reproduce in any shape, form, or colour, any of the photographs taken or supplied to me by you.

I acknowledge that I have received a duplicate of this contract.

Customer's Signature :

Accepted by :

Date :

For and on behalf of Christopher

Bede Studios Ltd."

N.Z.L.R.    BEDE STUDIOS *v.* UNITED PORTRAITS. (T. A. GRESSON J.)    253

It was acknowledged by counsel for the defendant that the crucial question for determination was whether cl. 7 of this agreement vested the copyright in the photographs in the plaintiff company. If it did so, the defendant company did not dispute, and, indeed, on the evidence it could not dispute, that the copyright had been infringed by the defendant company. It is to be observed that the word "copyright" appears on the original contract between the plaintiff company and its customer in capital letters, and the latter is specifically informed that :

"The term copyright means that only you have the right to print, copy or reproduce in any shape, form, or colour, any of the photographs taken or supplied to me by you."

There is thus no element of fraud, misrepresentation or active concealment by the plaintiff company. Moreover, it was the company's practice to leave a duplicate of the contract with the customer.

When the proofs were sent out they were endorsed on the back as follows :

"'Copyright' by Christopher Bede Studios Ltd.

Studio No.——————  Proof No. ——————

The negative of this proof has not been retouched and improvements may be effected by our 'Retouchers' and 'Finishers' when completing ordered photographs. Please read order form for further information. As per signed agreement this proof is the customer's property, but only Christopher Bede Studios Ltd. have the right to reproduce this proof in any form.

Any portraits from the plaintiff company were also embossed with the words "Copyright by Christopher Bede Auckland".

On September 21, 1951, the plaintiff company wrote to the defendant company in the following terms :

21st September, 1951.

"The Manager,
United Portraits Ltd.,
48 Shortland Street,
*Auckland*, C.1.
Dear Sir,

*Copyright in our photographs.*

We desire to have it known beyond all possible doubt what the position is as to the copyright in all photographs taken by us.

You may, in the course of your business, be asked to reproduce or copy in some way photographs which we have taken. If, however, you do any of those things then you would be committing a breach of our rights for the reason that *all photographs taken by us are so taken on an express written condition that the copyright belongs to us.* We alone, therefore, have the right to reproduce such photographs in any shape, size, colour or otherwise howsoever.

This notice is not given to you because of any specific instance of infringement on your part but solely to leave you in no doubt on the subject of our copyright.

Yours faithfully,
Managing Director,
Christopher Bede Studios Ltd.

In July and November, 1952, Mr T. G. Sherman, managing director of United Portraits Ltd. of Auckland, challenged the validity of the plaintiff company's claim to copyright in its photographs and stated bluntly that he did not propose to recognize any such claim. His company continued to reproduce and colour the plaintiff company's portraits and on December 16, 1952, the plaintiff company issued a

writ against United Portraits Ltd. alleging infringement of copyright and claiming an injunction and, substantially, the same relief as is claimed in the present writ. Under legal advice this action was settled by deed of May 4, 1953, whereby the defendant company agreed :

1. The defendant shall pay and the plaintiff shall accept the sum of    5
One hundred and fifty pounds (£150) in full satisfaction of all damages and costs to this date suffered or incurred by the plaintiff *by reason of the infringements of the plaintiff's copyright by the defendant as claimed in the said Statement of Claim.* (The italics are mine.)

2. The defendant undertakes and promises to the plaintiff that it will    10
not at any time hereafter without the written consent of the plaintiff print copy or reproduce in any shape form or colour any photograph or part of a photograph when the copyright in any such photograph is owned by the plaintiff.

3. The plaintiff will have the hearing of the said action adjourned in-    15
definitely from the 16th day of April 1953 but shall have the right to bring the said action on for trial if at any time hereafter the defendant shall commit a breach of its undertaking and promise set forth in preceding paragraph 2 hereof.

Towards the end of 1955 the plaintiff company discovered further    20
instances of infringement of copyright by the defendant company and complained accordingly. On February 24, 1956, the defendant company's solicitor wrote to the plaintiff company's solicitor stating, inter alia :

"Our client company has used its best endeavours to carry out the    25
arrangement made in 1953 but it cannot control the actions of a salesman who removes names from photographs and in other ways obliterates notices concerning copyright . . . My company instructs me to assure you that it is its firm policy to keep to the terms of the arrangement made in 1953 and that it trusts your company will have no further cause for complaint."    30

Notwithstanding this "assurance", the defendant company has continued to commit further infringements of the agreement and these have led to the present proceedings.

Section 8 (1) (*a*) of the Copyright Act 1913, provides :

Subject to the provisions of this Act *the author of a work shall be the first owner*    35
*of the copyright therein :*

Provided that :

Where, in the case of an engraving, photograph, or portrait, the plate or other original was ordered by some other person, and was made for valuable consideration in pursuance of that order, then, *in the absence of any agreement to the contrary,*    40
the persons by whom such plate or other original was ordered shall be the first owner of the copyright.

Section 27 of the Act deals expressly with photographs as follows :

27. The term for which copyright shall subsist in photographs shall be fifty years from the making of the original negative from which the photograph was    45
directly or indirectly derived ; *and the person who was the owner of such negative at the time when such negative was made shall be deemed to be the author of the work,* and, where such owner is a body corporate, the body corporate shall be deemed for the purposes of this Act to reside in New Zealand if it has established a place of business in New Zealand.    50

The draftsman of cl. 7 of the appointment contract would appear to have had these sections expressly in view when settling its terms. In my view, cl. 7 of the appointment contract is not a transfer or assignment of an existing copyright, but is an agreement for valuable consideration whereby the orderer of the photograph agrees that the plaintiff    55
company, as the holder of the negative, shall be the first owner of the copyright in all photographs taken by it, thus excluding the operation of s. 8 (1) (*a*) of the Act which would otherwise make the orderer of the photograph the first owner of the copyright.

Counsel for the defendant conceded, and rightly in my view, that in the absence of fraud or misrepresentation a failure to read or appreciate the terms of a signed contract cannot affect its validity.   As Scrutton L.J. stated in *L'Estrange* v. *F. Graucob Ltd.* [1934] 2 K.B. 394 :

5 " In *Parker* v. *South Eastern Railway Co.* (1877) 2 C.P.D. 416, 421,
" Mellish L.J. laid down in a few sentences the law which is applicable
" to this case.   He there said :   ' In an ordinary case where an action
" ' is brought on a written agreement which is signed by the defendant,
" ' the agreement is proved by proving his signature, and in the absence
10 " ' of fraud it is wholly immaterial that he has not read the agreement
" ' and does not know its contents '   . . .   When a document con-
" taining contractual terms is signed, then, in the absence of fraud or,
" I will add, misrepresentation, the party signing it is bound, and it
" is wholly immaterial whether he has read the document or not "
15 " (*ibid.*, 402).   In the same case Maugham L.J. said :   " There can be
" no dispute as to the soundness in law of the statement of Mellish L.J.
" in *Parker* v. *South Eastern Railway Co.* to the effect that where a
" party has signed a written agreement it is immaterial to the question
" of his liability under it that he has not read it and does not know
20 " its contents.   That is true in any case in which the agreement is
" held to be an agreement in writing.

" There are, however, two possibilities to be kept in view.   The
" first is that it might be proved that the document, though signed
" by the buyer, was signed in circumstances which made it not her
25 " act.   That is known as the case of non est factum. . . .   Another
" possibility is that the buyer might have been induced to sign the
" document by misrepresentation " (*ibid.*, 406).

The principle referred to above has been graphically expressed by Denning L.J. in *Curtis* v. *Chemical Cleaning and Dyeing Co.* [1951]
30 1 K.B. 805 ; [1951] 1 All E.R. 631, as follows :   " If the party affected
" signs a written document, knowing it to be a contract which governs
" the relations between him and the other party, *his signature is irre-*
" *fragable evidence of his assent to the whole contract,* including the
" exempting clauses, unless the signature is shown to be obtained by
35 " fraud or misrepresentation " (*ibid.*, 808 ; 633).

Counsel for the defendant contends that the maxim of *non est factum* applies in this case as the evidence shows that few, if any, of the persons ordering photographs and signing the original contract with the plaintiff company, fully appreciated that they were parting,
40 even in anticipation, with the copyright, which, but for cl. 7 of the agreement, would have belonged to them as the orderer of the photographs by virtue of s. 8 (1) (*a*) of the Copyright Act 1913.

I have examined the cases set out in *Chitty on Contracts* (*General Principles*), 21st ed., 314, to which I was referred, and find as I antici-
45 pated in the course of the argument that in cases where the defence of *non est factum* has been upheld a party has been misled by fraud or otherwise and   " there is usually a fraudulent element ".   For example, in the well-known case of *Foster* v. *MacKinnon* (1869) L.R. 4 C.P., 704, 711, the defendant was induced to endorse a bill of exchange
50 on the false representation that it was a guarantee similar to one he had signed on a previous occasion.   The plea is referred to in *11 Hals-bury's Laws of England*, 3rd ed., p. 360, para. 586, as follows :

" The plea of *non est factum* or *nient son fait* is that by which a man sought
to be charged in some action or proceeding upon a writing alleged to have
55 been sealed and delivered by him avers that it is not his deed.   This plea

is only available where the party sued can show either that there never has been, or that there is not existing at the time of the plea, any valid execution of the deed on his part.   If a man has been induced by the machinations of some other persons (whether a party or a stranger to the deed) to execute a deed under a substantial mistake as to its contents, believing it to give effect to an entirely different transaction from what is expressed therein, so that when he executed it his mind did not accompany his outward act, he may plead that for this reason the deed is not his deed, and if this plea is established by the evidence, the deed will be altogether void from the beginning.   A deed so procured is no more the deed of the person who was induced to execute it, than a forged deed is."

It is sufficient to repeat that in the present case there is no element of fraud, "machination" or misrepresentation.   Clause 7 of the appointment contract relates to the subject-matter of the contract—namely, the photographs—and cannot be said to be accepted by the orderer in the belief that it relates to an entirely different transaction from what is expressed therein.   It may well be that a large proportion of those signing the appointment contract do not read the entire document, others may read it but not fully comprehend its significance, and some may be aware of the clause but quite indifferent as to the ownership of the copyright in the photographs.   The plaintiff company is no doubt aware of these tendencies and may, to some extent, exploit these human failings, but speculations of this nature cannot, in my view, be allowed to affect the validity of the plain terms of a straightforward contract.   I accordingly hold that, by virtue of cl. 7 of the appointment contract, the plaintiff company becomes the first owner of the copyright in its photographs in all cases where the contract has been effectively signed by the customer and the representative of the company.

The evidence establishes deliberate and persistent infringement of the plaintiff company's copyright by the defendant company and there will accordingly be an order in terms of the statement of claim, granting an injunction restraining the defendant, its servants and agents, from reproducing in any form whatsoever, without the consent of the plaintiff, photographs taken by the plaintiff in which the copyright is owned by the plaintiff.   Counsel should submit a draft order, but if necessary I will hear them further as to the precise terms of the injunction and as to the nature of the inquiry which will require to be undertaken by the Registrar.   The plaintiff is entitled to costs which are reserved, pending completion of the Registrar's inquiry.

*Injunction accordingly.*

Solicitors for the plaintiff : *Mc Kenzie and Bartleet* (Auckland).
Solicitors for the defendant : *Hesketh and Richmond* (Auckland).

———  ———