**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE WAVE STUDIO, LLC, a New York
Limited Liability Corporation,

     Plaintiff,

    v.

GENERAL HOTEL MANAGEMENT, et al.,

     Defendants.

**CASE NO. 7:13-cv-09239-CS-PED**

## DECLARATION OF GORDON IONWY DAVID LLEWELYN

I, Gordon Ionwy David Llewelyn, declare:

  1.  My name is Gordon Ionwy <u>David</u> Llewelyn.  I am Professor (Practice) and Deputy Dean of the School of Law, Singapore Management University.  In addition, I am Professor of Intellectual Property Law at King's College London and Honorary Professor in the Faculty of Law, Hong Kong University.

  2.  I have a Bachelor of Laws degree with honours from the University of Southampton, England, and a Bachelor of Civil Law (a postgraduate degree) from the University of Oxford, UK. I qualified as a solicitor of the Supreme Court of England and Wales in April 1985 and practised as a solicitor in London until March 2010 (when I moved to live in Singapore).  From April 2010 to December 2012, I was Of Counsel to the Singapore office of White & Case, resigning this position to permit me to carry out legal consultancy and arbitration work without being subject to the conflict of interest rules governing an international law firm with its headquarters in New York.

3.      I practised law as a solicitor in the fields of intellectual property (IP) and commercial law, both contentious and non-contentious, from my qualification in 1985 until my move to Singapore.  From 1999 to 2010 I was a partner and head of the London office's intellectual property ("IP") department at international law firm White & Case.  Prior to that (in reverse order), I was the founding partner of specialist litigation and IP firm of solicitors Messrs Llewelyn Zietman (1994-1999), partner in the commercial department of Messrs McKenna & Co Solicitors (as it then was) (1988-1994) and trainee and assistant solicitor, in turn, at Messrs Linklaters & Paines solicitors (as it then was) (1982-1988).

4.      From 1982 to 2010 I combined the practice of law in the IP field with teaching in that area; from 1982 to 1988 I was a visiting lecturer on the Master of Laws programme at the London School of Economics, from 1988 to 2002 held various visiting positions on the Masters of Law programme at Queen Mary College University of London, and from 2002 to 2004 had the position of Visiting Professor at King's College London.  In 2004 I was appointed to the tenured position of Professor of IP Law at King's College London, which I still hold on a fractional appointment.

5.      I have written extensively on IP law and other legal subjects (as set out in my detailed curriculum vitae, attached as Exhibit 1).  I am the joint author of *Intellectual Property: Patents, Copyright, Trade Marks & Allied Rights* (for the 5th and 6th editions with Professor William Cornish, and for the 7th edition with Professors Cornish and Tanya Aplin) and of *Kerly's Law of Trade Marks and Trade Names* (13th, 14th and 15th editions, published originally in 1894).  My business book *Invisible Gold in Asia: Creating Value through Intellectual Property* was published in Singapore in 2010.  I should add at this juncture that a

number of articles that I have written on Singapore IP law have been cited with approval by the Singapore Court of Appeal[1] and the Singapore High Court[2].

6.    I continue to be consulted by law firms, corporations and governments on IP related matters, principally through my door tenancy at 8 New Square, the leading set of IP specialist barristers' chambers in London.

7.    Since arriving in Singapore I have taught in the School of Law at Singapore Management University, initially as a part-time Visiting Professor (Practice) and from the academic year 2011/12 to date as Professor (Practice).  In academic year 2012/13 I was appointed Deputy Dean of the School of Law and remain in that role today.

8.    Each academic year since I moved to Singapore I have taught courses on (a) Singapore intellectual property law and (b) the international commercialisation of intellectual property rights, to LLB and JD students.  The latter course includes teaching about the drafting and structuring of commercial agreements involving intellectual property rights and is very similar to a course I have taught each year since 2007 at King's College London and at Hong Kong University in their respective Master's degree in Laws (LLM) programmes.

9.    I should emphasise that I am not called to the bar in Singapore (my professional qualification is as a solicitor in England and Wales but I have not practised in that capacity since leaving my Of Counsel position with White & Case in 2012) and am not thus authorised to (and do not) advise clients in Singapore on matters of Singapore law.  I provide this opinion as an expert on Singapore intellectual property law.  In this connection, I should mention that I have recently been invited by the IP Office of Singapore (the local equivalent of the U.S.  Patent and

---

[1] See *Staywell Hospitality Group Pty Ltd v. Starwood Hotels & Resorts Worldwide, Inc and another and another appeal* [2014] 1 SLR 911 at paragraph 60.
[2] See, for example, *Han's (F&B) Pte Ltd v. Gusttimo World Pte Ltd* [2015] 2 SLR 825.

Trademark Office, which also deals with copyright-related matters) to join its Panel of IP Adjudicators (with effect from 1st April 2016); the duties of this position include giving decisions on matters of Singapore law.

10.    I am also a regular lecturer on both English and Singapore IP law topics at conferences both in Singapore and elsewhere. In the past year or so I have given presentations in Singapore (amongst others, for the IP Office of Singapore in its annual update series on Singapore law), in New York (for the legal department of pharmaceutical company Pfizer), at Oxford University (invitation-only conference on trade mark law), in London (in the Centre for Commercial Law Studies, Queen Mary University), at the IP Department of the Hong Kong SAR, China, and in Sydney, Australia (for the IP Society of Australia and New Zealand).

11.    I have been asked by the attorneys representing the Plaintiff to give my expert opinion on a number of questions of Singapore law and do so below. In giving my opinion I am fully cognisant of my duty to the court to provide an honest opinion without regard to the interests of the client represented by those who have asked for this opinion.

12.    In preparing this opinion, I have reviewed the documents set out in Exhibit 2.

### The Questions

13.    I have been asked to provide an expert opinion on the following questions arising under Singapore law:

a.    Who owns the copyright in the photographs which are the subject matter of this dispute (the "Photographs")?

i.    Does Section 30(5) of the Singapore Copyright Act apply to the Photographs such that copyright in the Photographs belongs to the

4

Defendant General Hotel Management or the hotels managed by the Defendant General Hotel Management (the "Hotels")?

ii.      If so, has the operation of Section 30(5) of the Singapore Copyright Act been excluded by way of the contractual relationship between the Defendant General Hotel Management or the Hotels, on the one hand, and Ms Lee, the Plaintiff, or the entities effectively controlled by Ms Lee at each relevant time (the "Wave Entities"), on the other hand?

b.      In the event that the Defendant General Hotel Management (or the Hotels who contracted with the Wave Entities) is/are owner of the copyright in the Photographs pursuant to Section 30(5) of the 1987 Act, may the author nonetheless seek damages and injunctive relief for uses by third parties and the 'commissioner' of the work for uses outside the particular purpose?

14.     Before I set out my opinion on these questions, I should address a preliminary point of international IP law which I consider may be relevant in these proceedings. In my opinion, it is trite law that the principle of territoriality governs how copyright law is enforced. The various international treaties on copyright law merely articulate minimum standards of protection of copyrights[3]. These treaties neither advocate any choice of law rule in relation to the ownership and infringement of foreign copyrights nor require domestic courts to apply foreign copyright law to questions concerning either ownership or infringement. The issues in this case relate to the ownership and infringement of a U.S. copyright before the U.S. courts and, with due respect to both the court and those requesting my opinion, it is in my opinion by no means clear that Singapore copyright law is of any relevance to the U.S. courts in its

---

[3] See Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, as last revised at Stockholm, July 14, 1967, 21 U.S.T. 1583, 828 U.N.T.S. 305; Berne Convention for The Protection of Literary and Artistic Works (1971 Paris text), 1161 U.N.T.S. 3 (first concluded in 1886).

determination of these issues. Nonetheless, given that the Defendant General Hotel Management has raised issues of Singapore law in this application and I am asked to provide my opinion, I do so below.

### Question 1: Ownership of the Copyright under Singapore Law

15.     Copyright is a statutory right in Singapore, which is a common law jurisdiction (that, like the United Kingdom (U.K.), does not have juries in civil trials) whose laws were influenced significantly by U.K. laws in the years following its independence from the U.K. in 1965, and until 1987 the Singapore law was that of a somewhat modified version of the U.K.'s Imperial Copyright Act 1911. In more recent times in relation particularly to copyright law, the Singapore courts and legislature have tended to look more at developments in Australia than those in the U.K. (Especially in view of the latter's membership of the European Union and the increasing influence of European law developments on the domestic laws of that country).

16.     In the field of copyright, the governing statute in Singapore is the Copyright Act 1987 (the "1987 Act"). The 1987 Act was modeled on the Australian Copyright Act 1968 (the "Australian Copyright Act 1968"), as amended by the Copyright Amendment Acts 1980 and 1984. The 1987 Act was revised in 1988, by the Copyright Act (Cap 63, 1988 Rev Ed), and 1999, by the Copyright Act (Cap 63, 1999 Rev Ed). (It should be noted that the Australian Copyright Act 1968 was itself influenced in many areas by U.K. copyright law, particularly the Copyright Act, 1956, and the Imperial Copyright Act 1911.)

17.     Section 30(2) of the 1987 Act sets out the basic rule that the author of a literary, dramatic, musical or artistic work shall be entitled to any copyright subsisting in the work.[4] The only ways that copyright may be owned by any person apart from the author is either by way of

---

[4] Section 30(2) at Exhibit 3.

the specific exceptions contained in Sections 30(4), (5) and (6) or by way of an assignment in writing by the author of present or future copyright works[5].

18.     Thus, for the purpose of applying Section 30(2) to the facts of the present case, it is crucial to identify at the outset what are the specific copyright works in issue and who is their author, before proceeding to determine ownership of those copyrights.

19.     The distinction between 'author' and 'owner' is one that lies at the heart of copyright law in Singapore.  This was noted by VK Rajah Judge of Appeal (as he was then) in *Asia Pacific Publishing Pte Ltd v. Pioneers & Leaders (Publishers) Pte Ltd* [2011] SGCA 37[6]:

> "We note that the Judge also relied on the case of *Alteco Chemical Pte Ltd v. Chong Yean Wah (trading as Yamayo Stationery Manufactuer) [1999] 2 SLR(R) 915* ("*Alteco*"), to support the proposition that an incorporated body could be the author of a copyright protected work.  In that decision, it appears that a "modern" interpretation of authorship was created, suggesting that the author had become the person who made the necessary arrangements and paid for the creation of the work.  A company could therefore be the author of the work if its employees created the work product.
>
> However, the High Court in *Alteco* did not expressly declare that a company could be an author of a work, a point acknowledged by the Judge.  Further, the decision in *Alteco* seemed to have blurred the distinctions between the concepts of authorship and ownership.  In Tan Tee Jim, SC and Ng-Loy Wee Loon, "Intellectual Property Law" (2000) 1 SAL Ann Rev 230 at 235–237, 251 ("*Tan and Ng*"), the authors observe that the *Alteco* case failed to make the distinction between authorship and copyright ownership in s 30 of the Act.  As *Tan and Ng* rightly point out, in essence what the Court did was to imply a constructive trust against the author of the work, thereby allowing the parent company to own the work, and there was no necessity for a "modern" interpretation of the word "author".
>
> This view has been similarly reiterated in *George Wei* [The Law of Copyright in Singapore] at pp. 1391–1393.  He points out that the Act adequately governs the law on ownership, even for foreign works which enjoy copyright in Singapore.  Additionally, it is observed that the person who made arrangements for the production of a work, or who paid for the work -- as in the case of *Alteco* -- would not be entitled to claim to be the

---

[5] See Exhibit 4, excerpt from George Wei, *The Law of Copyright in Singapore*, 2nd Ed. (SNP: 2000) at pages 368 and 404.
[6] See Exhibit 5, *Asia Pacific Publishing Pte Ltd v. Pioneers & Leaders (Publishers) Pte Ltd* [2011] SGCA 37.

author of the work as this did not generally relate to authorship skills.  We agree. *Alteco*'s innovative tailoring of the term "author" ought not to be followed."[7]

20.    In my opinion, there are two *distinct* categories of copyright works that arise out of the various contractual relationships between Mr Kawana, Ms Lee, the Wave Entities, the Plaintiff, the Defendant General Hotel Management and the Hotels: first, photographs taken by Mr Kawana and, second, the works comprised in the marketing collaterals supplied to the Hotels (some, but by no means all, of which incorporated either photographs taken by Mr Kawana or 'touched-up' versions thereof).

### Contract between the Wave Entities and the Defendant General Hotel Management and the Hotels

21.    It appears undisputed that the Defendant General Hotel Management or the Hotels contracted with the Wave Entities to carry out a range of services which culminated in the creation and supply of a range of marketing collaterals such as brochures.[8] The description of services to be carried out by the Wave Entities is clearly set out in each of the production estimates sent to the relevant Hotel.  By way of example only, in a production estimate from Waves dated 13 September 2004 which names The Legian, Bali as the client[9], the description of the subject matter of the contract is "Designing and overseeing production (up to printed product) of the Chedi Club, Tanah Gajah – DL Flyers: English, 6C x 5C with metallic Gold, Matte Laminate with Spot Glass and Matte Varnish".  The specification of the services to be carried out by this particular Wave Entity continues, "Design, Layout, Art Direction Finished Artwork,

---

[7] It should be noted that section 48(1) of the U.K. Copyright Act, 1956, provided that the author of a photograph was the person who at the time the photograph was taken was the owner of the material on which it was taken, and therefore the author could be a corporate entity.  This highly unusual position was not followed in the successor statute, the U.K. Copyright, Designs and Patents Act 1988, or in Australian law (on which the Singapore Act is based).

[8] See transcript of the videotaped deposition of Ralf Ohletz Graf von Plettenberg dated 23 September 2015 at 2:10pm (the "Plettenberg Deposition") at page 55 to 58.

[9] See production estimate from Waves dated 13 September 2004 which names The Legian, Bali as the client.

Copywriting, Typesetting, Films, Checking, Studio, Materials, Misc. Costs, Colour Separation Films, Printing and Supervision."

22. Photography is set out as merely one of a number of services to be carried out by the Wave Entities even when it is explicitly stated in production estimates. For example, in a production estimate from Waves dated 3 May 2004[10] which again names The Legian, Bali as the client, the description of the subject-matter of the contract includes "digital touch-up and pre-opening Brochure" alongside "Photography".

23. The fact that the Wave Entities were contracted to carry out a number of services which culminated in the creation and supply to the client of marketing collaterals, rather than merely to take and supply photographs, is clear from the depositions of both Ms Lee and Mr Ralf Ohletz Graf von Plettenberg of the Defendant General Hotel Management.[11]

24. The author of copyright in works comprised in or comprising the marketing collaterals would, pursuant to Section 30(2), be Ms Lee as their creator unless she or a Wave Entity (as the case may be) contracted a third party to create all or any particular copyright works comprised in them (as to which, see below at paragraphs 27 to 29 for my opinion on authorship and ownership of photographs taken in the course of carrying out the agreed activities set out in a production estimate).[12] The burden of proof (on a balance of probabilities) that Section 30(2)

---

[10] See production estimate from Waves dated 3 May 2004 which names The Legian, Bali as the client.

[11] See the Plettenberg Deposition at page 55 to 58 and the transcript of the videotaped deposition of Lee Kar Yin dated 21 May 2015 at 10:15am at pages 132 to 135.

[12] It should be noted that where a "raw photograph" taken by Mr Kawana was subsequently "touched-up" digitally by Ms Lee as part of the creation of the marketing collaterals, under Singapore copyright law Ms Lee would be the author of a new copyright work in the touched-up photograph that is separate from the copyright in the "raw photograph". Furthermore, on Ms Lee's evidence (the transcript of the videotaped deposition of Lee Kar Yin dated 21 May 2015 at 10:15am at page 179) that all the creative work behind each Photograph was attributable to her and that Mr. Kawana only "pressed the button" on her instructions, it is not unarguable that Ms Lee is the author of the photographs physically taken by Mr. Kawana (as well as the "touched-up' photographs) under Singapore law, although I consider that such an argument would fail.

does not apply lies on the Defendant General Hotel Management or the Hotels. On the facts and for the reasons I now go into, in my opinion that burden has not been satisfied.

### *Contract between the Wave Entities and Mr Kawana*

25.      The services carried out by each relevant Wave Entity under a particular production estimate frequently included the taking of photographs. Section 7(1) of the 1987 Act defines the author of a photograph as the person who takes the photograph. In the present case, the Wave Entities contracted directly with the author of the Photographs, Mr Kawana (and his company Irieeyes Pte Ltd), to take the Photographs (the "Irieeyes Contracts").[13]

26.      The Irieeyes Contracts specify that "All Photographs and rights contained therein, including copyright, remain the sole and exclusive properties of the Design Agency (the relevant Wave Entity) and the Photographer". However, in 2013, Mr Kawana and Irieeyes Pte Ltd assigned to Ms Lee all their interests in the copyrights in all Photographs created pursuant to the Irieeyes Contracts (the "Kawana Assignment").[14]

27.      In my opinion the Kawana Assignment is a valid assignment to Ms Lee of such copyright as was owned at the relevant time, by Mr Kawana and Irieeyes Pte Ltd, in the Photographs of which Mr Kawana was author: as such, it displaces the general principle that the author is the owner set out in Section 30(2) of the 1987 Act.

28.      Even if that were not the case, Section 30(5) of the 1987 Act would have operated to vest in the relevant Wave Entity the copyright in the Photographs of which Mr Kawana was author. Section 30(5) is a specific exception to Section 30(2) and provides that:

> "where — a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving by the other person; and the work is made in pursuance of the agreement, the

---

[13] See, for example, contract between Mr. Kawana/Irieeyes Pte Ltd and The Wave Design Pte Ltd dated 2 August 2006.

[14] See assignment agreement between Mr. Kawana/Irieeyes Pte Ltd and Ms Lee dated 1 October 2013.

first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work."[15]

29.    The relevant one of the Wave Entities at the particular time contracted directly for valuable consideration with Mr Kawana (and his company Irieeyes Pte. Ltd) to take the Photographs and thus the Photographs fall within the ambit of Section 30(5) as between the Wave Entities and Mr Kawana (and, in those circumstances, the effect of the Kawana Assignment would be to transfer or waive (as the case may be) the right of veto of the photographer under Section 30(5); in other words, it operated to assign such residual rights as Mr Kawana and Irieeyes Pte Ltd had at the relevant time).

**Question 2: Can the Defendant General Hotel Management or the Hotels assert ownership of copyrights in the Photographs pursuant to Section 30(5)?**

30.    It should be noted first of all that Section 30(5) applies only to photographs, engravings, paintings or portraits. Hence, neither the Defendant General Hotel Management nor the Hotels can rely on it to assert ownership of such copyrights as may subsist in the marketing collaterals as artistic or literary works other than photographs. In my opinion, they may not do so as Ms Lee was the author of such works (which might include text and overall layout of a marketing brochure or flyer, for example) and copyright in them was owned by her. As regards the Photographs only, again copyright in them has never vested in either the Defendant General Hotel Management or the Hotels, as explained in the next paragraph.

31.    It appears not to be in dispute that the author of the Photographs was Mr Kawana and that Mr Kawana had contracted with Ms Lee or the Wave Entities (and not with the Defendant General Hotel Management or the Hotels) for the taking of the Photographs: thus, if

---

[15] See Exhibit 3, Section 30(5).

there was no agreement to the contrary falling within Section 30(3), Section 30(5) vested ownership of that copyright in either Ms Lee or the Wave Entities (depending on the date of the photograph's creation) rather than the Defendant General Hotel Management or the Hotels, with whom Mr Kawana had no contractual relationship at all. In this context, it should be noted that due to the fact that Section 30(5) is an exception to the general principle in Section 30(2), of the author being first owner, the Defendant General Hotel Management has the burden of proving on a balance of probabilities that the facts of this case fall in the ambit of Section 30(5). On the facts as I understand them from the documents I have been provided, this it has failed to do.

***Does Section 30(5) apply in a case where a subcontractor is the author of the Photographs?***

32.    Notwithstanding my view that Section 30(5) does not apply to the contractual relationship between Ms Lee or the Wave Entities (as the case may be) and the Defendant General Hotel Management or the Hotels for the creation of marketing collaterals, I move to consider this question in relation to Mr Kawana.

33.    Dr Lai has argued in his Declaration that the Defendant General Hotel Management or the Hotels are the owners of the copyright in the Photographs. He relies on passages from two English law textbooks which state (in the words of one) that:

> "where part of the process for the making of the finished article has been sub-contracted out, it appears that it is the person who commissioned the making of the finished article, and not the immediate person who commissioned the making of the copyright work, who is entitled to the copyright".[16]

---

[16] See Declaration of Dr Stanley Lai dated 12 February 2016 ("Lai's Declaration") at paragraph 15. Citing Hugh Laddie, et al, *The Modern Law of Copyright and Designs*, 3rd Ed. (Butterworths: 2000) (Exhibit 3 to Lai's Declaration) at page 830.

34.     In my opinion, even if correct (and even the textbook cited by Dr Lai admits that the (English) court had difficulty arriving at its decision)[17], this statement does not apply to Singapore copyright law and should not be relied upon for the following reasons.

35.     First, English law is markedly different from Singapore law with respect to this specific area of copyright law.  The textbooks cited by Dr Lai comment on Section 4(3) of the UK Copyright Act, 1956, which states that:

> "where a person commissions the taking of a photograph, or the painting or drawing of a portrait, or the making of an engraving, and pays or agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein by virtue of this Part of this Act."[18]

However, Section 30(5) of the 1987 Act is not based on Section 4(3) of the U.K. Copyright Act, 1956.  Instead, it is derived from Section 35(5) of the Australian Copyright Act 1968, a sub-section that was passed by the Australian legislature with the intention of expanding the scope of protection available to authors of works rather than of expanding the rights available to persons who contract with authors of works.[19]

36.     In addition, there are two essential differences between the words of Section 30(5) of the Singapore Copyright Act and Section 4(3) of the UK Copyright Act, 1956: (a) unlike Section 30(5), Section 4(3) uses the word "commission", and (b) Section 4(3) is open-ended and focuses entirely on the "commissioner" without referring to the author of the work.  Accordingly, Section 4(3) is susceptible to a broad interpretation (as in the *John Arnold & Co. v. Miafern* case referred to by the U.K. textbook writers) whereby "the person who commissioned the making of

---

[17] See Hugh Laddie, et al, *The Modern Law of Copyright and Designs*, 3rd Ed.  (Butterworths: 2000) (Exhibit 3 to Lai's Declaration) at page 831.
[18] See Exhibit 6, Section 4(3) of the UK Copyright Act 1956.
[19] See Exhibit 7, *Report of the Committee appointed by the Attorney-General of the Commonwealth to Consider what Alterations are desirable to the Copyright Law of the Commonwealth, 1959* (the "Spicer Report") at paragraphs 81 to 85.

the finished article, and not the immediate person who commissioned the making of the copyright work, who is entitled to the copyright"[20].

37.    However, the same analysis cannot apply to Section 30(5) which refers explicitly to only two parties to a contract: the party taking a photograph etc. (the Australian provision on which it is based uses the term 'author' but Section 30(5) does not) and the person contracting with that party.  It contemplates a strictly bilateral relationship between the person taking the photograph and the person contracting with that person and therefore it is difficult to see how a plain and ordinary meaning of Section 30(5) could possibly produce the same legal result as through the application of Section 4(3) of the U.K. Copyright Act, 1956.

38.    Secondly, the Singapore courts have implicitly rejected the position in *James Arnold & Co. v. Miafern* that is relied on by the U.K. textbooks to support the principle Dr Lai seeks to rely on.  In *Wang Choong Li v. Wong Wan Chin* [2015] SGHC 128[21], the Singapore High Court (on appeal from the District Court) was called upon to determine ownership of copyrights in two categories of photographs commissioned by the respondent during her wedding.

39.    Given that Dr Lai has relied on this case to support the Defendant General Hotel Management's argument that it or the Hotels has ownership of copyright in the Photographs, it is helpful to set out the facts of the case in some detail.  In *Wang Choong Li v. Wong Wan Chin*, the appellant had been engaged by the respondent to provide a suite of wedding services which included photography.  Photographs taken in two different photo shoots were involved in this dispute.  First, the respondent had a photo-shoot before the wedding which culminated in the taking of pre-wedding photographs.    The pre-wedding photographs were taken by a

---

[20] See Hugh Laddie, et al, *The Modern Law of Copyright and Designs*, 3rd Ed.  (Butterworths: 2000) (Exhibit 3 to Lai's Declaration) at page 831.
[21] See *Wang Choong Li v. Wong Wan Chin* [2015] SGHC 128 (Exhibit 2 to Lai's Declaration).

photographer contracted by the respondent's husband.  Secondly, photographs of the wedding itself were taken by a freelance photographer who had been engaged by the appellant.

40.    The Singapore High Court Judicial Commissioner (equivalent to a Singapore High Court Justice except that he has yet to be awarded judicial tenure), Aedit Abdullah JC, applied Section 30(5) and held that copyright in the first set of photographs belonged to the respondent because it was the respondent (through her husband) who had contracted with the first photographer.  However, after considering the fact that the second set of photographs had been taken as a result of a contract between the appellant and the second photographer, he said "(I)n the absence of any evidence of an actual commission of the second photographer by the Respondent, the copyright in those photographs reside either with the maker, *i.e.* the photographer, or with the Appellant."[22]

41.    The respondent then put forward an argument on the lines of that in *James Arnold & Co v. Miafern*: that the appellant commissioned the second photographer on behalf of the respondent, *i.e.*, the appellant acted as the agent for the respondent.  However, the judge rejected this and held that:

> "the Respondent engaged the Appellant to provide photography.  This must mean there was no intention for the Respondent to enter into a contract with the photographer. Finding that agency arose between the Respondent and the Appellant in respect of the dealing with the second photographer is highly artificial.  I accept the arguments of the Appellant that an agency was not in the contemplation of either the Appellant or the Respondent."[23]

42.    This is very similar to the facts in the present dispute and I consider this case is authoritative on the approach that would be taken by the Singapore courts.  It appears clear on the facts as I understand them that the Defendant General Hotel Management, the Wave Entities

---

[22] *Wang Choong Li v. Wong Wan Chin* [2015] SGHC 128 at paragraph 64.
[23] *Wang Choong Li v. Wong Wan Chin* [2015] SGHC 128 at paragraph 63.

and Ms Lee all intended to confine Mr Kawana's contractual relationship to one with only the Wave Entities and/or Ms Lee.

43.    In the first place, the Irieeyes Contracts state clearly that "The Design Agency's client may not have any direct business with the Photographer."[24]

44.    Secondly, the Defendant General Hotel Management had knowledge of the direct contractual relationship between Mr Kawana and the Wave Entities/Ms Lee.  I base that conclusion on two specific exchanges of emails between Mr Kendall Oei, a director of the Defendant General Hotel Management, and Ms Lee.

45.    First, in an email from Mr Oei to Ms Lee dated March 28, 2005 (marked as TWS0355787), Mr Oei wrote "I had asked Pam to request from you a copy of the photo contract you use when employing photographers for GHM brochures.  I can't imagine that you don't have such a service contract".

46.    Secondly, in June 2006, it was discovered that a business called the Setai Club (located within one of the Hotels, the Setai Miami, but in different ownership), had been using some of the Photographs without the consent of the Wave Entities and Ms Lee and without the knowledge of the Defendant General Hotel Management.  Mr Oei, who was at the time responsible for the legal affairs of the Defendant General Hotel Management,[25] sent an email to Ms Lee on 26 June 2006[26] asking: "Do you have any documents to show that Waves/GHM own the photos?" In response, Ms Lee sent Mr Oei an email with the Irieeyes Contract attached, together with the contract between the Setai Miami (the Hotel) and Wave Pte Ltd (as evidenced by the relevant production estimate). Mr Oei's response was "Many thanks for sending copies of

---

[24] *Supra* note 13.
[25] See the Plettenberg Deposition at page 49.
[26] See emails between Hans Jenni, Kar Yin Lee and Kendall Oei, dated between 16 June 2006 and 26 June 2006.

the photos…as well as copies of your agreement with the photographers.  Waves supported by GHM may have to file an IP violation suit against the Setai Club.  That is an option we keep up our sleeve and may produce a pile of money for you."

47.     On these facts, I do not consider it possible for the Defendant General Hotel Management to prove, on a balance of probabilities, that it had an agency relationship with the Wave Entities which might allow it to rely on Section 30(5).

### Contracting out of Section 30(5)

48.     Even if my opinion on this is incorrect, Section 30(3) of the 1987 Act states that "operation of subsection (4), (5) or (6) in relation to copyright in a particular work may be excluded or modified by agreement."[27]  Under Singapore law, there are few formalities as to the nature of such agreement.  In his treatise on Singapore copyright law Professor George Wei (as he then was; he is now a High Court Justice) noted that "there is nothing that suggests that the agreement to be effective must be in writing"[28] and suggested that such agreements can be implied even through a course of conduct between the parties.  In my opinion, there are in this dispute both oral and written agreements which would be enforced by the Singapore courts were the question one of Singapore copyrights.

49.     These agreements are found primarily in the various production estimates sent by the Wave Entities to the Hotels.  In my opinion, a Singapore court would view each production estimate as an offer which was then accepted by the Hotels/the Defendant General Hotel Management either in writing or through conduct.  For example, in a production estimate from The Wave Design Pte Ltd to Ms Eleanor Hardy with respect to the Chedi, Chiang Mai, dated 3 October 2006, the relevant contractual language for the purposes of Section 30 of the 1987 Act is

---

[27] See Exhibit 3.
[28] See Exhibit 8, excerpt from George Wei, *The Law of Copyright in Singapore*, 2nd Ed.  (SNP: 2000) at pages 404 and 405.

"We      reserve      the      intellectual      property      copyright      to      all      designs/soft
copies/material/photography/projects undertaken" (the "Reservation Clauses").

50.    I note that Dr Lai takes the view that the language of the Reservation Clauses is
neither sufficiently clear nor specific to exclude the operation of Section 30(5).  I have the
opposite opinion both as a matter of law and practice.

51.    I consider the wording of the Reservation Clauses on the production estimates to
be clear and specific: in my experience, such all-encompassing clauses are standard and practical
in a market environment where design companies and similar businesses will not know with any
certainty what precise copyright works may be created in the course of a particular project and
do not wish to be constrained in their future work for others by arguments that they do not own
copyright.  In the present case there were numerous copyright works generated in the course of
the work carried out, including literary works, and photographs were one category of work only,
albeit an important one for Ms Lee and the Wave Entities.  The wording of all The Reservation
Clauses (there are slight variations) is clear and unambiguous as relating to copyrights generated
during the work referred to in the particular production estimate; whilst it could be argued that
the words "intellectual property" are open to debate as to what they cover, the word "copyright"
is not.  The fact that The Reservation Clauses are all- encompassing does not detract from the
clarity and cogency of their meaning.

52.    Dr Lai has relied on the New Zealand case of *Christopher Bede Studios v. United
Portraits Ltd* in support of his argument that reference to specific photographs would be required
in order for the Reservation Clauses to be effective.[29] The case involves Section 8(1)(a) of the
Copyright Act 1913, a provision similar to Section 30(5).  In my opinion, this reliance is

---

[29] Lai's Declaration at paragraph 22.  Citing *Christopher Bede Studios v. United Portraits Ltd* [1958]
NZLR 250 (Exhibit 5 to Lai's Declaration).

misplaced. At no point does the judgment in that case suggest that an agreement to exclude or modify the operation of a provision such as that in Section 30(5) (as specifically provided for in Section 30(3)) would require specific reference to a particular copyright work for the agreement to be effective. The contractual provision, as in the present dispute, stated that "copyright in all photographs taken and supplied" would be owned by the studio. This clause was upheld by the Supreme Court without question.

53.     In addition, the decision in *Christopher Bede Studios v. United Portraits Ltd* provides some assistance on the question as to whether the Reservation Clauses were effectively incorporated into the contracts. The court noted on the customer/photographer agreement in the case that "It may well be that a large proportion of those signing the appointment contract do not read the entire document...but speculations of this nature cannot be allowed to affect the validity of the plain terms of a straightforward contract."[30]

54.     The Defendant General Hotel Management has asserted[31] that it had no knowledge of the Reservation Clauses and therefore would not be bound to comply with it/them. In my opinion, this assertion is contradicted by documentary evidence. First, the Reservation Clauses are contained in the same section of each production estimate as other important contractual terms relating to the acceptance of the offer, the validity of the offer, and payment terms. Any reasonable person would have had sufficient notice of the Reservation Clauses.

55.     Secondly, a number of the production estimates were subsequently signed by the relevant employees of the Hotels and returned to the Wave Entities. Thirdly, knowledge of the Reservation Clauses is evident from the deposition evidence of Mr von Plettenberg as well as the

---

[30] See *Christopher Bede Studios v. United Portraits Ltd* [1958] NZLR 250 (Exhibit 5 to Lai's Declaration) at page 256.
[31] See the Plettenberg Deposition at pages 63 to 71.

fact that the Defendant General Hotel Management through its director, Kendall Oei, acted in a manner consistent with the Reservation Clauses.

56.    When Mr von Plettenberg was asked whether he had been aware of the Reservation Clauses, he conceded: "Well, I mean, I'm aware of it.  But you know, it's one of those typical small prints you never read"[32].  It is especially difficult for the Defendant General Hotel Management to rely on the distinction, drawn by Mr von Plettenberg, between being aware of the Reservation Clauses and not reading them given what I have set out at paragraph 53 above. It is also unlikely that a Singapore court (if seised of the matter) would accept that Mr von Plettenberg failed to read the Reservation Clauses given that the various production estimates are short and simple documents which contain very few terms: it is almost the diametric opposite to the situation where the relevant provision is buried in a long agreement.

57.    Moreover, as stated in paragraph 46 above, in June 2006, it was discovered that a business called the Setai Club (located within one of the Hotels, the Setai Miami, but in different ownership), had been using some of the Photographs without the consent of the Wave Entities and Ms Lee and without the knowledge of the Defendant General Hotel Management.  Mr Kendall Oei, who at the time was a director of the Defendant General Hotel Management responsible for its legal affairs[33], sent an email to Ms Lee on 26 June 2006 asking: "Do you have any documents to show that Waves/GHM own the photos?" In response, Ms Lee sent Mr Oei an email with the Irieeyes Contract attached and the contract between the Setai Miami (Hotel) and The Wave Private Ltd. (as evidenced by the relevant production estimate).  Mr Oei's response was "Many thanks for sending copies of the photos...as well as copies of your agreement with the photographers.  Waves supported by GHM may have to file an IP violation suit against the

---

[32] See the Plettenberg Deposition at page 110.
[33] Mr. Oei was responsible for the legal affairs of the Defendant. See the von Plettenberg Deposition at page 49.

Setai Club. That is an option we keep up our sleeve and may produce a pile of money for you." This is unequivocal evidence both that Mr Oei was aware that copyright in photographs taken under the production estimates was owned by the Wave Entities and that their unauthorized use by third parties constituted copyright infringement.

58.     In a separate series of emails, Mr Oei also wrote to Ms Lee, "Pam has sent you by email scanned copies of photos of the Lalu which appeared in the book Ultimate Spa. Would you please check and see if these photos are part of **your proprietary library** or whether they are third-party photos."[34] (emphasis added)

59.     In my opinion a Singapore court, were it be seised of the matter, would have no difficulty finding, on a balance of probabilities, that the Defendant General Hotel Management, through both Mr Oei and Mr von Plettenberg, had actual knowledge of the Reservation Clauses and was bound by them. Likewise, on the basis of the evidence of which I have had sight, the Hotels, by dint of the consistent course of conduct under which it was they (or the appropriate one of them) who received and approved the relevant production estimate containing the Reservation Clause and subsequently paid the amounts set out in it, would be found to have the requisite knowledge and to be so bound also.

60.     In this connection, Dr Lai has also asserted that the *contra preferentum* [sic] rule applies to this particular set of facts[35]. In my opinion, it is not relevant. First, the *contra proferentum* rule applies only where a contractual provision is vague and ambiguous. As set out at paragraph 50 above, in my opinion the provision is clear and unambiguous.

61.     Secondly, the *contra proferentum* rule is one that Singapore courts would be slow to apply. As noted in *Lewison*, a leading textbook referred to frequently by the Singapore courts,

---

[34] Email from Mr. Oei to Ms Lee dated 20 September 2006.
[35] Lai's Declaration at paragraph 24.

"this principle only applies where there is a doubt or ambiguity. It should not be used for the purpose of creating a doubt or ambiguity where the circumstances of the case raise no real difficulty."[36]

**Question 3: Even if Section 30(5) of the Singapore Copyright Act is applied such that ownership of the copyright in the Photographs is the Defendant's or the Hotels', is the Plaintiff entitled to restrain the use of the Photographs as the purpose of the creation of the marketing collaterals and the Photographs was for use only in such marketing collaterals and not for use on third party websites?**

62.     The operation of Section 30(5) to vest the copyright in a person other than the author of that work is subject to an important proviso that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise for that purpose, of any act comprised in the copyright in the work. The text of Section 30(5) can be found at paragraph 28 above.

63.     The leading commentary on Singapore copyright law, *Wei*, described this proviso as a "veto" which "gives the author a strong bargaining point should the commissioner decide to use the photographs in a way which was not contemplated at the time of the agreement. It recognizes that if the commissioner had told the author of the possibility that he might use the photographs for other purposes, that the author may charge a higher price. It protects the economic interests of the author. The wording of the proviso requires there to be communication of that purpose."[37]

/ / /

/ / /

---

[36] See Exhibit 9, Kim Lewison, *The Interpretation of Contracts*, 6th Ed. (Sweet & Maxwell, 2015) at page 396.
[37] See Exhibit 10, excerpt from George Wei, *The Law of Copyright in Singapore*, 2nd Ed. (SNP: 2000) at pages 388 and 389.

22

64.      From the evidence I have seen, it is not clear whether the purpose of the taking of the Photographs was communicated to Ms Lee.  If it was not communicated by the Defendant General Hotel Management and the Hotels that may be sufficient to render Section 30(5) inapplicable in the circumstances (on which see paragraphs 66 and 67 below).

65.      If a specific purpose was communicated when Ms Lee started her work for the Defendant General Hotel Management and the Hotels (explicitly or arguably through a course of conduct, although there is no authority whether this would suffice to bring a situation within Section 30(5)), it seems likely that it would have been that use of the Photographs would be limited to their use in the marketing collaterals and not for use on third party websites.  In such circumstances, subject to (a) the conflict of laws issue raised at paragraph 14 above, which may have the effect that the veto right relates to the Singapore copyright only and (b) the fact that it is not clear whether the author's right of veto may be assigned, the Plaintiff would be entitled pursuant to the "veto" to restrain the Defendant General Hotel Management, the Hotels and any third parties in that respect were the matter to come before the Singapore courts.

66.      Attorneys for the Plaintiff have asked for my opinion on how technological advances in the field of internet marketing may have impacted the rights and obligations arising from the application of Section 30(5).  In order to interpret how unforeseen technological advancements may affect the interpretation of Section 30(5), a Singapore court may have recourse to its legislative history as an aid to interpretation.  As noted at paragraph 35 above, Section 30(5) is based on Section 35(5) of the Australian Copyright Act 1968.  The intent behind the "veto" set out in both Section 30(5) and Section 35(5) in the respective copyright statutes is clear from the Report of the Australian Copyright Law Review Committee of 1959.  The Report, after consideration of Section 4(3) of the UK Copyright Act 1911, stated:

"The purpose for which a work is commissioned seems to us to be a vital consideration in determining who should be the owner of copyright. We see no reason why, for example, a person who commissions a photograph for the purpose of illustrating a book should be permitted to use it as a commercial advertisement without the consent of the author. As the Gregory Committee pointed out, "there is ground for supposing that when a work is commissioned for a particular purpose, that purpose may well have determined the price paid for it, and if it is used for another purpose the author may be prejudiced not only in respect of his immediate financial return but also in respect of his general reputation"…

We recommend, therefore, that a person who commissions a work for valuable consideration should, in the absence of agreement to the contrary, be the owner of copyright in the work insofar as it relates to the purpose for which he commissioned it, provided that his purpose was communicated to the author before the work was made. In all other respects copyright should remain in the author."[38]

67.     It is evident from this and the text of Section 30(5) that the obligation to communicate the particular purpose of a work to the author by the person contracting with the author is of vital importance. It should then follow that any change to that purpose caused by technological advances unforeseen by the parties at the time that the contract was made should be similarly communicated to the author and a variation of the contractual arrangement negotiated.

68.     Hence, if the Defendant General Hotel Management or the Hotels did have ownership of the copyright in the Photographs by virtue of Section 30(5), any changes to the original purpose for the taking of the Photographs, i.e. for inclusion in marketing collaterals subsequently supplied by the Wave Entities, caused by, for example, the rapid move in the past years of hotel marketing and promotion to the Internet, required at the very least the communication by the Defendant General Hotel Management or the Hotels of that change of purpose to Ms Lee or the Wave Entities, and arguably the renegotiation of the terms of use for that changed purpose.

---

[38] See the Spicer Report, Exhibit 7, at paragraphs 83 -85.

**Other Matters in response to Issues Raised in Dr Lai's Declaration**

69.     Finally, I should respond to one further discrete issues raised by Dr Lai which is tangential to, but does not affect, my analysis above.

### *Oral Agreements*

70.     Dr Lai has characterized the contractual relationship between the Wave Entities and the Hotels as a series of "oral commissioning agreement"[39] and states that the subsequent conduct of Ms Lee shows that Ms Lee did not believe that copyright in the Photographs belonged to her or the Wave Entities.  Further, Dr Lai has argued that industry norms should displace the terms of such an oral agreement.  In my opinion, both the characterization and the statement are inaccurate.

71.     In my opinion, the contractual relationship between the Wave Entities and the Hotels is contained in written documents supplemented by contractual terms agreed upon orally or through a course of conduct.  The basic terms of the agreements are set out expressly in writing in the various production estimates, some of which were signed and returned to the Wave Entities but all of which were implemented by the parties, including the payment by the relevant Hotel of the sums stated therein.  In this context, specifically the clear and unambiguous statement as to ownership of the copyright in work carried out, I cannot agree with Dr Lai's statement that "Bearing in mind the large amounts paid by the hotels to the respective Wave entities, it is unlikely that the hotels agreed that the copyright in the photographs would vest in the respective Wave entities".[40]

72.     Given that the basic terms of the contracts were clearly set out in writing, in my opinion it would be unnecessary for a Singapore court to consider and apply what the parties

---

[39] Lai's Declaration at paragraph 35.
[40] Lai's Declaration at paragraph 25.

would contend are industry norms or rely on a subsequent course of conduct by the parties to contradict the clear language of the Reservation Clauses. Furthermore, as far as I know and given the clear language of the Reservation Clauses, no additional requirement of specificity is required for derogation of statutory rights suggested by Dr Lai.[41]

73.     Moreover, the subsequent conduct of Ms Lee that Dr Lai relies on in support of the position that she did not believe that copyright in the Photographs belonged to her or the Wave Entities must be weighed against the written statements of Mr Oei set out at paragraph 57 and 58 above. Dr Lai expresses the view that certain emails dated 27 September 2007 from "jlee" to "ghmadmin@singnet.com.sg." show that Ms Lee "was aware that GHM had sent a photograph of The Chedi Muscat to Interior Design Magazine since GHM had asked her what the photography credit should be" and her failure to raise any objections shows "she understood that the copyright in the photographs belonged to the hotels"[42]. With all due respect to Dr Lai, there are various explanations for Ms Lee's failure to object and I do not speculate on them. However, a Singapore court would weigh whatever turned out to be those explanations against the written statements of Mr Oei set out at paragraphs 57 and 58 above where he states unequivocally that the Wave Entities "own the photos" and acknowledges that Ms Lee or the Wave Entities have a "proprietary library" of the Photographs.

### *Assignment of Copyright and Chain of Title*

74.     Dr Lai has taken the view that the assignment of the copyright in the Photographs between the Wave Entities to Ms Lee or Wave Studio Pte Ltd and ultimately to the Plaintiff would not be enforceable under Singapore law.[43]

/ / /

---

[41] Lai's Declaration at paragraph 24.
[42] Lai's Declaration at paragraph 26.
[43] Lai at 36.

75.    It is clear to me, upon review of the various assignment documents between the Wave Entities and Ms Lee as well as the corporate documents of the various Wave Entities, that any relevant copyright in the Photographs had been validly assigned to or had vested in either Ms Lee or to Wave Design Pte Ltd (subsequently renamed Wave Studio Pte Ltd) prior to their eventual assignment to the Plaintiff.

76.    The brief chronology of the various transactions, set out below, may be helpful in illustrating this point:

| Date | Event | Comment |
|------|-------|---------|
| 21 February 2007 | Wave-S is dissolved. | The assets of Wave-S as a sole proprietorship are automatically transferred to Ms Lee upon dissolution. |
| 27 July 2007 | Change of name of The Wave Design Pte. Ltd. to The Wave Studio Pte. Ltd. | |
| 1 August 2008 | The shareholders of The Wave Pte. Ltd. resolve that The Wave Pte. Ltd. should be dissolved. | The resolution also assigns all tangible and intangible assets of The Wave Pte. Ltd. to Ms Lee. |
| 11 November 2011 | Assignment of copyright from The Wave Pte. Ltd. to the Plaintiff. | The Wave Pte. Ltd. had been dissolved by this date. |
| 11 November 2011 | Assignment of copyright from The Wave Design Pte. Ltd. to the Plaintiff. | The Wave Design Pte. Ltd. had been renamed The Wave Studio Pte. Ltd. by this date. |
| 4 September 2015 | Declaration of Ms Lee and *Nunc Pro Tunc* Assignment | |

///

///

77.     I note that a number of mistakes had been made in relation to the assignments dated 11 November 2011. These mistakes relate to, as Dr Lai notes, "discrepancy and contradiction in the assignments of the copyright" and were sought to be corrected through the declaration and *nunc pro tunc* assignment between Ms Lee and the Plaintiff dated 4 September 2015.

78.     It is my view that the validity and legal effect of the assignments dated 11 November 2011 and the *nunc pro tunc* assignment dated 4 September 2015 are a question of U.S. law. Nonetheless, from the sequence of events set out in the chronology above, I am satisfied that, as at 1 August 2008, any relevant copyright in the Photographs had been vested in (by operation of law or shareholder resolution) either Ms Lee or The Wave Studio Private Ltd. The 2007 and 2008 assignments were in fact irrelevant and nugatory as the copyrights had already been vested at the relevant times and there were therefore (it appears unbeknownst to Ms Lee when she backdated the agreements in 2011[44]) no copyrights to assign.

### Conclusion

79.     In summary, my opinion is that:

a.     The Wave Entities or Ms Lee (as the case may be) was the owner of the copyright in the Photographs under Singapore law prior to their assignment to the Plaintiff because:

i.     The general position under Singapore copyright law is that the creator of a work is entitled to first ownership of any copyright in that work.

---

[44] The Plaintiff's Supplemental Responses and Objections to the First Set of Requests for Admission of Defendant General Hotel Management, Ltd at page 9, request for admission no. 14.

28

1.    The Hotels through the Defendant General Hotel Management contracted with the Wave Entities to carry out various design services which culminated in the production and supply of marketing collaterals. The author of copyright in works comprised in or comprising the marketing collaterals would, pursuant to Section 30(2), be Ms Lee as their creator and Ms Lee as the creator of the marketing collaterals had ownership of such copyright as subsisted in those marketing collaterals, and works preparatory to them.

2.    The author of the Photographs used in those marketing collaterals was Mr Masano Kawana (the photographer who had taken the Photographs, albeit under the creative direction of Ms Lee).

3.    However, Mr Kawana had, through the Kawana Assignment, assigned to Ms Lee such copyright in the Photographs as was owned at the relevant time, by Mr Kawana and Irieeyes Pte Ltd.

4.    Even if that were not the case, as the Wave Entities or Ms Lee (as the case may be) contracted with Mr Kawana to take the Photographs, copyright in the Photographs belongs to the Wave

/ / /

/ / /

29

Entities or Ms Lee (as the case may be) by operation of Section 30(5) of the 1987 Act.

ii.     Section 30(5) operates only between the author (Mr Kawana) and the person who had contracted with the author (the Wave Entities or Ms Lee, as the case may be) and neither the Defendant General Hotel Management nor the Hotels can rely on Section 30(5) to assert ownership of copyright in the Photographs.

iii.    Notwithstanding this, the Wave Entities excluded the operation of Section 30(5) by means of the Reservation Clauses that formed part of the contractual arrangements falling within Section 30(3) of the 1987 Act.

b.      Even if Section 30(5) of the Singapore Copyright Act were to be applied such that ownership of the copyright in the Photographs is found to belong to the Defendant General Hotel Management or the Hotels, the Plaintiff is entitled to restrain the use of the Photographs outside the particular agreed purpose of the creation of the marketing collaterals by the Defendant General Hotel Management, the Hotels or third parties.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March
11th, 2016, in London.

Gordon Ionwy David Llewelyn

30

EXHIBIT "1"

## G.I. DAVID LLEWELYN

| | |
|---|---|
| **MAJOR AREAS OF SPECIALISATION:** | (a) Intellectual property law (including technology transfer and joint ventures, dispute resolution);<br>(b) Information technology law;<br>(c) Commercial law;<br>(d) Law relating to the distribution and marketiug of products/services. |
| **PROFESSIONAL QUALIFICATION:** | Solicitor of the Supreme Court of England and Wales, admitted 1985. |

**CURRENT POSITIONS:**

| | |
|---|---|
| July 12- date | Deputy Dean, School of Law, Singapore Management University |
| July 11- date | Professor (Practice), School of Law, Singapore Management University |
| June 06-date | Professor of Intellectual Property Law, King's College London. |
| March 09-date | Honorary Professor, School of Law, The University of Hong Kong. |
| February 13-date | Door tenant of 8 New Square Chambers, London. |

### Editorial Boards

On the editorial boards of the Australian Intellectual Property Journal (Butterworths), the WIPO [World Intellectual Property Organisation] Journal (Sweet & Maxwell) and European Intellectual Property Review (Sweet & Maxwell).

### Advisory Board

On the International Advisory Board of the Franklin Pierce Center for Intellectual Property Law at the University of New Hampshire, USA.

**PREVIOUS
POSITIONS:**

| | |
|---|---|
| Sept 07-June 12 | External Director, IP Academy Singapore. Also, Chairman of the Global Forum on Intellectual Property held in Singapore in 2006, 2008 and 2011. |
| April 10-March 12 | Of Counsel, White & Case (Singapore). |
| Sept 07-March 12 | Deputy Chairman, IP Academy Singapore. |
| July 10-June 11 | Visiting Professor, School of Law, Singapore Management University. |
| May 10 | Visiting Scholar, School of Law, East China University of Political Science and Law, Shanghai. |
| Sept 99-March 10 | Solicitor, Head of Intellectual Property (Europe) and Partner at White & Case LLP, London. |
| Dec 04-Aug 07 | Director of the IP Academy Singapore. |
| Sept 04-May 06 | Visiting Professor, King's College London. |
| Sept 92-Sept 04 | Visiting Professorial Fellow, Queen Mary College, University of London and Visiting Professor, IP Research Institute, Queen Mary College, London. |
| July 1996 – December 2002 | Executive Editor of "International Review of Industrial Property and Copyright Law", publication of the Max Planck Institute, Munich. |
| 1984– Sept 1992 | Senior Visiting Fellow in Intellectual Property Law, Queen Mary and Westfield College, University of London. |
| July 1994-Sept 99 | Founding Partner of Llewelyn Zietman, specialist IP and Commercial Litigation law firm. |
| 1987-June 1994 | Partner in Commercial and Intellectual Property Law Group of McKenua & Co, solicitors, Londou. |
| 1982-1987 | Articled Clerk, Linklaters & Paines, |

|  |  |
|---|---|
|  | solicitors, London. Then solicitor in intellectual property department. |
| 1983-1995 | Part-time Lecturer on the Law against Unfair Trading (LL.M.), London School of Economics. |
| 1984-1988 | Adjunct Professor in EC Law, Pepperdine University Law School, Malibu, California. |
| 1982 (July-Nov) | Consultant to Morris, Fletcher & Cross, Solicitors, Brisbane, Australia, working on company law matters. |
| Jan 1980-Oct 1981, Germany | Research Fellow at the Max Planck Institute for Foreign and International Patent, Copyright and Competition Law, Munich, West Germany. |
| July 1979-Feb 1980 | NATO Research Fellow, wrote report on "The Political and Ecouomic Obstacles to the Development of a Common European Defence Procurement Policy". |
| Sept 1977-Sept 1978 | Lecturer in Law, Reading University, teaching contract, criminal and tort law. |

LANGUAGE:    German

UNIVERSITY:    Southampton University, Bachelor of Laws, Upper Second Class.
Winston Churchill Prize for the Outstanding Male Law Graduate - 1977
Worcester College, Oxford, Bachelor of Civil Law, First Class.
Worcester College Prize for Outstanding Achievement - 1979
Law Society Final Examination, City of London Polytechnic - 1981-1982

MISCELLANEOUS:    **Publications**

Books and Reports

Joint author of First Supplement to *Kerly's Law of Trade Marks and Trade Names*, 15th ed. (2014, Sweet & Maxwell).

Co-author of *Cornish, Llewelyn & Aplin, Intellectual Property:*

*Patents, Copyright, Trade Marks and Allied Rights*, 8th ed (2013, Sweet & Maxwell).

*Invisible Gold in Asia: Creating Wealth through Intellectual Property* (2010, Marshall Cavendish Singapore)

Co-author of *Cornish, Llewelyn & Aplin, Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 7th ed (2010, Sweet & Maxwell).

Co-author of *Cornish & Llewelyn, Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 5th ed (2003, Sweet & Maxwell) aud 6th ed (2007, Sweet & Maxwell).

Joint author of *Kerly's Law of Trade Marks and Trade Names*, 13th ed. (2001, Sweet & Maxwell), 14th ed. (2005) and 15th ed. (2011).

Assistant Editor of the Encyclopedia of UK and European Patent Law, Blanco White et al (Sweet & Maxwell, Looseleaf) 1984-1989.

Author of UK chapter of "Internationale Softwarevertrage" (International Software Contracts), ed. Ullrich 1996.

"The International registration of trade marks: present and future" (Report for The Common Law Institute of Intellectual Property 1986).

Edited Part II of Stewart "International Copyright and Neighbouring Rights" (Butterworths, 1984).

Law Reports: UK editor of "Intellectual Property Reports" (Butterworths, Sydney) 1989 - 1996.

## Articles (main)

"Free trade or protection: the problem of non-tariff barriers" Vol.1, No.4, (1980), The European.

"Legal Protection for the coloured get-up of Ethical Pharmaceuticals" [1981] IIC .

"Merchandising and Trade Marks: Legality Reviewed", [1983] EIPR 298 (with Wood).

"IBM v. Spirales - Copyright in computer programs upheld in Canada" [1984] EIPR 261.

"Overseas Programming Company Limited v Cinematography Commerzanstalt: taking of evidence in England for use in US proceedings", [1985] EIPR 81 (with Small)

"The sale and transmission of non-personal data into England: the legal issues", [1986] Computer Law & Practice.

"Copyright in vision - principal issues in cable transmission", Cable & Satellite Europe, June 1986 "Copyright in vision: principal issues in satellite transmissions", Cable & Satellite Europe, September 1986.

"The international registration of trade marks in the UK: The current position and chances of change", [1986] EIPR 74.

"Copyright in computer software: a reply", Solicitors' Journal, Vol 128.

"The New Industrial Design Right - Commercial Problems", Corporate Briefing, April 1988.

"Parallel Imports - Using Trade Marks to prevent them", Corporate Briefing, November 1988.

Existing copyrights - including industrial designs - The effect of the new law, (1989) 1 Intellectual Property in Business.

"The Colgate-Palmolive case and parallel imports", (1989) 1 Intellectual Property in Business.

"How to avoid too much of a good design", Building 15th December 1989.

"Pre-Launch Publicity and Passing Off - Practical Law for Companies, Volume II. No.1 Jan/Feb 1991.

Legal Protection of Computer Software in the Federal Republic of Germany: Recent Developments, [1981] IIC.

"Copyright and related rights in the construction industry" published in (1991) 3 Intellectual Property in Business.

International Encyclopedia of Business and Management (Volume Three), contribution on intellectual property.

"Angleichung des nationalen Markenrechts in der EWG: Vereinigtes Königreich", GRUR Int. 1992 pp 97-101.

"The New Law on Infringement of Registered Trade Marks in the

UK: Early Developments" [1996] AIPJ.

"Judicial Attitudes to the UK Trade Marks Act 1994: Implementing the Approximation Directive", in European Community Law in the English Courts, ed. Andenas (1998, OUP) at pp. 223-238.

"Product Shape and Trade Dress Protection under Trademark Law in Europe", International Intellectual Property Law & Policy (Fordham University), Volume 6 (2000).

"Oskar Hartwig's Thoughts on the English Legal System", with D.Stauder, in Intellectual Property in the New Millennium: Essays in Honour of William Cornish, eds Vaver & Bently (2004, CUP).

"Merchandising and English Law: Commercial Values versus Judicial Reluctance", in Perspectiven des geistigen Eigentume und Wettbewerbsrechts, Festschrift fuer Gerhard Schricker (2005, Beck).

"The Enforcement of Patent Rights in the United Kingdom", with W. Cornish, in Patent Enforcement Worldwide, eds Heath & Petit (2005, Hart Publishing).

"Trade mark dilution in Singapore: The aftermath of McDonald's v MacTea", with S.Leong, (2005) 16 AIPJ 138-151.

"Struggling for coherence: A review of recent developments in European trade mark law", (2006) AIPJ 17-39.

"Protection of 'Famous' Marks under Trademark Law and Passing Off" in Overlapping Intellectual Property Rights, eds Wilkof and Basheer (2012, OUP).

"Intellectual Property Liability of Consumers, Facilitators and Intermediaries: Concepts under Common Law" in Intellectual Property Liability of Consumers, Facilitators, and Intermediaries, eds Heath & Kamperman Sanders (Kluwer, 2012).

"Protection of 'Famous' Marks under Trademark Law and Passing Off" in *Overlapping Intellectual Property Rights* (eds Neil Wilkof and Shamnad Basheer, 2012, Oxford University Press) at pp.231-249.

Christopher Wadlow, *The Law of Passing-Off: Unfair Competition by Misrepresentation*, 4th ed. (Sweet & Maxwell, 2011: book review, (2012) 2 QMJIP 305-308.

"Intellectual Property Liability of Consumers, Facilitators and

Intermediaries: Concepts under Common Law" in *Intellectual Property Liability of Consumers, Facilitators, and Intermediaries* (eds Christopher Heath and Anselm Kamperman Sanders, 2012, Wolters Kluwer) at pp.17-35.

"Is there Confusion in the Law of Trade Marks in Singapore?: *Staywell Hospitality Group Pty Ltd v Starwood Hotels & Resorts Worldwide Inc* [2013] 1 SLR 489", (2013) 25 SAcLJ 339-351.

"Novartis loses Patent battle in India: Time to Realign the Bnsiness Model to Emerging Markets?" SMU Case & Teaching Note (with Prof Srinivas Reddy and Sarita Mathur, School of Business), November 2013.

"The Use of Experts in Legal Proceedings in Singapore Involving Intellectual Property Rights", (2013) 25 SAcLJ 480-509.

"China's IP Protection Minefield: separating fact from fiction", with Prof Peter Williamson of the Judge Business School Cambridge University, Intellectual Asset Management, pp 34-41, January/February 2015.

"Special Protection for Luxury Brands- Legal Sense or Nonsense?" in *The Luxury Economy and Intellectual Property: Critical Reflections* (eds Haochen Sun, Barton Beebe & Madhavi Sunder, 2015, Oxford University Press) at pp289-308.

"Assessment of Damages in Intellectual Property Cases- Some Recent Examples of 'the Exercise of a Sound Imagination and the Practice of a Broad Axe'", (2015) 27 SAcLJ 480-505.

### Conference Papers and Speeches, etc

Over 200 over the past 35 years, in London, Alicante, Brussels, Budapest, Cambridge, Copenhagen, Dublin, Geneva, Helsinki, Istanbul, Jerusalem, Leipzig, Luxembourg, Monte Carlo, Montreux, Munich, Paris, Prague, Sofia, Stockholm, Strasbourg, Tel Aviv, Trier, Warsaw, Boca Raton, Los Angeles, New York, Miami, Ottawa, Palo Alto, San Francisco, Stanford, Toronto, Washington, Auckland, Beijing, Hainan, Hong Kong, Macau, Melbourne, Mumbai, Pattaya, Shanghai, Singapore, Sydney, Taipei, Tokyo, Wellington.

Whilst at SMU, School of Law:

"Maximising Gains: The Smart Way of Capitalising on the

Intangible Asset in Your Company", speaker, IP Law Summit, 21 May 2012, Marina Bay Sands, Singapore.

"Intellectual Property Rights: what are they and why are they important?", SMU Alumni Knowledge Exchange, 15 September 2012.

"Intellectual Property Trends, Issues and Challenges for the 21st Century", speaker, International Malaysia Law Conference (Malaysian Bar Association annual conference), 27 September 2012, Kuala Lumpur.

"Intellectual Property Rights: Too Important to Leave to the Lawyers", Dean's Distinguished Speaker series, School of Business, University of Auckland, New Zealand.

"Intellectual Property in an Open Society", Keynote Address, Annual Seminar of the Institute of European Studies Macau, 22 April 2013, Macau.

"Some Recent Developments in European Trade Mark Law", speaker, Advanced Professional Intellectual Property Update, Institute of European Studies Macau/Intellectual Property Department of the Government of the SAR Hong Kong IP, 24 April 2013, Hong Kong.

Chair of session on "Future Directions in the Canadian Common Law of Contracts" by Professor John McCamus of Osgoode Hall Law School, Toronto, "Future Developments of Contract Law" Journal of Contract Law Conference, 3 May 2013, Singapore.

"How do we compare? A comparison of UK and EU trade mark infringement decisions with recent developments in Singapore", speaker, Law Society of Singapore, 14 August 2013, Singapore.

"IP- the New Asset Class", plenary session speaker, 4th Global Forum on Intellectual Property, IP Office of Singapore, 28 August 2013, Singapore.

"IP of the Future", plenary session moderator of panel from IBM, MIT and Caltech, 3rd Business of IP Asia Forum, 5 December 2013, Hong Kong.

"Managing IP's Milestone Case of 2013: Singapore and the St Regis case", speaker, 3rd Business of IP Asia Forum, 5 December 2013, Hong Kong.

"Patent Trolls: IP Bullies?", speaker, 3rd Business of IP Asia Forum, 6 December 2013, Hong Kong.

"How do we compare?  A comparison of UK and EU trade mark infringement decisions with recent developments in Singapore", speaker, Law Society of Singapore, 14 August 2013, Singapore.

"IP- the New Asset Class", plenary session speaker, 4th Global Forum on Intellectual Property, IP Office of Singapore, 28 August 2013, Singapore.

"IP of the Future", plenary session moderator of panel from IBM, MIT and Caltech, 3rd Business of IP Asia Forum, 5 December 2013, Hong Kong.

"Managing IP's Milestone Case of 2013: Singapore and the St Regis case", speaker, 3rd Business of IP Asia Forum, 5 December 2013, Hong Kong.

"Recent Developments in Trade Mark Law", speaker, IP Office of Singapore seminar, 12 March 2014, Singapore.

"IP Exploitation: Licensing, Tech transfer and IP Collaboration", moderator of panel of speakers from ATMD Bird & Bird, Rajah & Tann and Olswang, CIArb-WIPO-SIAC Intellectual Property Media & Technology Arbitration Symposium, 14 March 2014, Singapore.

"The search for the Yeti in European Trade Mark Law", keynote speaker, IP Society of Australia and New Zealand, 8 April 2014, Sydney.

"Value Pluralism and Intellectual Property Rights", commentator on presentations by a panel of speakers, Hong Kong University and University of Pennsylvania, 10/11 June 2014, Hong Kong.

"The Average Consumer in European Trade Mark Law, and Other Musings", keynote speaker, IP Department of Hong Kong, 17 June 2014, Hong Kong.

"Invisible Gold in Asia: IP and Singapore", guest lecture, Temasek Polytechnic, Singapore, 28 January 2015.

"Remedies for Breach of Confidence", speaker, Equitable Remedies in Commercial Litigation conference organised by the Singapore Academy of Law and the Chancery Bar Association, 5 March 2015, Singapore.

"The Current (Controversial) International and Regional Landscape", chair of session, Geographical Indications at the Crossroads of Trade, Development and Culture in Asia-Pacific conference, Centre for Asian Legal Studies NUS, 26 March 2015,

Singapore.

"IP Aspects of M&A Transactions in Singapore", seminar speaker, IP Office of Singapore, 14 April, Singapore.

"European trade Mark Law Developments", speaker, IP Department of Hong Kong, 12 June 2015, Hong Koug.

"The Construction of the Consumer in Trade Mark Law", roundtable participant, Seventh Trademark Scholars Roundtable, hosted by University of Oxford, 29/30 June 2015, Pembroke College, Oxford.

"Trade Secrets Law & Practice in the US, UK and Singapore", speaker, 5th Global Forum on Intellectual Property, 25 August 2015, Singapore.

"IP Developments concerning the Internet", chair of session, 5th Global Forum on Intellectual Property, 25 August 2015, Singapore.

"Update on Developments in Singapore Trade Mark Law and Passing Off", IPOS, 26 January 2016, Singapore.

EXHIBIT "2"

**List of Documents Review in the Course of Preparing the Opinion of Professor Gordon Ionwy David Llewelyn**

| S/No. | Description |
|---|---|
| 1. | Transcript of the deposition of Lee Kar Yin on 21 May 2015 |
| 2. | Transcript of the continued deposition of Lee Kar Yin on 9 September 2015 |
| 3. | Transcript of the deposition of Ralf Ohletz Graf von Plettenberg on 23 September 2015 |
| 4. | Emails between Hans Jenni, Kar Yin Lee and Kendall Oei, dated between 16 June 2006 and 26 June 2006 |
| 5. | Email between Kar Yin Lee and Kendall Oei dated 20 September 2006. |
| 6. | Email from between Kar Yin Lee and Kendall Oei dated 28 March 2005 [marked TWS0355786 and TWS0355787] |
| 7. | Declaration of Dr Stanley Lai dated 12 February 2016 and accompanying exhibits |
| 8. | Declaration of Abigail J. Remore dated 12 February 2016 and accompanying exhibits |
| 9. | Production estimate from Waves dated 13 September 2004 which names The Legian, Bali as the client |
| 10. | Production estimate from Waves dated 3 May 2004 which names The Legian, Bali as the client |
| 11. | Production estimate from The Wave Design dated 3 October 2006 which names Ms Eleanor Hardy as the client |
| 12. | Production estimate from Waves dated 3 May 2004 which names Mr Hansjoerg Meier – The Legian Bali as the client |
| 13. | Production estimate from Waves dated 1 June 2006 which names Mr Ayni Wongsowinoto – the Nam Hai, Hoi An, Vietnam as the client |
| 14. | Production estimate from Waves dated 17 June 2004 which names Mr Hansjoerg Meier – The Legian Bali as the client |
| 15. | Production estimate from The Wave Design dated 4 July 2005 which names the Setai Miami as the client |
|  | Production estimate from The Wave Design dated 29 July 2005 which names the Setai Miami as the client |
| 16. | Contract between Mr. Kawana/Irieeyes Pte Ltd and The Wave Design Pte Ltd dated 2 August 2006 |
| 17. | Contract between Mr. Kawana/Irieeyes Pte Ltd and The Wave Design Pte Ltd dated 31 March 2005 |
| 18. | Assignment agreement between Mr. Kawana/Irieeyes Pte Ltd and Ms. Lee dated 1 October 2013 |

EXHIBIT "3"

# COPYRIGHT ACT

# (CHAPTER 63)

An Act relating to copyright and matters related thereto.

## Ownership of copyright in original works

**30.**—(1)  This section shall have effect subject to Part X.

(2)  Subject to this section, the author of a literary, dramatic, musical or artistic work shall be entitled to any copyright subsisting in the work by virtue of this Part.

(3)  The operation of subsection (4), (5) or (6) in relation to copyright in a particular work may be excluded or modified by agreement.

(4)  Where a literary, dramatic or artistic work is made by the author in pursuance of the terms of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the proprietor shall be entitled to any copyright subsisting in the work by virtue of this Part insofar as the copyright relates to —

    (*a*)  publication of the work in any newspaper, magazine or similar periodical; or

    (*b*)  reproduction of the work for the purpose of its being so published,

but not otherwise.

(5)  Subject to subsection (4), where —

    (*a*)  a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving by the other person; and

    (*b*)  the work is made in pursuance of the agreement,

the first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.

(6)  Where a literary, dramatic or artistic work to which subsections (4) and (5) do not apply, or a musical work, is made by the author in pursuance of the terms of his employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part.
[*Aust. 1968, s. 35*]

EXHIBIT "4"

# The Law of
# Copyright in
# Singapore

## SECOND EDITION

**George Wei**
Dipl. Law, LL.M. (London)
Barrister, Inner Temple and Hong Kong
Advocate and Solicitor, Singapore



**SNP**
*Editions*

CHAPTER 7

# OWNERSHIP OF COPYRIGHT AND RELATED MATTERS

7.1   This chapter will look primarily at the issue of the initial ownership of copyright under the Copyright Act 1987. In connection with the question of ownership, it should be borne in mind that it is always open to the owner of the copyright to transfer his ownership, in whole or in part, by assignment to third parties. In some situations, it may also be the case that the ownership of the copyright in a work not yet made has been prospectively assigned to some third party. In addition, ownership of copyright might have been transferred to some other person by operation of law or by testamentary disposition. The question of ownership and subsequent dealings with the exclusive rights granted by copyright will be looked at in Chapter 12. Equitable interests will, however, be discussed at the end of this chapter. For convenience, this chapter will also look at certain presumptions relevant to the question of ownership and subsistence of copyright that are contained in the Copyright Act 1987.

7.2   In looking at the question of initial ownership, a sharp distinction has to be maintained between literary, dramatic, musical and artistic works and the neighbouring or entrepreneurial copyrights. In the case of original literary, dramatic, musical and artistic works,[1] the basic thrust of the Copyright Act 1987 is to confer on the author of the work in question the initial legal entitlement to the copyright. This can, in one sense, be taken to reflect the underlying policy of copyright to encourage intellectual effort and labour by authors for the greater good of society as a whole. In the case of the neighbouring or entrepreneurial rights, a very different scheme of things becomes apparent. Here, the desire is not so much to protect intellectual effort and labour as the desire to protect the risk taker behind the creation of the subject-matter in question. Hence, the label "entrepreneurial rights". Following from this, it will be seen that the Copyright Act 1987, by and large, confers the copyright in the case of entrepreneurial rights on the business or commercial entity behind the creation of the subject-matter rather than on the person whose intellectual effort and skill resulted in the subject-matter's creation.

---

[1] Authors' works are literary, dramatic, musical and artistic works. See s 7(1). The neighbouring or entrepreneurial rights are sound recordings, cinematograph films, broadcasts, cable programmes and published editions of works.

## ORIGINAL LITERARY, DRAMATIC, MUSICAL AND ARTISTIC WORKS: THE BASIC RULE

**7.3**    Section 30(2) sets out the basic rule, that subject to the section, the author of a literary, dramatic, musical or artistic work shall be entitled to any copyright subsisting in the work. The Copyright Act 1987 does not set out a general definition of authorship. Instead, that task has been left by Parliament to the courts. In many respects, there is a close affinity or relationship between the question of authorship and originality. As discussed already, originality essentially means "origin" and looks for the "originator" of the work. A person is the "originator" of a work if he is the "author" of the work in the sense that the expression is a product of his skill, labour and effort. Originality and authorship are in reality the same concept looked at from different view points. They are tied together by the requirement that copyright is concerned with protecting expression and not the underlying basic ideas or facts. Find the person whose intellectual effort and labour was responsible for the expression embodied in the work and the search for the author will be over. But, who in law is that person whose intellectual effort and labour results in the creation of expression? Of course, this is largely a question of fact, but at its margins, questions of law do come into play. What constitutes "expression" for the purposes of copyright law and what is the relevance of a reduction to writing or a material form to the question of authorship? As discussed in earlier chapters, there is still considerable ambiguity as to just where the dividing line between unprotectable idea and protectable expression lies. At best, the English cases demonstrate that it is only the general and basic idea that is excluded from protection. Non-literal elements, such as plots of novels, if sufficiently detailed, can certainly be protected by copyright. Will the contribution of the plot to a story which is given its literal elements (expression) by another person qualify the "plot contributor" as a joint author? Likewise, the point has already been made that the rationale for the requirement of a reduction to writing or material form is, on at least one theory, connected with the limitation of copyright to protecting expression. In many cases, the effort of creating the expression and reduction into writing or some other material form will come from one person. In such cases, the identity of the author is clear. Problems start to arise where a person bases his claim to authorship on his contribution of the "non-literal elements" and also in cases where the intellectual effort of creation is divorced from the act of reduction to material form. What follows is a summary, by way of illustration, of some of the cases on "authorship" together with a summary of the possible principles that can be extracted and the problems that remain.

(i)    *Kenrick & Co* v. *Lawrence & Co.*[2] K was in partnership with J as printers and publishers. J conceived the idea that illiterate voters would find it easier to fill out voting coupons if the latter were

---

[2] [1890] 25 QBD 99.

agreement to be effective must be in writing. That an implied agreement ousting the special exceptions is possible can be seen from the decision in *Noah v. Shuba*.[112] That case has already been discussed in paragraph 7.27 above; the main holding of Mummery J. being that the Guide was not written in the course of employment and that the copyright accordingly vested in the plaintiff. The judge went on to hold that in any event, even if the Guide had been written in the course of employment, that there was an implied term in the contract of service excluding the operation of the special statutory provisions vesting the copyright in the employer. The existence of the implied term was based on the evidence that the employer in that case had long acquiesced in a practice whereby copyright was retained by employee authors. After all, it was the employee authors in that case who would normally execute assignments of copyright to learned societies who were interested in publishing their articles.

7.36  In order for the agreement to be effective in ousting the special provisions, it must be one which was made before the relevant work was made. Once the work has been made, the special provisions will automatically operate to vest the copyright in the "commissioner" or employer as relevant. Any agreement made after the work is made can only have effect in the context of an assignment or licence of the copyright to the author.[113] Where, however, the agreement is not in writing and is oral, it will not be valid as an assignment in law.[114] The oral agreement, express or implied, may, however, take effect as an equitable assignment.

7.37  It should be noted that the general provisions of section 30(2) which vests the copyright in works into the author is not made subject to contrary agreements. Whilst the provisions of section 30(2) cannot be displaced by contrary agreement, there is nothing to stop the author from assigning the copyright in the work after it is made. As already noted, it is also possible under section 195 for the prospective owner of copyright to assign his future copyright in advance of the making of the work. The effect of an agreement to assign the future copyright in a work not yet made is that the copyright will vest in the assignee as soon as the work is created. To be valid at law, the agreement must be in writing since section 195 requires the prospective owner to sign the agreement.[115]

employees in the employer. If this was the case, the court would have no jurisdiction to make a vesting order. With regard to an alternative assertion that the plaintiff was an equitable owner, Mummery LJ. stated that this would depend on whether in all the circumstances surrounding the alleged oral agreement and passing of the special resolution, there was an implied, resulting or constructive trust.

[112] [1991] FSR 14.

[113] See *Noah v. Shuba* [1991] FSR 14 at p. 24.

[114] See s 194(3) discussed below at Chapter 12 at para. 12.2 *et seq*. No particular form of written words is needed. See Chapter 12 at paras. 12.2 and 12.16.

[115] Under the Imperial Copyright Act 1911, there was no statutory provision permitting an assignment of the copyright in a work not yet made. Such assignments under the 1911 Act may, however, have had effect in equity. See Ricketson, *The Law of Intellectual Property*, 1984 at para. 13.95. Assignment of copyright is considered later in Chapter 12.

EXHIBIT "5"

# Asia Pacific Publishing Pte Ltd
## v
## Pioneers & Leaders (Publishers) Pte Ltd

### [2011] SGCA 37

Court of Appeal — Civil Appeal No 147 of 2010
Chao Hick Tin JA, Andrew Phang Boon Leong JA and V K Rajah JA
9 February; 27 July 2011

*Copyright — Authorship — Whether incorporated entity could be author — Sections 27, 28 and 29 Copyright Act (Cap 63, 2006 Rev Ed)*

*Copyright — Authorship — Whether statutory presumptions applied as to authorship — Section 132 Copyright Act (Cap 63, 2006 Rev Ed)*

*Copyright — Groundless threat — Whether magazine publisher making groundless threats to bring legal proceedings for copyright infringement against rival magazine publisher — Section 200(1) Copyright Act (Cap 63, 2006 Rev Ed)*

*Copyright — Infringement — Whether there was infringement of work if copyright was found to subsist*

*Copyright — Subject matter — Compilations — Databases — Whether copyright subsisting in compilation of data*

*Tort — Passing off — Damage — Test for damage — Whether test of likelihood of damage or actual damage was required*

*Tort — Passing off — Goodwill — Whether there was goodwill in get-up of magazine*

*Tort — Passing off — Misrepresentation or confusion — Whether there was misrepresentation to relevant sector of public — Whether market survey could be relied on*

## Facts

The Respondent published a horse-racing magazine known as "*Punters' Way*" in both English and Chinese. From January 2007, the Appellant published a horse-racing magazine known as "*Racing Guide*". *Punters' Way* contained horse-racing information in a set of four tables ("the Tables") that was arranged in a specific sequence. From 30 June 2007 to 5 June 2008, *Racing Guide* contained the Tables in the exact same sequence. The Respondent claimed infringement of copyright in the Tables by the Appellant under the Copyright Act (Cap 63, 2006 Rev Ed) ("the Act").

*Punters' Way* also employed a colour coding scheme on its front cover. In January 2008, *Racing Guide* began to adopt similar colour coding. *Racing Guide* also employed the use of forward-facing pictures of horses and placed its advertisements panels on the bottom of the front cover, similar to that of *Punters' Way*. The Respondent additionally claimed against the Appellant under the law of passing off.

The High Court Judge ("the Judge") found that copyright subsisted in the Tables with the Respondent as the author. The Judge also found that a substantial part of the Tables had been copied and therefore the Appellant had infringed the Respondent's copyright and an injunction was granted to restrain the Appellant from further infringement. In addition, the Judge found that the Appellant had passed off *Racing Guide* as *Punters' Way*. The Respondent thus succeeded in both claims in the High Court. The appellant appealed against the Judge's decision.

**Held**, allowing the appeal:

(1)     The Tables clearly constituted a compilation. However, in order for any copyright to subsist in the compilation, the selection or arrangement of its contents had to be the product of intellectual creation. The Respondent had unequivocally pleaded that it alone was the original author of the Tables in *Punters' Way*. No human individuals were identified. The Respondent had not pleaded ownership of the Tables. Authorship and ownership were not synonymous terms: at [32] and [41] to [43].

(2)     Section 27 of the Act did not provide a definition of who could be an author of a subsisting copyright under the Act. However, this did not mean that the definition of "qualified person" could be extended to include non-living "persons" such as incorporated bodies. The duration of copyright protection had always been based on the author's life expectancy. Authors had to be living persons. Should companies qualify as authors, they would be entitled to claim a perpetual monopoly over their work: at [51], [60] and [64].

(3)     It was clear that the historical origins of the Act envisaged rights to be accorded to natural persons and not corporate bodies, and that legal rights flowed only from human authorship. Section 2 of the Interpretation Act ought not to be incorporated into the rubric of copyright law, and an "author" had to be a natural person in copyright law: at [65], [67] and [72].

(4)     Originality was closely related to the author. An author had to first be identified before the work in question could be deemed to be original. Without the identification of a human author from whom the work originated, there could be no "original work" capable of copyright protection: at [73], [75] and [82].

(5)     The statutory presumptions, such as s 132 of the Act, have little or no role to play where the question of subsistence of copyright in each of the works was the central issue between the parties. As the Appellant adduced evidence that copyright did not subsist in the Tables since there was no author, the s 132 presumption was displaced. The necessary elements of authorship, ownership, validity and subsistence had to be adequately pleaded for cases involving copyright infringement. The Respondent could not now rely on an alternative claim of ownership which was not pleaded in the proceedings below: at [90] to [93].

(6)     Despite the fact that the material used in the Tables was easily accessible to all, the information was presented in a distinct form which would attract copyright protection. The Tables in *Racing Guide* incorporated a substantial part of the Tables found in *Punters' Way* but as no copyright subsisted in the work,

there was no infringement of the Respondent's copyright by the Appellant: at [104], [113] and [114].

(7)    The "classical trinity" of goodwill, misrepresentation and damage had to be established by the party seeking to claim passing off before an action could succeed. Whether a get-up had acquired the necessary distinctiveness was a question of fact. The Respondent had been publishing *Punters' Way* for around 30 years and the Appellant's witness acknowledged *Punters' Way* was the market leader in Singapore at various stages in its history. Goodwill was therefore attached to the get-up of *Punters' Way*: at [116], [119] and [120].

(8)    Little reliance ought to be placed on the market survey as it was conducted by approximating the two issues which were most similar which was not a fair test. Additionally, the survey was conducted with the masthead removed. The punting audience to which both publications were targeted were circumspect and discerning. The large mastheads were significant distinguishing facts and there would be no confusion caused to the public. The cover pages of the two magazines were sufficiently distinct and were not likely to be confused by the relevant sector of the public: at [125], [126], [130] and [132].

(9)    The right test that should be applied for damages was that of "actual damage" and not "likelihood of damage" as the infringement period had long since ended. However, as the trial was bifurcated on the Appellant's application, it was not just to penalise the Respondent for not leading evidence of actual damages at the trial. However, the test for damages in situations where the period of infringement had passed should he proof of actual damage and nothing short of that: at [136] to [139].

(10)    The Respondent had made groundless threats against the Appellant for the purposes of s 200(1) of the Act as the Respondent's Tables did not have copyright subsisting: at [142].

[Observation: The Statute of Anne (8 Anne c 19) (UK) was the first copyright statute in the world. Ever since the enactment of the Statute of Anne, the objective of copyright law was to encourage the creativity of natural authors. The identification of the author was therefore a key function of copyright law as that was the person who was entitled to the benefits conferred by law. Authorship by a company could never have been contemplated by the Statute of Anne as companies operating as distinct legal entities were not a typical feature of commerce when it was enacted: at [41], [64] and [65].]

Case(s) referred to

*Alteco Chemical Pte Ltd v Chong Yean Wah* [1999] 2 SLR(R) 915; [2000] 1 SLR 119 (distd)

*Aron Salomon (pauper) v A Salomon and Co Ltd* [1897] AC 22 (refd)

*Chilton v Progress Printing and Publishing Co* [1895] 2 Ch 29 (refd)

*CIR v Muller & Co's Margarine Ltd* [1901] AC 217 (refd)

*Creative Purpose Sdn Bhd v Integrated Trans Corp Sdn Bhd* [1997] 2 MLJ 429 (refd)

*Feist Publications Inc v Rural Telephone Service Co Inc* 499 US 340 (1991) (refd)

*Fortuity Pty Ltd v Barcza* (1995) 32 IPR 517 (refd)

*IceTV Pty Ltd v Nine Network Australia Pty Ltd* [2009] HCA 14 (refd)

*Interfirm Comparison (Australia) Pty Ltd v Law Society (NSW)* [1977] RPC 137 (refd)

*Microsoft Corp v DHD Distribution Pty Ltd (t/as Austin Computers)* (1999) 45 IPR 459 (refd)

*Novelty Pte Ltd v Amanresorts Ltd* [2009] 3 SLR(R) 216; [2009] 3 SLR 216 (refd)

*Pioneers & Leaders (Publishers) Pte Ltd v Asia Pacific Publishing Pte Ltd* [2010] 4 SLR 744 (refd)

*Sands & McDougall Pty Ltd v Robinson* (1917) 23 CLR 49 (refd)

*Telstra Corp Ltd v Phone Directories Co Pty Ltd* [2010] FCA 44 (folld)

*Telstra Corp Ltd v Phone Directories Co Pty Ltd* [2010] FCAFC 149 (folld)

*Tong Guan Food Products Pte Ltd v Hoe Huat Hng Foodstuff Pte Ltd* [1991] 1 SLR(R) 903; [1991] SLR 133 (refd)

*University of London Press Ltd v University Tutorial Press Ltd* [1916] 2 Ch 601 (refd)

*Waterlow Publishers Ltd v Rose* [1995] FSR 207 (distd)

**Legislation referred to**

Copyright Act 1987 (Act 2 of 1987)

Copyright Act (Cap 63, 1988 Rev Ed)

Copyright Act (Cap 63, 1999 Rev Ed)

Copyright Act (Cap 63, 2006 Rev Ed) ss 7, 7A, 27, 28, 29, 131, 132 (consd); ss 27(2)(*d*), 27(4), 28(3), 28(5), 29(2)(*d*), 30, 92, 93, 94, 95, 96, 200(1)

Interpretation Act (Cap 1, 2002 Rev Ed) s 2

Copyright Act 1911 (c 46) (UK)

Copyright Act 1956 (c 74) (UK) s 20(4)

Copyright Act 1968 (Cth) ss 32, 33, 34, 128

Copyright Act 1987 (Act 332) (M'sia)

Copyright Amendment Act 1980 (Cth)

Copyright Amendment Act 1984 (Cth)

Copyright, Designs and Patents Act 1988 (c 48) (UK) ss 9, 9(1), 104(4)

Joint Stock Companies Act 1844 (c 110) (UK)

Second Charter of Justice 1826 (c 85) (UK)

Statute of Anne (c 19) (UK)

*Stanley Lai Tze Chang SC, Vignesh Vaerhn, Eunice Lim Ming Hui and Tan Lijun (Allen & Gledhill LLP) for the appellant;*
*Tan Tee Jim SC, Ng Guan Zhen (instructed), Irving Choh and Lim Bee Li (KhattarWong) for the respondent.*

[Editorial note: The decision from which this appeal arose is reported at [2010] 4 SLR 744.]

Asia Pacific Publishing Pte Ltd v
Pioneers & Leaders (Publishers) Pte Ltd

27 July 2011                                                    Judgment reserved.

**V K Rajah JA (delivering the judgment of the court):**

## Introduction

1      This is an appeal by the appellant, Asia Pacific Publishing Pte Ltd ("the Appellant"), against the decision of a High Court Judge ("the Judge"), allowing the claim by the respondent, Pioneers & Leaders (Publishers) Pte Ltd ("the Respondent") for copyright infringement and passing off. The Judge had also ordered an injunction to restrain the Appellant from infringing the Respondent's copyright.

2      A novel issue raised in this appeal is whether an incorporated body can be considered an "author" for the purposes of copyright law. The Judge found that a company could indeed be an author of an original work that attracted copyright protection. Her detailed reasons can be found in *Pioneers & Leaders (Publishers) Pte Ltd v Asia Pacific Publishing Pte Ltd* [2010] 4 SLR 744 ("the Judgment"). Before we analyse the legal issues that have arisen in this appeal the facts ought to be set out to give those issues context.

## The facts

3      The Appellant was incorporated in Singapore in 2006, while the Respondent was incorporated in Singapore in 1983. Both the Appellant and the Respondent have been, at all material times, in the business of books and magazines publication.

4      The Respondent has been publishing a horse-racing magazine known as "*Punters' Way*" in both English and Chinese since its incorporation in December 1983. Prior to 1983, *Punters' Way* had been published and sold since March 1977 by Pioneers & Leaders Co, a partnership registered in Singapore that is related to the Respondent. *Punters' Way* caters to horseracing punters, and contains all types of horse-racing information, including race cards, the names and description of the horses participating in each race, the pedigree of each horse and the particulars of trainers and jockeys and their performance history.

5      The Appellant, which was incorporated in November 2006, has, on its part, been publishing a horse-racing magazine known as "*Racing Guide*" only from January 2007. *Racing Guide* was first published in 1986, and was thereafter published by several different companies. The Appellant acquired the right to publish *Racing Guide* from Racing Guide Publications Pte Ltd soon after it was incorporated. The contents of *Racing Guide* are essentially similar to that of *Punters' Way* and it is also published in both English and Chinese. It is pertinent to note that both magazines obtain all their race information from the same source, that is to say, the Singapore Turf Club ("the Turf Club").

*The dispute between the parties*

6      From 30 June 2007 to 5 June 2008, both the Appellant's and Respondent's horse-racing magazines, *Racing Guide* and *Punters' Way* respectively, contained horse-racing information in a set of four tables ("the Tables") that was arranged in the same sequence. The Tables adopted the following sequence:

    (a)    Table 1 Race Card;

    (b)    Table 2 Results Panel;

    (c)    Table 3 Track Work; and

    (d)    Table 4 Records of Past Performances.

7      The Race Card consists of the line-up of the horses competing in each race, and readers are able to read about the horses that are participating in the race, their recent physical status, their performance and how they are to be equipped; the jockeys and their recent performances; and trainers' strike rates. The Results Panel consists of the choice selection of potential winning horses picked by the Respondent's tipsters. It also has blank spaces to allow readers to fill in the actual result of the race.

8      The Track Work table shows the preparation that each horse has been put through by its trainer. It includes particulars of the horses' performance before the race day for up to 21 days and is specially designed to give readers additional information on the recent physical state or condition of the horse. Finally, the Records of Past Performances table has a detailed history of each horse, including its pedigree, owner and stable; the stake money it has won; and the horses' past performances for the last six runs.

9      The Respondent alleged that as *Racing Guide* contained the Tables in the same sequence from 30 June 2007 to 5 June 2008, the Appellant had infringed the Respondent's copyright by way of the copying and reproduction of the compilation of the Tables as they were materially similar to those in *Punters' Way*.

10     Additionally, the Respondent claimed that since 1993, *Punters' Way* employed a different colour on the front cover to identify the various editions for each race day in Malaysia and Singapore. The Respondent also contended that the colour coding scheme has become a unique feature of the Respondent's publication and is in fact a badge of origin, which the Respondent uses to distinguish its products from the other products in the market. On or about 4 January 2008, the Appellant began to adopt similar colour coding for both its English and Chinese editions of *Racing Guide*. A comparison of the colour coding for both magazines is as follows:-

| Race Day | Punters' Way | Racing Guide |
|---|---|---|
| Singapore Friday | Maroon | Maroon |
| Singapore Saturday | Purple | Dark Purple |
| Singapore Sunday | Orange-red | Orange-red |
| Malaysia Saturday | Purple | Light Purple |
| Malaysia Sunday | Gold | Gold |

11    The Appellant also changed the pictures of the horses on the front cover page of *Racing Guide*, such that the horses were forward-facing, instead of the horses' side profile being shown, as was the case previously. In addition, the Appellant also placed an advertisement panel on the bottom of the front page from January 2008, which was similar to *Punters' Way*. Prior to January 2008, the Appellant used to place its advertisement panels in the middle left hand side of the front page.

12    Because of all these similarities, the Respondent claimed that the Appellant had misrepresented to members of the public that *Racing Guide* was connected to or associated with *Punters' Way*, causing confusion, and had attempted to pass off *Racing Guide* for *Punters' Way*. On 25 April 2008, a demand letter was issued by the Respondent to the Appellant. In the letter, the Respondent alleged that the Appellant had infringed the Respondent's copyright in the Tables, and had also passed off *Racing Guide* as *Punters' Way*. The Respondent claimed for a sum in lieu of damages as well as for the Appellant to cease and desist from the alleged infringement of copyright and passing off. The Appellant responded to the demand letter, rejecting the Respondent's assertions and claims. It bears mention that not long after the demand letter was sent the Appellant modified the Tables in its publication. The Respondent accepts that infringement ceased on 5 June 2008. Legal proceedings against the Appellant commenced on 12 November 2008 and the trial was heard in February and March 2010.

## The decision of the High Court

13    The Judge found that copyright subsisted in the Tables in *Punters' Way* and that a company could indeed be the author of a copyright protected work as there was nothing in principle that would prevent an incorporated company from authoring a work. In the Judge's view, who an "author" was ultimately depended on the facts of each case – more specifically, the rights that were sought to be protected, and the factual context from which the relevant work arose. In the present case, the Respondent was presumed to be the author of the Tables under s 131 of the Copyright Act (Cap 63, 2006 Rev Ed) ("the Act"). The Judge further found that there was no difficulty with determining the duration of the copyright owned by an incorporated entity as time will start to run from the moment the copyrighted works are published, consistent with ss 28–29 of the Act,

and the relevant period would be 70 years from the expiration of the calendar year in which the work was first published.

14    In addition, the Judge found that there was originality in the compilation of the Tables found in *Punters' Way* as there was skill and creativity expended in the selection of information to be presented in the Tables, which had been arranged in a way the Respondent believed was most useful to its readers. The Judge also held that the evidence showed that the presentation of horse-racing information in *Racing Guide* was substantially similar to that in *Punters' Way* and that a substantial part of the Tables had been copied. The court granted an injunction to prevent the Appellant from infringing the Respondent's copyright in *Punters' Way*.

15    In relation to the claim in passing off, the Judge found that without relying on any expert evidence, there was more than sufficient objective evidence to establish a compelling case that the Appellant had deliberately made changes to the cover page of *Racing Guide* to pass it off as *Punters' Way*. The Judge concluded that the similarities between the Chinese editions were also undeniably apparent. The expert evidence based on surveys conducted on readers of horse racing magazines further served to reinforce the court's findings. The court therefore found that the Respondent was entitled to damages resulting from the Appellant's passing off and/or infringement of copyright.

The issues

16    Three main issues arise for consideration before us in the present appeal, namely:

(a)    Is the Respondent entitled to assert copyright protection as the author of its publication? ("the First Issue");

(b)    If the Respondent is entitled to copyright protection, has the Appellant infringed its rights? ("the Second Issue"); and

(c)    Has the Respondent established the constituent elements to ground a passing off action? ("the Third Issue").

Copyright protection in Singapore

17    Before we examine the issues it would be apt to outline the current copyright legislative scheme in Singapore. As this was grandfathered in the United Kingdom ("the UK"), it will be useful to briefly narrate the historical evolution of copyright there. Interestingly, though the concept of copyright was born in the late 15th century, following the invention of printing, which made it possible to produce multiple copies of books quickly and cheaply, the very first Copyright Act was only passed in 1709 in the UK – the Statute of Anne 1709 (8 Anne c 19) (UK) ("the Statute of Anne"): see Kevin

Garnett *et al, Copinger and Skone James on Copyright* vol 1 (Sweet & Maxwell, 16th Ed, 2011) ("*Copinger*") at para 2-08.

18    The Statute of Anne was the first copyright statute in the world and it is the basal foundation on which the modern concept of copyright has been built. As pointed out in *Copinger* at para 2-16, two of the principles established by the Statute of Anne were revolutionary at the time: recognition of the author as the fountainhead of protection; and adoption of the principle of a limited term of protection for published works.

19    The Statute of Anne gave authors copyright protection for all existing printed books for a period of 21 years, and a maximum of 28 years for new works. It envisaged rights to be accorded to natural persons who created a work, balanced with the public interest of maintaining a robust public domain in which original literary, musical and artistic works are produced. The object of copyright protection was to encourage human progress through the sharing of learning and writings while safeguarding the potential economic benefits through the grant of monopoly rights of a limited duration. The social contract created protected original creativity without reference to literary merit.

20    The UK Copyright Act 1911 (c 46) (UK) ("the UK Copyright Act 1911") subsequently codified the modern law on copyright. Additionally, it abolished common law copyright in unpublished works and conferred copyright protection on a number of works previously unprotected. Here, for the first time, the common law requirement that a literary work had to be "original" to secure copyright protection was acknowledged. To qualify as an original work, the work had to originate from an author without copying.

21    In Singapore, the Statute of Anne applied pursuant to the Second Charter of Justice of 1826 (c 85) (UK). This was then replaced by the UK Copyright Act 1911. However, in response to vastly changed circumstances, the UK Copyright Act 1911 was eventually repealed and replaced by the Singapore Copyright Act 1987 (Act 2 of 1987) ("the 1987 Act"). The 1987 Act was modelled on the Australian Copyright Act 1968 (Act No 63 of 1968) (Cth) ("the Australian Copyright Act 1968"), as amended by the Copyright Amendment Acts 1980 (Act No 154 of 1980) (Cth) and 1984 (Act No 43 of 1984) (Cth). The 1987 Act was later revised in 1988, by way of the Copyright Act (Cap 63, 1988 Rev Ed), and 1999 by way of the Copyright Act (Cap 63, 1999 Rev Ed) ("the 1999 Act"), before becoming the Act as it exists today.

22    The Act governs the law of copyright in Singapore and copyright prevails only when permitted by the Act. As we will show below, the concepts of authoring and authorship take centre-stage in the Act. The general framework of copyright law in Singapore encompasses the following:

    (a)    the subject matter of protection;

    (b)    the scope of protection granted;

    (c)    the term of protection; and

    (d)    formalities.

### The subject matter of protection

23     The subject matter accorded protection falls into two principal categories. The first, protected under Part III and more specifically found in s 27 of the Act, includes traditional types of subject matter such as literary, dramatic, musical and artistic works which are original. The second category, protected under ss 97–101 in Part IV of the Act, relates to "SUBJECT-MATTER OTHER THAN WORKS" and includes sound recordings, television broadcasts and cinematograph films amongst others.

24     Section 27 of the Act is *in pari materia* with s 32 of the Australian Copyright Act 1968, which has its origins in the UK Copyright Act 1911. Thus, both English and Australian cases are useful reference points on the issue of originality. However, while the cases are helpful in illuminating the application of the legal principles, it has to be remembered that ultimately the originality of each particular work is everything in determining if copyright exists.

### The scope of protection granted

25     The scope of protection accorded differs according to the type of subject matter concerned. Copyright protection is concerned with the unauthorised reproduction or dissemination by third parties of the form in which a person has chosen to express himself or herself, whether by way of a book, painting, or something else. Nevertheless this protection may be broader in some cases than in others, due to the nature of the subject matter in question. For example, for literary, dramatic and musical works, a person may prevent a wide range of unauthorised reproductions such as, *inter alia*, adaptations, public performances and other public communications of the work. However, for artistic works and subject matter other than works, the protection accorded is more limited and more narrowly interpreted.

### The term of protection

26     In general, the term of protection for works is the author's life plus 70 years as stated in s 28 of the Act; while the term of protection for other subject matter, as well as certain limited categories of works such as those published anonymously or pseudonymously is 70 years from the date of first publication, as seen in s 29 and ss 92–96 of the Act respectively.

27     The length that ought to be accorded to copyright protection has always been robustly debated. This stems from the difficulty of striking an

appropriate balance between the competing tensions of public and private interests. On one hand, there is the interest of the public in securing both new and established works freely and as early as possible, and, on the other, the need to ensure that authors receive a just return for their creative efforts and are thereby encouraged to keep on creating. The perennial problem has been to find the right period of protection which strikes the appropriate balance between these competing tensions.

28     As mentioned earlier in [19], the statutory protection provided by the Statute of Anne was a maximum period of 28 years. As an aside, it bears noting that the average human life span then was much shorter. The initial statutory period was enlarged in 1814 to the term of the author's life, if the author was still living at the end of 28 years. In 1842, it was changed to the life of the author plus seven years or 42 years, whichever was the longer. The rationale for this new term was based on the argument that the earlier legislation tended to penalise the author who published his work shortly before his death. This, coupled with the desire to secure rights which would benefit the heirs of the author, resulted in the new extended copyright period. Snbseqnently, the UK Copyright Act 1911 provided that the term for copyright would be the author's life plus 50 years. This was the position adopted in the 1987 Act when it was first enacted.

29     In May 2003, the United States - Singapore Free Trade Agreement was signed, obliging Singapore to add 20 years to the then-existing term for authors' works, performances and phonograms. The result was that in July 2004, the 1999 Act was amended to reflect the current copyright term for works as the author's life plus 70 years. The history and rationale of the term of copyright will be explicated further below at [57]–[60].

*Formalities*

30     There is no requirement of registration before copyright protection attaches under the Act. However, in order for copyright to subsist, s 27 of the Act requires that one of the following connecting factors must exist in relation to the work or subject matter in question, that is:

(a)     that the author or maker be a "qualified person";

(b)     that the work or subject matter be first published in Singapore; or

(c)     in the case of sound recordings, films and broadcasts, that they be made in Singapore.

This will be elaborated upon further below at [46]–[56].

31     As mentioned above, the sections in the Act are largely modelled on the Australian Copyright Act 1968, which was found to be the most compatible with Singapore's requirements bearing in mind "our legal system [and] our need to be up-to-date and comprehensive": see *Singapore*

*Parliamentary Debates, Official Report* (5 May 1986) vol 48 at col 12 (Prof S Jayakumar, Second Minister for Law). However as we have earlier stated, English cases still have significance since both Singapore and Australia copyright law have deep English roots.

**Copyright protection in compilations**

32    It is necessary that the Tables fall under one of the categories of subject matter accorded protection. Section 7A of the Act reads as follows:-

> Literary works include compilation and computer program
>
> 7A.—(1) For the purposes of this Act, 'literary work' includes —
>
> > (*a*)    a compilation in any form; and
> >
> > (*b*)    a computer program.
>
> (2)    Any copyright subsisting in a compilation by virtue of Part III —
>
> > (*a*)    is limited to the selection or arrangement of its contents which constitutes an intellectual creation; and
> >
> > …
>
> (3)    For the purposes of this section —
>
> 'compilation' means —
>
> > …
> >
> > (*c*)    a compilation, or table, of data other than relevant materials or parts of relevant materials,
>
> which, by reason of the selection or arrangement of its contents, constitutes an intellectual creation;

Typically, provided a subject matter can reasonably be called a table, compilation or database, it will almost always fall within the statutory description: see *Copinger* ([17] *supra*) at para 3-27. The information in the Tables in *Punters' Way* would clearly constitute a table of data other than relevant materials, capable of being termed a "compilation", and by extension, the Tables would be a "literary work". It has therefore been common ground that the Tables in *Punters' Way* are indeed compilations. But, in order for any copyright to subsist in the compilation, the selection or arrangement of its contents must be the product of intellectual creation.

33    It has been rightly pointed out, in *George Wei, The Law of Copyright in Singapore* (SNP Editions, 2nd Ed, 2000) ("*George Wei*") at p 1331, that the notion of "*intellectual creation*" ties in with the basic copyright principle that only "original" compilations are protected by copyright. The test for compilations remains the same as the general test for a literary work, namely that of originality – whether there is sufficient amount of skill, labour and judgment involved in the creative process.

34    This threshold is heavily fact-centric and it is often a problematic matter of "which side of the line the case falls": see *Chilton v Progress Printing and Publishing Company* [1895] 2 Ch 29. Similarly, *George Wei* points out at p 54 that:

> [while the] basic notion of originality is easy enough to understand and to apply at a broad level of abstraction; it is much more tricky at its margins, especially in the case of fact based works ...

In the same vein, it has also been observed in *Copinger* at para 3-130 that there is no guiding principle as to the precise quantum of labour, skill or judgment required, but rather it is a question of fact and degree and thus has to be determined on the facts of the particular case.

35    As an aside, it can be said that the Anglo-Australian requirement of originality, while taking account of the intellectual effort of the author, has traditionally placed greater emphasis on the time, labour and effort involved. However, we note that several of the cases where copyright was granted in respect of seemingly mundane compilations (such as a timetable index, street directories, football fixture lists and a racing information service) were decided predominantly in the early 19th century to the early 20th century, before computer usage became part of everyday life. With the proliferation of computers and the ready availability of software, the law on copyright ought also to evolve to take into account the ease and convenience that computers bring to the process of compiling in the 21st century. Tediously painstaking works when done manually, such as the tabulation of timetables, or broadcasting programmes, are now effortlessly completed with the touch of a computer key or two, without much exertion or skill being called for. Older decisions that had focussed on the gathering of information as the touchstone rather than the productive effort involved in expression may therefore require reconsideration one day.

36    For now, it can be said that where someone has expended effort in creating something that has some literary value, it is worthy of protection, irrespective of the precise quantum of intellectual input involved in producing it or the literary merits or novelty of the work product. Having stated this general proposition, we should caution that "[w]hen the particular form of expression contains facts and information, it is not helpful to refer to the "rough and practical test [in *University of London Press, Limited v University Tutorial Press, Limited* [1916] 2 Ch 601 ("*University Tutorial Press*") at 610] that what is worth copying is prima facie worth protecting"": see *IceTV Pty Limited v Nine Network Australia Pty Ltd* [2009] HCA 14 at [31].

37    This is because the law of copyright does not protect ideas, facts or information. It is only the particular form in which the ideas, facts or information is presented after creativity has been added to the mix that may be protected. Similarly, it is not the preparatory efforts or process of

gathering facts that is protected. Rather it is the thought effort involved in creating the particular form of expression that is embraced by copyright. Not infrequently, the expression of data, say, through an alphabetical listing, will involve little ingenuity or skill beyond mechanical labour or routine programming. In such matters, it may be difficult to argue that copyright protection is called for.

38     In assessing copyright for compilations, in particular, we think it is always profitable to bear in mind the four key principles discerningly summarised in *Feist Publications Inc v Rural Telephone Service Company Inc* 499 US 340 (1991). First, facts are not copyrightable. Second, compilations of facts, however, are generally copyrightable. Third, the *sine qua non* of copyright is originality. Fourth, originality simply means that the work was independently created by the author and that it possesses some minimal degree of creativity, the level of creativity required being extremely low: see *George Wei* ([33] *supra*) at pp 84–85.

39     In this matter, the Second Issue of whether copyright subsists in the Tables in *Punters' Way* and if so whether the Appellant has infringed that copyright, rests primarily on the fourth principle – the existence of a minimum degree of creativity independently exercised by the author. However, before addressing the Second Issue, we turn now to the prior First Issue, which deals with whether the Tables were independently created by the Respondent as an author.

**The First Issue: Is the Respondent entitled to assert copyright protection as the author of its publication?**

40     A leading treatise on intellectual property, Staniforth Ricketson and Christopher Creswell, *The Law of Intellectual Property: Copyright, Designs & Confidential Information* (Lawbook Co, 2nd Ed (Revised), 2010 release) ("*Ricketson*") at para 7.45 states that originality refers to "the contribution which is made by the author to the form in which the work is expressed". This approach was underscored in the storied decision of Isaacs J in *Sands & McDougall Pty Ltd v Robinson* (1917) 23 CLR 49, where it was noted (at 55–56):

> in copyright law the two expressions 'author' and 'original work' have always been correlative; *the one connotes the other*. [emphasis added]

41     It seems plain to us after our brief overview of the copyright scheme above that ever since the enactment of the Statute of Anne, the objective of copyright law has been to encourage the creativity of natural authors. *The identification of the author is therefore a key function of copyright law as that is the person who is entitled to the benefits conferred by law.*

42     Returning to the facts, it is crucial to note that the Respondent unequivocally pleaded in its Statement of Claim (Amendment No 1) that it *alone* was the original author of the Tables in *Punters' Way*; and that the

Tables were the intellectual creation of the Respondent. No human individuals were identified. *Further, no copyright claim was made in respect of the software that was responsible for generating the relevant tables.* For ease of reference we reproduce the relevant portion of the pleading:

> 8.    In particular, most of the information that was compiled in '*Punters' Way*' is specially tabulated according to its nature and contents. *Among other information, there is a set of four tables which is specially compiled by the [Respondent].* This set of tables is compiled in a sequence after very careful consideration and trial runs. It gives [readers] quick reference and useful guides. *The [Respondent] creates this compilation and is its author. It is the [Respondent's] original literary work and there are no similar horse-racing publications either within Singapore or outside Singapore that has compiled the four tables in such a manner.* [emphasis added]

43    It should be noted that the Respondent had not pleaded *ownership* of the Tables. *Authorship and ownership are not synonymous terms.* The former refers to the concept of creating and the latter to one of possessing proprietary rights. An author need not be an owner and the converse is equally true. Further, the authorship of the Tables was not pleaded as one of joint-authorship by the Respondent's employees. The crucial issue which therefore arises is whether the Respondent, as a body corporate can indeed legally be considered an author of a copyrighted work assuming that this was factually what happened. We shall now consider this issue.

*Who is an author?*

44    First, the Act, and similarly the Australian Copyright Act 1968, is silent as to the definition of "author", except to say in s 7 that an author, in relation to a photograph, means the person who took the photograph. As a result, the answer to who an author is can only be deduced from other sources.

45    A useful starting point is s 9 of the UK Copyright, Designs and Patent Act 1988 (c 48) (UK) ("the 1988 UK Act"). Section 9(1) of the 1988 UK Act provides that an "author", in relation to a work, means the person who creates it. This definition is reiterated in *Words and Phrases Legally Defined* vol I (David Hay gen ed) (LexisNexis, 4th Ed, 2007) at p 212.

46    Second, a closer examination of s 27 of the Act seems obligatory (in the light of the Appellant's arguments) in order to ascertain the legislative intent of who an "author" might be. Section 27 provides the following:

> Original works in which copyright subsists
>
> 27.—(1) ...
>
> ...
>
> (2)    Subject to the provisions of this Act, *where an original literary, dramatic, musical or artistic work has been published —*

(*a*)    copyright shall subsist in the work; or

(*b*)    if copyright in the work subsisted immediately before its first publication, copyright shall continue to subsist in the work,

if, but only if —

(*c*)    the first publication of the work took place in Singapore;

(*d*)    the author of the work was a qualified person at the time when the work was first published; or

(*e*)    the author died before that time hut was a qualified person immediately before his death.

...

(4)    In this section, *'qualified person' means a citizen of Singapore or a person resident in Singapore.*

[emphasis added]

47    The Appellant argued that s 27 of the Act requires an author to be a "qualified person", and as "qualified person" has been defined to mean "a citizen of Singapore or a person resident in Singapore" in s 27(4) of the Act, the Respondent as a body corporate cannot claim to be an author under the Act. We have difficulties with this contention.

48    The Judge, in our view, was correct in holding that sub-ss 27(2)(*c*), (*d*) and (*e*) of the Act are disjunctive, and not conjunctive. This is also the settled Australian position: see below at [49]. Australia, as a signatory to the Berne Convention for the Protection of Literary and Artistic Works ("the Berne Convention") had to give effect to Art 3(1) of the Berne Convention, which sets out alternative connecting factors based on an author's personal status and the place of first publication of the work. Protection will be accorded where one of the connecting factors is established. Having acceded to the Berne Convention in December 1998, Singapore has also unambiguously agreed to comply with the minimum terms set out by the Berne Convention. In any event, as s 27 of the Act was modelled on s 32 of the Australian Copyright Act 1968, we do not think it can be seriously argued that the position in Singapore differs from the Australian one on this.

49    *Ricketson* ([40] *supra*) at para 5.10 confirms that only one of the "connecting factors" is required by s 32 of the Australian Copyright Act 1968 to be present, at the time the type of work or subject matter in question is created or made, for copyright to subsist. These connecting factors refer either to the personal status of the author or maker of the work or other subject matter at the time of making ("the personal criterion") or to the place of first publication of the subject matter ("the territorial criterion"). It is therefore abundantly clear that the personal criterion and the territorial criterion are meant to be alternatives, and fulfilling either criterion would suffice.

50    We note that *George Wei* ([33] *supra*) at p 288 n 118, also takes the same view that:

> s 27(2) essentially sets out two *alternative* connecting factors for published works, namely, first publication in Singapore (s 27(2)(c)) and the personal status of the author as a qualified person (s 27(2)(d) & (e)). It is submitted that it is not necessary under s 27(2) for published works to be both first published in Singapore and made by a qualified person at the relevant time. Either factor will do … *It is submitted that limbs (c), (d) and (e) of s 27(2) do not set out cumulative requirements.* [emphasis in original in italics; emphasis added in bold italics]

Satisfying either the personal criterion or the territorial criterion is sufficient for the work to acquire copyright in Singapore. The Judge, therefore, quite correctly rejected the Appellant's submissions at trial that the author must be a qualified person, as this would make s 27(2)(*d*) mandatory, contrary to the intent of the statute.

51    The Judge was also correct when she held that the purpose of s 27(2) was only to ensure that a claim for copyright had sufficient connection with Singapore in order to warrant protection under the Act, rather than to provide a definition of who could be an author of a subsisting copyright under the Act: see [26] of the Judgment.

52    However, the Judge erred in declaring subsequently (at [25] of the Judgment) that "although the author of the work must be a qualified person *for the purposes* of meeting the criteria of s 29(2)(*d*), there is no statutory provision that exhaustively states that the only 'author' relevant for all purposes of the Copyright Act *must* be a qualified person" [emphasis in original]. The Judge relied on s 2 of the Interpretation Act (Cap 1, 2002 Rev Ed) ("the Interpretation Act") (which defines "person" to include any company or association or body of persons, corporate or unincorporated) to substantiate her point, and added, for good measure, that there are also no statutory provisions in the Act which state that an author must necessarily be a living person: see [25] of the Judgment.

53    While it is true that s 2 of the Interpretation Act defines "person" as including a company, it must be remembered that the words and expressions defined in the Interpretation Act only have the meanings respectively assigned to them in the absence of anything in the subject or context of the relevant statute that is inconsistent with such meanings. As a matter of principle, in interpreting statutes, the general ordinarily gives way to the special or particular.

54    It is also interesting to briefly digress and note that an altogether different position has been statutorily adopted in Malaysia. In the Malaysian Copyright Act 1987 (Act 332) (Malaysia), the term "qualified person" has been expanded to include:

>   (a)   in relation to an individual, ... a person who is a citizen of, or a permanent resident in, Malaysia; and (b) in relation to a body corporate, ... a body corporate established in Malaysia and constituted or vested with legal personality under the laws of Malaysia ...

The Malaysian definition of "qualified person" is thus fundamentally different from the definition in the Act and the Australian Copyright Act 1968, both of which do not explicitly provide for a body corporate. It therefore does not come as a surprise that the Malaysian courts have had no difficulty in interpreting the word "author" as referring not only to natural persons, but also to companies: see *Creative Purpose Sdn Bhd v Integrated Trans Corp Sdn Bhd* [1997] 2 MLJ 429. However, since the Act is silent on this point, can it similarly be inferred that non-living "persons" could be authors for the purposes of copyright?

55      Returning to the legal position here, it is also noteworthy that leading treatises in Australia and England take the view that only natural persons can be qualified persons. *Ricketson* ([40] *supra*) at para 5.20 unequivocally points out that:

>   In the context of s 32 of the *Copyright Act 1968* (Cth) [(equivalent to s 27 of the Act)] (which is concerned with works), it is clear that 'qualified person' applies only to natural persons. [emphasis in original]

56      Likewise, Kevin Lindgren QC *et al, Copyright and Designs* vol 1 (LexisNexis, 2004) at para 12,040, states:

>   It is important to note that a body corporate cannot be a 'qualified person' in relation to original works. The reason for this is that the 'qualified person' and first owner of copyright in an original work is the 'author', and although a body corporate may be the copyright owner by virtue of the operation of a contract of employment, an assignment, or in any of the other ways expressly provided for in [the Australian Copyright Act 1968], *it cannot be an author.* [emphasis added]

We also note that *Copinger* ([17] *supra*) at para 4-10 has taken the view that:

>   [w]ith very limited exceptions [such as computer-generated works and old photographs], *the 'author' of these categories of work must be a natural person.* The fact that one person is acting as employee of another cannot affect the question of authorship, nor can the fact that one person is an agent for another ... [emphasis added]

With these views in mind we will now excavate further the historical and legislative policy considerations undergirding this issue.

### *A non-living author?*

57      The 19th century saw the emergence of the European doctrine of *droit moral* under which authors' intellectual and creative rights in their works were recognised in addition to their purely economic rights. Continental jurisdictions therefore regarded an author's work as an emanation or

extension of his or her personality, inseparably linked with his or her honour and reputation and thus deserving of a long period of protection: see *Ricketson* at para 6.55. This concept naturally leads to the conclusion that an author must be a human being.

58    Hugh Laddie *et al*, *The Modern Law of Copyright and Designs* vol 1 (Butterworths, 3rd Ed, 2000) ("*Laddie*") points out at para 10.8 that the Berne Convention is concerned with the rights of human authors to their original literary, dramatic, musical and artistic works. As a consequence, Laddie further observes, that the Continental legal tradition has always been to regard the author's right to his property as the starting point, and to look upon limitations to its term as a regrettable necessity. It is because of this that Art 7 of the Berlin Revision of the Berne Convention in 1908 provided that the term of protection should include the life of the author plus 50 years after his death. The extension of the term of copyright was inextricably linked to increased life expectancies at that time.

59    The UK's approach to the duration of copyright has been slightly different from that of the Continental jurisdictions in that "those who seek legislation in favour of exclusive privileges which restrain trade and freedom of communication ought to show that they are justified in the public interest": see *Laddie* at para 10.8. This approach equally takes into account the fact that the starting point of copyright is a human author. Both the UK Copyright Act 1911 and the 1988 UK Act have provided for the term of protection as the author's life plus 50 years. This was supposed to reflect two generations of heirs of the author. However, with increased life expectancy in developed countries, especially in regional groupings where the majority of member countries are developed with relatively high standards of living such as the European Union, it was unsurprising that the European Commission issued a directive in 1993 which increased the *post mortem auctoris* period to 70 years, and this has been implemented in the UK since 1995.

60    Since the duration of copyright protection has always been based on the author's life expectancy and the rationale for the *post mortem auctoris* term was so as to benefit two generations of the author's heirs, it is patently clear that incorporated bodies were never contemplated to have been "authors" for the purposes of copyright. It would be absurd to suggest that a company could have a lifespan, let alone generations of heirs. Thus, it must follow that authors have to be living persons.

61    However, the Judge found that there was no difficulty in accepting that an incorporated body could be the author of an original work: see [31] of the Judgment. The Judge considered that it would be (at [32] of the Judgment):

> consistent with the statutory regime found in [the Act] if the copyright in the
> work is found to expire 70 years after the expiration of the calendar year in
> which the work was first published.

This is provided for in ss 28(3) and 29 of the Act in situations where a work
is unpublished before the death of the author, or where it is an anonymous
and pseudonymous work.

62    In our view, the Judge plainly erred on this point. Neither of these
scenarios is present in this case. There was no posthumous publication
because if the Respondent qualifies as the "author" of the Tables, *Punters'*
*Way* would have been published during the "lifetime" of the Respondent.
Similarly, if the Respondent was the author of the Tables, then the Tables
cannot possibly be an anonymous or pseudonymous work and s 29 does
not apply. The prerequisites for the operation of either section have not
been satisfied by the Respondent.

63    Sections 28 and 29 of the Act are *in pari materia* with ss 33 and 34 of
the Australian Copyright Act 1968. It has been established that the rationale
of these provisions is to encourage the ultimate disclosure and
dissemination of protected works and the information and knowledge that
they contain. This objective would not be achieved if such works remain
protected indefinitely and are withheld from the public domain.
Superimposing ss 28(3) and 29 onto the factual matrix at hand would be
wrong as these provisions plainly do not contemplate scenarios where an
incorporated body is an author. Since it is not possible to rely on the date of
publication as the litmus test for the expiry of the copyright, it appears that
if a company qualifies as an author it would possess an indefinite and
extraordinary perpetual copyright to its work. Pertinently, we should add,
sub-ss 28(3) and 28(5) of the Act expressly refer to the "death of an author"
as the reference event for copyright protection in certain instances. Why
would this be the case if non-living authors were intended to be embraced
by the Act?

64    The rationale underpinning copyright protection is not about the
utility of the work, but rather the protection of the originality of the
expression employed to communicate ideas. It is therefore unhelpful to say
that the contents in a compilation will become obsolete, irrelevant or
useless after some time, and therefore not worth copying or protecting, for
as long as there is evidence of originality in the work, protection is
conferred. Even if the work becomes obsolete after time, the copyright
owner would still be able to bring an action against anyone who utilises the
work for an infringement of copyright, regardless of the relevaucy of the
work at that time. Should companies and like entities qualify as authors,
they would be entitled to claim a perpetual monopoly over their works to
maximise the economic returns of copyright protection. This would be
contrary to the underlying policy of the Act which is to accord copyright

protection for a limited duration that best strikes a balance between the competing public and private interests: see above at [26]–[29].

65    It also seems obvious that authorship by a company could never have been contemplated by the Statute of Anne as companies operating as distinct legal entities were not a typical feature of commerce when it was enacted. In the UK, prior to the mid-19th century, incorporation was only done by way of royal charter or by private Act of Parliament. However, the Crown and Parliament were usually suspicious of lending their dignity and the benefits of separate personality to commercial organisations. As a result, most joint-stock companies did not have separate legal personality. Parliament finally permitted the incorporation of companies by registration when it passed the Joint Stock Companies Act 1844 (7 & 8 Vict c 110) (UK).

66    It was only in the late 19th century that there was a proliferation of incorporated entities in the UK and whereupon a registered company could acquire separate personality upon registration. This principle of separate legal corporate personality was affirmed in the celebrated case of *Aron Salomon (pauper) v A Salomon and Company, Limited* [1897] AC 22.

67    From the foregoing, it is clear that the historical origins of the Act envisaged rights to be accorded to natural persons and not corporate bodies, and that legal rights flowed only from human authorship. In addition, it is telling that the duration of copyright in subject matter other than works is merely stated as continuing to subsist until the expiration of 70 (or 50) years after the expiration of the calendar year in which the recording/film/broadcast was first published/made. Our views are further fortified by the recent decision of the Australian Federal Court of Appeal in *Telstra Corporation Limited v Phone Directories Company Pty Ltd* [2010] FCAFC 149 ("the *Telstra Appeal*"), where two members of the quorum stated unequivocally (at [100] and [134]) that under Australian law an author had to be a human author.

68    We note that the Judge also relied on the case of *Alteco Chemical Pte Ltd v Chong Yean Wah* [1999] 2 SLR(R) 915 ("*Alteco*"), to support the proposition that an incorporated body could be the author of a copyright protected work. In that decision, it appears that a "modern" interpretation of authorship was created, suggesting that the author had become the person who made the necessary arrangements and paid for the creation of the work. A company could therefore be the author of the work if its employees created the work product.

69    However, the High Court in *Alteco* did not expressly declare that a company could be an author of a work, a point acknowledged by the Judge. Further, the decision in *Alteco* seemed to have blurred the distinctions between the concepts of authorship and ownership. In Tan Tee Jim and Ng-Loy Wee Loon, "Intellectual Property Law" (2000) 1 SAL Ann Rev 230 at 235–237, 251 ("*Tan and Ng*"), the authors observe that the *Alteco* case

failed to make the distinction between authorship and copyright ownership in s 30 of the Act. As *Tan and Ng* rightly point out, in essence what the Court did was to imply a constructive trust against the author of the work, thereby allowing the parent company to own the work, and there was no necessity for a "modern" interpretation of the word "author".

70    This view has been similarly reiterated in *George Wei* ([33] *supra*) at pp 1391–1393. He points out that the Act adequately governs the law on ownership, even for foreign works which enjoy copyright in Singapore. Additionally, it is observed that the person who made arrangements for the production of a work, or who paid for the work – as in the case of *Alteco* – would not be entitled to claim to be the author of the work as this did not generally relate to authorship skills. We agree. *Alteco*'s innovative tailoring of the term "author" ought not to be followed.

71    It must be emphasised that a work created by an employee author has a limited duration dependent on the life of the employee even if first ownership vests in the employer. Thus while the law accepts that a person other than the author may be a first owner, the question of who the author is remains a distinct and an important one.

72    We therefore reject the Respondent's argument that an "author" for the purposes of copyright law can and should extend to corporate entities. It would clearly be against public policy to allow copyright protection in perpetuity. This would be the scenario should a company be deemed capable of being an author for the purpose of copyright. Section 2 of the Interpretation Act ought not to be incorporated into the rubric of copyright law, and an "author" must be a natural person in copyright law.

*Can a natural author be identified?*

73    The identification of an author is still pertinent as s 27 of the Act provides that in order for copyright to subsist in a work, the work must be original. As mentioned in [40] above, originality is closely related to the author. This principle was recently affirmed in *Telstra Corporation Limited v Phone Directories Company Pty Ltd* [2010] FCA 44 ("*Telstra*"). Gordon J masterfully condensed the position thus at [20]:

> … 'originality' under [the Australian Copyright Act 1968] 'means that the creation … of the work required some independent intellectual effort' and/or the exercise of 'sufficient effort of a literary nature'. … [E]ach phrase confirms that for a work to be sufficiently original for the subsistence of copyright, 'substantial labour' and/or 'substantial expense' is not alone sufficient. More is required. What that more is will, of course, vary from case to case but *must involve 'originality' by an identified author in an identified work*. [emphasis added]

74    In the *Telstra Appeal* ([67] *supra*) at [32], Keane CJ heartily affirmed Gordon J's *dicta*:

Authorship and originality are correlatives. The question of whether copyright subsists is concerned with the particular form of expression of the work. You must identify authors, and those authors must direct their contribution (assessed as either an 'independent intellectual effort' of a 'sufficient effort of a literary nature') to the particular form of expression of the work. *Start with the work. Find its authors.* They must have done something, howsoever defined, that can be considered original. [emphasis added]

75    We agree with this approach. An author must first be identified before the work in question can be deemed to be original. In fact, the Respondent's counsel acknowledge in the Respondent's skeletal submissions, that all that is required for the test for originality is that "the work originates with an author or joint authors from some independent intellectual effort". Since the Respondent is unable to assert that it is the author of the work as a body corporate, the remaining question at this juncture is whether the Respondent is even able to identify specific human authors of the Tables. To avoid doubt, we should add that it is not necessary to name each and every author to make out a claim for copyright protection but it has to be shown that the work product in question has been generated from human author(s) working alone or collaboratively, *ie*, the existence of such persons must be clearly established.

76    The Respondent's witness Phan Tjun Sern ("Phan") had stated in his Affidavit of Evidence in Chief ("AEIC") that *Punters' Way* was a continuing project, developed from ideas and valuable contributions by racing professionals and readers. However, ideas and contributions put forward by the readers and horse racing experts would not be protected by the scope of copyright, as copyright protects the material form of a work, and not the ideas in the work. Even if the suggestions could be protected, the readers and horse racing experts were not employees of the Respondent, and correspondingly, the Respondent would not be able to claim copyright ownership of the Tables, if any.

77    Further, relying on a passage in *Laddie* ([58] *supra*) at para 3.94, the Respondent submits that the definition of a literary work includes a compilation, and the author of such a work is the person who gathers or organises the collection of material and who selects, orders and arranges it. The Respondent then contends that as its employees were the people who gathered, organised, selected, ordered and arranged the information and data, they were the authors of the Tables, which was an original work capable of being protected by copyright.

78    However, we hesitate to accept this definition of authors in this situation. Although the contributions of these individuals may have led to the compilation of the work, they were not part of the actual process of compilation. In this context, the *Telstra Appeal* at [92] is instructive. It affirmed that where the work of individuals was not collaborative, but was

instead merely organised to facilitate the production of the work, this would not be collaboration of the kind contemplated by the definition of joint authorship.

79    Here, the collection of the horse-racing data, such as the horses' and jockeys' names, as well as their track work records, and the organisation and selection of such data were either computerised, or done by separate people. However, each individual's responsibility and contribution (which has not been particularised) was, based on the evidence before us, insufficient to render the individual an author, or joint author of the Tables.

80    It certainly cannot be said that a reader who writes in with suggestions for the improvement of the publication can be considered an "author". Neither can the IT employee who entered the names of the horses in a race be considered an "author" of the compilation. Although it is undeniable that both contributed to the end product, data aggregation or input is not creativity.

81    Not infrequently, in cases involving a high degree of automation, there will be no original work produced for the simple reason that there are no identifiable human authors. This may well be the reason why the Respondent was unable to identify any particular individual or individuals or a specific group of people as being the human authors of the Tables. However, whatever the case may be, it is clear that copyright cannot subsist without a human author, and the Respondent is unable to even begin to satisfactorily identify any author, let alone, authors. It remains unclear who was responsible for the compilations. Even assuming *arguendo* that the Respondent's employees had some authorship role in the compilations, the evidence did not satisfactorily establish when copyright protection attached.

82    In the circumstances, without the identification of a human author from whom the work originates, there can be no "original work" capable of copyright protection. We therefore find that the Respondent's claim that copyright subsists in the Tables that were "authored" by it fails.

### The statutory presumptions

83    Additionally, the Act contains statutory presumptions designed to assist a claimant in a copyright action for infringement of copyright. We now examine these presumptions to determine if they can assist the Respondent's claim.

84    The Judge found (at [35] of the Judgment) that the presumption under s 131 of the Act applies – where a name purporting to be that of the author of a literary work appeared on copies of the work as published, then it shall be presumed unless the contrary is established that the person is the author of the work. The Judge therefore accepted that the Respondent was

the author of the Tables as its name appeared on *Punters' Way* and the onus was on the Appellant to disprove the Respondent's anthorship.

85      It is pertinent, however, that the Respondent itself acknowledges that s 131 of the Act is not applicable in the present circumstances, as the Respondent's name appears only as "Publisher" in *Punters' Way*, and not as the author.

86      The statutory presumption which the Respondent might be entitled to rely on would be s 132 of the Act, which provides:

> **Presumptions in relation to publisher of work**
>
> 132.  Where, in an action brought by virtue of this Part in relation to a literary, dramatic, musical or artistic work, section 131 does not apply, but it is established —
>
> > (*a*)   that the work was first published in Singapore and was so published during the period of 70 years that ended immediately before the commencement of the calendar year in which the action was brought; and
> >
> > (*b*)   that a name purporting to be that of the publisher appeared on copies of the work as first published,
>
> then, unless the contrary is established, copyright shall be presumed to subsist in the work and the person whose name so appeared shall be presumed to have been the owner of that copyright at the time of the publication.

As the Respondent is identified as the publisher in *Punters' Way*, the Respondent contends that copyright subsists in the Tables, and the Respondent would be presumed to be the owner.

87      Section 128 of the Australian Copyright Act 1968 is *in pari materia* with s 132 of the Act, and this issue was comprehensively dealt with in *Telstra* ([73] *supra*). We agree fully with Gordon J's analysis on s 128 of the Australian Copyright Act 1968 (equivalent to s 132 of the Act) at [37]:

> *In my view, the Applicants' reliance upon ss 128 and 129 is misplaced. Each section reinforces the importance of identifying the author or authors of the work in suit.* In understanding the operation of the presumptions it is important to note the distinction between identifying *an* author or authors of the original work and *the identity of the* author or authors of the original work. Lest it be overstated, the [Australian Copyright Act 1968] fixes on the author or authors … . *If an author or authors (within the meaning of the [Australian Copyright Act 1968]) cannot be identified at all, in contradistinction to a situation where the author's or authors' exact identity cannot be identified, copyright cannot subsist. On a reading of ss 128 and 129, it is the latter situation to which the [Australian Copyright Act 1968] is directed.* [emphasis in original in italics; emphasis added in bold italics]

88    The Respondent also relies on the case of *Waterlow Publishers Ltd v Rose* [1995] FSR 207 ("*Waterlow*"), which referred to the presumption in s 20(4) of the UK Copyright Act 1956 (4 & 5 Eliz 2 c 74), which is similar to s 132 of the Act. In *Waterlow*, the fact that the publisher's name appeared on the copies of the work was enough to justify a finding that the presumption applied, in accordance with the intention of s 20(4). Even though there were no identifiable authors, copyright was held to nonetheless subsist in the relevant work, with the publisher being the owner of the copyright.

89    However, cases which have relied on the equivalent of the s 132 presumption, such as *Waterlow* and *Microsoft Corporation v DHD Distribution Pty Ltd (t/as Austin Computers)* (1999) 45 IPR 459, did not deal with the scenario where the very fact of authorship took centre-stage. Further, the presumption was also not decisive in the dispute and it was not argued in those cases that an author could not be identified at all. These cases are therefore of limited assistance here. We also note that *Waterlow* appears to be an *ex tempore* decision. This is another reason why undue deference should not be accorded to it.

90    *Laddie* ([58] *supra*) at para 3.94 states that where no name purporting to be that of the author appears on the work as first published, but that of the publisher appears, there is potentially available under s 104(4) of the 1988 UK Act a presumption that the named person was the owner of the copyright at the time of publication. However, Gordon J in *Telstra* (at [39]) thought that at its highest, this passage merely suggests that it may be necessary in particular instances to rely upon the statutory presumptions. Further, these presumptions have little or no role to play where the question of subsistence of copyright in each of the works is the central issue between the parties.

91    Pertinently, it has also been observed in *Laddie* at para 39.85:

> All that the presumption does is to compel the court to reach the appropriate conclusion in the absence of evidence to the contrary. If the opponent does offer evidence in rebuttal (sufficient to satisfy the legal requirement of *some* evidence) the presumption disappears, and the case is in the court's hands free from any rule. [emphasis in original]

As authorship is in dispute in the present case and the Appellant has adduced evidence that copyright does not subsist in the Tables since there is no author, the s 132 statutory presumption has been displaced.

92    We round up our analysis of this issue by emphasising that it is settled practice that the necessary elements of authorship, ownership, validity and subsistence must be adequately pleaded for cases involving copyright infringement: see *Bullen & Leake & Jacob's Precedents of Pleadings* vol 2 (Lord Brennan and William Blair gen eds) (Sweet & Maxwell, 14th Ed, 2001) at para 66-Q1. The Respondent has found itself in a quandary having

pleaded that the company is the author of the Tables and having maintained this stance throughout the High Court proceedings. Had the Respondent merely pleaded to be the owner of the copyright, as the presumed owner of the copyright assigned to it by its employees, the Respondent would still have had the *locus standi* to maintain a claim of infringement against the Appellant. The Respondent tried to salvage its case by initially submitting to this Court that the Respondent is both the author *and* owner of the Tables. However, in the course of the hearing of this appeal, the Respondent abruptly changed tack and submitted that it was primarily arguing its case on the basis of ownership; and *alternatively*, authorship.

93     Regrettably, such a course was no longer open to the Respondent on the basis of its pleaded case and the conduct of the proceedings below. It had unequivocally nailed its colours to the mast and the Appellant had contested the case on that basis. The Respondent cannot now rely on an alternative claim of ownership which was neither pleaded nor advanced in the proceedings below.

*Summary of the First Issue*

94     In summary, the concept of authorship is integral to copyright, and no such protection can be accorded without an author from which an original work emanates, and from which the legal rights flow. We can do no better than to reiterate the views of Gordon J in *Telstra* ([73] *supra*) at [35]:

> [A]uthorship is central to the determination of whether copyright subsists. To suggest that copyright does not require the identification of authors where a work is sufficiently original ... puts the cart before the horse. It ignores the fact that it is the original work of an author or authors who contribute to the particular form of expression of the work and reduce the work to a material form that is the act giving rise to the statutory protection of copyright.

95     As the Respondent could not identify a human author or authors and we find that an incorporated body cannot be an author of a copyrighted work; we reject the Respondent's assertion that it was entitled to copyright protection *qua* author. Accordingly, we do not find that copyright subsists in the Tables.

**The Second Issue: If the Respondent is entitled to copyright protection, has the Appellant infringed its rights?**

96     As we disagreed with the Judge that the Respondent is entitled to copyright protection, it is, strictly speaking, unnecessary for us to delve into the issue of copyright infringement at all. However, out of deference to counsel, who have made extensive submissions on this issue, we shall briefly give our views on this as well.

97    To start with, it is common ground that the information in the Tables is freely available in the public domain. The Respondent acknowledges that the information is "mostly, if not all, provided in raw form by the related Turf Club. Publishers usually obtain these data from the Turf Club".

98    The Judge found that the Respondent had organised the information that was to be included in *Punters' Way*; set up tables of the information and decided how best the tables should be presented in a reader-friendly manner; studied, experimented and compiled the information to be placed in *Punters' Way*; and constructed the tables found in *Punters' Way*. The Judge noted (at [40] of the Judgment) that the threshold for originality was not set at an exceedingly high level. She also found that there was sufficient skill and labour applied to the Tables, and agreed with the Respondent that there was originality in terms of the selection, arrangement and presentation of the information in the Tables: see [41]–[43] of the Judgment.

99    More specifically, the Judge eventually (at [41] of the Judgment) held that the transformation of such "intangible and unexpressed ideas given by different personnel … into the manifested forms as shown in the publications naturally gave rise to an inference that some effort and labour had been involved".

100    We agree with the Judge in so far as she held that the Respondent's copyright claim cannot be in the information or data itself, as this is freely available in the public domain. Copyright, if any, would only exist in the selection, arrangement and presentation of the information. It is trite that there cannot be a monopoly in facts or information, but only in the way of presenting or expressing them and it is always a question of fact whether the skill and labour involved in the presentation or expression justifies the incidence of copyright: see [33]–[37] above.

101    We also agree with the Judge that the threshold for originality is traditionally low: see [36] and [38] above. In *University Tutorial Press* ([36] *supra*) at 608–609, Peterson J summarised the meaning of originality in the following classical passage:

> The word 'original' does not in this connection mean that the work must be the expression of original or inventive thought. Copyright Acts are not concerned with the originality of ideas, but with the expression of thought, and, in the case of 'literary work', with the expression of thought in print or writing. The originality which is required relates to the expression of the thought. But the Act does not require that the expression must be in an original or novel form, but that the work must not be copied from another work—that it should originate from the author.

102    The threshold of originality in compilations has also been helpfully summed up in *Ricketson* ([40] *supra*) at para 7.60:

> [S]omething more is required by way of original authorial contribution than simply the act of giving material expression to something. ... [This poses problems] where the work is of a factual or informational kind, and the author's contribution consists of an ordering, arrangement or summarising of that information. ... In such a case, ... the requirement of 'originality' assumes a heightened importance ... . It is only the author's presentation of the data that is protected, and this must display or reflect the application of some identifiable element of skill and labour on the part of the author. The final work therefore must be more than a bare recital of facts or figures.

103   In the present situation, while the Tables published in *Punters' Way* contain information extracted from the Turf Club, the Respondent had not merely reprinted the horse-racing data wholesale or in alphabetical order, but had selected information it thought relevant and arranged it in a manner that was thought to be most conducive for readers.

104   We find in this context the approach adopted in *Interfirm Comparison (Australia) Pty Ltd v Law Society (NSW)* [1977] RPC 137 instructive. In that case, Bowen CJ held that despite the fact that the work exhibited little material that could be regarded as having much novelty or originality in the ordinary sense of that term, it was specifically drawn for a particular profession and for a particular purpose and, although it used much old and publicly-known material, it presented it in a new form as the work of the author. Similarly, despite the fact that the material used in the Tables was easily accessible to all, the information was *presented* in a distinct form which would attract copyright protection.

105   We therefore accept that the Tables in *Punters' Way* had a "quality of character not possessed by the raw material": see *Fortuity Pty Ltd v Barcza* (1995) 32 IPR 517. This is evident as the raw information provided by the Turf Club is distinct from what was eventually published in *Punters' Way* which was more comprehensible.

### Was there a causal connection?

106   The Judge found (at [45] of the Judgment) that as the Appellant's managing director and sole witness, Levar Steven Michael ("Levar"), was employed by the Respondent, he had access to the Tables. However we pause to note that the Judge incorrectly found Levar to have been previously employed by the Respondent. In actual fact, Levar had set up his own consultancy services to race clubs and to those who transact in the sale and purchase of horses. He had done this consultancy work for the Respondent in June 2006. Additionally, although he was also the horse-racing expert on the Respondent's website, <http://www.winner21.com>, for around six months, he was never an employee of the Respondent.

107   Nevertheless this distinction is merely technical, as Levar's connection with the Respondent was immaterial since *Punters' Way*, as well as the raw data were freely available in the public domain and Levar could

easily have access to *Punters' Way*. As long as there is substantial similarity between the Appellant's and Respondent's work, and it can be shown that the Appellant had access to the Respondent's work, this will give rise to a *prima facie* inference of copying by the Respondent. But it must be remembered that this is not just a quantitative assessment, it is essentially a qualitative test.

108    It is established that so long as a causal connection can be established between the two works, it is not consequential if the copying is direct or indirect. It is clear in this situation that Levar, or any of the Appellant's employees could easily purchase a copy of *Punters' Way* and adopt its presentation in subsequent publications of *Racing Guide*.

109    It is also apparent that over time, *Racing Guide* publications morphed and began to appear somewhat similar to *Punters' Way*. While there used to be an additional "Selections" feature between Table 1 (Race Card) and Table 2 (Results Panel) of *Racing Guide*, this was subsequently altered such that this feature was incorporated into Table 2, resulting in identical sequential arrangements of the Tables in both publications. Additionally, the Appellant had included a "J-1-2-3" feature in Table 1 (Race Card) of *Racing Guide*, which mimicked the "R-1-2-3" feature in *Punters' Way*. These were only added after Levar had joined the Appellant as managing director in 2007. Further, the column for the total runs of the horses was not featured in *Racing Guide* prior to Levar's taking over the helm of the Appellant.

110    From the above, it is apparent that the Tables in *Racing Guide* were derived from the Tables in *Punters' Way*.

*Was a substantial part of the work copied?*

111    We agree with the Judge that the Tables in *Racing Guide* were arranged in a sequence that was exactly the same as that found in *Punters' Way*. However, although the Judge had found that there was copying and infringement of the Tables in *Punters' Way* by *Racing Guide* from June 2007–June 2008, no copies of the *Punters' Way* editions from June 2007–December 2007 were exhibited. In fact, the earliest copy we have for comparison would be the January 2008 issue. Thus, no finding of copying ought to have been made for the months of June 2007–December 2007.

112    On a comparison of the January 2008 issues of both publications, we agree with the Judge that the eight columns of Table 1 (Race Card) found in *Racing Guide* were arranged in substantially the same sequence as that in *Punters' Way*. There was only a slight difference in that the last two columns of Table 1 were interchanged. In addition, Table 2 (Results Panel) was substantially similar in that both publications included the exact sequence of the top four horses, followed by the "time" column, with a

dollar sign found in each column. Further, both Tables 3 (Track Work) and 4 (Results of Past Performances) were sequentially identical.

113    We also agree with the Judge that the existence of dissimilarities did not necessarily mean that there was no copying. The dissimilarities between *Racing Guide* and *Punters' Way* were either *de minimis* or merely cosmetic. In essence, looking at the manner of presentation and compilation of the horse-racing information as a whole, the Tables in *Racing Guide* incorporated a snbstantial part of the Tables found in *Punters' Way* even with the minor additions in *Racing Guide*: see the Judgment at [58]. We do not find it necessary to depart from the Judge's finding that, *prima facie*, a substantial part of the Tables had been copied and that this had not been rebutted by the Appellant.

114    Nonetheless this finding of copying by the Appellant is now moot as we have pointed out above that no copyright subsisted in the work. It follows, therefore, that there was no infringement of the Respondent's copyright by the Appellant.

**The Third Issue: Has the Respondent established the constituent elements for a passing off action?**

115    Apart from pursuing a claim for copyright infringement, the Respondent also claimed that the Appellant had committed the tort of passing off by copying the get-up of *Punters' Way*, which includes the colour code of the front covers, the picture of forward-facing racehorses and the advertisement panel across the bottom of the cover. The Respondent claimed that goodwill existed in the get-up of *Punters' Way* as it had been selling copies since 1977, and the colour code had been in place since 1993. Consequently, the Respondent alleged misrepresentation by the Appellant in adopting a remarkably similar colour coding and using a similar picture featuring forward-facing racehorses on the cover of *Racing Guide*. The Respondent also alleged that it had suffered damage as a result of the passing off.

116    *Novelty Pte Ltd v Amanresorts Ltd* [2009] 3 SLR(R) 216 ("*Amanresorts*") affirmed (at [37]) that the "classical trinity" of goodwill, misrepresentation and damage must be established by the party seeking to claim passing off before an action can succeed. We now proceed to examine whether each of these elements have been satisfied by the Respondent in the present case.

*Goodwill*

117    The Respondent is required to establish that it had acquired goodwill at the relevant date, which is the date on which the conduct of the Appellant that the Respondent complained of started. The classic definition of goodwill may be derived from *The Commissioners of Inland Revenue v*

*Muller & Co's Margarine, Limited* [1901] AC 217 at 223–224, which held that goodwill "is the benefit and advantage of the good name, reputation, and connection of a business".

118    In the present circumstances, the Respondent claimed goodwill in: (a) the colour code for the different race days over a weekend; (b) the picture of forward-facing racehorses; and (c) the advertisement panel across the bottom of the cover. According to the Respondent, the colour code has been in use by *Punters' Way* since 1993 in order to allow punters and readers to easily identify the particular race day they were interested in by the colour of the book. In addition, the Respondent alleges that since 1977, *Punters' Way* has been selling an average of 31,000 copies weekly.

119    Whether a get-up has acquired the necessary distinctiveness is a question of fact. Here, the Respondent has been publishing *Punters' Way* for around 30 years, since 1977. It has also been shown in a market survey done by Nielsen Company in March 2007, that overall the Respondent enjoyed 80% of the market share in the horse-racing industry in Singapore. In addition, Levar acknowledged "that *Punters' Way* was the market leader in Singapore at various stages in its history". With the Appellant's own witness acknowledging the dominant presence of the Respondent's products in the horse-racing market, it ought to be accepted that there is indeed a business within the jurisdiction of Singapore in which goodwill can attach.

120    We agree with the Judge that the Respondent had built up considerable goodwill in the business and overall get-up of *Punters' Way* as *Punters' Way* had adopted the unique colour-coding since 1993, had been sold in a substantial number of stores and newsstands in Singapore, and had been advertised with considerable effort: at [73] of the Judgment. We therefore find that goodwill is attached to the particular get-up of *Punters' Way*.

### *Misrepresentation*

121    The Respondent is also required to show that:

> (a)    the Appellant has made a misrepresentation to the relevant sector of the public; and

> (b)    such misrepresentation has resulted in or is likely to result in damage to the Respondent's goodwill.

122    As noted by this court in *Amanresorts* ([116] *supra*) at [69], the elements of misrepresentation and damage are very closely linked, and it is crucial to appreciate that both the misrepresentation and the damage must relate to the Respondent's goodwill. A misrepresentation is actionable as a tort of passing off only if it causes (or is likely to cause) damage to the Respondent's goodwill.

123  The essential question is whether the Appellant has made a false representation that led to deception or confusion amongst the relevant sector of the public. The relevant sector of the public would, in this situation, clearly be punters, and people with a keen interest in the horse races. In the case of a claim of adoption of get-up, the real question is whether the get-up adopted by the offending party is sufficiently similar to that of the plaintiff as to give rise to confusion. In proving misrepresentation, it has been previously established in *Tong Guan Food Products Pte Ltd v Hoe Huat Hng Foodstuff Pte Ltd* [1991] 1 SLR(R) 903 ("*Tong Guan*") at [24] that the court is not concerned with the "moron in a hurry" being confused. Rather, the test that is to be applied is whether ordinary sensible members of the public would be confused. It is sufficient that a substantial proportion of persons who are probably purchasers of the goods of the kind in question would in fact be confused.

124  The Judge found that on a perusal of the cover pages of *Racing Guide* and *Punters' Way*, there was a compelling case that the Appellant had consciously and deliberately made changes to the cover of *Racing Guide* to misrepresent *Racing Guide* as *Punters' Way*: at [76] of the Judgment. This was especially so since the same colours for the covers were used for the same specific function as those devised by the Respondent. Further, the Judge found that the Appellant had changed the position of its advertisement panel such that it was similar to the Respondent's publication and that there was also striking similarity between the Chinese titles for both publications. The Judge made her observations on the similarities between the two publications without regard to the market survey done by the Respondent's expert witness Greg Coops ("Coops") but nevertheless found that Coops' evidence only served to reinforce her findings: at [77]–[79] of the Judgment.

125  However, we find that little reliance ought to be placed on the market survey due to the lack of objectivity in the way the survey was conducted. The survey included the comparison of issues of *Punters' Way* and *Racing Guide* which were published on different days – 19 October 2008 for *Punters' Way* and 27 April 2008 for *Racing Guide*. The two issues appear to have been deliberately chosen as they were most similar in their get-up – including the colour of the cover page, and the pictures of the horses. The survey was therefore conducted by approximating the two issues which were most similar. However, the stubborn fact remains that these two issues were not published on the same day. Such a comparison would not be a fair test.

126  Additionally, the survey was conducted with the masthead removed. The masthead accounts for one-third of the magazine and would be a key distinguishing feature for punters seeking to purchase a particular magazine. The target survey audience were also questioned as to whether

they could identify the magazines without the name and title of the magazines. This would not be a fair comparison.

127    Further, one of the questions asked in the survey was "how likely would it be for you to confuse these two magazines if you were in a hurry and you were selecting one of them?". This question would lead to an inaccurate finding of misrepresentation to the public as it approximates the "moron in a hurry" test. Therefore, we disagree with the Judge that the survey conducted by Coops was appropriate and representative of the public's view.

128    With respect, we also find that the scenario described by the Judge, that race-goers who were "less educated or who were late and/or were in a hurry to get into the grounds of the race track" (at [87] of the Judgment) would be confused and would buy a racing guide thinking it was *Punters' Way* when it was actually *Racing Guide*, was flawed, as this similarly approximated the "moron in a hurry" test.

129    The correct test that should be applied is that of the imperfect recollection test – not to compare both publications side by side, but to take into account the fact that the "confusion which may occur will take place when the customer has in his mind his recollection of the plaintiff's mark, which may well be only an idea of the whole or actual mark": see *Tong Guan* ([123] *supra*) at [26].

130    It appears unlikely to us, in the absence of cogent evidence, that the punting audience to which both publications are targeted are undiscerning. They would know precisely which publication they wanted to purchase and would ask for either *Punters' Way* or *Racing Guide*, two very dissimilar names, when purchasing the magazine. The assumption that customers purchase the magazines on the basis of colour has not been proved by the Respondent, and may in fact not be true. The colour-coding may have been irrelevant to the customers and, if so, there would be no misrepresentation. It was also unpersuasive that the picture of forward-facing racehorses on the front cover was misleading as every horse-racing guide would logically feature horses on its cover page. The Respondent cannot be said to have a monopoly over pictures of commonplace horses or even forward-facing racehorses. Additionally, the titles of the publications are prominently displayed on the magazines. We are of the opinion that the large mastheads are significant distinguishing factors and as such, there would be no confusion caused to the public.

131    In the case of *Tong Guan*, illiteracy was seen as "an evaporating consideration" (at [30]) in Singapore by 1991, and the court took the view that a purchaser would use ordinary care to read (whether in English or Chinese) the brand names of the products in order to distinguish between two different brands. In the present circumstances, it can be said that the problem of illiteracy is even more removed than it was in 1991.

Furthermore, punters and race-goers are likely to be a circumspect and discerning audience. As in *Tong Guan*, where the court held that the brands "Tong Guan" and "Deer Brand" were sufficiently distinguishable, it can also be similarly argued that "Punters' Way" and "Racing Guide" are phonetically and visually different and thus a customer using ordinary care would not be confused.

132   We therefore disagree with the Judge and find that no misrepresentation leading to confusion of the public has been proven by the Respondent on the present facts. The cover pages of the two magazines are sufficiently distinct and are not likely to be confused by the relevant sector of the public.

### Damage

133   Even if the Appellant could be shown to have misrepresented *Racing Guide* as *Punters' Way*, thereby causing confusion between the Respondent's racing guide and that of the Appellant, such misrepresentation is not in itself actionable unless it has caused, or is likely to cause, damage to the Respondent's goodwill.

134   The Respondent claimed the net loss of profits that it suffered from 30 June 2007 to 5 June 2008, as well as continuing damages and loss from 5 June 2008 to the date of filing of the Statement of Claim for the Respondent's continued infringement. The Respondent also sought the costs incurred in conducting market surveys to verify the extent of the damage caused, as well as an injunction to restrain the Appellant from infringing the Respondent's copyright. However, the Respondent only invited the court to infer damage or the likelihood of damage that had been suffered by the Respondent as a result of the misrepresentation by the Appellant. The Respondent did not lead any evidence on a loss of sales, or a decline in the growth of sales of *Punters' Way*.

135   The Judge found (at [82] of the Judgment) that where parties are in direct competition with one another, the court will readily infer the likelihood of damage to the Respondent's goodwill, not merely through the loss of sales, but also through the loss of the exclusive use of his get-up.

136   We do not agree that the test for damages has been correctly applied by the Judge on the established facts. While it is accepted that the common test applied in proving damage is "actual damage or a real likelihood of damage", it must be noted that the period of infringement alleged by the Respondent was a limited one – from 30 June 2007 to 5 June 2008. This was not a situation where the infringement by the Appellant was ongoing or impending and therefore unquantifiable. In actual fact, the infringement period had long since ended. The Respondent ought therefore to have been able to prove a decline in sales of *Punters' Way*, or a reduced growth in sales of *Punters' Way*, if this had indeed taken place. In such a situation, the right

test that should be applied would be that of "actual damage" and not "likelihood of damage".

137  *Prima facie* proof of damage is essential in the present situation in establishing the Appellant's liability. However, the Respondent had failed to lead any evidence on the damage that it had suffered to its goodwill from the Appellant's alleged misrepresentation of *Punters' Way*. The Respondent had merely relied on a "logical" inference that as the Appellant and the Respondent's publications were in a common field of activity, it would therefore not be far-fetched to conclude that the Respondent had suffered losses.

138  The Respondent had submitted at the hearing of the appeal, that because the trial had been bifurcated, no evidence of damages was led at trial. The application for bifurcation had in fact been taken out by the Appellant and it was heard on 9 November 2009 before an assistant registrar. During the bifurcation hearing, the Appellant's counsel had argued that the trial should be bifurcated as all that the Respondent was required to prove was a likelihood of damage and not the quantum of the damage. The assistant registrar subsequently allowed a bifurcation of the trial.

139  In these circumstances, since the Appellant's counsel himself was of the opinion that a likelihood of damage was all that was required to prove the tort of passing off, we do not find it just to penalise the Respondent for not leading evidence of actual damages at the trial. However we reiterate that, ideally, the test for damages in situations where the period of infringement had passed should be proof of actual damage and nothing short of that.

### Our conclusion on the passing off claim

140  We therefore respectfully disagree with the Judge, and conclude that the element of misrepresentation in the tort of passing off has not been successfully proven by the Respondent and therefore the claim of passing off cannot succeed.

### Consequential relief

141  The Appellant, in the court below, counterclaimed against the Respondent under s 200(1) of the Act for making groundless threats of legal proceedings. Section 200(1) of the Act provides that where a person threatens another person with a copyright infringement action, the latter may bring an action against the former for, *inter alia*, a declaration that the threat is unjustifiable, unless the former satisfies the court that the alleged infringing acts "constituted, or if done, would constitute, an infringement of copyright". The full text of s 200(1) reads as follows:

Groundless threats of legal proceedings

200.—(1) Where a person, by means of circulars, advertisements or otherwise, threatens a person with an action or proceeding in respect of an infringement of copyright, then, whether the person making the threats is or is not the owner of the copyright or an exclusive licensee, a person aggrieved may bring an action against the first-mentioned person and may —

    (*a*)    obtain a declaration to the effect that the threats are unjustifiable;

    (*b*)    obtain an injunction against the continuance of the threats; and

    (*c*)    recover such damages, if any, as he has sustained,

unless the first-mentioned person satisfies the court that the acts in respect of which the action or proceeding was threatened constituted, or, if done, would constitute, an infringement of copyright.

142   Having regard to our findings that copyright did not subsist in the Tables in *Punters' Way*, and that the Appellant therefore could not have infringed any copyright of the Respondent's, it must follow that the Respondent has made groundless threats against the Appellant for the purposes of s 200(1) of the Act.

Conclusion

143   In the result, we find that the Respondent's threats to bring an action for copyright infringement against the Appellant are unjustifiable. The Respondent's claim for the tort of passing off is similarly untenable. Accordingly, the present appeal against the Judge's decision is allowed. The injunction granted by the Judge to restrain the Appellant from infringing the Respondent's copyright in its publications of *Punters' Way* is discharged. The Appellant is entitled to damages against the Respondent for groundlessly threatening the Appellant with copyright infringement under s 200(1) of the Act (which shall be assessed by an assistant registrar), and an injunction restraining the Respondent from making further threats against the Appellant in respect of the subject matter of these proceedings. Because the Appellant has not succeeded in several of its arguments (here and below) we invite the parties to make written submissions on the appropriate costs order we should make for the entire proceedings. The parties have seven days from the date of this judgment to make these submissions.

Reported by Seraphina Fong.

EXHIBIT "6"

# Copyright Act, 1956

4 & 5 ELIZ. 2   CH. 74

ARRANGEMENT OF SECTIONS

PART I

COPYRIGHT IN ORIGINAL WORKS

Sections
1. Nature of copyright under this Act.
2. Copyright in literary, dramatic and musical works.
3. Copyright in artistic works.
4. Ownership of copyright in literary, dramatic, musical and artistic works.
5. Infringements by importation, sale and other dealings.
6. General exceptions from protection of literary, dramatic and musical works.
7. Special exceptions as respects libraries and archives.
8. Special exception in respect of records of musical works.
9. General exceptions from protection of artistic works.
10. Special exception in respect of industrial designs.
11. Provisions as to anonymous and pseudonymous works, and works of joint authorship.

PART II

COPYRIGHT IN SOUND RECORDINGS, CINEMATOGRAPH
FILMS, BROADCASTS, ETC.

12. Copyright in sound recordings.
13. Copyright in cinematograph films.
14. Copyright in television broadcasts and sound broadcasts.
15. Copyright in published editions of works.
16. Supplementary provisions for purposes of Part II.

PART III

REMEDIES FOR INFRINGEMENTS OF COPYRIGHT

17. Action by owner of copyright for infringement.
18. Rights of owner of copyright in respect of infringing copies, etc.
19. Proceedings in case of copyright subject to exclusive licence.
20. Proof of facts in copyright actions.
21. Penalties and summary proceedings in respect of dealings which infringe copyright.
22. Provision for restricting importation of printed copies.

A                          i

(5) The acts restricted by the copyright in an artistic work are—

    (*a*) reproducing the work in any material form ;

    (*b*) publishing the work ;

    (*c*) including the work in a television broadcast ;

    (*d*) causing a television programme which includes the work to be transmitted to subscribers to a diffusion service.

**4.**—(1) Subject to the provisions of this section, the author of a work shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

*Ownership of copyright in literary, dramatic, musical and artistic works.*

(2) Where a literary, dramatic or artistic work is made by the author in the course of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship, and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the said proprietor shall be entitled to the copyright in the work in so far as the copyright relates to publication of the work in any newspaper, magazine or similar periodical, or to reproduction of the work for the purpose of its being so published ; but in all other respects the author shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

(3) Subject to the last preceding subsection, where a person commissions the taking of a photograph, or the painting or drawing of a portrait, or the making of an engraving, and pays or agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein by virtue of this Part of this Act.

(4) Where, in a case not falling within either of the two last preceding subsections, a work is made in the course of the author's employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

(5) Each of the three last preceding subsections shall have effect subject, in any particular case, to any agreement excluding the operation thereof in that case.

(6) The preceding provisions of this section shall all have effect subject to the provisions of Part VI of this Act.

**5.**—(1) Without prejudice to the general provisions of section one of this Act as to infringements of copyright, the provisions of this section shall have effect in relation to copyright subsisting by virtue of this Part of this Act.

*Infringements by importation, sale and other dealings.*

EXHIBIT "7"

COMMONWEALTH    OF    AUSTRALIA.

# REPORT

OF THE

## Committee Appointed by the Attorney-General of the Commonwealth

TO

## Consider what Alterations are Desirable

IN

## The Copyright Law of the Commonwealth.

*By Authority:*
A. J. ARTHUR, Commonwealth Government Printer, Canberra.
(Printed in Australia.)

4531/63.

# REPORT

OF

# The Copyright Law Review Committee, 1959.

4531/63.—2

# CONTENTS.

|  |  | Paragraphs. |
|---|---|---|
| I. | Introductory . . . . . . . . . . . . . . . . . | 1- 13 |
| II. | History of Australian Legislation . . . . . . . . . . | 14-22 |
| III. | British Act of 1956 . . . . . . . . . . . . . | 23-26 |
| IV. | Differences between 1911 Act and 1956 Act . . . . . . . | 27-28 |
| V. | Brussels Convention and Universal Copyright Convention . . . . ., | 29-52 |
| VI. | Literary, Dramatic and Musical Works . . . . . . . . . | 53-70 |
| VII. | Artistic Works . . . . ., . . . . . . . . | 71-78 |
| VIII. | Ownership of Copyright. . . . . . . . . . . . | 79-91 |
| IX. | Infringement by Importation, Sale and Other Dealings . . . . . | 92-105 |
| X. | General Exceptions from Protection of Literary, Dramatic and Musical Works . . | 106-128 |
| XI. | Works in Libraries . . . . . . . . . . . | 129-151 |
| XII. | Compulsory Licence to Manufacture Records . . . . . ., | 152-216 |
| XIII. | General Exceptions from Protection of Artistic Works . . . . . . | 217-221 |
| XIV. | Anonymous and Pseudonymous Works and Works of Joint Authorship . . | 222-225 |
| XV. | Copyright in Sound Recordings, Cinematograph Films, Broadcasts and Typographical Arrangements . . . . . . . . . . | 226-227 |
| XVI. | Gramophone Records . . . . . . . . . . . . | 228-264 |
| XVII. | Cinematography Films . . . . . . . . . . . . | 265-278 |
| XVIII. | Sound and Television Broadcasts . . . . . . . . . . | 279-300 |
| XIX. | Typographical Arrangements . . . . . . . . . . | 301-302 |
| XX. | Infringement of Copyright in Records, Films, etc., by Importation, Sale or Other Dealings . . . . . . . . . . . . . | 303-304 |
| XXI | Remedies for Infringement . . . . . . .. .. .. | 305-339 |
| XXII. | Tribunal . . . . . . . . . . .. .. .. | 340-378 |
| XXIII. | Extension or Restriction of Operation of Act .. .. .. .. | 379-388 |
| XXIV. | Assignment, Licences and Testamentary Dispositions .. .. .. | 389-400 |
| XXV. | The Crown . . . . . . . .. .. .. | 401-406 |
| XXVI. | Diffusion Services and Broadcasts of Recordings and Films .. .. | 407-413 |
| XXVII. | Use of Copyright Material for Education . . . . .. .. .. | 414-419 |
| XXVIII. | False Attribution of Authorship . . . . . .. .. .. | 420-425 |
| XXIX. | Forfeited Works . . . . . . . .. .. .. | 426-427 |
| XXX. | Industrial Designs . . . . . . . .. .. .. | 428-437 |
| XXXI. | Definitions . . . . . . . . . .. .. .. | 438-443 |
| XXXII. | *Copyright Act* 1912-1950-- | |
|  | Registration and Summary Offences . . . . . . ., .. | 444-466 |
|  | Deposit of Books . . . . . . . . . . . . | 467-470 |
|  | Groundless Threats of Legal Proceedings: . . . . . . . | 471 |
| XXXIII. | Miscellaneous . . . . . . . . . . . . . | 472-503 |
| XXXIV. | Summary of Recommendations . . . . . . . . . . | 504 |

20

78. We recommend elsewhere that, in conformity with the 1956 Act and with present law, a work should be taken to have been published only if reproductions of the work have been issued to the public. Under our recommendations, therefore, the mere exhibition of an artistic work will not be an infringement of copyright. The inclusion of an artistic work in a television broadcast is, in our view, similar, for present purposes, to its exhibition in public and we would prefer that (c) and (d) above should not be restricted acts. It may be, however, that Article 11 bis of the Brussels Convention requires that protection be given to artistic works in this respect and, if that be so, we recommend accordingly. In this regard we direct attention to the comments of the Canadian Commission (p. 45). If it be decided that the Brussels Convention requires this protection we recommend certain limitations. We deal with these later (para. 219).

## VIII. OWNERSHIP OF COPYRIGHT.

79. We approve the basic principle set out in section 4 (1) of the 1956 Act and in our present law that, subject to certain exceptions, the author of a work should be the first owner of copyright.

80. *Work produced in the course of employment.—* Section 4 (4) of the 1956 Act provides that where, in a case not falling within sub-sections (2) and (3) of that section (which relate to work made by journalists and to commissioned work), a work is made in the course of an author's employment by another person under a contract of service or apprenticeship, the employer shall be entitled to any copyright subsisting in the work. This provision, generally speaking, conforms to our existing law and to the general principles of common law regarding things done and produced in the course of employment and we favour it.

81. *Commissioned Work.—* The Gregory Committee recommended that where a work is commissioned for valuable consideration, the person who commissioned the work should, in the absence of agreement to the contrary, be the owner of copyright in the work (para. 27 I). It was further recommended that, where the work was commissioned for a particular purpose, the author should have the right to restrain its use for any other purpose without his consent (para. 272).

82. The 1956 Act does not conform to those recommendations. Under that Act, the author, subject to agreement to the contrary, retains copyright in a commissioned work except in the case of *(a)* a photograph or an engraving or (b) a painting or drawing of a portrait. In the latter cases, copyright is in the person who commissioned the work (section 4 (3)). The 1911 Act contains a similar provision in section 5 (1.).

83. We do not approve of the provisions of the 1911 Act or the 1956 Act in this regard. The purpose for which a work is commissioned seems to us to be a vital consideration in determining who should be the owner of copyright. We see no reason why, for example, a person who commissions a photograph for the purpose of illustrating a book should be permitted to use it as a commercial advertisement without the consent of the author. As the Gregory Committee pointed out, " there is ground for supposing that when a work is commissioned for a particular purpose, that purpose may well have determined the price paid for it, and if it is used for another purpose the author may be prejudiced not only in respect of his immediate financial return but also in respect of his general reputation " (para. 272).

21

84. Similarly, we are of the view that if, say, a literary work is commissioned for the purposes of broadcasting, the author should not, in the absence of agreement to the contrary, be permitted to authorize its broadcast by a rival broadcasting station. In those circumstances, copyright in the work, so far as it concerns broadcasting, should, we think, be vested in the broadcaster who commissioned it.

85. We recommend, therefore, that a person who commissions a work for valuable consideration should, in the absence of agreement to the contrary, be the owner of copyright in the work insofar as it relates to the purpose for which he commissioned it, provided that his purpose was communicated to the author before the work was made. In all other respects copyright should remain in the author.

86. *Publications in Newspapers and Periodicals.*— Both the 1911 Act and the 1956 Act contain special provisions regarding works published in newspapers, magazines and similar periodicals. The 1911 Act provides, in section 5 (1.) (b), that where a work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical. Section 4 (2) of the 1956 Act is as follows:—

(2) Where a literary, dramatic or artistic work is made by the author in the course of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship, and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the said proprietor shall be entitled to the copyright in the work insofar as the copyright relates to publication of the work in any newspaper, magazine or similar periodical, or to reproduction of the work for the purpose of its being so published, but in all other respects the author shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

87. The latter sub-section conforms more closely than the provision in the 1911 Act to the recommendation we have made regarding commissioned works and we recommend the enactment of a provision to the same effect as section 4 (2).

88. It has been submitted to us by the Australian Journalists' Association that an employee-journalist should, in the absence of agreement to the contrary, have copyright jointly with his employer in works produced in the course of his employment insofar as the copyright relates to publication in arty newspaper, magazine or similar periodical other than the first one in which it is published. The Journalists' Association asks for this increased protection on the ground that overseas sales and extensive syndication " provide a huge and profitable field for the exploitation of material out of all proportion to the wage which is the employee's sole claim, under the present law, to profit from exceptional work".

89. We doubt whether a provision of that nature would make any practical difference to the position of the journalist as a newspaper proprietor could, and doubtless would, ensure that his employee's contract of service provided to the contrary.

90. It is to be noted that if our recommendations are accepted journalists will be in a more favorable position than they are under our present law. Indeed, journalists who are employees are and, will under these recommendations continue to be, in a uniquely favorable position as compared with employees in other fields. Furthermore, it seems to us that this question is related to conditions of employment that would be more appropriately dealt with by an industrial tribunal than by the copyright law.

EXHIBIT "8"

# The Law of

# Copyright in

# Singapore

## SECOND EDITION

**George Wei**
Dipl. Law, LL.M. (London)
Barrister, Inner Temple and Hong Kong
Advocate and Solicitor, Singapore



**SNP**
*Editions*

author made the work in pursuance to the terms of his employment. Whether or not this is so can raise difficult questions of fact.[106]

**7.34**   *Transitional Provisions.* Section 213(1) provides that the special provisions of section 30(4) do not apply to works made before the commencement of the Act (10 April 1987). For the purposes of the transitional provisions, section 206 clarifies that a work shall not be regarded as made before the commencement of the Act unless the making of it was completed before the commencement of it. Section 213(7) provides that in such cases:

> "Where the work is a literary, dramatic or artistic work that was made by the author in pursuance of the terms of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship and was so made for the purpose of publication in a newspaper, magazine or similar periodical, the author is entitled to restrain the publication of the work otherwise than in a newspaper, magazine or similar periodical."

Accordingly, in cases governed by section 213(7), the employed journalist is merely given the equivalent of a right of veto to restrain publication otherwise than in a newspaper, magazine or similar periodical.[107] This is a very much less favourable position than is the case of works made after 10 April 1987 and which are governed by section 30(4).

## CONTRACTING OUT OF THE STATUTORY PROVISIONS ON OWNERSHIP

**7.35**   The general rule that copyright in literary, dramatic, musical and artistic works vests in the author is, as noted, subject to a number of special exceptions concerning certain types of "commissioned" artistic works,[108] works made in the course of employment under a contract of service[109] and works made by employees of newspapers, magazines and similar periodicals for publication therein.[110] These special rules can themselves be displaced under section 30(3) by agreement.[111] There is nothing to suggest that the

---

[106] See *Byrne v. Statist Co* [1914] 1 KB 622 noted above at para. 7.27.
[107] Note that s 213(4) provides that this is subject to any contrary agreements.
[108] S 30(5).
[109] S 30(6).
[110] S 30(4).
[111] S 30(3) states that sub-ss (4), (5) & (6) may be excluded or modified by agreement. Query who must be the parties to the agreement. For an example of a recent UK case on equivalent provisions under the Copyright Act 1956, see *Orwin v. Attorney General* [1998] FSR 415 which concerned the ownership of copyright in works created by the plaintiff whilst he was the Chairman, Managing Director and employee of a company that had gone into creditors voluntary liquidation. Did the copyright vest in the Crown? The plaintiff sought an order vesting the copyright into himself. Mummery LJ. noted that there was a possibility that the plaintiff was all the while the legal owner of the copyright and that the copyright never vested in the company because there was an oral agreement evidenced by a special resolution displacing the operation of law (under the Copyright Act 1956 (UK)) vesting the work of

agreement to be effective must be in writing. That an implied agreement ousting the special exceptions is possible can be seen from the decision in *Noah v. Shuba*.[112] That case has already been discussed in paragraph 7.27 above, the main holding of Mummery J. being that the Guide was not written in the course of employment and that the copyright accordingly vested in the plaintiff. The judge went on to hold that in any event, even if the Guide had been written in the course of employment, that there was an implied term in the contract of service excluding the operation of the special statutory provisions vesting the copyright in the employer. The existence of the implied term was based on the evidence that the employer in that case had long acquiesced in a practice whereby copyright was retained by employee authors. After all, it was the employee authors in that case who would normally execute assignments of copyright to learned societies who were interested in publishing their articles.

7.36    In order for the agreement to be effective in ousting the special provisions, it must be one which was made before the relevant work was made. Once the work has been made, the special provisions will automatically operate to vest the copyright in the "commissioner" or employer as relevant. Any agreement made after the work is made can only have effect in the context of an assignment or licence of the copyright to the author.[113] Where, however, the agreement is not in writing and is oral, it will not be valid as an assignment in law.[114] The oral agreement, express or implied, may, however, take effect as an equitable assignment.

7.37    It should be noted that the general provisions of section 30(2) which vests the copyright in works into the author is not made subject to contrary agreements. Whilst the provisions of section 30(2) cannot be displaced by contrary agreement, there is nothing to stop the author from assigning the copyright in the work after it is made. As already noted, it is also possible under section 195 for the prospective owner of copyright to assign his future copyright in advance of the making of the work. The effect of an agreement to assign the future copyright in a work not yet made is that the copyright will vest in the assignee as soon as the work is created. To be valid at law, the agreement must be in writing since section 195 requires the prospective owner to sign the agreement.[115]

employees in the employer. If this was the case, the court would have no jurisdiction to make a vesting order. With regard to an alternative assertion that the plaintiff was an equitable owner, Mummery LJ. stated that this would depend on whether in all the circumstances surrounding the alleged oral agreement and passing of the special resolution, there was an implied, resulting or constructive trust.

[112] [1991] FSR 14.
[113] See *Noah v. Shuba* [1991] FSR 14 at p. 24.
[114] See s 194(3) discussed below at Chapter 12 at para. 12.2 *et seq.* No particular form of written words is needed. See Chapter 12 at paras. 12.2 and 12.16.
[115] Under the Imperial Copyright Act 1911, there was no statutory provision permitting an assignment of the copyright in a work not yet made. Such assignments under the 1911 Act may, however, have had effect in equity. See Ricketson, *The Law of Intellectual Property*, 1984 at para. 13.95. Assignment of copyright is considered later in Chapter 12.

EXHIBIT "9"

# THE INTERPRETATION OF CONTRACTS

## 6TH EDITION

### SIR KIM LEWISON
*A Lord Justice of Appeal*

SWEET & MAXWELL  THOMSON REUTERS

CONSTRUCTION CONTRA PROFERENTEM

In *BHP Petroleum Ltd v British Steel Plc*,[188] Evans L.J. said:

> "It is common ground that the rule of construction known as contra [proferentem] operates against the respondent for two reasons. First, they rely upon the clause to exclude or to limit the liability alleged against them, and, secondly, they were responsible for introducing during the negotiating process the particular parts of the clause on which they now rely."[189]

In *Whitecap Leisure Ltd v John H Rundle Ltd*,[190] Moore-Bick L.J. said of a time bar clause:

> "However, in cases where there is uncertainty about the parties' intention, and therefore about the meaning of the clause, such uncertainty will be resolved against the person relying on the clause and the more significant the departure is said to be from what are accepted to be the obligations ordinarily assumed under a contract of the kind in question, the more difficult it will be to persuade the court that the parties intended that result."

The various formulations of the principle may conflict with each other in some cases. In *North v Marina*,[191] Campbell J. said:

> "When there are these different strands of principle recognised in the case law concerning the application of the maxim, those strands could themselves come into conflict. A common example is the one given by Sir Frederick Jordan in *Fenwick*,[192] that a conveyance of land is commonly prepared by the transferee, yet it is a grant made by the transferor."[193]

It was, perhaps, considerations of this kind that led Hoffmann J. to say that in most cases the application of the maxim to a lease would be entirely arbitrary.[194]

### (g)   *When the maxim applies*

Given the differing, and potentially conflicting, formulations of the principle, it is not possible easily to predict the cases in which the court will find the maxim a useful tool. Thus in *CDV Software Entertainment AG v Gamecock Media Europe Ltd*,[195] Gloster J. said that the principle was "of uncertain application and little utility in the context of commercially negotiated agreements". Perhaps the most that can be said is that the court will resort to the maxim where the justice of the case demands it. Some reliance was placed on the *contra proferentem* principle "very much as a last resort" in *Landlord Protect Ltd v St Anselm Development Co Ltd*.[196]

---

[188]  [2000] 2 Lloyd's Rep. 277 at 281.
[189]  The court considered the clause both in its original form and its form as amended during negotiations.
[190]  [2008] 2 Lloyd's Rep. 216.
[191]  [2003] NSWSC 64.
[192]  *Fenwick & Co Pty Ltd v Federal Steam Navigations Co Ltd* (1943) 44 S.R. (N.S.W.) 1.
[193]  The author is not convinced that this really is a conflict. Although it is true that in traditional conveyancing the transferee drafts the conveyance, the contents of the conveyance will have been prescribed by the contract that precedes it. The contract will have been drafted by the transferor, or will at best have been a joint drafting effort.
[194]  *Amax International Ltd v Custodian Holdings Ltd* [1986] 2 E.G.L.R. 111.
[195]  [2009] EWHC 2965.
[196]  [2008] EWHC 1582 (Ch).

[395]

THE CANONS OF CONSTRUCTION

The principle was also applied by the Court of Appeal in *Pratt v Aigaion Insurance Co*,[197] interpreting a warranty given in an insurance policy.

*(h)    Principle to be applied only in cases of doubt*

However, the principle only applies where there is a doubt or ambiguity.[198] It should not be used for the purpose of creating a doubt or magnifying an ambiguity, where the circumstances of the case raise no real difficulty.[199] Before concluding that the contract is ambiguous, thus opening the way for the application of the *contra proferentem* principle, the court should examine the background and commercial purpose of the contract. In *Direct Travel Insurance v McGeown*,[200] Auld L.J. said:

> "A court should be wary of starting its analysis by finding an ambiguity by reference to the words in question looked at on their own. And it should not, in any event, on such a finding, move straight to the *contra proferentem* rule without first looking at the context and, where appropriate, permissible aids to identifying the purpose of the commercial document of which the words form part. Too early recourse to the *contra proferentem* rule runs the danger of "creating" an ambiguity where there is none."

As the Upper Tribunal rightly observed in *Burchell v Raj Properties Ltd*[201]:

> "It is wrong in principle to seize on the presence of any ambiguity or difficulty of construction as sufficient justification immediately to resort to the *contra proferentem* principle as a trump card."

So the court's first task is to construe the document properly on ordinary principles.[202] As Warren J. explained in *PNPF Trust Co Ltd v Taylor*[203]:

> "The fact that there are difficulties about a point of construction does not mean that there is a doubt or ambiguity of a type to which the *contra proferentem* rule may be applicable. If conventional canons of construction are capable of resolving the issue, they should he applied."

So also in *Morris v Blackpool Borough Council*,[204] Gloster L.J. said:

> "… the presumption can only come into play if the court finds itself unable on the material before it to reach a sure conclusion on the construction of a reservation or other contractual term. The presumption itself is not a factor to be taken

197  [2009] 1 Lloyd's Rep. 225.
198  *Joint London Holdings Ltd v Mount Cook Land Ltd* [2005] 3 E.G.L.R. 119 CA, (referring to the equivalent paragraph in the previous edition of this book); *Static Control Components v Egan* [2004] 2 Lloyd's Rep. 429; *Quest 4 Finance Ltd v Maxfield* [2007] 2 C.L.C. 706.
199  *Cornish v Accident Insurance Co* (1889) 23 Q.B.D. 453 at 456; *Tektrol Ltd v International Insurance Co of Hanover Ltd* [2005] 2 Lloyd's Rep. 701.
200  [2004] 1 All E.R. (Comm) 609, applied in *West v Ian Finlay & Associates (a firm)* [2014] EWCA Civ 316.
201  [2014] L. & T.R. 4.
202  *Cattles Plc v Welcome Financial Services Ltd* [2010] EWCA Civ 599 referring to *Static Control Components (Europe) Ltd v Egan* [2004] 2 Lloyd's Rep. 429 CA.
203  [2010] EWHC 1573 (Ch).
204  [2014] EWCA Civ 1384; [2015] L. & T.R. 6.

[396]

CONSTRUCTION CONTRA PROFERENTEM

into account by the court in reaching its conclusion on construction. In my judgment the wording of the lease is not so vague or ambiguous that the court in the present case is unable to reach a sure conclusion on the material before it, applying the established principles of contractual interpretation."

In *London and Lancashire Fire Insurance Co Ltd v Bolands Ltd*,[205] Lord Sumner said:

"It is suggested further that there is some ambiguity about the proviso, and that, under the various well-known authorities, upon the principle of reading words *contra proferentes*, we ought to construe this proviso, which is in favour of the insurance company, adversely to them. That, however, is a principle which depends upon there being some ambiguity that is to say, some choice of an expression—by those who are responsible for putting forward the clause, which leaves one unable to decide which of two meanings is the right one. In the present case it is a question only of construction. There may be some difficulty, there may be even some difference of opinion, about the construction, but it is a question quite capable of being solved by the ordinary rules of grammar, and it appears to me that there is no ground for saying that there is such an ambiguity as would warrant us in reading the clause otherwise than in accordance with its express terms."

In *Birrell v Dryer*,[206] Earl of Selbourne L.C. said:

"I do not think that the evidence discloses any ambiguity or uncertainty, sufficient to prevent the application of the ordinary rules and principles of construction. ... There does not appear to me to be any necessity for resorting to presumptions in favour of or against either party, whether founded on the rule *fortius contra proferentem*, or on the onus of proving an exception from the general affirmative terms of this contract."

So too in *Patching v Dubbins*,[207] Page Wood V.C. said:

"I had at first an inclination of opinion, that if the words were doubtful, and it could be construed in favour of the defendants, the general rule would be this, that it being equivalent to a grant on the part of the vendor, the construction must be taken most strongly against the grantor. But, on the other hand, there is another rule of construction well established, namely, that it is right to give effect to every word, if it can be reasonable and properly done. I do not feel, therefore, at liberty to say that it is doubtful; if, in putting one construction upon this covenant, I give complete effect to all the words, whereas I should be leaving a portion of the words without effect in giving to the covenant a contrary construction."

---

[205] [1924] A.C. 836 at 848, HL. See also *Cornish v Accident Insurance Co* (1889) 23 Q.B.D. 453 at 456, CA, per Lindley L.J.:

"In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty." *Singh v Rathour* [1988] 2 All E.R. 16 CA.

[206] (1884) 9 App. Cas. 345.
[207] (1853) 1 Kay 1.

[397]

THE CANONS OF CONSTRUCTION

So too in *Parkinson v Barclays Bank Ltd*,[208] Cohen L.J. said:

"[Counsel] pressed us with the maxim that a deed must be construed *contra proferentem*. But if, applying the ordinary principles of construction, we arrive at a clear conclusion as to what the parties meant by the language which they used, I do not think that the maxim comes into action."

Similarly, in *St Edmundsbury and Ipswich Diocesan Board of Finance v Clark (No.2)*,[209] the Court of Appeal held that the presumption can only come into play if the court finds itself unable to reach a sure conclusion on the construction of the provision in question; and that the presumption is not a factor which may be taken into account in reaching that conclusion. So also in *Mira Oil Resources of Tortola v Bocimar*,[210] Colman J. said:

"Further, this is not a case where the meaning of the words is so finely balanced that the *contra proferentem* rule should be applied in favour of the owners. If in the view of the Court one of the two suggested meanings is significantly preferable to the other, as a matter of construction, it can safely be concluded that the former meaning reflects the mutual intention of the parties."

In *The Olympic Brilliance*,[211] Eveleigh L.J. said that the principle was: "usually a rule of, if not last, very late resort".

And in *Macey v Qazi*,[212] the Court of Appeal went further, and declared that the presumption is to be used only as a last resort. In *Sinochem International Oil (London) Co Ltd v Mobil Sales & Supply Corp*,[213] Mance L.J. also said:

"I bear in mind that cl. 18 was proffered by Mobil Delaware. But construction against the party putting forward a clause is a rule of last resort."

In *McCann v Switzerland Insurance Australia Ltd*,[214] Kirby J. said:

"Courts now generally regard the *contra proferentem* rule (as it is called) as one of last resort because it is widely accepted that it is preferable that judges should struggle with the words actually used as applied to the unique circumstances of the case and reach their own conclusions by reference to the logic of the matter, rather than by using mechanical formulae."

In the case of contracts of guarantee it is often said that they are to be construed *contra proferentem*; that is in favour of the guarantor.[215] However, in the light of the *ICS* case it is doubtful whether the mere fact that a contract is a contract of guarantee is enough to bring the *contra proferentem* principle into play.[216] Even if it does, the principle cannot be pressed too far. In *Coughlan v SH Lock (Australia)*

---

[208] [1951] 1 K.B. 368 CA.
[209] [1975] 1 W.L.R. 468.
[210] [1999] 2 Lloyd's Rep. 101.
[211] [1982] 2 Lloyd's Rep. 205 CA.
[212] *The Independent*, January 13, 1987.
[213] [2000] 1 Lloyd's Rep. 339.
[214] [2000] HCA 65.
[215] See e.g. *Eastern Counties Building Society v Russell* [1947] 1 All E.R. 500.
[216] *Egan v Static Control Components (Europe) Ltd* [2004] 2 Lloyd's Rep. 429 CA; *Meritz Fire & Marine Insurance Co Ltd* [2010] EWHC 3362 (Comm).

[398]

CONSTRUCTION CONTRA PROFERENTEM

*Ltd,*[217] Lord Oliver said:

> "At the outset [counsel] has reminded their Lordships of certain well-known principles of construction in relation to guarantees. Such a document falls to be construed strictly; it is to be read *contra proferentem*; and, in case of ambiguity, it is to be construed in favour of the surety. But these principles do not, of course, mean that where parties to such a document have deliberately chosen to adopt wording of the widest possible import that wording is to be ignored. Nor do they oust the principle that where wording is susceptible of more than one meaning regard may be had to the circumstances surrounding the execution of the document as an aid to construction."

Similarly, in *Johnsey Estates Ltd v Webb,*[218] Millett J. said:

> "On the other hand the words have to be fairly construed in their context and in accordance with their proper meaning without in any way favouring the guarantor, who is not placed in any more favourable position in this regard than any other contracting party. The so-called rule of construction is very much a matter of last resort."

### (i)  *Effect of the maxim*

Where the principle applies, it does not mean that the court should decide the case against the interest of the *proferens* wherever it can. The maxim was applied to a clause in an employment contract which permitted the employer unilaterally to vary the employee's rights.[219] But the narrow interpretation was in fact relied on by the employee. As the court said:

> "of course the meaning of the clause cannot vary depending upon who is praying it in aid."

Similarly, where a use clause in a lease was ambiguous, the application of the principle led to the adoption of a broader rather than a narrower permitted use, even though for the purposes of rent review it was in the tenant's commercial interest to argue for a narrow use.[220] Likewise, in a dissenting judgment in *Crawford v Morrow,*[221] Côté J. said:

> "If the doctrine does apply, it tells the Court to select one of the two possible interpretations of the contract, the one less favourable to the party who drafted the contract.
>
> That refers to selecting one interpretation of the contract, not selecting one result of the suit. The proper interpretation of the contract must exist at the time that it is made, and not change. It cannot come and go as the parties' fortunes wax and wane. It cannot be unknowable and shrouded in fog until after the event. For example, one interprets an insurance contract the same way before and after a fire, and it has meaning before any fire."

---

[217] (1987) 3 B.C.C. 183 PC. See also *The Kalma* [1999] 2 Lloyd's Rep. 374.
[218] [1990] 1 E.G.L.R. 80.
[219] *Dresdner Kleinwort Ltd v Attrill* [2013] EWCA Civ 394.
[220] *Skillion Plc v Keltec Industrial Research Ltd* [1992] 1 E.G.L.R. 123.
[221] (2004) 244 D.L.R. (4th) 144.

[399]

EXHIBIT "10"

# The Law of

# Copyright in

# Singapore

## SECOND EDITION

**George Wei**
Dipl. Law, LL.M. (London)
Barrister, Inner Temple and Hong Kong
Advocate and Solicitor, Singapore


SNP
Editions

**7.16**   In the United Kingdom, after some hesitation, it was decided to introduce in 1988 a new statutory definition of authorship for computer generated works. The effect of the provisions is that where a work is generated by a computer in circumstances where there is no human author, the author is to be taken to be the person by whom the necessary arrangements for the creation of the work are undertaken.[57] This definition is interesting for a number of reasons. First, it expressly recognises that in some circumstances it may be impossible using general principles to identify any person as author of the work. Conversely, it recognises that just because a computer is used to generate the work does not mean that there is no room for finding a human author. Third, in those cases where the computer generated work has no human author, the test of authorship chosen is similar to that adopted for cinematograph film rights. It is suggested that when the opportunity next arises in Singapore for a reform of her copyright laws, consideration should be given to the desirability of having a statutory definition of authorship. Whilst the definition in the Copyright, Designs and Patents Act 1988 (UK) is not free from problems of application, it does seem to point the way forward.

## ORIGINAL LITERARY, DRAMATIC, MUSICAL AND ARTISTIC WORKS: THE EXCEPTIONS WHERE COPYRIGHT IS NOT GIVEN TO THE AUTHOR

**7.17**   Section 30(4), (5) and (6) sets out a number of exceptions when the copyright in an author's work is not given to the author.

### *Commissioned Works*

**7.18**   Section 30(5) deals with certain types of "commissioned" works. It provides that where a person makes an agreement with another person for valuable consideration to:

(i)   take a photograph,[58]

(ii)   make an engraving,[59] or

(iii)   make a painting[60] or drawing of a portrait,[61]

---

[57] See ss 9(8) and 178, Copyright, Designs and Patents Act 1988 (UK).

[58] Photograph is defined in s 7(1) as meaning "a product of photography or of a process similar to photography, other than an article or thing in which visual images forming part of a cinematograph film have been embodied, and includes a product of xerography, and photography shall have a corresponding meaning". Note also the common meaning of photography discussed at n 41 above.

[59] Engraving is defined in s 7(1) as "etching, lithograph, product of photogravure, woodcut, print or similar work, not being a photograph". See Chapter 2 at para. 2.74 above.

[60] As to what is a painting, see Chapter 2 at para. 2.72 above.

[61] On what is a portrait, see *Leah v. Two Worlds Publishing Co Ltd* [1951] 1 Ch 393 where an artist had the ability through extra-sensory perception to paint likenesses of deceased persons whom he had never seen. The process involved the formation of a mental image of the deceased person through contact with a living person who had known the deceased. It was

then, so long as the work is made in pursuance to the agreement, the copyright in the work (if any) will belong to the first mentioned person (the person "commissioning" the work), and not the other person, even though the other person is the author.[62]

7.19   In order for section 30(5) to operate, it is necessary to show that the relevant work was produced in consequence of an agreement made for valuable consideration. If the work was not produced in consequence of the agreement, but was merely bought after it was made, the special provisions do not apply.[63] Take, for example, the decision in *Leah v. Two Worlds Publishing Co Ltd.*[63] This was a case decided under similar provisions set out in section 5(1) of the Imperial Copyright Act 1911. The father of a deceased son had purchased a portrait which had been sketched by the plaintiff after the son had died. The plaintiff had not known the son and he made the portrait based on his contact with the father. The evidence as to whether the father had "ordered" the portrait from the plaintiff was vague and uncertain. In short, at the time when the plaintiff had made the portrait, there was no clear evidence that a binding agreement had been entered into. What was clear was that the portrait was offered and accepted after it was completed. On that basis, the special provisions did not apply so as to displace the general rule that copyright in authors' works vests in the author. By buying the portrait, the father became the owner of the canvas on which the sketch was made. He was not the owner of the copyright.

7.20   In some cases, the work to which section 30(5) applies may have been jointly commissioned by two or more individuals. Take, for example, the rather tragic facts in *Mail Newspapers Plc v. Express Newspapers Plc.*[64] A

---

held, *inter alia*, that the likenesses that were produced were "portraits". "Portrait" covered portraits produced by the mental process of the artist and intended to represent a deceased person as that person was when living. It remained a portrait even though the material used was entirely subjective.

[62] Note that s 30(5) does not actually use the word "commission" unlike the equivalent provisions to be found under s 4(3) of the UK Copyright Act 1956. See n. 64 below. "Commissioner" is used in the discussion in the text as a shorthand reference to the person who is making the agreement with the author. See also *Kalamazoo (Aust) Pty Ltd v. Compact Business Systems Pty Ltd* (1985) 5 IPR 213 at p. 239. In this case, Pincus J. held that the party who desires to displace the prima facie entitlement of the author to copyright under s 35(2) of the Copyright Act 1968 (Australia) by showing that copyright exists in another person under s 35(5) of the Copyright Act 1968 (Australia), has an onus of proving the requirements of s 35(5). Note: s 35(2) of the Copyright Act 1968 (Australia) is equivalent to s 30(2) of the Copyright Act 1987 (Singapore) and s 35(5) of the Copyright Act 1968 (Australia) is similar to s 30(5) of the Copyright Act 1987 (Singapore).

[63] [1951] 1 Ch 393. See also *Apple Corps Ltd v. Cooper* [1993] FSR 286 (under appeal) where it was held that under the provisions set out in s 4(3) of the Copyright Act 1956 (UK) vesting copyright, *inter alia*, in commissioned photographs in the commissioner, that it was necessary to show that the requirements of s 4(3) were satisfied at the moment when the light struck the film.

[64] [1987] FSR 90. This case was decided under s 4(3) of the Copyright Act 1956 (UK). The latter provides that "where a person commissions the taking of a photograph ... and agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein ..." See also *Apple Corps Ltd v. Cooper* [1993] FSR 286 for a discussion of what constitutes "commission".

couple who were engaged to be married arranged for a photographer to take their wedding photographs. The evidence was that shortly before the wedding the groom had asked the bride to contact photographers to make the necessary arrangements. The photographs were paid for by the groom. Years later when the wife was pregnant she suffered a brain haemorrhage and her bodily functions were kept going thereafter by life support machines. It was probable that she was "brain dead" already. She was kept on the life support machine in the hope that the baby could be born alive. Media interest in the story was strong and the plaintiffs managed to obtain an "exclusive" right to the story[65] from the husband which included an exclusive right to use the photographs. The defendants challenged the validity of the exclusive licence on the basis that the copyright in the photographs belonged jointly to the husband and wife on the basis that they jointly commissioned their taking. On an application for an interlocutory injunction, Millet J. accepted the argument of the defendants. He pointed out that it was settled law that one joint owner cannot grant an exclusive licence without the consent of the other owners. He also noted that even if it was possible for one co-owner to grant a licence without the consent of the others, that the licence could not be exclusive since he could not, without the consent of the others, exclude the others or their licensees.[66] Millet J. also held on the facts that the husband and wife held their interests as joint tenants and not as tenants in common.[67] The significance of this latter holding being that on the death of the wife, the principle of right of survivorship would vest the deceased wife's share in the husband. Once that occurred the husband would have the right to grant an exclusive licence.[68]

**7.21**  *The Proviso To Section 30(5).* The operation of section 30(5) to vest the copyright in the commissioner is subject to an important proviso that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that purpose, of any act comprised in the copyright in the work. For example, suppose that A commissions B to take a series of photographs of Bukit Timah Nature Reserve. He tells B that he wants the photograph for use in an advertisement for a product. Ordinarily, copyright in artistic works will vest in the author and in the case of photographs the author is the photographer. Section 30(5), however, vests the copyright in A. If A reproduces the photographs in a book on tropical rainforests, B can use his "right of veto" to stop A. The veto gives B a strong bargaining point, if A should subsequently decide to use the photographs in a way which was not contemplated at the time of the

---

[65] Note that copyright cannot be asserted to protect facts or news. Other newspapers could write up their own reports so long as they did not copy the report of the plaintiffs. See *Express Newspapers Plc v. News (UK) Plc* [1990] FSR 359.
[66] Note that a single co-owner can sue to restrain infringement. See Millet J. at p. 94.
[67] See also above at paras. 7.9–7.11. See also Chapter 12 at para. 12.63.
[68] Query whether the purported exclusive licence would have been automatically validated upon the wife's death.

agreement. It recognises that if A had told B of the possibility that he might use the photographs for non-advertisement purposes, that B might have either refused the commission or charged a higher price. In this way, the right of veto seeks to protect the author's economic interests. It may also be asserted in some cases to protect the author's moral right to protect the integrity of the work. Whilst the objective behind this proviso is readily understandable, there are some problems in its interpretation and application. The proviso applies where the work is required for a particular purpose. Presumably, the relevant time at which the existence of the purpose is to be determined is at the time of the agreement.[69] Factual disputes can of course arise as to what that purpose was and in some cases, the commissioner may not in fact have had any "particular" purpose in mind save his own personal enjoyment. Suppose that it is only later that he decides on a particular use for the work, will the "veto" still apply? The proviso only applies where the commissioner had a "particular purpose" in mind. Will a desire to have the photograph for personal pleasure be regarded as a "particular purpose"? Will "personal pleasure" be sufficiently certain so as to be capable of amounting to a "particular purpose"? At first sight, this may be difficult and it is also stressed that the statutory provision relates to a "particular" purpose. In such circumstances, it may be difficult for the author to assert the right of veto.[70] Problems might also arise where the commissioner does have a particular purpose but then fails to communicate it to the author. The wording of the proviso requires that where there is a particular purpose, that the purpose is to be communicated to the author. What then is the consequence of a failure to communicate the purpose? One possibility is that the failure to communicate will have the effect of negating the effect of section 30(5). After all, the objective behind the subsection is to give the copyright to the commissioner by way of special exception to the general rule; the interests of the author being safeguarded by the right of veto. The use of the veto is in turn based on the communication

---

[69] In the Select Committee hearings on the Copyright Bill 1986, Professor Jayakumar, then Minister for Home Affairs and 2nd Minister for Law, noted that the function of the proviso is to require the purpose to be communicated to the author at the time of the commission. See Report of the Select Committee on the Copyright Bill, Parl. 9 of 1986 at D9. See also the general comments of the British Copyright Council and the International Confederation of Societies of Authors and Composers set out in the Report. Note also that whilst Singapore's Copyright Act 1987 is modelled on the Copyright Act 1968 of Australia, there are some important differences in the Australian equivalent to s 30(5). In particular, the proviso under the Australian Act of 1968 applies only if at the time the agreement was made the person had expressly or impliedly made the purpose for which the work was required known to the author. There seems to be no compulsion to reveal the purpose under the Australian provisions if there was one.

[70] See generally, the Gregory Committee Report on Copyright (UK) Cmnd. 8662 at 272. That Committee had recommended that a right of veto be given to the author in the case of commissioned works on the grounds that "we think that there is ground for supposing that when a work is commissioned for a particular purpose, that purpose may well have determined the price paid for it, and if it is used for another purpose the author may be prejudiced not only in respect of his immediate financial return but also in respect of his reputation ... Thus if a sketch has been commissioned for illustration as a magazine story it should not be used as an advertisement for a commercial product without the author's permission." Note that the right of veto was regarded by the Committee as safeguarding both moral and economic interests of the author.

of the purpose to the author. Accordingly, since the proviso is linked to the special exception it might be argued that the failure to communicate can undermine the operation of section 30(5) as a whole. The trouble with this view is that it effectively renders non-compliance with the duty to inform, penal in effect.[71] Leaving aside the issue as to the duty to communicate the purpose, questions may also arise as to the damages that can be awarded if there is a breach of the right of veto. This has been considered recently in Australia by the Federal Court of Australia in *Matthews* v. *ACP Publishing Pty Ltd*.[72] The plaintiff was a professional photographer and was commissioned by the defendant in 1995 to take about five photographs of Kate Fisher. It appears that at the time the agreement was made, the defendant had made known to the plaintiff that the photograph was required for a purpose, namely for reproduction in an article on Kate Fisher in *Cleo* magazine. Subsequently, the defendant supplied a copy of the photograph to a third party who in turn supplied a copy to another party for use on the cover of a magazine. Several issues were raised including an action for breach of section 35(5) of the Copyright Act 1968 (Australia).[73] The relief sought was for both an injunction and damages. At the trial, the claim for injunctive relief ceased to be a live issue since the defendant was prepared to give an undertaking not to reproduce or authorise the reproduction of the photograph or a substantial part of the photograph for any purpose other than reproduction in the December 1995 edition of *Cleo* magazine without the licence of the plaintiff. The main issue concerned the jurisdiction of the court to award damages. It was argued that the plaintiff was entitled to either (a) damages for breach of a statutory right of restraint or (b) damages in equity in addition to an injunction. Beaumont J. held that the court had the power to award damages in lieu or in addition to the grant of any injunction. In coming to this conclusion, the following points were made:

---

[71] Query whether, as an alternative, non-compliance with the s 30(5) duty to inform may be actionable as breach of statutory duty. Query also whether this right of veto is a personal right that is limited to the particular author that was commissioned. Can the right be assigned or transmitted to the author's heirs? In the first edition, it was suggested that the language of the sub-section suggests that the right is personal to the author. The point could be made, however, that the rationale for the right is the desire to strike a fair balance between the commissioned author and the commissioner. Whilst the latter gets the copyright, the author gets the right of veto thereby recognising the author's moral and economic interests in the work. Moral rights, whilst of a personal nature, can be transmitted to an author's heirs under the laws of many countries. See, e.g., s 95 of the Copyright, Designs and Patents Act 1988 (UK). Note also Art. *6bis* of the Berne Convention. Note, however, that whilst moral rights can in the UK be transmitted to the heirs of the author, s 94 of the Copyright, Designs and Patents Act 1988 (UK) prevents their assignment. It is, therefore, suggested that even if the right of veto is regarded as a type of moral right and of a personal nature, this alone should not mean that it should not be made transmissible to the author's heirs. Assignment may of course be a different matter. The language of s 30(5) does suggest, however, that the right of veto may not be transmissible. If this is in fact the position, is there a case for an amendment so as to make the right of veto transmissible or exercisable by the estate of the deceased?

[72] (1998) 41 IPR 535.

[73] The Australian provision whilst not identical to the Singapore provision in s 30(5) is similar.

(i)   Under the Federal Court of Australia Act, section 5(2) provided that the Court is a superior court of record and is a court of law and equity.

(ii)   Section 22 of the Federal Court of Australia Act also provided that the Court shall in every matter before the Court, grant either absolutely or on such terms as the Court thinks just, all remedies to which any of the parties appears to be entitled in respect of a legal and equitable claim properly brought forward ... so that, as far as possible, all matters in controversy between the parties may be completely and finally determined and all multiplicity of proceedings concerning any of those matters avoided.

(iii)   Section 23 of the Federal Court of Australia Act which states that the Court has power in relation to matters in which it has jurisdiction to make orders of such kinds as the Court thinks appropriate.

Under these provisions, Beaumont J. was of the view that the Federal Court, as a statutory court, enjoyed the same powers as a modern court of equity to award damages in addition to, or in lieu of, an injunction or its equivalent. Beaumont J. was of the view that breach of section 35(5) was breach of a legal and not any equitable right. Alternatively, it was felt that the power to award damages was available "indirectly via section 68 of the Supreme Court Act 1970 (NSW) (the local version of Lord Cairn's Act) when it is picked up by section 79 of the Judiciary Act". Beaumont J. was of the opinion that section 35(5) of the Copyright Act 1968 (Australia) manifested

"an intention to create a private cause of action in damages in lieu of or in addition to the grant of an injunction where the award of compensation is appropriate".[74]

Turning to the question as to how the damages were to be assessed, Beaumont J. held that the appropriate measure was best approached from the perspective of:

"a case of a lost opportunity or lost chance ... the opportunity or chance in question being one to negotiate a further fee ... as a price for the grant of ... permission to ... use the photograph for purposes beyond its contemplated use in one edition of *Cleo*".[75]

In assessing the damages using this method, Beaumont J. took into account evidence as to the practice of the industry. Beaumont J. accepted, however, that any estimate as to how a hypothetical negotiation may have occurred could only proceed on a "by and large" basis and that the fair sum

---

[74] (1998) 41 IPR 535 at p. 544.
[75] *Ibid.* at p. 544.

to be awarded in all the circumstances was A$1,500. This figure was arrived at based on the "celebrity" or "newsworthy" status of Ms Fisher and the fact that A$3,000 was realistically the largest amount that could have been asked for in negotiations. This was reduced to A$1,500 as the court estimated the plaintiff's chance of persuading the defendant to pay A$3,000 as about even. In Singapore, at date of writing, there has yet to be a reported case on the question of damages for breach of section 30(5). It is felt probable that a similar approach will be taken in respect of the mode of assessment. On the question of the jurisdiction to award damages in addition to or in lieu of injunctive relief, a power to do so can be found in paragraph 14 of the First Schedule to the Supreme Court of Judicature Act.[76] This provides that the High Court enjoys the "power to grant all reliefs and remedies at law and in equity, including damages in addition to, or in substitution for, an injunction or specific performance."[77]

**7.22**    *Other Types of Commissioned Works.* The special provisions in section 30(5) only apply to a very limited range of artistic works. They do not cover any type of literary, dramatic or musical work. Accordingly, if X commissions Y to write a biography on X, the basic rule that copyright vests in the author will apply under section 30(2). As the earlier discussion on authorship demonstrates, in many cases the author will be Y even though the information is supplied by X, the subject of the biography. The mere fact that X supplied the bare information will not suffice on its own to make him a joint author.[78] It follows that where literary, dramatic and musical works are commissioned, the commissioner will not have any legal entitlement to the copyright unless there was an agreement by the author that the copyright in the resulting work was to belong to the commissioner by way of a purported assignment of the prospective copyright in the work. Where there is a purported assignment of the copyright in the future work, section 195 operates so as to automatically vest the copyright in the assignee on the completion of the work.[79] It is to be noted that the agreement to assign must be in writing and signed by or on behalf of the prospective owner of the copyright (in this context, the author). An oral agreement to assign the prospective copyright is not valid at law, although it may give rise to rights in equity. In the absence of any agreement to assign the

---

[76] Cap. 322 of the 1985 Rev. Ed.

[77] Note that para. 14 was introduced into the First Schedule by Supreme Court of Judicature (Amendment) Act 1993. Prior to this, there was some considerable doubt as to whether the High Court enjoyed a power to award equitable damages. See *Shiffon Creations (Singapore) Pte Ltd v. Tong Lee Co Pte Ltd* [1988] 1 MLJ 363 and Soh Kee Bun, *Jurisdiction to Award Equitable Damages in Singapore*, (1988) 30 Mal LR 79 and Soh Kee Bun, *Powers of Supreme Court in Awarding Damages and Interest*, [1994] SJLS 91. For an unreported case which appears to involve s 30(5), see *The Straits Times*, Singapore, 30 January 1999. This case, which was settled, appears to concern a situation where a commissioned photograph for a corporate brochure was subsequently used in advertisements and other promotional activities.

[78] See *Donoghue v. Allied Newspapers Limited* [1938] 1 Ch. 106, *Wiseman v. George Weidenfeld & Nicolson Ltd & Donaldson* [1985] FSR 525. But see *Najma Heptulla v. Orient Longman Limited* [1989] FSR 598 discussed at para. 7.3 above.

[79] See below at Chapter 12 at para. 12.7.