**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE WAVE STUDIO, LLC, a New York
Limited Liability Corporation,

                Plaintiff,

      v.

GENERAL HOTEL MANAGEMENT, et al.,

                Defendants.

**CASE NO. 7:13-cv-09239-CS-PED**

## DECLARATION OF VIJAY K. TOKE

I, Vijay K. Toke, declare:

    1.     I am an attorney at law, licensed to practice in the State of California and this Court, and a partner with the law firm of Cobalt, LLP attorneys for plaintiff The Wave Studio, LLC, a New York Limited Liability Corporation ("Wave"). I submit this Declaration.

    2.     Unless otherwise qualified, I have personal knowledge of the facts set forth in this Declaration.

    3.     Filed concurrently with this Declaration are the Declarations of Lee Kar Yin and Gordon Ionwy David Llewelyn.

    4.     Attached hereto as <u>Exhibit A</u> is a true and correct copy of relevant pages of the court reporter's transcript of the Deposition of Lee Kar Yin, Plaintiffs principal, that took place May 21, 2015, along with the complete index to said transcript ("Lee May Depo").

/ / /

/ / /

5.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of relevant pages of the court reporter's transcript of the Continued Deposition of Lee Kar Yin, Plaintiffs principal, that took place on September 9, 2015, along with the complete index to said transcript ("Lee Sept. Depo").

6.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of relevant pages of the court reporter's transcript of the deposition of Ralf Ohletz Graf von Plettenberg that took place on September 23, 2015 ("Ohletz Depo").

7.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of relevant pages of the court reporter's transcript of the deposition of Monica Chng that took place on September 22, 2015 ("Chng Depo").

8.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of American Express's letter brief to the Court dated July 2, 2015, ECF Dkt. No. 43, in Case No. 7:15-cv-03420-CS.

9.      Attached hereto as <u>Exhibit F</u> are true and correct copies of Defendants' indemnity demand documents produced by General Hotel Management.

10.     Attached hereto as <u>Exhibit G</u> is a true and correct copy of the Whois report on the ownership of the ghmhotels.com website server.

11.     Attached hereto as <u>Exhibit H</u> is a true and correct copy of the production estimate attached to the Ohletz Depo as Exhibit 53.

I declare under penalty and perjury that the foregoing is true and correct.  Executed on March 14, 2016, in Berkeley, California.

_____
Vijay K. Toke

Exhibit "A"

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3          Civil Action No. 7:13-cv-09239

4    THE WAVE STUDIOS, LLC,

5          Plaintiffs,

6

          vs.

7

8    GENERAL HOTEL MANAGEMENT LTD.,

9    et al.,

10          Defendants.

11    - - - - - - - - - - - - - - - - -

12

13              TRANSCRIPT of the videotaped deposition of

14    LEE KAR YIN in the above-entitled matter as taken by

15    and before RUTHANNE UNGERLEIDER, a Certified Court

16    Reporter and Notary Public, held at the office of

17    CLAUSEN MILLER, P.C., 28 Liberty Street, New York,

18    New York, on Thursday, May 21, 2015, commencing at

19    approximately 10:15 in the forenoon.

20

21

22

23

24

25    Job No. NJ2071258

Page 2

```
 1  A P P E A R A N C E S:
 2
 3  COBALT, LLP
    918 Parker Street, Bldg. A21
 4  Berkeley, California 94710
      BY: VIJAY TOKE, ESQ.
 5  Attorneys for Plaintiff
 6
    CHIESA, SHAHINIAN & GIANTOMASI, P.C.
 7  One Boland Drive
    West Orange, New Jersey 07052
 8    BY: HOWARD J. SCHWARTZ, ESQ.
      ABIGAIL J. REMORE, ESQ.
 9  Attorneys for Defendant General Hotel Management
    Ltd.
10
11  CLAUSEN MILLER, P.C.
    28 Libert Street, 39th Floor
12  New York, New York 10005
      BY: MATTHEW J. VANDUSEN, ESQ.
13  Attorneys for Defendants d/b/a About.com, Alliance
    Reservation Network d/b/a Reservetravel.com, Bookit,
14  Expedia, Fareportal d/b/a Cheapair.com, Farebuzz,
    Frommer, Getaroom, Hotels.com, Hotelsbyme,
15  Hotelplanner, Insanelycheapflights.com, JetBlue,
    Kayak, Lonely Planet, Metro travel Guide, Metro
16  Travel Guide, Netadvantage, Partner Fusion, Inc.,
    Reservation Counter d/b/a reservation counter.com,
17  Pegasus, Random House d/b/a Foders.com, This Exit,
    LLC-Roadside America, Travelocity, Tripadvisor,
18  United Airlines, Gogobot, Inc. d/b/a gogobot.com,
    Qantas Airways, Ltd., WK Travel, Inc., VFM Leonardo,
19  Inc.
20
    AKIN GUMP, LLP
21  One Bryant Park
    New York, New York 10036
22    BY: CAROLYN C. MATTUS, ESQ.
    Attorneys for non-party American Express
23
24  ALSO PRESENT:
    JONATHAN POPHAM, Videographer
25
```

Page 3

```
 1              I N D E X
 2
 3  LEE KAR YIN                      PAGE
 4  By: Mr. Schwartz    5
 5
 6
 7          E X H I B I T S
 8  NUMBER   DESCRIPTION              PAGE
 9
      1    Certificate of Registration   33
10    2    Document TWS0199392      41
      3    Document TWS0199384-386      46
11    4    Document TWS0199389-391      58
      5    Document TWS0199380-383      65
12    6    Certificate of Registration   69
      7    Certificate of Recordation    73
13    8    Document TWSO199397-399      73
      9    Document TWSO200283      96
14   10    Document TWSO199686-87     113
     11    Document GHM 00546      144
15   12    Masano Kawana Photography   167
    Services Agreement
16   13    Confirmation of Assignment   183
    of Copyright
17   14    Amended Complaint      194
     15    Settlement Agreement      208
18
19     REQUESTS FOR DOCUMENT PRODUCTION
20  DESCRIPTION                      PAGE
21  Sandals offer              247
22  Worksheet created for damages   248
23
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  We are now on the
 2  record.
 3          Please note that the microphones are
 4  sensitive and may pick up whispering and private
 5  conversations.  Please turn off all cell phones or
 6  place them away from the microphones, as they can
 7  interfere with the deposition audio.
 8          Recording will continue until all
 9  parties agree to go off the record.
10          My name is Jonathan Popham, representing
11  Veritext.  The date today is May 21, 2015, and the
12  time is approximately 10:15 a.m.
13          This deposition is being held at Clausen
14  Miller, located at 28 Liberty Street, New York,
15  New York.  The caption of this case is The Wave
16  Studio, LLC, versus General Hotel Management Limited,
17  et al.
18          This case is being held in the United
19  States District Court, For The Southern District of
20  New York, Civil Action Number 7:13-cv-09239.  The
21  name of the witness is Lee Kar Yin.
22          At this time, will the attorneys present
23  in the room please voice identify themselves and the
24  parties they represent.
25          MR. TOKE:  Vijay Toke.
```

Page 5

```
 1          MR. SCHWARTZ:  Howard M. Schwartz on
 2  behalf of General Hotel Management, and Abigail
 3  Remore is also here from my firm.
 4          MR. VAN DUSEN:  Matthew VanDusen from
 5  Clausen Miller, PC.  We represent 28 Defendants in
 6  this matter, the secondhand Defendant being Leonardo.
 7  We provided a list to the court reporter earlier.
 8          MS. MATTUS:  My name is Carolyn Mattus.
 9  I'm here from Akin Gump.  We represent American
10  Express Company.  We are not a party to this case,
11  but in a case that has been deemed related.  The
12  parties have been kind enough to let me just observe,
13  so thank you.
14          THE VIDEOGRAPHER:  Okay.  Our court
15  reporter is Ruth Ungerleider, representing Veritext.
16          Will you please swear in the witness,
17  and we can proceed.
18  LEE KAR YIN, sworn.
19  DIRECT EXAMINATION BY MR. SCHWARTZ:
20      Q    My name is Howard Schwartz.  I'm the
21  lawyer for General Hotel Management.
22          If you can, I just ask if you could try
23  to keep your voice up a little bit because everything
24  has to be recorded and it may be actually hard for me
25  to hear.
```

Page 6

```
1     A    I'm sorry.
2     Q    I understand you have a very modest
3  voice.
4     A    He said any whisper can be picked up, so
5  I'm just afraid it become too loud.
6     Q    Okay. We'll try to work it out.
7          Okay. Have you ever been deposed
8  before?
9     A    No, sir.
10    Q    Have you ever been in a courtroom in the
11 United States before?
12    A    No, sir.
13    Q    Okay.
14         When did you arrive in New York for the
15 purpose of this deposition?
16    A    I arrived on 20, May --
17    Q    Okay.
18    A    -- 2015.
19    Q    And was that iu California or that was
20 here in New York?
21    A    In New York.
22    Q    Okay.
23         And during that time, have you had a
24 chance to meet with your attorney?
25         MR. TOKE: And objection to the extent
```

Page 7

```
1  that it calls for attorney-client privilege, but go
2  ahead.
3     Q    Did you meet with your attorney?
4     A    Yes.
5     Q    And what is his name?
6     A    Mr. Vijay Toke.
7     Q    Don't tell me what he said to you.
8          About how many days did you meet with
9  him to prepare for this deposition?
10    A    Arrived on -- arrived on 17 May, in the
11 morning, in San Francisco, left San Francisco at
12 night on 19 May, 2015, arrived in New York in the
13 morning of 20 May.
14    Q    And is that wheu you met with Vijay, on
15 May 20?
16    A    No.
17    Q    Oh, you met with him in San Francisco?
18    A    That's correct.
19    Q    Okay.
20         And did you review documents with him in
21 preparation for this deposition?
22    A    Yes.
23    Q    Can you describe, generally, what you
24 looked at?
25    A    Settlement agreement, the topics for
```

Page 8

```
1  today. It's called notice of deposition.
2     Q    Uh-huh.
3          Can you tell -- as you're sitting here
4  uow, was there any document you know of that you
5  looked at to prepare for this deposition that hasn't
6  been given to your attorney to then give to me during
7  the process of this case?
8     A    No, I gave everything that I have.
9     Q    Okay.
10         So everything that you looked at, as far
11 as you know, has been already given to the Defendant?
12    A    That's correct.
13    Q    Okay.
14         Have you -- during the course of this
15 case, up to date, you've turned over all of your
16 files to your attorney regarding the issues in this
17 case?
18    A    That's correct.
19    Q    Okay.
20         And in preparation for the deposition,
21 did your attorney generally describe to you what
22 would happen today?
23    A    That I would be asked a lot of
24 questions.
25    Q    Okay, that's fair enough.
```

Page 9

```
1          So I'm going to ask you a lot of
2  questions, just as he said. You have to answer all
3  of the questions verbally. It's hard to just nod yes
4  or no because the court reporter will then get mad at
5  all of us.
6     A    Okay.
7     Q    And if you don't understand the question
8  that I ask, just tell me that you don't understand it
9  and I'll try to rephrase it. Is that agreeable?
10    A    Yes, sir.
11    Q    If you answer the question that I ask,
12 that means you understood it and you're giving me the
13 best answer that you can.
14         Is that agreeable?
15    A    Yes.
16    Q    Okay.
17    A    I'll try to find the right word.
18    Q    If you're having trouble, just tell me,
19 because I want to make sure that you answer it in the
20 right words as best you can.
21         MR. TOKE: Sorry to interrupt. I just
22 want to mention that Ms. Lee, her first language is
23 not English, it is Cantonese.
24         THE WITNESS: My mother tongue is
25 Cantonese.
```

3 (Pages 6 - 9)

Page 10

1      MR. TOKE:  And so she sort of thinks in
2  Cantonese and has to translate back into English and
3  kind of go back and forth, so sometimes her word
4  choice isn't -- she's translating from Cantonese,
5  which may not have the same meaning in English.
6      MR. SCHWARTZ:  Right.
7      Q    And I think we asked if you needed an
8  interpreter and you said no.  So you're comfortable
9  in English, correct?
10     A    Normal English, not legal jargon.
11     Q    I'll try to speak normal English and not
12  legal jargon, but if you don't understand something,
13  make sure you tell me.  Okay?
14     A    Yes, sir.
15     Q    I know you traveled a lot to get here.
16  Is there any reason why you can't testify today, or
17  you can testify?
18     A    I'm here to testify.
19     Q    And you're not under any medication or
20  anything like that that's interfering with your
21  memory?
22     A    Not yet.
23     Q    Okay.
24          When you said "Not yet," is there some
25  medication that you're taking?

Page 11

1      A    No.
2           What if I get mind jamb after this?
3      Q    If you get tired, tell me, we can take a
4  break during some times and that will be okay.
5      A    Okay.
6      Q    All right?
7           So can you describe just generally what
8  your personal business is?
9      A    Wave is in the business of creative
10  works in nature.
11     Q    Are you personally a photographer?
12     A    I do everything.
13     Q    Okay.
14          So you take pictures yourself?
15     A    Yeah.
16     Q    Okay.
17          Would you consider -- are you a
18  professional photographer?
19     A    Yes.
20     Q    Okay.
21          And can you describe to me Wave -- what
22  is Wave-S?
23     A    Wave-S was a sole proprietorship which I
24  set up after a few years of working with advertising
25  agencies, and so on, to provide creative work

Page 12

1  services.
2      Q    Okay.
3           And Wave-S was a sole proprietorship for
4  yourself?
5      A    Yes.
6      Q    Okay.
7           And you said Wave-S was a business
8  setup.
9           Is Wave-S still in existence?
10     A    No, sir.
11     Q    When did Wave-S cease to exist?
12     A    Approximately 2005, thereabouts.
13     Q    2005?
14     A    Yeah.
15     Q    Okay.
16     A    Approximately.
17     Q    Okay.
18          And is there a document that you had to
19  create to show that Wave-S stopped doing business in
20  2005?
21     A    Yes.
22          My accountant -- basically, my
23  accountant told me after about eight, nine years as a
24  sole proprietor, Wave has grown up, and it's about
25  time to incorporate private limited at that point.

Page 13

1      Q    Okay.
2           So Wave-S, prior to 2005, did business
3  with some of the hotels in -- I'm sorry?
4      A    Can I just count?
5      Q    Sure, of course.
6      A    I remember Wave has been -- was around
7  for more than five years, so I'm trying to give you
8  the most accurate.
9      Q    Sure.
10     A    I can't remember.
11          But I still cannot remember for sure.
12     Q    Okay.
13          So it may have been around 2005?
14     A    Thereabouts.
15     Q    Is there a piece of paper that could
16  refresh your memory to say when Wave-S stopped doing
17  business?
18          Did your accountant have to file
19  something with the government?
20     A    Yes, yes, they have to file -- before
21  Wave -- Wave-S, as a sole proprietor, was dissolved,
22  my accountant helped me to set up the private limited
23  company, which was called The Wave Private, Limited.
24  So once The Wave Private, Limited was established,
25  then my accountant proceeded to systematically

Page 14

1  dissolve Wave-S as sole proprietor.
2      Q     Okay.
3          So is it that Wave-S became Wave Pte.,
4  Ltd.?
5      A     Yes, it became The Wave.
6          MR. TOKE: Objection to the extent that
7  it assumes facts not in evidence.
8          I want you to listen to the question.
9          Could you repeat the question again,
10  please?
11          MR. SCHWARTZ: Well, I'll just rephrase
12  it because I just wasn't sure.
13      Q     What company began to do business after
14  Wave-S?
15      A     The Wave Private, Limited.
16      Q     So would that be Wave Pte., Ltd., is
17  that what "Pte." stands for?
18      A     Private Limited, yes.
19      Q     Okay.
20          So Wave Pte., Ltd. began to do business
21  after Wave-S?
22      A     That's correct.
23      Q     Okay.
24          Okay.
25          And how long did Wave Private, Ltd. or

Page 15

1  Wave Pte., Ltd. stay in existence?
2      A     Not for very long. Probably, at the
3  region of a year.
4      Q     Okay.
5          And then what company came into
6  existence after Wave Private, Ltd.?
7      A     That would be The Wave Design Private,
8  Limited.
9      Q     Okay.
10          So why did Wave Private, Limited cease
11  doing business and become or transfer its business to
12  Wave Design Private, Limited?
13      A     Because there were too many people who
14  would call up or ask me if I sell water, so I needed
15  to put the "design" so that they know, we don't sell
16  water.
17      Q     Oh, because Wave implied water, so you
18  were getting strange --
19      A     Yeah.
20      Q     Okay.
21          Okay.
22          So was there a formal dissolution of
23  Wave Private, Ltd.?
24      A     Yes, sir.
25      Q     And is there a document that shows that?

Page 16

1      A     Yes, sir.
2      Q     And was there a formal transfer of
3  assets from Wave Private, Ltd. to Wave Design
4  Private, Ltd.?
5      A     Yes, sir.
6          The requirement in Singapore law is that
7  before you dissolve a company, everything, all the
8  properties of the company, whether it is a pencil or
9  whatnot, all the properties, regardless, will have to
10  be returned to the director.
11      Q     Okay.
12          So just so I can try to understand this,
13  Wave-S was a sole proprietorship of you alone?
14      A     That's correct.
15      Q     Wave Private, Ltd. is a corporation?
16      A     If that's what it's called here.  It's a
17  private limited company.
18      Q     Okay, private limited company.
19          And who owned Wave Private, Limited?
20      A     Myself and a friend, called Mr. Chua
21  Kiat Hong.
22      Q     Could you spell that for us?
23      A     C-H-U-A K-I-A-T H-O-N-G.
24      Q     And what was his role in Wave Private,
25  Ltd.?

Page 17

1      A     He doesn't have any role in The Wave
2  Private, Limited because the requirement by Singapore
3  government back then is that you need two names to
4  form a private limited, and it has to be a permanent
5  resident or a Singaporean, and Mr. Chua lend me his
6  name so that it can be formed.
7      Q     So Wave Private, Ltd. was really just
8  you doing business?
9      A     Yes.
10      Q     Did it have any permanent employees?
11      A     The Wave Private, Limited, yes; Ms. Gwee
12  Wei Wei.
13      Q     Could you spell that?
14      A     Okay. G-W-E-E, Wei Wei, W-E-I W-E-I,
15  two Weis.
16      Q     And there was another one at Wave
17  Private, Ltd.?
18      A     No, we start with Wei Wei first.
19      Q     Okay.
20          And then approximately when did Wave
21  Private, Ltd. stop doing business; in 2008, I think?
22      A     Thereabouts.
23      Q     Okay.
24          And what did Wave Private, Ltd., do with
25  its assets; did it transfer them to somebody?

5 (Pages 14 - 17)

Page 18

1     A     It was all transferred to me as a
2  director.
3     Q     So Wave Pte., Ltd.'s assets all went to
4  you personally?
5     A     Yes.
6     Q     Okay.
7           Is there a document that shows that?
8     A     Yes.
9           Company resolution, which Mr. Chua Kiat
10  Hong also signed.
11     Q     I don't believe we have that.
12     MS. REMORE:  We have it.
13     MR. SCHWARTZ:  We do have it, okay.
14     Q     And then Wave Design, Pte., Ltd., who
15  were the employees of that company?
16     A     Same, Mr. -- Ms. Gwee Wei Wei, Goh Wai
17  Ying.
18     Q     How do you spell that?
19     A     G-O-H W-A-I Y-I-N-G.
20     Q     Okay.
21     A     Mr. Lim See, L-I-M S-E-E, K-O-N-G.
22     Q     Okay.
23           So at a certain point, you formed
24  Wave -- The Wave Studio, LLC?
25     A     LLC, that's in New York, yes.

Page 19

1     Q     In New York.
2           And why did you do that?
3     A     The Wave Studio, LLC was formed because
4  United States -- the justice system in United States
5  of America is one of the best to protect the creative
6  works of Wave, and naturally I want all creative
7  works of The Wave --
8     Q     I'm sorry, I couldn't understand.
9     A     Naturally, I want Wave's work to be
10  protected and respected.
11     Q     So you -- you chose the United States --
12  you chose to try to protect, in your view, the rights
13  of your companies, and you came to the United States
14  specifically for that purpose?
15     A     Yes, because --
16     MR. TOKE:  Hold on.  Objection.
17     MR. SCHWARTZ:  No, she was answering.
18           You want to state an objection, state an
19  objection.
20     MR. TOKE:  Yes.
21     MR. SCHWARTZ:  Why don't you wait to let
22  her finish first?
23     MR. TOKE:  That's fine.
24           Go ahead and answer your question, and
25  then I'll interpose an objection.  So remember that,

Page 20

1  just wait, give me an opportunity to object before
2  you answer, but in this instance, go ahead and answer
3  the question and I will interpose my objection in a
4  moment.
5     Q     I was saying that you chose to come to
6  the United States, and New York specifically, to take
7  advantage of the laws?
8     A     Not take advantage, but it has the best
9  system, where every single work has a name.  They're
10  recognized individually.
11     Q     And when did you become aware, in your
12  mind, that the United States law is, I think you
13  used the word "the most protective."  Is that what
14  you were trying to say?
15     MR. TOKE:  Objection to the extent that
16  it calls for attorney-client privilege, but go ahead
17  and answer.
18     MR. SCHWARTZ:  Okay.
19     Q     Do you remember the question?
20           Could you read the question back?
21           (Whereupon, the requested portion is
22  read back by the reporter.)
23     A     How do I say it is the best system?
24           Is one of the best system in the world
25  where the infrastructure, the legal system, protects

Page 21

1  the work of the -- the creative work of artists and
2  it protects minorities.
3     Q     Okay.
4           And when did you form that view?
5     A     Well, over time, I started reading.
6  It's just like when Wave was a sole proprietor, the
7  advice was to go into private limited because it has
8  matured, you know, like progression of things, as you
9  grow, and I started reading and was, like, "Okay,
10  I've got all this creative works.  Wave has got all
11  this creative works.  Where would be the best place
12  for them to be protected?  Where would they be
13  respected?"
14           If I may use this term, they're my
15  babies.
16     Q     And I very much appreciate that's your
17  baby, and I understand that completely.
18           So you began -- as you sit here today,
19  and I know you're not a lawyer, so I'm just asking
20  for your own personal opinion.  In what way does the
21  United States, in your opinion, does United States
22  law protect your babies better than Singapore
23  copyright law?
24     A     I checked and read and read Intellectual
25  Property Office of Singapore website.  They had

6 (Pages 18 - 21)

Page 22

1  nothing prior to 2012. I went around asking
2  lawyers --
3       MR. TOKE: Hold it. I do not want you
4  to talk about anything that's attorney-client
5  privilege. All right?
6    Q    You can say you went to them.
7    A    I just want to know, like, how do I have
8  a certificate for my work, and apparently they say,
9  "Registration is not required."
10   Q    In Singapore?
11   A    Yes.
12   Q    Okay.
13   A    So how do you know if my baby is Ahmat,
14 Abdullah, or Jane or Jill? There's no name.
15   Q    So I'm not quite sure I understand what
16 you mean.
17   A    Like, if I have all this -- all this
18 images of creative work or logo design, they're all
19 lumped together, how is it that these works don't
20 even have a name or a number? How do you know which
21 one you're protecting?
22   Q    So, again, I know you're not a lawyer,
23 but just as an experienced business person, prior to
24 2011, what was your understanding of the protection
25 that your works was given under Singapore law?

Page 23

1    A    Registration isn't required.
2    Q    Okay.
3         And then prior to 2011, what was your
4  understanding of copyright law in the United States
5  with respect to your babies?
6         MR. TOKE: Again, I'm going to object to
7  the extent that it calls for expert testimony or
8  legal testimony that Ms. Lee is not an expert in.
9  She's not a lawyer.
10        So to the extent that you have an
11 understanding, go ahead.
12        MR. SCHWARTZ: Right. I'm just asking
13 for her personal understanding, exactly.
14   A    My understanding is what I read on
15 copyrightoffice.gov. I started that reading.
16   Q    Okay.
17        So you started reading the U.S.
18 government website for copyright. And what
19 conclusion did you come to after you -- after you
20 personally did that reading?
21   A    That my babies will have a name.
22   Q    Okay.
23        And when you -- when you mean they have
24 a name, you mean that they get registered in the
25 United States?

Page 24

1    A    Yeah. It's like they have
2  identification number.
3    Q    Okay.
4         And why is that important -- why is that
5  important to you compared to the Singapore copyright
6  law, in your personal understanding?
7         MR. TOKE: Again, I'm going to object to
8  the extent that Ms. Lee is not a lawyer and doesn't
9  understand exactly -- is not going to be able to
10 parse out different copyright statutes, so --
11        MR. SCHWARTZ: Let me --
12   I, a hundred percent, agree you're not a
13 lawyer. I'm not asking for your interpretation of
14 law. You said you went on the website, you went on
15 the U.S. website, and you are a resident of Singapore
16 who's done business there. I'm just asking, so that
17 we're clear -- don't tell me what lawyers told you --
18 just your understanding as a person and a business
19 person of the differences prior to 2011 between the
20 Singapore -- your understanding of Singapore law and
21 your understanding of the United States law with
22 respect to copyright and the photograph that you
23 took.
24        So we all agree on that, so I'll ask the
25 question.

Page 25

1         Prior to 2011, what was your
2  understanding, your personal understanding, of the
3  differences between Singapore law and the United
4  States law with respect to your photographs?
5         MR. TOKE: If you had any.
6         MR. SCHWARTZ: Fine.
7         MR. TOKE: If you had any.
8         So, go ahead.
9    A    My children will have names.
10   Q    Okay, right, you said that.
11        So is it that there is -- the Singapore
12 law doesn't -- apparently doesn't require
13 registration and the United States law does?
14        So was there any other reason, that you
15 can think of, for your -- for your registering your
16 photographs in the United States law or that was the
17 sole reason; the sole reason being that they would
18 have names, as you put it?
19        MR. TOKE: Objection, calls for
20 speculation, but go ahead.
21   A    I want -- if you have children, you want
22 to know them by name.
23   Q    Okay, I understand that.
24        So other than wanting to know them by
25 name, was there any other reason that you had to come

Page 26

1  to the United States to register your photographs in
2  the United States?  Was there any other reason?
3      A    As I said, the U.S. justice system is
4  one of the best to protect creative works by artists.
5  We are minorities.
6      Q    Okay.
7          So I'm asking for your personal
8  understanding as a business person in Singapore, what
9  was your understanding -- prior to 2011, what did you
10 understand the ownership rights to a photograph of a
11 photographer?
12         MR. TOKE:  Again, objection, calls for
13 expert opinion and the knowledge of a lawyer, and so
14 to the extent you know.
15         MR. SCHWARTZ:  Can you read back the
16 question just so we don't have to go through this
17 exercise all the time?
18         Just read back the question, please.
19         (Whereupon, the requested portion is
20 read back by the reporter.)
21     A    I understand the creator to creative
22 work is the owner of the work.
23     Q    And that's what you understood -- that's
24 what you understood the situation was in Singapore?
25     A    That's the general understanding.  If

Page 27

1  you gave birth to them, they're your children.
2      Q    Okay, okay.
3          And what was your -- your personal
4  understanding of the -- of the law in Singapore --
5  let me rephrase that so I don't have the professional
6  advice issue.
7          What was your understanding, as a
8  business person in the photography business, prior to
9  2011, of who would own the copyright in the
10 circumstance where one person hired a photographer to
11 take a picture?  Who would own the copyright then, as
12 you understand it?
13     A    That depends on contract.
14     Q    Okay.
15         Is there any -- did you have any
16 understanding at the time, prior to 2011, that if
17 there was no -- assuming there was no contract
18 between the person who hired and the photographer,
19 who would own the copyright?
20         MR. TOKE:  Objection, incomplete
21 hypothetical, calls for speculation.
22         Go ahead.
23     Q    You can answer.
24     A    Can you repeat the question again?
25     Q    Sure.

Page 28

1          In -- what was your understanding -- as
2  a business person in Singapore, prior to 2011, what
3  was your understanding of who would own the copyright
4  when one person hired a photographer to take a
5  picture and there was no contract, there was no
6  written contract?
7      A    Would you consider verbal agreement a
8  contract?
9      Q    Well, answer -- give me the answer as
10 best you can.
11         MR. TOKE:  And, again, calls for
12 speculation, but if you know.
13     A    It should be the creator.  That would be
14 the photographer.
15     Q    Okay.
16         And do you understand -- did you, prior
17 to 2011, understand the expression "a work for hire"?
18     A    The expression for "work for hire" prior
19 to 2011?
20     Q    Yes.
21     A    We call it differently.
22     Q    Okay.
23         Well, first, what do you understand the
24 "work for hire" to be, or what did you understand it
25 to be in 2011, if you had an understanding of it at

Page 29

1  all in 2011?
2      A    If you have an agreement -- you hire
3  somebody, and if you have an agreement, what are the
4  terms, and so on and so forth, that's work for hire,
5  and if it's agreeable, then you have an agreement,
6  that's work for hire.
7      Q    Okay.
8          And you started to answer it that you
9  had some understanding that that expression means
10 something different in Singapore?
11     A    No --
12         MR. TOKE:  Objection, misstates the
13 testimony, but go ahead.
14     A    No.
15         I mean, we don't have the term "work for
16 hire" in Singapore.  We generally have what we call
17 "open market willing buyer, willing seller."
18         If I want to hire A, what are the terms
19 between A and B.  For companies, it's called letter
20 of employment in Singapore.  For outside vendor, it
21 really depends what you agreed upon.  If both parties
22 agree, then there is an agreement.
23     Q    Okay.
24         Prior to 2011, did you have the
25 understanding -- did you understand, prior to 2011,

8 (Pages 26 - 29)

Page 30

1  that if one company hires a photographer to take a
2  picture, that the copyright is owned by the company
3  hiring the photographer? Did you understand that?
4      MR. TOKE: Hold on.
5      Can you read back the question, please?
6      (Whereupon, the requested portion is
7  read back by the reporter.)
8      MR. TOKE: Objection, incomplete
9  hypothetical, but if you have -- if you know the
10  answer, if you have an answer, go ahead.
11     A    It is not automatic.
12     Q    So when, as you -- in your
13  understanding, if it's not automatic, when is it the
14  case that the person hiring the photographer owns the
15  copyright in the picture, in Singapore?
16     MR. TOKE: Calls for speculation, asked
17  and answered, but go ahead.
18     A    It's like if you hire a wedding
19  photographer; what you want, how many days, how long
20  is your wedding. Let's say three days, four days,
21  whatever days. At the end of the hire, what you're
22  ordering is actually the photo album. You don't own
23  those pictures.
24     Q    Who is the "you" doesn't own them?
25     A    I mean the company or, in this case, the

Page 31

1  bride and bridegroom.
2      If the bride and bridegroom wants the
3  ownership of the pictures, you have to say, "I want
4  the ownership, I want the copyright, and you sell it
5  to me."
6      So before a job is taken, or before a
7  job is offered or accepted, then those terms must be
8  there.
9      Wedding photographers, the end result
10  that you will get is only the photo album.
11     Q    So is it -- is it -- was it your
12  experience, prior to 2011, in Singapore, that it
13  would be very important for the terms of ownership of
14  a copyright between someone who hired a photographer
15  and the photographer be set forth in a written
16  agreement?
17     A    Written or mutually agreed orally.
18     Q    Okay.
19     Okay.
20     MR. SCHWARTZ: So -- can you just read
21  back the question?
22     MR. TOKE: Can we take a quick -- I just
23  want to go off the record for a second after -- I
24  think there is no question pending.
25     MR. SCHWARTZ: Well, let me just have

Page 32

1  this read back so that we can continue.
2      MR. TOKE: Sure, that's fine.
3      (Whereupon, the requested portion is
4  read back by the reporter.)
5      Q    So it is very important that the terms
6  of ownership of a copyright when one person hires the
7  photographer that the description of who owns the
8  copyright be set forth either in a written agreement
9  or orally agreed upon, and that's very important?
10     MR. SCHWARTZ: Just let her answer.
11     MR. TOKE: Well, hold on, misstates the
12  testimony.
13     MR. SCHWARTZ: Wait, she hasn't
14  answered. There is a question pending.
15     THE WITNESS: I thought I answered.
16     MR. TOKE: Yeah, asked and answered.
17  She already answered that question.
18     MR. SCHWARTZ: Okay. Just repeat the
19  question just to make sure.
20     (Whereupon, the requested portion is
21  read back by the reporter.)
22     Q    And the answer is yes?
23     MR. TOKE: You're not going to put words
24  in her mouth.
25     Let her answer the question.

Page 33

1      Q    What is the answer?
2      A    Ideally, yes.
3      MR. SCHWARTZ: Take a break for a
4  second.
5      You wanted to go off the record to say
6  something? If that's the case, then she should leave
7  the room, with all respect to you.
8      MR. TOKE: No. I wanted to take a break
9  and I wanted to actually talk about something
10  earlier. There are some documents that I meant to
11  discuss with you, so.
12     MR. SCHWARTZ: All right. So we can
13  take a break right now, if you would like.
14     MR. TOKE: Let's go off the record for a
15  second.
16     THE VIDEOGRAPHER: Going off the record,
17  10:54 a.m.
18     (Whereupon Certificate of Registration
19  is received and marked as Exhibit 1 for
20  identification.)
21     THE VIDEOGRAPHER: We are back on the
22  record at 11:16 a.m.
23     Q    Okay. Welcome back.
24     We just came back from a break.
25     Did you discuss the testimony that you

9 (Pages 30 - 33)

Page 34

1  were giving with your lawyer during the break?
2      A     No.  Looking for --
3      Q     Okay.
4      A     -- cigarettes.
5      Q     Okay.
6          I've handed you what's been marked as
7  Exhibit 1.  It's a registration, and we'll call it by
8  the last three numbers, 331.
9          Do you see 331 on the top?
10     A     Yes.
11     Q     Okay.  So we'll refer to this as
12  registration 331.
13         And if you look on the second page of
14  Exhibit 1, about two-thirds of the way down, is that
15  your signature?
16     A     Yes.
17     Q     Okay.
18         So you've signed this?
19     A     Yes.
20     Q     And where were you when you signed this;
21  in Singapore or New York?
22     A     I was in Singapore.
23     Q     Okay.
24         And it's dated December 28, 2010?
25     A     That's correct.

Page 35

1      Q     Did you ever -- around the year 2010 or
2  2011, when Wave, LLC was -- well, let me rephrase
3  that whole question.
4          Wave Studio, LLC was formed by you?
5      A     That's correct.
6      Q     Do you remember approximately when it
7  was formed?
8      A     2011.
9      Q     Okay.
10         So around 2011, during that year in
11  2011, were you in White Plains, New York, at all?
12     A     No.
13     Q     Okay.
14         Were you in the State of New York in
15  2011?
16     A     The State of New York?
17         No.
18     Q     Okay.
19         Were you in the United States in 2011?
20     A     Yes.
21     Q     When were you in the United States?
22     A     May -- around May 2011.
23     Q     Okay.
24         Where were you?
25     A     I was in San Francisco.

Page 36

1      Q     Okay.
2          For business purposes?
3      A     Part business, part leisure photography
4  shooting.
5      Q     Okay.
6          So when the LLC was formed in 2011, does
7  it maintain an office in White Plains?
8      A     Well, yeah -- I mean, office, you mean
9  with people?
10     Q     Yes.
11     A     No.
12     Q     So it has no employees in New York at
13  all, correct?
14     A     Uh-huh.
15     Q     And never had any employees in New York?
16     A     Not yet.
17     Q     Okay.
18         Does it -- is it fair to say that the
19  LLC is just created as an entity existing on a piece
20  of paper and the location is listed at the address of
21  your then attorneys?
22     A     You mean that's the sole purpose?
23     Q     No, no, no.  Let me rephrase the
24  question.
25         The LLC has no employees in New York,

Page 37

1  correct?
2      A     Uh-huh.
3      Q     It never had any employee in New York?
4      A     Not yet.
5      Q     Okay.
6          Does it have a lease for any office
7  space?
8      A     Not yet.
9      Q     Does it own any property in New York?
10     A     Property; you mean, like, brick and
11  mortar?
12     Q     Yes, brick and mortar.
13     A     No.
14     Q     And its mailing location is care of a
15  law firm, correct?
16     A     That's right.
17     Q     Okay.
18         So it doesn't have its own physical
19  brick-and-mortar existence in an office, correct?
20     A     Uh-huh.
21     Q     You have to say yes or no.
22     A     Oh, sorry.
23         Yeah.
24     Q     Yes, it's correct, it doesn't have a
25  physical office?

10 (Pages 34 - 37)

Page 38

1    A    Yes.
2    Q    Okay.
3         Let's go back to Exhibit 331 for a
4    second.
5         MR. TOKE:  Exhibit 1?
6    Q    Exhibit 1.
7         That was your signature, and you signed
8    it when you were in Singapore?
9    A    Uh-huh.
10   Q    And if you look at the copyright
11   claimant -- that's number four on the first page.
12   A    Uh-huh.
13   Q    The copyright claimant is Wave Pte.,
14   Ltd., correct?
15   A    Uh-huh.
16   Q    And that's listed in Singapore, correct?
17   A    Correct.
18   Q    And do you know what -- did you have an
19   understanding in 2011 of what the words "first
20   publication" means?
21   A    When it's first printed.
22   Q    Okay.
23        That's what your understanding was in
24   2011?
25   A    When it's first published for anyone to

Page 39

1    see.
2    Q    Okay.
3         So if you look at Page 3, Section B --
4    A    Page 3?
5    Q    Section B.
6    A    B, uh-huh.
7    Q    So in the column on the right where it
8    says, "Nation of first publication," all of the
9    photographs that are registered here in this
10   Exhibit 1, which is registration 331, the nation of
11   first publication is Singapore for each and every
12   one, correct?
13   A    Uh-huh.
14   Q    And you list that the copyright claimant
15   is a Singapore company, correct?
16   A    Yes.
17   Q    And you, at the time, were a resident of
18   Singapore?
19   A    Yes.
20   Q    So if I understand it, a Singapore
21   author, as you claim, Wave Private, Ltd., is
22   registering photographs where the nation of first
23   publication is Singapore, correct?
24   A    Uh-huh.
25   Q    Okay.

Page 40

1         In your mind -- never mind.  Strike
2    that.
3         So let me show you -- before I finish,
4    let me ask another question.
5         So the certificate has, on Page 2, in
6    section nine -- Page 2, section nine -- the name of
7    Jennison & Shultz.
8         Who are they?
9    A    My lawyer who helped me to register.
10   Q    Okay.
11        And how did you come to know -- it's Mr.
12   Jennison, right?
13   A    Yes, John Jennison.
14   Q    How did you know -- how did you get
15   introduced to John Jennison?
16   A    Well, my good friends are in Virginia.
17   Q    Okay.
18        How long did you know him prior to 2011?
19   A    About six months, because I was -- I was
20   in Virginia --
21   Q    Okay.
22   A    -- to visit friends.
23   Q    Okay.
24        So you met Mr. Jennison in Virginia in
25   approximately 2011, 2010 sometime?

Page 41

1    A    Oh, no, I was in Virginia in 2009.
2    Q    You met him then about?
3    A    He's my friend's friend.  It's not like
4    sit down and have dinner.
5    Q    Okay.
6         So let me show you this --
7         MR. SCHWARTZ:  We'll mark this as
8    Exhibit 2.
9         (Whereupon Document Bates-stamped
10   TWS0199392 is received and marked as Exhibit 2 for
11   identification.)
12   Q    So that's your signature on Exhibit 2 at
13   the bottom where it says "Chairman"?
14   A    Uh-huh.
15   Q    You have to say yes or no.
16   A    Oh, yes.
17   Q    And that's your signature under
18   "Present," and you were present at the time?
19   A    Yes.
20   Q    And so this is a document that says it's
21   the minutes of an extraordinary general meeting of
22   Wave Private, Ltd.?
23   A    Uh-huh.
24   Q    Correct?
25   A    Yes.

11 (Pages 38 - 41)

Page 42

```
 1     Q    And the date -- and the date is
 2  August 1, 2008, correct?
 3     A    Yes.
 4     Q    Okay.
 5          And the date -- this document,
 6  Exhibit 2, is the dissolution of Wave Private, Ltd.?
 7     A    You mean the actual date?
 8     Q    The purpose of the -- the part of this
 9  meeting, of this document, is to say that Wave Pte.,
10  Ltd. no longer exists, correct?
11     A    To be struck off.
12     Q    "Struck off," and what does that mean?
13     A    To close it.
14     Q    It's closed, it no longer exists,
15  correct?
16          MR. TOKE:  Well, hold on.
17          MR. SCHWARTZ:  No, no.  I asked the
18  question.  I mean, if you want to object, you can
19  object, but I asked the question.
20          MR. TOKE:  I understand.  I'm just
21  saying -- well, go ahead and answer the question.
22     Q    Okay.
23     A    I mean, whatever pertaining to documents
24  to the companies, they were all prepared by my
25  lawyer -- by my accountant, who's also the company
```

Page 43

```
 1  secretary, so he -- he will say, "Okay, you need to
 2  sign this."
 3          I said, "Sign?"
 4     Q    Okay.
 5     A    Whether it's before or after the company
 6  struck off, I think it's before because we need to
 7  prepare all the documents for striking off, and then
 8  hand it to ACRA.
 9     Q    I'm sorry?
10     A    ACRA is a Singapore body for company
11  registration.
12     Q    Okay.
13     A    They did all these things.
14          I mean, my business is just creating
15  creative work.
16     Q    Okay.
17          So you -- your accountant prepared this
18  document?
19     A    Who is also my company secretary.
20     Q    Okay.
21          And I'll just read one paragraph of it.
22  It's the paragraph under the caption "Striking Off
23  the Company's Name from the Register."
24     A    Uh-huh.
25     Q    You have to say yes.
```

Page 44

```
 1     A    Yes.
 2     Q    This document says, "That the Board of
 3  Directors has no inclination to continue operating
 4  the business and the company shall apply to strike
 5  off its name from register under Section 344 of the
 6  companies' Act," correct?
 7     A    Yes.
 8     Q    And you read that before you signed it,
 9  correct?
10     A    Yes.
11     Q    And that says that the Board of
12  Directors has no inclination to continue operating
13  the business, correct?
14     A    Yes.
15     Q    And so The Wave Pte., Ltd. stopped doing
16  business as of August 1, 2008, correct?
17     A    Yes.
18     Q    And what does it mean that it's struck
19  from the register, under Section 344, of the
20  company's act?
21          What's your understanding of that?
22          Do you have any understanding of what it
23  means?
24     A    No.
25     Q    Okay.
```

Page 45

```
 1     A    It was all prepared by my company
 2  secretary and accountant.
 3     Q    But it's true -- I mean, you were on the
 4  Board of Directors at the time, correct?
 5     A    That's correct.
 6     Q    And it's true that the Board of
 7  Directors has no inclination to continue operating
 8  the business, is that correct?
 9     A    Under The Wave Private, Limited, yes.
10     Q    So this company stopped doing business,
11  correct?
12     A    That's correct.
13     Q    And that at that time, as of August 1,
14  2008, the next paragraph says all the tangible assets
15  and intangible assets, after discharging its
16  liabilities, shall be repatriated and assigned to
17  you, correct?
18     A    That's correct.
19     Q    Okay.
20          So what was your understanding -- what
21  is your understanding of the intent of this
22  particular -- of this Exhibit 2?
23     A    What's my understanding?
24     Q    Let me rephrase it.
25          When you signed it, did you intend that
```

Page 46

1  Wave Private, Ltd. would no longer be doing business,
2  correct?
3  A    No, we just changed to The Wave Design
4  Private, Limited, but at that point in time,
5  Singapore government -- coincidentally, Singapore
6  government was encouraging entrepreneurship, and for
7  all new business registered in that year, new
8  business, new businesses are eligible for tax
9  concession for three years.
10       So I took the opportunity, since I'm
11  going to change The Wave Private, Limited to The Wave
12  Design Private, Limited, I took the opportunity to
13  incorporate The Wave Design Private, Limited and
14  enjoy the tax concessions.
15  Q    Okay.
16       Why don't we also take a look at this,
17  which will be Exhibit 3.
18       (Whereupon Document Bates-stamped
19  TWS0199384 through 386 is received and marked as
20  Exhibit 3 for identification.)
21  Q    Okay.  So Exhibit 3 is a three-page
22  document, and the last three digits of the Bates
23  Stamp at the bottom are 384, 385 and 386.
24  A    Uh-huh.
25  Q    Okay.

Page 47

1       So have you seen this document before?
2  A    Yes.
3  Q    Okay.
4       And that's your signature on Page 386?
5  A    Yes.
6  Q    And you signed on behalf -- you signed
7  as the managing director of Wave Pte., Ltd., on the
8  left-hand side, correct?
9  A    Uh-huh.  Yes.
10  Q    And you signed as the managing director
11  of Wave Studio, Pte., Ltd., on the right-hand side,
12  correct?
13  A    Yes.
14  Q    So the first page -- this document is
15  entitled "An Assignment of Copyright," correct?
16  A    Yes.
17  Q    And it's dated effective July 28, 2008,
18  correct, at the very top?
19  A    That's correct.
20  Q    So if you compare, or if you put
21  Exhibit 2 next to Exhibit 3 --
22  A    Yes.
23  Q    -- so Exhibit 2 is the ceasing -- the
24  cessation of operation of the business of Wave Pte.,
25  correct?

Page 48

1  A    Yes.
2  Q    And that occurred on August 1, 2008,
3  correct?
4  A    Yes.
5  Q    So two days before, two days or so
6  before, Wave Pte., Ltd. stopped doing business and
7  assigned its copyrights, correct?
8  A    Yes.
9  Q    And it assigned its copyrights to The
10  Wave Studio, Pte., Ltd., correct?
11  A    Yes.
12  Q    And that was accomplished -- the
13  assignment was accomplished by this document, which
14  is Exhibit 3?
15  A    According to my attorney, yes.
16  Q    According to -- who prepared this
17  assignment of copyright?
18  A    Mr. John Jennison.
19  Q    Okay.
20       And when did you first meet him?  What
21  year did you say?
22  A    I was in Virginia '09.
23       2010.
24  Q    Okay.
25       So this assignment of copyright is dated

Page 49

1  2008, correct?
2  A    Uh-huh.
3  Q    So are you sure that Mr. Jennison
4  prepared this?
5  A    Yes.
6  Q    Okay.
7       And where were you when you signed this?
8  A    Singapore.
9  Q    Okay.
10       And this is an assignment between two
11  Singapore companies, correct?
12  A    Yes.
13  Q    So if you look at the assignment,
14  effective July 28, 2008, it assigns the works on the
15  annex, which is at Page 385, correct?
16       Do you see that?
17       The second page.
18  A    Yes.
19  Q    So this document says that The Wave
20  Pte., Ltd., on July 28, 2008, assigned the works,
21  which are at Page 385, to The Wave Studio, Pte.,
22  Ltd., correct?
23  A    Uh-huh.
24  Q    So as of July 2008, Wave Pte., Ltd. no
25  longer owned the works listed on the annex at Page

13 (Pages 46 - 49)

Page 50

1  385, correct?
2        MR. TOKE:  Can you repeat that question,
3  please?
4        MR. SCHWARTZ:  Okay.
5        MR. TOKE:  I was just asking the court
6  reporter.
7        MR. SCHWARTZ:  Do you want to read it
8  back?
9        (Whereupon, the requested portion is
10  read back by the reporter.)
11       MR. TOKE:  Okay.
12   A    That's correct.
13   Q    Okay.
14       So if we look at the works on the annex,
15  which is Page 385, take the first listing, which is
16  the Setai, S-E-T-A-I, 042 to 181, right?
17       Do you see that?
18   A    Uh-huh.
19   Q    Those are works that are listed on the
20  annex that you've assigned from The Wave Pte., Ltd.
21  to Wave Studio, Pte., Ltd., correct?
22       Here, look at the annex.  It's on this
23  page.
24   A    Yes.
25   Q    So this assignment, the one in your left

Page 51

1  hand, says that you've assigned the Setai 042, dash,
2  Setai 181 to The Wave Studio, Pte., Ltd. as of
3  July 28, 2008, correct?
4   A    Uh-huh.
5   Q    You have to say --
6   A    Yes.
7   Q    Okay.
8        So that's correct.
9        So now, just picking on the first
10  listing of the photographs that were assigned to The
11  Wave Studio Pte., Ltd., the Setai 042 and the Setai
12  181.
13       Do you see that in the annex?  Do you
14  see that?
15   A    Yes, I see it in the annex.
16   Q    So those were assigned as of 2008.
17       So now if you look at Exhibit 1, which
18  is Page 10 of 35 across the top.
19       Go to Page 10.
20       So this document, which is Exhibit 1,
21  the Certificate of Registration, shows that Wave
22  Pte., Ltd. in 2010 is claiming to register the Setai
23  042 to the Setai 181, correct?
24   A    Yes.
25   Q    But as of the date, December 30, 2010,

Page 52

1  Wave Pte., Ltd. no longer owned those, correct?
2   A    There's another assignment where it's
3  actually from my name.
4   Q    And where is that?
5   A    There are four assignments.
6   Q    We have never seen such an assignment.
7        MR. TOKE:  There are --
8   A    There are four assignments.
9        MR. TOKE:  There are a number of
10  assignments.
11       Let's go off the record for a second.
12       THE VIDEOGRAPHER:  Okay, we're going off
13  the record at 11:37 a.m.
14       MR. SCHWARTZ:  Let's stay on the record
15  for a second.  Let me just try to follow up.
16       Stay on the record a second.
17       THE VIDEOGRAPHER:  We're back on the
18  record, 11:37 a.m.
19   Q    So you believe there's an assignment --
20  well, explain to me what happened, in your
21  understanding of the photographs, the Setai 042 to
22  Setai 181 that are being registered by The Wave Pte.,
23  Ltd.
24       MR. TOKE:  Objection to the extent that
25  that mischaracterizes what the document says.

Page 53

1        MR. SCHWARTZ:  I said explain to me in
2  your own words what happened after the Setai
3  photographs 042 to 181 were assigned from Wave Pte.,
4  Ltd. to Wave Studio Pte., Ltd. in 2008.
5   A    I think what happened was I was asked
6  which job was done by which entity, okay, so all
7  those are filled in according to which entity did
8  those jobs.  You know, like The Wave Private,
9  Limited, did all this jobs.  And Mr. John Jennison
10  registered it this way, as according to which company
11  did which work.  Subsequently -- I know what you're
12  trying to ask, but subsequently we have an assignment
13  that all properties, all intellectual properties that
14  were returned to me by any of The Wave entities was
15  also assigned to The Wave Studio, LLC because I
16  don't --
17   Q    So you mean -- you mean that there's an
18  assignment from The Wave Pte., Ltd. to The Wave
19  Studio, LLC?
20   A    No, there is an assignment from me as a
21  person -- okay, Wave-S, Wave, the first one, sole
22  proprietor, struck off.  All the properties went to
23  me.  The Wave Private, Limited, prior to striking
24  off, all tangible and intangible assets went to me,
25  my name.  And the final one, the final assignment is

14 (Pages 50 - 53)

Page 54

1  from me to The Wave Studio, LLC.
2      Q    So you individually is what you're
3  saying?
4      A    Yes.
5      Q    Okay.
6      A    Because when you strike off a company,
7  whatever the company has, has to be returned to the
8  director. So this one, I think what happened was,
9  identifying which work was done by which company,
10 because there was so many works.
11     Q    Okay.
12         So let's just see though -- let us deal
13 with what we have in writing right now. Okay?
14     A    Uh-huh.
15         I need to know where all the four
16 assignments.
17         MR. TOKE: Right, that's why I want to
18 go off the record to talk about those because, again,
19 obviously --
20     Q    So you think that -- you're referring to
21 the assignments into the LLC, correct, is that what
22 you want to see?
23     A    All four assignments, all the
24 entities --
25     Q    Okay.

Page 55

1         MR. SCHWARTZ: We have those?
2      A    -- into The Wave Studios, LLC.
3      Q    Okay, just a second, I'll give them to
4  you.
5         MR. TOKE: I want to go off the record
6  for a second to address what you mentioned, that you
7  didn't have these assignments, and so I want to make
8  sure that -- now you're telling me that there are
9  assignments, so I want to make sure that we're on the
10 same page with that.
11         MR. SCHWARTZ: Okay, let's go back onto
12 the record then. Okay?
13         MR. TOKE: We're not off the record.
14         MS. REMORE: So I think I know what he's
15 asking, if we want to go off the record and discuss
16 it.
17         MR. SCHWARTZ: No, let's just stay with
18 what we got. Let's try to do it in the order that I
19 think we have.
20     Q    So you think there is another document,
21 which we'll come to, but at least we've established
22 that Exhibit 3 is an assignment from The Wave Pte.,
23 Ltd. to The Wave Studio Pte., Ltd., and it lists the
24 photographs that are contained in -- in the
25 registration number 331, correct?

Page 56

1      A    Correct.
2      Q    So does it appear, at least from these
3  documents -- and you say there's another one, and
4  we'll try to get to it, but without anything else,
5  this document number three shows that Wave Pte., Ltd.
6  assigned its rights to all of the photographs listed
7  on the annex at Page 385 to Wave Studio Pte., Ltd. as
8  of July 28, 2008, correct?
9      A    Correct.
10     Q    So if this is the only document -- let's
11 just assume that for a second. We'll see if we can
12 correct it with something else.
13         If Exhibit 3 is the only document -- is
14 the only assignment dealing with the Setai 042 to the
15 Setai 181, as well as the others, would that show, to
16 your mind, that Wave Pte., Ltd. was not the owner of
17 those photographs?
18         Did that make sense to you or is that
19 too convoluted?
20         MR. TOKE: I was going to say vague and
21 ambiguous.
22         MR. SCHWARTZ: Okay. Let me rephrase
23 the question, it didn't work really well.
24     Q    Would you agree that the assignment,
25 which is Exhibit 3, covers the same photographs that

Page 57

1  Wave Pte., Ltd. claims to own in its registration,
2  which is Exhibit 1?
3      A    I do not agree because I cannot assume
4  knowing that there are four assignments.
5      Q    And the assignments you're referring to
6  are assignments going into LLC, correct?
7      A    That's correct.
8      Q    Okay. That's fine, we can work with
9  that.
10         So prior -- prior to the --
11         MS. REMORE: These are for this specific
12 registration. If we're dealing with them
13 registration by registration, I can get -- it
14 actually covers two registrations.
15         MR. SCHWARTZ: Okay. Let's have these
16 three marked in sequence as the next ones, and let's
17 just see if this is what you're talking about.
18         MS. REMORE: They're the same document,
19 so there is three copies.
20         MR. SCHWARTZ: Okay. I'm sorry. I'm
21 going to have this one marked as 4.
22         MR. TOKE: May I have a copy of that,
23 please?
24         MR. SCHWARTZ: Sure, as soon as she
25 marks it.

15 (Pages 54 - 57)

Page 58

```
 1        (Whereupon Copyright Assignments is
 2  received and marked as Exhibit 4 for identification.)
 3     Q    Okay.  So I've shown you Exhibit 4.
 4        Can you describe to me what Exhibit 4
 5  is?
 6     A    I'm sorry, sir, there are four
 7  assignments.
 8     Q    Okay, but let's just take this one
 9  first.
10        MR. TOKE:  Yeah.
11     Q    Let's just take this one first.
12        MR. TOKE:  Answer the question.
13        So look at the document, and he asked
14  you to identify it.
15        Do you know what it is?
16     A    Okay.
17     Q    Okay?
18        So Exhibit 4 is a three-page document
19  with the last three digits 389, 390 and 391, correct?
20     A    Correct.
21     Q    And this is your signature on the second
22  page?
23     A    That's correct.
24     Q    On behalf of Wave Pte., Ltd.?
25     A    That's correct.
```

Page 59

```
 1     Q    And also on behalf of Wave Studio, LLC,
 2  correct?
 3     A    That's correct.
 4     Q    Is this one of the assignments you were
 5  referring to previously --
 6     A    No.
 7     Q    -- before?
 8     A    There's the fourth assignment, the final
 9  assignment.
10     Q    Okay, then let's just deal with this one
11  then and then we'll see what else there is.
12        So this assignment is dated November 11,
13  2011, correct?
14     A    That's correct.
15     Q    And this assignment -- who prepared this
16  assignment?
17     A    Mr. John Jennison.
18     Q    Okay.
19        So this assignment, on the first line,
20  the first few lines says it's entered into between
21  Wave Pte., Ltd., as assignor, right?
22     A    That's correct.
23     Q    And The Wave Studio, LLC, correct?
24     A    Uh-huh, that's correct.
25     Q    So we've already -- we already have
```

Page 60

```
 1  Exhibit 2, which shows that Wave Pte., Ltd. ceased
 2  operating business, correct?
 3     A    That's correct.
 4     Q    And we also have the assignment of
 5  copyright number three, which shows that Wave Pte.,
 6  Ltd. assigned its works to The Wave Studio Pte.,
 7  Ltd., correct?
 8     A    That's correct.
 9     Q    So if you just look at Exhibits 2 and 3,
10  it would appear that Wave Pte., Ltd. no longer had
11  any copyrights in its ownership, correct?
12     A    That's correct.  And it was -- it was
13  all cleanup on the fourth assignment.
14     Q    Okay.
15        Is Exhibit 4 the fourth assignment that
16  you're referring to?
17     A    No.
18     Q    Okay.
19     A    It is not.
20     Q    So if we're just dealing, though, with
21  the assignments that we have in front of us, and if
22  there is another one, I'll try to help you find it,
23  but with the assignments in front of us, it shows --
24  Exhibit 4 shows that Wave Pte., which we agreed
25  was -- ceased operating business in 2008, and
```

Page 61

```
 1  assigned its copyrights also in July 2008, was
 2  claiming to assign it copyrights to The Wave Studio,
 3  LLC, correct?
 4     A    That's correct.
 5     Q    And the listing of things that Exhibit 4
 6  claims to assign from Wave Pte., to Wave Studio, LLC,
 7  at Page 391 on Attachment A, is the registration 331,
 8  which is our Exhibit 1, correct?
 9     A    Correct.
10     Q    So let me just see if the documents that
11  we have -- I understand you're saying there's another
12  one, but the documents we have are, Exhibit 1 is the
13  registration 331, and that's dated December 30, 2010.
14        Prior to 2010, Wave Pte., Ltd. ceased
15  operating on August 1, 2008, correct?
16     A    Correct.
17     Q    And on July 28, 2008, Wave Pte. assigned
18  its copyrights to The Wave Studio Pte., Ltd.,
19  correct?
20     A    Correct.
21     Q    So that would appear that everything
22  that Wave Pte. had was assigned to Wave Studio Pte.,
23  Ltd. pursuant to Exhibit 3, dated July 28, 2008,
24  correct?
25     A    Correct.
```

16 (Pages 58 - 61)

Page 62

1    Q    So as of July 28, Wave Studio Pte., Ltd.
2    owned the copyrights listed on -- owned the rights
3    listed on the annex?
4    A    That's correct.
5    Q    So that unless there's something between
6    July 28, 2008 and this Exhibit 4, which is
7    November 11, 2011, can we agree that Wave Pte., Ltd.
8    did not own the photographs listed as Attachment A on
9    the assignment, and that document number is 391?
10         MR. TOKE:  Objection to the extent that
11   this requires a legal conclusion and expert testimony
12   on the effect of these documents, but to the extent
13   that you can answer the question, go ahead.
14   Q    You signed all these documents.  So was
15   it your understanding that as of 2011, Wave Pte.
16   Ltd., based on these documents, did not have any
17   ownership interest in the photographs assigned from
18   Wave Pte., Ltd. to Wave, LLC in Exhibit 4?
19         Did that make sense?
20   A    But, sir, I just want to say, my
21   understanding was this works were done by this
22   company, and that work is done by this other company,
23   and the fourth and final assignment addressed all
24   those.
25   Q    Okay.

Page 63

1         If you can, to help us try to find it,
2    who do you think the fourth -- what parties were
3    involved in the fourth assignment that you're talking
4    about?
5    A    All parties.  Lee Kar Yin, as a person;
6    Wave-S, as sole proprietorship, because everything
7    came back to me; The Wave Private, Limited,
8    everything came back to me; The Wave Design, which
9    subsequently changed name.  It's not another entity,
10   it's just a name change.  They're all there together.
11   Assigned everything to The Wave Studio, LLC.
12   Q    And that's in one particular document or
13   a series of documents?
14   A    One.
15        Just like -- just like this, you know,
16   one set like this.
17   Q    Okay.
18        Okay.
19        And when was that document dated, do you
20   know?
21   A    I can't remember, that's why I need to
22   see the document.
23   Q    Okay.
24        Was it -- do you recall it being the
25   same time -- do you recall it being November 11,

Page 64

1    2011, the same time?
2    A    I'm sorry, sir, I can't remember.
3    Q    And do you think that -- do you think
4    that Mr. Jennison prepared that?
5    A    Yes.
6    Q    Okay.
7         So if you can, because I wasn't quite
8    sure, so you think there's one document --
9    A    There are four.  We have seen two.
10        As far as my recollection.
11   Q    Okay.
12        Then -- let's keep going, then, and tell
13   me what you think the other one is.
14        So in this sequence, in the sequence
15   just relating to registration 331 and Wave Pte.,
16   Ltd., in those sequence of documents, you think there
17   is another document pertaining to the rights and
18   ownership of these --
19   A    There are four assignments.
20   Q    Okay.
21        In your own words, describe the chain --
22   the chain of assignments, the chain that goes in the
23   assignment.
24   A    I'm sorry, sir, I need to see the
25   documents.

Page 65

1    Q    Okay, okay.
2         Okay, so let me show you --
3         MR. SCHWARTZ:  Let me have this one
4    marked.
5         (Whereupon Document Bates-stamped
6    TWS199380 through 383 is received and marked as
7    Exhibit 5 for identification.)
8    Q    Okay, I've handed you a document that
9    we've marked Exhibit 5.  Why don't you take a look at
10   it.
11        Can you tell me what this is?
12   A    Assignment of copyright.
13        It's supposed to be for what you call
14   nunc pro tunc.
15   Q    Nunc pro tunc?
16   A    Nunc pro tunc.
17   Q    And what is your understanding of what
18   that means?
19   A    I was told it means now for then.
20   Q    Okay.
21        So explain to me, why was this document
22   created --
23   A    Oh --
24   Q    -- then for now or now for then?
25   A    Because I told Mr. Jennison, The Wave

17 (Pages 62 - 65)

Page 66

1  Private, Limited was struck off in 2008 -- 2008, is
2  it? That means we need to do a nunc pro tunc. So we
3  did this. And subsequently I told him, Mr. Jennison,
4  all the properties for companies that --
5      MR. TOKE: I do not want you talking
6  about what you told counsel that's attorney-client
7  privilege.
8      Q   Do you want to tell me what you said to
9  him?
10     A   No.
11     Q   Okay.
12         So explain to me the purpose of this
13  document.
14     A   Now for then.
15     Q   Well, why did you prepare this now for
16  then? What was the purpose of creating this
17  document?
18     A   Because I told him The Wave Private,
19  Limited was struck off.
20     Q   So what was your intention in preparing
21  this document?
22     A   I didn't prepare it, Mr. Jennison did.
23     Q   What was your intention in signing this
24  document?
25     A   So that the copyright would be

Page 67

1  recognized.
2      Q   So did you backdate this, is that what
3  you mean by "now for then"?
4      MR. TOKE: Objection, misstates the
5  testimony.
6      MR. SCHWARTZ: I didn't -- I asked her a
7  question, I didn't say what the testimony was.
8  Can you read back the question?
9      (Whereupon, the requested portion is
10  read back by the reporter.)
11     A   I didn't backdate it. I just said The
12  Wave Private, Limited was struck off.
13     Q   Okay.
14         So why -- why did you present this
15  document to -- this looks like a counselor
16  associate -- at the United States Embassy?
17     A   Yes.
18     Q   So why did you go there?
19     A   Because I was told to have it notarized,
20  signed in front of Notary Public.
21     Q   Okay.
22         So this is just a notarized copy, is
23  that what this is?
24     A   It's an assignment to be signed in front
25  of an authority.

Page 68

1      Q   Okay.
2          So if you look at the last page on this
3  exhibit, the date of July 28, 2008 is crossed out.
4      A   Uh-huh.
5      Q   And it's notarized October 15, 2012.
6          Do you see that?
7      A   Uh-huh.
8      Q   You have to say yes or no.
9      A   Oh, yes.
10     Q   Okay.
11         So this, document five, is the same as
12  document four -- I'm sorry -- as document three,
13  except it's notarized on October 15, 2012, right?
14     A   Document five, document four --
15     Q   No. Document three. Three and five are
16  the same --
17     A   Two, three -- two, four -- one, two,
18  four, five. I don't have three.
19         MS. REMORE: Underneath two, perhaps.
20     A   Sorry. What was your question again?
21     Q   Three and five are the same, correct,
22  except in five the date is crossed off and it's
23  notarized October 15, 2012, right?
24     A   Yes.
25     Q   But the effective date on Page 1 of the

Page 69

1  assignment is still July 28, 2008, correct?
2      A   Yes.
3      Q   So I'm just trying to understand, why
4  did you have this notarized on October 15, 2012?
5      A   Because --
6          MR. TOKE: Asked and answered, but go
7  ahead.
8      A   Because Mr. Jennison told me it has to
9  be notarized by an authority. So bring it to the
10  authority and sign in front of them.
11     Q   Okay.
12         But it wasn't your intention to change
13  the effective date of the assignment at all, correct?
14     A   No.
15     Q   No, that's not correct, or yes, it's
16  correct?
17     A   It's not my intention to change the
18  effective date at all.
19     Q   Okay. All right.
20         MR. SCHWARTZ: Okay. Let's try the next
21  one.
22         (Whereupon Certificate of Registration
23  is received and marked as Exhibit 6 for
24  identification.)
25     Q   So, hopefully, this will go a little bit

18 (Pages 66 - 69)

1  faster, but it's essentially the same.
2          So if you look at Exhibit 6, this is a
3  registration of unpublished works, correct?
4      A    Yes.
5      Q    Okay.
6          And the -- if you look on the first page
7  of Exhibit 6, you'll see it says that the author is
8  The Wave Pte., Ltd.
9      A    Yes.
10     Q    And it says that the copyright claimant
11  is The Wave Pte., Ltd.
12     A    Yes.
13     Q    Correct?
14         And you certify it at the bottom of the
15  page. That's your name there?
16     A    Yes.
17     Q    Okay.
18         And, so, this was also dated in 20 --
19  2010, December 30, 2010. It's across the top over
20  here.
21     A    Yes.
22     Q    And so 2010 is after Wave Pte. ceased
23  doing business, correct?
24     A    Yes.
25     Q    And it's also after Wave Pte. assigned

1  its rights to the ownership of those photographs and
2  copyrights to those photographs to the other Wave
3  company, correct?
4      A    Yes.
5          MR. TOKE: By "the other Wave
6  company" --
7      Q    To Wave Studio Pte., Ltd., pursuant to
8  Exhibit 3, correct?
9          It would be --
10     A    Yes.
11     Q    Yes, okay.
12         And so you believe that there is another
13  document --
14     A    I know there is another document.
15     Q    Okay.
16         From Wave Pte., Ltd. and to you
17  individually, of all the rights?
18     A    I need to see the document.
19         MR. TOKE: This is not going to be a
20  memory contest.
21         MR. SCHWARTZ: I know it's not a memory
22  contest.
23     Q    But we don't seem to have what you're
24  referring to and I don't think we've ever seen it.
25         In your own words, not a legal

1  conclusion, just in your own words, what is the other
2  document you're referring to? Try to describe what
3  it does.
4      A    You mean the assignment?
5      Q    If -- yes. If the assignment, if that's
6  what you think it is, the missing document, what do
7  you think is missing?
8          MR. TOKE: Well, it assumes that it's
9  missing. I don't know that.
10     Q    Okay.
11         What do you think hasn't been shown to
12  you yet?
13     A    There are four assignments. Now, what
14  we have -- what I have here is two assignments.
15         There are four assignments.
16         Wave-S, before it was struck off, all
17  assets came back to me as owner. The Wave Private,
18  Limited, before it struck off, all assets came back
19  to me as the owner. The fourth assignment assigned
20  everything from me, from The Wave Design, from The
21  Wave Studio Private, Limited, everything housed in
22  The Wave Studio, LLC.
23     Q    So is that document different from what
24  Exhibit 3 -- Exhibit 4 did, for example?
25         Exhibit 4 is a document going into LLC,

1  right?
2      A    Yes.
3          That document has more than this two
4  signatures. It has four or five of my signature.
5      Q    Okay.
6          MR. SCHWARTZ: Why don't we take a
7  two-second break for a second. Okay?
8          Go off the record.
9          THE VIDEOGRAPHER: Going off the record
10  at 12:03 p.m.
11         (Brief recess taken.)
12         (Whereupon Certificate of Recordation is
13  received and marked as Exhibit 7 for identification.)
14         (Whereupon Document Bates-stamped
15  TWS0199397 through 399 is received and marked as
16  Exhibit 8 for identification.)
17         THE VIDEOGRAPHER: We are back on the
18  record at 1:48 p.m. This starts the beginning of
19  media two.
20     Q    So I think we had 7 and 8 marked.
21         Let's just look at number 8 first.
22         MR. TOKE: Do we have that, Counsel?
23         MR. SCHWARTZ: Yes, you do.
24         She has it, I'm sorry.
25         MR. TOKE: So I don't have a copy.

19 (Pages 70 - 73)

Page 74

```
 1        Which document is this first one?
 2        MR. SCHWARTZ:  Number 8.
 3        MR. TOKE:  And may I get a copy of
 4   Number 7 as well, then, please?
 5        Thank you.
 6   Q    We are looking at Number 8, correct?
 7   A    Yes.
 8   Q    So Number 8 is -- the last three digits
 9   are Bates-stamped Number 397, 398 and 399.  And this
10   document is entitled "Assignment of Copyright," is
11   that right?
12   A    Yes.
13   Q    And is that your signature on Page 3 of
14   the document?
15   A    Yes.
16   Q    And that's dated February 15, 2007?
17   A    Yes.
18   Q    And if you look at the first page of
19   this document, it's between Wave-S and Wave Design,
20   Pte., Ltd.?
21   A    Yes.
22   Q    And, in your own words, what is this
23   document intended to do?
24   A    It assigns works from Wave to Wave
25   Design Private, Limited.
```

Page 75

```
 1   Q    Wave Design Private, limited?
 2   A    Yep.
 3   Q    Okay.
 4        And the works that it assigns as of
 5   February 15, 2007 are the works listed in the annex,
 6   which is on Page 398, correct?
 7   A    That's correct.
 8   Q    So, in your view, as of February 15,
 9   2007, Wave-S no longer had any of the rights as
10   described in this document to the works listed in the
11   annex at Page 398, correct?
12   A    Yes.
13   Q    Okay.
14        All right.  So let's look at the next
15   document then.
16        The next document was Number 7.
17   Okay?
18        So document Number 7 doesn't have any
19   Bates Stamp numbering at the bottom, right?  There's
20   no numbers at the bottom like the other documents,
21   right?
22   A    Yes, that's correct.
23   Q    Okay.
24        So I guess then we have to start -- the
25   first page is the Certificate of Recordation.
```

Page 76

```
 1        So let's turn that page over.
 2        So at the -- the date of execution of
 3   this agreement looks like -- date of execution of
 4   this document that is attached is January 7, 2013,
 5   right?
 6   A    That's correct.
 7   Q    Okay.
 8        And if we turn the page to the third
 9   page, this page has, at the top, the Declaration of
10   Dissolution of Wave-S, et cetera?
11   A    Uh-huh.
12        Yes.
13   Q    Okay.
14        So paragraph two of this page says,
15   "Wave-S was a sole proprietorship and upon its
16   dissolution of all copyrights was transferred to me."
17   A    Yes, that's right.
18   Q    Okay.
19        And what was the date of dissolution?
20   A    I can't remember, sir.
21   Q    Okay.
22        Is there -- there is a document, though,
23   you said, that does have the specific date of
24   dissolution?  You have such a document in your files?
25   A    Yes.  My accountant should have it.
```

Page 77

```
 1   Q    Okay.
 2        And do you know, was it before or after
 3   Wave-S executed the -- let me rephrase that.
 4        Do you know whether Wave-S was dissolved
 5   before or after February 15, 2007, which is the date
 6   that Wave-S assigned all of it copyrights?
 7        MR. TOKE:  Sorry.  Could you read that
 8   question again, please?
 9        (Whereupon, the requested portion is
10   read back by the reporter.)
11   A    Sorry, sir, I cannot remember.
12   Q    Okay.
13        So just looking at paragraph two, again,
14   it says, "Upon its dissolution, the ownership of all
15   rights was transferred to me."
16        Was that transfer documented in a
17   writing?
18   A    I have to ask my accountant, but this is
19   the standard procedure in Singapore for sole
20   proprietorship.
21   Q    Okay.
22        Is it the standard practice in Singapore
23   for a sole proprietorship to have a writing
24   transferring the copyrights upon dissolution of the
25   sole proprietorship?
```

20 (Pages 74 - 77)

Page 78

```
 1    A    For Singapore?
 2    Q    Yes.
 3         MR. TOKE: Again, I don't -- this
 4    witness is not an expert on Singapore copyright law,
 5    so to the extent you're asking for a legal opinion, I
 6    object to the question.
 7    Q    You can answer.
 8    A    I only know that everything that Wave --
 9    as a sole proprietor, everything that Wave owned goes
10    back to the owner automatically.
11    Q    Okay.
12         And you believe that's pursuant to
13    Singapore law?
14    A    That's what my accountant told me.
15    Q    Okay, okay.
16         So -- so if you look again at the
17    assignment, which is paragraph -- which is numbered
18    eight, the different one, number eight is the
19    different document where Wave-S assigns its interests
20    in the copyrights and photographs which are in the
21    annex, why was that prepared if everything reverts
22    back to you?
23    A    Again, sir, I just submitted all
24    documents. I don't know how this goes about. These
25    are all the documents, all the entities, and how to
```

Page 79

```
 1    go about doing this, I don't know.
 2    Q    Okay. Okay.
 3         Do you have a recollection, as you sit
 4    here, of what actual copyrights were transferred in
 5    paragraph two from Wave-S to you individually?
 6    A    It would be all the works that were done
 7    under Wave.
 8    Q    So it's your belief that all photographs
 9    that Wave-S took were, upon its dissolution,
10    transferred to you automatically?
11    A    Yes.
12         Not just photographs; all designs, all
13    creative works, all drawings.
14    Q    Okay.
15         So -- okay.
16         Let's look at paragraph three.
17         Paragraph three says, Wave Private, Ltd.
18    was a private limited company, and upon its
19    dissolution the ownership of all copyrights was
20    transferred to you.
21    A    Yes.
22    Q    Do you know -- can you recall, was that
23    done in a writing?
24    A    Yes --
25    Q    Let me rephrase the question.
```

Page 80

```
 1         Okay.
 2         Is that this one, Exhibit 3?
 3         MR. TOKE: We're talking about which
 4    paragraph in -- in number --
 5         THE WITNESS: Number three.
 6         MR. SCHWARTZ: Paragraph three, out of
 7    document Number 7, says, Wave Pte., Ltd., upon its
 8    dissolution, the ownership of all copyrights was
 9    transferred to Ms. Lee.
10         MR. TOKE: Uh-huh.
11    Q    So my question is, was that -- is your
12    statement in exhibit -- in paragraph three of
13    Exhibit 7, was that transfer of ownership of all
14    copyrights documented in a writing someplace?
15    A    It's in the --
16    Q    It's in one of the exhibits we've given
17    you already?
18    A    Number two.
19    Q    It's in number two. Okay.
20         Hold on a second.
21         Yes.
22         Okay.
23         And so this was dated August 1, 2008,
24    correct?
25    A    Uh-huh.
```

Page 81

```
 1         Yes.
 2    Q    Yes.
 3         And then prior to that date, hold on a
 4    second -- hold on one second.
 5         So you just referred to the dissolution
 6    document, which is dated August 1, 2008, correct?
 7    A    That's correct.
 8    Q    And I'm saying, look at Exhibit 3, which
 9    is the transfer document from Wave Pte. to Wave
10    Studio Pte., correct?
11    A    Correct.
12    Q    And so that's what you're referring to
13    in paragraph three of Exhibit 7?
14    A    When you say "that," you mean Exhibit 3
15    or Exhibit 2?
16    Q    Exhibit 3.
17    A    I was actually referring to this.
18    Q    Okay.
19         Referring to Exhibit 2?
20    A    Yes.
21    Q    Okay.
22         And Exhibit 3 occurred before Exhibit 2,
23    correct?
24    A    Yes.
25    Q    So whatever Exhibit 3 didn't transfer,
```

21 (Pages 78 - 81)

Page 82

1  you're saying, went to you in Exhibit 2, correct?
2      A    That's a requirement by the law.
3      Q    Yes.
4          But it's clear -- let's just try to make
5  this on the record.
6          So Exhibit 3 is an assignment of
7  copyright, and it assigns the works in the annex,
8  right, which is part of the document?
9      A    Right.
10     Q    Aud that occurred before the transfer,
11 as you say, by law, as of August 1?
12     A    Before striking off.
13     Q    Okay?
14     A    Yep.
15     Q    We've agreed.
16         Okay. So then that takes care of
17 paragraph three.
18         So paragraph four in Exhibit 7 says,
19 "The Wave Design Pte., Ltd. was a private limited
20 company and upon its change of name all copyrights
21 were transferred to The Wave Studio Pte., Ltd."
22         Do you see that?
23     A    Yes.
24     Q    Paragraph four?
25     A    Yes.

Page 83

1      Q    Is there a document saying that The
2  Wave -- Wave Design Pte., Ltd.'s ownership of all
3  copyrights were transferred to The Wave Studio Pte.,
4  Ltd.?
5      A    There should be. I'm not sure.
6      Q    So you think -- you think there is such
7  a document?
8      A    Yes, because everything was done by my
9  attorney.
10     Q    Okay.
11         Okay.
12     A    My job was just recall which work was
13 done by which company.
14     Q    Okay.
15         So this declaration on Exhibit 7 is
16 describing in paragraphs two, three and four what you
17 think occurred, correct?
18     A    According to my attorney, this is what
19 it is, and I said okay.
20     Q    Okay.
21         So paragraph four, you think that
22 there's a document that says all copyrights of Wave
23 Design Pte., Ltd. were transferred to The Wave Studio
24 Pte., Ltd.?
25     A    That's correct.

Page 84

1      Q    You think that. Okay.
2          And let me see about paragraph five for
3  a second.
4          Okay.
5          So if you look at the signature lines on
6  this page, you're signing on behalf of Wave-S,
7  correct?
8      A    Yes.
9      Q    And Wave-S was dissolved?
10     A    Yes.
11     Q    Okay.
12         Dissolved years earlier, correct?
13     A    Yes.
14         MR. TOKE: Hold on, years earlier
15 than --
16         MR. SCHWARTZ: Than the date of this,
17 which is January 7, 2013.
18         Thanks.
19         MR. TOKE: Okay.
20     Q    So, just to be clear, as your attorney
21 pointed out, Wave-S was dissolved many years earlier
22 than January 7, 2013?
23     A    Wave-S, yes.
24     Q    Okay.
25         And Wave Pte., Ltd., that was also

Page 85

1  dissolved many years earlier than January 7, 2013,
2  correct?
3      A    Correct.
4      Q    Okay.
5          And The Wave Design Pte., Ltd. is a
6  company whose name was changed to The Wave Studio
7  Pte., Ltd.?
8      A    That's correct.
9      Q    And is there a document that shows that?
10     A    Yes. It is a requirement as well.
11     Q    Okay. I don't believe we've ever seen
12 that.
13         About when did that happen, do you know?
14     A    Sometime around 2007.
15     Q    Okay.
16     A    If I remember correctly.
17     Q    Okay.
18         All right.
19         So this Exhibit 7 is the document that
20 you were referring to this morning that you said
21 cleaned up all the --
22     A    That's what I've been told.
23     Q    Okay.
24         So there's no other document that you're
25 referring to, it's this one?

22 (Pages 82 - 85)

Page 86

1     "This one" meaning Exhibit 7.
2     A    I have to check with my attorney.
3     Q    Okay.
4          Do you know of any other document
5     that -- never mind, we'll just leave that the way it
6     is.
7          MR. SCHWARTZ:  Have we marked this one,
8     the Wave-S assignment -- yes.
9     Q    You have Number 8, correct?
10    A    Yes, that should be it.
11         Yes.
12    Q    So there are a series of copyright
13    registrations in the name of Wave-S, and they're
14    all -- hold on a second -- all the registrations are
15    dated February 18, 2011.  So I don't have to go
16    through all of these.
17         You understand that?
18         Let me take one second to try to speed
19    this up.  Okay?  Because otherwise I'm going to have
20    to go through each one of these individually.
21         So Wave-S is the claimant, the copyright
22    claimant, on registration VAU1-060-182, correct?
23         I'll just show you that.
24         We don't have to mark this, just take a
25    quick look at it.

Page 87

1     A    Yes.
2     Q    Okay.
3          And the copyright application, the
4     certification is dated December 29, 2010, correct?
5     A    Yes.
6     Q    So the Wave-S was dissolved earlier,
7     correct?
8     A    Yes.
9     Q    And it's still claiming that it's the
10    copyright registrant, right, in 2010?
11    A    My job is to identify which work is done
12    by which company.
13         MR. TOKE:  Yeah, the document speaks for
14    itself.
15         MR. SCHWARTZ:  Okay.  I won't have to go
16    through all them.
17         We have done the assignment of
18    copyright, which is Exhibit A.
19         Okay, I think we can work with that.
20         Okay.
21    Q    When you would be -- you would do work
22    for some of the hotels that are listed in the
23    complaint at paragraph ten?
24         MR. TOKE:  If you're going to talk about
25    the complaint, can we get it in front of her?

Page 88

1          MR. SCHWARTZ:  Sure.
2          MR. VAN DUSEN:  Are we using the
3     complaint or the amended complaint?
4          MR. SCHWARTZ:  Amended complaint.
5          MR. VAN DUSEN:  That's document seven, I
6     believe, right?
7          MS. REMORE:  With the Court?
8          MR. VAN DUSEN:  Yeah.
9          MS. REMORE:  Yes.
10         MR. TOKE:  Yeah, I think that's right.
11         MS. REMORE:  Here are two copies, if we
12    want to just give her -- I don't know if Vijay wants
13    a copy too and I can copy yours?
14         MR. SCHWARTZ:  Yeah.
15         MR. TOKE:  That would be great.  Thank
16    you.
17         Are we marking this?  Or I don't think
18    we need to.
19         MR. SCHWARTZ:  No, I just want to
20    refresh her recollection.
21         MR. TOKE:  Yeah.
22    Q    So just look at paragraph ten.
23         And were you or Wave-S or Wave Design or
24    one of your companies hired to -- to do photo shoots
25    for those hotels listed in paragraph ten?

Page 89

1     A    Wave, or all the entities, were hired to
2     produce marketing collaterals for all these hotels.
3     Q    Okay.
4     A    And photo shoots were images that we
5     required to produce the collaterals.
6          MR. SCHWARTZ:  Can you read that back,
7     for a second?
8          (Whereupon, the requested portion is
9     read back by the reporter.)
10    Q    When you say "Wave," you're not
11    including Wave, LLC, the New York company?
12    A    No.
13    Q    Okay, okay.
14         So was there one master contract between
15    you and GHM hiring you to prepare marketing
16    collaterals for these meetings?
17    A    There isn't.
18    Q    There is not?
19    A    No.
20    Q    So --
21    A    You're referring to master contract.
22    Q    But there is no master contract?
23    A    Nope.
24    Q    So would you consider the work you did
25    for each hotel as a specific project or a specific

23 (Pages 86 - 89)

Page 90

1  job?
2      A    It was supposed to be like that, until
3  Mr. Ohletz, the then vice-president, told everyone
4  nothing gets printed without Junior Lee's approval.
5      Q    What was the name of that gentleman?
6      A    Mr. Ralph Ohletz.
7      Q    Okay.
8          How do you spell his last name?
9      A    O -- Ohletz.
10     O-H-L-E-T-Z.
11     Q    Okay.
12         MR. SCHWARTZ: Could you just read that
13  back a second?
14         (Whereupon, the requested portion is
15  read back by the reporter.)
16     Q    So let's just skip that a second.
17         Do you know what date that occurred on,
18  that statement that you were just talking about?
19     A    Sorry, sir.
20     Q    What year?
21     A    No.
22     Q    You don't know.
23         So would it be the case that you would
24  get an assignment, for example, for The Chedi Milan?
25     A    Uh-huh.

Page 91

1      Q    That would be yes?
2      A    Would I be the case --
3      Q    Upon occasion, you would get hired to
4  prepare marketing collaterals for The Chedi Milan?
5      A    Marketing collaterals, yes.
6      Q    And can you recall a specific instance
7  where that happened with The Chedi Milan?
8      A    I'm sorry, sir, I cannot remember dates.
9      Q    No, no, no. I meant just in general,
10  not the date for The Chedi Milan, but how did it
11  occur that you would get to do a job for The Chedi
12  Milan? Who would call you up?
13     A    Vaguely, either Ralph, or Mr. Larry Van
14  Ooyen.
15     Q    And is that a gentleman from The Chedi
16  Milan itself?
17     A    He was a special project manager for
18  GHM.
19     Q    Okay.
20     A    And the general manager.
21         I can't remember his name.
22     Q    The general manager of the hotel?
23     A    Yes.
24     Q    Okay, so his name isn't important.
25     A    Yes.

Page 92

1      Q    So the general manager of the hotel?
2      A    Yes.
3      Q    So -- I'm sorry, I think I interrupted
4  you.
5          So one of those gentleman would call you
6  up?
7      A    Yes.
8      Q    And they would say, "We want you to do a
9  job," something like that?
10         MR. TOKE: Hold on. You said they would
11  call you up.
12     A    E-mail or call.
13     Q    They would contact you?
14     A    Yeah, contact.
15     Q    Somebody would contact you either from
16  the hotel itself or from GHM would contact you,
17  correct?
18     A    Yes.
19     Q    Okay.
20         And after you were contacted, what would
21  you do?
22     A    I need to ask what marketing collaterals
23  they need.
24     Q    Okay.
25         And you would do that by E-mail -- why

Page 93

1  don't you explain to me, in general, how the process
2  would work where you would be hired and provide
3  marketing collaterals.
4          MR. TOKE: And you're speaking now just
5  in general, not just --
6          MR. SCHWARTZ: In general.
7      A    I worked closely with Ralph Ohletz, so
8  I'll just use Mr. Ohletz.
9          Mr. Ohletz contact me and say, "We need
10  marketing collaterals," for whichever hotel.
11         I say, "Okay. Can you send me
12  materials," because I don't know these hotels.
13         So he would send me materials and ask me
14  what -- what do I think.
15         This would be for hotels that are
16  already built, not hotels that are still under
17  construction.
18         So looking at it, he would ask me, what
19  do I think.
20         I would say, "It's not good enough."
21         He said, "Then do whatever it takes to
22  make good collaterals."
23         He said, "What do you need?"
24         I said, "I need better quality images."
25         He say, "Then go do your images. I need

1  good brochures. I need good marketing collaterals.
2  We need to sell, sell, sell."
3      I say, "Okay."
4      Q    Okay.
5          And then would -- would you send a
6  single document that's called a contract to the
7  hotel?
8      A    To established -- I mean, already built,
9  previously, I didn't know who owns what, so I would
10 send to GHM, and then they would ask me to send to
11 the hotel, but eventually it became a standard
12 practice.
13      If it's a hotel, you have to send it to
14 the hotel.
15     Q    And the "it," are you referring to a
16 document that your companies generally referred to as
17 an estimate?
18     A    Yes, estimate, quotation.
19     Q    So for each of the individual projects,
20 was there a single document that you would refer to
21 as a contract?
22     A    My estimates.
23     Q    Okay.
24          I don't mean to confuse you in the legal
25 sense, I just want to make sure that we understand

1  each other.
2          There were a series of documents that
3  would go back and forth between you and GHM and the
4  hotels itself, is that right?
5      MR. TOKE: Misstates the testimony.
6      MR. SCHWARTZ: I didn't say it was the
7  testimony. I'm asking her directly. I'm not
8  misstating the testimony.
9      MR. TOKE: She's already testified about
10 the process.
11     MR. SCHWARTZ: Can you read back the
12 question?
13          If you don't understand it, just tell
14 me, but it was a pretty simple question.
15          (Whereupon, the requested portion is
16 read back by the reporter.)
17     MR. TOKE: I think it's vague and
18 ambiguous as to the word "documents." Are you
19 talking about contracts or -- she's talking about --
20     MR. SCHWARTZ: Okay. No speaking
21 objections.
22          I'll withdraw the question. I'll start
23 all over again.
24          Okay?
25          So why don't we mark this.

1          This will be 9.
2          (Whereupon Document Bates-stamped
3  TWSO200283 is received and marked as Exhibit 9 for
4  identification.)
5      Q    Okay.
6          So Exhibit 9 is two pages?
7      A    Yes.
8      Q    Okay.
9          So could you describe what this is?
10     A    These are production estimates.
11     Q    And what company was this one from?
12     A    The Wave Design Private, Limited.
13     Q    Okay.
14          Were all of the production estimates on
15 the same form for Wave-S and the other Wave
16 companies?
17     A    After 2004, yes.
18     Q    Okay.
19          So would you agree that you reserved all
20 the rights to the work that you created? Do you
21 agree with that?
22     A    Yes.
23     Q    And you agree that's an important thing
24 to communicate to the hotel or to GHM?
25     A    Yes.

1          And I did communicate.
2      Q    Okay.
3          And in what way did you communicate
4  that?
5      A    I said, "Ralph, all this are Wave's
6  work."
7          I'm not referring to just photographs,
8  all of them.
9      Q    Okay.
10          And was that one specific conversation
11 you had?
12     A    No, one or two.
13          And then he said, "Yeah, yeah."
14     Q    Okay.
15     A    "Yeah, yeah, they are your images.
16 Now" -- and he said this, "Now that you got all these
17 beautiful images, you should make a hardcover coffee
18 book for us."
19     Q    Okay.
20          And about when was that?
21     A    I'm sorry, I don't remember years.
22     Q    Okay.
23          Did you ever make a coffee book?
24     A    No, because I told him this, "Ralph, who
25 is paying for the production? Do you know how much

Page 98

1　printing is, let alone color separation?"
2　　　　He said, "You are."
3　　　　I said, "Where am I going to find the
4　money to print? If you want, we can do the design,
5　we can do the art work, but please, I don't have the
6　money to print hardcover coffee table book."
7　　Q　Okay. Let's go back to taking about
8　ownership of rights. Okay?
9　　　　So when you made the production
10　estimate, what did you believe the results of your
11　work would be used for?
12　　A　For the marketing collaterals. I mean,
13　all these images were only created for one sole
14　purpose, because Wave was only supposed to deliver
15　collateral -- collaterals.
16　　　　This is just part of the services.
17　Like, for example, copyrighting is also another
18　service.
19　　Q　Copyrighting; you mean writing copy?
20　　A　Whatever it takes, the ingredients to
21　produce the final result of what is ordered, that
22　would be the collateral, the flier, whatever it may
23　be.
24　　　　It goes back to, if you ask the
25　photographer, "Take my wedding picture," okay, at the

Page 99

1　end of the result, you get a photo album. At the end
2　of the result to the order that we've got is actually
3　the collaterals, be it a brochure, be it a press kit,
4　be it a flier or a take-one.
5　　Q　Okay.
6　　　　So you knew that you were being hired to
7　create what, in your mind, was called collateral
8　materials?
9　　A　Marketing collaterals, yes.
10　　Q　Okay.
11　　　　And that included photographs?
12　　A　Amongst many things.
13　　　　MR. TOKE: Hold on.
14　　　　Misstates the testimony. That's not
15　what she said.
16　　　　MR. SCHWARTZ: You know what? I didn't
17　say that's what she said. I'm allowed to ask
18　questions. They're going forward. I didn't say,
19　"Did you say that?"
20　　　　MR. TOKE: I understand that.
21　　　　MR. SCHWARTZ: Okay.
22　　　　Your objection is noted, that's fine.
23　　Q　So your estimate included payment for
24　services including taking photographs, right?
25　　A　Services, yes.

Page 100

1　　Q　Well, photographs.
2　　　　MR. TOKE: Asked and answered.
3　　A　I already answered that.
4　　　　I mean, if the marketing collateral
5　requires drawing, then we will have the object drawn,
6　and in order to produce, say, the final paper
7　carrier, we do paper carriers, we do packaging, and
8　if I don't think an image will work for a paper
9　carrier, a drawing would, then we will -- we will
10　have the drawing done.
11　　Q　But I'm not understanding this. Are --
12　included in your production estimates are costs for
13　photography. Are we fighting about that, that you
14　estimated the cost for photography?
15　　A　I also estimated the cost of
16　copyrighting.
17　　Q　But that wasn't my question.
18　　　　Listen to the question.
19　　　　MR. TOKE: You're getting argumentative
20　with her.
21　　　　MR. SCHWARTZ: Okay. I'm rephrasing the
22　question.
23　　A　This is a service.
24　　Q　Is there some difficulty in
25　acknowledging -- in your acknowledging that one of

Page 101

1　the things you estimated was the cost of photography?
2　　A　As a service, yes.
3　　Q　Well, as a service, as opposed to what?
4　　A　This is --
5　　　　MR. TOKE: Again, asked and answered.
6　She's already explained this.
7　　A　I have tried to answer you many times,
8　sir.
9　　　　The order -- the client ordered
10　collaterals. Whatever it takes to produce the
11　collaterals. In this instance, if it's brochures,
12　then I need images. In other instances, it's a
13　drawing, which we have also done, then it will be a
14　drawing. It will be a separate charge for that
15　service.
16　　Q　Right.
17　　A　Yes.
18　　Q　So, again, I'm confused because --
19　　A　I'm confused too.
20　　Q　Okay. So maybe we're both confused, and
21　if it's my fault, I apologize, but I was simply
22　trying to say that you estimate the cost of
23　photography, correct?
24　　A　As a service to produce the marketing
25　collaterals.

26 (Pages 98 - 101)

Page 102

```
 1    Q    Are you saying as a service as opposed
 2  to ownership, is that what you mean?
 3    A    I don't know where you're getting that.
 4    Q    You keep saying "as a service," and I
 5  don't understand what you're trying to tell me by
 6  that.
 7    A    In order to produce the collaterals -- I
 8  cannot have every page blank, so if I'm supposed to
 9  produce a collateral, what are the ingredients that I
10  need? The ingredient would be copyrighting. The
11  ingredient would be images. The ingredient would be
12  drawing of the location, the map.
13         This is one of the ingredients in order
14  to make the final product to be delivered.
15    Q    Okay, fine. Okay.
16         So did you ever have a specific
17  discussion with Ralph about using your photographs on
18  GHM's website?
19         MR. TOKE: Vague and ambiguous.
20         What do you mean, "using"?
21         MR. SCHWARTZ: You can object. You
22  can't make a speaking objection.
23         MR. TOKE: That's fine. I'm just
24  asking. I said vague and ambiguous as to --
25         MR. SCHWARTZ: Okay.
```

Page 103

```
 1    A    I didn't need to ask him because Wave
 2  created the first GHM website.
 3    Q    So the answer to my question is, you
 4  never had a conversation with Ralph about using
 5  Wave's photographs on GHM's website?
 6    A    For the first website, it's not
 7  necessary.
 8    Q    I'm sorry. It's not necessary to have
 9  the conversation with him?
10    A    He said, "Do the website."
11         I said. "Okay. I have the ingredients,
12  I do the website."
13    Q    And was that website that's available to
14  the general public?
15    A    Yes.
16    Q    Okay.
17         So -- and when did this conversation
18  take place?
19    A    I have to look back when the first GHM
20  website was created because Wave created that.
21    Q    Okay.
22         Approximately when?
23    A    I'm sorry, sir, I cannot remember dates.
24    Q    Okay.
25         Was it -- not specifically, but within a
```

Page 104

```
 1  year, was it before 2005 or after 2005, if you can
 2  remember?
 3    A    I don't.
 4    Q    Okay.
 5         So you knew, at some point, that
 6  photographs that you had taken were being used on the
 7  GHM website?
 8    A    The one Wave created or --
 9    Q    Well, I don't know. You tell me.
10    A    I only -- Wave only created one website.
11    Q    Well, describe the website that you
12  created for GHM.
13    A    Corporate color. Black --
14    Q    No, no, no, no. I mean, who had access
15  to that website? Was it open to the public?
16    A    Yes.
17    Q    Okay.
18         So if someone from the public wanted to
19  look at hotels that were managed by GHM, they could
20  go to the GHM website and see photographs that you
21  took?
22    A    Yes.
23    Q    And was that during the whole time that
24  you were doing work with GHM?
25    A    Yes.
```

Page 105

```
 1    Q    Okay.
 2         And you didn't have any objection to
 3  that at that time, correct?
 4    A    Because the creation of the website,
 5  that's the end result, okay, users, with pictures.
 6    Q    Right.
 7    A    Why would I have objection to the
 8  business?
 9         I mean, website designing is also
10  another --
11    Q    -- business of The Wave companies, is
12  that fair to say?
13    A    Yes.
14    Q    Okay.
15         So were at least some of the pictures
16  that were on the GHM website the pictures that were
17  registered for copyright in the U.S.?
18    A    I mean, the first website?
19    Q    Yes.
20    A    Yes.
21    Q    Are you -- as part of this lawsuit, any
22  of the photographs that were on the GHM website --
23  let me rephrase that question.
24         Are you claiming that GHM infringed any
25  rights belonging to any of your companies by virtue
```

27 (Pages 102 - 105)

Page 106

1  of having those pictures up on their website?
2      A    Yes, because it's a different website.
3      Q    Which website are you claiming
4  infringed?
5      A    The GHM website that you're seeing now
6  is not the one that I created.
7      Q    And when did you know there was a change
8  in websites?
9      A    I don't know.
10          2002, thereabouts.
11     Q    2002?
12     A    Yeah, thereabouts.
13     Q    Okay.
14          So let me see if I understand.
15          You have to realize I don't know what
16  you know, so that's why I'm asking these questions.
17     A    And I'm trying to understand your
18  question.
19     Q    Okay.  That's why I don't want you to
20  get frustrated with me.
21          So you created a website for GHM prior
22  to, approximately, 2002 that contained pictures that
23  you created and were paid for, correct?
24     MR. TOKE:  Objection.
25     MR. SCHWARTZ:  It's noted.

Page 107

1      Q    You can answer.
2      A    You asked -- well, if the client said,
3  "I want a website," then, okay, this is the estimate
4  for the website, and yes, the end result -- whatever
5  ingredients to put in, the end result, that would be
6  the website, and you have to pay for the creation of
7  that website.
8      Q    Okay.
9          So you're saying that GHM had a
10  different website after 2002 that you didn't create,
11  correct?
12     A    Yes.
13     Q    And it was using some of the same
14  photographs?
15     A    Yes.
16     Q    That you had created, correct?
17     A    Yes.
18     Q    So did you notify GHM in 2002 that you
19  objected to their use of your photographs on a
20  website that -- on a website that you didn't create?
21     A    I'm sorry, sir, it's actually quite
22  pointless to notify GHM.  I notified them for many,
23  many years of unpaid bills, and the final -- the
24  final E-mail for unpaid bills that I got, I kept
25  asking -- they kept asking me to send true copies.  I

Page 108

1  think I send no less than three sets of true copies
2  of unpaid bills.  And the final answer I got from
3  GHM, the finance director said, "We joined prior to
4  all these things that had happened."  To put it
5  bluntly, "There's nothing we can do to help you."
6      Q    Okay.
7          Can you repeat my question, please?
8          (Whereupon, the requested portion is
9  read back by the reporter.)
10     Q    Okay, so I'll repeat my question.
11          Did you hear the question?
12     A    Yes, sir.
13     Q    And so the answer is, no, you didn't
14  notify them that you objected to the use of your
15  photographs, or photographs of your companies, that
16  you saw on their website after 2002, correct?
17     A    That's correct, I did not notify them.
18     Q    Okay.
19          And were there photographs that you or
20  your companies had taken that you knew were on
21  websites of the hotels prior to 2011?
22     MR. TOKE:  Hold on.  Read back the
23  question, please.
24          (Whereupon, the requested portion is
25  read back by the reporter.)

Page 109

1      A    No, I did not.
2      Q    Okay.
3          Have you seen any of your -- of the
4  photographs that were registered for copyright in the
5  United States in 2011, had you seen those photographs
6  on any websites prior to 2011?
7      A    No.
8      Q    No?
9      A    No, because I was very busy being yanked
10  to court by GHM for unpaid bills.  I didn't have any
11  time.
12     Q    So you had no time to look up on the
13  websites because you were being brought to court by
14  GHM, is that what you're saying?
15     A    Well, I sued them for unpaid bills, as
16  you know.
17     Q    Yep.
18     A    And as a Plaintiff, I found out that all
19  the burden of proof, it was on me, so I have to find
20  all the documents, put them together.
21     Q    So it seems that you have a certain kind
22  of upset or bitterness about the unpaid bills with
23  GHM, is that fair to say?
24     A    Bitterness, no.  I just want some kind
25  of fairness.  I mean, I paid everybody.  I paid for

1  printing.
2       In short, in short, I had to pay to work
3  for GHM.
4    Q   Okay.
5    A   Okay.
6    Q   And is your feeling of unfairness a
7  reason why you're suing GHM here today?
8       MR. TOKE: Objection, argumentative.
9    A   No, I'm trying to protect Wave's right.
10   Q   Okay.
11      All right.
12      So, at least in 2002, you knew that some
13 of Wave's photographs were being used on GHM's
14 website that you didn't prepare, right?
15   A   That's correct.
16   Q   And you never notified GHM that you
17 objected to that, correct?
18      MR. TOKE: Asked and answered.
19   A   I already answered.
20   Q   You can answer it again.
21   A   What was the question again?
22      MR. SCHWARTZ: Can you read it back?
23      (Whereupon, the requested portion is
24 read back by the reporter.)
25   A   I did not notify them, yes, correct.

1    Q   Okay.
2       And did you — when you saw that your
3  photographs were being used on a website that you
4  didn't prepare, or create, for GHM, did you believe
5  that it violated the rights that you or your
6  companies had?
7    A   Yes.
8    Q   Okay.
9       Did you tell GHM that?
10   A   How am I supposed to tell?
11   Q   So the answer is no, you didn't?
12   A   Yes, I did not.
13   Q   Okay.
14   A   They did not notify me before stealing
15 my things.
16   Q   Okay.
17      And, at any time, did you ever visit --
18 did you ever prepare photographs -- did you or your
19 companies ever get an assignment to create the
20 website for the hotels?
21   A   Yes. The Setai.
22   Q   Okay.
23      The one in Florida?
24   A   Yes.
25   Q   Okay.

1       And did you take photographs that were
2  used in its website?
3    A   Yes.
4    Q   And were you paid for that?
5    A   Paid for the website, yes.
6    Q   Okay.
7       So -- and about what year was that,
8  about?
9    A   I'm sorry.
10   Q   Well, look at Exhibit 9.
11      Actually, she points outs that Exhibit 9
12 is dated July 2005.
13   A   This is not the website creation.
14   Q   I know, but was this before or after?
15   A   I'm sorry, sir.
16   Q   You don't know. Okay.
17   A   Because we have gone back to the Setai,
18 like, three, four times.
19   Q   Okay.
20      But you knew, certainly in 2002, and
21 when -- let me rephrase that.
22      You certainly knew in 2002 with respect
23 to GHM?
24   A   2002?
25      2002?

1    Q   Right, 2002.
2       Okay. This may help you with the dates.
3       MR. SCHWARTZ: Why don't we mark this as
4  Exhibit 10.
5       (Whereupon Document Bates-stamped
6  TWS0199686 and 87 is received and marked as Exhibit
7  10 for identification.)
8    Q   Okay.
9       You see Exhibit 10?
10   A   Yes.
11   Q   And that is an estimate for the Setai
12 website creation?
13   A   Yes.
14   Q   That's dated October 3, 2005?
15   A   Yes.
16   Q   Okay.
17      So does that help you refresh your
18 recollection that you were creating or were
19 retained -- or you estimated the creation of the
20 Setai website in 2005?
21   A   Yes, this helps.
22   Q   Okay.
23      Okay.
24      So were your photographs used on the
25 Setai website?

29 (Pages 110 - 113)

Page 114

```
1     A    Yes.
2     Q    Okay.
3          And, in 2005, did you look at any other
4  hotel websites to see what they looked like to form a
5  basis of artistic comparison?
6          MR. TOKE:  Hold on.
7          What year was that?
8          MR. SCHWARTZ:  2005, the same time as
9  this.
10    A    Is your question did I look at other
11 people's websites?
12    Q    Yes.
13    A    Generally, I don't like to do that.
14    Q    Okay.
15         Just for your own information, at any
16 time up to 2010, did you ever look at the websites of
17 the hotels that are listed in the complaint in
18 paragraph ten?
19    A    Prior to when?
20         Sorry.
21    Q    2011.
22    A    No.
23    Q    Why not?
24    A    Sir, I was very, very tired.  In fact, I
25 was planning to relocate to the U.S.
```

Page 115

```
1     Q    So is that -- is being too tired the
2  reason you wouldn't look at somebody's website?
3          MR. TOKE:  Objection, argumentative.
4     A    I'm sorry, sir, I actually declined
5  jobs.
6     Q    Right.
7     A    Hotel jobs.  I didn't even want to look
8  at hotels.  I'm just very, very tired.
9     Q    At that time?
10    A    Prior to 2011?
11    Q    Yes.
12    A    Yes, because the unpaid bills case
13 didn't even get settled until February -- somewhere
14 around February 2012.
15    Q    Okay.
16         And what's the connection between the
17 lawsuit and your looking at somebody else's website?
18    A    It requires me to use my eyes.
19    Q    Okay.
20    A    I'm already reading so many E-mails and
21 whatever they are asking from me.
22    Q    Okay.
23         Did you ever tell any of the hotel
24 managers --
25    A    About?
```

Page 116

```
1     Q    Did you ever tell any of the hotel
2  managers that they could not use photographs that you
3  took on their websites?
4     A    It is stated very clearly on my
5  estimates, and Ralph already told them, "Nothing gets
6  printed without Junior Lee's approval."
7          Everyone was supposed to send whatever
8  they want to do to me.
9     Q    Look at Exhibit 9.
10         That's one of your production estimates,
11 right?
12    A    Yes.
13    Q    Okay.
14         Where is it stated very clearly that
15 they can't use your photographs on a website?
16    A    "We reserve the intellectual property
17 copyright to all designs, soft copies, material,
18 photographs, projects undertaken."
19    Q    And that's what you're relying on saying
20 that they can't use it on their websites?
21    A    Yes.
22    Q    On their websites.
23    A    And I would think Ralph would have told
24 everyone because that is the reason why he told
25 everyone, "Nothing gets printed, done, without Junior
```

Page 117

```
1  Lee's approval."
2     Q    Okay.
3          Is that expression by Ralph the reason
4  why you believe each of the hotels does not have the
5  right to put your photographs on their websites?
6     A    That, and as well as numerous E-mails
7  where GHM acknowledges that those are Wave's
8  photographs.  In fact, I was asked to identify on --
9  first it was T8.  I was asked to identify which are
10 Wave's photographs, which I did.  And then the next
11 one was The Setai Club.  I was asked again to
12 identify Wave's photographs, and I did.  And the
13 director of GHM then, Mr. Kendall Oei, told me on
14 E-mail, "Wave may need to file an IP violation suit
15 against The Setai Club, but that is something that we
16 keep up our sleeves," something like that, "and it
17 will produce a lot of money for you."
18         That was in 2006.
19         And then he said something like, "Well,
20 keep me updated," or something.
21         When I didn't hear from him, I was
22 actually quite happy.  Whatever -- I don't know what
23 happened between any of the hotels and GHM, and when
24 he did not revert after that E-mail, I'm actually
25 quite happy because I thought they -- whatever
```

Page 118

1  differences, they had settled it amicably.
2       Okay?
3       And also -- and also, I found printed
4  magazines, printed by GHM, where they gave Lee Kar
5  Yin the photo credit in there.
6    Q    Okay.
7       So just referring to the T8 circumstance
8  for a second, was -- and correct me if I'm wrong --
9  was that a circumstance where GHM asked you if you
10 could -- GHM asked you who owned the copyrights?
11      Did you have anything in writing?
12      Isn't that something they asked you
13 then?
14   A   No, that's not what -- that's not what I
15 said, and that's not what it says on the E-mail.
16 What it says on the E-mail was, "Dear Junior: Please
17 identify which picture belongs to The Wave," and I
18 had to go through and identify them.
19   Q    And wasn't that the circumstance where
20 they asked if you had anything in writing with any of
21 your photographers?
22   A   Yes.
23   Q   Okay.
24      And what -- and what did you tell them
25 after they asked you did you have anything in writing

Page 119

1  with your photographers?
2    A   That was before or after?
3    Q   Before.
4    A   Before T8?
5    Q   Well, you tell me the circumstance where
6  it came about where someone from GHM asked you if you
7  had anything in writing with your photographers.
8    A   That would be before T8.
9    Q   Okay.
10      What was that circumstance?
11   A   They asked if there's any agreement, and
12 I said, at that point in time, not yet, but we had --
13 we had verbal agreement. I know it's not good
14 enough. I'll get an agreement done. And when an
15 agreement was done, I E-mailed it to Mr. Kendall Oei.
16 And note that agreement was in 2005, when under The
17 Wave Private, Limited, the following year, 2006, I
18 changed the name to The Wave Design Private, Limited,
19 and there was an updated agreement.
20   Q   Okay.
21      And that's an agreement with Masano?
22   A   Masano Kawana.
23   Q   And his company, actually, right?
24   A   Irieeyes.
25   Q   I just want to see if you can recall,

Page 120

1  under that agreement, who owned the copyrights -- if
2  Masano took a photograph for you, who owned the
3  copyright?
4    A   Wave does. Masano was just a cameraman.
5    Q   Okay.
6       MR. SCHWARTZ: Let's make copies of this
7  and we'll show you that, and we'll take a short break
8  because we're meandering a bit.
9    Q   Okay.
10      Just before we jump ahead, just again
11 looking at Exhibit 9, which is your production
12 estimate for the Setai, do you see that?
13   A   Yes.
14   Q   So we were looking at the last line at
15 the bottom there where it says, "We reserve the
16 intellectual property copyright."
17      Right?
18   A   Yes.
19   Q   And in any other document that you have
20 that you send to either GHM for the hotel, is there
21 anything in writing that you know of that says, in
22 the specific words, that your photographs cannot be
23 used on their websites?
24   A   The answer is no, because I would think
25 that Wave is made very clear on my estimates, and

Page 121

1  Ralph also say that, and Mr. Kendall Oei also say
2  that to T8.
3    Q   Okay.
4       So let's just stick with this for one
5  last second.
6       On Exhibit 9, you think that the last
7  line that says, "We reserve the intellectual property
8  copyright to all designs," is clear, in your mind, in
9  that it does not grant the right to the hotels or GHM
10 to use photographs that they hire you to take in
11 their websites?
12      MR. TOKE: Objection, misstates her
13 testimony, but go ahead.
14      MR. SCHWARTZ: Just a second.
15   Q   Why don't you answer the question?
16      MR. TOKE: Can you read the question
17 back, please?
18      MR. SCHWARTZ: Sure.
19      (Whereupon, the requested portion is
20 read back by the reporter.)
21   A   I need to make clear one thing.
22      I was hired to produce -- to create, to
23 design, marketing collaterals, and that in the age of
24 website, including website designs and E-Newsletter,
25 electronic newsletter, photography, or the

31 (Pages 118 - 121)

Page 122

1  photographs, were created in order to produce the end
2  result. It is not like GHM or the properties hire
3  Wave to do photography, specifically photography.
4        There is a difference here.
5        When the collaterals were ordered, Wave
6  went to shoot photographs. Okay? And they knew that
7  Wave owns the copyright.
8        There are a lot of repeats, repeat
9  orders to reprint the brochures, to reprint the
10  fliers. As in when they say -- say, for example,
11  first 10,000 brochures are almost depleted in stock.
12  Now, next we will need to refresh the content,
13  change -- maybe change the picture to the next
14  bedroom instead of it looking so boring.
15        So Wave owns the copyright, there's no
16  doubt about that, and they kept coming back for
17  reprint of anything. Wave was not hired just to do
18  photographs and give it to them and they do whatever,
19  no.
20     Q    And where does it say that?
21     A    It has always been the practice.
22        If they can go on -- if they can go off
23  and do their own brochures, they should have done
24  that, instead of getting Wave to reprint again and
25  again whenever there is a change, and Ralph said --

Page 123

1  I'm repeating myself, I'm sorry -- "Nothing gets
2  printed without Junior Lee's approval."
3     Q    Okay.
4     A    They did not hire Wave for photography.
5        The reason for a photography contract,
6  they're marketing collaterals contract.
7     Q    So your -- you believe that the work
8  that you were hired to do through your companies
9  meant that they -- that the hotels, or GHM, could
10  only use the photographs in brochures, hardcopy
11  brochures?
12     A    That would be reprinted or redesigned by
13  Wave.
14        Please bear in mind, Internet marketing
15  did not exist in southeast Asia then. There was no
16  such thing as Internet marketing even up to 2007.
17     Q    Okay.
18        So -- well, you created a website in
19  2002?
20     A    Yes, but that is specifically for the
21  hotel. It's not to be given to any Tom, Dick and
22  Harry. I created the website, and it's fine, because
23  we got paid for that website, and the sales
24  channeling, the traffic, is through that website.
25     Q    So you believe that -- that the

Page 124

1  photographs that the hotels paid for when they hired
2  you could not be used on their websites?
3        MR. TOKE:  Objection, misstates her
4  testimony.
5        MR. SCHWARTZ:  Just a second.
6        Can you step out of the room for a
7  second?
8        Can you just step out of the room for a
9  second? I want to have a conversation just with your
10  lawyer.
11        You have to take off the microphone.
12        We'll come get you.
13        (Witness leaves conference room.)
14        MR. SCHWARTZ:  Look, I don't mean to be
15  rude, but that's hugely annoying. I am not saying
16  that that's her testimony. I'm asking her a new
17  question.
18        MR. TOKE:  You're characterizing her
19  testimony in a way that is inconsistent with the way
20  she's testified.
21        MR. SCHWARTZ:  Well, then she can answer
22  that, but you can't object like that. That's highly
23  improper.
24        I am not -- can you read hack my
25  question that I asked just so I'll make sure --

Page 125

1  because if I made a mistake, I'll apologize.
2        (Whereupon, the requested portion is
3  read back by the reporter.)
4        MR. SCHWARTZ:  That's a perfectly
5  legitimate question.
6        If she doesn't like my question, she can
7  say that that's not her belief.
8        MR. TOKE:  She has specifically said
9  that repeatedly.
10        MR. SCHWARTZ:  Well, then she can say
11  that.
12        I don't believe she said that.
13        I'm not -- it's clear I'm not harassing.
14  I'm trying to be as delicate as I possibly can. So
15  I'm telling you I don't want you to make that
16  objection anymore because I'm not -- or you can have
17  a blanket objection, that's fine, because I'm not
18  characterizing her testimony. I'm allowed to ask her
19  questions.
20        MR. TOKE:  Yes, you are. She has
21  repeatedly said no, they have paid for photography
22  services, so when you say "photographs," that is not
23  what she said, and you're trying to slip something by
24  her that is inaccurate compared to what she said.
25        She said they pay for photography

32 (Pages 122 - 125)

1 services. She goes and -- as an ancillary aspect of
2 providing marketing collateral, that's what she has
3 repeatedly said, and you want to characterize it in a
4 particular way and slip it by her, and that is
5 inaccurate. That's not what she said. She said
6 services they paid for. They're not paying for
7 photographs.
8        MR. SCHWARTZ: Okay. I'll ask her that
9 question specifically.
10        MR. TOKE: Fine.
11        MR. SCHWARTZ: Let's take a two-minute
12 break.
13        THE VIDEOGRAPHER: We're going off the
14 record at 2:54 p.m.
15        (Brief recess taken.)
16        THE VIDEOGRAPHER: We are back on the
17 record at 3:15 p.m. This marks the beginning of
18 media three.
19    Q    Was there something you wanted to say to
20 correct or change or add?
21    A    Yes. I need to clarify.
22        I mean, if -- the questions were, to me,
23 to my mind, were a bit convoluted, but I need to
24 clarify two things, very important. One, I did not
25 know that GHM was using my pictures on their website

1 until 2012. Two, Wave sold services to GHM. Wave
2 did not sell, to GHM or the hotels or anyone, the
3 rights to any photographs.
4        I'm sorry to say this, but GHM pays for
5 a glass of milk and now claims they own the cow.
6        It's like the wedding photography. You
7 pay for the services, the time, but you don't own the
8 photographs. What you get at the end of the day is a
9 photo album. What they got at the end of the day was
10 the brochures, was the flier, website creation,
11 whatever it may be, but that is the end product that
12 they ordered.
13        Photography was a service that Wave
14 billed them for, Wave did not bill them for rights.
15    Q    Okay.
16        I didn't mean to interrupt you, but have
17 you clarified what you thought you wanted to?
18    A    Yes. Sorry.
19    Q    Okay.
20        Do you think that GHM is claiming
21 ownership of the photographs that are registered in
22 the copyright office?
23    A    That's what I've been told.
24    Q    Who told you that?
25    A    My attorney.

1    Q    Okay.
2        MR. TOKE: Objection to the extent I
3 don't want you to talk about anything that's
4 attorney-client privilege, so.
5    Q    GHM -- I'm telling you now, GHM is not
6 claiming ownership of the copyright of those
7 photographs. Okay? Do you understand that?
8    A    Yes, sir.
9    Q    You seem hesitant.
10        Why -- in what way do you think GHM or
11 the hotels are claiming ownership of the photograph?
12    A    If they don't own the photographs,
13 why -- why -- why am I being hammered here?
14    Q    You're the Plaintiff. You're not being
15 hammered.
16    A    Then what are we -- what are we trying
17 to clarify?
18    Q    Well, that's a fairly good question.
19        So just so that you should know, when
20 you came here today, did you believe that in this
21 lawsuit GHM was claiming ownership of the photographs
22 that are registered in the copyright office?
23    A    Your question is if they -- if GHM is
24 claiming ownership?
25    Q    Did you believe that?

1    A    I would -- yes; otherwise, why are we
2 here?
3    Q    Okay.
4        So what led -- is it advice or is it
5 information you got from an attorney that led you to
6 believe that GHM is claiming ownership of rights?
7        MR. TOKE: Objection.
8    Q    I'll rephrase the question.
9        Outside of any statement that an
10 attorney may have given you, do you have any reason
11 to believe that GHM or the hotels or any of the
12 Defendants are claiming ownership rights in the
13 photographs?
14    A    Sir, I don't even know why I'm here
15 except to deliver to you the truth, and if nobody is
16 claiming ownership to the photographs, why am I here?
17    Q    You're suing us, that's why you're here.
18    A    Yes, and if I own the pictures --
19    Q    Okay.
20        Okay. Fair question.
21        Let's try -- let's try to discuss that
22 because your attorney and I had a brief discussion
23 about that.
24        You assert that your companies were paid
25 for photography services, correct?

Page 130

1    A    Correct.
2    Q    Okay.
3         And you now know, because I've told you,
4    GHM and the Defendants do not claim that they own the
5    rights, correct?
6         I've told you that.
7    A    Now that you have said.
8    Q    Okay.
9         Would you agree -- would you agree that
10   you were paid by the clients and they purchased
11   marketing materials that incorporate your photos and
12   that they, the hotels and GHM, purchased the
13   marketing materials from you inclusive of the
14   license?
15   A    For however many, let's say 10,000
16   brochures, or 5,000 brochures, they can use those
17   brochures.
18   Q    Okay.
19        So we now understand that there's a line
20   between just photography services and ownership,
21   correct?
22   A    Yes.
23   Q    Okay.
24        So when the hotels, or GHM, ordered the
25   photographs, they want -- you're looking at me

Page 131

1    like -- what did I say wrong?
2    A    They didn't order the photographs. They
3    ordered marketing collaterals. I created the
4    photographs in order to provide the collaterals.
5    Q    Okay.
6         How would you like me to say that in a
7    shorthand way?
8         When they hired you to create
9    photographs for the collaterals, is that the way to
10   say it?
11   A    They hired me to create the collaterals.
12        Whatever it takes to sell those hotels,
13   if it's a painting, I decide what is best to sell the
14   hotels.
15   Q    Okay.
16   A    So in some instances, it would be
17   images. In some instances, they're actually
18   paintings.
19   Q    Okay. So let's just talk about the time
20   that we're dealing with images, not paintings. Okay?
21   A    Okay. I just wanted to clarify.
22   Q    That's fine.
23        So at some point, at some times, in your
24   judgment, giving you the credit, as you described,
25   you decide that some photographs may be best to go in

Page 132

1    the collaterals, correct?
2    A    Yes.
3    Q    And you then -- how do you present that
4    to the hotels?
5    A    If they don't have images, I'll say, "We
6    need images."
7    Q    Okay.
8         And the images then are photographed,
9    correct?
10   A    Correct.
11   Q    And you deliver, to the hotels and GHM,
12   CD's of the photographs you take?
13   A    Okay. One of the requirements for Wave
14   is, once an estimate is approved, Wave require
15   50 percent payment to buy tickets or whatnot, and
16   when we finish photography, we bring -- we still have
17   to do post-production. After everything is done, the
18   requirement was to send a copy to GHM, a copy to the
19   sales department, and a copy to the hotel, whichever
20   one, so that they can verify that Wave did do the job
21   and not loaf around and eat for free, stay for free.
22   And I have to give it to them in CD, read-only
23   memory, read-only memory, to prove that we did the
24   job so that we can get 50 percent payment. That
25   CD-ROM, read-only memory, also acts as a catalog, in

Page 133

1    time to come, if you want, whichever number,
2    whichever picture, you order from us. Like, when you
3    want to do a new brochure, then it would be so much
4    easier to say, "Okay" -- they will tell me, "I don't
5    want this picture, I want dining room two, or dining
6    room four."
7    Q    From -- from the CD-ROM?
8    A    Yes, because then they will know -- I
9    have a lot of E-mails say, "We don't want that
10   picture, we want another picture."
11   Q    So of the photographs that you
12   delivered -- of the images on the CD-ROM that you
13   delivered to the hotels and GHM, it's your
14   understanding, isn't it, that the hotels, or GHM, had
15   the right to select photographs to use, correct?
16   A    To order from me.
17   Q    Okay.
18   A    Just like previous time when they
19   reprint, they will also say, "We don't want this
20   picture," all the reprints come to Wave.
21   Q    Okay.
22        And so on the times that there were
23   reprints of brochures, would you -- you would get
24   paid for the reproduction of the brochures?
25   A    Printing costs and so on, yes, they

34 (Pages 130 - 133)

Page 134

1  order the collateral.
2      Q    Okay.
3          But you wouldn't get paid a separate
4  photograph fee, right?
5      A    It's worked into the printing cost.
6      Q    "It's worked into the printing cost,"
7  what does that mean?
8      A    Meaning that for print, for print, the
9  license fees would normally be how many copies, where
10  are the circulation, where is it used, on the cover,
11  inside back cover and so on and so forth.
12      Q    What do you mean, by print?
13          This has nothing to do with the hotels,
14  correct?
15      A    No, it has to do with the collaterals
16  ordered.
17          When you want new brochures, it has to
18  go for print.
19      Q    Sure.
20      A    Okay?
21          So if the -- for simple and most
22  inexpensive way, Wave adopted this method, if they
23  ordered 10,000 brochures, the print costs will be
24  doubled because license fees always go hand in hand.
25      Q    Where are the license fees?

Page 135

1          Can you show me where the license
2  fees -- were the license fees ever put down in
3  writing someplace?
4      A    No, I told Ralph this.
5          He said okay.
6      Q    Oh, so let's just deal with this for a
7  second.
8          You say that there are license fees that
9  were charged by Wave to the different Wave companies,
10  right?
11      A    Yes, but very minimal.
12      Q    Well, let's just stay with one thing at
13  a time.
14          Were the license fees put in writing
15  someplace?
16      A    No.  I told Ralph and, be say, "Yes,
17  that's fine, that's fine."
18      Q    Okay.
19          So what would you consider a license
20  fee?
21      A    If you -- if you print 10,000 brochures,
22  let's say, 10,000 brochures, and print cost is
23  $10,000, just for example, then chargeable would be
24  20,000.
25      Q    Well, look at Exhibit 9, for example.

Page 136

1          Okay?
2          This is a production estimate.
3          Where are the license fees mentioned in
4  Exhibit 9?
5      A    There will be no license fees here
6  because it's not the collateral.
7      Q    Is there a separate -- is there a
8  separate production estimate for collaterals?
9      A    Yes.
10      Q    Okay.
11          So in the -- in the separate production
12  estimate, there's a document that says "Production
13  estimate collateral license fee"?
14      A    The license fee is not put there.
15      Q    Okay.
16          So the license fee is in your mind?
17      A    No.
18          MR. TOKE:  Objection.
19      A    No.
20          I actually told Ralph.
21      Q    Okay.
22          And what did you tell Ralph about
23  license fees?
24      A    I said, "Ralph, it's very, very
25  difficult to, one, the quantity order could change

Page 137

1  last minute; two, the picture, you say, could change
2  last minute even before -- even when we are at
3  press."
4          He say, "Wait, wait, wait, wait, we
5  don't want that picture," or "We want two more
6  pictures," and it's very difficult to keep sending
7  estimates, so a better and more effective way to do
8  this is if you print 10,000, the license fee -- if
9  you print 10,000 brochures and it cost $10,000, the
10  license fee will be 10,000, which is very, very
11  minimal for 30 pictures in a brochure.
12      Q    What, in your mind, is a license fee?
13      A    A license fee is license fees.
14      Q    But what -- what does that mean?  If
15  you're giving a license fee to somebody, what does
16  that permit them to do?
17      A    That the 10,000 brochures, they have the
18  right to distribute, to use.
19      Q    So, in your mind, there's -- there's an
20  initial production estimate like Exhibit 9, right?
21      A    Uh-huh.
22      Q    That doesn't have anything to do with
23  license fees, right?
24      A    Because Exhibit 9 is photography
25  services.

35 (Pages 134 - 137)

1    Q    Right.

2         So what's -- what's the next document in

3    sequence from Wave Studios?

4    A    It really depends if they want a

5    brochure, presentation kit, a flier.

6    Q    Okay.

7    A    Those things necessitate a separate

8    estimate.

9    Q    Okay.

10        And so what, for example, would that

11   estimate have listed in the description portion? It

12   wouldn't have the word license fee, correct?

13   A    No.

14   Q    Okay.

15        Okay.

16        All right.

17        So you would give the hotels and GHM

18   CD-ROM's with images on the CD-ROM's, correct?

19   A    Read-only memory CD-ROM.

20   Q    Okay.

21        So across the -- across the images, were

22   there any markings by Wave or any of The Wave

23   companies saying that it belonged to Wave and nobody

24   else could use it or it's not to be -- not to be used

25   on a website, anything like that?

1    A    We don't need to -- well, it says

2    "Produced by The Wave," okay, but we don't need to

3    because it's a known fact.

4         Ralph said -- I worked closely only with

5    Ralph. Okay?

6         Ralph say, "Yeah, yeah, yeah, they all

7    know they all come back to you for reprint."

8    Q    Okay, okay.

9         And I think -- excuse me if I've asked

10   this before, but sometimes I get lost in it, so I

11   don't mean to be offensive, but we've -- you've never

12   discussed with Ralph the use of the photographs on

13   websites?

14   A    There was no such thing as website until

15   much later.

16   Q    Okay.

17        So when did websites, to your knowledge,

18   first become used in advertising or marketing for the

19   hotels?

20        MR. TOKE: For these hotels?

21        MR. SCHWARTZ: Yes.

22        MR. TOKE: The ones involved here?

23        MR. SCHWARTZ: For these hotels in

24   paragraph ten.

25   A    It would be around this time, 2005.

1    Q    2005?

2    A    Yeah.

3         Not websites, it's just one corporate

4    site.

5    Q    Okay, let me rephrase the question then.

6         When did you become aware that the

7    hotels in paragraph ten were using the Internet to

8    advertise their hotels?

9    A    After 2012, much later.

10   Q    Okay.

11        And you're sure of that answer?

12        MR. TOKE: Hold on.

13        Read the question back and listen -- pay

14   attention to what he's asking and answer the question

15   directly.

16        (Whereupon, the requested portion is

17   read back by the reporter.)

18   A    The hotels was using my pictures to

19   advertise.

20   Q    No.

21        MR. SCHWARTZ: Just read the question

22   again.

23        (Whereupon, the requested portion is

24   read back by the reporter.)

25   A    I'm aware of the one I created. That's

1    corporate website for the Setai.

2    Q    And what year is that; 2005?

3    A    I mean, only this one, because we

4    created it, 2005. I mean, we finish the job in 2006.

5    Q    Okay.

6         Were you aware in 2005 or 2006 of the

7    possibility of your photographs being used by the

8    hotels on the Internet for marketing purposes for the

9    hotels?

10        MR. TOKE: Calls for speculation.

11   A    No, sir.

12   Q    And you have not, prior to -- let me

13   rephrase that so it's English.

14        Prior to 2012, you did not go on the

15   Internet to look at the websites of any of the hotels

16   listed in paragraph ten?

17   A    No. I didn't even know when GHM stopped

18   communicating with me. That would be about 2008.

19   Q    What happened in 2008?

20   A    My last meeting with Mr. Jenni, I picked

21   up -- I picked up paper carriers, packaging, amenity

22   boxes, match boxes, from the Nam Hai. They copied my

23   work for the Setai and the Lalu. I had never done

24   that work for the Nam Hai, so I made an appointment,

25   carrying all the pirated -- I would use pirated

36 (Pages 138 - 141)

Page 142

1  copies. I made an appointment with Mr. Jenni. I
2  went to see him in hope that he can help me stop -- I
3  don't know who. The Nam Hai is using things that I
4  created for the Setai. The only change is -- the
5  only change is the logo. Okay?
6       So I went to see Mr. Jenni in hope that
7  he will help me address this. So when I saw him, I
8  said, "Mr. Jenni, I found all this at the Nam Hai,
9  and they had exact replicate of what I did for the
10  Setai, except I did not do this for the Nam Hai."
11    Q    Okay. I don't -- what was the question?
12         MR. SCHWARTZ: Can you read back the
13  question?
14         (Whereupon, the requested portion is
15  read back by the reporter.)
16    A    2007 right?
17         MR. TOKE: He said 2008.
18    A    Yeah, but the last time I met Mr. Jenni
19  was 2007.
20    Q    In 2007, 2008, did you have a break with
21  GHM?
22    A    I did not. I went to see -- that's what
23  I'm trying to tell you.
24    Q    Okay. Who is Mr. Jenni?
25    A    Ralph's boss.

Page 143

1    Q    Okay.
2         At GHM?
3    A    Yes.
4    Q    Okay.
5    A    And I showed him all the pirated copies
6  that I found at the Nam Hai. He screamed his lungs
7  out to the executive secretary. He said, "Pamela,
8  get me John Lane." And I just sat there shocked.
9  And I don't know what John Lane said, but I could
10  hear what Mr. Jenni said, "Junior Lee went to Nam Hai
11  and she found all these things copied, using her work
12  for the Setai. I don't F'ing care what you use. All
13  I care -- you can use an F'ing white paper carrier.
14  Don't ever use Junior Lee's work."
15    Q    Okay.
16         And so in what way did -- did there come
17  a time when GHM stopped hiring you?
18    A    No.
19    Q    Okay.
20         After you sued them, they didn't stop
21  hiring you?
22    A    No. Before I sued them, they stopped
23  hiring me.
24    Q    Okay.
25         So why do you think they stopped hiring

Page 144

1  you?
2    A    I don't know, because the last meeting
3  with Mr. Jenni, I ask him, sir, "Why are you angry?
4         He said, "No, I'm not angry."
5         I said, "I'm not -- I'm not taking legal
6  action, I'm just hoping that you can help me stop
7  this."
8         Then I said, "What did I do wrong?"
9         He said, "No, you did nothing wrong."
10    Q    And you're referring to somebody else
11  using your photographs, right?
12    A    No, my designs.
13    Q    Your designs, okay.
14    A    The design has a photograph, my
15  painting.
16    Q    Okay.
17         Okay.
18         And that had -- okay, let's just skip
19  that.
20    A    So I'm not sure when or why we stopped.
21  That was my last meeting with Mr. Jenni.
22    Q    Okay.
23         Let's just go back and do some
24  documents. Why don't we mark this as Number 11.
25         (Whereupon Document Bates-stamped GHM

Page 145

1  00546 is received and marked as Exhibit 11 for
2  identification.)
3    Q    So this is an invoice from The Wave
4  Design to Mr. Jenni, J-E-N-N-I?
5    A    Mr. Hans Jenni.
6    Q    Jenni, okay.
7         And what is -- what was this for? What
8  were you invoicing them for?
9    A    Chedi Milan website.
10    Q    Okay.
11         So I think before you said that you
12  didn't know prior to 2012 that the companies or that
13  hotels were using websites, is that correct?
14    A    No, for the corporate website.
15         This is a corporate website.
16         My understanding was -- when you asked
17  me, my understanding was did I know that they use
18  it -- they distributed my pictures and selling the
19  hotels to other websites.
20         I didn't know that. No one has ever
21  told me.
22    Q    Okay.
23         So let me rephrase -- let me ask the
24  question again.
25         Try to listen to my question. Don't

37 (Pages 142 - 145)

Page 146

1  interpret what I'm saying.
2       I'm not saying did you know that you
3  think somebody sent them to somebody else. Did you
4  know, prior to 2011, that the hotels had websites
5  that were using your photographs?
6     A    Apart from those I did, after my meeting
7  with Mr. Jenni, because he said, "I don't F'ing care
8  what you do or what you use. For all I care, you use
9  a white paper carrier. Don't ever use Junior Lee's
10  work."
11     Q    Okay. I'm sorry --
12     A    So I don't know that they were still
13  using, because they started changing everything,
14  including the logos that I designed, which I saw, and
15  I said, "Yeah, never to use Junior Lee's design."
16     Q    Who are you referring to? Who changed
17  your logo?
18     A    All the hotels started to change the
19  logo. I did the corporate branding for GHM.
20     Q    Okay.
21       Listen -- let's try it this way -- let's
22  try it this way.
23       For the Chedi Milan, okay, did you know,
24  prior to 2011, that the Chedi Milan had your
25  photographs on their website?

Page 147

1     A    I'm trying to answer you the best I can.
2     Q    Uh-huh.
3       It's sort of a yes-or-no question. I
4  don't understand why you can't say yes or no.
5     A    If I say yes, then you tell me, "Look,
6  you knew that they're using your work," but this is
7  in 2006. By 2007, Mr. Jenni already scream his head
8  off never to use Junior Lee's work.
9     Q    Okay.
10       Listen to me. Listen. You have to just
11  listen to what I'm asking you.
12       MR. TOKE: Look, she obviously doesn't
13  understand the question.
14     A    I'm sorry, I did listen. You said prior
15  to 20 --
16     Q    '11.
17     A    -- 11.
18       Okay. Prior to 2011 means it could be
19  1999 all the way to 2010.
20     Q    Yes, exactly, exactly.
21     A    So how can I say a yes or a no?
22       I did this website in 2007. Mr. Jenni
23  scream his head off to --
24     Q    But I didn't ask you if Mr. --
25     A    So I will say that -- I would say that

Page 148

1  before 2007 I created all these websites.
2       Sure, I knew, only the ones that I
3  created.
4       After -- after the screaming marathon by
5  Mr. Jenni and he saying, never to use Junior Lee's
6  design, how am I supposed to know?
7       I would think that everyone start to
8  changing, even the logo, the letterhead, everything
9  change. When I went to Setai, or when I went to
10  Kuala Lumpur, they all changed their logo, which I
11  designed. So I would think that, "Hey," you know, he
12  said, "Change. Never to use Junior Lee's work."
13       Okay?
14       Now I see all the logos in front of the
15  building of Carcosa Seri Negara or the Saujana all
16  change.
17       I would take it that they will never use
18  my work again.
19     Q    Okay.
20       So after this shouting match -- which
21  you don't recall when it was, right?
22     A    2007.
23     Q    2007. Okay.
24     A    So I'm sorry if I cannot answer your
25  question because prior to 2012, it could go back to

Page 149

1  1993.
2     Q    But that's okay. Then you can answer
3  the question that way.
4     A    That's why I'm trying to clarify.
5       I knew -- obviously, I knew because I
6  created all this in 2006, but after the shouting
7  marathon, how do I know?
8       I saw everything started changing.
9       MR. TOKE: Can we go back to the
10  question?
11       I'm not even sure what the question is
12  anymore.
13       MR. SCHWARTZ: I agree, so let's try to
14  go back.
15     Q    So did you ever look at the website for
16  the Leela Goa in India?
17       MR. TOKE: It's Goa.
18     A    The Leela Goa.
19     Q    Listen to my question.
20       Prior to 2012, did you ever look at the
21  website for the Leela Goa?
22     A    I'm sorry, sir. I didn't even know, up
23  to now, now that you say -- do they have a website,
24  the Leela Goa?
25     Q    Just answer the question.

38 (Pages 146 - 149)

Page 150

1    MR. TOKE: I think you got your answer.
2    MR. SCHWARTZ: No, no, no.
3    That may be the case.
4    Q    Is the answer to my question no?
5    A    Yes. No.
6    Q    Okay.
7    A    I cannot remember the URL's.
8    Q    You cannot remember the URL's?
9    A    After a while, I found so many --
10    Q    These questions seem -- I'm trying to
11    ask this in the simplest possible way, so I'm going
12    to try with another hotel.
13    For the Chedi Muscat in Oman, have you
14    ever gone on their website prior to 2012?
15    A    No.
16    Actually, the Chedi Muscat website, I
17    only found through a link from GHM website. I didn't
18    even know Chedi Muscat had its own website. It was
19    actually link from GHM's hotels website.
20    Q    Okay.
21    So when did you find that out?
22    A    It's linked to GHM hotels website, so it
23    would be in 2012.
24    Q    Did you go on GHM website prior to 2012
25    at any time?

Page 151

1    A    No.
2    Q    You never went on GHM's website prior to
3    2012?
4    A    No.
5    Q    Okay.
6    And so it's your testimony -- let me
7    rephrase that.
8    To be clear, you have not seen any of
9    the websites of the hotels that you listed in
10    paragraph ten prior to 2012?
11    A    Listed in paragraph ten, there's also
12    other hotels like La Pari-Pari, I've seen those.
13    Q    So tell me, of the hotels listed in
14    paragraph ten, how many websites have you seen?
15    MR. TOKE: At any time?
16    MR. SCHWARTZ: Prior to 2012.
17    A    None.
18    Q    Okay.
19    A    I mean, except for La Pari-Pari, which
20    is not under GHM.
21    Q    Okay.
22    Anything else you want to add about that
23    or you've just never seen any of those websites?
24    MR. TOKE: You're talking about prior to
25    2012?

Page 152

1    MR. SCHWARTZ: Yes.
2    I don't know how many more times I can
3    restate the same question.
4    A    From my recollection, no.
5    MR. SCHWARTZ: Okay. Why don't we take
6    a break because I'm getting -- why don't we just take
7    a break.
8    THE VIDEOGRAPHER: We're going off the
9    record at 3:45 p.m.
10    (Brief recess taken.)
11    THE VIDEOGRAPHER: We are back on the
12    record at 3:57 p.m.
13    Q    Okay.
14    If you can, put Exhibits 9 and 10 in
15    front of you.
16    So Exhibit 9 is to the Setai Miami, and
17    the product line says, "Photo shoot six days."
18    Do you see that at the top?
19    A    Yes.
20    MR. TOKE: Which -- we're looking at --
21    MR. SCHWARTZ: Exhibit 9.
22    MR. TOKE: Nine?
23    Where does it say -- "product"?
24    MR. SCHWARTZ: Second line, from the
25    top.

Page 153

1    MR. TOKE: Oh, uh-huh, yep.
2    MR. SCHWARTZ: Okay.
3    Q    All right.
4    And so that includes at number one, the
5    photography services, correct?
6    A    Yes.
7    Q    Okay.
8    And the photography services include, if
9    you go down to number 8, photo digital touch-up, and
10    including the delivery of pictures to the hotel or to
11    GHM, right?
12    A    Yes, for payment.
13    Q    Okay.
14    Okay.
15    Now, look at number ten. That's also
16    the Setai Miami, and it's a couple months later.
17    Number nine is July. Number ten is
18    October.
19    And number ten is a product estimate to
20    create the Setai website.
21    And that's 65,000 Singapore dollars,
22    correct?
23    A    Yes, correct.
24    Q    Okay.
25    Does the -- so that's an additional

39 (Pages 150 - 153)

**Page 154**

1 $65,000. It's not the same as the -- as the estimate
2 for number nine, correct?
3    A    Yes, correct.
4    Q    Okay.
5        So what photographs did you use to
6 create the Setai website that you made an estimate
7 for in number ten?
8    A    I cannot remember.
9    Q    Is there anything that could refresh
10 your recollection? Could you look at something that
11 would enable you to remember?
12    A    You're asking me to remember every
13 single photo on that site. I cannot remember.
14    Q    No, I just asked you if there's
15 something you could go back and look at that would
16 refresh your recollection.
17    A    No, I don't even -- I don't even have
18 the files here.
19    Q    Okay.
20        So --
21        MR. TOKE: Maybe I could help.
22    What are you asking?
23    What do you want to know?
24    Q    So where did you get the photographs
25 that went on the Setai website that you created

**Page 155**

1 pursuant to Exhibit Number 10?
2    A    From trip one, two, three, four -- no,
3 maybe three.
4        Trip three.
5        Trip four, I cannot remember when, but
6 it has to be after trip three.
7    Q    Okay.
8        So, in other words, trip one, two and
9 three, would that have been included in Exhibit 9?
10    A    Trip one, two, three, yes.
11    Q    Okay.
12        So you -- you were paid for the
13 photography services in Number 9, correct?
14    A    Services, yes.
15    Q    Okay.
16        And you took photographs during the time
17 period covered by the production estimate form Number
18 9, correct?
19    A    Took photographs, yes.
20    Q    And those photographs were used in the
21 Setai website that you estimated for Number 10,
22 correct?
23    A    Yes.
24    Q    Okay.
25        And the payment for those photographs

**Page 156**

1 came from Exhibit Number 9?
2    A    What do you mean by that?
3    Q    Can you show me, in Exhibit 10, where
4 there is a charge for photography services?
5    A    Exhibit 10?
6    Q    Yes.
7    A    You mean pictures?
8    Q    I'm asking you.
9    A    Pictures, including pictures used.
10    Q    Okay.
11        So you now think that you took
12 additional photographs that were used in the Setai
13 website, or you don't know?
14    A    I can't remember.
15        MR. TOKE: I think the question is
16 confusing her, to be honest.
17        MR. SCHWARTZ: Okay.
18    Q    So I guess the best answer is, you don't
19 know where you -- you don't know?
20    A    I cannot remember. I didn't say I don't
21 know.
22    Q    Okay.
23        You can't remember?
24    A    Yes, because you asked me to remember
25 pictures. I cannot remember.

**Page 157**

1    Q    Okay.
2        Can you remember taking pictures, going
3 on a photo shoot to create the website?
4    A    I don't understand the question. I
5 cannot remember.
6    Q    Okay.
7        You charged for photography services,
8 right?
9    A    Correct.
10    Q    And if you look at Exhibit 9, number
11 one, there is a charge, photography services -- well,
12 you say it's photography services -- 4,000 Singapore
13 dollars a day times six days for a photo shoot.
14    A    Correct.
15    Q    Isn't that the normal way you charge
16 when you go on a photo shoot? You charge per day for
17 a photo shoot?
18    A    For the service, for the time.
19    Q    Yes, exactly.
20        And there is no charge in Exhibit 10,
21 correct?
22    A    There's pictures, but I cannot remember
23 which picture.
24    Q    Okay. Listen to my question.
25        MR. TOKE: Pay attention to the

Page 158

1  question.
2      Q    Can you show me where on Exhibit 10 the
3  words "photo shoot" or the words "photo services" are
4  located?
5      A    On Exhibit 10?
6      Q    Yep.
7      MR. TOKE: It doesn't -- the document
8  speaks for itself.
9      A    Can I show you on Exhibit 10, photo
10 shoot, is that what you're asking?
11     Can I show you on Exhibit 10 if there's
12 any photo shoot in here?
13     Q    Yeah, yeah.
14     A    None.
15     Q    Thank you.
16     Okay.
17     So is the description -- in the
18 production estimate, that's how you came up with the
19 charge of -- the charge of 65,000 Singapore dollars
20 includes the things that you listed in the
21 description, correct, that's what you're charging
22 them for?
23     A    Yes, programming, flash, Java.
24     Q    Okay.
25     And do you see the word "license fee" in

Page 159

1  there any place?
2      A    No, because license fee, we do not have
3  to put. That's what Ralph told me.
4      Q    Okay.
5      So, in your mind, based upon what you
6  believe Ralph told you, there was no need for you to
7  put the expression "license fee" in any of your
8  estimates or invoices?
9      A    Yes.
10     Q    And Ralph said that -- and you already
11 testified as to what Ralph said, right?
12     A    Yes.
13     Ralph was the vice-president.
14     Q    Right.
15     Did he ever use the words "license fee"
16 to you?
17     A    I told him there's license fees.
18     He say, "Yeah, yeah, yeah. You just put
19 it into printing," or whatever.
20     Q    When did that occur?
21     That's different -- when did that occur?
22     A    That was before all this website thing.
23     In the beginning of year 2000,
24 thereabouts.
25     Q    Okay.

Page 160

1      And so he said that you should put
2  license fee in writing?
3      A    No.
4      He said just put it in the printing.
5      I said, "Where am I supposed to put
6  this?"
7      He said, "In the printing. Everything
8  in the printing."
9      Q    And you understood that to mean that you
10 would charging a license fee and that charge would be
11 included in the expression "printing"?
12     A    Yes.
13     Q    Okay.
14     And the sole basis for that belief is
15 something that Ralph said to you?
16     MR. TOKE: Objection, mischaracterizes
17 her testimony.
18     MR. SCHWARTZ: You know, I didn't say
19 what her testimony was.
20     If you want to object, just object. You
21 can't make a speaking objection.
22     MR. TOKE: It's not a speaking
23 objection.
24     MR. SCHWARTZ: I'm not going to argue
25 with you.

Page 161

1      Q    Can you just answer the question,
2  please?
3      A    What was the question?
4      MR. SCHWARTZ: Can you read it back?
5      (Whereupon, the requested portion is
6  read back by the reporter.)
7      A    And the sole basis of that belief is
8  what Ralph said to me?
9      I believe Ralph.
10     Q    Right.
11     So you believe -- you believe that he
12 said that.
13     And the sole reason why you believe that
14 the word "printing" includes the expression "license
15 fee" --
16     A    Because --
17     Q    -- because Ralph said so?
18     A    Because license fees is attached to the
19 number of print that you are going to do --
20     Q    Okay.
21     A    -- for printed materials.
22     Q    Okay. Let's try to do this again.
23     Can you tell me if you ever had any
24 discussion with anybody at any of the hotels
25 mentioned in paragraph ten where you used the

41 (Pages 158 - 161)

Page 162

1  expression "license fee" to them?
2     A    It is not my duty because it was GHM.
3     I don't --
4     Q    Okay.
5         And the only time --
6     A    All of us listen to Ralph's
7  instructions.
8     Q    Okay.
9         And the only time that there was a
10  discussion about license fee was when Ralph told you
11  that license fee is included in the word "printing"?
12    A    Yeah.
13        He said, "You just put it in the
14  printing."
15    Q    Okay, okay. And this, I do apologize,
16  because I think you said it was -- and correct me if
17  I'm wrong, I'm not trying to characterize your
18  testimony. I think you said it was around the year
19  2000.
20    A    No, after 2000, like, every ten years.
21  The beginning of -- the beginning of the tenth year,
22  it's not at the end. Like, 2000 to 2010, that's one
23  decade.
24    Q    Right.
25    A    Beginning of the decade.

Page 163

1     Q    Oh.
2         So in the beginning of 2000's is when
3  you had a conversation with Ralph in which Ralph said
4  the expression "license fee" is included in printing?
5     A    He just said, "Put it into the license
6  fee," yeah, yeah, yeah.
7     Q    And that occurred early in 2000, 2001,
8  something like that?
9     A    Forgive me, I cannot remember numbers.
10    Q    Okay, okay.
11        And -- okay.
12        When did Ralph leave?
13    A    I don't know.
14    Q    Okay.
15        And was there anybody else at GHM that
16  you spoke with concerning licensing of your
17  photographs?
18    A    No. We all work for Ralph.
19    Q    Okay, okay.
20        And when you would do a job for a
21  particular hotel, were you paid by the hotel or were
22  you paid by GHM?
23    A    When the job is for the hotel?
24    Q    Yes. .
25    A    By the hotel.

Page 164

1     Q    Okay.
2         And when you would go to a hotel, would
3  you -- when you would go on a job for a particular
4  hotel, would they tell you -- would the hotel people,
5  not the GHM people, would the hotel people tell you
6  what they wanted in the -- in the marketing
7  materials?
8     A    Yes.
9     Q    Okay.
10        And would they tell you what to -- what
11  to shoot, you know, to shoot the -- no, that was up
12  to your discretion?
13    A    Yes.
14        Sorry, I'm supposed to answer.
15    Q    No, that's okay.
16    A    Sorry.
17    Q    So, in your mind, who was your client;
18  was it GHM or was it the individual hotel?
19    A    The client is the individual hotel, but
20  the work has to be in line with the corporate
21  branding that I created for GHM.
22    Q    Okay.
23    A    Or that Wave created for GHM.
24    Q    So I'm not sure in what way that's
25  different.

Page 165

1  Would GHM ask you to do corporate
2  branding for the hotel?
3     A    Yes.
4     Q    Okay.
5         And --
6     A    The five star, the four star.
7     Q    And was the decision on what to accept
8  from the services you rendered made by the hotel
9  itself?
10    A    I don't know who makes those decisions.
11    Q    Okay, okay.
12        Okay.
13        To your mind, did GHM own any of the
14  hotels?
15    A    I thought -- I don't know what authority
16  arrangements are.
17    Q    Okay.
18        You knew that GHM was a management
19  company, correct?
20    A    GHM, general hotel management,
21  management, yes.
22    Q    Okay.
23        And they were -- and you knew that they
24  were acting on behalf of the particular hotel that
25  they would ask you to do something for?

42 (Pages 162 - 165)

Page 166

1    A    Sir, I'm not very sure because there
2  were a couple of times, like, in the beginning, GHM
3  paid for some of the brochures for Mexico.
4    Q    Okay.
5    A    So I really don't know what GHM owns or
6  what they don't own.
7    Q    Okay.
8        Putting aside -- I accept that, of
9  course, but putting aside what they owned, you knew
10  that they were a management company for the ten
11  hotels -- for the hotels in paragraph ten?
12    A    They manage, but they could also be
13  owners, co-managers, but they manage.
14    Q    Right.
15        I wasn't trying to trick you about the
16  management -- about the ownership. I'm just saying
17  you knew they were a management company and they act
18  on behalf of the hotels?
19    A    Yes.
20    Q    Okay.
21    A    Eventually, yes.
22    Q    Okay.
23    A    I didn't know that in the beginning.
24    Q    What time was the beginning?
25    A    From the time I started my first job

Page 167

1  with them, in '94, '95.
2    Q    So you began working with GHM in '94?
3    A    '94, '95, thereabouts.
4    Q    Okay.
5        And when, approximately, did you stop
6  working for them, or with them?
7    A    2-0-0 -- it has to be after the shouting
8  marathon.
9        I can only give you approximate.
10    Q    Okay.
11    A    Maybe around 2008.
12    Q    Okay.
13        MR. SCHWARTZ: We'll mark that one.
14  That will be 12.
15        (Whereupon Masano Kawana Photography
16  Services Agreement is received and marked as Exhibit
17  12 for identification.)
18    Q    So, can you take a look at Exhibit 12?
19    A    Uh-huh.
20    Q    And can you tell me what this is?
21    A    This is an agreement.
22    Q    Between whom?
23    A    Between Wave and Masano, Mr. Masano
24  Kawana.
25    Q    Well, the actual party -- what are the

Page 168

1  corporation names?
2    A    Between Wave and The Wave Private,
3  Limited, and Irieeyes Private, Limited.
4    Q    Okay.
5        And who is the person at Irieeyes?
6    A    Masano Kawana.
7    Q    And can you tell me, how did this
8  agreement come about?
9    A    Well, basically, we didn't have a
10  written agreement prior to this, we had verbal
11  agreement, as I've said to Mr. Kendall Oei, and
12  obviously I know Mr. Kendall Oei also wanted a
13  written agreement, so when Wave matured, and upon
14  Wave being The Wave Private, Limited, thought it was
15  best to have things written, you know, like on
16  record. But for the record, Masano Kawana was hired
17  as a cameraman, but he did ask me if it's okay to put
18  him as, you know, the named photographer, because
19  when I first met him in the very beginning, he was --
20  he came from New Zealand, he was a cameraman in New
21  Zealand, and he wanted to see if there were
22  opportunities in Singapore.
23        So I figured, it's okay, you know.
24    Q    Where is he today, do you know?
25    A    No idea.

Page 169

1    Q    Is he in Japan?
2        You don't know?
3    A    I don't know.
4    Q    Okay.
5        If you look at paragraph B on Exhibit
6  12 --
7    A    Uh-huh.
8    Q    -- it says, "All photographs and rights
9  contained therein, including copyright, remain the
10  sole and exclusive properties of the design agency
11  and the photographer."
12    A    Uh-huh.
13    Q    So the design agency is Wave-S and Wave
14  Private, Ltd., correct?
15    A    Yes, correct.
16    Q    And the photographer is Irieeyes Pte.,
17  Ltd., correct?
18    A    "Irieeyes Pte., yep.
19    Q    Okay.
20        So the sentence in paragraph B that I
21  just read says that the design agency and the
22  photographer own all photographs and rights contained
23  therein.
24    A    Yeah, but this is a very poorly written
25  agreement, and then we had another agreement in 2006,

43 (Pages 166 - 169)

Page 170

1  slightly better.
2      Please bear with me, because I don't
3  know how to write all this, but we do have 2006
4  agreement as well as the final agreement where it's
5  better written.
6    Q    So --
7    A    Because the idea to this is that from
8  day one, before he was hired, from day one, all hired
9  will follow my creative direction, that's one.
10     Number two, I made clear that all works,
11 including photography, belong to Wave.
12    Q    Okay.
13     So you tell us now that there's another
14 document beside this, another agreement?
15    A    There are two more, because, see, this
16 one is under The Wave Private, Limited, but by 2006,
17 The Wave Private, Limited was dissolved, so there was
18 another agreement under The Wave Design Private,
19 Limited. We have to update the agreement.
20    Q    Okay.
21     Well, let me tell you, I've never seen
22 any of those agreements, so none have been produced.
23    MR. TOKE: Okay.
24    MR. SCHWARTZ: So this is the second
25 time that I --

Page 171

1    MR. TOKE: You mean the public document?
2    MR. SCHWARTZ: Yes, the public document,
3  that wasn't produced, yes, I would go along with you
4  saying that. It was a public document that wasn't
5  produced by Plaintiff. A fairly significant, in your
6  view, document, and "your view" meaning the
7  Plaintiff, and now we have an allegation or a
8  statement that there are other agreements that change
9  the agreement that's Exhibit 12, which -- and we have
10 never seen the other agreements.
11     All right, so we'll deal with that a
12 little bit later, but let's try to deal with reality
13 here.
14    Q    We have Exhibit 12.
15     Who prepared this?
16    A    A lawyer.
17    Q    Which lawyer?
18     One in Singapore?
19    A    Yes.
20    Q    Do you know who it was?
21    A    DSH.
22    Q    And there are agreements after this one?
23    A    Yeah, because The Wave Private, Limited
24 dissolved in 2006, so it became The Wave Design
25 Private, Limited. So obviously --

Page 172

1    Q    You just have to go a little bit slower.
2     So Wave Private dissolved in 2006,
3  right?
4    A    Thereabouts.
5     2005, 2006.
6    Q    Okay.
7     And so why does that mean that you had
8  to have another agreement?
9    A    Because then Wave was -- I was operating
10 under The Wave Design Private, Limited, so it has to
11 be updated; otherwise, this will also not be
12 acknowledged because the company died, dissolved.
13     So -- that's what I thought.
14    Q    And do you have a different thought now
15 that you didn't need to change it or do you agree
16 that you did need to change it because The Wave
17 Private, Ltd. dissolved, is that your word, or it was
18 dead?
19    A    Yeah, it was struck off.
20    Q    It was struck off.
21     So if The Wave Pte., Ltd. dissolved or
22 was struck off, as you testified, it's not able to
23 enter into new agreements, is that right?
24    MR. TOKE: This is what I'm talking
25 about.

Page 173

1    MR. SCHWARTZ: I'm asking her -- yes.
2    MR. TOKE: This is what I'm talking
3  about. That's not what she said.
4    MR. SCHWARTZ: I don't care. I'm asking
5  her a question.
6    MR. TOKE: You're trying to put words in
7  her mouth is what you're trying to do, but go ahead,
8  answer the question, if you can.
9    A    So I start a new entity called The Wave
10 Design Private, Limited. Whatever The Wave Design
11 Private, Limited were to do will have to have new
12 agreement because this is, like, one person who has
13 died and then the other person was born.
14    Q    Okay.
15    A    So that's what I thought.
16    Q    Okay.
17     And your thoughts are The Wave Pte.,
18 Ltd., in your example, was the person that died and
19 no longer existed, correct?
20    A    Something like that, yes.
21    Q    Okay.
22     And that was your understanding at about
23 the time, 2005, 2006?
24    A    Yeah, because otherwise, all the jobs,
25 whatever jobs that were done by The Wave, the new

44 (Pages 170 - 173)

Page 174

1  entity, The Wave Design Private, Limited, will not
2  have any agreement.
3      Q    Okay.
4          So there's a new agreement between
5  Irieeyes and The Wave Design Pte., Ltd.?
6      A    That's correct.
7      Q    Okay.
8          Okay.
9          And what's -- approximately, what's the
10 date of that?
11     A    That would be 2006.
12     Q    Okay.
13         And does that mean that going forward in
14 2000 -- going forward from 2006, there's a different
15 agreement between Wave Design Pte. and Irieeyes?
16     A    I need to see the document.
17     Q    Okay.
18         But as best you can remember, because
19 you signed the document, right?
20     A    Yes, but that was nine years ago.
21     Q    Okay.
22         What's your understanding of the
23 relationship between Wave Design Pte. and Irieeyes,
24 the new company, your new company, right?
25     A    Wave Design?

Page 175

1      Q    Wave Design.
2          In 2006, what's your understanding, as
3  best you can, if you can remember, of the ownership
4  of the copyrights?
5      A    The ownership of the copyrights belong
6  to Wave, The Wave Design.
7      Q    And that's in your agreement, as best
8  you can recall, in the written -- is it a written
9  agreement?
10     A    Yes.
11     Q    So, as best you can recall, there's a
12 written agreement between Wave Design and Irieeyes in
13 approximately 2006 which says that the photographs
14 that Irieeyes takes are owned by Wave Design?
15     A    Yes.
16     Q    Okay.
17         And you said there was then another
18 agreement after that?
19     A    Yes.
20     Q    And what's that agreement?
21     A    Basically, the last agreement, the third
22 agreement, assigns -- is a better -- is a
23 better-worded agreement to record everything that we
24 have agreed upon. Whether it's written or verbally
25 agreed from day one, that agreement assigns

Page 176

1  everything to Lee Kar Yin.
2      Q    And approximately when is that
3  agreement?
4      A    2013, because I was leaving Singapore.
5      Q    Okay.
6          So does the 2013 agreement claim to go
7  back in time to -- does it claim to go back in time?
8          Does that make sense?
9          Let me rephrase the question.
10         Who prepared the document?
11     A    My attorney.
12     Q    Which one?
13     A    I got it from John.
14     Q    The gentleman in Virginia, John
15 Jennison?
16     A    Yes.
17     Q    Okay.
18         Does that agreement, as best you can
19 recall, because I know you don't have it here, affect
20 rights prior to the date that it was signed?
21     A    It encompasses everything.
22     Q    Okay.
23         So in 2013, as best you can recall,
24 without seeing it iu front of you, you signed a
25 document that, in your mind, is supposed to go back

Page 177

1  in time and affect rights prior to that?
2      A    It records everything that we have
3  agreed upon from day one.
4      Q    And what's day one, approximately; the
5  year 2000?
6      A    Thereabouts.
7      Q    Okay.
8      A    Thereabouts.
9      Q    So, again, I haven't seen it, but just
10 let me make sure I understand generally what you
11 think it is.
12         Your lawyer, John Jennison, prepares a
13 document in 2013 that affects the rights, the
14 ownership rights of photographs taken by Irieeyes
15 going back as far as the year 2000, give or take.
16     A    It's not taken by Irieeyes. I have to
17 correct you there.
18     Q    Okay.
19     A    Those are my photographs. Every single
20 image were put into frames by me.
21         Just so that you understaud better.
22     Q    Okay.
23     A    They are 3.11 million angles to any
24 given subject.
25     Q    I don't mean to say that -- what I meant

45 (Pages 174 - 177)

Page 178

1    that they were taken by him, I meant that,
2    physically, he took the photographs.
3        A    He was the cameraman.  I hired him based
4    on that.
5        Q    Okay.
6        A    When I say okay to shoot, he shoots,
7    including the shutter speed, including the
8    composition.
9        Q    Okay.
10        So you're there at the same time he is?
11        A    I photographed those.  He just pushed
12    the button when I say it's okay to push.
13        Q    Okay.
14        A    The subject matter, everything was
15    determined by me.
16        Q    Okay.
17        So -- listen to my question.
18        So is it true that every time Masano
19    physically took a picture, you were there with him,
20    for the photographs that are involved in this
21    lawsuit?
22        A    When I say okay to shoot, he presses the
23    button.
24        MR. SCHWARTZ:  Can you repeat my
25    question?

Page 179

1        Q    Just listen to the question.
2        (Whereupon, the requested portion is
3    read back by the reporter.)
4        A    I am with him, but I would disagree that
5    he physically took the picture.  He just pressed the
6    button when I say it's okay.
7        Q    Okay.
8        Okay.
9        So you were there -- just to close the
10    loop, you were physically -- you were there every
11    time Masano physically pressed the button at your
12    instruction, is that correct?
13        A    After I'm done coordinating everything,
14    styled the entire frame, make sure that the lighting
15    are all in the essence to the place, which angle, at
16    what time, then yes, I will check.
17        He will ask me, "Check."
18        I said, "Okay, let me check."
19        If it's not good enough, the lighting
20    over there no good, I say, "Please diffuse or please"
21    -- ditto, ditto -- "the spotlight."
22        Q    Okay.
23        A    Okay?
24        Then I say, "Okay, press brackets."
25        Q    Okay.

Page 180

1        So let's look at Exhibit 12 again for a
2    second.
3        Do you have it?
4        A    Yes.
5        Q    So we're going back to paragraph B.
6        Got it?
7        A    Yes.
8        Q    And you signed this, and -- did you read
9    it before you signed it?
10        A    Yes.
11        Q    Okay.
12        So paragraph B, I've read before, says
13    that the copyrights remain the sole and exclusive
14    properties of Wave as well as Irieeyes, correct?
15        A    What it was -- can I just say what it
16    was intended to mean?
17        Q    Sure.
18        A    It was intended to mean that Wave owns
19    all works created, but Masano Kawana has the right to
20    put it up on his own website.  He can use it for self
21    promotion.  He can use it for teaching.  If he
22    teaches some day.
23        He can use it to exhibit, if he puts up
24    an exhibition, he can use it.
25        Q    Okay.

Page 181

1        And that was your intention on March 31,
2    2005?  That was your intention when you entered into
3    this agreement, right?
4        A    It did not start from March 31, 2005.
5    It started from day one when he was hired as the
6    cameraman.
7        Q    Okay.
8        Nevertheless, on March 31, 2005, that was
9    your intention, correct?
10        A    In written, yes.
11        Q    Okay.
12        Why isn't that in writing?
13        A    I'm sorry, sir, I didn't write this.  I
14    do not know how to write agreements.
15        Q    Right.
16        But you can read?
17        A    Yes.
18        Q    And when you read it, it didn't say what
19    you just wanted it to say, correct?
20        A    Yes, but it says also, the design
21    agency -- it says, "Editorial commission are of
22    unlimited assignments."
23        And then the second one addresses that
24    he can use it for life, for reproduction, display
25    rights of all photographs for use of photographic

Page 182

1  competition, promotional materials, and any
2  publication to promote oneself.
3     Q    Okay.
4        So when the words in paragraph B say,
5  "The copyrights remain the sole and exclusive
6  properties of the design agency and the
7  photographer," you understood those words to mean
8  differently, right?
9     A    Yes, that's why we had another agreement
10  and another agreement.
11    Q    Okay.
12        But at the time you signed this, you
13  understood that those words that I just read not to
14  mean what they say, right?
15        MR. TOKE:  Objection.
16        Again --
17    A    Not to mean what you said.  I only
18  understood that Wave owns the copyright and Masano
19  and Wave can use it for personal promotion.
20    Q    Okay.
21        But -- but what you understood -- what
22  you wanted it to say isn't what's in writing,
23  correct?
24        MR. TOKE:  Objection.
25        Calls for expert testimony and --

Page 183

1     A    It was written by a lawyer, and this is
2  what I told him.
3        I paid for -- I paid for this to be
4  written.
5     Q    Right.
6        And so --
7     A    If he wrote it wrongly -- anyway, we
8  have another agreement in 2006 and another agreement
9  in 2013 to really put in words what it really meant
10  from day one.
11    Q    Okay.
12    A    I'm sorry if my English is no good.
13    Q    No, your English is fine.
14        MR. SCHWARTZ:  Let's take another
15  two-minute break because I'm personally getting just
16  a little bit tired, so I need some more breaks in
17  between as we go along with this.
18        MR. TOKE:  I understand.
19        THE VIDEOGRAPHER:  We're going after the
20  record at 4:33 p.m.
21        (Brief recess taken.)
22        (Whereupon Confirmation of Assignment of
23  Copyright is received and marked as Exhibit 13 for
24  identification.)
25        THE VIDEOGRAPHER:  We are back on the

Page 184

1  record at 5 p.m.
2     Q    Okay.
3        I have marked, as Exhibit 13, a document
4  entitled "Confirmation of Assignment of Copyright,"
5  which we're seeing for the first time today.  This
6  document apparently was, according to the last page
7  of the document, was received by the Copyright Office
8  on May 20.
9        And what's today's date?
10        MR. TOKE:  The 21st.
11    Q    So it was received yesterday.
12        And, Ms. Lee, if you look at the second
13  page of this document, is that your signature on the
14  second page?
15    A    Yes, sir.
16    Q    And that is dated May 18, 2015?
17    A    Yes, sir.
18    Q    Okay.
19        And who prepared this document?
20    A    Mr. John Jennison.
21    Q    And where were you when you signed this?
22    A    San Francisco.
23    Q    Okay.
24        And why was this document created?
25    A    Mr. Jennison told me it's confirmation

Page 185

1  of assignment.
2     Q    He's your lawyer, right?
3     A    Yes.
4     Q    Okay.
5        Have you -- you seek his legal advice?
6     A    I don't know.  I seek his advice.
7     Q    Okay.
8        Okay.
9        So why do you -- what do you believe
10  this document does?
11    A    It records everything that was --
12  whether verbally agreed upon or documented, it
13  basically summarizes the entire gist to the agreement
14  between Masano, Irieeyes and Lee Kar Yin.
15    Q    Okay.
16        If you look at Attachment A, which is
17  the fourth page --
18    A    Uh-huh.
19    Q    -- that's the one that's signed by
20  Masano Kawana?
21    A    Yes.
22    Q    And Irieeyes Pte., Ltd.?
23    A    Yes.
24    Q    And that's dated October 1, 2013?
25    A    Yes.

47 (Pages 182 - 185)

Page 186

1    Q    Did you pay him anything for this
2  memorandum of understanding? You know, it looked
3  like you were nodding yes.
4         MR. TOKE: Oh, I'm sorry, I was
5  listening to the question. I apologize.
6    A    I'm sorry, without my glasses, I
7  actually can't see much.
8    Q    Okay.
9    A    Therefore, valuable consideration, yes.
10   Q    And how much did you pay him?
11        THE WITNESS: Am I supposed to divulge?
12        MR. TOKE: Yes.
13   Q    Yes.
14        (Cell phone rings.)
15        MR. TOKE: Sorry. I forgot I had
16  that on for a second. Sorry about that.
17   A    Four thousand.
18   Q    And when did you pay him that?
19   A    Upon signing.
20   Q    So, October 2013, you paid him $4,000 to
21  sign this?
22   A    Not to sign this.
23   Q    What did you pay him for?
24   A    I mean, it's not just, "Oh, please sign
25  this, I give you money.

Page 187

1    Q    Well, what did you pay him $4,000 for?
2    A    Because it say for valuable
3  consideration, so it has to be with a value.
4    Q    How did you arrive at $4,000?
5    A    Mutually agreed.
6    Q    Okay.
7         What did he ask for first?
8         MR. TOKE: Assumes facts, but okay.
9    A    He said up to me because it's already
10  something that we both understood from day one, he
11  said --
12   Q    Who prepared Attachment A?
13   A    Attachment A?
14   Q    The part that you're looking at.
15   A    This one?
16   Q    Uh-huh.
17   A    I got it from Mr. John Jenuison.
18   Q    Okay.
19        And so that would have been prior to
20  October 1 he would have sent it to you? Because it's
21  signed on October 1.
22   A    Yes.
23   Q    Okay.
24        And where was -- was Masano physically
25  with you in October when he signed it?

Page 188

1    A    Yes, at my accountant's office.
2    Q    And that's in Singapore?
3    A    That's right.
4    Q    And as far as you know then, where
5  was -- where was Masano living?
6    A    Singapore, then.
7    Q    Okay.
8         And you think he moved after that?
9    A    I don't know because I was planning to
10  come to U.S.
11   Q    Okay.
12        So did you go to Masano to ask him to
13  sign this agreement?
14   A    Well, I'm leaving, so I said, you know,
15  "We have to sort out everything clean because I
16  intend to start shop in the U.S. if United States to
17  accept me."
18   Q    So did you understand that the purpose
19  of having him sign this memorandum of understanding
20  was to change the relationship and ownership that you
21  had earlier?
22   A    No, it's not changing. It's just
23  consolidating everything agreed, whether orally or
24  written, into one. That's why he said, "You don't
25  have to do this."

Page 189

1         I said, "We need to clean it up. We
2  need to have everything black and white, everything
3  we agreed upon."
4    Q    Okay.
5         Okay.
6    A    Because I'm starting shop here.
7    Q    Okay.
8         Now, I'm reading this for the first
9  time, so just give me a second.
10        So did you pay him anything in
11  addition -- separate from the $4,000 for the
12  Confirmation of Assignment of Copyright on Page 3?
13   A    No.
14   Q    Do you discuss with Mr. Jennison the
15  fact that this lawsuit exists?
16        MR. TOKE: Objection.
17        MR. SCHWARTZ: That's just a yes or no.
18   Q    You don't have to tell me what you say
19  to him, but do you have conversations with him about
20  this present lawsuit?
21   A    I don't think I need to say to him
22  because it's on the Internet.
23   Q    Okay. But my question is --
24        MR. SCHWARTZ: Can you repeat my
25  question?

48 (Pages 186 - 189)

1        (Whereupon, the requested portion is
2   read back by the reporter.)
3        MR. TOKE:  And I'm just going to -- to
4   the extent that this could reveal attorney-client
5   privilege -- you can answer the question.  I don't
6   want you to reveal anything about those discussions,
7   but answer the question directly.
8       A     Sorry.  May I ask for a repeat?
9       Q     Sure.
10        MR. SCHWARTZ:  Can you repeat one more
11   time?
12        (Whereupon, the requested portion is
13   read back by the reporter.)
14      A     "Discuss" is a long word.
15      I just told him that --
16        MR. TOKE:  I told you, I do not want you
17   to reveal what -- it's a yes-or-no question.
18      A     Yes.
19      Q     Okay.
20      And how many times have you had
21   discussions with him about the lawsuit?
22      A     I cannot, like, tell you a number.
23      Q     Can you give me an estimate; like, every
24   month, every week, once a year?
25      A     On and off, when he read about this

1   thing on law 366 -- 360, then he said -- he would say
2   to me --
3        MR. TOKE:  I don't want -- do not reveal
4   the conversations.
5        MR. SCHWARTZ:  That's up to her, but you
6   can tell her she doesn't have to if she doesn't want
7   to.  You can't tell her not to.  It's up to her.
8        MR. TOKE:  I can instruct her -- I'm
9   telling you --
10      A     I'm sorry, I'm sorry.  What was the
11   question?
12      Q     No, there's no question pending.
13      So can -- can you describe the
14   relationship between The Wave companies and yourself
15   and Mr. Jennison?
16        MR. TOKE:  Vague and ambiguous, but what
17   are you -- go ahead.
18      A     Relationship?
19      Q     Yeah.  Do you have an attorney-client
20   relationship with him?
21      A     Mr. Jennison help Wave to register.
22      Q     Okay.
23      And do you seek -- this is a yes-or-no
24   question.
25      Do you seek his advice with respect to

1   this lawsuit?
2       A     No.  He's not a litigator.
3       Q     Okay.
4       Okay, okay.
5       Do you know if he speaks with Mr. Toke?
6       A     Do I know -- pertaining to
7   registrations, perhaps.
8       Q     Okay.
9       Perhaps -- do you know or you don't know
10   or you're just not sure?
11      A     I'm not sure.
12      Q     Okay.
13      Do you know if he ever spoke about
14   the -- do you know if he ever spoke with Cameron
15   Reuber, who was the prior lawyer for you in this
16   case?
17      A     I wouldn't know, sir.
18      Q     Okay.
19      But you've spoken with Mr. Jennison
20   about the creation of Exhibit 13?
21      A     Yes, sir.
22      Q     Okay.
23      Okay, let's put that aside for a second.
24      So you believe that you have reserved
25   all of the rights to -- that Wave -- the different

1   Wave companies have reserved all of the rights in the
2   photographs that you took, as you described it, even
3   though Mr. Kawana pressed the button?
4       A     Yes.
5       Q     Okay.
6       And you believe that your expression
7   that you and The Wave companies reserve all your
8   rights was communicated to GHM and the hotels in
9   writing?
10      A     On my terms?
11      Q     Yes.
12      A     On my terms, yes.
13      Q     And your terms, meaning the estimate
14   that we've marked as an exhibit, Exhibit 10, for
15   example, and no other place in writing, correct?
16      A     Correct.
17      Q     Okay.
18      And the only conversation that you had
19   concerning your reservation of rights, as you're
20   describing it, was the conversation that you've
21   described with Ralph?
22      A     Mr. Ohletz.
23      Q     Okay.
24      And no other conversations?
25      A     And Mr. Kendall Oei.  That's why

49 (Pages 190 - 193)

Page 194

1 Mr. Kendall Oei wrote to me and ask me to count how
2 many Wave pictures.
3    Q.    Okay.
4         Other than those two examples -- that's
5 what you mean. Other than those two examples and the
6 written -- the form invoice -- the form estimate that
7 you use, other than those two oral examples, there
8 are no other oral examples where you specifically
9 reserve, to use your expression, all your rights?
10   A.    Yes.
11   Q.    Okay.
12        Okay.
13        And if you look at -- I guess we should
14 mark it as Exhibit 13, the complaint.
15        MR. TOKE: This is already 13.
16        14.
17        MR. SCHWARTZ: I'm sorry, 14.
18        MR. VAN DUSEN: The amended complaint?
19        MR. TOKE: The amended complaint.
20        (Whereupon Amended Complaint is received
21 and marked as Exhibit 14 for identification.)
22   Q    So if you look on Page 20, please.
23        Look at paragraph 73.
24        Have you had a chance to read that, 73?
25   A    Yes.

Page 195

1    Q.    Okay.
2         So the first -- the first sentence says,
3 "From December 2000, Ms. Lee was exclusively
4 commissioned to shoot a series of photographs at the
5 hotels for advertising, promotion and documentation
6 purposes."
7         Was that a course of conduct that you
8 were commissioned by GHM over that time or are you
9 saying there was one agreement in December 2000?
10        MR. TOKE: Objection to the extent this
11 witness didn't write this document, so, I mean, if
12 you're asking --
13        MR. SCHWARTZ: So what?
14        She read it.
15        MR. TOKE: I understand.
16        MR. SCHWARTZ: Okay.
17   Q    Can you see that sentence?
18   A    Uh-huh.
19   Q    So my question is, is there one
20 agreement in December 2000 or did you have a series
21 of separate orders indicated by your estimates and
22 then the purchase orders and acknowledgments and
23 things like that?
24   A    Sorry, sir, I don't know how to answer
25 this; so can you help me?

Page 196

1    Q.    Sure. I'll try to rephrase it if you
2 don't understand it. That's my fault probably, so.
3         Have you ever seen this amended
4 complaint before?
5    A    I saw the first one.
6    Q    Look at the whole -- look at the whole
7 document. It's fairly big.
8         Do you know what this is?
9    A    Complaint?
10   Q    Yeah.
11   A    Did I look through -- I'm not sure if I
12 saw this one or the other one, and to be honest with
13 you, I didn't exactly read because it's just a lot of
14 words.
15   Q    Okay.
16        So let me -- you're not sure if you've
17 ever read this?
18   A    I mean, I read here -- I don't know if
19 it's this one or another one, but I just look at
20 this, and look at this, and that's it.
21   Q    Okay.
22        What you pointed to was the names of the
23 Defendants?
24   A .  Yeah.
25   Q    And why did you look at the names of the

Page 197

1 Defendants?
2    A    Because -- I don't remember -- there are
3 a few I don't remember, like, for example, the Exit,
4 LLC, I didn't remember who they are.
5         Like, when I saw Exit, LLC, who are
6 they? Then I have to ask, like, what is d/b/a, and
7 then I was told it's "doing business as."
8    Q    Okay.
9    A    So I was also told it means
10 RoadsideAmerica.com is the owner of
11 RoadsideAmerica.com -- no, that means, Exit, LLC, is
12 the owner of RoadsideAmerica.com.
13   Q    Okay.
14        So you received a copy of this at some
15 point and you looked at the names of the Defendants,
16 right?
17   A    Yeah, at a glance.
18   Q    Okay.
19   A    Whatever I couldn't understand, I just
20 asked.
21   Q    Okay.
22        And who did you ask?
23   A    Cameron.
24        MR. TOKE: And, again, I don't want you
25 to reveal any attorney-client privilege.

50 (Pages 194 - 197)

Page 198

1    THE WITNESS: Okay.
2    Q    Let me try to explain what that means.
3    You can decide if you want to tell us
4  that you had a conversation with your lawyers. You
5  don't have to. It's up to you.
6    Okay?
7    All right.
8    So -- and you can seek advice from
9  Mr. Toke about that, that's fine, but it's up to you,
10  you make that decision.
11    When -- when -- you received a copy of
12  this from Camerou at some point, right?
13    A    Should be, but I don't know whether
14  amended or not amended and how many times it has been
15  amended because they somehow beginning to look the
16  same.
17    Q    Okay.
18    So this one on top says it's filed on
19  4/23/14, April, April 23, 1914.
20    MR. TOKE: 1914?
21    That was a long time ago.
22    MR. SCHWARTZ: That's just getting
23  tired, so I know how you feel because I'm tired too.
24    Q    Do you recall reading the complaint or
25  the amended complaint at any time?

Page 199

1    A    Yeah, a little bit of it, like,
2  "Ms. Lee, Malaysian photographer," and then by the
3  time I got through God knows how many pages, I just
4  left it.
5    Q    You just left it?
6    A    Yeah.
7    Q    Can you remember approximately where you
8  just left it, where you stopped looking at it?
9    A    Sorry, I don't.
10    Q    When -- was there a time when a document
11  called a draft complaint or draft amended complaint
12  was sent to you?
13    A    Should be, but I have been reading so
14  many things, I don't even remember anymore, and to be
15  honest with you, I check the dictionary, and after a
16  while I just gave up.
17    Q    Okay.
18    When you viewed either -- you think you
19  got a draft of either the complaint or the amended
20  complaint?
21    A    I think.
22    Q    Okay.
23    Okay.
24    Did you see anything in the draft,
25  whichever one it was that you disagreed with, and

Page 200

1  then communicated that disagreement to the lawyers?
2    Don't tell me what the disagreement was,
3  just whether or not you corrected something in the
4  draft.
5    Let me rephrase the question to try to
6  make it easier.
7    Do they send you a draft to sort of take
8  a look at it and that was the end of it, or they sent
9  you a draft of whatever it was and you made
10  corrections -- and you told them to make corrections?
11    A    You know, I trust the lawyers. I don't
12  think -- I don't even know legal jargons, so I would
13  trust whatever they write is correct.
14    Q    Okay.
15    So it's not even necessarily the legal
16  jargon part.
17    Was there anything in the draft that yon
18  saw, if you saw it, that was factual that you had to
19  correct? Do you remember making any corrections, or
20  you pretty much relied on what the lawyers said?
21    A    I rely on the attorneys.
22    Q    Okay.
23    All right.
24    So let's look, then, at paragraph 73
25  again, the second sentence.

Page 201

1    Do you see that?
2    A    Yes.
3    Q    It says, specifically, "Ms. Lee and GHM
4  entered into an agreement under which GHM would
5  arrange for Ms. Lee to photograph certain hotel
6  properties, and the hotels themselves would
7  compensate Ms. Lee for her work."
8    Now, that's not true, is it?
9    It's not true in the sense that there
10  wasn't one agreement?
11    A    Mr. Schwartz, I just gave whatever
12  documents I have. I don't know what this term is,
13  agreement, or what they call it, contractual
14  agreement. I don't know all these terms.
15    Whatever I had, I gave it to the
16  attorney.
17    Q    Okay.
18    All right.
19    So if you look at paragraph 74 then, so
20  that says, "On or around August 2003, Ms. Lee
21  submitted her hotel photographs to GHM, as agreed."
22    What -- what happened in August 2003?
23    A    No recollection.
24    Q    So this is the amended complaint filed
25  on behalf of your company and it says on or around

51 (Pages 198 - 201)

1  August -- August 2003, you submitted "her hotel
2  photographs to GHM, as agreed."
3      Do you have any idea what that means?
4   A  No, sir.
5      Whatever I went through, settlement
6  agreement, whatever, estimates, all these agreements,
7  registration, I just gave it to my attorney;
8  however -- wherever they pick the date, I wouldn't
9  know, like, because all the agreements,
10  communications, whatever, whatever documents.
11   Q  So that sentence has no particular
12  meaning. Can we agree on that?
13   A  I cannot agree or disagree. I don't
14  know.
15   Q  Okay.
16      So this is your complaint and you don't
17  know what that means?
18   A  Because my attorney is supposed to know.
19   Q  Okay.
20      When I say, "Okay," I'm not agreeing
21  with you, I'm just saying we'll move on.
22      So -- so -- let me see.
23      You had the assignment or the agreement
24  with Irieeyes and Masano where the both of you were
25  owning the copyright, that's what it said in the

1  assignment, and you -- do you remember that?
2   A  The '05, '06.
3   Q  The first one.
4   A  Uh-huh.
5   Q  Okay.
6      And you signed that, you said, because
7  your lawyer prepared it, right?
8   A  Yes.
9   Q  Even though you had a different meaning,
10  in your mind, from what the words on the piece of
11  paper said, right?
12   A  Yes.
13   Q  And is that the same thing with this
14  particular sentence in this particular complaint, you
15  think that because the lawyers write it, it must be
16  correct?
17   A  It's almost like it's the first time I'm
18  reading it.
19      I have to trust my lawyers.
20   Q  Okay, okay.
21   A  I can only give what I have.
22   Q  All right.
23      So the next sentence in paragraph 74
24  says -- I'm sorry.
25      The balance of that sentence says that

1  "Ms. Lee submitted her hotel photograph to GHM, as
2  agreed," period.
3      The next sentence says, "GHM accepted
4  the hotel photographs, but repeatedly refused to
5  honor its payment obligation without cause."
6      Do you know what that's referring to?
7   A  No.
8   Q  Okay.
9      Then the -- it's in your complaint.
10      Did you read that before it was filed?
11      MR. TOKE: Asked and answered. You've
12  already asked this.
13   Q  So the answer is no, you didn't read
14  this before it was filed, right?
15      MR. TOKE: That's not what she said.
16      MR. SCHWARTZ: Well, okay, if it's asked
17  and answered, and I don't know what the answer is,
18  how are we supposed to know?
19   Q  What is the answer to that question?
20   A  How am I supposed to say yes or no when
21  I read, like, the first page, the second page. I
22  don't understand d/b/a. Like, what's d/b/a?
23      I read "Ms. Lee, Malaysian
24  Photographer," and then after that I stopped reading.
25   Q  Okay.

1      So you stopped reading after what page?
2   A  304, I suppose.
3   Q  Okay.
4      So you stopped reading after Page 304.
5      Okay.
6      Then the next sentence in paragraph 74
7  says, "Ultimately, after litigation, GHM and Ms. Lee
8  amicably resolved the dispute."
9      What is that referring to?
10   A  Amicably?
11   Q  "Amicably" means friendly, in a friendly
12  way.
13   A  That means it's over in a friend --
14  amicably, resolved amicably.
15   Q  Okay.
16      What litigation are you referring to
17  there?
18   A  The unpaid bills. The non-payment of
19  bills.
20   Q  Okay.
21      And did that have something to do with
22  August 2003?
23   A  I'm not sure, but I know Wave took GHM
24  to task in 2009, and I was told there's this thing
25  called statute of limitations, six years, so if I

Page 206

```
1   minus 0-0-9, six years, that would be 2003, but I'm
2   not sure which invoices is 2003.
3       Q     Okay.
4             So is it correct, then, that at some
5   point The Wave Studio Pte., Ltd. sued General Hotel
6   Management?
7       A     In 2009, for non-payment of bills.
8       Q     Okay.
9             So you were the Plaintiff?
10      A     Yes.
11      Q     Okay.
12            And where was that litigation?
13      A     In Singapore.
14      Q     Okay.
15            And that's between two Singapore
16  companies in Singapore, right?
17      A     I know I'm -- my company is in
18  Singapore. I don't know where GHM is.
19      Q     Is that true, you don't know where GHM
20  is?
21      A     I mean, GHM office, I know, but I don't
22  know where they are registered.
23      Q     Okay.
24            But you sued them in Singapore?
25      A     Yes.
```

Page 207

```
1       Q     And -- do you know what the date of the
2   invoices you sued them over was?
3             Does that make sense?
4       A     There were more than ten invoices, so I
5   cannot remember.
6       Q     Okay.
7             Do you know what the date of the
8   invoices were?
9       A     I don't remember, sir.
10      Q     Okay.
11            And how much money were you suing them
12  for?
13      A     Some were in U.S.D. Some were in S.G.D.
14      Q     In U.S. dollars.
15            Whatever is easier for you.
16            MR. TOKE: No. What she said was some
17  were in Singapore, some were in U.S.
18      Q     I'm sorry, I didn't hear you say that.
19      A     Sorry.
20      Q     About what was the total?
21      A     Approximate?
22      Q     Approximate.
23      A     My recollection, not in U.S.D.
24      Q     Okay.
25      A     My recollection is that the region of a
```

Page 208

```
1   hundred thousand, my recollection.
2       Q     In Singapore dollars?
3       A     That's the thing, I cannot remember
4   which bill is U.S.D.
5             MR. SCHWARTZ: Okay. Why don't we mark
6   this.
7             (Whereupon Settlement Agreement is
8   received and marked as Exhibit 15 for
9   identification.)
10            MR. TOKE: This is what number?
11            Sorry.
12            MR. SCHWARTZ: Fifteen.
13            MR. TOKE: Fifteen, okay.
14      Q     Okay.
15            Do you see 15?
16      A     Yes, sir.
17      Q     Okay.
18            Can you tell me what it is?
19      A     It's non-payment case in Singapore.
20      Q     Okay.
21            So let's look at the fourth page then,
22  and tell me what that is.
23            MR. TOKE: The fourth page?
24            MR. SCHWARTZ: Well, I have it as the
25  fourth page. It says "Settlement Agreement" on top.
```

Page 209

```
1       A     Yes.
2       Q     Okay, okay.
3             So what is that?
4       A     This is a settlement agreement.
5       Q     Okay.
6             And that's your signature on the last
7   page?
8       A     Yes.
9       Q     Okay.
10            In your own words, what do you
11  understand the settlement agreement to be?
12      A     My understanding is the settlement is
13  for non-payment of the affected bills. That Wave
14  cannot sue GHM for non-payment pertaining to this
15  case. The 14 or ten -- the 14 bills, I think, Wave
16  cannot take GHM to task again and ask for payment.
17      Q     Okay.
18            But it's your understanding that Wave
19  Studio Pte., Ltd. can sue GHM for things other than
20  payment of those invoices, that's your understanding?
21      A     Yes.
22      Q     Okay.
23            And did you have that understanding in
24  April 6, 2011?
25            That's the date of this. That's the
```

Page 210

1  date of the document, if you look on page -- that
2  page, the very first line.
3      A    Yes.
4      Q    Okay.
5          So did you tell that to anyone at GHM
6  during the course of the litigation leading up to
7  this settlement?
8      A    Tell what to GHM?
9      Q    Did you -- did you or your lawyers, if
10 you know, tell anyone at GHM or their lawyers that it
11 was your intention to settle this case only regarding
12 the invoices and that you were going to sue GHM for
13 copyright infringement?
14     A    There's no such case back then.
15 Whatever copyright infringement, all I know is GHM
16 lawyer -- lawyers, and my lawyer, discussed this at
17 length, and the judge agreed that whatever dispute,
18 it should be kept within this 14 affected bills.
19     Q    So was there --
20         MR. SCHWARTZ:  Can you read my question
21 back?
22     Q    Because I don't think you actually
23 answered my question.
24         Listen to the question.
25         (Whereupon, the requested portion is

Page 211

1  read back by the reporter.)
2      Q    So that's the question.
3          Did you or your lawyers say that?
4      A    I don't know what my lawyer said, but
5  there was no copyright infringement at this point in
6  time and I didn't say anything.  Again, I left
7  everything to the lawyers.
8      Q    Okay.
9          When did you personally form the opinion
10 that the Defendants in this case -- let me rephrase
11 that, make it simple.
12         When did you form the opinion that GHM
13 infringed on the copyrights that are registered in
14 this case?
15     A    I only found the infringement on their
16 website in 2012.  I thought I can just pack and try
17 to come here to set up shop.
18     Q    Okay.
19         Is that the first time, in 2012, when
20 you saw the infringement of any -- on behalf of any
21 of the Defendants in this case was 2012?
22     A    Can you rephrase that?
23     Q    Sure.
24         So I asked you first about GHM, and I
25 wanted to make sure that it now includes all the

Page 212

1  other Defendants.
2          So when was the first time you formed
3  the belief, in your mind, that any of the Defendants
4  were infringing works that you believed you had a
5  copyright on?
6      A    I found on GHM website.
7          It's not like I suddenly knew everyone.
8          I found on GHM website, and that's
9  infringement, and then by clicking the link, I got to
10 the NamHaiHoiAn.com.  It's just one link to the next
11 link.  And then I got to ghmhotels-japan.com.  I
12 never knew all this.  Like, it got just more and
13 more --
14     Q    And --
15     A    -- in 2012.
16     Q    So you're clear that 2012 is the first
17 time you discovered all of this?
18     A    I cannot remember, like, for sure.  It's
19 approximately 2012 because I was actually quite happy
20 if we can just settle this amicably and get on with
21 my life.
22     Q    Okay.
23         So you -- I think I recall you saying
24 this, and correct me if I'm wrong, that the judge in
25 this case, in the Singapore case, said that the

Page 213

1  settlement only applies to the invoices that are
2  involved in this case, right?
3      A    That's what my lawyers told me.
4      Q    Okay.
5          So that implies that there was some
6  discussion that the settlement would apply to
7  something outside the invoices.
8          Do you remember having a discussion
9  about that?
10     A    No.
11     Q    Okay.
12     A    Mr. Schwartz, I do creative work.  It's
13 not just photography, logos, haudcrafted, and so on.
14 It's just for non-payment.
15     Q    I'm sorry?
16     A    This is just for non-payment.
17     Q    Right.
18     A    And uothing else.
19     Q    Okay.
20         Have you -- have your companies ever
21 sued anybody else in Singapore?
22     A    No.
23     Q    Have -- have your companies ever been
24 sued for anything?
25     A    No.

54 (Pages 210 - 213)

Page 214

1    Q    Okay.
2         Prior -- this is dated April 6, 2011.
3         Did you ever consult with anybody about
4    copyright infringement prior to April 6, 2011?
5    A    Consult?
6         No, I just thought it's good to register
7    my work.
8    Q    And when did you have that thought?
9    A    I've had that thought for a very long
10   time, just that I got to do it in 2010.
11   Q    You're talking about the U.S.
12   registrations?
13   A    Yes.
14   Q    Okay.
15   A    When you ask me, so is it brick and
16   mortar, do I have office, my answer to you just now
17   was not yet, because I do intend to set up shop here,
18   but somewhere warmer.
19   Q    I'm sorry?
20   A    In a warmer state, like San Diego.
21   Q    Okay.
22        MR. SCHWARTZ: Let me take another
23   two-minute break for a second.
24        MR. TOKE: Sure.
25        THE VIDEOGRAPHER: We're going off the

Page 215

1    record at 5:40 p.m.
2         (Brief recess taken.)
3         THE VIDEOGRAPHER: We're back on the
4    record at 5:55 p.m.
5    Q    Okay.
6         If you look on Page 5, paragraph ten.
7    A    On?
8    Q    On the complaint, the big -- big
9    document.
10        That's exhibit --
11        MS. REMORE: 14.
12   Q    -- 14, the amended complaint.
13        It's Page 5, paragraph ten, the last
14   sentence.
15        Would you read it, if you can?
16   A    Page 5.
17   Q    It says, "GHM targets New York residents
18   to book accommodation and other hospitality services
19   at the," capital H, "Hotels when they travel to those
20   vacation destinations."
21        Do you see that?
22   A    Yes.
23   Q    Okay.
24        In what way does GHM target New York
25   residents?

Page 216

1    A    I think my attorney can answer that
2    because I don't know how to answer.
3    Q    Okay.
4         Would it be fair to say you have no idea
5    about that particular sentence?
6    A    Because of a lot of infringement by U.S.
7    companies, that would be my understanding.
8    Q    Okay.
9         But the sentence actually says "GHM
10   targets New York residents to book accommodation at
11   the Hotels."
12        Do you know what that means?
13   A    I can only tell you what I understand --
14   Q    Okay.
15   A    -- from reading.
16        Because infringements of -- majority of
17   the infringements are found in U.S., so I don't know
18   how it's worded.
19   Q    What do you mean by "the majority of
20   infringements are found in the U.S."?
21   A    All these Defendants, they are
22   U.S.-based companies.
23   Q    I see.
24   A    Maybe that's what it means.
25   Q    I see. Okay.

Page 217

1    A    I'm sorry, I'm not going to guess. You
2    have to ask Cameron. I'm sorry.
3    Q    Okay.
4         So you, as the client, have no idea
5    whether or not GHM targets New York residents, as
6    indicated in that sentence in paragraph ten?
7    A    I can't speak for GHM.
8    Q    I'm not speaking for -- no, no, you
9    understand that this is your complaint, your amended
10   complaint, right? And you, Wave LLC, are claiming
11   that GHM targets New York residents. And do you
12   personally have any idea what that means, or -- let
13   me rephrase that.
14        Do you have any idea in what way GHM
15   targets New York residents to book accommodations at
16   the Hotels?
17   A    My understanding is because a lot of
18   infringers are in the U.S., or in New York.
19   Q    But this is different. This is
20   saying -- and I don't want to -- I don't want to
21   upset anybody and have an argument with you. I'm
22   just trying to make sure that we understand each
23   other.
24        This says, "GHM targets New York
25   residents to book accommodations."

Page 218

1    At the moment, that sentence has nothing
2  to do with infringements. It's just saying "GHM
3  targets New York residents."
4    Can you tell me in what way you believe
5  GHM targets New York residents to book
6  accommodations?
7    A    I'm sorry, I cannot answer because I
8  didn't write this.
9    Q    And you have no idea, right, whether GHM
10  targets New York residents?
11    A    All I know is a lot of infringement in
12  the U.S. That's all I know.
13    Q    Well, by that, you mean the Defendants
14  are in the U.S., right?
15    A    Yes.
16    Q    So paragraph ten, by the way, lists all
17  those hotels.
18    How come the hotels aren't Defendants?
19    MR. TOKE:  And objection to the extent
20  that it calls for attorney-client privilege.
21    Q    You believe that the hotels are
22  infringing your copyrights, right?
23    A    Yes, but I don't -- I did not find,
24  like, Serai Club.
25    Q    I'm sorry?

Page 219

1    A    Like Serai Club, I didn't find -- I
2  didn't find that they have a website.
3    Sir, I did not, like, one by one, look
4  through, whatever there was prompted, like, one link
5  lead to another, lead to another, I didn't
6  specifically go and take a look at, like, "Oh, is
7  this one infringing or is that one infringing."
8    Q    So how did you find the Defendants that
9  are listed in this amended complaint?
10    A    You see, sometimes it will appear -- I'm
11  not sure how it work, but sometimes when you click on
12  a certain hotel, and somehow the advertisement will
13  appear on Facebook. Then I will -- I see my picture,
14  I'm, like, I click on the advertisement on Facebook.
15    Q    It's a picture of a hotel or something?
16    A    The picture, my picture.
17    Q    Your picture?
18    A    On Facebook, like, okay.
19    Q    Your picture of a hotel on Facebook,
20  right?
21    A    Yeah.
22    Q    Or wherever.
23    So it's the hotel, right?
24    It's a picture of a hotel --
25    A    Yes.

Page 220

1    Q    -- that you believe was your client for
2  that photo -- for that photo shoot for whenever.
3    So why didn't you sue the hotel?
4    A    But when I click on it, the picture
5  comes on, would be Expedia, you know, when I click on
6  the -- my picture, out comes Expedia.
7    Q    Okay.
8    Okay.
9    Turn to Page 21, please.
10    Look at paragraph 76.
11    A    Okay.
12    Q    Can you read that to yourself for a
13  moment?
14    A    Aside from my legal counsel --
15    Q    No, no, read it yourself to -- just so
16  that you understand what it says.
17    A    Okay.
18    (Witness reviews document.)
19    Q    Do you see what that -- have you read
20  it?
21    A    Okay.
22    Q    Is this the first time you've read that
23  paragraph?
24    A    Carefully, yeah, but even then --
25    Q    Okay.

Page 221

1    So it says, "Aside from her legal
2  counsel and certain government agencies, Ms. Lee did
3  not disclose the hotel photographs to anyone other
4  than GHM or otherwise allow them to be publicly
5  disseminated in any manner, including on the
6  Internet."
7    Do you agree with that?
8    A    I don't know how to answer.
9    Q    Well, the part I'm asking about, it says
10  that except your lawyers and certain government
11  agencies, which I assume -- well, do you know what it
12  means?
13    Do you know what it means, "certain
14  government agencies"?  Do you know what that is?
15    A    No.
16    Q    Okay.
17    It says -- the balance of it says,
18  "Ms. Lee did not disclose the hotel photographs to
19  anyone other than GHM."
20    That's not true, is it?
21    A    What do you mean, it's not true?
22    Q    Well, what do you understand that -- it
23  says, "Ms. Lee did not disclose the hotel photographs
24  to anyone other than GHM."
25    What does that mean to you?

Page 222

```
1     A    That means I did not give it to the
2   hotel.
3     Q    That's what its seems to say, but that's
4   not true.  You gave it to the hotel, didn't you?
5     A    But the hotel general manager all has --
6   let's say -- they all work for GHM.
7     Q    So, in your mind, this statement is
8   true?  You think that the hotels work for GHM?
9     A    The general managers.
10    Q    Okay.
11         So let's go back to this sentence then,
12  that says, "Ms. Lee did not disclose the hotel
13  photographs to anyone other than GHM."
14         Is that true?
15    A    The general managers work for GHM.
16    Q    Didn't you send CD-ROM's to the hotels?
17    A    To the general manager.  When they write
18  to me, it will always be Eleanor, Eleanor
19  Hardy@ghmhotels.com, but she is the general manager
20  of Chedi Chiang Mai, so I will send it to the general
21  manager of the Chedi, and her E-mail says
22  Eleanor.Hardy@ghmhotels.com.
23         So even I'm confused, am I sending it to
24  hotel or am I sending it to GHM, because her E-mail
25  says she works for GHM.
```

Page 223

```
1     Q    And the balance of that says, "Or
2   otherwise allow them," meaning the photographs, "to
3   be publicly disseminated in any manner."
4          Is that true?
5     A    What does it mean, "Otherwise allow them
6   to be publicly disseminated in any manner"?
7     Q    Well, what does it mean to you?
8          What do you think it means?
9     A    Sorry, I don't know.
10    Q    If you don't understand it, that's okay.
11         You don't understand it?
12    A    I never allowed anyone to distribute in
13  any manner.
14         MR. TOKE:  He's just asking you for your
15  understanding.
16    Q    If you can't understand it, just say
17  that you can't understand it.
18         MR. TOKE:  It's okay.
19    A    Yeah, I don't understand.
20    Q    So you do agree that the hotel
21  photographs were distributed to the public via
22  brochures?
23    A    Only on brochures.
24    Q    Okay.
25    A    Or leaflets, marketing collaterals.
```

Page 224

```
1     Q    Okay.
2          So -- so to that extent, of course, then
3   that statement is completely wrong.  You have no
4   opinion one way or the other way?  You don't know?
5     A    I don't know.
6     Q    Okay.
7          Look at paragraph 80, please, on Page
8   22.
9     A    Eighty?
10    Q    Eighty.
11         Okay.
12         So the first four words are, "Upon
13  information and belief."
14         Do you see that?
15    A    Yes.
16    Q    Okay.
17         What is the source of your information
18  and belief, as indicated in paragraph 80?
19    A    I think because the CD-ROM were only
20  given to GHM, so who else -- where else could anyone
21  get it from?
22         This is what I think.
23    Q    CD-ROM's were given to the hotels, you
24  said that, right?
25    A    But given to the general manager who
```

Page 225

```
1   works for GHM.
2     Q    So you consider giving something to the
3   hotels the same as giving it to GHM?
4     A    But it's directed to the general
5   manager, who works for GHM.
6          I do not know what their -- how they
7   arrange that kind of -- I do not know what kind of
8   work arrangement they have.  All I know is, when
9   E-mails come to me, the general manager always have
10  @ghmhotels.com.
11    Q    Okay.  All right.
12         So then that sentence in paragraph 80
13  says, "Upon information and belief, GHM has
14  reproduced and distributed the hotel photographs."
15         In what way did they reproduce and
16  distribute the hotel photographs?
17    A    I mean, if Wave has only given the
18  CD-ROM to GHM and the general manager who works for
19  ghmhotels.com, where else can it come from?  Where
20  did the Defendants get all -- all of my pictures?
21    Q    So, in other words, you don't know that
22  GHM has reproduced and distributed the hotel
23  photographs, right?
24         MR. TOKE:  That's not what she said.
25         Again, you're mischaracterizing her
```

57 (Pages 222 - 225)

Page 226

1  testimony.
2     A    I'm saying Wave has only given it to
3  GHM. I don't know who else could access to those
4  photographs other than GHM, or if anyone within GHM
5  took Wave's pictures on their own and given it to
6  their friends. I don't know all those. All I've
7  given to is GHM.
8     Q    Well --
9     A    I've never given any pictures to anyone.
10    Q    You're sure?
11    A    Yes.
12         The hotel general manager also works for
13  GHM.
14    Q    And you prepared at least two
15  websites -- well, three websites that we've seen so
16  far, right, and your pictures were on those websites,
17  right?
18    A    Yes.
19    Q    Okay.
20         Let's -- let's look at paragraph 82 on
21  that same page.
22         Okay.
23         Have you had a chance to read that?
24  Have you read it?
25    A    Not yet, sorry.

Page 227

1     Q    Paragraph 82.
2         (Witness reviews document.)
3     Q    Are you finished?
4     A    Yes, sir.
5     Q    So that paragraph says, "Unsurprisingly,
6  after GHM circulated the hotel photographs to its
7  business partners."
8         Who are its business -- who are GHM's
9  business partners?
10    A    I don't know. It must be one of the
11  Defendants.
12    Q    Okay.
13         Did you read this paragraph before
14  today?
15    A    I glanced -- I probably glanced through,
16  but maybe from the evidence and -- maybe from the
17  evidence, it was established, but I'm not going to
18  guess. I don't know.
19    Q    Okay.
20         So paragraph 22, the first sentence
21  says, "Unsurprisingly."
22         What does that mean -- what did you
23  intend to mean by using the word "unsurprisingly"?
24         MR. TOKE:  Objection.
25         Ms. Lee didn't prepare this document.

Page 228

1         If you want to ask her what she thinks
2  it means, fine, but she didn't prepare the document.
3     Q    You said you reviewed the drafts of it,
4  right?
5     A    I said I read a little bit.
6     Q    Okay. All right.
7         So what does the word "unsurprisingly"
8  mean to you in this paragraph?
9     A    Not shocked.
10    Q    Well, what do you think that sentence is
11  trying to imply by using the word "unsurprisingly"?
12    A    Mr. Schwartz, I'm very sorry, I'm not
13  qualified -- I'm not qualified to decipher English
14  language.
15    Q    Okay.
16         Okay.
17         Look at paragraph 83.
18         That says, "Upon information and belief,
19  GHM Hotel photographs purposefully disseminated the
20  hotel photographs." I'm assuming that "hotel
21  photographs," in that first part, is a typographical
22  mistake.
23         In what way -- or what's the basis of
24  your information and belief that GHM purposefully
25  disseminated the hotel photographs?

Page 229

1     A    Again, I did not write this. My lawyer
2  had the files and have done the research, I think,
3  I'm not sure, that led them, you know, to write what
4  they write.
5     Q    Okay.
6         So you relied -- would it be fair to say
7  that you relied on the investigation done by the
8  lawyers that filed this amended complaint?
9     A    Yes, because I wouldn't know how to --
10    Q    Okay, okay.
11         And so in the portions of the paragraphs
12  that say, "Upon information and belief," it's not
13  information and belief that you supplied. You
14  believe that it's information and belief that the
15  lawyers who filed this amended complaint
16  investigated?
17         MR. TOKE:  That's -- again, misstates
18  her testimony. That's not what she said.
19         MR. SCHWARTZ:  I didn't say it's what
20  she said. I'm asking her a separate question.
21         So could you repeat the question,
22  please?
23         (Whereupon, the requested portion is
24  read back by the reporter.)
25    A    Sorry, it's just --

58 (Pages 226 - 229)

Page 230

1    Q    You don't understand?
2    A    -- a mouthful of --
3    Q    Okay, okay.
4         Let me try it one more time.
5    A    And I didn't write this. Whatever I
6    had, I gave it to the lawyers, and they did the
7    investigation. Whatever they found through their
8    investigation or research, they wrote this.
9    Q    Okay.
10        Look at paragraph 93 on Page 24.
11   A    Page --
12   Q    Ninety-three.
13        Do you see that?
14        It says, "Upon information and belief,
15   the hotel photographs that are the subject of
16   the copyrighted works have been seen and continue to
17   be seen by millions of users on a daily basis."
18        Do you know that?
19   A    Again, they did their research.
20        Is there a way to count? I don't know.
21        Is there a way to count, like, how many
22   people have seen whichever -- whichever page or site
23   or whatever? I don't know, sir.
24   Q    Right.
25        Okay, so --

Page 231

1    A    It's their application. I don't know.
2    Q    Okay.
3         Paragraph 94 says, "Upon information and
4    belief, Defendants, including, but not limited to,
5    Defendant Does one through a hundred, have utilized
6    the hotel photographs for purposes of trade,
7    including promoting and advertising the bookings to
8    the boutique and high-end hotels featured in those
9    works; thus, realizing millions of dollars in
10   revenue."
11        How do you know that?
12   A    I already said I didn't do the research
13   or whatnot. I don't know how to do all this
14   research.
15        You're asking me -- all I know is I
16   submitted my documents.
17   Q    You realize I'm asking these questions
18   because this is in a complaint that your company has
19   filed against the Defendants. I'm not making that
20   up. Right? You understand that?
21   A    I understand, but you have to try to
22   understand, these are investigated by my attorney.
23   My company doesn't know how to do all this
24   investigation.
25   Q    Okay.

Page 232

1         So we really have no way of knowing if
2    the Defendants have realized millions of dollars in
3    revenue, it's just a guess, as far as you're
4    concerned, right?
5    A    You have to ask my attorney.
6    Q    I'm asking you. As far as you're
7    concerned, you, personally.
8    A    They did the investigation, not me.
9    Q    And you think that they did an
10   investigation that shows that the Defendants have
11   realized millions of dollars in revenue?
12   A    If that's what they say, they must have
13   a basis to support that.
14   Q    I agree, they should have a basis to
15   support that.
16   A    I don't know.
17   Q    You don't know?
18   A    I don't know how to --
19   Q    Okay.
20        And as you -- as you sit here today, do
21   you have a view as to how much damage the
22   infringements have caused the Plaintiff?
23   A    How much damage caused the Plaintiff,
24   me?
25   Q    Yeah.

Page 233

1         Well, the Plaintiff is Wave, LLC.
2    A    I don't know.
3    Q    You have no idea?
4    A    I mean, there's basis of calculation,
5    and perhaps I could sit down and start calculating.
6    Q    Well, do you have -- this complaint was
7    filed 4/23/2014. About a year ago.
8    A    Yeah, more than a year ago.
9    Q    Do you personally, on behalf of the
10   Plaintiff, have you ever sat down and calculated the
11   damages that Wave, LLC has incurred?
12   A    The answer to that is yes, but based on
13   many, many different things. Seven hundred fifty --
14   you know, the different tier.
15        I don't -- there's so many different
16   ways to calculate.
17   Q    Well, you're the Plaintiff. Do you have
18   a way to calculate the damages?
19   A    Yes.
20   Q    Have you done it?
21   A    For some.
22   Q    What's the number?
23   A    I can't remember because there's so
24   many. There are four columns. If it's 750 per
25   register -- I don't know. I mean, which one -- which

59 (Pages 230 - 233)

Page 234

1  one do we take?
2       I don't know either.
3       Q    Yeah, you're the Plaintiff. Which one
4  do you take? You haven't decided yet?
5       MR. TOKE: Objection.
6       You're being argumentative. She
7  simply -- well, if you want to ask her a fact
8  question.
9       MR. SCHWARTZ: You've objected.
10      MR. TOKE: Ask her a fact question.
11      A    You're asking me to remember numbers.
12  How am I supposed to remember so many numbers from
13  years to how much are the invoices that happened,
14  like, nine, ten years ago, and how much are the
15  damages when there's so many, and the different ways
16  of calculation; how am I supposed to remember?
17      Q    Okay. I'm going to ask you a factual
18  question.
19      As you personally sit here today, do you
20  have a value as to the injury incurred in this case
21  by Plaintiff as a result of Defendants' actions?
22      MR. TOKE: A total number?
23      MR. SCHWARTZ: The question is on the
24  floor.
25      A    To whom; all the Defendants?

Page 235

1       MR. SCHWARTZ: Could you read the
2  question back?
3       (Whereupon, the requested portion is
4  read back by the reporter.)
5       Q    Do you understand the question?
6       MR. TOKE: I want to ask one question:
7  Defendants, apostrophe, like all of the Defendants?
8  I think it's vague and ambiguous as to that. Or are
9  you talking about just GHM?
10      MR. SCHWARTZ: The word was plural.
11      MR. TOKE: Right.
12      Can you read the question back?
13      Q    Do you understand the question?
14      Do you understand the question now?
15      A    Like, how much have Wave lost?
16      Q    Okay, if you want to say it that way;
17  how much has Wave lost?
18      A    But to how many people? Is it to -- how
19  many? Is it just GHM or all the Defendants here?
20      Q    All the Defendants.
21      A    I don't have the number. I need to sit
22  down and count.
23      Q    Have you done -- has Wave, LLC hired an
24  expert to calculate damages?
25      A    Hired -- hire an expert?

Page 236

1       Q    Yes.
2       A    No.
3       Q    So you're under oath, you understand
4  that?
5       A    Yes.
6       Q    And you're saying that as of today Wave,
7  LLC has no opinion as to the damages that it has
8  incurred by the Defendants as a result of all the
9  claims you made in this case?
10      A    That's not what I said.
11      MR. TOKE: That's not what she said.
12      A    I said Wave did not hire expert --
13  expert to count this.
14      Q    That's not -- okay, that's fine, The
15  Wave has not hired an expert to count it.
16      Start all over again. Listen to my
17  question.
18      What is the amount of damages that Wave
19  has incurred as a result of Defendants' actions in
20  this lawsuit?
21      A    I have yet to sit down and count.
22      Q    Okay.
23      MR. TOKE: Let's take a break for a
24  second.
25      MR. SCHWARTZ: Okay, take a break.

Page 237

1       MR. TOKE: Let's go off.
2       THE VIDEOGRAPHER: Going off the record
3  at 6:25 p.m.
4       (Brief recess taken.)
5       THE VIDEOGRAPHER: We're back on the
6  record at 6:35 p.m.
7       MR. SCHWARTZ: Yes, I started to say off
8  the record that I had no more questions, then Mr.
9  Toke -- I have no more questions at the moment. Then
10  Mr. Toke said that the witness wanted to make a
11  statement.
12      Q    So you want to say something?
13      A    Yeah, I just want to clarify, because
14  when you kept asking me all this paragraph by
15  paragraph, I'm actually flustered, maybe most of us
16  are, and I'm shutting down.
17      I just want to say, all the paragraphs
18  that you mentioned just now how -- how do you assume
19  that there are millions of dollars of revenue, or how
20  I assume that millions of people have seen it.
21      Basic -- all this evidence, I give it to
22  my lawyer.
23      Q    And that would be Cameron --
24      A    Mr. Cameron Reuber.
25      Q    Uh-huh.

60 (Pages 234 - 237)

Page 238

```
1       A    And the Defendants are the biggest
2   travel sites in the world, so I don't think it is --
3   even though it is an assumption, I don't think it is
4   wrong to say they have been viewed by millions of
5   people, that's one.
6           As to generating a lot of money for
7   whether the -- for the Defendants, I think -- I think
8   so because the hotels that I did, they're all luxury
9   hotels. Setai Miami costs no less than 1,000 a
10  night, and that's the cheapest, based on what I
11  found. Okay?
12          And you asked me for damages.
13          I don't have a -- like, a figure in
14  front of me, but I have done the calculations based
15  on how many photographs were infringed, how long they
16  have been infringed.
17          But if you ask -- all the Defendants
18  here, I have done the Excel sheets, just that if you
19  ask me to combine everything, I can't calculate that
20  fast. I don't have that. I don't have, like, all
21  together, how much. I don't have that all together,
22  but I have individual, like, website A, how much;
23  website B, how much. How many photographs did they
24  infringe? How did they use it? Was it used as
25  advertising or was it used to, you know -- whether
```

Page 239

```
1   it's promotional or commercial purpose, I have done
2   that.
3       Q    And when did you do that?
4       A    This year.
5       Q    Okay.
6           And did you do that on your own or did
7   somebody help you?
8       A    I did that on my own, but I did ask a
9   friend to help me formulate Excel sheet so it's
10  easier for me to calculate. I don't know how to
11  formulate Excel.
12      Q    Right.
13          So the friend just did computer stuff,
14  not substantive stuff?
15      A    Yeah.
16      Q    So did anybody -- did your lawyers ask
17  you to compile that Excel spreadsheet?
18      A    They asked me the same question you
19  asked me, how much. So I have to have a basis on how
20  it's calculated. And I have done the calculation.
21      Q    Okay.
22          And so what were the elements that went
23  into your calculation?
24      A    One, how many photographs were involved.
25      Q    Okay.
```

Page 240

```
1       A    Two, what's the media that they were
2   being used.
3       Q    And what was the media that they were
4   being used, what were they, what were the media that
5   the photographs are being used, according to you?
6       A    Well, Internet is one thing.
7       Q    Yes.
8       A    If you use it to -- if you printed it,
9   if you printed -- a print infringement would be more
10  expensive than an infringement on the Internet.
11      Q    Are you aware of any print
12  infringements?
13      A    Yes.
14      Q    Okay.
15          And which infringements are those?
16      A    I think the one that you just saw, the
17  magazine.
18      Q    I'm sorry, I wasn't -- I only looked at
19  this top one.
20          So you want to show something? Feel
21  free.
22      A    Yeah, the magazine.
23          I only have six volumes, and I believe
24  there are 13, because not only were these printed,
25  the electronic version was also uploaded as PDF
```

Page 241

```
1   format and they were circulated.
2       Q    Let me see.
3           It has a sticker on it, so I'll turn to
4   that page.
5           And whose magazine -- who publishes
6   this?
7       A    GHM.
8       Q    Okay.
9           And so this one has a sticker.
10          Which photograph; Carcosa Seri Negara?
11      A    Yes, this one.
12          And, Mr. Schwartz, you will find
13  photography credit to my name, my Chinese name, Lee
14  Kar Yin.
15      Q    Okay.
16          You have to excuse me for a second.
17          Is this one of the hotels that were --
18  in paragraph ten that listed as work that you did at
19  the request of GHM, the Carcosa?
20      A    Carcosa, yes.
21      Q    Yes. Okay.
22          And so were you paid for these
23  photographs?
24      A    For the rights to use these photographs?
25          No. I didn't even know that these
```

1  existed.
2      Q    Okay.
3          But you were paid -- you sent -- this
4  goes in a circle a bit, but you sent an estimate to
5  either GHM or Carcosa, right?
6      A    For the service of photography. I did
7  not sell the rights to use.
8      Q    Okay.
9          So that's -- right, we've discussed that
10  subject before.
11         Okay.
12         All right.
13         Have you -- in the damage -- what are
14  the other elements that you considered in creating
15  your Excel spreadsheet for damages?
16     A    How long they have been uploaded.
17     Q    Okay.
18     A    Well, basically, how long was the usage.
19     Q    Do you have any document on behalf of
20  any one of the companies that we talked about --
21  starting with Wave-S, do you have any document which
22  specifically sets forth, by its expressed terms, in
23  writing, a license fee to use a photograph on the
24  Internet?
25     A    No.

1          Back then, there was no Internet
2  marketing.
3      Q    Okay.
4      A    And, also, for a basis of calculation, I
5  actually found my photographs being copied, like,
6  replicated.
7      Q    Okay, but my --
8          MR. TOKE: Well, hold on. Let her
9  finish. She's responding to your question.
10         MR. SCHWARTZ: Actually, she's not
11  responding to the question. She's going way beyond
12  the question.
13         But you can go on.
14         MR. TOKE: Continue.
15     A    I need a basis -- you know, someone out
16  there replicated my pictures, and it was uploaded on
17  Getty Images, and this would be -- these pictures
18  would have been done with authorization because you
19  can't corner off the entire hotel without
20  authorization. Okay? And I just used that license
21  fees, they copied my work, and they're selling it for
22  a certain price.
23     Q    Okay.
24         And what license fee are you referring
25  to?

1      A    How much they are selling a copy of my
2  work.
3      Q    Who's selling it?
4      A    Getty Images are selling it.
5      Q    And how much do they charge for that?
6      A    For Internet use, Internet, not media, I
7  think it's about -- it's below 4,000.
8      Q    Okay.
9          And how do you know that?
10     A    Because you can just select the picture.
11  Getty has a calculation.
12     Q    On their site?
13     A    Yeah. You can just select a copy of my
14  picture and put -- you can put what is the usage and
15  how long is the usage and what is the circulation,
16  whether it is just U.S. or worldwide. You can select
17  the number of country.
18     Q    So Getty has -- on the Getty site, Getty
19  has your picture and --
20     A    Copycat.
21     Q    I'm sorry?
22     A    Copycat. Someone out there copied my
23  pictures. At one glance, they look alike.
24     Q    Well, are you saying that somebody took
25  a photograph -- well, let me rephrase the question to

1  the beginning.
2          When did you find that out?
3      A    Sometime --
4          MR. TOKE: Find what out?
5      A    The copycat.
6      Q    Yes -- no, no, that the picture is on
7  the Getty site.
8      A    Sometime end of last year.
9      Q    Okay.
10         Did you notify Getty to take it down?
11     A    It's a picture by someone else. They
12  copied my picture. The person actually took it, but
13  it's an exact replica of my picture. The only
14  difference is -- the only difference is it's not so
15  detailed.
16     Q    So, in other words, somebody took a
17  picture of the same topic?
18     A    Yeah, but exact angle.
19     Q    Okay.
20         And you think that's an infringement?
21     A    No, no, no. I did not say that's an
22  infringement.
23     Q    Oh, I see. You're using that as the
24  basis for the value of the license?
25     A    Correct.

62 (Pages 242 - 245)

Page 246

1    Q    Okay, okay.
2        Do you know the name of the person who
3    took that photograph?
4    A    Something -- there is a Lee in the back.
5    Q    Okay.
6        But it's not you?
7    A    No, it's a man.
8    Q    Would it be fair to say that there are
9    different -- a picture by Pablo Picasso is different
10   than a picture by Howard Schwartz, but that the name
11   of the creator sometimes has its own value?
12   A    I think in terms of value, it really is
13   on when you see the two pictures, which one has more
14   quality.
15   Q    Okay, fair enough.
16       So let me ask you, have you ever had a
17   picture in Getty licensed, licensed through Getty?
18   A    No, I have never sold to anyone.
19   Q    Okay.
20       Have you ever licensed any of your
21   pictures for use anyplace, other than as we've
22   discussed in this particular case?
23   A    I've been offered by Sandals.
24   Q    Okay.
25       And is that offer in writing?

Page 247

1    A    Yes, on E-mail.
2    Q    Okay.
3        Do you have a copy of that?
4    A    I should be able to find it.
5    Q    Okay.
6        When was that?
7    A    Either '09 or '10.
8    Q    Okay.
9        And how much did Sandals offer?
10   A    Up to a thousand per picture.
11   Q    Okay.
12       And this is in writing and you have it?
13   A    Yes.
14   Q    So --
15       MR. SCHWARTZ:  This is just between
16   lawyers.
17       I ask that that be produced for us.
18       MR. TOKE:  Sure.
19   Q    Other than that, have you ever -- did
20   you agree to license it?
21   A    Not at that price, no.
22   Q    Okay.
23       Do you have any other documents where
24   you were offered to license your works or where you,
25   in fact, licensed your works?

Page 248

1    A    No.
2    Q    Okay.
3        MR. SCHWARTZ:  And I call for the
4    production of the worksheet that she said was created
5    to come up with some number for damages.
6        Okay.  We're going to stop now.  I think
7    that's what I initially started to say, and we meet
8    tomorrow at the Magistrate Judge, right.
9        So this is just for the record, you
10   don't have to respond to this.
11       I took this deposition on behalf of GHM
12   only.  I'm not representing any other Defendants or
13   any of their rights.
14       And let's take a break.  Let's stop for
15   today.
16       MR. TOKE:  We're done.
17       THE VIDEOGRAPHER:  This completes
18   today's testimony of Lee Kar Yin.  We're going off
19   the record at 6:49 p.m.  This also includes media
20   four.
21       (Proceedings concluded at 6:49 p.m.)
22
23
24
25

Page 249

1        C E R T I F I C A T E
2
3        I, RUTHANNE UNGERLEIDER, a Certified Court
4    Reporter and Notary Public, certify that the
5    foregoing is a true and accurate transcript of the
6    stenographic notes of the deposition of said witness
7    who was first duly sworn by me, on the date and
8    place hereinbefore set forth.
9        I FURTHER CERTIFY that I am neither
10   attorney, nor counsel for, nor related to or
11   employed by, any of the parties to the action in
12   which this deposition was taken, and further that I
13   am not a relative or employee of any attorney or
14   counsel in this case, nor am I financially
15   interested in this case.
16
17
18
19
20
     _____
     RUTHANNE UNGERLEIDER, C.C.R., C.R.R.
21   LICENSE NO. XIO1634, XIO0115
22
23
24
25

63 (Pages 246 - 249)

| & |
| --- |

**&**  2:6 40:7

| 0 |
| --- |

**0-0-9**  206:1
**00546**  3:14 145:1
**042**  50:16 51:1,11
  51:23 52:21 53:3
  56:14
**05**  203:2
**06**  203:2
**07052**  2:7
**09**  48:22 247:7
**09239**  1:3 4:20

| 1 |
| --- |

**1**  3:9 33:19 34:7,14
  38:5,6 39:10 42:2
  44:16 45:13 48:2
  51:17,20 57:2 61:8
  61:12,15 68:25
  80:23 81:6 82:11
  185:24 187:20,21
**1,000**  238:9
**10**  3:14 51:18,19
  113:4,7,9 152:14
  155:1,21 156:3,5
  157:20 158:2,5,9,11
  193:14 247:7
**10,000**  122:11
  130:15 134:23
  135:21,22,23 137:8
  137:9,9,10,17
**10005**  2:12
**10036**  2:21
**10:15**  1:19 4:12
**10:54**  33:17
**11**  3:14 59:12 62:7
  63:25 144:24 145:1
  147:16,17
**113**  3:14
**11:16**  33:22
**11:37**  52:13,18
**12**  3:15 167:14,17
  167:18 169:6 171:9

171:14 180:1
**12:03**  73:10
**13**  3:16 183:23
  184:3 192:20
  194:14,15 240:24
**14**  3:17 194:16,17
  194:21 209:15,15
  210:18 215:11,12
**144**  3:14
**15**  3:17 68:5,13,23
  69:4 74:16 75:5,8
  77:5 208:8,15
**167**  3:15
**17**  7:10
**18**  86:15 184:16
**181**  50:16 51:2,12
  51:23 52:22 53:3
  56:15
**183**  3:16
**19**  7:12
**1914**  198:19,20
**194**  3:17
**1993**  149:1
**1999**  147:19
**1:48**  73:18

| 2 |
| --- |

**2**  3:10 40:5,6 41:8
  41:10,12 42:6 45:22
  47:21,23 60:1,9
  81:15,19,22 82:1
**2-0-0**  167:7
**20**  6:16 7:13,15
  70:18 147:15 184:8
  194:22
**20,000**  135:24
**2000**  159:23 162:19
  162:20,22 163:7
  174:14 177:5,15
  195:3,9,20
**2000's**  163:2
**2001**  163:7
**2002**  106:10,11,22
  107:10,18 108:16
  110:12 112:20,22

112:24,25 123:19
**2003**  201:20,22
  202:1 205:22 206:1
  206:2
**2004**  96:17
**2005**  12:12,13,20
  13:2,13 104:1,1
  112:12 113:14,20
  114:3,8 119:16
  139:25 140:1 141:2
  141:4,6 172:5
  173:23 181:2,4,8
**2006**  117:18 119:17
  141:4,6 147:7 149:6
  169:25 170:3,16
  171:24 172:2,5
  173:23 174:11,14
  175:2,13 183:8
**2007**  74:16 75:5,9
  77:5 85:14 123:16
  142:16,19,20 147:7
  147:22 148:1,22,23
**2008**  17:21 42:2
  44:16 45:14 47:17
  48:2 49:1,14,20,24
  51:3,16 53:4 56:8
  60:25 61:1,15,17,23
  62:6 66:1,1 68:3
  69:1 80:23 81:6
  141:18,19 142:17
  142:20 167:11
**2009**  41:1 205:24
  206:7
**2010**  34:24 35:1
  40:25 48:23 51:22
  51:25 61:13,14
  70:19,19,22 87:4,10
  114:16 147:19
  162:22 214:10
**2011**  22:24 23:3
  24:19 25:1 26:9
  27:9,16 28:2,17,19
  28:25 29:1,24,25
  31:12 35:2,8,10,11
  35:15,19,22 36:6

38:19,24 40:18,25
  59:13 62:7,15 64:1
  86:15 108:21 109:5
  109:6 114:21
  115:10 146:4,24
  147:18 209:24
  214:2,4
**2012**  22:1 68:5,13
  68:23 69:4 115:14
  127:1 140:9 141:14
  145:12 148:25
  149:20 150:14,23
  150:24 151:3,10,16
  151:25 211:16,19
  211:21 212:15,16
  212:19
**2013**  76:4 84:17,22
  85:1 176:4,6,23
  177:13 183:9
  185:24 186:20
**2015**  1:18 4:11 6:18
  7:12 184:16
**208**  3:17
**21**  1:18 4:11 220:9
**21st**  184:10
**22**  224:8 227:20
**23**  198:19
**24**  230:10
**247**  3:21
**248**  3:22
**28**  1:17 2:11 4:14
  5:5 34:24 47:17
  49:14,20 51:3 56:8
  61:17,23 62:1,6
  68:3 69:1
**29**  87:4
**2:54**  126:14
**2oo2**  113:1

| 3 |
| --- |

**3**  3:10 39:3,4 46:17
  46:20,21 47:21
  48:14 55:22 56:13
  56:25 60:9 61:23
  71:8 72:24 74:13

[3 - agree]                                                                    Page 2

| | | | |
|---|---|---|---|
| 80:2 81:8,14,16,22 | **4:33** 183:20 | 120:11 121:6 | **acra** 43:8,10 |
| 81:25 82:6 113:14 | **5** | 135:25 136:4 | **act** 44:6,20 166:17 |
| 189:12 | | 137:20,24 152:14 | **acting** 165:24 |
| **3.11** 177:23 | **5** 3:4,11 65:7,9 | 152:16,21 155:9,13 | **action** 1:3 4:20 |
| **30** 51:25 61:13 | 184:1 215:6,13,16 | 155:18 156:1 | 144:6 249:11 |
| 70:19 137:11 | **5,000** 130:16 | 157:10 | **actions** 234:21 |
| **304** 205:2,4 | **50** 132:15,24 | **918** 2:3 | 236:19 |
| **31** 181:1,4,8 | **58** 3:11 | **93** 230:10 | **acts** 132:25 |
| **33** 3:9 | **5:40** 215:1 | **94** 167:1,2,3 231:3 | **actual** 42:7 79:4 |
| **331** 34:8,9,12 38:3 | **5:55** 215:4 | **94710** 2:4 | 167:25 |
| 39:10 55:25 61:7,13 | **6** | **95** 167:1,3 | **add** 126:20 151:22 |
| 64:15 | | **96** 3:13 | **addition** 189:11 |
| **344** 44:5,19 | **6** 3:12 69:23 70:2,7 | **a** | **additional** 153:25 |
| **35** 51:18 | 209:24 214:2,4 | | 156:12 |
| **360** 191:1 | **65** 3:11 | **a.m.** 4:12 33:17,22 | **address** 36:20 55:6 |
| **366** 191:1 | **65,000** 153:21 154:1 | 52:13,18 | 142:7 |
| **383** 65:6 | 158:19 | **a21** 2:3 | **addressed** 62:23 |
| **384** 46:23 | **69** 3:12 | **abdullah** 22:14 | **addresses** 181:23 |
| **385** 46:23 49:15,21 | **6:25** 237:3 | **abigail** 2:8 5:2 | **adopted** 134:22 |
| 50:1,15 56:7 | **6:35** 237:6 | **able** 24:9 172:22 | **advantage** 20:7,8 |
| **386** 46:19,23 47:4 | **6:49** 248:19,21 | 247:4 | **advertise** 140:8,19 |
| **389** 58:19 | **7** | **about.com** 2:13 | **advertisement** |
| **390** 58:19 | | **accept** 165:7 166:8 | 219:12,14 |
| **391** 58:19 61:7 62:9 | **7** 3:12 73:13,20 74:4 | 188:17 | **advertising** 11:24 |
| **397** 74:9 | 75:16,18 76:4 80:7 | **accepted** 31:7 204:3 | 139:18 195:5 231:7 |
| **398** 74:9 75:6,11 | 80:13 81:13 82:18 | **access** 104:14 226:3 | 238:25 |
| **399** 73:15 74:9 | 83:15 84:17,22 85:1 | **accommodation** | **advice** 21:7 27:6 |
| **39th** 2:11 | 85:19 86:1 | 215:18 216:10 | 129:4 185:5,6 |
| **3:15** 126:17 | **73** 3:12,13 194:23 | **accommodations** | 191:25 198:8 |
| **3:45** 152:9 | 194:24 200:24 | 217:15,25 218:6 | **affect** 176:19 177:1 |
| **3:57** 152:12 | **74** 201:19 203:23 | **accomplished** 48:12 | **afraid** 6:5 |
| **4** | 205:6 | 48:13 | **age** 121:23 |
| | **750** 233:24 | **accountant** 12:22,23 | **agencies** 11:25 |
| **4** 3:11 57:21 58:2,3 | **76** 220:10 | 13:18,22,25 42:25 | 221:2,11,14 |
| 58:4,18 60:15,24 | **7:13** 1:3 4:20 | 43:17 45:2 76:25 | **agency** 169:10,13,21 |
| 61:5 62:6,18 72:24 | **8** | 77:18 78:14 | 181:21 182:6 |
| 72:25 | | **accountant's** 188:1 | **ago** 174:20 198:21 |
| **4,000** 157:12 186:20 | **8** 3:13 73:16,20,21 | **accurate** 13:8 249:5 | 233:7,8 234:14 |
| 187:1,4 189:11 | 74:2,6,8 86:9 153:9 | **acknowledged** | **agree** 4:9 24:12,24 |
| 244:7 | **80** 224:7,18 225:12 | 172:12 | 29:22 56:24 57:3 |
| **4/23/14** 198:19 | **82** 226:20 227:1 | **acknowledges** 117:7 | 62:7 96:19,21,23 |
| **4/23/2014** 233:7 | **83** 228:17 | **acknowledging** | 130:9,9 149:13 |
| **41** 3:10 | **87** 113:6 | 100:25,25 | 172:15 202:12,13 |
| **46** 3:10 | **9** | **acknowledgments** | 221:7 223:20 |
| | | 195:22 | 232:14 247:20 |
| | **9** 3:13 96:1,3,6 | | |
| | 112:10,11 116:9 | | |

agreeable 9:9,14 29:5
agreed 29:21 31:17 32:9 60:24 82:15 175:24,25 177:3 185:12 187:5 188:23 189:3 201:21 202:2 204:2 210:17
agreeing 202:20
agreement 3:15,17 7:25 28:7 29:2,3,5 29:22 31:16 32:8 76:3 119:11,13,14 119:15,16,19,21 120:1 167:16,21 168:8,10,11,13 169:25,25 170:4,4 170:14,18,19 171:9 172:8 173:12 174:2 174:4,15 175:7,9,12 175:18,20,21,22,23 175:25 176:3,6,18 181:3 182:9,10 183:8,8 185:13 188:13 195:9,20 201:4,10,13,14 202:6,23 208:7,25 209:4,11
agreements 170:22 171:8,10,22 172:23 181:14 202:6,9
ahead 7:2 19:24 20:2,16 23:11 25:8 25:20 27:22 29:13 30:10,17 42:21 62:13 69:7 120:10 121:13 173:7 191:17
ahmat 22:13
airlines 2:18
airways 2:18
akin 2:20 5:9
al 1:9 4:17

albnm 30:22 31:10 99:1 127:9
alike 244:23
allegation 171:7
alliance 2:13
allow 221:4 223:2,5
allowed 99:17 125:18 223:12
ambignons 56:21 95:18 102:19,24 191:16 235:8
amended 3:17 88:3 88:4 194:18,19,20 196:3 198:14,14,15 198:25 199:11,19 201:24 215:12 217:9 219:9 229:8 229:15
amenity 141:21
america 2:17 19:5
american 2:22 5:9
amicably 118:1 205:8,10,11,14,14 212:20
amount 236:18
ancillary 126:1
angle 179:15 245:18
angles 177:23
angry 144:3,4
annex 49:15,25 50:14,20,22 51:13 51:15 56:7 62:3 75:5,11 78:21 82:7
annoying 124:15
answer 9:2,11,13,19 19:24 20:2,2,17 27:23 28:9,9 29:8 30:10,10 32:10,22 32:25 33:1 42:21 58:12 62:13 78:7 101:7 103:3 107:1 108:2,13 110:20 111:11 120:24 121:15 124:21 140:11,14 147:1

148:24 149:2,25 150:1,4 156:18 161:1 164:14 173:8 190:5,7 195:24 204:13,17,19 214:16 216:1,2 218:7 221:8 233:12
answered 30:17 32:14,15,16,17 69:6 100:2,3 101:5 110:18,19 204:11 204:17 210:23
answering 19:17
anybody 161:24 163:15 213:21 214:3 217:21 239:16
anymore 125:16 149:12 199:14
anyplace 246:21
anyway 183:7
apart 146:6
apologize 101:21 125:1 162:15 186:5
apostrophe 235:7
apparently 22:8 25:12 184:6
appear 56:2 60:10 61:21 219:10,13
application 87:3 231:1
applies 213:1
apply 44:4 213:6
appointment 141:24 142:1
appreciate 21:16
approval 90:4 116:6 117:1 123:2
approved 132:14
approximate 167:9 207:21,22
approximately 1:19 4:12 12:12,16 17:20 35:6 40:25 103:22 106:22 167:5 174:9

175:13 176:2 177:4 199:7 212:19
april 198:19,19 209:24 214:2,4
argue 160:24
argument 217:21
argumentative 100:19 110:8 115:3 234:6
arrange 201:5 225:7
arrangement 225:8
arrangements 165:16
arrive 6:14 187:4
arrived 6:16 7:10,10 7:12
art 98:5
artistic 114:5
artists 21:1 26:4
asia 123:15
aside 166:8,9 192:23 220:14 221:1
asked 8:23 10:7 30:16 32:16 42:17 42:19 53:5 58:13 67:6 69:6 100:2 101:5 107:2 110:18 117:8,9,11 118:9,10 118:12,20,25 119:6 119:11 124:25 139:9 145:16 154:14 156:24 197:20 204:11,12 204:16 211:24 238:12 239:18,19
asking 21:19 22:1 23:12 24:13,16 26:7 50:5 55:15 78:5 95:7 102:24 106:16 107:25,25 115:21 124:16 140:14 147:11 154:12,22 156:8 158:10 173:1 173:4 195:12 221:9 223:14 229:20

[asking - believe]

231:15,17 232:6
234:11 237:14
aspect 126:1
assert 129:24
assets 16:3 17:25
18:3 45:14,15 53:24
72:17,18
assign 61:2,6
assigned 45:16 48:7
48:9 49:20 50:20
51:1,10,16 53:3,15
56:6 60:6 61:1,17
61:22 62:17 63:11
70:25 72:19 77:6
assignment 3:16
47:15 48:13,17,25
49:10,13 50:25 52:2
52:6,19 53:12,18,20
53:25 55:22 56:14
56:24 59:8,9,12,15
59:16,19 60:4,13,15
62:9,23 63:3 64:23
65:12 67:24 69:1,13
72:4,5,19 74:10
78:17 82:6 86:8
87:17 90:24 111:19
183:22 184:4 185:1
189:12 202:23
203:1
assignments 52:5,8
52:10 54:16,21,23
55:7,9 57:4,5,6 58:1
58:7 59:4 60:21,23
64:19,22 72:13,14
72:15 181:22
assignor 59:21
assigns 49:14 74:24
75:4 78:19 82:7
175:22,25
associate 67:16
assnme 56:11 57:3
221:11 237:18,20
assumes 14:7 72:8
187:8

assuming 27:17
228:20
assumption 238:3
attached 76:4
161:18
attachment 61:7
62:8 185:16 187:12
187:13
attention 140:14
157:25
attorney 6:24 7:1,3
8:6,16,21 20:16
22:4 48:15 66:6
83:9,18 84:20 86:2
127:25 128:4 129:5
129:10,22 176:11
190:4 191:19
197:25 201:16
202:7,18 216:1
218:20 231:22
232:5 249:10,13
attorneys 2:5,9,13
2:22 4:22 36:21
200:21
audio 4:7
august 42:2 44:16
45:13 48:2 61:15
80:23 81:6 82:11
201:20,22 202:1,1
205:22
author 39:21 70:7
anthority 67:25
69:9,10 165:15
anthorization
243:18,20
automatic 30:11,13
automatically 78:10
79:10
available 103:13
aware 20:11 140:6
140:25 141:6
240:11

b

b 2:13,14,16,17,18
3:7 29:19 39:3,5,6
169:5,20 180:5,12
182:4 197:6 204:22
204:22 238:23
babies 21:15,22
23:5,21
baby 21:17 22:13
back 10:2,3 17:3
20:20,22 26:15,18
26:20 30:5,7 31:21
32:1,4,21 33:21,23
33:24 38:3 50:8,10
52:17 55:11 63:7,8
67:8,10 72:17,18
73:17 77:10 78:10
78:22 89:6,9 90:13
90:15 95:3,11,16
98:7,24 103:19
108:9,22,25 110:22
110:24 112:17
121:17,20 122:16
124:24 125:3
126:16 134:11
139:7 140:13,17,24
142:12,15 144:23
148:25 149:9,14
152:11 154:15
161:4,6 176:7,7,25
177:15 179:3 180:5
183:25 190:2,13
210:14,21 211:1
215:3 222:11
229:24 235:2,4,12
237:5 243:1 246:4
backdate 67:2,11
balance 203:25
221:17 223:1
based 62:16 159:5
178:3 216:22
233:12 238:10,14
basic 237:21

basically 12:22
168:9 175:21
185:13 242:18
basis 114:5 160:14
161:7 228:23
230:17 232:13,14
233:4 239:19 243:4
243:15 245:24
bates 41:9 46:18,22
65:5 73:14 74:9
75:19 96:2 113:5
144:25
bear 123:14 170:2
beautiful 97:17
bedroom 122:14
began 14:13,20
21:18 167:2
beginning 73:18
126:17 159:23
162:21,21,25 163:2
166:2,23,24 168:19
198:15 245:1
behalf 5:2 47:6
58:12 59:1 84:6
165:24 166:18
201:25 211:20
233:9 242:19
248:11
belief 79:8 125:7
160:14 161:7 212:3
224:13,18 225:13
228:18,24 229:12
229:13,14 230:14
231:4
believe 18:11 52:19
71:12 78:12 85:1·1
88:6 98:10 111:4
117:4 123:7,25
125:12 128:20,25
129:6,11 159:6
161:9,11,11,13
185:9 192:24 193:6
218:4,21 220:1
229:14 240:23

**believed** 212:4
**belong** 170:11 175:5
**belonged** 138:23
**belonging** 105:25
**belongs** 118:17
**berkeley** 2:4
**best** 9:13,20 19:5
  20:8,23,24 21:11
  26:4 28:10 131:13
  131:25 147:1
  156:18 168:15
  174:18 175:3,7,11
  176:18,23
**better** 21:22 93:24
  137:7 170:1,5
  175:22,23 177:21
**beyond** 243:11
**big** 196:7 215:8,8
**biggest** 238:1
**bill** 127:14 208:4
**billed** 127:14
**bills** 107:23,24
  108:2 109:10,15,22
  115:12 205:18,19
  206:7 209:13,15
  210:18
**birth** 27:1
**bit** 5:23 69:25 120:8
  126:23 171:12
  172:1 183:16 199:1
  228:5 242:4
**bitterness** 109:22,24
**black** 104:13 189:2
**blank** 102:8
**blanket** 125:17
**bldg** 2:3
**bluutly** 108:5
**board** 44:2,11 45:4
  45:6
**body** 43:10
**boland** 2:7
**book** 97:18,23 98:6
  215:18 216:10
  217:15,25 218:5

**bookings** 231:7
**bookit** 2:13
**boring** 122:14
**born** 173:13
**boss** 142:25
**bottom** 41:13 46:23
  70:14 75:19,20
  120:15
**boutique** 231:8
**boxes** 141:22,22
**brackets** 179:24
**branding** 146:19
  164:21 165:2
**break** 11:4 33:3,8
  33:13,24 34:1 73:7
  120:7 126:12
  142:20 152:6,7
  183:15 214:23
  236:23,25 248:14
**breaks** 183:16
**brick** 37:10,12,19
  214:15
**bride** 31:1,2
**bridegroom** 31:1,2
**brief** 73:11 126:15
  129:22 152:10
  183:21 215:2 237:4
**bring** 69:9 132:16
**brochure** 99:3 133:3
  137:11 138:5
**brochures** 94:1
  101:11 122:9,11,23
  123:10,11 127:10
  130:16,16,17
  133:23,24 134:17
  134:23 135:21,22
  137:9,17 166:3
  223:22,23
**brought** 109:13
**bryant** 2:21
**building** 148:15
**built** 93:16 94:8
**burden** 109:19
**business** 11:8,9 12:7
  12:19 13:2,17 14:13

  14:20 15:11,11 17:8
  17:21 22:23 24:16
  24:18 26:8 27:8,8
  28:2 36:2,3 43:14
  44:4,13,16 45:8,10
  46:1,7,8 47:24 48:6
  60:2,25 70:23 105:8
  105:11 197:7 227:7
  227:8,9
**businesses** 46:8
**busy** 109:9
**button** 178:12,23
  179:6,11 193:3
**buy** 132:15
**buyer** 29:17

**c**

**c** 2:1,22 16:23 249:1
  249:1
**c.c.r.** 249:20
**c.r.r.** 249:20
**calculate** 233:16,18
  235:24 238:19
  239:10
**calculated** 233:10
  239:20
**calculating** 233:5
**calculation** 233:4
  234:16 239:20,23
  243:4 244:11
**calculations** 238:14
**california** 2:4 6:19
**call** 15:14 28:21
  29:16 34:7 65:13
  91:12 92:5,11,12
  201:13 248:3
**called** 8:1 13:23
  16:16,20 29:19 94:6
  99:7 173:9 199:11
  205:25
**calls** 7:1 20:16 23:7
  25:19 26:12 27:21
  28:11 30:16 141:10
  182:25 218:20

**cameraman** 120:4
  168:17,20 178:3
  181:6
**cameron** 192:14
  197:23 198:12
  217:2 237:23,24
**cantonese** 9:23,25
  10:2,4
**capital** 215:19
**caption** 4:15 43:22
**carcosa** 148:15
  241:10,19,20 242:5
**care** 37:14 82:16
  143:12,13 146:7,8
  173:4
**carefully** 220:24
**carolyu** 2:22 5:8
**carrier** 100:7,9
  143:13 146:9
**carriers** 100:7
  141:21
**carrying** 141:25
**case** 4:15,18 5:10,11
  8:7,15,17 30:14,25
  33:6 90:23 91:2
  115:12 150:3
  192:16 208:19
  209:15 210:11,14
  211:10,14,21
  212:25,25 213:2
  234:20 236:9
  246:22 249:14,15
**catalog** 132:25
**cause** 204:5
**caused** 232:22,23
**cd** 132:22,25 133:7
  133:12 138:18,18
  138:19 222:16
  224:19,23 225:18
**cd's** 132:12
**cease** 12:11 15:10
**ceased** 60:1,25
  61:14 70:22
**ceasing** 47:23

cell 4:5 186:14
certain 18:23
  109:21 201:5
  219:12 221:2,10,13
  243:22
certainly 112:20,22
certificate 3:9,12,12
  22:8 33:18 40:5
  51:21 69:22 73:12
  75:25
certification 87:4
certified 1:15 249:3
certify 70:14 249:4
  249:9
cessation 47:24
cetera 76:10
chain 64:21,22,22
chairman 41:13
chance 6:24 194:24
  226:23
change 46:11 63:10
  69:12,17 82:20
  106:7 122:13,13,25
  126:20 136:25
  137:1 142:4,5
  146:18 148:9,12,16
  171:8 172:15,16
  188:20
changed 46:3 63:9
  85:6 119:18 146:16
  148:10
changing 146:13
  148:8 149:8 188:22
channeling 123:24
characterize 126:3
  162:17
characterizing
  124:18 125:18
charge 101:14 156:4
  157:11,15,16,20
  158:19,19 160:10
  244:5
chargeable 135:23
charged 135:9 157:7

charging 158:21
  160:10
cheapair.com 2:14
cheapest 238:10
check 86:2 179:16
  179:17,18 199:15
checked 21:24
chedi 90:24 91:4,7
  91:10,11,15 145:9
  146:23,24 150:13
  150:16,18 222:20
  222:21
chiang 222:20
chiesa 2:6
children 25:9,21
  27:1
chinese 241:13
choice 10:4
chose 19:11,12 20:5
chua 16:20 17:5
  18:9
cigarettes 34:4
circle 242:4
circulated 227:6
  241:1
circulation 134:10
  244:15
circumstance 27:10
  118:7,9,19 119:5,10
civil 1:3 4:20
claim 39:21 130:4
  176:6,7
claimaut 38:11,13
  39:14 70:10 86:21
  86:22
claiming 51:22 61:2
  87:9 105:24 106:3
  127:20 128:6,11,21
  128:24 129:6,12,16
  217:10
claims 57:1 61:6
  127:5 236:9
clarified 127:17
clarify 126:21,24
  128:17 131:21

149:4 237:13
clausen 1:17 2:11
  4:13 5:5
clean 188:15 189:1
cleaned 85:21
cleanup 60:13
clear 24:17 82:4
  84:20 120:25 121:8
  121:21 125:13
  151:8 170:10
  212:16
clearly 116:4,14
click 219:11,14
  220:4,5
clicking 212:9
client 7:1 20:16 22:4
  66:6 101:9 107:2
  128:4 164:17,19
  190:4 191:19
  197:25 217:4
  218:20 220:1
clients 130:10
close 42:13 179:9
closed 42:14
closely 93:7 139:4
club 117:11,15
  218:24 219:1
cobalt 2:3
coffee 97:17,23 98:6
coincidentally 46:5
collateral 98:15,22
  99:7 100:4 102:9
  126:2 134:1 136:6
  136:13
collaterals 89:2,5,16
  91:4,5 92:22 93:3
  93:10,22 94:1 98:12
  98:15 99:3,9 101:10
  101:11,25 102:7
  121:23 122:5 123:6
  131:3,4,9,11 132:1
  134:15 136:8
  223:25
color 98:1 104:13

column 39:7
columns 233:24
combine 238:19
come 20:5 23:19
  25:25 40:11 55:21
  124:12 133:1,20
  139:7 143:16 168:8
  188:10 211:17
  218:18 225:9,19
  248:5
comcs 220:5,6
comfortable 10:8
coming 122:16
commencing 1:18
commercial 239:1
commission 181:21
commissioned 195:4
  195:8
communicate 96:24
  97:1,3
communicated
  193:8 200:1
communicating
  141:18
communications
  202:10
companies 19:13
  29:19 42:24 44:6
  49:11 66:4 88:24
  94:16 96:16 105:11
  105:25 108:15,20
  111:6,19 123:8
  129:24 135:9
  138:23 145:12
  191:14 193:1,7
  206:16 213:20,23
  216:7,22 242:20
company 5:10 13:23
  14:13 15:5 16:7,8
  16:17,18 18:9,15
  30:1,2,25 39:15
  42:25 43:5,10,19
  44:4 45:1,10 53:10
  54:6,7,9 62:22,22
  71:3,6 79:18 82:20

[company - correct]                                                  Page 7

83:13 85:6 87:12
89:11 96:11 119:23
165:19 166:10,17
172:12 174:24,24
201:25 206:17
231:18,23
**company's** 43:23
44:20
**compare** 47:20
**compared** 24:5
125:24
**comparison** 114:5
**compensate** 201:7
**competition** 182:1
**compile** 239:17
**complaint** 3:17
87:23,25 88:3,3,4
114:17 194:14,18
194:19,20 196:4,9
198:24,25 199:11
199:11,19,20
201:24 202:16
203:14 204:9 215:8
215:12 217:9,10
219:9 229:8,15
231:18 233:6
**completely** 21:17
224:3
**completes** 248:17
**composition** 178:8
**computer** 239:13
**concerned** 232:4,7
**concerning** 163:16
193:19
**concession** 46:9
**concessions** 46:14
**concluded** 248:21
**conclusion** 23:19
62:11 72:1
**conduct** 195:7
**conference** 124:13
**confirmation** 3:16
183:22 184:4,25
189:12

**confuse** 94:24
**confnsed** 101:18,19
101:20 222:23
**confusing** 156:16
**connection** 115:16
**consider** 11:17 28:7
89:24 135:19 225:2
**consideration** 186:9
187:3
**considered** 242:14
**consolidating**
188:23
**construction** 93:17
**consult** 214:3,5
**contact** 92:13,14,15
92:16 93:9
**contacted** 92:20
**contained** 55:24
106:22 169:9,22
**content** 122:12
**contest** 71:20,22
**continue** 4:8 32:1
44:3,12 45:7 230:16
243:14
**contract** 27:13,17
28:5,6,8 89:14,21
89:22 94:6,21 123:5
123:6
**contracts** 95:19
**contractnal** 201:13
**conversation** 97:10
103:4,9,17 124:9
163:3 193:18,20
198:4
**conversations** 4:5
189:19 191:4
193:24
**convolnted** 56:19
126:23
**coordinating** 179:13
**copied** 141:22
143:11 243:5,21
244:22 245:12
**copies** 57:19 88:11
107:25 108:1

116:17 120:6 134:9
142:1 143:5
**copy** 57:22 67:22
73:25 74:3 88:13,13
98:19 132:18,18,19
197:14 198:11
244:1,13 247:3
**copycat** 244:20,22
245:5
**copyright** 3:16
21:23 23:4,18 24:5
24:10,22 27:9,11,19
28:3 30:2,15 31:4
31:14 32:6,8 38:10
38:13 39:14 47:15
48:17,25 58:1 60:5
65:12 66:25 70:10
74:10 78:4 82:7
86:12,21 87:3,10,18
105:17 109:4
116:17 120:3,16
121:8 122:7,15
127:22 128:6,22
169:9 182:18
183:23 184:4,7
189:12 202:25
210:13,15 211:5
212:5 214:4
**copyrighted** 230:16
**copyrighting** 98:17
98:19 100:16
102:10
**copyrightoffice.gov.**
23:15
**copyrights** 48:7,9
60:11 61:1,2,18
62:2 71:2 76:16
77:6,24 78:20 79:4
79:19 80:8,14 82:20
83:3,22 118:10
120:1 175:4,5
180:13 182:5
211:13 218:22
**corner** 243:19

**corporate** 104:13
140:3 141:1 145:14
145:15 146:19
164:20 165:1
**corporation** 16:15
168:1
**correct** 7:18 8:12,18
10:9 14:22 16:14
34:25 35:5 36:13
37:1,15,19,24 38:14
38:16,17 39:12,15
39:23 41:24 42:2,10
42:15 44:6,9,13,16
45:4,5,8,11,12,17,18
46:2 47:8,12,15,18
47:19,25 48:3,7,10
49:1,11,15,22 50:1
50:12,21 51:3,8,23
52:1 54:21 55:25
56:1,8,9,12 57:6,7
58:19,20,23,25 59:2
59:3,13,14,22,23,24
60:2,3,7,8,11,12
61:3,4,8,9,15,16,19
61:20,24,25 62:4
68:21 69:1,13,15,16
70:3,13,23 71:3,8
74:6 75:6,7,11,22
76:6 80:24 81:6,7
81:10,11,23 82:1
83:17,25 84:7,12
85:2,3,8 86:9,22
87:4,7 92:17 101:23
105:3 106:23
107:11,16 108:16
108:17 110:15,17
110:25 118:8
126:20 129:25
130:1,5,21 132:1,9
132:10 133:15
134:14 138:12,18
145:13 153:5,22,23
154:2,3 155:13,18
155:22 157:9,14,21
158:21 162:16

[correct - design]                                                                 Page 8

165:19 169:14,15 169:17 173:19 174:6 177:17 179:12 180:14 181:9,19 182:23 193:15,16 200:13 200:19 203:16 206:4 212:24 245:25
**corrected** 200:3
**corrections** 200:10 200:10,19
**correctly** 85:16
**cost** 100:14,15 101:1 101:22 134:5,6 135:22 137:9
**costs** 100:12 133:25 134:23 238:9
**counsel** 66:6 73:22 220:14 221:2 249:10,14
**counselor** 67:15
**count** 13:4 194:1 230:20,21 235:22 236:13,15,21
**counter** 2:16
**counter.com** 2:16
**country** 244:17
**couple** 153:16 166:2
**course** 8:14 13:5 166:9 195:7 210:6 224:2
**court** 1:1,15 4:19 5:7,14 9:4 50:5 88:7 109:10,13 249:3
**courtroom** 6:10
**cover** 134:10,11
**covered** 155:17
**covers** 56:25 57:14
**cow** 127:5
**create** 12:19 99:7 107:10,20 111:4,19 121:22 131:8,11 153:20 154:6 157:3

**created** 3:22 36:19 65:22 96:20 98:13 103:2,20,20 104:8 104:10,12 106:6,21 106:23 107:16 122:1 123:18,22 131:3 140:25 141:4 142:4 148:1,3 149:6 154:25 164:21,23 180:19 184:24 248:4
**creating** 43:14 66:16 113:18 242:14
**creation** 105:4 107:6 112:13 113:12,19 127:10 192:20
**creative** 11:9,25 19:5,6 21:1,10,11 22:18 26:4,21 43:15 79:13 170:9 213:12
**creator** 26:21 28:13 246:11
**credit** 118:5 131:24 241:13
**crossed** 68:3,22
**cv** 1:3 4:20

**d**

**d** 2:13,14,16,17,18 3:1 197:6 204:22,22
**daily** 230:17
**damage** 232:21,23 242:13
**damages** 3:22 233:11,18 234:15 235:24 236:7,18 238:12 242:15 248:5
**dash** 51:1
**date** 4:11 8:15 42:1 42:1,5,7 51:25 68:3 68:22,25 69:13,18 76:2,3,19,23 77:5

81:3 84:16 90:17 91:10 174:10 176:20 184:9 202:8 207:1,7 209:25 210:1 249:7
**dated** 34:24 47:17 48:25 59:12 61:13 61:23 63:19 70:18 74:16 80:23 81:6 86:15 87:4 112:12 113:14 184:16 185:24 214:2
**dates** 91:8 103:23 113:2
**day** 127:8,9 157:13 157:16 170:8,8 175:25 177:3,4 180:22 181:5 183:10 187:10
**days** 7:8 30:19,20,20 30:21 48:5,5 152:17 157:13
**dead** 172:18
**deal** 54:12 59:10 135:6 171:11,12
**dealing** 56:14 57:12 60:20 131:20
**dear** 118:16
**decade** 162:23,25
**december** 34:24 51:25 61:13 70:19 87:4 195:3,9,20
**decide** 131:13,25 198:3
**decided** 234:4
**decipher** 228:13
**decision** 165:7 198:10
**decisions** 165:10
**declaration** 76:9 83:15
**declined** 115:4
**deemed** 5:11
**defendant** 2:9 5:6 8:11 231:5

**defendants** 1:10 2:13 5:5 129:12 130:4 196:23 197:1 197:15 211:10,21 212:1,3 216:21 218:13,18 219:8 225:20 227:11 231:4,19 232:2,10 234:21,25 235:7,7 235:19,20 236:8,19 238:1,7,17 248:12
**delicate** 125:14
**deliver** 98:14 129:15 132:11
**delivered** 102:14 133:12,13
**delivery** 153:10
**department** 132:19
**depends** 27:13 29:21 138:4
**depleted** 122:11
**deposed** 6:7
**deposition** 1:13 4:7 4:13 6:15 7:9,21 8:1 8:5,20 248:11 249:6 249:12
**describe** 7:23 8:21 11:7,21 58:4 64:21 72:2 96:9 104:11 191:13
**described** 75:10 131:24 193:2,21
**describing** 83:16 193:20
**description** 3:8,20 32:7 138:11 158:17 158:21
**design** 15:7,12,15 16:3 18:14 22:18 46:3,12,13 63:8 72:20 74:19,25 75:1 82:19 83:2,23 85:5 88:23 96:12 98:4 119:18 121:23 144:14 145:4

146:15 148:6
169:10,13,21
170:18 171:24
172:10 173:10,10
174:1,5,15,23,25
175:1,6,12,14
181:20 182:6
**designed** 146:14
148:11
**designiug** 105:9
**designs** 79:12
116:17 121:8,24
144:12,13
**destinations** 215:20
**detailed** 245:15
**determined** 178:15
**dick** 123:21
**dictionary** 199:15
**died** 172:12 173:13
173:18
**diego** 214:20
**difference** 122:4
245:14,14
**differences** 24:19
25:3 118:1
**different** 24:10
29:10 72:23 78:18
78:19 106:2 107:10
135:9 159:21
164:25 172:14
174:14 192:25
203:9 217:19
233:13,14,15
234:15 246:9,9
**differently** 28:21
182:8
**difficult** 136:25
137:6
**difficulty** 100:24
**diffuse** 179:20
**digital** 153:9
**digits** 46:22 58:19
74:8
**dining** 133:5,5

**dinner** 41:4
**direct** 5:19
**directed** 225:4
**direction** 170:9
**directly** 95:7 140:15
190:7
**director** 16:10 18:2
47:7,10 54:8 108:3
117:13
**directors** 44:3,12
45:4,7
**disagree** 179:4
202:13
**disagreed** 199:25
**disagreement** 200:1
200:2
**discharging** 45:15
**disclose** 221:3,18,23
222:12
**discovered** 212:17
**discretion** 164:12
**discuss** 33:11,25
55:15 129:21
189:14 190:14
**discussed** 139:12
210:16 242:9
246:22
**discussion** 102:17
129:22 161:24
162:10 213:6,8
**discussions** 190:6,21
**display** 181:24
**dispute** 205:8
210:17
**disseminated** 221:5
223:3,6 228:19,25
**dissolution** 15:22
42:6 76:10,16,19,24
77:14,24 79:9,19
80:8 81:5
**dissolve** 14:1 16:7
**dissolved** 13:21 77:4
84:9,12,21 85:1
87:6 170:17 171:24
172:2,12,17,21

**distribute** 137:18
223:12 225:16
**distributed** 145:18
223:21 225:14,22
**district** 1:1,2 4:19
4:19
**ditto** 179:21,21
**divulge** 186:11
**document** 3:10,10
3:11,11,13,13,14,14
3:19 8:4 12:18
15:25 18:7 41:9,20
42:5,9 43:18 44:2
46:18,22 47:1,14
48:13 49:19 51:20
52:25 55:20 56:5,10
56:13 57:18 58:13
58:18 62:9 63:12,19
63:22 64:8,17 65:5
65:8,21 66:13,17,21
66:24 67:15 68:11
68:12,12,14,14,15
71:13,14,18 72:2,6
72:23,25 73:3,14
74:1,10,14,19,23
75:10,15,16,18 76:4
76:22,24 78:19 80:7
81:6,9 82:8 83:1,7
83:22 85:9,19,24
86:4 87:13 88:5
94:6,16,20 96:2
113:5 120:19
136:12 138:2
144:25 158:7
170:14 171:1,2,4,6
174:16,19 176:10
176:25 177:13
184:3,6,7,13,19,24
185:10 195:11
196:7 199:10 210:1
215:9 220:18 227:2
227:25 228:2
242:19,21
**documentation**
195:5

**documented** 77:16
80:14 185:12
**documents** 7:20
33:10 42:23 43:7
56:3 61:10,12 62:12
62:14,16 63:13
64:16,25 75:20
78:24,25 95:2,18
109:20 144:24
201:12 202:10
231:16 247:23
**doing** 12:19 13:16
15:11 17:8,21 44:15
45:10 46:1 48:6
70:23 79:1 104:24
197:7
**dollars** 153:21
157:13 158:19
207:14 208:2 231:9
232:2,11 237:19
**doubled** 134:24
**doubt** 122:16
**draft** 199:11,11,19
199:24 200:4,7,9,17
**drafts** 228:3
**drawing** 100:5,9,10
101:13,14 102:12
**drawings** 79:13
**drawn** 100:5
**drive** 2:7
**dsh** 171:21
**duly** 249:7
**dnsen** 5:4 88:2,5,8
194:18
**duty** 162:2

**e**

**e** 2:1,1 3:1,7 17:14
17:14,14,14 18:21
18:21 50:16 90:10
92:12,25 107:24
115:20 117:6,14,24
118:15,16 119:15
121:24 133:9 145:4
222:21,24 225:9

247:1 249:1,1
**earlier** 5:7 33:10
84:12,14,21 85:1
87:6 188:21
**early** 163:7
**easier** 133:4 200:6
207:15 239:10
**eat** 132:21
**editorial** 181:21
**effect** 62:12
**effective** 47:17
49:14 68:25 69:13
69:18 137:7
**eight** 12:23 78:18,18
**eighty** 24:9,10
**either** 32:8 91:13
92:15 120:20
199:18,19 234:2
242:5 247:7
**eleanor** 222:18,18
**eleanor.hardy**
222:22
**electronic** 121:25
240:25
**elements** 239:22
242:14
**eligible** 46:8
**else's** 115:17
**embassy** 67:16
**employed** 249:11
**employee** 37:3
249:13
**employees** 17:10
18:15 36:12,15,25
**employment** 29:20
**enable** 154:11
**encompasses** 176:21
**encouraging** 46:6
**english** 9:23 10:2,5
10:9,10,11 141:13
183:12,13 228:13
**enjoy** 46:14
**enter** 172:23
**entered** 59:20 181:2
201:4

**entire** 179:14
185:13 243:19
**entities** 53:14 54:24
78:25 89:1
**entitled** 1:14 47:15
74:10 184:4
**entity** 36:19 53:6,7
63:9 173:9 174:1
**entrepreneurship**
46:6
**esq** 2:4,8,8,12,22
**essence** 179:15
**essentially** 70:1
**established** 13:24
55:21 94:8 227:17
**estimate** 94:17,18
98:10 99:23 101:22
107:3 113:11
120:12 132:14
136:2,8,12,13
137:20 138:8,11
153:19 154:1,6
155:17 158:18
190:23 193:13
194:6 242:4
**estimated** 100:14,15
101:1 113:19
155:21
**estimates** 94:22
96:10,14 100:12
116:5,10 120:25
137:7 159:8 195:21
202:6
**et** 1:9 4:17 76:10
**eventually** 94:11
166:21
**everybody** 109:25
**evidence** 14:7
227:16,17 237:21
**exact** 142:9 245:13
245:18
**exactly** 23:13 24:9
147:20,20 157:19
196:13

**examination** 5:19
**example** 72:24
90:24 98:17 122:10
135:23,25 138:10
173:18 193:15
197:3
**examples** 194:4,5,7
194:8
**excel** 238:18 239:9
239:11,17 242:15
**exclusive** 169:10
180:13 182:5
**exclusively** 195:3
**excuse** 139:9 241:16
**executed** 77:3
**executiou** 76:2,3
**executive** 143:7
**exercise** 26:17
**exhibit** 33:19 34:7
34:14 38:3,5,6
39:10 41:8,10,12
42:6 45:22 46:17,20
46:21 47:21,21,23
48:14 51:17,20
55:22 56:13,25 57:2
58:2,3,4,18 60:1,15
60:24 61:5,8,12,23
62:6,18 65:7,9 68:3
69:23 70:2,7 71:8
72:24,24,25 73:13
73:16 80:2,12,13
81:8,13,14,15,16,19
81:22,22,25 82:1,6
82:18 83:15 85:19
86:1 87:18 96:3,6
112:10,11 113:4,6,9
116:9 120:11 121:6
135:25 136:4
137:20,24 145:1
152:16,21 155:1,9
156:1,3,5 157:10,20
158:2,5,9,11 167:16
167:18 169:5 171:9
171:14 180:1,23
183:23 184:3

192:20 193:14,14
194:14,21 208:8
215:10
**exhibition** 180:24
**exhibits** 60:9 80:16
152:14
**exist** 12:11 123:15
**existed** 173:19 242:1
**existence** 12:9 15:1
15:6 37:19
**existing** 36:19
**exists** 42:10,14
189:15
**exit** 2:17 197:3,5,11
**expedia** 2:14 220:5
220:6
**expensive** 240:10
**experience** 31:12
**experienced** 22:23
**expert** 23:7,8 26:13
62:11 78:4 182:25
235:24,25 236:12
236:13,15
**explain** 52:20 53:1
65:21 66:12 93:1
198:2
**explained** 101:6
**express** 2:22 5:10
**expressed** 242:22
**expression** 28:17,18
29:9 117:3 159:7
160:11 161:14
162:1 163:4 193:6
194:9
**extent** 6:25 14:6
20:15 23:7,10 24:8
26:14 52:24 62:10
62:12 78:5 128:2
190:4 195:10
218:19 224:2
**extraordinary** 41:21
**eyes** 115:18

**f**

f 249:1
f'ing 143:12,13
 146:7
facebook 219:13,14
 219:18,19
fact 114:24 117:8
 139:3 189:15 234:7
 234:10 247:25
facts 14:7 187:8
factual 200:18
 234:17
fair 8:25 36:18
 105:12 109:23
 129:20 216:4 229:6
 246:8,15
fairly 128:18 171:5
 196:7
fairness 109:25
far 8:10 64:10
 177:15 188:4
 226:16 232:3,6
farebuzz 2:14
fareportal 2:14
fast 238:20
faster 70:1
fault 101:21 196:2
featured 231:8
february 74:16 75:5
 75:8 77:5 86:15
 115:13,14
fee 134:4 135:20
 136:13,14,16 137:8
 137:10,12,13,15
 138:12 158:25
 159:2,7,15 160:2,10
 161:15 162:1,10,11
 163:4,6 242:23
 243:24
feel 198:23 240:20
feeling 110:6
fees 134:9,24,25
 135:2,8,14 136:3
 136:5,23 137:13,23

159:17 161:18
 243:21
fifteen 208:12,13
fifty 233:13
fighting 100:13
figure 238:13
figured 168:23
file 13:18,20 117:14
filed 198:18 201:24
 204:10,14 229:8,15
 231:19 233:7
files 8:16 76:24
 154:18 229:2
filled 53:7
final 53:25,25 59:8
 62:23 98:21 100:6
 102:14 107:23,24
 108:2 170:4
finance 108:3
financially 249:14
find 9:17 60:22 63:1
 98:3 109:19 150:21
 218:23 219:1,2,8
 241:12 245:2,4
 247:4
fine 19:23 25:6 32:2
 57:8 99:22 102:15
 102:23 123:22
 125:17 126:10
 131:22 135:17,17
 183:13 198:9 228:2
 236:14
finish 19:22 40:3
 132:16 141:4 243:9
finished 227:3
firm 5:3 37:15
first 9:22 17:18
 19:22 28:23 38:11
 38:19,21,25 39:8,11
 39:22 47:14 48:20
 50:15 51:9 53:21
 58:9,11 59:19,20
 70:6 73:21 74:1,18
 75:25 103:2,6,19
 105:18 117:9

122:11 139:18
 166:25 168:19
 184:5 187:7 189:8
 195:2,2 196:5 203:3
 203:17 204:21
 210:2 211:19,24
 212:2,16 220:22
 224:12 227:20
 228:21 249:7
five 13:7 68:11,14
 68:15,18,21,22 73:4
 84:2 165:6
flash 158:23
flier 98:22 99:4
 127:10 138:5
fliers 122:10
floor 2:11 234:24
florida 111:23
flustered 237:15
foders.com 2:17
follow 52:15 170:9
following 119:17
foregoing 249:5
forenoon 1:19
forgive 163:9
forgot 186:15
form 17:4 21:4
 96:15 114:4 155:17
 194:6,6 211:9,12
formal 15:22 16:2
format 241:1
formed 17:6 18:23
 19:3 35:4,7 36:6
 212:2
formulate 239:9,11
forth 10:3 29:4
 31:15 32:8 95:3
 134:11 242:22
 249:8
forward 99:18
 174:13,14
found 109:18 118:3
 142:8 143:6,11
 150:9,17 211:15
 212:6,8 216:17,20

230:7 238:11 243:5
four 30:20 38:11
 52:5,8 54:15,23
 57:4 58:6 64:9,19
 68:12,14,17,18
 72:13,15 73:4 82:18
 82:24 83:16,21
 112:18 133:6 155:2
 155:5 165:6 186:17
 224:12 233:24
 248:20
fourth 59:8 60:13
 60:15 62:23 63:2,3
 72:19 185:17
 208:21,23,25
frame 179:14
frames 177:20
francisco 7:11,11,17
 35:25 184:22
free 132:21,21
 240:21
friend 16:20 41:3
 205:13 239:9,13
friend's 41:3
friendly 205:11,11
friends 40:16,22
 226:6
frommer 2:14
front 60:21,23 67:20
 67:24 69:10 87:25
 148:14 152:15
 176:24 238:14
frustrated 106:20
further 249:9,12
fusion 2:16

**g**

g 16:23 17:14 18:19
 18:19,21
general 1:8 2:9 4:16
 5:2,21 26:25 41:21
 91:9,20,22 92:1
 93:1,5,6 103:14
 165:20 206:5 222:5
 222:9,15,17,19,20

224:25 225:4,9,18
226:12
**generally** 7:23 8:21
11:7 29:16 94:16
114:13 177:10
**generating** 238:6
**gentleman** 90:5
91:15 92:5 176:14
**getaroom** 2:14
**getting** 15:18 100:19
102:3 122:24 152:6
183:15 198:22
**getty** 243:17 244:4
244:11,18,18,18
245:7,10 246:17,17
**ghm** 3:14 89:15
91:18 92:16 94:10
95:3 96:24 103:2,19
104:7,12,19,20,24
105:16,22,24 106:5
106:21 107:9,18,22
108:3 109:10,14,23
110:3,7,16 111:4,9
112:23 117:7,13,23
118:4,9,10 119:6
120:20 121:9 122:2
123:9 126:25 127:1
127:2,4,20 128:5,5
128:10,21,23 129:6
129:11 130:4,12,24
132:11,18 133:13
133:14 138:17
141:17 142:21
143:2,17 144:25
146:19 150:17,22
150:24 151:20
153:11 162:2
163:15,22 164:5,18
164:21,23 165:1,13
165:18,20 166:2,5
167:2 193:8 195:8
201:3,4,21 202:2
204:1,3 205:7,23
206:18,19,21
209:14,16,19 210:5

210:8,10,12,15
211:12,24 212:6,8
215:17,24 216:9
217:5,7,11,14,24
218:2,5,9 221:4,19
221:24 222:6,8,13
222:15,24,25
224:20 225:1,3,5,13
225:18,22 226:3,4,4
226:7,13 227:6
228:19,24 235:9,19
241:7,19 242:5
248:11
**ghm's** 102:18 103:5
110:13 150:19
151:2 227:8
**ghmhotels** 212:11
**ghmhotels.com**
222:19 225:19
**ghmhotels.com.**
222:22 225:10
**giautomasi** 2:6
**gist** 185:13
**give** 8:6 13:7 20:1
28:9 55:3 88:12
122:18 132:22
138:17 167:9
177:15 186:25
189:9 190:23
203:21 222:1
237:21
**given** 8:6,11 22:25
80:16 123:21
129:10 177:24
224:20,23,25
225:17 226:2,5,7,9
**giving** 9:12 34:1
131:24 137:15
225:2,3
**glance** 197:17
244:23
**glanced** 227:15,15
**glass** 127:5
**glasses** 186:6

**go** 4:9 7:1 10:3
19:24 20:2,16 21:7
23:11 25:8,20 26:16
27:22 29:13 30:10
30:17 31:23 33:5,14
38:3 42:21 51:19
52:11 54:18 55:5,11
55:15 62:13 67:18
69:6,25 73:8 79:1
86:15,20 87:15
93:25 95:3 98:7
104:20 118:18
121:13 122:22,22
131:25 134:18,24
141:14 144:23
148:25 149:9,14
150:24 153:9
154:15 157:16
164:2,3 171:3 172:1
173:7 176:6,7,25
183:17 188:12
191:17 219:6
222:11 237:1
243:13
**goa** 149:16,17,18,21
149:24
**god** 199:3
**goes** 64:22 78:9,24
98:24 126:1 242:4
**gogobot** 2:18
**gogobot.com** 2:18
**goh** 18:16
**going** 9:1 23:6 24:7
24:9 32:23 33:16
46:11 52:12 56:20
57:6,21 64:12 71:19
72:25 73:9 86:19
87:24 98:3 99:18
126:13 150:11
152:8 157:2 160:24
161:19 174:13,14
177:15 180:5
183:19 190:3
210:12 214:25
217:1 227:17

234:17 237:2
243:11 248:6,18
**good** 40:16 93:20,22
94:1,1 119:13
128:18 179:19,20
183:12 214:6
**government** 13:19
17:3 23:18 46:5,6
221:2,10,14
**grant** 121:9
**great** 88:15
**grow** 21:9
**grown** 12:24
**guess** 75:24 156:18
194:13 217:1
227:18 232:3
**guide** 2:15,16
**gump** 2:20 5:9
**gwee** 17:11 18:16

**h**

**h** 3:7 16:23,23 18:19
90:10 215:19
**hai** 141:22,24 142:3
142:8,10 143:6,10
**hammered** 128:13
128:15
**hand** 43:8 47:8,11
51:1 134:24,24
**handcrafted** 213:13
**handed** 34:6 65:8
**hans** 145:5
**happen** 8:22 85:13
**happened** 52:20
53:2,5 54:8 91:7
108:4 117:23
141:19 201:22
234:13
**happy** 117:22,25
212:19
**harassing** 125:13
**hard** 5:24 9:3
**hardcopy** 123:10
**hardcover** 97:17
98:6

[hardy - indicated]

hardy  222:19
harry  123:22
head  147:7,23
hear  5:25 108:11
  117:21 143:10
  207:18
held  1:16 4:13,18
help  60:22 63:1
  108:5 113:2,17
  142:2,7 144:6
  154:21 191:21
  195:25 239:7,9
helped  13:22 40:9
helps  113:21
hereiubefore  249:8
hesitaut  128:9
hey  148:11
high  231:8
highly  124:22
hire  28:17,18,24
  29:2,4,6,16,18
  30:18,21 121:10
  122:2 123:4 235:25
  236:12
hired  27:10,18 28:4
  31:14 88:24 89:1
  91:3 93:2 99:6
  121:22 122:17
  123:8 124:1 131:8
  131:11 168:16
  170:8,8 178:3 181:5
  235:23,25 236:15
hires  30:1 32:6
hiring  30:3,14 89:15
  143:17,21,23,25
hold  19:16 22:3 30:4
  32:11 42:16 80:20
  81:3,4 84:14 86:14
  92:10 99:13 108:22
  114:6 140:12 243:8
houest  156:16
  196:12 199:15
hong  16:21 18:10
honor  204:5

hope  142:2,6
hopefully  69:25
hopiug  144:6
hospitality  215:18
hotel  1:8 2:9 4:16
  5:2,21 89:25 91:22
  92:1,16 93:10 94:7
  94:11,13,14 96:24
  114:4 115:7,23
  116:1 120:20
  123:21 132:19
  150:12 153:10
  163:21,21,23,25
  164:2,4,4,5,18,19
  165:2,8,20,24 201:5
  201:21 202:1 204:1
  204:4 206:5 219:12
  219:15,19,23,24
  220:3 221:3,18,23
  222:2,4,5,12,24
  223:20 225:14,16
  225:22 226:12
  227:6 228:19,20,20
  228:25 230:15
  231:6 243:19
hotelplanner  2:15
hotels  13:3 87:22
  88:25 89:2 93:12,15
  93:16 95:4 104:19
  108:21 111:20
  114:17 115:8 117:4
  117:23 121:9 123:9
  124:1 127:2 128:11
  129:11 130:12,24
  131:12,14 132:4,11
  133:13,14 134:13
  138:17 139:19,20
  139:23 140:7,8,18
  141:8,9,15 145:13
  145:19 146:4,18
  150:19,22 151:9,12
  151:13 161:24
  165:14 166:11,11
  166:18 193:8 195:5
  201:6 215:19

216:11 217:16
  218:17,18,21 222:8
  222:16 224:23
  225:3 231:8 238:8,9
  241:17
hotels.com  2:14
hotelsbyme  2:14
house  2:17
housed  72:21
howard  2:8 5:1,20
  246:10
hugely  124:15
huh  8:2 36:14 37:2
  37:20 38:9,12,15
  39:6,13,24 41:14,23
  43:24 46:24 47:9
  49:2,23 50:18 51:4
  54:14 59:24 68:4,7
  76:11 80:10,25
  90:25 137:21 147:2
  153:1 167:19 169:7
  169:12 185:18
  187:16 195:18
  203:4 237:25
hundred  24:12
  208:1 231:5 233:13
hypothetical  27:21
  30:9

---

**i**

idea  168:25 170:7
  202:3 216:4 217:4
  217:12,14 218:9
  233:3
ideally  33:2
identificatiou  24:2
  33:20 41:11 46:20
  58:2 65:7 69:24
  73:13,16 96:4 113:7
  145:2 167:17
  183:24 194:21
  208:9
identify  4:23 58:14
  87:11 117:8,9,12
  118:17,18

identifying  54:9
image  100:8 177:20
images  22:18 89:4
  93:24,25 97:15,17
  98:13 101:12
  102:11 131:17,20
  132:5,6,8 133:12
  138:18,21 243:17
  244:4
implied  15:17
implies  213:5
imply  228:11
important  24:4,5
  31:13 32:5,9 91:24
  96:23 126:24
improper  124:23
inaccurate  125:24
  126:5
inclination  44:3,12
  45:7
include  153:8
included  99:11,23
  100:12 155:9
  160:11 162:11
  163:4
iucludes  153:4
  158:20 161:14
  211:25 248:19
including  89:11
  99:24 121:24
  146:14 153:10
  156:9 169:9 170:11
  178:7,7 221:5 231:4
  231:7
inclusive  130:13
incomplete  27:20
  30:8
inconsistent  124:19
incorporate  12:25
  46:13 130:11
incurred  233:11
  234:20 236:8,19
india  149:16
indicated  195:21
  217:6 224:18

**individual** 94:19 164:18,19 238:22

**individually** 20:10 54:2 71:17 79:5 86:20

**iuexpensive** 134:22

**information** 114:15 129:5 224:13,17 225:13 228:18,24 229:12,13,14 230:14 231:3

**infrastructure** 20:25

**infringe** 238:24

**infringed** 105:24 106:4 211:13 238:15,16

**infringement** 210:13,15 211:5,15 211:20 212:9 214:4 216:6 218:11 240:9 240:10 245:20,22

**iufringements** 216:16,17,20 218:2 232:22 240:12,15

**infringers** 217:18

**infringing** 212:4 218:22 219:7,7

**ingredient** 102:10 102:11,11

**ingredients** 98:20 102:9,13 103:11 107:5

**initial** 137:20

**initially** 248:7

**injury** 234:20

**insanelycheapflig...** 2:15

**inside** 134:11

**instance** 20:2 91:6 101:11

**instances** 101:12 131:16,17

**instruct** 191:8

**instruction** 179:12

**instructions** 162:7

**intangible** 45:15 53:24

**intellectual** 21:24 53:13 116:16 120:16 121:7

**intend** 45:25 188:16 214:17 227:23

**intended** 74:23 180:16,18

**intent** 45:21

**intention** 66:20,23 69:12,17 181:1,2,9 210:11

**interest** 62:17

**interested** 249:15

**interests** 78:19

**interfere** 4:7

**interfering** 10:20

**internet** 123:14,16 140:7 141:8,15 189:22 221:6 240:6 240:10 242:24 243:1 244:6,6

**interpose** 19:25 20:3

**interpret** 146:1

**interpretation** 24:13

**interpreter** 10:8

**interrupt** 9:21 127:16

**interrupted** 92:3

**introduced** 40:15

**investigated** 229:16 231:22

**investigation** 229:7 230:7,8 231:24 232:8,10

**invoice** 145:3 194:6

**invoices** 159:8 206:2 207:2,4,8 209:20 210:12 213:1,7 234:13

**invoicing** 145:8

**involved** 63:3 139:22 178:20 213:2 239:24

**ip** 117:14

**irieeyes** 119:24 168:3,5 169:16,18 174:5,15,23 175:12 175:14 177:14,16 180:14 185:14,22 202:24

**issue** 27:6

**issues** 8:16

**j**

**j** 2:8,8,12 145:4

**jamb** 11:2

**jane** 22:14

**jauuary** 76:4 84:17 84:22 85:1

**japan** 169:1

**japan.com.** 212:11

**jargon** 10:10,12 200:16

**jargons** 200:12

**java** 158:23

**jenni** 141:20 142:1,6 142:8,18,24 143:10 144:3,21 145:4,5,6 146:7 147:7,22 148:5

**jennison** 40:7,12,13 40:15,24 48:18 49:3 53:9 59:17 64:4 65:25 66:3,22 69:8 176:15 177:12 184:20,25 187:17 189:14 191:15,21 192:19

**jersey** 2:7

**jetblue** 2:15

**jill** 22:14

**job** 1:25 31:6,7 53:6 83:12 87:11 90:1 91:11 92:9 132:20 132:24 141:4

**j** 163:20,23 164:3 166:25

**jobs** 53:8,9 115:5,7 173:24,25

**john** 40:13,15 48:18 53:9 59:17 143:8,9 176:13,14 177:12 184:20 187:17

**joined** 108:3

**jonathan** 2:24 4:10

**judge** 210:17 212:24 248:8

**judgment** 131:24

**july** 47:17 49:14,20 49:24 51:3 56:8 61:1,17,23 62:1,6 68:3 69:1 112:12 153:17

**jump** 120:10

**junior** 90:4 116:6,25 118:16 123:2 143:10,14 146:9,15 147:8 148:5,12

**justice** 19:4 26:3

**k**

**k** 16:23 18:21

**kar** 1:14 3:3 4:21 5:18 63:5 118:4 176:1 185:14 241:14 248:18

**kawana** 3:15 119:22 167:15,24 168:6,16 180:19 185:20 193:3

**kayak** 2:15

**keep** 5:23 64:12 102:4 117:16,20 137:6

**kendall** 117:13 119:15 121:1 168:11,12 193:25 194:1

**kept** 107:24,25 122:16 210:18

237:14
**kiat**  16:21 18:9
**kind**  5:12 10:3
  109:21,24 225:7,7
**kit**  99:3 138:5
**knew**  99:6 104:5
  108:20 110:12
  112:20,22 122:6
  147:6 148:2 149:5,5
  165:18,23 166:9,17
  212:7,12
**know**  8:4,11 10:15
  15:15 21:8,19 22:7
  22:13,20,22 25:22
  25:24 26:14 28:12
  30:9 38:18 40:11,14
  40:18 53:8,11 54:15
  55:14 58:15 63:15
  63:20 71:14,21 72:9
  77:2,4 78:8,24 79:1
  79:22 85:13 86:4
  88:12 90:17,22
  93:12 94:9 97:25
  99:16 102:3 104:9
  106:7,9,15,16
  109:16 112:14,16
  117:22 119:13
  120:21 126:25
  128:19 129:14
  130:3 133:8 139:7
  141:17 142:3 143:9
  144:2 145:12,17,20
  146:2,4,12,23 148:6
  148:11 149:7,22
  150:18 152:2
  154:23 156:13,19
  156:19,21 160:18
  163:13 164:11
  165:10,15 166:5,23
  168:12,15,18,23,24
  169:2,3 170:3
  171:20 176:19
  181:14 185:6 186:2
  188:4,9,14 192:5,6
  192:9,9,13,14,17

195:24 196:8,18
  198:13,23 200:11
  200:12 201:12,14
  202:9,14,17,18
  204:6,17,18 205:23
  206:17,18,19,21,22
  207:1,7 210:10,15
  211:4 216:2,12,17
  218:11,12 220:5
  221:8,11,13,14
  223:9 224:4,5 225:6
  225:7,8,21 226:3,6
  227:10,18 229:3,9
  230:18,20,23 231:1
  231:11,13,15,23
  232:16,17,18 233:2
  233:14,25 234:2
  238:25 239:10
  241:25 243:15
  244:9 246:2
**knowing**  57:4 232:1
**knowledge**  26:13
  139:17
**known**  139:3
**knows**  199:3
**kuala**  148:10

**l**

**l**  18:21 90:10
**la**  151:12,19
**lalu**  141:23
**lane**  143:8,9
**language**  9:22
  228:14
**larry**  91:13
**law**  16:6 20:12
  21:22,23 22:25 23:4
  24:6,14,20,21 25:3
  25:4,12,13,16 27:4
  37:15 78:4,13 82:2
  82:11 191:1
**laws**  20:7
**lawsuit**  105:21
  115:17 128:21
  178:21 189:15,20

190:21 192:1
  236:20
**lawyer**  5:21 21:19
  22:22 23:9 24:8,13
  26:13 34:1 40:9
  42:25 124:10
  171:16,17 177:12
  183:1 185:2 192:15
  203:7 210:16,16
  211:4 229:1 237:22
**lawyers**  22:2 24:17
  198:4 200:1,11,20
  203:15,19 210:9,10
  210:16 211:3,7
  213:3 221:10 229:8
  229:15 230:6
  239:16 247:16
**lead**  219:5,5
**leading**  210:6
**leaflets**  223:25
**lease**  37:6
**leave**  33:6 86:5
  163:12
**leaves**  124:13
**leaving**  176:4
  188:14
**led**  129:4,5 229:3
**lee**  1:14 3:3 4:21
  5:18 9:22 23:8 24:8
  63:5 80:9 118:4
  143:10 176:1
  184:12 185:14
  195:3 199:2 201:3,5
  201:7,20 204:1,23
  205:7 221:2,18,23
  222:12 227:25
  241:13 246:4
  248:18
**lee's**  90:4 116:6
  117:1 132:3 143:14
  146:9,15 147:8
  148:5,12
**leela**  149:16,18,21
  149:24

**left**  7:11 47:8 50:25
  199:4,5,8 211:6
**legal**  10:10,12 20:25
  23:8 62:11 71:25
  78:5 94:24 144:5
  185:5 200:12,15
  220:14 221:1
**legitimate**  125:5
**leisure**  36:3
**lend**  17:5
**length**  210:17
**leonardo**  2:18 5:6
**letter**  29:19
**letterhead**  148:8
**liabilities**  45:16
**libert**  2:11
**liberty**  1:17 4:14
**license**  130:14 134:9
  134:24,25 135:1,2,8
  135:14,19 136:3,5
  136:13,14,16,23
  137:8,10,12,13,13
  137:15,23 138:12
  158:25 159:2,7,15
  159:17 160:2,10
  161:14,18 162:1,10
  162:11 163:4,5
  242:23 243:20,24
  245:24 247:20,24
  249:21
**licensed**  246:17,17
  246:20 247:25
**licensing**  163:16
**life**  181:24 212:21
**lighting**  179:14,19
**lim**  18:21
**limitations**  205:25
**limited**  4:16 12:25
  13:22,23,24 14:15
  14:18 15:8,10,12
  16:17,18,19 17:2,4
  17:11 21:7 45:9
  46:4,11,12,13 53:9
  53:23 63:7 66:1,19
  67:12 72:18,21

74:25 75:1 79:18
82:19 96:12 119:17
119:18 168:3,3,14
170:16,17,19
171:23,25 172:10
173:10,11 174:1
231:4
**line** 59:19 120:14
121:7 130:19
152:17,24 164:20
210:2
**lines** 59:20 84:5
**link** 150:17,19 212:9
212:10,11 219:4
**linked** 150:22
**list** 5:7 39:14
**listed** 36:20 38:16
49:25 50:19 56:6
62:2,3,8 75:5,10
87:22 88:25 114:17
138:11 141:16
151:9,11,13 158:20
219:9 241:18
**listen** 14:8 100:18
140:13 145:25
146:21 147:10,10
147:11,14 149:19
157:24 162:6
178:17 179:1
210:24 236:16
**listening** 186:5
**listing** 50:15 51:10
61:5
**lists** 55:23 218:16
**litigation** 205:7,16
206:12 210:6
**litigator** 192:2
**little** 5:23 69:25
171:12 172:1
183:16 199:1 228:5
**living** 188:5
**llc** 1:4 2:17 4:16
18:24,25 19:3 35:2
35:4 36:6,19,25
53:15,19 54:1,21

55:2 57:6 59:1,23
61:3,6 62:18 63:11
72:22,25 89:11
197:4,5,11 217:10
233:1,11 235:23
236:7
**llp** 2:3,20
**loaf** 132:21
**located** 4:14 158:4
**location** 36:20 37:14
102:12
**logo** 22:18 142:5
146:17,19 148:8,10
**logos** 146:14 148:14
213:13
**lonely** 2:15
**long** 14:25 15:2
30:19 40:18 190:14
198:21 214:9
238:15 242:16,18
244:15
**longer** 42:10,14 46:1
49:25 52:1 60:10
75:9 173:19
**look** 34:13 38:10
39:3 46:16 49:13
50:14,22 51:17
58:13 60:9 65:9
68:2 70:2,6 73:21
74:18 75:14 78:16
79:16 81:8 84:5
86:25 88:22 103:19
104:19 109:12
112:10 114:3,10,16
115:2,7 116:9
124:14 135:25
141:15 147:5,12
149:15,20 153:15
154:10,15 157:10
167:18 169:5 180:1
184:12 185:16
194:13,22,23 196:6
196:6,11,19,20,25
198:15 200:8,24
201:19 208:21

210:1 215:6 219:3,6
220:10 224:7
226:20 228:17
230:10 244:23
**looked** 7:24 8:5,10
114:4 186:2 197:15
240:18
**looking** 34:2 74:6
77:13 93:18 115:17
120:11,14 122:14
130:25 152:20
187:14 199:8
**looks** 67:15 76:3
**loop** 179:10
**lost** 139:10 235:15
235:17
**lot** 8:23 9:1 10:15
117:17 122:8 133:9
196:13 216:6
217:17 218:11
238:6
**loud** 6:5
**ltd.'s** 18:3 83:2
**lumped** 22:19
**lumpur** 148:10
**lungs** 143:6
**luxury** 238:8

**m**

**m** 5:1 18:21
**mad** 9:4
**magazine** 240:17,22
241:5
**magazines** 118:4
**magistrate** 248:8
**mai** 222:20
**mail** 92:12,25
107:24 117:14,24
118:15,16 222:21
222:24 247:1
**mailed** 119:15
**mailing** 37:14
**mails** 115:20 117:6
133:9 225:9

**maintain** 36:7
**majority** 216:16,19
**making** 200:19
231:19
**malaysian** 199:2
204:23
**man** 246:7
**manage** 166:12,13
**managed** 104:19
**management** 1:8 2:9
4:16 5:2,21 165:18
165:20,21 166:10
166:16,17 206:6
**manager** 91:17,20
91:22 92:1 222:5,17
222:19,21 224:25
225:5,9,18 226:12
**managers** 115:24
116:2 166:13 222:9
222:15
**managing** 47:7,10
**manner** 221:5 223:3
223:6,13
**map** 102:12
**marathon** 148:4
149:7 167:8
**march** 181:1,4,8
**mark** 41:7 86:24
95:25 113:3 144:24
167:13 194:14
208:5
**marked** 33:19 34:6
41:10 46:19 57:16
57:21 58:2 65:4,6,9
69:23 73:13,15,20
86:7 96:3 113:6
145:1 167:16
183:23 184:3
193:14 194:21
208:8
**market** 29:17
**marketing** 89:2,15
91:4,5 92:22 93:3
93:10 94:1 98:12
99:9 100:4 101:24

121:23 123:6,14,16
126:2 130:11,13
131:3 139:18 141:8
164:6 223:25 243:2
**marking** 88:17
**markings** 138:22
**marks** 57:25 126:17
**masano** 3:15 119:21
119:22 120:2,4
167:15,23,23 168:6
168:16 178:18
179:11 180:19
182:18 185:14,20
187:24 188:5,12
202:24
**master** 89:14,21,22
**match** 141:22
148:20
**material** 116:17
**materials** 93:12,13
99:8 130:11,13
161:21 164:7 182:1
**matter** 1:14 5:6
178:14
**matthew** 2:12 5:4
**mattns** 2:22 5:8,8
**matured** 21:8
168:13
**mean** 22:16 23:23
23:24 29:15 30:25
36:8,8,22 37:10
42:7,12,18,23 43:14
44:18 45:3 53:17,17
67:3 72:4 81:14
94:8,24 98:12,19
100:4 102:2,20
104:14 105:9,18
109:25 124:14
126:22 127:16
134:7,12 137:14
139:11 141:3,4
151:19 156:2,7
160:9 171:1 172:7
174:13 177:25
180:16,18 182:7,14

182:17 186:24
194:5 195:11
196:18 206:21
216:19 218:13
221:21,25 223:5,7
225:17 227:22,23
228:8 233:4,25
**meandering** 120:8
**meaning** 10:5 86:1
134:8 171:6 193:13
202:12 203:9 223:2
**means** 9:12 29:9
38:20 44:23 65:18
65:19 66:2 147:18
197:9,11 198:2
202:3,17 205:11,13
216:12,24 217:12
221:12,13 222:1
223:8 228:2
**meant** 33:10 91:9
123:9 177:25 178:1
183:9
**media** 73:19 126:18
240:1,3,4 244:6
248:19
**medication** 10:19,25
**meet** 6:24 7:3,8
48:20 248:7
**meeting** 41:21 42:9
141:20 144:2,21
146:6
**meetings** 89:16
**memorandnm**
186:2 188:19
**memory** 10:21
13:16 71:20,21
132:23,23,25
138:19
**mention** 9:22
**mentioned** 55:6
136:3 161:25
237:18
**met** 7:14,17 40:24
41:2 142:18 168:19

**method** 134:22
**metro** 2:15,15
**mexico** 166:3
**miami** 152:16
153:16 238:9
**microphone** 124:11
**microphones** 4:3,6
**milan** 90:24 91:4,7
91:10,12,16 145:9
146:23,24
**milk** 127:5
**miller** 1:17 2:11
4:14 5:5
**million** 177:23
**millions** 230:17
231:9 232:2,11
237:19,20 238:4
**mind** 11:2 20:12
40:1,1 56:16 86:5
99:7 121:8 123:14
126:23 136:16
137:12,19 159:5
164:17 165:13
176:25 203:10
212:3 222:7
**minimal** 135:11
137:11
**minorities** 21:2 26:5
**minus** 206:1
**minute** 126:11
137:1,2 183:15
214:23
**minntes** 41:21
**mischaracterizes**
52:25 160:16
**mischaracterizing**
225:25
**missing** 72:6,7,9
**misstates** 29:12
32:11 67:4 95:5
99:14 121:12 124:3
229:17
**misstating** 95:8
**mistake** 125:1
228:22

**modest** 6:2
**moment** 20:4 218:1
220:13 237:9
**money** 98:4,6
117:17 186:25
207:11 238:6
**month** 190:24
**months** 40:19
153:16
**morning** 7:11,13
85:20
**mortar** 37:11,12,19
214:16
**mother** 9:24
**mouth** 32:24 173:7
**mouthfnl** 230:2
**move** 202:21
**moved** 188:8
**muscat** 150:13,16
150:18
**mntually** 31:17
187:5

**n**

**n** 2:1 3:1 16:23
18:19,21 145:4,4
**nam** 141:22,24
142:3,8,10 143:6,10
**name** 4:10,21 5:8,20
7:5 17:6 20:9 22:14
22:20 23:21,24
25:22,25 40:6 43:23
44:5 52:3 53:25
63:9,10 70:15 82:20
85:6 86:13 90:5,8
91:21,24 119:18
241:13,13 246:2,10
**named** 168:18
**names** 17:3 25:9,18
168:1 196:22,25
197:15
**namhaihoian.com.**
212:10
**nation** 39:8,10,22

naturally 19:6,9
nature 11:10
necessarily 200:15
necessary 103:7,8
necessitate 138:7
need 17:3 43:1,6
54:15 63:21 64:24
66:2 71:18 88:18
92:22,23 93:9,23,24
93:25 94:1,2 101:12
102:10 103:1
117:14 121:21
122:12 126:21,23
132:6 139:1,2 159:6
172:15,16 174:16
183:16 189:1,2,21
235:21 243:15
needed 10:7 15:14
negara 148:15
241:10
neither 249:9
uetadvantage 2:16
network 2:13
never 36:15 37:3
40:1 52:6 86:5
103:4 110:16
139:11 141:23
146:15 147:8 148:5
148:12,17 151:2,23
170:21 171:10
212:12 223:12
226:9 246:18
new 1:2,17,18 2:7
2:12,12,21,21 4:14
4:15,20 6:14,20,21
7:12 18:25 19:1
20:6 34:21 35:11,14
35:16 36:12,15,25
37:3,9 46:7,7,8
89:11 124:16 133:3
134:17 168:20,20
172:23 173:9,11,25
174:4,24,24 215:17
215:24 216:10
217:5,11,15,18,24

218:3,5,10
newsletter 121:24
121:25
night 7:12 238:10
nine 12:23 40:6,6
152:22 153:17
154:2 174:20
234:14
ninety 230:12
nj2071258 1:25
nod 9:3
nodding 186:3
nou 2:22 205:18
206:7 208:19
209:13,14 213:14
213:16
nope 89:23
normal 10:10,11
157:15
uormally 134:9
notarized 67:19,22
68:5,13,23 69:4,9
notary 1:16 67:20
249:4
note 4:3 119:16
noted 99:22 106:25
notes 249:6
notice 8:1
notified 107:22
110:16
notify 107:18,22
108:14,17 110:25
111:14 245:10
uovember 59:12
62:7 63:25
number 3:8 4:20
22:20 24:2 38:11
52:9 55:25 56:5
60:5 62:9 73:21
74:2,4,6,8,9 75:16
75:18 78:18 80:4,5
80:7,18,19 86:9
133:1 144:24 153:4
153:9,15,17,17,19
154:2,7 155:1,13,17

155:21 156:1
157:10 161:19
170:10 190:22
208:10 233:22
234:22 235:21
244:17 248:5
numbered 78:17
numbering 75:19
numbers 34:8 75:20
163:9 234:11,12
numerous 117:6
uunc 65:14,15,16
66:2

**o**

o 16:23 18:19,21
90:9,10
oath 236:3
object 20:1 23:6
24:7 42:18,19 78:6
100:5 102:21
124:22 160:20,20
objected 107:19
108:14 110:17
234:9
objection 6:25 14:6
19:16,18,19,25 20:3
20:15 25:19 26:12
27:20 29:12 30:8
52:24 62:10 67:4
99:22 102:22 105:2
105:7 106:24 110:8
115:3 121:12 124:3
125:16,17 128:2
129:7 136:18
160:16,21,23
182:15,24 189:16
195:10 218:19
227:24 234:5
objections 95:21
obligation 204:5
observe 5:12
obviously 54:19
147:12 149:5
168:12 171:25

occasion 91:3
occur 91:11 159:20
159:21
occurred 48:2 81:22
82:10 83:17 90:17
163:7
october 68:5,13,23
69:4 113:14 153:18
185:24 186:20
187:20,21,25
oei 117:13 119:15
121:1 168:11,12
193:25 194:1
offeusive 139:11
offer 3:21 246:25
247:9
offered 31:7 246:23
247:24
office 1:16 21:25
36:7,8 37:6,19,25
127:22 128:22
184:7 188:1 206:21
214:16
oh 7:17 15:17 37:22
41:1,16 65:23 68:9
135:6 153:1 163:1
186:4,24 219:6
245:23
ohletz 90:3,6,9 93:7
93:8,9 193:22
okay 5:14 6:6,7,13
6:17,22 7:19 8:9,13
8:19,25 9:6,16
10:13,23 11:4,5,13
11:16,20 12:2,6,15
12:17 13:1,12 14:2
14:19,23,24 15:4,9
15:20,21 16:11,18
17:14,19,23 18:6,13
18:20,22 20:18 21:3
21:9 22:12 23:2,16
23:22 24:3 25:10,23
26:6 27:2,2,14
28:15,22 29:7,23
31:18,19 32:18

33:23 34:3,5,11,17
34:23 35:9,13,18,23
36:1,5,17 37:5,17
38:2,22 39:2,25
40:10,17,21,23 41:5
42:4,22 43:1,4,12
43:16,20 44:25
45:19 46:15,21,25
47:3 48:19,24 49:6
49:9 50:4,11,13
51:7 52:12 53:6,21
54:5,11,13,25 55:3
55:11,12 56:22 57:8
57:15,20 58:3,8,16
58:17 59:10,18
60:14,18 62:25
63:17,18,23 64:6,11
64:20 65:1,1,2,8,20
66:11 67:13,21 68:1
68:10 69:11,19,20
70:5,17 71:11,15
72:10 73:5,7 75:3
75:13,17,23 76:7,13
76:18,21 77:1,12,21
78:11,15,15 79:2,2
79:14,15 80:1,19,22
81:18,21 82:13,16
83:10,11,14,19,20
84:1,4,11,19,24
85:4,11,15,17,23
86:3,19 87:2,15,19
87:20 89:3,13,13
90:7,11 91:19,24
92:19,24 93:11 94:3
94:4,23 95:20,24
96:5,8,13,18 97:2,9
97:14,19,22 98:7,8
98:25 99:5,10,21
100:21 101:20
102:15,15,25
103:11,16,21,24
104:4,17 105:1,5,14
106:13,19 107:3,8
108:6,10,18 109:2
110:4,5,10 111:1,8

111:13,16,22,25
112:6,16,19 113:2,8
113:16,22,23 114:2
114:14 115:15,19
115:22 116:13
117:2 118:2,6,23
119:9,20 120:5,9
121:3 122:6 123:3
123:17 126:8
127:15,19 128:1,7
129:3,19,20 130:2,8
130:18,23 131:5,15
131:19,20,21 132:7
132:13 133:4,17,21
134:2,20 135:5,18
136:1,10,15,21
138:6,9,14,15,20
139:2,5,8,8,16
140:5,10 141:5
142:5,11,24 143:1,4
143:15,19,24
144:13,16,17,18,22
145:6,10,22 146:11
146:20,23 147:9,18
148:13,19,23 149:2
150:6,20 151:5,18
151:21 152:5,13
153:2,7,13,14,24
154:4,19 155:7,11
155:15,24 156:10
156:17,22 157:1,6
157:24 158:16,24
159:4,25 160:13
161:20,22 162:4,8
162:15,15 163:10
163:10,11,14,19,19
164:1,9,15,22 165:4
165:11,11,12,17,22
166:4,7,20,22 167:4
167:10,12 168:4,17
168:23 169:4,19
170:12,20,23 172:6
173:14,16,21 174:3
174:7,8,12,17,21
175:16 176:5,17,22

177:7,18,22 178:5,6
178:9,12,13,16,22
179:6,7,8,18,22,23
179:24,25 180:11
180:25 181:7,11
182:3,11,20 183:11
184:2,18,23 185:4,7
185:8,15 186:8
187:6,8,18,23 188:7
188:11 189:4,5,7,23
190:19 191:22
192:3,4,4,8,12,18,22
192:23 193:5,17,23
194:3,11,12 195:1
195:16 196:15,21
197:8,13,18,21
198:1,6,17 199:17
199:22,23 200:14
200:22 201:17
202:15,19,20 203:5
203:20,20 204:8,16
204:25 205:3,5,15
205:20 206:3,8,11
206:14,23 207:6,10
207:24 208:5,13,14
208:17,20 209:2,2,5
209:9,17,22 210:4
211:8,18 212:22
213:4,11,19 214:1
214:14,21 215:5,23
216:3,8,14,25 217:3
219:18 220:7,8,11
220:17,21,25
221:16 222:10
223:10,18,24 224:1
224:6,11,16 225:11
226:19,22 227:12
227:19 228:6,15,16
229:5,10,10 230:3,3
230:9,25 231:2,25
232:19 234:17
235:16 236:14,22
236:25 238:11
239:5,21,25 240:14
241:8,15,21 242:2,8

242:11,17 243:3,7
243:20,23 244:8
245:9,19 246:1,1,5
246:15,19,24 247:2
247:5,8,11,22 248:2
248:6
**oman** 150:13
**once** 13:24 132:14
190:24
**ones** 57:16 139:22
148:2
**oneself** 182:2
**ooyen** 91:14
**open** 29:17 104:15
**operating** 44:3,12
45:7 60:2,25 61:15
172:9
**operation** 47:24
**opinion** 21:20,21
26:13 78:5 211:9,12
224:4 236:7
**opportunities**
168:22
**opportunity** 20:1
46:10,12
**opposed** 101:3
102:1
**oral** 194:7,8
**orally** 31:17 32:9
188:23
**orange** 2:7
**order** 55:18 99:2
100:6 101:9 102:7
102:13 122:1 131:2
131:4 133:2,16
134:1 136:25
**ordered** 98:21 101:9
122:5 127:12
130:24 131:3
134:16,23
**ordering** 30:22
**orders** 122:9 195:21
195:22
**outs** 112:11

**outside** 29:20 129:9
  213:7
**owned** 16:19 30:2
  49:25 52:1 62:2,2
  78:9 118:10 120:1,2
  166:9 175:14
**owner** 26:22 56:16
  72:17,19 78:10
  197:10,12
**owners** 166:13
**ownership** 26:10
  31:3,4,13 32:6
  60:11 62:17 64:18
  71:1 77:14 79:19
  80:8,13 83:2 98:8
  102:2 127:21 128:6
  128:11,21,24 129:6
  129:12,16 130:20
  166:16 175:3,5
  177:14 188:20
**owning** 202:25
**owns** 30:14 32:7
  94:9 122:7,15 166:5
  180:18 182:18

**p**

**p** 2:1,1
**p.c.** 1:17 2:6,11
**p.m.** 73:10,18
  126:14,17 152:9,12
  183:20 184:1 215:1
  215:4 237:3,6
  248:19,21
**pablo** 246:9
**pack** 211:16
**packaging** 100:7
  141:21
**page** 3:3,8,20 34:13
  38:11 39:3,4 40:5,6
  46:21 47:4,14 49:15
  49:17,21,25 50:15
  50:23 51:18,19
  55:10 56:7 58:18,22
  61:7 68:2,25 70:6
  70:15 74:13,18 75:6

75:11,25 76:1,8,9,9
  76:14 84:6 102:8
  184:6,13,14 185:17
  189:12 194:22
  204:21,21 205:1,4
  208:21,23,25 209:7
  210:1,2 215:6,13,16
  220:9 224:7 226:21
  230:10,11,22 241:4
**pages** 96:6 199:3
**paid** 106:23 109:25
  109:25 112:4,5
  123:23 124:1
  125:21 126:6
  129:24 130:10
  133:24 134:3
  155:12 163:21,22
  166:3 183:3,3
  186:20 241:22
  242:3
**painting** 131:13
  144:15
**paintings** 131:18,20
**pamela** 143:7
**paper** 13:15 36:20
  100:6,7,8 141:21
  143:13 146:9
  203:11
**paragraph** 43:21,22
  45:14 76:14 77:13
  78:17 79:5,16,17
  80:4,6,12 81:13
  82:17,18,24 83:21
  84:2 87:23 88:22,25
  114:18 139:24
  140:7 141:16
  151:10,11,14
  161:25 166:11
  169:5,20 180:5,12
  182:4 194:23
  200:24 201:19
  203:23 205:6 215:6
  215:13 217:6
  218:16 220:10,23
  224:7,18 225:12

226:20 227:1,5,13
  227:20 228:8,17
  230:10 231:3
  237:14,15 241:18
**paragraphs** 83:16
  229:11 237:17
**pari** 151:12,12,19
  151:19
**park** 2:21
**parker** 2:3
**parse** 24:10
**part** 36:3,3 42:8
  82:8 98:16 105:21
  187:14 200:16
  221:9 228:21
**particular** 45:22
  63:12 126:4 163:21
  164:3 165:24
  202:11 203:14,14
  216:5 246:22
**parties** 4:9,24 5:12
  29:21 63:2,5 249:11
**partner** 2:16
**partners** 227:7,9
**party** 2:22 5:10
  167:25
**pay** 107:6 110:2
  125:25 127:7
  140:13 157:25
  186:1,10,18,23
  187:1 189:10
**paying** 97:25 126:6
**payment** 99:23
  132:15,24 153:12
  155:25 204:5
  205:18 206:7
  208:19 209:13,14
  209:16,20 213:14
  213:16
**pays** 127:4
**pc** 5:5
**pdf** 240:25
**pegasus** 2:17
**pencil** 16:8

**pending** 31:24 32:14
  191:12
**people** 15:13 36:9
  164:4,5,5 230:22
  235:18 237:20
  238:5
**people's** 114:11
**percent** 24:12
  132:15,24
**perfectly** 125:4
**period** 155:17 204:2
**permanent** 17:4,10
**permit** 137:16
**person** 22:23 24:18
  24:19 26:8 27:8,10
  27:18 28:2,4 30:14
  32:6 53:21 63:5
  168:5 173:12,13,18
  245:12 246:2
**personal** 11:8 21:20
  23:13 24:6 25:2
  26:7 27:3 182:19
**personally** 11:11
  18:4 23:20 183:15
  211:9 217:12 232:7
  233:9 234:19
**pertaining** 42:23
  64:17 192:6 209:14
**phone** 186:14
**phones** 4:5
**photo** 30:22 31:10
  88:24 89:4 99:1
  118:5 127:9 152:17
  153:9 154:13 157:3
  157:13,16,17 158:3
  158:3,9,12 220:2,2
**photograph** 24:22
  26:10 120:2 128:11
  134:4 144:14 201:5
  204:1 241:10
  242:23 244:25
  246:3
**photographed**
  132:8 178:11

**photographer**  11:11
11:18 26:11 27:10
27:18 28:4,14 30:1
30:3,14,19 31:14,15
32:7 98:25 168:18
169:11,16,22 182:7
199:2 204:24
**photographers**  31:9
118:21 119:1,7
**photographic**
181:25
**photographs**  25:4
25:16 26:1 39:9,22
51:10 52:21 53:3
55:24 56:6,17,25
62:8,17 71:1,2
78:20 79:8,12 97:7
99:11,24 100:1
102:17 103:5 104:6
104:20 105:22
107:14,19 108:15
108:15,19 109:4,5
110:13 111:3,18
112:1 113:24 116:2
116:15,18 117:5,8
117:10,12 120:22
121:10 122:1,6,18
123:10 124:1
125:22 126:7 127:3
127:8,21 128:7,12
128:21 129:13,16
130:25 131:2,4,9,25
132:12 133:11,15
139:12 141:7
144:11 146:5,25
154:5,24 155:16,19
155:20,25 156:12
163:17 169:8,22
175:13 177:14,19
178:2,20 181:25
193:2 195:4 201:21
202:2 204:4 221:3
221:18,23 222:13
223:2,21 225:14,16
225:23 226:4 227:6

228:19,20,21,25
230:15 231:6
238:15,23 239:24
240:5 241:23,24
243:5
**photography**  3:15
27:8 36:3 100:13,14
101:1,23 121:25
122:3,3 123:4,5
125:21,25 127:6,13
129:25 130:20
132:16 137:24
153:5,8 155:13
156:4 157:7,11,12
167:15 170:11
213:13 241:13
242:6
**photos**  130:11
**physical**  37:18,25
**physically**  178:2,19
179:5,10,11 187:24
**picasso**  246:9
**pick**  4:4 202:8
**picked**  6:4 141:20
141:21
**picking**  51:9
**picture**  27:11 28:5
30:2,15 98:25
118:17 122:13
133:2,5,10,10,20
137:1,5 157:23
178:19 179:5
219:13,15,16,16,17
219:19,24 220:4,6
244:10,14,19 245:6
245:11,12,13,17
246:9,10,17 247:10
**pictures**  11:14 30:23
31:3 105:5,15,16
106:1,22 126:25
129:18 137:6,11
140:18 145:18
153:10 156:7,9,9,25
157:2,22 194:2
225:20 226:5,9,16

243:16,17 244:23
246:13,21
**piece**  13:15 36:19
203:10
**pirated**  141:25,25
143:5
**place**  4:6 21:11
103:18 159:1
179:15 193:15
249:8
**plains**  35:11 36:7
**plaintiff**  2:5 109:18
128:14 171:5,7
206:9 232:22,23
233:1,10,17 234:3
234:21
**plaintiffs**  1:5
**planet**  2:15
**planning**  114:25
188:9
**please**  4:3,5,23 5:16
14:10 26:18 30:5
50:3 57:23 74:4
77:8 98:5 108:7,23
118:16 121:17
123:14 161:2 170:2
179:20,20 186:24
194:22 220:9 224:7
229:22
**plural**  235:10
**point**  12:25 18:23
46:4 104:5 119:12
131:23 197:15
198:12 206:5 211:5
**pointed**  84:21
196:22
**poiutless**  107:22
**points**  112:11
**poorly**  169:24
**popham**  2:24 4:10
**portion**  20:21 26:19
30:6 32:3,20 50:9
67:9 77:9 89:8
90:14 95:15 108:8
108:24 110:23

121:19 125:2
138:11 140:16,23
142:14 161:5 179:2
190:1,12 210:25
229:23 235:3
**portions**  229:11
**possibility**  141:7
**possible**  150:11
**possibly**  125:14
**post**  132:17
**practice**  77:22 94:12
122:21
**preparation**  7:21
8:20
**prepare**  7:9 8:5 43:7
66:15,22 89:15 91:4
110:14 111:4,18
227:25 228:2
**prepared**  42:24
43:17 45:1 48:16
49:4 59:15 64:4
78:21 171:15
176:10 184:19
187:12 203:7
226:14
**prepares**  177:12
**preparing**  66:20
**present**  2:24 4:22
41:18,18 67:14
132:3 189:20
**presentation**  138:5
**president**  90:3
159:13
**press**  99:3 137:3
179:24
**pressed**  179:5,11
193:3
**presses**  178:22
**pretty**  95:14 200:20
**previous**  133:18
**previously**  59:5 94:9
**price**  243:22 247:21
**print**  98:4,6 134:8,8
134:12,18,23
135:21,22 137:8,9

161:19 240:9,11
**printed** 38:21 90:4
116:6,25 118:3,4
123:2 161:21 240:8
240:9,24
**printing** 98:1 110:1
133:25 134:5,6
159:19 160:4,7,8,11
161:14 162:11,14
163:4
**prior** 13:2 22:1,23
23:3 24:19 25:1
26:9 27:8,16 28:2
28:16,18 29:24,25
31:12 40:18 53:23
57:10,10 61:14 81:3
106:21 108:3,21
109:6 114:19
115:10 141:12,14
145:12 146:4,24
147:14,18 148:25
149:20 150:14,24
151:2,10,16,24
168:10 176:20
177:1 187:19
192:15 214:2,4
**private** 4:4 12:25
13:22,23,24 14:15
14:18,25 15:6,7,10
15:12,23 16:3,4,15
16:17,18,19,24 17:2
17:4,7,11,17,21,24
21:7 39:21 41:22
42:6 45:9 46:1,4,11
46:12,13 53:8,23
63:7 66:1,18 67:12
72:17,21 74:25 75:1
79:17,18 82:19
96:12 119:17,18
168:2,3,14 169:14
170:16,17,18
171:23,25 172:2,10
172:17 173:10,11
174:1

**privilege** 7:1 20:16
22:5 66:7 128:4
190:5 197:25
218:20
**pro** 65:14,15,16
66:2
**probably** 15:2 196:2
227:15
**procedure** 77:19
**proceed** 5:17
**proceeded** 13:25
**proceedings** 248:21
**process** 8:7 93:1
95:10
**produce** 89:2,5
98:21 100:6 101:10
101:24 102:7,9
117:17 121:22
122:1
**produced** 139:2
170:22 171:3,5
247:17
**product** 102:14
127:11 152:17,23
153:19
**production** 3:19
96:10,14 97:25 98:9
100:12 116:10
120:11 132:17
136:2,8,11,12
137:20 155:17
158:18 248:4
**professional** 11:18
27:5
**programming**
158:23
**progression** 21:8
**project** 89:25 91:17
**projects** 94:19
116:18
**promote** 182:2
**promoting** 231:7
**promotiou** 180:21
182:19 195:5

**promotional** 182:1
239:1
**prompted** 219:4
**proof** 109:19
**properties** 16:8,9
53:13,13,22 66:4
122:2 169:10
180:14 182:6 201:6
**property** 21:25 37:9
37:10 116:16
120:16 121:7
**proprietor** 12:24
13:21 14:1 21:6
53:22 78:9
**proprietorship**
11:23 12:3 16:13
63:6 76:15 77:20,23
77:25
**protect** 19:5,12
21:22 26:4 110:9
**protected** 19:10
21:12
**protectiug** 22:21
**protection** 22:24
**protective** 20:13
**protects** 20:25 21:2
**prove** 132:23
**provide** 11:25 93:2
131:4
**provided** 5:7
**providing** 126:2
**pte** 14:3,16,17,20
15:1 18:3,14 38:13
42:9 44:15 47:7,11
47:24 48:6,10 49:20
49:21,24 50:20,21
51:2,11,22 52:1,22
53:3,4,18 55:22,23
56:5,7,16 57:1
58:24 59:21 60:1,5
60:6,10,24 61:6,14
61:17,18,22,22 62:1
62:7,15,18 64:15
70:8,11,22,25 71:7
71:16 74:20 80:7

81:9,10 82:19,21
83:2,3,23,24 84:25
85:5,7 169:16,18
172:21 173:17
174:5,15,23 185:22
206:5 209:19
**public** 1:16 67:20
103:14 104:15,18
171:1,2,4 223:21
249:4
**publication** 38:20
39:8,11,23 182:2
**publicly** 221:4 223:3
223:6
**published** 38:25
**publishes** 241:5
**purchase** 195:22
**purchased** 130:10
130:12
**purpose** 6:15 19:14
36:22 42:8 66:12,16
98:14 188:18 239:1
**purposefully** 228:19
228:24
**purposes** 36:2 141:8
195:6 231:6
**pursuant** 61:23 71:7
78:12 155:1
**push** 178:12
**pushed** 178:11
**put** 15:15 25:18
32:23 47:20 107:5
108:4 109:20 117:5
135:2,14 136:14
152:14 159:3,7,18
160:1,4,5 162:13
163:5 168:17 173:6
177:20 180:20
183:9 192:23
244:14,14
**puts** 180:23
**putting** 166:8,9

**q**

qantas  2:18
qualified  228:13,13
quality  93:24
  246:14
quantity  136:25
question  9:7,11 14:8
  14:9 19:24 20:3,19
  20:20 24:25 26:16
  26:18 27:24 30:5
  31:21,24 32:14,17
  32:19,25 35:33 36:24
  40:4 42:18,19,21
  50:2 56:23 58:12
  62:13 67:7,8 68:20
  77:8 78:6 79:25
  80:11 95:12,14,22
  100:17,18,22 103:3
  105:23 106:18
  108:7,10,11,23
  110:21 114:10
  121:15,16 124:17
  124:25 125:5,6
  126:9 128:18,23
  129:8,20 140:5,13
  140:14,21 142:11
  142:13 145:24,25
  147:3,13 148:25
  149:3,10,11,19,25
  150:4 152:3 156:15
  157:4,24 158:1
  161:1,3 173:5,8
  176:9 178:17,25
  179:1 186:5 189:23
  189:25 190:5,7,17
  191:11,12,24
  195:19 200:5
  204:19 210:20,23
  210:24 211:2
  229:20,21 234:8,10
  234:18,23 235:2,5,6
  235:12,13,14
  236:17 239:18
  243:9,11,12 244:25

questions  8:24 9:2,3
  99:18 106:16
  125:19 126:22
  150:10 231:17
  237:8,9
quick  31:22 86:25
quite  22:15 64:7
  107:21 117:22,25
  212:19
quotation  94:18

**r**

r  2:1 249:1
ralph  90:6 91:13
  93:7 97:5,24 102:17
  103:4 116:5,23
  117:3 121:1 122:25
  135:4,16 136:20,22
  136:24 139:4,5,6,12
  159:3,6,10,11,13
  160:15 161:8,9,17
  162:10 163:3,3,12
  163:18 193:21
ralph's  142:25
  162:6
random  2:17
read  20:20,22 21:24
  21:24 23:14 26:15
  26:18,20 30:5,7
  31:20 32:1,4,21
  43:21 44:8 50:7,10
  67:8,10 77:7,10
  89:6,9 90:12,15
  95:11,16 108:9,22
  108:25 110:22,24
  121:16,20 124:24
  125:3 132:22,23,25
  138:19 140:13,17
  140:21,24 142:12
  142:15 161:4,6
  169:21 179:3 180:8
  180:12 181:16,18
  182:13 190:2,13,25
  194:24 195:14
  196:13,17,18

204:10,13,21,23
  210:20 211:1
  215:15 220:12,15
  220:19,22 226:23
  226:24 227:13
  228:5 229:24 235:1
  235:4,12
reading  21:5,9
  23:15,17,20 115:20
  189:8 198:24
  199:13 203:18
  204:24 205:1,4
  216:15
reality  171:12
realize  106:15
  231:17
realized  232:2,11
realizing  231:9
really  17:7 29:21
  56:23 138:4 166:5
  183:9,9 232:1
  246:12
reason  10:16 25:14
  25:17,17,25 26:2
  110:7 115:2 116:24
  117:3 123:5 129:10
  161:13
recall  63:24,25
  79:22 83:12 91:6
  119:25 148:21
  175:8,11 176:19,23
  198:24 212:23
received  33:19
  41:10 46:19 58:2
  65:6 69:23 73:13,15
  96:3 113:6 145:1
  167:16 183:23
  184:7,11 194:20
  197:14 198:11
  208:8
recess  73:11 126:15
  152:10 183:21
  215:2 237:4
recognized  20:10
  67:1

recollection  64:10
  79:3 88:20 113:18
  152:4 154:10,16
  201:23 207:23,25
  208:1
record  4:2,9 31:23
  33:5,14,16,22 52:11
  52:13,14,16,18
  54:18 55:5,12,13,15
  73:8,9,18 82:5
  126:14,17 152:9,12
  168:16,16 175:23
  183:20 184:1 215:1
  215:4 237:2,6,8
  248:9,19
recordation  3:12
  73:12 75:25
recorded  5:24
recording  4:8
records  177:2
  185:11
redesigned  123:12
refer  34:11 94:20
referred  81:5 94:16
referring  54:20 57:5
  59:5 60:16 71:24
  72:2 81:12,17,19
  85:20,25 89:21
  94:15 97:7 118:7
  144:10 146:16
  204:6 205:9,16
  243:24
refresh  13:16 88:20
  113:17 122:12
  154:9,16
refused  204:4
regarding  8:16
  210:11
regardless  16:9
region  15:3 207:25
register  26:1 40:9
  43:23 44:5,19 51:22
  191:21 214:6
  233:25

registered 23:24
39:9 46:7 52:22
53:10 105:17 109:4
127:21 128:22
206:22 211:13
registering 25:15
39:22
registrant 87:10
registration 3:9,12
22:9 23:1 25:13
33:18 34:7,12 39:10
43:11 51:21 55:25
57:1,12,13,13 61:7
61:13 64:15 69:22
70:3 86:22 202:7
registrations 57:14
86:13,14 192:7
214:12
related 5:11 249:10
relating 64:15
relationship 174:23
188:20 191:14,18
191:20
relative 249:13
relied 200:20 229:6
229:7
relocate 114:25
rely 200:21
relying 116:19
remain 169:9
180:13 182:5
remember 13:6,10
13:11 19:25 20:19
35:6 63:21 64:2
76:20 77:11 85:16
91:8,21 97:21
103:23 104:2 150:7
150:8 154:8,11,12
154:13 155:5
156:14,20,23,24,25
157:2,5,22 163:9
174:18 175:3 197:2
197:3,4 199:7,14
200:19 203:1 207:5
207:9 208:3 212:18

213:8 233:23
234:11,12,16
remore 2:8 5:3
18:12 55:14 57:11
57:18 68:19 88:7,9
88:11 215:11
rendered 165:8
repatriated 45:16
repeat 14:9 27:24
32:18 50:2 108:7,10
122:8 178:24
189:24 190:8,10
229:21
repeatedly 125:9,21
126:3 204:4
repeating 123:1
repeats 122:8
rephrase 9:9 14:11
27:5 35:2 36:23
45:24 56:22 77:3
79:25 105:23
112:21 129:8 140:5
141:13 145:23
151:7 176:9 196:1
200:5 211:10,22
217:13 244:25
rephrasing 100:21
replica 245:13
replicate 142:9
replicated 243:6,16
reporter 1:16 5:7,15
9:4 20:22 26:20
30:7 32:4,21 50:6
50:10 67:10 77:10
89:9 90:15 95:16
108:9,25 110:24
121:20 125:3
140:17,24 142:15
161:6 179:3 190:2
190:13 211:1
229:24 235:4 249:4
represent 4:24 5:5,9
representing 4:10
5:15 248:12

reprint 122:9,9,17
122:24 133:19
139:7
reprinted 123:12
reprints 133:20,23
reproduce 225:15
reproduced 225:14
225:22
reproductiou
133:24 181:24
request 241:19
requested 20:21
26:19 30:6 32:3,20
50:9 67:9 77:9 89:8
90:14 95:15 108:8
108:24 110:23
121:19 125:2
140:16,23 142:14
161:5 179:2 190:1
190:12 210:25
229:23 235:3
requests 3:19
require 25:12
132:14
required 22:9 23:1
89:5
requirement 16:6
17:2 82:2 85:10
132:18
requirements
132:13
requires 62:11
100:5 115:18
research 229:2
230:8,19 231:12,14
reservation 2:13,16
2:16 193:19
reserve 116:16
120:15 121:7 193:7
194:9
reserved 96:19
192:24 193:1
reservetravel.com
2:13

resident 17:5 24:15
39:17
residents 215:17,25
216:10 217:5,11,15
217:25 218:3,5,10
resolution 18:9
resolved 205:8,14
respect 23:5 24:22
25:4 33:7 112:22
191:25
respected 19:10
21:13
respond 248:10
responding 243:9
243:11
restate 152:3
result 31:9 98:21
99:1,2 105:5 107:4
107:5 122:2 234:21
236:8,19
results 98:10
retained 113:19
returned 16:10
53:14 54:7
reuber 192:15
237:24
reveal 190:4,6,17
191:3 197:25
revenue 231:10
232:3,11 237:19
revert 117:24
reverts 78:21
review 7:20
reviewed 228:3
reviews 220:18
227:2
right 9:17,20 10:6
11:6 22:5 23:12
25:10 33:12,13
37:16 39:7 40:12
47:11 50:16 54:13
54:17 59:21 68:13
68:23 69:19 73:1
74:11 75:14,19,21
76:5,17 82:8,9

85:18 87:10 88:6,10
95:4 99:24 101:16
105:6 110:9,11,14
113:1 115:6 116:11
117:5 119:23
120:17 121:9
133:15 134:4
135:10 137:18,20
137:23 138:1,16
142:16 144:11
148:21 153:3,11
157:8 159:11,14
161:10 162:24
166:14 171:11
172:3,23 174:19,24
180:19 181:3,15
182:8,14 183:5
185:2 188:3 197:16
198:7,12 200:23
201:18 203:7,11,22
204:14 206:16
213:2,17 217:10
218:9,14,22 219:20
219:23 224:24
225:11,23 226:16
226:17 228:4,6
230:24 231:20
232:4 235:11
239:12 242:5,9,12
248:8
**rights** 19:12 26:10
56:6 62:2 64:17
71:1,17 75:9 77:15
96:20 98:8 105:25
111:5 127:3,14
129:6,12 130:5
169:8,22 176:20
177:1,13,14 181:25
192:25 193:1,8,19
194:9 241:24 242:7
248:13
**rings** 186:14
**roadside** 2:17
**roadsideamerica.c...**
197:10,11

**roadsideamerica.c...**
197:12
**role** 16:24 17:1
**rom** 132:25 133:7
133:12 138:19
224:19 225:18
**rom's** 138:18,18
222:16 224:23
**room** 4:23 33:7
124:6,8,13 133:5,6
**rude** 124:15
**ruth** 5:15
**ruthanne** 1:15 249:3
249:20

**s**

**s** 2:1 3:7 11:22,23
12:3,7,9,11,19 13:2
13:16,21 14:1,3,14
14:21 16:13 18:21
50:16 53:21 63:6
72:16 74:19 75:9
76:10,15 77:3,4,6
78:19 79:5,9 84:6,9
84:21,23 86:8,13,21
87:6 88:23 96:15
169:13 242:21
**s.g.d.** 207:13
**sales** 123:23 132:19
**san** 7:11,11,17 35:25
184:22 214:20
**sandals** 3:21 246:23
247:9
**sat** 143:8 233:10
**saujana** 148:15
**saw** 108:16 111:2
142:7 146:14 149:8
196:5,12 197:5
200:18,18 211:20
240:16
**saying** 20:5 42:21
54:3 61:11 81:8
82:1 83:1 102:1,4
107:9 109:14
116:19 124:15

138:23 146:1,2
148:5 166:16 171:4
195:9 202:21
212:23 217:20
218:2 226:2 236:6
244:24
**says** 39:8 41:13,20
44:2,11 45:14 49:19
51:1 52:25 59:20
70:7,10 76:14 77:14
79:17 80:7 82:18
83:22 118:15,16
120:15,21 121:7
136:12 139:1
152:17 169:8,21
175:13 180:12
181:20,21 195:2
198:18 201:3,20,25
203:24,25 204:3
205:7 208:25
215:17 216:9
217:24 220:16
221:1,9,17,17,23
222:12,21,25 223:1
225:13 227:5,21
228:18 230:14
231:3
**schwartz** 2:8 3:4 5:1
5:1,19,20 10:6
14:11 18:13 19:17
19:21 20:18 23:12
24:11 25:6 26:15
31:20,25 32:10,13
32:18 33:3,12 41:7
42:17 50:4,7 52:14
53:1 55:1,11,17
56:22 57:15,20,24
65:3 67:6 69:20
71:21 73:6,23 74:2
80:6 84:16 86:7
87:15 88:1,4,14,19
89:6 90:12 93:6
95:6,11,20 99:16,21
100:21 102:21,25
106:25 110:22

113:3 114:8 120:6
121:14,18 124:5,14
124:21 125:4,10
126:8,11 139:21,23
140:21 142:12
149:13 150:2
151:16 152:1,5,21
152:24 153:2
156:17 160:18,24
161:4 167:13
170:24 171:2 173:1
173:4 178:24
183:14 186:15
189:17,24 190:10
191:5 194:17
195:13,16 198:22
201:11 204:16
208:5,12,24 210:20
213:12 214:22
228:12 229:19
234:9,23 235:1,10
236:25 237:7
241:12 243:10
246:10 247:15
248:3
**scream** 147:7,23
**screamed** 143:6
**screaming** 148:4
**second** 31:23 33:4
33:15 34:13 38:4
49:17 52:11,15,16
55:3,6 56:11 58:21
73:7,7 80:20 81:4,4
84:3 86:14,18 89:7
90:13,16 118:8
121:5,14 124:5,7,9
135:7 152:24
170:24 180:2
181:23 184:12,14
186:16 189:9
192:23 200:25
204:21 214:23
236:24 241:16
**secondhand** 5:6

secretary 43:1,19
  45:2 143:7
section 39:3,5 40:6,6
  44:5,19
see 18:21 34:9 39:1
  49:16 50:17 51:13
  51:14,15 54:12,22
  56:11 57:17 59:11
  61:10 63:22 64:24
  68:6 70:7 71:18
  82:22 84:2 104:20
  106:14 113:9 114:4
  119:25 120:12
  142:2,6,22 148:14
  152:18 158:25
  168:21 170:15
  174:16 186:7
  195:17 199:24
  201:1 202:22
  208:15 215:21
  216:23,25 219:10
  219:13 220:19
  224:14 230:13
  241:2 245:23
  246:13
seeing 106:5 176:24
  184:5
seek 185:5,6 191:23
  191:25 198:8
seen 47:1 52:6 64:9
  71:24 85:11 109:3,5
  151:8,12,14,23
  170:21 171:10
  177:9 196:3 226:15
  230:16,17,22
  237:20
select 133:15 244:10
  244:13,16
self 180:20
sell 15:14,15 31:4
  94:2,2,2 127:2
  131:12,13 242:7
seller 29:17
selling 145:18
  243:21 244:1,3,4

send 93:11,13 94:5
  94:10,10,13 107:25
  108:1 116:7 120:20
  132:18 200:7
  222:16,20
sending 137:6
  222:23,24
sense 56:18 62:19
  94:25 176:8 201:9
  207:3
sensitive 4:4
sent 146:3 187:20
  199:12 200:8 242:3
  242:4
sentence 169:20
  195:2,17 200:25
  202:11 203:14,23
  203:25 204:3 205:6
  215:14 216:5,9
  217:6 218:1 222:11
  225:12 227:20
  228:10
separate 101:14
  134:3 136:7,8,11
  138:7 189:11
  195:21 229:20
separation 98:1
sequence 57:16
  64:14,14,16 138:3
serai 218:24 219:1
seri 148:15 241:10
series 63:13 86:12
  95:2 195:4,20
service 98:18 100:23
  101:2,3,15,24 102:1
  102:4 127:13
  157:18 242:6
services 3:15 12:1
  98:16 99:24,25
  125:22 126:1,6
  127:1,7 129:25
  130:20 137:25
  153:5,8 155:13,14
  156:4 157:7,11,12
  158:3 165:8 167:16

215:18
set 11:24 13:22
  31:15 32:8 63:16
  211:17 214:17
  249:8
setai 50:16 51:1,2,11
  51:11,22,23 52:21
  52:22 53:2 56:14,15
  111:21 112:17
  113:11,20,25
  117:11,15 120:12
  141:1,23 142:4,10
  143:12 148:9
  152:16 153:16,20
  154:6,25 155:21
  156:12 238:9
sets 108:1 242:22
settle 210:11 212:20
settled 115:13 118:1
settlement 3:17 7:25
  202:5 208:7,25
  209:4,11,12 210:7
  213:1,6
setup 12:8
seven 88:5 233:13
shahinian 2:6
sheet 239:9
sheets 238:18
shocked 143:8 228:9
shoot 122:6 152:17
  157:3,13,16,17
  158:3,10,12 164:11
  164:11 178:6,22
  195:4 220:2
shooting 36:4
shoots 88:24 89:4
  178:6
shop 188:16 189:6
  211:17 214:17
short 110:2,2 120:7
shorthand 131:7
shouting 148:20
  149:6 167:7
show 12:19 40:3
  41:6 56:15 65:2

86:23 120:7 135:1
  156:3 158:2,9,11
  240:20
showed 143:5
shown 58:3 72:11
shows 15:25 18:7
  51:21 56:5 60:1,5
  60:23,24 85:9
  232:10
shultz 40:7
shutter 178:7
shutting 237:16
side 47:8,11
sign 43:2,3 69:10
  186:21,22,24
  188:13,19
signature 34:15
  38:7 41:12,17 47:4
  58:21 73:4 74:13
  84:5 184:13 209:6
  249:19
signatures 73:4
signed 18:10 34:18
  34:20 38:7 44:8
  45:25 47:6,6,10
  49:7 62:14 67:20,24
  174:19 176:20,24
  180:8,9 182:12
  184:21 185:19
  187:21,25 203:6
signing 66:23 84:6
  186:19
simple 95:14 134:21
  211:11
simplest 150:11
simply 101:21 234:7
singapore 16:6 17:2
  21:22,25 22:10,25
  24:5,15,20,20 25:3
  25:11 26:8,24 27:4
  28:2 29:10,16,20
  30:15 31:12 34:21
  34:22 38:8,16 39:11
  39:15,18,20,23

43:10 46:5,5 49:8
49:11 77:19,22 78:1
78:4,13 153:21
157:12 158:19
168:22 171:18
176:4 188:2,6
206:13,15,16,18,24
207:17 208:2,19
212:25 213:21
**singaporean** 17:5
**single** 20:9 94:6,20
154:13 177:19
**sir** 6:9,12 9:10 10:14
12:10 15:24 16:1,5
58:6 62:20 64:2,24
76:20 77:11 78:23
90:19 91:8 101:8
103:23 107:21
108:12 112:15
114:24 115:4 128:8
129:14 141:11
144:3 149:22 166:1
181:13 184:15,17
192:17,21 195:24
202:4 207:9 208:16
219:3 227:4 230:23
**sit** 21:18 41:4 79:3
232:20 233:5
234:19 235:21
236:21
**site** 140:4 154:13
230:22 244:12,18
245:7
**sites** 238:2
**sitting** 8:3
**situation** 26:24
**six** 40:19 152:17
157:13 205:25
206:1 240:23
**skip** 90:16 144:18
**sleeves** 117:16
**slightly** 170:1
**slip** 125:23 126:4
**slower** 172:1

**soft** 116:17
**sold** 127:1 246:18
**sole** 11:23 12:3,24
13:21 14:1 16:13
21:6 25:17,17 36:22
53:21 63:6 76:15
77:19,23,25 78:9
98:13 160:14 161:7
161:13 169:10
180:13 182:5
**somebody** 17:25
29:3 92:15 115:17
137:15 144:10
146:3,3 239:7
244:24 245:16
**somebody's** 115:2
**someplace** 80:14
135:3,15
**soon** 57:24
**sorry** 6:1 9:21 13:3
19:8 37:22 43:9
57:20 58:6 64:2,24
68:12,20 73:24 77:7
77:11 90:19 91:8
92:3 97:21 103:8,23
107:21 112:9,15
114:20 115:4 123:1
127:4,18 146:11
147:14 148:24
149:22 164:14,16
181:13 183:12
186:4,6,15,16 190:8
191:10,10 194:17
195:24 199:9
203:24 207:18,19
208:11 213:15
214:19 217:1,2
218:7,25 223:9
226:25 228:12
229:25 240:18
244:21
**sort** 10:1 147:3
188:15 200:7
**source** 224:17

**southeast** 123:15
**southern** 1:2 4:19
**space** 37:7
**speak** 10:11 217:7
**speaking** 93:4 95:20
102:22 160:21,22
217:8
**speaks** 87:13 158:8
192:5
**special** 91:17
**specific** 57:11 76:23
89:25,25 91:6 97:10
102:16 120:22
**specifically** 19:14
20:6 103:25 122:3
123:20 125:8 126:9
194:8 201:3 219:6
242:22
**speculation** 25:20
27:21 28:12 30:16
141:10
**speed** 86:18 178:7
**spell** 16:22 17:13
18:18 90:8
**spoke** 163:16 192:13
192:14
**spoken** 192:19
**spotlight** 179:21
**spreadsheet** 239:17
242:15
**stamp** 46:23 75:19
**stamped** 41:9 46:18
65:5 73:14 74:9
96:2 113:5 144:25
**standard** 77:19,22
94:11
**stands** 14:17
**star** 165:6,6
**start** 17:18 75:24
95:22 148:7 173:9
181:4 188:16 233:5
236:16
**started** 21:5,9 23:15
23:17 29:8 146:13
146:18 149:8

166:25 181:5 237:7
248:7
**starting** 189:6
242:21
**starts** 73:18
**state** 19:18,18 35:14
35:16 214:20
**stated** 116:4,14
**statement** 80:12
90:18 129:9 171:8
222:7 224:3 237:11
**states** 1:1 4:19 6:11
19:4,4,11,13 20:6
20:12 21:21,21 23:4
23:25 24:21 25:4,13
25:16 26:1,2 35:19
35:21 67:16 109:5
188:16
**statute** 205:25
**statutes** 24:10
**stay** 15:1 52:14,16
55:17 132:21
135:12
**stealing** 111:14
**stenographic** 249:6
**step** 124:6,8
**stick** 121:4
**sticker** 241:3,9
**stock** 122:11
**stop** 17:21 142:2
143:20 144:6 167:5
248:6,14
**stopped** 12:19 13:16
44:15 45:10 48:6
141:17 143:17,22
143:25 144:20
199:8 204:24 205:1
205:4
**strange** 15:18
**street** 1:17 2:3,11
4:14
**strike** 40:1 44:4 54:6
**striking** 43:7,22
53:23 82:12

**struck** 42:11,12 43:6
44:18 53:22 66:1,19
67:12 72:16,18
172:19,20,22
**studio** 4:16 18:24
19:3 35:4 47:11
48:10 49:21 50:21
51:2,11 53:4,15,19
54:1 55:23 56:7
59:1,23 60:6 61:2,6
61:18,22 62:1 63:11
71:7 72:21,22 81:10
82:21 83:3,23 85:6
206:5 209:19
**studios** 1:4 55:2
138:3
**stuff** 239:13,14
**styled** 179:14
**subject** 177:24
178:14 230:15
242:10
**submitted** 78:23
201:21 202:1 204:1
231:16
**subseqnently** 53:11
53:12 63:9 66:3
**substantive** 239:14
**suddenly** 212:7
**sue** 209:14,19
210:12 220:3
**sued** 109:15 143:20
143:22 206:5,24
207:2 213:21,24
**suing** 110:7 129:17
207:11
**suit** 117:14
**summarizes** 185:13
**supplied** 229:13
**snpport** 232:13,15
**suppose** 205:2
**supposed** 65:13 90:2
98:14 102:8 111:10
116:7 148:6 160:5
164:14 176:25
186:11 202:18

204:18,20 234:12
234:16
**snre** 9:19 10:13 13:5
13:9,11 14:12 22:15
27:25 32:2,19 49:3
55:8,9 57:24 64:8
83:5 88:1 94:25
121:18 124:25
134:19 140:11
144:20 148:2
149:11 164:24
166:1 177:10
179:14 180:17
190:9 192:10,11
196:1,11,16 205:23
206:2 211:23,25
212:18 214:24
217:22 219:11
226:10 229:3
247:18
**swear** 5:16
**sworn** 5:18 249:7
**system** 19:4 20:9,23
20:24,25 26:3
**systematically** 13:25

**t**

**t** 3:7 16:23 50:16
90:10 249:1,1
**t8** 117:9 118:7 119:4
119:8 121:2
**table** 98:6
**take** 11:3,14 20:6,8
27:11 28:4 30:1
31:22 33:3,8,13
46:16 50:15 58:8,11
65:9 73:6 86:18,24
98:25 99:4 103:18
112:1 120:7 121:10
124:11 126:11
132:12 148:17
152:5,6 167:18
177:15 183:14
200:7 209:16
214:22 219:6 234:1

234:4 236:23,25
245:10 248:14
**taken** 1:14 31:6
73:11 104:6 108:20
126:15 152:10
177:14,16 178:1
183:21 215:2 237:4
249:12
**takes** 82:16 93:21
98:20 101:10
131:12 175:14
**talk** 22:4 33:9 54:18
87:24 128:3 131:19
**talked** 242:20
**talking** 57:17 63:3
66:5 80:3 90:18
95:19,19 151:24
172:24 173:2
214:11 235:9
**tangible** 45:14 53:24
**target** 215:24
**targets** 215:17
216:10 217:5,11,15
217:24 218:3,5,10
**task** 205:24 209:16
**tax** 46:8,14
**teaches** 180:22
**teaching** 180:21
**tell** 7:7 8:3 9:8,18
10:13 11:3 24:17
64:12 65:11 66:8
95:13 102:5 104:9
111:9,10 115:23
116:1 118:24 119:5
133:4 136:22
142:23 147:5
151:13 161:23
164:4,5,10 167:20
168:7 170:13,21
189:18 190:22
191:6,7 198:3 200:2
208:18,22 210:5,8
210:10 216:13
218:4

**telling** 55:8 125:15
128:5 191:9
**ten** 87:23 88:22,25
114:18 139:24
140:7 141:16
151:10,11,14
153:15,17,19 154:7
161:25 162:20
166:10,11 207:4
209:15 215:6,13
217:6 218:16
234:14 241:18
**tenth** 162:21
**term** 21:14 29:15
201:12
**terms** 29:4,18 31:7
31:13 32:5 193:10
193:12,13 201:14
242:22 246:12
**testified** 95:9 124:20
159:11 172:22
**testify** 10:16,17,18
**testimony** 23:7,8
29:13 32:12 33:25
62:11 67:5,7 95:5,7
95:8 99:14 121:13
124:4,16,19 125:18
151:6 160:17,19
162:18 182:25
226:1 229:18
248:18
**thank** 5:13 74:5
88:15 158:15
**thanks** 84:18
**thereabouts** 12:12
13:14 17:22 106:10
106:12 159:24
167:3 172:4 177:6,8
**thing** 96:23 121:21
123:16 135:12
139:14 159:22
191:1 203:13
205:24 208:3 240:6
**things** 21:8 43:13
61:5 99:12 101:1

108:4 111:15
126:24 138:7 142:3
143:11 158:20
168:15 195:23
199:14 209:19
233:13
**think** 10:7 17:21
20:12 25:15 31:24
43:6 53:5 54:8,20
55:14,19,20 63:2
64:3,3,8,13,16
71:24 72:6,7,11
73:20 83:6,6,17,21
84:1 87:19 88:10,17
92:3 93:14,19 95:17
100:8 108:1 116:23
120:24 121:6
127:20 128:10
139:9 143:25
145:11 146:3 148:7
148:11 150:1
156:11,15 162:16
162:18 177:11
188:8 189:21
199:18,21 200:12
203:15 209:16
210:22 212:23
216:1 222:8 223:8
224:19,22 228:10
229:2 232:9 235:8
238:2,3,7,7 240:16
244:7 245:20
246:12 248:6
**thinks** 10:1 228:1
**third** 76:8 175:21
**thirds** 34:14
**thought** 32:15
117:25 127:17
165:15 168:14
172:13,14 173:15
211:16 214:6,8,9
**thoughts** 173:17
**thousand** 186:17
208:1 247:10

**three** 30:20 34:8
46:9,21,22 56:5
57:16,19 58:18,19
60:5 68:12,15,15,17
68:18,21 74:8 79:16
79:17 80:5,6,12
81:13 82:17 83:16
108:1 112:18
126:18 155:2,3,4,6
155:9,10 226:15
230:12
**thursday** 1:18
**tickets** 132:15
**tier** 233:14
**time** 4:12,22 6:23
12:25 21:5 26:17
27:16 39:17 41:18
45:4,13 46:4 63:25
64:1 104:23 105:3
109:11,12 111:17
114:8,16 115:9
119:12 127:7
131:19 133:1,18
135:13 139:25
142:18 143:17
150:25 151:15
155:16 157:18
162:5,9 166:24,25
170:25 173:23
176:7,7 177:1
178:10,18 179:11
179:16 182:12
184:5 189:9 190:11
195:8 198:21,25
199:3,10 203:17
211:6,19 212:2,17
214:10 220:22
230:4
**times** 11:4 101:7
112:18 131:23
133:22 152:2
157:13 166:2
190:20 198:14
**tired** 11:3 114:24
115:1,8 183:16

198:23,23
**today** 4:11 8:1,22
10:16 21:18 110:7
128:20 168:24
184:5 227:14
232:20 234:19
236:6 248:15
**today's** 184:9
248:18
**toke** 2:4 4:25,25
6:25 7:6 9:21 10:1
14:6 19:16,20,23
20:15 22:3 23:6
24:7 25:5,7,19
26:12 27:20 28:11
29:12 30:4,8,16
31:22 32:2,11,16,23
33:8,14 38:5 42:16
42:20 50:2,5,11
52:7,9,24 54:17
55:5,13 56:20 57:22
58:10,12 62:10 66:5
67:4 69:6 71:5,19
72:8 73:22,25 74:3
77:7 78:3 80:3,10
84:14,19 87:13,24
88:10,15,21 92:10
93:4 95:5,9,17
99:13,20 100:2,19
101:5 102:19,23
106:24 108:22
110:8,18 114:6
115:3 121:12,16
124:3,18 125:8,20
126:10 128:2 129:7
136:18 139:20,22
140:12 141:10
142:17 147:12
149:9,17 150:1
151:15,24 152:20
152:22 153:1
154:21 156:15
157:25 158:7
160:16,22 170:23
171:1 172:24 173:2

173:6 182:15,24
183:18 184:10
186:4,12 187:8
189:16 190:3,16
191:3,8,16 192:5
194:15,19 195:10
195:15 197:24
198:9,20 204:11,15
207:16 208:10,13
208:23 214:24
218:19 223:14,18
225:24 227:24
229:17 234:5,10,22
235:6,11 236:11,23
237:1,9,10 243:8,14
245:4 247:18
248:16
**told** 12:23 24:17
65:19,25 66:3,6,18
67:19 69:8 78:14
85:22 90:3 97:24
116:5,23,24 117:13
127:23,24 130:3,6
135:4,16 136:20
145:21 159:3,6,17
162:10 183:2
184:25 190:15,16
197:7,9 200:10
205:24 213:3
**tom** 123:21
**tomorrow** 248:8
**tongue** 9:24
**top** 34:9 47:18 51:18
70:19 76:9 152:18
152:25 198:18
208:25 240:19
**topic** 245:17
**topics** 7:25
**total** 207:20 234:22
**touch** 153:9
**trade** 231:6
**traffic** 123:24
**transcript** 1:13
249:5

**transfer** 15:11 16:2
  17:25 77:16 80:13
  81:9,25 82:10
**transferred** 18:1
  76:16 77:15 79:4,10
  79:20 80:9 82:21
  83:3,23
**transferring** 77:24
**translate** 10:2
**translatiug** 10:4
**travel** 2:15,16,18
  215:19 238:2
**traveled** 10:15
**travelocity** 2:17
**trick** 166:15
**tried** 101:7
**trip** 155:2,4,5,6,8,10
**tripadvisor** 2:17
**trouble** 9:18
**true** 45:3,6 107:25
  108:1 178:18 201:8
  201:9 206:19
  221:20,21 222:4,8
  222:14 223:4 249:5
**trust** 200:11,13
  203:19
**truth** 129:15
**try** 5:22 6:6 9:9,17
  10:11 16:12 19:12
  52:15 55:18 56:4
  60:22 63:1 69:20
  72:2 82:4 86:18
  129:21,21 145:25
  146:21,22 149:13
  150:12 161:22
  171:12 196:1 198:2
  200:5 211:16 230:4
  231:21
**trying** 13:7 20:14
  53:12 69:3 101:22
  102:5 106:17 110:9
  125:14,23 128:16
  142:23 147:1 149:4
  150:10 162:17
  166:15 173:6,7

  217:22 228:11
**tunc** 65:14,15,16
  66:2
**turn** 4:5 76:1,8
  220:9 241:3
**turned** 8:15
**two** 17:3,15 34:14
  48:5,5 49:10 57:14
  64:9 68:17,17,17,19
  72:14 73:3,7,19
  76:14 77:13 79:5
  80:18,19 83:16
  88:11 96:6 97:12
  126:11,24 127:1
  133:5 137:1,5 155:2
  155:8,10 170:10,15
  183:15 194:4,5,7
  206:15 214:23
  226:14 240:1
  246:13
**tws0199384** 46:19
**tws0199384-386**
  3:10
**tws0199389-391**
  3:11
**tws0199392** 3:10
  41:10
**tws0199397** 73:15
**tws0199686** 113:6
**tws199380** 65:6
**tws199380-383** 3:11
**twso199397-399**
  3:13
**twso199686-87** 3:14
**twso200283** 3:13
  96:3
**typographical**
  228:21

**u**

**u** 16:23
**u.s.** 23:17 24:15
  26:3 105:17 114:25
  188:10,16 207:14
  207:17 214:11

216:6,17,20,22
  217:18 218:12,14
  244:16
**u.s.d.** 207:13,23
  208:4
**uh** 8:2 36:14 37:2,20
  38:9,12,15 39:6,13
  39:24 41:14,23
  43:24 46:24 47:9
  49:2,23 50:18 51:4
  54:14 59:24 68:4,7
  76:11 80:10,25
  90:25 137:21 147:2
  153:1 167:19 169:7
  169:12 185:18
  187:16 195:18
  203:4 237:25
**ultimately** 205:7
**underneath** 68:19
**understand** 6:2 9:7
  9:8 10:12 16:12
  19:8 21:17 22:15
  24:9 25:23 26:10,21
  27:12 28:16,17,23
  28:24 29:25 30:3
  39:20 42:20 61:11
  69:3 86:17 94:25
  95:13 99:20 102:5
  106:14,17 128:7
  130:19 147:4,13
  157:4 177:10,21
  183:18 188:18
  195:15 196:2
  197:19 204:22
  209:11 216:13
  217:9,22 220:16
  221:22 223:10,11
  223:16,17,19 230:1
  231:20,21,22 235:5
  235:13,14 236:3
**uuderstauding**
  22:24 23:4,11,13,14
  24:6,18,20,21 25:2
  25:2 26:8,9,25 27:4
  27:7,16 28:1,3,25

29:9,25 30:13 38:19
  38:23 44:21,22
  45:20,21,23 52:21
  62:15,21 65:17
  100:11 133:14
  145:16,17 173:22
  174:22 175:2 186:2
  188:19 209:12,18
  209:20,23 216:7
  217:17 223:15
**understood** 9:12
  26:23,24 160:9
  182:7,13,18,21
  187:10
**undertaken** 116:18
**unfairness** 110:6
**ungerleider** 1:15
  5:15 249:3,20
**united** 1:1 2:18 4:18
  6:11 19:4,4,11,13
  20:6,12 21:21,21
  23:4,25 24:21 25:3
  25:13,16 26:1,2
  35:19,21 67:16
  109:5 188:16
**unlimited** 181:22
**uupaid** 107:23,24
  108:2 109:10,15,22
  115:12 205:18
**unpublished** 70:3
**unsurprisingly**
  227:5,21,23 228:7
  228:11
**update** 170:19
**updated** 117:20
  119:19 172:11
**uploaded** 240:25
  242:16 243:16
**upset** 109:22 217:21
**url's** 150:7,8
**usage** 242:18 244:14
  244:15
**use** 21:14 93:8
  107:19 108:14
  115:18 116:2,15,20

121:10 123:10
130:16 133:15
137:18 138:24
139:12 141:25
143:12,13,14
145:17 146:8,8,9,15
147:8 148:5,12,17
154:5 159:15
180:20,21,23,24
181:24,25 182:19
194:7,9 238:24
240:8 241:24 242:7
242:23 244:6
246:21
**users** 105:5 230:17
**utilized** 231:5

**v**

**vacation** 215:20
**vague** 56:20 95:17
102:19,24 191:16
235:8
**vaguely** 91:13
**valuable** 186:9
187:2
**value** 187:3 234:20
245:24 246:11,12
**van** 5:4 88:2,5,8
91:13 194:18
**vandusen** 2:12 5:4
**vau1-060-182** 86:22
**vendor** 29:20
**verbal** 28:7 119:13
168:10
**verbally** 9:3 175:24
185:12
**verify** 132:20
**veritext** 4:11 5:15
**version** 240:25
**versus** 4:16
**vfm** 2:18
**vice** 90:3 159:13
**videographer** 2:24
4:1 5:14 33:16,21
52:12,17 73:9,17

126:13,16 152:8,11
183:19,25 214:25
215:3 237:2,5
248:17
**videotaped** 1:13
**view** 19:12 21:4
75:8 171:6,6 232:21
**viewed** 199:18 238:4
**vijay** 2:4 4:25 7:6,14
88:12
**violated** 111:5
**violation** 117:14
**virginia** 40:16,20,24
41:1 48:22 176:14
**virtue** 105:25
**visit** 40:22 111:17
**voice** 4:23 5:23 6:3
**volumes** 240:23
**vs** 1:6

**w**

**w** 17:14,14,14 18:19
**wai** 18:16
**wait** 19:21 20:1
32:13 137:4,4,4,4
**want** 9:19,22 14:8
19:6,9,18 22:3,7
25:21,21 29:18
30:19 31:3,4,23
42:18 50:7 54:17,22
55:5,7,9,15 62:20
66:5,8 88:12,19
92:8 94:25 98:4
106:19 107:3
109:24 115:7 116:8
119:25 124:9
125:15 126:3 128:3
130:25 133:1,3,5,5
133:9,10,19 134:17
137:5,5 138:4
151:22 154:23
160:20 190:6,16
191:3,6 197:24
198:3 217:20,20
228:1 234:7 235:6

235:16 237:12,13
237:17 240:20
**wanted** 33:5,8,9
104:18 126:19
127:17 131:21
164:6 168:12,21
181:19 182:22
211:25 237:10
**wanting** 25:24
**wants** 31:2 88:12
**warmer** 214:18,20
**water** 15:14,16,17
**wave** 1:4 4:15 11:9
11:21,22,23 12:3,7
12:9,11,19,24 13:2
13:6,16,21,21,23,24
14:1,3,3,5,14,15,16
14:20,21,25 15:1,6
15:7,10,12,17,23
16:3,3,13,15,19,24
17:1,7,11,16,20,24
18:3,14,24,24 19:3
19:6,7 21:6,10 35:2
35:4 38:13 39:21
41:22 42:6,9 44:15
45:9 46:1,3,11,11
46:13 47:7,11,24
48:6,10 49:19,21,24
50:20,21 51:2,11,21
52:1,22 53:3,4,8,14
53:15,18,18,21,21
53:23 54:1 55:2,22
55:23 56:5,7,16
57:1 58:24 59:1,21
59:23 60:1,5,6,10
60:24 61:2,6,6,14
61:17,18,22,22 62:1
62:7,15,18,18 63:6
63:7,8,11 64:15
65:25 66:18 67:12
70:8,11,22,25 71:2
71:5,7,16 72:16,17
72:20,21,22 74:19
74:19,24,24 75:1,9
76:10,15 77:3,4,6

78:8,9,19 79:5,7,9
79:17 80:7 81:9,9
82:19,21 83:2,2,3
83:22,23 84:6,9,21
84:23,25 85:5,6
86:8,13,21 87:6
88:23,23 89:1,10,11
96:12,15,15 98:14
103:1,20 104:8,10
105:11 117:14
118:17 119:17,18
120:4,25 122:3,5,7
122:15,17,24 123:4
123:13 127:1,1,13
127:14 132:13,14
132:20 133:20
134:22 135:9,9
138:3,22,22,23
139:2 145:3 164:23
167:23 168:2,2,13
168:14,14 169:13
169:13 170:11,16
170:17,18 171:23
171:24 172:2,9,10
172:16,21 173:9,10
173:17,25 174:1,5
174:15,23,25 175:1
175:6,6,12,14
180:14,18 182:18
182:19 191:14,21
192:25 193:1,7
194:2 205:23 206:5
209:13,15,18
217:10 225:17
226:2 233:1,11
235:15,17,23 236:6
236:12,15,18
242:21
**wave's** 19:9 97:5
103:5 110:9,13
117:7,10,12 226:5
**way** 21:20 34:14
53:10 86:5 97:3
124:19,19 126:4
128:10 131:7,9

134:22 137:7
143:16 146:21,22
147:19 149:3
150:11 157:15
164:24 205:12
215:24 217:14
218:4,16 224:4,4
225:15 228:23
230:20,21 232:1
233:18 235:16
243:11
**ways** 233:16 234:15
**we've** 55:21 59:25
65:9 71:24 80:16
82:15 85:11 99:2
139:11 193:14
226:15 242:9
246:21
**website** 21:25 23:18
24:14,15 102:18
103:2,5,6,10,12,13
103:20 104:7,10,11
104:15,20 105:4,9
105:16,18,22 106:1
106:2,3,5,21 107:3
107:4,6,7,10,20,20
108:16 110:14
111:3,20 112:2,5,13
113:12,20,25 115:2
115:17 116:15
121:24,24 123:18
123:22,23,24
126:25 127:10
138:25 139:14
141:1 145:9,14,15
146:25 147:22
149:15,21,23
150:14,16,17,18,19
150:22,24 151:2
153:20 154:6,25
155:21 156:13
157:3 159:22
180:20 211:16
212:6,8 219:2
238:22,23

**websites** 106:8
108:21 109:6,13
114:4,11,16 116:3
116:20,22 117:5
120:23 121:11
124:2 139:13,17
140:3 141:15
145:13,19 146:4
148:1 151:9,14,23
226:15,15,16
**wedding** 30:18,20
31:9 98:25 127:6
**week** 190:24
**wei** 17:12,12,14,14
17:18,18 18:16,16
**weis** 17:15
**welcome** 33:23
**went** 18:3 22:1,6
24:14,14 53:22,24
82:1 122:6 142:2,6
142:22 143:10
148:9,9 151:2
154:25 202:5
239:22
**west** 2:7
**whatnot** 16:9
132:15 231:13
**whichever** 93:10
132:19 133:1,2
199:25 230:22,22
**whisper** 6:4
**whispering** 4:4
**white** 35:11 36:7
143:13 146:9 189:2
**willing** 29:17,17
**withdraw** 95:22
**witness** 4:21 5:16
9:24 32:15 78:4
80:5 124:13 186:11
195:11 198:1
220:18 227:2
237:10 249:6
**wk** 2:18
**word** 9:17 10:3
20:13 95:18 138:12

158:25 161:14
162:11 172:17
190:14 227:23
228:7,11 235:10
**worded** 175:23
216:18
**words** 9:20 32:23
38:19 53:2 64:21
71:25 72:1 74:22
120:22 155:8 158:3
158:3 159:15 173:6
182:4,7,13 183:9
196:14 203:10
209:10 224:12
225:21 245:16
**work** 6:6 11:25 19:9
20:9 21:1,1 22:8,18
26:22,22 28:17,18
28:24 29:4,6,15
43:15 53:11 54:9
56:23 57:8 62:22
83:12 87:11,19,21
89:24 93:2 96:20
97:6 98:5,11 100:8
104:24 110:2 123:7
141:23,24 143:11
143:14 146:10
147:6,8 148:12,18
163:18 164:20
201:7 213:12 214:7
219:11 222:6,8,15
225:8 241:18
243:21 244:2
**worked** 93:7 134:5
134:6 139:4
**working** 11:24
167:2,6
**works** 11:10 19:6,7
21:10,11 22:19,25
26:4 49:14,20,25
50:14,19 54:10 60:6
62:21 70:3 74:24
75:4,5,10 79:6,13
82:7 170:10 180:19
212:4 222:25 225:1

225:5,18 226:12
230:16 231:9
247:24,25
**worksheet** 3:22
248:4
**world** 20:24 238:2
**worldwide** 244:16
**write** 170:3 181:13
181:14 195:11
200:13 203:15
218:8 222:17 229:1
229:3,4 230:5
**writing** 54:13 77:17
77:23 79:23 80:14
98:19 118:11,20,25
119:7 120:21 135:3
135:14 160:2
181:12 182:22
193:9,15 242:23
246:25 247:12
**written** 28:6 31:15
31:17 32:8 168:10
168:13,15 169:24
170:5 175:8,8,12,24
181:10 183:1,4
188:24 194:6
**wrong** 118:8 131:1
144:8,9 162:17
212:24 224:3 238:4
**wrongly** 183:7
**wrote** 183:7 194:1
230:8

| x |
|---|

**x** 3:1,7
**xio0115** 249:21
**xio1634** 249:21

| y |
|---|

**y** 18:19
**yanked** 109:9
**yeah** 11:15 12:14
15:19 24:1 32:16
36:8 37:23 58:10
87:13 88:8,10,14,21
92:14 97:13,13,15

| | |
|---|---|
| 97:15 106:12 139:6 | 217:5,11,15,18,24 |
| 139:6,6 140:2 | 218:3,5,10 |
| 142:18 146:15 | **z** |
| 158:13,13 159:18 | **z** 90:10 |
| 159:18,18 162:12 | **zealand** 168:20,21 |
| 163:6,6,6 169:24 | |
| 171:23 172:19 | |
| 173:24 191:19 | |
| 196:10,24 197:17 | |
| 199:1,6 219:21 | |
| 220:24 223:19 | |
| 232:25 233:8 234:3 | |
| 237:13 239:15 | |
| 240:22 244:13 | |
| 245:18 | |

**year** 15:3 35:1,10
46:7 48:21 90:20
104:1 112:7 114:7
119:17 141:2
159:23 162:18,21
177:5,15 190:24
233:7,8 239:4 245:8
**years** 11:24 12:23
13:7 46:9 84:12,14
84:21 85:1 97:21
107:23 162:20
174:20 205:25
206:1 234:13,14
**yep** 75:2 82:14
109:17 153:1 158:6
169:18
**yesterday** 184:11
**yin** 1:14 3:3 4:21
5:18 63:5 118:5
176:1 185:14
241:14 248:18
**ying** 18:17
**york** 1:2,17,18 2:12
2:12,21,21 4:14,15
4:20 6:14,20,21
7:12 18:25 19:1
20:6 34:21 35:11,14
35:16 36:12,15,25
37:3,9 89:11 215:17
215:24 216:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit "B"

Page 250

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF NEW YORK

3     Civil Action No. 7:13-cv-09239

4     -------------------------------------------x

5     THE WAVE STUDIOS, LLC,

6                              Plaintiff,

7     vs.

8     GENERAL HOTEL MANAGEMENT LTD., et al.,

9                              Defendants.

10    -------------------------------------------x

11                         One Chase Manhattan Plaza

                           New York, New York   10005

**Condensed Transcript**

12                         September 9, 2015

13                         10:41 a.m.

14

15         CONTINUED DEPOSITION of LEE KAR YIN, on

16    behalf of THE WAVE STUDIOS, LLC, the

17    Plaintiff in the above-entitled action, held

18    at the above time and place, taken before

19    Jessica R. Taft, a Notary Public of the

20    State of New York, pursuant to Order and

21    stipulations between Counsel.

22

23                  *        *        *

24

25    Job No. NJ2126707

Page 251

```
 1   APPEARANCES:
 2
 3   COBALT, LLP
       Attorneys for Plaintiff
 4   The Wave Studios, LLC
       918 Parker Street, Bldg. A21
 5     Berkeley, California 94710
 6   BY: VIJAY TOKE, ESQ.
 7
 8   CHIESA, SHAHINIAN & GIANTOMASI, P.C.
       Attorneys for Defendant
 9   General Hotel Management Ltd.
       One Boland Drive
10     West Orange, New Jersey 07052
11   BY: HOWARD J. SCHWARTZ, ESQ.
         -and-
12     ABIGAIL I. REMORE, ESQ.
13
14   CLAUSEN MILLER, P.C.
       Attorneys for Defendants
15   About.com, Alliance Reservation Network
       d/b/a Reservetravel.com, Bookit, Expedia,
16   Fareportal d/b/a Cheapair.com, Farebuzz,
       Frommer, Getaroom, Hotels.com, Hotelsbyme,
17   Hotelplanner, Insanelycheapflights.com,
       JetBlue, Kayak, Lonely Planet, Metro travel
18   Guide, Metro Travel Guide, Netadvantage,
       Partner Fusion, Inc., Reservation Counter
19   d/b/a ReservationCounter.com, Pegasus,
       Random House d/b/a Fodors.com, This Exit,
20   J.J.C-Roadside America, Travelocity,
       Tripadvisor, United Airlines, Gogobot, Inc.
21   d/b/a gogobot.com, Qantas Airways, Ltd., WK
       Travel, Inc., VFM Leonardo, Inc.
22     One Chase Manhattan Plaza, 39th Floor
       New York, New York  10005
23
24   BY: MATTHEW J. VANDUSEN, ESQ.
25
```

Page 252

```
 1
 2              STIPULATIONS
 3
 4
 5         IT IS HEREBY STIPULATED AND AGREED by
 6   and between the attorneys for the respective
 7   parties hereto that the sealing, filing and
 8   certification of the transcript of the
 9   within examination before trial be, and the
10   same hereby are waived.
11
12         IT IS FURTHER STIPULATED AND AGREED
13   that said transcript may be signed and sworn
14   to before any Notary Public or Commissioner
15   of Deeds with the same force and effect as
16   if signed and sworn to before an officer of
17   this Court.
18
19         IT IS FURTHER STIPULATED AND AGREED
20   that all objections, except as to the form
21   of the questions, are reserved to the time
22   of the trial.
23
24
25
```

Page 253

```
 1         LEE KAR YIN, having been first duly
 2   sworn by a Notary Public within and for the
 3   State of New York, was examined and
 4   testified under oath as follows:
 5   EXAMINATION BY
 6   MR. SCHWARTZ:
 7      Q   Do you understand you are under oath?
 8      A   Yes.
 9      Q   And as we said during the first
10   session, I am going to ask you a series of
11   questions.  Do you understand that?
12      A   Yes.
13      Q   And if you answer the question,
14   we are going to assume that that is the best
15   answer you can give today and that you are
16   swearing that it is true.  Agreed?
17      A   Yes.
18      Q   Have you reviewed the transcript
19   of your previous deposition?
20      A   Transcript, no.  We reviewed the video.
21      Q   Did you watch the video of the
22   previous deposition?
23      A   Yes.
24      Q   As you are sitting here now, is
25   there anything that occurred during that
```

Page 254

```
 1              LEE KAR YIN
 2   deposition that you want to correct?
 3      A   Yes, I do.
 4      Q   What?
 5      A   I went back to check my records.
 6   One, I got to know Mr. John Jennison in 2010
 7   by e-mail introduction and mistaken he was
 8   someone else in 2009, 2009.
 9      Q   I am sorry, I couldn't hear the
10   last part.  So you met Mr. Jennison in 2010.
11   I couldn't get the last sentence.
12      A   I mistaken him for another
13   gentleman in 2009, which I met in Arlington.
14      Q   So, you mistook Mr. Jennison for
15   another gentleman?
16      A   Yes.
17      Q   So you met Mr. Jennison for the
18   first time in 2010?
19      A   In 2010.
20      Q   Do you know what month?
21      A   End of 2010.
22      Q   Any other corrections you want to make?
23      A   Yes.  Also, the -- you asked me
24   who prepared the 2007 and 2008 assignment.
25   I went back to check.  I prepared it.  I
```

2 (Pages 251 - 254)

Page 255

LEE KAR YIN

1
2  just filled in the company's name on the
3  template and -- yeah, and then I made an
4  appointment with U.S. Embassy and we had it
5  signed and notarized at the U.S. Embassy in
6  Singapore. They think that -- of course,
7  U.S. Embassy say, "Oh, you cannot notarize
8  anything that is backdated," so they will
9  put the date of when it was notarized.
10     So I said, "Okay." My friend
11  said, "Okay, doesn't matter, because they
12  are all your companies and it is okay."
13  Even if it is in 2012 or 2011, it is now or
14  then. That was my thought. And by so
15  doing, I thought I will save some money.
16     Q  Who was your friend who told you that?
17     A  Sarah. Sarah is the one who
18  signed the -- my signature on the left and
19  Sarah signed on the right in front of a
20  notary public, you call it, but it was done
21  at the U.S. Embassy.
22     Q  What relation is Sarah to you?
23     A  A friend.
24     Q  Is she a lawyer?
25     A  No.

Page 256

LEE KAR YIN

1
2     Q  What is her business profession?
3     A  She is a PR manager at Dell.
4     Q  Can you explain how come you didn't
5  remember that during the last deposition?
6     A  Because I filled in hundreds and
7  hundreds of forms, and at that point in time
8  the registration -- I only remember communicating
9  with John because he helped to register everything
10  pertaining to U.S. and so on, so immediately
11  I just thought, Oh, it should be John.
12     Q  Is there anything else you want
13  to change?
14     A  The first GHM website that Wave
15  designed was on 2005.
16     Q  And did you look at something to
17  refresh your recollection that that was the
18  date of the first GHM website?
19     A  Yes, because I had to find who
20  the copywriter, I mean, who the people who
21  contributed to the creation of the website.
22  So I found the copywriter e-mailing me the
23  copies for different hotels, and that was
24  Michele Yansen and that was in 2005.
25     Q  Anything else you want to change?

Page 257

LEE KAR YIN

1
2     A  That is about all I can remember.
3     Q  Did you discuss these changes
4  with anybody?
5     MR. TOKE:  Objection to the
6  extent that it calls for
7  attorney-client privilege.
8     So, I don't want you to reveal
9  any attorney-client privilege with
10  anyone else.
11  BY MR. SCHWARTZ:
12     Q  You can make the decision whether
13  you want to or not. You can consult with
14  your lawyer about it, but it is your
15  decision to make, not your lawyer's decision
16  about whether you want to.
17     A  You mean, did I consult anyone?
18     Q  Yes.
19     MR. TOKE:  I am telling you
20  that you should not reveal any
21  attorney-client privilege.
22     THE WITNESS:  Then I choose not
23  to answer.
24     MR. SCHWARTZ:  So that is on
25  the record, that he instructed her not

Page 258

LEE KAR YIN

1
2  to answer?
3     THE REPORTER:  Yes.
4     MR. SCHWARTZ:  Can you repeat
5  the question because it is not -- could
6  you just repeat the question I asked.
7     (Thereupon, the record was read
8  back by the reporter as recorded above.)
9  BY MR. SCHWARTZ:
10     Q  It is yes or no.
11     A  Yes, I told my friend Sarah.
12     Q  Did you mention the changes to
13  your lawyer?
14     A  No, I just told Sarah. The
15  assignments are redundant. We didn't even
16  have to go through all this.
17     Q  So, the changes that you have
18  identified so far today you did not discuss
19  with any lawyer?
20     A  I am not going to answer that.
21     Q  I am sorry?
22     A  I am not going to answer. Can I
23  choose not to answer that?
24     Q  No.
25     MR. SCHWARTZ:  Can you repeat

3 (Pages 255 - 258)

Page 259

```
1              LEE KAR YIN
2    the question?
3           (Thereupon, the record was read
4    back by the reporter as recorded above.)
5           THE WITNESS:  I discussed with
6    my lawyer.
7    BY MR. SCHWARTZ:
8        Q    Who is that?
9        A    Vijay.
10       Q    Okay.  Did you discuss it with
11   him before you made the change in your mind?
12   Let me rephrase that.
13           Did you tell him that you think
14   there should be changes, or did he say to
15   you that there may be changes?
16       A    No.
17           MR. TOKE:  Again, I am going to
18   object.  Attorney-client, calls for
19   attorney-client privilege and that is
20   a privileged communication.
21           MR. SCHWARTZ:  Are you
22   instructing her not to answer?
23           MR. TOKE:  Yes, I am
24   instructing her not to answer.
25   BY MR. SCHWARTZ:
```

Page 260

```
1              LEE KAR YIN
2        Q    Did you review the video with
3    your lawyer?
4        A    Yes.
5        Q    After you reviewed it with him,
6    did you come to any conclusions about the
7    things you said during the deposition?
8        A    The last thing --
9        Q    I will rephrase the question.
10           After you consulted with your
11   lawyer, did you --
12       A    After reviewing it, not consulting.
13       Q    Okay.  After reviewing it with
14   your lawyer, Mr. Toke?
15       A    Uh-huh, I did.
16       Q    Did you, after reviewing it with
17   Mr. Toke, realize that there should be changes?
18       A    After.  I wouldn't say I realized
19   it after reviewing because I went back to
20   search like when was 2007, 2009 or 2008
21   assignments were done and reviewing the
22   video.  I need to hear what was said.  So I
23   said, "Oh, this is wrong."
24       Q    I am going to show you what has
25   been previously marked as Exhibit 14, which
```

Page 261

```
1              LEE KAR YIN
2    is a copy of the amended complaint.  Just
3    take a look at that, if you would like.  And
4    if you can, just look at paragraph 11 first
5    on page five.  Do you have that?
6        A    Yes.
7        Q    Do you want to read it first?
8           How did you determine the
9    business of VFM Leonardo as described in
10   paragraph 11?
11       A    I actually went to check who VFM
12   Leonardo is when I found VFM Leonardo
13   putting their name on my pictures, claiming
14   -- you know, basically, it is implying that
15   the pictures, my pictures, Wave pictures,
16   are from them or by them since there is no
17   other name.
18           Like, who is VFM Leonardo?  So I
19   went, I Googled, okay?  And that is how I
20   found out more about them.  That is one.
21           Number two, I also found VFM
22   Leonardo putting the advertisement, like the
23   V brochure they call it, is for $80 per
24   month.  And if the evidence is what they
25   consider as V brochure, there are eight
```

Page 262

```
1              LEE KAR YIN
2    pictures, so basically I would assume that
3    anyone can sign up to subscribe to the V
4    brochure at $80 per month.
5        Q    When did you find that out?
6        A    From the evidence, probably about
7    2012, thereabouts.
8        Q    Do you have any file that
9    indicates that you determined that in 2012?
10       A    No, it is just based on evidence.
11   Once I saw it, I am like, who is VFM Leonardo?
12       Q    But --
13       A    Prior to that I wouldn't know.
14   When I see a picture, my picture, and VFM
15   Leonardo giving themselves the credit.  And
16   not only that.  They distorted my picture.
17   They saturated my picture.  They tamper with
18   my picture.
19       Q    Do you have a copy of that?
20       A    Yes.
21       Q    Where is that?
22           MR. TOKE:  I believe they were
23   produced.
24   BY MR. SCHWARTZ:
25       Q    How do you know it was 2012 that
```

4 (Pages 259 - 262)

Page 263

LEE KAR YIN

1
2  you did that research?
3      A  I started from 2012 to 2013, so I
4  wouldn't know whether it is 2013 or 2012.
5      Q  What happened in 2012 that caused
6  you to do research on VFM?
7      A  I mean, look, someone else is
8  claiming credit to my picture and they are
9  selling. Like, who are these people?
10     Q  When did you first find that out?
11     A  I just told you, based on
12  evidence. I mean, if you look at the
13  evidence, you will have the date, as
14  recaptured the evidence.
15     Q  So the first time you determined
16  that VFM, according to you, was using your
17  pictures was 2012?
18     A  Yes.
19     Q  And what caused you to look at
20  VFM in 2012?
21     A  I saw it on another site. I
22  either saw it on About.com -- I didn't
23  specifically look for VFM because I didn't
24  know, but my pictures appeared on About.com.
25  So when I click, VFM came on and the credit line.

Page 264

LEE KAR YIN

1
2      Q  When were you looking at About.com?
3      A  Sir, I told you already. Every,
4  all the evidence is from 2012 to 2013.
5      Q  Okay. What made you start
6  looking in 2012 at About.com?
7      A  I think I told you in the first
8  deposition there's one link to another and
9  another. And when I typed -- let's just say
10  on Google I just typed Setai, S-E-T-A-I, and
11  all these -- you know, when you do a Google
12  search, all these words will come on. I
13  wouldn't know if my picture is inside. I
14  just clicked. And then when I click, I saw it.
15     Q  So my question is: What made you
16  look in 2012 as compared to 2011 or 2010?
17     A  Because I first saw it from the
18  Facebook, I told you already. I saw my
19  picture on a banner advertisement. I am
20  like, what is this? So I click on the
21  banner, and then another window came on and
22  my pictures were there.
23         And I said, What is happening?
24  So, just out of the blue, I just put, okay,
25  let's see, Setai. I just typed Setai to

Page 265

LEE KAR YIN

1
2  search on Google and then all these words
3  came out, all these words, and I just
4  clicked on any of the links.
5      Q  What in your mind is the
6  connection between GHM and VFM?
7      A  I have no idea. My first
8  question was, Where did VFM get all these
9  pictures from? And how can they put their
10  name on my pictures?
11     Q  So, after you had that question
12  in your mind in 2012, "How did VFM get my
13  pictures?", what did you do?
14     A  I went to find out who VFM is.
15     Q  Did you notify VFM that they were
16  using your pictures in 2012?
17     A  No.
18     Q  Did you notify GHM that you thought
19  that VFM was using your pictures in 2012?
20     A  No.
21     Q  Why not?
22     A  I think I answered that already
23  in my first deposition.
24         I have asked or rather pleaded
25  for unpaid bills to be paid for years. And

Page 266

LEE KAR YIN

1
2  I was not -- not only was I ignored, the
3  final e-mail says, "It is none of our
4  business." Okay? Whatever Wave did with
5  whichever hotels, it is not GHM's
6  responsibility.
7         It is a fact, it is a fact that
8  GHM maintained even in Singapore court,
9  "Whatever bills to the hotels, please, go
10  get your payment from the hotels, not us.
11  It has nothing to do with us."
12         Okay. When I found in 2012, who
13  do I go to, because GHM already said, "It is
14  none of our business."
15     Q  Okay. So, you have no idea of
16  any relationship between GHM and VFM?
17     A  No.
18     Q  No, that is correct, you have no idea?
19     A  Yes, I have no idea.
20     Q  Then the next, I think the next
21  paragraph describes a company called Pegasus
22  Solutions, if you look at number 12. If you
23  want to read that for a second, you can.
24     A  Okay.
25     Q  What is the relationship in your

1          LEE KAR YIN
2    mind between Pegasus and GHM?
3        A    I do not know.
4        Q    You have no idea?
5        A    Yes, I have no idea.
6        Q    If you would look at paragraph 76
7    on page 21, please.
8            MR. TOKE:  Paragraph 76?
9            MR. SCHWARTZ:  Yes.
10            MR. TOKE:  Okay.
11    BY MR. SCHWARTZ:
12        Q    You have read that?
13        A    Read?
14        Q    You have read it just now, right?
15        A    Yes.
16        Q    So, when each project was done, I
17    think you have already testified that you
18    would deliver a CD read only to --
19        A    Memory.
20        Q    -- read only memory, all right,
21    to GHM and the hotel that ordered it, correct?
22        A    I said the CD ROM, read only
23    memory, was delivered to GHM and the general
24    manager of the hotel, whom -- I am not sure,
25    but whom also has at, let's say,

1          LEE KAR YIN
2    Hans.Meier@GHMHotels.com. I think I have
3    testified to that.
4        Q    But you understood that, or in
5    your mind were you delivering one CD ROM to
6    GHM and one CD ROM to the hotel itself?
7        A    To GHM, to the general manager,
8    so that they can verify Wave did the job in
9    order to get payment.
10        Q    You mean the general manager at
11    the hotel, correct?
12        A    Yes.
13        Q    In your mind you considered the
14    general manager an employee of GHM, right?
15        A    I am not too sure because GHM
16    chooses to take position A when it suits
17    them and takes position B when it suits
18    them. I don't know who pays the general
19    manager's salary.
20        Q    Would that make a difference to
21    you who paid the general manager's salary?
22        A    Because you are asking me?
23        Q    Yes.
24        A    So, it is to the hotel. I don't
25    know if the general manager is paid by the

1          LEE KAR YIN
2    hotel, like their staff, or paid by GHM, so
3    it is GHM staff.
4        Q    So you have no idea whether it is
5    hotel's stuff, as you put it, or GHM's
6    stuff, as you put it?
7        A    Correct, but --
8            MR. TOKE:  Staff.
9    BY MR. SCHWARTZ:
10        Q    Staff or stuff?
11        A    Staff, S-T-A-F-F.
12        Q    Okay.  But, in any event, it is
13    clear that there were two CDs that were sent,
14    one to GHM and one physically to the hotel?
15        A    Yes, so that the general manager
16    can show it to the owner that Wave did the job.
17        Q    So paragraph 76 says, "Aside from
18    her legal counsel and certain government
19    agencies, Ms. Lee did not disclose the hotel
20    photographs to anyone other than GHM or
21    otherwise allow them to be publicly disseminated
22    in any manner, including on the Internet."
23            That's not exactly correct
24    because you sent a copy to the hotel, right?
25            MR. TOKE:  Objection, argumentative.

1          LEE KAR YIN
2        THE WITNESS:  I am sorry, I
3    think I have answered that like many,
4    many times.  And I am trying very hard
5    to explain to you that I sent it to
6    the general manager, whom I do not
7    know whether works for hotel or GHM
8    because all the communications have at
9    GHM Hotels dot-com.
10        So it is Hans.Meier@GHMHotels.com,
11        Eleanor.Hardy@GHMHotels.com.  Even the
12        PR manager for Setai is
13        Detyanni.Puri@GHMHotels.com.
14    BY MR. SCHWARTZ:
15        Q    So you don't know, correct?
16        A    All I know is it is given to them
17    to verify so that we can get payment.  Even
18    so, Wave did not get payment for some of them.
19        Q    Let me show you what is Exhibit 2
20    to your complaint. I only have one copy, so
21    do you want --
22        A    Correction. Masano had some
23    copies because -- Masano Kawana. I have a
24    correction for paragraph 76.
25        Those -- how do I explain this?

6 (Pages 267 - 270)

LEE KAR YIN

1  I will try to explain this as best I can.
2          Those images were not created
3  with a touch of a button. They go through
4  lengthy postproduction process done by four
5  people around the clock. Collectively,
6  those images were created no less, by using
7  no less than 10 to 15 years. Okay? And
8  Masano had to get it from me for his self,
9  for his website, for his self-promotional
10 items, as I have explained before.
11         So, Masano has a few copies after
12 we put together all the pictures. The
13 original pictures do not look like that.
14     Q   Any other corrections you want to
15 make to paragraph 76?
16     A   Yes. Two other people also got
17 like 10 to 15 pictures. One is Mr. Laden
18 Thompson. He was the lighting designer. He
19 only wanted pictures to showcase his
20 lighting for the hotel. And the other
21 person who asked also for own website is
22 Mr. Koichi, Koichisan.
23     Q   Can you spell that for the
24 reporter, please.

LEE KAR YIN

1     A   K-O-I-C-H-I. Mr. Koichi. San is
2  just a respective term. From Spin Design,
3  Koichi was in charge of restaurant design,
4  like interior. So they wanted some pictures
5  to put on their website for self-promotion,
6  but they only got like specific pictures
7  that will showcase what they did.
8          Like lighting, Laden Thompson got
9  lighting. He wanted only lighting. I think
10 he was given about 10 to 20 pictures just on
11 lighting.
12         And Koichi, Koichi only asked for
13 Setai restaurant that he designed, and that
14 is also about 10 to 20. They don't want any
15 other pictures.
16     Q   So you read this amended
17 complaint before it was filed, right?
18     A   Yes, briefly, yes.
19     Q   And so, why didn't you make the
20 corrections when you read paragraph 76 at
21 the time before it was filed?
22     A   I overlooked.
23     Q   So let me show you Exhibit 2 to
24 your complaint.

LEE KAR YIN

1          (Thereupon, the document was
2  marked Exhibit 16 for identification,
3  as of this date.)
4  BY MR. SCHWARTZ:
5     Q   So this is Exhibit 2 to your
6  complaint, which appears to be screenshots
7  from, at least the first page is from
8  Kayak.com.
9          So, you have identified here --
10 or, can you tell me what this is? What does
11 the first page of Exhibit 2 indicate?
12         MR. TOKE:  And let's be clear,
13 Exhibit 2 to the complaint, which is
14 Exhibit 16 to her deposition.
15         MR. SCHWARTZ:  Yes.
16         MR. TOKE:  Just for the record.
17 BY MR. SCHWARTZ:
18     Q   What is that?
19     A   That is the evidence screenshot.
20     Q   It is an evidence screenshot?
21     A   Screenshot evidence.
22     Q   And so the yellow tag is
23 something that you put on?
24     A   Uh-huh. Yes.

LEE KAR YIN

1     Q   And so, the yellow tag shows that
2  Kayak is using a particular photograph that
3  is from one of your copyright registrations;
4  is that correct?
5     A   That is correct.
6     Q   Can you tell me, what is the
7  relationship between General Hotel
8  Management and that picture?
9     A   I don't know. That is what discovery
10 is all about. I am trying to find out.
11     Q   So, when you filed this
12 complaint, you had no idea of how Kayak got
13 a copy of that picture?
14     A   All I know is these pictures,
15 Koichi doesn't have, Laden Thompson doesn't
16 have. They are not interested in these kind
17 of pictures. And Wave delivered, we only,
18 memory CD to GHM.
19     Q   And the hotel manager, right?
20     A   And the general manager.
21     Q   So, as you sit here today, you
22 have no idea if GHM had any connection to
23 that picture appearing on Kayak.com?
24     A   That is correct.

7 (Pages 271 - 274)

Page 275

LEE KAR YIN

1    LEE KAR YIN
2        Q    And when you --
3        A    But I would assume because those
4    are the only people I gave to, because
5    Masano told me he always -- he always tell
6    me, "I need some pictures only for
7    self-promotion or for my website."
8        Q    So, what is the date of this
9    particular screenshot from deposition
10    Exhibit 16, Exhibit 2 to the complaint,
11    amended complaint?
12        A    I am sorry, I cannot answer that
13    because I cannot remember.
14        Q    Is there a date on this?  Is
15    there a date up there?
16        A    That is Friday, 10:51 p.m.  This
17    only appears if I type, if I type -- like,
18    if you do a search, you just simply put
19    whichever date on the search, see whether it
20    is available or not.  You know, arrival,
21    departure.
22        Q    So, at some point, probably in
23    2012, you think --
24        A    Yes.
25        Q    -- you --

Page 276

LEE KAR YIN

1    LEE KAR YIN
2        A    Should be 2012, 2013.
3        Q    Just let's look at the first page
4    for a second, stay on the Kayak one.  You
5    believed, at that time when you saw that,
6    that GHM was responsible for that picture
7    appearing on Kayak, right?
8        MR. TOKE:  Objection, misstates
9    the testimony.
10        MR. SCHWARTZ:  Listen, I didn't
11    say that is her testimony.  I am
12    asking a question.  I am entitled to
13    ask a question.
14        MR. TOKE:  You are, but when
15    you ask a question --
16        MR. SCHWARTZ:  Listen, I am not
17    going to have an argument with you.
18    You objected.  That is it.
19        You can answer the question.
20        THE WITNESS:  Can you repeat
21    the question?
22        MR. SCHWARTZ:  Can you read it back?
23        (Thereupon, the record was read
24    back by the reporter as recorded above.)
25        THE WITNESS:  When I saw these

Page 277

LEE KAR YIN

1    LEE KAR YIN
2    pictures, my mind went blank.  But if
3    you asked me do I link it to GHM, I
4    only gave it to GHM.  Who gave it to
5    them, I, too, would like to find out.
6    BY MR. SCHWARTZ:
7        Q    Did you take any steps to try to
8    find out?
9        A    How?
10        Q    So the answer to my question is
11    no, you took no steps?
12        A    Yes.
13        Q    Okay.  You didn't make any
14    inquiries to Kayak itself as to how it got
15    the picture, right?
16        A    There are so many.  You mean I
17    have to write to all of them?
18        Q    It is right that you didn't make
19    any inquiries to Kayak as to how they got
20    the picture, right?
21        A    No.
22        Q    You didn't make any inquiries at
23    GHM as to how Kayak got that picture, right?
24        A    GHM wouldn't want to communicate
25    with me.

Page 278

LEE KAR YIN

1    LEE KAR YIN
2        Q    So the answer to my question is
3    it is correct, you made no attempt to
4    contact GHM?
5        A    Yes.
6        Q    Did you make any attempt to
7    contact the hotel itself in that picture?
8        A    No.
9        Q    Why not?
10        A    I don't know who gave it to them.
11        Q    But I am asking you:  Why didn't
12    you contact the hotel in 2012 when you saw
13    that picture on Kayak?
14        A    Because there will be a lot of
15    people to contact.  How am I supposed to do that?
16        Q    So the answer is it is too much
17    effort for you to contact the hotel?
18        MR. TOKE:  Objection.
19        THE WITNESS:  Can I just say
20    this?  I found out this, a lot of
21    them, I didn't know what to do.
22    Please don't, try not to assume that
23    everyone is like so high tech and
24    everyone knows what to do.  You know,
25    my mind went blank.  I have to ask --

8 (Pages 275 - 278)

Page 279

```
 1                LEE KAR YIN
 2        (Thereupon, a discussion was
 3   held off the record.)
 4        THE WITNESS:  What I did was,
 5   the next best thing I knew what to do
 6   is to consult a lawyer.  What do I do?
 7   BY MR. SCHWARTZ:
 8     Q   Which lawyer did you consult?
 9     A   John.
10     Q   John Jennison?
11     A   Yes.
12     Q   In America?
13     A   Yes.
14     Q   Were you represented by lawyers
15   at the time you found this Exhibit 16 --
16     A   Right at that time?
17        MR. TOKE:  Let him finish the
18   question.
19   BY MR. SCHWARTZ:
20     Q   At the time you found the
21   deposition Exhibit 16, weren't you
22   represented by lawyers in the lawsuit
23   against GHM in Singapore?
24     A   Rajah & Tann, my lawyer,
25   Mr. Thong Chee Kun, said he is not a
```

Page 280

```
 1                LEE KAR YIN
 2   copyright lawyer.
 3     Q   Did you ask them to recommend a
 4   copyright lawyer in Singapore?
 5     A   No, because since I know John and
 6   John is familiar with copyright registration,
 7   maybe he is the best person for me to ask.
 8     Q   But John was located in the
 9   United States.  Why did you go to the United
10   States for a lawyer?
11     A   But my work is also registered in
12   United States.  And Kayak and most of the
13   defendants are also based in the U.S.  So, I
14   asked John, "What am I supposed to do?"
15     Q   And so, among the defendants are
16   no hotels.  Did you know that, no hotels
17   whose photographs you took?
18     A   Sorry, can you repeat that for me?
19     Q   Sure.
20        Why don't you look at the list of
21   the hotels that were listed in the complaint
22   in paragraph ten.  None of the hotels listed
23   in paragraph ten, except for The Setai, are
24   listed as defendants, correct?
25     A   No, the NamHaiHoiAn.com is also
```

Page 281

```
 1                LEE KAR YIN
 2   registered by GHM.
 3     Q   Listen to me.
 4     A   Yeah, but that is the site for
 5   the hotel.  You are asking me why didn't I
 6   sue the hotel.  Did I understand it correctly?
 7     Q   Correct.
 8     A   So, I saw the Nam Hai Hoi An, but
 9   the registrant is also GHM.  I saw --
10     Q   What do you mean the registrant
11   is also GHM?
12     A   That means the owner of the site
13   is GHM.
14     Q   Where did you see that?
15     A   WHOIS.
16     Q   You saw it on WHOIS?
17     A   Yes.  Then I think Chedi Muscat
18   is also, the registrant is also GHM.
19     Q   What do you mean the registrant,
20   the person who registered the website is GHM?
21     A   That is what it states in WHOIS.
22     Q   Let's say the person or the
23   entity who registered the website is GHM.
24   Why didn't you sue the hotels?
25     A   Because we -- what I understood
```

Page 282

```
 1                LEE KAR YIN
 2   was if you found this on, let's say,
 3   ABCD.com website, then you must know who is
 4   the owner.  So I went to WHOIS to see who is
 5   the owner.  And the owner is the registrant,
 6   and the registrant is GHMHotels.com, GHM Hotels
 7     Q   You went to WHOIS roughly at the
 8   same time period, 2012, 2013?
 9     A   Yes, thereabouts.
10     Q   Is there any other reason why you
11   didn't sue the hotels themselves?
12     A   It is the owner of the site is
13   GHM.  I sue GHM.
14     Q   So the answer is there is no
15   other reason, that is the only reason?
16     A   I would think so because they own
17   this and this is infringing.
18     Q   And if you look at the next page
19   in Exhibit 16, what website is that?
20     A   About.com.
21     Q   And what connection does GHM have
22   to About.com?
23     A   I do not have any idea.
24     Q   So, would the same be true of all
25   exhibits through Exhibit 84 attached to your
```

9 (Pages 279 -- 282)

Page 283

LEE KAR YIN

1
2  complaint, which are screenshots that you
3  have, that you have no idea of any
4  connection between GHM and any of the
5  screenshots that are attached to your
6  complaint, correct?
7      A    I can only assume because the
8  only person or entity that has the entire
9  collection is GHM.
10     Q    So, every one of the exhibits
11  from Exhibit 2 to Exhibit 42 is based on
12  your assumption that GHM delivered the
13  photographs to the particular entity that
14  you have a screenshot of?
15     A    Possibly.  But I want to find out
16  in discovery too.  I would like to know too.
17     Q    So you started the lawsuit and
18  you don't have any idea really, you just
19  have your own assumption, correct?
20     A    I don't have any idea?  I mean,
21  as far as I am concerned, the only person or
22  entity that has the entire collection is GHM.
23     Q    Okay.
24     A    No one else has the entire collection.
25     Q    So other than your assumption

Page 284

LEE KAR YIN

1
2  that only GHM has the entire collection of
3  all the photographs, there is no other
4  connection between GHM and any other screenshots
5  from Exhibit 2 to Exhibit 84, correct?
6      A    That is correct.
7      Q    And for any of the screenshots
8  from all of the entities which are listed as
9  defendants, you made no effort whatsoever to
10  contact any of the defendants?
11     A    The first thing I did was to
12  contact a lawyer to understand what to do.
13     Q    That was Mr. Jennison, right?
14     A    Mr. Jennison can only link me to...
15     Q    You can answer that.  You can answer.
16     A    Because John told me he is not a
17  litigator.  So I said, "Do you know anyone
18  who is, who can advise me?"
19         He said he will find and -- he
20  will find and let me know.  And then I got
21  to Leason Ellis.
22         MS. REMORE:  L-E-A-S-O-N, E-L-L-I-S.
23  BY MR. SCHWARTZ:
24     Q    When about was that that you
25  first contacted Leason Ellis?

Page 285

LEE KAR YIN

1
2      A    I do not remember.  All I know is
3  I want to know what to do.
4      Q    Did you physically go to meet
5  with anyone at Leason Ellis?
6      A    Sometime in -- the answer is yes.
7      Q    When about was that?
8      A    2012, 2013, it has to be around
9  these two years.
10     Q    Was it before or after you
11  incorporated Wave LLC that you met with
12  Leason Ellis?
13     A    After, no.  Mr. Schwartz, I am
14  sorry, I cannot remember because I relocated
15  as well.
16     Q    So, Exhibits 2 through 84 to your
17  complaint, or amended complaint, are all
18  screenshots that you personally took, right?
19     A    Yes.
20     Q    How much time did it take you to
21  do all that work, roughly?
22     A    On and off, 2012, 2013, then I stopped.
23     Q    To your knowledge, did Leason Ellis
24  ever contact any of the defendants to notify
25  them that you believed they were improperly

Page 286

LEE KAR YIN

1
2  using your photographs?
3      A    To my best knowledge, no.  I was
4  not told whether they did or they didn't.
5      Q    Leason Ellis never contacted GHM
6  to tell GHM that you believed they were
7  improperly using your photographs, correct?
8      A    They did not tell me, so I don't
9  have any recollection of Leason Ellis
10  telling me that they contacted GHM.
11     Q    So, the first time that you saw,
12  for example, the screenshots in Exhibit 2
13  was approximately in 2012, right?
14     A    2012.
15     Q    You think that it was improper
16  for, for example, Kayak to be using that
17  photograph that's in Exhibit 2, right?
18     A    Yes, and also with the credit line.
19     Q    So, at the time you first saw
20  this, why didn't you contact Kayak and tell
21  them to stop?
22         MR. TOKB:  Asked and answered.
23         THE WITNESS:  I have to find
24  out, like, I have to -- I have to look
25  deeper.  Like, okay, Kayak is VFM, but

10 (Pages 283 - 286)

Page 287

LEE KAR YIN

1  who is VFM and how does this work?
2  What does it mean?
3      To be honest with you, I didn't
4  even know about WHOIS until probably
5  June, sometime mid-2012, because I was
6  at a loss. I need to know, like, who
7  owns all these sites. Who are they?
8  Where are they? I didn't even know
9  who owns all these sites.
10 BY MR. SCHWARTZ:
11     Q    Why would that be important for
12 you to know who owned them if you wanted to
13 contact them?
14     A    So that I know who they are and
15 where they are. I mean, even if you want to
16 contact someone, if you don't know the
17 address, who are you looking for?
18     Q    So, are you saying that you were
19 on Kayak's website and you didn't think you
20 could contact Kayak directly?
21     A    I need to be certain who is the
22 owner because who is -- I remember typing on
23 Google "who is the owner of" whatever site.
24 That is how I got to Who dot Is.

Page 288

LEE KAR YIN

1      So, I have to be certain, like,
2  who is the owner so that you hopefully
3  contact the right person. And in a very big
4  organization, you don't really know who to
5  contact. Like, there must be a department
6  and there must be someone in charge. But
7  who is that someone?
8      Q    So you spent all that time, as
9  you said, during 2012 and 2013, coming up
10 with Exhibits 2 through 84, and you made no
11 attempt whatsoever to contact any of the
12 present defendants in this lawsuit?
13     A    I wouldn't say that. I asked --
14 the first thing I did -- I already said, my
15 mind went blank. What do I do? So the best
16 thing to do is to consult a lawyer.
17     Q    Why is that the best thing to do?
18     A    Because I don't know what to do.
19 Why are they stealing my work? Who gave it
20 to them?
21     Q    And so the first person you
22 contacted was an American lawyer?
23     A    No, I asked Chee Kun first.
24     Q    I see. And so that lawyer said

Page 289

LEE KAR YIN

1  that that firm wasn't a copyright specialist?
2      A    Chee Kun say it's not a copyright
3  lawyer. Then I thought, okay, since I know
4  John, maybe I can ask John.
5      Q    At the time that you asked John,
6  roughly 2012, 2013, it would have had to
7  have been after you discovered these
8  websites, right?
9      A    You know what? I am not going
10 into numbers because, to be honest with you,
11 I am very, very bad with numbers.
12     Q    I am not talking about numbers.
13 We are talking about dates.
14     A    Yes, dates are also numbers.
15     Q    Okay.
16     A    When I watch a video, what do you
17 call it, a deposition video, you kept saying
18 2002, 2002. I didn't even hear properly. I
19 say yeah, yeah, yeah. Then when I look at
20 the video, oh my God, in 2002 we didn't even
21 have that many pictures. We only had
22 pictures of Chedi Phuket and the Lalu, L-A-L-U.
23     MR. TOKB:  C-H-E-D-I, P-H-U-K-E-T.
24     A    You know, okay, 2002, why not,

Page 290

LEE KAR YIN

1  because I only remember 222. And when I
2  watch the video, I say no, no, no, it can't
3  be possible. We only had, like, a handful
4  of pictures. How can the website be created
5  in 2002? So I went to look, like, when was
6  the website created, the first website
7  created by Wave for GHM. You see, it would
8  escape me.
9      Q    So, we can agree, or can we agree
10 that you searched these websites in 2012
11 through 2013, correct, these websites
12 referring to Exhibit 2 through 84 of the
13 complaint; is that right?
14     A    Thereabouts, should be, should be.
15     Q    I am asking you. These are
16 yours, not mine. Is there something in here
17 that you think will help you refresh your
18 recollection?
19     A    No. The files would have the
20 dates. None of this have the dates.
21     Q    Are you sure?
22     A    Yeah, because it has the date
23 like Friday -- that is my computer, Friday,
24 whatever time, but it doesn't tell me the

11 (Pages 287 - 290)

Page 291

LEE KAR YIN

1    LEE KAR YIN
2  date. So the only thing that will tell me
3  the date is the evidence.
4        Q    What evidence?
5        A    The screenshot.
6        Q    So the screenshot has the date?
7        A    Yes.
8        Q    And so, did you contact a lawyer
9  prior to you getting the screenshots or
10  after you getting these screenshots,
11  referring to Exhibits 2 through 84?
12        A    This aside, this aside, I wanted
13  to set up shop, as I said in my first
14  deposition. Okay? After all the
15  registration was done, I asked John, "How do
16  I set up here? I need someone to help me
17  establish a company." And that happened in
18  2011. And that is how Leason Ellis also
19  came about, but they -- we didn't know about
20  all these infringement.
21        I wanted to set up shop at least
22  in New York, the Big Apple. You know the
23  saying, if you make it in New York, you make
24  it anywhere. So it was a good thing to have.
25        Q    So you contacted Mr. Jennison

Page 292

1    LEE KAR YIN
2  prior to 2012 because you were thinking of
3  setting up shop in the United States?
4        A    Correct. All this --
5        Q    So let me --
6        A    Hang on. All this copyright
7  registrations, the whole idea is that they
8  are done correctly, accurately, so that it
9  can be housed in one place. Not Wave, The
10  Wave, and so on and so forth.
11        In any case, all these entities
12  belong to me. So I wanted to clean up, put
13  it into one place, and The Wave Studio, LLC
14  was born.
15        Q    When did you first have the idea
16  that you wanted to sue these defendants for
17  copyright infringement?
18        A    When I found out -- when I found
19  out this, as I said, my mind went blank. I
20  need to know what am I supposed to do, and
21  the best person is to check with a copyright
22  lawyer. As I said, Chee Kun said he is not.
23  So I asked John and John said okay, he will
24  find the lawyer. Because there are so many
25  lawyer, you don't know who is good in what.

Page 293

1    LEE KAR YIN
2        Q    So, after 2012, after you found
3  these Exhibits 2 through 84, you came to New
4  York to meet with representatives from
5  Leason Ellis, lawyers?
6        A    Yes.
7        Q    And you are not sure when that is?
8        A    I can check my passport, my
9  previous passport.
10        Q    Did you have the belief that you
11  would make a lot of money from this lawsuit?
12        A    No.
13        Q    You didn't have that belief?
14        A    My first objective is to, one, I
15  want to know who gave it to them. Two,
16  please stop this. And three...
17        Q    "And three" what?
18        A    Apology.
19        Q    Why didn't you ask GHM for one,
20  two and three that you just described? Why
21  did you start a lawsuit instead?
22        A    I would go as according to what
23  my lawyer advised me.
24        MR. TOKE: I am also going to
25  instruct you not to reveal any

Page 294

1    LEE KAR YIN
2  attorney-client privilege, but you can
3  speak generally.
4  BY MR. SCHWARTZ:
5        Q    So, are you going to follow
6  Mr. Toke's advice and not say what your
7  lawyer said?
8        A    Yes, I am going to follow Mr.
9  Toke's advice because he is my lawyer.
10        MR. SCHWARTZ: Can you just
11  read back my question.
12        (Thereupon, the record was read
13  back by the reporter as recorded above.)
14  BY MR. SCHWARTZ:
15        Q    The answer, can you answer that
16  question, or are you going to refuse to
17  answer on attorney-client privilege?
18        A    Attorney-client privilege.
19        MR. SCHWARTZ: Just read back
20  the question one more time.
21        (Thereupon, the record was read
22  back by the reporter as recorded above.)
23  BY MR. SCHWARTZ:
24        Q    You wanted an apology, right?
25        A    Yes, which I -- yes.

12 (Pages 291 - 294)



Page 295

LEE KAR YIN

1
2     Q   You didn't ask for one, did you?
3     A   I think Leason Ellis did.
4     Q   So you now think that Leason
5  Ellis had some communication with GHM in
6  which it asked for an apology from GHM? Are
7  you making that up or do you --
8     A   No, I remember. I remember that
9  we asked for a public apology.
10         I said okay, good.
11    Q   When did the request from you or
12  Leason Ellis for a public apology from GHM
13  occur? When did that happen?
14    A   This is just a phone conversation,
15  like, we would ask for a public apology to
16  remove, like cease and desist, or something
17  like that. I said yes, good.
18    Q   Who were you speaking with at GHM
19  when you asked for a public apology?
20    A   Not me. I didn't speak to GHM.
21  This conversation is between Cameron and me.
22        Am I supposed to tell all this?
23    Q   You can say whatever you want to say.
24        MR. TOKE: Well, if there is --
25  I don't want you to talk about any

Page 296

LEE KAR YIN

1
2  advice that was given between Leason
3  Ellis and you. If you are talking
4  about a communication they had with
5  someone else, that is fine.
6  BY MR. SCHWARTZ:
7     Q   So, someone at Leason Ellis told
8  you that there was a telephone conversation
9  with somebody at GHM in which they asked --
10    A   They did not --
11    Q   Let me finish.
12        So, did someone at Leason Ellis
13  tell you that there was a conversation
14  between someone at Leason Ellis and someone
15  at GHM in which they asked for an apology or
16  asked GHM to stop some activity that you
17  claim was occurring?
18    A   They did not tell me that they
19  had communications with GHM. They told me
20  what we will be asking for. We will be
21  asking for a public apology. We will be
22  asking them to remove all infringed materials.
23    Q   Was it your understanding that
24  they were going to ask for a public apology
25  and to remove the infringing materials by

Page 297

LEE KAR YIN

1
2  way of a lawsuit or by way of a letter?
3     A   That I do not know at that point
4  in time.
5     Q   To the best of your knowledge,
6  you never saw any letter from anybody asking
7  GHM for a public apology or asking it to
8  remove what you believe to be infringing
9  photographs, right?
10    A   Yes.
11    Q   And you were never told that
12  there was a conversation between anybody at
13  GHM and anybody at Leason Ellis regarding a
14  public apology or stopping the, what you
15  claim to be the use of infringing
16  photographs, right?
17    A   That is correct.
18        MR. SCHWARTZ: Okay. Why don't
19  we just take a two-second break.
20        (Brief break.)
21  BY MR. SCHWARTZ:
22    Q   I want to show you Exhibit 17.
23        (Thereupon, the documents are
24  marked collectively as Exhibit 17 for
25  identification, as of this date.)

Page 298

LEE KAR YIN

1
2  BY MR. SCHWARTZ:
3     Q   This was sent to us yesterday in
4  the evening.
5     A   Yes.
6     Q   So, do you know what this is?
7     A   This whole stack?
8     Q   Yes.
9     A   This, to my understanding, is to
10  clean up all the inaccuracies in the
11  registration as well as in the assignments.
12        Thank you for pointing them out,
13  because my intent is solely to have them
14  recorded accurately. And this, I believe,
15  would have addressed all the inaccuracies
16  and corrected all the registration as well
17  as the assignment.
18    Q   So let's look at the page at the
19  bottom, the third page in, and it is Bates
20  number ending in 772.
21    A   Okay.
22    Q   Look at paragraph five for a second.
23        So the first day of your
24  deposition you said you didn't know anything
25  about Singapore law and you really were just

13 (Pages 295 - 298)

Page 299

LEE KAR YIN

1
2  a humble photographer, and yet paragraph
3  five seems to indicate that all right, title
4  and interest was automatically transferred
5  to you by operation of Singapore law?
6       MR. TOKE:  Objection,
7  argumentative and misstates her
8  testimony.  She actually testified
9  several times in her deposition --
10      MR. SCHWARTZ:  Don't say what
11  she testified to.  Okay?  I will
12  rephrase the question.  All you have
13  to say is objection.
14  BY MR. SCHWARTZ:
15      Q   Do you consider yourself an
16  expert in Singapore law?
17      A   No, but I did say during the
18  first deposition that my understanding is
19  that sole proprietor and sole proprietorship
20  is one and the same.  And when a sole
21  proprietorship is ceased, upon cessation, my
22  understanding was all, everything that
23  Wave-S owned comes back automatically to the
24  sole proprietor, me.  I think I am actually
25  repeating that.  I remember saying that.

Page 300

LEE KAR YIN

1
2      Q   So, you had an understanding of
3  that aspect of Singapore law?
4      A   Yes.
5      Q   Why don't you turn to page 774,
6  paragraph 19.  Why don't you read that to
7  yourself for a second.
8       So you read this entire document
9  which is called "The declaration of Lee Kar Yin"?
10      A   Yes.
11      Q   When was the first time you read this?
12      A   Last week.
13      Q   Was a draft sent to you last week?
14      A   Yes.
15      Q   Did you make any changes in the
16  initial draft, or did you sign what was sent
17  to you?
18      A   I read it.  Did I make any
19  amendments?  Yes.  Some of the, like the
20  name of the hotels were misspelled and my
21  name was misspelled, so I corrected them.
22      Q   Other than the misspellings,
23  grammatical mistakes, did you make any
24  substantive changes in what was presented to you?
25      A   No, not that I can recall.

Page 301

LEE KAR YIN

1
2      Q   So let's look at paragraph 19.
3  You just read it, right?
4      A   Yes.
5      Q   What does purported mean?
6      A   A wrong, a wrong assignment, error.
7      Q   So when you signed, when you
8  signed this and you read paragraph 19, what
9  did you understand the word purported to mean?
10      A   Error.
11      Q   So, a wrong assignment of
12  copyright was entered into; is that what
13  that is supposed to mean?
14      A   I believe so.
15      Q   And was made effective as of
16  February 15, 2007.  On information and
17  belief, this assignment was made in error.
18  What was the error?
19      A   That is the one that I mentioned
20  just now, the 2007 and 2008 assignments that
21  I did and went through the whole round,
22  making appointment with U.S. Embassy to get
23  it notarized.  At the point when they were
24  made, I really thought they were correct
25  because it is now for then.

Page 302

LEE KAR YIN

1
2       So, what I really wanted is that
3  the correct entity would be registered for
4  whichever works that the entity did.  So I
5  thought it was correct.
6       Am I making any sense?
7      Q   None at all, in my opinion.
8      So --
9      A   So, let's say if I have 10,000 --
10  let's say if I have 20,000 works done by
11  entity A.  I think it is -- at that point in
12  time, I said it is good because then I can
13  identify these 20,000 works that were done
14  by entity A.
15       Then entity B did these 300 --
16  30,000 works.  So at least there is a
17  recollection of which works were done by
18  which entity.
19      Q   Let's go back to the sentence for
20  a second.  "On information and belief," what
21  does that mean?
22      A   Based on information and belief,
23  based on information.
24      Q   What information?  What
25  information came to you with respect to

14 (Pages 299 - 302)

Page 303

LEE KAR YIN

1  paragraph 19 that led you to believe that
2  the assignment was made in error?
3      A    You know, for first, for the
4  first deposition, we spent a long time on
5  all these registrations and assignments.
6      Q    Yes, we did, didn't we?
7      A    Yes.
8      Q    And now you are saying that they
9  are all wrong, right?
10     A    No.  I mean, I need to find out,
11 did I register them wrongly?  I mean, all
12 these companies belong to me.  I am the
13 owner.  Like, did I put anything wrong?  Did
14 I fill in forms wrongly, or did I understand
15 what is supposed to have meant wrongly?
16     Q    In what sense is it wrong?
17     A    That is why I had to rely on my
18 attorney.  Like, okay, let's take a look at
19 everything laid out.  Like, what went wrong?
20     Q    But what is wrong?  You tell me.
21 What is wrong with the assignment dated
22 February 15, 2007?  What is wrong?
23     A    Basically, my understanding is
24 if all this assets automatically went back
25

Page 304

LEE KAR YIN

1  to me as a sole proprietor, then why do I
2  need this assignment?
3      Q    When did you come to that conclusion?
4      A    We went through it for such a
5  long time during deposition, and after that
6  I said there must be something wrong.  Put
7  everything together.  What is wrong with the
8  assignments?
9      Q    It is wrong because you wouldn't
10 have standing to sue, right; that is what is
11 wrong, isn't it?
12     A    Why wouldn't I?
13     Q    So you tell me what is wrong.
14 Look at Exhibit H.
15     A    Why wouldn't I have the right --
16     Q    Look at Exhibit H and tell me
17 what is wrong.
18     A    H.
19         MR. TOKE:  Asked am answered.
20 You are getting argumentative with
21 her, Howard.  She has already answered
22 this question.
23         THE WITNESS:  Is this the one
24 that was notarized?  It was struck
25

Page 305

LEE KAR YIN

1  off, the dates.
2         MR. TOKE:  No.
3         MR. SCHWARTZ:  Just a minute.
4  You can't answer her.  Just a second.
5  You can't answer that.
6         So, go ahead.
7         MR. TOKE:  She asked me a question
8         MR. SCHWARTZ:  No.
9         THE WITNESS:  Because it is a
10 photocopy and it looks like it has a
11 strike-off, but it doesn't.
12 BY MR. SCHWARTZ:
13     Q    So, this is your document, right,
14 that was sent to us last night, right?
15     A    Yes.
16     Q    This is done to correct all the
17 prior mistakes, right?
18     A    That is correct.
19     Q    And so, what is Exhibit H?  You
20 tell me.
21     A    Exhibit H is the wrong assignment.
22     Q    Is Exhibit H the wrong assignment
23 because the document isn't the one that was
24 submitted to the copyright office?
25

Page 306

LEE KAR YIN

1  Isn't there another one like this
2  where the date was crossed off, that was
3  submitted to the notary?
4      A    Notarized by U.S. Embassy.
5      Q    Okay.  So you tell me, then, what
6  is wrong with the Exhibit H that you have
7  attached to this document?
8         MR. TOKE:  Asked and answered.
9         THE WITNESS:  Because it is not
10 necessary.
11 BY MR. SCHWARTZ:
12     Q    Why isn't it necessary?
13         MR. TOKE:  Asked and answered.
14         THE WITNESS:  Upon cessation of
15 sole proprietorship, everything goes
16 back to the sole proprietor.  Sole
17 proprietor and sole proprietorship is
18 the same, is one and the same.  Then
19 why do we have an assignment that is
20 not necessary?  It should have been
21 me, Lee Kar Yin, to The Wave Studio,
22 LLC.  So that is a mistake.
23         Why can't I correct the
24 mistake?  Whether it's Wave-S, or
25

15 (Pages 303 - 306)

Veritext Legal Solutions

800-227-8440                                                          973-410-4040

LEE KAR YIN

1
2       Wave, or Lee Kar Yin, they are all
3       owned by me.  Why can't I correct my
4       mistakes?
5  BY MR. SCHWARTZ:
6       Q    So it is a mistake because of, by
7  operation of law, when you cease doing business
8  as Wave-S, everything went back to you?
9       A    Yes, Lee Kar Yin.
10      Q    Did you know that on
11  February 15th of 2007?
12      A    I knew that, but I thought it is
13  also good to have this because it will
14  register Wave-S did which work.
15      Q    Initially you said that Mr. Jennison
16  prepared this document, Exhibit H, right?
17      A    Yes.  I made a mistake in my
18  recollection because I filled in hundreds
19  and hundreds of forms.  Then I went back to
20  check all my documents.  Then I realized
21  that I actually filled in into an empty
22  template, thinking that it will save me money.
23      Q    Where did you get this template from?
24      A    My friend.
25      Q    Which friend, Sarah?

LEE KAR YIN

1
2       A    No.  I just said, Does any one of
3  you know if there is any template for
4  assignments?
5       Q    When you signed this in
6  February of 2007, did you understand what
7  this was?
8       A    I didn't sign this in 2007.
9       Do you have the notarized copy?
10      Q    Excuse me.  What is date on this
11  document?
12      A    This is 15 February 2007.
13      Q    So, wait a minute.  So, it is
14  dated 2007 and you didn't sign it in 2007?
15      A    We signed.  We signed it and we
16  went, we went to U.S. Embassy, and U.S.
17  Embassy told me and Sarah you cannot
18  backdate.  They cannot notarize anything
19  backdated.  If it is okay, they will strike
20  off and put a stamp on it the day it was
21  notarized.  I said yeah, it is okay.  It is
22  now for then, fine.
23      Why is it that you don't have the
24  notarized copy?
25      Q    Excuse me.  You didn't sign this

LEE KAR YIN

1
2  on February 15, 2007?
3       A    No, thinking...
4       MR. TOKE:  Asked and answered.
5       THE WITNESS:  My understanding
6  was it is now for then.  Okay?  So, I
7  put a date there and signed.  But at
8  U.S. Embassy they said you cannot,
9  they cannot notarize anything that is
10  backdated.  I said okay.
11      Obviously, we brought this
12  along because we don't know how to do
13  this.  We brought the signed copy as
14  well as the empty copy, and then they
15  said it is fine, this copy, but they
16  will strike out the dates if that is
17  okay with us.  I said sure because,
18  yeah, it is now for then.
19  BY MR. SCHWARTZ:
20      Q    So, just a second.  So, to go
21  back to the actual document that was served
22  on us yesterday, what does the expression
23  void ab initio mean?
24      A    Void.
25      Q    Do you know what that expression

LEE KAR YIN

1
2  means?
3       A    Wrong?  Void?
4       Q    So you are taking a guess; you
5  don't really know what it means?
6       A    I just relied on this word void.
7       Q    Do you know what ab initio means?
8       A    I am sure it was mentioned to me,
9  but I cannot remember.
10      Q    Did you ask what that meant
11  before you signed it?
12      A    No, I think it was told to me.
13      Q    Before you signed it or after you
14  signed it?
15      A    Before.
16      Q    What do you think it means?
17      A    Void, null.
18      Q    From the beginning or as of the
19  time that -- as of today?
20      A    From the beginning.
21      Q    Why was it important for it to be
22  voided from the beginning?
23      A    Because it is wrong.
24      Q    And it is wrong because --
25      A    It is not necessary.

16 (Pages 307 - 310)

Page 311

LEE KAR YIN

1
2   Q   So, in your view today, it wasn't
3   necessary for you to sign an assignment from
4   Wave to Wave Design Pte. because the
5   copyrights in Wave-S automatically went back
6   to you, right?
7       A   Yes.
8       Q   Why, then, did you sign Exhibit H
9   in 2007?
10      A   Because ---
11          MR. TOKE:  Objection, misstates
12      her testimony.  She told you when she
13      signed it.
14          You said 2007.
15          THE WITNESS:  I did.  I did.
16      Many times I did.
17  BY MR. SCHWARTZ:
18      Q   Wait, wait.  Let's get this
19  straight.  So it is dated in 2007, right?
20  Why is it dated 2007?
21          MR. TOKE:  Asked and answered.
22  BY MR. SCHWARTZ:
23      Q   Why is it dated 2007?
24      A   Before the company was, went into
25  cessation.

Page 312

LEE KAR YIN

1
2       Q   Why did you pick the date
3   February 15, 2007, to put on this document?
4       A   Seems like a nice date.
5       Q   So it is just a random date in
6   your mind?
7       A   I don't know how to do all this.
8   I wanted to save money.
9       Q   Correct me if I am wrong.  It is
10  dated February 15th of 2007, but you didn't
11  sign it on February 15, 2007, correct?
12      A   Yes, I just told you, because I
13  thought it is now for then.
14      Q   And it is witnessed by Sarah
15  Lawrence, right?  Did she know that it
16  wasn't dated -- that it wasn't signed on
17  February 15, 2007?
18      A   Yes.
19          Mr. Schwartz, we are laymen.  If
20  it is now for then and all these works were
21  done by Wave-S and Lee Kar Yin owned Wave-S,
22  laymen don't see the difference.
23          But when we went to U.S. Embassy,
24  U.S., the lady said you cannot, they cannot
25  notarize anything backdated.  They can only

Page 313

LEE KAR YIN

1
2   notarize on the date itself, the date.  So
3   we said okay.
4       Q   Let's go to paragraph 20.
5   Paragraph 20 refers to Exhibit I.
6           Do you see that in front of you?
7       A   Yes.
8       Q   Exhibit I is dated July 28, 2008,
9   right?
10      A   Yes, 2008.
11      Q   And you prepared this assignment,
12  right?
13      A   Yes.
14      Q   Not Mr. Jennison, right?
15      A   Yes, that is correct.
16      Q   You were in error when you
17  testified earlier?
18      A   Correct.
19      Q   This one says it is between Wave
20  Pte. Ltd. and Wave Studio Pte. Ltd., right?
21      A   Yes, correct.
22      Q   And so, in paragraph 20 it says
23  that on information and belief, this
24  assignment was made in error.
25      A   You mean on the 20th, okay.

Page 314

LEE KAR YIN

1
2       Q   What is wrong with this assignment?
3       A   It is actually the same
4   principle, because when I look at the
5   resolution, like, hang on, it has already
6   been given back to me.  That is one.
7           But, as I said just now, when
8   these assignments were done, my thought is
9   it is great to be able to identify which job
10  was done, were done by which entity, so at
11  least we can trace it back.  If it is just
12  Lee Kar Yin, at that point in time I thought
13  if it says Lee Kar Yin, who is going to find
14  it?  No one knows my Chinese name.  If they
15  type Wave, at least they could find
16  something.  That was my thought.
17      Q   So, what happened on July 28,
18  2008, that led to you prepare this assignment?
19          MR. TOKE:  Assumes facts not in
20      evidence.
21          THE WITNESS:  They are the same
22      reason because they were notarized on
23      the same day.
24  BY MR. SCHWARTZ:
25      Q   Okay.

17 (Pages 311 - 314)

Page 315

LEE KAR YIN

1
2      A   By the same officer who told us
3  the same thing.
4      Q   So let's try to take this slowly,
5  then.  So, I am looking now at Exhibit H.
6  Exhibit H was prepared by you, correct?
7      A   Yes.
8      Q   And Exhibit H has typed in it 28
9  July 2008 as the effective date.  That is on
10 documents 808 and 381.  It was produced twice.
11     Right?  Do you see that?
12     A   Sorry, what is the page?  This is
13 five, okay, 804, 808.
14     Q   Can we agree that you prepared
15 this document and the document says at the
16 top, "This assignment is made and entered
17 into with effect from July 28, 2008," correct?
18     A   Correct.
19     Q   What happened on July 28, 2008?
20     A   (No response.)
21     Q   Why did you pick this date for
22 this to be effective?
23     A   It is a good number in Chinese.
24 If I can, I will put everything 8/18/28.
25     Q   But July isn't the 8th month of

Page 316

LEE KAR YIN

1
2  the year.  It is the 7th month of the year.
3      A   Yeah, but I like July.
4      Q   So you are just making it up?
5      A   It is not making it up.  I needed
6  a date there.  All I am trying to do is to
7  correctly do my registrations.  I went
8  through a long, long process to even correct
9  whatever there is wrong.  If this is wrong,
10 too, please let me know.  I don't know what
11 else to do.  I am trying to record
12 everything correctly.
13     Q   Okay.  So let's see.  So, on page
14 810, 810, you prepared this and you have the
15 date as 28 July 2008.  Correct?
16     A   Yes.
17     Q   And it was witnessed by Sarah
18 Lawrence, who you described before as well,
19 right?
20     A   Yes.
21     Q   She witnessed it and she witnessed
22 it for the date July 28, 2008, correct?
23     A   No.  It was backdated and I
24 didn't know it was a no-no because the
25 notary public say, "No, we cannot notarize

Page 317

LEE KAR YIN

1
2  anything backdated."  So, okay, they will
3  put the stamp for that day.  I said okay.
4      Q   So, you went to the U.S. Embassy
5  on October 15, 2012, to have this notarized,
6  correct?
7      A   Yes, correct.
8      Q   You went with it, to use your
9  expression, with a document that was
10 backdated, correct?
11     A   Yes, it is backdated.
12     Q   It is backdated to July 28, 2008,
13 which you claim is just a date you picked at
14 random, right?
15     A   Correct.  And, to me, it also
16 represents now for then.  And then they told
17 us we cannot do that.  So, okay, you put the
18 date, whichever date you are notarizing.  I
19 mean, if I knew it was wrong or whatnot, I
20 wouldn't have done it, because every piece
21 costs $50 USD.
22     Q   Let's see what you have as being
23 wrong about this.
24     So, you were wrong when you
25 testified that this was prepared by Mr.

Page 318

LEE KAR YIN

1
2  Jennison, right?
3      A   I remember wrongly, yes.
4      Q   That was wrong.  It is wrong that
5  the date of July 28, 2008, was the date that
6  was signed, right?
7      A   Yes, correct.
8      Q   Yes, correct, it is wrong?
9      A   I was wrong.
10     Q   And yes, it is correct that the
11 information contained in here, the actual
12 assignment from The Wave Pte. Ltd. to the Wave
13 Studio Pte. Ltd. is wrong and null and void?
14     A   Yes.
15     Q   So you are saying that this piece
16 of paper is a complete waste, right?
17     A   Yes, and it wasted my time too.
18 But when I was doing that, when I was doing
19 all this, I really thought they were
20 correct.  All I wanted to do is to record
21 everything accurately.  If I were to be
22 wrong, please tell me.  If this whole thing
23 is wrong, too, please tell me.
24     Q   This whole thing, which you are
25 referring to as Exhibit H, is recorded with

18 (Pages 315 - 318)

LEE KAR YIN

1
2  the U.S. Copyright Office, right?
3      A  Yes.
4      Q  And it is all wrong?
5      A  My mistake.  In one thing to
6  record everything correctly, I thought it
7  should be registered.  It should be recorded
8  as Wave-S doing all this work.  Whichever
9  entity did whichever work, it should be
10  recorded correctly.
11      Q  It should be recorded correctly
12  because Wave Pte. Ltd. didn't want to assign
13  its copyrights to Wave Studio Pte.?
14      A  No.  They were already assigned
15  to my name.
16      Q  So, it is your position now, today --
17      A  What do you mean now?  I said
18  this -- sorry.
19      Q  So it is your position now --
20      A  I said this during deposition one.
21      Q  So, it is your position now, in
22  2015, that from the year 2000 to the year
23  2010 you individually owned all the copyrights?
24      A  For Wave-S.
25      Q  And all the documentation that

LEE KAR YIN

1
2  you have presented before and all the
3  documentation that has been filed with the
4  copyright office is null and void, right?
5      A  No, it just need to be corrected.
6  The name, the photo titles are correct.
7      Q  But the ownership is incorrect, right?
8      A  Instead of my company, instead of
9  my company, it should be my name.
10      Q  Because you say so?
11      A  No, because -- because Singapore
12  law requires for sole proprietorship it is
13  automatic.  There isn't anything that you
14  need to record.  Whatever Wave-S owned upon
15  cessation, it goes back to the sole
16  proprietor.  For a private limited company,
17  you have to follow the procedures.  The
18  company is not allowed to strike off if you
19  did not do -- there is a checklist for it.
20  If the company has a debt, if the company is
21  in lawsuit, you are only allowed to strike
22  off once they ascertain that the company
23  does not have any more asset, no debt, no
24  suit.  That means the company is clean.
25  Then only you are allowed to strike off.

LEE KAR YIN

1
2      Q  So, it is your understanding
3  today of Singapore law that a company can
4  only be stricken off if it doesn't have any
5  more assets, right?
6      A  According to the law, yes,
7  Singapore law.
8      Q  As you understand it.  And so,
9  you are now giving us your view of Singapore
10  law, right?
11      MR. TOKE:  Objection.
12      MR. SCHWARTZ:  No, no,
13  that's -- repeat the question.
14      (Whereupon, the referred-to
15  question and answer are read back by
16  the Reporter.)
17      MR. TOKE:  Objection, vague and
18  ambiguous.  As to this point of law,
19  yes, go for it.
20  BY MR. SCHWARTZ:
21      Q  So, Wave Pte. Ltd., according to
22  Exhibit I, assigned all of its rights in the
23  works on July 28, 2008, correct, according
24  to this document?  That is what this
25  document says, right?

LEE KAR YIN

1
2      A  Okay, yes.
3      Q  And then didn't Wave Pte. Ltd.
4  get stricken off on August 1, 2008?
5      A  The resolution was signed on
6  August 2008, but it is not immediate.
7      Q  But what I am saying is:  So,
8  wasn't Exhibit I transferring copyrights,
9  ownership rights from Wave Pte. two days
10  prior to it being stricken off so that Wave
11  Pte. wouldn't have any assets, as you just
12  described?
13      A  But it is not even -- look, first
14  of all -- I am sorry, what do you want?
15  Whether it is Wave-S or Lee Kar Yin, those
16  work belong to somebody.  Those work belong
17  to me.  They are not orphan work.  Somebody
18  owns not just photographs, whatever assets,
19  tables, chairs, somebody owns all those.
20      Q  So you are telling me now that
21  even though this assignment, which is
22  Exhibit I, was dated July 28, 2082, two days
23  before the company was stricken off, you are
24  telling me that, never mind, it doesn't make
25  a difference because you don't care?

19 (Pages 319 - 322)

Page 323

```
             LEE KAR YIN
 1
 2      A   Not that. This assignment cannot
 3  be backdated. That is what I am trying to
 4  tell you. That means it is not correct. I
 5  didn't know that at that point in time,
 6  thinking nunc pro tunc is now for then.
 7      Q   Are you telling me, then, that
 8  the first time you prepared this document
 9  was on or about October 15, 2012, when you
10  went to have it notarized?
11      A   What is the question? When I
12  went to notarize?
13      (Thereupon, the record was read
14  back by the reporter as recorded above.)
15      THE WITNESS: Yes. It is very
16  expensive. I cannot keep registering --
17  BY MR. SCHWARTZ:
18      Q   Was it your intent when you filed
19  this document with the copyright office, in
20  approximately 2012, to file this document
21  and make it appear that the document was
22  dated or signed July 28, 2008?
23      MR. TOKE: Objection.
24      THE WITNESS: I didn't make it
25  appear to --
```

Page 324

```
             LEE KAR YIN
 1
 2      MR. TOKE: Hold on.
 3      Objection, misstates the
 4  testimony. This was not filed with
 5  the copyright office in 2012.
 6  BY MR. SCHWARTZ:
 7      Q   When was Exhibit H filed with the
 8  copyright office?
 9      A   I am sorry, if you ask me dates,
10  again, I will say I cannot. I am not --
11      MR. TOKE: Let's go off the
12  record for a second.
13      MR. SCHWARTZ: No, no.
14      MR. TOKE: No, I want to
15  clarify this with you.
16      MR. SCHWARTZ: Well, I don't
17  need clarification right now. Let's
18  just keep going.
19      MR. TOKE: You are putting
20  words in her mouth and actually having --
21      MR. SCHWARTZ: Make an objection.
22  Fine, you made an objection.
23      MR. TOKE: I want to go off the
24  record so we can talk about this.
25      MR. SCHWARTZ: No, I do not
```

Page 325

```
             LEE KAR YIN
 1
 2  want to go off the record. You are
 3  interrupting me. I want to just keep
 4  going on. Okay?
 5      MR. TOKE: Okay.
 6  BY MR. SCHWARTZ:
 7      Q   Look at paragraph number nine in
 8  this document. Paragraph number nine says
 9  that The Wave Pte. Ltd. owned all right,
10  title and interest in certain professional
11  photographs, including the photographs
12  registered at, and then you have 9A and 9B.
13      So, is it your belief that you
14  filed with the copyright office the document
15  that wasn't signed on the date indicated on
16  the document itself?
17      MR. TOKE: Objection, vague and
18  ambiguous.
19      MR. SCHWARTZ: Okay, you
20  objected. Go ahead.
21      MR. TOKE: Do you understand
22  the question?
23      MR. SCHWARTZ: Stop coaching her.
24      MR. TOKE: I am not coaching her.
25  BY MR. SCHWARTZ:
```

Page 326

```
             LEE KAR YIN
 1
 2      Q   Do you understand the question?
 3      A   Can you --
 4      Q   What part of the question don't
 5  you understand?
 6      A   Can you repeat the question?
 7      MR. SCHWARTZ: Sure.
 8      Can you repeat the question?
 9      (Thereupon, the record was read
10  back by the reporter as recorded above.)
11      THE WITNESS: Is it my belief?
12  Is it my belief, is that the question?
13      (Thereupon, the record was read
14  back by the reporter as recorded above.)
15      THE WITNESS: This is going to
16  be a longer answer. It was notarized
17  on 15 October 2012. U.S. Embassy told
18  us it cannot be that date; it can only
19  be the date when it is notarized.
20      So, it is what it is. U.S.
21  Embassy put the date there. Did I
22  know you cannot backdate? I did not
23  know. And if you tell me you cannot
24  backdate, I am trying to do everything
25  I could because Wave-S, The Wave Private
```

20 (Pages 323 - 326)

Page 327

LEE KAR YIN

Limited all belong to Lee Kar Yin.
I said this again and again, the reason why I put Wave-S and The Wave Private Limited is because I thought it made a lot of sense so that we can identify which job was done by which entity.
BY MR. SCHWARTZ:
Q If you would look at paragraph ten, please. Do you see that?
A Yes.
Q Turn to Exhibit B, please.
Paragraph ten says, "A true and correct copy of the corporate minutes reflecting this resolution is attached as Exhibit B."
Exhibit B doesn't contain a true and correct copy of the corporate minutes, does it?
A I think it says Exhibit E.
MR. TOKE: It is E.
MR. SCHWARTZ: I am sorry, my mistake.
BY MR. SCHWARTZ:
Q So Exhibit E shows that Wave Pte.

Page 328

LEE KAR YIN

is stricken off as of August 1, 2008.
So, does that help refresh your recollection why the assignment contained as Exhibit I was dated July 28, 2008?
A No, it doesn't help me recollecting anything.
Q So let me see if I am understanding this.
Exhibit E, which is the minutes dated August 1, 2008, striking off Wave Pte. as a company, required the company not to have any assets, right?
A For striking off?
Q Yes.
A Yes.
Q And so, if Exhibit I, the assignment, is null and void, then doesn't Wave Pte. still have assets as of August 1, 2008?
A That is what I am trying to tell you.
Q And you are saying then that, therefore, Wave Pte. Ltd., when it was stricken off, all of the copyrights went to you?
A All assets, tangible and intangible.
Q Go to you?

Page 329

LEE KAR YIN

A Yes. In the first place, the two assignments that I did, they are wrong. I didn't know you cannot backdate. And U.S. Embassy, as you see, did not backdate; they just put the date there. If I knew, I wouldn't have done it. It costs a lot of money.
Q So let me see something.
A They are not even valid. That is what I am trying to say.
Q I understand that you are trying to say that they are not valid because it doesn't help you. But --
A It is not that it doesn't help me. They are not even valid because it cannot be backdated. And it is not like I want to backdate. I thought it was now for then. And U.S. Embassy put a stamp there on the date it was signed.
Q Okay.
A I am sorry if all of us artists do not know what law and which law and so on and so forth. All I knew was these are jobs made by Wave-S and I am the owner of The Wave. So, if it is not Wave, it would be

Page 330

LEE KAR YIN

Lee Kar Yin. These jobs cannot be orphan.
Q What made you think that you had to create Exhibit I to transfer the copyrights from Wave Pte. to Wave Studio Pte.?
A Well, when I first heard the term nunc pro tunc, which means now for then, I --
Q When did you first hear that expression?
MR. TOKE: Can we go off the record for a second? I am getting a call about a family, my family. Just for a second.
MR. SCHWARTZ: Sure.
(Brief break.)
BY MR. SCHWARTZ:
Q When did you come to the belief that Exhibits H and I and the other exhibits in deposition Exhibit 17 were null and void?
A Actually, thank you for pointing it out during deposition one. I wouldn't know because copyright registration is not required in Singapore. I have never gone through any of this. What you call assignment, or recordation, I have never

Page 331

LEE KAR YIN

1  done of this before.
2  So, we spent such a long time
3  going through all these documents during the
4  first deposition, it made me think that what
5  is wrong with my, what is wrong with my
6  registration? What did I do wrong?
7  Q   So you came to the conclusion that
8  you did something wrong with your registration,
9  and you wanted to correct it so that you
10  would own all of the copyrights, right?
11  A   In the first place, I do own all
12  the copyrights. So, if I recorded it
13  wrongly or inaccurately, I need to correct
14  them, and I have every right to correct
15  them. And correcting them is even more
16  expensive. I just want them to be recorded
17  accurately if there is anything else that is
18  not accurate.
19  Q   So, it was your intention always,
20  from 2000 through 2012, that you
21  individually owned the copyrights?
22  A   It actually belonged to the
23  company. I never thought too much about
24  things like that. So, my sole purpose is

Page 332

LEE KAR YIN

1  just to focus on what I do. This was never
2  a big thing. I mean, for us creative
3  people, or for me creative people, my job is
4  to do the next good job, good job, good job.
5  Q   So, as you sit here today, do you
6  believe that GHM is a reputable company?
7  Let me rephrase that.
8  As you sit here today, do you
9  think that GHM is a company with a good
10  reputation?
11  A   I can't answer that.
12  Q   Why not?
13  A   It is like if you asked me is
14  Coca-Cola a good company. I don't know.
15  Q   I am asking for your belief. Do
16  you believe, do you personally believe that
17  GHM has a good reputation?
18  MR. TOKE: You mean in the public?
19  BY MR. SCHWARTZ:
20  Q   In your mind.
21  A   I don't have any good or bad or
22  medium. I don't think of things like that, sir.
23  Q   So you don't have any belief one
24  way or the other about GHM's --

Page 333

LEE KAR YIN

1  A   GHM is just a company.
2  Q   As you sit here today, do you
3  believe any affiliation with GHM would be a
4  positive thing for you?
5  A   I don't think of things like
6  that. Why would I want to think of things
7  like that?
8  MR. SCHWARTZ: So, can you
9  repeat my question?
10  (Thereupon, the record was read
11  back by the reporter as recorded above.)
12  THE WITNESS: I have no belief
13  in whatever.
14  BY MR. SCHWARTZ:
15  Q   Do you believe that being associated
16  with GHM would be a negative, would have a
17  negative -- let me rephrase the question.
18  Do you believe that you
19  individually or any of your companies being
20  associated with GHM would be a negative
21  thing for you or your companies?
22  A   I don't have any belief.
23  Q   Are you aware of any trademarks
24  that GHM has?

Page 334

LEE KAR YIN

1  A   No, I am not aware of any trademarks.
2  Q   Do you ever use the name GHM to
3  promote your own business?
4  A   I use the things that I created
5  to promote my business. Whether those
6  marketing materials are for Citibank or for
7  Raffles Hotel or for Philippines hotel or
8  for SBC or GHM, I put it on my website. Those
9  are the works that were done, or for
10  Development Bank of Singapore.
11  Q   So, on your website, you still
12  use the name GHM, right?
13  A   I mean, I have -- I believe if it
14  says GHM, let's say, a GHM calendar, at the
15  bottom it says GHM calendar. It has to be
16  descriptive.
17  Q   Do you use the name GHM on the
18  opening page of your website?
19  A   No.
20  Q   Do you use the name GHM on your
21  website at all?
22  A   GHM name would be on the website
23  just like this.
24  Q   Why do you --

22 (Pages 331 - 334)

LEE KAR YIN

1
2     A    If the portfolio, if the
3   portfolio shows GHM calendar, then the
4   description is GHM calendar.  If the
5   portfolio is Citibank sales kit, then it's
6   Citibank sales kit.
7     Q    So you still use the name GHM,
8   correct, on your website?
9         MR. TOKE:  Asked and answered.
10        THE WITNESS:  I have to describe
11   what the picture is.  It's GHM calendar
12   or Coopers & Lybrand calendar.
13        MR. SCHWARTZ:  Why don't we
14   mark that as the next exhibit,
15   whatever number it is.
16        (Thereupon, the document was
17    marked Exhibit 18 for identification,
18    as of this date.)
19   BY MR. SCHWARTZ:
20     Q    I have just shown you Exhibit 18.
21   Can you identify what that is?
22     A    That is my website.
23     Q    And if you look at document 684,
24   which is the third or fourth page in --
25     A    Uh-huh.

LEE KAR YIN

1
2     Q    -- can you describe what that is?
3     A    That is the logo that I did.
4     Q    I am sorry?
5     A    That is the logo that I did.  I
6   designed that logo.
7     Q    Can you read what it says in the
8   lower left-hand side?
9     A    General Hotel Management.
10     Q    Did you ask permission to use
11   their name?
12     A    Why do I have to ask permission
13   to use the name?  I designed this and this
14   job is for General Hotel Management.
15     Q    So my question was:  Did you ask
16   permission to use their name?
17        MR. TOKE:  She answered the
18   question.
19        MR. SCHWARTZ:  No, she didn't.
20   She asked a question.
21        THE WITNESS:  No, I did not.
22   BY MR. SCHWARTZ:
23     Q    On your website, are there other
24   uses -- can you recall, as you are sitting
25   here today, other uses of the name General

LEE KAR YIN

1
2   Hotel Management?
3     A    No.  Basically, whatever designs
4   that we did, this is a portfolio.  So if it
5   is The Setai logo that Wave did, then it
6   says The Setai, South Beach, Miami.  What
7   did we do?  We created The Setai identity
8   with application and stationery.
9     Q    Did you ask permission to use The
10   Setai name in your website?
11     A    No, I did not.  It is descriptive
12   to what we did, our portfolio.
13     Q    What does descriptive mean?
14     A    I have to describe this logo as
15   The Setai.  We did -- what did we do?  We
16   did the corporate branding logo stationery.
17   What did we do?  How was this applied?
18     Q    So, if you go through this, and
19   there's more than a hundred pages, would you
20   agree that there are many instances of your
21   use of the names of the hotels that are
22   described in your complaint at Exhibit 10?
23     A    Yes, because we did all the work.
24   This is a portfolio.
25     Q    Yes.  And you have never asked

LEE KAR YIN

1
2   for permission to use the name of any of
3   those hotels, correct?
4         MR. TOKE:  Asked and answered.
5         THE WITNESS:  Like this, for
6   example, editables.
7   BY MR. SCHWARTZ:
8     Q    What page number is at the bottom?
9     A    00692.  So I did that for Raffles
10   International.  So, looking -- it is like a
11   presentation of what you have done.  So, if
12   you are asked, like, who was, what is
13   editables, or who was this for, or this was
14   done for Raffles International, created the
15   identity and the brochure template.
16     Q    You have in the back, for example,
17   at 748 you have The Nam Hai from Vietnam, right?
18         So, that is your picture on the
19   right-hand side?
20     A    Yes.
21     Q    You chose to use the name of the
22   hotel, right, on the left-hand side?
23     A    That is the name of the picture,
24   where it was shot.
25     Q    Right.  But the words The Nam Hai

23 (Pages 335 - 338)

Page 339

LEE KAR YIN

1
2 Vietnam are not on the picture, right?
3    A   It is to --
4    Q   Identify the picture?
5    A   Yes, this is The Nam Hai Hoi An
6 in Vietnam. It is just like if I take a
7 picture now and said this is Manhattan.
8    Q   Right. So, aren't you putting
9 the name Nam Hai on that picture to identify
10 where the picture was taken?
11    A   Yes.
12    Q   And you are doing it to show that
13 you have taken pictures of very nice hotels,
14 right?
15    A   Very nice pictures for the hotels.
16 There are also other people who took
17 pictures of the hotel and they are crappy.
18    Q   Right, of course.
19    But the picture, the picture that
20 you took can stand by itself as a beautiful
21 picture without your using the name of the
22 hotel, correct?
23    A   But we are allowed to use it for
24 our self-promotion.
25    Q   What is the basis of that statement?

Page 340

LEE KAR YIN

1
2    A   It is our portfolio.
3    Q   It is your portfolio. But did
4 The Nam Hai know that you were using this
5 photograph on your website?
6    A   I think Ralph knows. He has seen
7 this. You know, this is my first and only
8 website. I think some of them know because
9 they commented that this is --
10    MR. TOKE: Go ahead, finish.
11 Then I will interpose an objection.
12    THE WITNESS: This is a personal
13 portfolio. All artists do that.
14    MR. TOKE: So, I am going to
15 ask you, what exactly is the relevance
16 of this testimony? Since, as you have
17 pointed out repeatedly, the only issue
18 that is open for discovery at this
19 point has to do with ownership or
20 licensing of the copyrights, what does
21 this have to do with that?
22    MR. SCHWARTZ: It is my question.
23 That is what it has to do with.
24    MR. TOKE: No, no, hold on.
25 No, you take -- GHM has taken the

Page 341

LEE KAR YIN

1
2 position that discovery cannot be
3 taken at this point with regard to
4 anything but the issues, the threshold
5 issue of ownership of copyrights. Yes?
6    MR. SCHWARTZ: I am not here to
7 answer your questions. You can make
8 any objection you want to. I am going
9 to continue asking questions unless
10 you stop, and you are wasting the time.
11    THE WITNESS: If I take a
12 picture of an apple, okay, without the
13 label, I will put that Washington
14 apple because that is the name of the
15 apple. Am I supposed to ask for
16 permission from Washington apple?
17    If I take a picture of, let's
18 say, Empire State Building and, like,
19 I am going to put that this is a --
20 the picture of Empire State Building
21 is here, and I am going to put here
22 Empire State, New York.
23 BY MR. SCHWARTZ:
24    Q   Are you done?
25    A   I am trying to explain to you.

Page 342

LEE KAR YIN

1
2    MR. SCHWARTZ: Okay. So, your
3 lawyer has also said that for purposes
4 of this deposition, I cannot ask you
5 questions about damages.
6    Is that right?
7    MR. TOKE: Yes.
8    MR. SCHWARTZ: So, I think this
9 is about the end of the time period
10 that was allotted, and I am telling
11 you now that I am going to ask for
12 additional time because I got
13 Exhibit 17 late last night. It was
14 not fair for me to have to try to
15 prepare to ask questions about it
16 today and bump other questions I have.
17    In addition, I believe I am
18 entitled to ask questions about
19 damages and follow up on the documents
20 that the witness already said during
21 the first transcript relating to
22 damages which my adversary is not
23 agreeing to give to me.
24    So, I am adjourning the
25 deposition at this point because I

24 (Pages 339 - 342)

Page 343

```
 1              LEE KAR YIN
 2   think my time is up.  And you can make
 3   whatever statement you want to make,
 4   and then we will go back to the magistrate.
 5        MR. TOKE:  Okay, that is fine.
 6   If GHM wants to seek extra time, that
 7   is its prerogative.  I understand.
 8   GHM has taken the position that
 9   discovery is limited, and so we are
10   simply following the position that GHM
11   has taken.
12        If GHM wants to change that
13   position, we are certainly open to
14   discussion, and I would expect that
15   GHM should answer questions in discovery
16   that it hasn't responded to so far on
17   the basis that discovery is limited.
18        So, if GHM wants to do that,
19   fine.  Then it has got to be
20   reciprocal, and the plaintiff is
21   willing to talk about that.
22        MR. SCHWARTZ:  Okay.  Let's
23   adjourn the deposition.
24        THE REPORTER:  Does anyone want
25   a copy of this transcript?
```

Page 344

```
 1              LEE KAR YIN
 2        MR. TOKE:  Yes.
 3        MR. VANDUSEN:  Yes, I will take
 4   a copy.  My file number is 24-7287-00-6.
 5        (Time noted:  12:55 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 345

```
 1
 2        A C K N O W L E D G E M E N T
 3
 4   STATE OF NEW YORK  )
 5                      :SS
 6   COUNTY OF        )
 7
 8        I, LEE KAR YIN, hereby certify
 9   that I have read the transcript of my
10   testimony taken under oath in my deposition
11   of September 9, 2015; that the transcript is
12   a true, complete and correct record of my
13   testimony, and that the answers on the
14   record as given by me are true and correct.
15
16
17              LEE KAR YIN
18
19
20   Signed and Subscribed to
21   before me, this _____ day
22   of _____, 2015.
23
24
25   Notary Public, State of New York
```

Page 346

```
 1              I N D E X
 2   WITNESS
 3   LEE KAR YIN
 4   EXAMINATION BY:                    PAGE
 5        MR. SCHWARTZ                  253
 6
 7
 8        E X H I B I T S
 9
10   NUMBER       DESCRIPTION          PAGE
11   16      Exhibit 2 to the complaint  273
12   17      Stack of documents        297
13   18      Website document          335
14   *Ex. 16 was retained by counsel.
15
16
17
18
19
20
21
22
23
24
25
```

25 (Pages 343 - 346)

Page 347

```
1              C E R T I F I C A T E
2
3    STATE OF NEW YORK  )
                        :SS
4    COUNTY OF NEW YORK )
5
6          I, JESSICA R. TAFT, a Shorthand
7    Reporter and Notary Public within and for
8    the State of New York do hereby certify:
9          That LEE KAR YIN, the witness
10   whose examination is herein before set
11   forth, was duly sworn by me and that this
12   transcript of such examination is a true
13   record of the testimony given by such
14   witness.
15         I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage and that I am in no way
18   interested in the outcome of this matter.
19
20   IN WITNESS WHEREOF, I have hereunto set my
21   hand this 13th day of September 2015.
22
23            Jessica Taft
24            JESSICA R. TAFT
              Commission Number 01TA6041411
25            Expires: 05/07/2018
```

Page 349

```
1                 Veritext Legal Solutions
                290 W. Mt. Pleasant Ave. - Suite 3200
2                 Livingston, New Jersey 07039
              Toll Free: 800-227-8440  Fax: 973-629-1287
3    _____
4    _____, 2015
5    To: Vijay Toke, Esq.
6    Case Name: The Wave Studio v. GMBH
7    Veritext Reference Number: 2126707
8    Witness:  Leo Kar Yin    Deposition Date: 9/9/2015
9
     Dear Sir:
10
     Enclosed please find a deposition transcript.  Please have the witness
11   review the transcript and note any changes or corrections on the
     included errata sheet, indicating the page, line number, change, and
12   the reason for the change.  Have the witness' signature at the bottom
     of the sheet notarized except in California where they are signing
13   under penalty of perjury and forward the errata sheet back to us at
     the address shown above.
14
15
16   If the jurat is not returned within thirty days of your receipt of
17   this letter, the reading and signing will be deemed waived.
18
19
20   Sincerely,
21
22   Production Department
23
24   Encl.
25   Cc: All Counsel
```

Page 348

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS
2        800-227-8440
     ASSIGNMENT NO. NJ2126707
3    CASE NAME: The Wave Studio v. GMBH
     DATE OF DEPOSITION: 9/9/2015
4    WITNESS' NAME: Leo Kar Yin
5
     PAGE/LINE(S)   CHANGE      REASON
6     /     /
7     /     /
8     /     /
9     /     /
10    /     /
11    /     /
12    /     /
13    /     /
14    /     /
15    /     /
16    /     /
17    /     /
18    /     /
19    /     /
20        Leo Kar Yin
21   (Notary not required in California)
     SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS ____ DAY
     OF _____, 2015.
23
24   NOTARY PUBLIC
25   MY COMMISSION EXPIRES _____
```

[& - actual]                                                                    Page 1

| & |
|---|
| **&**   251:8 279:24 |
| 335:12 |

| 0 |
|---|
| **00692**   338:9 |
| **01ta6041411**   347:24 |
| **05/07/2018**   347:25 |
| **07039**   349:2 |
| **07052**   251:10 |
| **09239**   250:3 |

| 1 |
|---|
| **1**   322:4 328:2,11,19 |
| **10**   271:8,18 272:11 |
| 272:15 337:22 |
| **10,000**   302:9 |
| **10005**   250:11 |
| 251:22 |
| **10:41**   250:13 |
| **10:51**   275:16 |
| **11**   261:4,10 |
| **12**   266:22 |
| **12:55**   344:5 |
| **13th**   347:21 |
| **14**   260:25 |
| **15**   271:8,18 301:16 |
| 303:23 308:12 |
| 309:2 312:3,11,17 |
| 317:5 323:9 326:17 |
| **15th**   307:11 312:10 |
| **16**   273:3,15 275:10 |
| 279:15,21 282:19 |
| 346:11,14 |
| **17**   297:22,24 330:19 |
| 342:13 346:12 |
| **18**   335:17,20 346:13 |
| **19**   300:6 301:2,8 |
| 303:2 |

| 2 |
|---|
| **2**   270:19 272:24 |
| 273:6,12,14 275:10 |
| 283:11 284:5 |
| 285:16 286:12,17 |
| 288:11 290:13 |

291:11 293:3
346:11
**20**   272:11,15 313:4
313:5,22
**20,000**   302:10,13
**2000**   319:22 331:21
**2002**   289:19,19,21
289:25 290:6
**2005**   256:15,24
**2007**   254:24 260:20
301:16,20 303:23
307:11 308:6,8,12
308:14,14 309:2
311:9,14,19,20,23
312:3,10,11,17
**2008**   254:24 260:20
301:20 313:8,10
314:18 315:9,17,19
316:15,22 317:12
318:5 321:23 322:4
322:6 323:22 328:2
328:5,11,19
**2009**   254:8,8,13
260:20
**2010**   254:6,10,18,19
254:21 264:16
319:23
**2011**   255:13 264:16
291:18
**2012**   255:13 262:7,9
262:25 263:3,4,5,17
263:20 264:4,6,16
265:12,16,19
266:12 275:23
276:2 278:12 282:8
285:8,22 286:13,14
287:6 288:10 289:7
290:11 292:2 293:2
317:5 323:9,20
324:5 326:17
331:21
**2013**   263:3,4 264:4
276:2 282:8 285:8
285:22 288:10
289:7 290:12

| 2015 |
|---|
| **2015**   250:12 319:22 |
| 345:11,22 347:21 |
| 348:22 349:4 |
| **2082**   322:22 |
| **20th**   313:25 |
| **21**   267:7 |
| **2126707**   349:7 |
| **222**   290:2 |
| **24-7287-00-6**   344:4 |
| **253**   346:5 |
| **273**   346:11 |
| **28**   313:8 314:17 |
| 315:8,17,19 316:15 |
| 316:22 317:12 |
| 318:5 321:23 |
| 322:22 323:22 |
| 328:5 |
| **290**   349:1 |
| **297**   346:12 |

| 3 |
|---|
| **30,000**   302:16 |
| **300**   302:15 |
| **3200**   349:1 |
| **335**   346:13 |
| **381**   315:10 |
| **39th**   251:22 |

| 4 |
|---|
| **42**   283:11 |

| 5 |
|---|
| **50**   317:21 |

| 6 |
|---|
| **684**   335:23 |

| 7 |
|---|
| **748**   338:17 |
| **76**   267:6,8 269:17 |
| 270:24 271:16 |
| 272:21 |
| **772**   298:20 |
| **774**   300:5 |
| **7:13**   250:3 |
| **7th**   316:2 |

| 8 |
|---|
| **8/18/28**   315:24 |
| **80**   261:23 262:4 |
| **800-227-8440**   348:2 |
| 349:2 |
| **804**   315:13 |
| **808**   315:10,13 |
| **810**   316:14,14 |
| **84**   282:25 284:5 |
| 285:16 288:11 |
| 290:13 291:11 |
| 293:3 |
| **8th**   315:25 |

| 9 |
|---|
| **9**   250:12 345:11 |
| **9/9/2015**   348:3 |
| 349:8 |
| **918**   251:4 |
| **94710**   251:5 |
| **973-629-1287**   349:2 |
| **9a**   325:12 |
| **9b**   325:12 |

| a |
|---|
| **a.m.**   250:13 |
| **a21**   251:4 |
| **ab**   309:23 310:7 |
| **abcd.com**   282:3 |
| **abigail**   251:12 |
| **able**   314:9 |
| **about.com**   251:15 |
| 263:22 264:2,6 |
| 282:22 |
| **about.com.**   263:24 |
| 282:20 |
| **accurate**   331:19 |
| **accurately**   292:8 |
| 298:14 318:21 |
| 331:18 |
| **action**   250:3,17 |
| 347:16 |
| **activity**   296:16 |
| **actual**   309:21 |
| 318:11 |

addition 342:17
additional 342:12
address 287:18
  349:13
addressed 298:15
adjourn 343:23
adjourning 342:24
adversary 342:22
advertisement
  261:22 264:19
advice 294:6,9 296:2
advise 284:18
advised 293:23
affiliation 333:4
agencies 269:19
agree 290:10,10
  315:14 337:20
agreed 252:4,11,18
  253:16
agreeing 342:23
ahead 305:7 325:20
  340:10
airlines 251:20
airways 251:21
al 250:8
alliance 251:15
allotted 342:10
allow 269:21
allowed 320:18,21
  320:25 339:23
ambiguous 321:18
  325:18
amended 261:2
  272:17 275:11
  285:17
amendments 300:19
america 251:20
  279:12
american 288:23
answer 253:13,15
  257:23 258:2,20,22
  258:23 259:22,24
  275:12 276:19
  277:10 278:2,16
  282:14 284:15,15

285:6 294:15,15,17
  305:5,6 321:15
  326:16 332:12
  341:7 343:15
answered 265:22
  270:3 286:22
  304:20,22 306:9,14
  309:4 311:21 335:9
  336:17 338:4
answers 345:13
anybody 257:4
  297:6,12,13
apology 293:18
  294:24 295:6,9,12
  295:15,19 296:15
  296:21,24 297:7,14
appear 323:21,25
appeared 263:24
appearing 274:24
  276:7
appears 273:7
  275:17
apple 291:22 341:12
  341:14,15,16
application 337:8
applied 337:17
appointment 255:4
  301:22
approximately
  286:13 323:20
argument 276:17
argumentative
  269:25 299:7
  304:21
arlington 254:13
arrival 275:20
artists 329:21
  340:13
ascertain 320:22
aside 269:17 291:12
  291:12
asked 254:23 258:6
  265:24 271:22
  272:13 277:3
  280:14 286:22

288:14,24 289:6
  291:15 292:23
  295:6,9,19 296:9,15
  296:16 304:20
  305:8 306:9,14
  309:4 311:21
  332:14 335:9
  336:20 337:25
  338:4,12
asking 268:22
  276:12 278:11
  281:5 290:16
  296:20,21,22 297:6
  297:7 332:16 341:9
aspect 300:3
asset 320:23
assets 303:25 321:5
  322:11,18 328:13
  328:19,24
assign 319:12
assigned 319:14
  321:22
assignment 254:24
  298:17 301:6,11,17
  303:3,22 304:3
  305:22,23 306:20
  311:3 313:11,24
  314:2,18 315:16
  318:12 322:21
  323:2 328:4,17
  330:25 348:2
assignments 258:15
  260:21 298:11
  301:20 303:6 304:9
  308:4 314:8 329:3
associated 333:16
  333:21
assume 253:14
  262:2 275:3 278:22
  283:7
assumes 314:19
assumption 283:12
  283:19,25
attached 282:25
  283:5 306:8 327:16

attempt 278:3,6
  288:12
attorney 257:7,9,21
  259:18,19 294:2,17
  294:18 303:19
attorneys 251:3,8,14
  252:5
august 322:4,6
  328:2,11,19
automatic 320:13
automatically 299:4
  299:23 303:25
  311:5
available 275:20
ave 349:1
aware 333:24 334:2

b

b 251:15,16,19,19
  251:21 268:17
  302:15 327:13,16
  327:17 346:8
back 254:5,25 258:8
  259:4 260:19
  276:22,24 294:11
  294:13,19,22
  299:23 302:19
  303:25 306:17
  307:8,19 309:21
  311:5 314:6,11
  320:15 321:15
  323:14 326:10,14
  333:12 338:16
  343:4 349:13
backdate 308:18
  326:22,24 329:4,5
  329:17
backdated 255:8
  308:19 309:10
  312:25 316:23
  317:2,10,11,12
  323:3 329:16
bad 289:12 332:22
bank 334:11

banner 264:19,21
based 262:10 263:11
  280:13 283:11
  302:22,23
basically 261:14
  262:2 303:24 337:3
basis 339:25 343:17
bates 298:19
beach 337:6
beautiful 339:20
beginning 310:18,20
  310:22
behalf 250:16
belief 293:10,13
  301:17 302:20,22
  313:23 325:13
  326:11,12 330:17
  332:16,24 333:13
  333:23
believe 262:22 297:8
  298:14 301:14
  303:2 332:7,17,17
  333:4,16,19 334:14
  342:17
believed 276:5
  285:25 286:6
belong 292:12
  303:13 322:16,16
  327:2
belonged 331:23
berkeley 251:5
best 253:14 271:2
  279:5 280:7 286:3
  288:16,18 292:21
  297:5
big 288:4 291:22
  332:3
bills 265:25 266:9
blank 277:2 278:25
  288:16 292:19
bldg 251:4
blood 347:17
blue 264:24
boland 251:9

bookit 251:15
born 292:14
bottom 298:19
  334:16 338:8
  349:12
branding 337:16
break 297:19,20
  330:15
brief 297:20 330:15
briefly 272:19
brochure 261:23,25
  262:4 338:15
bronght 309:11,13
building 341:18,20
bump 342:16
business 256:2
  261:9 266:4,14
  307:7 334:4,6
button 271:4

### c

c 251:1 272:2 289:24
  345:2 347:1,1
calendar 334:15,16
  335:3,4,11,12
california 251:5
  348:21 349:12
call 255:20 261:23
  289:18 330:12,24
called 266:21 300:9
calls 257:6 259:18
cameron 295:21
care 322:25
case 292:11 348:3
  349:6
caused 263:5,19
cc 349:25
cd 267:18,22 268:5
  268:6 274:19
cds 269:13
cease 295:16 307:7
ceased 299:21
certain 269:18
  287:22 288:2
  325:10

certainly 343:13
certification 252:7
certify 345:8 347:8
  347:15
cessation 299:21
  306:15 311:25
  320:15
chairs 322:19
change 256:13,25
  259:11 343:12
  348:5 349:11,12
changes 257:3
  258:12,17 259:14
  259:15 260:17
  300:15,24 349:11
charge 272:4 288:7
chase 250:11 251:22
cheapair.com
  251:16
check 254:5,25
  261:11 292:21
  293:8 307:20
checklist 320:19
chedi 281:17 289:23
chee 279:25 288:24
  289:3 292:22
chiesa 251:8
chinese 314:14.
  315:23
choose 257:22
  258:23
chooses 268:16
chose 338:21
citibank 334:7
  335:5,6
civil 250:3
claim 296:17 297:15
  317:13
claiming 261:13
  263:8
clarification 324:17
clarify 324:15
clausen 251:14
clean 292:12 298:10
  320:24

clear 269:13 273:13
click 263:25 264:14
  264:20
clicked 264:14
  265:4
client 257:7,9,21
  259:18,19 294:2,17
  294:18
clock 271:6
coaching 325:23,24
cobalt 251:3
coca 332:15
cola 332:15
collection 283:9,22
  283:24 284:2
collectively 271:6
  297:24
com 270:9
come 256:4 260:6
  264:12 304:4
  330:17
comes 299:23
coming 288:10
commented 340:9
commission 347:24
  348:25
commissioner
  252:13
commnnicate
  277:24
communicating
  256:8
communication
  259:20 295:5 296:4
communications
  270:8 296:19
companies 255:12
  303:13 333:20,22
company 266:21
  291:17 311:24
  320:8,9,16,18,20,20
  320:22,24 321:3
  322:23 328:12,12
  331:24 332:7,10,15
  333:2

company's 255:2
compared 264:16
complaint 261:2
  270:20 272:18,25
  273:7,14 274:13
  275:10,11 280:21
  283:2,6 285:17,17
  290:14 337:22
  346:11
complete 318:16
  345:12
computer 290:24
concerned 283:21
conclusion 304:4
  331:8
conclusions 260:6
connection 265:6
  274:23 282:21
  283:4 284:4
consider 261:25
  299:15
considered 268:13
consult 257:13,17
  279:6,8 288:17
consulted 260:10
consulting 260:12
contact 278:4,7,12
  278:15,17 284:10
  284:12 285:24
  286:20 287:14,17
  287:21 288:4,6,12
  291:8
contacted 284:25
  286:5,10 288:23
  291:25
contain 327:17
contained 318:11
  328:4
continue 341:9
continued 250:15
contributed 256:21
conversation 295:14
  295:21 296:8,13
  297:12

coopers 335:12
copies 256:23
  270:23 271:12
copy 261:2 262:19
  269:24 270:20
  274:14 308:9,24
  309:13,14,15
  327:14,18 343:25
  344:4
copyright 274:4
  280:2,4,6 289:2,3
  292:6,17,21 301:12
  305:25 319:2 320:4
  323:19 324:5,8
  325:14 330:22
copyrights 311:5
  319:13,23 322:8
  328:23 330:4
  331:11,13,22
  340:20 341:5
copywriter 256:20
  256:22
corporate 327:15,18
  337:16
correct 254:2
  266:18 267:21
  268:11 269:7,23
  270:15 274:5,6,25
  278:3 280:24 281:7
  283:6,19 284:5,6
  286:7 290:12 292:4
  297:17 301:24
  302:3,5 305:17,19
  306:24 307:3 312:9
  312:11 313:15,18
  313:21 315:6,17,18
  316:8,15,22 317:6,7
  317:10,15 318:7,8
  318:10,20 320:6
  321:23 323:4
  327:14,18 331:10
  331:14,15 335:8
  338:3 339:22
  345:12,14

corrected 298:16
  300:21 320:5
correcting 331:16
correction 270:22
  270:24
corrections 254:22
  271:15 272:21
  349:11
correctly 281:6
  292:8 316:7,12
  319:6,10,11
costs 317:21 329:7
counsel 250:21
  269:18 346:14
  349:25
counter 251:18
county 345:6 347:4
course 255:6 339:18
court 250:1 252:16
  266:8
crappy 339:17
create 330:4
created 271:3,7
  290:5,7,8 334:5
  337:7 338:14
creation 256:21
creative 332:3,4
credit 262:15 263:8
  263:25 286:18
crossed 306:3
cv 250:3

**d**

d 251:15,16,19,19
  251:21 289:24
  345:2 346:1
damages 342:5,19
  342:22
date 255:9 256:18
  263:13 273:4 275:8
  275:14,15,19
  290:23 291:2,3,6
  297:25 306:3
  308:10 309:7 312:2
  312:4,5 313:2,2

315:9,21 316:6,15
  316:22 317:13,18
  317:18 318:5,5
  325:15 326:18,19
  326:21 329:6,19
  335:18 348:3 349:8
dated 303:22 308:14
  311:19,20,23
  312:10,16 313:8
  322:22 323:22
  328:5,11
dates 289:14,15
  290:21,21 305:2
  309:16 324:9
day 298:23 308:20
  314:23 317:3
  345:21 347:21
  348:22
days 322:9,22
  349:16
dear 349:9
debt 320:20,23
decision 257:12,15
  257:15
declaration 300:9
deeds 252:14
deemed 349:17
deeper 286:25
defendant 251:8
defendants 250:9
  251:14 280:13,15
  280:24 284:9,10
  285:24 288:13
  292:16
deliver 267:18
delivered 267:23
  274:18 283:12
delivering 268:5
dell 256:3
department 288:6
  349:22
departure 275:21
deposition 250:15
  253:19,22 254:2
  256:5 260:7 264:8

[deposition - expert]    Page 5

265:23 273:15
275:9 279:21
289:18 291:14
298:24 299:9,18
303:5 304:6 319:20
330:19,21 331:5
342:4,25 343:23
345:10 348:3 349:8
349:10
**describe** 335:10
336:2 337:14
**described** 261:9
293:20 316:18
322:12 337:22
**describes** 266:21
**description** 335:4
346:10
**descriptive** 334:17
337:11,13
**design** 272:3,4
311:4
**designed** 256:15
272:14 336:6,13
**designer** 271:19
**designs** 337:3
**desist** 295:16
**determine** 261:8
**determined** 262:9
263:15
**detyanni.puri**
270:13
**development** 334:11
**difference** 268:20
312:22 322:25
**different** 256:23
**directly** 287:21
**disclose** 269:19
**discovered** 289:8
**discovery** 274:10
283:16 340:18
341:2 343:9,15,17
**discuss** 257:3
258:18 259:10
**discussed** 259:5

**discussion** 279:2
343:14
**disseminated**
269:21
**distorted** 262:16
**district** 250:1,2
**document** 273:2
300:8 305:14,24
306:8 307:16
308:11 309:21
312:3 315:15,15
317:9 321:24,25
323:8,19,20,21
325:8,14,16 335:16
335:23 346:13
**documentation**
319:25 320:3
**documents** 297:23
307:20 315:10
331:4 342:19
346:12
**doing** 255:15 307:7
318:18,18 319:8
339:12
**dot** 270:9 287:25
**draft** 300:13,16
**drive** 251:9
**duly** 253:1 347:11

**e**

**e** 251:1,1 253:1,1
254:7 256:22
264:10 266:3
284:22,22 289:24
289:24 327:20,21
327:25 328:10
345:2,2,2 346:1,8
347:1,1
**earlier** 313:17
**editables** 338:6,13
**effect** 252:14 315:17
**effective** 301:15
315:9,22
**effort** 278:17 284:9

**eight** 261:25
**either** 263:22
**eleanor.hardy**
270:11
**ellis** 284:21,25 285:5
285:12,23 286:5,9
291:18 293:5 295:3
295:5,12 296:3,7,12
296:14 297:13
**embassy** 255:4,5,7
255:21 301:22
306:5 308:16,17
309:8 312:23 317:4
326:17,21 329:5,18
**empire** 341:18,20,22
**employee** 268:14
**empty** 307:21
309:14
**encl** 349:24
**enclosed** 349:10
**entered** 301:12
315:16
**entire** 283:8,22,24
284:2 300:8
**entities** 284:8
292:11
**entitled** 250:17
276:12 342:18
**entity** 281:23 283:8
283:13,22 302:3,4
302:11,14,15,18
314:10 319:9 327:8
**errata** 348:1 349:11
349:13
**error** 301:6,10,17
301:18 303:3
313:16,24
**escape** 290:9
**esq** 251:6,11,12,23
349:5
**establish** 291:17
**et** 250:8
**evening** 298:4
**event** 269:12

**evidence** 261:24
262:6,10 263:12,13
263:14 264:4
273:20,21,22 291:3
291:4 314:20
**ex** 346:14
**exactly** 269:23
340:15
**examination** 252:8
253:5 346:4 347:10
347:12
**examined** 253:3
**example** 286:12,16
338:6,16
**excuse** 308:10,25
**exhibit** 260:25
270:19 272:24
273:3,6,12,14,15
275:10,10 279:15
279:21 282:19,25
283:11,11 284:5,5
286:12,17 290:13
297:22,24 304:15
304:17 305:20,22
305:23 306:7
307:16 311:8 313:5
313:8 315:5,6,8
318:25 321:22
322:8,22 324:7
327:13,16,17,20,25
328:5,10,17 330:4
330:19 335:14,17
335:20 337:22
342:13 346:11
**exhibits** 282:25
283:10 285:16
288:11 291:11
293:3 330:18,18
**exit** 251:19
**expect** 343:14
**expedia** 251:15
**expensive** 323:16
331:17
**expert** 299:16

expires 347:25
  348:25
explain 256:4 270:5
  270:25 271:2
  341:25
explained 271:11
expression 309:22
  309:25 317:9 330:9
extent 257:6
extra 343:6

**f**

f 269:11,11 347:1
facebook 264:18
fact 266:7,7
facts 314:19
fair 342:14
familiar 280:6
family 330:12,12
far 258:18 283:21
  343:16
farebuzz 251:16
fareportal 251:16
fax 349:2
february 301:16
  303:23 307:11
  308:6,12 309:2
  312:3,10,11,17
file 262:8 323:20
  344:4
filed 272:18,22
  274:12 320:3
  323:18 324:4,7
  325:14
files 290:20
filing 252:6
fill 303:15
filled 255:2 256:6
  307:18,21
final 266:3
find 256:19 262:5
  263:10 265:14
  274:11 277:5,8
  283:15 284:19,20
  286:23 292:24

303:11 314:13,15
  349:10
fine 296:5 308:22
  309:15 324:22
  343:5,19
finish 279:17 296:11
  340:10
firm 289:2
first 253:1,9 254:18
  256:14,18 261:4,7
  263:10,15 264:7,17
  265:7,23 273:8,12
  276:3 284:11,25
  286:11,19 288:15
  288:22,24 290:7
  291:13 292:15
  293:14 298:23
  299:18 300:11
  303:4,5 322:13
  323:8 329:2 330:6,8
  331:5,12 340:7
  342:21
five 261:5 298:22
  299:3 315:13
floor 251:22
focus 332:2
foders.com 251:19
follow 294:5,8
  320:17 342:19
following 343:10
follows 253:4
force 252:14
form 252:19
forms 256:7 303:15
  307:19
forth 292:10 329:23
  347:11
forward 349:13
found 256:22
  261:12,20,21
  266:12 278:20
  279:15,20 282:2
  292:18,18 293:2
four 271:5

fourth 335:24
free 349:2
friday 275:16
  290:24,24
friend 255:10,16,23
  258:11 307:24,25
frommer 251:16
front 255:19 313:6
further 252:11,18
  347:15
fusion 251:18

**g**

g 345:2
general 250:8 251:9
  267:23 268:7,10,14
  268:18,21,25
  269:15 270:6 274:8
  274:21 336:9,14,25
generally 294:3
gentleman 254:13
  254:15
getaroom 251:16
getting 291:9,10
  304:21 330:11
ghm 256:14,18
  265:6,18 266:8,13
  266:16 267:2,21,23
  268:6,7,14,15 269:2
  269:3,14,20 270:7,9
  274:19,23 276:6
  277:3,4,23,24 278:4
  279:23 281:2,9,11
  281:13,18,20,23
  282:6,13,13,21
  283:4,9,12,22 284:2
  284:4 286:5,6,10
  290:8 293:19 295:5
  295:6,12,18,20
  296:9,15,16,19
  297:7,13 332:7,10
  332:18 333:2,4,17
  333:21,25 334:3,9
  334:13,15,15,16,18
  334:21,23 335:3,4,7

335:11 340:25
  343:6,8,10,12,15,18
ghm's 266:5 269:5
  332:25
ghmhotels.com
  270:10 282:6
ghmhotels.com.
  268:2 270:11,13
giantomasi 251:8
give 253:15 342:23
given 270:16 272:11
  296:2 314:6 345:14
  347:13
giving 262:15 321:9
gmbh 348:3 349:6
go 258:16 266:9,13
  271:4 280:9 285:4
  293:22 302:19
  305:7 309:20 313:4
  321:19 324:11,23
  325:2,20 328:25
  330:10 337:18
  340:10 343:4
god 289:21
goes 306:16 320:15
gogobot 251:20
gogobot.com 251:21
going 253:10,14
  258:20,22 259:17
  260:24 276:17
  289:10 293:24
  294:5,8,16 296:24
  314:13 324:18
  325:4 326:15 331:4
  340:14 341:8,19,21
  342:11
good 291:24 292:25
  295:10,17 302:12
  307:13 315:23
  332:5,5,5,10,15,18
  332:22
google 264:10,11
  265:2 287:24
googled 261:19

government 269:18
grammatical 300:23
great 314:9
guess 310:4
guide 251:18,18

**h**

h 272:2 289:24,24
  304:15,17,19
  305:20,22,23 306:7
  307:16 311:8 315:5
  315:6,8 318:25
  324:7 330:18 346:8
hai 281:8 338:17,25
  339:5,9 340:4
hand 336:8 338:19
  338:22 347:21
handful 290:4
hang 292:6 314:5
hans.meier 268:2
  270:10
happen 295:13
happened 263:5
  291:17 314:17
  315:19
happening 264:23
hard 270:4
hear 254:9 260:22
  289:19 330:8
heard 330:6
held 250:17 279:3
help 290:18 291:16
  328:3,6 329:13,14
helped 256:9
hereto 252:6
hereunto 347:20
high 278:23
hoi 281:8 339:5
hold 324:2 340:24
honest 287:4 289:11
hopefully 288:3
hotel 250:8 251:9
  267:21,24 268:6,11
  268:24 269:2,14,19
  269:24 270:7

271:21 274:8,20
  278:7,12,17 281:5,6
  334:8,8 336:9,14
  337:2 338:22
  339:17,22
hotel's 269:5
hotelplanner 251:17
hotels 256:23 266:5
  266:9,10 270:9
  280:16,16,21,22
  281:24 282:6,11
  300:20 337:21
  338:3 339:13,15
hotels.com 251:16
hotelsbyme 251:16
house 251:19
housed 292:9
howard 251:11
  304:22
huh 260:15 273:25
  335:25
humble 299:2
hundred 337:19
hundreds 256:6,7
  307:18,19

**i**

idea 265:7 266:15
  266:18,19 267:4,5
  269:4 274:13,23
  282:23 283:3,18,20
  292:7,15
identification 273:3
  297:25 335:17
identified 258:18
  273:10
identify 302:13
  314:9 327:7 335:21
  339:4,9
identity 337:7
  338:15
ignored 266:2
images 271:3,7
immediate 322:6

immediately 256:10
implying 261:14
important 287:12
  310:21
improper 286:15
improperly 285:25
  286:7
inaccuracies 298:10
  298:15
inaccurately 331:14
included 349:11
including 269:22
  325:11
incorporated 285:1
incorrect 320:7
indicate 273:12
  299:3
indicated 325:15
indicates 262:9
indicating 349:11
individually 319:23
  331:22 333:20
information 301:16
  302:20,22,23,24,25
  313:23 318:11
infringed 296:22
infringement
  291:20 292:17
infringing 282:17
  296:25 297:8,15
initial 300:16
initially 307:15
initio 309:23 310:7
inquiries 277:14,19
  277:22
insanelycheapflig...
  251:17
inside 264:13
instances 337:20
instruct 293:25
instructed 257:25
instructing 259:22
  259:24

intangible 328:24
intent 298:13
  323:18
intention 331:20
interest 299:4
  325:10
interested 274:17
  347:18
interior 272:5
international
  338:10,14
internet 269:22
interpose 340:11
interrupting 325:3
introduction 254:7
issue 340:17 341:5
issues 341:4
items 271:11

**j**

j 251:11,12,23
jennison 254:6,10
  254:14,17 279:10
  284:13,14 291:25
  307:15 313:14
  318:2
jersey 251:10 349:2
jessica 250:19 347:6
  347:24
jetblue 251:17
job 250:25 268:8
  269:16 314:9 327:7
  332:4,5,5,5 336:14
jobs 329:23 330:2
john 254:6 256:9,11
  279:9,10 280:5,6,8
  280:14 284:16
  289:5,5,6 291:15
  292:23,23
jnly 313:8 314:17
  315:9,17,19,25
  316:3,15,22 317:12
  318:5 321:23
  322:22 323:22
  328:5

[june - lighting]                                                    Page 8

**june** 287:6
**jurat** 349:16

**k**

**k** 253:1 272:2
  289:24 345:2
**kar** 250:15 254:1
  255:1 256:1 257:1
  258:1 259:1 260:1
  261:1 262:1 263:1
  264:1 265:1 266:1
  267:1 268:1 269:1
  270:1 271:1 272:1
  273:1 274:1 275:1
  276:1 277:1 278:1
  279:1 280:1 281:1
  282:1 283:1 284:1
  285:1 286:1 287:1
  288:1 289:1 290:1
  291:1 292:1 293:1
  294:1 295:1 296:1
  297:1 298:1 299:1
  300:1,9 301:1 302:1
  303:1 304:1 305:1
  306:1,22 307:1,2,9
  308:1 309:1 310:1
  311:1 312:1,21
  313:1 314:1,12,13
  315:1 316:1 317:1
  318:1 319:1 320:1
  321:1 322:1,15
  323:1 324:1 325:1
  326:1 327:1,2 328:1
  329:1 330:1,2 331:1
  332:1 333:1 334:1
  335:1 336:1 337:1
  338:1 339:1 340:1
  341:1 342:1 343:1
  344:1 345:8,17
  346:3 347:9 348:4
  348:20 349:8
**kawana** 270:23
**kayak** 251:17 274:3
  274:13 276:4,7
  277:14,19,23

278:13 280:12
  286:16,20,25
  287:21
**kayak's** 287:20
**kayak.com** 274:24
**kayak.com.** 273:9
**keep** 323:16 324:18
  325:3
**kept** 289:18
**kind** 274:17
**kit** 335:5,6
**knew** 279:5 307:12
  317:19 329:6,23
**know** 254:6,20
  261:14 262:13,25
  263:4,24 264:11,13
  267:3 268:18,25
  270:7,15,16 274:10
  274:15 275:20
  278:10,21,24 280:5
  280:16 282:3
  283:16 284:17,20
  285:2,3 287:5,7,9
  287:13,15,17 288:5
  288:19 289:4,10,25
  291:19,22 292:20
  292:25 293:15
  297:3 298:6,24
  303:4 307:10 308:3
  309:12,25 310:5,7
  312:7,15 316:10,10
  316:24 323:5
  326:22,23 329:4,22
  330:22 332:15
  340:4,7,8
**knowledge** 285:23
  286:3 297:5
**knows** 278:24
  314:14 340:6
**koichi** 271:23 272:2
  272:4,13,13 274:16
**koichisan** 271:23
**kun** 279:25 288:24
  289:3 292:22

**l**

**l** 253:1 284:22,22,22
  289:23,23 345:2
**label** 341:13
**laden** 271:18 272:9
  274:16
**lady** 312:24
**laid** 303:20
**lalu** 289:23
**late** 342:13
**law** 298:25 299:5,16
  300:3 307:7 320:12
  321:3,6,7,10,18
  329:22,22
**lawrence** 312:15
  316:18
**lawsuit** 279:22
  283:17 288:13
  293:11,21 297:2
  320:21
**lawyer** 255:24
  257:14 258:13,19
  259:6 260:3,11,14
  279:6,8,24 280:2,4
  280:10 284:12
  288:17,23,25 289:4
  291:8 292:22,24,25
  293:23 294:7,9
  342:3
**lawyer's** 257:15
**lawyers** 279:14,22
  293:5
**laymen** 312:19,22
**leason** 284:21,25
  285:5,12,23 286:5,9
  291:18 293:5 295:3
  295:4,12 296:2,7,12
  296:14 297:13
**led** 303:2 314:18
**lee** 250:15 254:1
  255:1 256:1 257:1
  258:1 259:1 260:1
  261:1 262:1 263:1
  264:1 265:1 266:1

267:1 268:1 269:1
  269:19 270:1 271:1
  272:1 273:1 274:1
  275:1 276:1 277:1
  278:1 279:1 280:1
  281:1 282:1 283:1
  284:1 285:1 286:1
  287:1 288:1 289:1
  290:1 291:1 292:1
  293:1 294:1 295:1
  296:1 297:1 298:1
  299:1 300:1,9 301:1
  302:1 303:1 304:1
  305:1 306:1,22
  307:1,2,9 308:1
  309:1 310:1 311:1
  312:1,21 313:1
  314:1,12,13 315:1
  316:1 317:1 318:1
  319:1 320:1 321:1
  322:1,15 323:1
  324:1 325:1 326:1
  327:1,2 328:1 329:1
  330:1,2 331:1 332:1
  333:1 334:1 335:1
  336:1 337:1 338:1
  339:1 340:1 341:1
  342:1 343:1 344:1
  345:8,17 346:3
  347:9 348:4,20
  349:8
**left** 255:18 336:8
  338:22
**legal** 269:18 348:1
  349:1
**lengthy** 271:5
**leonardo** 251:21
  261:9,12,12,18,22
  262:11,15
**letter** 297:2,6
  349:17
**licensing** 340:20
**lighting** 271:19,21
  272:9,10,10,12

limited 320:16
    327:2,5 343:9,17
line 263:25 286:18
    348:5 349:11
link 264:8 277:3
    284:14
links 265:4
list 280:20
listed 280:21,22,24
    284:8
listen 276:10,16
    281:3
litigator 284:17
livingston 349:2
llc 250:5,16 251:4
    251:20 285:11
    292:13 306:23
llp 251:3
located 280:8
logo 336:3,5,6 337:5
    337:14,16
lonely 251:17
long 303:5 304:6
    316:8,8 331:3
longer 326:16
look 256:16 261:3,4
    263:7,12,19,23
    264:16 266:22
    267:6 271:14 276:3
    280:20 282:18
    286:24 289:20
    290:6 298:18,22
    301:2 303:19
    304:15,17 314:4
    322:13 325:7
    327:10 335:23
looking 264:2,6
    287:18 315:5
    338:10
looks 305:11
loss 287:7
lot 278:14,20 293:11
    327:6 329:7
lower 336:8

lybrand 335:12

m

m 345:2
magistrate 343:4
mail 254:7 266:3
mailing 256:22
maintained 266:8
making 295:7
    301:22 302:6 316:4
    316:5
management 250:8
    251:9 274:9 336:9
    336:14 337:2
manager 256:3
    267:24 268:7,10,14
    268:25 269:15
    270:6,12 274:20,21
manager's 268:19
    268:21
manhattan 250:11
    251:22 339:7
manner 269:22
mark 335:14
marked 260:25
    273:3 297:24
    335:17
marketing 334:7
marriage 347:17
masano 270:22,23
    271:9,12 275:5
materials 296:22,25
    334:7
matter 255:11
    347:18
matthew 251:23
mean 256:20 257:17
    263:7,12 268:10
    277:16 281:10,19
    283:20 287:3,16
    301:5,9,13 302:21
    303:11,12 309:23
    313:25 317:19
    319:17 332:3,19
    334:14 337:13

means 281:12 310:2
    310:5,7,16 320:24
    323:4 330:7
meant 303:16
    310:10
medium 332:23
meet 285:4 293:4
memory 267:19,20
    267:23 274:19
mention 258:12
mentioned 301:19
    310:8
met 254:10,13,17
    285:11
metro 251:17,18
miami 337:6
michele 256:24
mid 287:6
miller 251:14
mind 259:11 265:5
    265:12 267:2 268:5
    268:13 277:2
    278:25 288:16
    292:19 312:6
    322:24 332:21
mine 290:17
minute 305:4
    308:13
minutes 327:15,18
    328:10
misspelled 300:20
    300:21
misspellings 300:22
misstates 276:8
    299:7 311:11 324:3
mistake 306:23,25
    307:6,17 319:5
    327:23
mistaken 254:7,12
mistakes 300:23
    305:18 307:4
mistook 254:14
money 255:15
    293:11 307:22
    312:8 329:7

month 254:20
    261:24 262:4
    315:25 316:2
mouth 324:20
mt 349:1
muscat 281:17

n

n 251:1 253:1
    284:22 345:2,2
    346:1
nam 281:8 338:17
    338:25 339:5,9
    340:4
name 255:2 261:13
    261:17 265:10
    300:20,21 314:14
    319:15 320:6,9
    334:3,13,18,21,23
    335:7 336:11,13,16
    336:25 337:10
    338:2,21,23 339:9
    339:21 341:14
    348:3,4 349:6
names 337:21
namhaihoian.com
    280:25
necessary 306:11,13
    306:21 310:25
    311:3
need 260:22 275:6
    287:7,22 291:16
    292:20 303:11
    304:3 320:5,14
    324:17 331:14
needed 316:5
negative 333:17,18
    333:21
netadvantage
    251:18
network 251:15
never 286:5 297:6
    297:11 322:24
    330:23,25 331:24
    332:2 337:25

[new - photo]                                                    Page 10

| new | o | | pages |
|---|---|---|---|
| new 250:2,11,11,20 251:10,22,22 253:3 291:22,23 293:3 341:22 345:4,25 347:3,4,8 349:2 | o 272:2 284:22 345:2 | 325:4,5,19 329:20 341:12 342:2 343:5 343:22 | pages 337:19 |
| nice 312:4 339:13,15 | oath 253:4,7 345:10 | once 262:11 320:22 | paid 265:25 268:21 268:25 269:2 |
| night 305:15 342:13 | object 259:18 | open 340:18 343:13 | paper 318:16 |
| nine 325:7,8 | objected 276:18 325:20 | opening 334:19 | paragraph 261:4,10 266:21 267:6,8 269:17 270:24 271:16 272:21 280:22,23 298:22 299:2 300:6 301:2,8 303:2 313:4,5,22 325:7,8 327:10,14 |
| nj2126707 250:25 348:2 | objection 257:5 269:25 276:8 278:18 299:6,13 311:11 321:11,17 323:23 324:3,21,22 325:17 340:11 341:8 | operation 299:5 307:7 | |
| notarize 255:7 308:18 309:9 312:25 313:2 316:25 323:12 | | opinion 302:7 | |
| | | orange 251:10 | |
| | | order 250:20 268:9 | |
| notarized 255:5,9 301:23 304:25 306:5 308:9,21,24 314:22 317:5 323:10 326:16,19 349:12 | objections 252:19 | ordered 267:21 | parker 251:4 |
| | objective 293:14 | organization 288:5 | part 254:10 326:4 |
| | obviously 309:11 | original 271:14 | particular 274:3 275:9 283:13 |
| | occur 295:13 | orphan 322:17 330:2 | parties 252:6 347:16 |
| notarizing 317:18 | occurred 253:25 | outcome 347:18 | partner 251:18 |
| notary 250:19 252:13 253:2 255:20 306:4 316:25 345:25 347:7 348:21,24 | occurring 296:17 | overlooked 272:23 | passport 293:8,9 |
| | october 317:5 323:9 326:17 | owned 287:13 299:23 307:3 312:21 319:23 320:14 325:9 331:22 | payment 266:10 268:9 270:17,18 |
| | office 305:25 319:2 320:4 323:19 324:5 324:8 325:14 | | pays 268:18 |
| | | | pegasus 251:19 266:21 267:2 |
| note 349:11 | officer 252:15 315:2 | | penalty 349:13 |
| noted 344:5 | oh 255:7 256:11 260:23 289:21 | owner 269:16 281:12 282:4,5,5,12 287:23,24 288:3 303:14 329:24 | people 256:20 263:9 271:6,17 275:4 278:15 332:4,4 339:16 |
| notify 265:15,18 285:24 | okay 255:10,11,12 259:10 260:13 261:19 264:5,24 266:4,12,15,24 267:10 269:12 271:8 277:13 283:23 286:25 289:4,16,25 291:14 292:23 295:10 297:18 298:21 299:11 303:19 306:6 308:19,21 309:6,10,17 313:3 313:25 314:25 315:13 316:13 317:2,3,17 322:2 | ownership 320:7 322:9 340:19 341:5 | period 282:8 342:9 |
| null 310:17 318:13 320:4 328:18 330:19 | | owns 287:8,10 322:18,19 | perjury 349:13 |
| | | | permission 336:10 336:12,16 337:9 338:2 341:16 |
| number 261:21 266:22 298:20 315:23 325:7,8 335:15 338:8 344:4 346:10 347:24 349:7,11 | | p | person 271:22 280:7 281:20,22 283:8,21 288:4,22 292:21 |
| | | p 251:1,1 289:24 | |
| | | p.c. 251:8,14 | |
| | | p.m. 275:16 344:5 | personal 340:12 |
| numbers 289:11,12 289:13,15 | | page 261:5 267:7 273:8,12 276:3 282:18 298:18,19 300:5 315:12 316:13 334:19 335:24 338:8 346:4 346:10 348:5 349:11 | personally 285:18 332:17 |
| nunc 323:6 330:7 | | | pertaining 256:10 |
| | | | philippines 334:8 |
| | | | phone 295:14 |
| | | | photo 320:6 |

photocopy 305:11
photograph 274:3
  286:17 340:5
photographer 299:2
photographs 269:20
  280:17 283:13
  284:3 286:2,7 297:9
  297:16 322:18
  325:11,11
phuket 289:23
physically 269:14
  285:4
pick 312:2 315:21
picked 317:13
picture 262:14,14
  262:16,17,18 263:8
  264:13,19 274:9,14
  274:24 276:6
  277:15,20,23 278:7
  278:13 335:11
  338:18,23 339:2,4,7
  339:9,10,19,19,21
  341:12,17,20
pictures 261:13,15
  261:15,15 262:2
  263:17,24 264:22
  265:9,10,13,16,19
  271:13,14,18,20
  272:5,7,11,16
  274:15,18 275:6
  277:2 289:22,23
  290:5 339:13,15,17
piece 317:20 318:15
place 250:18 292:9
  292:13 329:2
  331:12
plaintiff 250:6,17
  251:3 343:20
planet 251:17
plaza 250:11 251:22
pleaded 265:24
pleasant 349:1
please 266:9 267:7
  271:25 278:22
  293:16 316:10

318:22,23 327:11
  327:13 349:10,10
point 256:7 275:22
  297:3 301:23
  302:11 314:12
  321:18 323:5
  340:19 341:3
  342:25
pointed 340:17
pointing 298:12
  330:20
portfolio 335:2,3,5
  337:4,12,24 340:2,3
  340:13
position 268:16,17
  319:16,19,21 341:2
  343:8,10,13
positive 333:5
possible 290:4
possibly 283:15
postproduction
  271:5
pr 256:3 270:12
prepare 314:18
  342:15
prepared 254:24,25
  307:16 313:11
  315:6,14 316:14
  317:25 323:8
prerogative 343:7
present 288:13
presentation 338:11
presented 300:24
  320:2
previous 253:19,22
  293:9
previously 260:25
principle 314:4
prior 262:13 291:9
  292:2 305:18
  322:10
private 320:16
  326:25 327:5
privilege 257:7,9,21
  259:19 294:2,17,18

privileged 259:20
pro 323:6 330:7
probably 262:6
  275:22 287:5
procedures 320:17
process 271:5 316:8
produced 262:23
  315:10
production 349:22
profession 256:2
professional 325:10
project 267:16
promote 334:4,6
promotion 272:6
  275:7 339:24
promotional 271:10
properly 289:19
proprietor 299:19
  299:24 304:2
  306:17,18 320:16
proprietorship
  299:19,21 306:16
  306:18 320:12
pte 311:4 313:20,20
  318:12,13 319:12
  319:13 321:21
  322:3,9,11 325:9
  327:25 328:11,18
  328:22 330:5,5
public 250:19
  252:13 253:2
  255:20 295:9,12,15
  295:19 296:21,24
  297:7,14 316:25
  332:19 345:25
  347:7 348:24
publicly 269:21
purported 301:5,9
purpose 331:25
purposes 342:3
pursuant 250:20
put 255:9 264:24
  265:9 269:5,6
  271:13 272:6
  273:24 275:18

292:12 303:14
  304:7 308:20 309:7
  312:3 315:24 317:3
  317:17 326:21
  327:4 329:6,18
  334:9 341:13,19,21
putting 261:13,22
  324:19 339:8

### q

qantas 251:21
question 253:13
  258:5,6 259:2 260:9
  264:15 265:8,11
  276:12,13,15,19,21
  277:10 278:2
  279:18 294:11,16
  294:20 299:12
  304:23 305:8
  321:13,15 323:11
  325:22 326:2,4,6,8
  326:12 333:10,18
  336:15,18,20
  340:22
questions 252:20
  253:11 341:7,9
  342:5,15,16,18
  343:15

### r

r 250:19 251:1 253:1
  347:1,6,24
raffles 334:8 338:9
  338:14
rajah 279:24
ralph 340:6
random 251:19
  312:5 317:14
read 258:7 259:3
  261:7 266:23
  267:12,13,14,18,20
  267:22 272:17,21
  276:22,23 294:11
  294:12,19,21 300:6
  300:8,11,18 301:3,8
  321:15 323:13

[read - salary]                                                                Page 12

326:9,13 333:11
336:7 345:9
**reading** 349:17
**realize** 260:17
**realized** 260:18
307:20
**really** 283:18 288:5
298:25 301:24
302:2 310:5 318:19
**reason** 282:10,15,15
314:22 327:4 348:5
349:12
**recall** 300:25 336:24
**recaptured** 263:14
**receipt** 349:16
**reciprocal** 343:20
**recollecting** 328:7
**recollection** 256:17
286:9 290:19
302:17 307:18
328:4
**recommend** 280:3
**record** 257:25 258:7
259:3 273:17
276:23 279:3
294:12,21 316:11
318:20 319:6
320:14 323:13
324:12,24 325:2
326:9,13 330:11
333:11 345:12,14
347:13
**recordation** 330:25
**recorded** 258:8
259:4 276:24
294:13,22 298:14
318:25 319:7,10,11
323:14 326:10,14
331:13,17 333:12
**records** 254:5
**redundant** 258:15
**reference** 349:7
**referred** 321:14
**referring** 290:13
291:11 318:25

**refers** 313:5
**reflecting** 327:15
**refresh** 256:17
290:18 328:3
**refuse** 294:16
**regard** 341:3
**regarding** 297:13
**register** 256:9
303:12 307:14
**registered** 280:11
281:2,20,23 302:3
319:7 325:12
**registering** 323:16
**registrant** 281:9,10
281:18,19 282:5,6
**registration** 256:8
280:6 291:15
298:11,16 330:22
331:7,9
**registrations** 274:4
292:7 303:6 316:7
**related** 347:16
**relating** 342:21
**relation** 255:22
**relationship** 266:16
266:25 274:8
**relevance** 340:15
**relied** 310:6
**relocated** 285:14
**rely** 303:18
**remember** 256:5,8
257:2 275:13 285:2
285:14 287:23
290:2 295:8,8
299:25 310:9 318:3
**remote** 251:12
284:22
**remove** 295:16
296:22,25 297:8
**repeat** 258:4,6,25
276:20 280:18
321:13 326:6,8
333:10
**repeatedly** 340:17

**repeating** 299:25
**rephrase** 259:12
260:9 299:12 332:8
333:18
**reporter** 258:3,8
259:4 271:25
276:24 294:13,22
321:16 323:14
326:10,14 333:12
343:24 347:7
**representatives**
293:4
**represented** 279:14
279:22
**represents** 317:16
**reputable** 332:7
**reputation** 332:11
332:18
**request** 295:11
**required** 328:12
330:23 348:21
**requires** 320:12
**research** 263:2,6
**reservation** 251:15
251:18
**reservationcounter...**
251:19
**reserved** 252:20
**reservetravel.com**
251:15
**resolution** 314:5
322:5 327:16
**respect** 302:25
**respective** 252:5
272:3
**responded** 343:16
**response** 315:20
**responsibility** 266:6
**responsible** 276:6
**restaurant** 272:4,14
**retained** 346:14
**returned** 349:16
**reveal** 257:8,20
293:25

**review** 260:2 349:11
**reviewed** 253:18,20
260:5
**reviewing** 260:12,13
260:16,19,21
**right** 255:19 267:14
267:20 268:14
269:24 272:18
274:20 276:7
277:15,18,20,23
279:16 284:13
285:18 286:13,17
288:4 289:9 290:14
294:24 297:9,16
299:3 301:3 303:10
304:11,16 305:14
305:15,18 307:16
311:6,19 312:15
313:9,12,14,20
315:11 316:19
317:14 318:2,6,16
319:2 320:4,7 321:5
321:10,25 324:17
325:9 328:13
331:11,15 334:13
338:17,19,22,25
339:2,8,14,18 342:6
**rights** 321:22 322:9
**roadside** 251:20
**rom** 267:22 268:5,6
**roughly** 282:7
285:21 289:7
**round** 301:21

**s**

**s** 251:1 264:10
269:11 284:22,22
299:23 306:25
307:8,14 311:5
312:21,21 319:8,24
320:14 322:15
326:25 327:4
329:24 346:8 348:5
**salary** 268:19,21

| | | | |
|---|---|---|---|
| sales 335:5,6 | 327:9,22,24 330:14 | series 253:10 | singapore 255:6 |
| san 272:2 | 330:16 332:20 | served 309:21 | 266:8 279:23 280:4 |
| sarah 255:17,17,19 | 333:9,15 335:13,19 | session 253:10 | 298:25 299:5,16 |
| 255:22 258:11,14 | 336:19,22 338:7 | set 291:13,16,21 | 300:3 320:11 321:3 |
| 307:25 308:17 | 340:22 341:6,23 | 347:10,20 | 321:7,9 330:23 |
| 312:14 316:17 | 342:2,8 343:22 | setai 264:10,25,25 | 334:11 |
| saturated 262:17 | 346:5 | 270:12 272:14 | sir 264:3 332:23 |
| save 255:15 307:22 | screenshot 273:20 | 280:23 337:5,6,7,10 | 349:9 |
| 312:8 | 273:21,22 275:9 | 337:15 | sit 274:22 332:6,9 |
| saw 262:11 263:21 | 283:14 291:5,6 | setting 292:3 | 333:3 |
| 263:22 264:14,17 | screenshots 273:7 | shahinian 251:8 | site 263:21 281:4,12 |
| 264:18 276:5,25 | 283:2,5 284:4,7 | sheet 348:1 349:11 | 282:12 287:24 |
| 278:12 281:8,9,16 | 285:18 286:12 | 349:12,13 | sites 287:8,10 |
| 286:11,19 297:6 | 291:9,10 | shop 291:13,21 | sitting 253:24 |
| saying 287:19 | sealing 252:6 | 292:3 | 336:24 |
| 289:18 291:23 | search 260:20 | shorthand 347:6 | slowly 315:4 |
| 299:25 303:9 | 264:12 265:2 | shot 338:24 | sole 299:19,19,20,24 |
| 318:15 322:7 | 275:18,19 | show 260:24 269:16 | 304:2 306:16,17,17 |
| 328:21 | searched 290:11 | 270:19 272:24 | 306:18 320:12,15 |
| says 266:3 269:17 | second 266:23 276:4 | 297:22 339:12 | 331:25 |
| 313:19,22 314:13 | 297:19 298:22 | showcase 271:20 | solely 298:13 |
| 315:15 321:25 | 300:7 302:20 305:5 | 272:8 | solutions 266:22 |
| 325:8 327:14,20 | 309:20 324:12 | shown 335:20 | 348:1 349:1 |
| 334:15,16 336:7 | 330:11,13 | 349:13 | somebody 296:9 |
| 337:6 | see 262:14 264:25 | shows 274:2 327:25 | 322:16,17,19 |
| sbc 334:9 | 275:19 281:14 | 335:3 | sorry 254:9 258:21 |
| schwartz 251:11 | 282:4 288:25 290:8 | side 336:8 338:19,22 | 270:2 275:12 |
| 253:6 257:11,24 | 312:22 313:6 | sign 262:3 300:16 | 280:18 285:14 |
| 258:4,9,25 259:7,21 | 315:11 316:13 | 308:8,14,25 311:3,8 | 315:12 319:18 |
| 259:25 262:24 | 317:22 327:11 | 312:11 | 322:14 324:9 |
| 267:9,11 269:9 | 328:8 329:5,8 | signature 255:18 | 327:22 329:21 |
| 270:14 273:5,16,18 | seek 343:6 | 347:23 349:12 | 336:4 |
| 276:10,16,22 277:6 | seen 340:6 | signed 252:12,15 | south 337:6 |
| 279:7,19 284:23 | self 271:9,10 272:6 | 255:5,18,19 301:7,8 | southern 250:2 |
| 285:13 287:11 | 275:7 339:24 | 308:5,15,15 309:7 | speak 294:3 295:20 |
| 294:4,10,14,19,23 | selling 263:9 | 309:13 310:11,13 | speaking 295:18 |
| 296:6 297:18,21 | sense 302:6 303:17 | 310:14 311:13 | specialist 289:2 |
| 298:2 299:10,14 | 327:6 | 312:16 318:6 322:5 | specific 272:7 |
| 305:4,9,13 306:12 | sent 269:13,24 270:5 | 323:22 325:15 | specifically 263:23 |
| 307:5 309:19 | 298:3 300:13,16 | 329:19 345:20 | spell 271:24 |
| 311:17,22 312:19 | 305:15 | signing 349:12,17 | spent 288:9 303:5 |
| 314:24 321:12,20 | sentence 254:11 | simply 275:18 | 331:3 |
| 323:17 324:6,13,16 | 302:19 | 343:10 | spin 272:3 |
| 324:21,25 325:6,19 | september 250:12 | sincerely 349:20 | ss 345:5 347:3 |
| 325:23,25 326:7 | 345:11 347:21 | | |

stack 298:7 346:12
staff 269:2,3,8,10,11
stamp 308:20 317:3
329:18
stand 339:20
standing 304:11
start 264:5 293:21
started 263:3
283:17
state 250:20 253:3
341:18,20,22 345:4
345:25 347:3,8
statement 339:25
343:3
states 250:1 280:9
280:10,12 281:21
292:3
stationery 337:8,16
stay 276:4
stealing 288:20
steps 277:7,11
stipulated 252:4,11
252:18
stipulations 250:21
252:2
stop 286:21 293:16
296:16 325:23
341:10
stopped 285:22
stopping 297:14
straight 311:19
street 251:4
stricken 321:4 322:4
322:10,23 328:2,22
strike 305:12 308:19
309:16 320:18,21
320:25
striking 328:11,14
struck 304:25
studio 292:13
306:22 313:20
318:13 319:13
330:5 348:3 349:6
studios 250:5,16
251:4

stuff 269:5,6,10
submitted 305:25
306:4
subscribe 262:3
subscribed 345:20
348:21
substantive 300:24
sue 281:6,24 282:11
282:13 292:16
304:11
suit 320:24
suite 349:1
suits 268:16,17
supposed 278:15
280:14 292:20
295:22 301:13
303:16 341:15
sure 267:24 268:15
280:19 290:22
293:7 309:17 310:8
326:7 330:14
swearing 253:16
sworn 252:12,15
253:2 347:11
348:21

t

t 264:10 269:11
289:24 345:2 346:8
347:1,1
tables 322:19
taft 250:19 347:6,24
tag 273:23 274:2
take 261:3 268:16
277:7 285:20
297:19 303:19
315:4 339:6 340:25
341:11,17 344:3
taken 250:18 339:10
339:13 340:25
341:3 343:8,11
345:10
takes 268:17
talk 295:25 324:24
343:21

talking 289:13,14
296:3
tamper 262:17
tangible 328:24
tann 279:24
tech 278:23
telephone 296:8
tell 259:13 273:11
274:7 275:5 286:6,8
286:20 290:25
291:2 295:22
296:13,18 303:21
304:14,17 305:21
306:6 318:22,23
323:4 326:23
328:20
telling 257:19
286:10 322:20,24
323:7 342:10
template 255:3
307:22,23 308:3
338:15
ten 280:22,23
327:11,14
term 272:3 330:6
testified 253:4
267:17 268:3 299:8
299:11 313:17
317:25
testimony 276:9,11
299:8 311:12 324:4
340:16 345:10,13
347:13
thank 298:12
330:20
thereabouts 262:7
282:9 290:15
thing 260:8 279:5
284:11 288:15,17
288:18 291:2,24
315:3 318:22,24
319:5 332:3 333:5
333:22
things 260:7 331:25
332:23 333:6,7

334:5
think 255:6 259:13
264:7 265:22
266:20 267:17
268:2 270:3 272:10
275:23 281:17
282:16 286:15
287:20 290:18
295:3,4 299:24
302:11 310:12,16
327:20 330:3 331:5
332:10,23 333:6,7
340:6,8 342:8 343:2
thinking 292:2
307:22 309:3 323:6
third 298:19 335:24
thirty 349:16
thompson 271:19
272:9 274:16
thong 279:25
thought 255:14,15
256:11 265:18
289:4 301:24 302:5
307:12 312:13
314:8,12,16 318:19
319:6 327:6 329:17
331:24
three 293:16,17,20
threshold 341:4
time 250:18 252:20
254:18 256:7
263:15 272:22
276:5 279:15,16,20
282:8 285:20
286:11,19 288:9
289:6 290:25
294:20 297:4
300:11 302:12
303:5 304:6 310:19
314:12 318:17
323:5,8 331:3
341:10 342:9,12
343:2,6 344:5
times 270:4 299:9
311:16

**title** 299:3 325:10
**titles** 320:6
**today** 253:15 258:18
  274:22 310:19
  311:2 319:16 321:3
  332:6,9 333:3
  336:25 342:16
**toke** 251:6 257:5,19
  259:17,23 260:14
  260:17 262:22
  267:8,10 269:8,25
  273:13,17 276:8,14
  278:18 279:17
  286:22 289:24
  293:24 295:24
  299:6 304:20 305:3
  305:8 306:9,14
  309:4 311:11,21
  314:19 321:11,17
  323:23 324:2,11,14
  324:19,23 325:5,17
  325:21,24 327:21
  330:10 332:19
  335:9 336:17 338:4
  340:10,14,24 342:7
  343:5 344:2 349:5
**toke's** 294:6,9
**told** 255:16 258:11
  258:14 263:11
  264:3,7,18 275:5
  284:16 286:4 296:7
  296:19 297:11
  308:17 310:12
  311:12 312:12
  315:2 317:16
  326:17
**toll** 349:2
**top** 315:16
**touch** 271:4
**trace** 314:11
**trademarks** 333:24
  334:2
**transcript** 252:7,12
  253:18,20 342:21
  343:25 345:9,11

347:12 349:10,11
**transfer** 330:4
**transferred** 299:4
**transferring** 322:8
**travel** 251:17,18,21
**travelocity** 251:20
**trial** 252:8,21
**tripadvisor** 251:20
**true** 253:16 282:24
  327:14,17 345:12
  345:14 347:12
**try** 271:2 277:7
  278:22 315:4
  342:14
**trying** 270:4 274:11
  316:6,11 323:3
  326:24 328:20
  329:10,11 341:25
**tunc** 323:6 330:7
**turn** 300:5 327:13
**twice** 315:10
**two** 261:21 269:13
  271:17 285:9
  293:15,20 297:19
  322:9,22 329:2
**type** 275:17,17
  314:15
**typed** 264:9,10,25
  315:8
**typing** 287:23

**u**

**u** 289:23,24
**u.s.** 255:4,5,7,21
  256:10 280:13
  301:22 306:5
  308:16,16 309:8
  312:23,24 317:4
  319:2 326:17,20
  329:4,18
**uh** 260:15 273:25
  335:25
**understand** 253:7
  253:11 281:6
  284:12 301:9

303:15 308:6 321:8
  325:21 326:2,5
  329:11 343:7
**understanding**
  296:23 298:9
  299:18,22 300:2
  303:24 309:5 321:2
  328:9
**understood** 268:4
  281:25
**united** 250:1 251:20
  280:9,9,12 292:3
**unpaid** 265:25
**usd** 317:21
**use** 297:15 317:8
  334:3,5,13,18,21
  335:7 336:10,13,16
  337:9,21 338:2,21
  339:23
**uses** 336:24,25

**v**

**v** 261:23,25 262:3
  348:3 349:6
**vague** 321:17
  325:17
**valid** 329:9,12,15
**vandusen** 251:23
  344:3
**verify** 268:8 270:17
**veritext** 348:1 349:1
  349:7
**vfm** 251:21 261:9,11
  261:12,18,21
  262:11,14 263:6,16
  263:20,23,25 265:6
  265:8,12,14,15,19
  266:16 286:25
  287:2
**video** 253:20,21
  260:2,22 289:17,18
  289:21 290:3
**vietnam** 338:17
  339:2,6

**view** 311:2 321:9
**vijay** 251:6 259:9
  349:5
**void** 309:23,24
  310:3,6,17 318:13
  320:4 328:18
  330:19
**voided** 310:22
**vs** 250:7

**w**

**w** 345:2 349:1
**wait** 308:13 311:18
  311:18
**waived** 252:9
  349:17
**want** 254:2,22
  256:12,25 257:8,13
  257:16 261:7
  266:23 270:21
  271:15 272:15
  277:24 283:15
  285:3 287:16
  293:15 295:23,25
  297:22 319:12
  322:14 324:14,23
  325:2,3 329:17
  331:17 333:7 341:8
  343:3,24
**wanted** 271:20
  272:5,10 287:13
  291:12,21 292:12
  292:16 294:24
  302:2 312:8 318:20
  331:10
**wants** 343:6,12,18
**washington** 341:13
  341:16
**waste** 318:16
**wasted** 318:17
**wasting** 341:10
**watch** 253:21
  289:17 290:3
**wave** 250:5,16 251:4
  256:14 261:15

266:4 268:8 269:16
270:18 274:18
285:11 290:8 292:9
292:10,13 299:23
306:22,25 307:2,8
307:14 311:4,4,5
312:21,21 313:19
313:20 314:15
318:12,12 319:8,12
319:13,24 320:14
321:21 322:3,9,10
322:15 325:9
326:25,25 327:4,5
327:25 328:11,18
328:22 329:24,25
329:25 330:5,5
337:5 348:3 349:6
**way** 297:2,2 332:25
347:17
**website** 256:14,18
256:21 271:10,22
272:6 275:7 281:20
281:23 282:3,19
287:20 290:5,7,7
334:9,12,19,22,23
335:8,22 336:23
337:10 340:5,8
346:13
**websites** 289:9
290:11,12
**week** 300:12,13
**went** 254:5,25
260:19 261:11,19
265:14 277:2
278:25 282:4,7
288:16 290:6
292:19 301:21
303:20,25 304:5
307:8,19 308:16,16
311:5,24 312:23
316:7 317:4,8
323:10,12 328:23
**west** 251:10
**whatnot** 317:19

**whatsoever** 284:9
288:12
**whereof** 347:20
**whichever** 266:5
275:19 302:4
317:18 319:8,9
**whois** 281:15,16,21
282:4,7 287:5
**willing** 343:21
**window** 264:21
**witness** 257:22
259:5 270:2 276:20
276:25 278:19
279:4 286:23
304:24 305:10
306:10,15 309:5
311:15 314:21
323:15,24 326:11
326:15 333:13
335:10 336:21
338:5 340:12
341:11 342:20
346:2 347:9,14,20
348:4 349:8,10
**witnessed** 312:14
316:17,21,21
**witness'** 349:12
**wk** 251:21
**word** 301:9 310:6
**words** 264:12 265:2
265:3 324:20
338:25
**work** 280:11 285:21
287:2 288:20
307:14 319:8,9
322:16,16,17
337:23
**works** 270:7 302:4
302:10,13,16,17
312:20 321:23
334:10
**write** 277:17
**wrong** 260:23 301:6
301:6,11 303:10,14
303:17,20,21,22,23

304:7,8,10,12,14,18
305:22,23 306:7
310:3,23,24 312:9
314:2 316:9,9
317:19,23,24 318:4
318:4,8,9,13,22,23
319:4 329:3 331:6,6
331:7,9
**wrongly** 303:12,15
303:16 318:3
331:14

| x |
| --- |
| **x** 250:4,10 346:1,8 |

| y |
| --- |
| **y** 253:1 |

**yausen** 256:24
**yeah** 255:3 281:4
289:20,20,20
290:23 308:21
309:18 316:3
**year** 316:2,2 319:22
319:22
**years** 265:25 271:8
285:9
**yellow** 273:23 274:2
**yesterday** 298:3
309:22
**yin** 250:15 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1,9 301:1 302:1

303:1 304:1 305:1
306:1,22 307:1,2,9
308:1 309:1 310:1
311:1 312:1,21
313:1 314:1,12,13
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1,15
323:1 324:1 325:1
326:1 327:1,2 328:1
329:1 330:1,2 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:8,17
346:3 347:9 348:4
348:20 349:8
**york** 250:2,11,11,20
251:22,22 253:3
291:22,23 293:4
341:22 345:4,25
347:3,4,8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit "C"

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| IN THE MATTER OF | ) |
|  | ) |
|  | ) |
| THE WAVE STUDIO, LLC, a New York | ) |
| Limited Liability Corporation, | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) CASE NO: |
| v. | ) 7:13-cv-09239-CS-PED |
|  | ) |
| GENERAL HOTEL MANAGEMENT LTD., | ) |
| et al, | ) |
| Defendants. | ) |
|  | ) |

- - - - - - - - - - - - - - - - - -


VIDEOTAPED DEPOSITION OF RALF OHLETZ GRAF VON PLETTENBERG

Wednesday, September 23, 2015

AT:  2:10 p.m.


Taken at:

Allen & Gledhill

31st Floor, 1 Marina Boulevard

Singapore 018989


Court Reporter:

Helen Case

Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Plaintiff:
        MR. VIJAY TOKE
        COBALT LAW LLP
        918 Parker Street, Building A21
        Berkley, CA 94710
        Telephone:  (510) 841-9800

Appearing for the Defendant:
        MR. HOWARD J. SCHWARZ
        CHIESA SHAHINIAN & GIANTOMASI PC
        One Boland Drive
        West Orange, NJ 07052
        Telephone:  (973) 530-2031

Also present:
        Ms. Lee Kar Yin

VIDEOGRAPHER:
        Chee Meng Chen
        Flex Video Productions

# W I T N E S S   I N D E X

Page

RALF OHLETZ COUNT VON PLETTENBERG ....................5

   EXAMINATION BY MR. SCHWARZ ......................6

   EXAMINATION BY MR. TOKE ........................37

   FURTHER EXAMINATION BY MR. SCHWARZ ............135

E X H I B I T S   I N D E X

Number                                                          Page

Exhibit 45   Pre-opening brochure for The Chedi Club, ....16
             Tanah Gujah, Ubud, Bali, unnumbered

Exhibit 46   Brochure for The Legian, Bali, unnumbered ...21

Exhibit 47   A4 brochure entitled "GHM A Style To ........27
             Remember", unnumbered

Exhibit 48   Sewing kit marked "The Setai", unnumbered ...56

Exhibit 49   The Wave Design production estimate, ........60
             dated 1 June 2008, unnumbered

Exhibit 50   Wave S production estimate, dated ..........64
             13 September 2004, unnumbered

Exhibit 51   The Wave Design production estimate, ........67
             dated 3 October 2008, unnumbered

Exhibit 52   Wave S production estimate, dated 3 May .....75
             2004, Bates numbered TWS0355359

Exhibit 53   The Wave Design production estimate, dated ..77
             4 July 2005, Bates numbered TWS0355721-TWWS035722

Exhibit 54   Emails between Hans Jenni, Kar Yin Lee ......97
             and Kendall Oei, dated between 6/16/2006
             and 6/26/2006, unnumbered

Exhibit 55   Emails between Kendall Oei and Kar Yin .....105
             Lee, dated 09/20/2006, Bates numbered
             TWS0355933-TWS0355934

Exhibit 56   The Magazine No.1, unnumbered .............118

Exhibit 57   The Magazine No.3, unnumbered .............118

Exhibit 58   The Magazine No.4, unnumbered .............118

Exhibit 59   The Magazine No.2, unnumbered .............118

Exhibit 60   The Magazine No.7, unnumbered .............118

Exhibit 61   Email thread, unnumbered ..................127

```
              1                    P R O C E E D I N G S
14:10:32      2          VIDEOGRAPHER:  This is the video operator
14:10:34      3   speaking, Chee Meng Chen of DTI, 1 Raffles Place #50-00,
14:10:46      4   Tower 1, Singapore 048616.  Today is 23rd September 2015 and
14:10:55      5   the time is 2:11 p.m.
14:10:59      6          We are at the offices of Allen & Gledhill, 31st
14:11:05      7   floor, 1 Marina Boulevard, Singapore, to take the videotaped
14:11:10      8   deposition of Ralf Ohletz in the matter of The Wave Studio
14:11:17      9   LLC, a New York Limited Liability Corporation, v. General
14:11:21     10   Hotel Management et al.
14:11:24     11          Will counsel please introduce themselves for the
14:11:27     12   record.
14:11:29     13          MR. SCHWARZ:  Howard Schwarz, representing General
14:11:31     14   Hotel Management.
14:11:33     15          MR. TOKE:  Vijay Toke, representing The Wave
14:11:35     16   Studio LLC.
14:11:40     17          VIDEOGRAPHER:  Will the court reporter, Helen Case
14:11:43     18   of DTI, please swear in the witness.
14:11:49     19          COURT REPORTER:  Would you state your full name,
14:11:50     20   please.
14:11:51     21          A.  My name is Ralf Ohletz Count von Plettenberg.
14:11:55     22          RALF OHLETZ COUNT VON PLETTENBERG,
14:12:08     23   having been duly affirmed, testified as follows:
14:12:11     24          MR. SCHWARZ:  With respect to the swearing of the
14:12:12     25   witness, we will have the same agreement as yesterday, that
```

Dep - CA No.13-CV-09239-CS-PED                           23 September 2015

14:12:16  1    the court reporter is authorized to give the oath and there

14:12:19  2    will be no objection to that.

14:12:22  3         MR. TOKE:  So stipulated.

14:12:24  4         MR. SCHWARZ:  Okay.

14:12:24  5         EXAMINATION BY MR. SCHWARZ:

14:12:25  6         Q.  Have you ever been deposed before?

14:12:28  7         A.  No, this is my first time.

14:12:30  8         Q.  We are going to ask you a series of questions

14:12:33  9    and you have to answer them verbally.  You understand that?

14:12:36 10         A.  Yes.

14:12:37 11         Q.  If you don't understand the question, just

14:12:39 12    tell me or Mr. Toke and we'll try to rephrase it.

14:12:43 13         A.  Yes.

14:12:46 14         Q.  Where are you presently employed?

14:12:48 15         A.  I'm the president of Regent Hotels and

14:12:49 16    Resorts.

14:12:52 17         Q.  What are your job responsibilities generally

14:12:54 18    there?

14:12:54 19         A.  Well, I overlook all aspects of the hotel

14:12:58 20    business, from the tangible, the intangible and the

14:13:01 21    positioning, meaning the development of hotels, the

14:13:04 22    management of hotels and the positioning of hotels.

14:13:08 23         Q.  How long have you been president?

14:13:09 24         A.  Five and a half years.

14:13:10 25         Q.  Prior to that where did you work?

A Court Reporting Transcript by DTI

14:13:12  1          A.  I was more than 20 years with GHM Hotels.

14:13:16  2          Q.  During the time that you were with GHM

14:13:19  3  Hotels -- General Hotel Management Ltd., the defendant in

14:13:23  4  this case.

14:13:25  5          A.  Yes.

14:13:26  6          Q.  And during the time that you were there, what

14:13:28  7  were your responsibilities?

14:13:29  8          A.  I was the vice-president of the company,

14:13:31  9  meaning the number 2 in the company.

14:13:35  10         Q.  Who was number 1 in the company?

14:13:37  11         A.  Hans Jenni.

14:13:38  12         Q.  During the time that you were vice-president

14:13:39  13  of the company, over the 20 years that you were there, what

14:13:43  14  were among the responsibilities that you had?

14:13:46  15         A.  Again, it was creating the product that made

14:13:50  16  GHM famous.  So I -- the tangible element of the product,

14:13:55  17  which is development of hotels, conceptual, overlooking the

14:14:00  18  marketing and sales material and the food concepts.

14:14:05  19         Q.  During the time that you were there, what was

14:14:07  20  the business of General Hotel Management?

14:14:09  21         A.  Hotel management and hotel restaurant

14:14:12  22  management.

14:14:14  23         Q.  Was there a particular niche hotel that

14:14:17  24  General Hotel Management developed and worked for?

14:14:19  25         A.  Yes, absolutely.  In those days -- it's

14:14:22  1    25 years ago now -- in those days we were called the

14:14:26  2    boutique operator, which means it's a very specific type of

14:14:30  3    hotel which focused on lifestyle, rather than generic

14:14:33  4    selling a room.  And that's -- and we did this particularly

14:14:38  5    well because we didn't have a generic name, like Hyatt,

14:14:41  6    Hilton, Four Seasons, we had individual names.

14:14:45  7         So, GHM was the company based in Singapore who put

14:14:52  8    this together, but the names were always with the owners, so

14:14:56  9    Legian, Datai, Setai, individual names.  So we were very

14:15:04  10   clearly product driven rather than name driven.  And this is

14:15:07  11   a very specific skill, because if you look at hotels

14:15:10  12   generally, people book them because of their name.  If you

14:15:14  13   know, say, tomorrow we are going to Bali and we stay in

14:15:17  14   Hilton Hotel, you know pretty much what a Hilton Hotel looks

14:15:22  15   like, it's not going to be a great surprise to you.  Even

14:15:25  16   though nowadays, 25 years later it has changed.

14:15:27  17        So all major companies have gone into our business

14:15:31  18   model, so all Four Seasons and Ritz-Carltons and so on have

14:15:35  19   now become boutique operators as well because they realized

14:15:40  20   that made the success it had, ie for Marriott bought

14:15:44  21   Ritz-Carlton and Ritz-Carlton has now another brand called

14:15:48  22   Ritz-Carlton Reserve, and so everything is much more

14:15:52  23   segmented.

14:15:54  24        We did that already 25 years ago, so we saw this

14:15:56  25   coming, and that's why it was very important for us not to

14:16:00  1    have a generic name and it was more important to have the

14:16:03  2    hotel speak for itself or its product.  So, GHM was also

14:16:08  3    very small at the bottom, a GHM hotel.  But the name Setai

14:16:13  4    or Sukhothai or whatever it is, was in full front and the

14:16:18  5    GHM was at the back.

14:16:23  6            Q.  Are you having trouble?

14:16:24  7            A.  Sorry, am I speaking too fast?

14:16:25  8            Q.  Yes.

14:16:25  9            A.  I will slow down a bit.

14:16:27 10            Q.  You used the term "lifestyle".  Can you

14:16:29 11    describe to people who may not know what it is, what do you

14:16:32 12    mean by the GHM lifestyle hotel?

14:16:35 13            A.  Well, lifestyle very clearly is -- okay, let's

14:16:39 14    put it in a very simple context.  If you take a taxi from

14:16:42 15    the airport to downtown, you have a choice of a

14:16:46 16    Mercedes-Benz or you have a choice of a normal small car.

14:16:51 17    So there's a difference in price, even though the distance

14:16:56 18    is the same.  So I would say that this ride is a bit more of

14:17:01 19    a luxury lifestyle because if you have a Mercedes-Benz, you

14:17:04 20    have more space and maybe the driver probably speaks

14:17:06 21    English, while if you take a normal car, you're just another

14:17:10 22    passenger.

14:17:12 23            So, the Mercedes-Benz driver -- and there are

14:17:15 24    differences in these taxi companies -- charge a different

14:17:19 25    price for a different experience.  So we are in the

14:17:22  1    experience economy here.  So it's not just only because you

14:17:25  2    have a Mercedes-Benz but because you have a guy who

14:17:28  3    understands perhaps what you want better.

14:17:31  4           So that's -- it's the same thing in the hotel.  We

14:17:33  5    understand our customer, it's very customer focused.  We

14:17:39  6    don't operate hotels that have 500 rooms, we are very much

14:17:43  7    into the 150 room category.  We have now added residential

14:17:49  8    elements to this.  I'm talking about GHM, right, because

14:17:52  9    Regent is a little bit of a different story.

14:17:55  10           And so I think that really made the success of GHM

14:18:03  11   because every hotel that we open up became the leader in its

14:18:08  12   market.

14:18:10  13           Q.  Okay.  And what role did GHM have in

14:18:14  14   developing the hotel that you are talking about?

14:18:17  15           A.  Well, we conceptualized the hotels, meaning

14:18:22  16   the concept is very important.  I give an example perhaps of

14:18:25  17   the Setai, since we're talking to an American judge here --

14:18:28  18   I don't know whether the judge will know the Setai, but it's

14:18:32  19   a hotel in Miami, and Miami as a destination, I think the

14:18:37  20   hotel is about 15 years old now, was a very predictable

14:18:41  21   destination for partying.  So people from New York used to

14:18:44  22   go to Miami in the winter and party.

14:18:47  23           The two famous hotels you had there was the Delano

14:18:51  24   and the Shore Club.  And when the Delano opened it was

14:18:55  25   really a big, big thing, it was done by Philippe Starck, it

14:18:58  1    was a lifestyle product, you know, big curtains in the lobby

14:19:01  2    and, you know, everybody went there because it was a party

14:19:03  3    destination.

14:19:05  4            When we did the Setai, we didn't want to be in

14:19:07  5    that same category.  And one of the most important

14:19:12  6    trademarks really of GHM was we never benchmark ourselves.

14:19:16  7    So we focus purely on our product and the reason why the

14:19:19  8    product was very interesting is because we looked at things

14:19:23  9    differently.  Yes, we sold rooms, but we, as an Asian

14:19:27  10   company, we wanted to bring an Asian experience to Miami,

14:19:32  11   which had never happened before.

14:19:36  12           So one of the interesting elements in Miami is the

14:19:40  13   art decor architecture, I suppose.  I mean, we're not quite

14:19:44  14   the same as Los Angeles or New York, but nevertheless,

14:19:48  15   that's what it is.  So we used that art decor architecture

14:19:54  16   as a concept to develop what we have developed, which is now

14:19:58  17   the Setai, i.e. we looked at what is the Asian equivalent to

14:20:03  18   a New York art decor building and we saw in Asia it's -- of

14:20:08  19   course, the best city that represents art decor would be

14:20:11  20   Shanghai.

14:20:12  21           So while we were doing development in Shanghai, in

14:20:17  22   China overall, we were looking at -- a lot of Chinese

14:20:22  23   buildings were pulled down and made way for high rise.  So

14:20:26  24   that fact we used and bought a lot of used bricks.  So,

14:20:32  25   while our hotel was a new hotel, and the bricks were 120 --

14:20:38  1   from the 1920s, so almost 100 years old, it gave us

14:20:43  2   immediately a patina to the hotel.  So we used them on the

14:20:48  3   walls and the floors, instead of a typical in situ.  So this

14:20:53  4   is what I describe as a concept.

14:20:57  5          We had three different pools with three different

14:21:00  6   temperatures.  We brought every year 70 Balinese from our

14:21:04  7   hotels in Bali to work at the poolside, to give this

14:21:09  8   additional Asian service element there.  And so the whole --

14:21:13  9   it was very, very concept driven rather than manual driven.

14:21:16  10  Manual driven, I would call manual driven, in another

14:21:21  11  company, let's say, Four Seasons or Ritz-Carlton, they have

14:21:24  12  a manual standard guidelines and they pretty much work to

14:21:28  13  these guidelines.  That has all changed now because they

14:21:31  14  realize these characteristic hotels, i.e. concept hotels, do

14:21:34  15  much better than the generic one-of-a-kind run-of-the-mill

14:21:38  16  hotel.

14:21:38  17         So that created the success of the Setai.  So

14:21:42  18  that's when I talk about creating a concept, this was a

14:21:46  19  concept which was different for America, it was appealing

14:21:49  20  and because of that reason we charged more than double what

14:21:53  21  the Four Seasons and the Ritz-Carlton, who were also present

14:21:57  22  at the time in the market, were.

14:22:00  23         Q.  During the time that you worked at GHM

14:22:03  24  developing lifestyle, did you have any role in the marketing

14:22:07  25  of the hotels?

14:22:09  1          A.  I'm sorry, did I have any?

14:22:11  2          Q.  Any role in the marketing of the hotels?

14:22:14  3          A.  No.  Marketing was a separate department.  But

14:22:16  4     I was preparing -- as I said, there are three steps for

14:22:21  5     hotel operation; it's the tangible, the intangible, the

14:22:26  6     management of the hotel and the positioning of the hotel.

14:22:29  7     So I was involved in the concept and I was involved in

14:22:32  8     everything what -- the concept is a tangible element, so

14:22:36  9     what the guest sees, touches and feels, everything that goes

14:22:41  10    in the room, from the shampoo, everything, to the guest

14:22:44  11    experience really, right.  So therefore I was absolutely

14:22:49  12    100 per cent in charge of the brochures, all the materials,

14:22:53  13    the marketing materials.

14:22:57  14         Q.  During the time that you were in charge of all

14:22:59  15    the marketing materials, did there come a time when you met

14:23:02  16    with Junior Lee?

14:23:03  17         A.  Yes.  We worked for 10 years.  So obviously at

14:23:08  18    one stage we met, I think we were introduced through a

14:23:13  19    common friend called Puri, who was at the time the food and

14:23:16  20    beverage director of the Raffles Hotel here in Singapore,

14:23:19  21    which is a leading hotel.  He's American.  And Junior was

14:23:22  22    doing some work for him and so we were growing and so she

14:23:26  23    was recommended by him and we were working for 10 years with

14:23:34  24    her.

14:23:34  25         Q.  Over the 10 years that you would work with

14:23:37  1    Junior, can you describe the course of conduct that you

14:23:39  2    engaged in with her for creating materials to establish the

14:23:47  3    lifestyle for the hotels.

14:23:49  4         A.  Well, we gave her a brief.  So, I would call

14:23:53  5    her typically, and then we'd say, "Well, we are doing a

14:23:56  6    hotel there and there."  And then we've established a

14:24:00  7    long-term working relationship because we had certain needs

14:24:07  8    for different types of brochures, pre-opening brochure,

14:24:11  9    actual brochure and then various other types of things --

14:24:14 10    in-room packaging, you know, for toothpaste and all of that.

14:24:19 11    So the whole package.  So I did this with her, yes.

14:24:27 12         Q.  Can you give me an example of how your work

14:24:30 13    relationship with Junior Lee would go on during the course

14:24:35 14    of the creation of the material that you were talking about.

14:24:39 15         A.  Well, it was work in progress, because this is

14:24:43 16    a lot of work, because she comes up with an idea, and then

14:24:45 17    by the time we finalize and massage the idea -- because

14:24:49 18    I ultimately was in charge of this thing and so I ultimately

14:24:54 19    make the decision, what things should look like.  But she

14:24:57 20    made a lot of recommendations.  And then, of course, it

14:25:01 21    needs to be implemented, i.e. printed.

14:25:03 22         And so having an idea or having a format is one

14:25:06 23    thing, but then I wanted somebody, because -- I don't know,

14:25:13 24    prior to her coming to GHM we had other people and it was

14:25:16 25    very complicated for me because we were dealing with so many

14:25:20  1    different type of people.  So I wanted a one-stop solution.

14:25:24  2         So a one-stop solution is where she comes in, we

14:25:27  3    talk about what we need for a hotel and she takes it from

14:25:30  4    there.  So, i.e., not just taking photographs for a brochure

14:25:34  5    but also make sure that it's properly printed, properly set

14:25:39  6    up, properly color separated and, you know, all of that.

14:25:43  7    So, right from day one to the end, to the final product on

14:25:47  8    my desk, so to speak, yes.

14:25:49  9         Q.  Would you be present at a hotel when Ms. Lee

14:25:52  10   was working?

14:25:53  11        A.  Doing what?  You mean at a photo shoot?

14:25:57  12        Q.  Taking pictures, yes.

14:25:58  13        A.  Yes, mostly, mostly.  Maybe not all but

14:26:00  14   mostly, yes.

14:26:01  15        Q.  Mostly, perhaps 90 percent of the time?

14:26:03  16        A.  Yes, probably, yes.

14:26:05  17        Q.  So, can you describe how you would work with

14:26:08  18   her at the location, what actually was going on between

14:26:12  19   yourselves.

14:26:13  20        A.  Well, we usually start -- depends what we

14:26:16  21   shoot.  If we shoot a pre-opening brochure, obviously there

14:26:19  22   is only a mock-up for the shoot, so you have the mock-up

14:26:23  23   room from different angles, then you do a few detailed

14:26:27  24   shots, a few location shots, in order to have this brochure

14:26:30  25   that you have, you know, which is a three --

14:26:34  1          Q.  Would you like to refer to one of these?

14:26:36  2          A.  Yes.

14:26:37  3          Q.  Pull one out, if you want, and then give it to

14:26:39  4     the reporter and she'll mark it.  We only have one copy.

14:26:43  5          A.  This is what I would call a pre-opening

14:26:45  6     brochure.

14:26:46  7          Q.  Okay.  Hold on one second.  If you hand it to

14:26:47  8     the reporter, she'll be able to mark it as an exhibit.

14:26:52  9          A.  This is a --

14:26:52  10         Q.  Hold it.  She's physically going to put a

14:26:52  11    number on it.

14:26:52  12         (Exhibit 45  marked for identification)

14:26:52  13         Q.  This is just so we know what you're talking

14:26:52  14    about when the case goes to court, it will be numbered.

14:27:21  15         MR. TOKE:  This is a pre-opening brochure?

14:27:24  16         A.  This is like a pre-opening brochure, because

14:27:26  17    you have little information.  As I said, you have just a

14:27:29  18    villa or a room.  And so it's a quarter, a third A4, so

14:27:35  19    based like this.  Okay?  So we would shoot that.

14:27:39  20         If we shot -- which is normally three days,

14:27:43  21    perhaps, I don't know, depending on how many detailed shots

14:27:47  22    we do as well.

14:27:49  23         BY MR. SCHWARZ:

14:27:50  24         Q.  Describe that.  How many shots would be taken

14:27:52  25    on a ---

14:27:53  1           A.  Well, I mean if you see here, we have here how

14:27:54  2     many shots -- one, two, three, four shots.  Right?  So we

14:27:59  3     would take 20 or 25, because we need this for different

14:28:03  4     purposes.  And the pre-opening brochure is something to be

14:28:07  5     mailed.  In those days we mailed things, the internet was

14:28:10  6     not as developed as it is now.  But it was used for all sort

14:28:14  7     of purposes, and to tease the and to inform the travel agent

14:28:20  8     that we are within a year opening this hotel.

14:28:22  9           So we had a little flyer here which goes in there

14:28:26  10    and it says this is what we're having, and these will be the

14:28:27  11    rooms, these are the restaurants, and we are opening this

14:28:32  12    hotel in one year's time or thereabouts.

14:28:35  13          Q.  When you were present, who would actually be

14:28:30  14    taking the photographs?

14:28:40  15          A.  Masano, the photographer.

14:28:41  16          Q.  Can you give us his full name, if you know it?

14:28:44  17          A.  I don't know his full name.  As a matter of

14:28:46  18    fact, Regent is using Masano for quite a while now, because

14:28:51  19    we appreciate his work and so, therefore, totally unrelated

14:28:50  20    to what's happening here, we work with Masano, and he has a

14:28:59  21    different set-up now.  But -- so we had a lot of choices of

14:29:06  22    photographers but we choose to work with her because I knew

14:29:09  23    him and he knows what I want, so it's good to have a

14:29:13  24    consistency there.

14:29:14  25          Q.  Who would have final approval as to what

14:29:16  1    photographs would be selected between yourself and Ms. Lee?

14:29:20  2       A.   Well, I have the final say but we did it

14:29:23  3    together.

14:29:24  4       Q.   When you say you did it --

14:29:27  5       A.   When she comes up with, you know, a layout and

14:29:30  6    you say, "No, do this, do this, do that, do that," and

14:29:33  7    then -- you know, it was a joint effort.

14:29:36  8       Q.   It was a joint effort to create something but

14:29:40  9    you had the final approval of what would be used?

14:29:43 10       A.   Yes, yes, of course.

14:29:44 11       Q.   Did Ms. Lee ever tell you that she wanted to

14:29:47 12    have final approval?

14:29:48 13       A.   No, and she wouldn't have gotten final

14:29:51 14    approval because she was engaged by us.   Why would she?

14:29:56 15       Q.   When you say "by us", who --

14:29:57 16       A.   We gave her a lot of artistic freedom, of

14:30:01 17    course, if you mean by approval like this, okay.   Okay?   We

14:30:01 18    tried a lot of things and she came up with ideas, and

14:30:03 19    sometimes we massaged the ideas.   But the approval was

14:30:06 20    always by myself.

14:30:07 21       Q.   And she never protested that?

14:30:08 22       A.   Not that I can recollect, no.

14:30:11 23       Q.   And she accepted that you were the -- that

14:30:14 24    you, on behalf of the hotels, were commissioning the work?

14:30:17 25       A.   Yes.   I was -- I was giving the contract to

14:30:21  1    her, I mean the job to her, yes.

14:30:26  2        Q.  You were giving the job to her, meaning you

14:30:28  3    called her up and you gave her instructions on what to do?

14:30:33  4        A.  I called her up and said, "Come on over, we

14:30:34  5    have a new job," yes, yes.  I was the liaison.

14:30:39  6        Q.  Between whom?

14:30:40  7        A.  Between GHM and her.

14:30:41  8        Q.  Okay.  And who paid --

14:30:41  9        A.  So I would say, I would say -- that's why I'm

14:30:45  10   here, totally on a free will.  I didn't have to appear here,

14:30:49  11   I have nothing to do with GHM as such, and I'm quite baffled

14:30:52  12   at this whole situation here, and that's why I'm coming here

14:30:56  13   to you to tell you what it is.

14:30:58  14        So, I worked with her for 10 years and I've never

14:31:00  15   encountered any issues, any problems, and that's why we

14:31:04  16   worked with her for 10 years.  And so --

14:31:08  17        Q.  When did you stop working at GHM?

14:31:11  18        A.  Five and a half years ago.

14:31:13  19        Q.  So, to go back again to the working

14:31:15  20   relationship that you had with Ms. Lee --

14:31:24  21        A.  I call her Junior --

14:31:28  22        Q.  Okay, Junior.

14:31:28  23        A.  -- because we have a very cordial

14:31:30  24   relationship.  It was not a relationship, I would say,

14:31:32  25   between a stranger and a supplier.

14:31:35  1              Q.  You got along well with her?

14:31:36  2              A.  Yes, absolutely.

14:31:38  3              Q.  And, as far as today is concerned, you would

14:31:40  4  still consider --

14:31:41  5              A.  Absolutely.  What's happening with her and GHM

14:31:43  6  is nothing to do with me.  I just state the facts the way

14:31:47  7  I see them and the way I see them happen.

14:31:49  8              Q.  Okay.  And during the 10 years that she worked

14:31:53  9  for you and the hotels, how would you evaluate her work

14:31:58 10  ethic and her work product?

14:32:00 11              A.  Look, if I would have any complaints,

14:32:03 12  I wouldn't have continued working with her.  I think she's

14:32:07 13  extremely talented.  And what I liked about her is her

14:32:12 14  system of getting things done.  And she is very focused and

14:32:20 15  that's -- that's her great qualities.

14:32:23 16              So, you know, when you start working with

14:32:25 17  somebody, you know what people like.  And she understood the

14:32:29 18  brand, she understood what is expected of her and what we

14:32:34 19  liked as a brand and how we positioned our hotels.

14:32:37 20              Q.  So, in your words --

14:32:39 21              A.  And it made it really easy for everybody, you

14:32:41 22  know.  Otherwise, if you continue to change, it's difficult.

14:32:44 23              Q.  So, in your words, what did you believe her to

14:32:47 24  understand about the brand when you were working with her?

14:32:51 25              A.  Well, I mean, she was a supplier and over the

14:32:55  1    time she understands the way we wanted to do things.  And

14:32:59  2    so, I think, since she's been to all the hotels and she has

14:33:05  3    seen the growth of the various properties, that they are all

14:33:09  4    different, we had a -- we had a certain thread of lifestyle

14:33:16  5    that went through each hotel, but it was important that they

14:33:20  6    were all different.  But what bound them all together were

14:33:24  7    the brochures.  So when you go to a travel agent and you

14:33:27  8    look at the brochures of many other competitors, you see our

14:33:32  9    brochures stand out.

14:33:34  10          And this is the full brochure -- because I didn't

14:33:38  11   answer the earlier question properly.  This is a pre-opening

14:33:41  12   brochure which has five or six photographs, this is a full

14:33:45  13   brochure of maybe 20 or 30 photographs.

14:33:46  14          Q.  Okay.  Why don't we just stop and let the

14:33:49  15   reporter mark that one.

14:33:50  16          A.  When the hotel opened, we would do this

14:33:53  17   exercise, which is sometimes a week, 10 days, I don't know

14:33:56  18   how long it would take, but thereabouts.

14:33:58  19          Q.  Let the court reporter mark The Legian

14:34:03  20   brochure as 46.

14:34:05  21          A.  So this is what we call a pre-opening brochure

14:34:07  22   and this is a regular brochure.

14:34:24  23          (Exhibit 46  marked for identification)

14:34:26  24          Q.  So,at any time during the 10 years that you

14:34:30  25   worked with Junior, did she ever tell you that she believed

14:34:34  1    she owned any of the rights to any of the photographs or

14:34:38  2    designs in either a pre-opening brochure or a brochure as in

14:34:45  3    exhibit number 46?

14:34:46  4             A.  No.  If she would have --

14:34:49  5             MR. TOKE:  Excuse me, can we have the question

14:34:50  6    read back again, please.

14:34:51  7                     (Question read back.)

14:35:09  8             A.  No.  Because if she would have done, it would

14:35:12  9    have been her last day with us.

14:35:14  10            BY MR. SCHWARZ:

14:35:14  11            Q.  And why is that?

14:35:15  12            A.  Because it makes it complicated.  The very

14:35:17  13   fact is -- we worked with her for 10 years and the very fact

14:35:21  14   is that we have opened hotels in different parts of the

14:35:24  15   world, we could have gone to a different photographer.  So,

14:35:28  16   for instance, America example, since we did the Setai

14:35:33  17   brochure, we had easily access to American photographers who

14:35:36  18   didn't have to fly all the way down from here.  As a matter

14:35:40  19   of fact, the excess luggage that they bring along, the

14:35:46  20   lights, the this, the that, was quite substantial, and it

14:35:50  21   was stuck, I think, in customs at one stage.

14:35:52  22            So, to undergo this thing, you need to work with

14:35:54  23   somebody who understands what we want, number 1.  But also

14:35:57  24   you don't want to have any problems.  Because every country

14:36:00  25   has different laws and different regulations to this.  So

14:36:03  1    for us it was an easy relationship, it was a full

14:36:06  2    understanding.  Because we made full use of the brochures as

14:36:09  3    we feel fit, not just only for the brochures.  We shot on

14:36:12  4    average, let's say, 100 photographs or more and used maybe a

14:36:17  5    third for a big brochure like this, and the rest was used,

14:36:22  6    the detailed shots, for magazines, for, you know, internal

14:36:28  7    promotions, for F&B promotions, whatever.

14:36:31  8            So, it would have been much easier and cost

14:36:34  9    effective to get a local firm.  But we were insisting that

14:36:37  10   we have Junior and her team, because she wasn't alone

14:36:43  11   there -- but she wasn't the photographer, the photographer

14:36:45  12   was Masano, but she was part the team -- to come along and

14:36:50  13   set this up because she understood what we are doing.

14:36:54  14           Q.  At any time -- to rephrase my question -- at

14:37:01  15   any time during the 10 years that you worked with Junior did

14:37:03  16   she ever use the expression "copyright"?

14:37:07  17           A.  I can't recall that.  I don't know.

14:37:10  18           MR. TOKE:  You said, "I can't recall that"?

14:37:12  19           A.  I can't recall, no.

14:37:14  20           MR. TOKE:  No, I just couldn't hear you.  Sorry.

14:37:15  21           A.  I can't recall that.

14:37:16  22           As I said, I repeat again, if that conversation

14:37:19  23   had ever come up, that would have been her last day, for

14:37:23  24   sure.

         25

14:37:23  1          BY MR. SCHWARZ:

14:37:24  2          Q.  And why is that?

14:37:25  3          A.  Because it's complicated, as I just expressed.

14:37:28  4   Why would we go through all this exercise, when you work

14:37:31  5   with somebody for a long time who understands what you want

14:37:36  6   to do, bring her around the world, when we can have local

14:37:39  7   guys doing this.  And she wasn't the -- that's why I'm quite

14:37:44  8   baffled, she wasn't the photographer.  The photographer was

14:37:47  9   Masano.  She was part of the photographer team.

14:37:50 10          Q.  Okay.  And during the time --

14:37:53 11          A.  By the way, we didn't have any -- this is what

14:37:56 12   I've learned of course, so maybe I'm jumping the gun here a

14:37:59 13   little bit -- we had no understanding whatsoever that there

14:38:03 14   was a side deal between her and Masano, that Masano gave her

14:38:08 15   the right of the photography.

14:38:09 16          I work in the meantime with many other

14:38:12 17   photographers, and I've worked with photographers before, we

14:38:14 18   never had any issues.  So, we never knew that, according to

14:38:18 19   Masano, she had the right of the photographs.  Because that

14:38:22 20   was a side deal she did with him.

14:38:25 21          Q.  When you refer to you've worked with many

14:38:27 22   photographers and you never had any issues, you mean no

14:38:30 23   photographer ever claimed that they own the intellectual

14:38:35 24   property and photographs --

14:38:38 25          A.  No.

A Court Reporting Transcript by DTI

14:38:38  1              Q.  Let me finish.  You have to let me finish.

14:38:38  2      That GHM took on behalf of the hotels and for which the

14:38:40  3      hotels paid.

14:38:41  4              A.  Well, this -- this, to my knowledge, being in

14:38:47  5      this business for 40 years, being in the lifestyle business

14:38:50  6      and five-star business, this would be a very unusual

14:38:53  7      practice.  I don't know which hotel group would do that.

14:38:55  8      But I find it absolutely unacceptable because in the hotel

14:38:59  9      business you have to use materials that you produce and pay

14:39:01 10      for in numerous forms.  So, for anyone to put that

14:39:05 11      restriction on to a third company, I think would be very

14:39:11 12      difficult to work with.

14:39:13 13              Q.  That's a good point.

14:39:14 14              Did Junior ever tell you at any point during the

14:39:18 15      10 years that any of the work, the photographs, that Masano

14:39:22 16      took with her or any of the work that she contributed to the

14:39:27 17      projects that you worked on, did she ever say that -- did

14:39:31 18      she ever say to you that she owned any intellectual property

14:39:36 19      rights in any of her photographs or any of the work that she

14:39:41 20      did?

14:39:41 21              A.  No.

14:39:41 22              Q.  Okay.  Did she ever say to you any time during

14:39:44 23      the 10 years that you worked with her that she owned any

14:39:47 24      rights at all, not just intellectual property right or not

14:39:52 25      copyright, but that she believed she had any ownership in

14:39:58  1    the photographs or the designs or any of the work that went

14:40:02  2    into the lifestyle materials that were produced?

14:40:04  3             A.   No.   Because if she would have any ownership,

14:40:07  4    there would have been a reference.

14:40:09  5             Q.   And what do you mean by that?

14:40:10  6             A.   Well, the reference is -- if you take a

14:40:13  7    photograph from Annie Leibovitz and she photographs a house

14:40:16  8    and it's published in 'Architectural Digest', then there's a

14:40:20  9    reference of her on the side or there's a reference on the

14:40:24 10    brochure.   There's no reference of anything.   The reference

14:40:26 11    is GHM and the reference is our marketing distributor,

14:40:30 12    Leading Hotels of the World.

14:40:32 13             Q.   And, to you, what does that signify, that

14:40:36 14    there was no reference or credit to Junior on any of the

14:40:39 15    marketing materials?

14:40:40 16             A.   Well, you know, she was paid for a job, she

14:40:44 17    delivered the job, and that I would consider the end of her

14:40:49 18    job.

14:40:50 19             Q.   So --

14:40:51 20             A.   So, if there would be a claim -- and, again,

14:40:55 21    as I said, I worked with her for 10 years -- if there would

14:40:59 22    be a claim at any time during the 10 years, she would say to

14:41:02 23    me, "Well, you know, this is my brochure, I would like to

14:41:06 24    have a reference here, you know, I did this," which I would

14:41:08 25    have never agreed.

```
14:41:11  1              Q.   Okay.  And who paid her -- you mentioned that
14:41:19  2       she was paid.  Who paid her?
14:41:21  3              A.   She was paid by the individual hotels, because
14:41:23  4       these brochures refer to the hotels.
14:41:25  5              Q.   Okay.  And was there --
14:41:28  6              A.   Even if she did a GHM brochure, which is a
14:41:30  7       collection of the hotels, it was charged individually by the
14:41:33  8       hotels.  So there's an A4 brochure, which is something like
14:41:37  9       that size.  This is not the one.  Yes, this is the one, it's
14:41:38  10      is the one here.  There's an A4 brochure, this size.
14:41:41  11             Q.   What are you calling it?
14:41:43  12             A.   We just call it an A4 brochure.
14:41:46  13             Q.   Okay.
14:41:46  14             A.   The format is A4.  And this is a GHM brochure.
14:41:50  15      It says "GHM", right?  And inside are the collection of all
14:41:56  16      the hotels that GHM is managing.  So that brochure is
14:42:01  17      paid -- let's say the brochure is $10 and we have 10 hotels,
14:42:05  18      each hotel has to pay $1 for the production of that
14:42:09  19      brochure.
14:42:09  20             Q.   Okay.  Just stop for a second.  Let's mark
14:42:11  21      that.
14:42:12  22             (Exhibit 47  marked for identification)
14:42:18  23             MR. TOKE:  Could you read -- you're speaking very
14:42:18  24      quickly.  I'm just trying to understand.  Could you read
14:42:18  25      back that last answer, please.
```

14:42:35   1                    (Answer read back.)

14:43:07   2              A.   So while, in contrast to this brochure here,

14:43:12   3     this is the hotel brochure here of The Legian, if we print

14:43:16   4     1,000 brochures, the whole 1,000 brochures expense goes to

14:43:20   5     The Legian.  So I just wanted to make the difference between

14:43:24   6     the two, between the corporate brochure and the hotel

14:43:27   7     brochure.

14:43:28   8              BY MR. SCHWARZ:

14:43:29   9              Q.   At any time after Junior was paid by the

14:43:32   10    hotels did she then claim to you that she had ownership

14:43:36   11    rights in the photographs or any of the marketing materials?

14:43:40   12             A.   No.

14:43:41   13             Q.   Okay.

14:43:41   14             A.   Because, as I said, we -- we took, let's say

14:43:45   15    on average 100 photographs, I don't know exactly, but in

14:43:49   16    this brochure here, which is a very comprehensive brochure,

14:43:52   17    the hotel brochure, we have maybe 30 photographs, 40, and

14:43:57   18    the rest we used at liberty for various publications, for

14:44:04   19    various promotions, for in-house, in the lifts and, you

14:44:08   20    know, F&B promotion, etc.

14:44:19   21             Q.   When you used the expression "at liberty", can

14:44:21   22    you elaborate on what you mean?

14:44:23   23             A.   Yes.  Once the disk was given, then it was

14:44:25   24    ours and we used all the photos the way we see fit.

14:44:29   25             Q.   Okay.  What do you mean by "the disks"?

14:44:31  1          A.  Well, I mean, okay, in those days, we were

14:44:34  2   handed -- when the job was done by Junior Lee, we were

14:44:37  3   handed a disk, I mean a CD-ROM, so one was given to the

14:44:41  4   hotel and one was given to us -- "us" as in head office

14:44:45  5   copy.

14:44:47  6          Q.  Okay.  And was there any markings on the

14:44:50  7   photographs on the disks indicating that Junior Lee was

14:44:53  8   asserting rights to the photographs?

14:44:54  9          A.  Absolutely none.

14:44:56  10         Q.  Okay.  And what would --

14:44:59  11         A.  Because if there would be, because they were

14:45:02  12  not used only by myself, I mean my job was then finished and

14:45:06  13  then it was handed over to the marketing department, and if

14:45:10  14  it would be the case, the marketing department would have

14:45:12  15  definitely come back to me and said, "What's this?"

14:45:15  16         Q.  Okay.  So, there were two CDs delivered; is

14:45:18  17  that correct?

14:45:19  18         A.  Generally, yes.

14:45:20  19         Q.  One to --

14:45:20  20         A.  I mean -- yes.  Maybe not in quantity but one

14:45:21  21  set for the hotel and one set for the office.

14:45:23  22         Q.  I meant there were two sets delivered?

14:45:27  23         A.  Yes, two sets.

14:45:28  24         Q.  And to your knowledge did the set that was

14:45:31  25  sent to the hotel have any markings on it that said "Owned

14:45:35  1    by Junior Lee" or anything to that effect?

14:45:37  2            A.  I don't know that, because -- no.  I don't

14:45:40  3    know.  No.

14:45:43  4            MR. TOKE:  You said "No" or "I don't know"?

14:45:45  5            A.  I don't know.

14:45:47  6            MR. TOKE:  You don't know.  Okay.  I'm asking for

14:45:48  7    clarification.  Thank you.

14:45:48  8            A.  I don't know.

14:45:50  9            BY MR. SCHWARZ:

14:45:51  10           Q.  Did Junior at any time tell that you there was

14:45:54  11   a limit to the ways that the hotels could use the

14:45:57  12   photographs?

14:45:58  13           A.  No.  And, again, that would have been totally

14:46:01  14   unacceptable to me.

14:46:09  15           Q.  To your knowledge, over the 10 years that you

14:46:12  16   worked with her and had the course of conduct that you have

14:46:14  17   described, is it your understanding that Junior Lee

14:46:17  18   understood that she didn't own the rights?

14:46:21  19           A.  Again, as I said, I'm here at my own free

14:46:24  20   will, I'm not -- I'm repeating myself -- I've worked with

14:46:28  21   Junior for 10 years and I'm baffled that this comes up.  So,

14:46:32  22   I mean, no, we never had a conversation about any of this.

14:46:37  23           Q.  Okay.  At the time -- again, just the lawyers

14:46:44  24   have to do this to clarify things -- at the time, during the

14:46:47  25   10 years that you were working and supervising Junior Lee,

14:46:52  1    would it be fair to say you supervised her?

14:46:55  2          A.  Well, I approved the final product.

14:46:56  3          Q.  Okay.

14:46:57  4          A.  Supervised, no, because she has her own

14:47:00  5    company and she produced the product for us and once it was

14:47:04  6    agreeable then it was printed.

14:47:06  7          Q.  Okay.  So, during the time that you were --

14:47:07  8          A.  So if you mean supervising, no, because we had

14:47:11  9    a certain standard when it comes to, as I said, to the print

14:47:14  10   run and this and that.  She always did that by herself.

14:47:17  11   That's what she gets paid for.  We didn't want to be

14:47:22  12   supervising all this.

14:47:23  13         Q.  Okay.  So, during the time of the 10 years

14:47:24  14   that you had final authority over Junior for the products

14:47:27  15   that were to be delivered to you on behalf of the hotels,

14:47:31  16   what was your understanding of who owned the photos?

14:47:36  17         A.  The hotel.

14:47:37  18         Q.  And why?

14:47:37  19         A.  The hotel paid for it.

14:47:40  20         Q.  Okay.  If you don't mind, I need to take a

14:47:43  21   break, just for a men's room break.

14:47:51  22         VIDEOGRAPHER:  Going off the record.  The time is

14:47:53  23   2:47 p.m.

14:47:56  24   (2:47 p.m.)

14:47:59  25                       (Recess taken.)

14:52:51  1    (2:55 p.m.)

14:53:01  2            VIDEOGRAPHER:  Back on the record.  The time is

14:55:42  3    2:55 p.m.

14:55:44  4            BY MR. SCHWARZ:

14:55:45  5            Q.  During the 10-year period that you worked with

14:55:53  6    Junior and had approval over the work that she was

14:55:59  7    commissioned to do by you on behalf of the hotels, did you

14:56:04  8    and Junior or did anyone on behalf of General Hotel

14:56:07  9    Management and Junior ever sign a specific agreement

14:56:12  10   regarding her work?

14:56:14  11           A.  I certainly didn't.

14:56:15  12           Q.  And during the time that you worked with

14:56:18  13   Junior over the 10 years, would it be fair to say that you

14:56:23  14   developed a pattern and a course of conduct of how you would

14:56:25  15   work together with her?

14:56:27  16           A.  Well, absolutely.  That's why the relationship

14:56:29  17   lasted as long as it did.  And it was very easy because, you

14:56:33  18   know, she understood what we wanted, we worked with her very

14:56:37  19   well, we liked her work.  Absolutely.

14:56:39  20           Q.  Okay.  And, again, at no point during that

14:56:43  21   course of conduct over 10 years did she ever indicate in any

14:56:47  22   way at all, whether in writing or oral, that she believed

14:56:53  23   that she owned any rights in any of the photographs that

14:56:56  24   were taken when she worked under your --

14:56:59  25           A.  Well, certainly not in writing.  Oral,

14:57:01  1     I cannot recall anything, and I don't think so.  As I said,

14:57:05  2     my reaction would have been very different to that.

14:57:10  3          Q.  And what would your reaction have been?

14:57:13  4          A.  Well, if she would have asked me this, I would

14:57:15  5     have said, "Well, it's too complicated for us, so we find

14:57:20  6     somebody else."

14:57:21  7          Because the reason why we went with her is it was

14:57:25  8     a one-stop solution, as I mentioned.  Because the moment you

14:57:28  9     start taking photographs, using the photographs for

14:57:30  10    different publications -- i.e., media, print media, our own

14:57:34  11    publications, internet, etc., etc. -- it's a very

14:57:37  12    complicated thing.  And so, for us, it was -- it was much

14:57:40  13    better to go with one person than having dealt with so many

14:57:45  14    people.  And it would have made our working, or working with

14:57:48  15    anyone, very complicated.

14:57:50  16         Just, can you imagine, you have to ask anyone, or

14:57:52  17    you have to ask somebody who owns a photograph, every time

14:57:54  18    you use that for something else, for permission.  I mean,

14:57:58  19    this is just -- never mind whether there should be a payment

14:58:01  20    or not.  Right?  But this -- this is -- I've never heard

14:58:05  21    this in our industry, and I'm a captain of this industry.

14:58:08  22         Q.  So, that's a good point you brought out.  At

14:58:11  23    any time did Junior Lee ask you for payment for the use of

14:58:14  24    the photographs in the brochure itself?

14:58:16  25         A.  No.  It was one payment, it was done by the

14:58:18  1    hotel, it was end of story.

14:58:20  2          Q.  Okay.

14:58:20  3          A.  No.

14:58:21  4          Q.  Did Junior ever --

14:58:23  5          A.  And this was for 10 years.  So, obviously, if

14:58:26  6    something went wrong afterwards, I don't know.  But for

14:58:29  7    10 years nobody asked, nobody paid.  So ...

14:58:33  8          Q.  Nobody asked for a license fee --

14:58:38  9          A.  That's right, yes.

14:58:38 10          Q.  -- and nobody paid a license fee?

14:58:39 11          A.  And nobody paid a license fee.

14:58:40 12          Q.  She was paid her -- whatever her bill was, she

14:58:44 13    was paid?

14:58:45 14          A.  She was paid her fee, and that was the end of

14:58:46 15    it.

14:58:47 16          Q.  Okay.  Did Junior Lee ever tell you at any

14:58:50 17    point during the 10 years that you had your course of

14:58:53 18    conduct and working relationship with her that the photos

14:58:56 19    could not be used to market the hotels?

14:58:58 20          A.  Well, the whole purpose of this was marketing

14:59:00 21    the hotels.  No.

14:59:02 22          Q.  So, she never said that?

14:59:04 23          A.  Well, otherwise, why would I engage her?  The

14:59:07 24    whole purpose is it's a marketing tool.

14:59:10 25          Q.  Okay.

14:59:10  1          A.  It's not something --

14:59:10  2          MR. TOKE:  I'm sorry, can we go back two questions

14:59:12  3   before that.  I didn't quite -- the answer was quick.

14:59:46  4          MR. SCHWARZ:  Okay.

14:59:46  5          (Questions and answers read back.)

14:59:48  6          Q.  Okay.

14:59:51  7          A.  They are not for decorative purposes, like in

14:59:53  8   the room or whatever.  Therefore, the entire purpose of this

14:59:56  9   is marketing.  It's positioning.  And marketing positioning

15:00:00 10   is a big -- it has a big umbrella, it entails all sorts of

15:00:06 11   mediums, including internet and, nowadays, of course, the

15:00:12 12   use of computer -- not computer, iPhones and all of that

15:00:16 13   sort of thing, you know.  So this is -- of course, it's

15:00:19 14   different all the time.

15:00:21 15          Q.  Okay.

15:00:21 16          A.  So I would not see that we would restrict

15:00:24 17   ourselves, as we need to go with the times.  To restrict

15:00:27 18   ourselves, doing it only for a brochure or only for a film

15:00:30 19   or only for a specific promotion, I mean, it makes no sense

15:00:34 20   to me.

15:00:35 21          Q.  And not only did it not make sense to you but

15:00:38 22   Junior Lee never asked --

15:00:40 23          A.  No.

15:00:41 24          Q.  Let me just finish the question.  She never

15:00:46 25   asked for -- she never claimed that she reserved the right

15:00:49  1      to limit the use of the photographs in any fashion other

15:00:52  2      than marketing for the hotels?

15:00:54  3           A.  No.

15:00:55  4           Q.  No, that's correct what I said?

15:00:58  5           A.  Yes.  Because, as I said again, if that would

15:01:00  6      have come up, that would have been the end of our

15:01:02  7      relationship, and working -- working relationship.

15:01:04  8           MR. TOKE:  Could you read the question again,

15:01:05  9      please?

15:01:05  10          (Questions and answers read back.)

15:01:05  11          MR. TOKE:  Did you say "other than for marketing"?

15:01:05  12          COURT REPORTER:  "Other than marketing for the

15:01:05  13     hotels," yes.

15:01:05  14          MR. TOKE:  Okay.

15:01:54  15          A.  Yes, we only used it for that, not for any --

15:01:57  16     as I said, for decoration or whatever, yes.  So it was

15:02:01  17     marketing a product.

15:02:05  18          BY MR. SCHWARZ:

15:02:06  19          Q.  At any time during the 10-year course of

15:02:11  20     conduct that you had with Junior did she ever say or

15:02:13  21     indicate to you in any way that she was licensing the

15:02:17  22     intellectual property rights or the copyright or the

15:02:20  23     ownership rights of the photographs to you?

15:02:22  24          A.  No.

15:02:23  25          Q.  In any fashion whatsoever, over the entire

Page 36

A Court Reporting Transcript by DTI

15:02:26  1    time that you worked with her, was there any conduct by

15:02:33  2    Junior that indicated to you that she owned the photos?

15:02:37  3             A.  No.

15:02:39  4             Q.  Did she ever -- let me rephrase that.

15:02:45  5             Over the entire time you worked with her, was

15:02:48  6    there any conduct by Junior that indicated to you that she

15:02:52  7    was claiming that she owned the intellectual property to the

15:02:55  8    photos?

15:02:56  9             A.  No.

15:02:57  10            MR. SCHWARZ:  I have no further questions at this

15:02:58  11   time.  As I said, I'd like to reserve some time at the end.

15:03:01  12   I think I've stopped at about an hour.

15:03:05  13            MR. TOKE:  Hold on.  I didn't restart.

15:03:05  14            MR. SCHWARZ:  It's about an hour.

15:03:06  15            MR. TOKE:  Okay.

15:03:16  16            VIDEOGRAPHER:  Forty-five minutes.

15:03:19  17            MR. SCHWARZ:  Okay.  Even better.

15:03:43  18            MR. TOKE:  Okay.  Why don't we just take that one

15:03:43  19   last question.  Could you read that last question back,

15:03:43  20   please?

15:03:43  21                 (Question and answer read back.)

15:03:47  22            EXAMINATION BY MR. TOKE:

15:04:00  23            Q.  I can't believe in 45 minutes we covered this

15:04:03  24   many pages of stuff.  You speak very quickly.  It's very

15:04:06  25   helpful in some ways but it's hard to follow sometimes.  So,

| | | |
|---|---|---|
| 15:04:09 | 1 | I'll ask you to slow down a little bit, if you don't mind. |
| 15:04:14 | 2 | Mr. Ohletz, good afternoon, thank you for being |
| 15:04:17 | 3 | here.  My name is Vijay Toke, I represent the plaintiff in |
| 15:04:21 | 4 | this matter, The Wave Studio LLC, which I can tell you is a |
| 15:04:25 | 5 | company owned by Junior Lee. |
| 15:04:26 | 6 | I'll call her Junior, as well, if you don't mind, |
| 15:04:30 | 7 | since I know you do. |
| 15:04:32 | 8 | Let's talk about your history at GHM.  You said |
| 15:04:37 | 9 | that you, for 20 years, were at GHM; is that right? |
| 15:04:40 | 10 | A.  That's right. |
| 15:04:41 | 11 | Q.  What were the years of your employ there? |
| 15:04:43 | 12 | A.  I beg your pardon? |
| 15:04:45 | 13 | Q.  What were the years of your employ at GHM? |
| 15:04:47 | 14 | What years were you there? |
| 15:04:50 | 15 | A.  Oh, five and a half years ago.  I don't know. |
| 15:04:52 | 16 | Twenty years. |
| 15:04:54 | 17 | Q.  Right.  So let's see -- okay.  So you started |
| 15:04:56 | 18 | at Regent Hotels in 2010? |
| 15:04:59 | 19 | A.  Five and a half years ago.  So you can work it |
| 15:05:01 | 20 | back. |
| 15:05:02 | 21 | Q.  So, 2010? |
| 15:05:03 | 22 | A.  So, when I left GHM I went to Regent |
| 15:05:07 | 23 | immediately. |
| 15:05:08 | 24 | Q.  Okay.  So around 2010; is that right? |
| 15:05:10 | 25 | A.  Yes, thereabouts, yes. |

```
15:05:12  1            Q.  Okay.  And so 20 years before that, so around
15:05:14  2    1990 you started working for GHM?
15:05:17  3            A.  Yes.
15:05:17  4            Q.  Okay.  And were you the -- I think you said
15:05:20  5    you were the senior vice-president or vice-president?
15:05:23  6            A.  Senior vice-president, yes, or vice-president.
15:05:24  7    I was the number 2 in the company.
15:05:26  8            Q.  You were number 2 in the company.  Okay.
15:05:28  9            A.  Yes.
15:05:28 10            Q.  And you were there for 20 years, so 1990 to
15:05:32 11    roughly 2010, as vice-president or senior vice-president --
15:05:35 12            A.  Yes.
15:05:35 13            Q.  -- of the company?
15:05:36 14            If you'll let me just finish the question, then
15:05:38 15    that way there's no overlap and it's easier, there's a
15:05:41 16    cleaner record, if you wouldn't mind.  Thank you.
15:05:45 17            So, you were the number 2 in the company.  As the
15:05:47 18    number 2 in the company, what were your duties?  I think you
15:05:51 19    elaborated on some, but did you -- could you walk us through
15:05:55 20    that again, just in terms of your overall duties for the
15:05:58 21    company.
15:06:01 22            A.  Since this was a boutique hotel company and we
15:06:05 23    were not developing hotels according to manuals alone, i.e.,
15:06:09 24    we were developing projects, different projects, my
15:06:14 25    responsibility made sure -- was to ensure that the guest
```

15:06:19  1    experience is as different as possible from our competitor.

15:06:22  2    So, which means we have crafted all our products, the

15:06:26  3    hotels, the restaurants, whatever we did -- so you would

15:06:31  4    call it crafted nowadays -- rather than from experience.

15:06:36  5            So, we looked at what the market is, or the market

15:06:39  6    we want to appeal to, and so it was a crafted experience

15:06:46  7    whereby everything from the concept to the delivery to the

15:06:52  8    marketing had to be different.

15:06:54  9            As you can see here already from the brochures,

15:06:56  10   the brochures are -- these are old brochures now -- but

15:07:00  11   these are not your typical normal brochures.  And I can

15:07:03  12   elaborate if you want.

15:07:04  13           Q.  No, no, that's great.  So --

15:07:07  14           A.  No, I think I should elaborate because I think

15:07:11  15   it's very important, if you don't mind.

15:07:14  16           Q.  Well, what are you going to elaborate on?

15:07:16  17   Because I was asking more about your duties.

15:07:18  18           A.  Okay.

15:07:18  19           Q.  And so --

15:07:18  20           A.  Well, my duties is -- because it will explain

15:07:21  21   when I elaborate this.

15:07:23  22           Q.  Oh, okay.

15:07:24  23           A.  So, my duties very clearly is to define our

15:07:28  24   product from the competition.  And if you look at this

15:07:30  25   brochure here, okay, and it has 30 pages, just say, okay,

15:07:35  1    but if you look through all the brochures here, in

15:07:37  2    general -- maybe I'll do it like this, for the camera

15:07:40  3    here -- you find one very distinct element not existing in a

15:07:44  4    typical brochure.

15:07:45  5         Q.   Words.

15:07:46  6         A.   Text.  Right?  And this is an absolute vital

15:07:48  7    part of my working with her.  Because we want people to see

15:07:54  8    the brochure and say, "Oh, this is very nice," rather than

15:07:59  9    stating we are the best, we are this, we are that, it's a

15:08:03  10   great location and so on.  That's why it was absolutely very

15:08:06  11   important that the photographs were just stating the fact

15:08:09  12   here -- the suite, the lobby, the whatever.  Right?  And so,

15:08:11  13   just describing what you see, but we don't describe what you

15:08:14  14   normally find in a brochure.

15:08:16  15        So that is a very distinctive factor of how we

15:08:19  16   would market and what's the difference between our hotels

15:08:21  17   and most hotels.  If you look at most hotel brochures, you

15:08:25  18   will find text in it and you'll find photographs also that

15:08:29  19   were staged, with people in it, the best view, big food

15:08:32  20   baskets, big flower arrangement and all this, and when I go

15:08:36  21   to the hotels, you don't find all this.

15:08:38  22        So what we did in our hotels, very distinctively

15:08:41  23   here, this is what you'll see when you go there.

15:08:45  24        Q.   Yes.  So, a picture is worth a thousand words.

15:08:47  25        A.   This was my responsibility.

```
15:08:48  1              Q.  Okay.

15:08:50  2              A.  And that responsibility was told to Junior,

15:08:53  3      and together we came up with this sort of look.

15:08:58  4              Q.  A picture is worth a thousand words.

15:09:00  5              A.  Absolutely.

15:09:00  6              Q.  Right.

15:09:00  7              A.  That was our --

15:09:02  8              Q.  And that was the concept.

15:09:04  9              A.  Yes.

15:09:05 10              Q.  So you conceptualized all of these hotels?

15:09:08 11              A.  As I said --

15:09:08 12              Q.  Okay.

15:09:08 13              A.  I conceptualized, developed and opened the

15:09:12 14      hotels.

15:09:13 15              Q.  So, you worked with Junior approximately

15:09:15 16      10 years; correct?

15:09:16 17              A.  Or thereabouts, yes, a good part.

15:09:18 18              Q.  So, you do you remember when the relationship

15:09:21 19      ended?  It was around 2007, wasn't it?

15:09:23 20              A.  Could be.  I don't know.

15:09:25 21              Q.  Does that sound about right?

15:09:26 22              A.  It sounds about right, yes.

15:09:27 23              Q.  Okay.  So, you started working with Junior

15:09:29 24      maybe late '90s until about 2007?  Sounds about right?

15:09:33 25              A.  No, because I think -- she did not start from
```

Dep - CA No.13-CV-09239-CS-PED                                    23 September 2015

15:09:35  1    the beginning with us, because she was 10 years -- I was

15:09:41  2    20 years with the company, so she came in much later.

15:09:44  3    I don't know the exact time.  It was the time when Puri, who

15:09:48  4    was the general manager of the Setai -- at that time, he was

15:09:54  5    the food and beverage manager of the -- this I don't know,

15:09:58  6    but I can easily find that out.

15:10:00  7              Q.  Sure.  No, no, no, I'm just asking --

15:10:00  8              A.  So, when he was food and beverage manager at

15:10:02  9    th Raffles, our relationship started, whenever that was.

15:10:07 10              Q.  Okay.  Okay.  That's fine.  And you said

15:10:08 11    before you worked with Junior you would come up with these

15:10:11 12    types of brochures but you had to work with a lot of

15:10:13 13    different companies; is that right?

15:10:14 14              A.  I didn't come up with these types of

15:10:15 15    brochures, I came up with the idea.

15:10:18 16              Q.  Pardon me.

15:10:18 17              A.  We came up with the brochure.

15:10:20 18              Q.  Understood.  So, you came up with the idea for

15:10:21 19    the brochures and then, to make that happen, you would work

15:10:24 20    with a number of different companies in order to do that;

15:10:28 21    right?

15:10:28 22              A.  No.  We worked with Junior alone, not with a

15:10:31 23    number of different companies.

15:10:32 24              Q.  What I'm saying is, before working with

15:10:37 25    Junior --

Page 43

A Court Reporting Transcript by DTI

15:10:39  1          A.  Oh, before, that's right, before, correct,

15:10:39  2     yes.

15:10:39  3          Q.  Because you testified that one of the

15:10:39  4     appealing things --

15:10:39  5          A.  Absolutely.

15:10:39  6          Q.  Let me finish my question.  You can answer the

15:10:40  7     question after I've finished it, please.  Thank you.

15:10:43  8          MR. SCHWARZ:  That's for the court reporter.  She

15:10:47  9     can't record two people at once.

15:10:48  10         A.  Yes, I'm sorry.

15:10:48  11         MR. SCHWARZ:  Okay.

15:10:49  12         BY MR. TOKE:

15:10:49  13         Q.  I appreciate it.  I know in every --

15:10:50  14         A.  It's my first time, so sorry.

15:10:52  15         Q.  No, no, absolutely, it's understandable.  But

15:10:55  16    it's important that we do not overlap, so that she can take

15:10:59  17    one person talking at one time.

15:11:00  18         A.  Okay.

15:11:03  19         Q.  So, you testified before Junior -- I'm sorry.

15:11:06  20    You testified that one of the things that was really

15:11:09  21    appealing in working with Junior -- and when I say Junior, I

15:11:12  22    mean Wave, her companies.  You understand?

15:11:14  23         A.  No.  I worked with Junior.

15:11:16  24         Q.  That wasn't a question actually.

15:11:19  25         A.  I had a very cordial relationship.

15:11:19  1          Q.  Hold on.  I'm trying to finish my question.

15:11:20  2          I'm saying -- for the purposes of my questioning

15:11:23  3   you, when I say you were working with Junior, you were

15:11:26  4   working with one of her companies; isn't that right?

15:11:29  5          A.  No.  I was working with Junior.

15:11:32  6          Q.  Okay.  So --

15:11:34  7          A.  I didn't know she had several companies.

15:11:36  8   I relate to Junior as a person, and she presented a bill;

15:11:40  9   whatever the bill says on top -- Wave, willy-nilly, Mickey

15:11:45  10  Mouse -- was none of my concern.  I related to her because

15:11:51  11  she related to me of what I wanted.

15:11:53  12         Q.  Okay.  So --

15:11:53  13         A.  It was irrelevant of the name of the company.

15:11:54  14         Q.  Okay.  That's fine.  So, you testified that

15:11:56  15  one of the things that was really appealing of working with

15:11:58  16  Junior was that she was a one-stop shop; yes?

15:12:02  17         A.  Absolutely, yes.

15:12:02  18         Q.  Okay.  And so what that meant was she would

15:12:05  19  coordinate all the work that needed to be done in order to

15:12:09  20  produce, for example, this brochure for The Legian?

15:12:13  21         A.  Yes, absolutely.

15:12:15  22         Q.  And before you were working with Junior, you

15:12:18  23  would have to -- you were working with several different

15:12:21  24  companies to create the same kind of product; yes?

15:12:24  25         A.  Well, yes.  Because we had a photographer

15:12:26  1    traditionally.  I would there do -- be also around, do a bit

15:12:30  2    of the stage setting, which Junior did then for us, and, you

15:12:35  3    know, then we worked with a writer.  So it was all

15:12:38  4    complicated.  And so we cut all this out.  So we decided no

15:12:42  5    more text.

15:12:43  6         So it was as all -- and then at the end of the day

15:12:45  7    when you had, let's say, the films -- in those days you had

15:12:48  8    films, right? -- who's going to produce it then?  Then

15:12:52  9    somebody has to go to a printer and the print run, all of

15:12:55  10   this, my God, what a headache.  And I was glad that she

15:12:59  11   was -- because she took all of that.  And she got paid for

15:13:01  12   this.  Meaning, you know, she sent bills and -- she didn't

15:13:03  13   do it for free.  But this was a godsend because it was very

15:13:07  14   easy.  And that's why we worked for so long, because she

15:13:10  15   produced -- I mean, this is five years old at least and this

15:13:13  16   is exceptional quality still today.

15:13:16  17        Q.  It looks incredible.

15:13:18  18        A.  Absolutely, yes.

15:13:20  19        Q.  Okay.  Let's talk about who at GHM reported to

15:13:25  20   you during your tenure at the company.

15:13:28  21        A.  Who reported to me in what sense?

15:13:32  22        Q.  There were people that worked under you at

15:13:35  23   GHM; yes?

15:13:36  24        A.  Yes, the general managers generally.

15:13:39  25        Q.  Pardon me?  The general managers --

15:13:40  1          A.  The general managers, yes.

15:13:40  2          Q.  -- of the hotels?

15:13:41  3          A.  We had -- the company was run by two people,

15:13:44  4   Hans Jenni and myself.

15:13:45  5          Q.  Okay.  And the people that reported to you

15:13:46  6   were the GMs?

15:13:48  7          A.  And we did different things, so when it comes

15:13:51  8   to day-to-day management, when it comes to keeping up the

15:13:54  9   standards, I went every three or four months around the

15:13:57 10   properties.  When it came to budgets, when it came to

15:14:00 11   marketing, when it came to all of these sorts of things,

15:14:03 12   Hans Jenni took care of that.  So we had a very clear

15:14:07 13   defined work.

15:14:08 14          Q.  Okay.  And you said the GMs of the hotels

15:14:14 15   reported to you as well; correct?

15:14:15 16          A.  Yes.

15:14:16 17          Q.  But they weren't employees of GHM?

15:14:18 18          A.  No.  They were employees of the owner who paid

15:14:22 19   them.

15:14:22 20          Q.  Okay.

15:14:22 21          A.  But they were under our directive because we

15:14:24 22   did things for and on behalf of the owner.  So ...

15:14:27 23          Q.  Understood.  And who is Kendall Oei?

15:14:29 24          A.  Kendall Oei was a director of the company --

15:14:32 25          Q.  Okay.  Do you know how long ---

A Court Reporting Transcript by DTI

Dep - CA No.13-CV-09239-CS-PED                           23 September 2015

```
15:14:32  1           A.  -- who represented -- the main shareholder of
15:14:34  2      GHM was Adriaan Zecha, who is the founder of Aman Resorts,
15:14:39  3      and a founder of GHM Hotels.
15:14:42  4           Q.  And Regent; no?
15:14:44  5           A.  And Regent, of course, yes, absolutely, one of
15:14:46  6      the founders.  And so -- but Adriaan Zecha, not in order to
15:14:51  7      get conflict of interest, because obviously Aman Resort was
15:14:55  8      his baby, he couldn't be involved directly, and so he had
15:15:00  9      Kendall there to represent his interest in many ways.  But,
15:15:03 10      yes, that's what he did.
15:15:05 11           Q.  And so, you said Kendall Oei was the director?
15:15:07 12           A.  He was a director of the company, yes.
15:15:08 13           Q.  And who did he report to?
15:15:10 14           A.  This I don't know.
15:15:12 15           Q.  At the company, at GHM, you don't know who he
15:15:15 16      reported to?
15:15:16 17           A.  No, because I just said, he represented
15:15:18 18      Adriaan Zecha.  That's all I need to know.  Who he reported
15:15:22 19      to, I assume to Adriaan Zecha.
15:15:24 20           Q.  Okay.
15:15:24 21           A.  He was --
15:15:25 22           Q.  And what was Adriaan Zecha's role --
15:15:28 23           MR. SCHWARZ:  You interrupted him.  He was about
15:15:29 24      to answer.
15:15:29 25           MR. TOKE:  Sorry.  Go ahead.
```

A Court Reporting Transcript by DTI

15:15:30  1         A.  Adriaan Zecha is a major shareholder of the

15:15:34  2    company, he owns 75 percent of GHM.  So he represented his

15:15:36  3    interests.  So, whether Kendall Oei reported to his wife or

15:15:40  4    his dog or him, I don't know, but he represented Adriaan

15:15:44  5    Zecha's interests.  That's all I know.

15:15:48  6         Q.  And what were Kendall Oei's responsibilities

15:15:51  7    at the company?

15:15:52  8         A.  Kendall Oei is a banker by nature, an

15:15:56  9    investment banker, as a matter of fact, so he was involved

15:15:58 10    in all the legal issues, when it comes it contractual

15:16:02 11    issues, etc.

15:16:04 12         Q.  So he did all the --

15:16:06 13         A.  So he interacted -- he interacted more with

15:16:10 14    Hans Jenni than myself.

15:16:13 15         MR. TOKE:  We can switch to the next.

15:16:16 16         MR. SCHWARZ:  He has to switch the tapes.

15:16:20 17         A.  Okay.

15:16:21 18         VIDEOGRAPHER:  This marks the end of tape number 1

15:16:23 19    in the deposition of Ralf Ohletz.

15:16:26 20         Going off the record.  The time is 3:16 p.m.

15:16:31 21         A.  I think -- I'm not sure whether it's of any

15:16:34 22    relevance, but my name is not Ralf Ohletz, I have a full

15:16:38 23    name.  So, just for the state record, right?  Because --

15:16:40 24         MR. SCHWARZ:  Okay.  You can put that on, as soon

15:16:42 25    as we go back on the record.

15:16:45  1            A.  Yes, okay.  Because you have to go to my legal

15:16:49  2    document, so the passport is a full name.  It doesn't matter

15:16:53  3    to me.  I'm just saying.

15:16:55  4    (3:16 p.m.)

15:17:23  5                        (Recess taken.)

15:17:24  6    (3:17 p.m.)

15:17:31  7            VIDEOGRAPHER:  Back on the record.  Here marks the

15:17:33  8    beginning of tape number 2 in the deposition of Ralf Ohletz.

15:17:38  9    The time is 3:17 p.m.

15:17:42 10            BY MR. TOKE:

15:17:43 11            Q.  Mr. Ohletz, when we were off the record you

15:17:45 12    were mentioning something about your full name.

15:17:47 13            Could you state your full name for the record.

15:17:49 14            A.  My full name is Ralf Ohletz Graf von

15:17:55 15    Plettenberg, German name.

15:17:57 16            Q.  Very good.  And can you spell that for us?

15:17:58 17            A.  What do you want spelt?  G-r-a-f v-o-n

15:18:01 18    Plettenberg.

15:18:03 19            Q.  Okay.  Fine.

15:18:05 20            So we were just talking about Kendall Oei and you

15:18:09 21    said he was a banker by trade, an investment banker

15:18:12 22    actually, yes, and he did all the legal docs for GHM.

15:18:15 23            A.  Right.

15:18:16 24            Q.  And then you said he had a lot more

15:18:18 25    interaction with Hans Jenni --

| | | |
|---|---|---|
| 15:18:22 | 1 | A. That's right. |
| 15:18:22 | 2 | Q. -- correct? |
| 15:18:22 | 3 | A. That's right, yes. |
| 15:18:23 | 4 | Q. Again, please let me finish the question, so |
| 15:18:25 | 5 | there's not an overlap in the record. Please just bear with |
| 15:18:29 | 6 | me, I appreciate it. |
| 15:18:32 | 7 | Okay. How about Pamela Tan, what was her job? |
| 15:18:36 | 8 | A. Who? Sorry? |
| 15:18:37 | 9 | Q. Pamela Tan. Do you remember Pamela Tan? |
| 15:18:40 | 10 | A. Pamela Tan was, or is still today, Hans |
| 15:18:43 | 11 | Jenni's secretary. |
| 15:18:44 | 12 | Q. Okay. How about See Soo Eng? |
| 15:18:48 | 13 | A. She was at the time the director of marketing |
| 15:18:49 | 14 | and sales for GHM. |
| 15:18:51 | 15 | Q. Okay. And she's no longer at GHM? |
| 15:18:55 | 16 | A. No, she retired. |
| 15:18:56 | 17 | Q. Do you know when she left? |
| 15:18:58 | 18 | A. I guess about six years ago. |
| 15:19:00 | 19 | Q. Okay. So, around 2009? |
| 15:19:01 | 20 | A. But she was there quite a long time. |
| 15:19:03 | 21 | Q. So, around 2009? |
| 15:19:04 | 22 | A. Probably all the time Junior was there. |
| 15:19:07 | 23 | Q. Okay. Good. Sheila Joseph? |
| 15:19:11 | 24 | A. She was also working in the sales department. |
| 15:19:13 | 25 | Q. Okay. She assisted See Soo Eng? |

15:19:19  1            A.  See Soo Eng is the director of marketing and

15:19:23  2    sales.

15:19:23  3            Q.  What I was saying, did Sheila Joseph assist

15:19:26  4    Soo Eng?

15:19:27  5            A.  That's right, yes.

15:19:29  6            Q.  How about Sukhdeep Singh?

15:19:32  7            A.  Sukhdeep Singh was the predecessor of Monica.

15:19:34  8            Q.  And by Monica you mean Monica Chng?

15:19:37  9            A.  Yes, Monica.

15:19:38  10           Q.  Who is in the room today?

15:19:40  11           A.  Who is in the room today, yes.

15:19:41  12           Q.  Okay.  And how about Alvin Fong?

15:19:43  13           A.  Alvin is my assistant, or was my assistant,

15:19:46  14   who is still there.  I guess he was one of the first

15:19:51  15   employees.  With GHM, we were only a small handful of

15:19:56  16   people, and so Pamela Tan and Alvin -- yes, Alvin handled

15:20:00  17   all my affairs, yes.

15:20:03  18           Q.  Okay.  And you worked very closely with him

15:20:07  19   then?

15:20:07  20           A.  Yes, absolutely.

15:20:12  21           Q.  Okay.  So let's talk -- let's go to --

15:20:15  22   actually, before we go there, for the last five and a half

15:20:22  23   years you have been at Regent or the president of Regent;

15:20:26  24   correct?

15:20:27  25           A.  Yes.

```
15:20:27  1            Q.   What are your responsibilities as the

15:20:29  2    president of Regent?

15:20:30  3            A.   I oversee the positioning development of the

15:20:33  4    brand.

15:20:33  5            Q.   Do you, as a matter of your duties, read the

15:20:38  6    contracts for the various -- for the hotels?

15:20:42  7            A.   No.  We have lawyers for that.  I'm not a

15:20:44  8    lawyer.

15:20:45  9            Q.   Not a lawyer.  And how long have you been in

15:20:47 10    the hotel industry?

15:20:50 11            A.   Oh, maybe you should rephrase that, how long

15:20:53 12    have I been in the luxury hotel industry --

15:20:57 13            Q.   Fair enough.

15:20:57 14            A.   -- because it's different.  Forty years.

15:20:58 15            Q.   Forty years in the luxury hotel --

15:20:59 16            A.   I opened the Oriental there --

15:21:01 17            Q.   Is that right?

15:21:01 18            A.   -- the Mandarin Oriental, 1985.  Then I was

15:21:04 19    seven years with the Mandarin group in Hong Kong, then

15:21:07 20    I joined Intercontinental in London then I went with Four

15:21:11 21    Seasons in New York and then I joined Adriaan Zecha.

15:21:16 22            So, prior to joining GHM, that's how I got

15:21:19 23    together with GHM, I was together with Adriaan Zecha,

15:21:22 24    creating the Beaufort Hotel here on Sentosa and the

15:21:30 25    Sukhothai in Bangkok --
```

A Court Reporting Transcript by DTI

15:21:32  1          Q.   Impressive.

15:21:31  2          A.   -- before this brand was then sold to the

15:21:34  3   owners.  And so then GHM was established.

15:21:37  4          Q.   Okay.  And when you were -- during your

15:21:42  5   20 years at GHM did you review any of the contracts that

15:21:46  6   were --

15:21:47  7          A.   No.

15:21:48  8          Q.   Let me finish the question, please.  Any of

15:21:49  9   the contracts that the company entered into?  Say, for

15:21:53 10   example -- I'll leave it at that.

15:21:54 11          Did you review, during your 20 years, any of the

15:21:57 12   contracts with any owner or vendor that was -- that GHM

15:22:04 13   contracted with?

15:22:05 14          A.   No.

15:22:06 15          Q.   That was what Kendall Oei would do?

15:22:09 16          A.   That was not my responsibility.

15:22:10 17          Q.   That was what Kendall would do?

15:22:15 18          A.   I assume so that's what he did.  It was

15:22:17 19   definitely one of his responsibilities.  Whether he did it

15:22:20 20   or not, I don't know.  But that was his responsibility, yes.

15:22:22 21          Q.   Okay.  So, his understanding of the legal

15:22:24 22   aspects was correct?

15:22:25 23          A.   Anything to do with contracts, you know --

15:22:26 24   again, my job was the position and the creation of the

15:22:32 25   brand.

15:22:32  1          Q.  Understood.  Okay.

15:22:34  2          So let's move on to the arrangement that you had

15:22:37  3   with Wave.  As you testified earlier, Wave would essentially

15:22:42  4   help implement your brand concept for the marketing of the

15:22:48  5   hotels; is that correct?

15:22:49  6          A.  No.  This is the arrangement I had with

15:22:52  7   Junior.

15:22:54  8          Q.  Fine, with Junior.  Supplant Junior into my

15:22:57  9   question.

15:22:58 10          A.  Yes.

15:22:59 11          Q.  Okay.  So, for example -- I'm going to

15:23:09 12   introduce -- you testified that Junior would create various

15:23:22 13   different things for the hotels, not just brochures with

15:23:26 14   photographs but things without photographs; correct?

15:23:29 15          A.  Absolutely.

15:23:29 16          Q.  So, for example, I've got --

15:23:32 17          A.  Lalu.  I recognize it, yes.

15:23:34 18          Q.  This is The Setai, actually.

15:23:36 19          A.  Oh.  The Setai.  Sorry.

15:23:37 20          Q.  If you could hold on to that.  We could --

15:23:45 21   let's just mark that.  We'll mark this as exhibit 48, next

15:23:53 22   in order.

15:23:54 23          This says "The Setai" and it's a sewing kit.

15:23:58 24          A.  A sewing kit, that's right, yes.

15:23:59 25          Q.  And so this would be another product that

15:24:02  1     Junior put together for GHM for the marking of the Setai;

15:24:06  2     correct?

15:24:06  3           A.   Yes.

15:24:06  4           Q.   Because it would have the same look and feel

15:24:08  5     and the overall luxury --

15:24:10  6           A.   Yes.

15:24:10  7           Q.   -- feel that you were looking to achieve; yes?

15:24:12  8           A.   Yes.

15:24:13  9           Q.   Okay.  You can mark that.

15:24:15  10          Sorry, I only have one.

15:24:15  11          MR. SCHWARZ:  No, no, that's okay.

15:24:40  12          (Exhibit 48  marked for identification)

15:24:41  13          A.   There's just more than one.  You know, there's

15:24:41  14    a whole lot of things there.

15:24:41  15          COURT REPORTER:  Just a minute.

15:24:41  16          BY MR. TOKE:

15:24:41  17          Q.   Yes.  This is an example.

15:24:42  18          You were saying there are a number of other

15:24:45  19    accoutrements that would go with it?

15:24:48  20          A.   Yes, yes, all sorts of things, toothbrush

15:24:51  21    covers.  I mean, you know, 10 pieces at least.

15:24:53  22          Q.   The shower cap box and --

15:24:55  23          A.   Yes, all of this, all of this, yes.

15:24:56  24          Q.   And it was all meant to create a cohesive

15:24:59  25    branding identity for the hotel; correct?

```
15:25:01   1              A.   That's correct.

15:25:01   2              Q.   And junior was in charge of implementing your

15:25:05   3      vision of what you wanted for the hotels; correct?

15:25:07   4              A.   Yes, she was executing it, yes.

15:25:09   5              Q.   Okay.  And would she get involved from the

15:25:12   6      very beginning of when a new property came under GHM

15:25:17   7      management?

15:25:17   8              A.   Yes, that's right.

15:25:18   9              Q.   Okay.  Now, as you've testified, some of

15:25:21  10      these -- I'll use the term "marketing collateral" for all of

15:25:27  11      these products.  Is that a fair term?

15:25:28  12              A.   Yes.

15:25:29  13              Q.   Okay.  Some of the collateral, like the sewing

15:25:32  14      kit, doesn't really have a photograph involved with it;

15:25:35  15      correct?

15:25:35  16              A.   Yes.

15:25:36  17              Q.   But others, like the brochures, did; correct?

15:25:40  18              A.   Yes.

15:25:40  19              Q.   Okay.  And so, is it fair to say that the idea

15:25:45  20      was that Junior would implement your vision for the hotel

15:25:50  21      and in order to do that she needed to create the design for

15:25:54  22      the logo, perhaps the little logo, the two trees in the

15:26:01  23      logo, she would have to conduct a photo shoot so you would

15:26:05  24      have photos to use for the marketing collateral, she would

15:26:10  25      create text for copy for other brochures, even though
```

15:26:14  1    there's not a lot, but there would be some copy.

15:26:16  2           A.  No, she didn't create that.  That would be --

15:26:19  3    we said, room, room.  She didn't create that.

15:26:23  4           Q.  Okay.

15:26:23  5           A.  Because that's why we didn't want any text, so

15:26:26  6    we didn't have another third party.

15:26:29  7           Q.  Fair enough.  But, other than the text part,

15:26:31  8    I was accurate in my description?

15:26:32  9           A.  Yes.

15:26:32  10          Q.  Okay.  So, the idea was that for each of the

15:26:34  11   hotels she would go and do a photo shoot or arrange for a

15:26:38  12   photo shoot and go to the property, you would do the photo

15:26:42  13   shoot and, as you testified, there would be a disk that went

15:26:46  14   to GHM and a disk that went to the hotels; correct?

15:26:49  15          A.  Right.

15:26:49  16          Q.  Okay.  And the idea would be that you would

15:26:52  17   use the hotels -- I mean, the photographs, in order to have

15:26:58  18   Junior create marketing collaterals?

15:27:02  19          A.  Yes.

15:27:02  20          Q.  Okay.  So, you might say, for example, "Okay,

15:27:04  21   Junior, we've got to do the pre-opening or the regular

15:27:07  22   brochure for The Legian, we just did -- you just did a photo

15:27:11  23   shoot for The Legian, and we want the photo of the statue

15:27:16  24   that you put in and then we want a photo of the -- whatever

15:27:23  25   this room is or this fountain".

15:27:26  1          A.  No.

15:27:27  2          Q.  That's not how it would work?

15:27:29  3          A.  No, not how it works.

15:27:29  4          Q.  How would it work?

15:27:31  5          A.  When we go -- since you have The Legian

15:27:33  6    brochure here with you, when we go to a property, we -- as

15:27:37  7    I said, I was not there all the time, but most of the time

15:27:40  8    I should think.  But the whole sequence the way it works is

15:27:44  9    that the team would go two days prior to the photo shoot,

15:27:47 10    okay, depending on the weather and this and that.  And then

15:27:51 11    it looks -- and Junior knew exactly what we need for a

15:27:55 12    brochure.  So we need, obviously, the rooms, we need

15:27:59 13    restaurants, we need some detailed shots which you find also

15:28:02 14    here.

15:28:02 15          And so we would have -- again, I repeat myself,

15:28:07 16    what I said -- this would have perhaps 30 photographs,

15:28:12 17    I don't know exactly, okay.  But we would shoot way more

15:28:15 18    than that because sometimes this shot is not very good or

15:28:19 19    that angle is better, and we pick the best one for the

15:28:22 20    brochures.  And we would have many, many other photographs

15:28:25 21    that we would use for our own, at our own discretion, for

15:28:31 22    internal publications, like in the lifts, like if we do food

15:28:35 23    promotions, if we do whatever, you know.

15:28:38 24          So, these photographs are used for a lot of

15:28:41 25    things, not only for the brochures.

15:28:43  1            Q.  No, I understand.  But then, let's say -- and

15:28:45  2    you might want to do a follow-up brochure a couple of years

15:28:48  3    later and you might want to swap out --

15:28:51  4            A.  Which we did.  Which we did.

15:28:53  5            Q.  Let my finish my question.

15:28:54  6            So, if you wanted to do a follow-up brochure a

15:28:56  7    couple of years later, you might swap out a couple of

15:28:59  8    photographs and use a different photograph; is that correct?

15:29:01  9            A.  Yes, correct.

15:29:01 10            Q.  So that was what this disk would be used for,

15:29:03 11    right, to --

15:29:04 12            A.  Yes.

15:29:06 13            Q.  Okay.

15:29:06 14            A.  And that was -- that's quite common because

15:29:10 15    when you open a hotel, the garden is not matured, certain

15:29:13 16    things are not there.  So there was always a follow-up of --

15:29:16 17    usually after two years or within a two-year range.

15:29:36 18            Q.  Let me mark this as the next in order, 49.

15:30:05 19            (Exhibit 49  marked for identification)

15:30:11 20            Take a moment to just read through the document,

15:30:13 21    please, Mr. Ohletz, and let me know when you're done.

15:30:18 22            A.  It's for a logo replacement on the Range

15:30:20 23    Rover.

15:30:22 24            Q.  Okay.  And this is for the Nam Hai --

15:30:26 25            A.  Mm-hm.

15:30:27  1          Q.  -- correct?  So --

15:30:27  2          MR. SCHWARZ:  Let me just stop for one second for

15:30:29  3   a lawyer thing.  So, there's no Bates number on the bottom

15:30:31  4   of this?

15:30:32  5          MR. TOKE:  Yes.  It's been produced.  We didn't

15:30:35  6   have the copy here but it's been produced.

15:30:39  7          MR. SCHWARZ:  Okay.

15:30:42  8          MR. TOKE:  Anyway, it has.

15:30:47  9          Q.  This is -- it says "The Wave Design" at the

15:30:53  10  top; correct?

15:30:53  11         A.  Yes.

15:30:53  12         Q.  And it says "Production estimate".  And the

15:30:56  13  client is someone at the Nam Hai Hoi An; yes?  That's a

15:31:02  14  property that was managed by GHM in 2006?

15:31:05  15         A.  Yes.  I don't know who this person is.  It

15:31:08  16  must be the controler.  No, I don't know who she is.

15:31:11  17         Q.  Okay.  But this would have been -- they had a

15:31:13  18  Range Rover at the Nam Hai and they needed to do a logo

15:31:17  19  replacement for what was on the car, probably; yes?

15:31:20  20         A.  Yes.

15:31:21  21         Q.  Okay.  And this is dated 1 June 2006; correct?

15:31:24  22         A.  Yes, it says 2006, yes.

15:31:25  23         Q.  There is someone's signature, presumably

15:31:29  24  Mr. Yani Wong, the person that's named on the document.

15:31:32  25         A.  No, it must be the signature of the general

15:31:34  1    manager.

15:31:35  2              Q.  Or the general manager of the hotel?

15:31:37  3              A.  Yes, because he would be the only one

15:31:40  4    authorized to authorize payment.

15:31:42  5              Q.  Okay.  Very good.

15:31:42  6              A.  So if it's addressed to the financial

15:31:44  7    controler, the general manager would still sign it, because

15:31:47  8    he would still sign all checks --

15:31:50  9              Q.  Okay.

15:31:50  10             A.  -- countersigned together with the -- but an

15:31:52  11   order like this, because it has to fit into a budget, or

15:31:56  12   somehow has to go into a budget, it has to be explained to

15:31:59  13   the owners, would have to be signed by the general -- so

15:32:01  14   I don't know whose signature that is.  I can't read it.

15:32:04  15             Q.  Okay.  And how would this order be placed,

15:32:13  16   meaning how would Junior know to send this to the Nam Hai?

15:32:20  17   Would you or someone in your department at GHM say, "Junior,

15:32:24  18   it turns out that the Nam Hai needs a logo replacement on

15:32:30  19   the Range Rover"?

15:32:31  20             A.  Right.

15:32:31  21             Q.  That's how it would happen?

15:32:33  22             A.  Yes.

15:32:33  23             Q.  Okay.  So, you would contact Junior and say,

15:32:34  24   "Junior, the Nam Hai needs a logo replacement on the Range

15:32:40  25   Rover."  She would then send --

15:32:40  1          A.  I don't know whether it was a replacement or

15:32:42  2     whether it was a new logo, because when -- this was probably

15:32:45  3     the time when the hotel opened, so it had no logo, so it

15:32:49  4     needed a logo.  So that would fall into her role of

15:32:51  5     responsibilities, yes.

15:32:52  6          Q.  Okay.  And so, then she would send this

15:32:53  7     production estimate to the hotel?

15:32:54  8          A.  Yes.

15:32:55  9          Q.  Would it go to you as well?

15:32:57 10          A.  No.

15:32:57 11          Q.  Okay.

15:32:57 12          A.  Because I gave the instructions and then the

15:32:59 13     hotel has to sign it, because ultimately the hotel has to

15:33:03 14     pay for it.

15:33:04 15          Q.  Right.  And, as you said, the --

15:33:07 16          A.  As long as we are in the budget.  If there's

15:33:08 17     something that would not be in the budget, the hotel would

15:33:11 18     come back to me and say, "Sorry, we haven't got the money,"

15:33:16 19     whatever it is.  They would come back to me.  Other than

15:33:16 20     that, if it's all clear, it would not come back to me.

15:33:21 21          Q.  Okay.  So, you wouldn't have ever seen this

15:33:24 22     document?

15:33:24 23          A.  No.

15:33:25 24          Q.  Okay.  Because the hotels were responsible --

15:33:27 25          A.  It's a smaller --

15:33:27  1          Q.  Hold on.  Let me finish my question.

15:33:27  2          And that's because the hotels were responsible for

15:33:27  3  the charges for anything specific to the hotels?

15:33:30  4          A.  Yes, and also it's a very small amount.

15:33:33  5  So ...

15:33:33  6          Q.  Okay.  So, if it was a bigger amount you would

15:33:37  7  probably see it?

15:33:38  8          A.  No.  As I said, if it's a bigger amount and

15:33:41  9  it's not in the budget then it would definitely be brought

15:33:46  10 to my attention, yes.  Otherwise no.

15:33:49  11         Q.  Let's mark this the next in order.  This will

15:33:52  12 be exhibit 50.

15:33:55  13         (Exhibit 50  marked for identification)

15:34:14  14         And once you've read through the document, please

15:34:18  15 let me know when you're ready for me to ask questions about

15:34:23  16 it.

15:34:38  17         A.  I have no questions.

15:34:39  18         Q.  No, I said I have questions.

15:34:42  19         A.  Sorry.

15:34:42  20         Q.  I have questions, however.

15:34:44  21         A.  I'm sorry.

15:34:44  22         Q.  But you've read the document?  You're --

15:34:45  23         A.  I've read the document, yes.

15:34:47  24         Q.  Okay.  Very good.  And so, this is another

15:34:48  25 production estimate.  This is for the Chedi Club Tanah

15:34:52  1    Gajah.  It's a DL flyer.  Do you know what that is?

15:35:00  2         A.  I don't know.  DL flyer.  It's a flyer,

15:35:02  3    meaning it's a very simple thing.

15:35:05  4         Q.  Okay.

15:35:06  5         A.  I don't know what's DL flyer.  But I know what

15:35:09  6    the term "flyer" is.

15:35:11  7         Q.  And, to you, what does that mean?

15:35:14  8         A.  A flyer is a simple little thing like that

15:35:16  9    which you give to American Express or whatever to put in

15:35:19 10    there, like a -- you know, a small thing.  It's not a

15:35:21 11    brochure, it's a flyer.

15:35:22 12         Q.  Okay.  Got it.

15:35:23 13         A.  That's way -- it's a light thing, it flies

15:35:25 14    away.  I guess, it's an American term, I don't know.

15:35:28 15         Q.  No worries.

15:35:29 16         A.  But --

15:35:29 17         Q.  And this is dated 13 --

15:35:32 18         MR. SCHWARZ:  You interrupted.  He wasn't

15:35:35 19    finished.  Just let him finish.

15:35:35 20         BY MR. TOKE:

15:35:35 21         Q.  Go ahead.

15:35:36 22         A.  I don't know what DL means, unless it's --

15:35:37 23    I don't know the abbreviation.

15:35:40 24         Q.  Okay.  But this is for The Chedi Club, Tanah

15:35:42 25    Gajah, which was in September 2004, which was managed by

15:35:46  1    GHM; correct?

15:35:47  2              A.  Yes.  It's still managed by GHM.

15:35:49  3              Q.  It's still managed by GHM.  Good.

15:35:52  4              And you'll see at the bottom it has "Estimate

15:35:56  5    prepared by" and -- does that signature look familiar to

15:35:58  6    you?

15:35:59  7              A.  Well, it's my signature and the signature of

15:36:01  8    the general manager who was overseeing both hotels, which is

15:36:06  9    Hans Meier.

15:36:07 10              Q.  Hans Meier.  Okay.

15:36:07 11              He was overseeing The Legian and The Chedi Club?

15:36:10 12              A.  Yes, that's right.

15:36:11 13              Q.  Okay.  And so, obviously you saw this one?

15:36:13 14              A.  I saw this one.  Maybe I was there at the

15:36:16 15    time.  Yes, absolutely.  Because obviously, again, maybe

15:36:19 16    this was a -- an amount, even though it's not a big amount,

15:36:24 17    it was not in the budget and so he needed a countersignature

15:36:27 18    to approve it.  Because that's what I said earlier on,

15:36:31 19    I repeat myself, if it's not within the budget it will come

15:36:34 20    to my attention and I would countersign it, meaning for

15:36:37 21    approval.  If it was within the budget I would not sign it

15:36:40 22    because it would be signed by the general manager and it

15:36:43 23    goes straight through.

15:36:45 24              Q.  Okay.

15:36:50 25              A.  I mean, I'm only assuming this because I would

| | | |
|---|---|---|
| 15:36:53 | 1 | never sign anything to that nature, so it has to be |
| 15:36:57 | 2 | something like that. |
| 15:36:58 | 3 | Q. Okay. Let's do this next in order. This is |
| 15:37:01 | 4 | exhibit 51. |
| 15:37:23 | 5 | (Exhibit 51 marked for identification) |
| 15:37:38 | 6 | Mr. Ohletz, let me know when you've finished. |
| 15:37:41 | 7 | A. Yes, I've finished. |
| 15:37:42 | 8 | Q. Okay, good. So, this is another production |
| 15:37:44 | 9 | estimate, this one for the Chedi Chiang Mai? |
| 15:37:47 | 10 | A. Yes. |
| 15:37:48 | 11 | Q. Which is dated 3 October 2006, which at the |
| 15:37:50 | 12 | time the hotel was managed by GHM; correct? |
| 15:37:55 | 13 | A. Correct, yes. |
| 15:37:56 | 14 | Q. Okay. And so, this is for the "Reprinting of |
| 15:37:58 | 15 | The Chedi, Chiang Mai corporate brochure with supervision |
| 15:38:01 | 16 | and new tariff with pricing amended in Thai baht". That's |
| 15:38:07 | 17 | what it says; correct? |
| 15:38:09 | 18 | A. Hm-mm. Yes. |
| 15:38:12 | 19 | Q. Okay. So, I'm assuming that the "Client's |
| 15:38:13 | 20 | approval" down below, that's again the general manager of |
| 15:38:17 | 21 | the hotel? |
| 15:38:17 | 22 | A. Yes. That's Eleanor Hardy's signature, yes. |
| 15:38:21 | 23 | Q. That's Eleanor Hardy's signature. And if you |
| 15:38:22 | 24 | look at the top, where it says "Client", that's Eleanor |
| 15:38:24 | 25 | Hardy; correct? |

15:38:27  1              A.   No, the client is the Chedi Chiang Mai.

15:38:30  2              Q.   Okay.

15:38:30  3              A.   I mean, Eleanor Hardy represents the client,

15:38:33  4    being the general manager.  But the client is the Chedi

15:38:37  5    Chiang Mai.

15:38:38  6              Q.   Okay.  Okay.  That's great.

15:38:49  7              Now, you testified earlier, Junior would usually

15:38:54  8    send a bill at some point or an invoice

15:38:56  9              A.   Invoice, yes.

15:38:57 10              Q.   So she would send an invoice that would

15:39:00 11    correspond to the production estimate; yes?

15:39:02 12              A.   I assume, yes.

15:39:04 13              Q.   So, you would have a production estimate for a

15:39:06 14    certain amount, she would provide the service or the

15:39:11 15    product, and then invoice -- issue an invoice after that;

15:39:17 16    correct?

15:39:17 17              A.   Yes.

15:39:18 18              Q.   And would a copy of that go to GHM?

15:39:21 19              A.   I don't know.  I've never seen a copy of it

15:39:26 20    because, as far as we are concerned is, or I'm concerned is,

15:39:28 21    I see an estimate and sometimes when the estimate is, let's

15:39:33 22    say, over the budget, people would negotiate with her,

15:39:37 23    meaning the general manager.  Right?  And I remember a few

15:39:42 24    instances at The Setai where a lot of things needed to be

15:39:46 25    done and, you know, it was negotiated with Junior.  But Puri

15:39:50  1    did the negotiation.

15:39:51  2             So, once ultimately the order is approved, then

15:39:55  3    I don't see this any more because it is not -- it is then

15:39:59  4    between Junior and the hotel.

15:40:01  5             Q.  So, essentially, once the production estimate

15:40:03  6    was looked at --

15:40:06  7             A.  The production estimate I would see.

15:40:07  8             Q.  Let me finish my question.  Let me finish my

15:40:09  9    question.  Okay?

15:40:13 10             Once the production estimate was sent to the

15:40:15 11    hotel, and potentially you, if it was outside the budget or

15:40:20 12    some other -- it was a larger amount, and it was approved,

15:40:24 13    Junior would do the work and then she would send an invoice

15:40:27 14    to the hotel?

15:40:28 15             A.  Yes.  But it's not quite like that.  When an

15:40:32 16    order is given, we talked about whatever, a production

15:40:36 17    estimate comes to us and the hotel, i.e. to my desk.  I make

15:40:41 18    sure that -- the estimate is one thing, but also that the

15:40:46 19    description here, where she describes what she needs to

15:40:49 20    do -- brochure, doing this, doing that, supervision -- that

15:40:52 21    this is what we have discussed.

15:40:54 22             Q.  Okay.  So, let me understand that.  So, when

15:40:57 23    an order is given, you contacted Junior, she sends a

15:41:00 24    production estimate to the hotel, as well as to your desk?

15:41:02 25             A.  Right.

15:41:03  1          Q.   You both review it and then, once it's

15:41:06  2     approved by you and the hotel, she does the work?

15:41:09  3          A.   Yes.

15:41:09  4          Q.   And then she invoices the hotel?

15:41:13  5          A.   Correct.

15:41:14  6          Q.   And the hotel pays it?

15:41:15  7          A.   Correct.

15:41:16  8          Q.   Would you see a copy of the invoice?

15:41:18  9          A.   No.

15:41:20  10         Q.   Okay.

15:41:20  11         A.   There's no need because the approval was

15:41:21  12    already given.

15:41:22  13         Q.   Okay.

15:41:22  14         A.   Unless, as I said, as I stated earlier on,

15:41:25  15    unless in this case perhaps there's no money available or

15:41:29  16    it's not in the budget or it's an extraordinary something,

15:41:34  17    then it comes back to me, I have to countersign.

15:41:37  18         Q.   Okay.  And when you said "this", you're

15:41:39  19    referring to exhibit 50?

15:41:40  20         A.   That's right, to this one, yes.

15:41:41  21         Q.   Okay.

15:41:41  22         A.   Because the general manager is not authorized

15:41:43  23    to sign anything out of his jurisdiction above the budget.

15:41:46  24    So that approval has to come from me.

15:41:52  25         Q.   Okay.

15:42:20  1          So, we talked about how some -- the concept was

15:42:25  2    that Wave, for each of the properties, or Junior, would

15:42:30  3    conduct a photo shoot of each of the hotels on a number of

15:42:33  4    occasions to gather photos to be used in various collateral

15:42:37  5    that GHM would put an order in for.  Is that accurate?

15:42:41  6          A.  No, because she didn't conduct a photo shoot.

15:42:44  7    Junior was part of a team that conducted a photo shoot.

15:42:47  8          Q.  Okay.

15:42:48  9          A.  There was a photographer, there was the

15:42:50 10    assistant photographer, in some cases there was myself, and

15:42:52 11    there was also an assistant from the hotel, buying props,

15:42:57 12    buying this, buying that.  So she was part of that team.

15:43:01 13          Q.  Okay.

15:43:02 14          A.  It was not Junior Lee who conducted that.

15:43:03 15          Q.  I see.  Okay.

15:43:04 16          A.  She supervised everything, because that was

15:43:06 17    the deal, but she didn't conduct it.  It was conducted by

15:43:11 18    various individuals.

15:43:13 19          Q.  Okay.  I understand.  So you're telling me

15:43:17 20    that she supervised the photo shoots?

15:43:20 21          A.  Correct.

15:43:20 22          Q.  And so can you explain to me what that would

15:43:24 23    mean to you, by "supervised", what would --

15:43:26 24          A.  It means, you know, they go two days before,

15:43:29 25    the whole team.  Right?  And they look at what flowers are

15:43:34  1    available, what props we need, what needs to be shot,

15:43:37  2    outside facade, etc., etc., and then she would set it up.

15:43:42  3            Q.  She would set up each shot?

15:43:44  4            A.  Yes.

15:43:45  5            Q.  So, she would say, for example -- let's take a

15:43:47  6    look --

15:43:47  7            A.  Well, in the old days, in the old days, the

15:43:50  8    set-up means the photographer would shoot with a Polaroid

15:43:55  9    camera, because it was not sophisticated like today.  Right?

15:43:57 10    We have everything in one.  They used a Polaroid shot and

15:44:00 11    then she showed me the Polaroid shot and then we agreed and

15:44:05 12    then, once the look and feel was established, she went on

15:44:08 13    with it.

15:44:10 14            Q.  Okay.  So, let's use, for example, this front

15:44:14 15    cover photo of The Legian brochure that's been marked as

15:44:17 16    exhibit 46.

15:44:18 17            A.  Yes.

15:44:19 18            Q.  So, Junior and her team would go to The

15:44:21 19    Legian, they'd scout it out, figure out angles and

15:44:25 20    interesting photos that might showcase this beautiful

15:44:29 21    property in the way that you envisioned; yes?

15:44:33 22            A.  No.  For the contents of the photographs, yes.

15:44:36 23    For the outside not.  We told her very clearly what we want

15:44:40 24    to have shot for the outside brochure, because we have a

15:44:44 25    consistent look.  If you look at The Chedi here, we have a

15:44:47  1    consistent look here, so we said what we wanted there.

15:44:50  2            Q.  Okay.

15:44:50  3            A.  Inside, yes.  The outside doesn't represent

15:44:52  4    what she recommended.

15:44:54  5            Q.  Okay.  That's fine.  So, bad example, sorry.

15:44:55  6            Let's then look at what is probably the fourth

15:45:00  7    page.  It's the first one that actually has some sort of a

15:45:06  8    label on what the room is.  It says "The studio suite".

15:45:09  9            A.  Right.

15:45:10  10           Q.  Do you see that?  So, let's use this as an

15:45:11  11   example.

15:45:12  12           So, junior and her team would go to The Legian,

15:45:14  13   they would go to the studio suite and they'd capture an

15:45:18  14   angle, lighting, etc., at her direction; correct?

15:45:20  15           A.  Yes.

15:45:21  16           Q.  So she would say, "Okay, I want to take the

15:45:24  17   picture of this room from this angle with this lighting, and

15:45:28  18   I want the pillow should be angled just so" --

15:45:32  19           A.  What she did, the art direction --

15:45:34  20           Q.  Let me finish the question.  And so, she would

15:45:37  21   direct how the photo was going to be, was going to look;

15:45:39  22   yes?

15:45:42  23           A.  No.  She coordinated the direction.  She

15:45:45  24   coordinated the set-up, she did the set-up.  But the

15:45:48  25   actual -- the actual lighting and so on, that was done by

15:45:50   1    the photographer and the assistant.  That's why they were

15:45:53   2    there for.

15:45:54   3            Q.  At her direction?

15:45:55   4            A.  In consultation, I would say.

15:45:56   5            Q.  Okay.  So she would consult with them, they

15:45:58   6    would --

15:45:59   7            A.  She was part of a team.  She was not Junior

15:46:01   8    doing it alone.  I was there sometimes, the photographer was

15:46:06   9    there, the assistant photographer was there and staff

15:46:09  10    helping with props were there.  So she was part of a team.

15:46:13  11    It was not Junior Lee being Superman, do everything herself.

15:46:18  12            Q.  That's not what I asked.  I simply asked --

15:46:19  13            A.  My answer is that it just was not her, at her

15:46:22  14    discretion.  It was a joint effort.

15:46:24  15            Q.  Okay.  But you did say that she set up the

15:46:27  16    photo?

15:46:27  17            A.  Yes, she did.

15:46:29  18            Q.  Okay.  And then she would direct when she

15:46:33  19    wanted the photo to be taken; yes?

15:46:35  20            A.  Well, that was also in consultation with the

15:46:38  21    photographer.  Because, depending on the morning and this

15:46:41  22    and that, because you know you have to take good photographs

15:46:44  23    at all sorts of -- sometimes very early in the morning, you

15:46:48  24    know.

15:46:48  25            Q.  Okay.  Great.

15:46:49  1           A.   The photographer was not her lapdog.   The

15:46:53  2    photographer is a very well known photographer, which I'm

15:46:56  3    working with now for the past three years and, you know, he

15:46:59  4    has his own mind.   Because ultimately if the photos are no

15:47:03  5    good, we will go back to her and say, "What the hell is

15:47:06  6    this?"   She is not taking the photographs, the photographer

15:47:09  7    is taking the photographs.   So it was a joint effort between

15:47:13  8    her and the photographer and me looking -- looking at the

15:47:16  9    Polaroid shots.

15:47:17 10           Q.   Okay.   And so, nonetheless -- so, Junior would

15:47:33 11    issue a production estimate for going and doing a photo

15:47:38 12    shoot at a particular property; correct?

15:47:40 13           A.   Yes.

15:47:41 14           Q.   Okay.   So let's use this as an example.   This

15:47:46 15    will be marked as the next in order.

15:48:05 16           COURT REPORTER:   Fifty-two.

15:48:09 17           (Exhibit 52  marked for identification)

15:48:09 18           BY MR. TOKE:

15:48:15 19           Q.   This might be for an example of a photography

15:48:20 20    estimate; correct?

15:48:23 21           A.   Mm-hm.   Yes.

15:48:24 22           Q.   Okay.   It says "Photography", it is dated

15:48:27 23    3 May 2004, and it says:

15:48:30 24           "Photography, Photo Art Direction and Supervision

15:48:32 25    including Digital Processing Charges for 5 days'

| | | |
|---|---|---|
| 15:48:36 | 1 | Photoshoot."  $16,000 and various other expenses; correct? |
| 15:48:40 | 2 | A.  Mm-hm.  Yes. |
| 15:48:43 | 3 | Q.  Including photo digital touch-up. |
| 15:48:46 | 4 | A.  Yes. |
| 15:48:46 | 5 | Q.  Junior did the digital photo touch-up -- |
| 15:48:49 | 6 | A.  Yes. |
| 15:48:49 | 7 | Q.  -- after the photo shoot; correct? |
| 15:48:51 | 8 | A.  Yes.  Well, I assume.  I don't know whether |
| 15:48:53 | 9 | she did or the architect -- or the photographer, but |
| 15:48:54 | 10 | I assume she did it, yes. |
| 15:48:56 | 11 | Q.  Okay. |
| 15:48:56 | 12 | A.  Because we discussed, you know, take this out, |
| 15:48:58 | 13 | take that out.  She came to my -- she would come to my |
| 15:49:00 | 14 | office, typically, and show me the raw pictures and then we |
| 15:49:03 | 15 | would agree on the pictures that we're going to use and then |
| 15:49:06 | 16 | if there's, let's say, a fire extinguisher or whatever, I'd |
| 15:49:11 | 17 | say, "Take this out," "Take that out."  So it was done.  So, |
| 15:49:15 | 18 | I assume she did it, yes. |
| 15:49:17 | 19 | Q.  So, the photos that we see in these various |
| 15:49:19 | 20 | products, these brochures, are not the raw photos that were |
| 15:49:22 | 21 | taken but, in fact, are another product, essentially, the |
| 15:49:25 | 22 | photographs that have been retouched -- |
| 15:49:27 | 23 | A.  Yes. |
| 15:49:27 | 24 | Q.  -- to take out certain elements? |
| 15:49:30 | 25 | A.  They are retouched photos, yes. |

15:49:32  1          Q.  Okay.  And that retouching was done by Junior?

15:49:34  2          A.  This I don't know.  It was -- she represented

15:49:35  3     it to me.  So what I know is we discussed it jointly, what

15:49:40  4     is taken out, and then she came back with a final product.

15:49:42  5     So, whether she did it, I was not present, so I don't know.

15:49:46  6          Q.  Okay.  But that is reflected in the invoice;

15:49:48  7     correct?

15:49:48  8          A.  Yes, because that was --

15:49:50  9          Q.  And the production estimate?

15:49:51  10         A.  That was her responsibility, that's what she

15:49:53  11    got paid for.

15:49:54  12         Q.  Okay.  Very good.  And so, when we look at

15:49:55  13    this one, for example -- which, by the way, is Bates labeled

15:49:57  14    TWS0355359 -- as you testified earlier, one copy of the

15:50:02  15    production estimate would have gone to the hotel and one

15:50:05  16    production estimate to your desk?

15:50:07  17         A.  Yes.

15:50:08  18         Q.  To approve?

15:50:08  19         A.  Yes.

15:50:15  20         Q.  So.  Let's go to -- this will be next in

15:50:37  21    order, 53.

15:50:54  22         (Exhibit 53  marked for identification)

15:50:57  23         When you've looked at this document, please let me

15:50:59  24    know.

15:51:00  25         A.  Yes, I've read it.

15:51:01  1          Q.  Okay.  So, this is another production

15:51:03  2     estimate.  This is for another photo shoot; correct?

15:51:06  3          A.  Yes.

15:51:07  4          Q.  This is of The Setai?

15:51:08  5          A.  Correct, yes.

15:51:09  6          Q.  This is the one in Miami you were talking

15:51:12  7     about earlier?

15:51:13  8          A.  Yes.  Mr. Puri, who was the general manager at

15:51:16  9     the time.

15:51:16  10         Q.  Okay.  So, Mr. Puri.  And that's the same

15:51:17  11    Mr. Puri that worked at the Raffles Hotel?

15:51:19  12         A.  That's the same Mr. Puri who is very familiar

15:51:22  13    with Junior.

15:51:23  14         Q.  Okay.  And he is -- so, you see the charges

15:51:25  15    here, SGD 47,600.00; correct?

15:51:30  16         A.  Yes.

15:51:31  17         Q.  This is dated 4 July 2005; correct?

15:51:33  18         A.  Yes.

15:51:34  19         Q.  Okay.  And it looks like it was signed at the

15:51:37  20    bottom.  Do you recognize that signature?

15:51:40  21         A.  That's Puri's signature.

15:51:42  22         Q.  That's Puri's signature.  And it's dated

15:51:43  23    7-29-05; correct?

15:51:47  24         A.  Yes.  Yes, that's right.

15:51:48  25         Q.  That's when he signed it, it appears?

| | | |
|---|---|---|
| 15:51:51 | 1 | A. Yes. |
| 15:51:51 | 2 | Q. Okay. And, again, just as you testified |
| 15:51:53 | 3 | earlier, a copy of this estimate would have gone to Puri and |
| 15:51:56 | 4 | a copy of it would have been on your desk? |
| 15:51:58 | 5 | A. Yes. |
| 15:51:59 | 6 | Q. For both of you to approve; correct? |
| 15:52:01 | 7 | A. Yes. |
| 15:52:01 | 8 | Q. Okay. |
| 15:52:01 | 9 | A. I would -- I would ask Puri whether this is |
| 15:52:03 | 10 | within his budget and if it's well within the budget, it was |
| 15:52:09 | 11 | the end of my story, in terms of the documentation, because |
| 15:52:11 | 12 | he would have to take care of the payment thereafter. |
| 15:52:14 | 13 | Q. Understood. |
| 15:52:15 | 14 | MR. SCHWARZ: I'm just going to make one |
| 15:52:16 | 15 | objection, because I think that the document is not or may |
| 15:52:21 | 16 | not be the document that Mr. Ohletz was thinking he saw, |
| 15:52:30 | 17 | because there's a handwriting arrow at the bottom, and |
| 15:52:36 | 18 | I just don't know whether that arrow was there at the time |
| 15:52:38 | 19 | or that has been added subsequent to the date. |
| 15:52:40 | 20 | MR. TOKE: Fair enough. I -- |
| 15:52:40 | 21 | A. I didn't sign anything here. |
| 15:52:46 | 22 | MR. TOKE: No, no. Let me respond to that. |
| 15:52:48 | 23 | A. Did I sign something? There's not my |
| 15:52:48 | 24 | signature on here. |
| 15:52:48 | 25 | MR. SCHWARZ: No. |

A Court Reporting Transcript by DTI

15:52:48  1          MR. TOKE:  Let me respond to that.  I can

15:52:48  2    represent that no one at Wave or her counsel, or its

15:52:52  3    counsel, has added that marking.  And, to be honest, we

15:52:57  4    don't know where that marking came from.  Okay?

15:53:01  5          But this document is Bates labeled TWS0355721 to

15:53:09  6    TWS0355722.

15:53:44  7          Q.  You testified earlier, Mr. Ohletz, that your

15:53:47  8    understanding was because the hotels were the parties that

15:54:11  9    paid for the photo shoots --

15:54:15  10         (Interruption from cell phone ringing.)

15:54:16  11         A.  Sorry about that.  I forgot to turn it off.

15:54:16  12   Can you repeat, please?

15:54:16  13         Q.  Of course.  Because the hotels were the

15:54:16  14   parties that paid for the photo shoots --

15:54:16  15         A.  Yes.

15:54:16  16         Q.  -- they were the owner of the copyrights to

15:54:18  17   the photos that were the product of those photo shoots; is

15:54:22  18   that correct?

15:54:23  19         A.  Right.

15:54:23  20         Q.  Okay.  And the basis for that is because they

15:54:26  21   paid for it; correct?

15:54:28  22         A.  They paid for it.

15:54:29  23         Q.  Okay.

15:54:30  24         A.  Because, as a hotelier, you have to justify

15:54:33  25   what you spent to an owners' committee.  And if you tell an

15:54:38   1    owners' committee that you have limited rights to certain

15:54:40   2    things, when you go through all this rigmarole here,

15:54:44   3    bringing people from all over here, from Singapore and this

15:54:48   4    and that, here and there, the owner would immediately say,

15:54:50   5    "You've got to be joking me.  Why are you not taking

15:54:54   6    somebody locally?"

15:54:55   7            Q.   Right.   Okay.   So, let's say, for example --

15:54:57   8    let's look at exhibit 53, again.   It's still in front of

15:55:01   9    you?

15:55:01  10            A.   Yes.

15:55:01  11            Q.   Okay.   So, as you said, the client is the

15:55:04  12    hotel; correct?   And it's addressed to Mr. Puri, who is the

15:55:10  13    general manager; correct?

15:55:11  14            A.   Yes.

15:55:11  15            Q.   So, the client is The Setai Miami?

15:55:16  16          · A.   Mm-hm.

15:55:16  17            Q.   Okay.   And the only other party to this

15:55:21  18    document is The Wave Design, right, signed by Junior at the

15:55:25  19    bottom; correct?

15:55:26  20            A.   Mm-hm.

15:55:28  21            Q.   So, really, the only two parties in this

15:55:30  22    document are The Wave Design and The Setai; correct?

15:55:33  23            A.   Yes.

15:55:34  24            Q.   Okay.   GHM is not named on this document;

15:55:39  25    correct?

15:55:39  1          A.   No.   That's right.

15:55:41  2          Q.   Nor is GHM a party to this document; correct?

15:55:43  3          A.   Correct.

15:55:43  4          Q.   Okay.   So the only potential two parties that

15:55:47  5     could own the copyrights to the photos that were part of the

15:55:53  6     photography in this invoice are either The Wave Design or

15:55:58  7     The Setai; correct?   The only possible?

15:56:00  8          A.   Well, it's The Setai --

15:56:01  9          MR. SCHWARZ:   Objection, calls for --

15:56:01 10          A.   -- as far as I'm concerned.

15:56:03 11          MR. SCHWARZ:   Wait a second.   Objection, it calls

15:56:04 12     for a legal conclusion.   You can answer the question.

15:56:07 13          BY MR. TOKE:

15:56:08 14          Q.   So, I'm just saying the only two possible

15:56:10 15     choices?

15:56:11 16          A.   No, because it's The Setai because they paid

15:56:14 17     for it.   Because this copyright issue never came up until

15:56:17 18     very recently.   And, again, I repeat what I said, I'm amazed

15:56:21 19     that this comes up and that it's happening, what I'm doing

15:56:24 20     here today.

15:56:25 21          Q.   Yes.

15:56:25 22          A.   Unbelievable.

15:56:26 23          Q.   No, no, I understand the answer.   All I'm

15:56:28 24     saying is -- I'm not asking you to say which one it is.

15:56:31 25     I understand --

15:56:32  1          A.  As far as I'm concerned, it belongs to The

15:56:34  2   Setai.

15:56:36  3          Q.  I totally understand.  And I think you've

15:56:38  4   testified, once again, that the reason it is owned by The

15:56:41  5   Setai is because The Setai paid for it; correct?

15:56:45  6          All I'm saying is there are only two companies

15:56:47  7   that are part of this document; correct?

15:56:49  8          A.  There are two signatures on there, that's

15:56:49  9   right, yes.

15:56:50  10         Q.  Right.  Junior for The Wave Design and

15:56:53  11  Mr. Puri for The Setai; correct?

15:56:55  12         So, there are only two possible entities that

15:56:58  13  could own the copyrights to the photographs?

15:57:00  14         A.  This is hypothetically.

15:57:01  15         Q.  Yes, absolutely hypothetically.  I'm saying

15:57:03  16  there are -- because there are only two parties to this

15:57:07  17  document --

15:57:07  18         A.  Well, now, are we engaging in hypotheticals

15:57:10  19  here?

15:57:10  20         Q.  Yes.

15:57:10  21         A.  I don't know, but -- (simultaneous speakers -

15:57:10  22  unclear)

15:57:14  23         Q.  I'm entitled to ask you the question.

15:57:15  24         A.  I'm in an American court here, but --

15:57:16  25         Q.  I'm entitled to ask you the question.

| 15:57:16 | 1 | COURT REPORTER:  Excuse me, one at a time. |
| 15:57:16 | 2 | BY MR. TOKE: |
| 15:57:22 | 3 | Q.  I'm entitled to ask you the question. |
| 15:57:23 | 4 | All I'm saying is -- |
| 15:57:23 | 5 | A.  Okay. |
| 15:57:23 | 6 | Q.  -- I'm not asking you to draw a conclusion -- |
| 15:57:23 | 7 | A.  Then hypothetically, I suppose so, yes. |
| 15:57:23 | 8 | COURT REPORTER:  Just a minute.  Excuse me, one at |
| 15:57:23 | 9 | a time, please. |
| 15:57:23 | 10 | BY MR. TOKE: |
| 15:57:23 | 11 | Q.  You can repeat the answer.  What did you say? |
| 15:57:26 | 12 | A.  Hypothetically, I suppose, because we have two |
| 15:57:29 | 13 | signatures here.  But one signature is for an offer, the |
| 15:57:33 | 14 | other signature is for paid for the offer. |
| 15:57:38 | 15 | Q.  Right.  Understood. |
| 15:57:39 | 16 | A.  Right?  So I don't understand how the one who |
| 15:57:41 | 17 | gives an offer, if I buy a car, I sign a purchase agreement. |
| 15:57:46 | 18 | Right?  So how can, at the end of the day, if I pay for the |
| 15:57:49 | 19 | car, the guy says, "No, no, no, you can only drive the car |
| 15:57:53 | 20 | for 100 miles, the rest you have to pay me separate.  It's a |
| 15:57:57 | 21 | license fee."  Sorry.  This is a purchase agreement, the way |
| 15:57:59 | 22 | I read it, the way I see it.  And I'm not a lawyer, I'm |
| 15:58:02 | 23 | sorry, but -- |
| 15:58:03 | 24 | Q.  I understand. |
| 15:58:04 | 25 | A.  So, as far as I'm concerned -- |

15:58:05  1           COURT REPORTER:  Just a minute.

15:58:05  2           A.  -- as far as I'm concerned, it's The Setai who

15:58:07  3   gives the instruction for work to be done and I assume The

15:58:10  4   Setai paid for it.  I don't know.

15:58:12  5           BY MR. TOKE:

15:58:12  6           Q.  No, I understand that.  And, fair enough, I'm

15:58:14  7   not challenging that part of your testimony.  I understand

15:58:17  8   that that's what you believe and that's what you've said.

15:58:20  9           All I'm asking is, hypothetically, there are only

15:58:22  10  two possible companies that could own the copyright to --

15:58:29  11          A.  I don't believe in hypotheticals.

15:58:30  12          COURT REPORTER:  Just a minute.  Just a minute.

15:58:30  13          BY MR. TOKE:

15:58:31  14          Q.  You have to answer the question, though.

15:58:33  15          I'm saying, hypothetically speaking --

15:58:35  16          A.  Do I have to answer the question?

15:58:37  17          MR. SCHWARZ:  He answered the question, saying he

15:59:38  18  doesn't believe in hypotheticals.

15:58:39  19          BY MR. TOKE:

15:58:40  20          Q.  Well, I'm asking you -- you've already said

15:58:42  21  there are only two companies that are part of this document?

15:58:47  22          A.  Yes.

15:59:47  23          Q.  So, all I'm saying is, the only two companies

15:58:50  24  that could possibly own the copyright are either The Wave or

15:58:53  25  The Setai.  I understand that you have a position that The

15:58:56  1    Setai is the owner.  I'm just saying there's only two

15:59:00  2    possibilities: either Wave owns it or The Setai owns it?

15:59:03  3            A.   No.

15:59:04  4            Q.   Okay.

15:59:05  5            A.   That's my answer.

15:59:06  6            Q.   Your answer is no, there's no possibility?

15:59:09  7            A.   My answer is no.  There's only one owner.

15:59:12  8            Q.   Only one possibility?

15:59:13  9            A.   No.  There's no other possibility.  There's

15:59:15  10   one owner.

15:59:16  11           Q.   Okay.

15:59:16  12           A.   She got paid for what she offered.

15:59:18  13           Q.   Okay.

15:59:19  14           A.   There's one owner.  I mean, I don't -- I don't

15:59:21  15   see how there could be a possible other owner.

15:59:25  16           Q.   Have you ever -- no.  Okay.

15:59:41  17           So, if there's no other possible owner but in your

15:59:45  18   mind The Setai, clearly -- so, GHM did not own the copyright

15:59:49  19   to the photos; correct?

15:59:50  20           A.   I'm not part of GHM.  This is my view and it's

15:59:53  21   the view I take.  It's very clear here.  If you show this to

15:59:57  22   a third party here, this is an offer, and, assuming he paid,

16:00:01  23   this is the guy who owns it.

16:00:02  24           Q.   And when you were at GHM, that was your

16:00:05  25   understanding?

16:00:05  1          A.   Absolutely.

16:00:06  2          Q.   Okay.  So your understanding was that the

16:00:08  3   owner of the copyrights to the photographs were the hotels?

16:00:12  4          A.   Yes.

16:00:12  5          Q.   When you were at GHM?

16:00:14  6          A.   Correct.

16:00:15  7          Q.   And it was not GHM, it was the hotels?

16:00:17  8          A.   It was the hotels, yes.

16:00:20  9          Q.   Okay.  So, what was the basis for GHM's using

16:00:24  10   the photographs that were owned by the various hotels in the

16:00:30  11   various brochures and the A4 brochure, for example?  Where

16:00:34  12   was the permission from the hotels to GHM to use those

16:00:39  13   photographs owned by the hotels given?

16:00:43  14          A.   There's no permission given.  If you look at

16:00:44  15   the management agreement, the management agreement says GHM,

16:00:49  16   who represents the interests of the owner, has all the

16:00:53  17   rights to use all means and ways of maximising the exposure

16:00:57  18   and the positioning of the hotel.  Because we are going to

16:01:00  19   be judged by our results.

16:01:03  20          And so, therefore, if somebody pays for something

16:01:09  21   and I have 100 photographs, I'd better make sure that I use

16:01:12  22   these 100 photographs as often as many as I can.  Because

16:01:15  23   I cannot justify this other management company otherwise,

16:01:18  24   that if there is a limitation attached to it, how would I,

16:01:21  25   as a third party manager, justify this to the owner?  And he

```
16:01:26  1    says, "You mean every time I want to do something, I've got

16:01:29  2    to ask somebody?"

16:01:30  3             That's why, for me, this is just mind-boggling.

16:01:33  4    Which hotel company does that?  You name me one.  I'm in

16:01:37  5    this business for 40 years.  I'm sorry, I find this

16:01:40  6    ridiculous.

16:01:41  7             Q.  Okay.  I was simply just asking --

16:01:44  8             A.  Yes, and I have simply answered.

16:01:45  9             Q.  Yes.  And I'm asking you.  So, the answer to

16:01:47  10   the question is the basis for GHM's ability to use these

16:01:50  11   photographs was the management agreement; correct?

16:01:54  12            A.  Yes, absolutely.  Because we are responsible

16:01:56  13   for maximising the exposure which ultimately results in bums

16:02:01  14   into beds.

16:02:02  15            Q.  And did --

16:02:04  16            A.  Results.

16:02:04  17            Q.  Right.  I like that phrase, by the way --

16:02:06  18            A.  Yes, sorry.

16:02:06  19            Q.  -- bums into beds.

16:02:08  20            So, did that permission then allow for GHM to use

16:02:18  21   the photographs to give to other third parties?

16:02:21  22            A.  I don't understand you what permission.

16:02:23  23   There's no permission needed.  We are the agent for the

16:02:26  24   owner.  So we don't need a permission from a general manager

16:02:29  25   of The Setai Hotel to do what we want to do.  We do what we
```

16:02:33  1    see fit.  Because if we don't do it we go against our

16:02:37  2    contractual arrangements.

16:02:38  3           Q.  And so, if -- and then, as soon as the

16:02:41  4    management agreement is terminated, then that ability to do

16:02:45  5    that ends; correct?

16:02:46  6           A.  Absolutely, yes, that would end, because we

16:02:48  7    have no more responsibility as a result.

16:03:02  8           Q.  Okay.  One thing I wanted to confirm, that --

16:03:07  9    so, with regard to a photo shoot, for example, like we have

16:03:11  10   in exhibit 52 -- no, pardon me, 53, this is the one you have

16:03:17  11   in front of you; yes?

16:03:18  12          A.  The Setai, yes.

16:03:19  13          Q.  So, again, the only two documents related to

16:03:22  14   this photo shoot and the monies paid for it would be the

16:03:25  15   production estimate and the invoice; correct?

16:03:28  16          A.  Yes.

16:03:28  17          Q.  Okay.  So, now, let's take a look at -- and

16:03:47  18   you testified that you reviewed every one of these

16:03:51  19   estimates.  So let's take a look at --

16:03:56  20          MR. SCHWARZ:  I don't believe that's -- you made a

16:03:57  21   statement which I don't believe is correct.

16:04:01  22          MR. TOKE:  Okay.

16:04:01  23          Q.  You testified that whenever an order was

16:04:04  24   placed and you were the one that placed an order with --

16:04:09  25   gave, I think the word, the term you used was you gave the

16:04:12   1    job to Junior; correct?

16:04:15   2           A.   Hm-mm.

16:04:17   3           Q.   So, for all of these photo shoots for all of

16:04:19   4    the hotels managed by GHM for whom Wave provided some

16:04:23   5    photography services, you would give Junior the job;

16:04:25   6    correct?

16:04:26   7           A.   Yes.

16:04:27   8           Q.   And you testified then that the production

16:04:28   9    estimate would go one copy to the hotel, one copy to you in

16:04:32  10    all of these instances?

16:04:34  11           A.   Correct.

16:04:34  12           Q.   Okay.  And then once you and the hotel had

16:04:36  13    approved it then Junior would do the photo shoot and --

16:04:40  14           A.   No, I didn't approve anything.  I made sure

16:04:43  15    that what was in the estimate is what the hotel needed of

16:04:47  16    her services.

16:04:48  17           Q.   Okay.  And that's because the contracting

16:04:51  18    parties, really, were the hotel who was paying for it and

16:04:54  19    Junior; correct?

16:04:55  20           A.   Correct.

16:04:56  21           Q.   Okay.  So, let's take a look at the language

16:05:00  22    at the bottom of page 53 -- exhibit 53.  There are two I'd

16:05:06  23    like you to look at.  The first one is the very last bullet

16:05:12  24    point at the bottom.

16:05:16  25           A.   There's an arrow here.  I can't read it but

16:05:18  1    I know what it says.

16:05:19  2             Q.  Okay.  What does it say?

16:05:21  3             A.  What it says, basically -- and I can't read

16:05:23  4    it, it's so smashed up -- but it's "We reserve the

16:05:29  5    intellectual property copyright to the design, soft copies"

16:05:33  6    or whatever.  Anyway, "photography of project undertaken".

16:05:38  7    Anyway, it relates to the copyright.

16:05:43  8             Q.  Right.  So it says:

16:05:44  9             "We reserve the intellectual property copyright to

16:05:47  10   all designs / soft copies / material / photographs /

16:05:50  11   projects undertaken."

16:05:53  12            A.  Yes.

16:05:53  13            Q.  Yes?  That's what it says?

16:05:54  14            A.  That's what it says, yes.

16:05:55  15            Q.  Okay.  Then if you go two bullet points up

16:05:57  16   from there, it says:

16:05:59  17            "We will proceed on the basis that this estimate

16:06:01  18   is wholly acceptable unless advised to the contrary in

16:06:04  19   writing before the work is undertaken."

16:06:06  20            Do you see that?

16:06:07  21            A.  Yes, I see that, yes.

16:06:08  22            Q.  And you see that it's been signed by Mr. Puri.

16:06:12  23   You testified that that was Mr. Puri's signature?

16:06:14  24            A.  Yes.

16:06:15  25            Q.  Okay.  So, Mr. Puri signed this on behalf of

16:06:17  1      The Setai; correct?

16:06:20  2              A.  Yes.

16:06:20  3              Q.  Okay.  And indicated that --

16:06:24  4              A.  Well, everybody signs it here.  I mean, this

16:06:26  5      is the same thing everywhere here.

16:06:28  6              Q.  So, on all of them; right?

16:06:31  7              A.  Well, as far as I can see, yes.

16:06:32  8              Q.  So, all of them have said that?

16:06:34  9              A.  Yes.

16:06:35  10             Q.  And these spanned --

16:06:36  11             A.  It says that.

16:06:36  12             Q.  Let's see, 53 is dated in 2005, 52 is in 2004,

16:06:42  13     51 is in 2006, 50 is in 2004, and 49 is 2006.  Correct?

16:06:53  14             A.  Mm-hm, yes.

16:06:54  15             Q.  And all of them say the same thing; correct?

16:06:56  16             A.  Yes.

16:06:57  17             Q.  Okay.  So, now, you testified that your

16:07:20  18     understanding was that the copyrights were owned by -- the

16:07:24  19     copyrights to the photographs taken of these various hotels

16:07:27  20     was owned by the hotels; right?

16:07:31  21             A.  (Witness nods.)

16:07:31  22             Q.  And that's because they paid for it?

16:07:33  23             A.  Well, because there was never an issue about

16:07:36  24     copyrights.

16:07:36  25             Q.  But you've testified so far, a number of

Page 92

A Court Reporting Transcript by DTI

```
16:07:39  1    times, that it's because they paid for it?

16:07:41  2           A.  Yes.

16:07:41  3           Q.  Right?  Okay.

16:07:41  4           A.  Because we never talked about copyrights.

16:07:43  5           Q.  Well, except that these documents --

16:07:45  6           A.  Yes, no, I understand, I understand.

16:07:46  7           Q.  These documents say something about copyright

16:07:48  8    and -- (simultaneous speakers - unclear)

16:07:48  9           A.  Yes, yes, I understand.  I can -- I know what

16:07:50 10    it says.

16:07:51 11           Q.  Okay.  And do you believe that others at GHM

16:08:07 12    had the same view that you did, that the copyrights to the

16:08:11 13    photographs of the various properties were owned by the

16:08:15 14    hotels?

16:08:16 15           A.  I can't speak for others.  I don't know.

16:08:19 16           Q.  Okay.  We were talking earlier about Kendall

16:08:24 17    Oei, he was the director.  Would you say he was like

16:08:30 18    number 3 in the company?

16:08:31 19           A.  He was representing Adriaan Zecha's interests.

16:08:34 20    He was there.  So there was no such -- he didn't get

16:08:38 21    involved in the day-to-day operation or anything like that.

16:08:40 22    He was representing his interest.  So, I wouldn't classify

16:08:44 23    as number 3.  He was a director.

16:08:46 24           Q.  He was the director of the company?

16:08:47 25           A.  Yes.
```

A Court Reporting Transcript by DTI

16:08:47  1          Q.   What does the director do?

16:08:50  2          A.   Directs.

16:08:50  3          Q.   The operations of the company?

16:08:52  4          A.   No.   Directs, makes sure that the company goes

16:08:53  5   in accordance with the main shareholders' wishes.

16:08:57  6          Q.   Okay.   And he was also, as you testified, in

16:09:00  7   charge of the legal aspects of the company?

16:09:03  8          A.   Well, he was in charge of all the contractual

16:09:05  9   issues, yes.

16:09:06  10         Q.   Okay.   And would he have seen -- you said

16:09:10  11  these invoices and the estimates went on your desk.   Would

16:09:15  12  he see them as well?

16:09:17  13         A.   I would have been very surprised.   He was

16:09:18  14  hardly in town.

16:09:19  15         Q.   He was hardly in town.   Okay.

16:09:20  16         Do you know if he had an understanding of who

16:09:22  17  owned the copyrights to the photographs?

16:09:24  18         A.   He's American.

16:09:25  19         Q.   That wasn't my question.   That was, like,

16:09:27  20  really nonresponsive.

16:09:29  21         A.   So I suppose -- yes, I suppose so.   I mean,

16:09:31  22  the copyright issue -- again I repeat what I've said -- it

16:09:35  23  was never an issue because Junior Lee never acted upon,

16:09:39  24  while I was working with her, mentioning anything of

16:09:44  25  copyright, mentioning anything that we can use these

16:09:47  1    photographs only for a limited -- for limited use.

16:09:50  2            So this -- yes, I can see what it says here, but

16:09:54  3    in the 10 years I was working with Junior this was never an

16:09:56  4    issue.

16:09:58  5            Q.  Okay.  And that was because --

16:09:59  6            A.  Because, I repeat again, if that would have

16:10:02  7    come up, if she would have acted upon it, it would have been

16:10:05  8    the last time I would have been working with her.

16:10:08  9            Q.  Wouldn't that --

16:10:08  10           A.  Because it creates a problem.

16:10:09  11           Q.  I understand.

16:10:09  12           A.  Because in our industry you need to have all

16:10:11  13   sorts of spreads to do the message.  In those days, it was

16:10:16  14   travel agencies, brochures, newspapers, magazines, etc.,

16:10:22  15   etc.  Nowadays it's -- and then, of course, the internet,

16:10:26  16   nowadays.  It's, I mean, all sorts of things.

16:10:30  17           Q.  I understand.  I --

16:10:31  18           A.  So if you limit anything to anyone --

16:10:31  19           Q.  At this point --

16:10:32  20           MR. SCHWARZ:  No, no, you can't interrupt him.

16:10:34  21   That's --

16:10:35  22           MR. TOKE:  He's not answering the question.  He's

16:10:37  23   just going on a colloquy.

16:10:37  24           MR. SCHWARZ:  Okay.

16:10:37  25           A.  I'm answering the question.

16:10:39  1                BY MR. TOKE:

16:10:40  2                Q.  Okay.  My question actually was --

16:10:41  3                MR. SCHWARZ:  No, no, no, you're -- let him

16:10:41  4       finish.

16:10:41  5                MR. TOKE:  Let's read the question back, please.

16:10:43  6                MR. SCHWARZ:  Before you do that, it doesn't make

16:10:44  7       a difference.  You can ask another question afterwards if

16:10:48  8       you're not satisfied, but under no circumstances can you

16:10:51  9       just interrupt the witness.

16:10:53  10               MR. TOKE:  Sure I can.

16:10:55  11               MR. SCHWARZ:  No you can't.

16:10:56  12               MR. TOKE:  Okay.  Well, let's take a look at the

16:10:57  13      question and I'd like you to answer that question, please.

16:11:29  14                    (Questions and answers read back.)

16:11:29  15               You can stop there.

16:11:29  16               Q.  I asked you, do you know if Mr. Oei had an

16:11:34  17      understanding of who owned the copyrights to the photographs

16:11:37  18      taken by Wave?

16:11:38  19               A.  I can't speak for Mr. Oei.

16:11:40  20               Q.  Okay.  How about Mr. Jenni?

16:11:46  21               A.  Mr. Jenni had very little interaction with

16:11:49  22      Junior.  I would say 90 percent of the interaction with

16:11:53  23      Junior was with me.

16:11:54  24               Q.  Okay.  But I'm asking, did you know if

16:11:57  25      Mr. Jenni had an understanding of who owned the copyright?

Dep - CA No.13-CV-09239-CS-PED                          23 September 2015

16:12:00  1              A.  I can't speak for Mr. Jenni either.

16:12:02  2              Q.  Okay.  You said, though, Mr. Jenni was the

16:12:04  3      president and co-founder of the company; correct?

16:12:06  4              A.  He is still the president of the company.

16:12:08  5              Q.  Okay.  And remains the co-founder.

16:12:11  6              A.  That's right.

16:12:11  7              Q.  Okay.

16:12:12  8              MR. SCHWARZ:  Is this a good time to take a break?

16:12:17  9              MR. TOKE:  If you want, sure.

16:12:20  10             MR. SCHWARZ:  Let's take a break.  We've been

16:12:20  11     going for a long time.

16:12:20  12             MR. TOKE:  Actually, I'm almost done with this one

16:12:22  13     document.  Give me two -- just a few more minutes.  Let's go

16:12:25  14     back on the record.

16:12:29  15             Let's mark this as 54.  It will just be a couple

16:12:33  16     of minutes.

16:12:35  17             MR. SCHWARZ:  No, but I thought you were going to

16:12:36  18     say it was the same document.  But, okay, if it's going to

16:12:38  19     be short, it's fine.

16:12:41  20             MR. TOKE:  It shouldn't be too long.  Thank you.

16:13:07  21             (Exhibit 54  marked for identification)

16:13:08  22             Exhibit 54 is an email thread that involves three

16:13:22  23     players.  It looks like Kendall Oei.  See where it says

16:13:26  24     "K Oei" at the top?

16:13:29  25             A.  Yes.

A Court Reporting Transcript by DTI

16:13:30  1            Q.  And then to Junior Lee?  Do you see that?

16:13:33  2            A.  Yes, I see that.

16:13:34  3            Q.  Okay.  And then let's go to the bottom of this

16:13:37  4     thread.  The re line for this is "Re: The Setai Club Website

16:13:44  5     Pictures."  Do you see that?

16:13:45  6            A.  Yes.

16:13:47  7            Q.  So when you go to the bottom of it and it

16:13:50  8     says:

16:13:51  9            "On 16 Jun 2006, at 6:48 PM, jr lee wrote:

16:13:56  10           Dear Mr Jenni,

16:13:58  11           Please find attached, the summary of pictures

16:14:01  12    usage on The Setai Club for your perusal.

16:14:04  13           Thank you and best regards,

16:14:06  14           Jr lee"

16:14:07  15           And he writes back at 9:49 a.m:

16:14:12  16           "Dear Junior

16:14:12  17           Please mark the ones which have been produced

16:14:15  18    during your photo shoot and then we can assume that the rest

16:14:17  19    is from their library."

16:14:20  20           Do you see where that says that?

16:14:22  21           A.  Yes, yes, yes.

16:14:22  22           Q.  Okay.  Then there's a response from Junior

16:14:24  23    Lee, writing:

16:14:26  24           "Dear Mr Jenni,

16:14:27  25           They have already been marked.  The ones in

16:14:29  1      'Yellow Dots' are shot by us or by the property a long time

16:14:35  2      ago and were put into our archive.  Those that are from

16:14:35  3      their library are marked with 'Pink Star'.

16:14:37  4              Attached is the file for your perusal."

16:14:41  5          Do you see that?

16:14:41  6          A.  Yes.

16:14:42  7          Q.  Okay.  "Thanks Junior," Mr. Jenni writes back.

16:14:46  8      There's a little backward back and forth.

16:14:49  9              And then Mr. Jenni forwards this email thread, it

16:14:51 10      looks like, on Friday, 23 June 2006, to Kendall Oei.  So

16:14:57 11      this is the president and co-founder of the company sending

16:15:01 12      an email to the director of the company.

16:15:03 13          A.  Which page is that?

16:15:05 14          Q.  I'm sorry.  The second page.  The second page.

16:15:07 15          A.  We're going back again.

16:15:07 16          Q.  Sorry.  You'll see -- do you see where I am?

16:15:09 17          A.  Yes, yes, second page.

16:15:10 18          Q.  Okay.  And it says:

16:15:11 19          "Kendall

16:15:14 20          Do we sue?

16:15:16 21          Hans"

16:15:16 22          Do you see that?

16:15:17 23          A.  Yes.

16:15:19 24          Q.  Okay.  Then --

16:15:22 25          A.  What's he referring to?  I don't know.

16:15:24  1          Q.  Well, presumably The Setai Club website

16:15:27  2  pictures; yes?

16:15:29  3          A.  Oh.

16:15:30  4          Q.  Right?

16:15:30  5          A.  I don't know.

16:15:31  6          Q.  Okay.

16:15:31  7          A.  It just says the subject but he doesn't know

16:15:34  8  what he wants to sue about.

16:15:36  9          Q.  Sure.  Then, above that, it's Kendall Oei

16:15:40 10  writing to Junior Lee, saying:

16:15:41 11          "Dear Junior

16:15:42 12          See the enclosed email.  Will you please send me

16:15:45 13  the marked up attachment so that I can view the photos and

16:15:49 14  follow up with our lawyers.  Do you have any documents to

16:15:53 15  show that Waves/GHM own the photos?"

16:15:57 16          Then there is an email above that from Junior Lee

16:15:59 17  to Kendall Oei, 26 June 2006:

16:16:03 18          "Dear Kendall,

16:16:05 19          Here are the documents:

16:16:07 20          Photography Agreement between The Wave and

16:16:11 21  IrieEyes."

16:16:12 22          Do you know what IrieEyes is?

16:16:15 23          A.  That's the company name of -- of Masano.

16:16:19 24          Q.  That's the cameraman or photographer that you

16:16:19 25  talked --

16:16:20  1          A.  Yes.

16:16:21  2          Q.  Okay.  And number 2:

16:16:22  3          "Our quotation with all the terms stated in

16:16:22  4   bullets.

16:16:24  5          An updated Photography Agreement will be signed

16:16:24  6   soon as we have changed the company's name ..."

16:16:29  7          Blah, blah, blah.  Do you see that?

16:16:29  8          Do you see that?

16:16:29  9          A.  Yes.

16:16:30  10         Q.  Okay.  And then, finally, the last bit is

16:16:31  11  above that, where it says:

16:16:33  12         "Dear Junior

16:16:34  13         Many thanks for sending copies of the photos on

16:16:36  14  The Setai Club website as well as copies of your agreement

16:16:36  15  with the photographers.

16:16:37  16         Waves supported by GHM may have to file an IP

16:16:42  17  violation suit against The Setai Club.  That is an option we

16:16:47  18  keep up our sleeves and may produce a pile of money for

16:16:50  19  you."

16:16:51  20         Do you see what that says that?

16:16:52  21         A.  Mm-hm.

16:16:53  22         Q.  "Will revert later.

16:16:55  23         Kind regards,

16:16:57  24         Kendall Oei

16:16:58  25         Director."

16:16:58  1          Do you see that?

16:16:58  2          A.  Mm-hm.

16:16:59  3          Q.  This would be contrary to the viewpoint that

16:17:00  4   the hotels were the copyright owner; correct?

16:17:04  5          A.  Well, The Setai Club was a total different

16:17:07  6   entity.  I don't know, because it's very disjointed here,

16:17:12  7   you are putting things together here.  I don't know in what

16:17:15  8   context it is.  But, yes, I read what it says, yes.

16:17:18  9          Q.  So, it does seem contradictory to the

16:17:22  10  viewpoint that the hotels were the owner of the photographs

16:17:25  11  taken; correct?

16:17:25  12         A.  The Setai Club is not the hotel.  The Setai

16:17:27  13  Club was a different entity of the hotel.

16:17:31  14         Q.  Okay.  But there was a -- understood.  But

16:17:32  15  there were photos taken by Wave, or Junior, of the Setai

16:17:35  16  Club; correct?

16:17:38  17         A.  This I don't know.

16:17:39  18         Q.  Okay.  Okay.  But you would agree that this

16:17:42  19  seems to suggest --

16:17:43  20         A.  No, I wouldn't agree.  Because The Setai Club,

16:17:46  21  as I said, and repeat myself, is a different entity.  The

16:17:49  22  Setai Club is nothing to do with the hotel.  The Setai Club

16:17:53  23  is a private membership club located in the hotel.  It's a

16:17:58  24  separate ownership.

16:17:59  25         Q.  Okay.

16:17:59  1          A.  And it was not --

16:17:59  2          Q.  And it was not managed by GHM?

16:18:01  3          A.  No, of course not.

16:18:02  4          Q.  Okay.  So, that would suggest -- and you're

16:18:03  5     not aware -- were you at The Setai Club shoots, The Setai

16:18:07  6     shoots?

16:18:07  7          A.  I don't know.  This I don't know.  I can't

16:18:09  8     remember, it's so long ago.

16:18:11  9          Q.  Okay.  So, you don't recall?

16:18:13 10          A.  We're talking about 10 years here.  Now

16:18:14 11     I can't remember if I was there.

16:18:16 12          Q.  So, you don't recall if you were at The Setai

16:18:19 13     for any of the photo shoots?

16:18:20 14          A.  I was at The Setai, yes.

16:18:22 15          Q.  Okay.

16:18:22 16          A.  I was at The Setai photo shoots.  This

16:18:24 17     I remember because I remember the big hoo-ha we had to pay

16:18:27 18     to get Junior Lee's luggage out of the thing.  I remember

16:18:31 19     that very well because we had to pay extra money to bring

16:18:36 20     all these equipment into the country.  So, I was there,

16:18:38 21     right.

16:18:38 22          I can't remember the photo shoot of The Setai

16:18:40 23     Club.  That was a club which was done by The Setai

16:18:46 24     developer.  We did the cleaning and this and that but they

16:18:49 25     sold the memberships.  It was a membership club, a private

16:18:53  1    membership club.

16:18:57  2              Q.  I understand.  But you --

16:18:58  3              A.  So this club has nothing to do with Puri nor

16:19:05  4    the hotel.

16:19:06  5              Q.  Okay.

16:19:06  6              A.  The developers of The Setai established a

16:19:09  7    membership club inside the hotel.  Part of the membership --

16:19:12  8    part of The Setai Club was a Lenny Kravitz recording studio.

16:19:17  9              Q.  Okay.

16:19:17  10             You want to take a break.  We can take that break

16:19:21  11   now.

16:19:22  12             MR. SCHWARZ:  It was Lenny Kravitz.

16:19:29  13             A.  Lenny Kravitz.

16:19:31  14             MR. SCHWARZ:  Let's take a break.

16:19:34  15             VIDEOGRAPHER:  This marks the end of videotape

16:19:37  16   number 2 in the deposition of Ralf Ohletz Count von

16:19:42  17   Plettenberg.

16:19:44  18             A.  Now you're making it all confusing.

16:19:44  19             VIDEOGRAPHER:  The time is 4:18 p.m.

16:19:51  20   (4:18 p.m.)

16:19:53  21                    (Recess taken.)

16:32:22  22   (4:32 p.m.)

16:32:50  23             VIDEOGRAPHER:  Back on the record.

16:32:52  24             Here marks the beginning of tape number 3 in the

16:32:55  25   deposition of Ralf Ohletz Count von Plettenberg.  The time

Dep - CA No.13-CV-09239-CS-PED                                    23 September 2015

```
16:33:01  1      is 4:33 p.m.

16:33:06  2              BY MR. TOKE:

16:33:07  3              Q.  Okay.  Back on the record.

16:33:14  4              Let's mark next in order, 55, this document.

16:33:44  5              (Exhibit 55  marked for identification)

16:33:52  6              Exhibit 55 is Bates labeled TWS0355933 and 355934.

16:34:02  7      This is another email string.

16:34:03  8              Do you see this, Mr. Ohletz?

16:34:05  9              A.  The first page or second page?

16:34:08  10             Q.  Let's look at the second page, so we see the

16:34:10  11     older email.

16:34:11  12             A.  Yes.

16:34:11  13             Q.  It looks like it's an email from Mr. Oei.

16:34:16  14     It's hard to tell when it was sent, but it says:

16:34:19  15             "Dear Junior

16:34:19  16             I had asked Pam to request from you a copy of the

16:34:22  17     photo contract you use when employing photographers to shoot

16:34:22  18     photos for GHM brochures.  I can't imagine that you don't

16:34:24  19     have such a service contract.  Please email me a copy.

16:34:28  20             Many thanks."

16:34:29  21             Do you see that?

16:34:32  22             And then we have the next page, which is -- well,

16:34:34  23     the first page actually, which appears to be an email from

16:34:38  24     Mr. Oei to Ms. Lee, to Junior, September 20, 2006:

16:34:45  25             "Dear Junior
```

16:34:46  1            Pam has sent to you by email scanned copies of the

16:34:49  2    photos of The Lalu which appeared in the book Ultimate Spa.

16:34:56  3    Would you please check and see if these photos are part of

16:34:59  4    your proprietary library or whether they are third-party

16:35:03  5    photos."

16:35:04  6            Do you see what he says there?

16:35:07  7            A.  Yes.

16:35:08  8            Q.  What do you think he means by that?

16:35:10  9            A.  Well, he means very clearly that there's a spa

16:35:11  10   brochure or a spa whatever -- Ultimate Spa, I don't know

16:35:16  11   what that is.  A book?  And there are photographs in there.

16:35:20  12   I mean, that's how it says.

16:35:22  13           Q.  Some of which were of The Lalu; correct?

16:35:26  14           A.  That's what he assumes, yes.

16:35:28  15           Q.  What he says.  He doesn't assume it.

16:35:31  16           A.  What he says.

16:35:31  17           Q.  Okay.  And it suggests -- he says, "Would you

16:35:34  18   please check and see if these photos are part of your

16:35:37  19   proprietary library" of photos of The Lalu; correct?

16:35:42  20           A.  Yes.

16:35:43  21           Q.  So it appears that Mr. Oei believes that the

16:35:46  22   photos taken by Junior of The Lalu are part of her

16:35:50  23   proprietary library; correct?

16:35:52  24           A.  No.  That's -- that's not how I would --

16:35:57  25   I would interpret this because --

16:35:58  1          Q.  How would you interpret it?

16:36:00  2          A.  I would see this, because there are lots of

16:36:03  3   photographs that Junior Lee would take or the group would

16:36:07  4   take, and I guess The Lalu would have issued some

16:36:11  5   photographs to -- because occasionally you have this as a

16:36:16  6   hotel company, that the publisher of books comes and sees

16:36:21  7   you and says, "Look, we'd like to do a spa book, do you

16:36:24  8   have" -- and, of course, the spa was one of the best spas in

16:36:28  9   Taiwan, very beautiful.  So I can imagine that they have

16:36:31 10   given them some photographs.  That's how I read this.  Okay?

16:36:34 11          So The Lalu gave the guy some photographs and

16:36:37 12   Kendall wants to know whether they are The Lalu photographs

16:36:41 13   or whether they are third party photographs.

16:36:42 14          Q.  Right.  The Lalu photographs taken by Junior?

16:36:45 15          A.  Correct, yes.

16:36:46 16          Q.  Okay.  But when -- okay.

16:36:48 17          A.  That's how I read this, very clearly.

16:36:50 18          Q.  Okay.  And when he says "part of your

16:36:55 19   proprietary library", how do you understand that?

16:36:58 20          A.  Because at that time, 2006, The Lalu was not

16:37:02 21   any more part of the management of GHM.

16:37:05 22          Q.  Ah, right.  So -- right, exactly.

16:37:08 23          A.  So --

16:37:08 24          Q.  So then -- so The Lalu's use of these --

16:37:11 25          MR. SCHWARZ:  Just a second.

16:37:11  1          MR. TOKE:  I'm sorry.

16:37:11  2          MR. SCHWARZ:  Don't interrupt him.

16:37:12  3          BY MR. TOKE:

16:37:13  4          Q.  I'm sorry.  Continue, please.

16:37:13  5          A.  Yes.  So it was not any more part of GHM, so

16:37:17  6   he wants to know whether the photograph that The Lalu is

16:37:20  7   using, okay, from -- taken by her or taken by a third party.

16:37:26  8          Q.  Right.

16:37:26  9          A.  So, meaning the proprietary library, because

16:37:29 10   you can't go back to The Lalu and ask that because The Lalu

16:37:32 11   is not part of the GHM portfolio any more, so you ask her.

16:37:37 12          Q.  And the reason is because The Lalu couldn't

16:37:39 13   use the photos any more and that's why he wants to know if

16:37:42 14   it's part of her proprietary library, because they were no

16:37:45 15   longer --

16:37:46 16          A.  I can only assume that.

16:37:47 17          Q.  So, you can -- that's what he's trying to say;

16:37:49 18   right?  That he's saying -- so, Kendall Oei is saying The

16:37:51 19   Lalu, because it's no longer managed by GHM, cannot use the

16:37:55 20   photos that were taken by Junior of The Lalu, since they

16:37:59 21   were no longer under contract with GHM; correct?  That's

16:38:02 22   what you're interpreting this as?

16:38:05 23          A.  No.  The way I interpret this is that The

16:38:10 24   Lalu, which is not part of GHM, has to do -- whether The

16:38:14 25   Lalu is giving photographs from their old library to this

16:38:16  1     book or not.  So, he just wants to establish whether it

16:38:21  2     comes from the work that she's done or whether the work is

16:38:24  3     by a third party.  That's what he wants to establish.

16:38:27  4             Q.  Why is that -- why would that be important?

16:38:28  5             A.  I don't know.  It doesn't say here.

16:38:31  6             Q.  Ah.  Okay.  Okay.

16:38:31  7             A.  I just read what he says.

16:38:33  8             Q.  Okay.

16:38:33  9             A.  Because he was asking merely whether these

16:38:36  10    photographs used in that book are taken by Junior or taken

16:38:41  11    by a third party.  That's what he's asking.

16:38:52  12            Q.  Okay.  Earlier you testified that --

16:39:10  13            A.  May I just add something to this?

16:39:12  14            Q.  I don't know what it's going to be responsive

16:39:14  15    to, so, no, I -- (simultaneous speakers - unclear)

16:39:15  16            A.  Yes, I know, because it relates to The Lalu.

16:39:18  17            Q.  It relates to The Lalu?

16:39:19  18            MR. SCHWARZ:  If he wants to finish his answer.

16:39:20  19    I clearly let Ms. Lee supplement her answers.

16:39:25  20            MR. TOKE:  If it's responsive to my question, yes.

16:39:27  21            A.  Yes, it is, because -- because The Lalu, when

16:39:30  22    it became or when it started to be owned under their own

16:39:36  23    management, used all the photographs until now, until last

16:39:40  24    week, until I got an email from The Lalu saying, "Oh, I have

16:39:45  25    somebody called Junior Lee giving us trouble with the

16:39:47  1    photographs."  I can show it to you.  The guy sent it to me,

16:39:51  2    one of our ex-staff, and they were quite perplexed, you see.

16:39:55  3    So, meaning The Lalu, quite clearly, used the photographs

16:39:59  4    well after GHM has left, and rightly so, because they're

16:40:03  5    theirs.

16:40:03  6            Q.  Even until last week?

16:40:04  7            A.  They could not use -- what they could not use

16:40:07  8    is the format that we had established and the logo of GHM.

16:40:12  9    Everything else they can use until the cows come home, as

16:40:15 10    far as I'm concerned.

16:40:16 11            Q.  As far as you're concerned.  Okay.  That's

16:40:17 12    fine.

16:40:18 13            When we were looking at the various production

16:40:21 14    estimates, you looked below and you said, "Yes, they always

16:40:24 15    have that similar language" --

16:40:26 16            A.  Yes.

16:40:26 17            Q.  -- "that Wave reserves all the intellectual

16:40:28 18    property copyrights to the" --

16:40:31 19            A.  Yes.

16:40:31 20            Q.  -- "including photographs".  Correct?

16:40:31 21            A.  Yes.

16:40:31 22            Q.  Okay.  You just read that today?

16:40:33 23            A.  No.  Well, I mean, I'm aware of it.  But, you

16:40:35 24    know, it's one of those typical small prints you never read,

16:40:38 25    you know.  But --

16:40:40  1          Q.  Okay.  When did you --

16:40:42  2          MR. SCHWARZ:  Let him finish.

16:40:43  3          BY MR. TOKE:

16:40:44  4          Q.  Go ahead.

16:40:45  5          A.  It's one of those typical small prints you

16:40:47  6  never read.

16:40:48  7          And there was never an issue with the rights of

16:40:51  8  who owns the photographs.  If there would have been ever

16:40:54  9  brought up, this would have been immediately put to bed.

16:40:57 10  And, as I said again, or I repeat, I repeat for the fifth

16:41:00 11  time already, she would not have had a job with us.

16:41:04 12          Q.  I understand.  So you said --

16:41:06 13          MR. SCHWARZ:  No, no --

16:41:06 14          MR. TOKE:  He can't keep going on these -- I'm

16:41:06 15  trying to --

16:41:06 16          MR. SCHWARZ:  You can't interrupt the witness.

16:41:09 17  It's not fair.  So, let him finish.

16:41:11 18          BY MR. TOKE:

16:41:12 19          Q.  Go ahead, if you want to.

16:41:13 20          A.  So, what I'm saying is if you put yourself

16:41:16 21  into a situation of a hotel company whose job it is to

16:41:19 22  manage a third party asset and part of the management is to

16:41:25 23  use photography that is done by a photographer, it is

16:41:30 24  totally counterproductive to give a photographer a license,

16:41:36 25  saying, "This is your photography," and every time I want to

16:41:40  1    use it for whatever device or whatever means, I have to go

16:41:43  2    back to you.  I mean, absolutely unheard of, and totally

16:41:47  3    counterproductive.

16:41:48  4              The very reason why I went with her is because it

16:41:52  5    was worry free.  So yes, I see it, because I'm not saying

16:41:56  6    that you have put it on there before.  But it was

16:42:00  7    inconsequential because she never acted upon it.

16:42:04  8         Q.  So, you're telling me that when you get these

16:42:07  9    production estimates you would see that language?

16:42:10 10         A.  Well, no.

16:42:10 11         Q.  Or, when did you first read that language?

16:42:13 12         A.  Yes and no.  Because what I look at ultimately

16:42:15 13    in these estimates is to see that what I wanted her to do is

16:42:24 14    here, because that ultimately is what the hotel pays.  Then

16:42:27 15    I see the price, which I really was not too concerned about

16:42:30 16    because, as I said earlier on, if it fits within the budget,

16:42:34 17    and if it's too much -- she also then bargained with the

16:42:38 18    hotel, which is fine, because she did that between the

16:42:42 19    general manager, and definitely, I remember, with Puri,

16:42:45 20    because Puri is a bit of a tight arse and she would have

16:42:49 21    definitely -- I'm sure there was another estimate here which

16:42:52 22    was higher.  So it was negotiated, I'm quite sure.  And she

16:42:55 23    was always very open to that.  Okay?  So, other than --

16:42:58 24         Q.  And that's because --

16:42:58 25         MR. SCHWARZ:  No, no.

A Court Reporting Transcript by DTI

16:42:59  1          A.  Other than that line, really, I didn't care

16:43:02  2   really what it said --

16:43:03  3          BY MR. TOKE:

16:43:03  4          Q.  So, you're telling me that you --

16:43:03  5          A.  (simultaneous speakers - unclear) -- very

16:43:03  6   honestly.

16:43:08  7          Q.  So, you're telling me that you -- so, you're

16:43:09  8   telling me that you did read that line but --

16:43:11  9          A.  No, I didn't.

16:43:12 10          Q.  You never read that line?

16:43:14 11          A.  No.

16:43:14 12          Q.  So, you weren't aware of that.  And you didn't

16:43:17 13   care because it was a contract between the hotel and her;

16:43:21 14   right?

16:43:22 15          A.  Yes, it was one of these small prints you

16:43:24 16   don't read, you know, really.  Because, as I said, my focus

16:43:26 17   was on the amount, my focus was on what she had to do.  And,

16:43:31 18   yes, perhaps rightly or wrongly so.  But if it would have

16:43:35 19   caught my attention, I would have definitely asked her,

16:43:37 20   "Well, what's that?"  But she also didn't bring it up to my

16:43:41 21   attention.

16:43:41 22          So, as I said, I didn't read it or I didn't

16:43:44 23   acknowledge it and she didn't bring it up to my attention,

16:43:47 24   like it is here with an arrow.  Right?  I mean, "Look, what

16:43:49 25   about this one here?"  Right?  Then I wonld have said, "Oh.

16:43:52  1    What is this?"  Because what we definitely want to avoid is

16:43:56  2    problems.

16:43:56  3              Q.  And you testified earlier, though, you agreed

16:43:58  4    that this is a contract between the hotel and Ms. Lee

16:44:00  5    because --

16:44:01  6              A.  It's not a contract.  It's an estimate.

16:44:04  7              Q.  Okay.

16:44:05  8              A.  A contract --

16:44:05  9              Q.  But there's a signature at the bottom from

16:44:08  10   Ms. Lee and the hotel; correct?

16:44:10  11             A.  From the general manager, right, acknowledging

16:44:13  12   that this is roughly -- the final bill could have been

16:44:15  13   different.

16:44:15  14             Q.  Okay.

16:44:15  15             A.  That's what it says, "estimate"; estimate

16:44:18  16   meaning not final.  It could have been more, could have been

16:44:21  17   less.

16:44:21  18             Q.  Okay.

16:44:21  19             A.  So the final bill would have been presented to

16:44:23  20   the general manager.  It was just for the purpose of making

16:44:27  21   sure that it fits in the budget.

16:44:29  22             Q.  You testified earlier that, you know, when you

16:44:31  23   go to a car dealer and you sign at the bottom, you expect

16:44:34  24   you own the car; right?

16:44:35  25             A.  Yes.

16:44:36  1             Q.  Okay.  Have you ever leased a car?

16:44:39  2             A.  No.

16:44:40  3             Q.  Okay.  You know how a lease works, though;

16:44:42  4   right?

16:44:43  5             A.  Yes.

16:44:43  6             Q.  Yes.  And so, you sign at the bottom, you get

16:44:45  7   the car, but you don't own it; correct?

16:44:48  8             A.  But the difference is the price.

16:44:49  9             Q.  Right.  Exactly.  So you -- but it's based on

16:44:52  10  the terms of the contract; right?

16:44:54  11            A.  Yes.

16:44:54  12            Q.  Okay.  So, when you're leasing a car, you sign

16:44:56  13  at the bottom line, just like you do for a purchase

16:44:59  14  contract; right?  But you don't own the car because the

16:45:02  15  price is different; correct?

16:45:03  16            A.  (Witness nods.)

16:45:04  17            Q.  Okay.  And then there are conditions on when

16:45:06  18  you can use it and how many miles you can drive, etc.?

16:45:09  19            A.  Not when you lease a car.  That's when you

16:45:12  20  rent a car.  There's a difference.

16:45:15  21            Q.  Okay.  So --

16:45:15  22            A.  So, if you lease a car you can drive as much

16:45:18  23  as you want.  When you rent a car, it stipulates

16:45:21  24  differently.  So we're not renting anything here, we're not

16:45:24  25  renting any photographs here.

16:45:25  1             Q.  Okay.  You testified earlier that you believe

16:45:28  2    that Mr. Masano was the photographer; correct?

16:45:31  3             A.  Yes.

16:45:32  4             Q.  And one of the things you said was you know

16:45:35  5    that because there was no attribution in these documents

16:45:38  6    to -- or in these brochures to Lee Kar Yin as the

16:45:42  7    photographer; correct?

16:45:44  8             A.  Yes.  She wasn't the photographer.

16:45:46  9             Q.  Right.  And I'm saying, and one of the things

16:45:48  10   you said, you testified, as a proof of that GHM didn't or

16:45:53  11   you didn't view that she was the photographer, was there is

16:45:57  12   no attribution of Lee Kar Yin or Wave as the photographer;

16:46:01  13   correct?

16:46:02  14            A.  No, because --

16:46:03  15            Q.  I'm asking you:  That's correct; right?

16:46:05  16            A.  Yes.

16:46:05  17            Q.  Okay.  So, if there were attribution, if there

16:46:09  18   were attribution in any of these documents, that would

16:46:12  19   suggest that she was the photographer; correct?

16:46:14  20            A.  That's irrelevant because we are paying for a

16:46:15  21   service and ultimately what we are saying is the service is

16:46:18  22   done by a group of people.  So, you know, so that's what

16:46:23  23   we're saying.  So ultimately I don't care if it's done by

16:46:27  24   her, by him or whatever.  He was always there --

16:46:29  25            Q.  I understand.

16:46:29  1          A.  -- with his assistant, with the whole lighting

16:46:31  2    machine and all this sort of thing what you need there.

16:46:34  3          Q.  I understand.  That wasn't my question.

16:46:36  4          My question was -- pointed to your testimony

16:46:38  5    earlier that if she had been considered the photographer,

16:46:41  6    there would have been some sort of attribution in these

16:46:45  7    brochures that she was the photographer; correct?

16:46:48  8          A.  I don't know.

16:46:49  9          Q.  That's not what you testified before?

16:46:51  10         A.  No, I don't know.  Because I'm paying for a

16:46:53  11   service -- I keep on repeatings myself -- I'm paying for a

16:46:57  12   service which includes photography.  So, it says here very

16:47:00  13   clearly, photography, design, art direction, all this, it's

16:47:04  14   the whole package.  I didn't ask her to do, be the

16:47:07  15   photographer nor did I hire her for a specific purpose.

16:47:12  16   I hired her to give me the end product.

16:47:16  17         Q.  Okay.  And if you were to see attribution of

16:47:24  18   her name in a particular product, if you did put it in here,

16:47:29  19   would that suggest that she was the photographer?

16:47:34  20         A.  If I would have seen in any of the work that

16:47:37  21   she then presents to us, in front of the CD, on the side, a

16:47:44  22   reference to her photography, I would say, "What is that?"

16:47:47  23   I would have definitely questioned her.

16:47:49  24         Q.  So -- okay.

16:47:56  25         A.  There was never any reference of any of her

16:47:59  1    photography work that it is Wave or her.  Never ever have

16:48:05  2    I seen.

16:48:06  3            Q.  And that's because you didn't consider her the

16:48:09  4    photographer?

16:48:10  5            A.  No.  That's because I hired her for a complete

16:48:13  6    job, not part of a job.  Photography is part of it.

16:48:16  7    I didn't hire a photographer.  I hired somebody who designs,

16:48:21  8    conceptualizes and delivers a full product, which includes

16:48:24  9    photography.

16:48:25  10           Q.  Okay.

16:48:29  11           A.  That was the deal.

16:48:39  12           Q.  You will be holding on to these; right?  The

16:48:41  13   original will come back to us, of these?

16:48:51  14           COURT REPORTER:  Yes.

16:48:54  15           MR. TOKE:  Okay.  So, I'd like to mark the next

16:48:59  16   five exhibits -- this will be just quickly -- these various

16:49:04  17   magazines.  Okay.

16:49:05  18           A.  I'm familiar with the magazines.

16:50:20  19           Q.  You are?

16:50:21  20           A.  Yes, I'm familiar with the magazines.

16:50:31  21           (Exhibit 56  marked for identification)

16:50:31  22           (Exhibit 57  marked for identification)

16:50:31  23           (Exhibit 58  marked for identification)

16:50:31  24           (Exhibit 59  marked for identification)

16:50:31  25           (Exhibit 60  marked for identification)

16:50:33  1          BY MR. TOKE:

16:50:34  2             Q.  Mr. Ohletz, what has now been placed in front

16:50:36  3      of you are exhibits 56 through 60.  These, I will represent

16:50:42  4      to you, are various GHM published magazines, called The

16:50:47  5      Magazine; correct?

16:50:48  6             A.  Yes.

16:50:49  7             Q.  Okay.  And you said you're familiar with these

16:50:52  8      magazines; correct?

16:50:54  9             A.  I'm familiar with the magazine because they

16:50:56  10     were published, I don't know, every quarter or something.

16:51:01  11            Q.  From about when to when?

16:51:02  12            A.  Oh, this I don't know.

16:51:03  13            Q.  Give me an estimate.

16:51:05  14            A.  I don't know.

16:51:06  15            Q.  Okay.  When did -- do you remember when The

16:51:08  16     Magazine started?

16:51:09  17            A.  Let's say 10 years ago, maybe.  Because The

16:51:12  18     Magazine came about, Mr. Graf, who was publishing the

16:51:19  19     magazine, was a regular guest of The Datai and he's from

16:51:24  20     Switzerland, he met Mr. Jenni and then he offered to do a

16:51:29  21     magazine as a third party.  So he printed The Magazine in

16:51:32  22     Switzerland because he's a -- he prints various magazines.

16:51:35  23     And so Mr. Jenni said it was a good idea, and this was his

16:51:40  24     little thing.  I was never involved in that magazine.

16:51:48  25            Q.  This was Mr. Jenni's little thing?

16:51:50  1          A.  This was Mr. Jenni's little toy.

16:51:53  2          Q.  And would you see these before they were

16:51:55  3    published?

16:51:56  4          A.  Absolutely no way.  Because, as I said, this

16:51:59  5    was done, context, everything, this was Mr. Jenni, because

16:52:03  6    he had a very close relationship with the publisher.  And so

16:52:06  7    he controled totally editorial, whatever.  I only saw them

16:52:10  8    when they arrived.  So I had absolutely nothing to do with

16:52:13  9    this.

16:52:15 10          Q.  Then who at GHM then would have had any

16:52:19 11    involvement?

16:52:19 12          A.  I don't think anybody.  Only the -- you know,

16:52:22 13    because I was in one of those magazines, I don't know

16:52:25 14    whether it's here, but -- because we interviewed sometimes

16:52:29 15    guests, we interviewed the general manager here, and he puts

16:52:31 16    in -- because he puts together the magazines, so this is all

16:52:34 17    his contribution.  You see it's a motor cycle.  So, this is

16:52:42 18    Hans Meier, one of our general managers.  So, it's obviously

16:52:47 19    the guys who -- we tell them Hans Meier, Graf goes there,

16:52:52 20    takes photographs and then does the text.  So this is a

16:52:54 21    one-man show, I guess.

16:52:55 22          Q.  Would no one at GHM ever look at it before it

16:52:59 23    was published?

16:53:01 24          A.  This I don't know.  I doubt it very much.  But

16:53:02 25    I don't know that.  Certainly not me.

16:53:04  1          Q.  Where would he have gotten any information

16:53:07  2   about -- or even where would he have gotten the photographs

16:53:11  3   that are put into the magazine?

16:53:13  4          A.  Well, it's very clearly a hotel magazine, our

16:53:17  5   hotel -- I mean, the GHM magazine, and the photographs that

16:53:20  6   are in here are from GHM.

16:53:21  7          Q.  Okay.  So, someone at GHM would have given him

16:53:25  8   the -- (simultaneous speakers - unclear)

16:53:26  9          A.  I mean, you know -- of course, absolutely.

16:53:27  10         Q.  Okay.  And they would have --

16:53:27  11         A.  I mean, GHM, the hotels or --

16:53:28  12         MR. SCHWARZ:  Let him finish.

16:53:28  13         A.  I don't know how they -- how he got the

16:53:31  14  things.  I don't know who.  But these are hotel photographs,

16:53:33  15  our hotel's photographs, and they were given to this man.

16:53:36  16         BY MR. TOKE:

16:53:38  17         Q.  Okay.  By someone at GHM?

16:53:40  18         A.  This I don't know.  But they sell the hotel.

16:53:44  19         Q.  Okay.

16:53:45  20         A.  So it's another one of these brochures.  But

16:53:48  21  this is one thing that I didn't control.

16:53:53  22         Q.  Okay.

16:53:55  23         A.  Because it was Mr. Jenni's favourite, so to

16:53:58  24  speak, and he liked that magazine.

16:54:01  25         Q.  Okay.  Did he ever look at the documents, at

16:54:03  1    these, before they were published, do you know?

16:54:07  2          A.  This I don't know.

16:54:08  3          Q.  You don't know.  Okay.

16:54:08  4          A.  I'm sure he must have had correspondence of

16:54:10  5    the context because, you know, he was a friend of Mr. Graf,

16:54:12  6    and I'm sure that before it was published he would be

16:54:18  7    seeing, you know -- I'm assuming here, I don't know.

16:54:23  8          But, you know, this is entirely between Mr. Graf

16:54:25  9    and Hans Jenni, this.  Nobody in the office would ever get

16:54:28 10    involved in that.

16:54:31 11          Q.  Okay.

16:55:47 12          Let's take a look at the same one we've been

16:55:49 13    looking at, which is exhibit 56.  We've tagged now here a

16:55:55 14    number of photos that I will represent to you were taken by

16:56:01 15    Junior Lee as The Wave.

16:56:04 16          A.  Well, I'm quite sure, because she was the only

16:56:07 17    person doing these sort of things.  So who else's

16:56:10 18    photographs would be in there?

16:56:11 19          Q.  Right.  So let's see.  We're looking at one

16:56:14 20    page that has a photo of The Leela, The Chedi, Chiang Mai,

16:56:17 21    The Setai --

16:56:19 22          A.  Yes, yes, I understand.

16:56:20 23          Q.  Yes.  And so, were you at any of these shoots,

16:56:23 24    do you know?  Do you recall?

16:56:26 25          A.  I don't know which shoot.  I remember the

16:56:28  1    Setai.  I mean, quite a few, not all, because I think

16:56:31  2    probably at the very beginning more.  Then later on, again,

16:56:35  3    you know, one has a very good understanding of the way we

16:56:39  4    work together and she did it by herself, you know.  But

16:56:42  5    I think -- I mean, 80 percent, 70 percent, I don't know.

16:56:47  6    But I certainly was at some of the shoots, yes, not all of

16:56:51  7    them probably, but --

16:56:52  8              Q.  And was Masano at most of these shoots?

16:56:57  9              A.  I assume.  Certainly the shoots I was there.

16:57:00 10              Q.  Okay.  So let's go to the back.  It says,

16:57:05 11    actually here, on the second to last page, there's a little

16:57:10 12    title that says "Imprint", and if you look at "Photography",

16:57:13 13    do you see what that says?

16:57:15 14              A.  Yes.  "James Graf, Peter Hillert, Lee Kar

16:57:20 15    Yin."

16:57:21 16              Q.  And who is Lee Kar Yin?

16:57:22 17              A.  I don't know.  I guess it's Junior.

16:57:25 18              Q.  It's Junior; correct?

16:57:26 19              A.  Yes.  I don't know.  Yes.  I don't know her

16:57:29 20    full name.

16:57:29 21              Q.  Well, I can represent to you that that's what

16:57:31 22    her name is, Lee Kar Yin.

16:57:35 23              A.  Okay.

16:57:36 24              Q.  Okay.  And so --

16:57:37 25              A.  Maybe -- maybe because she was put in there

16:57:39  1    because she sent the photographs.  I don't know.  How would

16:57:42  2    they get the photographs otherwise?

16:57:44  3            Q.  I asked you.  And you said --

16:57:45  4            A.  I don't know.  I'm just saying, maybe her

16:57:48  5    reference is there because she sent the photographs.

16:57:50  6    Because this was very common that because she had a lot of

16:57:53  7    photographs, she had a photographic library, you know --

16:57:56  8    because you have to understand, there were not two copies,

16:57:59  9    there were three copies, one for the hotel, one for GHM and

16:58:05 10    one library that she kept.

16:58:08 11            So, very often, someone else would ask her, "Well,

16:58:13 12    don't give any others," because, you know, when you do

16:58:17 13    publication, you need to -- you have to have new things.  So

16:58:21 14    we certainly can't use the always same photography that we

16:58:24 15    use in brochures, because it's a magazine, otherwise it's --

16:58:27 16    it repeats herself.

16:58:28 17            So, I can just imagine that people ask her, "Well,

16:58:30 18    we have to do this magazine, send something else other than

16:58:34 19    a brochure photograph," because she was -- she was dealing

16:58:36 20    with this.  And nobody in the office would have the better

16:58:39 21    understanding of sending photographs to somebody, third

16:58:42 22    party, than her.

16:58:43 23            Q.  But you have no personal knowledge that Junior

16:58:48 24    was actually the one that sent these photographs?

16:58:50 25            A.  No, I have no personal knowledge.

```
16:58:52  1          Q.  Okay.  So that's pure speculation on your

16:58:55  2    part?

16:58:56  3          A.  Absolutely, yes.

16:58:57  4          Q.  So, let's go to --

16:58:59  5          A.  But he must have gotten them from someone.

16:59:02  6          Q.  True.  Clearly.  They're in The Magazine.

16:59:03  7          A.  And you know -- sorry.  The speculation is, to

16:59:06  8    me, very solid, because why would Graf, who is the editor

16:59:11  9    and publisher, use her name in there?  So, if you are a

16:59:16  10   third party magazine supplier, you do that out of courtesy,

16:59:20  11   absolutely.  So, otherwise GHM would be in there, but GHM is

16:59:23  12   the publisher of this.

16:59:25  13         Q.  Right.  And so, you're saying as a courtesy,

16:59:28  14   because as the photographer of the --

16:59:30  15         A.  She's not the photographer.  She is the holder

16:59:32  16   of -- I mean, why are we going over?  She is not the

16:59:36  17   photographer.  She is the holder of our library, of the

16:59:39  18   library of photos.

16:59:40  19         Q.  Okay.  So we can take a look at each one of

16:59:43  20   these, and you'll agree that they indicate that

16:59:47  21   "Photography", there's an attribution to Lee Kar Yin;

16:59:52  22   correct?

16:59:54  23         A.  Yes, and I just explained why I think it's

16:59:56  24   there.

16:59:57  25         Q.  I understand.  I'm just saying that that's
```

16:59:57  1    what it says; correct?

16:59:58  2         A.   That would be -- that's all I would know.

17:00:00  3    Otherwise I don't know.

17:00:03  4         Q.   No, I understand.  You'll agree that in the

17:00:04  5    tabbed area on each of these magazines, where it says

17:00:07  6    "Photography", there's an attribution to Lee Kar Yin;

17:00:11  7    correct?

17:00:11  8         A.   If there are photos from her in there, of

17:00:14  9    course, yes.

17:00:16  10        Q.   Yes.  Okay.  And I'm just asking you to take a

17:00:17  11   look at each one, just to confirm that that's in fact what

17:00:21  12   it says.  Yes?

17:00:22  13        A.   Yes.

17:00:23  14        Q.   Okay.

17:00:24  15        A.   But this is -- but this is a third party

17:00:25  16   publisher.

17:00:26  17        Q.   I understand.

17:00:26  18        A.   Nothing to do with GHM.  GHM buys it from him.

17:00:29  19        Q.   I understand.  Okay.

17:00:31  20        A.   So, you have to ask Mr. Graf.  He knows that.

17:00:34  21   I don't know.

17:00:35  22        Q.   Sure.  But I'm just asking you to agree that

17:00:36  23   this --

17:00:37  24        A.   I don't agree.  I acknowledge that her name is

17:00:39  25   there.  That's what I do.

17:00:40  1          Q.  Right.  And this is a GHM published magazine?

17:00:42  2          A.  No, that's a GHM magazine published by

17:00:45  3   Mr. Graf.

17:00:46  4          Q.  Ah.  Okay.  So, let's take a look at the

17:00:48  5   bottom then of this page, where it says:

17:00:54  6          "All rights reserved by General Hotel Management."

17:00:58  7          Correct?

17:00:58  8          A.  Mm-hm.  Yes.

17:01:00  9          Q.  So doesn't that suggest that it's published by

17:01:03  10  General Hotel Management?

17:01:03  11         A.  No.  It says that the contents which are in

17:01:07  12  there are General Hotel Management contents, which is

17:01:09  13  probably correct because it was coordinated with Mr. Graf.

17:01:14  14         Q.  Okay.

17:01:18  15         A.  It would be a reference to editing, more or

17:01:21  16  less the same.

17:01:30  17         Q.  Okay.  Next in order, please.  This is exhibit

17:01:33  18  61.

17:01:35  19         (Exhibit 61  marked for identification)

17:02:01  20         A.  How old are these magazines, by the way?

17:02:03  21         COURT REPORTER:  Just a minute.

17:02:03  22         BY MR. TOKE:

17:02:03  23         Q.  Actually, before we finish, let's take a look

17:02:06  24  at this one, which is marked 57.  If you'll read again just

17:02:11  25  the bottom, this says:

17:02:13  1            "Published and all rights reserved by" --

17:02:19  2        A.  "The Magazine".

17:02:20  3        Q.  Right.  And then what does that say

17:02:22  4  underneath, "General Hotel Management"?

17:02:23  5        A.  "General Hotel Management", yes.

17:02:25  6        Q.  Correct?

17:02:25  7        A.  Yes.

17:02:26  8        Q.  Okay.  That's all.  Thank you.

17:02:28  9        A.  How old is that magazine?

17:02:30  10        Q.  It's No. 3 in the series.  I don't know.

17:02:32  11        A.  Well, it's a very early one, which means we're

17:02:35  12  talking about 10 years ago.  So, 10 years ago, you know, for

17:02:39  13  10 years Junior was our absolute keeper of everything that

17:02:43  14  was in the publishing world.  So it would only be fair to

17:02:47  15  have her name in there.  I would be very disappointed not to

17:02:50  16  see her name in there.

17:02:51  17        Q.  Okay.  Let's look at exhibit 61, please.  This

17:02:56  18  is another email thread.  This looks like -- if you go to

17:03:07  19  the bottom of the first page, you'll see it's an email

17:03:11  20  from --

17:03:14  21            MR. SCHWARZ:  Excuse me, I need a copy.

17:03:17  22            MR. TOKE:  Sorry, I apologize.

17:03:28  23        Q.  You'll see at the bottom it's an email from

17:03:31  24  Meghan Edwards, who appeared to be at Reed Business, writing

17:03:35  25  to ghmadmin@singnet.com.sq.  Do you see that?

17:03:43  1          A.  Yes, I see that.

17:03:43  2          Q.  And the "Subject" line is "Interior Design

17:03:44  3  magazine - photography credit for the Chedi Muscat".  Do you

17:03:47  4  see that?

17:03:47  5          A.  Mm-hm.

17:03:47  6          Q.  It says:

17:03:47  7          "Dear Alvin Fong,

17:03:49  8          I'm writing on behalf of Interior Design magazine.

17:03:49  9  We're using an image that you sent us of the Chedi Muscat in

17:03:54 10  Oman in our October issue.  What should the photography

17:03:57 11  credit be for this image?

17:04:00 12          As we're on deadline, please respond as soon as

17:04:03 13  you receive this.

17:04:04 14          Meghan Edwards."

17:04:05 15          Then there is an email above that, which appears

17:04:10 16  to be from Mr. Alvin Fong to Junior on September 27, 2007,

17:04:14 17  saying:

17:04:14 18          "Hi Junior,

17:04:15 19          Do you want to reply to her below?  Or is there a

17:04:18 20  standard credit we can give out to anybody?"

17:04:21 21          Do you see that?

17:04:22 22          A.  She says Wave Studios, yes.  That's the

17:04:25 23  courtesy we would -- we would give to people who work with

17:04:29 24  us very closely, absolutely, and it's correct.

17:04:34 25          Q.  Because it suggests -- it's saying that the

| | | |
|---|---|---|
| 17:04:36 | 1 | photography credit should go to The Wave Studio; correct? |
| 17:04:40 | 2 | That's what's the above -- that's what Junior is writing |
| 17:04:42 | 3 | about? |
| 17:04:43 | 4 | A.   That's what it says, that's right, yes. |
| 17:04:46 | 5 | Q.   Okay.   And that's because -- |
| 17:04:47 | 6 | A.   That's because she was not the photographer. |
| 17:04:48 | 7 | But she was part of the photography team.   So, obviously, |
| 17:04:51 | 8 | who are we going to put the credit in there, GHM?   I mean, |
| 17:04:55 | 9 | I don't understand -- |
| 17:04:55 | 10 | Q.   Or the photographer. |
| 17:04:56 | 11 | A.   Just one minute.   She has been dealing with |
| 17:05:00 | 12 | anything third party publication for 10 years for this |
| 17:05:03 | 13 | company, 10 years.   So, therefore, we used her and we give |
| 17:05:10 | 14 | her the courtesy to have her name appear. |
| 17:05:12 | 15 | Q.   Would it be -- why wouldn't be it Masano, who |
| 17:05:15 | 16 | you claim is the photographer? |
| 17:05:16 | 17 | A.   Because she is part of the team, because she |
| 17:05:19 | 18 | did the whole brochure together. |
| 17:05:21 | 19 | Q.   She didn't do that.   I mean, this is her -- |
| 17:05:22 | 20 | A.   Because we never received the bill from |
| 17:05:25 | 21 | Masano, we received the bill from her.   So, our dealings |
| 17:05:28 | 22 | were with her.   Masano was part of her team. |
| 17:05:31 | 23 | Q.   Okay.   That's fine.   Okay. |
| 17:05:32 | 24 | A.   If he would have done, had a bill from her, |
| 17:05:34 | 25 | then Masano would have been the photographer, absolutely. |

A Court Reporting Transcript by DTI

17:05:37  1    But, as I explained, this is -- this was a one-stop

17:05:40  2    experience.  She did everything -- design, printing,

17:05:44  3    supervision -- for everything.

17:05:47  4              Q.  Okay.

17:05:47  5              A.  And photography was part of it.

17:05:51  6              Q.  Understood.  I want to take a look at my

17:05:53  7    notes, but if you want to go --

17:05:56  8              MR. SCHWARZ:  We'll take a break.  You look at

17:05:59  9    your notes, I'll look at my notes, and then we'll see.

17:06:05  10             MR. TOKE:  Okay.  That sounds great.

17:06:06  11             Off the record.

17:06:07  12             VIDEOGRAPHER:  Going off the record.  The time is

17:06:11  13   5:06 p.m.

17:06:18  14   (5:06 p.m.)

17:06:20  15                  (Recess taken.)

17:15:04  16   (5:15 p.m.)

17:15:19  17             VIDEOGRAPHER:  Back on the record.  The time is

17:15:37  18   5:15 p.m.

17:15:48  19             BY MR. TOKE:

17:15:49  20             Q.  Mr. Ohletz, we are back on the record.

17:15:53  21             If you could pull back exhibit 54, please.

17:15:56  22   I think it's this one here.

17:16:03  23             A.  Yes.

17:16:03  24             Q.  Once again, this is that email from Kendall

17:16:06  25   Oei to Junior Lee about The Setai Club website pictures.

17:16:11  1    You remember -- let's look at the top, the top email again,

17:16:14  2    where it says:

17:16:15  3           "Many thanks for sending copies of the photos on

17:16:17  4    The Setai Club website as well as copies of your agreement

17:16:21  5    with the photographers.

17:16:23  6           Waves supported by GHM may have to file an IP

17:16:26  7    violation suit against The Setai Club.  That is an option we

17:16:30  8    keep up our sleeve and may produce a pile of money for you.

17:16:34  9    Will revert later."

17:16:36  10          I'd like to focus on this again.  I know you

17:16:39  11   testified earlier that The Setai Club is actually not

17:16:44  12   managed by GHM; correct?

17:16:46  13          A.  No.  As you can very clearly see here, "Many

17:16:49  14   thanks for sending copies of the photos for The Setai Club

17:16:53  15   website."  So there's a separate website, there's separate

17:16:56  16   entities, everything's separate.

17:16:58  17          Q.  Right.  Understood.

17:16:59  18          Now, so this is suggesting that The Setai Club --

17:17:03  19          A.  It's a membership club that's been sold by the

17:17:05  20   developer of the Setai.

17:17:07  21          Q.  Understood.

17:17:08  22          A.  With a music studio and all that kind of

17:17:11  23   thing.

17:17:11  24          Q.  Understood.  So, The Setai Club has its own

17:17:14  25   website; correct?

17:17:15  1          A.  That's what it says here, yes.

17:17:17  2          Q.  Yes.  And it seems like there are photos that

17:17:20  3   were taken by Wave, or Junior, that are on The Setai Club

17:17:25  4   website.  Is that how you read this?  That's how I read

17:17:28  5   this.

17:17:29  6          A.  That's how I read it, yes.

17:17:31  7          Q.  Okay.  And it suggests then that Junior could

17:17:33  8   file an IP violation suit against The Setai Club for using

17:17:37  9   the photographs without authorization; correct?

17:17:40  10         A.  I'm not familiar with the law, so I don't

17:17:42  11  know.

17:17:42  12         Q.  Well, how do you understand this: "Waves

17:17:45  13  supported by GHM may have to file an IP violation suit

17:17:49  14  against The Setai Club.  That is an option we keep up our

17:17:52  15  sleeve and may produce a pile of money for you [Junior

17:17:55  16  Lee]"?

17:17:56  17         A.  I understand exactly what it says, but that's

17:17:59  18  Kendall Oei's -- Kendall Oei's interpretation or whatever.

17:18:02  19  I don't know.

17:18:04  20         Q.  That's Kendall Oei's understanding?

17:18:07  21         A.  Yes.  I'm reading it the way you read it, but

17:18:09  22  what it means I don't know.

17:18:10  23         Q.  Oh, okay.  And Kendall Oei was the director of

17:18:12  24  GHM at that time; right?

17:18:15  25         A.  That's what it says, "Director".

17:18:16  1          Q.   Right.   And you testified earlier that he was

17:18:17  2     in charge of all legal contracts for GHM; right?

17:18:22  3          A.   We have a lawyer, lawyer's office, but he was

17:18:25  4     from the GHM team because he represents the major

17:18:28  5     shareholder in charge of, you know, overlooking these

17:18:31  6     things, yes.   He's not a lawyer.

17:18:33  7          Q.   Okay.   So you testified you read this the way

17:18:37  8     I do, which is that Kendall Oei said, "Okay, it likes look

17:18:41  9     The Setai Club has pictures that were taken by Wave on its

17:18:45 10     website and Waves should file an IP violation suit against

17:18:48 11     The Setai Club for having these photos" -- hold on, let me

17:18:51 12     finish my question -- "for having these photos taken by Wave

17:18:56 13     on The Setai Club website".   Yes?

17:19:00 14          A.   That's what it says here.

17:19:01 15          Q.   Okay.   That's --

17:19:01 16          A.   So I can only acknowledge what it says.   Why

17:19:04 17     he did it, I don't know.

17:19:07 18          Q.   Okay.   I have no further questions.

17:19:09 19          A.   I'm not familiar with the American law, what's

17:19:11 20     IP and all that, I don't know.

17:19:13 21          Q.   Okay.   No further questions.

17:19:14 22          A.   He would be familiar with it, being an

17:19:17 23     American, that's why I mentioned it.

17:19:18 24          Q.   No further questions.

17:19:19 25          A.   He would be familiar with all this.

17:19:20  1          Q.  Okay.  Thank you.

17:19:22  2              FURTHER EXAMINATION BY MR. SCHWARZ:

17:19:23  3          Q.  Is Mr. Oei a lawyer, to your knowledge?

17:19:25  4          A.  He's not a lawyer, no.  He is a banker.  But

17:19:29  5      because he was representing the major shareholder of the

17:19:32  6      company, obviously he needs to keep an eye on what's going

17:19:35  7      on.  But for all the legal work that GHM needed, we had

17:19:39  8      lawyers, a law office.  The contract was never drafted up by

17:19:45  9      Kendall or anybody.  So it was -- but he had a copy of it,

17:19:49 10      so he had knowledge of that.

17:19:52 11          Q.  And do you have any knowledge of what Kendall

17:19:54 12      Oei's background in intellectual property law is?

17:19:59 13          A.  No.

17:20:01 14          Q.  Okay.  I have no further questions.

17:20:06 15              MR. TOKE:  Great.  Thank you so much for your

17:20:08 16      time.

17:20:09 17          A.  Thank you.

17:20:10 18              VIDEOGRAPHER:  This marks the end of tape number 3

17:20:15 19      in the deposition of Ralf Ohletz Count von Plettenberg.

17:20:19 20              Going off the record.  The time is 5:20 p.m.

17:20:28 21      (5:20 p.m.)

17:20:33 22              (Whereupon the deposition concluded)

         23

         24

         25

CERTIFICATE OF DEPONENT

I, Ralf Ohletz Graf von Plettenberg, hereby certify that
I have read the foregoing pages, numbered 1 through 135, of
my deposition of testimony taken in these proceedings on
Wednesday, September 23, 2015, and, with the exception of
the changes listed on the next page and/or corrections, if
any, find them to be a true and accurate transcription
thereof.

Signed:    ................................

Name:      Ralf Ohletz Graf von Plettenberg

Date:      ................................

Dep - CA No.13-CV-09239-CS-PED                              23 September 2015

E R R A T A

Deposition of Ralf Ohletz Graf von Plettenberg

Page/Line No.        Description        Reason for change

Signed:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Name:      Ralf Ohletz Graf von Plettenberg

Date:      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CERTIFICATE OF COURT REPORTER

I, HELEN CASE, an Accredited Realtime Reporter with DTI
Global, Singapore, hereby certify that the testimony of the
witness Ralf Ohletz Graf von Plettenberg in the foregoing
transcript, numbered pages 1 through 135, taken on
Wednesday, September 23, 2015, was recorded by me in machine
shorthand and was thereafter transcribed by me; and that the
foregoing transcript is a true and accurate verbatim record
of the said testimony.

I further certify that I am not a relative, employee,
counsel or financially involved with any of the parties to
the within cause, nor am I an employee or relative of any
counsel for the parties, nor am I in any way interested in
the outcome of the within cause.

Signed:    ...............................

HELEN CASE

Dated:    ...............................