Exhibit "D"

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -

IN THE MATTER OF )

)

THE WAVE STUDIO, LLC, a New York )

Limited Liability Corporation, )

Plaintiff, )

)

) CASE NO:

v. ) 7:13-cv-09239-CS-PED

)

GENERAL HOTEL MANAGEMENT LTD., )

et al, )

Defendants. )

)

- - - - - - - - - - - - - - - - - -

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MONICA CHLOE CHNG

CONFIDENTIAL DEPOSITION (Pages 1-50 and 82-193)

FOR ATTORNEYS' EYES ONLY (Pages 51-81)

Tuesday, September 22, 2015

AT: 9:43 a.m.

Taken at:

Room 409, Maxwell Chambers

32 Maxwell Road

Singapore 069115

Court Reporter:

Helen Case

Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Plaintiff:
        MR. VIJAY TOKE
        COBALT LAW LLP
        918 Parker Street, Building A21
        Berkley, CA 94710
        Telephone:  (510) 841-9800

Appearing for the Defendant:
        MR. HOWARD J. SCHWARZ
        CHIESA SHAHINIAN & GIANTOMASI PC
        One Boland Drive
        West Orange, NJ 07052
        Telephone:  (973) 530-2031

Also present:
        Ms. Lee Kar Yin

VIDEOGRAPHER:
        Chee Meng Chen
        Flex Video Productions

# W I T N E S S   I N D E X

Page

MONICA CHLOE CHNG (affirmed) ........................7

    EXAMINATION BY MR. TOKE .........................7

    Ms. Lee left the deposition room ...............50

    FOR ATTORNEYS' EYES ONLY ........................51

    END OF FOR ATTORNEYS' EYES ONLY ................81

    Ms. Lee returned to the deposition room .........82

# E X H I B I T S   I N D E X

Number                                                              Page

Exhibit 19  Plaintiff The Wave Studio, LLC's .........9
            Notice of 30(b)(6) Deposition of General
            Hotel Management Ltd.

Exhibit 20  Plaintiff The Wave Studio, LLC's .........9
            First Amended Notice of 30(b)(6)
            Deposition of General Hotel Management

Exhibit 21  Agreement between Hotel ................43
            Leelaventure Ltd and GHM (Mauritius)
            Ltd, Bates numbered GHM00955-GHM00977

Exhibit 22  Management Agreement Saujana ...........43
            Hotel, Bates numbered GHM00978-GHM01012

Exhibit 23  Management Agreement The ...............43
            Andaman, Datai Bay, Langkawi, Bates
            numbered GHM01013-GHM01039

Exhibit 24  Management Agreement The Chedi .........43
            Club, Tanah Gajah, Ubud, Bali, Bates
            numbered GHM01040-GHM01059

Exhibit 25  Management Agreement The Chedi, ........43
            Chiang Mai, Bates numbered
            GHM01060-GHM01080

Exhibit 26  Management Agreement Elemata ...........43
            Gestioni Hotel SRL, Bates numbered
            GHM01081-GHM01119

Exhibit 27  Management Agreement Heritage ..........43
            House Inn, Bates numbered
            GHM01120-GHM01161

Exhibit 28  Management Agreement The Chedi .........43
            Phuket, Bates numbered GHM01162-GHM01181

Exhibit 29  Management Agreement The Club at .......43
            The Legian, Bates numbered
            GHM01182-GHM01200

Exhibit 30  Management Agreement Han Pi Lou ........43
            Hotel Co., Ltd., Bates numbered
            GHM01201-GHM01228

E X H I B I T S    I N D E X (continued)

Number                                                          Page

Exhibit 31   Management Agreement The Legian, ........43
             Bali, Bates numbered GHM01229-GHM01263

Exhibit 32   Management Agreement The Nam ...........43
             Hoi, Hoi An, Bates numbered
             GHM01263-GHM01283

Exhibit 33   Management Agreement The Datai, ........43
             Bates numbered GHM01284-GHM01305

Exhibit 34   Management Agreement Dempsey ...........43
             Vanderbilt Hotel, Bates numbered
             GHM01306-GHM01338

Exhibit 35   Management Agreement Saujana ...........43
             Golf and Country Club, Bates numbered
             GHM01339-GHM01365

Exhibit 36   Management Agreement Carcosa ...........43
             Seri Negara, Bates numbered
             GHM01366-GHM01442

Exhibit 37   Management Agreement The Serai .........43
             Club Jimbaran, Bali, Bates numbered
             GHM01443-GHM01472

Exhibit 38   Management Agreement Chedi, ............43
             Muscat and Serai, Muscat, Bates numbered
             GHM01473-GHM01504

Exhibit 39   Print-out from GHM Hotels ..............84
             website

Exhibit 40   Whois Record for ghmhotels.com, ........86
             unnumbered

Exhibit 41   QBE Insurance Policy for Setai ........111
             South Beach, LLC, Bates numbered
             GHM00804-GHM00954

Exhibit 42   Settlement Agreement, Bates ...........123
             numbered GHM01170-GHM01177

Exhibit 43   Series of screenshots from the ........166
             ghmhotels.com website, with additional
             notes attached, unnumbered

E X H I B I T S    I N D E X (continued)

Number                                                                Page


Exhibit 44  Series of screenshots from the ........180

            ghmsparrow.com website, with additional

            notes attached, unnumbered

PROCEEDINGS

VIDEOGRAPHER: This is the video operator speaking, Chee Meng Chen, of DTI, 1 Raffles Place #50-00 Tower 1, Singapore 048616. Today's date is 22 September 2015 and the time is 9:43 a.m.

We are at room 409, Maxwell Chambers, Singapore, to take the videotaped deposition of Monica Chng in the matter of The Wave Studio LLC, a New York Limited Liability Corporation, v. General Hotel Management.

Will counsel please introduce themselves for the record.

MR. TOKE: Vijay Toke on behalf of the plaintiff, The Wave Studio LLC.

MR. SCHWARZ: Howard J. Schwarz on behalf of defendant General Hotel Management.

VIDEOGRAPHER: Will the court reporter, Helen Case of DTI, please swear in the witness.

COURT REPORTER: Could you state your full name, please?

A. Monica Chloe Chng.

MONICA CHLOE CHNG,

having been duly affirmed, testified as follows:

EXAMINATION BY MR. TOKE:

Q. Good morning, Ms. Chng, my name is Vijay Toke. As I said on the record, I represent the plaintiff in this

matter, The Wave Studio LLC.

Counsel for General Hotel Management -- which I'll call GHM for short, just because it's easier, is that okay?

A. That's okay.

Q. -- and I have talked about the oath that was just given to you. We have agreed that, though the court reporter here in Singapore is not an official notary in the United States, we have authorized and agreed that she may administer an oath to you and that it should have the same force and effect as if in the United States.

So stipulated, counsel?

MR. SCHWARZ: Yes, that's correct.

BY MR. TOKE:

Q. Do you understand that, Ms. Chng?

A. Yes.

MR. SCHWARZ: Also, because it's a foreign reporter, so the stipulations applicable to this are all objections are reserved, except objections to form.

MR. TOKE: As in any deposition.

MR. SCHWARZ: Yes. I just wanted to make sure that that was on the record.

MR. TOKE: Yes. Yes, that's correct.

Q. Okay.

Ms. Chng, you have already stated your name for the record. Could you spell your name, please?

A. Monica spelt as M-o-n-i-c-a, Chloe C-h-l-o-e, and my last name is Chng C-h-n-g.

Q. Very good.

Ms. Chng, do you understand that you are appearing today for a deposition in your capacity as a representative of GHM for its deposition; correct?

A. Yes.

Q. I have premarked in front of you a couple of documents, exhibit 19 and exhibit 20. We are starting with those numbers.

(Exhibit 19 marked for identification)

(Exhibit 20 marked for identification)

MR. SCHWARZ: I don't have a copy.

MR. TOKE: They are right in front of you.

MR. SCHWARZ: Which one is 19?

MR. TOKE: The notice of 30(b)(6) deposition. And exhibit 20 is the first amended notice.

MR. SCHWARZ: Okay.

MR. TOKE: We are starting with exhibit 19 because counsel for plaintiff and GHM have agreed that we are numbering all exhibits in all the depositions in the case seriatim, for ease of reference, so we are starting with exhibit 19 in this instance.

Is that accurate, counsel?

MR. SCHWARZ: Yes.

BY MR. TOKE:

Q. Exhibit 19, if you will put that in front of you, please, is plaintiff Wave Studio LLC's notice of 30(b)(6) deposition of General Hotel Management Ltd.

Have you seen this document before?

A. Yes.

Q. You are here pursuant to that document; is that correct?

MR. SCHWARZ: She may not understand. Yes, she is, she is the 30(b)(6) witness.

BY MR. TOKE:

Q. Have you had your deposition taken before?

A. Could you repeat that question?

Q. Of course. Have you ever had your deposition taken before?

A. In this matter?

Q. In any matter?

A. No.

Q. Okay. And I don't want to know the substance of the discussion, but have you met with Mr. Schwarz, who is the lawyer for GHM, to prepare for today?

A. Yes, I did.

Q. Approximately how many occasions have you met with Mr. Schwarz?

A. Only once.

| 09:48:43 1 | Q. For approximately how long did you talk to |
| 09:48:45 2 | Mr. Schwarz? |
| 09:48:52 3 | A. I would say about four hours. |
| 09:49:02 4 | Q. Was that the only time you have met with |
| 09:49:05 5 | Mr. Schwarz to prepare for this deposition? |
| 09:49:07 6 | A. Yes. |
| 09:49:08 7 | Q. Did you go over any documents in preparation |
| 09:49:10 8 | for the deposition? |
| 09:49:11 9 | A. No. |
| 09:49:12 10 | Q. You did not? Did you go over this document, |
| 09:49:15 11 | the one in front of you? |
| 09:49:33 12 | A. Yes. |
| 09:49:36 13 | Q. Since this is your first time of being |
| 09:49:38 14 | deposed, there are some ground rules that go along with it. |
| 09:49:41 15 | As you know, next to you is a court reporter and that court |
| 09:49:45 16 | reporter is taking down all of our words. It's important |
| 09:49:48 17 | that we don't speak over each other -- so far you've been |
| 09:49:53 18 | excellent at it -- so that the court reporter can take each |
| 09:49:56 19 | of our words and not have to compete to try to figure out or |
| 09:50:00 20 | remember what each of us has said. |
| 09:50:02 21 | Does that make sense? |
| 09:50:03 22 | A. Yes. |
| 09:50:04 23 | Q. The reason is we want to have a clear record |
| 09:50:06 24 | on the deposition transcript, so that we know what each of |
| 09:50:09 25 | us has said. |

| 09:50:10 1 | Fair enough? |
| 09:50:11 2 | A. Yes. |
| 09:50:12 3 | Q. You have also done excellently -- either your |
| 09:50:15 4 | lawyer has prepared you well or you just naturally do it -- |
| 09:50:19 5 | to say "yes" or "no" to "yes" or "no" questions and to avoid |
| 09:50:24 6 | saying "uh-huh" or "mm-hm" or shaking your head or nodding |
| 09:50:27 7 | your head, all of which, of course, are not completely |
| 09:50:31 8 | understandable on a transcript. So I'll ask you to make |
| 09:50:35 9 | sure that you avoid saying uh-huhs or ahas or shaking the |
| 09:50:42 10 | head or nodding the head and instead using words. |
| 09:50:46 11 | Fair enough? |
| 09:50:47 12 | A. Yes. |
| 09:50:47 13 | Q. Okay, good. |
| 09:50:48 14 | I am entitled to your best estimate but I don't |
| 09:50:52 15 | want to you guess about anything. If I ask you something |
| 09:50:56 16 | that you have some basis for understanding or being able to |
| 09:51:00 17 | estimate, I'm entitled to have you do that. But I do not |
| 09:51:04 18 | want you to guess if you have no basis or if you would be |
| 09:51:08 19 | speculating about whatever I'm asking about. |
| 09:51:11 20 | Does that make sense? |
| 09:51:12 21 | A. Yes. |
| 09:51:17 22 | Q. Are you currently employed? |
| 09:51:19 23 | A. Yes, I am. |
| 09:51:21 24 | Q. By whom? |
| 09:51:24 25 | A. General Hotel Management. |

| 09:51:29 1 | Q. What's the address of General Hotel |
| 09:51:30 2 | Management? |
| 09:51:33 3 | A. When you say "address", would you be more |
| 09:51:36 4 | specific? |
| 09:51:39 5 | Q. I didn't know -- is that ambiguous to you? |
| 09:51:43 6 | I'm just wondering, where is the office of General |
| 09:51:45 7 | Hotel Management? |
| 09:51:46 8 | A. Number 32 Gilstead Road, Singapore, 309075. |
| 09:51:51 9 | Q. If you can explain to me why that was |
| 09:51:54 10 | ambiguous; can you explain why that was ambiguous? |
| 09:51:57 11 | A. Because when you said "address", is it the |
| 09:51:58 12 | registered address or the business address. |
| 09:52:00 13 | Q. Okay. So the business address is on Gilstead |
| 09:52:04 14 | Road? |
| 09:52:05 15 | A. Yes. |
| 09:52:05 16 | Q. Okay. Approximately how many people work at |
| 09:52:08 17 | GHM at the Gilstead Road address? |
| 09:52:11 18 | A. Fifteen. |
| 09:52:12 19 | Q. Okay. Are there any other addresses or |
| 09:52:15 20 | offices for the company anywhere in the world? |
| 09:52:21 21 | A. For the company, no. |
| 09:52:28 22 | Q. Okay. Fine. |
| 09:52:30 23 | Let's take a look at exhibit 19 again. You'll |
| 09:52:35 24 | note on the third page, which is attachment A, there is a |
| 09:52:41 25 | list of topics. Have you reviewed this list of topics with |

| 09:52:50 1 | your counsel? |
| 09:53:14 2 | A. Yes. |
| 09:53:16 3 | Q. Okay. What I'd like to do is go through each |
| 09:53:21 4 | of the topics and make sure that you're knowledgeable about |
| 09:53:24 5 | these topics, since you'll be testifying on behalf of GHM. |
| 09:53:31 6 | Okay? |
| 09:53:32 7 | So, are you knowledgeable about number 1, the |
| 09:53:34 8 | formation of -- actually, if it's easier, rather than me |
| 09:53:39 9 | having to read them, what I'd like you to do is take a look |
| 09:53:43 10 | at each one, we'll take number 1, and tell me if you're |
| 09:53:46 11 | knowledgeable about that topic or not. |
| 09:53:49 12 | MR. SCHWARZ: I'm going to object. |
| 09:53:51 13 | MR. TOKE: On what basis? |
| 09:53:53 14 | MR. SCHWARZ: It's impossible to understand really |
| 09:53:54 15 | what you really mean by "knowledgeable". I have no problem |
| 09:53:57 16 | if you ask her questions, substantive questions, about that, |
| 09:54:00 17 | but you're asking her to make a value judgment about her |
| 09:54:04 18 | knowledge about certain things and that's going to cause, |
| 09:54:07 19 | I believe -- I suspect it will probably cause confusion in |
| 09:54:10 20 | the record. |
| 09:54:10 21 | So, we're not limiting your ability to ask |
| 09:54:13 22 | questions. Ask questions -- |
| 09:54:15 23 | MR. TOKE: I just want to know what she knows |
| 09:54:17 24 | about these topics because -- |
| 09:54:18 25 | MR. SCHWARZ: You would ask questions to find out |

09:54:20  1    what she knows about them.

09:54:22  2        MR. TOKE:  It's easier for me to just ask if she

09:54:24  3    knows about them, and then I'll ask questions about them.

09:54:27  4    Because she's a 30(b)(6) witness, which is the person most

09:54:29  5    knowledgeable about these various topics, and so I'm trying

09:54:30  6    to glean whether or not she's knowledgeable about any or all

09:54:35  7    of them.  So I'm going to go ahead.

09:54:37  8        Q.  Tell me, are you knowledgeable about the

09:54:38  9    formation of GHM?

09:54:44  10       A.  I would like to ask a question before I answer

09:54:49  11   that.  Is this a "yes" or "no" answer, or I'm allowed to say

09:54:53  12   a certain degree?  Because I don't know, as we moved -- I'm

09:54:59  13   just saying that it might not just be a straight "yes" or

09:155:02  14   "no" answer.  It's not like, "Yes, I know," "No, I don't".

09:55:07  15       So I just want to understand, are you expecting a

09:55:08  16   "yes" or "no" from me or, like our attorney has said,

09:55:12  17   I mean, probably it's easier that you ask me questions and

09:55:17  18   I'm being able to answer to your questions.

09:55:20  19       Q.  Right.  I don't need a "yes" or "no".  If you

09:55:23  20   can say, "I'm generally aware of how the company was

09:55:25  21   formed," for example, that would be fine.  I'm not asking

09:55:27  22   you to tell me that you know everything about these topics

09:55:33  23   but I want to know the degree of which you are knowledgeable

09:55:34  24   about each of these topics.  So let's go with that.

09:55:38  25       I'd like to know the degree to which you are

09:55:40  1    knowledgeable about each of these topics.  So it's not a

09:55:43  2    strict "yes" or "no" but I would like to know your level of

09:55:46  3    understanding of each of these topics.  Okay?

09:55:48  4        Let's go with number 1, the formation of GHM.

09:55:51  5    What's the degree of your understanding?

09:55:54  6        A.  I generally would know.

09:55:56  7        Q.  Okay.  And the ownership of GHM, which is

09:55:59  8    number 2, and relationship between the owners of GHM?

09:56:02  9        A.  I would generally know.

09:56:03  10       Q.  Okay.  Three, the communications between any

09:56:07  11   of the Wave entities and GHM or any representative of GHM or

09:56:12  12   any employee or representative of any hotel ever managed by

09:56:16  13   GHM?

09:56:17  14       A.  Communications between any of the Wave

09:56:19  15   entities and GHM, this would be better explained by Mr. Ralf

09:56:27  16   Ohletz, who will be taking the stand tomorrow.  So he will

09:56:31  17   be in a position to -- he will have better knowledge of

09:56:35  18   this, given that he works with Wave entities back then.  So

09:56:42  19   I think perhaps this would be more a question that you can

09:56:45  20   ask Mr. Ohletz tomorrow directly.

09:56:47  21       Q.  Okay.  That's because you have only been at

09:56:50  22   GHM since 2008, isn't that right?

09:56:53  23       A.  I have been with GHM since 2008.  But through

09:56:59  24   book records, through speaking with my peers, past work

09:57:04  25   colleagues, including not limited to Mr. Ohletz, I do know

09:57:09  1    that I would think that Mr. Ohletz would be able to give you

09:57:14  2    better in-depth knowledge of this.

09:57:16  3        Q.  What I mean is that you don't know from

09:57:19  4    personal knowledge, you weren't there when it happened?

09:57:21  5        A.  I wasn't there.

09:57:22  6        Q.  Let's look at number 4, communications between

09:57:25  7    Junior Lee and GHM or any representative of GHM or any

09:57:29  8    employee or representative of any hotel ever managed by GHM.

09:57:33  9    The same answer as number 3 --

09:57:35  10       A.  My position would be --

09:57:37  11       Q.  -- right?

09:57:37  12       A.  -- the same as 3.

09:57:37  13       Q.  Again, please let me finish my question, so

09:57:40  14   that there's no overlap between us when we're talking.

09:57:44  15   Thank you.

09:57:44  16       Number 5, the terms and conditions of any

09:57:48  17   agreement entered into between Ms. Lee and/or the Wave

09:57:52  18   entities or any affiliate of GHM or any property ever

09:57:55  19   managed by GHM.  Same answer again?

09:58:03  20       A.  Same position.

09:58:06  21       Q.  Number 6, the terms and conditions of any

09:58:09  22   agreement entered into between GHM or any affiliate of GHM

09:58:13  23   or any property ever managed by GHM at any time.

09:58:22  24       A.  I do not quite understand the scope of the

09:58:24  25   question.

09:58:25  1        Q.  Okay.  Do you know about the agreements

09:58:27  2    between GHM and any of the hotels that it's ever managed?

09:58:36  3        A.  I do.

09:58:37  4        Q.  Okay.  Very good.

09:58:41  5        Number 7, any business relationship between

09:58:43  6    Ms. Lee and GHM or any affiliate of GHM or any employee

09:58:48  7    representative of any hotel ever managed by GHM.

09:58:51  8        Again, I would imagine it's the same as 3, 4 and

09:58:55  9    5; yes?

09:58:55  10       A.  The same position.

09:59:00  11       Q.  Number 8, same?

09:59:35  12       A.  Same.

09:59:36  13       Q.  Okay.  Number 9, the claims, defenses alleged,

09:59:41  14   damages and settlement of the civil action filed by The Wave

09:59:43  15   Studio Pte Ltd against GHM in Singapore.

09:59:48  16       A.  I do have knowledge.

09:59:49  17       Q.  Okay.  Number 10, the circumstances

09:59:57  18   surrounding the creation of each of the photographs at issue

10:00:00  19   in this case, and we have listed a number of copyright

10:00:06  20   registrations.  I assume it would be like 3, 4, 5, 7 and 8;

10:00:12  21   is that correct?

10:00:24  22       A.  The same position.

10:00:27  23       Q.  Number 11, communications between Ms. Lee and

10:00:30  24   any representative of GHM about the registrations.  Same

10:00:34  25   position?

3 (Pages 15 to 18)

10:00:42  1    A. Same position.

10:00:43  2    Q. Number 12, any communications between any

10:00:46  3  representatives of Wave and any representatives of GHM

10:00:49  4  relating to any of the photographs that are part of the

10:00:51  5  registrations listed. Same position?

10:00:54  6    A. That would be the same.

10:00:55  7    Q. Okay. Any and all payments made by GHM or any

10:00:59  8  property ever managed by GHM to Ms. Lee or any of the Wave

10:01:03  9  entities. Do you have any knowledge of that?

10:01:05  10   A. I do have knowledge of this.

10:01:15  11   Q. Number 14, current and past employees of GHM

10:01:18  12  who had interaction with any of the Wave entities or

10:01:22  13  Ms. Lee.

10:01:22  14   A. I have some knowledge of this.

10:01:24  15   Q. Okay. Internal discussions non-privileged --

10:01:31  16  this is number 15 -- and communications within GHM about

10:01:35  17  Ms. Lee, the Wave entities, photographs or registrations

10:01:41  18  involved.

10:01:41  19   I'll clarify this. I'm talking -- we're talking

10:01:51  20  about discussions at the time that Wave was working with

10:01:54  21  GHM. That would be the same position as the others, that

10:02:00  22  you don't have personal knowledge; is that correct?

10:02:02  23   A. The same.

10:02:11  24   Q. Any photographs taken by Ms. Lee -- this is

10:02:13  25  16 -- or any of the Wave entities of any property managed by

10:02:18  1  GHM at any time. The same; right?

10:02:27  2    A. Yes, the same.

10:02:28  3    Q. Okay. Number 17, the business activities of

10:02:32  4  GHM in the US.

10:02:33  5    A. Yes, I do have knowledge.

10:02:35  6    Q. Okay. GHM's website and its servers.

10:02:40  7    A. Yes, I do have knowledge.

10:02:42  8    Q. Okay. The business activities of Ms. Lee in

10:02:47  9  the United States.

10:02:48  10   A. I have no knowledge of this.

10:02:52  11   Q. The ownership of the copyrights to the

10:02:55  12  photographs that are subject to the registrations -- this is

10:02:58  13  number 20 -- including any additional photographs taken by

10:03:00  14  Ms. Lee or any of the Wave entities of any property managed

10:03:05  15  by GHM at any time.

10:03:06  16   A. I have some knowledge about this.

10:03:08  17   Q. Okay. The alleged -- number 21 -- licensing

10:03:17  18  or authorization of GHM to use any of the photographs taken

10:03:20  19  by Ms. Lee or any of the Wave entities.

10:03:23  20   A. I do have some knowledge of this.

10:03:25  21   Q. Okay. I assume that's personal knowledge, for

10:03:30  22  20 and 21?

10:03:32  23   MR. SCHWARZ: Object. You may want to clarify

10:03:34  24  what you mean by "personal knowledge". I'm not sure that

10:03:36  25  the witness would have what I understand first-hand

10:03:39  1  knowledge as opposed to knowledge of somebody telling her

10:03:42  2  something.

10:03:44  3    MR. TOKE: Right. I'm happy to clarify the

10:03:46  4  question.

10:03:46  5    Q. What I mean by "personal knowledge" is

10:03:48  6  knowledge that you received from being contemporaneously

10:03:52  7  there when these events that underlie this lawsuit happened,

10:03:59  8  that's personal knowledge, versus knowledge that someone

10:04:02  9  else has told you about what had happened.

10:04:08  10   A. To the best of my knowledge, I believe I would

10:04:10  11  generally have some knowledge on number 21.

10:04:12  12   Q. Personal knowledge, as I've just defined it?

10:04:22  13   A. To the best of my understanding of your

10:04:24  14  definition of "personal knowledge", I do think so.

10:04:28  15   Q. Okay. Great.

10:04:30  16   Number 22, the terms of any agreements between any

10:04:33  17  hotel ever managed by GHM and/or GHM with VFM/Leonardo.

10:04:40  18  That's number 22.

10:04:43  19   A. I would have knowledge.

10:04:55  20   Q. Okay. Twenty-three, GHM's use or distribution

10:05:04  21  in any manner of any of the photographs subject to the

10:05:08  22  registrations or taken by Ms. Lee or Wave of any of the

10:05:13  23  properties ever managed by GHM.

10:05:25  24   A. The same position as before.

10:05:27  25   Q. That you do not have some?

10:05:28  1    A. That I do not.

10:05:33  2    Q. How about 24, the use or distribution in any

10:05:35  3  manner of any photographs subject to the registrations or

10:05:39  4  any other photographs taken by Ms. Lee or the Wave entities

10:05:43  5  of any property ever managed by GHM, by any of its

10:05:47  6  representatives, agents or employees of any property managed

10:05:51  7  by GHM. The same position, yes, as number 23 --

10:05:55  8    A. The same position.

10:05:55  9    Q. -- and all the others before it that we have

10:06:00  10  listed. Yes?

10:06:02  11   A. Yes, same position.

10:06:03  12   Q. Twenty-five, the terms of any agreements

10:06:05  13  between GHM and any hotel ever managed by GHM that is

10:06:09  14  depicted in any of the photographs subject to the

10:06:12  15  registrations, the list of photographs.

10:06:23  16   A. Could you explain this question?

10:06:25  17   Q. Sure. There are various exhibits to number

10:06:29  18  25. Right? There are agreements between GHM and the

10:06:31  19  various hotels managed by it that are the subject of the

10:06:35  20  photographs taken by Wave.

10:06:39  21   MR. SCHWARZ: Could you just repeat the question,

10:06:40  22  because I'm not -- could you repeat the question back?

10:06:55  23   (Question read back.)

10:06:57  24   MR. SCHWARZ: I'm only going to object because

10:07:00  25  there may be an ambiguity in there. When you say "GHM" as

**Column 1 (Page 23)**

1 distinguished from -- there may not be any agreements
2 between GHM, as you are defining GHM, and the hotels, as you
3 should know from seeing the management agreements. Well,
4 the agreements are with the subsidiaries.
5 MR. TOKE: Let's say for the purposes --
6 understood. For the purposes of the question, when I say
7 GHM, I mean any GHM or GHM related entity.
8 MR. SCHWARZ: Okay.
9 BY MR. TOKE:
10 Q. That's a subsidiary -- I think that should
11 have been clear from the question. But you understand that;
12 yes?
13 A. Now I understand that.
14 Q. Okay. So, you agree there are various
15 agreements between GHM, that means GHM or any of its
16 subsidiaries, with the various hotels that were the subject
17 of the photographs taken by Wave. Right?
18 A. I do have knowledge.
19 Q. You do have knowledge of the terms of those
20 agreements?
21 A. (Witness nods.)
22 Q. Okay. Use or distribution by GHM -- this is
23 number 26 -- or any hotel ever managed by GHM of any of the
24 photographs of any such hotels taken by anyone other than
25 Ms. Lee or any of the Wave entities. So, photographs of any

**Column 2 (Page 24)**

1 MR. SCHWARZ: I'm objecting to the form of the
2 question.
3 MR. TOKE: Yes, just leave it there. I will ask
4 the question again, however.
5 Q. You have testified that there are now 13
6 topics on this list that you do not have personal knowledge
7 of because you weren't there at the time; correct?
8 A. I do not have personal knowledge.
9 Q. So, you've now told me that there is no one
10 else at GHM, that's currently at GHM, that has personal
11 knowledge of those 13 topics.
12 A. Yes.
13 Q. Okay. Is there anyone at GHM currently who
14 was also there at that time?
15 A. Yes.
16 Q. Who?
17 A. You want the names?
18 Q. Yes.
19 A. We have Ms. Sheladina Joseph.
20 Q. How do I spell that?
21 A. S-h-e-l-a-d-i-n-a J-o-s-e-p-h.
22 Q. What is Ms. Joseph's position at GHM?
23 A. She's the CRM executive.
24 Q. And what are her duties?
25 A. I wouldn't remember her scope of duties

**Column 3 (Page 25)**

1 of the GHM managed properties that were taken by anyone else
2 besides Ms. Lee or Wave.
3 A. I would generally have knowledge of this.
4 Q. Okay. Great.
5 So, of the ones where you said you did not have
6 personal knowledge, is there anyone -- I think that's
7 numbers 3, 4, 5, 7, 8, 10 -- sorry, let me start that
8 again -- numbers 3, 4, 5, 7, 8, 10, 11, 12, 15, 16, 23 and
9 24 of this list, some 13, so half of the topics, is there
10 anyone at GHM, who is currently at GHM, that is more
11 knowledgeable than you about any -- about those topics?
12 A. No.
13 Q. There isn't? Is there anyone at GHM that --
14 well, you're not knowledgeable at all, so you're telling me
15 there's no one else at GHM that has any knowledge, personal
16 knowledge, of those 13 topics?
17 MR. SCHWARZ: Let me object to the form of that
18 question.
19 MR. TOKE: You've done it. Great.
20 MR. SCHWARZ: If you could rephrase it, because
21 I don't think you characterize her knowledge correctly.
22 See, this was the whole point I was saying, just ask her
23 questions about what she knows.
24 So your question said --
25 MR. TOKE: Howard --

**Column 4 (Page 26)**

1 offhand.
2 Q. Okay. Do you generally have a sense of what
3 she does?
4 A. Per her title, she's CRM executive, that's
5 customer relationship management.
6 Q. She is a liaison between GHM and the various
7 hotels?
8 A. That's not exactly the way to put it.
9 Q. How would you put it?
10 A. In a nutshell, she manages customers' database
11 for the group.
12 Q. Okay. So the CRM, like Sales Force or Oracle
13 or something like that?
14 A. As her position states, customer relationship
15 management. So basically she handles customers' database.
16 Q. Okay. I may ask more questions about that
17 later, but that's fine.
18 How long has she been at GHM?
19 A. I don't remember offhand. I would say
20 10 years.
21 Q. Okay. So, approximately 2005?
22 A. I would not put my finger to it, but that
23 would be an estimate.
24 Q. Okay. Anyone else that's currently at GHM
25 that was also there at the time when GHM was working with

Q. Wave?

A. We have Mr. Hans Jenni.

Q. Actually, let me close the loop on Ms. Joseph.

So, would Ms. Joseph have had any relations with Wave, any correspondence with Wave, any communications or involvement with working with Wave with respect to any property managed by GHM?

A. To my knowledge, if there is any correspondence, it would be very minimal.

Q. So she probably doesn't know much about the situation with Wave?

A. I do not think I should answer that question because I'm not her, so I really cannot gauge how much knowledge she has.

Q. I'm just asking what you, based on your understanding of her involvement with the company, whether or not she would really have much occasion to learn anything about or know much about Wave.

A. I think I have addressed that. So, to the best of my knowledge, if there was any correspondence, it would be rather minimal.

Q. Okay. How about Mr. Hans Jenni, who is he?

A. Mr. Jenni is our president.

Q. He's the founder, too, isn't he?

A. He's one of the founders.

Q. Okay. Mr. Jenni did have a lot of interaction with Wave, didn't he?

MR. SCHWARZ: Objection to the form of the question. You can answer it.

I objected to the form, means that there was something in the question that I believed was improper. The question has "a lot". It's a matter of opinion, so that's the basis for my objection.

BY MR. TOKE:

Q. Go ahead.

A. Would you clarify "a lot"?

Q. Sure. Regular contact with Wave, with respect to the various projects that wave did for GHM managed properties.

A. What kind of a contact would "regular" refer to? Could you make it --

Q. You tell me.

A. -- a little bit more quantifiable --

Q. I'm simply asking: Did Mr. Hans Jenni have any interactions with Wave?

A. Interactions or a lot or regular?

Q. I'm just asking you if he had interactions.

A. If he has?

Q. Mm-hm.

A. To the best of my knowledge, even if there is,

it would be minimal.

Q. What are Mr. Jenni's responsibilities at GHM?

A. Mr. Jenni oversees the day-to-day running of the company, from a finance standpoint, administration. He makes day-to-day decisions on how the company is running. That's in a nutshell.

Q. Okay. Operations of the company. Is that a fair characterization?

A. I wouldn't use the word "operations". I would say day-to-day running.

Q. So, he runs the company?

A. Right.

Q. Does that include marketing or advertising that is being developed for the various properties managed by GHM?

A. Not directly.

Q. Not directly? Okay.

Would -- but people who worked with Mr. Jenni or below Mr. Jenni would report to him on issues like that; yes?

A. People would report to him. I don't know what you mean by "issues like that".

Q. Okay. I've already defined that he -- that there are advertising and marketing done for the various hotels managed by GHM; correct?

A. Yes. But if you would refer back to when I described Mr. Jenni's responsibilities in a nutshell, I said he runs the company and primarily in the finance and the administration of the company.

Q. So, he doesn't have any responsibility for the creation or the approval of any advertising or marketing done for the GHM managed properties?

A. To the best of my knowledge, not directly.

Q. Okay. Great.

Anyone else at GHM, currently at GHM, besides Ms. Sheladina Joseph and Hans Jenni, that were also there at GHM during the time that Wave was dealing with GHM?

A. Yes. There is a Ms. Pamela Tan.

Q. Okay. Who is Ms. Pamela Tan?

A. Pamela Tan is executive secretary to Mr. Jenni.

Q. Okay.

A. There is a Mr. Alvin Fong, A-l-v-i-n F-o-n-g.

Q. And what does Mr. Fong do?

A. He's assistant manager.

Q. Okay.

A. And he basically assists Pamela Tan in her duties.

Q. Who at GHM, during the period of time that Wave was working with GHM managed properties, was in charge

| | |
|---|---|
| 10:20:38 1 | of advertising and marketing, developing those advertising |
| 10:20:42 2 | and marketing campaigns or products for the various GHM |
| 10:20:48 3 | managed hotels? |
| 10:20:52 4 | A. Mr. Ohletz. |
| 10:20:56 5 | Q. Mr. Ohletz, okay, Ralf Ohletz. |
| 10:20:59 6 | What was his title? |
| 10:21:00 7 | A. Mr. Ohletz was then executive vice-president |
| 10:21:03 8 | of GHM. |
| 10:21:10 9 | Q. What about Mr. Kendall Oei? |
| 10:21:16 10 | A. Mr. Oei was a director of GHM. |
| 10:21:20 11 | Q. What were his duties? |
| 10:21:28 12 | A. I didn't hear you. |
| 10:21:30 13 | Q. Oh, sorry. What were his duties? |
| 10:21:33 14 | A. Mr. Oei was primarily involved in finance, |
| 10:21:36 15 | legal, those two main areas. |
| 10:21:48 16 | Q. By "legal", what do you mean by "legal"? |
| 10:21:55 17 | A. It means he gets involved in negotiating the |
| 10:22:01 18 | management contracts for and on behalf of the company. |
| 10:22:07 19 | Q. Would he be the person negotiating vendor |
| 10:22:11 20 | contracts as well? |
| 10:22:11 21 | A. No. |
| 10:22:12 22 | Q. Who was that? |
| 10:22:29 23 | A. Vendor contracts would usually be done by the |
| 10:22:33 24 | team or the person who engages the service. |
| 10:22:39 25 | Q. Okay. Who at GHM was that? |

| | |
|---|---|
| 10:24:19 1 | in the deposition of Monica Chng. |
| 10:24:22 2 | Going off the record. The time is 10.24 a.m. |
| 10:24:28 3 | (10.24 a.m.) |
| 10:24:32 4 | (Recess taken.) |
| 10:33:25 5 | (10:41 a.m.) |
| 10:41:26 6 | VIDEOGRAPHER: Back on the record. |
| 10:41:38 7 | Here marks the beginning of tape number 2 in the |
| 10:41:41 8 | deposition of Monica Chng. The time is 10:41 a.m. |
| 10:41:52 9 | MR. TOKE: Okay, back on the record. |
| 10:41:53 10 | Q. Ms. Chng, during the break did you discuss the |
| 10:41:57 11 | case at all with your lawyer? |
| 10:42:00 12 | A. No. |
| 10:42:05 13 | Q. You named a number of people who are still at |
| 10:42:12 14 | GHM that were there between 2000 and 2007 when GHM was -- |
| 10:42:21 15 | pardon me, when Wave was providing services for various GHM |
| 10:42:25 16 | managed properties. |
| 10:42:26 17 | Do you recall that testimony? |
| 10:42:29 18 | A. I'd like to rephrase that a little bit. |
| 10:42:33 19 | Q. Okay. |
| 10:42:34 20 | A. The names I've given to you are people who are |
| 10:42:37 21 | currently still with GHM and were there before 2007. |
| 10:42:42 22 | I cannot confirm if they were there between 2000 and 2007. |
| 10:42:48 23 | Q. Okay. Perfect. That's great. |
| 10:42:52 24 | That's because you weren't at GHM until 2008; is |
| 10:42:55 25 | that right? |

| | |
|---|---|
| 10:22:46 1 | A. At which particular point are you asking? |
| 10:22:49 2 | Q. During the time when Wave was working with the |
| 10:22:51 3 | various GHM managed properties, so let's say 2000 to 2007. |
| 10:23:00 4 | A. To the best of my understanding, it would be |
| 10:23:03 5 | the person who engaged the services. If I may give you an |
| 10:23:09 6 | example, if we want to buy stationery, Ms. Tan, who was in |
| 10:23:17 7 | charge of the office management, she would then engage a |
| 10:23:25 8 | stationery provider and discuss the terms from there. |
| 10:23:31 9 | Q. Ms. Tan would do that? |
| 10:23:32 10 | A. I'm giving you an example of stationery |
| 10:23:34 11 | purchase. |
| 10:23:35 12 | Q. Okay. How about the types of marketing |
| 10:23:39 13 | collateral that Wave created for the various GHM managed |
| 10:23:45 14 | properties? Who would have been involved in the negotiating |
| 10:23:48 15 | or discussions about contracts or the agreement between -- |
| 10:23:53 16 | with Wave? |
| 10:24:00 17 | A. Mr. Ohletz. |
| 10:24:02 18 | Q. Mr. Ohletz. |
| 10:24:03 19 | A. Would you mind if I take a lady's break? |
| 10:24:11 20 | COURT REPORTER: I'm sorry, could you speak up a |
| 10:24:11 21 | little bit? |
| 10:24:04 22 | A. I'm just asking for a ladies' room break. |
| 10:24:15 23 | BY MR. TOKE: |
| 10:24:15 24 | Q. Sure, not a problem. |
| 10:24:18 25 | VIDEOGRAPHER: This marks the end of tape number 1 |

| | |
|---|---|
| 10:43:00 1 | A. I joined GHM in 2008. The reason why I want |
| 10:43:04 2 | to make that clarity earlier on is because I haven't gone to |
| 10:43:08 3 | look at when every one of those people joined GHM. |
| 10:43:11 4 | Q. And would you have -- I'm sorry, let me |
| 10:43:18 5 | rephrase. |
| 10:43:22 6 | Just to confirm, as you said, you joined GHM in |
| 10:43:26 7 | 2008, so you were not actually at GHM between 2000 and 2007 |
| 10:43:31 8 | when Wave was providing various services for GHM managed |
| 10:43:36 9 | properties; isn't that correct? |
| 10:43:38 10 | A. That's correct. |
| 10:43:39 11 | Q. What's your current title at GHM? |
| 10:43:45 12 | A. Senior vice-president finance and |
| 10:43:48 13 | administration. |
| 10:43:48 14 | Q. What are your duties at GHM? |
| 10:43:53 15 | A. I handle finance, legal, human resource and |
| 10:44:04 16 | administration of the company. |
| 10:44:06 17 | Q. So, would it be fair to say that you |
| 10:44:09 18 | essentially do the job of Mr. Oei? |
| 10:44:17 19 | A. In broad sense, yes. |
| 10:44:21 20 | Q. Do you have any current overlap with what |
| 10:44:24 21 | Mr. Ohletz used to do? |
| 10:44:31 22 | A. No. |
| 10:44:31 23 | Q. And who do you report to? |
| 10:44:40 24 | A. I report to Mr. Hans Jenni. |
| 10:44:44 25 | Q. And did Mr. Kendall Oei -- who I think you've |

10:44:51  1    just said there's broad overlap in terms of what you do for

10:44:55  2    GHM now and what Mr. Oei did when he was at GHM; correct?

10:45:00  3        A.  No, I didn't say that there's a broad overlap

10:45:03  4    of what we did.

10:45:04  5        Q.  Okay.  What did you say?

10:45:05  6        A.  What was your question when you asked that?

10:45:08  7        Q.  Well, it's a few questions ago.  I think I was

10:45:12  8    just simply asking if you basically do what Mr. Oei used to

10:45:16  9    do.

10:45:16  10       A.  That's correct.  I said, in a broad sense,

10:45:19  11   yes.

10:45:20  12       Q.  Okay.  And you said you report to Mr. Hans

10:45:25  13   Jenni.  Who did Mr. Kendall Oei report to, if you know?

10:45:31  14       A.  I have no knowledge of that.

10:45:33  15       Q.  Okay.  And that's because you weren't at GHM

10:45:36  16   at that time; right?

10:45:39  17       A.  I just don't have knowledge of that.

10:45:41  18       Q.  Okay.  Did you overlap with Mr. Oei at all at

10:45:48  19   GHM?

10:45:51  20       A.  As in time?

10:45:53  21       Q.  Did you both work there at the same time?

10:45:58  22       A.  No.

10:45:58  23       Q.  When did he leave, do you know?

10:46:00  24       A.  No.

10:46:01  25       Q.  But it would have been before you --

10:46:03  1        A.  Yes.

10:46:07  2        Q.  Okay.  Have you always had the same title that

10:46:16  3    you have now at GHM?

10:46:17  4        A.  No.

10:46:18  5        Q.  Okay.  Why don't you run through the various

10:46:21  6    titles that you have had at GHM, the years that you held

10:46:23  7    them and what your responsibilities were during each of

10:46:26  8    those periods.

10:46:27  9        A.  Sure.  I joined GHM in 2008.  My title then

10:46:33  10   was financial controler.  My duties at that time was taking

10:46:41  11   charge of making out the accounting records of the company,

10:46:49  12   largely related to accounts payable, accounts receivable,

10:46:56  13   doing the day-to-day accounting transactions, churning

10:46:59  14   monthly reports for the management.

10:47:08  15       Q.  What is GHM's business?

10:47:12  16       A.  GHM's business is in managing and operating

10:47:18  17   hotels, resorts.

10:47:21  18       Q.  Does GHM own or have any ownership interest in

10:47:24  19   any of the resorts or hotels that it manages?

10:47:29  20       A.  Not that I know of.

10:47:31  21       Q.  Okay.  Would there be anyone else who would

10:47:37  22   know, if you did not?

10:47:43  23       A.  Maybe I should rephrase my answer.

10:47:45  24       Q.  Go ahead.

10:47:46  25       A.  I did not say I do not know.  I mean I know of

10:47:55  1    no ownership by GHM.

10:47:57  2        Q.  Okay.  So your testimony is that, to your

10:48:01  3    knowledge, GHM does not have any ownership interest in any

10:48:05  4    of the hotels or resorts that it manages?

10:48:08  5        A.  That's what I meant.

10:48:10  6        Q.  Okay.  Who owns GHM?

10:48:19  7        A.  GHM is owned by two individuals, one of which

10:48:25  8    is Mr. Adriaan Lauw Willem Zecha and the other is Mr. Hans

10:48:33  9    Jenni.

10:48:35  10            MR. SCHWARZ:  You may want to spell the name.

10:48:38  11       A.  Oh, okay, sorry.  The first one is Adriaan, as

10:48:41  12   in A-d-r-i-a-a-n, Willem W-i-l-l-e-m, Lauw L-a-u-w, and his

10:49:00  13   family name is Zecha Z-e-c-h-a.  The other individual is

10:49:07  14   Mr. Hans Jenni, H-a-n-s J-e-n-n-i.

10:49:12  15       BY MR. TOKE:

10:49:12  16       Q.  And do you know how much of the company each

10:49:15  17   of them owns?

10:49:22  18       A.  This is much related to the ownership of the

10:49:25  19   company.  I would like to --

10:49:27  20            MR. SCHWARZ:  So, I'm going to object.  I can

10:49:28  21   see -- the response is that the company would consider that

10:49:34  22   proprietary information, and so --

10:49:38  23            MR. TOKE:  On what basis?

10:49:39  24            MR. SCHWARZ:  It has nothing to do with this

10:49:39  25   lawsuit and the ownership interest is the ownership

10:49:41  1    interest.  How the two of them -- so I'm objecting, I'm

10:49:45  2    asserting that it's proprietary confidential information and

10:49:48  3    the witness should not answer the question.

10:49:51  4            MR. TOKE:  Okay.  You've noted that in the record?

10:49:57  5            COURT REPORTER:  Yes.

10:49:57  6            MR. TOKE:  That the witness was instructed not to

10:50:00  7    answer?

10:50:02  8            COURT REPORTER:  Yes.

10:50:09  9        BY MR. TOKE:

10:50:09  10       Q.  Are there any subsidiaries or affiliated

10:50:12  11   companies to GHM?  And when I say that, in this instance,

10:50:16  12   when I say GHM, I mean General Hotel Management Ltd., which

10:50:20  13   is, as I understand it, a British Virgin Islands company.

10:50:24  14       You're aware of that; yes?

10:50:26  15       A.  Yes.

10:50:26  16       Q.  Okay.  So, with that, given GHM for the

10:50:28  17   purposes of this question, are there any other subsidiaries

10:50:32  18   or affiliated companies to GHM?

10:50:36  19       A.  Yes.

10:50:37  20       Q.  What are they?

10:50:39  21       A.  Do you mean you want me to list the

10:50:46  22   subsidiaries?

10:50:48  23       Q.  Yes.

10:50:49  24       A.  Okay.  General Hotel Management (Singapore)

10:50:58  25   Pte Ltd.

```
10:51:03  1        Q. How do I spell that, bracket?
10:51:04  2        MR. SCHWARZ: Bracket, paren.
10:51:04  3        MR. TOKE: Oh, okay, got it.
10:51:05  4        A. Parenthesis.
10:51:07  5        Q. Got it. So, GHM (Singapore). Okay.
10:51:12  6    Any others?
10:51:18  7        A. GHM Mauritius, GHM Shanghai, GHM Thailand, GHM
10:51:47  8    Malaysia. Have I mentioned GHM Philippines?
10:52:10  9        Q. No.
10:52:11  10       A. GHM Philippines. GHM (Indochina).
10:52:18  11       Q. Indochina?
10:52:20  12       A. Indochina. Indochina in parentheses.
10:52:31  13       Q. Is there a GHM Muscat?
10:52:33  14       A. GHM Services Muscat.
10:52:44  15       Q. Okay. Any others? For example, is it -- go
10:53:31  16   ahead. Go ahead.
10:53:31  17       A. No, I wasn't saying.
10:53:35  18       Q. Can you think of any others?
10:53:38  19   For example, is there a GHM Americas or a GHM USA?
10:54:10  20       A. There was a GHM -- there's no GHM Americas.
10:54:19  21   Sorry, before we come to that, I'm just thinking.
10:54:22  22   GHM Development Ltd, okay, and GHM USA LLC.
10:54:33  23       MR. SCHWARZ: GHM USA LLC.
10:54:33  24       A. GHM USA LLC.
          25
```

```
10:54:33  1    BY MR. TOKE:
10:54:37  2        Q. And is the "USA" in parentheses? It's okay if
10:54:40  3    it isn't.
10:54:42  4        A. Not that I -- not that I remember.
10:54:45  5        Q. It doesn't matter.
10:54:45  6        A. If I -- I'd like to just ask you to bear with
10:54:48  7    me for another minute, so I just want to make sure that
10:54:54  8    I have everything.
10:55:12  9    Mauritius I've mentioned.
10:55:14  10       Q. You have.
10:55:36  11       A. I think that's what I can recall.
10:55:38  12       Q. Okay. And how are all these companies related
10:55:42  13   to GHM?
10:55:49  14       A. In that sense they are either wholly-owned
10:55:53  15   subsidiaries or at least majorly owned by GHM.
10:56:01  16       Q. So, either wholly-owned subsidiaries or
10:56:04  17   majority owned by GHM?
10:56:07  18       A. That would be correct.
10:56:09  19       Q. What about GHM Sparrow?
10:56:15  20       A. GHM Sparrow, it was a joint venture that was
10:56:23  21   with Sparrow, Sparrow something. But that didn't take off.
10:56:30  22   So in fact we took it off the -- it went off the radar. So
10:56:37  23   the cooperation didn't take off.
10:56:41  24       Q. Is that company now dissolved?
10:56:45  25       A. It is supposed to be dissolved but as we speak
```

```
10:56:49  1    right now, I just cannot tell you has it been dissolved.
10:56:53  2    But from our -- from our perspective, it is something that
10:56:58  3    needs to be dissolved.
10:57:01  4        Q. In other words, it's a company that is not
10:57:05  5    operating at this time?
10:57:05  6        A. It has never operated.
10:57:07  7        Q. Okay. Is it also a wholly-owned subsidiary of
10:57:16  8    GHM or a majority owned by GHM, like the other companies?
10:57:24  9        A. No. It's not -- it's not -- it's definitely
10:57:29  10   not wholly owned. It's not majorly owned as well.
10:57:34  11       Q. So, GHM owns a minority stake in GHM Sparrow?
10:57:41  12       A. Yes.
10:57:43  13       Q. Okay. Let's talk about the agreements between
10:58:24  14   GHM and the various hotels that were the subject of the Wave
10:58:26  15   photographs. Okay?
10:58:28  16       A. Could you refer me to which number is this?
10:58:31  17       Q. Sure. So, we're going to go back to exhibit
10:58:34  18   19. This is number 22.
10:58:44  19       A. Thank you.
10:58:52  20       Q. You testified that you in fact do have
10:58:54  21   knowledge of these agreements; isn't that correct?
10:59:02  22       A. Between any hotel ever managed by GHM and/or
10:59:06  23   GHM with VFM/Leonardo.
10:59:10  24       Q. Oh, pardon me, wrong one, I apologize. Not
10:59:14  25   the right one.
```

```
10:59:16  1    Number 25, the terms of any agreements between GHM
10:59:27  2    and any hotel ever managed by GHM.
10:59:29  3        A. Yes, I do.
10:59:30  4        Q. Okay. And what's the basis for your knowledge
10:59:32  5    of those agreements?
10:59:41  6        A. By virtue of my position now, I do have to
10:59:44  7    know them.
10:59:46  8        Q. You weren't there when they were negotiated,
10:59:48  9    correct, or signed?
11:00:00  10       A. I was not there when they were negotiated and
11:00:03  11   signed. I have to know them.
11:00:03  12       Q. For your job. And what about your job
11:00:09  13   requires you to know them?
11:00:16  14       A. I've said I also handle the legal aspects of
11:00:21  15   the company, so I do have to know them.
11:00:25  16       Q. Okay. Very good.
11:00:32  17   What I'd like to do is -- let's go off the record
11:00:41  18   for just a short while, because I want to introduce all of
11:00:44  19   the agreements as exhibits seriatim, so that we can talk
11:00:50  20   about them. So let's go off the record for a moment.
11:00:53  21       VIDEOGRAPHER: Going off the record. The time is
11:00:55  22   11:00 a.m.
11:01:01  23   (11:00 a.m.)
11:01:09  24       (Recess taken.)
          25
```

| | | |
|---|---|---|
| 11:01:09 | 1 | (Exhibit 21 marked for identification) |
| 11:01:09 | 2 | (Exhibit 22 marked for identification) |
| 11:01:09 | 3 | (Exhibit 23 marked for identification) |
| 11:01:09 | 4 | (Exhibit 24 marked for identification) |
| 11:01:09 | 5 | (Exhibit 25 marked for identification) |
| 11:01:09 | 6 | (Exhibit 26 marked for identification) |
| 11:01:09 | 7 | (Exhibit 27 marked for identification) |
| 11:01:09 | 8 | (Exhibit 28 marked for identification) |
| 11:01:09 | 9 | (Exhibit 29 marked for identification) |
| 11:01:09 | 10 | (Exhibit 30 marked for identification) |
| 11:01:09 | 11 | (Exhibit 31 marked for identification) |
| 11:01:09 | 12 | (Exhibit 32 marked for identification) |
| 11:01:09 | 13 | (Exhibit 33 marked for identification) |
| 11:01:09 | 14 | (Exhibit 34 marked for identification) |
| 11:01:09 | 15 | (Exhibit 35 marked for identification) |
| 11:01:09 | 16 | (Exhibit 36 marked for identification) |
| 11:01:09 | 17 | (Exhibit 37 marked for identification) |
| 11:01:09 | 18 | (Exhibit 38 marked for identification) |
| 11:34:15 | 19 | (11:35 a.m.) |
| 11:35:00 | 20 | VIDEOGRAPHER: Back on the record. The time is |
| 11:35:28 | 21 | 11:35 a.m. |
| 11:35:32 | 22 | MR. TOKE: Okay. Thanks very much. We were just |
| 11:35:38 | 23 | off the record to enter a number of exhibits, which comprise |
| 11:35:44 | 24 | documents produced for the first time by GHM last Wednesday, |
| 11:35:51 | 25 | September 16. And these comprise the agreements, as far as |

| | | |
|---|---|---|
| 11:37:32 | 1 | includes proprietary information, as I indicated to my |
| 11:37:36 | 2 | adversary, as well as information that is simply |
| 11:37:38 | 3 | non-responsive to the litigation whatsoever, and we left in |
| 11:37:41 | 4 | the category captions to indicate both of those terms. |
| 11:37:45 | 5 | So, the witness is here. I believe you should ask |
| 11:37:48 | 6 | the witness whatever questions you want to about the |
| 11:37:50 | 7 | information, about the contracts themselves. And |
| 11:37:53 | 8 | I suggested that if we are going to have questions |
| 11:37:59 | 9 | pertaining to attorneys' eyes only information, that we |
| 11:38:03 | 10 | respectfully request that Ms. Lee not be in the room and |
| 11:38:07 | 11 | that the pages be designated, as is common, that the pages |
| 11:38:10 | 12 | be designated as attorneys' eyes only and then you can have |
| 11:38:15 | 13 | your -- you reserve whatever rights you want to therein. |
| 11:38:18 | 14 | MR. TOKE: That's fine. Also, because the |
| 11:38:21 | 15 | documents have been heavily redacted and there is, as a |
| 11:38:24 | 16 | result, no way for plaintiff to actually assess whether or |
| 11:38:27 | 17 | not the large swathes of these documents are actually |
| 11:38:30 | 18 | non-responsive or irrelevant, we reserve the right to ask |
| 11:38:35 | 19 | for additional time to depose this witness, should that be |
| 11:38:40 | 20 | necessary, and reserve the right to request that it be at |
| 11:38:47 | 21 | GHM's expense. |
| 11:38:52 | 22 | MR. SCHWARZ: It's noted on the record, and we |
| 11:38:54 | 23 | disagree, obviously. |
| 11:38:56 | 24 | MR. TOKE: Sure. I understand. |
| 11:38:58 | 25 | Q. Ms. Chng, before you are a number of exhibits, |

| | | |
|---|---|---|
| 11:35:58 | 1 | we understand, between the -- between GHM or GHM |
| 11:36:04 | 2 | subsidiaries or affiliates and the hotels that are the |
| 11:36:08 | 3 | subject of the hotel photographs that underlie this |
| 11:36:12 | 4 | litigation. |
| 11:36:13 | 5 | The first thing the plaintiff wanted to indicate |
| 11:36:16 | 6 | is these documents have been designated under the protective |
| 11:36:21 | 7 | order as attorneys' eyes only. However, they have been |
| 11:36:26 | 8 | heavily redacted as well. No privilege log has been |
| 11:36:30 | 9 | provided or any basis for the redaction, other than a |
| 11:36:35 | 10 | representation that large portions of these agreements that |
| 11:36:40 | 11 | have been redacted are irrelevant to the proceedings. |
| 11:36:45 | 12 | Plaintiff's position is that the decision on |
| 11:36:48 | 13 | whether or not they are relevant or responsive has been |
| 11:36:51 | 14 | demonstrated by the fact that they have been produced and |
| 11:36:54 | 15 | they are responsive to discovery requests that have been |
| 11:36:57 | 16 | served on GHM and that the redaction of these documents is |
| 11:37:01 | 17 | improper and there is no basis for it. |
| 11:37:07 | 18 | Plaintiff also reserves its right to challenge the |
| 11:37:12 | 19 | designation as attorneys' eyes only for these documents. |
| 11:37:18 | 20 | That's what we want to put on the record. |
| 11:37:19 | 21 | I think counsel for GHM wants to put something on |
| 11:37:24 | 22 | the record as well. |
| 11:37:26 | 23 | MR. SCHWARZ: Yes. The documents were produced |
| 11:37:27 | 24 | under attorneys' eyes only, as provided in the |
| 11:37:28 | 25 | confidentiality order. The material that has been redacted |

| | | |
|---|---|---|
| 11:39:04 | 1 | as I indicated on the record, that were very recently |
| 11:39:07 | 2 | produced by GHM for the first time in this litigation, which |
| 11:39:12 | 3 | represent the underlying agreements with the hotels at issue |
| 11:39:15 | 4 | in this litigation. You understand that; yes? |
| 11:39:18 | 5 | A. Yes. |
| 11:39:19 | 6 | Q. And are you familiar -- you testified that |
| 11:39:21 | 7 | you, as a result of your position at GHM, are familiar with |
| 11:39:26 | 8 | all of these agreements; is that correct? |
| 11:39:29 | 9 | A. I said I have knowledge. |
| 11:39:31 | 10 | Q. By you have knowledge, what does that mean? |
| 11:39:36 | 11 | A. I know that there are these agreements. |
| 11:39:40 | 12 | Q. So, all you know is that they exist? |
| 11:39:42 | 13 | A. Maybe you should let me know what would you |
| 11:39:44 | 14 | expect by saying that I'm familiar. Do -- I mean, at least |
| 11:39:49 | 15 | give me an expectation of what you would define as |
| 11:39:55 | 16 | "familiar". |
| 11:39:55 | 17 | Q. What does the word "familiar" mean to you? |
| 11:39:59 | 18 | A. Familiar, in my understanding, that I hope I'm |
| 11:40:09 | 19 | not expected to know word by word in the agreement. |
| 11:40:14 | 20 | Q. I'm not asking. This is not a memory contest. |
| 11:40:18 | 21 | But what I'm saying, you testified earlier that because of |
| 11:40:21 | 22 | the responsibilities of your job, you have to have a working |
| 11:40:25 | 23 | knowledge of how these agreements work. Is that an accurate |
| 11:40:29 | 24 | summary of what you said? |
| 11:40:36 | 25 | A. Yes. |

11:40:38 1    Q. Okay. So you have a working knowledge of all these agreements; is that correct?

11:40:42 3    A. Yes.

11:40:42 4    Q. Okay. So let's take a look at -- well, let me ask you this: Are these generally the same in terms of the overall terms of the agreements with each of the hotels?

11:41:00 7    MR. SCHWARZ: Objection to the form. You can answer if it's possible.

11:41:07 9    MR. TOKE: Howard, as you've indicated to me in depositions before, no speaking objections. There's no need to coach the witness. All you've got to do is put the objection on the record, please.

11:41:16 13   MR. SCHWARZ: I wasn't sure that was coaching. But I object to the form of the question.

11:41:25 15   MR. TOKE: Good enough. Go ahead.

11:41:26 16   A. Okay. Can you repeat your question?

11:41:41 17   MR. TOKE: We can have the question read back, please.

11:41:45 19   (Question read back.)

11:41:50 20   A. The structure would basically be similar, save for negotiations and the results of these negotiations that would have taken place on or before the conclusion of these agreements.

11:42:09 24   Q. Okay. Perfect.

11:42:10 25   And how would you characterize the overall structure of these agreements? And by that, what I mean is what is GHM generally contracting with these hotels to provide?

11:42:23 4    A. When I say the overall structure will be the same or similar, is the word I used, it means -- I give you an example here -- all these agreements will be an agreement to operate and manage the hotel, instead of having ownership in the hotel. This is one example that I can broadly bring out.

11:42:49 10   Q. Okay. So, generally speaking, under all of these agreements, GHM provided management and operational services for these hotels. Is that correct?

11:42:59 13   A. Yes.

11:43:00 14   Q. What kinds of responsibilities would that mean for GHM?

11:43:07 16   A. It means we ensure the day-to-day operation of the hotel; that someone -- a guest comes to a hotel, checked in, doesn't find the hotel empty and no one would attend to his requirements.

11:43:23 20   Q. Are there ever any GHM employees that are staffed at any of the hotels?

11:43:35 22   A. Would you want to give me an example?

11:43:38 23   Q. Is there something you didn't understand about the question?

11:43:42 25   A. I may have not understood it correctly. So if you want to just make it a little bit clearer.

11:43:50 2    Q. Okay, sure.

11:43:54 3    Does GHM employ anyone who works at any one of the hotels on a day-to-day basis?

11:44:02 4    A. No.

11:44:39 6    Q. So no one who works at any of the hotels that GHM provides services for is actually employed by GHM; is that correct?

11:44:47 8    A. When you say "employed by GHM," do you mean that the employee in question is actually remunerated by GHM? Does that mean "employed by GHM"?

11:45:07 12   Q. What does the word "employee" mean to you?

11:45:17 13   A. That I'm being remunerated by the company.

11:45:20 14   Q. So let's use that example, yes.

11:45:22 15   Is there anyone who works at the hotels on a day-to-day basis that is remunerated by GHM?

11:45:28 17   A. No.

11:45:29 18   Q. So, all the people that work at the hotel are employees of the hotels themselves?

11:45:38 20   A. Yes, and remunerated by the hotel, that's correct.

11:45:43 22   Q. And that says -- and the agreements say so; right?

11:45:48 24   A. Yes.

11:45:49 25   Q. For example, let's -- as you said, the structure of a lot of these are the same. Let's take one at random. For example, let's look at exhibit 21. This is for the Leela.

11:46:21 4    MR. SCHWARZ: I'm not quite sure where you're going to, but I'm suspecting if you're going to ask questions, we should at this point mark this portion of the transcript as "Attorneys' Eyes Only", please.

11:46:35 8    MR. TOKE: You want to ask Ms. Lee to leave?

11:46:38 9    MR. SCHWARZ: Yes.

11:46:39 10   MR. TOKE: Okay. Would you step outside for a moment, please, Ms. Lee. Thank you.

11:46:45 13   (Ms. Lee left the deposition room.)

11:47:04 14   (Deposition continued marked "For Attorneys' Eyes Only")

11:47:04 17   (Pages 51-81 of transcript)

13:46:52  1    (1:47 p.m.)
13:47:07  2    VIDEOGRAPHER: Back on the record. The time is
13:47:13  3    1:47 p.m.
13:47:14  4    (Ms. Lee returned to the deposition room.)
13:47:18  5    BY MR. TOKE:
13:47:20  6    Q. Ms. Chng, you testified earlier that there's a
13:47:26  7    GHM USA LLC?
13:47:30  8    A. Yes.
13:47:30  9    Q. What properties are -- let me back up.
13:47:36 10    Does GHM USA LLC have any agreements with any
13:47:45 11    properties right now?
13:47:46 12    A. No.
13:47:48 13    Q. Did it ever?
13:47:56 14    A. Yes.
13:48:00 15    Q. What properties?
13:48:01 16    A. The Setai.
13:48:02 17    Q. The Setai Miami?
13:48:07 18    A. (Witness nods.)
13:48:08 19    Q. Okay. And you testified earlier that that
13:48:17 20    was -- is that exhibit 34? That's the agreement with GHM
13:48:21 21    USA LLC? Exhibit 34 was with the Dempsey Vanderbilt Hotel.
13:48:48 22    A. Yes, it is.
13:48:49 23    Q. This is the agreement. Okay.
13:48:51 24    What about Heritage House?
13:48:55 25    MR. SCHWARZ: Objection to the form of the

---

13:48:55  1    question. What's the question?
13:48:59  2    MR. TOKE: I asked what properties GHM USA had
13:49:04  3    contracts with or agreements with.
13:49:06  4    Q. You said the Setai, and you testified that
13:49:11  5    this exhibit 34 is the contract that you were referring to.
13:49:14  6    A. Yes, I did.
13:49:16  7    Q. Okay. And then I was asking, what about the
13:49:19  8    Heritage House, is that also an agreement with GHM USA?
13:49:23  9    A. No, it wasn't.
13:49:25 10    Q. Okay. Who was that with?
13:49:30 11    A. General Hotel Management Ltd.
13:49:32 12    Q. Okay. The British Virgin Islands company?
13:49:37 13    A. That's correct.
13:49:37 14    Q. Okay. Does GHM have a sales office in the
13:49:44 15    United States?
13:49:47 16    A. GHM does not have a sales office in the United
13:49:51 17    States. GHM has a sales representation office. The point
13:49:57 18    I'm trying to drive through is we don't have a direct office
13:50:02 19    by GHM per se. We engage a third party vendor to do this
13:50:07 20    part of the work.
13:50:08 21    Q. You testified earlier that sales -- that with
13:50:15 22    sales offices, GHM would enter into an agreement directly
13:50:19 23    with the sales office. Is this the same kind of sales
13:50:22 24    office contract you were referring to before?
13:50:26 25    A. It is.

---

13:51:11  1    Q. I would like to mark this next in order.
13:51:14  2    COURT REPORTER: Thirty-nine.
13:51:18  3    (Exhibit 39 marked for identification)
13:51:41  4    MR. TOKE:
13:52:09  5    Q. Ms. Chng, what's marked exhibit 39 are
13:52:13  6    print-outs from the GHM website. You can see that at the
13:52:17  7    bottom, it's at ghmhotels.com?
13:52:23  8    A. Yes.
13:52:26  9    Q. This is the "Contact us" page, which is a
13:52:30 10    sub-page of the sales and reservations. You can see the
13:52:33 11    highlighted or shaded-in area that says "Sales and
13:52:38 12    Reservations" on the left; yes?
13:52:40 13    A. Yes.
13:52:40 14    Q. This is pulled out of the main page, which
13:52:43 15    says "Sales and reservations." If you could flip to the
13:52:49 16    second page, towards the bottom you'll see "United States of
13:52:55 17    America." Do you see that?
13:52:57 18    A. Yes, I do.
13:52:58 19    Q. And there's an office listed in San Francisco;
13:53:01 20    correct?
13:53:02 21    A. Yes.
13:53:03 22    Q. Okay. And it says -- and there's an email
13:53:08 23    address to reach someone at ghmhotels.com; isn't that
13:53:14 24    correct?
13:53:14 25    A. That's correct.

---

13:53:15  1    Q. And it's ghmusa1@ghmhotels.com; yes?
13:53:23  2    A. That's correct.
13:53:23  3    Q. And then underneath that is a New York office;
13:53:27  4    right?
13:53:27  5    A. Yes.
13:53:28  6    Q. Okay. That's in New York, New York; correct?
13:53:29  7    A. Yes.
13:53:30  8    Q. Okay. And it also has a GHM email address to
13:53:33  9    reach GHM; correct?
13:53:36 10    A. Yes.
13:53:37 11    Q. Okay. And that's ghmusa@ghmhotels.com?
13:53:42 12    A. Yes.
13:53:43 13    Q. Okay. And this is GHM's own website; correct?
13:53:52 14    A. This is.
13:53:52 15    Q. Okay. And it's indicating that GHM has sales
13:53:57 16    in -- a sales office in the United States, doesn't it? Or
13:54:07 17    two, actually.
13:54:17 18    A. By virtue of what I've seen -- what is placed
13:54:21 19    in front of me right now, yes, it says "Sales and
13:54:24 20    Reservations."
13:54:25 21    Q. And it's got a ghmhotels email address; right?
13:54:32 22    A. Yes.
13:54:47 23    Q. Do you know where the ghmhotels.com, the
13:54:52 24    server that hosts ghmhotels.com is located?
13:54:59 25    A. I do not know exactly where the server is

13:55:03  1   located. I know the vendor who provides the service.
13:55:08  2       Q. Okay. Who's the vendor that provides the
13:55:11  3   service?
13:55:11  4       A. It's an IT company called Nodens.
13:55:19  5       Q. Noted?
13:55:20  6       A. Nodens, the way they pronounce it, N-o-d-e-n-s
13:55:27  7   IT.
13:55:39  8       Q. Nodens, okay.
13:55:41  9       Do you know who the registrar is of the ghmhotels
13:55:47  10  website -- pardon me, domain name?
13:55:50  11      A. The website or the domain name?
13:55:52  12      Q. The domain name.
13:56:06  13      A. I would believe it's been -- I believe the
13:56:08  14  registrant is General Hotel Management Ltd.
13:56:12  15      Q. Okay. Mark this exhibit 40, please.
13:56:47  16      (Exhibit 40 marked for identification)
13:57:16  17      I'll represent to you that this is a Whois report
13:57:21  18  on the ownership of the ghmhotels.com website. If you'll
13:57:30  19  look where it says "Whois & Quick Stats", do you see that?
13:57:36  20      A. Yes.
13:57:38  21      Q. There's something that says "Registrant Org".
13:57:42  22  Do you see that?
13:57:43  23      A. Yes.
13:57:46  24      Q. I assume it's actually "Registrant
13:57:49  25  Organization" or something like that. And it lists General

13:57:52  1   Hotel Management and it says it's associated with
13:57:54  2   approximately 177 other domain names. Do you see that?
13:57:57  3       A. Yes, I can see that.
13:57:59  4       Q. Okay. And you believe that General Hotel
13:58:03  5   Management is the owner of the ghmhotels.com website or
13:58:12  6   domain name; yes?
13:58:13  7       A. I believe so.
13:58:15  8       Q. Okay. You see where it says "IP Location,"
13:58:19  9   halfway down?
13:58:21  10      A. Yes.
13:58:22  11      Q. And it says, "Utah - Provo."
13:58:26  12      Do you have an understanding that the server
13:58:32  13  housing the GHM domain name is actually in Utah?
13:58:39  14      A. Like I testified earlier, I have no knowledge
13:58:42  15  where the physical location of the server can be, may be.
13:58:47  16  I only know who the vendor is.
13:58:54  17      Q. Okay. Okay. Very good.
13:59:38  18      Let's return to this. There have been a number of
13:59:41  19  hotels that are covered by the agreements that have been
13:59:46  20  marked as exhibits here that are no longer managed by GHM;
13:59:49  21  isn't that correct?
13:59:56  22      A. Yes.
13:59:56  23      Q. Okay. Do you know which ones those are, just
13:59:58  24  generally? I can list them for you, but do you know which
14:00:03  25  ones GHM no longer represents?

14:00:06  1       A. Saujana.
14:00:08  2       Q. I'm just asking. I said, do you know?
14:00:10  3       A. Yes.
14:00:11  4       Q. Okay. So, let's go through them, actually.
14:00:14  5       Does GHM still provide management services to the
14:00:22  6   Chiang Mai?
14:00:25  7       A. Do you mean the Chedi Chiang Mai?
14:00:31  8       Q. Yes.
14:00:32  9       A. No.
14:00:33  10      Q. Has it -- do you know approximately when it
14:00:35  11  stopped?
14:00:39  12      A. I wouldn't recall the actual date. I would
14:00:43  13  say it's some time towards late 2013.
14:00:48  14      Q. How about the Setai?
14:00:52  15      A. No.
14:00:52  16      Q. Do you know approximately when that
14:00:56  17  relationship ended?
14:01:00  18      A. Some time in 2012.
14:01:08  19      Q. How about -- you said the Saujana and The Club
14:01:11  20  at the Saujana. How about those two?
14:01:14  21      A. No longer managing.
14:01:16  22      Q. When did that relationship end?
14:01:32  23      A. I can't really remember. I would say late
14:01:44  24  2009.
14:01:49  25      Q. Okay. How about the Datai?

14:02:01  1       A. No longer.
14:02:02  2       Q. Okay. And when did that occur when that
14:02:05  3   relationship ended?
14:02:20  4       A. I can't remember is it going to be 2010 or
14:02:23  5   2011. It's one of those years.
14:02:33  6       Q. How about the Andaman?
14:02:36  7       A. No longer.
14:02:37  8       Q. Okay. And do you know when that relationship
14:02:42  9   ended?
14:02:51  10      A. Some time 2009 or 2010. I cannot remember the
14:02:53  11  date.
14:02:54  12      Q. You said 2009 or 2010?
14:02:55  13      A. Yes, 2009 or 2010.
14:02:57  14      Q. How about the Carcosa?
14:03:01  15      A. No longer managing. I can't remember.
14:03:11  16      Q. Approximately? Does around 2009 sound about
14:03:23  17  right, late 2009?
14:03:30  18      A. I can't put a time to that. I cannot
14:03:34  19  recollect.
14:03:34  20      Q. Okay. How about the Chedi Phuket?
14:03:56  21      A. No longer managing. I believe that's in 2009
14:03:59  22  as well.
14:03:59  23      Q. Okay. How about the Chedi Milan?
14:04:20  24      A. No longer managing. 2009.
14:04:32  25      Q. Okay. How about the Leela?

14:04:37  1          A. We are no longer managing. I cannot remember
14:04:40  2    the date, or the year in fact.
14:04:43  3          Q. Would it have been within the last couple of
14:04:49  4    years or longer than that?
14:04:52  5          A. Perhaps longer than that.
14:04:54  6          Q. Would it have been before 2010?
14:04:56  7          A. Yes. 2010, yes.
14:05:00  8          Q. Would it have been before 2009?
14:05:06  9          A. Yes.
14:05:08  10         Q. When did you start with GHM?
14:05:10  11         A. 2008.
14:05:11  12         Q. When in 2008?
14:05:12  13         A. June 2008.
14:05:14  14         Q. Were you managing the Chedi or the Leela at
14:05:18  15   that time?
14:05:34  16         A. I do not have a definite answer because I'm
14:05:37  17   already trying to recollect, I don't want to say the wrong
14:05:40  18   thing. I would say that I do not recollect this.
14:05:44  19         Q. But did you -- you were managing it -- if GHM
14:05:49  20   were managing it when you were there, did it manage it for
14:05:53  21   long?
14:05:55  22         A. I didn't understand your question.
14:05:57  23         Q. Sorry, never mind.
14:05:59  24         How about the Heritage House?
14:06:09  25         A. That was before I joined GHM.

14:06:12  1          Q. So, no longer managing?
14:06:14  2          A. No longer managing, and ended before I joined
14:06:18  3    GHM.
14:06:19  4          Q. Okay. How about the Lalu?
14:06:22  5          A. No longer managing. I don't recall the year.
14:06:26  6
14:06:27  7          Q. Was it managed by GHM when you joined?
14:06:32  8          A. I don't think so.
14:06:33  9          Q. Okay. So, some time before you left -- before
14:06:37  10   you came to GHM, the relationship ended?
14:06:40  11         A. That would be a fair statement to say.
14:06:41  12         Q. Okay. And what happens once -- when a
14:06:54  13   relationship ended with GHM for management services, do you
14:06:59  14   know what happened with any of those properties that -- what
14:07:03  15   happened to their management, who did it?
14:07:07  16         A. I have no idea.
14:07:08  17         Q. You have no idea. Okay. I'm just asking.
14:07:11  18   It's okay if you don't know.
14:07:16  19         A. I don't -- I don't follow them, so I don't
14:07:19  20   know.
14:07:20  21         Q. Okay. Typically, what would happen at the end
14:07:30  22   of a relationship like that with regard to any marketing
14:07:33  23   collateral, the materials that GHM might have furnished to
14:07:40  24   the hotels? Would they be returned to the hotel -- I mean
14:07:44  25   to GHM, pardon me?

14:07:50  1          A. Generally, when a relationship like this ends,
14:07:55  2    the hotel needs to cease usage of any marketing materials
14:08:03  3    that bears the GHM marks.
14:08:27  4          Q. How about any photographs that are used in any
14:08:30  5    of those marketing materials?
14:08:44  6          A. May I clarify?
14:08:45  7          Q. Yes.
14:08:45  8          A. You are talking about not the collaterals, as
14:08:48  9    in like, for example, the brochures; you are talking about
14:08:53  10   the photographs that is, like, within the brochure?
14:08:56  11         Q. Yes.
14:08:59  12         A. The hotel would be able to continue to use it
14:09:02  13   because they own the photos.
14:09:05  14         Q. They own the photos?
14:09:07  15         A. To the best of my knowledge they own the
14:09:09  16   photos.
14:09:10  17         Q. Okay. We'll talk more about that.
14:09:45  18         A couple of other properties. Sorry. What about
14:09:48  19   the Serai or the Chedi Villas Jimbaran, are they still under
14:09:54  20   GHM management?
14:09:57  21         A. Can you repeat the name of the property?
14:10:00  22         Q. The Serai, or called the Chedi Villas,
14:10:06  23   Jimbaran?
14:10:06  24         A. We don't have a Chedi Villas Jimbaran.
14:10:11  25         Q. Okay. Did you ever?

14:10:15  1          A. I'm not aware of any Chedi Villas Jimbaran.
14:10:21  2          Q. Any Chedi property at Jimbaran?
14:10:24  3          A. Yes, we do.
14:10:26  4          Q. Okay. That was the Serai?
14:10:31  5          A. Not the Serai.
14:10:33  6          Q. Okay. What is it?
14:10:35  7          A. It's the Chedi Club Jimbaran.
14:10:39  8          Q. The Chedi Club Jimbaran. Okay. And is that
14:10:44  9    still managed by GHM?
14:10:46  10         A. The property is not opened yet.
14:10:48  11         Q. Okay. When is that going to open?
14:10:52  12         A. We have not got an indicative opening date
14:10:56  13   yet.
14:11:23  14         Q. Okay.
14:11:31  15         Let's take a brief break. We will be back in five
14:11:43  16   minutes, 10 minutes.
14:11:45  17         A. Okay.
14:11:47  18         Q. Off the record, please.
14:11:49  19         VIDEOGRAPHER: This marks the end of tape number 3
14:11:51  20   in the deposition of Monica Chng.
14:11:53  21         Going off the record. The time is 2:12 p.m.
14:11:59  22   (2:12 p.m.)
14:12:02  23              (Recess taken.)
14:30:48  24   (2.30 p.m.)
14:30:54  25         VIDEOGRAPHER: Back on the record. Here marks the

14:31:01  1    beginning of tape number 4 in the deposition of Monica Chng.

14:31:06  2    The time is 2:31 p.m.

14:31:11  3    BY MR. TOKE:

14:31:12  4    Q. Okay, Ms. Chng, we're back on the record.

14:31:17  5    Let's go back to exhibit 39, which is the "Contact

14:31:23  6    us" page from the GHM website. Do you have any experience

14:31:44  7    with these US offices, in the sense that I see that there's

14:31:47  8    a toll-free number for the San Francisco office, do you see

14:31:51  9    that, within the USA?

14:31:54  10   A. Yes.

14:31:54  11   Q. There's a 415 number, which I can represent is

14:31:56  12   the area code for San Francisco. Do you see that?

14:32:00  13   A. Yes.

14:32:00  14   Q. And for the New York office there's a

14:32:02  15   telephone number that's 212, which I can represent is the

14:32:07  16   New York area code.

14:32:09  17   When a customer -- when someone calls these

14:32:13  18   numbers, how do they identify themselves?

14:32:16  19   A. I have no experience with this.

14:32:18  20   Q. You don't know?

14:32:19  21   A. I don't know.

14:32:22  22   Q. Okay. How about with any of the other sales

14:32:24  23   offices, wherever they might be in the world? With all

14:32:28  24   these numbers that are offered, do they answer "GHM" or how

14:32:33  25   do they answer?

14:32:34  1    A. I have no idea.

14:32:35  2    Q. You have no idea. Okay. Who would at GHM?

14:32:42  3    A. This would be a question I need to look for

14:32:44  4    the answer for you. I wouldn't know at this point in time.

14:32:48  5    Q. So you have no idea at GHM would know how

14:32:55  6    these sales offices answer the phone?

14:32:58  7    A. I have no idea as to who would have

14:33:03  8    information on how these people answer the phone when you

14:33:07  9    call each of these respective numbers.

14:33:11  10   Q. Who's in charge of these sales offices, like

14:33:16  11   connecting, liaising with these sales offices at GHM?

14:33:26  12   A. There are two levels of contact, one level of

14:33:29  13   which is at the sales and marketing office at the corporate

14:33:33  14   office in Singapore, another level would be by the property.

14:33:43  15   Q. Okay. And at the corporate office, who would

14:33:46  16   be the person at GHM who would have that level of contact?

14:33:57  17   A. I would say there wouldn't be one single

14:34:00  18   person. It will be the sales and marketing department at

14:34:02  19   the corporate office.

14:34:04  20   Q. Okay. I didn't ask which one person. I said

14:34:07  21   who? That is an open question as to who; it could be one or

14:34:11  22   more people.

14:34:12  23   So who at GHM are in the sales and marketing

14:34:16  24   department that have contact with these different

14:34:19  25   offices?

14:34:21  1    A. Do you mean you want me to list out the names?

14:34:24  2    Q. Yes.

14:34:32  3    A. One would be our senior vice-president for

14:34:34  4    sales and marketing.

14:34:37  5    Q. What is that person's name?

14:34:39  6    A. That is Mr. Clement Koh.

14:34:41  7    Q. That's Mr. Koh who is here in this room?

14:34:44  8    A. That's Mr. Koh.

14:34:46  9    Q. Okay. Who else?

14:34:58  10   A. We would have our PR and communications

14:35:04  11   manager.

14:35:05  12   Q. And what is that person's name?

14:35:07  13   A. That's Ms. Kathryn.

14:35:09  14   Q. Kathryn?

14:35:11  15   A. Koh.

14:35:12  16   Q. Any relation to Mr. Koh?

14:35:15  17   A. Not that I know of.

14:35:17  18   Q. Anyone else?

14:35:34  19   A. Ms. Rachel Loh.

14:35:36  20   Q. What is Ms. Rachel Loh's --

14:35:40  21   A. Ms. Rachel is personal assistant to Mr. Koh.

14:35:43  22   Q. Okay. Anyone else?

14:35:53  23   A. This would be the main three persons.

14:35:56  24   Q. Who else, if anyone, is in the sales and

14:35:59  25   marketing department?

14:36:01  1    A. There are.

14:36:02  2    Q. There are. Okay. Because you said earlier

14:36:06  3    that probably people in the sales and marketing department

14:36:09  4    would have connection with these offices; correct?

14:36:13  5    A. Yes.

14:36:14  6    Q. So you named three people. Who else -- how

14:36:15  7    many other people are there in the sales and marketing

14:36:17  8    department?

14:36:19  9    A. Another three or four more.

14:36:23  10   Q. Okay. And what are their names and what are

14:36:25  11   their responsibilities?

14:36:25  12   A. We have a Ms. Cheryl Siu.

14:36:34  13   Q. How do you spell that?

14:36:37  14   A. Cheryl, C-h-e-r-y-l, family name is Siu,

14:36:41  15   S-i-u.

14:36:42  16   Q. What does Ms. Siu do?

14:36:52  17   A. Cheryl does basically on digital marketing.

14:36:55  18   Q. Okay. And she's in touch with these sales

14:36:58  19   offices?

14:37:11  20   A. Is that a "yes" or "no" answer?

14:37:13  21   Q. It sounded like a "yes" or "no" question to

14:37:15  22   me.

14:37:16  23   A. Yes.

14:37:18  24   Q. Okay. And there are two or three more people.

14:37:20  25   Who else are they?

| | |
|---|---|
| 14:37:24  1 | A. One is Ms. Yvonne Lim. |
| 14:37:30  2 | Q. Okay. What is her title? |
| 14:37:32  3 | A. It's -- she is director of revenue management. |
| 14:37:37  4 | Q. Okay. And what does she do? |
| 14:37:42  5 | A. Revenue management. |
| 14:37:44  6 | Q. What does that mean? |
| 14:37:45  7 | A. That means she manages revenue for the hotel. |
| 14:37:51  8 | Q. Okay. Can you explain in greater detail what |
| 14:37:54  9 | that might mean? Managing revenue doesn't necessarily mean |
| 14:37:59 10 | anything in and of itself. |
| 14:38:04 11 | A. Well, in a nutshell, she -- she helps and she |
| 14:38:10 12 | guides the hotel in how to manage their inventory, as to |
| 14:38:17 13 | maximize the yields that is coming from the inventory. |
| 14:38:20 14 | Q. Okay. And she's in touch with the sales |
| 14:38:23 15 | offices also? |
| 14:38:38 16 | A. I would not know if she has a direct contact. |
| 14:38:41 17 | Q. Okay. |
| 14:38:42 18 | A. And there are probably one or two other |
| 14:38:44 19 | people. |
| 14:38:44 20 | Q. Who else are they? |
| 14:38:49 21 | A. One more. Sheladina Joseph, we mentioned her |
| 14:38:55 22 | before. |
| 14:38:56 23 | Q. Remind me again what her job is? |
| 14:38:59 24 | A. She is CRM executive. |
| 14:39:02 25 | Q. So this whole sales and marketing department |

| | |
|---|---|
| 14:40:45  1 | about San Francisco and New York in the United States; |
| 14:40:48  2 | correct? |
| 14:40:49  3 | A. That's correct. |
| 14:40:49  4 | Q. And so then they are meant to drive awareness |
| 14:40:54  5 | and sales of GHM managed properties, and you said just now |
| 14:40:59  6 | of GHM as well, in the United States in New York and San |
| 14:41:02  7 | Francisco and other parts of the United States? |
| 14:41:08  8 | A. I said to drive the awareness of GHM brand and |
| 14:41:14  9 | its hotels that it manages in the geographical region that |
| 14:41:18 10 | they are being located. |
| 14:41:20 11 | Q. So how would you define the geographical |
| 14:41:22 12 | region of the New York sales representative office? |
| 14:41:34 13 | A. Well, I don't define the region. |
| 14:41:36 14 | Q. I'm asking you. You just said it's in their |
| 14:41:40 15 | geographic market. Earlier you testified to that, did you |
| 14:41:43 16 | not? |
| 14:41:44 17 | A. You're asking me to define. I'm saying that |
| 14:41:47 18 | I don't define the geographic region for -- the example you |
| 14:41:52 19 | made was New York. I'm saying that I don't define the |
| 14:41:56 20 | geographic region. |
| 14:41:58 21 | Q. Okay. So you're telling me that they're |
| 14:42:01 22 | trying to drive sales outside of New York? |
| 14:42:06 23 | A. I don't understand your question. |
| 14:42:08 24 | Q. Well, did you or did you not testify that the |
| 14:42:15 25 | sales representation offices are meant to increase awareness |

| | |
|---|---|
| 14:39:05  1 | that you have now identified six or so people, are in charge |
| 14:39:09  2 | of coordinating with the sales offices throughout the world |
| 14:39:14  3 | to maximize sales of GHM managed properties; right? |
| 14:39:18  4 | A. Yes. |
| 14:39:19  5 | Q. And amongst those offices are two in the |
| 14:39:23  6 | United States, one in San Francisco and one in New York; |
| 14:39:26  7 | right? |
| 14:39:26  8 | A. Yes. |
| 14:39:31  9 | Q. You had said that these sales offices are |
| 14:39:37 10 | companies that GHM contracts with to drive sales in those |
| 14:39:41 11 | particular markets; right? |
| 14:39:44 12 | A. Yes. |
| 14:39:45 13 | Q. Okay. So that would mean that these two |
| 14:39:49 14 | offices are -- these two sales offices are responsible for |
| 14:39:54 15 | trying to drive sales of GHM managed properties in the |
| 14:40:00 16 | United States; right? |
| 14:40:12 17 | A. The main activities or the main |
| 14:40:14 18 | responsibilities of this sales -- not sales offices, I said |
| 14:40:19 19 | in one of my testimony earlier on, these are sales |
| 14:40:23 20 | representation offices -- they are meant to create awareness |
| 14:40:32 21 | of GHM group-wide as well as the hotels that they manage. |
| 14:40:38 22 | Q. In the particular geographic markets in which |
| 14:40:41 23 | they are located; correct? |
| 14:40:42 24 | A. That's correct. |
| 14:40:43 25 | Q. So in these two instances, you're talking |

| | |
|---|---|
| 14:42:22  1 | of the GHM brand and the hotels they manage in their |
| 14:42:27  2 | geographical markets? |
| 14:42:30  3 | A. Yes, I did. |
| 14:42:31  4 | Q. Okay. And the New York sales office is |
| 14:42:35  5 | located in New York; yes? |
| 14:42:37  6 | A. Yes, it is. |
| 14:42:38  7 | Q. Okay. So presumably it is then trying to |
| 14:42:42  8 | drive the awareness of the GHM brand and the hotels that GHM |
| 14:42:46  9 | manages in the area where it's located; yes? |
| 14:42:51 10 | A. Yes. |
| 14:42:52 11 | Q. Okay. And I was simply trying to ask what |
| 14:42:56 12 | that area is. We definitely know New York; correct? |
| 14:43:02 13 | A. That's what I said, in the geographic region |
| 14:43:04 14 | that it's located in. |
| 14:43:06 15 | Q. Would it cover other parts of the United |
| 14:43:08 16 | States as well? |
| 14:43:10 17 | A. I am not able to answer this question offhand |
| 14:43:14 18 | until I get details of the contract. |
| 14:43:20 19 | Q. Okay. That's another good area to talk about. |
| 14:43:26 20 | There are agreements between these sales |
| 14:43:28 21 | representative offices and GHM; correct? |
| 14:43:31 22 | A. Yes. |
| 14:43:31 23 | Q. There. There are written contracts? |
| 14:43:37 24 | A. Yes. |
| 14:43:38 25 | MR. TOKE: Okay. I'm going to say that these are |

14:43:41 1    clearly relevant, based on GHM's activities in the United
14:43:44 2    States. We've asked for them. These were asked for,
14:43:50 3    I believe, in 2014, about a year ago, and these documents
14:43:54 4    have still not been produced, despite meet and confer
14:43:57 5    efforts, and I'm going to once again call for the production
14:44:01 6    of these documents and reserve the right again to seek to
14:44:06 7    ask to take testimony of GHM again, at GHM's expense, since
14:44:11 8    these are now well over a year late.
14:44:16 9        MR. SCHWARZ: You've made your statement.
14:44:17 10   I understand it. I'm not quite sure what the controversy is
14:44:21 11   about that, but we take it under advisement.
14:44:24 12       MR. TOKE: Of course. I'm just putting it on the
14:44:27 13   record, so it's clear that we're making that objection that
14:44:30 14   these were not produced before. Okay.
14:44:35 15       Q. A few other questions. Let's see.
14:44:43 16       Who in GHM was in charge of the creation of the
14:44:45 17   hotels' corporate branding, like the logo identity, prior to
14:44:51 18   2008?
14:45:00 19       A. Mr. Ohletz.
14:45:01 20       Q. Mr. Ohletz. Okay.
14:45:04 21       It wasn't Mr. Jenni?
14:45:06 22       A. To the best of my knowledge, Mr. Ohletz.
14:45:09 23       Q. Who at GHM was in charge of the creation of
14:45:11 24   GHM's corporate website that was first published in 2005?
14:45:29 25       A. I have no definite knowledge on that.

14:45:31 1        Q. Do you have an idea?
14:45:33 2        A. No.
14:45:34 3        Q. Who at GHM was or is in charge of the creation
14:45:40 4    of the GHM magazine?
14:46:00 5        A. Our GHM magazine, it's created by this -- I'm
14:46:07 6    trying to just recall his name.
14:46:32 7        James Graf is our editor for the magazine, so he
14:46:37 8    takes care of that.
14:46:38 9        Q. Is he a GHM employee?
14:46:42 10       A. No, not a direct employee.
14:46:45 11       Q. Okay. So I'm actually asking who at GHM is in
14:46:48 12   charge then of working with Mr. -- I'm not sure how you
14:46:52 13   spell his name. How do you spell it?
14:46:57 14       A. Graf, G-r-a-f.
14:47:00 15       Q. Okay. What I'm asking is who at GHM is in
14:47:03 16   charge or was in charge of working with Mr. Graf for the
14:47:07 17   creation and production of the magazine?
14:47:10 18       A. I will not know before 2008.
14:47:16 19       Q. Okay. How about currently?
14:47:42 20       A. To the best of my knowledge currently, the
14:47:45 21   liaison work would be between Mr. Graf himself, as well as
14:47:50 22   our PR and communications.
14:47:52 23       Q. Who is PR and communications?
14:47:54 24       A. Ms. Kathryn Koh. I mentioned her name earlier
14:47:58 25   on.

14:47:59 1        Q. So Ms. Koh works completely and exclusively
14:48:02 2    with Mr. Graf on the creation of the GHM magazine?
14:48:07 3        A. I'm not comfortable with the word
14:48:09 4    "exclusively" or "solely". I know the liaison is between
14:48:17 5    them.
14:48:17 6        Q. Who does Ms. Koh report to?
14:48:21 7        A. Ms. Koh reports to our senior vice-president
14:48:25 8    sales and marketing.
14:48:27 9        Q. And that's Mr. Koh in this room?
14:48:29 10       A. That's Mr. Koh.
14:48:31 11       Q. Who does Mr. Koh report to?
14:48:33 12       A. Mr. Koh reports to our president, that's
14:48:35 13   Mr. Hans Jenni.
14:48:40 14       Q. Does Mr. Jenni have any involvement in the
14:48:46 15   magazine?
14:48:53 16       A. I don't have a direct answer to that.
14:48:55 17       Q. You don't have a direct answer. Does that
14:48:57 18   mean you don't know?
14:48:58 19       A. I don't know.
14:48:59 20       Q. There are 15 people in this company; right?
14:49:03 21       A. Yes.
14:49:06 22       Q. You're all located in Gilstead; is that right?
14:49:10 23       A. Yes, we are.
14:49:11 24       Q. How big is the office?
14:49:18 25       A. How big, as in?

14:49:20 1        Q. How many square meters?
14:49:33 2        A. I never measured.
14:49:34 3        Q. Give me an estimate.
14:49:37 4        A. Floor area, 7,000 square feet.
14:49:39 5        Q. 7,000 square feet? Okay.
14:49:41 6        A. I think about that.
14:49:42 7        Q. That's a lot of space. Okay. And do you have
14:49:45 8    any regular interaction with the other people, the other 14
14:49:48 9    people in the company?
14:49:53 10       A. How is regular?
14:49:55 11       Q. Every day. Do you talk to other people at the
14:49:57 12   office?
14:49:59 13       A. If regular means every day, then no.
14:50:03 14       Q. You don't talk to other people in your office
14:50:05 15   on a daily basis?
14:50:08 16       A. Not on a daily basis.
14:50:11 17       Q. You just sit in your office and talk to no
14:50:14 18   one?
14:50:15 19       A. Because I'm not in the office on a daily
14:50:18 20   basis.
14:50:19 21       Q. Okay. How about the days you're in the
14:50:21 22   office?
14:50:21 23       A. Yes, I do talk to my colleagues.
14:50:24 24       Q. Okay. And you're telling me that you don't
14:50:29 25   know if Mr. Jenni has any involvement whatsoever in the

14:50:33  1    creation or production of the magazine?

14:50:37  2        A. That's what I said.

14:50:38  3        Q. Okay. How about prior to 2008, you have no

14:50:44  4    idea?

14:50:45  5        A. I have no idea.

14:50:47  6        Q. That's again because you weren't at GHM prior

14:50:50  7    to 2008?

14:50:51  8        A. I was not at GHM prior to 2008.

14:50:53  9        Q. Yes, that's what I'm saying. Okay.

14:51:01 10        Who at GHM was or is in charge of the creation of

14:51:06 11    photography services after 2008 until today -- or 2007,

14:51:13 12    pardon me, until today?

14:51:29 13        A. Prior to Mr. Ohletz leaving GHM, he was always

14:51:33 14    the one in charge.

14:51:35 15        Q. Okay. And after Mr. Ohletz left?

14:51:38 16        A. After Mr. Ohletz left, I would say it's with

14:52:13 17    Ms. Kathryn Koh.

14:52:16 18        Q. Who, again, reports directly to Mr. Koh, who's

14:52:19 19    in this room?

14:52:20 20        A. Yes.

14:52:21 21        Q. When any of the currently managed properties

14:52:29 22    are in need of any photography to be done for anything, any

14:52:33 23    marketing that's going to be done for those properties, who

14:52:37 24    determines the subject matter, the style, the angle of the

14:52:40 25    lighting, etc., for such collateral?

14:54:52  1    photographs?

14:54:54  2        A. Yes.

14:55:11  3        A. I would say Ms. Kathryn Koh.

14:55:15  4        Q. Okay. How many properties does GHM currently

14:55:28  5    manage?

14:55:41  6        A. Six.

14:55:42  7        Q. What are they?

14:55:43  8        A. The Legian, Bali; The Club at the Legian,

14:55:48  9    Bali; The Chedi Club, Tanah Gajah; The Chedi Muscat; The Nam

14:55:58 10    Hai; the Chedi Andermatt.

14:56:03 11        Q. The Chedi?

14:56:05 12        A. Andermatt.

14:56:06 13        Q. Andaman?

14:56:08 14        A. Andermatt.

14:56:09 15        Q. How do you spell that?

14:56:13 16        A. A-n-d-e-r-m-a-t-t.

14:56:28 17        Q. You testified earlier that -- I had asked you

14:56:31 18    about when GHM's services were terminated by anyone -- that

14:56:40 19    upon the cessation of that relationship, the hotels had to

14:56:46 20    stop using marketing materials with GHM's marks; right?

14:56:51 21        A. Yes.

14:56:52 22        Q. So, was there usually any kind of a separation

14:56:56 23    agreement where anything like that -- or was it just

14:56:59 24    termination and then both parties separated?

14:57:06 25        A. Usually termination and parties separate.

14:52:46  1        MR. SCHWARZ: You mean at the present time, today?

14:52:51  2        MR. TOKE: At the present time. Yes, after 2007.

14:52:54  3        MR. SCHWARZ: That's not at the present time.

14:52:56  4        MR. TOKE: I'm saying from 2007 to the present

14:53:00  5    time.

14:53:01  6        MR. SCHWARZ: That's different. For my benefit,

14:53:03  7    do you want to read the question back? Because timing is a

14:53:06  8    significant issue in that, so let's just make sure it's

14:53:09  9    clear.

14:53:10 10        MR. TOKE: Sure.

14:53:11 11        MR. SCHWARZ: Do you want to rephrase it or just

14:53:13 12    read it back.

14:53:38 13        (Question read back.)

14:53:40 14        MR. SCHWARZ: There was no time period.

14:53:42 15        MR. TOKE: And now I'm putting in the time period

14:53:44 16    from 2007 to the present.

14:53:46 17        MR. SCHWARZ: Okay.

14:53:49 18        A. 2007 till the time when Mr. Ohletz was still

14:53:55 19    with GHM, Mr. Ohletz would be the person.

14:54:02 20    BY MR. TOKE:

14:54:02 21        Q. Okay. And when did Mr. Ohletz leave GHM?

14:54:17 22        A. I don't have the actual date. I would

14:54:20 23    estimate it to be some time in 2010.

14:54:32 24        Q. Okay. And then after Mr. Ohletz left?

14:54:51 25        A. This is in relation to the taking of the

14:57:10  1        Q. Okay. And so the hotels couldn't use anything

14:57:15  2    that used GHM marks; right?

14:57:19  3        A. Yes.

14:57:20  4        Q. And GHM couldn't use anything that had

14:57:24  5    intellectual property owned by the hotels; correct?

14:57:41  6        A. I would say no.

14:57:43  7        Q. That is not correct?

14:57:45  8        A. Yes.

14:57:45  9        Q. How is it not correct?

14:57:47 10        A. Because the agreement says so.

14:57:52 11        Q. The agreement says what?

14:57:56 12        A. The example that you referred me to, if you

14:57:59 13    were to read it, I do not think it says what you said

14:58:06 14    earlier on, in the second part of your question.

14:58:10 15        Q. Okay. That's what I'm asking you: What do you

14:58:13 16    think it says?

14:58:14 17        A. I think it says that once the hotel is not

14:58:19 18    managed by us, the hotels are not to use collaterals that

14:58:24 19    has GHM marks on it.

14:58:27 20        Q. We are agreed, yes. I agree, that's what

14:58:30 21    I said, that's the first part of what I said.

14:58:32 22        So, as soon as that separation occurs, the hotels

14:58:34 23    can no longer use any collateral that has the GHM mark on

14:58:39 24    it; correct?

14:58:40 25        A. Yes.

| | | | | |
|---|---|---|---|---|
| 14:58:41 | 1 | Q. Okay. And I said, and then the other side is, | 15:07:33 | 1 | MR. SCHWARZ: That means that the attorneys gave |
| 14:58:44 | 2 | because there's a separation, GHM can't use any materials | 15:07:35 | 2 | it to him. |
| 14:58:48 | 3 | that are owned by the hotels; correct? | 15:07:37 | 3 | BY MR. TOKE: |
| 14:58:54 | 4 | A. That is the part that I say I'm not sure. | 15:07:37 | 4 | Q. That means that Mr. Schwarz gave this to my |
| 14:58:58 | 5 | I don't know whether this is correct or not correct. | 15:07:43 | 5 | office. Okay? |
| 14:59:00 | 6 | Q. Okay. You don't know? | 15:07:46 | 6 | So -- claiming it to be documents that GHM has |
| 14:59:01 | 7 | A. I don't know. | 15:07:46 | 7 | that are responsive to requests for documents that we have |
| 14:59:02 | 8 | Q. Okay. Where would that be determined? Would | 15:07:51 | 8 | served on GHM. |
| 14:59:08 | 9 | it be -- it would be in the contract; right? | 15:07:53 | 9 | MR. SCHWARZ: No, that's not correct. |
| 14:59:24 | 10 | A. If I may take a look at the same example that | 15:07:55 | 10 | MR. TOKE: Okay. |
| 14:59:28 | 11 | we were referring to? | 15:07:56 | 11 | MR. SCHWARZ: It was under -- we were able to get |
| 14:59:30 | 12 | Q. Of course, please. | 15:07:58 | 12 | this but this did not come from GHM. I'm telling you, as |
| 15:01:04 | 13 | Okay. You've read the document. Has that | 15:08:02 | 13 | the lawyer, that it did not come from GHM's office. It came |
| 15:01:07 | 14 | refreshed your recollection or clarified anything for you? | 15:08:06 | 14 | directly from, I guess it's QBE, through the Setai. So I'm |
| 15:01:11 | 15 | A. No, I think it clarifies the fact that what we | 15:08:14 | 15 | not sure if this document was ever in the possession of GHM |
| 15:01:15 | 16 | mentioned in the first part of your question is correct and | 15:08:19 | 16 | here. Obviously there are named insured. |
| 15:01:18 | 17 | it is what it says. | 15:08:24 | 17 | So I don't know if this document was in fact in |
| 15:01:20 | 18 | Q. And what about the second part of the | 15:08:27 | 18 | the office of GHM. But we were able to get it because it's |
| 15:01:22 | 19 | question? The first part was the hotels can no longer use | 15:08:33 | 19 | something that we were entitled to get. |
| 15:01:27 | 20 | any materials that include the GHM marks. We agreed on | 15:08:36 | 20 | MR. TOKE: Okay. |
| 15:01:29 | 21 | that; okay? | 15:08:44 | 21 | Q. But you said you've seen a copy of an |
| 15:01:31 | 22 | A. Yes. | 15:08:47 | 22 | insurance policy to the Setai before; correct? |
| 15:01:32 | 23 | Q. What about the second part, that GHM cannot | 15:08:49 | 23 | A. Yes. |
| 15:01:34 | 24 | use anything that is owned by the hotels; correct? | 15:08:50 | 24 | Q. Approximately when? |
| 15:01:52 | 25 | A. Yes. | 15:09:09 | 25 | A. Maybe like a year ago. |

| | | | | |
|---|---|---|---|---|
| 15:01:53 | 1 | Q. Okay. | 15:09:10 | 1 | Q. A year ago? Okay. |
| 15:03:20 | 2 | I would like to mark the next document as the next | 15:09:38 | 2 | Let's go to page 00807. It says "Common Policy |
| 15:03:27 | 3 | exhibit in order, which is 41. | 15:09:48 | 3 | Declarations". Do you see in the first box at the bottom |
| 15:03:56 | 4 | (Exhibit 41 marked for identification) | 15:09:53 | 4 | where it says "Policy Period"? |
| 15:04:00 | 5 | While I'm getting the copy for your counsel, you | 15:09:56 | 5 | A. Yes. |
| 15:04:04 | 6 | can start looking at the document, please. | 15:09:57 | 6 | Q. "From 9/24/2010 to 9/24/2011". Is this -- was |
| 15:05:15 | 7 | Ms. Chng, what I've marked as exhibit 41 is a | 15:10:08 | 7 | the policy that you looked at for the same period of time? |
| 15:05:24 | 8 | document that's Bates numbered GHM 00804 all the way to GHM | 15:10:11 | 8 | A. I cannot confirm. |
| 15:05:32 | 9 | 00954. Have you seen this document before? | 15:10:13 | 9 | Q. You can't confirm that. Okay. |
| 15:06:41 | 10 | A. I've seen a similar one. I'm not sure if this | 15:10:14 | 10 | What made you look at a Setai insurance policy a |
| 15:06:44 | 11 | is the one. | 15:10:18 | 11 | year ago? |
| 15:06:46 | 12 | Q. Okay. What have you seen? You said a similar | 15:10:48 | 12 | A. I can't recall exactly why I would take a look |
| 15:06:49 | 13 | one. | 15:10:51 | 13 | at the insurance policy, but I've seen this document before. |
| 15:06:50 | 14 | A. As in the format and the way it looked. If | 15:10:56 | 14 | Q. Do you regularly look at insurance policies of |
| 15:06:55 | 15 | your questions extend to the word and the content, I need to | 15:11:00 | 15 | the hotels under GHM management? |
| 15:07:00 | 16 | look at it. | 15:11:05 | 16 | A. Yes. |
| 15:07:01 | 17 | Q. I understand. But we can agree that this is | 15:11:06 | 17 | Q. You do? Okay. |
| 15:07:06 | 18 | an insurance policy issued to the Setai in Miami; correct? | 15:11:09 | 18 | And is it a requirement from all of the GHM |
| 15:07:11 | 19 | A. Yes. | 15:11:12 | 19 | managed hotels to have an insurance policy in place? |
| 15:07:12 | 20 | Q. Okay. And so you've seen an insurance policy | 15:11:18 | 20 | A. Yes. |
| 15:07:17 | 21 | issued to the Setai Miami before? | 15:11:19 | 21 | Q. And do -- are the hotel properties required to |
| 15:07:21 | 22 | A. Yes. | 15:11:23 | 22 | name GHM as a named insured to those properties -- pardon |
| 15:07:22 | 23 | Q. I can represent that this is a document that | 15:11:34 | 23 | me, to those policies? |
| 15:07:24 | 24 | was produced by GHM in this litigation to us last week. | 15:11:54 | 24 | A. I do not know exactly. Most of these |
| 15:07:32 | 25 | So -- | 15:11:56 | 25 | insurance policies are prior to me joining, so they were |

15:12:00  1   already there.

15:12:01  2        Q. Okay. But you're familiar with all the

15:12:03  3   agreements; right?

15:12:04  4        A. Yes.

15:12:05  5        Q. We talked about that. Okay.

15:12:08  6        Do those agreements require the properties to have

15:12:11  7   insurance in place that also names GHM as an additional

15:12:15  8   insured?

15:12:16  9        A. Yes.

15:12:17  10       Q. Okay. That's what I was asking.

15:12:19  11       And this policy does that too; correct? For

15:12:23  12  example, if you look at GHM 00809, it's a document called

15:12:34  13  "Named Insured Extension Schedule". Do you see that?

15:12:39  14       A. Yes.

15:12:40  15       Q. It names GHM (South Beach), LLC. Also, a

15:12:45  16  little bit further down it puts down GHM Management and

15:12:50  17  General Hotel Management Ltd. Are all those GHM related

15:12:55  18  properties -- I mean companies?

15:13:04  19       A. Yes. GHM Management may not be the full name

15:13:07  20  of the legal entity.

15:13:09  21       Q. It might not actually be a legal entity. Is

15:13:13  22  that what you're saying?

15:13:34  23       It's a "yes" or "no" question.

15:13:43  24       A. No.

15:13:45  25       Q. Okay. So it is the name of a legal entity?

---

15:14:07  1        What I'm asking: Is there a company called GHM

15:14:12  2   Management? Does that exist, that you're aware of?

15:14:22  3        A. No.

15:14:23  4        Q. Okay. How about GHM (South Beach), LLC?

15:14:27  5        A. Yes.

15:14:28  6        Q. Okay. So that's another subsidiary that you

15:14:30  7   didn't name before; correct?

15:14:34  8        MR. SCHWARZ: Objection. Objection. I don't

15:14:36  9   think that's correct.

15:14:38  10       MR. TOKE: I don't think she named it. But that's

15:14:41  11  okay, I'm not --

15:14:43  12       MR. SCHWARZ: I think she did. I think that's one

15:14:45  13  of the contracts. But whatever.

15:14:48  14       BY MR. TOKE:

15:14:49  15       Q. Because I think you testified earlier that it

15:14:52  16  was GHM USA LLC that had the contract with the Setai; right?

15:15:06  17       A. I believe so.

15:15:07  18       Q. Okay. But you're now telling me that GHM

15:15:10  19  (South Beach), LLC -- and South Beach is in parentheses --

15:15:15  20  is an existing company?

15:15:18  21       A. It is.

15:15:18  22       Q. Okay. And do you believe that GHM (South

15:15:21  23  Beach), LLC has some connection to the Setai?

15:15:44  24       A. There would have been a connection between GHM

15:15:46  25  (South Beach) and the Setai.

---

15:15:49  1        Q. Where would that be reflected?

15:15:52  2        A. I believe the GHM (South Beach) would be the

15:15:56  3   entity that is with the Setai, and GHM USA LLC owns GHM

15:16:05  4   (South Beach).

15:16:07  5        Q. Okay. So the contract between -- with the

15:16:11  6   Setai for GHM's management services is actually between GHM

15:16:16  7   (South Beach), LLC and whoever the Setai owners are? Is

15:16:23  8   that what you're saying?

15:16:25  9        A. I believe so.

15:16:26  10       Q. Okay. And then GHM (South Beach) is a

15:16:29  11  wholly-owned subsidiary of GHM USA LLC?

15:16:35  12       A. Yes.

15:16:40  13       Q. And, of course, General Hotel Management Ltd.

15:16:45  14  is the main GHM entity; correct?

15:16:51  15       A. Yes.

15:16:54  16       Q. And do you understand that GHM is being

15:16:58  17  defended in this lawsuit pursuant to this insurance policy?

15:17:13  18       MR. SCHWARZ: Objection to the form, but you can

15:17:22  19  answer. It's okay, you can answer it.

15:17:24  20       A. Yes.

15:17:25  21       BY MR. TOKE:

15:17:26  22       Q. How did you form that understanding?

15:18:10  23       A. Just bear with me for a minute. I'm just

15:18:13  24  trying to think where did I find that understanding.

15:18:52  25       I was told by our attorney.

---

15:18:54  1        Q. Okay. I don't necessarily need to know any

15:18:57  2   more about that. But okay.

15:19:01  3        I'm not asking for any attorney/client privileged

15:19:05  4   material.

15:19:12  5        You said all of the other GHM managed properties

15:19:15  6   are required under their contracts with GHM to have

15:19:18  7   insurance policies that name GHM as additional insureds or

15:19:24  8   an additional insured; correct?

15:19:26  9        A. Yes.

15:19:26  10       Q. Are there any other insurance policies that

15:19:31  11  exist for any of the properties that are subject to these

15:19:33  12  agreements that would apply to the claims against GHM in

15:19:41  13  this case?

15:20:10  14       A. I do not know of any.

15:20:12  15       Q. Okay. So does that mean that there are no

15:20:15  16  other insurance policies that have been issued to any of

15:20:19  17  these other hotels, besides the Setai, that name GHM as an

15:20:24  18  additional insured?

15:20:59  19       A. Would you mind reading out the question again?

15:21:15  20       (Question read back.)

15:21:33  21       A. Sorry, the question before.

15:21:36  22       (Question read back.)

15:21:52  23       A. Like I said, I do not know of any.

15:21:56  24       Q. And then my second question, which you didn't

15:21:58  25  answer -- you can read the question again one more time,

15:22:01  1   please.
15:22:19  2           (Question read back.)
15:22:22  3       A. I need to clarify. In the first question, you
15:22:26  4   said in particular to this case, and in the second question
15:22:30  5   you did not say in particular to this case. So I want to
15:22:35  6   know whether it's particular to this case or in general.
15:22:40  7       Q. Well, the first question was: Are you aware --
15:22:44  8   that's right, that's correct.
15:22:46  9       The first question was, we know that this policy
15:22:50 10   that we're talking about was issued to the Setai and it
15:22:54 11   names GHM as an additional insured; right?
15:22:57 12       A. Yes.
15:22:58 13       Q. And I asked: Are there any other insurance
15:23:02 14   policies issued to any of the other hotels besides the Setai
15:23:07 15   that name GHM as an additional insured, regardless, not to
15:23:13 16   do anything with this case? We know this one exists. Are
15:23:16 17   there any insurance policies for any of the other hotels
15:23:20 18   that name GHM as an additional insured? And you said, "No."
15:23:28 19       A. I'd like to clarify that. I said "No" to any
15:23:32 20   other insurance policies that I know of that is relevant to
15:23:37 21   this case. If I understood the first question I think the
15:23:43 22   key word is "relevant to this case", in the first question.
15:23:47 23       Q. That wasn't my question, no. My question was
15:23:50 24   broader than that.
15:23:51 25       My question was: Are there any other policies,

15:23:54  1   period, that have been issued to any of these other hotels,
15:24:01  2   besides the Setai, that name GHM as an additional insured?
15:24:06  3   Period.
15:24:07  4       A. Is this your first question or your second
15:24:09  5   question?
15:24:12  6       Q. I can reread this again. But I will rephrase
15:24:16  7   it, I will ask it one more time. I do not think there's
15:24:20  8   anything unclear about this question.
15:24:22  9       Besides this policy here issued to the Setai, is
15:24:26 10   there any insurance policy issued to any of the other hotels
15:24:30 11   covered by these agreements that names GHM as an additional
15:24:36 12   insured?
15:24:37 13       A. I do not have a definite answer.
15:24:39 14       Q. Okay. So when you said earlier that "No,"
15:24:44 15   that was an incorrect answer?
15:24:46 16       A. Because in your first question you said "in
15:24:50 17   relevant to this case".
15:24:51 18       Q. I didn't.
15:24:52 19       A. And in your rephrased question, you said "in
15:24:55 20   broad sense". Unless I misunderstood the question. That's
15:24:59 21   why I requested a rereading of the question. And if you
15:25:02 22   would, please, repeat that question again.
15:25:05 23       MR. SCHWARZ: I'm just going to object, because
15:25:07 24   you made a mistake when you said that she -- what she said.
15:25:12 25   Her answers were exactly correct. I think you

15:25:15  1   misinterpreted what she said with respect to the first and
15:25:18  2   second question.
15:25:19  3       Just to try to clear it up, I think the answer is
15:25:21  4   very clear that there were no other insurance policies that
15:25:27  5   would have pertained to the claims in this particular case.
15:25:32  6   That's what she was referring to. Am I correct?
15:25:37  7       A. Yes, because I -- I heard the words "in this
15:25:43  8   case," unless I kind of like misunderstood. That's why
15:25:48  9   I requested for you to read.
15:25:51 10       MR. TOKE: I think that was my second question.
15:25:53 11   But okay.
15:25:53 12       MR. SCHWARZ: No, it wasn't actually. The second
15:25:55 13   question was the broader one.
15:25:57 14       MR. TOKE: No, the second question --
15:25:58 15       MR. SCHWARZ: Okay, then let's not confuse each
15:25:59 16   other. If you want to start all over again, rather than
15:26:03 17   have a fight.
15:26:04 18       BY MR. TOKE:
15:26:04 19       Q. Okay. So the first question is broad. It
15:26:06 20   doesn't have anything to do with this case, it's just about
15:26:11 21   insurance.
15:26:12 22       So, besides this policy here, is there any other
15:26:16 23   insurance policy issued to any of these other hotel
15:26:19 24   properties that names GHM as an additional insured?
15:26:22 25       A. I have no definite answer.

15:26:25  1       Q. Okay. And that's fine. Okay.
15:26:28  2       Next question, which is narrower, which is: As to
15:26:32  3   the claims made against GHM in this case, then are you
15:26:40  4   telling me that you are aware of no policy issued to any of
15:26:45  5   these hotels, besides the Setai, that would cover any of the
15:26:51  6   claims made against GHM in this case?
15:26:57  7       A. That's correct.
15:26:58  8       Q. Okay. So you're aware of no other policy.
15:27:00  9   Fine. That's all I was asking.
15:27:07 10       Let's stop for a moment and start again.
15:27:12 11       Can we take a five-minute break.
15:27:19 12       VIDEOGRAPHER: This marks the end of tape number 4
15:27:21 13   in the deposition of Monica Chng. The time is 3:27 p.m.
15:27:27 14       (3:27 p.m.)
15:27:29 15           (Recess taken.)
15:27:27 16       (3:48 p.m.)
15:47:59 17       VIDEOGRAPHER: Back on the record. Here begins
15:48:02 18   tape number 5 in the deposition of Monica Chng. The time is
15:48:07 19   3:48 p.m.
15:48:14 20       BY MR. TOKE:
15:48:15 21       Q. Ms. Chng, we're back on the record. Earlier
15:48:28 22   on in your testimony today you talked about the people that
15:48:31 23   are still at GHM that were at GHM at the time that Wave was
15:48:40 24   providing marketing collateral for various GHM managed
15:48:44 25   properties between 2000 and 2007.

15:48:46  1    Do you remember that testimony?

15:48:49  2    A. Yes. I would like just to add a little.

15:48:52  3    I said they were there before 2007 but I'm not sure if it's

15:48:58  4    2000 to 2007.

15:48:59  5    Q. Understood. I'm not saying that they were

15:49:01  6    there that entire period, but at some point between 2000 and

15:49:07  7    2007 they were there?

15:49:08  8    A. Yes.

15:49:09  9    Q. Okay. I'm just asking if you remember that

15:49:11  10    testimony.

15:49:12  11    You testified that, for example, Ms. Sheladina

15:49:17  12    Joseph, the CRM executive, probably didn't have much

15:49:21  13    interaction with Wave, if any; correct?

15:49:26  14    A. Yes.

15:49:31  15    Q. You also testified that you thought Mr. Jenni,

15:49:35  16    the president of GHM, also probably didn't have very much

15:49:39  17    contact with Wave; is that correct?

15:49:42  18    A. That's correct.

15:49:42  19    Q. How about Pamela Tan?

15:49:48  20    A. It would be minimal.

15:49:49  21    Q. Alvin Fong?

15:49:52  22    A. Minimal.

15:49:53  23    Q. Probably really minimal because he was the

15:49:57  24    assistant to Pamela Tan. If Pamela Tan didn't have much

15:50:03  25    contact with Wave, Mr. Fong, her assistant, probably had

15:50:07  1    even less; is that right?

15:50:08  2    A. Reasonable to say that.

15:50:10  3    Q. Reasonable. Right. How about Kendall Oei?

15:50:14  4    A. I can't make an answer to that because he --

15:50:17  5    I mean, he didn't overlap in time.

15:50:25  6    Q. Okay. Okay. How about Mr. Ohletz?

15:50:36  7    A. He's the primary person that works with Wave.

15:50:39  8    Q. Okay. So with Kendall, Mr. Oei, you just

15:50:44  9    don't know?

15:50:44  10    A. I don't know.

15:50:46  11    (Exhibit 42 marked for identification)

15:50:49  12    Q. Okay. I would like to mark next in order --

15:51:13  13    Ms. Chng, what's been marked as exhibit 42 is a document

15:52:09  14    entitled "Settlement Agreement" between The Wave Studio

15:52:15  15    Pte Ltd and General Hotel Management (Singapore) Pte Ltd.

15:52:19  16    Do you see this document?

15:52:21  17    A. Yes.

15:52:21  18    Q. Are you familiar with this document?

15:52:23  19    A. Yes.

15:52:24  20    Q. How are you familiar with this document?

15:52:33  21    A. I was with GHM at this time.

15:52:37  22    Q. Okay. Were you involved in the negotiation of

15:52:39  23    this document on behalf of GHM?

15:52:41  24    A. Yes.

15:52:44  25    Q. When was the last time you reviewed this

15:52:46  1    document?

15:52:51  2    A. I can't remember. Some time ago.

15:52:56  3    Q. Before this litigation began? The last couple

15:53:01  4    of years?

15:53:04  5    A. Yes, that would be.

15:53:06  6    Q. Okay. Can you characterize, do you have a

15:53:12  7    recollection of what this litigation was about?

15:53:21  8    A. This was about Wave Studio Pte Ltd asking for

15:53:28  9    payment.

15:53:30  10    Q. Payment of what?

15:53:34  11    A. Payment of what they believe that GHM

15:53:38  12    Singapore owes to them.

15:53:41  13    Q. Okay. And for what did they -- for what

15:53:48  14    service or goods did Wave Studio Pte Ltd claim GHM Singapore

15:53:53  15    Pte Ltd owed them?

15:53:57  16    A. This is like four and a half years ago. I do

15:54:00  17    not recollect details like that. In broad sense, they came

15:54:06  18    to us claiming monies that they think we owe to them.

15:54:11  19    Q. And did GHM believe that it owed that money to

15:54:14  20    the Wave?

15:54:17  21    A. Again, going to details of how this was being

15:54:21  22    settled or why it's arise and how it was settled, I have no

15:54:25  23    full recollection of the details.

15:54:28  24    Q. Right. My question was much more narrow.

15:54:31  25    Could you repeat that question, please?

15:54:41  1    (Question read back.)

15:54:43  2    A. Like I said, I don't recollect details to

15:54:45  3    that.

15:54:46  4    Q. So you don't recall whether GHM agreed or

15:54:50  5    disagreed with the Wave as to whether it owed the money?

15:54:53  6    A. The question was whether we believed we owed

15:54:55  7    the money. It wasn't whether we agreed we owed the money.

15:55:00  8    Q. Right.

15:55:01  9    A. To agree or not agree, I believe the

15:55:04  10    settlement agreement reached was signed dated on 6 April,

15:55:09  11    says it all.

15:55:14  12    Q. Okay. Well let's use the word "agree".

15:55:17  13    Did GHM agree that it owed the money that Wave

15:55:21  14    claimed to Wave?

15:55:33  15    A. If my recollection is correct, I don't think

15:55:36  16    we agree. That's why a defense was filed. Mediation was

15:55:43  17    carried out. A settlement agreement arose from that.

15:55:52  18    Q. Okay. That's fine. And this is that

15:55:55  19    settlement agreement?

15:55:56  20    A. This is it. Probably looks like it.

15:56:05  21    Q. Well, let's see.

15:56:12  22    If you look at the last page, which is Bates

15:56:14  23    labeled GHM 01177, there is a signature on behalf of GHM.

15:56:20  24    Do you recognize this signature?

15:56:22  25    A. Yes, of course.

15:56:23  1    Q. Whose is it?

15:56:24  2    A. That's me.

15:56:25  3    Q. That's you. Okay. So, you did sign this

15:56:27  4  agreement?

15:56:28  5    A. I did.

15:56:29  6    Q. Okay. Now, let's look at the agreement.

15:56:49  7  Let's look at the page labeled page 1, which is Bates

15:56:53  8  labeled GHM 01172. It says:

15:56:59  9    "THIS SETTLEMENT AGREEMENT is made on the 6th day

15:57:01  10  of April 2011.

15:57:02  11    BETWEEN:

15:57:03  12    (1) The Wave Studio Pte Ltd ...

15:57:04  13    AND

15:57:05  14    GENERAL HOTEL MANAGEMENT (SINGAPORE) PTE LTD ..."

15:57:11  15    Let's take a look at the whereas clauses. It

15:57:15  16  says:

15:57:17  17    "(A) Wave and GHM have had a business

15:57:19  18  relationship in which disputes have arisen."

15:57:22  19    Agreed?

15:57:23  20    A. Yes.

15:57:24  21    Q. Okay:

15:57:26  22    "(B) On or about 9 June 2010, Wave commenced the

15:57:30  23  legal proceedings in MC Suit No. 14699 of 2010/V [which is

15:57:38  24  defined as MC Suit No. 14699] in relation to certain

15:57:43  25  invoices issued by Wave to GHM for the sums of S$35,850.00

---

15:59:19  1    A. "MC Suit No. 14699 means the proceedings

15:59:22  2  commenced in the Subordinate Courts, Singapore by way of MC

15:59:26  3  Suit No. 14699 of 2010/V relating to Wave's invoice nos.

15:59:34  4  90524, 90694, 90746, 90750, 90751, 90747, 90711, 90714,

15:59:50  5  90722, 90530, 90666 and 90709 ..."

16:00:03  6    Q. Okay. So we can agree that MC Suit 14699,

16:00:07  7  which led to this settlement agreement, covered these

16:00:10  8  invoices that Wave was seeking payment for; correct?

16:00:14  9    A. Yes.

16:00:14  10    Q. Okay. Let's look at "Dispute". Please read

16:00:18  11  the definition of "Dispute", which is right under the

16:00:24  12  definition of MC Suit No. 14699?

16:00:24  13    A. "Dispute means the disputes set out in MC Suit

16:00:26  14  No. 14699 relating to and/or arising from the non-payment of

16:00:34  15  invoices issued by Wave in the course of the business

16:00:42  16  relationship between GHM and Wave which remain outstanding

16:00:45  17  as at 9 June 2010."

16:00:48  18    Q. Okay. So can we agree the dispute then means

16:00:53  19  the dispute between GHM and Wave for nonpayment of invoices

16:00:57  20  that are listed in the definition of MC Suit No. 14699?

16:01:11  21    A. I'm reading off the agreement. So that's what

16:01:14  22  it says there.

16:01:15  23    Q. That's what it says; correct?

16:01:16  24    A. Mm-hm.

16:01:17  25    Q. So, it says the dispute is limited to the

---

15:57:49  1  and US$12,618.01, interest on the said sums and interest on

15:58:01  2  the sum of S$4,230.00 which GHM had made payment for on

15:58:07  3  21 July 2009 except the interest accrued on such sum since

15:58:13  4  its accrual."

15:58:15  5    Accurate that I read that correctly; yes?

15:58:16  6    A. You have read that correctly.

15:58:18  7    Q. "GHM has filed a defense to MC Suit No.

15:58:21  8  14699."

15:58:22  9    Correct?

15:58:25  10    A. A defense to the MC Suit No. 14699.

15:58:29  11    Q. Yes, a defense to MC Suit No. 14699.

15:58:34  12    Finally, the whereas clause (D):

15:58:36  13    "Parties are desirous of settling MC Suit No.

15:58:40  14  14699 and the Dispute in accordance with and subject to the

15:58:44  15  terms and conditions set out in this Settlement Agreement,

15:58:45  16  and without admission of liability."

15:58:48  17    Correct?

15:58:50  18    A. Yes, correct.

15:58:52  19    Q. Okay. Let's take a look at -- can you read on

15:58:58  20  page 2, Bates labeled GHM 01173, what is the definition of

15:59:05  21  MC Suit No. 14699?

15:59:11  22    MR. SCHWARZ: I'm sorry, where is it?

15:59:14  23    MR. TOKE: At the top of the page.

15:59:16  24    MR. SCHWARZ: Okay.

15:59:17  25    MR. TOKE: You can read that, please.

---

16:01:19  1  invoices that are listed in the definition of MC Suit

16:01:25  2  No. 14699; correct?

16:01:30  3    A. I'm not sure if it's limited to, but it says

16:01:33  4  what it says there.

16:01:34  5    Q. Okay. What is your understanding of what

16:01:35  6  "Dispute" means, then?

16:01:37  7    A. Exactly what I've read out.

16:01:41  8    Q. Okay. I'm asking you to interpret it for me

16:01:44  9  so that you can tell me, because you're telling -- the way

16:01:48  10  I read this, it tells me that the dispute that is the

16:01:51  11  subject of this settlement agreement is the dispute between

16:01:56  12  GHM and Wave as to what's set forth in MC Suit No. 14699,

16:02:06  13  which is limited to the invoices listed in the definition to

16:02:11  14  MC Suit No. 14699. That's the way I read this. Do you read

16:02:15  15  it the same way?

16:02:18  16    A. I read it the same way, with the exception

16:02:21  17  I don't read the word "limited" anywhere.

16:02:24  18    Q. I didn't say that. I'm just saying that

16:02:30  19  I understand these two definitions together to mean that

16:02:33  20  "Dispute" is limited to the dispute between GHM and Wave set

16:02:40  21  forth in MC Suit No. 14699, which covers only the invoices

16:02:48  22  listed in the definition of MC Suit No. 14699.

16:02:54  23    MR. SCHWARZ: Objection. There's no question.

16:02:55  24  You haven't stated a question.

16:02:59  25    MR. TOKE: Read it back, please.

16:03:27  1          (Question read back.)

16:03:30  2          BY MR. TOKE:

16:03:30  3          Q.  With my reading of this, do you understand

16:03:33  4   these two definitions to mean how I read them?

16:03:40  5          MR. SCHWARZ:  Objection to the form of the

16:03:41  6   question.  You can answer it if you want.

16:03:47  7          A.  The way I understood these two paragraphs,

16:03:50  8   these definitions of both "MC Suit No. 14699" and "Dispute"

16:03:55  9   is exactly what I read out.  MC Suit 14699 is related to

16:04:05 10   invoices numbers whatever is listed there.

16:04:08 11          BY MR. TOKE:

16:04:08 12          Q.  And the dispute?

16:04:09 13          A.  "Dispute" means the dispute set out in the

16:04:12 14   aforesaid paragraph in relation to nonpayment of the

16:04:15 15   invoices that were issued by Wave and still outstanding as

16:04:19 16   at 9 June 2010.

16:04:21 17          Q.  Right.  And those invoices are the ones listed

16:04:24 18   in MC Suit No. 14699; correct?

16:04:29 19          A.  Correct.

16:04:42 20          Q.  Let's go to -- let's read.

16:04:58 21          You just said that's correct, which is reinforced

16:05:00 22   by section 2.2, if you'll take a look at that, on GHM 01174.

16:05:09 23          MR. SCHWARZ:  I'm going to object.  You're just

16:05:12 24   categorizing things.  You're not asking questions.

16:05:16 25          MR. TOKE:  I was about to.

16:06:49  1          Well, actually, I'll rephrase that.

16:06:51  2          What is your understanding of what section 2.2

16:06:53  3   says?

16:06:59  4          A.  My understanding of 2.2 says that this

16:07:06  5   settlement is full and final settlement.  That's what 2.2

16:07:12  6   tells me.

16:07:13  7          Q.  Between GHM and Wave, in full and final

16:07:20  8   settlement of MC Suit No. 14699; correct?

16:07:24  9          A.  Yes.

16:07:25 10          Q.  And, as we've looked at, the definition of MC

16:07:29 11   Suit 14699 is the proceedings commenced for -- relating to

16:07:35 12   Wave's invoices set forth here?

16:07:38 13          A.  Yes.

16:07:40 14          Q.  Okay.  So 2.2 confirms that this settlement

16:07:46 15   embodied by this agreement is to cover those invoices listed

16:07:52 16   in the definition of Suit 14699; correct?

16:08:05 17          A.  I would rephrase it.

16:08:06 18          Q.  Okay.

16:08:07 19          A.  That 2.2 is full and final settlement of the

16:08:11 20   invoices listed in MC Suit No. 14699.

16:08:15 21          Q.  Okay.  And that's all that's covered by this

16:08:18 22   settlement agreement.  Correct?

16:08:26 23          MR. SCHWARZ:  Objection, calls for a legal

16:08:28 24   conclusion.  But you can answer.

         25

16:05:18  1          MR. SCHWARZ:  But you shouldn't then -- objection

16:05:21  2   to the form of the question.  You're making an introductory

16:05:25  3   assessment that's not part of the question.  It's unfair.

16:05:29  4          MR. TOKE:  Fair enough.  Let's take a look at

16:05:30  5   section 2.2:

16:05:32  6          "Both Wave and GHM confirm and agree that this is

16:05:33  7   a full and final settlement of MC Suit No. 14699 each

16:05:34  8   between them and that there are no other outstanding

16:05:37  9   invoices due and owing GHM to Wave as of 9 June 2010."

16:05:43 10          Do you see that paragraph?

16:05:44 11          A.  Yes.

16:05:45 12          Q.  And I read that accurately; correct?

16:05:46 13          A.  Yes.

16:05:47 14          Q.  So, again, when you look at the definition of

16:05:49 15   "Dispute", it says that the dispute is the dispute set out

16:05:54 16   between the two parties in MC Suit No. 14699 relating to

16:06:00 17   invoices that remain outstanding as of June 9, 2010.

16:06:06 18          So, all I'm saying is that reinforces what you had

16:06:10 19   already said is correct, that the dispute is limited to

16:06:13 20   those invoices set forth in MC Suit No. 14699 and which are

16:06:20 21   set forth specifically in the definition of MC Suit No.

16:06:26 22   14699; correct?

16:06:28 23          A.  I don't get your question.

16:06:29 24          Q.  That's okay.  Never mind.  It's okay.

16:06:32 25          I can -- I'll rephrase it.  But we'll get there.

16:08:31  1          BY MR. TOKE:

16:08:32  2          Q.  That's your understanding of what section 2.2

16:08:34  3   means?

16:08:35  4          A.  To the best of my understanding, yes.

16:08:46  5          Q.  Let's look at paragraph 5 on page 3 of Bates

16:08:50  6   label GHM 01174, which is entitled "Entire Agreement":

16:09:04  7          "This Settlement Agreement contains the entire

16:09:06  8   agreement between the Parties as to their subject matter and

16:09:09  9   any previous agreements, understandings and negotiations on

16:09:12 10   that subject matter cease to have any effect."

16:09:15 11          So this is the only document to deal with the

16:09:17 12   settlement of MC Suit No. 14699; isn't that correct?

16:09:25 13          A.  Yes, to the best of my knowledge, yes.

16:09:52 14          Q.  Let's look at section 2.1 on page 2, which is

16:09:56 15   Bates labeled GHM 01173.

16:10:00 16          A.  Okay.

16:10:02 17          Q.  You agreed, before I asked my question about

16:10:05 18   2.1, that GHM made some payments, the payment of money, to

16:10:24 19   Wave in settlement of this case; correct?

16:10:24 20          A.  Yes.

16:10:25 21          Q.  And that's the settlement amount that's set

16:10:27 22   forth, that's mentioned in section 2.1 and defined in

16:10:34 23   section 1.1?  Yes?

16:10:51 24          A.  I didn't get the question.

16:10:52 25          Q.  That's okay.  I'll rephrase it.

16:10:55  1    So if you look in section 1.1, we can agree that
16:11:02  2  GHM paid some money to settle this case; correct?
16:11:05  3    A. Yes.
16:11:06  4    Q. And that settlement amount, the amount that
16:11:08  5  was paid, is defined in section 1.1, where it says
16:11:12  6  "Settlement Amount", is that correct?  You can read the
16:11:17  7  section to confirm.
16:11:18  8    A. "Settlement Amount means the aggregated sum of
16:11:22  9  S$28,055.16 and US$13,898.37 to be paid by GHM to Wave in
16:11:32 10  accordance with the terms of this Settlement Agreement."
16:11:36 11    Q. Okay.  So that's the amount that GHM paid to
16:11:39 12  settle this case; right?
16:11:40 13    A. Yes.
16:11:41 14    Q. Okay.  So now let's look at 2.1:
16:11:45 15    "In consideration of the payment of the Settlement
16:11:47 16  Amount [the amount that GHM paid to settle the case] by GHM
16:11:50 17  to Wave, Wave, with effect from and subject to Completion
16:11:55 18  [which is defined and we can talk about more in a moment],
16:11:58 19  and not otherwise, unconditionally and irrevocably waives,
16:12:04 20  releases and discharges GHM from all Claims in the Dispute
16:12:07 21  and MC Suit No. 14699."
16:12:12 22    Do you see that?
16:12:14 23    A. Yes.
16:12:15 24    Q. What did this -- so this paragraph means that
16:12:19 25  in exchange for the settlement amount, Wave releases and

16:16:28  1    A. That the hotels paid Wave for the job and they
16:16:37  2  have the copyright.
16:16:41  3    Q. And did anyone -- you weren't there at GHM
16:16:45  4  when Wave was working with these hotels managed by GHM;
16:16:56  5  correct?
16:16:56  6    A. I was not with GHM prior to June 2008.
16:17:00  7    Q. Right.  And I can represent to you that by
16:17:05  8  2007 Wave was no longer doing any work for any of the
16:17:09  9  properties managed that are covered in these agreements
16:17:15 10  here.  I can make that representation to you.
16:17:17 11    So, I'll ask again: You were not at GHM when Wave
16:17:23 12  was working with these properties in providing various
16:17:28 13  marketing collateral; correct?
16:17:30 14    A. That's correct.
16:17:30 15    Q. Okay.  So you must have come up with this
16:17:35 16  understanding that the hotels own the copyrights to these
16:17:39 17  photographs some time after Wave stopped working for these
16:17:44 18  hotels; correct?
16:17:44 19    A. Yes.
16:17:45 20    Q. Okay.  About when did you gain that
16:17:48 21  understanding?
16:18:41 22    A. I would like to say that I've always had that
16:18:45 23  understanding.
16:18:46 24    Q. So, from the moment you got to GHM in June
16:18:48 25  2008 you understood that the hotels owned the copyrights to

16:12:30  1  discharges GHM from any claims in the dispute as defined in
16:12:37  2  the agreement and MC Suit No. 14699 as defined in the
16:12:42  3  agreement; correct?
16:12:43  4    A. Yes.
16:12:43  5    Q. And that means that Wave is waiving, releasing
16:12:47  6  and discharging any claims against GHM with regard to
16:12:53  7  nonpayment of the invoices listed in MC Suit No. 14699;
16:12:58  8  correct?
16:12:59  9    A. Yes.
16:13:15 10    Q. Is there anything else that you believe that
16:13:17 11  this release covers, besides the dispute as it's defined,
16:13:26 12  which only covers the invoices listed in MC Suit No. 14699?
16:13:34 13    A. I don't understand your question.
16:13:35 14    Q. I'm just asking.  So the only thing covered by
16:13:40 15  paragraph 2.1 are claims against GHM for nonpayment of the
16:13:46 16  invoices listed in MC suit 14699.  That's the only thing
16:13:50 17  that's covered by paragraph 2.1; correct?
16:14:28 18    A. Yes.
16:15:43 19    Q. You testified earlier that it was your
16:15:46 20  understanding that the ownership of the copyrights to any
16:15:52 21  photographs that were created by Wave with respect to any of
16:15:56 22  the properties covered by the agreements here were owned by
16:16:01 23  the hotels themselves; correct?
16:16:03 24    A. Yes.
16:16:05 25    Q. Where did you form that understanding?

16:18:55  1  the photographs that Wave created for use in marketing
16:19:01  2  collateral for these properties?
16:19:02  3    A. I'd like to rephrase that.
16:19:05  4    Q. Okay.
16:19:08  5    A. Any time after my joining of GHM, through
16:19:14  6  books records, through interaction on a daily basis, if I'm
16:19:18  7  in the office with my colleagues, I have the understanding
16:19:24  8  that the work produced for the hotel paid by the hotel is
16:19:31  9  owned by the hotel.
16:19:32 10    Q. So that's from the time that you got to GHM to
16:19:37 11  the present?
16:19:40 12    A. I'm not sure if you are talking about the
16:19:43 13  present as in your question, because you said Wave, and Wave
16:19:47 14  is not present in my books now.
16:19:51 15    Q. That was not my question.  I was asking about
16:19:54 16  Wave before.  Let's reread my question, please.
16:20:03 17    (Question read back.)
16:20:07 18    BY MR. TOKE:
16:20:07 19    Q. Let me rephrase the question.
16:20:09 20    So, from the time that you got to GHM in June 2008
16:20:12 21  to the present, you understand, or you understood, that any
16:20:24 22  photographs or marketing materials created for any of the
16:20:27 23  hotels managed by GHM but paid for by the hotels is owned by
16:20:31 24  the hotels?
16:20:32 25    A. I would like to clarify.

Q. Okay.

A. Earlier you said, was it photos or was it marketing materials?

Q. In this question I asked both. But is it different for the two?

A. I just want to clarify.

Q. In this question I asked for both. Because your answer before, you did not -- you did not limit it to photographs. You said if the hotels paid for it and it was made for the hotels, it's owned by the hotel. So I was just mirroring what you said.

If you're telling me that the rule is different in your understanding between photographs and other marketing materials, I'd like to know that.

A. Can I ask for a read-out of the question, please.

(Question read back.)

A. So I go back to this question where you ask, you are asking about the photographs that was made by Wave that are used in marketing collaterals. That's where then I said that it's the hotel who paid for it and hence it's my understanding that they owned the copyright. So I just want to set the record correct, that you did not -- that the first question which I gave my answer, it was specific to photographs.

Q. Okay, that's fine. But I can ask whatever question I want. So I was asking beyond that. But okay.

So, let's -- so your understanding was that the photographs created by Wave that were used in marketing collateral for the various hotels involved here, managed by GHM, were owned by the hotels themselves?

A. The photographs?

Q. Yes.

A. Yes.

Q. Okay. And what is the basis for that understanding?

MR. SCHWARZ: I'm going to object for attorney/client privilege to anything that you discussed with lawyers, you can't talk about.

MR. TOKE: She can if she wants.

MR. SCHWARZ: Right. And I'm instructing you not to.

MR. TOKE: Okay. And that's noted on the record; right?

COURT REPORTER: Yes.

BY MR. TOKE:

Q. Okay. Go ahead.

Other than what an attorney might have told you in terms of advice, where did you get the understanding that Wave -- pardon me, that the hotels owned the copyrights to

any of the photographs that were used in marketing materials for the hotels managed by GHM in this case?

A. The hotels paid for it. My understanding is that they owned the copyright to it.

Q. I understand that. I asked, where did you get that understanding? Did you just -- where did you get that understanding, other than from a lawyer?

A. I think I said before, from talking with my peers.

Q. Okay. So, your peers gave you that understanding, that the photographs that Wave created for use in marketing materials for these various hotels were owned by the hotels?

A. Yes.

Q. Who told you that?

A. Mr. Ohletz.

Q. So Mr. Ohletz told you. Okay. When did Mr. Ohletz tell you that?

A. I don't have a specific timing as to when he told me that. The understanding is such.

Q. Okay. You have no specific understanding. Give me an approximate.

A. I would say during the course of my work, any time after I'm with GHM.

Q. Okay. And Mr. Ohletz left GHM in about 2010; correct?

A. I can't remember the exact time. I said before, I believe it's in 2010.

Q. Okay. Let's say it's in 2010. So, you're telling me that Mr. Ohletz told you on some occasion between June 2008 when you joined GHM and some time in 2010 when he left GHM, some time in that one and a half year to two-year period, he told you that the ownership of the copyrights to the photographs created by Wave for use in marketing collateral with various properties, hotel properties, involved in this lawsuit were owned by the hotels?

MR. SCHWARZ: Objection. That's not what she said. You have totally mischaracterized her specific testimony.

MR. TOKE: I'm asking her if that's what she said.

MR. SCHWARZ: Oh. Then I object to the form of the question. It's an improper question to ask somebody to repeat what they said. If you're really interested in it, then you should ask the reporter to read back what she said.

MR. TOKE: Read back what she said? No, I'm trying to clarify. I'm trying to understand what you said.

Q. Am I correct in saying that what you've testified now is that some time between the time that you

16:28:53  1   got to GHM in June 2008 and the time that Mr. Ohletz left
16:28:57  2   GHM in 2010, Mr. Ohletz told you that the copyright to the
16:29:06  3   photographs used in marketing collateral for these various
16:29:10  4   hotel properties managed by GHM that were created by Wave
16:29:15  5   were owned by the hotels?
16:29:27  6       A. That was not exactly what I said.
16:29:29  7       Q. Okay. What did you say?
16:29:30  8       A. I said the understanding was from talking to
16:29:32  9   the people I worked with.
16:29:34  10      Q. Right. And you testified that that person was
16:29:36  11  Mr. Ohletz.
16:29:38  12      A. Yes.
16:29:39  13      Q. Okay.
16:29:41  14      MR. SCHWARZ: I object to the form. She didn't
16:29:43  15  say only Mr. Ohletz.
16:29:45  16      MR. TOKE: That's fine.
16:29:47  17      Q. Were there any other people? I tell you what,
16:29:50  18  let's do that. Why don't you list all the people, all the
16:29:53  19  peers of yours, that have told you that understanding, that
16:29:58  20  the hotels own the copyrights to the photographs created by
16:30:00  21  Wave?
16:30:02  22      A. No, I don't think this is a possible question
16:30:05  23  to answer because I don't walk around making a list of names
16:30:13  24  and subject titles of what people tell me over the past
16:30:19  25  eight years.

16:30:20  1       So I made it clear that it's during the course of
16:30:23  2   my work that I had this understanding and one main person
16:30:30  3   who has given me the understanding -- I did not say he told
16:30:34  4   me -- is Mr. Ohletz. But to answer your question, I do not
16:30:41  5   make a list of names and topics, subjects, of what people
16:30:49  6   tell me, talk to me, over the past eight years that I'm with
16:30:53  7   GHM.
16:30:54  8       Q. Okay.
16:30:55  9       A. Henceforth, I do not think I have an answer to
16:30:59  10  the second part of your question.
16:31:01  11      Q. So your testimony is that at some point, from
16:31:05  12  someone you can't recall, or more than one person at GHM
16:31:12  13  over the course of your seven years there, told you that the
16:31:17  14  copyrights to Wave's photographs were owned by the hotels,
16:31:21  15  but you can't recall whom?
16:31:24  16      A. That's incorrect.
16:31:26  17      Q. Okay.
16:31:27  18      A. My testimony is that during the course of my
16:31:30  19  work, since I started with GHM in 2008, I have the
16:31:37  20  understanding from my interaction with my peers that I have
16:31:44  21  this understanding.
16:31:46  22      Q. That the hotels own the copyrights to the
16:31:52  23  photographs created by Wave that were used in the marketing
16:31:55  24  materials for these various hotel properties?
16:31:57  25      A. Yes.

16:31:58  1       Q. Okay. Was there any -- were there documents
16:32:08  2   that they talked to you about, that supported that view?
16:32:24  3       A. I can't recall offhand.
16:32:26  4       Q. Have you reviewed any of the contractual
16:32:32  5   documents related to the photographs that Wave created for
16:32:37  6   use in marketing collateral for these various hotels?
16:32:46  7       A. I wasn't there.
16:32:47  8       Q. Different question. Can you read back the
16:32:49  9   question, please?
16:33:01  10      (Question read back.)
16:33:04  11      A. What contractual documents?
16:33:07  12      Q. Well, let's go -- let's break that down.
16:33:10  13      Do you have any understanding of what contractual
16:33:14  14  documents or what documents at all exist between Wave and
16:33:18  15  the hotels or GHM related to any of the photographs that
16:33:23  16  were created by Wave for any of the hotels?
16:33:34  17      A. Could you read the question?
16:33:52  18      (Question read back.)
16:34:07  19      I know there is a production estimate.
16:34:11  20      Q. Okay. So there's a production estimate.
16:34:13  21  Would there usually be an invoice after that?
16:34:23  22      A. I'm not sure if it's after that or whatever
16:34:29  23  point in time. To answer your point, I've seen invoices
16:34:33  24  from Wave, we spoke about that.
16:34:37  25      Q. Okay. So there would be the production

16:34:39  1   estimate, there would be an invoice at some point. Any
16:34:42  2   other documents that would relate to the creation of
16:34:46  3   photographs that would be used in marketing collateral for
16:34:49  4   the hotels?
16:34:58  5       A. I'm not sure.
16:34:59  6       Q. You don't know?
16:35:01  7       A. I'm not sure.
16:35:03  8       Q. What I'm saying is, do you know? If you don't
16:35:05  9   know, that's okay, say you don't know.
16:35:09  10      A. I don't know.
16:35:10  11      Q. Okay.
16:35:12  12      And would you agree that if those documents stated
16:35:23  13  something other than the hotels owned the copyrights to the
16:35:27  14  photographs, that that would be contradictory to your
16:35:31  15  understanding that the hotels owned the copyrights to the
16:35:37  16  photographs?
16:35:40  17      MR. SCHWARZ: Objection to the form of the
16:35:40  18  question.
16:35:41  19      BY MR. TOKE:
16:35:42  20      Q. But go ahead.
16:35:43  21      A. I don't think I will be in a position to give
16:35:44  22  an answer to that, given that I'm not there when the
16:35:48  23  document is created.
16:35:49  24      Q. Okay. So you can't -- you don't know really
16:35:52  25  because you weren't there?

16:35:56  1    A. I said I cannot cast an opinion because I was
16:35:59  2  not there when the document was created.
16:36:01  3    Q. Okay. So, let's go back to you testified that
16:36:05  4  over the time that you've been at GHM you somehow came to
16:36:11  5  the conclusion or understanding that the copyright to the
16:36:14  6  photographs created by Wave were owned by the hotels, but
16:36:22  7  you can't recall exactly who might have told you that, with
16:36:28  8  the exception of Mr. Ohletz; correct?
16:36:31  9    MR. SCHWARZ: Or the lawyers.
16:36:32  10    MR. TOKE: Or the lawyers. The lawyers. That's
16:36:34  11  fine.
16:36:36  12    A. I did not say I was told that by anybody.
16:36:42  13    Q. Sure you did. You said Mr. Ohletz told you,
16:36:44  14  because I asked you which of your peers would have told you
16:36:47  15  that, and you said Mr. Ohletz.
16:36:49  16    A. I said, in the course of my work since
16:36:52  17  I joined in 2008, they were in the course of my work and my
16:36:54  18  interaction with my peers, this is the understanding that
16:37:00  19  I get.
16:37:01  20    Q. Right. But you must have gotten it somehow,
16:37:03  21  right? Because no one is going to look at you in the eye
16:37:07  22  and not say anything and you somehow understand this.
16:37:10  23  Right? There's got to be some sort of communication that
16:37:17  24  tells you that; right?
16:37:20  25    MR. SCHWARZ: Objection. That was four questions.

16:37:22  1  BY MR. TOKE:
16:37:22  2    Q. There's got to be some form of communication
16:37:24  3  between your peers and you to convey that understanding;
16:37:28  4  correct?
16:37:57  5    A. Like I said, in the interaction during the
16:38:01  6  course of work, I derived that understanding.
16:38:05  7    Q. Right. So, by interaction, what do you mean
16:38:07  8  by interaction? People saying stuff to you; right?
16:38:26  9    A. Interaction could be someone saying stuff to
16:38:29  10  me, but not limited to just that.
16:38:32  11    Q. What else could it be?
16:38:34  12    A. It was in the course of my work.
16:38:36  13    Q. What else could it be?
16:39:04  14    A. No, like I said, they paid for the photos, so
16:39:08  15  they have the right to use the photos.
16:39:12  16    Q. So -- right, I understand that you've said
16:39:16  17  that. But there's an underlying understanding of if you pay
16:39:23  18  for the photos you have the right to the photos, that you
16:39:26  19  own the copyrights to the photos. Where did that
16:39:29  20  understanding come from?
16:39:32  21    MR. SCHWARZ: I think she -- objection. She said
16:39:35  22  if you pay for it you own it. I don't know how many times
16:39:40  23  she can say that.
16:39:42  24    MR. TOKE: She's not said that. I mean --
16:39:44  25    MR. SCHWARZ: She's said it 10 times.

16:39:47  1    MR. TOKE: That's your --
16:39:47  2    Q. But what I'm asking is, I'm asking
16:39:51  3  specifically with Wave. You have testified that over the
16:39:53  4  course of your period of time in interactions with your
16:39:56  5  peers that you came to understand that the copyrights to the
16:39:59  6  photographs created by Wave for use in marketing collaterals
16:40:05  7  with these hotels were owned by the hotels.
16:40:09  8    MR. SCHWARZ: Now, I'm going to object because
16:40:10  9  this is the problem with saying that this is her testimony.
16:40:13  10  That actually wasn't her testimony. You kept repeating, is
16:40:17  11  this your testimony? So she said she had the understanding
16:40:21  12  that if the hotels pay for it, they own it. You then said,
16:40:25  13  is it your testimony that Wave -- that the photographs that
16:40:29  14  Wave took were owned by the hotels because Mr. Ohletz said
16:40:33  15  so, which was different. So you can't --
16:40:36  16    MR. TOKE: Okay. So, Howard, when I object on
16:40:38  17  this basis and you shut me down and you tell me that I'm
16:40:42  18  just asking a question, I'm going to do the same thing.
16:40:45  19    MR. SCHWARZ: But you're not asking a question.
16:40:47  20  You're characterizing -- I never said a witness testified to
16:40:50  21  something. You're saying her testimony was something.
16:40:52  22  I have no problem if you ask her the direct question, but
16:40:57  23  you are characterizing her testimony, which is why the
16:40:59  24  questions become very convoluted and difficult.
16:41:03  25    I'm not interrupting, I don't want to slow you

16:41:07  1  down. Just do what you want to do.
16:41:10  2    MR. TOKE: I'm trying to ask a question. But
16:41:12  3  okay.
16:41:13  4    Q. Again, I'm just trying to understand where you
16:41:15  5  came to the understanding about the ownership of the
16:41:17  6  copyrights to the Wave photographs, from whom?
16:43:39  7    A. I'm just trying to think about your original
16:41:42  8  question when you asked about --
16:41:43  9    Q. Forget about that. I'm asking a new question
16:41:46  10  right now. Don't think about any of the other questions.
16:41:49  11  I'm asking you a new question right now. That question is:
16:41:52  12  Please read it.
16:42:05  13    (Question read back.)
16:42:24  14    A. Again, I'm saying from the course of my work
16:42:26  15  I have derived this understanding, what I've said before.
16:42:33  16    Q. So there are a few possible ways -- let's see.
16:42:37  17  You testified -- you mentioned Mr. Ohletz by name earlier
16:42:41  18  with regard to this understanding; correct?
16:42:44  19    A. Yes.
16:42:44  20    Q. Okay. So what did Mr. Ohletz tell you that
16:42:49  21  gave you this understanding?
16:42:55  22    A. This is a difficult question because I don't
16:42:57  23  walk around with a pen and a pad to write down every single
16:43:02  24  word everyone speaks to me, at least during the day.
16:43:07  25    Q. No, I understand that. I'm just asking

generally, what did he say?

A. I can't tell you generally what did he say.
I can only tell you that this is the understanding -- your
question was where did I get the understanding. My
understanding is during the course of my work and my
interaction with my peers.

Q. So you said that Mr. Ohletz --

MR. SCHWARZ: I don't think she was finished.

MR. TOKE: Oh. Go ahead.

A. To ask me what did Mr. Ohletz tell me, I have
no answer to that.

Q. He must have said something to give you that
understanding; right?

A. Yes and no, because I don't walk around with a
pen and a pad, so to tell you exactly what he said to give
me that understanding, I have no answer at this moment for
you.

Q. Okay. But he said something to you that gave
you that understanding; right?

A. I wouldn't say yes to that.

Q. So, somehow Mr. Ohletz conveyed to you that
the copyright to these Wave photographs was owned by the
hotels, but you have no way to characterize or summarize or
even remember what had happened. Is that what you're
telling me?

MR. SCHWARZ: Objection to the form of the
question. It had multiple parts to it. It's an improper
question.

BY MR. TOKE:

Q. Go ahead, answer the question.

A. It's a long question. Would you repeat?

MR. TOKE: Go ahead, read it back.

(Question read back.)

A. No, I don't understand how you want me to
categorize an understanding.

Q. I'm just trying to understand how you got the
understanding.

A. I said that a lot of times already.

Q. Right. In this completely vague penumbral
way, "I have no idea." Let's --

MR. SCHWARZ: Okay. I'm objecting to that.
That's arguing with her. It's improper.

MR. TOKE: Fine. I'm withdrawing that.

Q. Why would ownership of the copyright to
photographs created by Wave come up from the time that you
were at Wave -- pardon me, at GHM, to the present, since
Wave stopped doing work for these hotels in 2007?

A. I'm not sure at any point in time saying that
it came up.

Q. So you're telling me -- well, did it come up?

A. I didn't say anything to say that it came up.

Q. Fine. But I'm asking you now: Did it?

A. You need to rephrase your question. I'm not
understanding it.

Q. Can you read back the question?

(Question read back.)

Q. So I'm asking you: Did it come up?

A. I just didn't understand what is "come up"?

Q. You don't understand what "come up" means?

A. Well, I understand in English terms.

Q. Then --

A. But I don't understand --

Q. -- it's an English question.

A. -- why would it mean like how the question or
the ownership, whatever the question was, come up?

Q. I'm asking you: How did the occasion to talk
about the ownership of the copyrights to photographs created
by Wave for use in marketing collaterals with these hotels
come up, since you've been at GHM from 2008 to the present?
How did it come up?

A. That wasn't the question. The question was --

Q. Go ahead.

(Question read back.)

A. No, before that, sorry.

(Question read back.)

A. Then the next question was more specific.

Q. Let's have you answer that question.

A. I answered that already.

Q. I'd like you to answer it again.

A. I said at any point in time I didn't recall me
saying that the ownership question came up.

Q. Well, that's fine. But now you've also
testified that through these interactions with your peers
you understand that the copyright to the photographs created
by Wave that were used in the collateral for these hotels
was owned by the hotels; you came up -- somehow, with these
interactions, you came to that understanding; right?

A. Yes.

Q. So, okay. But you can't remember what those
interactions were or who told you that; correct?

A. Okay, I'm getting a little bit confused
here --

Q. I'm not sure why. But okay.

A. -- because I have a few questions that you
asked and I feel it's a little bit jumbled.

Q. Sorry. I'm trying to come at it from a lot of
different angles because I'm trying to understand how you
understand this. Let's break it down a little bit more.
Okay.

You agreed that you've testified that you somehow

16:51:11  1  got the understanding from your peers that the copyrights to

16:51:15  2  Wave's photographs was owned by the hotels?

16:51:18  3       A. Yes.

16:51:19  4       Q. And I'm asking you -- and you can't remember

16:51:24  5  who told you; right?

16:51:34  6       A. You reminded me that I mentioned Ralf Ohletz.

16:51:38  7  All I said was I didn't walk around with a pen and a pad so

16:51:43  8  I wasn't able to tell you exactly what he told me.

16:51:46  9       Q. Okay. So you do remember that at some point

16:51:50  10  Mr. Ohletz told you something that convey to you this

16:51:54  11  understanding; right?

16:51:55  12       A. Yes.

16:51:56  13       Q. Okay. So how did that topic of the ownership

16:52:02  14  of the copyrights to Wave's photographs come up?

16:52:09  15       A. Like I said, I did not recall saying that this

16:52:14  16  subject matter come up.

16:52:16  17       Q. So he just told you out of the blue?

16:52:21  18       A. I said, during the course of my work.

16:52:25  19       Q. Right. So during the course of your work

16:52:28  20  there must have been some reason in the course of your work

16:52:32  21  that this was a relevant topic.

16:52:35  22       MR. SCHWARZ: Okay. I'm going to object. We have

16:52:37  23  been doing this for half an hour now, and I think you're

16:52:41  24  harassing the witness. She's answered the question to the

16:52:43  25  best of her ability and I'm going to --

16:52:48  1       MR. TOKE: She has said nothing.

16:52:51  2       MR. SCHWARZ: That's not true. You don't like the

16:52:52  3  answer but she's answered every question you gave her.

16:52:57  4       MR. TOKE: Okay.

16:52:57  5       MR. SCHWARZ: You can ask her one more question if

16:52:59  6  you want, but I'm saying that I think you are absolutely

16:53:02  7  harassing the witness at this point and I'm objecting to

16:53:05  8  continuing to harass her.

16:53:09  9       MR. TOKE: I disagree with the characterization

16:53:10  10  that I'm harassing her. I'm allowed to try to jog her

16:53:14  11  memory. I'm coming at it from a number of different angles

16:53:19  12  and I'm allowed to do that. So --

16:53:24  13       MR. SCHWARZ: She didn't -- you just said you're

16:53:25  14  trying to jog --

16:53:28  15       MR. TOKE: If you're going to put an objection on

16:53:30  16  the record, please do, or if you're going to instruct the

16:53:33  17  witness, fine. But I'm going to ask some questions and you

16:53:36  18  can deal with them as you will in a succinct manner. That's

16:53:41  19  it.

16:53:42  20       MR. SCHWARZ: No, no, you can't say, "That's it."

16:53:42  21  You've had a discussion with me and you made a statement and

16:53:45  22  so I'm now entitled to respond to it.

16:53:47  23       MR. TOKE: Okay.

16:53:48  24       MR. SCHWARZ: And I'm saying that she answered the

16:53:48  25  question. You said that you're entitled to jog her memory.

16:53:49  1  You're entitled to jog her memory if she says she doesn't

16:53:53  2  remember. She didn't say she didn't remember, she testified

16:53:56  3  exactly to what she said. I'm not going to recategorize it.

16:54:01  4  So, if you want to ask her another question on another

16:54:04  5  topic, go ahead.

16:54:06  6       MR. TOKE: No. What I'm saying is -- now we've

16:54:09  7  established, we're making some progress actually, because

16:54:10  8  you've now testified that --

16:54:11  9       MR. SCHWARZ: Is that a question? You can't make

16:54:14  10  a speech to the witness. You can ask her a question.

16:54:17  11       MR. TOKE: I am asking her a question.

16:54:21  12       MR. SCHWARZ: But that's a speech, that's not a

16:54:23  13  question.

16:54:24  14       MR. TOKE: I understand. But we are not at trial.

16:54:26  15  We are not -- what I'm trying to do is create a premise that

16:54:27  16  that will be the basis for my question. I'm just trying to

16:54:29  17  recap where we are, because this witness is going to tell me

16:54:30  18  that she's confused. So what I'm trying to do --

16:54:35  19       So, now, what you've told me is that Mr. Ohletz --

16:54:37  20  you gleaned this understanding about the ownership of the

16:54:40  21  copyrights to Wave's photographs from Mr. Ohletz in the

16:54:43  22  course of your working at GHM.

16:54:46  23       And I'm asking: Why would this information be

16:54:54  24  relevant to your work at GHM, since Wave stopped doing these

16:54:59  25  photographs for the hotels in 2007?

16:55:04  1       MR. SCHWARZ: Objection to the form of the

16:55:06  2  question. If you want to answer it, you can answer it.

16:55:10  3       A. Before I answer your question, while you guys

16:55:12  4  were talking, I was actually trying to interrupt for a

16:55:16  5  ladies' room break. I don't know whether -- can I go for my

16:55:19  6  break and then come back to answer your question?

16:55:23  7       Q. There is actually a question pending to you,

16:55:23  8  so you have to answer that question, and then you can go.

16:55:57  9       A. Okay. Fine. So the question again?

16:55:57  10       Q. Please read it.

16:56:00  11       (Question read back.)

16:56:02  12       A. I think it's the same question in a different

16:56:04  13  form.

16:56:08  14       Q. So, please answer the question.

16:56:10  15       A. During the course of my work.

16:56:13  16       Q. But you don't recall why it came up?

16:56:20  17       A. I can't recall as to specifically why and in

16:56:23  18  what situation it came up.

16:56:26  19       Q. You can't -- do I understand what you're

16:56:29  20  saying: You're saying that you can't recall specifically why

16:56:33  21  it came up?

16:56:34  22       A. As to why it came up.

16:56:36  23       Q. But that it came up at some point?

16:56:39  24       A. Whether it was what I was thinking as to how

16:56:42  25  we used the word "it came up", it came up as in, you know,

16:56:49  1    someone walking in my face and saying, whatever, to the
16:56:55  2    ownership, or it's during the course of my work.
16:56:59  3        Q. Right. Okay. So, what would be the source of
16:57:01  4    that information; your peers?
16:57:05  5        A. I said, during the course of my work,
16:57:07  6    interaction with my peers, one of whom I have named him.
16:57:12  7        Q. Okay. Go ahead for your break. Let's go off
16:57:19  8    the record, please.
16:57:21  9        VIDEOGRAPHER: This marks the end of tape number 5
16:57:23 10    in the deposition of Monica Chng.
16:57:26 11        Going off the record. The time is 4:57 p.m.
16:57:33 12        (4:57 p.m.)
16:57:36 13            (Recess taken.)
17:08:21 14        (5:08 p.m.)
17:08:27 15        VIDEOGRAPHER: Back on the record. This marks the
17:08:36 16    beginning of tape number 6 in the deposition of Monica Chng.
17:08:40 17    The time is 5:08 p.m.
17:08:50 18    BY MR. TOKE:
17:08:51 19        Q. Ms. Chng, we are back on the record. Do you
17:08:53 20    know who VFM/Leonardo is?
17:08:58 21        A. I don't know who they are.
17:09:02 22        Q. You've heard the name of the company before?
17:09:05 23        A. Not until this case came up.
17:09:07 24        Q. Okay. And do you -- okay.
17:09:13 25        So tell me about how you -- what you learned about

17:10:25  1    informing them that they have been involved in a way on this
17:10:35  2    issue.
17:10:37  3        Q. That they have been sued?
17:10:40  4        A. I can't recall if this is the thing.
17:10:45  5        Q. Does GHM have a contract with VFM/Leonardo?
17:10:49  6        A. Not any more.
17:10:50  7        Q. And you are head of legal, so you would know?
17:10:57  8        A. I missed that.
17:10:59  9        Q. You are head of legal at GHM, so you would
17:11:01 10    probably know if there was a contract between GHM and
17:11:05 11    VFM/Leonardo?
17:11:08 12        A. That's fair to say that.
17:11:10 13        Q. How about a company called Pegasus, do you
17:11:12 14    know who Pegasus is?
17:11:13 15        A. No.
17:11:14 16        Q. You've never heard of the name Pegasus? Okay.
17:11:19 17        MR. SCHWARZ: You have to say "No."
17:11:21 18        A. No. I said "No."
17:11:23 19    BY MR. TOKE:
17:11:24 20        Q. How about Ice Portal?
17:11:25 21        A. No.
17:11:26 22        Q. How about Saber Holdings?
17:11:48 23        A. No.
17:11:49 24        Q. You've never heard of that company?
17:11:50 25        A. No.

17:09:17  1    VFM/Leonardo since this case came up?
17:09:22  2        MR. SCHWARZ: Objection. You can't say anything
17:09:24  3    that the lawyers told you.
17:09:26  4        MR. TOKE: Of course she can.
17:09:28  5        MR. SCHWARZ: I'm instructing you that you are
17:09:31  6    entitled to invoke the attorney/client privilege and that
17:09:33  7    you should do so if the answer to the question is that you
17:09:36  8    learned it from one of the lawyers.
17:09:38  9        MR. TOKE: Although I will say this: Yes as to
17:09:41 10    legal advice. If there's just discussion of facts about
17:09:44 11    what VFM/Leonardo is, that's different, and I don't know
17:09:48 12    that's covered by the attorney/client privilege. If it's
17:09:51 13    advice, I don't want to know about it, that's okay, I'm not
17:09:55 14    asking. But if you learned some facts about VFM/Leonardo,
17:10:01 15    you can tell me that.
17:10:03 16        MR. SCHWARZ: And if you're not sure, you're
17:10:05 17    entitled to consult with me. This is lawyers just jockeying
17:10:08 18    back and forth. So let's go ahead. No problem with me.
17:10:09 19    BY MR. TOKE:
17:10:10 20        Q. What did you learn about VFM/Leonardo since
17:10:11 21    the start of this case?
17:10:14 22        A. I didn't learn anything about VFM/Leonardo.
17:10:18 23    I only know of them when this case start.
17:10:21 24        Q. And what do you know of them?
17:10:23 25        A. That they reach out to our properties,

17:11:53  1        Q. Do you have a sense -- let me rephrase that.
17:11:57  2        Do you know who GHM may have given Wave
17:12:05  3    photographs to?
17:12:10  4        MR. SCHWARZ: Objection to the form of the
17:12:11  5    question. That's assuming facts that you haven't
17:12:14  6    established yet.
17:12:17  7        MR. TOKE: It was a question. I said, "Do you
17:12:20  8    know"?
17:12:20  9        MR. SCHWARZ: Yes. And my objection is the
17:12:22 10    question assumed facts that you haven't established.
17:12:26 11    BY MR. TOKE:
17:12:27 12        Q. Okay. You can answer the question.
17:12:34 13        A. No.
17:12:36 14        Q. Okay. Do you know if GHM gave any Wave
17:12:41 15    photographs to any third parties?
17:12:47 16        A. No.
17:12:48 17        Q. You do not know?
17:12:50 18        A. No.
17:12:54 19        Q. Okay. You testified earlier that when GHM is
17:13:26 20    terminated as the management company for any of these
17:13:32 21    properties, the relationship terminates and that hotels
17:13:39 22    can't use any marketing collateral with the GHM mark or
17:13:44 23    logo; correct?
17:13:46 24        A. Yes.
17:13:47 25        Q. Then you also testified that because of that

17:13:51 1    split, GHM can't use anything owned by the hotels; correct?

17:13:55 2    You testified to that; correct?

17:14:14 3        A. Yes.

17:14:14 4        Q. Okay. So if GHM used anything that belonged

17:14:18 5    to the hotels after the termination, then that would be --

17:14:25 6    that would not be authorized; correct?

17:14:40 7        MR. SCHWARZ: Objection to the form of the

17:14:41 8    question, it's hypothetical.

17:14:43 9        BY MR. TOKE:

17:14:44 10       Q. Go ahead.

17:14:44 11       A. I won't be able to say whether it's

17:14:47 12   unauthorized.

17:14:48 13       Q. Yes, you're right. Let's assume for the

17:14:51 14   purposes of this question this there was no authorization

17:14:57 15   given by the hotels.

17:15:01 16       A. If this is an assumption --

17:15:03 17       Q. Yes, it is.

17:15:05 18       A. -- I --

17:15:11 19       Q. Yes, it is. I'm assuming for the purposes of

17:15:14 20   this question that there is no authorization given by the

17:15:17 21   hotels, okay, that have been terminated, or where GHM has

17:15:27 22   been terminated. That's the assumption. GHM's use of the

17:15:30 23   photographs, which are owned by the hotels, you testified to

17:15:37 24   that; right? That would not be authorized.

17:16:18 25       A. I would think so.

---

17:16:19 1        Q. Okay. Let me go back.

17:16:23 2        Actually, when you said you didn't know if GHM

17:16:26 3    gave any of the Wave photographs to third parties, is there

17:16:31 4    anyone at GHM who would know that?

17:16:37 5        A. I wouldn't have an answer to that question.

17:16:40 6        Q. Really? So you're not aware of anyone at GHM

17:16:44 7    who would know whether or not GHM gave photographs that were

17:16:50 8    created by Wave to any third parties?

17:17:00 9        A. No.

17:17:01 10       Q. Let's go through the different people. Would

17:17:03 11   Hans Jenni know whether GHM gave photographs that were

17:17:08 12   created by Wave to third parties?

17:17:09 13       A. I wouldn't know if Hans Jenni know of anybody.

17:17:13 14       Q. I'm just saying, you're the vice-president or

17:17:15 15   a vice-president at GHM; right?

17:17:17 16       A. No.

17:17:18 17       Q. I'm sorry, what was your title again?

17:17:22 18       A. Senior vice-president.

17:17:23 19       Q. Pardon me, senior vice-president. Not even

17:17:24 20   just a junior one, you're a senior vice-president at GHM.

17:17:30 21       MR. SCHWARZ: Objection. Really, that's being

17:17:31 22   rude. Don't do that. Don't make those qualifications and

17:17:34 23   remarks.

17:17:35 24       MR. TOKE: Okay.

17:17:36 25       Q. So you're a senior vice-president at GHM;

---

17:17:38 1    right? Correct?

17:17:39 2        A. Yes.

17:17:40 3        Q. It's a company of 15 people; correct?

17:17:44 4        A. Yes.

17:17:44 5        Q. Okay. And you don't know who at GHM might

17:17:51 6    know, might be responsible for to whom GHM gives

17:17:58 7    photographs?

17:18:04 8        A. I answered that before.

17:18:06 9        Q. Who could be? You don't know who has

17:18:10 10   responsibility for sending out photographs to various

17:18:13 11   parties?

17:18:15 12       MR. SCHWARZ: Objection. That question assumes

17:18:18 13   facts that haven't been established. It's an impossible

17:18:23 14   question to answer as phrased. It's like, "When did you

17:18:29 15   stop beating your wife?" That's that question.

17:18:33 16       MR. TOKE: Howard, you can make an objection

17:18:34 17   and --

17:18:35 18       MR. SCHWARZ: I did and I'm telling you what --

17:18:37 19       MR. TOKE: -- and stop at the objection, please.

17:18:40 20       MR. SCHWARZ: Okay. So I object to the form. She

17:18:42 21   can answer it. But you understand that because I've

17:18:44 22   objected to the form and you haven't corrected it, that it

17:18:47 23   can't be used at trial.

17:18:50 24       MR. TOKE: That's fine. I understand. But I will

17:18:53 25   rephrase in this instance. Okay.

---

17:18:59 1        Q. So, you would agree that GHM at various times

17:19:06 2    has created marketing collateral or asked for marketing

17:19:15 3    collateral to be created for the hotel properties involved

17:19:22 4    in this litigation; right?

17:19:24 5        A. Yes.

17:19:25 6        Q. Okay. And sometimes that involved

17:19:28 7    photography; correct?

17:19:29 8        A. Yes.

17:19:30 9        Q. And those photographs have to be distributed

17:19:33 10   somewhere to people; correct?

17:19:54 11       A. Yes.

17:19:54 12       Q. Okay. Who at GHM would have any control over

17:19:58 13   to whom photographs and marketing collateral are sent?

17:20:34 14       A. Presently?

17:20:35 15       Q. Presently.

17:20:45 16       A. Kathryn Koh.

17:20:47 17       Q. And how long has Kathryn Koh been at GHM,

17:20:51 18   again?

17:20:57 19       A. Five years.

17:20:58 20       Q. So, since about 2010?

17:20:59 21       A. On or about there.

17:21:01 22       Q. Okay. And then how about before 2010, who

17:21:04 23   would have been responsible at GHM?

17:21:07 24       A. Mr. Ohletz.

17:21:08 25       Q. Mr. Ohletz. Okay. How about Kendall Oei?

17:21:23  1    A. I do not know for sure but I don't think so.

17:21:26  2    Q. Okay. Anyone else before Ms. Koh who might

17:21:34  3  have some responsibility or oversight over to whom

17:21:38  4  photographs are given?

17:21:41  5    A. No.

17:21:42  6    Q. So the answer to the original question, which

17:21:43  7  was who would know at GHM to whom photographs were given,

17:21:48  8  would be Ms. Koh since 2010 and Mr. Ohletz prior to 2010?

17:21:57  9    A. This question is slightly different from the

17:21:59 10  original question.

17:22:00 11    Q. Okay. Well, that's the question I'm asking

17:22:02 12  now.

17:22:03 13    So I answer the question now?

17:22:06 14    Q. Correct.

17:22:07 15    A. That's correct.

17:22:07 16    Q. Okay.

17:22:30 17    I'm going to mark this next in order. This is 43.

17:22:35 18    (Exhibit 43 marked for identification)

17:23:37 19    Q. Ms. Chng, this exhibit is a series of

17:23:42 20  screenshots from the ghmhotels.com website. Can we agree on

17:23:50 21  that?

17:23:51 22    MR. SCHWARZ: No, it's a series of screenshots

17:23:54 23  that have marks on it as well. So I doubt that that was --

17:23:58 24    MR. TOKE: I understand that.

17:24:00 25    MR. SCHWARZ: So, no, it's not what you said it

17:24:02  1  is.

17:24:04  2    MR. TOKE: Alright. Actually, I disagree. They

17:24:05  3  are. I will say that there are additional notes that are

17:24:10  4  added to them.

17:24:11  5    Q. But take away the notes that we'll discuss,

17:24:15  6  that have been added to these pages, but they are otherwise

17:24:19  7  screenshots from the ghmhotels.com website; correct?

17:24:27  8    A. Save for the additional comments, I think it

17:24:31  9  is.

17:24:32 10    Q. Yes, okay. So, yes, again, just assume these

17:24:38 11  additional comments in boxes are not part of these

17:24:44 12  documents, they are otherwise screenshots from the

17:24:50 13  ghmhotels.com website; yes? Correct?

17:25:03 14    A. Sorry?

17:25:06 15    Q. Taking aside the additional boxes that have

17:25:09 16  been added to these pages, these are otherwise screenshots

17:25:13 17  from the ghmhotels.com website; yes?

17:25:16 18    A. I replied that question. I said, save for the

17:25:18 19  additional comments, I think it is.

17:25:20 20    Q. Okay. Good. And in particular it's actually

17:25:22 21  a subpage that shows the various magazines, the GHM magazine

17:25:26 22  that we talked about earlier; correct?

17:25:37 23    A. It seems like it.

17:25:38 24    Q. Okay. If you go to the third page, this is a

17:25:53 25  picture -- it looks like a flower in a pot or something like

17:26:00  1  that. Do you see that?

17:26:01  2    A. Yes.

17:26:02  3    Q. Okay. And there's a box that I will represent

17:26:04  4  has been added by the plaintiff, that says:

17:26:10  5    "VA 1-432-329

17:26:17  6    Wave-S Photographs 2004

17:26:20  7    Leela 030"

17:26:21  8    I will represent to you that this is a photograph

17:26:23  9  that was taken by Wave at the Leela. Okay?

17:26:32 10    You would agree -- or you testified earlier that

17:26:36 11  the Leela is no longer managed by GHM; correct?

17:26:42 12    A. Up to presently, yes, that's correct.

17:26:45 13    Q. And, what does "up to presently" mean?

17:26:50 14    A. I mean as we speak now it's no longer managed.

17:26:53 15    Q. Right. At the moment it's not managed by GHM;

17:26:56 16  correct?

17:26:56 17    A. Yes.

17:26:57 18    Q. When did that relationship terminate, again?

17:27:02 19    A. I think I said prior to 2008.

17:27:06 20    Q. Okay. Right.

17:27:09 21    A. But I wasn't sure of the year.

17:27:12 22    Q. Right. Around 2008, you testified to

17:27:15 23  something like that. Okay. Right.

17:27:52 24    Then go to the next page, please. You'll see

17:28:01 25  there's a background photo that's kind of in sepia tone,

17:28:07  1  that's kind of a pool or something like that. Do you see

17:28:09  2  that photograph?

17:28:10  3    A. Yes.

17:28:11  4    Q. Okay. I'll represent to you that that is

17:28:13  5  another Wave taken photograph, which is of the Setai.

17:28:18  6    Now, you would agree that the Setai is no longer,

17:28:22  7  as of today, managed by GHM; correct?

17:28:24  8    A. Yes.

17:28:24  9    Q. And when did that relationship end?

17:28:27 10    A. Some time in 2012.

17:28:31 11    Q. Some time in 2012. Okay.

17:28:37 12    Next page, please. Actually, not the next page,

17:28:40 13  the fifth page, please.

17:28:50 14    MR. SCHWARZ: Which one is that?

17:28:53 15    MR. TOKE: If you look at the screenshot, there is

17:28:54 16  a "Page [blank] of 23". It actually says "7 of 23". Okay.

17:29:01 17  You'll see three photos that have photos in them with yellow

17:29:08 18  boxes; yes?

17:29:09 19    A. Yes.

17:29:11 20    Q. The bottom photo is one of the Setai, I'll

17:29:15 21  represent to you, that that was a photo taken by Wave.

17:29:19 22  Directly above it is a photo of the Leela, again taken by

17:29:23 23  Wave. And we both agree that both the Setai -- that GHM

17:29:29 24  ceased managing the Setai in 2012; right?

17:29:33 25    A. Yes.

17:29:34  1    Q. And the Leela in around 2008; right?
17:29:37  2    A. Before 2008.
17:29:39  3    Q. Before 2008. Sure.
17:29:40  4    And then how about the Chiang Mai? That's no
17:29:44  5  longer managed by GHM either; correct?
17:29:47  6    A. That's correct.
17:29:47  7    Q. And when did that relationship end?
17:29:49  8    A. I said it was some time late 2013.
17:29:54  9    Q. 2013. Okay. Late 2013. Okay.
17:29:57  10   Let's go to the page -- I think it's the next
17:30:02  11  page, that says "10 of 23". Do you see that one?
17:30:06  12   A. Yes.
17:30:07  13   Q. Okay. Bottom right, that's another photo from
17:30:13  14  the Leela, and in fact it says "The Leela" at the corner
17:30:17  15  there, right, the top left corner of the photograph says
17:30:22  16  it's "The Leela".
17:30:25  17   A. Yes.
17:30:25  18   Q. Again, The Leela, GHM stopped managing The
17:30:29  19  Leela in 2008; right?
17:30:31  20   A. Yes.
17:30:31  21   Q. Or before 2008.
17:30:33  22   The next page, which says in the same top of the
17:30:39  23  screenshot, "12 of 23", I will represent this is another
17:30:43  24  photo taken by Wave that is subject to a copyright
17:30:47  25  registration, of The Leela, or at The Leela.

17:32:51  1  photographs from the Carcosa. Do you see where those notes
17:32:56  2  say they are from the Carcosa?
17:32:58  3    A. Yes.
17:32:59  4    Q. I'll represent these two are Wave taken
17:33:02  5  photographs, and the Carcosa is not managed by GHM any more;
17:33:06  6  is that correct?
17:33:06  7    A. That's correct.
17:33:07  8    Q. When did that relationship end?
17:33:09  9    A. I do not recollect.
17:33:10  10   Q. Okay. Would some time in 2009 sound about
17:33:17  11  right?
17:33:21  12   A. That would be a good estimate but I cannot
17:33:23  13  remember.
17:33:24  14   Q. Okay. That's a good estimate.
17:33:25  15   A. Yes.
17:33:26  16   Q. Okay.
17:33:30  17   Let's go to the next page --
17:33:39  18   MR. SCHWARZ: Which is?
17:33:40  19   MR. TOKE: Which is 22 of 23.
17:33:42  20   Q. On the right, the right column, there are
17:33:45  21  three photographs that these notes that the plaintiff has
17:33:48  22  added to the page indicate photographs of the Chiang Mai.
17:33:54  23  These, I can also represent, are Wave taken photographs of
17:33:57  24  the Chiang Mai, and the Chiang Mai also is not represented
17:34:01  25  by GHM any more; correct?

17:30:54  1    And the next page, 13 of 23, I will represent that
17:30:58  2  this is a photograph taken by Wave of the Datai, and the
17:31:06  3  Datai is also no longer represented by GHM; correct?
17:31:11  4    A. That's correct.
17:31:12  5    Q. And when did that relationship end, again?
17:31:16  6    A. I can't remember exactly. Some time 2010 or
17:31:20  7  2011.
17:31:21  8    Q. 2010 or 2011. Okay.
17:31:24  9    Next page, 18 of 23, the photo on the left is of
17:31:28  10  The Setai. Again, you testified -- of The Setai.
17:31:34  11   And that was a photograph taken by Wave.
17:31:39  12   Go to the next page, 20 of 23. You'll see three
17:31:44  13  boxes on the left-hand side, each of them pointing to the
17:31:51  14  photographs directly to the right, and those three I will
17:31:56  15  represent are also photographs taken by Wave of The Setai.
17:32:04  16   And then on the right there's a box that indicates
17:32:08  17  it's a picture of The Legian and The Club at The Legian.
17:32:13  18  I will represent this is a photograph taken by Wave.
17:32:16  19   And The Legian and The Club at Legian are also no
17:32:21  20  longer managed by GHM; correct?
17:32:23  21   A. It is being managed by GHM.
17:32:26  22   Q. Oh, pardon me. Never mind.
17:32:35  23   Next page, 21 of 23, there's three photographs of
17:32:40  24  The Leela that are pointed out that are Wave photographs.
17:32:46  25  And then to the right there's actually -- there are two

17:34:04  1    A. That's correct.
17:34:05  2    Q. When did that relationship end, again?
17:34:07  3    A. Some time late 2013.
17:34:09  4    Q. Late 2013. Okay.
17:34:16  5    Let's go to the third to the last page. It's a
17:34:35  6  page that has a box in it that says "Page Info".
17:34:44  7    MR. SCHWARZ: 23 of 23?
17:34:48  8    MR. TOKE: 23 of 23 is what it says, yes.
17:34:49  9    MR. SCHWARZ: There are two of them. I'm just
17:34:51  10  trying to see if they are different.
17:34:53  11   MR. TOKE: They are a little different. I want to
17:34:54  12  look at the one that has a red box around the word
17:34:57  13  "Modified" and a date.
17:35:03  14   MR. SCHWARZ: Okay.
17:35:05  15   MR. TOKE: Okay.
17:35:07  16   Q. So do you see where it says "Modified: 1 April
17:35:11  17  2014"?
17:35:12  18   A. Yes.
17:35:14  19   Q. Okay. This would indicate that these pages
17:35:18  20  were modified on that date, last modified on that date;
17:35:24  21  correct?
17:35:26  22   A. I'm not an IT professional. I am not sure
17:35:29  23  whether the modification here means that the pages were
17:35:33  24  modified at that time and date or that particular web page
17:35:45  25  was modified at that time and date.

Q. Okay. I can represent to you -- well, at the very least we know something was done to these pages on April 1, 2014; correct?

A. Can you clarify? When you say "these pages"?

Q. These pages that we've just looked at. Because if you look at it, it says "Layout 1 - ghm_no1". And if you -- right at the top of this box, "Layout 1 - ghm_no1.pdf"."?

A. Yes.

Q. And when we look at the first page, it looks like what these are, are actually pdf documents that you can actually click on and download each of these photos -- each of these magazines. Would you agree with that?

A. Yes, to what you just mentioned, yes.

Q. Okay. Because you've been to this part of the website before, haven't you?

A. To this page of the website, yes.

Q. Okay.

MR. SCHWARZ: The witness is indicating the front page.

A. Yes, I'm looking at the front.

BY MR. TOKE:

Q. This is basically pdfs of the each of the magazines that GHM has produced; yes?

A. Yes.

Q. And you can click on any one of these, right, and it will download the pdf of that magazine; correct?

A. I believe so.

Q. Okay. And so, when we look at the second page, it looks like there must have been some sort of hovering over the "Issue 1", because it's blacked out and it says "Click to download". Right?

MR. SCHWARZ: Where is this?

MR. TOKE: Second page.

MR. SCHWARZ: Yes.

BY MR. TOKE:

Q. Then we go to the third page and it says "No. 1" on the cover of the magazine; right?

A. Yes.

Q. This suggests this was magazine No. 1 of GHM and that this -- the following pages are the pdf file that comprises this magazine No. 1; yes?

MR. SCHWARZ: Some of the pages, yes.

MR. TOKE: Okay. I'm asking the witness. But okay.

Q. Or at least some of the pages of the magazine; correct?

A. Yes, that's correct.

Q. Do you have a sense of when magazine No. 1 would have come out?

A. I have no idea. Way before I joined.

Q. Way before you joined. Okay.

You would agree that this is -- I can represent to you that these pages were actually pulled off the GHM website on September 14, 2015. So I don't know, what is today -- today is the 22nd, so a little over a week ago these pages were pulled off the GHM website.

You would agree that with regard to all of the photographs that we looked at, with the exception of that Chedi Club one, I apologize for that, but all of the other ones are from hotels that are no longer managed by GHM; correct?

A. Yes.

Q. And you testified earlier that post termination -- well, you testified that the hotels own all the photographs, the copyrights to the photographs owned by Wave; correct?

A. Yes.

Q. That was your understanding; right?

A. Yes.

Q. Okay. So -- and you also testified that post termination GHM was not allowed to use any of the photographs that were owned by the hotels; correct?

MR. SCHWARZ: Objection. Without authorization, I think she said.

MR. TOKE: For the purposes of my question, without authorization.

Q. So it was not allowed to without authorization; correct?

A. Yes.

Q. So, if you didn't have authorization, this would be an infringement today, wouldn't it?

MR. SCHWARZ: Objection. That calls for a legal conclusion.

MR. TOKE: Okay. You have stated your objection.

Q. You can answer.

A. The way I look at it, this magazine was produced when we are managing the hotels.

Q. You know that for a fact?

A. No reason for us to -- no reason for GHM to feature a hotel that it doesn't manage for free publicity in its magazine. It just doesn't make sense.

Q. That wasn't my question. My question was: This is a publication of these photographs on the GHM website; correct?

MR. SCHWARZ: Objection to that question. It also calls -- I think you are using that as a legal principle and I'm objecting to the form of the question because that calls for a legal conclusion.

MR. TOKE: Okay. That's fine.

17:41:15   1         Q. You can go ahead and answer the question.
17:41:17   2         A. No, I don't think this is a publication of the
17:41:20   3     photographs on the GHM website.
17:41:21   4         Q. You don't think so?  Okay.  But this was --
17:41:24   5         A. Per my knowledge, I don't think so.
17:41:28   6         Q. This exists on the GHM website; correct?
17:41:41   7         A. Yes.
17:41:42   8         Q. Okay.  Are you aware of any authorization from
17:41:47   9     any of these hotels that are no longer managed by GHM to
17:41:50  10     have these photographs on the GHM website?
17:42:05  11         A. I'm not sure if there are or not.
17:42:07  12         Q. So you do not know?
17:42:09  13         A. Prior to my time, nothing unusual.
17:42:11  14         Q. I'm talking about now.  Actually, I'm talking
17:42:15  15     about since the date that each of these properties
17:42:18  16     terminated GHM.
17:43:23  17         A. Is your question in relation to the photos
17:43:27  18     here specific?
17:43:33  19         Q. Any photos of these hotels.
17:43:39  20         MR. SCHWARZ:  Okay, so I need to know, what was
17:43:41  21     the original question?  I've lost the original question.
17:44:01  22         (Question read back.)
17:44:04  23         A. That's what I'm asking.  I assume that your
17:44:07  24     question only revolves around the photographs produced by --
17:44:12  25     any photographs produced by Wave?

17:46:26   1         MR. TOKE:  Read the question again, please.
17:46:26   2         (Question read back.)
17:46:43   3         Q. What I'm asking you, again, is you were not
17:46:46   4     aware of any authorizations from any of these terminated
17:46:49   5     hotels to use any of the photographs taken by Wave of those
17:46:53   6     hotels?
17:46:55   7         A. I said I do not know.
17:46:58   8         Q. Okay.  Let's look at this document.  This is
17:47:19   9     going to be the next in order.  This is number 44.
17:47:22  10         (Exhibit 44 marked for identification)
17:47:23  11         MR. SCHWARZ:  If I can just ask a question:  Is
17:47:25  12     the exercise going to be that we are going to look at each
17:47:29  13     one of the magazines?
17:47:30  14         MR. TOKE:  No.  I mean, we could, but I don't
17:47:33  15     think that's worthwhile.
17:47:35  16         MR. SCHWARZ:  I agree.
17:47:36  17         MR. TOKE:  We have established that --
17:47:38  18         MR. SCHWARZ:  Okay, that's fine.
17:47:40  19         MR. TOKE:  No, I --
17:47:42  20         MR. SCHWARZ:  I just asked if we are going to do
17:47:43  21     all of them.  But we're not, so we can move on.
17:47:47  22         MR. TOKE:  Okay.  But I will represent that there
17:47:48  23     are photographs just like that in all of them.
17:48:48  24         What's been marked here as exhibit 44, similar to
17:48:57  25     exhibit 43, are screenshots of pages from the GHM Sparrow

17:44:15   1         BY MR. TOKE:
17:44:15   2         Q. Yes.
17:44:16   3         A. Yes?
17:44:17   4         Q. Yes.
17:44:46   5         A. I'm not sure if there is.
17:44:48   6         Q. You testified earlier that one of your main
17:44:50   7     functions at GHM is legal; correct?
17:44:53   8         A. Yes.
17:44:55   9         Q. So if there were any legal authorization from
17:44:58  10     any of these hotels to use any of the photos taken by Wave
17:45:03  11     post termination of GHM's services, you would know about it,
17:45:07  12     wouldn't you?
17:45:24  13         A. I should.
17:45:24  14         Q. And you don't know of any, do you?
17:45:42  15         A. Not in relation to the photographs that we're
17:45:45  16     looking at right now.
17:45:46  17         Q. As to any other photographs that were taken by
17:45:49  18     Wave of these hotels?
17:46:08  19         A. I have answered your question in relation to
17:46:10  20     these photographs.
17:46:11  21         Q. No, I'm asking you a different question and
17:46:13  22     you should answer it.  Please read the question.
17:46:16  23         (Question read back.)
17:46:23  24         MR. SCHWARZ:  Okay.  Then I object to the form of
17:46:24  25     the question because that question makes no sense.

17:49:04   1     website, with the exception of some additional boxes and
17:49:07   2     commentary that have been added by the plaintiff.
17:49:11   3         Can we agree on that?
17:49:14   4         A. Yes.
17:49:15   5         Q. Okay.
17:49:19   6         The first page is a photograph, I will represent
17:49:24   7     to you, is of the Chedi Chiang Mai that was taken by Wave.
17:49:32   8     And, as you've already testified, the Chedi Chiang Mai is no
17:49:37   9     longer represented by GHM; correct?
17:49:40  10         A. Yes.
17:49:41  11         Q. And that relationship ended some time at the
17:49:43  12     end of 2013; right?
17:49:45  13         A. Yes.
17:49:46  14         Q. Okay.  I can represent to you that this is a
17:49:50  15     page from the GHM Sparrow website that was pulled off of the
17:49:56  16     website on September 14, 2015 -- again, just over a week
17:50:01  17     ago.
17:50:04  18         Have you been on the GHM Sparrow website?
17:50:09  19         A. No.
17:50:10  20         Q. You have not?
17:50:31  21         You know you are listed as one of the executives
17:50:34  22     of GHM Sparrow; right?
17:50:35  23         A. Yes.
17:50:36  24         Q. What is your title at GHM Sparrow?
17:50:47  25         A. Chief financial officer.

17:50:49  1    Q. You're the chief financial officer of GHM
17:50:52  2  Sparrow. Okay.
17:50:54  3    So this photograph was pulled a little over a week
17:50:59  4  ago, and you would agree that it is of a property that is no
17:51:03  5  longer managed by GHM; correct?
17:51:05  6    A. Correct.
17:51:06  7    Q. And GHM isn't actually -- GHM Sparrow is a
17:51:11  8  separate company from GHM; correct?
17:51:16  9    A. It's a joint venture.
17:51:19  10    Q. That wasn't the question. It is a separate
17:51:21  11  company from GHM; correct? It's not GHM; right?
17:51:32  12    A. I'm not getting your question. When you say
17:51:34  13  it's not GHM?
17:51:37  14    Q. I think you testified earlier that GHM Sparrow
17:51:40  15  is a joint venture between Sparrow and GHM; correct?
17:51:45  16    A. I did.
17:51:46  17    Q. But what is the -- but the company is called
17:51:49  18  GHM Sparrow Asset Management Ltd.; correct?
17:51:52  19    A. Yes.
17:51:53  20    Q. That's a separate company from GHM; correct?
17:51:57  21    A. That's what I said, it's a joint venture.
17:52:00  22    Q. I understand. But it is not the same entity,
17:52:02  23  it's not the same corporate entity, as GHM; correct?
17:52:16  24    A. I don't understand what you said by different
17:52:19  25  corporate entity. To me, it's a different legal entity.

17:52:22  1    Q. Good enough. And GHM Sparrow doesn't provide
17:52:25  2  any management services; correct?
17:52:43  3    A. No.
17:52:44  4    Q. And GHM Sparrow doesn't have any agreements
17:52:48  5  with any of the -- well, it doesn't have any agreements with
17:52:53  6  the Chedi Chiang Mai; right?
17:53:04  7    A. Not GHM Sparrow, no.
17:53:07  8    Q. That's what my question was. Okay.
17:53:12  9    Well, and GHM doesn't any more either; right?
17:53:17  10    A. Presently, as we speak, no.
17:53:19  11    Q. Okay. That's right.
17:53:23  12    And it hasn't since late 2013; right?
17:53:25  13    A. That's correct.
17:53:28  14    Q. So at some point after -- well, isn't it true
17:53:35  15  that GHM probably gave this photograph to GHM Sparrow; isn't
17:53:40  16  that correct?
17:54:18  17    A. Probably, yes.
17:54:20  18    Q. And you would agree that this is a photograph
17:54:27  19  that as of late 2013, based on your understanding that the
17:54:33  20  hotels own the copyrights to the photographs taken by Wave,
17:54:36  21  that as of late 2013 GHM didn't have authorization to use
17:54:42  22  this photograph? Correct?
17:54:56  23    A. We didn't use this photograph in 2013.
17:55:01  24    Q. Now, this is from a week ago on GHM Sparrow's
17:55:06  25  website.

17:55:06  1    A. From what I see, the website was last modified
17:55:09  2  on 17 August 2012 at 8:17:40 pm.
17:55:14  3    Q. That's right. So -- but at some point, a
17:55:18  4  little over a year after that, GHM no longer had the rights
17:55:22  5  to use the photograph, unless there was some other written
17:55:26  6  authorization; correct?
17:55:28  7    MR. SCHWARZ: Objection. Calls for a legal
17:55:28  8  conclusion. You can answer it.
17:55:37  9    A. I would say late 2013 up to now we do not
17:55:40  10  manage this hotel any more.
17:55:41  11    BY MR. TOKE:
17:55:41  12    Q. Right. So after that point GHM no longer had
17:55:45  13  authorization to use this photograph; correct?
17:56:11  14    A. That's correct.
17:56:12  15    Q. And GHM Sparrow never had an agreement with
17:56:16  16  the Chedi Chiang Mai to have authorization to use this
17:56:21  17  photograph; isn't that correct?
17:56:22  18    A. I have no idea.
17:56:23  19    Q. You have no idea. Okay.
17:56:24  20    But you said there are no contracts between GHM
17:56:27  21  Sparrow and the Chedi Chiang Mai?
17:56:30  22    A. Not that I know of.
17:56:32  23    Q. Okay. And during the time that GHM was
17:56:36  24  managing any of these hotel properties, based on what you've
17:56:44  25  testified your understanding of the copyright ownership of

17:56:47  1  the photographs, which is the hotels own the photographs,
17:56:51  2  was GHM authorized to use the photographs that were taken by
17:56:58  3  Wave?
17:57:01  4    A. I missed that.
17:57:23  5    (Question read back.)
17:57:28  6    A. When they are managing the properties? This
17:57:30  7  is your question?
17:57:32  8    Q. Mm-hm.
17:57:34  9    A. When we are managing the properties we are the
17:57:39  10  ones putting together the marketing collaterals. So, of
17:57:43  11  course, by virtue of the work we get to use the photos.
17:57:47  12    Q. And what is GHM allowed to do with the photos?
17:58:03  13    A. In broad sense, sales and marketing of the
17:58:06  14  property --
17:58:10  15    Q. So the kinds of --
17:58:11  16    A. -- promotion of the property.
17:58:13  17    Q. So the kinds of collateral that Wave created?
17:58:32  18    A. When you say collaterals that Wave created,
17:58:35  19  what are we looking at?
17:58:37  20    Q. Well, as an example, and I don't mean you to
17:58:42  21  limit it just to this, but as an example, brochures,
17:58:45  22  banners, promotional DVDs, anything that might include
17:58:50  23  photographs.
17:58:52  24    MR. SCHWARZ: What was the underlying -- I lost
17:58:53  25  the underlying question. What's the underlying question?

| | |
|---|---|
| 17:59:28 1 | (Question read back.) |
| 17:59:31 2 | A. Yes. |
| 17:59:31 3 | BY MR. TOKE: |
| 17:59:32 4 | Q. Anything else that GHM was allowed to do to -- |
| 17:59:36 5 | let me rephrase that. |
| 17:59:38 6 | Any other uses of the Wave photographs that GHM |
| 17:59:43 7 | was allowed to do to, in this broad sense, market the |
| 17:59:47 8 | hotels? |
| 17:59:59 9 | A. Do you have specific examples? |
| 18:00:02 10 | Q. I'm asking you. |
| 18:00:13 11 | A. I would say in the broad sense we are allowed |
| 18:00:15 12 | to use it for the promotion, for the brand, for the hotel. |
| 18:00:21 13 | Q. What I'm asking is: You said that that means |
| 18:00:25 14 | that GHM could use them for creating the marketing |
| 18:00:29 15 | collaterals like the kind that Wave created for the hotels; |
| 18:00:34 16 | right? |
| 18:00:36 17 | MR. SCHWARZ: Objection. That's not what she |
| 18:00:38 18 | said. |
| 18:00:38 19 | BY MR. TOKE: |
| 18:00:40 20 | Q. How is that not correct? |
| 18:00:41 21 | A. I said we can use it for the promotion of the |
| 18:00:44 22 | brand and of the hotel. |
| 18:00:46 23 | Q. Right. I understand that. And I was trying |
| 18:00:48 24 | to clarify -- to understand what that means. That's all I'm |
| 18:00:52 25 | trying to understand. So one of the things that it means is |

| | |
|---|---|
| 18:04:13 1 | other third parties to use on their websites? |
| 18:04:38 2 | A. Third parties, I assume, are parties not |
| 18:04:42 3 | related to GHM? |
| 18:04:43 4 | Q. Right, or the hotels. |
| 18:04:46 5 | A. No. I mean, when you say GHM gives the |
| 18:04:50 6 | photographs to third parties to use, who are these third |
| 18:04:53 7 | parties? |
| 18:04:55 8 | Q. People who are not related to GHM or companies |
| 18:04:58 9 | that are not related to GHM or the hotels. |
| 18:05:37 10 | A. The question was: Can GHM give? |
| 18:05:40 11 | Q. Yes. |
| 18:05:41 12 | A. The way I would answer, if giving of these |
| 18:05:46 13 | photos are still in line with the broad sense of wanting to |
| 18:05:50 14 | promote the brand and the hotel, I would say yes. |
| 10:05:55 15 | Q. Okay. |
| 18:05:57 16 | A. I'm sorry, I'm not finished. I would say, |
| 18:06:01 17 | yes, GHM can. |
| 18:06:03 18 | Q. Would that end when the relationship is |
| 18:06:05 19 | terminated, since the hotels own the photographs, in your |
| 18:06:18 20 | understanding? |
| 18:06:52 21 | A. Yes. |
| 18:06:53 22 | Q. It would have. Okay. |
| 18:06:55 23 | And where in these agreements is there an |
| 10:07:03 24 | authorization for GHM to use the photographs -- pardon me, |
| 10:07:10 25 | to give the photographs to third parties for this broad |

| | |
|---|---|
| 18:00:56 1 | GHM could have marketing collateral, like the kind Wave did, |
| 18:01:01 2 | created for the hotels; correct? |
| 18:01:04 3 | A. Including but not limited to. |
| 18:01:07 4 | Q. Right. I'm just saying including, I'm not |
| 18:01:10 5 | saying limited. |
| 18:01:11 6 | So, what else could -- so, we've now said, yes, |
| 18:01:14 7 | GHM was authorized to create these kinds of collaterals like |
| 18:01:17 8 | the kinds Wave created. What else could GHM do with the |
| 18:01:21 9 | photographs? |
| 18:01:39 10 | A. Another example would be on the website. |
| 18:01:41 11 | Q. Whose website? Are you talking about GHM's |
| 18:01:47 12 | website? |
| 18:01:55 13 | A. If GHM is managing the property, on GHM's |
| 18:01:58 14 | website. |
| 18:01:59 15 | Q. Okay. So, until the time that GHM is no |
| 18:02:01 16 | longer representing or managing the property, it can use it |
| 18:02:05 17 | on its website; correct? |
| 18:02:07 18 | A. That's my understanding. |
| 18:02:09 19 | Q. Okay. Anything else they could do? |
| 18:03:20 20 | A. I don't know whether I would be able to |
| 18:03:24 21 | pinpoint examples at this time. |
| 18:03:27 22 | Q. So you're not aware of anything else that they |
| 18:03:29 23 | could do? |
| 18:04:04 24 | A. I can't think of specific examples. |
| 18:04:09 25 | Q. For example, could GHM give the photos to |

| | |
|---|---|
| 18:07:15 1 | promotional sense? Can you point me to the provision within |
| 18:07:27 2 | the agreements? |
| 18:07:29 3 | MR. SCHWARZ: So which question -- that's two |
| 18:07:31 4 | questions. It's not fair. It's not fair. |
| 18:07:33 5 | MR. TOKE: Sorry. Fine. |
| 18:07:35 6 | Let's go with the second question. In fact, I'll |
| 18:07:38 7 | rephrase it. |
| 18:07:39 8 | Q. Can you point me to the terms of these |
| 18:07:44 9 | agreements where there's an authorization given from the |
| 10:07:49 10 | hotel to GHM to use any photographs created by Wave or any |
| 18:07:56 11 | photographs for the purposes of the general promotion? |
| 18:08:01 12 | MR. SCHWARZ: Like I said, I'm going to object to |
| 18:08:03 13 | the form. Now I'm not sure, did it include created by Wave |
| 18:08:08 14 | or not created by Wave? Did you put both? |
| 18:08:11 15 | MR. TOKE: I mean it to include Wave. |
| 18:08:14 16 | MR. SCHWARZ: Okay. Would you mind reading it |
| 18:08:15 17 | back, so I understand it. |
| 18:08:36 18 | (Question read back.) |
| 18:08:38 19 | A. I believe earlier I -- in answer to your |
| 18:08:43 20 | earlier question, there was somewhere where I testified that |
| 18:08:47 21 | there is nowhere in the agreements that specified clearly as |
| 18:08:50 22 | to the photographs in particular. So then naturally I would |
| 18:08:59 23 | not be able to point any particular reference that gives the |
| 10:09:04 24 | authorization. |
| 18:09:04 25 | But in the course, when I say that GHM would need |

to use the photographs to promote a hotel, and I would say that take normal human nature that you will not book a hotel without even knowing how the hotel looks like.

MR. TOKE: Okay. Let's take a break. We need to switch the --

MR. SCHWARZ: How much time has gone?

VIDEOGRAPHER: This marks the end of tape number 6 in the deposition of Monica Chng. Going off the record. The time is 6:09 p.m.

(6:09 p.m.)

(Recess taken.)

(6:17 p.m.)

VIDEOGRAPHER: Back on the record.

This marks the beginning of tape number 7 in the deposition of Monica Chng. The time is 6:18 p.m.

MR. TOKE: Okay. I have no further questions at the moment.

But we reserve the right to use the remainder of our time to call back this witness at some other time, especially in light of the fact that the documents that were produced, the sales agreements, were heavily redacted and we may seek leave of the court to have those documents produced without redactions and to call back the witness to discuss the documents in unredacted form, as well as because this 30(b)(6) witness was not knowledgeable about 13 of the 26 topics on the deposition notice, as well as the fact that this witness has identified that there were sales office contracts that were not produced in response to outstanding discovery from plaintiff.

So we reserve all our rights with regard to that, as well as to seek more time with this witness based on whatever comes out of these other objections.

MR. SCHWARZ: So there is more time here today. And I understand the objection about the redacted documents -- I disagree but I understand that and we will discuss that with the judge if you want to. I don't understand -- or I disagree with your statement that the witness was not knowledgeable about certain categories. That's your opinion. Feel free to express your opinion.

But you've said you have no more questions, except with respect to the redacted materials, and I think you said with respect to one other thing -- I can't remember that.

MR. TOKE: The sales office contracts.

MR. SCHWARZ: The sales office contracts. And I'm not sure what relevance the sales office contracts would have to this particular case, unless you're talking about jurisdiction.

MR. TOKE: I am.

MR. SCHWARZ: Okay, so I understand that.

Other than that, there is no grounds to ask this witness to come back, other than the two that you're specifically --

MR. TOKE: I'm not saying that. When you reserved the rest of your time with regard to plaintiff, you did not limit yourself to additional -- in terms of the questions that you had.

MR. SCHWARZ: No, no, no. That day stopped because it was the end of the day and everybody wanted to stop. We're here. If you want to go more, then you go more. We're in Singapore and if you have more questions, you have to ask them. You can't stop now, except for the things that you have reserved on, that I understand.

MR. TOKE: No. All I'm saying is if -- all I'm saying is we are reserving our time with regard to these issues. If there are other issues that come up as a result of these or ancillary to anything, absolutely. I'm reserving it. You can argue against it and that's fine. But I'm just saying that I do not have any more questions for this witness today, based on the fact that I don't have the documents in the form that I would have wanted them, but -- or other documents that may be produced in the future. So if there are any documents that are, I should have a chance to talk to this witness.

I understand we're in Singapore, but these documents were produced a week ago, and so -- yes, that's it. And, like I said, the witness said that she did not have knowledge about half the topics. I'm not saying that she isn't knowledgeable, she said she didn't know. She did.

Anyway, we've said what we need to say on the record and that's it.

MR. SCHWARZ: Just for the record, I just totally disagree with your statement that the witness was not knowledgeable. She answered every question that you gave to her. And that's it. The record speaks for itself. Thank you very much.

MR. TOKE: Thank you.

VIDEOGRAPHER: This marks the end of tape number 7 in the deposition of Monica Chng.

Going off the record. The time is 6:22 p.m.

(6:22 p.m.)

(Whereupon the deposition concluded)

28 (Pages 190 to 193)

CERTIFICATE OF DEPONENT

1
2
3    I, MONICA CHLOE CHNG, hereby certify that I have read the
     foregoing pages, numbered 1 through 193, of my deposition of
4    testimony taken in these proceedings on Tuesday, September
     22, 2015, and, with the exception of the changes listed on
5    the next page and/or corrections, if any, find them to be a
     true and accurate transcription thereof.
6
7
8
9
10   Signed: ...............................
11   Name:    MONICA CHLOE CHNG
12   Date:    ...............................
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF COURT REPORTER

1
2
3    I, HELEN CASE, an Accredited Realtime Reporter with DTI
     Global, Singapore, hereby certify that the testimony of the
4    witness MONICA CHLOE CHNG in the foregoing transcript,
     numbered pages 1 through 193, taken on Tuesday, September
5    22, 2015, was recorded by me in machine shorthand and was
     thereafter transcribed by me; and that the foregoing
6    transcript is a true and accurate verbatim record of the
     said testimony.
7
8    I further certify that I am not a relative, employee,
     counsel or financially involved with any of the parties to
9    the within cause, nor am I an employee or relative of any
     counsel for the parties, nor am I in any way interested in
10   the outcome of the within cause.
11
12
13
14
15   Signed: ...............................
16       HELEN CASE
17   Dated: ...............................
18
19
20
21
22
23
24
25

E R R A T A

1
2    Deposition of MONICA CHLOE CHNG
3    Page/Line No.    Description      Reason for change
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   Signed: ...............................
24   Name:    MONICA CHLOE CHNG
25   Date:    ...............................

CERTIFICATE OF DEPONENT


I, MONICA CHLOE CHNG, hereby certify that I have read the

foregoing pages, numbered 1 through 193, of my deposition of

testimony taken in these proceedings on Tuesday, September

22, 2015, and, with the exception of the changes listed on

the next page and/or corrections, if any, find them to be a

true and accurate transcription thereof.




Signed:    ................................

Name:      MONICA CHLOE CHNG

Date:      ................................

E R R A T A

Deposition of MONICA CHLOE CHNG

Page/Line No.          Description          Reason for change

A Court Reporting Transcript by DTI

## CERTIFICATE OF COURT REPORTER

I, HELEN CASE, an Accredited Realtime Reporter with DTI Global, Singapore, hereby certify that the testimony of the witness MONICA CHLOE CHNG in the foregoing transcript, numbered pages 1 through 193, taken on Tuesday, September 22, 2015, was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: .....................................

HELEN CASE

Dated: ... October 6, 2015 ..............

Exhibit "E"



**Akin Gump**

STRAUSS HAUER & FELD LLP

ANTHONY T. PIERCE
+1 202.887.4411/fax: +1 202.887.4288
apierce@akingump.com

July 2, 2015

VIA ELECTRONIC COURT FILING

Hon. Cathy Seibel
United States Judge
Charles L. Brieant United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

Re:    *The Wave Studio, LLC v. American Express Company*
Case No. 7:15-CV-03420-CS

*The Wave Studio, LLC v. General Hotel Management Ltd., et al.*
Case No. 7:13-CV-9239-CS-PED

Dear Judge Seibel:

This firm represents the defendant, American Express Company ("American Express" or "Defendant") in *The Wave Studio, LLC v. American Express Company*, Case No. 7:15-CV-03420-CS. Pursuant to the Court's ruling on June 18, 2015, we write in advance of the August 19, 2015 bench ruling to request a stay of its case now that it is consolidated with *The Wave Studio, LLC v. General Hotel Management Ltd., et al*, Case No. 7:13-CV-9239-CS-PED ("GHM litigation").

By way of background, on April 30, 2015, American Express and The Wave Studio, LLC ("Wave" or "Plaintiff") consented to a transfer to the Southern District of New York. On May 4, 2015 this Court accepted this case and deemed it related to the GHM litigation pursuant to Local Civil Rule 13. On June 18, 2015, this Court consolidated the above captioned cases.

### GHM Litigation Stay

In the GHM litigation, a stay was previously issued on July 2, 2014 as to all 58 defendants other than General Hotel Management Ltd. ("GHM"). The central claim in the GHM litigation is that GHM exclusively hired photographer, Junior Lee to photograph GHM properties. Amend. Compl., *Gen. Hotel Mgmt.*, 7:13-cv-09239-CS-PED (S.D.N.Y. Apr. 23, 2014), ECF No. 7 at ¶ 73. As both GHM and Wave admit in their pre-motion letters for a stay in 2014, the crux of the GHM litigation is whether GHM had the right to use and distribute the Plaintiff's photographs. Letter Mot. re: Conf., *Gen. Hotel Mgmt.*, 7:13-cv-09239-CS-PED

**Akin Gump**

STRAUSS HAUER & FELD LLP

July 2, 2015
Page 2

(S.D.N.Y. June 18, 2014), ECF No. 50 at 2. In the pre-motion hearing, GHM stated "the defendants in the case are our marketing partners who obtained these photographs because we wanted them to have them and we wanted them to market the hotel." Conf. Tr., *Gen. Hotel Mgmt.*, 7:13-cv-09239-CS-PED (S.D.N.Y. July 2, 2014), at 7-8. GHM went on to say about the defendants, "frankly, they're innocent infringers, which is why we proposed this approach." *Id.* at 8. GHM clarified that there were some defendants that did not receive the photographs directly from GHM. To determine which defendants were interconnected with GHM, the parties agreed to let GHM decipher which defendants were GHM partners. *Id.* at 12-13.[1] The parties acknowledged that without a stay the expenses of litigation would be astronomical because even the number of lawyers that would need to be present at deposition would be overwhelming. Further, without a stay all defendants would initiate cross-claims against GHM, which would further compound the cost of litigation and unnecessarily expend judicial resources.

Accordingly, in GHM's June 26, 2014 letter, it stated "Plaintiff has no objection to litigating the issue of GHM's purported rights to use and distribute Plaintiff's intellectual property *before* addressing the purported rights of any other Defendants deriving therefrom . . ." Letter Mot. re: Resp. Def.'s Pre-Mot. Letter, *Gen. Hotel Mgmt.*, 7:13-cv-09239-CS-PED (S.D.N.Y. June 26, 2014), ECF No. 60 at 1. This Court issued a stay to allow GHM and Wave to resolve the issue of rightful ownership because it would be a dispositive ruling for the other defendants. Order, *Gen. Hotel Mgmt.*, 7:13-cv-09239-CS-PED (S.D.N.Y. June 26, 2014), ECF No. 67. Now, Wave claims to oppose a stay for American Express unless American Express can prove all of the photographs in its Complaint derived from GHM.

<u>American Express's Request for a Stay</u>

The American Express litigation was consolidated with the GHM litigation because at least at this early stage, the central question in each is the same – whether Junior Lee retained the rights to her photographs. The purpose of the consolidation was to conserve judicial resources and avoid duplicating discovery efforts. This very purpose will be undermined if the stay does not apply to American Express.

---

[1] Counsel for GHM stated: "To the extent the plaintiff wants us to identify who doesn't belong in the case because they're independent of GHM, I don't have a problem with that being part of the discovery scope or I think just informally, and the point being the plaintiff may not want to stay the case as to those defendants because they're not affected by the threshold issue." Conf. Tr., Gen. Hotel Mgmt., 7:13-cv-09239-CS-PED (S.D.N.Y. July 2, 2014) at 12-13. Counsel for Plaintiff responded, "But we have no objection to staying the case as to those other defendants before we find out whether or not they should be proper parties pursuant to our original theory of the case." *Id.* at 13. Notably, the Court asked counsel to repeat this statement and he did.

**Akin Gump**

STRAUSS HAUER & FELD LLP

July 2, 2015
Page 3

All hotels at issue in the American Express litigation are or were managed or promoted by GHM. Further, the hotels are either named defendants in the GHM litigation or otherwise identified by Wave as GHM hotels in the GHM Amended Complaint. Amend. Compl., *Gen. Hotel Mgmt.*, 7:13-cv-09239-CS-PED (S.D.N.Y. Apr. 23, 2014), ECF No. 7 at ¶ 10. Wave alleges in the American Express Complaint that photographs were improperly published on six websites.[2] American Express has advised Wave that at least three of the American Express-branded websites were hosted and/or managed by current or former defendants in the GHM litigation. These entities provided all images appearing on those sites. With respect to the FHR site, managed by American Express, the current or former GHM hotels themselves provided the images. American Express has explained to Wave that American Express' agreements with current defendants in the GHM litigation, like Orbitz Worldwide LLC ("Orbtiz") and Travelocity.com LP ("Travelocity") contain indemnification provisions. Thus far, Orbitz has agreed to indemnify American Express for Wave's claims relating to the Orbitz-managed website. If the case proceeds against American Express, American Express will have to bring cross-claims against every potential indemnitor that are current defendants in the GHM litigation. In short, although American Express is the named party, the majority of any litigation would involve present or former defendants in the GHM litigation who are awaiting resolution of whether they were provided photographs by GHM lawfully.

Notably, neither Wave nor GHM have identified any evidence to suggest that the photographs allegedly improperly published on American Express-branded websites derive from any source other than GHM. And as Wave knows, GHM is in the process of determining which defendants are GHM-affiliated. There is every indication that the third parties that American Express received the photographs from received the photographs from GHM and thus are rightfully benefiting from the stay in the GHM litigation. If the stay does not apply to American Express, these same parties will now have to be involved in duplicative discovery alongside GHM.

### Legal Authority

The Court has broad discretion to control pretrial procedures. *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971). A court "may decide in its discretion to stay civil proceedings pursuant to the power inherent in every court to control the disposition of the causes on its docket . . . [t]he party seeking a stay bears the burden of establishing its need. When

---

[2] These websites are americanexpressfhr.com, amextravel.com, travel.americanexpress.com, go.americanexpress-travel.com, travelandleisure.com, and travelandleisureasia.com. Time Inc., is the current owner of travelandleisure.com and travelandleisureasia.com.

**Akin Gump**
STRAUSS HAUER & FELD LLP

July 2, 2015
Page 4

considering whether to enter a stay, the basic goal is to avoid prejudice." *Nautilus Neurosciences, Inc. v. Fares*, No. 13 CIV. 1078(SAS), 2013 WL 3009488, at *2 (S.D.N.Y. June 14, 2013). This Circuit generally considers five factors when deciding whether to grant a stay pending the outcome of a related action: (1) the private interests of the Plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the Plaintiffs if delayed; (2) the private interests of and burden on the Defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *GTFM, Inc. v. Park*, No. 02 CIV. 7020(DLC), 2002 WL 31890940, at *2 (S.D.N.Y. Dec. 30, 2002) (citations omitted) (denying stay pending resolution of appeals in a related case). The burden is on "the movant to make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Pippins v. KPMG LLP*, No. 11 CIV. 0377(CM), 2011 WL 1143010, at *6 (S.D.N.Y. Mar. 21, 2011) (holding movant made no argument regarding hardship or inequity) (citing *Consol. Edison Co. of N.Y. v. United States*, 30 F.Supp.2d 385, 389 (S.D.N.Y.1998)) (internal citations omitted).

All five factors weigh in favor of granting American Express's request for a stay. All parties will be best served by awaiting the resolution of the GHM dispute with Wave over ownership of the photographs. A stay of proceedings will preserve resources by, among other things preventing wasteful discovery into ownership, procurement, and use of the photographs when it is highly likely that only GHM has exposure here. Further, the interests of American Express, the other defendants, the Court, and the public plainly favor a stay, as proceeding with Wave's claims against American Express will undermine the Court's current stay. Specifically, proceeding with Wave's claims against American Express will greatly prejudice American Express and the other defendants because it will commence the litigation of claims that are already stayed as to GHM defendants who hosted and/or managed the American Express-branded websites.

There is also no substantial burden or prejudice to Wave because the litigation against GHM is proceeding to determine who owns the rights to the photographs at issue, which will impact the rest of the defendants. Should Plaintiff prevail in demonstrating that it holds the copyright to the photographs at issue, nothing precludes Plaintiff from then litigating against the remaining defendants, including American Express to establish that Plaintiff's copyright was subsequently infringed. Moreover, based on a similar analysis this Court granted a stay to which Wave formerly consented. Thus, it is in the interest of the Court to extend the stay as to American Express to maintain consistent outcomes.



**Akin Gump**
STRAUSS HAUER & FELD LLP

July 2, 2015
Page 5

     Based on the foregoing, American Express respectfully requests that this consolidated
action be stayed until such time as the stay is lifted in the GHM litigation.


                                           Respectfully submitted,


                                           /s/ Anthony T. Pierce


cc:    Nate Garhart, Cobalt, LLP, Counsel for Plaintiff
       Vijay K. Toke, Cobalt, LLP, Counsel for Plaintiff

Exhibit "F"

BURNS & LEVINSON LLP

125 SUMMER STREET  BOSTON, MA 02110
T 617.345.3000  F 617.345.3299
BURNSLEV.COM

DAVID M. LOSIER
617.345.3644
DLOSIER@BURNSLEV.COM

March 25, 2014

**VIA ELECTRONIC MAIL**  info@ghmhotels.com  ghmusa@ghmhotels.com

Corporate Office
General Hotel Management Ltd.
#04-02 Tourism Court
1 Orchard Spring Lane
Singapore 247729

> **Re:**   *The Wave Studio LLC v. General Hotel Management Ltd.*
> *Civil Docket SDNY, 13CV9239*

Dear Sir/Madam:

   This letter shall serve as formal notice from Questex Media Group LLC's and fivestaralliance.com's (collectively "fivestaralliance") claim for indemnity or contribution from General Hotel Management Ltd. ("GHM") for costs and fees associated with the above-referenced litigation.  This letter is not intended to contain an exhaustive statement of our clients' claims and our client expressly reserves its rights in this connection.

   As I am sure you are aware from reviewing the Complaint in the above matter (the "Complaint"), The Wave Studio, LLC alleges Ms. Junior Lee ("Ms. Lee") was hired by GHM to take photographs of certain hotels and properties for marketing purposes and for the benefit of GHM.  As you know, GHM represented to and assured fivestaralliance it at all times had the authority, via ownership or licensing right, to permit fivestaralliance to reproduce or publish the photographs to advertise or promote GHM's hotels or related properties.  At all times fivestaralliance relied in good faith on GHM's assurances in this connection and fivestaralliance had no reason to think GHM did not own or have the right to authorize fivestaralliance to use the photographs for this purpose.  This understanding was further emphasized when GHM provided fivestaralliance a password and all necessary access codes to GHM's secured database of images for GHM properties.

   Our client was shocked to learn from the Complaint that GHM may not have authority to use the photographs or to allow fivestaralliance to use them for GHM's benefit.  In any event, through this letter fivestaralliance requests that you provide us with all documentation or other evidence supporting that GHM owned or had authority to publish the images in question or the

MASSACHUSETTS ⫶⫶⫶ NEW YORK ⫶⫶⫶ RHODE ISLAND

GHM 00247

*March 25, 2014*
*Page 2*

B U R N S *&* L E V I N S O N LLP

right to allow fivestaralliance to publish the images on behalf of GHM. Also, please provide me with your assurance GHM will indemnify fivestaralliance for its costs, fees or damages in connection with this matter.

If you have any questions or wish to discuss the matter, feel free to call me. I look forward to your prompt attention to this matter.

Very truly yours,

David M. Losier

DML/kad

cc:    fivestaralliance.com
       David Amidon, Esq.

4836-1266-6905.1

MASSACHUSETTS ⫶⫶⫶ NEW YORK ⫶⫶⫶ RHODE ISLAND

GHM 00248

*Law Offices*

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

DAVID GURNICK, ESQ.
DGurnick@lewitthackman.com
(818) 907-3285

16633 VENTURA BOULEVARD
ELEVENTH FLOOR
ENCINO, CALIFORNIA 91436-1865

(818) 990-2120
TELECOPIER (818) 981-4764
WWW.LEWITTHACKMAN.COM

REFER TO FILE NUMBER

July 22, 2014

Kenneth R. Hartmann, Esq.
Kozyak Tropin Throckmorton
krh@kittlaw.com
2525 Ponce de Leon, 9th Floor
Miami, FL 33134

> Request for Reimbursement of Legal Expenses and Indemnification in
> The Wave Studio, LLC v. General Hotel Management Ltd, et al.
> U.S. Dist. Court, Southern Dist. of N.Y. Case No.. 13 CV 9239 CS

Dear Mr. Hartmann,

The Lewitt Hackman law firm represents Signature Travel Network Cooperative, Inc.,
("Signature"). Signature is a cooperative of retail travel agencies. Signature and three of its
members (Frosch, Tzell and Lorraine) were named as defendants in The Wave Studio, LLC vs.
General Hotel Management Ltd. The claims against Signature and its members concern images
that were loaded onto Signature's website by a representative of The Setai hotel currently
believed to be on or about September 26, 2007 and again on July 4, 2012. For this reason,
Signature previously requested indemnification from The Setai for fees and costs incurred and to
be incurred in the defense of the lawsuit.

The Setai's lawyer, Kathleen McCarthy of King & Spalding, told me the actions alleged
in the litigation which resulted in the claim against Signature and its members, were taken by
General Hotel Management ("GHM"), not The Setai, that you represent GHM, that Signature
should make its indemnity request to your client GHM, and to direct the request to you.

Signature incurred legal fees to the Lewitt Hackman firm in the matter. Prior to what was
an impending deadline to file a responsive pleading, Signature engaged the services of a New
York lawyer, Kenneth S. Weitzman of Weitzman Law Offices, LLC. I understand that you and
Mr. Weitzman discussed the likelihood that Signature would request indemnification from GHM
following the hearing on July 2, 2014. This letter is a formal request that GHM indemnify
Signature, Frosch and Tzell from any and all attorney's fees, costs and/or liability incurred in the
litigation. Please let me know within the next week whether GHM will reimburse Signature for
its legal fees incurred in connection with its defense of the litigation.

Nothing included in or omitted from this letter waives or modifies Signature's request for
indemnification to The Setai or other rights, claims, remedies and defenses. All are reserved.

Very truly yours,

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN

By: David Gurnick

GHM 00249

BOURLAND, WALL & WENZEL, P.C.

KAMI K. BEATY
MICHAEL V. BOURLAND
BETHANY L. BROOKS
SEAN M. BUCKLEY
JOHN W. CONNER
STEPHANIE M. DALEY
DAVID P. DUNNING
GRAEGORY B. FANCHER
DAVID J. GOODMAN
SAMUEL D. HAMANN
BRYON R. HAMMER

ATTORNEYS AND COUNSELORS
301 COMMERCE STREET, SUITE 1500
FORT WORTH, TEXAS 76102-4115

(817) 877-1088 FAX (817) 877-1636

www.bwwlaw.com

WILLIAM P. KORB
RYANN LAMB
W. MARC MCDONALD
ERIC T. MILLNER
DARREN R. MOORE
JEFFREY N. MYERS
JAY B. NEWTON
JEREMY R. PRUETT
MEGAN C. SANDERS
LEWIS D. WALL III
KENNETH L. WENZEL
DUSTIN G. WILLEY

E-Mail Address  emillner@bwwlaw.com

July 25, 2014

**VIA FEDERAL EXPRESS**
Debbie Chee
Director of Sales & Marketing
The Nam Hai
Hamlet 1 Dien Duong Village
Dien Ban District
Hoi An Quang Nam Province
Vietnam

Re:    The Wave Studio, LLC Copyright Infringement Claim

Dear Ms. Chee:

This law firm represents Virtuoso, Ltd. ("Virtuoso") related to certain claims for copyright infringement alleged by The Wave Studio, LLC ("Wave") involving the use of a photograph of The Nam Hai (the "Hotel"), as well as potential indemnity claims by and against Virtuoso related to same. This letter is sent to provide you notice of Wave's claims, as well as the indemnity responsibilities owed by the Hotel to Virtuoso related to same under the Preferred Supplier Agreements between them.

Wave has filed a lawsuit in the United States District Court for the Northern District of California against Virtuoso and MasterCard International Incorporated ("MasterCard") alleging that certain images used by Virtuoso and MasterCard on their respective websites infringed on copyright registrations filed by a photographer represented by Wave. A copy of the Amended Complaint filed in Wave's lawsuit against Virtuoso and MasterCard is enclosed herewith. Exhibits 2 and 3 to the Amended Complaint specifically show the photograph(s) at issue.

Wave has asserted contributory infringement claims for the images posted on MasterCard's website, including one or more images of the Hotel. MasterCard sent Virtuoso a demand for indemnity related to the images posted on MasterCard's website, a copy of which is enclosed herewith. In this regard, Virtuoso had entered into a Strategic Alliance Agreement with MasterCard whereby Virtuoso would provide certain marketing services to MasterCard. In connection with these services, Virtuoso provided certain marketing materials for use by MasterCard in connection with the Strategic Alliance Agreement, including the image(s) of the Hotel that were posted on MasterCard's website and are at issue in Wave's claims. Virtuoso received these images from the Hotel pursuant to the Preferred Supplier Agreements between the Hotel and Virtuoso. Wave has alleged that the image was provided by the photographer to the Hotel for only limited usages, and that the Hotel did not have the right to provide the image to Virtuoso.

GHM 00252

July 25, 2014
Page 2

      Pursuant to the Strategic Alliance Agreement, as amended, Virtuoso undertook to indemnify MasterCard in connection with intellectual property claims concerning images and other related marketing materials provided by Virtuoso to MasterCard. MasterCard has alleged that the claim filed by Wave is subject to indemnification by Virtuoso pursuant to the Strategic Alliance Agreement.

      Virtuoso is in the process of investigating the alleged claims and whether this matter might be resolved promptly without requiring litigation. Additionally, Virtuoso has discovered that there is currently litigation pending in Case No. 13-CV-09239-CS in the United States District Court for the Southern District of New York between Wave and General Hotel Management, Ltd. ("GHM"), which we understand owns and/or manages the Hotel or, at the time the photographs were provided to Virtuoso by the Hotel, did own and/or manage the Hotel. One of the issues in controversy in the New York lawsuit is the question of whether or not the Hotel or the photographer owns the intellectual property rights to these images in light of a prior settlement between GHM and the photographer. Obviously, a determination of that issue could directly affect or even resolve the claims by Wave against Virtuoso and MasterCard.

      In the Hotel's Preferred Supplier Agreements, the Hotel represented and warranted to Virtuoso that it has the legal right to provide Virtuoso any and all Preferred Supplier Materials, including images such as those involved in Wave's copyright infringement claim. The Hotel further agreed to indemnify, defend, and hold harmless Virtuoso against such claims. In the event that the alleged claims against MasterCard and Virtuoso related to the photograph provided by the Hotel cannot be quickly resolved and/or it is determined that the Hotel did not have the right to distribute the photograph in question to Virtuoso, Virtuoso intends to seek a defense and indemnity from the Hotel.

      If you have any information that would show that the Hotel had the right to distribute the photograph to Virtuoso, I would request that you provide such information promptly.

      If you should have any questions in this regard, please do not hesitate to contact me.

                 Sincerely,

                 BOURLAND, WALL & WENZEL, P.C.

                 Eric J. Millner

EJM/jz/305237.2
Enclosures
cc:    Virtuoso, Ltd.

GHM 00253

# leonardo

111 Peter Street
Suite 630
Toronto, Ontario
Canada M5V 2H1

telephone
+1 416 593 6834

toll free
+1 877 593 6834

fax
+1 416 593 7572

web
www.leonardo.com

BY: COURIER

January 16, 2014

TO:    Claudina Kozma Kaplan
       Senior Vice President, Marketing and Communications
       The Leading Hotels of the World, Ltd.
       485 Lexington Ave, New York, NY
       10017
       U.S.A

AND TO: Managing Director
        The Chedi Muscat
        North Ghubra 32, Way No. 3215
        18th November Street
        Muscat, Sultanate of Oman

RE: ALLEGATION OF COPYRIGHT INFRINGEMENT

Dear Sir/Madam:

I am writing with respect to the Hotel Chain VScape Digital Asset Management &
Distribution License Agreement between The Leading Hotels of the World, Ltd.
("Your Hotel Chain") and Leonardo Worldwide Corporation, formerly known as
VFM Leonardo Inc. ("Leonardo") dated as of September 1, 2009 (as amended and
extended, the "Agreement") relating to the license of Leonardo's VScape Digital
Asset Management & Distribution System ("VScape") for the storage,
management and distribution of hotel digital still images and other digital content
to Your Hotel Chain and hotels which are members of Your Hotel Chain ("Your
Hotels").

Leonardo has received notification of a lawsuit (entitled The Wave Studio, LLC v.
General Home Management, et al. – Civil Action No. 7:13-cv-09239-CS
(S.D.N.Y.), a copy of which is attached for your reference, (the "Lawsuit") by a
photographer (The Wave Studio, LLC, "Wave Studio") containing allegations of
copyright violations as a result of Leonardo's distribution of hotel property images
produced by Wave Studio.  As you will see the Lawsuit specifically identifies
images relating to The Chedi Muscat ("Subject Hotel").

Under the terms of the Agreement and the Hotel Service Terms attached thereto
as Appendix 1 ("Terms of Service"), Your Hotels are solely responsible for ensuring
that Your Hotels have all required intellectual property ownership rights for any
images distributed by Your Hotels through VScape.  Additionally, under Section 10
of said Terms of Service, Your Hotels have an obligation to indemnify, hold
harmless and defend Leonardo and each distribution partner channel to which
Leonardo distributes Your Hotels images for, from, and against any and all claims

GHM 00399



damages, liabilities, costs and expenses (including, but not limited to attorney's fees) incurred by the VFML Indemnified Parties (as defined in the Terms of Service) as a result of any threatened or actual suit of a third party against the VFML Indemnified Parties arising from, among other things, any violation of any third party right, including without limitation any copyright, property, or privacy right in any images provided by Your Hotels for distribution by Leonardo. That Section further provides that Your Hotels have the right to control and defend or settle any such claim at Your Hotels expense and with Your Hotels choice of counsel.

Please confirm at your earliest convenience and no later than January 24, 2014, that Your Hotel either (a) assume the defense of this Lawsuit as it pertains to the Subject Hotel or (b) indemnify Leonardo and the VFML Indemnified Parties as required by Section 10 of the Terms of Service. If we do not hear from your or your attorneys by that date, we will be forced to timely respond to the Lawsuit, and we will expect Your Hotel to, among other things, reimburse Leonardo and the VFML Indemnified Parties for any costs and fees, including attorney fees, incurred in defending the lawsuit.

Additionally, we kindly request as follows:

- If you have loaded into VScape any images produced by Wave Studio, please remove them from VScape as soon as possible. Likewise, if we are able to identify which images are from Wave Studio, we reserve the right, in good faith, and pursuant to the Digital Millennium Copyright Act, 17 § U.S.C., to remove or disable access to the allegedly infringing images from Leonardo's network of partner distribution channels ("VNetwork");

- If you believe that any allegedly infringing images have been removed and/or access thereto has been disabled by Leonardo by mistake or misidentification, AND IF YOU HAVE THE RIGHT TO DISTRIBUTE THE ALLEGEDLY INFRINGING IMAGES TO THE VNETWORK, then you may send Leonardo a written communication (preferably by physical delivery and e-mail) that includes substantially the following:

  1. A physical or electronic signature of the subscriber.
  2. Identification of the material that has been removed or to which access has been disabled, and the location at which the material appeared before it was removed, or access to it was disabled.
  3. A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.
  4. The subscribers name, address, and telephone number, and a statement that the subscribers consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscribers address is outside of the United States, for any judicial district in which the service provider may be found, and that the

GHM 00400



subscriber will accept service of process from the person who provided notification under 17 § U.S.C. 512(c)(1)(C) or an agent of such person.

Please send all communications concerning the foregoing to Stephen McDonald, Chief Financial Officer, Leonardo Worldwide Corporation at 111 Peter St., Suite 530, Toronto, Ontario M5V2H1 (email: stephen.mcdonald@leonardo.com).

Sincerely,

Stephen McDonald
Chief Financial Officer
Leonardo Worldwide Corporation

GHM 00401

 hotelbeds

**The Chedi Muscat Hotel**
North Ghubra 32, Way No. 3215 .O. Box 964
Al Khuwair, Muscat 133, Oman

April 28th, 2014

Dear Sir or Madam,

We contact you on behalf of Hotelbeds Spain, SLU (hereinafter "Hotelbeds") in order to inform you about a lawsuit that one of our clients, it is, a Travel Agency based in United States, has received related to the content that The Chedi Muscat Hotel has provided to Hotelbeds.

As you may know, Hotelbeds acts as an intermediary to distribute your property through its clients. In order to do so, The Chedi Muscat Hotel undertook to provide Hotelbeds the content related to its property located in Oman and that all the content does not infringe third party rights.

On 6th February, 2014, our client Escalavacations.com was served with a Lawsuit lodged by the company **The Wave Studio, LLC** in the District Court for the southern District of New York with regard to the supposedly inappropriate use of certain pictures of your property alleging that the use of such pictures infringes the intellectual property rights of their client, Mr. Junior Lee.

Hotelbeds as intermediary provided to Escalavacations.com all the content of your property, provided by you in order to sell it among their customers. Please find the affected pictures attached.

According to the aforementioned we give you notice about the facts we have been informed and ask you to provide enough evidence of the ownership and legality in the use of the related pictures.

Your faithfully

Francisca Monserrat Domingo
Legal Department
**Hotelbeds Spain, SLU**

**Please send your reply to:**
**Francisca Monserrat Domingo**
**73 Bukit Timah Road #03-00,**
**Rex House Singapore 229832**
f.monserrat@hotelbeds.com

GHM 00486

# LINDQUIST & VENNUM

Minneapolis · Denver

Bruce H. Little
(612) 371-2437
blittle@lindquist.com
www.lindquist.com

Lindquist & Vennum LLP
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: (612) 371-3211
Fax: (612) 371-3207

July 22, 2014

**VIA FEDERAL EXPRESS**

The Nam Hai
Hamlet 1, Dien Duong Village
Dien Ban District
Quang Nam Province, Vietnam

General Hotel Management Ltd.
1 Orchard Spring Lane
#04-02 Tourism Court
Singapore 247729

Re:   **The Wave Studio, LLC v. MasterCard**
       **Case No. 3:14-cv-01342-RS (N.D. Cal.)**
       Our File No. 523412.0001

Dear Sirs:

Our client, CWT Global B.V. and its subsidiary Carlson Wagonlit Travel, Inc. (collectively, "CWT"), have received the enclosed request for indemnity from MasterCard International Incorporated ("MasterCard"). Pursuant to Paragraph 4 of that certain World Elite and Resorts Portfolio Supplier Agreement dated October 24, 2011, between CWT and The Nam Hai, our client CWT hereby seeks indemnity from The Nam Hai in connection with that claim.

Please arrange for your counsel to contact me at the earliest opportunity to discuss this matter.

CWT reserves all of its rights.

Very truly yours,

Lindquist & Vennum LLP

Bruce H. Little

Encl.
cc:    Travis L. Bachman, Esq.

DOCS-#4270965-v1

GHM 00509



MasterCard Worldwide
2000 Purchase Street
Purchase, NY 10577-2509

tel 1-914-249-3517
fax 1-914-249-4262
www.mastercard.com

MasterCard
Worldwide

**\*\*IMMEDIATE RESPONSE REQUESTED\*\***

May 21, 2014

**VIA FEDERAL EXPRESS**

Mr. Douglas Anderson
CEO and Acting CFO
Carlson Wagonlit Global B.V.
701 Carlson Parkway
Minnetonka, MN 55305

Re:    *The Wave Studio, LLC v. MasterCard; Case #:4:14-cv-01342*

Dear Mr. Anderson:

MasterCard International Incorporated ("MasterCard") has received the enclosed demand letter, Summons and Complaint and other court filings from the attorneys representing The Wave Studio LLC in a copyright infringement lawsuit filed in the US District Court, Northern District of California. The demand letter seeks payment of $100,000 by May 21, 2014, in order to avoid service of the Complaint. However, the Plaintiff in the case has agreed to extend this service deadline date for a reasonable period of time.

As you will see, The Wave Studio, LLC claims to hold rights in several photographs that it alleges were infringed when the photographs were displayed on certain websites by MasterCard. Certain of the photographs in question, however, were provided to MasterCard by CWT Global B.V. ("CWT") while it was acting as MasterCard's service provider pursuant to the Master Services Agreement, dated August 19, 2011 (the "Agreement"). MasterCard is therefore submitting this claim to CWT pursuant to its indemnity obligations under Section 10 of the Agreement.

Please have an authorized individual endorse the signature line below indicating that CWT is accepting tender and acknowledging the above and then return a copy to me no later than **May 28, 2013.**

If you have any questions, please feel free to contact me. Thank you for your courtesy and cooperation in this matter.

Sincerely,

Brooke E. Pietrzak, Esq.
Senior Counsel, Litigation
(914) 249-1324

GHM 00510

Page 2

Accepted and Acknowledged this
____ day of _____, 2014.


By: _____

(Print Name:)


_____

(Title:)


Enclosures

GHM 00511



# THE LEADING HOTELS
## OF THE WORLD, LTD.®

VIA COURIER AND E-MAIL (execoffice@chedimuscat.com; miseli@ghmhotels.com)

Hotels Management Company International SAOG
PO Box, 964, Al Khuwair
Muscat 133, Sultanate of Oman

Attn:    Mr. Markus Iseli, General Manager
         The Chedi Muscat

May 12, 2014

Re:  Copyright Infringement Action

Dear Sirs:

As you are aware, The Leading Hotels of the World, Ltd., ("LHW") has been named as a defendant in a lawsuit commenced by Wave Studio, LLC against General Hotel Management Ltd. ("GHM") et al., Case No. 7:13-cv-09239-CS (S.D.N.Y.) (the "Litigation"), alleging copyright infringement as a result of its distribution of hotel property images of and provided by The Chedi Muscat. These images were allegedly produced by Wave Studio.  LHW has now been served with an Amended Complaint in the Litigation.

Section 12.1 of the Hotel's Hotel Membership Agreement (the "Agreement") provides that the Hotelier will indemnify and defend Hotel Representative AG and its affiliates and subsidiaries, which would include LHW, in the event of a claim such as the one alleged in the Litigation.

We are writing to inform you that, as a courtesy to you, GHM has retained counsel, at its own expense, to defend LHW in the Litigation. However, please be advised that the Hotelier's indemnity obligations to LHW pursuant to the Agreement remain in full force and effect, and that Hotelier will continue to be responsible for the payment of any costs and fees actually incurred by LHW in connection with the Litigation including payment of any legal fees, should at any time it be necessary for LHW to retain counsel, as well as costs, judgments and/or settlement amounts.

It is not necessary for you to retain counsel to defend LHW at this point in time, as the defense will be provided by the counsel retained by GHM.  However, if you wish to retain additional counsel to represent LHW in this matter or to oversee the Litigation, please advise us immediately.

SUSAN M. ZILUCA, ESQ.
VICE PRESIDENT & GENERAL COUNSEL

485 LEXINGTON AVENUE, SUITE 401, NEW YORK, NY 10017 | LHW.COM
T: 212.515.5771 | F: 212.515.5635 | SZILUCA@LHW.COM

GHM 00679



## THE LEADING HOTELS
### OF THE WORLD, LTD.®

TIME IS OF THE ESSENCE, as it is necessary to answer the Amended Complaint in less than two weeks. If we do not hear from you by May 15, 2014, we will assume that you understand your indemnity obligations, do not wish to engage separate counsel at this point in time, and that we should rely on the defense by counsel provided by GHM.

Please contact me immediately if you have any questions or would like to discuss this matter with me.

Sincerely,

Susan M. Ziluca

SUSAN M. ZILUCA, ESQ.
VICE PRESIDENT & GENERAL COUNSEL

485 LEXINGTON AVENUE, SUITE 401, NEW YORK, NY 10017 | LHW.COM
T: 212.515.5771 | F: 212.515.5635 | SZILUCA@LHW.COM

GHM 00680

BOURLAND, WALL & WENZEL, P.C.
ATTORNEYS AND COUNSELORS
301 COMMERCE STREET, SUITE 1500
FORT WORTH, TEXAS 76102-4115

(817) 877-1088 FAX (817) 877-1636

www.BWWLAW.com

KAMI K. BEATY
MICHAEL V BOURLAND
BETHANY L. BROOKS
SEAN M. BUCKLEY
JOHN W. CONNER
STEPHANIE M. DALEY
DAVID P. DUNNING
GRAIGORY B. FANCHER
DAVID J. GOODMAN
SAMUEL D. HAMANN
BRYON R. HAMMER

WILLIAM R. KORB
RYANN LAMB
W. MARC MCDONALD
ERIC J. MILLNER
DARREN D. MOORE
JEFFREY N. MYERS
JAY D. NEWTON
JEREMY R. PRUETT
MEGAN C. SANDERS
LEWIS D. WALL III
KENNETH L. WENZEL
DUSTIN G. WILLEY

E-Mail Address: emillner@bwwlaw.com

July 25, 2014

**VIA US PRIORITY MAIL EXPRESS**
**INTERNATIONAL #**
Simone Broekhaar
Director of Sales & Marketing
The Chedi Muscat
P.O. Box 964
Al Khuwair
Postal Code 133
Muscat

Re:    The Wave Studio, LLC Copyright Infringement Claim

Dear Ms. Broekhaar:

This law firm represents Virtuoso, Ltd. ("Virtuoso") related to certain claims for copyright infringement alleged by The Wave Studio, LLC ("Wave") involving the use of a photograph of The Chedi Muscat (the "Hotel"), as well as potential indemnity claims by and against Virtuoso related to same. This letter is sent to provide you notice of Wave's claims, as well as the indemnity responsibilities owed by the Hotel to Virtuoso related to same under the Preferred Supplier Agreements between them.

Wave has filed a lawsuit in the United States District Court for the Northern District of California against Virtuoso and MasterCard International Incorporated ("MasterCard") alleging that certain images used by Virtuoso and MasterCard on their respective websites infringed on copyright registrations filed by a photographer represented by Wave. A copy of the Amended Complaint filed in Wave's lawsuit against Virtuoso and MasterCard is enclosed herewith. Exhibits 2 and 3 to the Amended Complaint specifically show the photograph(s) at issue. Wave's Amended Complaint includes claims based upon images of the Hotel that were provided to Virtuoso pursuant to the Preferred Supplier Agreements between the Hotel and Virtuoso. Wave has alleged that the image was provided by the photographer to the Hotel for only limited usages, and that the Hotel did not have the right to provide the image to Virtuoso.

In addition to claims for copyright infringement for images posted on Virtuoso's website, Wave has asserted contributory infringement claims for the images posted on MasterCard's website, including one or more images of the Hotel. MasterCard sent Virtuoso a demand for indemnity related to the images posted on MasterCard's website, a copy of which is enclosed herewith. In this regard, Virtuoso had entered into a Strategic Alliance Agreement with MasterCard whereby Virtuoso would provide certain marketing services to MasterCard. In connection with these services, Virtuoso provided certain

GHM 00878

July 25, 2014
Page 2

marketing materials for use by MasterCard in connection with the Strategic Alliance Agreement, including the image(s) of the Hotel that were posted on MasterCard's website and are at issue in Wave's claims. As with the images posted on Virtuoso's website, Virtuoso received these images from the Hotel pursuant to the Preferred Supplier Agreements between the Hotel and Virtuoso.

Pursuant to the Strategic Alliance Agreement, as amended, Virtuoso undertook to indemnify MasterCard in connection with intellectual property claims concerning images and other related marketing materials provided by Virtuoso to MasterCard. MasterCard has alleged that the claim filed by Wave is subject to indemnification by Virtuoso pursuant to the Strategic Alliance Agreement.

Virtuoso is in the process of investigating the alleged claims and whether this matter might be resolved promptly without requiring litigation. Additionally, Virtuoso has discovered that there is currently litigation pending in Case No. 13-CV-09239-CS in the United States District Court for the Southern District of New York between Wave and General Hotel Management, Ltd. ("GHM"), which we understand owns and/or manages the Hotel or, at the time the photographs were provided to Virtuoso by the Hotel, did own and/or manage the Hotel. One of the issues in controversy in the New York lawsuit is the question of whether or not the Hotel or the photographer owns the intellectual property rights to these images in light of a prior settlement between GHM and the photographer. Obviously, a determination of that issue could directly affect or even resolve the claims by Wave against Virtuoso and MasterCard.

In the Hotel's Preferred Supplier Agreements, the Hotel represented and warranted to Virtuoso that it has the legal right to provide Virtuoso any and all Preferred Supplier Materials, including images such as those involved in Wave's copyright infringement claim. The Hotel further agreed to indemnify, defend, and hold harmless Virtuoso against such claims. In the event that the alleged claims against MasterCard and Virtuoso related to the photographs provided by the Hotel cannot be quickly resolved and/or it is determined that the Hotel did not have the right to distribute the photograph in question to Virtuoso, Virtuoso intends to seek a defense and indemnity from the Hotel.

If you have any information that would show that the Hotel had the right to distribute the photograph to Virtuoso, I would request that you provide such information promptly.

If you should have any questions in this regard, please do not hesitate to contact me.

Sincerely,

BOURLAND, WALL & WENZEL, P.C.

Eric J. Millner

EJM/jz/305218.2
Enclosures
cc:      Virtuoso, Ltd.

GHM 00879

MasterCard Worldwide
2000 Purchase Street
Purchase, NY 10577-2509

tel 1-914-249-2157
fax 1-914-249-4212
www.mastercard.com

**MasterCard**
Worldwide

**\*\*IMMEDIATE RESPONSE REQUESTED\*\***

May 9, 2014

**VIA FEDERAL EXPRESS**

Mr. Matthew D. Upchurch
Chief Executive Officer
Virtuoso Ltd.
505 Main Street, Suite 500
Forth Worth, Texas 76102

Re:   *The Wave Studio, LLC v. MasterCard; Case #:4:14-cv-01342*

Dear Mr. Upchurch:

MasterCard International Incorporated ("MasterCard") has received the enclosed demand letter, Summons and Complaint and other court filings from the attorneys representing The Wave Studio LLC in a copyright infringement lawsuit filed in the US District Court, Northern District of California. The demand letter seeks payment of $100,000 by May 21, 2014, in order to avoid service of the Complaint.

As you will see, The Wave Studio, LLC claims to hold rights in several photographs that it alleges were infringed when the photographs were displayed on certain websites by MasterCard. The photographs in question, however, were provided to MasterCard by Virtuoso, Ltd. ("Virtuoso") while it was acting as MasterCard's service provider pursuant to the First Amended and Restated Strategic Alliance Agreement, dated December 15, 2008 (the "Agreement"). MasterCard is therefore submitting this claim to Virtuoso pursuant to its indemnity obligations under Section 20(a) of the Agreement.

Please have an authorized individual endorse the signature line below indicating that Virtuoso is accepting tender and acknowledging the above and then return a copy to me no later than May 16, 2014.

If you have any questions, please feel free to contact me. Thank you for your courtesy and cooperation in this matter.

Sincerely,

*Brooke E. Pietrzak*

Brooke E. Pietrzak, Esq.
Senior Counsel, Litigation
(914) 249-1324

GHM 00880

Page 2


Accepted and Acknowledged this
___ day of _____, 2014.


By: _____

(Print Name:)


_____

(Title:)


Enclosures

GHM 00881

KAMI K. BEATY
MICHAEL V. BOURLAND
BETHANY L. BROOKS
SEAN M. BUCKLEY
JOHN W. CONNER
STEPHANIE M. DALEY
DAVID P. DUNNING
GRAIGORY D. FANCHER
DAVID J. GOODMAN
SAMUEL D. HAMANN
BRYON R. HAMMER

**BOURLAND, WALL & WENZEL, P.C.**

ATTORNEYS AND COUNSELORS
301 COMMERCE STREET, SUITE 1500
FORT WORTH, TEXAS 76102-4115

(817) 877-1088 FAX (817) 877-1636

www.BWWLAW.com

WILLIAM R. KORB
RYANN LAMB
W MARC MCDONALD
ERIC J. MILLNER
DARREN D. MOORE
JEFFREY N MYERS
JAY B. NEWTON
JEREMY R. PRUETT
MEGAN C. SANDERS
LEWIS D. WALL III
KENNETH L. WENZEL
DUSTIN G. WILLEY

E-Mail Address: emillner@bwwlaw.com

August 1, 2014

**VIA EXPRESS MAIL INTERNATIONAL**
**and VIA EMAIL: sbroekhaar@ghmhotels.com**
Simone Broekhaar
Director of Sales & Marketing
The Chedi Muscat
P.O. Box 964
Al Khuwair
Postal Code 133
Muscat

Re:    The Wave Studio, LLC Copyright Infringement Claim

Dear Ms. Broekhaar:

This law firm represents Virtuoso, Ltd. ("Virtuoso") related to certain claims for copyright infringement alleged by The Wave Studio, LLC ("Wave") involving the use of a photograph of The Chedi Muscat (the "Hotel"), as well as potential indemnity claims by and against Virtuoso related to same. I previously provided you notice of those claims by my letter dated July 25, 2014. As stated in that prior letter, Wave's Amended Complaint includes copyright infringement claims against Virtuoso based upon images of the Hotel that were provided to Virtuoso pursuant to the Preferred Supplier Agreements between the Hotel and Virtuoso. For your reference, I am enclosing herewith copies of the specific images of the Hotel that were included as exhibits in Wave's Amended Complaint (the "Subject Images").

I understand that the images of the Hotel that appear in the image gallery on Virtuoso's website are uploaded by the Hotel to ICE Portal, a third-party content management provider, and are then published to Virtuoso's website through a feed from ICE Portal. As a result, the Hotel is able to manage and change the images of the Hotel that are published to Virtuoso's website without Virtuoso even having reviewed or approved the posting of the images ahead of time. It is the Hotel's responsibility under its Preferred Supplier Agreement to ensure that it has the legal right to provide Virtuoso any and all images, content, and other materials that will be used in Virtuoso's marketing for the Hotel, including but not limited to online marketing through the Virtuoso.com website.

It has come to our attention that copies of the Subject Images were uploaded by the Hotel to ICE Portal. Virtuoso demands that the Hotel immediately remove from ICE Portal the Subject Images, as well as any other images that could potentially violate any copyright claimed by Wave, and confirm to me in writing within forty-eight (48) hours of receiving this letter that all such images have been removed.

GHM 01029

August 1, 2014
Page 2

Virtuoso further demands that the Hotel cease and desist from uploading to ICE Portal the Subject Images or any other images that could potentially violate any copyright claimed by Wave.

If Wave's allegations are correct that it owns the copyright in the Subject Images and that the Hotel did not have the right to provide the image to Virtuoso, the Hotel's actions could expose Virtuoso to liability for copyright infringement. The Hotel would be required to indemnify Virtuoso from that liability under the terms of its Preferred Supplier Agreement.

Thank you in advance for your full and prompt cooperation with the demands set forth herein. If you should have any questions in this regard, please do not hesitate to contact me.

Sincerely,

BOURLAND, WALL & WENZEL, P.C.

Eric J. Millner

EJM/jz/306227
Enclosures
cc:    Virtuoso, Ltd.

Exhibit "G"

gHmHotels.com WHOIS, DNS, & Domain Info - DomainTools

HOME    RESEARCH

PROFILE    CONNECT    MONITOR    ACQUIRE    SUPPORT    WHOIS          LOGIN    Free Trial

Home :- Whois Lookup :- gHmHotels.com

## Whois Record for gHmHotels.com

### Related Domains For Sale or At Auction            1  2  3  More >

CheapHotelsOnline.com ($3,599)          OnlineCasinoHotels.com ($4,000)
CheapHotelsGuide.com ($1,995)           DiscountHotelsOnline.com ($4,250)
ChinaBusinessHotels.com ($2,799)        OnlineDiscountHotels.com ($1,488)

### Whois & Quick Stats

| | |
|---|---|
| Email | ghmadmin@ghmhotels.com is associated with ~182 domains |
| | abuse@web.com is associated with ~9,559,306 domains |
| | ghmsin@singnet.com.sg is associated with ~7 domains |
| Registrant Org | General Hotel Management Ltd is associated with ~177 other domains |
| Registrar | NETWORK SOLUTIONS, LLC. |
| Registrar Status | clientTransferProhibited |
| Dates | Created on 1996-05-16 - Expires on 2021-11-12 - Updated on 2012-04 |
| Name Server(s) | NS97.WORLDNIC.COM (has 2,890,959 domains) |
| | NS98.WORLDNIC.COM (has 2,890,959 domains) |
| IP Address | 198.57.229.162 - 6 other sites hosted on this server |
| IP Location | ▓ - Utah - Provo - Unified Layer |
| ASN | ▓ AS46606 UNIFIEDLAYER-AS-1 - Unified Layer (registered Oct 24, ? |
| Domain Status | Registered And Active Website |
| Whois History | 86 records have been archived since 2001-12-20 |
| IP History | 10 changes on 7 unique IP addresses over 9 years |
| Registrar History | 1 registrar with 2 drops |
| Hosting History | 4 changes on 4 unique name servers over 9 years |
| Whois Server | whois.networksolutions.com |

### Website

D☐P☐ Exhibit  40
Deponent  CHNG
Date  9|22|15
Rptr  HC     DTI

gHmHotels.com WHOIS, DNS, & Domain Info - DomainTools

| | |
|---|---|
| **Website Title** | G |
| | Luxury Hotels, 5 Star Resorts, Boutique Hotels & Luxury Resorts by Gl |
| **Server Type** | Apache/2.2.27 (Unix) mod_ssl/2.2.27 OpenSSL/0.9.8e-fips-rhel5 DAV/2 |
| **Response Code** | 200 |
| **SEO Score** | 97% |
| **Terms** | 383 (Unique: 223, Linked: 125) |
| **Images** | 1 (Alt tags missing: 0) |
| **Links** | 56   (Internal: 47, Outbound: 9) |

**Whois Record ( last updated on 2015-09-17 )**

```
Domain Name: GHMHOTELS.COM
Registry Domain ID: 3719720_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.networksolutions.com
Registrar URL: http://networksolutions.com
Updated Date: 2015-01-28T23:26:58Z
Creation Date: 1996-05-16T04:00:00Z
Registrar Registration Expiration Date: 2021-11-12T05:00:00Z
Registrar: NETWORK SOLUTIONS, LLC.
Registrar IANA ID: 2
Registrar Abuse Contact Email: abuse@web.com
Registrar Abuse Contact Phone: +1.8003337680
Reseller:
Domain Status: clientTransferProhibited http://www.icann.org/epp#
clientTransferProhibited
Registry Registrant ID:
Registrant Name: General Hotel Management Ltd
Registrant Organization: General Hotel Management Ltd
Registrant Street: 32 Gilstead Road
Registrant City: Singapore
Registrant State/Province:
Registrant Postal Code: 309075
Registrant Country: SG
Registrant Phone: +65.62233755
Registrant Phone Ext:
Registrant Fax: +65.62211535
Registrant Fax Ext:
Registrant Email: ghmsin@singnel.com.sg
Registry Admin ID:
Admin Name: Jenni, Hans
Admin Organization: General Hotel Management Ltd
Admin Street: 32 Gilstead Road
Admin City: Singapore
Admin State/Province:
Admin Postal Code: 309075
Admin Country: SG
Admin Phone: +65.2233755
Admin Phone Ext:
Admin Fax: +65.2211535
Admin Fax Ext:
Admin Email: ghmadmin@ghmhotels.com
Registry Tech ID:
Tech Name: Jenni, Hans
Tech Organization: General Hotel Management Ltd
Tech Street: 32 Gilstead Road
```

gHmHotels.com WHOIS, DNS, & Domain Info - DomainTools

```
Tech City: Singapore
Tech State/Province:
Tech Postal Code: 309075
Tech Country: SG
Tech Phone: +65.2233755
Tech Phone Ext:
Tech Fax: +65.2211535
Tech Fax Ext:
Tech Email: ghmadmin@ghmhotels.com
Name Server: NS97.WORLDNIC.COM
Name Server: NS98.WORLDNIC.COM
DNSSEC: Unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdpr
s.internic.net/
```

**Tools**





**Available TLDs**

**General TLDs**    Country TLDs

The following domains are available through our preferred partners. Select domains below
for more information. (3rd party site)

Taken domain.
Available domain.
Deleted previously owned domain.

gHmHotels.com WHOIS, DNS, & Domain Info - DomainTools

gHmHotels.c...                                     View
                                                   Whois

gHmHotels.net                                      Buy Domain

gHmHotels.org                                      Buy Domain

gHmHotels.info                                     Buy Domain

gHmHotels.biz                                      Buy Domain

gHmHotels.us                                       Buy Domain



Sitemap   Blog   Terms of Service   Privacy Policy   Contact Us   Domain News   © 2015 DomainTools

Exhibit "H"

# thewΛvedesign

## production estimate

client    mr m. p. s. puri - the setai, miami (f 1 305-520 6600)
product   the setai, miami - photoshoot ( 6 days )
version   1
date      4th july 2005

| description | SGD |
|---|---|
| 1. photography, photo art direction and supervision with digital processing charges (sgd 4,000 x 6 days' photoshoot) august 14 - 23 | 24,000.00 |
| 2. recce (sgd 1,500 x 1 day ) | 2,000.00 |
| 3. travelling days ( sgd 1,500 x 3 days ) | 4,500.00 |
| 4. ata carnet fee | 500.00 |
| 5. travel insurance | 600.00 |
| 6. airfare including airport tax ( 3 pax ) - approximate | 9,000.00 |
| 7. excess baggage - approximate | 1,000.00 |
| 8. photo digital touch-up (60 hours) including 30 pix in high resolution, digital editing and archiving them into 4 sets of master pix cd-rom | 6,000.00 |
| **TOTAL** | **SGD 47,600.00** |

Note
- client to provide accommodation, ground transportation, laundry and 3 meals a day for 3 pax throughout the entire above mentioned period
- Overtime rates apply when work day exceeds 8 hours (rates based on 2 times of the main rate, equivalent to SGD 1,000.00 per hour )
- Additional charges will be billed separately if (a) the final creative brief differs from the original requirements or (b) additional services or equipment is required.
- Additional charges will be billed if on any further photo digital imaging, editing and touch-ups exceeding 60 hours is required.

PIS SEND SOL DEPOSIT IRAI ...

estimate prepared by _____    client's approval _____

date    4th july 2005    date _____

- This estimate is only valid for 10 days from the date stated above.
- terms of payment: 50% on commencement, balance on completion.
- In the event of cancellation, all creative & ad materials that apply under terms by that point is deemed chargeable.
- This is an estimate only. A subsequent charge & specifications or pricing will exceed the amount quoted.
- We will proceed on the basis that this information is wholly acceptable unless advised to the contrary in writing before the work commences.
- 5% interest will be charged from the date of all invoices / debit notes until full payment is made.
- We retain all the intellectual property rights to all designs / art works / material / photographs / projects undertaken.

THE WAVE DESIGN PTE LTD (200506695G)  10a trengganu street singapore 058464  t 59 6227 3700  f 65 6227 3971

TWS0355721

D☐P☐ Exhibit __S3__
Deponent __OHLETZ__
Date 9/23/15
Rptr __HC__    DTI