# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE WAVE STUDIO, LLC, <br><br> Plaintiff, <br><br> v. <br><br> GENERAL HOTEL MANAGEMENT, LTD. *et al.,* <br><br> Defendants. | Case No.:  13-cv-09239 (CS) (PED) <br><br> **DECLARATION OF DR. STANLEY LAI, SC IN FURTHER SUPPORT OF DEFENDANT GENERAL HOTEL MANAGEMENT, LTD.'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF THE WAVE STUDIO, LLC'S CROSS MOTION FOR SUMMARY JUDGMENT** |

I, **DR. STANLEY LAI TZE CHANG, SC**, declare as follows:

1.     I have read the Declaration of Gordon Ionwy David Llewelyn ("**Prof Llewelyn**") and make this Declaration to respond to various points made by Prof Llewelyn in his Declaration.

2.     I adopt the same abbreviations used in my earlier Declaration, dated February 12, 2016, in this Proceeding.  My opinion expressed herein is premised on the factual matrix of the Suit as described in paragraphs 6 to 8 of my earlier Declaration as well as the documents I have reviewed as set out in paragraph 10 of my earlier Declaration.

3.     At the outset, I wish to highlight that Prof Llewelyn's Declaration appears to be premised on certain factual assumptions which differ from the factual matrix upon which I rendered my opinion in my earlier Declaration.  In particular, his opinion appears to assume or have been based on the premise that:

(i)     the engagement of the respective Wave entity and Lee Kar Yin ("**Lee**") to take photographs was always "bundled up" with other services, namely the production of marketing collateral (see paragraphs 22 to 23 of Prof Llewelyn's Declaration);

(ii)    the respective Wave entity and Lee engaged Masano Kawana in their capacities of agents of General Hotel Management, Ltd. ("**GHM**"); and

(iii)   GHM/hotels paid the exact sums specified on every production estimate (see paragraph 71).

4.      These factual assumptions are significant. As I will elaborate further below, they lead to and affect the analysis of the issues concerning copyright ownership of the photographs and the operation of Section 30(5) of Singapore's Copyright Act. The conclusions reached by Prof Llewelyn in his Declaration must be understood in the context of these factual assumptions, which in my view, appear to be incorrect or at the very least appear to disregard the commercial and practical realities of the dealings between the parties as demonstrated through Lee's Deposition and Ohletz's Deposition as well as the documents that I reviewed for the purposes of my earlier Declaration. First, the engagement for photography was not always "bundled up" with other services, namely the production of marketing collateral, because some of the production estimates pertained only to photography. Secondly, that the respective Wave entity and Lee engaged Masano Kawana ("**Masano**") in the capacity of an agent of GHM is a wrong factual premise that is unsupported and I have not had sight of any evidence of such agency. I highlight that in Lee's Deposition of 21 May 2015, she speaks of Masano as her sub-contractor, notably with the statement that he "only pushed the button". Ohletz's

2

Deposition also states in no uncertain terms that the party whom GHM had engaged was Lee and the respective Wave entity. That GHM intended to engage Masano for the photography through Lee and/or the respective Wave entity as GHM's agent does not appear to be supported by Lee's Deposition or Ohletz's Deposition. Finally, Prof Llewelyn assumes that GHM/hotels paid out the exact specific sums on every production estimate but based on the factual matrix of my earlier Declaration and Ohletz' Deposition, payments were made based on invoices that were rendered and I would also observe that the invoiced sums sometimes differed from the production estimates.

5.      Prof Llewelyn treats the engagement of Masano by the respective Wave entity as a commissioning arrangement to which Section 30(5) applies so that the copyright in the photographs taken by Masano vests in the respective Wave entity (see paragraphs 28 and 29). Prof Llewelyn states at paragraph 29 of his Declaration that the Confirmation of Assignment of Copyright executed by Lee on 18 May 2015 attaching Attachment A which is the "Memorandum of Understanding and Ownership" signed by Masano and Irieeyes Pte Ltd on one part and Lee on the other dated 1 October 2013 ("**2013 Kawana Assignment**")[1] operated to assign such residual rights (the right of veto of the photographer under Section 30(5)) as Masano and Irieeyes Pte Ltd had at that relevant time. Respectfully, I disagree with this analysis. In my view, the fact that there was a need for a "confirmatory" agreement to be entered into in 2013 is indicative that in actual fact, there was never any commissioning agreement between Masano and the respective Wave entity. The terms of the 2005 Irieeyes Photography Service Agreement[2]

---

[1] Declaration of Abigail J. Remore, dated April 14, 2016 ("Remore April Decl.") at Ex. 7.

[2] See Declaration of Lee Kar Yin, dated March 14, 2016 ("Lee Decl.") at Ex. D.

do not speak of a commissioning agreement, particularly since they provide that "All Photographs and rights contained therein, including copyright, remain the sole and exclusive properties of the Design Agency (the relevant Wave Entity) and the Photographer." First, this clause is contradictory as it says that the rights on the photograph belong to both the relevant Wave Entity and the Photographer. Secondly, in my experience as a legal practitioner (of more than 16 years) in Singapore, such a clause is highly unusual, especially in what is purportedly a commissioning agreement based on Prof Llewelyn's opinion.

6.     Prof Llewelyn indicates at the end of paragraph 30 that copyright in the photographs have never vested in GHM or the hotels. His reasoning is that Masano is the author of the photographs (as defined by Section 7 of the Copyright Act) and Section 30(5) does not apply because there is no contractual relationship between Masano and GHM/hotels. It is apparent that in his analysis and in arriving at his conclusion, his starting point is that Masano is the author of the photographs and he was engaged by the respective Wave entity (or Lee) and hence the commissioning agreement exists between these 2 entities. The difficulty with this analysis is that it ignores what is apparent on the facts, which is that:

(i)     Masano was the sub-contractor of the relevant Wave entity;

(ii)    For all intents and purposes, it was the respective Wave entity whom GHM engaged. It was never the case that it was Masano whom GHM set out to engage and GHM hired the respective Wave entity to act as its agent to engage Masano. The fact that GHM knew of Masano's existence or that he was hired by Lee and the respective Wave entity to take the photographs does

4

not give rise to any automatic conclusion or inference that the respective Wave entity was acting as GHM's agent in hiring Masano.[3]

(iii)    But for GHM's engagement of the Wave entity to take photographs of the hotels, Masano would have never been instructed by Wave to take the photographs of the hotels.  The photographs were taken by Masano because GHM first engaged the relevant Wave entity, and it was only then that Wave instructed Masano to take the photographs for Wave's performance of GHM's engagement.

7.    Any analysis of the issue of copyright ownership of the photographs must take into account that reality of the commercial dealings between the parties, which are well borne out in Lee's Deposition and Ohletz's Deposition:



_____

[3] In fact, I do not even have information sufficient to show that Masano took all of the photographs in dispute in this proceeding.

**Interpretation of Section 30(5)**

8.    In paragraphs 15 and 16 of my earlier Declaration, I expressed the opinion that Section 30(5) would operate even where the party commissioned to take a photograph employs a third party sub-contractor to take the photograph for the party commissioned and the copyright in the photograph taken by the sub-contractor would still vest in the commissioning party by operation of Section 30(5). Prof Llewelyn disagrees that Section 30(5) would operate where there is a sub-contractor (see paragraphs 32 to 37). First, he distinguishes the wording of Section 4(3) of the UK Copyright Act, 1956 from the wording of Section 30(5) of Singapore's Copyright Act and Section 35(5) of the Australian Copyright Act (upon which as Prof Llewelyn rightly points out formed the basis for Section 30(5) of Singapore's Copyright Act). According to Prof Llewelyn, because the UK provision uses the word "commission" and is open-ended and focusses entirely on the "commissioner" without referring to the author of the work, the UK provision is broad enough to encompass a sub-contractor situation. Prof Llewelyn argues that, in contrast, Section 30(5) "refers explicitly to only two parties to a contract: the party taking a photograph etc… and the person contracting with that party" and "contemplates a strictly bilateral relationship between the person taking the photograph and the person contracting with that person". Prof Llewelyn thus concludes that on a plain and ordinary meaning of Section 30(5), Section 30(5) could not possibly produce the same legal result as an application of the UK provision. I note that Prof Llewelyn has not made any references to Singapore parliamentary debates to support his interpretation of Section 30(5) of the Copyright Act.

6

9.    In response, my view is that such a narrow and restrictive interpretation would mean that in all commissioning scenarios where A and B enter into an agreement with B for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving and B uses the services of a sub-contractor C to perform all or part of the work, the commissioning party would never be able to rely on Section 30(5). Such an outcome, in my view, would be contrary to legislative intent.    Section 9A(1) of the Interpretation Act (Cap. 1) provides that:

> *In the interpretation of a provision of a written law, <u>an interpretation that would promote the purpose or object underlying the written law</u> (whether that purpose or object is expressly stated in the written law or not) <u>shall be preferred</u> to an interpretation that would not promote that purpose or object.*
> [emphasis added]

10.    The interpretation that the references in Section 30(5) to "a person" who makes an agreement with "*another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving*" does not preclude the operation of Section 30(5) to a situation where A commissions B (e.g. a photo studio) to take the photograph and B hires a photographer to take the photo for B's performance of the commissioning agreement. Such a reasonable interpretation better promotes *the purpose or object underlying* Section 30(5) rather than the interpretation adopted by Prof Llewelyn. The purpose or object underlying Section 30(5) is that where a party who contracts with another party for the taking of a photograph for valuable consideration, the commissioning party ought to own the copyright in the photograph since the photograph was taken on his commission, at his request and further, for valuable consideration.

7

11.     Having been in intellectual property law practice in Singapore for more than 16 years, I have taken the view that a commissioning party is entitled to own copyright in specific commissioned works (namely photograph, painting, portrait or engraving) by reason of Section 30(5). This would remain the case even if a sub-contractor of the commissioned party was involved in creating part of or the entire commissioned work at the request of the commissioned party.

12.     At paragraphs 38 to 41, Prof Llewelyn places reliance on Aedit Abdullah JC's decision in *Wang Choong Li v Wong Wan Chin* [2015] SGHC 128 (a case involving wedding photography) to suggest that the Singapore Courts have implicitly rejected the position in the UK relied upon in my earlier Declaration. I respectfully disagree with Prof Llewelyn's reliance on this decision as authority for the Singapore Court's rejection of the position that Section 30(5) is applicable to situations like the one in the present Suit (as illustrated at paragraph 7 above).

13.     The decision was an appeal to the High Court from the first instance decision in the lower courts. The Respondent had sued the Appellant for copyright infringement over the use of the Respondent's wedding photographs to market the Appellant's business. The dispute in the case involved 2 sets of photographs — the pre-wedding photo shoot and photographs of the actual wedding day. The JC agreed with the trial judge that Section 30(5) applied in respect of the pre-wedding photo shoot since the facts and circumstances showed clearly that there was a commissioning agreement between Respondent and the photographer (not a party to the case) who took the photographs. The Appellant was not involved in the taking of the pre-wedding photo shoot. In relation to the photographs of the actual wedding day, the photographs were

8

taken by a photographer hired by the Appellant and the photographs were part of a bridal package sold to the Respondent. The JC disagreed with the trial judge's finding that the copyright in the actual wedding day photographs belonged to the Respondent under Section 30(5). The JC noted at [59] that the conceptual basis for the trial judge's decision "*appears to have been that the Appellant commissioned the second photograph on behalf of the Respondent, ie, the Appellant acted as the agent for the Respondent. This was the characterisation of the trial judge's reasoning adopted by the Appellant.*" The JC then begins paragraph 60 with the statement "*I find that agency is not borne out on the facts or by the law.*" This is important as it makes clear that the JC's reasoning and eventual finding that the Respondent did not own copyright in the photographs because there was no privity of contract and no commissioning agreement between the Respondent and the actual photographer related to the issue of whether the Appellant acted as an agent of the Respondent in hiring the actual photographer. Applying the legal principles of the law of agency in Singapore, the JC found on the facts that no principal and agent relationship was borne out and accordingly the conceptual basis upon which the trial judge decided that Section 30(5) applied was in error. The relevant paragraphs of the JC's decision on this particular point are paragraphs 58 to 64.

14.    In particular, I set out below, for ease of reference, paragraphs 60, 61, 63, 64 and 65 of the decision:

> 60    *I find that agency is not borne out on the facts or by the law. The point that consideration ultimately came from the Respondent cannot determine the outcome – back-to-back contracts are common in many contexts. It does not follow that in such situations that the intermediate contracts can be disregarded, and that privity is established between the parties at the two ends of the chain of transactions.*

*61        Privity can be so established if the intermediary was an agent. This requires that the erstwhile agent act not for herself, but for the benefit of the supposed principal. Certainly, as argued by the Respondent, there may be undisclosed agency, but such absence of disclosure of the fact of agency only affects the third party. As between the principal and agent, there should be consent on both sides for the latter to act for the former: see Chitty on Contracts – Volume II: Specific Contracts (H G Beale gen ed) (Sweet & Maxwell, 31st Ed, 2012) at para 31-006.*

*...*

*63        Furthermore as noted by the Appellant, the Respondent engaged the Appellant to provide photography. This must mean there was no intention for the Respondent to enter into a contract with the photographer. Finding that agency arose between the Respondent and the Appellant in respect of the dealing with the second photographer is highly artificial. I accept the arguments of the Appellant that an agency was not in the contemplation of either the Appellant or the Respondent.*

*64        In the absence of any evidence of an actual commission of the second photographer by the Respondent, the copyright in those photographs reside either with the maker, ie, the photographer, or with the Appellant. It is not, however, necessary for me to decide the matter in this appeal. It suffices that I find that the copyright does not reside with the Respondent.*

*65        I would also emphasise that the position as to the existence of agency will vary with the facts. The conclusion here is based on the evidence adduced in this case only.*

15.    It is clear from reading paragraphs 60, 61, 63, 64 and 65 that the JC's statements were made in the context of finding that there was no agency relationship between the Respondent and the Appellant.  As such, I would submit that the JC's statements should not to be properly taken as authority for the position that where A commissions B to take a photograph and B engages a sub-contractor C to perform all or part of the work for it, Section 30(5) cannot operate to vest copyright in the photograph

taken by C in A. I respectfully take the view that Prof Llewelyn's reliance on this decision in support of his interpretation of Section 30(5) is misconceived, and incorrect.

16.    Further, Prof Llewelyn's reliance on this case and his conclusion that Section 30(5) cannot apply to GHM/hotels is premised on the assumption that facts of the present Suit are that GHM/hotels was the principal and Wave was the agent in hiring Masano. However, as mentioned above in paragraph 4, this is not the case based on my understanding of the factual matrix formed from my review of Lee's Deposition and Ohletz's Deposition and the documents described at paragraph 10 of my earlier Declaration. A principal-agency relationship has also markedly different legal implications from a situation where A engages B and B then engages its own sub-contractor to perform the work. My understanding of the factual matrix of the Suit is that the nature of the relationship between the parties was that the agreement was between GHM (as agent of the hotels) and the respective Wave Entity. Masano was a sub-contractor of the respective Wave Entity. There is nothing in what I have reviewed to suggest that at any point in time, the respective Wave Entities or Lee conducted themselves or saw themselves as GHM's agent or that GHM saw the Wave Entities or Lee as their agent to hire Masano.

17.    I thus disagree with Prof Llewelyn's statements in paragraph 42 of his Declaration that the facts of *Wang Choong Li v Wong Wan Chin* are very similar to the facts in the present dispute and that the decision is authoritative on the approach that would be taken by the Singapore Courts.

18.    It is clear from the documents that I have reviewed that GHM knew that Masano took the photographs (although I am not aware as to whether Masano took all the

11

photographs in dispute).  However, from a Singapore law perspective, this would not lead to any inference of a principal-agency relationship between GHM and the respective Wave Entities and Lee.  I also note that in Lee's Deposition of 21 May 2015, she appears to view Masano as simply her sub-contractor and she wanted to be seen as the photographer.  She testified that he "just pushed the button when I say it's okay to push".[4]  It thus appears that she did not see herself as engaging Masano on GHM's behalf as GHM's agent.

19.    As Prof Llewelyn rightly notes, Section 30(5) is very similar to and was adapted from Section 35(5) of the Australian Copyright Act.  Based on my research on Australian case law involving Section 35(5) of the Australian Copyright Act, it would appear that the issue of the scope of operation of Section 35(5) and its application to situations where the commissioned party engages a sub-contractor has not been addressed in any reported decision before the Australian Courts.

**Right of commissioned party to restrain the doing of any act comprised in the copyright in the commissioned work for any particular purpose, other than the particular purpose communicated by the commissioning party at the time of commissioning under Section 30(5)**

20.    Prof Llewelyn considers that the purpose of the commissioning must be communicated failing which it may be sufficient to render Section 30(5) inapplicable (see paragraph 64).  The reference to the communication of the purpose of the commissioning is found in what is referred to as the proviso in Section 30(5), underlined below:

> Subject to subsection (4), _where_ —
>
> (a) a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or

---

[4] Declaration of Abigail J. Remore, dated February 12, 2015 ("Remore Feb. Decl") at Ex. C (Lee May Dep.), Page 178 and lines 11 to 12.

> *drawing of a portrait or the making of an engraving by the other person; and*
> *(b) the work is made in pursuance of the agreement,*
> *the first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part,*
> <u>*except that **if** the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.*</u>

He appears to suggest that the communication of the purpose is a prerequisite for the application of Section 30(5). I respectfully disagree with this.

21.    In *The Law of Copyright in Singapore* (Second Edition), George Wei (cited by Prof Llewelyn at paragraph 63) at [7.21][5], the author identifies and discusses the problems in the interpretation and the application of the proviso. He recognizes that the proviso only applies where the commissioning party had a "particular purpose" in mind. First, the commissioning party may not necessarily have a "particular purpose" in mind at the time of commissioning save for his own personal enjoyment. There is the question of what is sufficiently certain to constitute a "particular purpose" and there may be circumstances where it would be difficult for the author to assert the right of veto. At the same time, he also highlights that problems arise when there is a particular purpose but that is not communicated to the commissioned party. To adopt the view that the failure to communicate will have the effect of negating the effect of Section 30(5) would safeguard the interests of the commissioned party, but would effectively render the failure to communicate the purpose penal in effect. Given that there is no Singapore

---

[5] Attached hereto as Exhibit A.

court decision on this point, there is no authority that the failure to communicate the purpose would lead to the exclusion of the application of Section 30(5).[6]

22.     It should also be noted that the "right of veto" in the proviso to Section 30(5) is purely a right to object or restrain the use of the commissioned work for purposes outside the communicated particular purpose for commissioning.  The commissioned party does not acquire any copyright in the commissioned work but only a "limited "right of veto" in relation to non-commissioned purposes."[7]

23.     If Professor Llewelyn's analysis represents the true legal position under Singapore law, which I strongly dispute for reasons elaborated above, then the 2005 Photography Service Agreement between Masano and Wave-S and The Wave Pte Ltd would also suffer from the same defect, based on Prof Llewelyn's analysis by not mentioning any particular purpose (the particular purpose of taking the photographs for hotels managed by GHM ought to have been mentioned) and Section 30(5) will not apply to vest copyright in the respective Wave entities as the commissioning party.  The 2005 Photography Service Agreement between Masano and Wave-S and The Wave Pte Ltd would fail on Prof Llewelyn's own analysis.

24.     I note there is nothing in the documents reviewed to suggest that the respective Wave Entities and Lee were hired / commissioned to take the photographs for

_____

[6] This is acknowledged by other academic writings on Section 30(5) by other commentators on Singapore intellectual property law.  See "Intellectual Property Law in Singapore: A General Overview" by Ng Siew Kuan, Singapore Academy of Law Journal (1992) 32 (attached hereto as Exhibit B) at page 50 where at footnote 78, she notes that "… it is unclear as to the precise effect of the failure to inform the person commissioned of the particular purpose the work is required for."

[7] "Intellectual Property Law in Singapore: A General Overview" by Ng Siew Kuan, Singapore Academy of Law Journal (1992) 32 at page 50, attached hereto as Exhibit B.

the particular purpose of use in only the specific marketing collaterals produced by the respective Wave Entity as part of the overall business dealing between the parties, or that it was ever conveyed to the respective Wave Entities and Lee that the photographs were for the particular purpose of use only in the marketing collaterals produced by the respective Wave Entity.  It would appear that Lee understood that the photographs would be used for a range of publicity purposes, including but not limited to the marketing collaterals and brochures produced by her or the respective Wave Entities for the hotels. Paragraph 73 of the First Amended Complaint pleads that "From December 2000, Ms Lee was exclusively commissioned by GHM to shoot a series of photographs at the Hotels for advertising, promotion and documentation purposes".  Some of the emails that I reviewed for the purposes of the expert opinion lend support to my understanding.  For instance, in the email dated 6 October 2006 at 10:08pm from one Astrid Djuansjah to "jlee" with copy to "General Manager; Director of Marketing; Sales Administrator" on subject "Re: The Beach House Images", Astrid informs Lee that The American Airline and Conde Nast Traveler will be featuring the Beach House for their next edition and asks her to send the CD and arrive as soon as possible.[8]  This email suggests that Lee knew that the photographs she was commissioned to take would be used for more than simply inclusion in marketing collaterals and brochures that she designed.  She was well aware that the photographs were also to be used in general by the hotels to promote the hotels by display of these photographs in third party media, such as The American Airline and Conde Nast Traveler.

---

[8] Remore Feb. Decl. at Ex. L.

**Terms of the contract between GHM and the respective Wave Entities**

25.     Prof Llewelyn expressed the view that the contractual relationship between the Wave Entities and the hotels are contained in the production estimates and supplemented by contractual terms agreed upon orally or through a course of conduct. For the reasons stated at paragraphs 25 to 27 of my earlier Declaration, I do not agree with his opinion. I would consider the course of conduct of the parties through the years constituting the commissioning agreement. It would be fair to say that there was a pattern of conduct over the years between Lee and GHM and the hotels and the terms of the commissioning agreement are constituted by the pattern of conduct, rather than the production estimates.

26.     The pattern of conduct was that the respective Wave Entity would send a quote by first rendering a production estimate and the hotels would sometimes sign on it and sometimes would not. It also appears from my review of the documents that Wave would not insist on the production estimates being signed. Thereafter, payment would only be made based on an invoice (rather than the production estimate). It is significant that there was no clear pattern of signature on the production estimates and that payments were only made on invoices rather than the production estimates. If a Singapore Court was adjudicating the current dispute, it would not regard the production estimates as constituting the terms of the commissioning agreement between the parties. In paragraph 73 of the First Amended Complaint, the Plaintiff pleads that "*Specifically, Ms. Lee and GHM entered an agreement under which GHM would arrange for Ms. Lee to photograph certain hotel properties, and the hotels themselves would compensate Ms. Lee for her work.*" It would thus appear that it is not the Plaintiff's pleaded case that each production

16

estimate constitutes a separate binding contract. I also note that in Ohletz's Deposition, he testified that he did not consider each production estimate to constitute a separate binding contract.[9]

27.    In addition, if emphasis is placed on the fact that the author of the photographs is Masano, the Wave Entities would technically not have any intellectual property rights in the photographs to "reserve" as purported under the Production Estimates since they are not the authors of the photographers. I repeat paragraph 20 of my earlier declaration.

**Assignment of Copyright and Chain in Title**

28.    Prof Llewelyn is of the opinion that as of 1 August 2008, any relevant copyright in the photographs vested in (by operation of law or shareholder resolution) either Ms Lee or The Wave Studio Private Ltd. The 2007 and 2008 assignments were, according to Prof Llewelyn and Plaintiff, in fact irrelevant and nugatory as the copyrights had already been vested at the relevant times and there were therefore no copyrights to assign. I would make the brief but pertinent observation that shareholder resolutions are insufficient to constitute a valid assignment of copyright under the Copyright Act. A shareholder's resolution reflects the decision and agreement of the shareholders concerning the copyright but I do not consider that it satisfies Section 194(2) of the Act

---

[9] Ohletz's Deposition from pages 62 to 64 and page 68 to 70 appears to indicate that GHM and the hotel managers treated the production estimates as fee quotes for their budgeting purposes. At page 68 lines 13 to page 69 line 1, Ohletz refers to negotiations with Lee where the amount quoted in the production estimate exceeded their budget. This suggests that neither GHM nor the hotels saw each production estimate as constituting a separate binding contract or as a contractual document that bound the parties. *See* Remore April Decl. at Ex. 3.

which provides that *"No assignment of copyright (whether total or partial) shall have effect unless it is in writing <u>signed by or on behalf of the assignor</u>."*

29.    I also make the brief observation that if the matter was adjudicated in the Singapore Courts, based on my experience, the complicated state of the multiple assignment agreements entered into by Lee and the Wave Entities, some of which were to make corrections to earlier purported assignments, would likely be treated with some circumspection.

30.    The Confirmation of Assignment of Copyright executed by Lee on 18 May 2015 attaching Attachment A which is the "Memorandum of Understanding and Ownership" signed by Masano and Irieeyes Pte Ltd on one part and Lee on the other dated 1 October 2013 confirms the assignment to Lee of "all rights, titles and interests in the photographs (collectively known as the "Works") that were created during 2000-2007 shoots…".    The fifth paragraph of Attachment A provides that *"For valuable consideration, receipt of which is hereby acknowledged, Assignee hereby confirms assignment to Assignee of all of Assignor's rights, title and interest worldwide, in the Works, together with any and all other rights and interests arising out of, and in connection with, or in relation to the Works, including derivative works."*    Such a clause would be insufficient to assign the right to sue for past infringements.    The right to sue for past infringements is a separate chose in action from the copyright it arises out of.    It is a cause or right of action that is a distinct right from the copyright itself.[10]    As such, if an assignor wishes to assign the right to sue for past infringements, the relevant agreement must expressly provide for the assignment of the chose in action, namely the

---

[10] See [7.03] of The Law of Assignment, Second Edition, Marcus Smith QC and Nico Leslie, attached hereto as Exhibit C.

18

right to sue for past infringements as part of the subject matter of the assignment.[11]  The phase "assignment of all right title and interest in the Works" on its own would not suffice to assign the right to sue for past infringements.  I would also mention that as a matter of practice, if the parties intended for the right to sue for past infringements to be assigned to the assignee together with the intellectual property right, the agreement would be drafted to provide expressly for the assignment of (i) the intellectual property right; and (ii) the right to sue for past infringements.

**Conclusion**

31.  In conclusion, I briefly reiterate my opinion under Singapore law as set out in my earlier Declaration and the foregoing paragraphs in this Declaration:

(i)  Photographs that were commissioned by the hotels through GHM (as agent) are owned by the commissioning party as the first owner of the copyright and not the photographer by operation of Section 30(5) of the Act.  Section 30(5) applies notwithstanding that the commissioned party, the respective Wave Entity engaged a sub-contractor, Masano, to take the photographs.

(ii)  The language used in the production estimate does not exclude nor modify the operation of Section 30(5) in the commissioning agreement between GHM (acting on behalf of the hotels) and the respective Wave business entities.  Further, it is also unlikely that a finding of an inference would be made under Singapore law that it was a term of the oral agreement between the parties (since there was no master

---

[11] See [13.38] of The Law of Assignment, Second Edition, Marcus Smith QC and Nico Leslie, attached hereto as Exhibit C, where it states that the chose in action must be sufficiently identified.

agreement) that the copyright in the Photographs would vest in the respective Wave entity and not the hotels.

(iii)   The Declaration and Assignment unilaterally declares that the previous assignments entered into between the respective Wave Entities were entered in error and void *ab initio*.  Under Singapore law, the Declaration and Assignment would not be valid under Singapore law and would not be effective to "correct" the errors in the chain of title after the fact.

(iv)   Section 30(5) displaces the general rule that the author is the first owner of copyright in the work.  By reason of Section 30(5), the hotels are the owners of copyright in the photographs.  As such, the agreements between Masano and Lee or the respective Wave entities have no effect since Masano does not own copyright in the photographs and has no copyright that he can validly assign to Lee or the respective Wave entities.

*SIGNATURE PAGE FOLLOWS*

20

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct.


Executed on April **13**, 2016
at Singapore

By: _____
DR. STANLEY LAI TZE CHANG, SC

# Exhibit A

# The Law of Copyright in Singapore

## SECOND EDITION

### George Wei
Dipl. Law, LL.M. (London)
Barrister, Inner Temple and Hong Kong
Advocate and Solicitor, Singapore



couple who were engaged to be married arranged for a photographer to take their wedding photographs. The evidence was that shortly before the wedding the groom had asked the bride to contact photographers to make the necessary arrangements. The photographs were paid for by the groom. Years later when the wife was pregnant she suffered a brain haemorrhage and her bodily functions were kept going thereafter by life support machines. It was probable that she was "brain dead" already. She was kept on the life support machine in the hope that the baby could be born alive. Media interest in the story was strong and the plaintiffs managed to obtain an "exclusive" right to the story[65] from the husband which included an exclusive right to use the photographs. The defendants challenged the validity of the exclusive licence on the basis that the copyright in the photographs belonged jointly to the husband and wife on the basis that they jointly commissioned their taking. On an application for an interlocutory injunction, Millet J. accepted the argument of the defendants. He pointed out that it was settled law that one joint owner cannot grant an exclusive licence without the consent of the other owners. He also noted that even if it was possible for one co-owner to grant a licence without the consent of the others, that the licence could not be exclusive since he could not, without the consent of the others, exclude the others or their licensees.[66] Millet J. also held on the facts that the husband and wife held their interests as joint tenants and not as tenants in common.[67] The significance of this latter holding being that on the death of the wife, the principle of right of survivorship would vest the deceased wife's share in the husband. Once that occurred the husband would have the right to grant an exclusive licence.[68]

**7.21**  *The Proviso To Section 30(5).* The operation of section 30(5) to vest the copyright in the commissioner is subject to an important proviso that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that purpose, of any act comprised in the copyright in the work. For example, suppose that A commissions B to take a series of photographs of Bukit Timah Nature Reserve. He tells B that he wants the photograph for use in an advertisement for a product. Ordinarily, copyright in artistic works will vest in the author and in the case of photographs the author is the photographer. Section 30(5), however, vests the copyright in A. If A reproduces the photographs in a book on tropical rainforests, B can use his "right of veto" to stop A. The veto gives B a strong bargaining point, if A should subsequently decide to use the photographs in a way which was not contemplated at the time of the

---

[65] Note that copyright cannot be asserted to protect facts or news. Other newspapers could write up their own reports so long as they did not copy the report of the plaintiffs. See *Express Newspapers Plc v. News (UK) Plc* [1990] FSR 359.

[66] Note that a single co-owner can sue to restrain infringement. See Millet J. at p. 94.

[67] See also above at paras. 7.9–7.11. See also Chapter 12 at para. 12.63.

[68] Query whether the purported exclusive licence would have been automatically validated upon the wife's death.

agreement. It recognises that if A had told B of the possibility that he might use the photographs for non-advertisement purposes, that B might have either refused the commission or charged a higher price. In this way, the right of veto seeks to protect the author's economic interests. It may also be asserted in some cases to protect the author's moral right to protect the integrity of the work. Whilst the objective behind this proviso is readily understandable, there are some problems in its interpretation and application. The proviso applies where the work is required for a particular purpose. Presumably, the relevant time at which the existence of the purpose is to be determined is at the time of the agreement.[69] Factual disputes can of course arise as to what that purpose was and in some cases, the commissioner may not in fact have had any "particular" purpose in mind save his own personal enjoyment. Suppose that it is only later that he decides on a particular use for the work, will the "veto" still apply? The proviso only applies where the commissioner had a "particular purpose" in mind. Will a desire to have the photograph for personal pleasure be regarded as a "particular purpose"? Will "personal pleasure" be sufficiently certain so as to be capable of amounting to a "particular purpose"? At first sight, this may be difficult and it is also stressed that the statutory provision relates to a "particular" purpose. In such circumstances, it may be difficult for the author to assert the right of veto.[70] Problems might also arise where the commissioner does have a particular purpose but then fails to communicate it to the author. The wording of the proviso requires that where there is a particular purpose, that the purpose is to be communicated to the author. What then is the consequence of a failure to communicate the purpose? One possibility is that the failure to communicate will have the effect of negating the effect of section 30(5). After all, the objective behind the subsection is to give the copyright to the commissioner by way of special exception to the general rule; the interests of the author being safeguarded by the right of veto. The use of the veto is in turn based on the communication

---

[69] In the Select Committee hearings on the Copyright Bill 1986, Professor Jayakumar, then Minister for Home Affairs and 2nd Minister for Law, noted that the function of the proviso is to require the purpose to be communicated to the author at the time of the commission. See Report of the Select Committee on the Copyright Bill, Parl. 9 of 1986 at D9. See also the general comments of the British Copyright Council and the International Confederation of Societies of Authors and Composers set out in the Report. Note also that whilst Singapore's Copyright Act 1987 is modelled on the Copyright Act 1968 of Australia, there are some important differences in the Australian equivalent to s 30(5). In particular, the proviso under the Australian Act of 1968 applies only if at the time the agreement was made the person had expressly or impliedly made the purpose for which the work was required known to the author. There seems to be no compulsion to reveal the purpose under the Australian provisions if there was one.

[70] See generally, the Gregory Committee Report on Copyright (UK) Cmnd. 8662 at 272. That Committee had recommended that a right of veto be given to the author in the case of commissioned works on the grounds that "we think that there is ground for supposing that when a work is commissioned for a particular purpose, that purpose may well have determined the price paid for it, and if it is used for another purpose the author may be prejudiced not only in respect of his immediate financial return but also in respect of his reputation … Thus if a sketch has been commissioned for illustration as a magazine story it should not be used as an advertisement for a commercial product without the author's permission." Note that the right of veto was regarded by the Committee as safeguarding both moral and economic interests of the author.

of the purpose to the author. Accordingly, since the proviso is linked to the special exception it might be argued that the failure to communicate can undermine the operation of section 30(5) as a whole. The trouble with this view is that it effectively renders non-compliance with the duty to inform, penal in effect.[71] Leaving aside the issue as to the duty to communicate the purpose, questions may also arise as to the damages that can be awarded if there is a breach of the right of veto. This has been considered recently in Australia by the Federal Court of Australia in *Matthews* v. *ACP Publishing Pty Ltd*.[72] The plaintiff was a professional photographer and was commissioned by the defendant in 1995 to take about five photographs of Kate Fisher. It appears that at the time the agreement was made, the defendant had made known to the plaintiff that the photograph was required for a purpose, namely for reproduction in an article on Kate Fisher in *Cleo* magazine. Subsequently, the defendant supplied a copy of the photograph to a third party who in turn supplied a copy to another party for use on the cover of a magazine. Several issues were raised including an action for breach of section 35(5) of the Copyright Act 1968 (Australia).[73] The relief sought was for both an injunction and damages. At the trial, the claim for injunctive relief ceased to be a live issue since the defendant was prepared to give an undertaking not to reproduce or authorise the reproduction of the photograph or a substantial part of the photograph for any purpose other than reproduction in the December 1995 edition of *Cleo* magazine without the licence of the plaintiff. The main issue concerned the jurisdiction of the court to award damages. It was argued that the plaintiff was entitled to either (a) damages for breach of a statutory right of restraint or (b) damages in equity in addition to an injunction. Beaumont J. held that the court had the power to award damages in lieu or in addition to the grant of any injunction. In coming to this conclusion, the following points were made:

---

[71] Query whether, as an alternative, non-compliance with the s 30(5) duty to inform may be actionable as breach of statutory duty. Query also whether this right of veto is a personal right that is limited to the particular author that was commissioned. Can the right be assigned or transmitted to the author's heirs? In the first edition, it was suggested that the language of the sub-section suggests that the right is personal to the author. The point could be made, however, that the rationale for the right is the desire to strike a fair balance between the commissioned author and the commissioner. Whilst the latter gets the copyright, the author gets the right of veto thereby recognising the author's moral and economic interests in the work. Moral rights, whilst of a personal nature, can be transmitted to an author's heirs under the laws of many countries. See, e.g., s 95 of the Copyright, Designs and Patents Act 1988 (UK). Note also Art. *6bis* of the Berne Convention. Note, however, that whilst moral rights can in the UK be transmitted to the heirs of the author, s 94 of the Copyright, Designs and Patents Act 1988 (UK) prevents their assignment. It is, therefore, suggested that even if the right of veto is regarded as a type of moral right and of a personal nature, this alone should not mean that it should not be made transmissible to the author's heirs. Assignment may of course be a different matter. The language of s 30(5) does suggest, however, that the right of veto may not be transmissible. If this is in fact the position, is there a case for an amendment so as to make the right of veto transmissible or exercisable by the estate of the deceased?

[72] (1998) 41 IPR 535.

[73] The Australian provision whilst not identical to the Singapore provision in s 30(5) is similar.

# Exhibit B

32          **Singapore Academy of Law Journal**          (1992)

## INTELLECTUAL PROPERTY LAW IN SINGAPORE:
## A GENERAL OVERVIEW[1]

### I. INTRODUCTION

In this age of rapid scientific and technological progress, research and development has given rise to new technologies, particularly in the area of information technology, computers and biotechnology. The advent of these new technologies have resulted in increasing growth in the importance of a legal system for the protection of industrial property and intellectual property rights. In recent years, the problems of counterfeiting and piracy of technology, sometimes resulting from the transfer of technology between industrialised and developing countries, have resulted in intellectual property issues being tabled at international trade negotiations.[2] This article will seek to provide a general overview of the protection of intellectual property rights in Singapore. A short discussion will be made on each of the main branches of intellectual property law, namely, the law of patents, copyright, registered designs, trade marks and trade names, passing-off and breach of confidence. A brief summary on computer software protection laws in Singapore will also be made. In order to gain a clearer perspective of the intellectual property system in Singapore, it may be appropriate to set out a short description of the Singapore legal system.

### II. SINGAPORE LEGAL SYSTEM

The Singapore legal system, with its English colonial heritage, finds its foundation firmly planted in the English common law.[3] Under the Second Charter of Justice of 1826, the laws of England as it existed on the 27th November 1826 was formally received into Singapore. This general reception was, however, subject to (i) local legislation; (ii) the religions, manners and customs of the inhabitants of Singapore; (iii) the suitability of its application to Singapore. As the Privy Council held in *Yeap Cheah Neo* v. *Ong Cheong Neo*[4]: "statutes relating to matters and exigencies peculiar

---

1  This article is based substantially on a paper delivered at the International Conference on Legal Regulation to Scientific and Technological Progress held in Shanghai, China on October 14–18, 1991.

2  See, in particular, the Uruguay Round of negotiations of the General Agreement on Tariffs and Trade (GATT).

3  For a more detailed discussion on the applicability of English law in Singapore and a general discussion on the Singapore legal system and legal history, see H. Chan, *An Introduction to The Singapore Legal System* (1986), especially chapters I and II; W. Woon (Ed.), *The Singapore Legal System* (1989), especially chapters 4 and 5; G.W. Bartholomew, "English Law *In Partibus Orientalium*" and Soon Choo Hock and A. Phang, "Reception of English Commercial Law in Singapore — A Century of Uncertainty", chapters 1 and 2 respectively in A.J. Harding (Ed.), *The Common Law in Singapore and Malaysia* (1985).

4  (1875) L.R. 6 P.C. 381 at p. 394.

Copyright in the works and other subject-matter can, thus, be secured in Singapore where there is a sufficient domestic "Singapore" connection as discussed above; or where the works or other subject-matter were first published in the United States of America, the United Kingdom or Australia; or where the works or other subject-matter were made by persons who, at a material time, were citizens or nationals or residents of the United States of America, the United Kingdom or Australia. Regulation 6 of the Copyright (International Protection) Regulations 1987 (as amended) also accords retrospective protection to works first published in (i) the United States of America before the commencement of the Copyright Act 1987 (that is, before the 10th April 1987) and (ii) Australia on or after 1st May 1969 but before 10th April 1987.[75] No such provision exists in the case of United Kingdom works.[76]

### C.  Ownership of Copyright in Works and Other Subject-matter

### 1.  Author's Works

As a general rule the ownership of the copyright in an "author's work" will belong to the author of the work, that is, the person who gave the work its form of expression.[77] There are, however, exceptions where the copyright in the work does not vest in the author. These are as follows:

  (a) in relation to works made by journalist employees, section 30(4) provides that the copyright in the literary, dramatic or artistic work is split between the employer newspaper and the journalist employee, where the work is made for the purpose of publication in a newspaper, magazine or similar periodical by a journalist employee in pursuance of the terms of his employment. The employer newspaper would acquire the newspaper publication rights, that is, the right to publish the work in a newspaper, magazine or similar periodical and the right to reproduce the work for the purpose of such publication. All other rights would belong to the journalist employee.

---

75  See Regulation 6 of the Copyright (International Protection) Regulations 1987 as amended and substituted by Regulation 2 of the Copyright (International Protection) (Amendment) Regulations 1990 as follows: "Regulation 6 of the Copyright (International Protection) Regulations 1987 ... is deleted and the following regulation substituted therefor: 6. Where a work was first published — (a) in the United States of America before 10th April 1987; or (b) in Australia (including its external Territories) on or after 1st May 1969 but before 10th April 1987, section 210 of the Act shall apply to the work as if, for the purpose of determining, for the purpose of that section, whether copyright subsisted in a work under the Copyright Act 1911 immediately before 10th April 1987, the work was first published in Singapore." Difficulties have arisen regarding the interpretation of regulation 6 of the Copyright (International Protection) Regulations 1987. See Wei, *The Law of Copyright in Singapore* (1989) at pp. 77–79.

76  For a discussion on copyright protection of old U.K. works, see Wei, *supra*, at pp. 79–94.

77  See section 30(2) of the Act.

(b) in the case of certain limited categories of commissioned artistic works, namely, a photograph, the painting or drawing of a portrait or the making of an engraving, section 30(5) provides that the copyright belongs to the commissioner (that is, the person who commissioned the taking of the photograph etc.) and not the author (that is, the person commissioned to do the work). However, section 30(5) also provides that "if the work is required for any particular purpose, that purpose shall be communicated to [the person commissioned to do the work] and that [person] shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work." Section 30(5) thus, requires the particular purpose (if any) for which the work is required to be disclosed to the author and the author would then acquire a "right of veto" to restrain the doing of any act for non-commissioned purposes. The author of the work would not, however, acquire the copyright in the work but would acquire this limited "right of veto" in relation to non-commissioned purposes.[78]

(c) in relation to works made by employees these are dealt with in section 30(6) which provides that where a literary, dramatic, musical or artistic work is made by an employee in pursuance of the terms of his employment the copyright would vest in the employer.

## 2. *Entrepreneurial Copyrights*

The copyright in the "entrepreneurial copyrights' would usually vest in the entrepreneur. In the case of:

(a) sound recording and cinematograph film, the copyright would vest in the maker of the sound recording[79] and cinematograph film[80] respectively.

(b) television and sound broadcast, the copyright would belong to the Singapore Broadcasting Corporation for broadcasts made by it; in the case of broadcasts made by a licensed broadcasting station, the

78  However, it is unclear as to the precise effect of the failure to inform the person commissioned of the particular purpose the work is required for. Such a failure to inform may amount to a breach of statutory duty or it may preclude the commissioner from relying on the section 30(5) exception and the copyright in the work may then vest in the author in accordance with the general rule.

79  See section 97(2) of the Act. Section 16(3)(b) read together with section 16(3)(a) would define the "maker of the sound recording" as the person who owned the first record embodying the recording. This would normally be the recording company. Note section 97(3) in relation to commissioned sound recording, where the copyright belongs to the commissioner. There is no "right of veto" unlike section 30(5) discussed above.

80  See section 98(2) of the Act. Section 98(3) contains provisions dealing with commissioned cinematograph film where the copyright in the commissioned cinematograph film is vested in the commissioner. Note also that there is no "right of veto" given to the person commissioned to make the film.

copyright subsisting in such broadcasts would belong to the relevant holder of the licence.[81]

(c) cable programme, the copyright would belong to the person providing the cable programme service.[82]

(d) published editions of works, the copyright would belong to the publisher of the edition of the works.[83]

D.   *Duration of Copyright*

1.   *Author's Works*

The copyright in a literary, dramatic, musical or an artistic work (other than a photograph) would continue to subsist for a period of the life of the author plus 50 years after the expiration of the calendar year in which the author died.[84] However, section 28(3) provides that if before the death of the author of a literary, dramatic or musical work:

(a) the work had not been published;

(b) the work had not been performed in public;

(c) the work had not been broadcast;

(d) the work had not been included in a cable programme; and

(e) records of the work had not been offered or exposed for sale to the public;

then the copyright in the work would continue to subsist until the expiration of 50 years after the end of the calendar year in which any one of the stated events in (a)–(e), first occurred.[85]

In the case of an engraving which has not been published before the death of the author, the copyright would continue to subsist until the expiration of 50 years from the end of the calendar year of its first publication.[86]

In the case of a photograph, the copyright would continue to subsist until the expiration of 50 years from the end of the calendar year of its first publication.[87]

---

81  See section 99 of the Act.
82  See section 100 of the Act.
83  See section 101 of the Act.
84  See section 28(2) of the Act.
85  Thus, it would appear that if none of the stated events in (a)–(e) ever occurs then the copyright could be perpetual.
86  See section 28(5) of the Act. Thus, if the unpublished engraving is never published, then the copyright may be perpetual.
87  See section 28(6) of the Act. The effect of this sub-section would appear to be that if the photograph is never published, then the copyright subsisting in it may be perpetual.

# Exhibit C

# THE LAW OF ASSIGNMENT

## SECOND EDITION

### Marcus Smith QC
*BCL, MA (Oxon)*

*Of Lincoln's Inn, Barrister*
*A Chairman of the Competition Appeal Tribunal*

### Nico Leslie
*BA (Cantab)*
*Of Lincoln's Inn, Barrister*



**OXFORD**
UNIVERSITY PRESS

# 7

# INTELLECTUAL PROPERTY

## A. Overview of the Chapter

Like shares and, to an extent, leases, the governing principles relating to intellectual prop-    **7.01**
erty are very different from the principles that underlie other choses, like rights under
contracts or debts. Like shares, intellectual property rights are characterized by specific
statutory rules relating to their creation, as well as to their transfer. The rules as to transfer
are considered in Chapter 20, but (as with shares) it is necessary, in order to understand
these rules, to consider how these rights are created in the first place.

Intellectual property rights are various and will be considered, in the rest of this chapter,    **7.02**
under the following six heads: (i) patents (Section B); (ii) copyright (Section C); (iii) moral
rights (Section D); (iv) industrial design rights (Section E); (v) trade marks (Section F); and
(vi) confidential information (Section G).[1] In each case, the rights conferred on the owner
are fundamentally negative in nature. Owning the right does not empower the holder to do
anything he could not otherwise do. Rather, the holder of the right is able, by virtue of his
ownership, to prevent *others* from doing what they otherwise *could* do.

Each of these intellectual property rights has four different aspects, which will be consid-    **7.03**
ered in turn in respect of each right. These may be listed as follows:

(1) *The intellectual property right itself.* The right itself—the patent, the copyright, the
    moral right, the industrial design right, and the trade mark, as the case may be—
    needs to be considered in terms of how the right first comes into being and what its
    nature is.
(2) *Rights of action for infringement.* A second aspect of intellectual property rights is
    the right of action that vests in the owner of the right[2] when the intellectual prop-
    erty right is *infringed.* Although inevitably related to the right that is infringed, an
    infringement action is a separate chose from the intellectual property right it arises
    out of. It is a cause or right of action. Such rights of action will briefly be considered
    in this section; but their correct classification is as a right or cause of action, as con-
    sidered in Chapter 3.
(3) *Validity challenges: revocation actions.* Thirdly, there are the mechanisms that exist for
    the challenge of someone's intellectual property right. Often, such challenges arise by

---

[1] This is not an exhaustive list. Some intellectual property rights, like plant breeder's rights and database
rights, are not the subject of specific consideration.
[2] And sometimes others—for instance, the exclusive licensee of a patent: see para 7.14.

### (4) The Chose Must be Identified or Identifiable with Reasonable Certainty

**13.38**   The chose being assigned must be sufficiently identified. In *Watson v The Duke of Wellington*,[45] Leach MR stated: 'In order to constitute an equitable assignment, there must be an engagement to pay out of the particular fund.'

**13.39**   A good illustration of this is *Percival v Dunn*.[46] In this case, two builders (Davis and Cook) owed money to one Percival, who had supplied them with materials. Davis and Cook had each contracted with a surveyor, Dunn, for the construction of buildings on a certain estate. Owing money to Percival, Davis and Cook each handed to Percival an order or direction, addressed to Dunn, and expressed in the following terms:[47]

> Dear Sir,
> Please pay Mr Percival the amount of his account and oblige. £43 14s 6d for goods delivered at Park.

Percival sued Dunn on the strength of these orders or directions, and the question arose whether these constituted assignments. Bacon VC held:[48]

> On the point of law now raised, it is clear that there is no ground on which I can say these documents are equitable assignments. They are, and they purport to be, requests to Dunn to pay money which the writers owe to some one else. They merely mean this: 'Lend me so much money, as I want to pay the man to whom I am indebted.'...The cases referred to all proceed on the view that the document before the Court in each of them was equivalent to an assignment. In *Ex parte Hall*, there was an order to pay out of a particular fund, and so in *Burn v Carvalho* and *Brice v Bannister*; and if I found in this case similar words referring to a particular fund due or belonging to the writers of these requests, I should be bound to follow these authorities; but I find nothing like such words in these documents. There is nothing in them to the effect that the sums mentioned were to be paid out of a fund for which Dunn was answerable, or which he was under any obligation to pay.
>
> Whether bills of exchange or not, they are, on the face of them, mere polite notes by one person asking some other person to pay his debt, and impose no kind of obligation upon that other person to pay the debt.

**13.40**   Even where the chose is identified, the assignment may fail, as where there is an assignment of a specific, but unidentified, part of a chose. This is analogous to the position of the transfer of tangibles, where the rule was well established that whilst it was perfectly possible for the owner of 20 cases of wine to transfer all the cases to another, the transfer of 10 of those

---

[45] (1830) 1 Russ & My 602 at 602, 39 ER 231 at 232; *Tailby v Official Receiver* (1888) 13 App Cas 523 (HL) at 529: 'There is no doubt that an assignment may be so indefinite and uncertain in its terms that the Courts will not give effect to it because of the impossibility of ascertaining to what it is applicable. But that is certainly not the case with such an assignment as that which we are now considering' (*per* Lord Herschell); *Re Gunsbourg* (1919) 88 LJKB 479 (KBD, CA) at 482 (*per* Swinfen Eady MR). See also Underhill & Hayton 2010, [8.14]–[8.22]; Snell 2010, [3–16].

[46] (1885) 29 ChD 128 (ChD).

[47] This is the order or direction drawn by Davis. That drawn by Cook was in similar, but not identical, terms.

[48] (1885) 29 ChD 128 (ChD) at 131–2.