UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE WAVE STUDIO, LLC, a New York Limited Liability Corporation,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL HOTEL MANAGEMENT, et al.,<br><br>Defendants. | CASE NO. 7:13-cv-09239-CS-PED |

**REPLY DECLARATION OF GORDON IONWY DAVID LLEWELYN**

1. I have read the Reply Memorandum dated 15 April 2016 submitted by the attorneys for the Defendant GHM ("the Reply Memorandum") and the Declaration of Stanley Lai Tze Chang ("Dr Lai") dated 13 April 2016 ("Second Declaration") responding to my Declaration of 11 March 2016 ("my first Declaration"), and now make this Declaration to respond briefly.

**The Reply Memorandum**

2. On page 23 of the Reply Memorandum, under the heading on the previous page "The analysis of plaintiff's "expert", Professor Llewelyn …", it is stated that "Plaintiff has offered as an expert on Singapore law someone who cannot practice law – and never has practised law in Singapore."  As is acknowledged earlier in the same paragraph, my earlier Declaration made no claim that I could or had.  However, to the extent that setting off the word "expert" in quotes and the other statements are intended to cast doubt on whether I am an expert on Singapore copyright law, I consider it appropriate to mention

1

that, although the Defendant GHM and its attorneys clearly do not so view me, the Singapore Court of Appeal (the highest court in Singapore) does. Since I signed my first Declaration, I have been appointed *amicus curiae* to assist the court in an appeal that concerns solely various issues of Singapore copyright law. In Singapore the appointment by the court of *amicus curiae* is made by the Court of Appeal in cases where it considers it will benefit from the opinion of an independent expert in a specialist legal field.

**Dr Lai's Second Declaration**

3. Dr. Lai seeks to question the opinions expressed in my first Declaration by suggesting that my opinion was based on certain unsubstantiated factual assumptions. Dr Lai's enumeration and discussion in paragraphs 3 to 7 of what he purports are the factual assumptions on which my earlier Declaration "appears to be premised" (Second Declaration, para.3) serve to obfuscate two of the essential questions to be decided under Singapore law in this case in the event the court decides not to apply the *lex fori* to them: first, who is the author of the works in question and, secondly, does the case fall within one of the very limited exceptions to the principle that the author owns copyright? Any determination of the contractual relationship between the parties must address those two questions.

4. Dr Lai states (at paragraph 3) that I made three factual assumptions in my earlier Declaration: (i) "the engagement of the respective Wave entity and Lee Kar Yin to take photographs was always 'bundled up' with other services"; (ii) "the respective Wave entity and Lee engaged Masano Kawana in their capacities of agents of [Defendant GHM]"; and (iii) "GHM/hotels paid the exact sums specified on every production

estimate." However, none of these facts was assumed by me or was the basis of my opinions set out in that earlier Declaration:

(1) I neither assumed nor stated in my Declaration that the work carried out by "the respective Wave entity and Lee Kar Yin to take photographs was always 'bundled up' with other services": I was and am well aware that on occasions the only marketing materials covered by a production estimate and subsequently created were photographs that were not incorporated in anything else such as a brochure. As promotional photographs, these were marketing collaterals in themselves; whether or not they were "bundled up" is irrelevant.

(2) I neither assumed nor stated that "the respective Wave entity and Lee engaged Masano Kawana in their capacities of [sic] agents of" the Defendant General Hotel Management. I did not assume nor anywhere suggest that the respective Wave entity was an agent of any party. In fact, what I stated (at para 29 of my earlier Declaration) is that the Wave Entities "contracted directly for valuable consideration with Mr Kawana (and his company Irieeyes Pte Ltd) to take the Photographs and thus the Photographs fall within the ambit of Section 30(5) as between the Wave Entities and Mr Kawana." In this connection, Dr. Lai's discussion of what he states is "apparent on the facts" (in para 6(i)-(iii)) that I purportedly ignored is wrong. Instead, the facts described by Dr Lai as "apparent" are exactly as I understood them to be, and they support my conclusions as to the resulting position under Singapore copyright law.

(3) Finally, I neither assumed nor stated, as Dr. Lai suggests in para 3(iii), that "GHM/Hotels paid the exact sums specified on every production estimate." I am of

3

course aware that the vagaries of commercial life mean financial figures contained in estimates are often not the amounts that end up being paid. My statement in paragraph 71 of my earlier Declaration on which Dr Lai relies, that "the basic terms of the agreements are set out expressly in writing in the various production estimates, some of which were signed and returned to the Wave Entities but all of which were implemented by the parties, including the payment by the relevant Hotel of the sums stated therein", was not meant to imply that exact sums were paid in all cases. As with many contracts involving estimates, no doubt there were instances where, by oral agreement, the payments actually made differed from those set out in the estimates.

5. In paras. 6 and 7, Dr Lai describes what he considers is the contractual relationship but does not address the question of "authorship," noting that "[Mr Kawana] was the sub-contractor of the relevant Wave entity…" and "it was the respective Wave entity whom GHM engaged…" and [a]ny analysis of the issue of copyright ownership must take into account the reality of the commercial dealings between the parties". As I have stated, I do not consider this is a correct legal analysis of the facts, but even if this analysis is adopted, Mr Kawana, whether described as a sub-contractor or as an agent, would still be the author. There is no evidence or principle of Singapore law put forward by Dr Lai to suggest otherwise. In this context, as made clear in paragraph 24 of my earlier Declaration, my opinion is: through application of the general rule contained in Section 30(2) the author of such copyright works as were created under the contracts was Ms Lee unless she or a Wave Entity (as the case may have been) contracted with a third party for that third party to create all or any of the copyright works comprised in them (on which I

4

refer to paragraphs 27 to 29 of my earlier Declaration). It is incumbent on any party who claims that the general rule in Section 30(2) does not apply to prove its claim on a balance of probabilities and I do not consider this burden has been discharged in this case.

6. Dr Lai states in paragraph 5, on the issue of what he defines as the 2013 Kawana Assignment, that he disagrees with my analysis set out in paragraph 29 of my earlier Declaration and concludes "the fact that there was a need for a "confirmatory" agreement to be entered into in 2013 is indicative that in actual fact, there was never any commissioning agreement between Masano and the respective Wave Entity." This is a *non sequitur*: the Irieeyes Contracts were agreements falling within Section 30(5) (and, unlike any of those between Wave and the Hotels that I have had sight of, contained the word "commission" in various places), and therefore the Wave Entities/Ms. Lee were owners of the copyright in Photographs taken under those contracts, subject only to whatever the effect of the wording that the copyright "remain the sole and exclusive properties of the Design Agency [the relevant Wave Entity] and the Photographer" might have had, whether creating joint or several ownership. Any doubt as to the effect of this modification to the section 30(5) position, which modification did not on any analysis affect ownership by the Wave Entity as at the very least joint owner, if not co-owner, was removed by the 2013 Kawana Assignment.

7. In my experience, in the context of copyright infringement actions, confirmatory agreements are not infrequently entered into to make certain that any potentially loose ends are tied up, often merely out of an abundance of caution. This is particularly so in those areas of the law, such as copyright authorship and ownership, that are not easy for

5

the lay person to comprehend in all its manifestations. In this example, the existence of a confirmatory agreement does not affect whether there was in fact a commissioning agreement between Masano/Irieeyes Pte Ltd and Ms Lee/Wave Entities that is governed by Section 30(5) (on which I give my opinion in my earlier Declaration at paras 25 to 29); if there was, which I consider is the position, the later agreement served to transfer only veto rights (or , more properly in terms of its legal effect, extinguish them) and any joint or several rights Masano/Irieeyes Pte Ltd may have had as a result of a contractual modification of the terms of Section 30(5) as permitted by Section 30(3).

8. On the interpretation of section 30(5), Dr Lai refers in paragraph 9 to Section 9A(1) of the Interpretation Act and sets out its terms. (Dr Lai quotes the statute as follows: "In the interpretation of a provision of a written law an interpretation that would promote the purpose or object underlying the written law (whether that purpose or object is expressly stated in the written law or not) shall be preferred to an interpretation that would not promote that purpose or object.") While this states that a purposive approach to statutory interpretation should be "preferred," this does not mean that one can ignore the plain and ordinary meaning of a statutory provision by adding in words that are not there or fundamentally changing its wording. In order for Dr Lai's interpretation of Section 30(5) as set out in paragraphs 10 and 11 to make sense, a court would have to either read in additional language or adopt a markedly different interpretation of the words "make" or "agreement" to their plain and ordinary meaning. In my opinion and with all due respect to Dr Lai, it is unlikely that any court, let alone a Singapore court, would do this; to do so would violate the basic tenets of statutory interpretation.

9. In addition, Dr Lai's interpretation of Section 30(5) is impractical, because it makes one of the underlying reasons for the provision – achieved through the inclusion of the duty to communicate purpose – extremely difficult to operate in the real world. Dr Lai's position is that all commissioning parties are entitled to copyright in commissioned works even if sub-contractors were involved in creating all or parts of those works. This presumably means that, as a matter of law, all sub-contractors automatically vest copyright in the main contractor. If that is the case, there is no indication in the wording of the statutory provision as to whose duty it would be to communicate the specific purpose: the commissioner or the main contractor. In complicated commissioning projects, with many sub-contractors and even sub-sub-contractors, ascertaining who owes the duty and to whom would become totally impractical. The matter is far more straightforward than the expansive and creative interpretation of the exception put forward by Dr Lai suggests. The logical and general principle in section 30(2) is simply this: the author owns the copyright. The exception in section 30(5) is a narrow one that does not admit of the interpretation put on it by Dr Lai.

10. In paragraphs 12 to 17 of the Second Declaration, Dr Lai deals with the *Wang Choong Li* decision and states that I placed reliance on it in paras 38 to 41 of my earlier Declaration. In fact, I examined the case because Dr Lai had cited it as authority in support of his interpretation of Section 30(5) in his First Declaration. The passages from the judgment that Dr Lai cites in paragraph 14 of the Second Declaration serve merely to reinforce the points made in my earlier Declaration (at paragraph 41): (a) that an agency relationship *may* fall within the ambit of Section 30(5); but (b) there was no intention to create an agency relationship in the *Wang Choong Li* case (as there was not in the present case,

although Dr Lai incorrectly states in paragraph 16 of the Second Declaration that I assume there was). Indeed, Dr Lai's own argument (in paragraph 6 of the Second Declaration) that (in his words) "what is apparent on the facts," the relationship between Lee and Kawana was that of contractor-subcontractor, moves the parties further away from the operation of Section 30(5), regardless of how the statute may be interpreted.

11. In paragraph 20 and following of the Second Declaration, Dr Lai deals with the author's so-called veto right in Section 30(5), which is an *exception* to the Section 30(5) *exception* to the general principle in Section 30(2) that the author is the first owner.  Dr Lai acknowledges that, as there is no decision of a Singapore court on the point, it remains unclear whether a failure to communicate a particular purpose would take the work outside the Section 30(5) exception.

12. In paragraph 21, Dr Lai refers to the identification and discussion of "problems in the interpretation and the application of" the veto right set out in §7.21 of *The Law of Copyright in Singapore* (2nd edition) by George Wei.  In the passage cited by Dr Lai, the learned author describes section 30(5) as a "special exception" before he comments that "[o]ne possibility is that the failure to communicate will have the effect of [taking the work in question out of Section 30(5)]"; without dismissing it he expresses reservations about this possibility.  It is noteworthy that in the first edition of his work in 1989 the learned author said: "An interesting point to note on section 30(5) is that the commissioner cannot circumvent this right of veto over "non-commissioned purposes" by the device of simply keeping quiet. … Section 30(5) requires the purpose (if there is one) to be revealed.  Presumably if there is a failure to inform, then section 30(5) will not operate so as to vest the copyright in the commissioner" (at §4.11; see Exhibit 11).  In the

second edition of his work, while he expands considerably on the practical problems that the right of veto could give rise to, the learned author does not conclude that his view in the first edition was wrong. Thus, a court seized of the issue would need to reconcile the argument that the effect of the wording is "penal in effect" with the language of the provision that, as the learned author accepts, points in favour of this interpretation.

13. At paragraph 25, Dr Lai states "It would be fair to say that there was a pattern of conduct over the years between Lee and GHM and the hotels and the terms of the commissioning agreement are constituted by the pattern of conduct, rather than the production estimates." Given that the production estimates set out in unequivocal and clear terms that copyright in work carried out thereunder belonged to Ms Lee or the respective Wave Entity (as the case may be), it is somewhat ironic that Dr Lai's opinion relates to fairness rather than legal effect. Dr Lai has failed to identify anything in the pattern of conduct that suggests that the Wave Entities vested the copyright in the Defendant General Hotel Management (or the Hotels), directly contrary to the unequivocal and clear statement in each production estimate. Indeed, I referred in my earlier Declaration (at paras 56 to 58) to documentary evidence that the Defendant General Hotel Management was both aware of the statement and accepted it by the parties' course of conduct lasting many years.

14. At paragraph 29, Dr Lai makes the statement that "shareholder resolutions are insufficient to constitute a valid assignment of copyright under the Copyright Act." I am not aware of any authority to support this bald statement and in my opinion it depends on the wording of such resolution. Dr Lai's sole challenge to the particular resolution identifies the requirement in section 194(2) of the CA that an assignment in writing must be "signed by or on behalf of the assignor" and he states it does not satisfy this

9

requirement. With respect, I consider this requirement has been satisfied given that Ms Lee signed the resolution as Chairman of the shareholders' meeting (and therefore on behalf of the company).

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 6, 2016, in Singapore.

                                                    Gordon Ionwy David Llewelyn

EXHIBIT "1"

# The Law of Copyright in Singapore

**George Wei**
Dipl. Law, LL.M. (London)
Barrister, I.T.,
Advocate and Solicitor, Singapore

Singapore National Printers Ltd

Publication Division

1989

is recorded.[10] A purchaser of a book is the legal owner of the book. He does not own the copyright in the novel which is recorded in the book. The same principle also applies to entrepreneurial copyrights. The purchaser of a record acquires legal title to the record. He does not become the owner of the copyright in the sound recording.

### ORIGINAL AUTHORS' WORKS: THE EXCEPTIONS WHERE COPYRIGHT IS NOT GIVEN TO THE AUTHOR

**4.9**   Section 30(4), (5) and (6) sets out a number of exceptions when the copyright in an author's work is not given to the author.[11]

#### *Commissioned Works*

**4.10**   The effect of section 30(5) is that where a person makes an agreement with another person for valuable consideration to:

(i) take a photograph,
(ii) make an engraving, or
(iii) make a painting or drawing of a portrait,

then, so long as the work is made in pursuance to the agreement, the copyright in the work (if any) will belong to the first mentioned person (ie. the commissioner), and not the other person, even though the latter is the author.

**4.11**   Section 30(5), however, also sets out a proviso that if the work is required for any particular purpose (presumably at the time of agreement), that purpose shall be communicated to that other person and, further, that other person is entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work. For example, suppose A commissions B to take a photograph of the Merlion statue. He tells B that he wants the photograph for advertising purposes. Ordinarily the copyright in the photograph would vest in the author. This is defined as meaning the photographer,[12] ie. B. Section 30(5), however, operates to give the copyright to A. If A, subsequently was to reproduce the photograph in a book on famous Singapore landmarks, then B can use his right of "veto" to stop A. This veto right gives B a strong bargaining point, if A should decide to use the photograph in a way which was not contemplated by the commission agreement. It recognises the fact that if A had told B of the possibility that he might use it for non-

---

10. See para. 1.26.
11. In the case of works made prior to the commencement of the Act, s 30(4) and (6) does not apply, see s 213(1). Likewise where a work is made in pursuance to an agreement made before the commencement of the Act, s 30(5) does not apply, see s 213(2). In such cases special transitional provisions are set out in s 213 (3)–(8).
12. See s 7(1).

advertisement purposes, then B might have either refused the commission or charged a higher price. An interesting point to note on section 30(5) is that the commissioner cannot circumvent this right of veto over "non-commissioned purposes" by the device of simply keeping quiet and not informing the commissioned author of the purpose in mind. Section 30(5) requires the purpose (if there is one) to be revealed. Presumably if there is a failure to inform, then section 30(5) will not operate so as to vest the copyright in the commissioner.[13] One other feature of section 30(5) is that the beneficiary of the proviso only receives a right of veto over the non-commissioned purposes. He does not acquire any copyright as such. Accordingly, he will not himself be able to exploit the work for non-commissioned purposes without the consent of the commissioner.

**4.12** The special provisions contained in section 30(5) only apply to a very limited range of authors' works. They do not, for example, apply to commissioned literary works. Thus if A commissions B to write a biography on A, the ordinary copyright rules will prevail. The copyright will vest in the author under section 30(2). The author is clearly B. The mere fact that A supplied the information to B does not make A the author of the work. So far as commissioned books are concerned, the commissioner will not have any legal entitlement to the copyright unless in the commission contract he specifically required the author to agree to assign the copyright in the work to him. In such a case, the agreement to assign the copyright in the future work will have the effect of automatically vesting legal ownership in the assignee on the completion of the work.[14] In the absence of such an agreement to assign the copyright, the copyright will vest in the author of the book. However, in such cases the court may be prepared to read in an implied licence to allow the commissioner to use the work for the purposes for which it was commissioned. Further, in appropriate cases, the court may even be prepared to hold that there is an implied term that the copyrights are to belong to the commissioner. The commissioner could then be treated as an equitable owner of the copyright with a sufficient title to demand an assignment. Whether the

---

[13] Alternatively, non-compliance with the s 30(5) duty to inform may be actionable as a breach of statutory duty. In the Select Committee hearings on the Copyright Bill 1986, Prof. Jayakumar (then Minister for Home Affairs and 2nd Minister for Law) noted that the function of the proviso is to require the purpose to be communicated to the author of the work at the time of the commission. See Report of the Select Committee on the Copyright Bill, Parl. 9 of 1986 at D.9. See also the comments of the British Copyright Council and the International Confederation of Societies of Authors and Composers set out in the Report. Query also whether this right of veto is a personal right limited to the person commissioned. Can it be transmitted to his heirs? The language of s 30(5) seems to suggest that the right is a personal one.

[14] See s 195 which, *inter alia*, deals with agreements to assign copyrights in works not yet made. This is discussed at para. 10.3.