

2121 AVENUE OF THE STARS      310 552 0130 TEL
SUITE 2800                    310 229 5800 FAX
LOS ANGELES, CA  90067        ROBINSKAPLAN.COM


ROMAN M. SILBERFELD
310 229 5807 TEL
RSILBERFELD@ROBINSKAPLAN.COM

November 27, 2023

***VIA ECF and Email***
Honorable Cathy Seibel
United States District Judge
Federal Building and United States Courthouse
300 Quarropas Street, Courtroom 621
White Plains, New York 10601

      Re:   *The Wave Studio, LLC. v. General Hotel Management, et al.*
           Case No. 7:13-cv-09239-CS-PED

Dear Judge Seibel:

       In an effort to streamline the review and consideration of the 14 letters that have been filed with the Court in response to the Court's order and in connection with the Court's hearing on November 29, we have prepared the attached chart which lists all 63 defendants and their counsel who submitted letters to the Court. The chart summarizes [without argument from us] the positions of the defendants and their counsel on the key questions that the Court asked for comment on.  In addition, because of some expressed uncertainty about what occurred in the Singapore proceedings, we respectfully submit herewith both the trial court decision and appellate decision in the Wave v. GHM matters in Singapore.

                Sincerely,

                Roman M.  Silberfeld
                Partner

Attachments

LETTERS RE: LIFTING STAY
**WAVE CONSOLIDATED CASES**

| Lawyer and Firm | Case | Represents | Letter | Joinder | Position on Stay | Master Amended Complaint | Opportunity to Respond if Stay Lifted | Meet and Confer |
|---|---|---|---|---|---|---|---|---|
| Remore, Abigail<br><br>Chiesa Shahinian & Giantomasi PC<br>One Boland Drive<br>West Orange, NJ 07052<br>(973) 530-2114 | Wave v. GHM<br>Case No. 7:13-cv-09239-CS | General Hotel Management Ltd | Dkt. 300<br><br>(Note: GHM requests that Plaintiff waive confidentiality of the Singapore settlement) | No. | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff can demonstrate "the scope of what was litigated and resolved in the Singapore action, how that compares with the GHM Actions, and the extent of the impact of the Singapore action on the GHM Actions." | **Yes.**<br><br>With specific allegations regarding (a) which photos were in Singapore action (b) which photo were infringed or are being infringed by each defendant and (c) whether each of the photographs were subject to the Singapore action/settlement.<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>Amount of time not specified. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| Ferrante, Eric M.<br><br>Nixon Peabody LLP (Clinton Sq, Rochester)<br>1300 Clinton Square<br>Rochester, NY 14616<br>585-263-1362 | Wave v. Amadeus<br>Case No. 7:15-cv-06995-CS | Cathay Pacific Airways Ltd. | Dkt. 95 | Joins Defendant General Hotel Management, Ltd.<br><br>(7:13-cv-09239-CS, Dkt. 300.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff can demonstrate "the scope of what was litigated and resolved in the Singapore action, how that compares with the GHM Actions, and the extent of the impact of the Singapore action on the GHM Actions." | **Yes.**<br><br>With specific allegations regarding (a) which photos were in Singapore action (b) which photo were infringed or are being infringed by each defendant and (c) whether each of the photographs were subject to the Singapore action/settlement.<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>60 days. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| Finn, Thomas J.<br><br>McCarter & English, LLP<br>CityPlace I, 185 Asylum Street, 36th Floor<br>Hartford, CT 06103<br>(860) 275-6700 | Wave v. GHM<br>Case No. 7:13-cv-09239-CS | Joe Mazzarella *doing business as* Roomrate.com | Dkt. 313 | Joins Defendant General Hotel Management, Ltd.<br><br>(7:13-cv-09239-CS, Dkt. 300.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff can demonstrate "the scope of what was litigated and resolved in the Singapore action, how that compares with the GHM Actions, and the extent of the impact of the Singapore action on the GHM Actions." | **Yes.**<br><br>With specific allegations regarding (a) which photos were in Singapore action (b) which photo were infringed or are being infringed by each defendant and (c) whether each of the photographs were subject to the Singapore action/settlement.<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>Amount of time not specified. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| McCue, Michael James<br><br>Lewis Roca Rothgerber<br>3993 Howard Hughes Pkwy., #600<br>Las Vegas, NV 89169<br>(702) 949-8200 | Wave v. Visa<br>Case No. 7:15-cv-04953-CS<br><br>Wave v. GHM<br>Case No. 7:13-cv-09239-CS | Visa Inc. | Dkt. 305 | Joins Defendant General Hotel Management, Ltd.<br><br>(7:13-cv-09239-CS, Dkt. 300.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff can demonstrate "the scope of what was litigated and resolved in the Singapore action, how that compares with the GHM Actions, and the extent of the impact of the Singapore action on the GHM Actions." | **Yes.**<br><br>With specific allegations regarding (a) which photos were in Singapore action (b) which photo were infringed or are being infringed by each defendant and (c) whether each of the photographs were subject to the Singapore action/settlement.<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>Amount of time not specified. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |

| Lawyer and Firm | Case | Represents | Letter | Joinder | Position on Stay | Master Amended Complaint | Opportunity to Respond if Stay Lifted | Meet and Confer |
|---|---|---|---|---|---|---|---|---|
| Pierce, Anthony T.<br><br>Akin Gump<br>1333 New Hampshire Avenue, N.W.<br>Washington, DC 20036<br>202-887-4000 | Wave v. American Express Case No. 7:15-cv-03420-CS | American Express Company | Dkt. 301 | Joins Defendant General Hotel Management, Ltd.<br><br>(7:13-cv-09239-CS, Dkt. 300.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff can demonstrate "the scope of what was litigated and resolved in the Singapore action, how that compares with the GHM Actions, and the extent of the impact of the Singapore action on the GHM Actions." | **Yes.**<br>With specific allegations regarding (a) which photos were in Singapore action (b) which photo were infringed or are being infringed by each defendant and (c) whether each of the photographs were subject to the Singapore action/settlement.<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br>60 days. | **Yes.**<br>After responsive pleadings are filed and motion practice is resolved. |

2

| Lawyer and Firm | Case | Represents | Letter | Joinder | Position on Stay | Master Amended Complaint | Opportunity to Respond if Stay Lifted | Meet and Confer |
|---|---|---|---|---|---|---|---|---|
| Perri, Carl M.<br><br>Clausen Miller PC<br>28 Liberty Street, 39th Floor, New York, NY 10005<br>212.805.3900 | Wave v. GHM Case No. 7:13-cv-09239-CS | -About, Inc.<br>-Alliance reservation Network<br>-Bookit.com, Inc.<br>-Expedia, Inc.<br>-Fareportal, Inc.<br>-Farebuzz<br>-Frommer Media<br>-Getaroom.com<br>-Hotels.com GP LLC<br>-Hotelsbyme<br>-Lexyl Travel Technologies<br>-Esteban Oliverez<br>-JetBlue Airways Corporation<br>-Kayak Software Corporation<br>- Lonely Planet Global, Inc.<br>-Metro Travel Guide<br>-Netadvantage.com<br>-Reservation Counter<br>-Pegasus Solutions, Inc.<br>-Random House<br>-This Exit, LLC<br>-Travelocity.com<br>-Tripadvisoir, LLC<br>-United Airlines, Inc.<br>-Gogobot, Inc.<br>-Qantas Airways Ltd.<br>-WK Travel, Inc.<br>-AOL, Inc.<br>-Travelzoo, Inc.<br>-Charles Kessler Associates, Inc.<br>- United Airlines, Inc., successor-in-interest to Continental Airlines, Inc.<br>-Swiss International Air Lines, LTD<br>-Virgin America, Inc.<br>-Virgin Vacations, Inc.<br>-Virgin Atlantic Airways Limited<br>-VFM Leonardo, Inc. | Dkt. 302 | Joins Defendant General Hotel Management, Ltd.<br><br>(7:13-cv-09239-CS, Dkt. 300.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff can demonstrate "the scope of what was litigated and resolved in the Singapore action, how that compares with the GHM Actions, and the extent of the impact of the Singapore action on the GHM Actions." | **Yes.**<br><br>With specific allegations regarding (a) which photos were in Singapore action (b) which photo were infringed or are being infringed by each defendant and (c) whether each of the photographs were subject to the Singapore action/settlement.<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>Amount of time not specified. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |

3

| Lawyer and Firm | Case | Represents | Letter | Joinder | Position on Stay | Master Amended Complaint | Opportunity to Respond if Stay Lifted | Meet and Confer |
|---|---|---|---|---|---|---|---|---|
| Oakley, Carla B.<br><br>Morgan Lewis & Bockius<br>One Market,<br>Spear Street Tower<br>San Francisco, CA 94105<br>415-442-1301 | Wave v. Amadeus<br>Case No. 7:15-cv-06995-CS<br><br>Wave v. Booking Holdings<br>Case No. 7:21-cv-02691-CS<br><br>Wave v. British Airways<br>Case No. 7:15-cv-07950-CS<br><br>Wave v. Citibank<br>Case No. 7:22-cv-05141-CS<br><br>Wave v. GHM<br>Case No. 7:13-cv-09239-CS | -Kayak Software Corp.<br><br>-Priceline.com LLC<br><br>-Agoda Company<br><br>-AGIP LLC<br><br>-Booking.com BV<br><br>-Booking.com USA<br><br>-Rocket Travel, Inc.<br><br>-Momondo A/S<br><br>-Hotels Combined LLC<br><br>-Air Canada<br><br>-Southwest Airlines Co.<br><br>-Getaroom.com | Dkt. 303 | No. | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff provides evidence regarding "the details of the scope of the Singapore action and what as resolved there, including identifying with specificity the photographs at issue in the Singapore action and the determinations reached for those photographs." | **Yes.**<br><br>Pleading "the requisite details of the specific photographs each Defendant is alleged to infringe, limited to those photographs at issue in the Singapore action."<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>60 days. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| Drohan, Vivian Rivera<br><br>Drohan Lee LLP<br>5 Penn Plaza<br>Ste 19th FL<br>New York, NY 10001<br>212-710-0004 | Wave v. GHM<br>Case No. 7:13-cv-09239-CS | Tablet Inc. | Dkt. 310 | Joins Defendants Kayak Software Corp., et al.<br><br>(7:13-cv-09239-CS, Dkt. 303.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff provides evidence regarding "the details of the scope of the Singapore action and what as resolved there, including identifying with specificity the photographs at issue in the Singapore action and the determinations reached for those photographs." | **Yes.**<br><br>Pleading "the requisite details of the specific photographs each Defendant is alleged to infringe, limited to those photographs at issue in the Singapore action."<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>60 days. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| Shapiro, Sim R.<br><br>Baxter & Smith, P.C.,<br>125 Jericho Turnpike<br>Jericho, NY 11753<br>(914)-684-1055 | Wave v. GHM<br>Case No. 7:13-cv-09239-CS | Delta Airlines, Inc. | Dkt. 312 | Joins Defendants Kayak Software Corp., et al.<br><br>(7:13-cv-09239-CS, Dkt. 303.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff provides evidence regarding "the details of the scope of the Singapore action and what as resolved there, including identifying with specificity the photographs at issue in the Singapore action and the determinations reached for those photographs." | **Yes.**<br><br>Pleading "the requisite details of the specific photographs each Defendant is alleged to infringe, limited to those photographs at issue in the Singapore action."<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>60 days. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |

| Lawyer and Firm | Case | Represents | Letter | Joinder | Position on Stay | Master Amended Complaint | Opportunity to Respond if Stay Lifted | Meet and Confer |
|---|---|---|---|---|---|---|---|---|
| Weitzman, Kenneth Scott<br><br>Weitzman Law Offices, LLC<br>425 Eagle Rock Avenue<br>Suite 102<br>Roseland, NJ 07068<br>(973)403-9940 | Wave v. GHM<br>Case No. 7:13-cv-09239-CS | -Signature Travel Network<br><br>-Frosh International Travel, Inc.<br><br>-Vacations by Tzell | Dkt. 306 | Joins Defendants Kayak Software Corp., et al.<br><br>(7:13-cv-09239-CS, Dkt. 303.) | **Oppose, <u>unless and until</u>:**<br><br>Plaintiff provides evidence regarding "the details of the scope of the Singapore action and what as resolved there, including identifying with specificity the photographs at issue in the Singapore action and the determinations reached for those photographs." | **Yes.**<br><br>Pleading "the requisite details of the specific photographs each Defendant is alleged to infringe, limited to those photographs at issue in the Singapore action."<br><br>And completing proper service on those upon which service was never completed. | **Yes.**<br><br>60 days. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| Frankel, William Harry<br><br>Brinks Gilson & Lione<br>455 N. Cityfront Plaza Dr<br>Chicago, IL 60611<br>(312) 321-7736 | Wave v. British Airways<br>Case No. 7:15-cv-07950-CS<br><br>Wave v. GHM<br>Case No. 7:13-cv-09239-CS | British Airways PLC | Dkt. 304 | No. | **Does not oppose** "to the extent that the Singapore Action completely resolved of all relevant claims between Plaintiff and [GHM]." | | | |
| Patel, Roma<br><br>Foley & Lardner LLP<br>90 Park Avenue<br>New York, NY 10016<br>212-338-3455 | Wave v. Citibank<br>Case No. 7:22-cv-05141-CS | Citibank N.A. | Dkt. 75 | No. | **Opposes** with respect to Citibank.<br><br>"[I]t would be more efficient to proceed with one or more of the earlier-filed actions."<br><br>"[T]he monetary relief sought from Citibank is likely to be much smaller compared to most of the other defendants." | | | |
| Bauer, John A.<br><br>Nelson Mullins Riley & Scarborough LLP<br>330 Madison Avenue<br>27th Floor<br>New York, NY 10017 | Wave v. Citibank<br>Case No. 7:22-cv-05141-CS | Emerging Travel, Inc. | Dkt. 78 | No. | **Opposes** with respect to ETG.<br><br>"[I]t would be more efficient to proceed with one or more of the earlier-filed actions."<br><br>"Without being able to compare the photographs that were at issue in the Singapore action to those at issue in the current litigation, any impact of the Singapore case cannot be reasonably ascertained." | **Yes.**<br><br>With specific allegations regarding "(1) the images purportedly covered by the asserted copyright registrations, and (2) all photographs Plaintiff alleges were infringed or are being infringed by ETG, and/or third parties who allegedly received the infringing photographs from ETC." | **Yes.**<br><br>60 days. | **Yes.**<br><br>After responsive pleadings are filed and motion practice is resolved. |
| Trokenheim, Matthew Scott<br><br>Goldberg Segalla LLP<br>665 Main Street<br>Buffalo, NY 14203<br>973-681-7024 | Wave v. GHM<br>Case No. 7:13-cv-09239-CS | Setai Owners LLC | Dkt. 311 | Joins GHM (Dkt. 300), Signature Travel (Dkt. 306) *and* Kayak (Dkt. 303) | **Does not oppose** "conditioned on Plaintiff first fulfilling its obligations to clarify the scope of the Singapore rulings and their effect on the consolidated actions through the procedures described in co-defendants letters." | **Yes.** | **Yes.** | **Yes.** |

5

**IN THE GENERAL DIVISION OF**
**THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

**[2022] SGHC 142**

Suit No 175 of 2018

Between

(1)  The Wave Studio Pte Ltd
(2)  Lee Kar Yin
(3)  The Wave Studio, LLC

… *Plaintiffs*

And

(1)  General Hotel Management
     (Singapore) Pte Ltd
(2)  General Hotel Management,
     Ltd

… *Defendants*

---

# GROUNDS OF DECISION

---

[Intellectual Property — Copyright — Infringement]
[Intellectual Property — Copyright — Licences]

## TABLE OF CONTENTS

INTRODUCTION...........................................................................................1

FACTS .......................................................................................................2

    THE PARTIES ...........................................................................................2

    ENGAGEMENT OF THE PLAINTIFFS TO WORK ON BRANDING
    CAMPAIGNS ............................................................................................4

    USE OF THE HOTEL PHOTOGRAPHS IN "THE MAGAZINE" ...............................7

    PROCEDURAL HISTORY AND PAST PROCEEDINGS............................................8

THE PARTIES' CASES ..............................................................................8

    THE PLAINTIFFS' CASE .............................................................................8

    THE DEFENDANTS' CASES .......................................................................10

ISSUES TO BE DETERMINED ..................................................................12

ISSUE (A)(1): ON WHO OWNED THE COPYRIGHT IN THE
HOTEL PHOTOGRAPHS AT THE TIME THE
PHOTOGRAPHS WERE CREATED...........................................................13

    THE LAW ON COPYRIGHT ......................................................................13

    BOTH THE RAW IMAGES AND FINAL PHOTOGRAPHS ARE SUBJECT TO
    THE PRESENT CLAIM...............................................................................14

    COPYRIGHT IN THE RAW IMAGES...........................................................15

    COPYRIGHT IN THE FINAL PHOTOGRAPHS ...............................................20

        *The agreement between Wave and the Hotels was not an
        agreement for the taking of photographs*..................................................22

            (1)    Wave's role as a "one-stop shop"................................22

            (2)    The Final Photographs were produced for use in
                    marketing collaterals created by Wave for the Hotels...............25

i

(3)     Conclusion ................................................................... 26

(4)     The plaintiffs' alternative argument that the Final
        Photographs did not constitute "photographs" within the
        definition in s 7 Copyright Act ...................................... 26

*The Hotels had accepted Wave's reservation of copyright in the
Hotel Photographs* ............................................................... 27

(1)     The provision of Production Estimates ......................... 27

(2)     The Reservation Clause ............................................... 28

(3)     The Reservation Clause was incorporated into the
        agreement between Wave and the Hotels ..................... 30

(4)     The defendants' contention that the Reservation Clause
        was not brought to their attention .............................. 33

(5)     The Hotels' acceptance of the Reservation Clause ....... 37

(6)     Conclusion ................................................................... 39

*Contemporaneous evidence of the parties' conduct showed that
they understood Wave owned the copyright in the Final
Photographs* ....................................................................... 39

ISSUE (A)(1): CONCLUSION ........................................... 43

**ISSUE (A)(2): ON WHOM THE PRESENT OWNER OF THE
COPYRIGHT IN THE HOTEL PHOTOGRAPHS IS FOR THE
PURPOSES OF THIS SUIT** ............................................ 44

ISSUE (A)(2): CONCLUSION ........................................... 48

**ISSUE (B): THE DEFENDANTS' SUBMISSIONS ON AN
"IMPLIED ASSIGNMENT" OF COPYRIGHT** ................. 48

ISSUE (B)(1): THE DEFENDANTS' SUBMISSIONS ON AN "IMPLIED
ASSIGNMENT" OF COPYRIGHT TO THE OWNERS OF THE HOTEL ...... 48

*The applicable legal principles* ............................................ 49

*Applying the principles to the facts of this case* ..................... 50

ISSUE (B)(2): THE DEFENDANTS' SUBMISSIONS ON AN "IMPLIED
ASSIGNMENT" OF COPYRIGHT TO THE SECOND DEFENDANT ......... 52

ISSUE (B)(3): WHETHER THE DEFENDANTS HAD AN IMPLIED LICENCE TO USE THE HOTEL PHOTOGRAPHS FOR GENERAL BRANDING, MARKETING AND ADVERTISING PURPOSES ...................................................56

*The applicable legal principles*.................................................................*56*

*Applying the principles to the facts of this case*.........................................*59*

    (1)    Memphis West ...........................................................61

    (2)    CD-ROMs..................................................................62

    (3)    "Interior Design", "American Airlines" and "Conde Nast Traveler"..................................................................67

    (4)    Gabrin v Universal Music Operations Ltd and another.............68

**ISSUE (C): WHETHER THE DEFENDANTS HAD INFRINGED THE COPYRIGHT IN THE HOTEL PHOTOGRAPHS .........................70**

THE APPLICABLE LEGAL PRINCIPLES ............................................71

THE ACTS OF INFRINGEMENT PLEADED BY THE PLAINTIFFS ...........................72

THE FIRST DEFENDANT'S DEFENCE OF NON-INVOLVEMENT...........................75

*Whether the first defendant had any involvement with the services provided by Wave to the Hotels* .................................................*75*

*Whether the first defendant had any involvement in the publication of "The Magazine"* ................................................*77*

**ISSUE (D): WHETHER THE DEFENCES OF LACHES, ACQUIESCENCE AND ESTOPPEL BY CONVENTION WERE AVAILABLE TO THE DEFENDANTS ....................................................80**

LACHES......................................................................................80

*Ms Chng's evidence about Ms Lee's awareness of the first eight issues of "The Magazine"*....................................................*82*

*The incident involving the 1000 CD-ROMs for The Chedi Muscat*.........*84*

*The incidents involving the use of Hotel Photographs in various industry publications*.................................................................*85*

ACQUIESCENCE.........................................................................88

ESTOPPEL BY CONVENTION .......................................................................89

**SUMMARY OF KEY FINDINGS AT THE CONCLUSION OF THE TRIAL** ....................................................................................**90**

**RELIEFS** ............................................................................................**91**

ON WHETHER THE PLAINTIFFS MAY SEEK RELIEF IN RESPECT OF THE RAW IMAGES ....................................................................................93

ON WHETHER THE PLAINTIFFS MAY SEEK DECLARATORY RELIEF ................93

ON INJUNCTIVE AND OTHER NON-DECLARATORY RELIEF ...........................100

ON WHETHER THE PLAINTIFFS WERE ENTITLED TO SEEK BOTH DAMAGES UNDER S 119(2)(B) AND AN ACCOUNT OF PROFIT UNDER S 119(2)(C) ..............................................................................................101

ON THE PLAINTIFFS' CLAIMS FOR ADDITIONAL DAMAGES AND INTEREST ............................................................................................104

FURTHER DIRECTIONS ON DAMAGES .........................................................105

**COSTS** ................................................................................................**106**

THE APPLICABLE LEGAL PRINCIPLES ..........................................................107

APPLYING THE PRINCIPLES TO THE FACTS OF THIS CASE ............................108

*Whether the plaintiffs' OTS was a serious and genuine offer* ...............*108*

*On the satisfaction of the Validity Requirement and the Favourability Requirement* ..................................................................*112*

ON THE COSTS AND DISBURSEMENTS DUE TO THE PLAINTIFFS....................114

> This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

## The Wave Studio Pte Ltd and others
### v
## General Hotel Management (Singapore) Pte Ltd and another

### [2022] SGHC 142

General Division of the High Court — Suit No 175 of 2018
Mavis Chionh Sze Chyi J
21–24, 28–30 September, 1, 5 October 2021, 18 January 2022, 22 March 2022

16 June 2022

**Mavis Chionh Sze Chyi J:**

## Introduction

1        At the heart of this dispute is the copyright in photographs produced over the course of the parties' working relationship, which spanned over a decade. The defendant companies are in the business of providing management, operational and promotional services to luxury hotels and resorts. Between 1995 and 2008, the plaintiffs provided branding, design and marketing services to the hotels and resorts managed by the defendant companies and were involved in taking and editing photographs of these hotels and resorts.

2        The plaintiffs claimed that some years after the termination of their working relationship with these hotels and with the defendants, they discovered these photographs featured in multiple online issues of the defendants'

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

magazine. In the absence of a formal copyright agreement between the parties, the parties sought the court's determination as to whether ownership of the copyright in these photographs had been vested in the plaintiffs or in the hotels, and whether the defendants were permitted to continue using these photographs after the termination of the working relationship with the plaintiffs.

3        At the conclusion of the trial, I ruled in favour of the plaintiffs.  As the defendants have appealed against my decision, I set out below my written grounds of decision ("GD").

**Facts**

***The parties***

4        The second plaintiff, Ms Lee Kar Yin ("Ms Lee"), is an interdisciplinary artist, creative designer and entrepreneur. She began working in the creative industry in Singapore around 1990.[1] Ms Lee is also known as "Junior" and is referred to as such in much of the correspondence exhibited in these proceedings.

5        Over the years, Ms Lee set up various business entities for the purpose of carrying out her work in the creative industry.  In the interests of simplicity, I will refer to the various business entities set up by Ms Lee over the years collectively as "Wave".

6        On 21 February 1994, Ms Lee registered Wave-S, a sole proprietorship, under the laws of Singapore. Wave-S was dissolved on 21 February 2007. On 8 February 2002, she incorporated The Wave Pte Ltd ("Wave PL") in Singapore.

---

[1] Statement of Claim (Amendment No. 3) at para 2.

2

On 1 August 2008, Wave PL's directors passed a resolution to assign Wave PL's assets, including its intellectual property, to Ms Lee and to dissolve Wave PL.[2]

7        On 1 July 2005, Ms Lee incorporated the first plaintiff, The Wave Studio Pte Ltd ("Wave Studio Singapore"), in Singapore. At that point, the company was known as The Wave Design Pte Ltd. Its name was changed to "The Wave Studio Pte Ltd" on 27 July 2007. Wave Studio Singapore's business activities comprised advertising, art, graphic design and photography.[3] On 1 September 2011, Ms Lee incorporated the third plaintiff, Wave Studio US, a limited liability company, in the United States ("US") under the laws of the State of New York. Wave Studio US was operated solely by Ms Lee and was formed to hold, manage and control the intellectual property rights to Ms Lee's literary and artistic works.[4]

8        The defendant companies are part of the GHM Group ("GHM") and share the same directors.[5] GHM manages, operates and promotes luxury hotels and resorts all over the world; and the various Wave entities provided their services to a number of these hotels and resorts.[6] I will use the term "the Hotels" to refer to the GHM-managed hotels and resorts to which Wave provided services.

9        The first defendant, GHM Singapore, was incorporated in Singapore on or about 26 June 1991 and is a wholly owned subsidiary of the second

---

[2] Statement of Claim (Amendment No. 3) at para 3.

[3] Statement of Claim (Amendment No. 3) at para 1.

[4] Statement of Claim (Amendment No. 3) at para 5.

[5] Statement of Claim (Amendment No. 3) at para 8.

[6] Statement of Claim (Amendment No. 3) at para 9.

3

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

defendant.[7] The second defendant, GHM BVI, was incorporated in the British Virgin Islands but with its principal place of business in Singapore.[8] The defendants have alleged in their pleadings that they are separate entities which perform different functions in GHM.[9] According to them, only the second defendant was engaged in the business of managing, developing, and operating the Hotels.[10]

### Engagement of the plaintiffs to work on branding campaigns

10      Between 1995 and 2008, Ms Lee – as well as the Wave entities – were engaged by GHM to provide an array of services to the Hotels which included the production of marketing, branding and promotional materials ("marketing collaterals") for the Hotels. The periods during which they provided these services were as follows:[11]

| Time Period | Wave entity providing services |
|---|---|
| 2006 to 2008 | Wave Studio Singapore |
| 2005 to 2006 | Wave PL |
| 1995 to 2005 | Wave-S |

11      Orders from the Hotels were communicated to the Wave entities via the following persons:

---

[7] Statement of Claim (Amendment No. 3) at para 6.

[8] Statement of Claim (Amendment No. 3) at para 7.

[9] Defence of the 1st Defendant (Amendment No 2) at para 6; Defence of the 2nd Defendant (Amendment No 3) at para 7.

[10] Defence of the 1st Defendant (Amendment No 2) at para 7; Defence of the 2nd Defendant (Amendment No 3) at para 8.

[11] Statement of Claim (Amendment No. 3) at para 12.

(a)    Mr Ralf Ohletz Graf von Plettenberg ("Mr Ohletz"), Vice-President of GHM Singapore and/or GHM BVI;

(b)    Mr Hans Jenni ("Mr Jenni"), President of GHM Singapore and/or GHM BVI;

(c)    Ms Pamela Tan, Executive Secretary to Mr Hans Jenni; and

(d)    Ms See Soo Eng, Sales Director of GHM Singapore and/or GHM BVI.[12]

12     In the course of producing the marketing collaterals for the Hotels, Wave engaged photographers to take photographs of the Hotels.[13] I will refer to the photo-shoots at which such photographs were taken as "the Hotel photo-shoots". Generally, Mr Masano Kawana ("Mr Kawana") was engaged to take most of the photos, save for the photoshoot for The Saujana in or around 2007, which was done by Mr Lim See Kong ("Mr Lim").[14] The unedited photographs taken by Mr Kawana and Mr Lim at the Hotel photo-shoots were referred to as "the Raw Images" by the parties in their pleadings and at trial; and I will use the same term to refer to them in this GD.

13     Ms Lee was involved in planning, styling and directing the Hotel photo-shoots.[15] After the photoshoots, Ms Lee would edit the Raw Images. She worked together with other employees or contractors engaged by the Wave entities, such as Ms Gwee Wei Wei ("Ms Gwee") and Mr Cheong Wing Kheong ("Mr

---

[12] Statement of Claim (Amendment No. 3) at para 13.

[13] Lee Kar Yin's AEIC (dated 10 September 2021) at para 48.

[14] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 76—78.

[15] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 49—50.

*The Wave Studio Pte Ltd v*                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

Cheong").[16] The Raw Images which underwent this editing process were referred to by parties as "the Final Photographs"; whereas the term "Hotel Photographs" was used to refer collectively to the Raw Images and the Final Photographs. In this GD, I will use the same terms accordingly. After this editing process, CD-ROMs containing the Final Photographs would be delivered to the second defendant and the Hotels.[17]

14      According to Ms Lee, from the outset when Wave began working with the defendants (from 1995 onwards), Wave would generally provide a document referred to as a "Production Estimate" to the defendants and the Hotels, as part of Wave's "standard procedure for all clients". Each Production Estimate would contain "the key terms and conditions that applied to the work required under the order".[18] Ms Lee admitted that she was unable to locate copies of the Production Estimates for some of the earlier Hotel photo-shoots, due to the passage of time. The records exhibited in Ms Lee's affidavit of evidence-in-chief ("AEIC") showed  Production Estimates for Hotel photo-shoots from 2003 onwards.[19] These Production Estimates typically contained a clause stating that the Wave entities reserved the intellectual property copyright to all designs, soft copies, material, photographs and projects undertaken ("the Reservation Clause").[20] Ms Lee or the relevant Wave entity would also issue to the Hotel an invoice describing the work done, usually after the provision of

---

[16] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 20 and 53, Cheong Wing Kheong's 1st AEIC at paras 18 to 23; Gwee Wei Wei's 1st AEIC at paras 23 to 28.

[17] Defence of the 2nd Defendant (Amendment No 3) at para 11(a)(6.4); Lee Kar Yin's AEIC (dated 10 September 2021) at para 54.

[18] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 38–39.

[19] Lee Kar Yin's AEIC (dated 10 September 2021) at Schedules 2 to 20.

[20] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 39 to 40, Schedules 2 to 20.

services.[21] Further, from around 2003, Wave-S would collect a deposit of 50% prior to the commencement of the project. The relevant Wave entity would commence work once the deposit was received.[22]

15      The last Hotel photo-shoot carried out by Wave was on 23 December 2004, for the Setai, Miami.[23] According to Mr Ohletz, GHM "started to use less" of Wave's services from around 2007 to 2008, because Mr Hans Jenni "wanted a fresh outtake [*sic*]" on "[GHM's] brand and promotional materials".[24]

### Use of the Hotel Photographs in "The Magazine"

16      According to Ms Lee, sometime in 2012, she discovered that some of the Hotel Photographs had appeared on the websites of several online travel agencies.[25] Subsequently, between 18 January 2013 and 30 June 2013, she discovered that the Hotel Photographs had appeared on 242 instances in Issues 1 to 12 of GHM's in-house production, "The Magazine", which she found she could access and download on GHM's website.[26] Issues of "The Magazine" were also available for download from other websites owned or operated by the GHM entities[27] and copies were distributed to hotels managed by GHM BVI and to their guests.[28]

---

[21] Statement of Claim (Amendment No. 3) at para 15.

[22] Statement of Claim (Amendment No. 3) at para 16.

[23] Lee Kar Yin's AEIC (dated 10 September 2021) at para 147.

[24] Ralf Ohletz Count Von Plettenberg's AEIC at para 40.

[25] Lee Kar Yin's AEIC (dated 10 September 2021) at para 169.

[26] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 171–173.

[27] Lee Kar Yin's AEIC (dated 10 September 2021) at para 178.

[28] Lee Kar Yin's AEIC (dated 10 September 2021) at para 177.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

### Procedural history and past proceedings

17      On 31 December 2013, Wave Studio US commenced an action against GHM BVI (the second defendant in the present suit) and other defendants in the United States District Court for copyright infringement of the Hotel Photographs. The United States District Court dismissed Wave Studio US's claims against GHM BVI on the grounds of *forum non conveniens* and held that Singapore was the natural forum to determine the ownership of copyright in the Hotel Photographs. Wave Studio US's proceedings against the other defendants for copyright infringement of the Hotel Photographs were also stayed pending the resolution of the present proceedings in Singapore.[29]

18      The writ of summons in the present proceedings was filed on 19 February 2018. On 30 April 2019, the High Court ordered that the trial of this suit be bifurcated as to liability and damages.

### The parties' cases

### The plaintiffs' case

19      The plaintiffs' case was that they owned the copyright in the Hotel Photographs. By way of a series of assignments of copyright effected by Wave and Ms Lee, the third plaintiff became the present owner of the copyright in the Hotel Photographs.[30] The plaintiffs claimed that the defendants had infringed their copyright to the Hotel Photographs in the following manner:

        (a)      under s 31 of the Copyright Act (Cap 63, 2006 Rev Ed) ("Copyright Act"), by reproducing Hotel Photographs in the GHM

---

[29] Statement of Claim (Amendment No. 3) at paras 34–36.

[30] Statement of Claim (Amendment No. 3) at para 28.

publication known as "The Magazine", without licence or consent from the plaintiffs.[31] 242 Hotel Photographs were allegedly reproduced in this manner;[32]

(b)      under s 31 of the Copyright Act, by communicating the Hotel Photographs in The Magazine to the general public, by making the said publication available for download on GHM websites, including to users in Singapore, from (at least) January 2013 to December 2020;[33]

(c)      under s 32 of the Copyright Act, by importing the infringing copies of The Magazine into Singapore for the purpose of trade, or by way of trade exhibiting the article in public, when they (the defendants) knew or ought reasonably to have known that the making of their publications constituted an infringement of the plaintiffs' copyright, or in the case of importation, that the making of the defendants' publication was carried out without the licence and/or consent of the plaintiffs.[34]

20      Further, in its reply to the second defendant's defence, the plaintiffs asserted that they were not aware of the reproduction of the Hotel Photographs in the defendants' publication until 2013; that they had commenced the US proceedings within the same year; and that they had never acquiesced to the

---

[31] Plaintiff's Closing Submissions dated 16th November 2021 at para 173; Statement of Claim (Amendment No. 3) at para 38(a).

[32] Plaintiff's Closing Submissions dated 16th November 2021 at para 171.

[33] Plaintiff's Closing Submissions dated 16th November 2021 at para 173; Statement of Claim (Amendment No. 3) at paras 38(b)–38(c).

[34] Plaintiff's Closing Submissions dated 16th November 2021 at para 174; Statement of Claim (Amendment No. 3) at para 38(c).

9

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

defendants' use of the Hotel Photographs for general branding, marketing and advertising purposes.[35]

### The defendants' cases

21      In its pleadings, the first defendant essentially sought to distance itself from any dealings between the plaintiffs on the one hand and the Hotels and/or the second defendant on the other. The first defendant claimed that it was not engaged in managing, developing and operating the Hotels at all material times.[36] According to the first defendant, although it shared the same directors with the second defendant, the two companies were separate legal entities that performed different functions in the GHM group.[37] According to the first defendant, it did not publish or cause to be published any issues of "The Magazine"; nor did it have any control over the publication and the content of the GHM websites.[38]

22      The second defendant pleaded that the copyright in the Hotel Photographs belonged to the owners of the Hotels. According to the second defendant:

> (a)      Pursuant to the "business arrangements" between Ms Lee and Wave on the one hand and the second defendant and the Hotels on the other, there was an implied term that any copyright held by Ms Lee

---

[35] Reply to the Defence of the 2nd Defendant (Amendment No. 3) at para 8(b).

[36] Defence of the 1st Defendant (Amendment No. 2) at para 7.

[37] Defence of the 1st Defendant (Amendment No. 2) at para 6.

[38] Defence of the 1st Defendant (Amendment No. 2) at para 8.

and/or Wave in the Hotel Photographs would be assigned to the owners of the Hotels;[39]

(b)    Further and/or in the alternative, ownership of the copyright vested in the owners of the Hotels by operation of s 30(5) of the Copyright Act;[40]

23    The second defendant also argued that even if copyright in the Hotel Photographs did not vest in the owners of the Hotel by virtue of an implied assignment or the operation of s 30(5) Copyright Act, and even if the third plaintiff had been assigned the copyrights to the Hotel Paragraphs (which was not admitted by the second defendant), the third plaintiff would only have ownership of the copyright previously held by:

(i)    Wave-S as of 7 January 2013;

(ii)    Wave PL as of 7 January 2013;

(iii)    Ms Lee as of 7 January 2013;

(iv)    The first plaintiff as of 11 November 2011; and

(v)    Mr Kawana as of 4 September 2015;[41]

24    Further and/or in the alternative, the second defendant alleged that Ms Lee and/or Wave had granted the second defendant and/or the owners of the Hotels an implied license to use the Hotel Photographs for general branding, marketing, and/or advertising purposes.[42]

---

[39] Defence of the 2nd Defendant (Amendment No 3) at para 12(a).

[40] Defence of the 2nd Defendant (Amendment No 3) at para 12(b).

[41] Defence of the 2nd Defendant (Amendment No 3) at para 12(c).

[42] Defence of the 2nd Defendant (Amendment No 3) at para 12(d).

*The Wave Studio Pte Ltd v*                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

25      Insofar as the owners of the Hotels owned the copyright subsisting in the Hotel Photographs or were granted an implied license to use the Hotel Photographs, the owners of the Hotels had granted the second defendant an implied license to use the Hotel Photographs for general branding, marketing, and/or advertising purposes pursuant to the hotel management contracts entered into between the owners of the Hotels and the second defendant.[43]

26      In addition, the second defendant claimed that the plaintiffs were "at all material times" fully aware of the use by [the second defendant] of the Hotel Photographs for general branding, marketing and/or advertising purposes".[44] The second defendant contended that as such, the plaintiffs were barred by the doctrine of laches from claiming any relief against the second defendant, and/or had acquiesced to the second defendant's use of the Hotel Photographs for the said purposes, and/or were "estopped by convention" from pursuing the present claim against the second defendant.[45]

**Issues to be determined**

27      In the trial before me, the issues to be determined were as follows:

        (a)      Whether the plaintiffs owned the copyright in the Hotel Photographs;

        (b)      Whether the defendants had an implied licence to use the Hotel Photographs for general branding, marketing and advertising purposes;

---

[43] Defence of the 2nd Defendant (Amendment No. 3) at para 12(e).

[44] Defence of the 2nd Defendant (Amendment No 3) at para 16(d).

[45] Defence of the 2nd Defendant (Amendment No 3) at paras 16(d)–16(f).

(c)     Whether the defendants had infringed the copyright in the Hotel Photographs; and

(d)     Whether the defences of laches, acquiescence and estoppel by convention were available to the defendants.

28     In respect of issue (a), I had to consider firstly, who owned the copyright in the Hotel Photographs at the time these photographs were created (Issue (a)(1)); and secondly, whom the present owner of the copyright in the Hotel Photographs is for the purposes of this suit (Issue (a)(2)).

## Issue (a)(1): On who owned the copyright in the Hotel Photographs at the time the photographs were created

### *The Law on Copyright*

29     I address first the issue of ownership of the copyright in the Hotel Photographs. Section 4 of our Copyright Act provides that subject to the provisions of the Act, no copyright shall subsist otherwise than by virtue of the Act.

30     The subject matter of this dispute – photographs – falls into the category of "artistic works" as *per* s 7 of the Copyright Act. Where copyright arises in artistic works, s 26(1)(*b*) of the Copyright Act confers the exclusive right to reproduce the work in a material form, to publish the work (if it is unpublished) in Singapore or in any country in relation to which the Act applies and/or to communicate the work to the public.

31     Under the Copyright Act, the default rule for copyright ownership in an artistic work such as a photograph is that the author of the work shall be entitled to any copyright subsisting in the work (s 30(2) Copyright Act). However, ss

*The Wave Studio Pte Ltd v*                            [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

30(4) to 30(6) of the Copyright Act provide for exceptions to this default rule. In turn, the operation of ss 30(4), 30(5) and 30(6) in relation to copyright in a particular work may be excluded or modified by agreement (s 30(3) Copyright Act).

### *Both the Raw Images and Final Photographs are subject to the present claim*

32     The defendants contended in their closing submissions that the "plaintiffs' claim for reliefs in respect of Hotel Photographs should only be in relation to the Final Photographs", and that the court should not make any orders in relation to the Raw Images. This was because (according to the defendants) it was the Final Photographs which had been provided in CD-ROMs by the plaintiffs to the second defendant and the Hotels; the pleaded breaches only related to the use of the Final Photographs; the work done by the plaintiffs in relation to the Hotel Photographs was to transform the Raw Images into the Final Photographs; and the Production Estimates relied on by the plaintiffs were not for the delivery of Raw Images.[46]

33     I found the defendants' objections to be devoid of any merit. First, this objection to the scope of the plaintiffs' claim was never pleaded in either defendant's defence. The general rule is that parties are bound by their pleadings, and the court is precluded from deciding on a matter that the parties have not put into issue (*V Nithia (co-administratrix of the estate of Ponnusamy Sivapakiam, deceased) v Buthmanaban s/o Vaithilingam and another* [2015] 5 SLR 1422 ("*V Nithia*") at [38]).

---

[46] Defendants' Closing Submissions at paras 61–67.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

34      Second, and in any event, it was clear from the Statement of Claim that the issue of copyright in the Raw Images was expressly pleaded by the plaintiffs.[47] Specifically, the issue of copyright in the Raw Images was pleaded as part of the plaintiffs' case in relation to the issue of copyright in the Final Photographs. The defendants themselves did not seriously dispute that the Final Photographs were really edited and processed "versions" of the Raw Images.[48] If the plaintiffs did not own the copyright in the Raw Images, questions would have arisen as to how they could have had the right to edit, process and manipulate the Raw Images to create the Final Photographs. As such, it was logical – indeed, necessary – for the plaintiffs to start with the issue of copyright in the Raw Images. I therefore considered the issue of copyright ownership in respect of *both* the Raw Images and the Final Photographs.

### Copyright in the Raw Images

35      As stated earlier (at [12]), the Wave Entities engaged two photographers to take the Hotel Photographs.[49] Mr Kawana was engaged as the photographer for all the Hotel photo-shoots save for the photo-shoot done for the Saujana in October 2007. For the Saujana photo-shoot in October 2007, Mr Lim was the photographer.[50]

36      I noted that in the deposition he provided in the US proceedings, the defendants' main witness Mr Ohletz also stated that Mr Kawana was the

---

[47] Statement of Claim (Amendment No. 3) at paras 24(a)–(c).

[48] Statement of Claim (Amendment No. 3) at para 24(d).

[49] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 20(c)–(d).

[50] Lee Kar Yin's AEIC (dated 10 September 2021) at para 76.

photographer at the Hotel photo-shoots;[51] and when cross-examined, he agreed that Ms Lee was not the photographer for the Hotel Photographs.[52]

37      Under s 7(1) of the Copyright Act, the author of a photograph is "the person who took the photograph". On the evidence before me, I was satisfied that Mr Kawana and Mr Lim – as the persons who had taken the photographs at the Hotel photo-shoots – were the authors of the Raw Images. I rejected the defendants' argument in their closing submissions that Ms Lee should be regarded as "the sole author" of the Raw Images.[53] This argument did not make sense, since Mr Ohletz himself admitted that Ms Lee was not the photographer at the Hotel photo-shoots.

38      As noted earlier, pursuant to s 30(2) of the Copyright Act, the first owner of the copyright in an artistic work such as a photograph is the author of that work – *but* this position is subject to ss 30(5) and 30(6) which provide:

> (5)  Subject to subsection (4), where —
>
>> (a) a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving by the other person; and
>>
>> (b) the work is made in pursuance of the agreement,
>
> the first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.

---

[51] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 116 line 1 to line 16.

[52] See transcript of 28 September 2021 p 35 at line 1 to line 7.

[53] Defendants' Closing Submissions at paras 73–80.

(6) Where a literary, dramatic or artistic work to which subsections (4) and (5) do not apply, or a musical work, is made by the author in pursuance of the terms of his employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part.

39      I address first the issue of the copyright in the Raw Images taken by Mr Lim at the Saujana photo-shoot in October 2007. Under s 30(6) (above), where the author of the artistic work made the work in pursuance of the terms of his employment, his employer "shall be entitled to any copyright subsisting in the work". Ms Lee gave evidence that Mr Lim had been employed by Wave.[54] Ms Lee's evidence was supported by the CPF payment advice for The Wave Pte Ltd from April to June 2005 which reflected payments to Mr Lim.[55]

40      Having reviewed the evidence before me, I found it sufficient to establish that Mr Lim had taken the Saujana photographs in pursuance of the terms of his employment by Wave under a contract of service. Accordingly, applying s 30(6) of the Copyright Act, I was satisfied that Wave was the owner of the copyright in the Raw Images taken by Mr Lim.

41      Turning next to the Raw Images taken by Mr Kawana, the evidence showed that he was engaged by Wave as the photographer for the various Hotel photo-shoots over the years.[56] Mr Kawana's estimates and invoices were made out to Wave; and it was not disputed that these invoices were paid by Wave. In the deposition he gave in the US proceedings, Mr Ohletz conceded that Mr Kawana's invoices were paid by Wave and that the defendants had never been billed by Mr Kawana for his photography services.[57] At trial, Mr Ohletz

---

[54] Lee Kar Yin's AEIC (dated 10 September 2021) at para 20(c).

[55] Agreed Bundle of Documents ("ABOD") Vol B at AB/B-23 to B-25.

[56] Lee Kar Yin's AEIC (dated 10 September 2021) at para 48.

[57] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 130 line 15 to line 22.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

confirmed in cross-examination that as far as he was aware, payment for the
Hotel photo-shoots was made to Wave: the defendants never received any
invoices from Mr Kawana.[58] Mr Ohletz also testified in cross-examination that
the defendants dealt with Wave and left it to Wave to coordinate with the various
service providers: as far as the photographer for the hotel photo-shoots was
concerned, Wave would be the one to call up the photographer, and it was
"always… the same photographer".[59]

42     There was thus nothing in the evidence to show a direct contractual
relationship between Mr Kawana and the defendants, or between Mr Kawana
and the Hotels. I should add that it was never pleaded – nor was any evidence
given – that Wave had acted as the Hotels' agent in engaging Mr Kawana's
photography services.

43     The law is clear that where no direct contractual relationship exists
between the alleged commissioning party and the person who takes the
photographs, the former does not in such a situation acquire the copyright in the
photographs under s 30(5) of the Copyright Act: *Wang Choong Li v Wong Wan
Chin* [2015] 4 SLR 41 ("*Wang Choong Li*") at [61] to [64]. Indeed, the position
of the Hotels in this case may be likened to that of the respondent bride in *Wang
Choong Li*, who contracted with the appellant bridal boutique owner for the
provision of wedding services including photography services. The wedding
day photographer was engaged by the appellant. The High Court noted that there
was no documentation showing a direct contractual relationship between the
respondent and the said photographer, nor any testimony to that effect. There
was nothing in terms of instructions that the respondent would have been

---

[58] See transcript of 28 September 2021 at p 48 line 16 to line 18.

[59] See transcript of 28 September 2021 at p 47 line 10 to p 48 line 8.

*The Wave Studio Pte Ltd v*                                          [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

expected to give to the said photographer before the event as to the scope of the
work required, terms of payment, or requirements as to the precise services or
equipment that would be deployed. As the High Court noted, the respondent had
engaged the appellant to provide photography; and this must mean that there
was no intention for the respondent to enter into a contract with the
photographer. The High Court added that finding that agency arose between the
respondent and the appellant in respect of the dealing with the wedding day
photographer was highly artificial: the court accepted the appellant's
submission that an agency was not in the contemplation of either the appellant
or the respondent. The court held that in the absence of any evidence of an actual
commission of the wedding day photographer by the respondent, copyright in
the photographs taken by the photographer did not reside in the respondent for
the purposes of s 30(5) of the Copyright Act.

44     The observations which the High Court made of the respondent's
position in *Wang Choong Li* are apposite in the present case. Based on the
evidence adduced, it was clearly Wave – and not the Hotels, or even the
defendants acting on behalf of the Hotels – who had commissioned Mr Kawana
to take the Raw Images at the Hotel photo-shoots. Applying s 30(5) of the
Copyright Act, I was satisfied that Wave owned the copyright in the Raw
Images taken by Mr Kawana.

45     I should add that documentation as between Mr Kawana and Wave
supported the above finding. I refer to the two photograph service agreements,
one dated 1 January 2000 between Irieeyes Pte Ltd (Mr Kawana's company)
and Wave-S and The Wave Pte Ltd,[60] and another dated 1 June 2005 between

---

[60] ABOD Volume B of AB/B-21.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

Irieeyes Pte Ltd, Wave-S, The Wave Pte Ltd and The Wave Design Pte Ltd;[61] as well as the Memorandum of Understanding and Ownership between Mr Kawana and Irieeyes Pte Ltd and Ms Lee dated 1 October 2013.[62] As Ms Lee pointed out, these documents – which were executed by Mr Kawana – showed that Mr Kawana's own understanding with Wave all along was that the copyright in the Raw Images belonged, not to him, but to Wave; and that there was no attempt by him, or by Irieeyes, to retain any copyright in the Raw Images.

**Copyright in the Final Photographs**

46      I address next the issue of ownership of the copyright in the Final Photographs. It was not seriously disputed that the process of curation and editing constituted a sufficiently material alteration of the Raw Images such that Ms Lee (or Ms Lee and the other Wave employees who worked with her on the Final Photographs) would be considered the author of the Final Photographs.[63] As an aside, I should add that although there was some faint suggestion in the defendants' opening statement that Ms Lee might not be an "employee" of Wave,[64] I considered this suggestion to be baseless. Ms Lee was able to adduce evidence of the CPF contributions paid to her by Wave; whereas conversely, no evidence at all was produced by the defendants to back up the suggestion made in their opening statement.

47      The plaintiffs submitted that Ms Lee (or Ms Lee and her fellow Wave employees) being the author(s) of the Final Photographs, it followed that Wave,

---

[61] ABOD Volume B at AB/B-30.

[62] ABOD Volume B at AB/B-73 to B-74.

[63] Defendants' Closing Submissions at para 92.

[64] Defendants' Opening Statement at para 34.

being the employer, owned the copyright in the Final Photographs pursuant to
s 30(6) of the Copyright Act.[65] More precisely, *per* Annex F to the plaintiffs'
Closing Submissions, it was submitted that:

> (a)    copyright in the Final Photographs produced from December
> 2000 to December 2004, which were taken at 13 photo-shoots and
> totalled 1023 photographs, belonged to Wave-S;

> (b)    copyright in the Final Photographs produced from February
> 2005 to June 2005, which were taken at 5 photo-shoots and totalled 364
> photographs, belonged to Wave PL; and

> (c)    copyright in the Final Photographs produced from August 2005
> to October 2007, which were taken at 11 photo-shoots and totalled 994
> photographs, belonged to Wave Studio Singapore.

48     In sum, the plaintiff asserted that the Wave entities owned the copyright
in 2381 Final Photographs taken in 29 photo-shoots from the period of
December 2000 to October 2007.[66]

49     The defendants, on the other hand, argued that while Ms Lee was the
author of the Final Photographs, s 30(5) of the Copyright Act applied so as to
vest in the Hotels ownership of the copyright in the Final Photographs. This was
because it was the Hotels who had commissioned the plaintiffs to produce the
photographs.[67]

---

[65] Plaintiffs' Closing Submissions at para 37.

[66] Plaintiffs' Closing Submissions at Annex F.

[67] Defendants' Opening Statement at para 9(a); Defence of the 2nd Defendant (Amendment No. 3) at para 12(b).

50      Having considered the evidence and parties' submissions, I found that copyright in the Final Photographs was owned by the relevant Wave entities listed in Annex F to the plaintiffs' closing submissions, and not by the Hotels. In gist, my reasons were as follows. First, in order for s 30(5) of the Copyright Act to apply in the case of photographs, the party purporting to rely on it (the alleged commissioning party) must have made an agreement for valuable consideration with the photographer "for the taking of a photograph". In the present case, having examined the evidence, I agreed with the plaintiffs that the agreement between Wave and the Hotels was not an agreement for the taking of photographs". Rather, it was an agreement for Wave to operate as a "one-stop shop" for the Hotels, providing branding, design and marketing services of which photography constituted but one supporting function.

51      Second, even assuming the agreement between Wave and the Hotels was an agreement for the taking of photographs, I was satisfied that the operation of s 30(5) had been excluded by agreement between the parties, *per* s 30(3). In gist, I found that the Hotels had accepted Wave's reservation of copyright in the Final Photographs by accepting the Reservation Clause in Wave's Production Estimates.

52      I now elaborate on my findings in respect of these two reasons.

*The agreement between Wave and the Hotels was not an agreement for the taking of photographs*

(1)      Wave's role as a "one-stop shop"

53      First, insofar as the agreement for Wave's services was concerned, Mr Ohletz's evidence in his US deposition was that Wave's client was the Hotel,

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

and that the general manager of the relevant hotel would usually sign off on Wave's Production Estimate for a job.[68]

54      In his US deposition, Mr Ohletz also explained that as far as GHM were concerned, they were responsible for "[conceptualizing]" the hotels[69] and positioning the "GHM brand and the GHM Hotels as a lifestyle". He gave the example of the Setai in Miami, where he said it was GHM that came up with the concept or idea that they "wanted to bring the Asian experience to Miami".[70]

55      Importantly, Mr Ohletz also admitted that "having an idea or having a format is one thing", but that what GHM wanted was someone who "takes it from there" after talking with GHM about "what we need for a hotel". According to Mr Ohletz, prior to Wave being engaged, GHM was "dealing with so many different [types] of people" which made it "very complicated"; and what Ms Lee and Wave provided was "a one-stop solution":[71]

> **We gave her a brief**. So, I would call her [Ms Lee] typically, and then we'd say, "Well, we are doing a hotel there and there," And then we've established a long-term working relationship because we had certain needs and different types of brochures, pre-opening [brochures], actual [brochures] and then various other types of things --- in-room packaging, you know, for toothpaste and all of that. So the whole package…**(S)he comes up with an idea, and then by the time we finalise and massage this idea --- because I ultimately was in charge of this thing and so I ultimately make the decision, what things should look like. But she made a lot of recommendations. And then, of course, it needs to be implemented, i.e. printed. And so having an idea or having a format is one things, but then I wanted somebody,**

---

[68] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 63 line 6 to p 68 line 5.

[69] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 10 line 13 to p 11 line 11.

[70] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 10 line 13 to p 11 line 11.

[71] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 14 line 4 to p 15 line 8.

> **because...prior to her coming to GHM, we had other people and it was very complicated for me because we were dealing with so many different type [*sic*] of people. So I wanted a one-stop solution. So a one-stop solution is where she [Ms Lee] comes in, we talk about what we need for a hotel and she takes it from there. So, i.e., not just taking photographs for a brochure but also make sure that it's properly printed, properly set up, properly colour-separated... So, right from day one to the end, to the final product on my desk**, so to speak, yes.

> [emphasis added]

56      The fact that Wave provided a "one-stop solution" for the Hotels' marketing, design and branding needs mattered – not only because it allowed the Hotels (and whoever managed them) to avoid the complications of dealing with multiple vendors, but also because it enabled them to ensure that all marketing and promotional materials produced for the Hotels were "consistent in their look and feel in displaying the high standards of style that is [*sic*] signature to GHM".[72]

57      From Mr Ohletz's evidence, it was also clear that the taking of photographs formed only part of the suite of services Wave was engaged to provide. Mr Ohletz himself put it best in his US deposition when he described Ms Lee and Wave as having been hired for "a complete job", to give the Hotels "the end product":[73]

> I'm paying for a service which includes photography. So, it says here very clearly [referring to a Production Estimate], photography, design, art direction, all this, it's the whole package. I didn't ask her to do, be the photographer nor did I hire her for a specific purpose. **I hired her to give me the end product... I hired her for a complete job, not part of a job. Photography is part of it. I didn't hire a photographer**. **I hired somebody who designs, conceptualizes and delivers a**

---

[72] Ralf Ohletz Count Von Plettenberg's AEIC at para 21.

[73] Tab 65 of exhibit LKY-40 at p 117 line 4 to p 118 line 11.

*The Wave Studio Pte Ltd v*                                     [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

> **full product, which includes photography**... That was the deal.

> [emphasis added]

58      Mr Ohletz's evidence thus corroborated Ms Lee's evidence. When questioned on whether she had been engaged to take the photos with time as a basis, Ms Lee's evidence was as follows:[74]

> Wave was engaged for a full suite of marketing collaterals. Taking the photos is just one of the ingredients... I mean, when you have a campaign, you will need brochures, you will need leaflets, you will need a lot of things and you need the entire theme to be consistent... they are [*sic*] conceptual photography and this is very common in advertising and design agencies... It wasn't a one-off photography service whereby, here, take some photographs and do whatever you want after that. That is not conceptual photography.

(2)      The Final Photographs were produced for use in marketing collaterals created by Wave for the Hotels

59      Additionally, as the plaintiffs pointed out, the evidence showed that the Final Photographs were produced for use in *the marketing and promotional materials created by Wave* for the Hotels. Ms Lee gave evidence to this effect in her AEIC; and her evidence was corroborated not only by the plaintiffs' other witnesses,[75] but also by the defendants' witnesses Mr Ohletz[76] and Mr Hans Joerg Meier[77] ("Mr Meier"), General Manager at the Legian in Seminyak Bali Indonesia and the Setai in Miami USA, and Senior Vice President of the second defendant. Mr Ohletz disagreed during cross-examination with the suggestion

---

[74] See transcript dated 21 September 2021 at p 136 line 4 to p 137 line 16.

[75] See, *eg*, Gwee Wei Wei's testimony, transcript of 24 September 2021 at p 25 line 2 to p 26 line 12.

[76] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 65 p 58 line 16 to line 19.

[77] See transcript dated 1 October 2021 at p 32 line 17 to p 33 line 6.

*The Wave Studio Pte Ltd v*                                             [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

that it was because "Wave owned the rights to the Final Photographs" that GHM and the Hotels had to "go back to Wave" "each time they wanted to order collaterals".[78] However, he was unable to put forward any evidence of the Final Photographs having been used by any vendor other than Wave to create marketing and promotional materials for the Hotels.

(3)     Conclusion

60      For the reasons set out above, I found that the agreement between Wave and the Hotels was not an agreement for the taking of photographs within the meaning of s 30(5) of the Copyright Act. Instead, it was an agreement for Wave to provide the Hotels with a "one-stop solution" to their branding, design and marketing needs; and as Mr Ohletz himself put it, photography was one component of this "one-stop solution", but photography was not what Wave was hired to do. In the circumstances, s 30(5) did not apply so as to vest in the Hotels the copyright in the Final Photographs; the copyright remained with Wave.

(4)     The plaintiffs' alternative argument that the Final Photographs did not constitute "photographs" within the definition in s 7 Copyright Act

61      The plaintiffs also argued in the alternative that s 30(5) had no application in this case because the Final Photographs did not constitute "photographs" within the definition given by s 7 of the Copyright Act. According to the plaintiffs, the Final Photographs – having been created as a result of extensive editing and manipulation of the Raw Images – could no longer be regarded as "photographs" insofar as a photograph was understood to involve the "capturing or recording of light on a particular medium". The

---

[78] See transcript of 29 September 2021 at p 40 line 11 to p 41 line 7.

*The Wave Studio Pte Ltd v*                                              [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

plaintiffs cited, as the basis of this argument, the Court of Appeal ("CA")'s judgment in *Singsung Pte Ltd v LG 26 Electronics Pte Ltd (t/a L S Electrical Trading)* [2016] 4 SLR 86 ("*Singsung*"). I should point out, however, that the CA made it clear in its judgment that its views on the definition of a "photograph" were "provisional" and remained "open for further consideration and analysis in an appropriate case" (at [106] of *Singsung*). In any event, given the findings I made in respect of the agreement between Wave and the Hotels, I did not find it necessary to make any ruling on this issue.

*The Hotels had accepted Wave's reservation of copyright in the Hotel Photographs*

62      Further and in any event, even assuming the agreement between Wave and the Hotels was an agreement for the taking of photographs, I found that the operation of s 30(5) had been excluded by agreement between the parties *per* s 30(3) of the Copyright Act, because the Hotels had accepted Wave's reservation of copyright in the Final Photographs.

(1)      The provision of Production Estimates

63      As alluded to earlier (at [14]), Ms Lee's evidence was that from "the very beginning when Wave began working with GHM, from 1995 onwards", Wave would provide a Production Estimate to the Hotel and to GHM in respect of each job. The provision of such Production Estimates formed part of Wave's standard procedure; and the only occasions when they were not provided to a client before commencement of work were "either ad-hoc jobs that Wave was asked to carry out at the last minute, or for re-prints of stationery where the price of printing had already been previously provided to the GHM Entities under/or

27

the Hotels and had remained unchanged".[79] The Production Estimates set out the "key terms and conditions that applied to the work required under the order" from the client. Ms Lee was firm in maintaining that these included not only terms as to the price and the scope of work but also a "Reservation Clause" – that is, "a term confirming that 'any intellectual property copyright' which arises from Wave's work on the project is owned by Wave".[80] As Ms Lee described it:[81]

> The exact language in the Reservation Clause in the Production Estimates varied over time as I developed a better understanding of how to better express the understanding that Wave owned the intellectual property rights to its artistic works… However, the meaning of each of the Reservation Clauses was clear: Wave owned the intellectual property rights to the designs and photographs that it had created.

(2)    The Reservation Clause

64    The varying forms in which the Reservation Clauses were worded included:

(a)    "We reserve the intellectual property copyright to all designs / projects undertaken";

(b)    "We reserve the intellectual property copyright to all designs / photographs / projects undertaken"; or

(c)    "We reserve the intellectual property copyright to all designs / soft copies / material / photographs/ projects undertaken".[82]

---

[79] Lee Kar Yin's AEIC (dated 10 September 2021) at para 38.

[80] Lee Kar Yin's AEIC (dated 10 September 2021) at para 39.

[81] Lee Kar Yin's AEIC (dated 10 September 2021) at para 40.

[82] Statement of Claim (Amendment No. 3) at para 32.

65      Ms Lee was candid in admitting that she had not been able to find copies of the Production Estimates for some of the earlier Hotel photo-shoots due to the passage of time. In her AEIC she was able to produce Production Estimates for Hotel photo-shoots from 2003 onwards.[83] Having considered Ms Lee's testimony, the available documentation and other evidence adduced, I accepted first of all her assertion that such Production Estimates had been provided to the Hotels from the outset when she started doing jobs for them. For one, there was clear evidence of Wave issuing Production Estimates even before 2003 in respect of work done for the Hotels and GHM, including work which did not involve Hotel photo-shoots. The documentary evidence in the Agreed Bundles included, for example, a Production Estimate dated 16 February 2001 sent to Ms See Soo Eng, in respect of posters required for two GHM-managed hotels and "an overall GHM Hotels Poster";[84] a Production Estimate dated 23 October 2002 sent to a Mr Daniel Meury of the Chedi Phuket in respect of "2004 Festive Season Card" and "Envelope" required by the Chedi Phuket;[85] and a Production Estimate dated 30 December 2002 sent to Ms See Soo Eng in respect of "GHM Corporate Folder[s]".[86] I found that the evidence that Wave had already been issuing Production Estimates even before 2003 supported Ms Lee's assertion that such Production Estimates were issued by Wave from the very outset when it started working with the Hotels.

66      Further, while it was true that some of these Production Estimates did not include a Reservation Clause, Ms Lee explained during her examination-in-chief that her recollection was that all the Production Estimates issued by Wave

---

[83] Lee Kar Yin's AEIC (dated 10 September 2021) at Schedules 2 to 20.

[84] ABOD Volume C at AB/C-2.

[85] ABOD Volume C at AB/C-22.

[86] ABOD Volume C at AB/C-24.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

*for the Hotel photo-shoots* included a Reservation Clause.[87] The defendants did not seek to challenge this portion of Ms Lee's evidence-in-chief during cross-examination; and the evidence itself was consistent with the contents of those Production Estimates for Hotel photo-shoots which were actually available at trial.[88] In the circumstances, I accepted Ms Lee's evidence that all the Production Estimates issued for the Hotel photoshoots did contain a Reservation Clause.

(3)    The Reservation Clause was incorporated into the agreement between Wave and the Hotels

67     The defendants did not dispute that the clear meaning of the Reservation Clause was that the plaintiffs retained the copyright to the Hotel Photographs. However, the defendants disputed that the Reservation Clause had contractual effect: they submitted that the clause was unilaterally inserted by Ms Lee and never brought to Mr Ohletz's attention.[89] Having evaluated the evidence adduced, I found no merit in the defendants' submission. I accepted Ms Lee's evidence that the Production Estimates for the Hotel photo-shoots were issued before the Hotel photo-shoots were carried out, and that they were accepted by the Hotels.[90] My reasons for arriving at these findings were as follows.

68     First, Ms Lee's evidence about the Production Estimates being issued prior to the commencement of work was supported by the evidence of the defendants' own witness, Mr Meier. Mr Meier had previously interacted with Wave during his tenure as General Manager at the Legian in Seminyak Bali

---

[87] See transcript of 21 September 2021 at p 41 ln 25 to p 42 ln 18.

[88] See, *eg*, Lee Kar Yin's AEIC (dated 10 September 2021) at Schedules 4 to 18.

[89] Defendants' Closing Submissions at para 96.

[90] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 38–42.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

Indonesia and the Setai in Miami USA.[91] In cross-examination at trial, Mr Meier agreed that the Production Estimates were meant to "get the hotel's approval… before the invoice is produced".[92] Although in his AEIC Mr Meier claimed that there were occasions when Wave issued invoices first and only got the Hotels to sign the Production Estimates later, he admitted in cross-examination that he had no personal knowledge of the evidence which he had cited in his AEIC (exhibit HJM-4) to support this claim. According to Mr Meier, he was not involved in dealing with the documents in HJM-4: they were provided to him by the "legal team" for the purposes of his AEIC; and he could not even recall if he had ever seen these documents before the preparation of his AEIC.[93] The dates of the Production Estimates in exhibit HJM-4 – which related to Hotel photo-shoots at the Chedi Chiang Mai and the Lalu – showed that these Production Estimates were issued *before* the relevant Hotel photo-shoot. Thus, insofar as Production Estimates were exhibited in HJM-4, they actually refuted Mr Meier's claim about such estimates having been issued by Wave much later and only after invoices had been sent. The Production Estimates in respect of the first Hotel photo-shoot for the Chedi Chiang Mai was dated 23 June 2004 and stated clearly that it was for a photo-shoot scheduled for "end of August / beginning of September". This was followed by an invoice dated 10 August 2004. As for the Production Estimate for the second photo-shoot for the Chedi Chiang Mai, this was dated 16 February 2006 and stated clearly that it was for a photo-shoot scheduled for "beginning June 2006". This was followed by an invoice dated 25 September 2006.[94]

---

[91] Hans Joerg Meier's AEIC at paras 7–10.

[92] See transcript of 1 October 2021 at p 57 line 22 to p 58 line 1.

[93] See transcript of 1 October 2021 at p 25 line 18 to p 29 line 20.

[94] See Hans Joerg Meier's AEIC at pp 101–106.

31

*The Wave Studio Pte Ltd v*                                        [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

69      In a similar vein, although Ms Alison Fraser (formerly the General manager at the Chedi Ubud and the Andaman Langkawi) claimed in her AEIC that Wave had issued Production Estimates only after work was done on the Hotel photo-shoots, the evidence she relied on (exhibit AF-3) actually refuted her claim. During cross-examination, Ms Fraser was obliged to concede that exhibit AF-3 appeared to show that the Production Estimate was issued by Wave first, before the issuance of the purchase order by the Hotel. She also conceded that leaving aside exhibit AF-3, she could not produce any other evidence to show that Wave had issued Production Estimates only after the work of the Hotel photo-shoots was done.[95]

70      Given Mr Meier's and Ms Fraser's capitulation in cross-examination, I did not place any weight on their allegations that Wave had issued Production Estimates only after completing the Hotel photo-shoots.

71      Ms Lee also gave evidence that upon their receipt of the Production Estimates from Wave, the "management of each Hotel would negotiate with Wave on the terms of the Production Estimates, often to try to lower the price or to expand the scope of the services that Wave was to provide".[96] If the terms were amended as a result of such negotiations, Wave would issue fresh Production Estimates to reflect the amended terms; and once the negotiations were complete, the Hotels would accept the Production Estimate by signing it, by instructing Wave to proceed with the work, or by issuing a purchase order on the terms of the Production Estimate. Ms Lee's evidence in this respect was not seriously disputed by the defendants.

---

[95] See transcript dated 5 October 2021 at p 18 line 4 to p 31 line 8.

[96] Lee Kar Yin's AEIC (dated 10 September 2021) at para 41.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

72      In sum, therefore, the Production Estimates for the Hotel photo-shoots would have been issued for the very purpose of obtaining the Hotels' agreement to the terms contained therein; and there would often have been negotiations between Wave and the management of the Hotel on these terms before the Hotel's eventual acceptance of a Production Estimate for a particular job. In the circumstances, there appeared to be no basis for the defendants' allegation that the Reservation Clause in these Production Estimates must have been "unilaterally inserted" by Ms Lee without Mr Ohletz's attention (and presumably, that of the Hotels' management) being drawn to the clause. Indeed, I found it telling that the defendants were unable to articulate with any coherence the further steps that should have been by Ms Lee to bring the Reservation Clause to GHM's and the Hotels' attention.

(4)      The defendants' contention that the Reservation Clause was not brought to their attention

73      During cross-examination, Mr Ohletz was asked about Production Estimates on which he had put his signature.[97] Despite having signed the Production Estimates, Mr Ohletz insisted that he had not accepted the Reservation Clause:

> MR RAI: Mr Plettenberg, this document had a section for you to sign indicating your acceptance, correct?
>
> A. Correct.
>
> Q. I have taken you to three examples where you did sign, indicating your acceptance, correct?
>
> A. Correct.
>
> Q. In addition to this – I don't have to take you through them but just take it from me, we have another 12 production estimates that were either addressed to you – sorry, nine production estimates that were either addressed to you or

---

[97] See transcript of 28 September 2021 from p 103 line 23 to p 109 line 13.

33

> copied to you and all of them had the reservation clause. My question: I am suggesting to you that you must have seen this clause on the reservation of intellectual property rights and yet you accepted this clause. Do you agree or disagree?
>
> A. I don't agree, because as I just told you, we never paid attention to the small print because our focus was mainly on the budgetary aspect, ie, the amount.[98]

74     I found Mr Ohletz's evidence quite unbelievable. Considering that the Reservation Clause appeared on the same single-page document as "the budgetary aspect" of the job being contracted, I did not believe that he could have noticed only the latter item but not the former when signing the Production Estimate to indicate acceptance. When pressed in cross-examination, Mr Ohletz conceded that "legally", he must have accepted the plaintiffs' reservation of copyright and that it was probably due to his own "negligence" that he had failed to notice the Reservation Clause:

> My response is – well, it's probably negligence because I never read the small print. I've acknowledged the fact that there is an estimate of 8,000 Euro, or whatever it was, or dollars, and, yeah, and that's what I acknowledge. I would never acknowledge this – this phrase here, that we reserve the rights of intellectual property... [99]
>
> ...
>
> A. Legally, I suppose I did [agree to the Reservation Clause], but as I repeat again, this – this clause in the production estimate doesn't make any sense because it's unworkable.[100]

75     I noted that despite conceding that he must have accepted the reservation clause when he signed off on the Production Estimate, Mr Ohletz continued to protest that the Reservation Clause "doesn't make any sense because it's unworkable" and that it was "not possible" that a "hotel company works like

---

[98] See transcript of 28 September 2021 from p 110 line 5 to line 25.

[99] See transcript of 28 September 2021 at p 105 line 20 to p 106 line 2.

[100] See transcript dated 28 September 2021 at p 108 line 17 to line 19.

*The Wave Studio Pte Ltd v*                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

that".[101] I should make it clear first of all that since Mr Ohletz had admitted to accepting the Reservation Clause, these protestations were really beside the point. In any event, if what he meant was that the Hotels would have found Wave's reservation of copyright in the Final Photographs commercially "unworkable", this contention too was unsustainable. As Ms Lee pointed out,[102] given that Wave worked with the Hotels and GHM for a not inconsiderable period of 13 years, it was reasonable to expect that if the Hotels wanted to have the copyright in the Final Photographs, they would have raised this "when negotiating the terms in the Production Estimate – or at the very least, at some point in the course of the 13 years". Yet there was no evidence at all of the Hotels having brought up any objections to the Reservation Clause.

76      I would also add that it did not appear to me the Hotels would have found Wave's reservation of copyright in the Final Photographs to be commercially "unworkable" or "impossible". As noted above (at [56]), GHM – in developing and managing the Hotels – aimed to achieve a consistent "look and feel" among all the hotels and resorts under their management; and it was with a view to achieving this consistency that the Hotels contracted with Wave for a "one-stop solution" to their branding, design and marketing needs. Photography was only one of the supporting services in the suite of services provided to the Hotels; and in line with the concept of a "one-stop solution" that would ensure a consistent "look and feel" across the various Hotels, the Final Photographs were created *by Wave* only for use in the marketing and promotional materials produced *by Wave*. Save for an incident involving the Andaman (which I will deal with later and which was characterised as an instance of unauthorised use of the Final Photographs), there was no evidence that during the tenure of

---

[101] See transcript dated 28 September 2021 at p 111 line 12 to line 13.

[102] Lee Kar Yin's AEIC (dated 10 September 2021) at para 42.

35

Wave's working relationship with the Hotels and GHM, third-party vendors were brought in to produce marketing and promotional materials using the Final Photographs. Given the context in which Wave and the Hotels were operating, therefore, there was nothing at all "unworkable" about Wave's reservation of the copyright in the Final Photographs.

77      Apart from Mr Ohletz, Mr Meier also gave evidence that he had not noticed the Reservation Clause in the Production Estimates provided by Wave.[103] However, Mr Meier conceded that the Production Estimates would have been looked at by at least two members of staff, on top of the accounts staff.[104] Although Mr Meier stated that he was unable to say whether these various persons who reviewed the Production Estimates would have noticed the Reservation Clause, it appeared to me highly improbable that a single-sentence clause in plain sight would have escaped the notice of *all* the various hotel staff who reviewed the Production Estimates over the 13-year period that Wave did work for the Hotels.

78      Further and in any event, even if all the personnel from the Hotels and from GHM failed to read the Reservation Clause throughout the 13 years of their interaction with Wave, the law is clear that failure by a contracting party to read or to understand a term of a contract will not preclude such a party from being bound by the term. In *Bintai Kindenko Pte Ltd v Samsung C&T Corp and another* [2019] 2 SLR 295 ("*Bintai Kindenko*"), the appellant was the sub-contractor in a construction project who had signed a contract with the Contractor (the respondent). The appellant sought to restrain the respondent from calling on a banker's guarantee it had provided. One of the issues for

---

[103] See Hans Joerg Meier's AEIC at para 33; See transcript dated 1 October 2021 at p 92 line 8.

[104] See transcript of 1 October 2021 at p 93 line 9 to line 17.

*The Wave Studio Pte Ltd v*                                        [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

determination on appeal was whether the appellant was precluded from relying on the ground of unconscionability by an exclusion clause in the Particular Conditions of Subcontract. The same exclusion clause also appeared in the Particular Conditions of Main Contract. The appellant argued that this exclusion clause could not have been incorporated into the Subcontract because it was not given a copy of either the Particular Conditions of Subcontract or the Particular Conditions of Main Contract at the time of contracting. In rejecting this argument, the CA held (at [58]) that it was "a well-established principle that in the absence of fraud or misrepresentation, a party is bound by all the terms of a contract that it signs, even if that party did not read or understand those terms". Thus, for example, if a term in a signed contract incorporated some or all the terms of a separate document by making reference to those terms, the parties to the contract would be bound by those separate terms even if they had no knowledge of what those terms were at the time of contracting; and this principle would hold true even if the terms of the separate document sought to be incorporated contained exclusion clauses like in *Bintai Kindenko* ([59] of the CA's judgment).

(5)     The Hotels' acceptance of the Reservation Clause

79     In the present case, the Reservation Clause appeared in the same document which contained other terms on which Wave and the Hotels contracted (*eg* price and scope of work). While the defendants' opening statement described the Reservation Clause as having somehow been "slipped… into" the Production Estimates,[105] the defendants did not actually plead any fraud or misrepresentation by Ms Lee in relation to the inclusion of the said clause in the Production Estimates. Nor, for that matter, did the

---

[105] Defendants' Opening Statement at para 56.

evidence of their witnesses (Mr Ohletz, Mr Meier and Ms Fraser) disclose the existence of any fraud or misrepresentation. Although Mr Ohletz complained in his AEIC that the Reservation Clause was "surreptitiously inserted" by Ms Lee,[106] I could not see how this complaint could be sustained, since there was nothing surreptitious about the inclusion of the Reservation Clause: as I observed earlier, this clause appeared on the same single-page document as "the budgetary aspect" of the Production Estimate that Mr Ohletz claimed he would have paid attention to.

80     In the circumstances, I was satisfied that the Hotels had accepted the Reservation Clause.

81     In the case of the ten Production Estimates listed in Annex C to the plaintiffs' closing submissions, it was clear that these had been accepted by the Hotels signing off on the said estimates. As for the other 18 Production Estimates which appeared to be unsigned, I noted that the defendants' own witness Mr Meier testified that the Hotels sometimes signed on the *back* of the Production Estimate, and that the apparently unsigned state of some of the Production Estimates shown to him at trial "doesn't mean that it…never got signed".[107] In fact, Mr Meier was adamant that "traditionally", quotes such as the Production Estimates would have to be signed because the accounts department of the Hotel would need a signed Production Estimate or a signed purchase order before making payment on an invoice – and because "an auditor would come and check".  Even Ms Fraser testified[108] – after conceding that her exhibit AF-3 actually appeared to show the Production Estimate having been

---

[106] Ralf Ohletz Count Von Plettenberg's AEIC at para 35.

[107] See transcript of 1 October 2021 at p 53 line 1 to p 55 line 25, p 56 line 18 to p 57 line 20.

[108] See transcript of 5 October 2021 at p 28 line 24 to p 30 line 7.

issued prior to the purchase order and the eventual invoice – that although the Production Estimate in AF-3 had not been signed by her, either GHM's Mr Kendall Oei (the director overseeing legal affairs) or Mr Jamies Case (the vice-president for Malaysia) would have signed it on behalf of the Andaman. I was satisfied that more probably than not, the Hotels had either signed them or indicated acceptance of them anyway.

(6)     Conclusion

82     Having regard to my findings as set out above at [62] to [81], I was satisfied that even if the agreement between Wave and the Hotels were to be considered an agreement for the taking of photographs, s 30(5) of the Copyright still did not apply because it had been excluded by agreement between the parties; namely, by the Hotels' acceptance of Wave's reservation of copyright in the Final Photographs.

*Contemporaneous evidence of the parties' conduct showed that they understood Wave owned the copyright in the Final Photographs*

83     The conclusion that Wave owned the copyright in the Final Photographs was bolstered by contemporaneous evidence of the parties' conduct which showed members of the defendants' senior management team acknowledging on more than one occasion that the copyright lay with Wave and not with the Hotels.

84     One example was the incident involving the unauthorized reproduction of certain Hotel Photographs by a hotel called The Setai Club on the latter's website.[109] The Setai Club was not managed by GHM: it was a separate entity

---

[109] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 114–117, LKY-40 Tabs 32 and 33.

from the Setai Miami which GHM did manage. Sometime in June 2006, it was discovered that The Setai Club had reproduced on its website Hotel Photographs taken at The Setai Miami and at other Hotels. On 23 June 2006, Mr Jenni emailed Mr Kendall Oei – the GHM Director then overseeing legal affairs – to ask for the latter's advice ("do we sue?"). Mr Oei subsequently emailed Ms Lee on 26 June 2006 at 10.24 am to ask her for "any documents to show that Wave / GHM own the photo". After receiving from Ms Lee copies of Wave's 2005 contract with Irieeyes and Wave's Production Estimate, Mr Oei sent her the following email at 2.36 pm on 26 June 2006:

> Many thanks for sending copies of the photos on the Setai Club website as well as copies of your agreement with the photographers.
>
> **Waves supported by GHM may have to file an IP violation suit against the Setai Club**. This is an option that we keep up our sleeve and **may produce a pile of money for you**. Will revert later.
>
> [emphasis added]

85    From Mr Oei's emails to Ms Lee, it was plain that he did *not* have the understanding that the Hotels owned the copyright in the Hotel Photographs. His initial request to Ms Lee was for documents which would show that "Wave / GHM own the photos" – but tellingly, after receiving from Ms Lee the copies of Wave's agreement with Irieeyes and Wave's Production Estimate, he told Ms Lee in no uncertain terms that it was Wave who would be able to sue The Setai Club for IP violation (albeit with GHM's support) – and that it was Wave who would receive the monetary compensation arising from any such suit.

86    I add that although Mr Ohletz alleged in cross-examination that Mr Oei "wouldn't know" whether the Hotels owned the copyright in the photographs, he could not provide any basis for this allegation, apart from making the irrelevant observation that Mr Oei "was not living in Singapore" and that he (Mr

Ohletz) was supposed to be "the main contact for [Ms Lee]".[110] Mr Ohletz's allegation that Mr Oei "wouldn't know" whether the Hotels owned the copyright appeared to me all the more spurious in light of his admission that it was Mr Oei – together with Mr Jenni – who handled GHM's legal affairs.[111]

87    Another example of how members of GHM's senior management had acknowledged Wave's ownership of the copyright in the Final Photographs was the incident involving the Lalu. Ms Lee gave evidence that sometime in September 2006, Mr Kendall Oei discovered that several of the Final Photographs of The Lalu had been reproduced in a publication known as "Ultimate Spa: Asia's Best Spas and Spa Treatments".[112] These photographs had been reproduced without Wave's permission.  On 20 September 2006, Mr Oei sent Ms Lee an email (copied to Mr Jenni) in the following terms:[113]

> Pam has sent to you by email scanned copies of photos of The Lalu which appeared in the book Ultimate Spa.  Would you **please check and see if these photos are part of your proprietary library** or whether they are third-party vendors.
>
> [emphasis added]

88    It should be noted that by September 2006, GHM was no longer managing The Lalu.[114] It should also be noted that according to the defendants' case, the Hotels owned the copyright in the Hotel Photographs; and that once the defendants ceased managing a Hotel, they would have no control over what that Hotel chose to do with these photographs.[115] According to the defendants'

---

[110] See transcript of 29 September 2021 at p 120 line 14 to p 121 line 24.

[111] See transcript of 29 September 2021 at p 121 line 1 to line 7.

[112] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 126–127.

[113] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 36.

[114] Monica Chloe Chng's AEIC at para 23(b).

[115] See, *eg*, transcript of 30 September 2021 at p 50 line 23 to p 51 line 24.

case, therefore, Mr Oei should have had no interest in the reproduction of Hotel Photographs of the Lalu in the "Ultimate Spas" publication. Indeed, according to the defendants' case, it made no sense for Mr Oei to bring the matter to Ms Lee's attention and to ask that she check "if these photos [were] *part of [her] proprietary library*". Mr Oei's conduct was inconsistent with the defendants' case and made sense only if he had acted on the understanding that it was Wave, and not the Hotels, who owned the copyright in the Final Photographs.

89      A third example of how GHM's senior management had acknowledged Wave's copyright was provided by Ms Lee in her AEIC,[116] where she recounted an incident in the second half of 2006 in which Mr Oei had informed her at an in-person meeting about the unauthorised reproduction of Hotel Photographs by The Andaman. It appeared that The Andaman had designed and produced a flyer which copied the design motif and designs created by Wave for previous flyers; and in so doing, The Andaman had reproduced some of the Hotel Photographs without Wave's permission. According to Ms Lee, Mr Oei informed her that "The Andaman's conduct was unacceptable, as the Hotel had infringed the copyright in the Hotel Photographs owed by Wave"; and he assured her he would speak to The Andaman on her behalf.[117] Following this incident, he also advised her in September 2006 to "print a copyright notice on the inner ring" of the CD-ROMs used to provide the Final Photographs to the Hotels; and this was what she proceeded to do.[118]

90      In cross-examination, Ms Lee rejected defence counsel's suggestion in cross-examination that Mr Oei had only raised with her the issue of the copying

---

[116] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 110–111.

[117] Lee Kar Yin's AEIC (dated 10 September 2021) at para 112.

[118] Lee Kar Yin's AEIC (dated 10 September 2021) at para 59.

*The Wave Studio Pte Ltd v*                                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

of the black and gold design theme from Wave's previous flyers.[119] Ms Lee's account of events struck me as being honest: she maintained her account of events under cross-examination and made no attempt to embellish it. I accepted her assertion that the incident involving The Andaman had taken place as she described.

91      Like the incidents involving The Setai Club and The Lalu, this incident involving The Andaman demonstrated that GHM's senior management had acknowledged Wave as the owner of the copyright in the Hotel Photographs. Mr Oei's actions in all three incidents were wholly contrary to the defendants' case that the Hotels owned the copyright. I should also point out that in the incidents involving The Setai Club and The Lalu, Mr Oei's statements to Ms Lee were documented in the emails sent. The authenticity of these emails was never challenged; and Mr Oei's statements therein were clear and unambiguous. If the defendants wanted to suggest that Mr Oei "wouldn't know" what he was talking about or that he meant something very different from what he actually said, it was up to the defendants to summon him as a witness and to put their suggestions to him. They elected not to do so and thus had no basis at all for these suggestions.

### Issue (a)(1): Conclusion

92      Having regard to my findings at [53] to [91], I was satisfied that the plaintiffs had established that Wave owned the copyright in the Raw Images and the Final Photographs (collectively, the Hotel Photographs) at the time of their creation. As to which Wave entity – Wave-S, Wave PL or Wave Studio Singapore – would have owned the copyright to the Hotel Photographs

---

[119] See transcript of 23 September 2021 at p 7 line 4 to line 24.

produced in each of the numerous Hotel photo-shoots conducted by Wave over the years, the list is set out in the table at Annex F to the plaintiffs' closing submissions. The defendants have not challenged the accuracy of this list. In gist, Wave-S owned the copyright in the Hotel Photographs created in the 13 Hotel photo-shoots it carried out in the period between 13 December 2000 and 23 December 2004; Wave PL owned the copyright in the Hotel Photographs created in the 5 Hotel photo-shoots it carried out between 24 February 2005 and 1 June 2005; and Wave Studio Singapore owned the copyright in the Hotel Photographs created in the 11 Hotel photo-shoots it carried out between 14 August 2005 and 24 October 2007.

**Issue (a)(2): On whom the present owner of the copyright in the Hotel Photographs is for the purposes of this suit**

93      The plaintiffs submitted that the third plaintiff, Wave Studio US, was the present owner of the copyright in the Hotel Photographs by dint of a series of copyright assignments over the years. Having reviewed the documentary evidence adduced, I accepted the plaintiffs' submission.

94      Under s 194(3) of the Copyright Act, an assignment of copyright must be in writing signed by or on behalf of the assignor. It was not disputed that the assignments relied on by the plaintiffs met this requirement. It was also not disputed that an assignment of copyright would not necessarily assign the right to sue in respect of past infringements of the copyright (George Wei, *The Law of Copyright in Singapore* (SNP Editions, 2nd Ed, 2000) at para 12.5). In the absence of an express assignment of accrued causes of action, the court would go through an exercise in construction to determine whether the parties to the copyright assignment had intended to assign the right to sue for past infringements.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

95      First, in respect of Wave-S' copyright, I found that this had been assigned to the third plaintiff as follows. Wave-S was a sole proprietorship; and it was not disputed that legally, there would have been no distinction between Wave-S' assets and Ms Lee's personal property. On 21 February 2007, Ms Lee filed a Notice of Cessation of Business for Wave-S.[120] On 7 January 2013, she executed a deed of assignment which assigned to the third plaintiff all copyright she owned.[121] Subsequently, on 4 September 2015, she also filed a Declaration to clarify that the effective date of her assignment of the Wave-S copyright to the third plaintiff was 11 November 2011.[122]

96      Second, in respect of Wave PL's copyright, I found that this had been assigned to the third plaintiff as follows. On 1 August 2008, Wave PL convened an extraordinary general meeting where they resolved to strike Wave PL off the register and transfer all of Wave PL's assets to Ms Lee.[123] For this purpose, Wave PL's directors executed an Assets Repatriation Agreement and Assignment to assign to Ms Lee all tangible and intangible assets owned by Wave PL.[124] As noted above, Ms Lee executed a deed of assignment on 7 January 2013 which assigned to the third plaintiff all copyright she owned; and through her 2015 declaration, she also subsequently clarified that the effective date of her assignment of the Wave PL copyright to the third plaintiff was 11 November 2011.

---

[120] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 6.

[121] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 44.

[122] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 45.

[123] Lee Kar Yin's AEIC (dated 10 September 2021) at para 152.

[124] Lee Kar Yin's AEIC (dated 10 September 2021) at LKY-40 Tab 47.

*The Wave Studio Pte Ltd v*                                   [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

97     Third, in respect of the copyright owned by the first plaintiff Wave
Studio Singapore, I found that this had been assigned to the third plaintiff as
follows. On 11 November 2011, the first plaintiff executed a deed of assignment
which assigned to the third plaintiff all its "present and future rights, title and
interest worldwide" in the Hotel photographs.

98     The defendants did not dispute that the 7 January 2013 Assignment and
the 2015 Declaration complied with the requirements under s 194(3) for an
assignment of copyright, such that the Wave-S copyright, the Wave PL
copyright and all other copyright owned by Ms Lee were validly assigned by
her to the third plaintiff. The defendants also did not dispute that the first
plaintiff Wave Studio Singapore's copyright was validly assigned to the third
plaintiff through the 11 November 2011 Assignment.[125]

99     The defendants took the position that the copyright presently owned by
the third plaintiff comprised the following:

(a)     Wave-S' copyright at least as of 7 January 2013;

(b)     Wave PL's copyright at least as of 7 January 2013;

(c)     Any other copyright owned by Ms Lee at least as of 7 January
2014;

(d)     Wave Studio Singapore's copyright as of 11 November 2011;

(e)     Any other copyright owned by Mr Kawana at least as of 4
September 2015.[126]

---

[125] Defendants' Closing Submissions at para 213.

[126] Defendants' Closing Submissions at para 215.

100      In their closing submissions, the defendants were prepared to accept that the 11 November 2011 assignment of Wave Studio Singapore's copyright to the third plaintiff was effective in assigning to the third plaintiff the right to sue for past infringements because the terms of this assignment expressly included "all rights to causes of action and related to the Copyrights". However, in respect of the 7 January 2013 Assignment and the 2015 Declaration, the defendants contended that these "do not specifically provide for an assignment to sue in respect of past infringements".[127]

101      Having examined the terms of the 7 January 2013 Assignment, I was satisfied that it *did* in fact assign to the 3rd plaintiff the right to sue for past infringements of the Wave-S copyright and the Wave PL copyright. The assignment referred to "all rights in the copyrights, including all world-wide rights, all derivative rights, all renewal rights, owned by [Ms Lee]"; and while it did not expressly mention "causes of action", I agreed with the plaintiffs that the surrounding factual matrix supported the inference that Ms Lee's intention was to include the right to sue for past infringements. Ms Lee's evidence was that she had incorporated the third plaintiff for the specific purpose of having it "hold, manage and control the intellectual property rights to Wave's work".[128] In other words, all copyright previously vested in the various Wave entities were to be consolidated in and managed by the 3rd plaintiff. As the plaintiffs also pointed out, by 7 January 2013 Ms Lee had become aware of the existence of unauthorized reproductions of the Hotel Photographs on a number of websites.[129] In the circumstances, it would not have made any commercial sense for Ms Lee to assign the Wave-S copyright and the Wave PL copyright to the

---

[127] Defendants' Closing Submissions at para 217.

[128] Lee Kar Yin's AEIC (dated 10 September 2021) at para 21.

[129] Lee Kar Yin's AEIC (dated 10 September 2021) at para 169.

third plaintiff without also assigning the right to sue for past infringements of these copyrights.

### Issue (a)(2): Conclusion

102     In sum, therefore, I found that the assignments of the Wave-S Copyright, the Wave PL Copyright and the Wave Studio Singapore Copyright to the third plaintiff did include assignment of the right to sue for past infringements of these copyrights. In the premises, I was satisfied that the third plaintiff was the present owner of the copyright in the Hotel Photographs.

103     In the interests of completeness, I should add that while there were several other instruments of copyright assignment executed by Ms Lee and/or Wave over the years (as tabulated by the plaintiffs in their closing submissions[130]), I do not find it necessary to deal with them in these written grounds as it was not disputed that these assignments were legally ineffective for one reason or another; and they did not impact on the validity of the 7 January 2013 Assignment, the 11 November 2011 Assignment and the 2014 Declaration.

### Issue (b): The defendants' submissions on an "implied assignment" of copyright

### Issue (b)(1): The defendants' submissions on an "implied assignment" of copyright to the owners of the Hotel

104     The defendants contended that should the copyright in the Hotel Photographs be found to belong to the plaintiffs, the court should nevertheless

---

[130] Plaintiffs' Closing Submissions at para 159.

*The Wave Studio Pte Ltd v*                                                          [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

find that there was an "implied term" as between Wave and the Hotels that the copyright in the photographs "shall be assigned to the owners" of the Hotels.[131]

*The applicable legal principles*

105    Both the plaintiffs and the defendants cited *Sembcorp Marine Ltd v PPL Holdings Pte and another* [2013] 4 SLR 193 ("*Sembcorp Marine*") for the decision of the CA on the approach to be adopted on the implication of terms. In *Sembcorp Marine*, the CA held that the process of implying terms into a contract "is best understood as an exercise in giving effect to the parties' *presumed* intentions": it is "an exercise in filling the gaps in the contract", but in doing so, it "is of paramount importance that the courts do so with due regard to what the *parties* would be presumed to have intended" (at [93] of *Sembcorp Marine*). The threshold for implying a term "is necessarily a high one", and "the law remains that a term will only be implied if it is necessary" (at [100]). The following three-step process was established for considering the implication of terms (at [101]):

> (a) The first step is to ascertain how the gap in the contract arises. Implication will be considered only if the court discerns that the gap arose because the parties did not contemplate the gap.
>
> (b) At the second stage, the court considers whether it is necessary in the business or commercial sense to imply a term in order to give the contract efficacy.
>
> (c) Finally, the court considers the specific term to be implied. This must be one which the parties, having regard to the need for business efficacy, would have responded "Oh, of course!" had the proposed term been put to them at time of the contract.

---

[131] Defence of the 2nd Defendant (Amendment No 3) at para 12(a).

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

> If it is not possible to find such a clear response, then, the gap
> persists and the consequences of that gap ensue.

106     In respect of (b) and (c), the CA noted that the business efficacy test and the officious bystander test were "used in conjunction" and "complementarily remain the prevailing approach for the implication of terms under Singapore law". The CA also alluded to a number of cases in which it had been held that "in addition to business efficacy and obviousness, the implied term must be reasonable and equitable, capable of clear expression; and not contradict any express term of the contract". In the view of the CA, these additional requirements simply restated "the basic overriding principle that a term is not to be implied into a contract lightly" (at [98]).

*Applying the principles to the facts of this case*

107     Applying the above principles to the present case, I should point again to my finding that the Reservation Clause reserving copyright in the Hotel Photographs to Wave had been accepted by the Hotels and incorporated into the agreement between them and Wave. In other words, the reservation of copyright by Wave was an express term of the agreement between the Hotels and Wave. To imply a term into the agreement whereby the copyright in the photographs was assigned to the Hotels would be directly to contradict this express reservation of copyright by Wave. To borrow the words of the CA in *Sembcorp Marine*: such a term would "necessarily fail the officious bystander test".

108     Second, as the plaintiffs pointed out, even assuming for the sake of argument that the Reservation Clause had not been incorporated into the agreement between the Hotels and Wave, the fact remained that Wave had included the clause in the Production Estimates issued for the Hotel photo-shoots. This meant that at the time of contracting, Wave had no intention to

50

assign the ownership of the copyright in the Hotels. In other words, the proposed implied term would also fail the business efficacy test: had this proposed implied term been put to both parties at the time of contracting, at least one party would *not* have responded. "Oh, of course".

109    Much of the defendants' case on the "necessity" for an implied term assigning the copyright in the Hotel Photographs to the Hotels appeared to be premised on the argument that it would "not be possible operationally" to seek Ms Lee's (or more accurately, Wave's) consent "each and every time GHM Hotels use her photographs".[132] I did not find this argument persuasive. As I pointed out earlier, Mr Ohletz himself repeatedly stressed that it was GHM's objective – in developing and managing the Hotels – to achieve a consistent "look and feel" among all the Hotels; and it was with a view to achieving this consistency that the Hotels contracted with Wave for a "one-stop solution" to their branding, design and marketing needs. Mr Ohletz went so far as to state that "many times" GHM would recommend that all GHM Hotels use Wave's services "even at the opposition of owners due to cost considerations".[133] As I also pointed out earlier, it was in line with the concept of a "one-stop solution" aimed at ensuring a consistent "look and feel" across the various Hotels that the Hotel Photographs were produced *by Wave* only for use in the marketing and promotional materials produced *by Wave*. Save for the incident involving the Andaman, there was no evidence that during the tenure of Wave's working relationship with the Hotels, third-party vendors were brought in by the Hotels to work on marketing and promotional materials using the Hotel Photographs. In fact, it would not have made sense for them to do so since it would not have been efficient for the Hotels and/or GHM to liaise with and instruct multiple

---

[132] Ralf Ohletz Count Von Plettenberg's AEIC at para 49.

[133] Ralf Ohletz Count Von Plettenberg's AEIC at para 35.

service providers for marketing collaterals – whereas with "more than 10 years' experience of working with GHM", Ms Lee was very familiar with GHM's vision for how the "promotional/marketing collaterals" should be "styled":[134]

> …Junior [Ms Lee] became s one-stop shop – she would handle all of the co-ordination for the taking of the Hotel Photographs, editing and use of the Hotel Photographs in Promotional Materials without causing much trouble for GHM and/or the GHM Hotels. That was why we worked with her for so long.

110    Having regard to the reasons set out above, I found no merit in the defendants' claims as to an "implied assignment" of copyright to the Hotels.

### Issue (b)(2): The defendants' submissions on an "implied assignment" of copyright to the second defendant

111    On the subject of copyright ownership, the defendants also contended for the first time in their closing submissions that if the plaintiffs were found to be the owners of the copyright in the Final Photographs, then the second defendants had "at the minimum an implied assignment…to the copyright in the Final Photographs".[135]

112    It must be noted, however, that the defendants never actually pleaded this alleged implied assignment of copyright to the second defendant. Their pleaded position as regards the ownership of the copyright in the Final Photographs was that the owners of the Hotels owned this copyright;[136] and that was how they ran their case at trial. The general rule is that parties are bound by their pleadings, and the court is precluded from deciding on a matter that the parties have not put into issue (*V Nithia* at [38]). The defendants failed to show

---

[134] Ralf Ohletz Count Von Plettenberg's AEIC at para 48.

[135] Defendants' Closing Submissions at para 104.

[136] Defence of the 2nd Defendant (Amendment No 3) at paras 12(a)–12(b).

the existence of any circumstances in this case which would justify departing from this general rule. Indeed, a proposition that the second defendant owned the copyright in the Final Photographs by virtue of an "implied assignment" from the plaintiffs would be so fundamental and important to the defendants' case that there should be no reason to omit pleading it in the defence. This omission was fatal to any attempt to rely on a purported defence of an "implied assignment" of copyright.

113    Further, and in any event, it was equally plain from the defendants' pleadings that they never pleaded the existence of an express contract between the second defendant on the one hand and Ms Lee and/or Wave on the other. Instead, their closing submissions on this belated claim of an "implied assignment" appeared to proceed on the basis that the court should "imply" an assignment of copyright if it could be shown that such an assignment was "necessary in the circumstances"; and that such an assignment was necessary in the present case for various reasons (*eg*, to allow the second defendant to implement a uniform "branding concept" for all the Hotels managed by GHM).[137] However, the only way in which an implied assignment of copyright could arise would be if there were an express contract in the first place between the second defendant on the one hand and Ms Lee and/or the Wave entities on the other: in such a scenario, the second defendant would then have to make out a case for implying a term whereby copyright was assigned from the rightful owner (whether Ms Lee or one or more of the Wave entities) to it. It would not be possible to have an implied term in the absence of an express contract (see, *eg*, *Higgins Danial Patrick v Mulacek, Philippe Emanual* [2016] 5 SLR 848 at [51]). This too was clear from the authority relied on by the defendants (*R Griggs Group Ltd and ors v Ross Evans and ors* [2005] EWCA Civ 11,

---

[137] Defendants' Closing Submissions at paras 105–167.

("*Griggs*")), where the remarks by the English Court of Appeal on implied assignments of copyright were made in the context of its consideration of circumstances justifying "the implication of terms in a contract" (at [13] of Jacob LJ's judgment).

114    I also noted the loose terminology used by the defendants in their closing submissions to refer to "the agreement between the Plaintiffs and *the Defendants/Hotels*".[138] In my view, there was no basis at all for this vague reference to an "agreement" between the plaintiffs and *the defendants*. To reiterate, the defendants never pleaded the existence of a contract between the second defendant (or the defendants) on the one hand and Ms Lee and/or Wave on the other. What they pleaded was that *"the 2nd Plaintiff and/or the Wave Entities were engaged to provide" certain services "to the Hotels or Project Hotels", which services "were paid for by the Hotels and/or Project Hotels", upon the issuance of invoices by "the 2nd Plaintiff and/or the Wave Entities" to the Hotels.*[139] These statements could not be understood as anything else other than the pleading of a contractual relationship between "the 2nd Plaintiff and/or the Wave Entities" on the one hand and the Hotels on the other. While there were also some references to "Business Arrangements" between all the parties (the "2nd Plaintiff and/or the Wave Entities", "the 2nd Defendant and/or the Hotels"),[140] this was very different from saying that the 2nd defendant had a contractual relationship with the "2nd Plaintiff and/or the Wave Entities".

115    Indeed, the defendants' case throughout the trial was conducted on the basis that it was the Hotels who had contracted with Wave for the provision of

---

[138] Defendants' Closing Submissions at para 104.

[139] Defence of the 2nd Defendant (Amendment No 3) at paras 11(a)(5)–11(a)(7).

[140] Defence of the 2nd Defendant (Amendment No 3) at paras 11(a)–11(c).

services: as I noted earlier, for example, Mr Ohletz's evidence in his US deposition was that Wave's client was the Hotel, with the general manager of the relevant hotel usually being the one to sign off on Wave's Production Estimate for a job.[141] The picture which the defendants' witnesses painted of the contractual arrangements in this case was one in which a GHM entity such as the second defendant contracted with a Hotel to provide management services to that Hotel, and where the Hotel in turn contracted with Wave – on GHM's recommendation – for the provision of a range of marketing- and design-related services. In his AEIC, Mr Ohletz stated that "GHM and the GHM Hotels" viewed Ms Lee as a "trusted business partner" and "recommended"[142] – even "strongly recommended"[143] – that *all GHM Hotels use her services many times even at the opposition of owners due to cost considerations*".[144] No mention was made by any of the defendants' witnesses of a contract between either defendant and Wave (or Ms Lee). Nor was the existence of any such contract ever put to Ms Lee in cross-examination. Further, in contrast to the documentary evidence of the contract between Wave and the Hotels (the Production Estimates, the invoices, the documented payments by the Hotels), no documentary evidence was put forward by the defendants to show the existence of a contract between Wave and the second defendant.

116    For the reasons given above, I rejected the defendants' submissions about an "implied assignment" of copyright to the second defendant.

---

[141] Lee Kar Yin's AEIC (dated 10 September 2021) at Tab 65 p 63 line 6 to p 68 line 5.

[142] Ralf Ohletz Count Von Plettenberg's AEIC at para 35.

[143] Ralf Ohletz Count Von Plettenberg's AEIC at para 28.

[144] Ralf Ohletz Count Von Plettenberg's AEIC at para 35.

*The Wave Studio Pte Ltd v*                                                 [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

### Issue (b)(3): Whether the defendants had an implied licence to use the Hotel Photographs for general branding, marketing and advertising purposes

117    As an alternative to their case that the Hotels owned the copyright in the Hotel Photographs, the defendants contended that the second defendant and/or the owners of the Hotels" had an implied licence granted by Wave to "use the Hotel Photographs for general branding, marketing and/or advertising purposes".[145] Alternatively, if the owners of the Hotels were found either to be the owners of the copyright in the photographs or to have an implied licence from Wave to use the Hotel Photographs, then the defendants contended that the second defendant in turn had an implied licence from the owners of the Hotel to "use the Hotel Photographs for general branding, marketing and/or advertising purposes".[146] According to the defendants, the implied licence which the Hotels and/or the second defendants had was a "perpetual and unrestricted" licence.[147]

### *The applicable legal principles*

118    I have earlier set out at [105] to [106] the three-step process established by the CA in *Sembcorp Marine* for considering the implication of terms in a contract. In addition, the plaintiffs cited the judgment of Lightman J in *Robin Ray v Classic FM Plc* [1988] ECC 488 ("*Robin Ray*"), which I found helpful. In *Robin Ray*, the plaintiff was a writer and broadcaster on classical music while the defendant was a radio station. The action concerned the parties' intellectual property rights in certain documents containing proposals for how the tracks on the defendant's music recordings should be categorized and cataloguing over

---

[145] Defence of the 2nd Defendant (Amendment No 3) at para 12(d); Defendants' Closing Submissions at para 177.

[146] Defence of the 2nd Defendant (Amendment No 3) at para 12(e).

[147] Defence of the 2nd Defendant (Amendment No 3) at para 11(a)(13).

*The Wave Studio Pte Ltd v*                                          [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

50,000 items of classical music compiled by the plaintiff over five years. These documents were prepared while the plaintiff was engaged to the defendant under a consultancy agreement; and the defendant then compiled a database in which the contents of the other documents were substantially reproduced. Differences arose between the plaintiff and the defendant over the latter's right to exploit the database by making copies and granting licences to foreign radio stations to use those copies. It was not disputed that the defendant was entitled to copyright in the database and that the defendant was entitled to use and make copies of the database for the purpose of broadcasting from its own radio station in the UK. What was disputed was whether the defendant had any additional rights.

119     In considering what terms if any were to be implied, Lightman J approached the question by pointing out firstly (at [45]) that the general principles governing the respective rights of the contractor and the client in the copyright in a work commissioned by the client were as follows. First, the contractor "is entitled to retain the copyright in default of some express or implied term to the contrary effect". Where Parliament intended the act of commissioning alone to vest copyright in the client, "the legislation expressly so provides" – but in all other cases, the client "has to establish the entitlement under some express or implied term of the contract". Referencing the House of Lords' decision in *Liverpool City Council v Irwin* [1977] AC 239 ("*Liverpool*"), Lightman J noted that for a term to be implied, it must be reasonable and equitable; it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; it must be so obvious that it "goes without saying"; it must be capable of clear expression; and it must not contradict any express term of the contract. He then went on to hold as follows:

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

(W)here (as in the present case) it is necessary to imply the grant of some right to fill a lacuna in the contract and the question arises how this lacuna is to be filled, guidance is again to be found in Liverpool.  The principle is clearly stated that in deciding which of various alternatives should constitute the contents of the term to be implied, the choice must be that which does not exceed what is necessary in the circumstances. In short a minimalist approach is called for.  An implication may only be made if this is necessary, and then only of what is necessary and no more.

(A)ccordingly if it is necessary to imply some grant of rights in respect of a copyright work, and the need could be satisfied by the grant of a licence or an assignment of the copyright, the implication will be of the grant of a licence only…

If necessity requires only the grant of a licence, the ambit of the licence must be the minimum which is required to secure to the Client the entitlement which the parties to the contract must have intended to confer upon him.  The amount of the purchase price which the Client under the contract has obliged himself to pay may be relevant to the ambit of the licence.  Thus in *Stovin-Bradford v Volpoint Properties Ltd*, where the Client agreed to pay only a nominal fee to his architect for the preparation of plans, he was held to have a licence to use the plans for no purpose beyond the anticipated application for planning permission.  By contrast in *Blair v Osborne & Tompkin,* where the client was charged the full RIBA scale, his licence was held to extend to using the plans for the building itself. Guidance as to the approach to be adopted is provided in a passage in the judgment of Jacobs J in *Beck v Montana Construction Pty Ltd*, cited with approval by Widgery LJ in *Blair v Osborne & Tompkin*:

It seems to me that the principle involved is this; that the engagement for reward of a person to produce material of a nature which is capable of being the subject of copyright implies a permission or consent, or licence in the person giving the engagement to use the material in the manner and for the purpose in which and for which it was contemplated between the parties that it would be used at the time of the engagement.

(T)he licence accordingly is to be limited to what is in the joint contemplation of the parties at the date of the contract, and

58

does not exist to enable the Client to take advantage of a new
and unexpected profitable opportunity.

120    In giving judgment for the plaintiff, Lightman J found (at [29]) that
while the plaintiff was not a joint author of the database, the defendant was not
a joint author of the documents in question; and there was no question of the
plaintiff's copyright having been subsumed in the copyright in the database (at
[35]). As such, when the defendant copied the documents and sold them abroad
without the plaintiff's consent, it had breached his copyright. The contractual
relationship between the plaintiff and the defendant was that of independent
contractors, and not employer-employee (at [37]). The defendant was "buying"
the plaintiff's "distinctive help and expertise" in getting its UK national station's
playlist "up and running"; and the consultancy agreement contemplated, as at
the date of contracting, that the plaintiff's work would be used to enable the
defendant to broadcast in the UK. It followed that the only necessary implication
was the grant of a licence to the defendant to use the copyright material for the
indefinite future for this purpose and for this purpose only (at [48]–[50]).

*Applying the principles to the facts of this case*

121    In considering the defendants' submissions regarding the grant of an
implied licence to the Hotel owners and/or the second defendant, I bore in mind
my earlier finding regarding the absence of any express contract between Wave
and the defendants (above at [113]). Insofar as the defendants were arguing for
the implication of a contractual term giving the second defendant a licence to
use the Hotel photographs, any such implication could only be in the context of
the contract between Wave and the Hotels.

122    Applying the principles established in *Sembcorp Marine* and *Robin Ray*
to the present case, I found no basis for implying that the Hotel owners and/or

*The Wave Studio Pte Ltd v*                                            [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

the second defendant had a "perpetual and unrestricted" implied licence from Wave to use the Hotel Photographs for general branding, marketing and/or advertising purposes. My reasons were as follows.

123    The defendants' case – as put to Ms Lee – was as follows[148]:

> (F)or the whole thing to make business sense, when they [the hotels] pay you so much money for the soft copies of the photos, they are entitled to use those photos for marketing purposes, whether they come to you, or they get their marketing materials from somebody else.

124    I have explained earlier why I found that in the agreement between Wave and the Hotels, the parties' intention was clearly for Wave to use the Final Photographs it had created in the marketing and promotional materials it produced for the Hotels – and not for Wave to create the photographs for use by any vendor that the Hotels might choose to go to (see above at [59]). It will be noted that the defendants' case, as put to Ms Lee, suggested that the amount of consideration paid by the Hotels was such that the parties must have jointly contemplated it would include the price of a "perpetual and unrestricted" licence for the Hotels to use the photographs for whatever marketing collateral they wanted from whichever vendor they chose. However, there was no evidence produced by the defendants to bear out this suggestion. In the two cases involving architect's plans cited by Lightman J in *Robin Ray*, there was evidence of what the architect's fees computed according to the RIBA[149] scale would be, such that it was possible for the court to evaluate where the amount paid to the architect in each case fell on this scale. Plainly, there was nothing of the sort in the present case.

---

[148] See transcript of 22 September 2021 at p 137 line 9 to p 48 line 8.

[149] Royal Institute of British Architects.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

(1)    Memphis West

125    Instead, Mr Ohletz and Ms Monica Chloe Chng (Senior Vice-President of Administration and Finance in the two defendant companies, "Ms Chng") sought to draw comparison between a Production Estimate rendered by Wave for a 5-day Hotel photo-shoot at The Legian Bali in 2007 and a quotation provided by another company (Memphis West Pictures Pte Ltd, "Memphis West") in 2013 for a 5-day photo-shoot at the same Hotel.[150] Mr Ohletz and Ms Chng sought to highlight that Wave had charged The Legian Bali S$54,000 for the 5-day Hotel photo-shoot;[151] whereas Memphis West, in "comparison", had charged US$10,000 – and his US$10,000 quotation had expressly provided that all images would be "licensed to The Legian Bali and [GHM] in perpetuity".[152] According to Ms Chng:[153]

> For such a price paid to Junior [Ms Lee], I would have expected that the GHM Hotels would own the hotel Photographs, or at least have the unrestricted right to use it without limitations like it does of the photographers that GHM and the GHM Hotels have worked with such as Mr Wesley and Memphis West.

126    I did not think the evidence of Memphis West's quotation assisted the defendants' case in any way. For one, it was wrong of Ms Chng to give the impression that Memphis West had charged The Legian Bali US$10,000 for exactly the same things that Wave had charged S$54,600 for. It was clear from Wave's Production Estimate that the amount of S$54,600 not only included items related to the photo-shoot but also items such as airfare, excess baggage and travel insurance – whereas Memphis West's quotation of US$10,000 was

---

[150] Ralf Ohletz Count Von Plettenberg's AEIC at paras 36–37; Monica Chloe Chung's AEIC at paras 39–44.

[151] Ralf Ohletz Count Von Plettenberg's AEIC at Exhibit RO-2 at p 36.

[152] Monica Chloe Chung's AEIC at Exhibit MCC-8

[153] Monica Chloe Chung's AEIC at para 43.

*The Wave Studio Pte Ltd v*                                          [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

stated to be for "5 days' photography", with items such as airfare, excess baggage, travel insurance, accommodation and meals to be borne separately by the Hotel. More fundamentally, evidence of what another vendor chose to charge a Hotel some 5 years after Wave ceased contracting with the Hotels could not be evidence of what Wave and the Hotels must have contemplated at the time of Wave's engagement. I agreed with the plaintiffs that only the evidence of the contracting parties' intentions at the time of contracting would be relevant to determining whether a term should be implied.[154] As the CA stated in *Sembcorp Marine* (at [127]), "the reference point for the implication of a term is at the time of contracting"; and as Lightman J emphasized in *Robin Ray* (at [45(9)]), the court's concern was with "what [was] in the joint contemplation of the parties at the date of the contract".

(2)    CD-ROMs

127    The defendants also sought to rely on Wave's provision of CD-ROMs of the Final Photographs as evidence that the Hotels and the defendants were at liberty to use the photographs without seeking Wave's permission and without payment of a licence fee. Having regard, however, to the evidence of how the CD-ROMs came to be provided, this suggestion did not appear to me to be borne out. First, Ms Lee's evidence was that the provision of the CD-ROMs to the Hotels and GHM served a two-fold purpose: as "proof of the work done during the photoshoots"; and "as a catalogue of the photographs generated during a particular project by Wave, from which the Hotels and/or GHM could review the Hotel Photographs and select the photographs that they wanted to feature or incorporate into the design of the marketing collaterals".[155]

---

[154] Plaintiffs' Closing Submissions at para 135(a).

[155] Lee Kar Yin's AEIC (dated 10 September 2021) at paras 57–58.

128     Further, Ms Lee testified that in fact, when Wave first started conducting Hotel photo-shoots in December 2000, no CD-ROMs of the Final Photographs were provided to the Hotels or to GHM. Instead, the photographs were printed onto "contact sheets" ("like thumbnails, but slightly bigger"), which would then be sent to the Hotels and GHM ("so that people can see").[156] The eventual selection of which photographs to use in the Hotels' marketing collaterals would then be done by Mr Ohletz. It was only in February 2004 – at the Hotel photo-shoot at The Leela Goa – that Wave started the practice of forwarding the photographs in CD-ROMs instead of on contact sheets.[157] The defendants did not dispute the above process. In other words, the use of CD-ROMs was something that only came about much later. This undisputed evidence thus supported the plaintiffs' submission that the provision of photographs in CD-ROMs was a continuation of Wave's established practice of providing the Hotel Photographs to the Hotels and GHM for them to select photographs for use in the marketing collaterals. The provision of the CD-ROMs did not in any way demonstrate that the Hotels and/or the defendants were allowed to use the photographs without seeking Wave's consent. In this connection, it should be reiterated that apart from the incident involving The Andaman (which according to Ms Lee was characterised by Mr Oei as an instance of unauthorised reproduction of Wave's copyrighted photographs – see [89] above), there was no evidence that in the course of their working relationship with Wave, the Hotels had regularly – or even occasionally – engaged third-party vendors to produce marketing collaterals using the Hotel Photographs created by Wave.

129     It should also be reiterated that according to Ms Lee, it was the Andaman incident that led to Mr Oei advising her to "print a copyright notice" on the inner

---

[156] See transcript of 23 September 2021 at p 176 line 5 to line 24.

[157] See transcript of 23 September 2021 at p 176 line 19 to line 24.

*The Wave Studio Pte Ltd v*                                          [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

ring of the CD-ROMs "to make it clear that Wave owned the copyright in the works on the CD"; and this was what she did from September 2006 onwards.

130     In the defendants' cross-examination of Ms Lee, much was made out of the fact that she appeared to believe that CD-ROMs in "read-only" format were incapable of having their contents copied by users.[158] While Ms Lee might have been mistaken in her belief, what was significant about her testimony was that it showed clearly the absence of any intention on her part to allow the Hotels and/or the defendants to copy or otherwise to use the photographs in the CD-ROMs without her consent.

131     In relation to the CD-ROMs of the Hotel Photographs, the defendants also brought up in their closing submissions an incident involving the production by Wave of 1000 CD-ROMs for The Chedi Muscat. The second defendant had requested Wave to produce these 1000 CD-ROMs in August 2005, apparently for the purpose of marketing the Hotel. The defendants claimed that Wave did not try to charge a licence fee for the use of the photographs in the preparation of the CD-ROMs and that this meant therefore that the second defendant had "unrestricted rights to use the Final Photographs for marketing, branding, promotion and advertising".[159]

132     With respect, this argument appeared to contradict both logic and evidence. If anything, the incident supported the plaintiffs' claim that the Hotel Photographs were created for use in marketing collateral produced *by Wave* for the Hotels, and that copyright in the photographs belonged *to Wave*. Despite the Hotel and GHM having already received CD-ROMs of the Final Photographs

---

[158] See transcript of 22 September 2021 at p 25 line 1 to p 26 line 1; p 102 line 14 to p 106 line 2.

[159] Defendants' Closing Submissions at paras 144(b), 195.

64

from the Hotel photo-shoots, they still went back to Wave when they wanted further marketing collaterals in the form of the 1000 CD-ROMs; and it was Wave that designed the CDs and prepared the 1000 CD-ROMs pursuant to their Production Estimate.[160]

133    In their closing submissions, the defendants also suggested that if it were true that the Final Photographs were intended only for use by Wave in producing marketing collaterals for the Hotels (or GHM), then once Wave ceased doing work for the Hotels, Wave "could have and would have asked for the return of all photographs" and/or notified the Hotels not to use the Final Photographs for any marketing collaterals.[161] The defendants submitted that Wave had not done so and that this militated against Wave's claim of copyright ownership in the photographs. Again, I found no merit in the defendants' submission. From the evidence, Wave had made their reservation of copyright clear beyond doubt by the inclusion of the Reservation Clause in the Production Estimates and of the copyright notice on the inner ring of the CD-ROMs. As such, even assuming for the sake of argument that Wave had omitted to request the return of the CD-ROMs after they stopped working with the Hotels and GHM, I did not think this necessarily meant that they must not have owned the copyright in the photographs to begin with. I stress that I say "*even assuming for the sake of argument*" because in truth, the defendants had no grounds whatsoever to make the above submission. For one, Wave's alleged failure to request the return of all CD-ROMs containing the Hotel Photographs after they stopped working with the Hotels should have been pleaded by the second defendant, since it constituted a material fact on the basis of which the latter disputed the plaintiffs' copyright ownership in the photographs: Order 18 rule 7(1) of the Rules of

---

[160] Lee Kar Yin's AEIC (dated 10 September 2021) at para 134, LKY-40 at Tab 38.

[161] Defendants' Closing Submissions at paras 126–127.

Court (Cap 322, 2014 Rev Ed) ("Rules of Court"). Having failed to plead this material fact, the defendants also failed to adduce any evidence from any witness to substantiate the allegations of Wave's purported omission and/or the purported reasons for it.

134    Quite apart from having no evidence to substantiate their allegations about Wave's alleged omission to request the return of the CD-ROMs and the reasons, these allegations were not put to Ms Lee in cross-examination, despite her having stated repeatedly her position on Wave's ownership of the copyright in the Hotel Photographs and the purposes for which the CD-ROMs of these photographs were provided to the Hotels. As the plaintiffs pointed out, this was a clear violation of the rule in *Browne v Dunn* [1893] 6 R 67, which requires that any matter on which it is proposed to contradict the evidence-in-chief of a witness must generally be put to her so that she has an opportunity to explain the contradiction.[162] Since the defendants' allegations were never put to Ms Lee and she never had the opportunity to respond, these allegations must be discounted.

135    For the reasons set out above, I was satisfied that the provision of the CD-ROMs did not show that the Hotels and/or the defendants had an implied licence to use the Hotel Photographs for their general marketing purposes on a "perpetual and unrestricted" basis. Instead, I accepted Ms Lee's evidence that these CD-ROMs were provided for two reasons: first, as proof of Wave's work in the Hotel photoshoots; and second, as a catalogue of the photographs from these photo-shoots, from which the Hotels and/or GHM could select photographs for use in marketing collaterals to be produced by Wave.

---

[162] Plaintiff's Reply Closing Submissions at para 34.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

(3)      "Interior Design", "American Airlines" and "Conde Nast Traveler"

136      Aside from the CD-ROMs, the defendants also contended that Ms Lee had on several occasions allowed the Hotels and GHM to use the Hotel Photographs without charging any licence fee. Mr Ohletz recounted an incident where GHM had – with Ms Lee's knowledge – sent a photograph taken by Wave of the Chedi Muscat to "Interior Design Magazine": according to Mr Ohletz,[163] Ms Lee had not raised any objections, nor had she asked for payment of a licence fee. Mr Meier recounted an incident, as well, where his staff had "chased" Ms Lee for the CD-ROMs of the Hotel Photographs so that photographs of the Beach House at The Legian Bali could be featured in the "American Airlines" and "Conde Nast Traveler" publications.[164]

137      In my view, these two incidents did not prove that Wave had allowed the Hotels and/or the second defendant to use the Hotel Photographs for their general branding, marketing and/or advertising purposes without obtaining Wave's consent and without paying a licence fee. Ms Lee's evidence in cross-examination was that in respect of the incident involving "Interior Design Magazine", she had tried to charge a licence fee for the use of the Hotel Photograph, but that Mr Ohletz had persuaded her not to do so, on the basis that having the picture in "Interior Design Magazine" would be "good advertising" for Wave, and that she should not be so "calculative" about charging licence fees for "one or two pictures" in view of the "many, many jobs" she had with the Hotels.[165] Ms Lee's testimony was put to Mr Ohletz; and he accepted her

---

[163] Ralf Ohletz Count Von Plettenberg's AEIC at para 39.

[164] Hans Joerg Meier's AEIC at para 31.

[165] See transcript of 22 September 2021 at p 112 line 18 to p 115 line 12.

account. In particular, he agreed that he had told her "not to be so calculative because it's good advertising for The Wave".[166]

138    As to the incident involving the "American Airlines" and "Conde Nast Traveler" publications, Ms Lee's evidence was that she did not seek to charge a licence fee for the use of the Hotel Photographs because she recognised that it was "true that it's American Airlines and Conde Nast, it would be very good advertising for The Wave"; and she was persuaded by Mr Ohletz not to be "so calculative" about the use of "one or two pictures".[167]

139    In light of the above evidence, I concluded that having been made aware of the proposed use of the Hotel Photographs in the said publications, Wave had refrained from charging a licence fee because Mr Ohletz had pointed out the "good advertising" value of having Wave's photographs featured in these publications and had also advised Ms Lee not to be "so calculative".

(4)    Gabrin v Universal Music Operations Ltd and another

140    In the interests of completeness, I should add that although the defendants cited *Gabrin v Universal Music Operations Ltd and another* [2003] EWHC 1335 (Ch) ("*Gabrin*")[168] as a "case that could be give [*sic*] some guidance" on the subject of implied licences, they failed to explain exactly why this case was relevant – especially since *Gabrin* did not actually involve an implied licence.  The case involved *inter alia* photographs taken in 1997; and one of the issues the court had to determine was whether the photographer (Mr Gabrin) retained copyright or whether the company which had commissioned

---

[166] See transcript of 29 September 2021 at p 146 line 3 to p 148 line 5.

[167] See transcript of 22 September 2021 at p 115 ln 24 to p 117 ln 4.

[168] Defendants' Closing Submissions at para 170.

*The Wave Studio Pte Ltd v*                                                   [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

the photographs (Stiff Records) had acquired copyright, and if so, in which photographs. On this issue, Patten J held that having heard the evidence, he was satisfied that it had been agreed between Stiff Records and Mr Gabrin that the latter would retain the copyright in any photographs he took which were not purchased by Stiff Records for use on a record sleeve. Patten J noted that "It [was] accepted that additional payments were made for record sleeves, and that such payments carried with them either the copyright or very extensive rights to use, and licence the use of, the photographs in connection with the recordings". In contrast, the evidence showed that "(f)or everything ese, a restricted licence to use the shots for publicity or advertising purposes sufficed, and the £50 fee [paid by Stiff Records] meant that they obtained the right to use these photographs comparatively cheaply": Stiff Records clearly understood that this "relatively small fee" was "not intended to pass the copyright in such photographs"; and they "were not prepared to pay for that" (at [23], [25]).

141    The defendants were at pains to emphasise that in *Gabrin*, although the court had found that "parties did not contemplate that the payment made to the photographer would cover a licence to use the photographs for all purposes", the "key point" was that "there were express terms for additional usage".[169] The defendants did not explain how this fact-specific finding was of any help to their own case; and I did not see how it helped them. As I noted earlier, only the evidence of the contracting parties' intentions at the time of contracting would be relevant to determining whether a term should be implied. In this connection, the court's findings in *Gabrin* could not shed any light on what Wave and the Hotels must have had in mind at the point of contracting.

**Issue (b): Conclusion**

---

[169] Defendants' Closing Submissions at para 170.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

142    For the reasons set out at [121] to [141], I found no merit in the defendants' contention that the Hotels and/or the second defendant had been given an implied licence by Wave to use the Hotel Photographs for their own general marketing, branding and advertising purposes.

143    As I found that the Hotels did not have an implied licence from Wave to use the Hotel Photographs for their own general marketing purposes, it followed that they did not have any power to grant sub-licences to the second defendant to use the Hotel Photographs for their own marketing purposes.

**Issue (c): Whether the defendants had infringed the copyright in the Hotel Photographs**

144    To recap: I found that copyright in the Hotel Photographs was owned at the time of their creation by the relevant Wave entities listed in Annex F to the plaintiffs' closing submissions, and not by the Hotels. I found that the copyright in these Hotel Photographs was subsequently validly assigned to the third plaintiff, Wave Studio US, who is the present copyright owner for the purposes of this trial. I also found that contrary to the defendants' assertion, neither the Hotels nor the second defendant had an implied licence from Wave to use the Hotel Photographs for their general marketing, branding and/or advertising purposes. Since the Hotels did not have such an implied licence, *a fortiori*, the second defendant did not have a sub-licence from any of the Hotels to use the Hotel Photographs for their general marketing purposes.

145    I next address the issue of whether the defendants had infringed the plaintiffs' copyright in the Hotel Photographs.

*The Wave Studio Pte Ltd v*                                   [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

### The applicable legal principles

146     Under s 26(1)(b) of the Copyright Act, the owner of the copyright in an artistic work such as a photograph has the exclusive right to:

> (a)     reproduce the work in a material form;

> (b)     publish the work in Singapore or any country in relation to which the Copyright Act applies, if the work is unpublished;

> (c)     communicate the work to the public.

147     In respect of (c), s 7(1) of the Copyright Act provides that "communicate" means to transmit by electronic means a work or other subject-matter, whether or not it is sent in response to a request, and includes making available a work or other subject-matter (on a network or otherwise) in such a way that the work or subject-matter may be accessed by any person from a place and at a time chosen by him.

148     Under s 31(1), the copyright in an artistic work is infringed by a person who, not being the owner of the copyright, and without the licence of the copyright owner, does in Singapore, or authorises the doing in Singapore, of any act comprised in the copyright.

149     Under s 32, the copyright in an artistic work is infringed by a person who, without the licence of the owner of the copyright, imports an article into Singapore for the purpose of selling the article, or distributing it for the purpose of trade, or by way of trade exhibiting the article in public and who knows or ought reasonably to know that the making of the article was carried out without the consent of the owner of the copyright.

71

*The Wave Studio Pte Ltd v*                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

### The acts of infringement pleaded by the plaintiffs

150    The plaintiffs have pleaded the following acts of infringement against
the defendants:

> (a)    reproducing Hotel Photographs in the GHM publication known
> as "The Magazine", without licence or consent from the plaintiffs. 242
> Hotel Photographs were allegedly reproduced in this manner;
>
> (b)    communicating the Hotel Photographs in The Magazine to the
> general public, by making the said publication available for download
> on GHM websites, including to users in Singapore, from (at least)
> January 2013 to December 2020;
>
> (c)    importing the infringing copies of The Magazine into Singapore
> for the purpose of trade, or by way of trade exhibiting the article in
> public, when they (the defendants) knew or ought reasonably to have
> known that the making of their publications constituted an infringement
> of the plaintiffs' copyright, or in the case of importation, that the making
> of the defendants' publication was carried out without the licence and/or
> consent of the plaintiffs.[170]

151    In respect of (a), Ms Lee set out in her AEIC the schedule[171] of the 242
Hotel Photographs which the defendants were said to have reproduced in the
GHM publication "The Magazine" without the plaintiffs' consent. The
defendants did not dispute the reproduction of the 242 photographs in "The
Magazine". As seen earlier (at [22] to [25] above), they ran the case that the

---

[170] Statement of Claim (Amendment No. 3) at para 38(c).

[171] Lee Kar Yin's AEIC (dated 10 September 2021) at Schedule 24.

copyright in these photographs belonged to the Hotels or the second defendant, not the plaintiffs; alternatively, that the Hotels and/or the second defendant had an implied licence to use the Hotel Photographs as they wished for their general marketing purposes. Since the allegedly infringing acts were not disputed and since I had rejected the defendants' case on copyright ownership and implied licence, it followed that infringement of the plaintiffs' copyright was made out. In this connection, I noted that the first defendant pleaded in its defence that it performed "different functions" from the second defendant within the GHM group; that it was not involved with the services provided by Wave to the Hotels; and that it had nothing to do with publishing "The Magazine" and/or with the content of the GHM websites.[172] I deal with this defence in [155] to [165] below.

152     In respect of (b), evidence was given by Ms Lee in her AEIC that "The Magazine" was available for download from various GHM websites which were accessible from Singapore from at least January 2013 (and which she identified).[173] In her AEIC, Ms Lee stated that she believed at all material times, the second defendant owned and operated the GHM websites, and had uploaded "The Magazine" to the GHM websites and made it available for download, including to users in Singapore.[174] She highlighted that there was evidence showing that the invoices issued by the web developers in 2012 for "designing and developing "the main GHM website"" and for creating "new versions" of all GHM websites were made out to the second defendant.[175] This was not challenged by the defendants during Ms Lee's cross-examination. Instead, as mentioned earlier, the defendants' case at trial focused on the issues of whom

---

[172] Defence of the 1st Defendant (Amendment No. 2) at para 8.

[173] Lee Kar Yin's AEIC at para 171(b).

[174] Lee Kar Yin's AEIC at para 180.

[175] Lee Kar Yin's AEIC at para 180(a).

owned the copyright in the photographs; and alternatively, whether the Hotels and/or the second defendant had an implied licence to use them. Again, since the allegedly infringing acts were not disputed and since I had rejected the defendants' case on copyright ownership and implied licence, I was satisfied that infringement of the plaintiffs' copyright was made out.

153    In respect of (c), it was not disputed by the defendants that "The Magazine" was printed in Switzerland and copies would then be distributed to the Hotels which the second defendant managed. It was also not disputed that copies of "The Magazine" had been brought into Singapore, to the Orchard Spring address. Ms Lee gave evidence that this was an address from which both the first and the second defendants operated;[176] the defendants did not dispute this. Ms Chng, for example, testified that after she started working for GHM in June 2008, she had seen "certain copies in the [Singapore] office lying around".[177]

154    The evidence showed that copies of "The Magazine" would habitually "be placed throughout the Hotel, from the individual guest rooms to the lobby of the hotel so that the hotel guests could have access to ["The Magazine"] and read it".[178] As Ms Fraser put it, "The Magazine" was a "branding and/or marketing tool" for the Hotels because it "exhibited the GHM brand and the GHM Hotels under the GHM brand"; and it also "showcased the General Managers of the Hotel, allowing [them] to give insights into [their] work and the Hotels [they] managed". From the above evidence, I inferred that "The Magazine" had been imported into Singapore by the defendants for a similar

---

[176] Lee Kar Yin's AEIC at para 180(b).

[177] See transcript of 5 October 2021 at p 123 line 20 to p 124 line 18.

[178] Hans Joerg Meier's AEIC at para 38; Alison Claire Fraser's AEIC at para 28.

purpose of showcasing "the GHM brand and the GHM Hotels under the GHM brand". I was satisfied that the "The Magazine" had been imported into Singapore for the purpose of distribution for the purpose of trade, or by way of trade exhibiting "The Magazine" in public, when the defendants knew or ought reasonably to have known that the making of their publications was carried out without the licence and/or consent of the plaintiffs.

### The first defendant's defence of non-involvement

155    Leaving aside the issues of copyright ownership and implied licence, the first defendant pleaded in its defence that it had nothing to do with publishing "The Magazine" and/or with the content of the GHM websites.[179]

*Whether the first defendant had any involvement with the services provided by Wave to the Hotels*

156    The first defendant's assertion that it had nothing to do with the publication of "The Magazine" or its availability on GHM's websites was essentially premised on the proposition that it was "not involved or engaged in the managing, developing and operation of the Hotels at all material times" and "[had] no involvement" with the services provided by Wave to the Hotels.[180] I found this to be a false premise, as there was evidence to demonstrate the first defendant's involvement in the management of the Hotels and the services provided by Wave to the Hotels.

157    First, as the plaintiffs pointed out, the undisputed documentary evidence showed that over the years that Wave carried out branding, marketing and design jobs for the Hotels, there were invoices for Wave's services which were

---

[179] Defence of the 1st Defendant (Amendment No 2) at para 8.

[180] Defence of the 1st Defendant (Amendment No 2) at paras 7 and 9.

sent to the first defendant for payment.[181] When Mr Ohletz was cross-examined, he agreed that "sometimes GHM Singapore [the first defendant] made payment on behalf of GHM BVI [the second defendant]". From Mr Ohletz's evidence,[182] it appeared that internally within GHM, no real distinction was drawn between the two companies when it came to dealing with invoices submitted by vendors:

> GH did everything for and on behalf of the owners [of the hotels]. So ultimately, the owners would have been charged and it all depends also on cash flow… (S)ometimes when you have a BVI company, the cash might not be enough to pay a bill that has to be paid on time but there might be cash enough in the Singapore office.

158     Second, Mr Meier testified that in the course of executing his duties as general manager of GHM Hotels, he received directions on the running of the Hotels from the directors of the first defendant (GHM Singapore). Mr Meier also testified that to him, GHM "was Mr Jenni, it was Ralf [Mr Ohletz] and the team there"; and he viewed the difference between the first defendant and the second defendant as being "more like a legal separation" – instead of there being a sharply defined difference between the roles or functions that each entity took on.[183] Ms Fraser too testified that while she was the general manager of The Chedi Bali and The Andaman Langkawi, she was not even aware of the first and the second defendants being two separate entities: as far as she was concerned, she simply dealt with them entities as "GHM", without distinguishing between the two.[184] Their evidence thus suggested that operationally, little if any distinction was drawn between the first defendant and the second defendant – especially in view of the common directors they shared.

---

[181] Plaintiff's Closing Submissions at para 178(c); ABOD Volume D at AB/D2-585, 652, 667 and 829.

[182] See transcript of 28 September 2021 at p 40 ln 5 to p 42 ln 22.

[183] See transcript of 1 October 2021 at p 8 ln 14 to p 10 ln 2.

[184] See transcript of 5 October 2021 at p 7 ln 4 to p 8 ln 2.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

*Whether the first defendant had any involvement in the publication of "The Magazine"*

159     As to the publication of "The Magazine", I noted that each issue contained an "Imprint" on the last page; and for the first six issues, the "Imprint" clearly stated that "The Magazine" was *produced by* either "General Hotel Management (GHM) Singapore" (for the first issue) or by "GHM Singapore" (for the second to sixth issues). For these six issues, the "Imprint" also stated that "The Magazine" was printed by the second defendant, "General Hotel Management Ltd" and provided the business address of the second defendant at Tourism Court, Singapore. From the seventh issue onwards, the "Imprint" in "The Magazine" omitted identification of the producer and the publisher.

160     In further and better particulars filed on 21 December 2018, the plaintiffs pleaded that "General Hotel Management (GHM) Singapore" and "GHM Singapore" were references to the first defendant General Hotel Management (Singapore) Pte Ltd.[185] The defendants did not plead a response to this assertion in their defences, but at trial, it was suggested to Ms Lee during cross-examination that "General Hotel Management (GHM) Singapore" should be understood as a reference to the 2nd defendant's office premises in Singapore.[186] The defendants' witness Ms Chng then claimed during cross-examination that the reference to "The Magazine" being produced by "General Hotel Management (GHM) Singapore" "does not necessarily mean it's the 1st [first] defendant". According to Ms Chng, it "just means this is GHM in Singapore... because GHM, the main office sits in Singapore".[187]

---

[185] See the answer at (3)(a)(i) of the Further & Better Particulars to the Statement of Claim dated 21 December 2018.

[186] See transcript of 21 September 2021 at p 120 line 20 to p 126 line 16.

[187] See transcript of 5 October 2021 at p 64 line 24 to p 65 line 9.

161     I did not find any merit in the defendants' belated suggestion. In respect of the suggestion that "General Hotel Management (GHM) Singapore" must be a reference to GHM's office premises in Singapore, the only evidence on this came from Ms Chng. However, Ms Chng was not even working for GHM at the time the first issue of "The Magazine" was produced in 2007; and when pressed in cross-examination, she conceded that she actually had no personal knowledge of the matter.[188]

162     More importantly, in the "Imprint" of the  first six issues, the second defendant – General Hotel Management Ltd – was expressly identified by name as the publisher, while the producer was stated to be "General Hotel Management (GHM) Singapore" / "GHM Singapore". If the second defendant had in fact been the producer as well, there was no need to refer to it by a different appellation within the same "Imprint": indeed, it made no sense to do so. Even Ms Chng eventually conceded that it was "weird" to do so, and that she had no explanation as to why this should have been done.[189] I agreed with the plaintiffs that the use of the two different appellations within the same "Imprint" clearly meant that two different entities were being referred to; and that "General Hotel Management (GHM) Singapore" / "GHM Singapore" clearly referred to the first defendant.

163     For the reasons set out above, I accepted the plaintiffs' assertion that the first defendant had – together with the second defendant - jointly published and/or produced the first six issues of "The Magazine".

---

[188] See transcript of 5 October 2021 at p 65 line 17 to p 66 line 1.

[189] See transcript of 5 October 2021 at p 65 line 10 to line 16.

*The Wave Studio Pte Ltd v*                                               [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

164    In coming to the above conclusion, I also accepted the plaintiffs' submission that since the first defendant had pleaded non-involvement in the publication of "The Magazine" as its sole defence, Mr Hans Jenni – being the man to whom the defendants themselves attributed responsibility for the publication of "The Magazine" – was plainly a material witness; and an adverse inference should be drawn against the defendants for failing to call Mr Jenni as a witness on this subject. It was not disputed that Mr Ohletz, Ms Fraser, and Mr Meier were all not involved in the publication of "The Magazine", whereas Ms Chng only joined GHM after the publication of the first three issues. As Mr Ohletz himself put it, Mr Jenni was "entirely in charge of ["The Magazine"]".[190] In fact, Mr Jenni was originally on the defendants' list of witnesses for the better part of a year; and the defendants had even applied successfully on 4 June 2021 for leave to adduce his evidence by way of video-link testimony (HC/SUM 1906 of 2021). Yet, just a month later on 21 July 2021, the defendants suddenly indicated at a pre-trial conference before the Senior Assistant Registrar that Mr Jenni might no longer be giving evidence; and this was confirmed via letter from defence counsel on 30 July 2021 – just four days before AEICs were due to be filed. To date, no explanation has been given by the defendants to explain their failure to call Mr Jenni as a witness.

165    Given the materiality of Mr Jenni's evidence on the subject of the entity responsible for publication of "The Magazine", as well as the defendants' failure to offer any explanation for their abrupt decision to withdraw him as a witness, I was satisfied that an adverse inference should be drawn against the defendants (see *Cheong Ghim Fah v Murugiam s/o Rangasamy* [2004] 1 SLR(R) 628 ("*Cheong Ghim Fah*") at [39]). The effect of such an adverse inference was to strengthen the evidence adduced by the plaintiffs to prove the

---

[190] See transcript of 29 September 2021 at p 144 line 23 to p 145 ln 3.

*The Wave Studio Pte Ltd v*                                           [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

joint involvement of the first defendant in publishing the first six issues of "The Magazine" (*Cheong Ghim Fah* at [42]).

**Issue (d): Whether the defences of laches, acquiescence and estoppel by convention were available to the defendants**

166    In addition to rejecting the defendants' case on copyright ownership and implied licence and the first defendant's defence of "non-involvement", I also rejected the defences of laches, acquiescence, and estoppel by convention pleaded by the second defendant.[191] My reasons were as follows.

*Laches*

167    The doctrine of laches is "properly invoked where essentially there has been a substantial lapse of time coupled with circumstances where it would be practically unjust to give a remedy either because the party has by his conduct done that which might fairly be regarded as equivalent to a waiver thereof; or where by his conduct and neglect he had, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him, if the remedy were afterwards to be asserted": per the High Court in *Cytec Industries Pte Ltd v APP Chemicals International (Mau) Ltd* [2009] 4 SLR(R) 769 ("*Cytec*", at [46]), which judgment was cited with approval by the CA in *Chng Weng Wah v Goh Bak Heng* [2016] 2 SLR 464 ("*Chng Weng Wah*", at [44]). The inquiry is a "broad-based" one and "it would be relevant to consider the length of delay before the claim was brought, the nature of the prejudice said to be suffered by the defendant, as well as any element of unconscionability in allowing the claim to be enforced" (*Cytec*, at [46]).

---

[191] Defence of the 2nd Defendant (Amendment No. 3) at paras 16(d)–16(f).

168     In *Chng Weng Wah*, for example, where the dispute centred on a joint investment involving the purchase of shares in a company, the respondent commenced proceedings in 2013 based on events which had occurred between 1999 and 2000, to seek an account of the shares and sale proceeds thereof. One of the key issues for determination by the court was whether the doctrine of laches could be invoked by the appellant. The court at first instance ruled that it could not. On appeal, however, the CA held that even based on the respondent's calculation of the period of delay involved in his commencement of proceedings, there was still a "rather significant delay" of ten years (at [52]). In the CA's view, there was a direct causal link shown between such inordinate delay and the prejudice suffered by the appellant in terms of the evidence available; and it was unconscionable for the respondent to seek an account from the appellant after such an inordinate delay, especially when the joint investment had been carried out on a relatively informal basis with limited documentation (at [56], [59]).

169     In the present case, I found that the second defendant could not even cross the first hurdle of establishing inordinate delay by the plaintiffs. To recap: Ms Lee's evidence was that she had first discovered Hotel Photographs featured on the websites of several travel agencies sometime in 2012.[192] Prior to this discovery, she was unaware that the Hotel Photographs had been reproduced elsewhere outside of the marketing collaterals created by Wave for the hotels and GHM.

170     The defendants disputed Ms Lee's evidence.  In the defence filed by the second defendant, it was pleaded that the plaintiffs "were at all material times fully aware of" the second defendant's use of the Hotel Photographs "for

---

[192] Lee Kar Yin's AEIC at paras 169–170.

general branding, marketing and/or advertising purposes".[193] The second defendant did not particularise in these pleadings the circumstances in which the plaintiffs allegedly became "fully aware" of its use of the Hotel Photographs. In the course of the trial and in their closing submissions, the defendants sought to rely on the following as evidence of the plaintiffs' knowledge.

*Ms Chng's evidence about Ms Lee's awareness of the first eight issues of "The Magazine"*

171    In Ms Chng's AEIC, she referred to a suit brought in the magistrates' courts (MC/MC 14699/2010) by Wave Studio Singapore against the first defendant in June 2010 ("the 2010 MC suit"), for unpaid invoices.[194] Ms Chng stated that since "around 8 issues" of "The Magazine" had been released by the time the 2010 MC suit for unpaid invoices was commenced, Wave Studio Singapore and Ms Lee "would or should have been aware" of "The Magazine" and of the second defendant's use of the Hotel Photographs, but nevertheless "did not raise this matter then" and instead "waited for 8 years before bringing the current action".[195]

172    I found Ms Chng's evidence to be composed of conjecture and suppositions which collapsed like a house of cards when she was pressed in cross-examination. In the first place, since the 2010 MC suit involved a claim for unpaid invoices and not for intellectual property violations, there was no basis for the contention that Ms Lee would – *as a result of commencing this suit*

---

[193] Defence of the 2nd Defendant (Amendment No. 3) at para 16(d).

[194] Monica Chloe Chung's AEIC at para 46.

[195] Monica Chloe Chung's AEIC at para 50.

– have discovered the second defendant's use of the Hotel Photographs. Ms Chng was obliged to concede as much in cross-examination[196].

173    Second, Ms Chng herself had stated in her AEIC that the digital version of "The Magazine" only started being made available "in or around March 2014".[197] When it was put to her in cross-examination that this meant the only way Wave could have found out about "The Magazines" before March 2014 was to visit the Hotels, Ms Chng claimed that "from the period before 2007", Ms Lee "was most of the time in the office" and would surely have known that "at least the first eight editions…are there".[198] Again, this claim was wholly conjecture on Ms Chng's part because on her own evidence, she only started working for GHM in June 2008, by which time GHM had ceased working with Wave.[199] In other words, Ms Chng never had any personal interaction with Ms Lee at the GHM office. There was thus no basis for her evidence that "before 2007" Ms Lee would have been at the GHM office "most of the time", or that Ms Lee would have realised from such purported visits the existence of the first eight issues of "The Magazine".  Moreover, in cross-examination, Ms Chng was obliged to concede that her evidence about Ms Lee having found out about "at least" the first eight issues "from the period before 2007" could not be true because the first two issues of "The Magazine" were only released in January 2007 and July 2007 respectively;[200] and she had no evidence either that there were hard copies of "The Magazine" in the GHM office when Ms Lee visited.[201]

---

[196] See transcript of 5 October 2021 at p 114 line 15 to line 24.

[197] Monica Chloe Chung's AEIC at para 51.

[198] See transcript of 5 October 2021 at p 113 line 12 to p 114 line 1.

[199] See transcript of 5 October 2021 at p 56 line 3 to line 15.

[200] See transcript of 5 October 2021 at p 114 line 7 to line 14.

[201] See transcript of 5 October 2021 at p 115 line 13 to line 17.

*The Wave Studio Pte Ltd v*            [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

Indeed, Ms Chng conceded that she had no evidence to show that Ms Lee had a copy of the print version of "The Magazine" prior to its being made available online.[202]

174    Ms Chng also agreed in cross-examination that since Ms Lee started the US proceedings in 2013 and since the digital version of "The Magazine" only started becoming available in March 2014, it was not reasonable to expect that Ms Lee would have discovered the use of the Hotel Photographs in the online version of the magazine prior to March 2014.[203]

*The incident involving the 1000 CD-ROMs for The Chedi Muscat*

175    Perhaps recognizing the parlous state of Ms Chng's evidence, the defendants chose in their closing submissions to focus on several incidents which they claimed demonstrated that the plaintiffs had failed to take any action in respect of the use of the Hotel Photographs by the Hotels and/or GHM.[204]  The defendants contended that these incidents were "all instances where the Plaintiffs were fully aware" that Hotel Photographs were being used without their approval; and that the "earliest point in time when [Ms Lee] knew of use other than for marketing collaterals prepared by the Plaintiffs would be in 2005".[205] (As an aside, it should be noted that the defendants appeared to rely on the same several incidents to support the defence of laches as well as the defence of acquiescence.)

---

[202] See transcript of 5 October 2021 at p 115 line 9 to line 12.

[203] See transcript of 5 October 2021 at p 115 line 18 to line 21.

[204] Defendants' Closing Submissions at paras 192–202.

[205] Defendants' Closing Submissions at paras 203–204.

176     The reference to 2005 appeared to be a reference to the incident in August 2005 when Wave was requested by the second defendant to compile Hotel Photographs of The Chedi Muscat onto CD-ROMs and to prepare 1000 copies of these CD-ROMs. I have dealt with this incident at [131] to [132] above, in the context of the defendants' reliance on an implied licence. In the context of their reliance on the defence of laches, the defendants' suggestion appeared to be that by August 2005, Wave knew of the use of Hotel Photographs for the production of the 1000 CD-ROMs, and yet chose not to charge licence fees for it or to do anything else to assert or protect their copyright.

177     I found no merit in this suggestion. Since the copyright in the photographs belonged to Wave, Wave had the right to reproduce them in the 1000 CD-ROMs in the course of preparing these marketing collaterals for The Chedi Muscat. There was no issue as to any infringement of Wave's copyright and thus no issue as to their needing to take action to assert or protect their rights.

*The incidents involving the use of Hotel Photographs in various industry publications*

178     Other incidents which the defendants brought up to support their reliance included the incidents relating to the reproduction of Hotel Photographs in industry magazines such as "Interior Design", "American Airlines" and "Conde Nast".  I have already dealt with the evidence relating to these incidents at [136] to [139] above.

179     I add that in relation to the incident involving the reproduction of Hotel Photographs in "Professional Lighting Design" magazine, Ms Lee gave evidence that there was acknowledgement from the defendants of her right to charge a licence fee: she pointed to an email from Mr Jenni in which – after

requesting her to get in touch with the individual putting together the feature in "Professional Lighting Design" magazine – he informed her, "*Any expenses to be billed as usual to GHM*."[206] Ms Lee's evidence was that in telling her to bill "any expenses" to GHM, Mr Jenni was acknowledging she could "charge GHM for the photos"; and that she did in fact charge a licence fee on that occasion.[207]

180    In their closing submissions, the defendants argued that the term "expenses" must have been a reference to expenses incurred by Ms Lee in assisting with the request from "Professional Lighting Design" magazine for photographs, and that it could not have included licence fees. However, this suggestion was never put to Ms Lee in cross-examination: instead, she was asked in cross-examination if she could point to an invoice or a bill for the licence fee charged on that occasion; and her response was that she could no longer find the document as she did not even have a home anymore.[208] Given that the defendants failed to challenge the meaning to be given to the term "expenses" during their cross-examination of Ms Lee, I did not think they should be permitted to bring such a challenge belatedly in their closing submissions.

181    In the interests of completeness, there are two other things I will deal with briefly. First, I noted that in seeking to establish the defence of laches, the defendants also relied in their closing submissions on the alleged failure by Wave to request the return of the CD-ROMs of Hotel Photographs after they stopped working with the Hotels from 2008 onwards. I have set out my findings

---

[206] See transcript dated 22 September 2021 at p 117 line 13 to p 121 line 7; also Plaintiff's Bundle of Documents at Tab 3 p 20.

[207] See transcript dated 22 September 2021 at p 117 line 17 to p 120 line 18.

[208] See transcript dated 22 September 2021 at p 120 line 19 to p 121 line 7.

*The Wave Studio Pte Ltd v*                                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

in respect of this issue at [133] to [134] in these written grounds and will not repeat them here.

182    Second, the defendants brought up two emails – one sent on 28 April 2006[209] by a Mr Alvin Fong to Ms See Soo Eng and Ms Lee, and one on 27 September 2007[210] by Mr Fong to Ms Lee – in their closing submissions as purported evidence of instances where the plaintiffs did nothing to assert their copyright despite being aware that Hotel Photographs were used without their permission and without payment of a licence fee.[211] Unfortunately, these emails were couched in vague and ambiguous terms. For example, Mr Fong's email simply contained a request from him to Ms Lee to go to a website so as to download some photographs: without elucidation from Mr Fong, it was not possible to determine what he was referring to.  Neither Ms See nor Mr Fong was called as a witness to elucidate the contents of these emails; and none of the defendants' witnesses even referred to these emails during the trial.

183    To sum up on the issue of laches: I accepted Ms Lee's evidence that she had found out about the copyright infringements only in December 2012. It was not disputed that the plaintiffs' US proceedings were commenced on 31 December 2013, and that they had commenced the proceedings in Singapore in February 2018, after the US court made its findings on *forum non conveniens* in March 2017.[212] As the second defendant could produce no evidence whatsoever of any inordinate delay by the plaintiffs in commencing the present

---

[209] ABOD Volume A at AB/A1-327

[210] ABOD Volume F at AB/F2-1483 to F2-1484.

[211] Defendants' Closing Submissions at paras 197 – 198.

[212] Lee Kar Yin's AEIC (dated 10 September 2021) at para 186.

proceedings, I did not find it necessary to go on to consider the element of prejudice.

### Acquiescence

184    As to the defence of acquiescence, the High Court in *Tan Yong San v Neo Kok Eng* [2011] SGHC 30 ("*Tan Yong San*" at [112]) – citing the CA's decision in *Genelabs Pte Ltd v Institut Pasteur* [2000] 3 SLR(R) 530 – explained the defence as follows:

> The term acquiescence is...properly used where a person having a right and seeing another person about to commit, or in the course of committing an act infringing that right, stands by in such a manner as really to induce the person committing the act and who might otherwise have abstained from it, to believe that he consents to it being committed; a person so standing by cannot afterwards be heard to complain of the act. In that sense the doctrine of acquiescence may be defined as quiescence under such circumstances that assent may reasonably be inferred from it and is no more than an instance of the law of estoppel words or conduct.

185    As I noted earlier, the defendants relied in their closing submissions on the same evidence in respect of the defence of laches and the defence of acquiescence. In gist, the defendants referred to a number of incidents in an attempt to argue that they showed the plaintiffs being aware of Hotel Photographs being used and doing nothing to collect licence fees or otherwise to assert their copyright. I have set out my findings in respect of the incidents cited by the defendants (see [171] to [**Error! Reference source not found.**]) and will not repeat them here. For the reasons I have explained, I did not accept the defendants' argument that these were incidents which demonstrated the plaintiffs' knowledge of Hotel Photographs being used and their failure to collect licence fees or otherwise to assert their copyright.

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

186    Just as they failed to establish laches, so too the defendants were unable to establish acquiescence.

**Estoppel by convention**

187    As for the defence of estoppel by convention, the law requires that for this defence to apply, parties must have acted on an incorrect assumption of law or fact which both sides must have shared or acquiesced in; further, that the party seeking to rely on this defence must show that it is unjust or unconscionable to allow parties to go back on the said assumption: see *Independent State of Papua New Guinea v PNG Sustainable Development Program Ltd* [2020] 2 SLR 200 at [49].

188    The second defendant pleaded in its defence that it and the plaintiffs had "acted on the assumption that the Hotel Photographs could be used by the 2nd Defendant for general branding, marketing and/or advertising purposes".[213] This was said to be an assumption which the second defendant had made and the plaintiffs had acquiesced in. The second defendant also pleaded that it would be "unjust or unconscionable to allow the Plaintiffs to go back on that assumption", without giving any particulars.

189    Oddly, in their closing submissions, the defendants did not specifically address the defence of estoppel by convention. In any event, given my finding that Ms Lee was telling the truth when she testified to having discovered the copyright infringements in December 2012, it was not possible for the plaintiffs to have "acquiesced" to any "assumption" made by the second defendant prior to December 2012.

---

[213] Defence of the 2nd Defendant (Amendment No. 3) at para 16(f).

89

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

**Summary of key findings at the conclusion of the trial**

190    To sum up, at the end of the trial, for the reasons set out above, I made the following findings:

(a)    The copyright in the Raw Images taken by Mr Lim See Kong was owned by Wave Studio Singapore, and the copyright in the Raw Images taken by Mr Masano Kawana was owned by Ms Lee trading as Wave-S or the Wave Pte Ltd;

(b)    The copyright in the Final Photographs was owned by the Wave entities;

(c)    The copyright in the Hotel Photographs (*ie*, the Raw Images and the Final Photographs) had been assigned to and is presently owned by the third plaintiff;

(d)    There was no implied license granted to either the Hotels or the defendants to use the Hotel Photographs for their general marketing, branding and advertising purposes;

(e)    The defendants had infringed the third plaintiff's copyright to the Hotel Photographs by reproducing 242 Hotel Photographs in various issues of "The Magazine", and by importing the infringing copies of The Magazine into Singapore for the purpose of trade, or by way of trade exhibiting the article in public;

(f)    The second defendant had infringed the third plaintiff's copyright to the Hotel Photographs by communicating the Hotel Photographs in "The Magazine" to the general public; namely, by making "The Magazine" available for download on GHM websites,

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

including to users in Singapore, from (at least) January 2013 to December 2020; and

(g)     The pleaded defences of laches, acquiescence, and estoppel by convention were not made out in the present case.

191     I next address the reliefs granted to the plaintiffs.

**Reliefs**

192     The plaintiffs sought a number of different reliefs:[214]

(a)     Declarations on the ownership of the copyright in the Hotel Photographs and the assignment of such copyright, the grant of permission governing the use of the Hotel Photographs, and the presence of copyright infringements;[215]

(b)     An injunction against GHM and their officers, employees, servants and agents in respect of further copyright infringements;[216]

(c)     Damages to be assessed, under s 119(2)(*b*) of the Copyright Act;

(d)     Alternatively, at the plaintiffs' option, an account of profits under s 119(2)(*c*);

(e)     Alternatively, at the plaintiffs' option, statutory damages under s 119(2)(*d*);[217]

---

[214] Statement of Claim (Amendment No. 3) at para 40.

[215] Statement of Claim (Amendment No. 3) at paras 40(a)–(i).

[216] Statement of Claim (Amendment No. 3) at para 40(j).

[217] Statement of Claim (Amendment No. 3) at paras 40(k)–(m).

(f)    Additional damages under s 119(4) of the Copyright Act, "because of, *inter alia*, the flagrancy of the infringements [by the defendants] and the benefits that have accrued to [the defendants] by reason of their infringements of the plaintiffs' copyright in the Hotel Photographs";[218]

(g)    Damages against each of the defendants for authorising the other to infringe the plaintiffs' copyright in the Hotel Photographs;[219]

(h)    Orders for delivery of all infringing copies of the Hotel Photographs or any articles used for making infringing copies, and for the forfeiture or destruction upon oath of infringing copies of the Hotel Photographs or any articles used for making infringing copies;[220]

(i)    A signed statutory declaration by the defendants confirming that they and their officers, employees, servants and agents will not further infringe the plaintiffs' copyright in the Hotel Photographs;[221]

(j)    Interest;[222] and

(k)    Costs.[223]

---

[218] Statement of Claim (Amendment No. 3) at para 40(n).

[219] Statement of Claim (Amendment No. 3) at paras 40(o) and (p).

[220] Statement of Claim (Amendment No. 3) at paras 40(q) and (r).

[221] Statement of Claim (Amendment No. 3) at para 40(s).

[222] Statement of Claim (Amendment No. 3) at para 40(t).

[223] Statement of Claim (Amendment No. 3) at paras 40(u).

*The Wave Studio Pte Ltd v*                                            [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

**On whether the plaintiffs may seek relief in respect of the Raw Images**

193     In their closing submissions, the defendants contended that there was no
need for the court to make any orders in respect of the Raw Images, on the basis
that they and the Hotels had only been given the Final Photographs.[224] I found
this submission to be misconceived: it was not disputed that the Final
Photographs were created by editing and manipulating the Raw Images and thus
necessarily encompassed those elements of the Raw Images which were
copyright-protected. As such, any unauthorised reproduction of the Final
Photographs would infringe not only the copyright in the Final Photographs but
also the copyright in the Raw Images. I have dealt with this issue elsewhere in
these written grounds (see above at [32]–[34]).

**On whether the plaintiffs may seek declaratory relief**

194     In respect of the prayers sought at paragraphs 40(a), 40(b), 40(d) and
40(e) of the statement of claim, the defendants argued that the plaintiffs had no
*locus standi* to seek the declarations sought because these prayers involved the
plaintiffs seeking declaratory relief on behalf of Mr Kawana and/or his company
Irieeyes.[225]

195     The parties accepted that the applicable legal principles were those
summarised by the CA in *Tan Eng Hong v Attorney-General* [2012] 4 SLR 476
("*Tan Eng Hong*") at [72] and [115]. *Per* the CA's judgment, the test for locus
standi in an action for declaratory relief remained the *Karaha Bodas* test
(*Karaha Bodas Co LLC v Pertamina Energy Trading Ltd and another appeal*
[2006] 1 SLR(R) 112 ("*Karaha Bodas*")  at [14], namely:

---

[224] Defendants' Closing Submissions at para 61.

[225] Defendants' Closing Submissions at paras 247–252.

(a)     The applicant must have a real interest in bringing the action;

(b)     There must be a "real controversy" between the parties to the action for the court to resolve; and

(c)     The declaration must relate to a right which is personal to the applicant and which is enforceable against an adverse party to the litigation.

196     In respect of the prayers at paragraphs 40(a), 40(b), 40(d), having considered the evidence, I found that the owners of the copyright in the Hotel Photographs at the time of their making were Wave-S (or Ms Lee trading as Wave-S), Wave PL and Wave Studio Singapore, depending on the Hotel photo-shoot from which the photographs were created (*per* the list in Annex F to the plaintiffs' closing submissions) (see above at [50]–[51], [190]). Ms Lee and Wave Studio Singapore are the first and the second plaintiffs in this suit. While Wave PL was dissolved on 1 August 2008, I also found in any event that the Wave-S copyright, the Wave PL copyright and the Wave Studio Singapore copyright were validly assigned to the third plaintiff Wave Studio US and are now owned by Wave Studio US (see above at [93]–[101]). On the basis of my findings on copyright ownership, there was no question that the plaintiffs had *locus standi* – *per* the *Karaha Bodas* test – to seek the declarations set out in prayers 40(a), 40(b), 40(d) of the statement of claim.

197     As for prayer 40(e), which was premised on an alternative scenario whereby Mr Kawana and/or Irieeyes were the original owners of the copyright in the Raw Images created at the hotel photo-shoots, my findings on copyright ownership made it unnecessary to consider the declaratory relief sought in this prayer.

*The Wave Studio Pte Ltd v*                                        [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

198     The defendants also objected to the declaratory relief prayed for at paragraphs 40(a) to 40(f) of the statement of claim. In gist, prayers 40(a) to 40(f) sought declarations as to the owners of the copyright in the Hotel Photographs were at the time of their making and the present owner of the copyright in these photographs. The defendants claimed that the declarations were sought for the purpose of assisting the plaintiffs in their US proceedings; and that caselaw prohibited the grant of such declarations. In this respect, the defendants' arguments were predominantly based on a passage extracted from the commentary in *Singapore Civil Procedure 2021 (Volume 1)* (Sweet & Maxwell, 2021) ("*Singapore Civil Procedure 2021*") (at 15/16/4) on Order 15 rule 16 of the Rules of Court, in which it was stated that a declaration would not be made "*merely to enable the plaintiff to utilise it in a foreign action*". Two authorities were cited by the authors of *Singapore Civil Procedure 2021* for this statement: *Karaha Bodas* and *Guaranty Trust of New York v Hannay & Co* [1915] 2 KB 536 ("*Guaranty Trust*").

199     Insofar as the defendants appeared to believe that the court must be barred without exception from granting a declaration which would be used in foreign proceedings, such a belief was grounded in a misunderstanding of the *Singapore Civil Procedure 2021* extract (see above at [198]) and the two authorities cited therein.

200     In *Guaranty Trust*, the defendants (who were based in England) bought cotton from dealers in America who drew a bill of exchange on the defendants for the price. The plaintiffs (who were based in America, with a branch office in England) bought the bill of exchange and sent it to the defendants with the bill of lading and other documentation. The bill of exchange was accepted by the defendants who paid it on maturity. It turned out that the bill of lading was a forgery: no cotton had been shipped under it. The defendants sued the

plaintiffs in America for the amount of the bill of exchange which they had paid. It was not disputed that the law of England applied to the case. Subsequently the plaintiffs brought an action in England seeking declarations to the effect that in presenting the bill for acceptance with the bill of lading attached, they had not represented the bill of lading to be genuine and were not bound therefore to repay the bill amount. They also sought an injunction to restrain the defendants from proceeding further with the action in America, on the ground that the action was vexatious and likely to cause injustice and expense. The defendants filed an application under Order XXV, r.4 (*in pari materia* with our present-day Order 15 rule 16) to strike out the plaintiffs' claims for the declarations on the ground that they disclosed no cause of action. This striking-out application was dismissed by the first-instance judge whose decision was affirmed on appeal by a majority of the English CA.

201    Of the two judges in the majority, Pickford LJ opined (at 562) that the effect of Order XXV, r.4 was "to give a general power to make a declaration whether there be a cause of action or not, and at the instance of any party who is interested in the subject-matter of the declaration". On the particular facts of *Guaranty Trust*, he noted that the defendants were entitled to bring their action in America and could only be prevented from doing so on the principles laid down in *Logan v Bank of Scotland* [1906] 1 KB 141. If the plaintiffs failed to establish their rights in that way, they should not be allowed to obtain it indirectly by way of the declarations (at 564–565) – but Pickford LJ went on to conclude that this did not go towards the power of the court to make the declarations sought.  In his view, the court had jurisdiction to make a declaration that a person was not liable in an existing or possible action, though it would likely only do so in "a very exceptional case". He was of the view, therefore,

*The Wave Studio Pte Ltd v*                                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

that the appeal should be dismissed on the ground that it was not a proper case for the summary procedure of striking-out.

202    The other judge in the majority, Bankes LJ, was similarly of the view (at 572) that Order XXV, r.4 did not require an applicant such as the plaintiff (whom he referred to as the respondent) in *Guaranty Trust* to establish a legal cause of action.  In his view, Order XXV, r.4 applied where a party was seeking relief or in whom a right to seek relief was alleged to exist: "relief" was not confined to relief in respect of a cause of action. In this particular case, Bankes LC opined (at 574) that if the plaintiffs' claim for a declaration were to be decided without reference to the claim for an injunction, then the plaintiffs' action would not be maintainable because the claim for a declaration was not in itself a claim for relief. However, the view he took of the plaintiffs' case was that what they really wanted was to stay the proceedings in America, and that the claim for the declarations was "merely ancillary to the claim for an injunction".

203    From these judgments, it was clear that the majority in *Guaranty Trust* did not lay down any general rule to the effect that the courts would never grant a declaration intended to be used in foreign proceedings, or that to seek such a declaration would be to pursue an invalid or improper purpose. In respect of the comment in the *Singapore Civil Procedure 2021* extract that a declaration would not be made "*merely* to enable the plaintiff to utilise it in a foreign action", the source for it appeared to be Bankes LJ's statement (at 574–575) that "(t)he claim for a declaration is not in itself a claim for relief", and that if the plaintiff could not establish any ground for relief from any further proceedings in the American courts, its application to the court would be "merely a request to the Court to supply them with evidence in a convenient form for use in the American action" – which was not a proceeding within Order XXV, r.4. This

97

was not a concern in the present case, because the declarations sought as to the ownership of copyright in the Hotel Photographs were not sought by the plaintiffs "merely" to enable them to utilise such declarations in the US proceedings. To borrow the words of Bankes LJ, the plaintiffs' prayers for declarations as to copyright ownership were not "merely a request to the Court to supply them with evidence in a convenient form for use in the American action". In the first place, it was clear that in the present suit, the plaintiffs' assertion of their copyright in the Hotel Photographs was vehemently disputed by the defendants: as the plaintiffs pointed out,[226] both sides had agreed prior to the trial that the list of disputed legal issues included the question of which entity owned the copyright in the Hotel Photographs, as well as the question of whether the copyrights had been validly assigned as between Wave-S, Wave PL, Ms Lee, Wave Studio Singapore and Wave Studio US. I agreed with the plaintiffs that given the issues in dispute, it was necessary for them to seek declarations that would firmly resolve the legal position; hence the prayers for the declarations set out in prayers 40(a) to 40(f). In other words, these declarations were not sought "merely" for use in the US proceedings.

204    Second, it was not disputed that in respect of the US proceedings, the second defendant had successfully applied in the US courts for those proceedings to be struck out against it on the ground of *forum non conveniens*, and that in so applying, it had argued that Singapore was the natural forum for determination of the issue of copyright ownership vis-à-vis the Hotel Photographs. This argument was accepted by Judge Seibel in the US District Court for the Southern District of New York, who held that copyright ownership was "likely to be a matter of Singapore law".[227] As against the remaining

---

[226] Plaintiffs' Closing Submissions at para 117.

[227] ABOD Vol F at AB/F3-1504.

defendants in the US proceedings, Judge Seibel granted a stay of those proceedings; and in this connection, it is important to note that the stay was agreed to by all remaining parties on the basis that they "recogniz[ed] that whether or not GHM infringed any of Plaintiff's [Wave Studio US] alleged copyright will inform the resolution of Plaintiff's claims against the other Defendants who allegedly received Plaintiff's photographs from GHM".[228] It was expressly contemplated by the US court, therefore, that the issues of whether the third plaintiff owned the copyright in the Hotel Photographs and whether GHM had infringed that copyright would be decided by a Singapore court; further, that the Singapore court's decision would inform the resolution of the US proceedings against the other defendants therein. Given this procedural background (which the second defendant could not be ignorant of), there was no basis for the defendants to argue that any intended use of the declarations in the US proceedings was an invalid or improper purpose.

205    As for *Karaha Bodas*, which was the other authority cited in the *Singapore Civil Procedure 2021* extract relied on by the defendants, the reasons for the CA's refusal to grant the declaration sought in that case were clearly explained in its judgment.  Those reasons did not assist the defendants at all in the present case. In brief, in *Karaha Bodas* had obtained an arbitration award against Pertamina and sought to enforce the award in Hong Kong by obtaining and serving a charging and garnishee order against a 99% subsidiary of Pertamina called Petral. The appellant believed that Petral had sent a sum of more than US$36,236,518-65 to its wholly owned subsidiary in Singapore (PES) in order to defeat the garnishee order. The appellant filed an originating summons ("OS") in the Singapore High Court to seek a declaration that the sum of US$36,236,518-65 was held by PES on trust for Petral, as well as an order

---

[228] ABOD Vol F at AB/F3-1506.

that PES repay this sum to Petral in Hong Kong. In upholding the High Court's dismissal of the OS, the CA held (at [18]) that "in order to establish *locus standi* [to seek declaratory relief], a plaintiff must show that he had a "real interest" in bringing the action"; and that related to this was "the idea that the court would only entertain a suit for a declaration if there was a "real controversy" between the parties to the action for the court to resolve". It was in this context that the CA found the appellant had not shown that it had any right to make a claim to the US$36,236,518-65. The only two parties who had any claim to the sum were Petral and PES, who had no dispute between them as to the status of the sum (at [20]). The CA agreed (at [19]) with the High Court that "a plaintiff should not be able to commence proceedings seeking a declaration that A owed money to B, when the plaintiff was neither A nor B". In the present case, the plaintiffs in the present case were not in any such position. It would be absurd for the defendants to claim that the plaintiffs had "no real interest" in bringing this action or that there was no "real controversy" between the parties for the court to resolve.

206    In sum, on the prayers for declaratory relief, having found for the plaintiffs on their claims of copyright ownership in the Hotel Photographs and of infringement by the defendants, I granted the declarations sought in prayers 40(a), 40(b), 40(c), 40(d), 40(f), 40(h) and 40(i) of the statement of claim. The prayers in paragraphs 40(e) and 40(g) were not necessary in view of my findings.

### On injunctive and other non-declaratory relief

207    In light of my findings on copyright ownership and infringement, I also granted the reliefs prayed for in paragraphs 40(j), 40(q) and 40(r). These were, respectively, an injunction under s 119(2)(*a*) of the Copyright Act to restrain the

defendants, their officers, employees, servants and agents from further infringing the plaintiffs' copyright in the Hotel Photographs; an order under s 120 for the delivery up to the plaintiffs of all infringing copies of the Hotel Photographs in the defendants' possession; and an order under s 120A for forfeiture to the plaintiffs or the destruction upon oath of any infringing copies of the Hotel Photographs or any articles used for making infringing copies of the Hotel Photographs.

### On whether the plaintiffs were entitled to seek both damages under s 119(2)(b) and an account of profit under s 119(2)(c)

208    It will be recalled that the trial of this action was ordered to be bifurcated on the issues of liability and damage. After I gave my decision on copyright ownership and other liability-related issues on 18 January 2022, parties requested time to put in additional written submissions to address the further directions needed in relation to the remaining prayers in the statement of claim and on costs. A further hearing was held on 22 March 2022 to allow parties to respond orally to each other's additional written submissions; and I gave my decision on the same day. I now address in these written grounds the issues which were raised in relation to the remaining prayers for relief.

209    In respect of monetary remedies, the plaintiffs had prayed in paragraphs 40(k), 40(l) and 40(m) for damages under s 119(2)(b), an account of profits under s 119(2)(c) and statutory damages under s 119(2)(d) respectively. At the conclusion of the trial, I had informed parties after giving my decision that I was inclined to grant only one of these prayers and that the plaintiffs were to choose in priority among these three remedies. The plaintiffs subsequently wrote in stating that they had elected to pursue the remedies of damages to be assessed

under s 119(2)(*b*) and an account of profits under s 119(2)(*c*)[229] (in addition to the prayer for additional damages under s 119(4) which I address in the next part of these written grounds).

210     The defendants argued that the plaintiffs were not entitled to seek both damages to be assessed and an account of profits. According to the defendants, under s 119(2A) of the Copyright Act, the court could only award one of the two remedies.[230]

211      s 119(2A) provides:

> When the court awards any damages under subsection (2)(b), the court may also make an order under subsection (2)(c) for an account of profits attributable to the infringement that have not been taken into account in computing the damages.

212     Also pertinent in this context is s 119(2B) which provides:

> Except as provided for in subsection (2A), the types of relief referred to in subsections 2(b), (c) and (d) are mutually exclusive.

213     Sections 119(2A) and 119(2B) should be examined together. On a plain reading of the two provisions, it was impossible to arrive at the position advocated by the defendants. s 119(2B) states that the types of reliefs referred to ss 119(2)(*b*), 119(2)(*c*) and 119(2)(*d*) are mutually exclusive *except as provided for in s 119(2A)*. s 119(2A) expressly provides for the court to be able to "*also make an order*" under s 119(2)(*c*) for an account of any profits that can be attributed to the infringement and that have not been taken into account in the computation of damages under s 119(2)(*b*). To say that s 119(2A) makes the

---

[229] See letter from Drew & Napier dated 31 January 2022 at para 3.

[230] Defendants' Submissions on Plaintiffs' Remedies and on Costs at paras 8–11.

remedies under ss 119(2)(*b*) and 119(2)(*c*) "the alternatives" which the plaintiffs must choose between "for an identified infringement" is to make nonsense of the express provisions of ss 119(2A) and 119(2B). Indeed, as the plaintiffs have pointed out, this supposed reading of s 119(2A) would render s 119(2B) otiose and devoid of meaning – which could not have been intended by Parliament.

214    I noted that in their submissions, the defendants claimed that such a reading was "on the Court's own motion".[231] If the defendants meant by this statement that I had already ordered on 18 January 2022 that the plaintiffs could only choose either the remedy of damages to be assessed or that of an account of profits, this was plainly an incorrect representation of my directions. The transcript of the hearing on 18 January 2022 showed that after remarking that I was "inclined to grant only one of [the] three prayers" set out in prayers 40(k), 40(m) and 40(l) and "would therefore require the plaintiffs to choose in priority among the three options", I had expressly stated that I would "hear parties on this before dealing with prayers 40(k), 40(m) and 40(l)".[232] That was precisely why both sides had requested time to put in additional written submissions and why there was a further hearing on 22 March 2022.

215    At the hearing on 22 March 2022, the defendants' counsel brought up a point about the differing natures of a hearing for the assessment of damages and a hearing for an account of profits. In this, he was not wrong, since an assessment of damages would involve the hearing of evidence on the losses suffered by the plaintiffs, whilst an account of profits would involve the hearing of evidence on the profits made by the defendants. However, this point about the differing natures of the two hearings *per se* did not support the argument

---

[231] Defendants' Submissions on Plaintiffs' Remedies and on Costs at para 8.

[232] See transcript of 18 January 2022 at p 7 line 31 to p 8 line 10.

that s 119(2A) rendered the two remedies mutually exclusive. In any event, the plaintiffs had never submitted that the account for profits must be heard at the same time and within the same hearing as the assessment of damages. On my querying him, the plaintiffs' counsel confirmed[233] that they were seeking to proceed with the hearing for assessment of damages first, for the court to make an award of damages for loss suffered by the Plaintiffs; and then to the extent that the plaintiffs could say at that juncture that there were profits made by the defendants which were attributable to the copyright infringement but not accounted for in the award of damages, they would then be entitled to an order for an account of those profits, with the hearing for such account of profit taking place later.

216    For the reasons set out above, I rejected the defendants' contention that s 119(2A) obliged the plaintiffs to choose between either the remedy of damages under s 119(2)(*b*) or that of an account of profits under s 119(2)(*c*).

### *On the plaintiffs' claims for additional damages and interest*

217    As to the plaintiffs' claims for additional damages under s 119(4), having considered the parties' further arguments, I agreed with the plaintiffs that any submissions on additional damages should be reserved to the damages tranche. Because of the bifurcation of liability and damages in the present case, no evidence was led during the trial on the matters which the court needed to consider under s 119(4) in determining whether an award of additional damages was "appropriate in the circumstances".

---

[233] See Notes of Evidence ("NE") 22 March 2022 at p 3 line 9 to line 19.

*The Wave Studio Pte Ltd v*                                        [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

218     Given my views on the plaintiffs' prayers in paragraphs 40(k) to 40(n), it followed that the issue of interest (at paragraph 40(t)) should also be reserved to the damages tranche.

### *Further directions on damages*

219     Both the plaintiffs and the defendants requested that the assessment of damages be heard before me. This made sense because having heard the trial on liability, I would be familiar with the background to the matter. As such, I made the following further directions in relation to the prayers for damages to be assessed and other monetary remedies:

(a)     The damages tranche of this suit would proceed to trial before me pursuant to O 37 r 4(1)(b) of the Rules of Court;

(b)     For the purposes of trial, both sides would be at liberty to have recourse to interlocutory processes including specific discovery and interrogatories;

(c)     Submissions on additional damages and on the issue of interest were reserved to the trial; and

*The Wave Studio Pte Ltd v*                                                       [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

(d)      The Registry was to conduct a pre-trial conference for the purpose of fixing trial dates before me and for issuance of any directions necessary on the timelines for filing of any interlocutory applications and the filing and exchange of AEICs. Both sides were to confirm at the pre-trial conference whether any expert witness would be called; and if yes, whether they are able to agree on a single expert (which would be preferable).

**Costs**

220      On the issue of costs, the plaintiff asked for an award in their favour of the costs of the proceedings up until the conclusion of the trial on liability. In addition, it was disclosed that on 5 January 2021, the plaintiffs had served on the defendants an offer to settle[234] ("OTS") which was not accepted. The plaintiffs submitted that the terms of the judgment they had obtained at the conclusion of the trial were no less favourable than the terms of the OTS, and that Order 22A rule 9(1) of the Rules of Court[235] therefore applied. Under O 22A r 9(1) where an OTS made by a plaintiff (a) is not withdrawn and has not expired before the disposal of the claim in respect of which the OTS was made, and (b) is not accepted by the defendant, and the plaintiff obtains a judgment not less favourable than the terms of the OTS, the plaintiff is entitled to costs on the standard basis to the date the OTS was served and costs on the indemnity basis from that date (unless the court orders otherwise). The plaintiffs submitted therefore that they should be entitled to costs on the indemnity basis from 5 January 2021 onwards.[236]

---

[234] Plaintiffs' Supplementary Bundle of Documents ("PSBOD") at Tab 3; Plaintiffs' Costs Submissions at para 4.

[235] Plaintiffs' Costs Submissions at para 17.

[236] Plaintiffs' Costs Submissions at para 17.

*The Wave Studio Pte Ltd v*                                              [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

### The applicable legal principles

221     It should not be controversial that offers to settle do not apply only to monetary claims. As the High Court in *Ram Das V N P v SIA Engineering Co Ltd* [2015] 3 SLR 267 ("*Ram Das*") pointed out (at [43]), one reason why the O 22A regime was introduced was to provide an alternative to the payment into court procedure under O 22, which was only available for monetary claims.  The court in *Ram Das* also highlighted an example of a non-monetary claim where an OTS was made: see *Mopi Pte Ltd v Central Mercantile Corporation (S) Ltd* [2001] SGHC 328, where the defendants' OTS dealt only with the use of a disputed trade mark and provided for the plaintiffs' cessation of use of that trade mark and the payment of costs.

222     From the terms of O 22A r 9(1), the costs consequences specified therein apply if two conditions are satisfied: first, the OTS was not withdrawn and had not expired before the disposal of the claim ("the Validity Requirement"); and second, the judgment is not less favourable than the terms of the OTS ("the Favourability Requirement"): see *NTUC Foodfare Co-operative Ltd v SIA Engineering Co Ltd and another* [2018] 2 SLR 1043 ("*NTUC Foodfare*") at [15].  As to the interpretation of the words "the disposal of the claim" in O 22A r 9, the CA in *NTUC Foodfare* held (at [17]) that it was "settled law" that these words referred to the final disposal of the claim on appeal if an appeal was filed.

223     It should also be noted that under O 22A r 3(5) of the Rules of Court, an OTS that does not specify a time for acceptance may be accepted at any time before the Court disposes of the matter in respect of which it is made.  In *Ong & Ong Pte Ltd v Fairview Developments Pte Ltd* [2015] 2 SLR 470, the CA held (at [54]–[55]) that the OTS remained open for acceptance so long as there

*The Wave Studio Pte Ltd v*                                              [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

was an outstanding matter not disposed of which was within the scope of the
OTS.

224    In respect of the Favourability Requirement, the CA in *NTUC Foodfare*
– citing Chan Sek Keong CJ's judgment in *CCM Industrial Pte Ltd v
Uniquetech Pte Ltd* [2009] 2 SLR(R) 20 – held (at [21]–[22]) that what was
"favourable" had to be determined on the terms of the offer to settle: all the
terms of the OTS would be "critical in determining whether the Favourability
Requirement [was] satisfied"; and even in a claim for damages, the settlement
sum stated in the OTS would not be the only relevant factor.

225    As the High Court put it (at [45]–[46]) of *Ram Das*:

> 45  Although favourability is normally determined on the basis
> of a dollar amount in the offer compared to that awarded in the
> judgment, this does not always have to be the case…
>
> 46  (T)here is no reason to restrict the validity of offers to settle
> to require a monetary value, even if the claim is for an
> unliquidated sum, when the action is bifurcated.  Rather, what
> is important is that **the offer to settle is a serious and
> genuine one** which must be a question of fact in every case.
>
> [emphasis added]

### *Applying the principles to the facts of this case*

*Whether the plaintiffs' OTS was a serious and genuine offer*

226    The plaintiffs' OTS comprised the following terms:[237]

(a)    That parties would agree to a proposed consent judgment
(attached as Annex A to the OTS[238]). This proposed consent judgment

---

[237] Plaintiffs' Costs Submissions at paras 18–19.

[238] PSBOD at pp 22-25.

essentially required the defendants to agree that the plaintiffs owned the copyright in the Hotel Photographs, that no licence (whether express or implied) was granted to any third parties to reproduce or deal with the Hotel Photographs in any manner, and that the defendants had infringed the plaintiffs' copyright in the Hotel Photographs despite knowing that neither they nor their current or former clients ever had any copyright or license to reproduce or deal with the photographs;

(b)    That the plaintiffs would waive their claims against the defendants for damages arising from the causes of action raised in the suit;

(c)    That the defendants would pay the plaintiffs' standard costs in the suit as at the date of acceptance of the OTS;

(d)    That within 30 days of acceptance of the OTS, the defendants would deliver up to the plaintiffs all copies of the Hotel Photographs and/or any articles used for making the copies of the Hotel Photographs; and

(e)    That the defendants agreed that they did not have any defences to the infringement of the third plaintiffs' copyrights to the Hotel Photographs.

227    In *Man B&W Diesel S E Asia Pte Ltd and another v PT Bumi International Tankers and another appeal* [2004] 3 SLR(R) 267 ("*PT Bumi*"), the CA held (at [8]) that "generally speaking, the element of compromise should be present in an offer to settle… It should contain in it an element which would induce or facilitate settlement". The CA elaborated on this in *Resorts World at*

*The Wave Studio Pte Ltd v*                                              [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

*Sentosa Pte Ltd v Goel Adesh Kumar and another appeal* [2018] 2 SLR 1070
(at [22]):

> In determining whether an offer to settle is reasonable, serious
> or genuine, it would suffice that there is a legitimate basis for
> the offer made and the offer is not illusory – in other words, the
> offer should "not [be made] just to entail the payment of costs
> on an indemnity basis" (PT Bumi at [8]), and should not be one
> where "the offeror effectively [expects] the other party to
> capitulate (PT Bumi at [14]). There is no strict necessity for the
> offer to provide for each head of the contested claim. Nor is there
> any requirement for the offer to bear some proportionality to the
> claim. To hold otherwise would suggest that a modest but
> realistic offer will not be treated as a reasonable, serious or
> genuine offer for the purposes of O 22A as long as the sum
> offered is substantially less than the amount claimed. Such an
> interpretation would undermine the very purpose of O 22A,
> which is designed to protect a defendant who has made a
> realistic effort in response to an inflated claim from escalating
> costs should the eventual judgment be less than the amount
> offered. In the same way as it is for the plaintiff to quantify his
> claim amount, it is likewise a defendant's right to assess the
> likely sum which the plaintiff may be awarded in order to
> protect himself from adverse costs consequences by making an
> appropriate offer to settle. At the end of the day, if the offer is
> more than the judgment sum, then the costs consequences
> under O 22A would be engaged even if the offer made is
> significantly less than the amount claimed, provided that, as
> stated above, the offer has a legitimate basis and is not illusory.

228     In resisting in oral arguments on 22 March 2022 the plaintiffs'
submission that their OTS was a serious and genuine offer, the defendants'
counsel argued that "this was not an offer that would have resolved the matter
as it goes well beyond what would have been the ambit of this case as it required
admissions that the plaintiffs would have gone on to use in the US courts, and
if accepted on those terms, would have denied the defendants any redress or
defences if joined as third parties in the US action".[239]

---

[239] See NE of 22 March 2022 at p 3 line 30 to p 4 line 3.

*The Wave Studio Pte Ltd v*                                      [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

229     As noted earlier, this proposed consent judgment would have required the defendants to admit to the plaintiffs' ownership of the copyright in the Hotel Photographs and their own infringement of that copyright.  Insofar as counsel's objection seemed to be that the making of these admissions would deprive the defendants of potential "redress or defences" if they were joined as third parties in the US proceedings. I must point out firstly that no evidence was produced by the defendants to substantiate this statement. Certainly, what documentary evidence I had of the terms on which Judge Seibel struck out the US proceedings against the second defendant and stayed the proceedings against the remaining defendants did not suggest that agreement by the defendants to the proposed consent judgment "would have denied the defendants any redress or defences if joined as third parties in the US action".[240]

230     Second, insofar as counsel appeared to suggest that the OTS was not reasonable or serious or genuine because it contemplated subsequent use of the admissions in the US proceedings, the legal reasoning behind this suggestion were not explained, nor were any authorities cited in support of it. As I noted earlier (see above at [204]), in striking out the US proceedings against the second defendant and staying those proceedings against the remaining defendants, the US court expressly contemplated that the issues of whether the third plaintiff owned the copyright in the Hotel Photographs and whether GHM had infringed that copyright would be decided by a Singapore court; further, that the Singapore court's decision would "inform the resolution of the [the plaintiffs'] claims against the other defendants". Given this procedural background (which the defence was amply aware of), it was not at all clear why any intended use of the admissions in the proposed draft judgment would have gone "well beyond what would have been the ambit of this case", or why such

---

[240] ABOD Vol F at AB/F3-1506 to F3-1507; F3-1509 to F3-1510.

intended use would preclude the OTS from being "reasonable, serious or genuine".

231    Having considered parties' arguments and having scrutinised the terms of the OTS, I was satisfied that it was a serious and genuine offer. There was clearly an element of compromise present in the offer, in that the plaintiffs would waive their right to damages arising from the causes of action raised in the suit. The OTS had a legitimate basis and was not illusory. Contrary to defence counsel's contention, I also did not see anything unreasonable either about the terms of the proposed consent judgment, given that the parties were all aware that the US proceedings had been stayed in order for the plaintiffs to obtain a ruling from the Singapore courts on the issues of copyright ownership and infringement which would inform the resolution of their claims before the US courts.

*On the satisfaction of the Validity Requirement and the Favourability Requirement*

232    As summarised above, O 22A r 9(1) requires two conditions to be satisfied before the costs consequences specified therein can apply: first, the OTS must not have expired or been withdrawn before the final disposal of the claim on appeal ("the Validity Requirement"); and second, the judgment obtained must be "not less favourable" than the terms of the OTS ("the Favourability Requirement").

233    In respect of the Validity Requirement, the OTS served by the plaintiffs was not subject to an expiry date; and it has not been withdrawn by the plaintiffs: the defendant's counsel himself acknowledged as much.[241] Somewhat oddly,

---

[241] NE of 22 March 2022 at p 4 line 6 to line 8.

*The Wave Studio Pte Ltd v*                                              [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

however, the defendants' counsel argued that the OTS was still "capable of being accepted" up to the "doorstep of the appeal" and that the costs consequences specified under O 22A r 9(1) should therefore "not flow". I say this was somewhat odd because this was not a case where the offeree was trying to accept or had purported to accept an OTS after judgment was given. Counsel said that there were still "outstanding issues of AD and so on", and that "the issue is not finally disposed of"[242]. Though not fully articulated, his argument appeared to be that the OTS remained open for acceptance all the way up to (and past) the assessment of damages, and that the defendants might still do better than the terms of the OTS (or the plaintiffs might do worse) at the assessment, such that it would be somehow unfair at this stage to impose on the defendants the costs consequences specified in O 22A r 9(1).

234    I did not find any merit in the above argument. In *Ong & Ong*, the CA made it clear that an OTS would be regarded as remaining open for acceptance "so long as there is an outstanding matter not disposed of which is within the scope of the [OTS]". In the present case, where the trial was bifurcated on the issues of liability and damages, all outstanding matters in respect of liability had been disposed of by the judgment which I gave in favour of the plaintiffs: declarations on the rightful owners of the copyright and on the defendants' infringement of that copyright had been granted in the plaintiffs' favour; orders for injunctive relief and for the delivery up and forfeiting of infringing items has been given; and damages were to proceed for assessment. In my view, it was plain that the OTS had ceased to exist on account of the fact that all outstanding matters relating to liability had been disposed of.

---

[242] NE of 22 March 2022 at p 4 line 8 to line 12.

*The Wave Studio Pte Ltd v*                                          [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

235      As to the Favourability Requirement, it was also plain that this had been satisfied. The plaintiffs' OTS had called for the defendants to admit (by way of the proposed consent judgment) that the plaintiffs owned the copyright in the Hotel Photographs, that no licence was granted to any third parties to reproduce or deal with the Hotel Photographs, and that the defendants had infringed the plaintiffs' copyright in the Hotel Photographs despite knowing that neither they nor their current or former clients ever had any copyright or license to reproduce or deal with the photographs. The declaratory reliefs I granted to the plaintiffs (at [194] to [206] above) in terms of prayers 40(a), 40(b), 40(c), 40(d), 40(f), 40(h) and 40(i) essentially gave the plaintiffs what they had sought in the proposed consent judgment. Further, since they were now entitled to proceed to have damages assessed, as the plaintiffs' counsel pointed out, even assuming they received only nominal damages at the assessment, they would have done better than the terms of their OTS, since those terms would have bound them to waive their right to seek any damages.

### *On the costs and disbursements due to the plaintiffs*

236      In sum, I was satisfied that the costs consequences set out in O 22A r 9(1) were applicable in this case. The plaintiffs were thus entitled to have their costs from 5 January 2021 onwards assessed on an indemnity basis. It was not disputed that costs on the indemnity basis would usually be assessed on the basis of a one-third uplift on the costs which would be given on the standard basis: *per* the CA in *Lin Jian Wei and another v Lim Eng Hock Peter* [2011] 3 SLR 1052 at [83].

237      On this basis, the plaintiffs contended that in respect of the costs of the proceedings on liability, they should be awarded costs of $426,750 as well as disbursements totalling $131,052-93. The defendants submitted that the

114

plaintiffs should be entitled only to the sum of $130,000 in costs. The defendants also disputed the plaintiffs' entitlement to several items of disbursements; in particular, the items relating to the plaintiffs' share of the transcription fees and witness supervision fees and the fees paid for the mediations on 5 April 2019 and 26 October 2020.

238    In assessing the appropriate quantum of costs, I took into account the fact that this was a moderately complex case both legally and evidentially. While the legal issues which parties had to address were not in my view novel, they did span a fairly broad range, from copyright and contract law, to equitable doctrines such as laches and acquiescence, to the principles governing the grant of declaratory relief. The evidence in this case was quite voluminous, as it covered nearly two decades of documentary evidence: there were a total of 9 volumes of agreed bundles of documents as well as 2 volumes of plaintiffs' bundles of documents. Over and above this, counsel obviously had to contend with the fact that witnesses were recalling events some years – even decades – in the past. All of this would have had a bearing on the level of skill, specialised knowledge and responsibility and the time and labour expected on counsel. I also took into account the fact that the bulk of the work required for the trial on liability – the drafting of AEICs, the conduct of the trial and the preparation of written submissions – took place after 5 January 2021. The trial was conducted over a total of 9 hearing days. Although the defendants argued that parties were not in court for the entire day on three of the hearing dates, the work which counsel needed to do for the conduct of the trial would hardly stop the moment they were no longer before the court: considerable time would still have had to be spent doing other getting-up for the following day's hearing.

239    In light of the above factors, I was of the view that the $130,000 figure proposed by the defendants was far too low. On the other hand, the $426,750

figure proposed by the plaintiffs was rather on the high side. It appeared that counsel had derived this figure by taking the highest point of the scale given in Appendix G to the Supreme Court Practice Directions for each major stage of the proceedings on liability. I did not agree with this approach. The highest point of the Appendix G scale should be applied only to cases involving highly complex legal and/or evidential issues. The present case being one of moderate complexity, it would be reasonable to take the mid-point of the scale, while bearing in mind the fact that the range of costs stated in Appendix G serve as a guide and is not intended to be a set of inflexible rules. I add that the plaintiffs requested a number of extensions of time for the filing of their AEICs and written submissions; and the resulting delay (though not substantial) – would have caused some degree of disruption (though not substantial), which should count against them by way of a small discount on their costs.

240     Bearing the above considerations in mind, I assessed that a reasonable figure for the plaintiffs' costs of the proceedings on liability would be $300,000 (excluding disbursements).

241     As to the disbursements, I did not agree with the plaintiffs that they should be entitled to claim the fees paid for the mediation on 5 April 2019 and 26 October 2020. Insofar as the plaintiffs asserted that it was the defendants who had refused to settle the parties' dispute at the mediation sessions, there was no basis for me to accept the accuracy of this assertion: as the defendants observed,[243] it could just as well be said that the plaintiffs were the ones who had refused to settle the parties' dispute by way of mediation; and since the proceedings in mediation were confidential, there was no way the trial court would be in a position to determine which side had behaved unreasonably in the

---

[243] Defendants' Submissions on Plaintiffs' Remedies and on Costs at para 22(h).

116

*The Wave Studio Pte Ltd v*                                    [2022] SGHC 142
*General Hotel Management (Singapore) Pte Ltd*

mediation. More fundamentally, the costs of the mediation were not in any event costs incurred in the legal proceedings before the court. For these reasons, I disallowed the item of disbursement relating to the mediation fees.

242     In the interests of completeness, I add that I found the defendants' objections to the disbursements relating to the plaintiffs' share of the transcription costs and the witness supervision costs (for witnesses testifying remotely) to be unmeritorious. Both items were in my view costs reasonably incurred in the legal proceedings before the court.

243     Taking into account the removal of the item relating to mediation fees, the disbursements to be paid to the plaintiffs would come to $110,615-93.



Mavis Chionh Sze Chyi J
Judge of the High Court

Mahesh Rai s/o Vedprakash Rai, Yong Wei Jun Jonathan and Samuel Soo Kuok Heng (Drew & Napier LLC) and Llewelyn Gordon Ionwy David, Tan Lin Yin Gladys and Moh Huixian Estelle (David Llewelyn & Co LLC) for the plaintiffs; Narayanan Sreenivasan SC, Ang Mei-Ling Valerie Freda, Tan Xin Ya and Cheong Wei Yang Daryl (K&L Gates Straits Law LLC) for the defendants; Tan Jing Han Alvin (Shook Lin & Bok LLP) for non-party Agoda Company Pte Ltd (watching brief).

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore

117

**IN THE APPELLATE DIVISION OF
THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

**[2023] SGHC(A) 11**

Civil Appeal No 12 of 2022

Between

(1)  General Hotel Management
(Singapore) Pte Ltd
(2)  General Hotel Management,
Ltd

… *Appellants*

And

(1)  The Wave Studio Pte Ltd
(2)  Lee Kar Yin
(3)  The Wave Studio, LLC

… *Respondents*

Civil Appeal No 46 of 2022

Between

(1)  General Hotel Management
(Singapore) Pte Ltd
(2)  General Hotel Management,
Ltd

… *Appellants*

And

(1)  The Wave Studio Pte Ltd
(2)  Lee Kar Yin
(3)  The Wave Studio, LLC

… *Respondents*

---

# **GROUNDS OF DECISION**

---

[Intellectual Property — Copyright — Ownership]
[Intellectual Property — Copyright — Licenses]
[Civil Procedure — Offer to settle]

## TABLE OF CONTENTS

INTRODUCTION.............................................................................1

MATERIAL BACKGROUND FACTS ..........................................2

    THE PARTIES ........................................................................3

    PRODUCTION ESTIMATES ..................................................4

    TAKING OF HOTEL PHOTOGRAPHS .................................4

    USE OF THE HOTEL PHOTOGRAPHS IN THE MAGAZINE ...................................5

    PROCEDURAL HISTORY ....................................................6

DECISION BELOW.....................................................................6

ISSUES BEFORE THE COURT .................................................10

OUR DECISION ON AD 12 .......................................................10

    ISSUE 1: THE RESERVATION CLAUSE AND S 30(5) OF THE COPYRIGHT ACT.......................................................10

        *The appellants' new arguments* ...............................12

        *The proper interpretation of s 30(5) of the Copyright Act*......................22

    ISSUE 2: THE IMPLIED LICENCE OR CONSENT ARGUMENT .............................31

    ISSUE 3: THE FIRST APPELLANT'S INVOLVEMENT IN THE MAGAZINE...........34

OUR DECISION ON AD 46 .......................................................36

    WHETHER THE OTS WAS A SERIOUS AND GENUINE OFFER ...........................39

    WHETHER THE JUDGMENT OBTAINED WAS LESS FAVOURABLE ....................40

CONCLUSION ...........................................................................42

> This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

# General Hotel Management (Singapore) Pte Ltd and another
v
## The Wave Studio Pte Ltd and others

### [2023] SGHC(A) 11

Appellate Division of the High Court — Civil Appeal Nos 12 of 2022 and 46 of 2022
Steven Chong JCA, Woo Bih Li JAD and Aedit Abdullah J
13 February 2023

4 April 2023

**Steven Chong JCA (delivering the grounds of decision of the court):**

**Introduction**

1    AD/CA 12/2022 ("AD 12") and AD/CA 46/2022 ("AD 46") were appeals against the decision of a judge in the General Division of the High Court (the "Judge") delivered on 16 June 2022, reported as *The Wave Studio Pte Ltd and others v General Hotel Management (Singapore) Pte Ltd and another* [2022] SGHC 142 (the "GD").

2    AD 12 concerned the proper interpretation of a provision in the Copyright Act (Cap 63, 2006 Rev Ed) (the "Copyright Act") (which has since been repealed) in relation to the commissioning of photographs. The question that was presented to us was: when a client engages a company for a photoshoot, who owns the copyright to the photographs – the client, the company, or the photographer?

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

3        Section 30(2) of the Copyright Act provides the default position that the copyright should belong to the "author", which in the context of photographs, is the photographer. However, that default position can be displaced by s 30(5) of the Copyright Act, which provides that the copyright belongs to the client when the client makes, for valuable consideration, an agreement with another person for the taking of the photographs. In the court below, the Judge held that for the default position to be displaced, the agreement must be made with the *actual photographer* and the agreement must *solely* be for the taking of photographs. For reasons explained below, we respectfully disagreed with the Judge on this point. AD 12 was however, ultimately dismissed as the operation of s 30(5) of the Copyright Act can be excluded by agreement. This was the case here, in the light of a validly incorporated provision in the agreement between the parties which reserved the copyright of the photographs to the company engaged for the photoshoot, *ie*, the respondents.

4        AD 46 was the appellants' appeal against the Judge's award of costs on an indemnity basis. In AD 46, we had to consider whether the respondents' offer to settle ("OTS") was a serious and genuine one; and whether the judgment obtained below was not less favourable than the OTS. AD 46 was allowed on the basis that the judgment obtained was in fact less favourable than the OTS.

5        We heard both appeals on 13 February 2023. AD 12 was dismissed while AD 46 was allowed with brief oral grounds. These are our detailed grounds.

**Material background facts**

6        The background facts have been comprehensively set out in the GD at [4]–[18]. We will therefore only highlight the facts pertinent to the appeals.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

### The parties

7       The second respondent, Ms Lee Kar Yin ("Ms Lee"), an interdisciplinary artist, creative designer and entrepreneur, set up various business entities for the purpose of carrying out her work in the creative industry (collectively, "Wave"). Wave provided design, branding and marketing services. The first respondent, The Wave Studio Pte Ltd, was incorporated on 1 July 2005 in Singapore. The third respondent, The Wave Studio, LLC, was incorporated as a limited liability company in the United States under the laws of New York. Through a series of assignments effected from 2008 to 2013, the third respondent had the eventual ownership of the intellectual property rights to Wave's literary and artistic works.

8       The first appellant was incorporated in Singapore and is a wholly owned subsidiary of the second appellant. The second appellant was a company incorporated in the British Virgin Islands with its principal place of business in Singapore. The appellants were part of the General Hotel Management Group ("GHM"), which managed, operated and promoted luxury hotels and resorts all over the world.

9       Between 1995 and 2008, GHM engaged Ms Lee, as well as Wave, to provide a range of services to the hotels under its management (collectively, the "Hotels"). Wave was appointed by GHM to provide exclusive "one-stop shop" services, which included comprehensive branding and marketing designs for the Hotels that GHM were managing. At the time when Ms Lee began her working relationship with the appellants, Mr Ralf Ohletz Count von Plettenberg ("Mr Ohletz"), the Executive Vice-President of the appellants until 2010, testified that GHM was "not too concerned with the paperwork" and that their

3

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

business was done "on a handshake basis". GHM thus never entered into any formal written contract of service or commissioning contract with Ms Lee.

### *Production Estimates*

10      From the outset of Wave's working relationship with the appellants, Wave would, as part of its standard procedure, provide a document referred to as a "Production Estimate" to GHM and the Hotels for its work in respect of the marketing collaterals. Each Production Estimate contained key terms and conditions that governed the work under each purchase order. Ms Lee or the relevant Wave entity would also issue to the Hotels an invoice describing the work done, typically after the provision of the services.

11      Critically, the Production Estimates contained a clause confirming that any "*intellectual property copyright*" which arose from Wave's work on the project is owned by Wave (the "Reservation Clause"). The exact wording of this clause varied over time, though the essence of the clause remained the same. No objections were raised to the Reservation Clause over the 13 years that Wave worked with GHM and the Hotels.

### *Taking of Hotel Photographs*

12      Hotel photoshoots were included as part of the "one-stop shop" services that Wave was engaged to provide to the Hotels. These were conducted at the premises of various hotels managed by the second appellant or other companies in GHM.

13      For the photoshoots, Ms Lee engaged two photographers in the following capacities:

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

(a)      Mr Masano Kawana ("Mr Kawana") was sub-contracted by Wave for most of the photoshoots, save for the photoshoot of The Saujana, Kuala Lumpur in 2007.

(b)      Mr Lim See Kong ("Mr Lim"), an employee of Wave, was involved in the photoshoot for The Saujana, Kuala Lumpur in 2007.

14      While Mr Kawana and Mr Lim took the raw photographs, Ms Lee was present at each photoshoot and was actively involved in the planning, composition and styling of the photoshoots. After each photoshoot, Ms Lee would commence post-production editing work on the raw images, together with other employees or contractors engaged by Wave. Ms Lee would then conduct a final review to produce a curated collection of photographs appropriate for the respective hotel's branding and design (the "Hotel Photographs").

## *Use of the Hotel Photographs in The Magazine*

15      Sometime in 2012, after the parties' working relationship had ended, it came to Ms Lee's attention that some of the Hotel Photographs were featured on the websites of several online travel agencies. Subsequently, between 18 January 2013 and 30 June 2013, Ms Lee discovered that the Hotel Photographs had appeared on 242 instances in Issues 1 to 12 of GHM's in-house production magazine entitled "The Magazine", which could be accessed and downloaded *via* GHM's website. Issues of The Magazine were also available for download from other websites owned or operated by GHM and copies were distributed to the Hotels managed by GHM and to their guests.

5

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

### Procedural history

16      On 31 December 2013, the third respondent commenced an action against the second appellant and other third parties in the United States District Court (the "US Action") for copyright infringement of the Hotel Photographs. The United States District Court dismissed the third respondent's claims against the second appellant on the grounds of *forum non conveniens* and held that Singapore was the natural forum to determine the ownership of the copyright in the Hotel Photographs. The third respondent's proceedings against the other third parties for copyright infringement of the Hotel Photographs were also stayed pending the resolution of the proceedings in Singapore. Thereafter, on 19 February 2018, the respondents commenced HC/S 175/2018 ("S 175") against the appellants.

17      On 5 January 2021, the respondents served on the appellants an OTS which was not accepted. The trial of the action took place over several tranches from September 2021 to March 2022 and on 16 June 2022, the Judge rendered her decision.

### Decision below

18      The Judge found that the ownership of the copyright in the Hotel Photographs belonged to the relevant Wave entity. In order for s 30(5) of the Copyright Act to apply to photographs, the party purporting to rely on it must have made an agreement for valuable consideration with the photographer for the taking of a photograph. Furthermore, the agreement between Wave and the Hotels was not an agreement for the taking of photographs, but was an agreement for Wave to operate as a "one-stop shop" for the Hotels' branding, design and marketing needs, for which photography was only one function (GD

6

at [50]). The operation of s 30(5) of the Copyright Act was nevertheless excluded by agreement between the parties *per* s 30(3) of the Copyright Act, as the Hotels had accepted Wave's reservation of the copyright in the Hotel Photographs by accepting the Reservation Clause in the Production Estimates (GD at [51]). Through a series of copyright assignments over the years, the owner of the copyright of the Hotel Photographs became the third respondent (GD at [93]–[97]).

19     The Judge found that there was no implied term assigning the copyright in the Hotel Photographs to the Hotels, as the Reservation Clause had been accepted by the Hotels and incorporated into the agreement between the parties. The Reservation Clause was thus an express term of the agreement between the Hotels and Wave. Wave had also included the clause in the Production Estimates issued for the photoshoots and this indicated that they had no intention to assign the ownership of the copyright to the Hotels (GD at [107]– [108]). There was also no implied assignment of copyright to the second appellant (GD at [111]) or implied licence granted by Wave to "use the Hotel Photographs for general branding, marketing and/or advertising purposes" (GD at [122]).

20     The allegedly infringing acts were not disputed. The appellants' case below therefore turned on the issue of who owned the copyright in the Hotel Photographs; and alternatively, whether the Hotels and/or the second appellant had an implied licence to use them. As the Judge found in favour of the respondents on these points, the appellants were determined to have infringed the copyright in the Hotel Photographs in three ways:

(a)    First, the appellants reproduced the Hotel Photographs in The Magazine, without licence or consent from the respondents (GD at [151]).

(b)    Second, the appellants communicated the Hotel Photographs in The Magazine to the general public, by making the said publication available for download on GHM websites from (at least) January 2013 to December 2020 (GD at [152]).

(c)    Third, the appellants imported the infringing copies of The Magazine into Singapore for the purpose of trade, or by way of trade exhibiting The Magazine in public, when the appellants knew or ought reasonably to have known that the making of their publications was carried out without the licence and/or the consent of the respondents (GD at [153]–[154]).

21    The Judge rejected the first appellant's defence of non-involvement as there was evidence to demonstrate the first appellant's involvement in the management of the Hotels and the services provided by Wave to the Hotels. The Judge also drew an adverse inference against the appellants for failing to call Mr Hans Jenni ("Mr Jenni"), the President of GHM, as a witness on the publication of The Magazine. The effect of the adverse inference was to strengthen the evidence adduced by the respondents to prove the joint involvement of the first appellant in publishing the first six issues of The Magazine. The Judge also rejected the second appellant's defences of laches, acquiescence and estoppel by convention (GD at [183]–[189]).

22    The Judge thus granted the respondents the following reliefs:

(a)    declaratory relief in respect of the ownership of the copyright in the Hotel Photographs and the assignment of such copyright to the third respondent (GD at [206]);

(b)    declaratory relief that the GHM entities infringed the copyright in the Hotel Photographs (GD at [206]);

(c)    an injunction under s 119(2)(*a*) of the Copyright Act to restrain the appellants, their officers, employees, servants and agents from further infringing the respondents' copyright in the Hotel Photographs (GD at [207]);

(d)    an order under s 120 of the Copyright Act for the delivery up to the respondents of all infringing copies of the Hotel Photographs in the appellants' possession (GD at [207]); and

(e)    an order under s 120A of the Copyright Act for forfeiture to the respondents or the destruction upon oath of any infringing copies of the Hotel Photographs or any articles used for making infringing copies of the Hotel Photographs (GD at [207]).

23      As for costs, the Judge was satisfied that the costs consequences as set out in O 22A r 9(1) of the Rules of Court (2014 Rev Ed) ("ROC") were applicable, and the respondents were thus entitled to have their costs from 5 January 2021 (the date of the OTS) onwards assessed on an indemnity basis (GD at [236]). The Judge was satisfied that the OTS was a serious and genuine offer (GD at [231]). The OTS served by the respondents was not subject to an expiry date and was not withdrawn by the respondents (GD at [233]). The declaratory reliefs granted to the respondents were also in essence what the

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

respondents had sought in the proposed consent judgment set out in the OTS (GD at [235]).

**Issues before the Court**

24    The three issues to be decided in AD 12 were:

(a)    whether the Reservation Clause excluded the operation of s 30(5) of the Copyright Act, such that the respondents own the copyright in the Hotel Photographs ("Issue 1");

(b)    whether, if the respondents owned the copyright in the Hotel Photographs, there was an implied licence or consent permitting the appellants to use the Hotel Photographs to market the GHM brand or the Hotels ("Issue 2"); and

(c)    the first appellant's involvement in The Magazine ("Issue 3").

25    In AD 46, the sole issue to be considered was whether the Judge erred in ordering the appellants to pay costs on an indemnity basis.

**Our decision on AD 12**

*Issue 1: The Reservation Clause and s 30(5) of the Copyright Act*

26    In determining the ownership of the copyright in the Hotel Photographs, an accurate understanding of the scheme of s 30 of the Copyright Act is essential. The relevant portions of s 30 of the Copyright Act are as follows:

> **Ownership of copyright in original works**
>
> **30.**—
>
> ...

10

(2) Subject to this section, the author of a literary, dramatic, musical or artistic work shall be entitled to any copyright subsisting in the work by virtue of this Part.

(3) The operation of subsection (4), (5) or (6) in relation to copyright in a particular work may be excluded or modified by agreement.

(4) Where a literary, dramatic or artistic work is made by the author in pursuance of the terms of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the proprietor shall be entitled to any copyright subsisting in the work by virtue of this Part insofar as the copyright relates to —

> (*a*) publication of the work in any newspaper, magazine or similar periodical; or
>
> (*b*) reproduction of the work for the purpose of its being so published,

but not otherwise.

(5) Subject to subsection (4), where —

> (*a*) a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving by the other person; and
>
> (*b*) the work is made in pursuance of the agreement,

the first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.

27     Under s 30(2) of the Copyright Act, the default position is that the owner of the copyright is the "author". In the context of photographs, this would be the photographer as defined in s 7 of the Copyright Act. This default position can be displaced under s 30(5) of the Copyright Act where a person, the client, makes for valuable consideration, an agreement with *another person* for the

*General Hotel Management (Singapore) Pte Ltd*                     [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

taking of the photographs. It should immediately be noted that s 30(5) does not make any reference to "author". Instead, it refers to "another person", the significance of which is expounded below. The operation of s 30(5) can, however, be excluded by agreement under s 30(3).

28     The respondents asserted that s 30(5) had no application to the agreement between the parties, as the agreement was not one for the taking of photographs and there was no direct contractual relationship between the Hotels and the photographer. The appellants' arguments on appeal were noticeably new arguments, which we now turn to consider.

*The appellants' new arguments*

29     On appeal, the appellants raised arguments in relation to the proper *interpretation* of the Reservation Clause. This was strikingly different from their case at the trial. In the court below, it was the appellants' case that the Reservation Clause was not validly *incorporated* into the contract. That was the appellants' only pleaded defence against the Reservation Clause. The Judge found otherwise. We noted that there was no appeal against this finding and as such, it was no longer a live issue in the appeal that the Reservation Clause was validly incorporated into the contract.

30     It was undisputed that the appellants' arguments on the interpretation of the Reservation Clause were new, and that leave of court was required under O 57 r 9A(4) of the ROC to pursue these arguments on appeal. Having considered the scheme of s 30 of the Copyright Act, it was unsurprising that the appellants' new arguments focused on the proper interpretation of the Reservation Clause – should the appellants fail on their arguments in relation to the Reservation Clause and an implied licence, their appeal could not succeed

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

even if the Judge had erred on her interpretation of s 30(5) of the Copyright Act. However, the appellants faced two distinct difficulties in advancing their new arguments.

31    First, in their pleadings, the appellants challenged the Reservation Clause on the sole basis that it had not been validly incorporated, which was also their case at the trial. The appellants were advancing a new defence in relation to the *interpretation* of the Reservation Clause. This was essentially an attempt to advance a new case on appeal. As cautioned by the Court of Appeal in *JWR Pte Ltd v Edmond Pereira Law Corp and another* [2020] 2 SLR 744 ("*JWR*"), such conduct can amount to an abuse of the appeal process as in such a case, there would be no appeal at all. In *JWR*, the appellant attempted to advance a new allegation of negligence against the respondents that was not raised during the trial. The Court of Appeal considered that the appellant's case on appeal "sought to do much more than merely raise an additional legal point in support of its appeal" but was "seeking to discard the entire basis on which its case proceeded during the three days of trial" (*JWR* at [31]). By its new case, the appellant was not challenging the trial judge's decision with which it was dissatisfied, but was instead seeking to conduct a second trial (*JWR* at [32]).

32    While the appellants did deny in their Defence that the Reservation Clause constituted an agreement to exclude the operation of s 30(5), the appellants' case at the trial was confined to whether the Reservation Clause had been brought to the attention of GHM and/or the Hotels. This led the Judge to make the unequivocal statement that there was *no dispute* as to the interpretation of the Reservation Clause before her (GD at [67]):

> **The defendants did not dispute that the clear meaning of the Reservation Clause was that the plaintiffs retained the copyright to the Hotel Photographs.** However, the defendants

13

*General Hotel Management (Singapore) Pte Ltd*                [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

> disputed that the Reservation Clause had contractual effect:
> they submitted that the clause was unilaterally inserted by
> Ms Lee and never brought to Mr Ohletz's attention. …
>
> [emphasis added]

The Judge therefore focused her analysis on whether the Reservation Clause was *validly incorporated* into the agreement between the parties (GD at [67]–[78]). There were no findings made in relation to the *interpretation* of the Reservation Clause as there was no necessity to do so.

33     Given that the Judge made no findings in relation to the interpretation of the Reservation Clause, the appellants' appeal on this point thus could not have arisen from any dissatisfaction from the Judge's decision. The basis of this new argument did not stem from an examination of whether the Judge was wrong in reaching the conclusions set out in her decision, as this point was not even placed before her. We echoed the Court of Appeal's comments in *JWR* that an appellate court should not be treated like a second trial court, as this would be an abuse of the appeal process.

34     Second, leave of court is required under O 57 r 9A(4) of the ROC to advance any new arguments on appeal. Order 57 r 9A(4) of the ROC states:

> (4)   If a party —
>
>    (*a*)   is abandoning any point taken in the Court below; or
>
>    (*b*)   intends to apply in the course of the hearing for leave
>            to introduce a new point not taken in the Court
>            below,
>
> this should be stated clearly in the Case, and if the new point
> referred to in sub-paragraph (*b*) involves the introduction of
> fresh evidence, this should also be stated clearly in the Case
> and an application for leave must be made under Rule 16 to
> adduce the fresh evidence.

35      It should be noted that failing to indicate one's basic intention to seek leave would, in most cases, be fatal to the application for leave. As noted by this court in *Wei Ho-Hung v Lyu Jun* [2022] 2 SLR 1066, "if an appellant or respondent fails to state his intention to apply for leave in his written case, and yet comes before an appellate court to seek such leave, he should be prepared to provide a very good explanation for his omission" (at [16]).

36      Typically, leave will be granted if the new arguments pertain to a question of law where no fresh evidence or amendment to the pleadings on either side is required (*Grace Electrical Engineering Pte Ltd v Te Deum Engineering Pte Ltd* [2018] 1 SLR 76 at [36]–[37], citing *Feoso (Singapore) Pte Ltd v Faith Maritime Co Ltd* [2003] 3 SLR(R) 556 at [34]). We recognised that the new argument mounted by the appellants was concerned with a question of *contractual interpretation*. This would be an objective exercise and the subjective views of the parties and their witnesses in relation to their interpretation of the Reservation Clause might not have been decisive or relevant.

37      However, not only were the arguments on the *interpretation* of the Reservation Clause not pleaded, the appellants' case on appeal was also contradicted by their own evidence below. To illustrate this, we turn to consider the appellants' new arguments in relation to the Reservation Clause. As highlighted in the GD (at [64]), the varying forms in which the Reservation Clauses were worded included:

(a)      "We reserve the intellectual property copyright to all designs / projects undertaken";

(b)    "We reserve the intellectual property copyright to all designs / photographs / projects undertaken"; or

(c)    "We reserve the intellectual property copyright to all designs / soft copies / material / photographs / projects undertaken".

While the exact wording of this clause varied over time, the essence of the clause remained the same – that the copyright in the Hotel Photographs were reserved by the respondents.

38    On appeal, the appellants submitted that the Reservation Clause should be reasonably construed as the respondents "simply stating that they are not waiving (or are 'reserving') whatever intellectual property rights they possess or would ordinarily come to possess at law". The appellants further submitted that their proposed interpretation should not be "confused with an agreement between the parties that section 30(5) of the [Copyright Act] would be inoperative".

39    It was apparent to us that the appellants' new positive case was *contrary* to their own evidence below and advancing such new arguments would amount to an abuse of process. Significantly, in the court below, the appellants did not dispute the clear meaning of the Reservation Clause. In fact, the second appellant's pleaded defence at the trial was that Ms Lee did not bring to the second appellant or the Hotels' attention the wording of the Reservation Clause. Any dispute in relation to the interpretation of the Reservation Clause was therefore not before the Judge below.

40    The appellants' witnesses also acknowledged the clear meaning of the Reservation Clause. In particular, Ms Alison Claire Fraser ("Ms Fraser"), the

16

former General Manager of two of the Hotels operated by GHM, unequivocally stated at the trial that the effect of the Reservation Clause was that Wave reserved the copyright in the Hotel Photographs. There was also contemporaneous evidence in the form of emails where the appellants expressly acknowledged the respondents' copyright to the Hotel Photographs. As comprehensively outlined by the Judge (GD at [83]–[91]), GHM's senior management had, on at least three occasions, acknowledged that Wave was the owner of the copyright in the Hotel Photographs. This express acknowledgement was indicative of GHM's acceptance that the ownership of the copyright in the Hotel Photographs had vested in Wave.

41      In any case, we were convinced that even on a consideration of the appellants' new arguments and adopting an objective interpretation of the Reservation Clause, its meaning was clear. On appeal, the appellants made two submissions in support of its interpretation of the Reservation Clause: first, that the purpose of the Production Estimate was to communicate the estimated costs and charges for the services, and not to record any agreement between the parties in relation to the statutory position under s 30(5) of the Copyright Act. Second, within this context, the Reservation Clause should be construed to mean only that Wave was not waiving or was reserving whatever intellectual property rights they possess or would ordinarily come to possess at law. At the appeal hearing, the appellants' counsel, Dr Stanley Lai SC, further elaborated that the Reservation Clause "cannot apply to copyright that, as a matter of law, did not even reside with the respondents in the first place". This was because the language of s 30(5) of the Copyright Act appeared to allow one to "partition" the purpose for which the work is done, and therefore the Reservation Clause should not be read to have displaced the operation of s 30(5) for the works commissioned by the appellants.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

42    We disagreed with the appellants for two reasons. First, we were of the view that the purpose of the Production Estimate did not make the Reservation Clause *any less* a contractual term to govern the agreement. The effect of the Production Estimate was akin to a quotation provided by the respondents to the appellants detailing the scope of work to be done and the corresponding prices. While a mere quotation that is not intended to give rise to any binding legal obligation will not constitute an offer in law, it is necessary to consider the construction of the language of the quotation concerned (*The Law of Contract in Singapore* vol 1 (Andrew Phang Boon Leong gen ed) (Academy Publishing, 2nd Ed, 2022) at para 03.087). In the absence of any other formal contractual documents or agreements, we were of the view that the Production Estimate was an offer by the respondents which, once accepted by the appellants, formed an agreement subject to the terms set out therein. The Production Estimate contained essential terms, including the parties, the price and the subject matter. The Production Estimate also outlined the terms of the payment and a cancellation clause. There were also negotiations on the terms in the Production Estimate, and after the negotiations were complete, Mr Ohletz and/or the relevant GHM representative would sign on the Production Estimate and issue a purchase order on the terms of the Production Estimate, indicating the appellants' acceptance to the terms. The work that was carried out by the respondents were in accordance with the items listed in the Production Estimates. It was thus common ground between the parties that the various agreements were all subject to the terms set out in the various Production Estimates, one of which was the Reservation Clause. We were therefore of the view that the Production Estimates, and therefore the Reservation Clause, had legal effect.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

43    Second, while the court's task is to interpret the Reservation Clause, we were of the view that no reasonable interpretation of the Reservation Clause had been put forth by the appellants. The appellants' submission that the Reservation Clause could not reserve the copyright to the Hotel Photographs if the respondents did not already own the copyright offered no interpretation as to the meaning and scope of the Reservation Clause. Instead, the appellants' interpretation had the practical effect of *nullifying* the contractual force of the Reservation Clause which, on a plain reading, was clear that the respondents own the works that they were commissioned to create. The strained interpretation put forth by the appellants also did not sit well with the clear statutory exception in s 30(3) of the Copyright Act, that parties can modify the default position by agreement.

44    We also did not agree with the appellants' argument that s 30(5) of the Copyright Act contemplates the "partitioning" of purposes. Section 30(5) provides that "if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work." This essentially gives the commissioned party the statutory right to restrain the commissioner, *ie*, the client from exploiting the work for a purpose beyond the scope of the agreement. We were unable to see how this right of restraint led to the appellants' interpretation that the Reservation Clause was not an agreement to exclude the operation of s 30(5) of the Copyright Act.

45    We also considered a clause of similar construction to the Reservation Clause that featured in *Lee Wei Ling and another v Attorney-General* [2017] 2 SLR 786 ("*Lee Wei Ling*"). That case concerned an oral history project

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

undertaken by the Government, which involved several tape recordings and transcripts of interviews with the late Mr Lee Kuan Yew ("Mr Lee"). Mr Lee had signed an interview agreement with the Secretary to the Cabinet and the former Director of the Archives and Oral History Department of the Ministry of Culture, which contained the following clause ("Clause 2(a)"):

> 2.    The use and administration of the recordings and transcripts shall be subject to the following terms and conditions:-
>
>> (a) I retain to myself all copyright including literary property rights to the recordings and transcripts until the year two thousand (2000) or 5 years after my death, whichever is later, at which time all copyright including any literary property rights in the recordings and transcripts shall vest in the Government of Singapore;
>
> ...

The Court of Appeal determined that the effect of Clause 2(a) was that the ownership of the copyright in the interview transcripts and recording was vested in Mr Lee until the year 2000. The Court of Appeal also considered that there was evidence that Clause 2(a) was negotiated upon (*Lee Wei Ling* at [48]). This was, significantly, a departure from the default position under s 18 of the Copyright Act 1911 (Cap 46), which is, in material terms, retained in ss 197(1) and 197(5) of the Copyright Act, and which provides that the copyright in a work published under the direction or control of any Government department vests in the Government.

46    Similar to s 30(5) of the Copyright Act, s 18 of the Copyright Act 1911 provided that the copyright in the work is "subject to any agreement" made with the author. This was retained in s 197(6) of the Copyright Act. The Court of Appeal in *Lee Wei Ling* gave primacy to the "clear and unambiguous wording" of Clause 2(a) (at [47]) to vary the default statutory position. Similarly, we were

20

of the view that the language of the Reservation Clause was clear, and that primacy must be given to the parties' agreement to vary the default statutory position as *per* s 30(3) of the Copyright Act.

47     The appellants also relied on the *contra proferentem* rule in support of the argument that the Reservation Clause should be construed as the respondents stating only that they were not waiving the intellectual property rights they possess or would ordinarily come to possess at law. We were of the view that this was misconceived. It has been clearly established that, in order for the *contra proferentem* rule to apply, two questions must be considered: whether there was any ambiguity in the contract; and if so, who was the party against whom the clauses were sought to be interpreted against (*LTT Global Consultants v BMC Academy Pte Ltd* [2011] 3 SLR 903 at [56]–[57]). In our view, the present case failed at the first stage, as there was no ambiguity in the Reservation Clause. The plain language of the Reservation Clause was abundantly clear – that Wave reserved the intellectual property copyright in all designs, soft copies, material, photographs and projects undertaken.

48     For completeness, the appellants submitted that there was a "similarly worded" clause in the English Court of Appeal case of *R Griggs Groups Ltd and others v Evans and others* [2005] EWCA Civ 11 ("*Griggs*") that the court found was not incorporated. Briefly, in *Griggs*, the claimant commissioned an advertising agency to create a logo. The logo was done by the first defendant, who was working at the advertising agency on a freelance basis. The first defendant then purported to assign the legal title to the second defendant, a competitor of the claimant. The first defendant argued that he retained the copyright in the work. The case turned on the terms of the commissioning

contract between the *advertising agency* and the *first defendant*. There was evidence that the advertising agency had, on its invoices, the following clause:

> The copyright in all artwork copy story-boards and films or televised commercials and other creative works created or commissioned by the Agency will rest in the Agency. If such material is to be published or developed by the client the Agency reserves the specific right to charge an appropriate fee in respect of copyright assignment and or loss of remuneration.

49    However, the clause in issue had *no* relevance to the contract between the advertising agency and the first defendant, as the clause was found on the invoices issued by the advertising agency to the claimant. As such, while Jacob LJ remarked in *obiter* that the clause was "ill-drafted" and seemed to "prevent the client from using the material for the agreed original intended purpose" (at [24]), the clause was *irrelevant* to the dispute between the parties in *Griggs*. We were thus of the view that *Griggs* provided no assistance to the appellants' case.

50    For the above reasons, we were of the view that leave should not be granted to the appellants to advance their new points on appeal. In any case, even if leave had been granted, the appellants' arguments in relation to the interpretation of the Reservation Clause would not have succeeded.

*The proper interpretation of s 30(5) of the Copyright Act*

51    Since we had determined that there was no issue with the proper interpretation and incorporation of the Reservation Clause, the operation of s 30(5) of the Copyright Act was thus effectively excluded by agreement. The appellants' reliance on s 30(5) of the Copyright Act would not have made any difference to the outcome. Nevertheless, we provided some brief views on the proper interpretation of s 30(5).

52    Section 30(5) of the Copyright Act states:

> (5) Subject to subsection (4), where —
>
> > (*a*)    a person makes, for valuable consideration, **an agreement with another person for the taking of a photograph**, the painting or drawing of a portrait or the making of an engraving **by the other person**; and
> >
> > (*b*) **the work is made in pursuance of the agreement**,
>
> the **first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part**, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.
>
> [emphasis added]

53    We further noted that s 7 of the Copyright Act defines "author" in relation to a photograph as follows:

> "author", in relation to a photograph, means the **person who took the photograph**; …
>
> [emphasis added]

54    In the court below, the Judge was of the view that for s 30(5) of the Copyright Act to apply in favour of the appellants, the agreement must be made with the actual photographer, *ie,* Mr Kawana, the photographer who took the raw images; and that the agreement between the parties was not an agreement for the taking of photographs within the meaning of s 30(5) of the Copyright Act, but was an agreement for a "one-stop shop" service for the branding, design and marketing needs of the appellants.

55    With respect, we did not agree with either of the Judge's findings. Under s 30(5) of the Copyright Act, there is no need for privity of contract between the

client and the author. Also, the agreement did not have to be *exclusively* for photography, as long as photography was a component of the agreement. We consider each reason in turn below.

(1)      Privity of contract and s 30(5) of the Copyright Act

56      For s 30(5) of the Copyright Act to apply in favour of the appellants, there is no statutory requirement that the agreement must be with the photographer who took the photographs. A plain reading of s 30(5) is clear that there is *no* express requirement that "another person" must be the author, *ie*, the photographer. All that is required under s 30(5) of the Copyright Act is that a person (the client) must pay valuable consideration to "another person" for the taking of a photograph, and the work is made pursuant to this agreement.

57      Furthermore, the word "author", though referred to in s 30(2) of the Copyright Act, is noticeably absent in s 30(5). In our view, it is clear that this distinction between "author" and "another person" is deliberate, as Parliament shuns tautology and does not legislate in vain (*Tan Cheng Bock v Attorney-General* [2017] 2 SLR 850 at [38], citing *JD Ltd v Comptroller of Income Tax* [2006] 1 SLR 484 at [43]). As such, while "another person" is broad enough to encompass the "author", "another person" could also refer to a third party to the agreement.

58      As such, the relevant inquiry is to examine whether there was an agreement with *another person* for the taking of photographs. What is material for the operation of s 30(5) of the Copyright Act is that the photographs were taken pursuant to an agreement for valuable consideration, and the person who commissioned the photographs pursuant to the agreement has ownership of the copyright in the photographs. Any other interpretation of s 30(5) would lead to

unworkable consequences that would disadvantage parties who commissioned the taking of the photographs. It is common for photographers to be sub-contracted to create works (as Mr Kawana was, in the present case), such that there is no direct contractual relationship between the photographer and the client. If "another person" is read restrictively as the author, *ie*, the photographer, this would deprive the party who commissioned the taking of the photographs of the copyright in the work that they paid for should the commissioned party unilaterally decide to sub-contract the photoshoot to a freelance photographer. Viewed in this manner, a restrictive reading of "another person" would effectively deprive s 30(5) of its intended legal effect.

59     This was in fact the case here. As far as the appellants were concerned, it did not matter who the actual photographer was, as long as the work was done by the respondents under the agreement with the appellants. The appellants also appeared fully aware that it was not Ms Lee herself who took the photographs, but that she would sub-contract photographers for the job. The choice of photographer was completely left to Ms Lee. In fact, the appellants did not know who took the photographs until much later. However, we were of the view that this arrangement in itself did not deprive the appellants of the ownership of the copyright under s 30(5) of the Copyright Act, as there was no statutory requirement for a direct contractual relationship between the appellants and Mr Kawana.

60     We noted that the Judge below, in reliance on the High Court case of *Wang Choong Li v Wong Wan Chin* [2015] 4 SLR 41 ("*Wang Choong Li*"), concluded that a direct contractual relationship was required between the commissioning party and the photographer for the former to acquire copyright in the photographs under s 30(5) of the Copyright Act (GD at [43]). In *Wang*

*Choong Li*, the respondent bride contracted with the appellant bridal boutique owner for the provision of wedding services, including photography services. There was no documentation showing a direct contractual relationship between the respondent and the photographer, nor any testimony to that effect. The High Court noted that the respondent had engaged the appellant to provide photography and that there was no intention for the respondent to enter into a contract with the photographer. In the absence of an actual commission of the wedding day photographer by the respondent, the copyright did not reside in the respondent for the purposes of s 30(5) of the Copyright Act (*Wang Choong Li* at [63]–[64]).

61      However, we did not think that the decision in *Wang Choong Li* was helpful or relevant to the dispute before us. In *Wang Choong Li*, it was *common ground* between the parties that there must be privity of contract between the actual photographer and the client for the purposes of s 30(5) of the Copyright Act. There were no submissions on any alternative interpretation of s 30(5), and certainly none to the effect as we have explained (at [56]–[58] above). In fact, the scope of the issue before the court in *Wang Choong Li* was whether an agency relationship could be found such that privity of contract between the photographer and the client could be established (*Wang Choong Li* at [15]–[16]). Notably, the respondent in *Wang Choong Li* had attempted to justify a direct contractual relationship between the respondent and the photographer for the operation of s 30(5) of the Copyright Act on the basis of agency law, prompting Abdullah JC (as he then was) to make the finding that an agency relationship was "highly artificial" (*Wang Choong Li* at [63]). For this reason, none of the points considered above were placed before the court in *Wang Choong Li.*

26

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

62      With respect, we were of the view that the Judge's reliance on *Wang Choong Li* unduly restricted the operation of s 30(5) of the Copyright Act. However, in fairness to the Judge, we were aware that the points made at [56]–[58] above were not argued before her. The parties in the present case appeared to have proceeded on the understanding that privity of contract was required for the operation of s 30(5), with Dr Lai only requesting to adopt the interpretation of s 30(5) set out above as part of the appellants' arguments after we had outlined this during the appeal hearing.

63      For completeness, we noted the respondents' submission that there was no need for this court to determine whether privity of contract was required between the commissioning party and the author of the work as this was "no longer a live issue". The respondents pointed to the fact that the Copyright Act had been repealed and that the Copyright Act 2021 (Act 22 of 2021), which came into force on 21 November 2021, now provides that the author of a work will own the copyright in the work by default. In support of this argument, counsel for the respondents, Mr Mahesh Rai, cited the Court of Appeal case of *Tan Ng Kuang Nicky (the duly appointed joint and several liquidator of Sembawang Engineers and Constructors Pte Ltd (in compulsory liquidation)) and others v Metax Eco Solutions Pte Ltd* [2021] 1 SLR 1135 ("*Nicky Tan*"). In that case, a five-judge coram of the Court of Appeal was convened to decide a novel point of insolvency law. The parties had, however, reached a settlement but allowed the appeal to continue as if the issue was live instead of apprising the court of the settlement that had been reached. The court found that counsel had breached their duties to the court and disapproved of their conduct in proceeding with the appeal without disclosing the settlement.

27

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

64    The respondents' reliance on *Nicky Tan* was clearly misplaced. Despite the repeal of the Copyright Act, the dispute as to whether s 30(5) of the Copyright Act applied to the arrangement between the parties remained a *live issue* before this court. While our views on s 30(5) may have little application to future cases, it could hardly be said that the arguments before us on this issue were purely academic. Mr Rai readily conceded this point when this was brought to his attention.

(2)    Agreement for a "one-stop shop"

65    We were also of the view that s 30(5) of the Copyright Act did not require that the agreement be *solely* for the taking of photographs. Section 30 of the Copyright Act is situated under Part 3 on "Copyright in Original Literary, Dramatic, Musical and Artistic Works". Copyright protection for such works can be seen to achieve the overall purpose of providing incentives for the creation and production of creative works (see Ng-Loy Wee Loon, *Law of Intellectual Property of Singapore* (Sweet & Maxwell, 3rd Ed, 2021) at paras 5.1.1–5.1.2). The default position under s 30(2) is in line with this overarching rationale, as the person who creates a work enjoys first ownership of the copyright in their work.

66    However, as exceptions to the default rule, the policy goals which ss 30(4), 30(5) and 30(6) of the Copyright Act seek to achieve are slightly different. These provisions vest copyright ownership in the party that provides consideration for its creation. To illustrate, under ss 30(4) and 30(6), employers, subject to contrary agreement, are the owners of copyright in works made by their employees in the course of their employment. Specifically:

(a)     Section 30(4) provides that the copyright of literary, dramatic, musical and artistic works made by a journalist employee belongs to his or her employer.

(b)     Section 30(6) provides that the copyright of literary, dramatic, musical and artistic works made by an employee in the course of employment are vested in the employer.

67     The employer, who provides consideration through the remuneration of the employee and has an influence on the nature of the work created, has first ownership of the work made by an employee in the course of employment. This justification similarly underwrites s 30(5) of the Copyright Act, which vests first ownership in the person who commissioned the work created pursuant to an agreement. As such, reading s 30(5) in the context of the surrounding provisions, what is essential is that *valuable consideration* was paid for the taking of photographs. The agreement therefore need not be *solely* for photography services. As long as *some part* of the agreement entailed the taking of photographs, the copyright in the photographs should vest in the commissioning parties.

68     In the present case, while the respondents were engaged to be a "one-stop shop" for the appellants and to provide comprehensive branding and marketing design projects for the Hotels, a critical part of this agreement was to take photographs of each Hotel's property and vicinity that would then be used in the marketing collaterals. The numerous Production Estimates, which detailed the job description and deliverables by the respondents to the appellants, all expressly referred to "photography" and "photoshoot". It was also abundantly clear that the photoshoots were a critical part of the agreement

29

between the parties, and were heavily featured in the marketing collaterals created by Wave. This was also evidenced by the fact that at the start of their working relationship, as some of the Hotels were relatively new, photographs of the Hotel premises were particularly important to the marketing of the Hotels. Ms Lee would also on occasion organise and direct the photoshoots *in anticipation* of the Hotels and GHM later ordering marketing collaterals. Mr Ohletz also testified that the key distinguishing element of the Hotel brochures was the photography. It can thus be concluded that the agreement between the parties fundamentally entailed the taking of photographs.

69     The fact that the Hotel Photographs were touched up and edited by Ms Lee further strengthened our view that the Hotel Photographs were the work of Wave. Ms Lee had an extremely active role in the process of the photoshoots. Ms Lee gave undisputed evidence that she would "stage and art direct the photoshoot", including "direct[ing] the angles and composition of each [photograph] frame". The images taken by Mr Kawana were then further processed and edited by Ms Lee. Consequently, it was only the final images which had undergone Ms Lee's editing and review that were presented to GHM. Ms Lee's considerable creative input in the photographic process thus made it clear that the author of the Hotel Photographs was, in any event, Wave and not Mr Kawana.

70     There was thus no need for the agreement to be one *solely* for the purposes of taking photographs. If there was such a requirement, this would mean that for s 30(5) to be operative, the appellants would have had to enter into two *separate* contracts with the respondents: the first for the taking of photographs and the second for the other creative services, and only the former

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

would attract the operation of s 30(5). That would not make any commercial sense.

### Issue 2: The implied licence or consent argument

71     The appellants submitted that the Judge had also erred in finding that the reproduction of the Hotel Photographs amounted to an infringement of copyright, as there was an implied licence/consent permitting the reproduction of the Hotel Photographs for the general purpose of marketing. We were of the view that this argument could not succeed.

72     At the outset, we noted that the second appellant pleaded that there was an "implied term of the arrangement between the parties that the photographs could be used … for branding, marketing and/or advertising of Hotels or Project Hotels without restriction as to time or manner of use". For a finding of an implied term in the agreement between the parties, the appellants would have to satisfy the three-step test laid down in *Sembcorp Marine Ltd v PPL Holdings Pte Ltd and another and another appeal* [2013] 4 SLR 193 ("*Sembcorp Marine*"). This test requires the court to ascertain whether (*Sembcorp Marine* at [101]):

> (a)     there is a gap in the contract that can be remedied by implication;
>
> (b)     it is necessary in the business or commercial sense to imply the term to give the contract efficacy; and
>
> (c)     the suggested term is so obvious that if it had been suggested at the time of contracting, the parties would have agreed to such a term immediately.

31

In addition, the reference point for the implication of a term is at the time of contracting. The presumed intention of the parties thus has to be assessed at the time when they entered into the contract.

73     We note that no specific attempt was made by the appellants to satisfy any stage of the three-step test laid down in *Sembcorp Marine*. Any attempt to do so would have, in any case, failed in the face of the express language of the Reservation Clause. We agreed with the Judge below that to imply a term into the agreement would directly contradict the express reservation of copyright in the Production Estimates (GD at [107]).

74     Nevertheless, we were of the view that the appellants would not have been able to satisfy any step of the *Sembcorp Marine* test. The appellants had not shown that there was a lacuna in the agreement between Wave and GHM that must be filled by the implication of a licence in order to give effect to the parties' presumed intentions. The appellants asserted that the ambit of the licence "extended to the use of the Hotel Photographs … for future marketing activities connected with the GHM brand and Hotels managed under the GHM brand" and that this was evidenced by the respondents' awareness of the "cross-selling" that the Hotels did to market other Hotels under the GHM group, and "the reference to all the Hotels managed and operated under the GHM brand in the GHM brochure and calendars". However, in the absence of any express agreement or agreement by consent that the parties could use the Hotel Photographs in an unrestricted manner for marketing purposes, this had no relevance to the ability of the appellants or the Hotels to allow persons other than Wave to use the Hotel Photographs to produce marketing and promotional materials.

75    In relation to the second stage of the *Sembcorp Marine* test, the implication of such a term would also not have been necessary to give business efficacy to the agreements between GHM and Wave. As the Judge had found, it was in line with the concept of a "one-stop solution" aimed at ensuring a consistent "look and feel" across the various Hotels that the Hotel Photographs were produced *by Wave* only for use in the marketing and promotional materials produced *by Wave* (GD at [76]). The appellants did not adduce any evidence that there had been third party vendors that were brought in to work on the marketing and promotional materials using the Hotel Photographs, as Wave was the sole vendor which the appellants had used for almost 13 years. There was thus no *necessity* for an implied licence to be granted to the appellants to reproduce the Hotel Photographs.

76    The appellants were also unable to fulfil the last stage of the *Sembcorp Marine* test. Implying the appellants' proposed term that the Hotels had an unrestricted and perpetual licence to use the Hotel Photographs for the general purpose of marketing would also fail the third stage of the *Sembcorp Marine* test. This was an extremely broad term that was unnecessary to give business efficacy to the agreement between the parties, and also was not one to which the parties would have responded "Oh, of course!"

77    On appeal, the appellants focused on the argument that there was an *implied licence* granted to the appellants, though conceding that this was not the basis of the appellants' pleadings or case below. In support of this argument, the appellants made a comparison with a quotation provided to them by another photography company, Memphis West Pictures Pte Ltd ("Memphis West"). In particular, the appellants pointed out that Memphis West charged $2,000 per day for photography services, whereas Wave charged about $4,000 per day for

33

photography services. The quotations provided by Memphis West contained a clause stating that the images were "licensed to [the relevant Hotel] and [GHM] for use in perpetuity". Given that the Wave entities were paid twice as much compared to Memphis West, the appellants submitted that the licence to use the Hotel Photographs could not possibly be limited for use only in the marketing materials provided by the Wave entities.

78    With respect, this mathematical comparison was completely irrelevant to the matter at hand. The conduct of the parties subsequent to the date of contracting was irrelevant in determining if a term should be implied, as the reference point for the implication of a term is at the time of contracting (*Sembcorp Marine* at [127]). This was especially so in this case since the contracts which the appellants were purporting to rely on were with a different party altogether, with whom the appellants had agreed on a completely different set of terms under different circumstances.

79    As such, there was no implied licence or consent that was given to the appellants to reproduce the Hotel Photographs in The Magazine.

### *Issue 3: The first appellant's involvement in The Magazine*

80    The last issue in AD 46 was in respect of the first appellant's involvement in the production and publication of The Magazine. The appellants argued that the first appellant was not involved in the production and publication of The Magazine for the following reasons:

(a)    The first appellant was not involved in Issues 5 and 6 of The Magazine, and therefore there was "no good reason" to believe that the first appellant would be involved in Issues 1 to 4 of The Magazine.

(b)     The second appellant made the payments to The Magazine's editor. This is "strong evidence" that the second appellant was the party behind the production and publication of The Magazine.

(c)     The second appellant uploaded The Magazine to the GHM websites and made it available for download.

81     We were of the view that this argument could be easily disposed of. On the last page of the first six issues of The Magazine, the publisher and producer of The Magazine was *expressly* stated to be the first appellant. On this point alone, we were unable to see how the finding by the Judge could be said to be against the weight of the evidence.

82     Furthermore, we agreed with the Judge that there was a lack of a clear distinction between the operations of the first and second appellant. The first and second appellant shared the same directors. Mr Ohletz himself also testified that when there were insufficient funds in the accounts of the second appellant, the first appellant would assist to settle the payments. There was thus no distinction between the first and second appellants when it came to the payment of invoices and bills.

83     The appellants also submitted that the Judge was wrong to have drawn an adverse inference against the appellants for failing to call Mr Jenni (who was overall responsible for The Magazine) as a witness. We disagreed. Mr Jenni's evidence was in fact material to the proceedings, as he was responsible for the publication of The Magazine. At the hearing below, Mr Ohletz testified that Mr Jenni was "entirely in charge" of the publication of The Magazine, together with one Mr James Graf. The appellants' witnesses who testified at the trial, including Mr Ohletz and Ms Fraser, were also not involved in the publication

of The Magazine. Mr Jenni's evidence on the involvement of the first appellant with The Magazine would thus have been material. We were thus of the view that the Judge was justified in drawing an adverse inference against the appellants for failing to produce Mr Jenni at the trial.

84      For the above reasons, we were of the view that the first appellant was involved in the production and publication of The Magazine and was rightly found to be liable to the respondents.

**Our decision on AD 46**

85      In our judgment, the Judge did err in ordering costs against the appellant on an indemnity basis. Although we agreed with the Judge that the OTS was a serious and genuine one, the judgment obtained below (the "Judgment") was less favourable than the OTS.

86      It was undisputed that on 5 January 2021, the respondents served on the appellants an OTS which required the parties to agree to a draft consent judgment (attached as Annex A to the OTS) (the "Consent Judgment"). This proposed Consent Judgment required the appellants to agree to, *inter alia*, the following terms:

> (a)      that the respondents owned the copyright in the Hotel Photographs, that no licence (whether express or implied) was granted to any third parties to reproduce or deal with the Hotel Photographs in any manner, and that the appellants had wilfully and intentionally infringed the respondents' copyright in the Hotel Photographs despite knowing that neither they nor their current or former clients ever had any copyright or license to reproduce or deal with the photographs;

(b)      that the respondents and other persons or entities acting in concert or participation with GHM are permanently restrained and enjoined from using any of the Hotel Photographs anywhere on any medium for any purpose, and from enabling or facilitating any third party to use the Hotel Photographs;

(c)      that within 30 days of acceptance of the OTS, the appellants would deliver up to the respondents all copies of the Hotel Photographs and/or any articles used for making the copies of the Hotel Photographs;

(d)      that the appellants agree that they, or any other person or entity for whom GHM or their affiliates may have acted as a manager or agent (including but not limited to the GHM entities' current or former clients), did not have any rights or licences (express or implied) with respect to the copyright in the Hotel Photographs, or defences to the infringement of the third respondent's copyright in the Hotel Photographs;

(e)      that the respondents would waive their claims against the appellants for damages arising from the causes of action raised in S 175; and

(f)      that the appellants would pay the respondents' standard costs in S 175 as at the date of acceptance of the OTS.

87      Order 22A r 9(1) of the ROC states:

(1)      Where an offer to settle made by a plaintiff –

    (a)      is not withdrawn and has not expired before the disposal of the claim in respect of which the offer to settle is made; and

> (b)    is not accepted by the defendant, and the plaintiff obtains a judgment not less favourable than the terms of the offer to settle,
>
> the plaintiff is entitled to costs on the standard basis to the date an offer to settle was served and costs on the indemnity basis from that date, unless the Court orders otherwise.

88    As the appellants did not accept the respondents' OTS, the general rule on costs under O 22A r 9(1) of the ROC would apply if two conditions are satisfied. First, the OTS must not have been withdrawn or the time limit for acceptance must not have expired before the disposal of the claim in respect of which the offer to settle is made. Second, the judgment obtained is not less favourable than the terms of the OTS (*Ong & Ong Pte Ltd v Fairview Developments Pte Ltd* [2015] 2 SLR 470 at [19(f)]).

89    The principles on offers to settle are well established by several salient decisions of the Court of Appeal. In particular, the OTS must be a serious and genuine offer and not just to entail the payment of costs on an indemnity basis (*Man B&W Diesel S E Asia Pte Ltd and another v PT Bumi International Tankers and another appeal* [2004] 3 SLR(R) 267 ("*Man B&W Diesel*") at [8]). The OTS should also contain an element which would induce or facilitate settlement. As such, an offer to compromise for 100% of the amount claimed has no element of compromise in it (*Man B&W Diesel* at [11], citing *Tickell v Trifleska Pty Ltd* (1991) 25 NSWLR 353).

90    In the present case, there was no dispute that the OTS was not subject to an expiry date and had not been withdrawn by the respondents at any point. As such, the two questions before us in relation to the OTS were whether the OTS was a serious and genuine offer, and whether the Judgment obtained was less favourable than the OTS.

*General Hotel Management (Singapore) Pte Ltd*                [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

**Whether the OTS was a serious and genuine offer**

91      The appellants submitted that the OTS was not a serious and genuine offer of compromise because it required them to "capitulate on the issue of liability" after S 175 had been bifurcated.

92      In support of this, the appellants cited the case of *Colliers International (Singapore) v Senkee Logistics Pte Ltd* [2007] 2 SLR(R) 230 ("*Colliers International (Singapore)*"). In that case, the plaintiff submitted that the defendant's OTS was not a genuine or serious offer to settle but a "tactical move to obtain indemnity costs" (at [104]). The court considered that the defendant's offer of $10,000 was "derisory" in comparison to the plaintiff's claim of $300,000 (at [111]). The court also made reference to the case of *Singapore Airlines Ltd v Fujitsu Microelectronics (Malaysia) Sdn Bhd and others* [2001] 1 SLR(R) 38 where the appellant offered $347 to settle the respondent's claim of US$286,344.14 for the loss of a package which the appellant carried from Tokyo to Kuala Lumpur *via* Singapore. In that case, the court held that there was no incentive to settle nor was there a genuine effort to settle the crux of the dispute (*Colliers International (Singapore)* at [112]–[114]).

93      However, the present OTS could be clearly distinguished from that in *Colliers International (Singapore)*. Unlike the OTS in *Colliers International (Singapore)*, the present OTS was not a "tactical move" to obtain indemnity costs. There was no "derisory" offer that was made. Instead, there was a legitimate basis and incentive to settle in the offer made – that the respondents would waive their rights to damages arising from the causes of action raised in S 175. The OTS made by the respondents was for the purpose of facilitating a genuine settlement between the parties, and not just to secure indemnity costs.

We were thus of the unequivocal view that the OTS was a serious and genuine one.

### Whether the Judgment obtained was less favourable

94      In determining whether the judgment obtained is less favourable than the terms of the OTS, the court should consider *all the terms* of the OTS (*NTUC Foodfare Co-operative Ltd v SIA Engineering Co Ltd and another* [2018] 2 SLR 1043 at [21]–[22], citing *CCM Industrial Pte Ltd v Uniquetech Pte Ltd* [2009] 2 SLR(R) 20 at [40]). The settlement sum stated in the OTS would thus not be the only relevant factor.

95      The appellants submitted that the OTS required the appellants to agree that *third parties*, including those with whom the appellants no longer had any business relations, did not have any defences to a claim for copyright infringement in respect of the Hotel Photographs. There was no reason that they had to agree to such a term to resolve the specific dispute between the parties. In support of this, the appellants also pointed out that a number of third parties named as defendants in the US Action sought indemnification from the second appellant on the basis that they had received the Hotel Photographs from the second appellant, and that the Consent Judgment, if agreed to, would have resulted in significant exposure for the second appellant in the US Action. This argument led the respondents to submit that the appellants' potential exposure to indemnification claims was raised by the appellants for the first time on appeal and therefore should not be allowed.

96      In our view, the appellants' new argument in relation to the potential impact of the Consent Judgment missed the point as to whether the Judgment obtained was less favourable than the terms of the OTS. Instead, the inquiry

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

simply involved a straightforward exercise of examining the terms of the OTS
with reference to the Judgment obtained by the respondents in the court below.

97    For convenience, we set out the relevant paragraphs of the OTS in full
here:

> 2. The Plaintiffs agree to waive their claims against only the 1st
> and 2nd Defendants and not any other person or entity,
> including but not limited to the 1st and 2nd Defendants' legal
> or beneficial owners, investors, members, partners, parents,
> subsidiaries, corporate affiliates, shareholders, employees,
> officers, directors, successors, predecessors, agents,
> administrators, trustees, managers, beneficiaries, trusts,
> trustees, or assigns, for damages arising from the causes of
> action raised in the Suit.
>
> …
>
> 6. … The 1st and 2nd Defendants further agree that neither the
> 1st and 2nd Defendants nor any other person or entity for
> whom they or their affiliates may have acted as a manager or
> agent (including but not limited to the 1st and 2nd Defendants'
> current or former clients) have any defences with respect to the
> infringement of the 3rd Plaintiff's copyright in the Hotel
> Photographs.

98    Paragraph 6 of the OTS had an extremely broad effect, as it essentially
required the appellants to admit that they and *other entities*, including their
managers and agents, did not have any defences to the infringement. It should
be noted that this admission was not limited to S 175. It was also significant that
the waiver of claims set out in paragraph 2 of the OTS only extended to the
appellants and specifically excluded all other parties referred to in paragraph 6.
This might suggest that the respondents have intention to pursue their claims of
copyright infringement in the Hotel Photographs against other third parties in
the US Action following our decision. That was not before us.

41

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

99     We noted that the remedy sought in paragraph 6 was *not* pleaded by the respondents, and an examination of the Judgment revealed that the remedy sought was also not granted by the court below. This was not unexpected since the remedy sought in paragraph 6 was a remedy which the court *could not* have granted, as the court could not require the appellants to admit that other parties (who were not parties in this action) had no defences whatsoever to the infringement.

100     While the court below did grant an injunction to restrain the appellants and other entities under their control from using the photographs *moving forward*, this was clearly distinct from requiring the appellants to admit that they and *other entities*, including their managers and agents, have no defences to *any prior* infringement. Viewed in this manner, it was clear that the Judgment obtained by the respondents was indeed less favourable than the OTS.

101     Consequently, costs should have been ordered on a standard basis. The costs order was thus revised downwards from $300,000 plus disbursements to $200,000 plus disbursements.

**Conclusion**

102     The appellants' appeal in AD 12 was therefore dismissed while the appeal in AD 46 was allowed. The appellants were ordered to pay the respondents net costs of $45,000, inclusive of disbursements for both appeals.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

In addition, the respondents were ordered to refund the excess of the costs retained by them to the appellants. The usual consequential orders applied.

Steven Chong                                    Woo Bih Li
Judge of the Court of Appeal                     Judge of the Appellate Division

Aedit Abdullah
Judge

Lai Tze Chang Stanley SC, Ramesh Kumar s/o Ramasamy and Edmond Lim Tian Zhong (Allen & Gledhill LLP) for the appellants; Mahesh Rai s/o Vedprakash Rai, Yong Wei Jun Jonathan and Samuel Soo Kuok Heng (Drew & Napier LLC) for the respondents.

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore

43