**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE WAVE STUDIO, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL HOTEL MANAGEMENT LTD., *et al.*,<br><br>Defendants. | No. 7:13-cv-09239-CS-VR<br><br><br>Related Action:<br>No. 7:23-cv-03586 |

**DECLARATION OF LECK KWANG HWEE ANDY**

I, Leck Kwang Hwee Andy, declare as follows:

1.    I am the head of the Intellectual Property and Technology Practice Group in Wong & Leow LLC ("**W&L**"), a Singapore law firm, and Baker & McKenzie.Wong & Leow ("**BMWL**"), a joint law venture between Baker & McKenzie and Wong & Leow LLC.

2.    I have been retained by the Trip Defendants to provide my expert opinion in response to the Plaintiff's Opposition to the Motion to Dismiss the Plaintiff's Claims on *Forum Non Conveniens* Grounds and insofar as it concerns copyright law and civil proceedings in Singapore. W&L is being compensated for my work on this case. This compensation is not contingent upon the results of my analysis or the substance of this declaration.

3.    I have a Bachelor of Laws degree with honours from the University of Bristol, England. I was called to the Bar as an advocate and solicitor in Singapore in 1993. I also qualified as a solicitor of the Supreme Court of England and Wales in 1992, and was admitted as a solicitor in Hong Kong in 2000.

4.    In Singapore, I have specialised in the fields of intellectual property ("**IP**"), commercial and technology law, both contentious and non-contentious, since my qualification until present day. Since 2007, I have been a partner of W&L's and BMWL's IP & Technology practice group. I also served as Managing Principal of W&L and BMWL from 2013 to 2019.

5.    I was appointed by the Intellectual Property Office of Singapore ("**IPOS**") as an IP Adjudicator to hear disputes at IPOS for a two-year term from April 2021, which required me to give first-instance IPOS decisions on matters of Singapore law, with a right of appeal to the High Court. I have also been an appointed

member of the Singapore Copyright Tribunal between May 2010 and June 2024, and a mediator with the WIPO Arbitration & Mediation Centre as well as the Singapore Mediation Centre.

6.    I have received the following documents:

(a)    the Plaintiff's Second Amended Complaint dated 5 June 2023;

(b)    the Memorandum of Law in support of Trip Defendants' Motion to Dismiss Plaintiff's Claims on *Forum Non Conveniens* Grounds dated 25 August 2025 ("**Memorandum**");

(c)    the Plaintiff's Opposition to Motion to Dismiss Plaintiff's Claims on *Forum Non Conveniens* Grounds by Trip.com Group Limited, Trip.com Singapore, and Skyscanner Ltd. dated 22 September 2025 ("**Opposition**"); and

(d)    the Declaration of Gordon Ionwy David Llewelyn in support of Opposition to Trip Defendants' Motion to Dismiss Plaintiff's Claims on *Forum Non Conveniens* Grounds cited within the Opposition ("**Declaration**") and the accompanying exhibits, including the decisions of the Singapore High Court and the Appellate Division of the Singapore High Court in *The Wave Studio Pte Ltd v General Hotel Management (Singapore) Pte Ltd* [2022] SGHC 142 and *General Hotel Management (Singapore) Pte Ltd v The Wave Studio Pte Ltd* [2023] SGHC(A) 11 (collectively, the "**Singapore Decisions**").

7.    I have reviewed the abovementioned documents and respectfully offer my opinion in response based on my knowledge of and expertise on the laws of Singapore.

8.    For the purposes of this opinion, I have been asked to assume that:

(a)    the domain name www.trip.com is operated by Trip.com Travel Singapore Pte. Ltd. ("**Trip.com Singapore**");

(b)    the decisions to publish the relevant Photographs at issue in this lawsuit ("**Photographs**") on www.trip.com were made in Singapore by Trip.com Singapore;

(c)    Trip.com Singapore operates, hosts, maintains, and is responsible for www.trip.com; and

(d)    the website server for www.trip.com and the Trip.com Singapore database where the Photographs have been stored are located in Singapore.

2

## I.    SINGAPORE COURTS ARE AN ADEQUATE ALTERNATIVE FORUM TO ADJUDICATE THIS DISPUTE

9.    Singapore law permits adjudication of the subject matter of the dispute between parties. It provides appropriate causes of action and remedies commensurate with the claims pleaded in this dispute.

10.    The Singapore Copyright Act 2021 ("**CA 2021**") sets out a comprehensive statutory regime for copyright protection in, among others, artistic works such as photographs. It recognises exclusive rights to do certain acts (see paragraph 11 below) and includes provisions on infringement if those exclusive rights are done without the permission of the copyright owner.

11.    Under Singapore law, copyright in an artistic work (which includes photographs)[1] refers to the exclusive right to do all or any of the following acts:[2]

(a)    to make a copy of the work;

(b)    to publish the work if it is unpublished; and

(c)    to communicate the work to the public.

12.    The definition of "communicate", in relation to a work, means transmission of the work by electronic means, and includes making the work available (on a network or otherwise) in a way that it may be accessed by any person on demand.[3]

13.    The principles and framework under CA 2021 relating to copyright infringement can be readily applied to this case.

14.    Under Section 146(1) of CA 2021, subject to the provisions of CA 2021, copyright is infringed if:[4]

(a)    a person does in Singapore, or authorises the doing in Singapore of, any act comprised in the copyright (my emphasis added); and

(b)    the person neither owns the copyright nor has the licence of the copyright owner.

15.    Based on the facts at hand, the allegedly infringing act of communicating the Photographs to the public occurred in Singapore, such that Singapore copyright law applies.

---

[1] Copyright Act 2021, Section 20(1)(a)(i) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P12-#pr20->.
[2] Copyright Act 2021, Section 113 <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P13-#pr113->.
[3] Copyright Act 2021, Section 61(1) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P12-#pr61->.
[4] Copyright Act 2021, Section 146(1) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P13-#pr146->.

16.    To date, there are no published Singapore court decisions which deal directly with the issue as to when a communication of a photograph to the public is deemed to take place in Singapore (such that the infringement has occurred in Singapore and Singapore copyright law would apply). Nonetheless, *if* such an issue were to be decided before the Singapore courts, I am of the view that the Singapore courts would find the test adopted by the English courts persuasive.

17.    Depending on the specific subject-matter involved, English case law can be persuasive in Singapore due to the shared common law heritage between the two jurisdictions. Singapore courts are prepared to refer to English law decisions for interpretive guidance, particularly in areas where domestic jurisprudence is still evolving and equivalent statutes are *in pari materia* with Singapore law statutes (as is the case here).[5]

18.    Under the applicable test under English law, an act of communication is deemed to have occurred in-country if the person making the work available is located in the UK.[6]

19.    Assuming there was infringement (which is denied), such infringement occurred in Singapore such that Singapore copyright law applies.

20.    Section 63 of CA 2021 states that the maker of a communication is the person responsible for deciding the content of the communication when the communication is made. Section 2(1) of the Interpretation Act 1965 defines "*person*" to include any company or association or body of persons, corporate or unincorporate. In other words, the "person" referred to in Section 63 of CA 2021 does not only refer to natural persons, and may include companies and corporate bodies.

21.    Based on the assumed facts discussed above at paragraph 8, the maker of the communication of the Photographs on www.trip.com would be Trip.com Singapore. Regarding the act(s) of communication of the Photographs on www.trip.com, as Trip.com Singapore is incorporated and has its principal place of business in Singapore, under the test discussed in paragraph 18 above, such act(s) of communication are deemed to have occurred in Singapore.

22.    Because these acts of alleged infringement occurred in Singapore, the alleged infringement would have taken place in Singapore per Section 146(1) of CA 2021 (see paragraph 14 above), and the Singapore Courts would apply Singapore copyright law to hear the dispute.

---

[5]    See Copyright Act 2021, Sections 61 <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P12-#pr61-> and 113 <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P13-#pr113-> and Copyright, Designs and Patents Act 1988, Section 20 <https://www.legislation.gov.uk/ukpga/1988/48>.

[6]    Ng-Loy Wee Loon, S.C., *Law of Intellectual Property of Singapore* (Sweet & Maxwell Asia, 3rd Ed., 2021) at [10.1.9]; *Football Association Premier League Ltd v British Sky Broadcasting Ltd* [2013] EWHC 2058 (Ch) at [30] to [31].

## II.    SINGAPORE LAW PROVIDES FOR ROBUST REMEDIES COMMENSURATE WITH THE CLAIMS PLEADED IN THIS DISPUTE

23.    Under the CA 2021, a Singapore Court may grant the following remedies for a rights infringement:[7]

    (a)    an injunction to restrain further infringement (both interim and final, which may be subject to terms);

    (b)    damages (including additional damages);

    (c)    an account of profits;

    (d)    if the claimant so elects, statutory damages;

    (e)    a delivery up order; and

    (f)    a disposal order.

*24.*    Remedies for damages (including additional damages), statutory damages and an account of profits are mutually exclusive.[8] However, where a Singapore Court orders damages (with or without additional damages) in respect of a rights infringement, the Court may also order an account of profits attributable to the infringement, but only insofar as the profits have not been taken into account in computing those damages.[9]

### A.    *Damages*

25.    In cases of copyright infringement, a claimant is ordinarily entitled to <u>damages</u>. If a claimant is in the business of licensing their copyrighted works, the quantum of damages would be calculated to reflect a hypothetical licence fee or royalty.[10] In other instances, the quantum of damages would be calculated based on the depreciation in the copyrighted work's value due to the infringement, or the actual damage caused to the claimant's reputation.[11]

26.    In addition to damages, a Singapore Court may also make an award for <u>additional damages</u>, which are punitive in nature, if it is appropriate in the circumstances, and having regard to all relevant matters, including:[12]

    (a)    the flagrancy of the infringement; and

---

[7] Copyright Act 2021, Section 305(1) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr305->.
[8] Copyright Act 2021, Section 305(2) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr305->.
[9] Copyright Act 2021, Section 305(3) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr305->.
[10] *Halsbury's Laws of Singapore, Intellectual Property,* Vol. 13(3) (LexisNexis) at [160.127].
[11] *Halsbury's Laws of Singapore, Intellectual Property,* Vol. 13(3) (LexisNexis) at [160.127].
[12] Copyright Act 2021, Section 307 <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr307->.

(b)    any benefit gained by the defendant because of the infringement.

27.    A Singapore Court may grant a remedy of <u>statutory damages</u> for a rights infringement (if so elected by the claimant), in lieu of actual damages suffered.[13] An election for statutory damages is especially useful for copyright owners in situations where it is difficult to prove the quantum of actual losses.[14] The Court will assess the quantum of statutory damages, based on compensatory principles, according to the prescribed amounts in Section 308 of CA 2021.

28.    In assessing the quantum of statutory damages to award, a Singapore Court must also consider all relevant matters, including:[15]

(a)    the nature and purpose of the act constituting the rights infringement, including whether the act is of a commercial nature or otherwise;

(b)    the flagrancy of the rights infringement;

(c)    whether the defendant acted in bad faith;

(d)    any loss that the claimant has suffered or is likely to suffer because of the infringement;

(e)    any benefit gained by the defendant because of the infringement;

(f)    the conduct of the parties before and during the proceedings; and

(g)    the need to deter similar infringements.

### B.    *Account of profits*

29.    An account of profits aims to prevent an infringer from being unjustly enriched by its act(s) of infringement.[16] It requires the infringer to pay to the claimant the share of profits made from the infringement.

### C.    *Injunctive relief*

30.    A key remedy that claimants seek to obtain when suing for copyright infringement in Singapore, is injunctive relief. The Singapore Courts have the power to grant both interlocutory and final injunctions under Singapore

---

[13] Copyright Act 2021, Section 305(1)(d) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr305->.
[14] *Singapore Parliamentary Debates, Official Report* (16 November 2004) vol 78 at col 1048 (Prof S Jayakumar, Minister for Law) (PDF page 5).
[15] Copyright Act 2021, Section 308(5) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr308->.
[16] *Halsbury's Laws of Singapore, Intellectual Property*, Vol. 13(3) (LexisNexis) at [160.131].

law. Any person who intentionally disobeys or breaches an order by the Singapore Court (including that for an injunction) commits a contempt of court.[17]

31.    The Singapore Courts would have the power to enjoin Trip.com Singapore from publishing the Photographs on the www.trip.com website or otherwise disseminating, publishing and/or communicating the Photographs.

## D.    *Innocent user defence*

32.    CA 2021 also provides that no damages may be awarded for a rights infringement if, when doing that act, the person does not know and could not reasonably have known that the act is a rights infringement.[18] In other words, while this does not affect the potential *liability* of an "innocent user", it circumscribes the claimant's right to *damages* for such innocent infringement.

33.    However, innocent infringement does not prevent the Court from ordering any other remedy (including account of profits, injunctions, delivery up order, disposal order etc.) for the infringement.[19]

## E.    *No double recovery of damages*

34.    The general compensatory principle in damages is that an award of damages generally goes toward compensating a plaintiff for the *actual loss* suffered, and no further.[20] This is aligned with the principle of an award of damages – to place the plaintiff in the same position, as far as it is possible, as if the breach of contract or tort (or in this instance, the act of copyright infringement) had not occurred.[21]

35.    GHM has been found liable in the Singapore Decisions for copyright infringement. I am not aware of any publicly reported judgments or decisions relating to the quantum of damages awarded against GHM, and I assume that the claimants in the Singapore Decisions and GHM have privately agreed to terms in respect of such quantum. *If* a Singapore Court were to find the Trip Defendants liable for copyright infringement and award damages in favour of the Plaintiff, any damages awarded to the Plaintiff would, in principle, take into account the damages already paid by GHM to the Plaintiff, to the extent that there is overlap in the actual loss suffered by the Plaintiff.

36.    I further attach hereto Exhibits A to G to this declaration:

    (a)    Exhibit A is a true and correct copy of Sections 20, 61, 63, 113, 146, 305, 306, 307 and 308 of the Copyright Act 2021 <https://sso.agc.gov.sg/Act/CA2021>, as of 3 October 2025.

---

[17] Administration of Justice (Protection) Act 2016, Section 4(1) <https://sso.agc.gov.sg/Act/AJPA2016?ProvIds=P12-#pr4->.
[18] Copyright Act 2021, Section 306(1) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr306->.
[19] Copyright Act 2021, Section 306(2) <https://sso.agc.gov.sg/Act/CA2021?ProvIds=P16-#pr306->.
[20] *Lo Kok Jong v Eng Beng* [2024] 1 SLR 964 at [14].
[21] *Lo Kok Jong v Eng Beng* [2024] 1 SLR 964 at [14].

(b)     Exhibit B is a true and correct copy of Section 4(1) of the Administration of Justice (Protection) Act 2016 <https://sso.agc.gov.sg/Act/AJPA2016?ProvIds=P12-#pr4->, as of 3 October 2025.

(c)     Exhibit C is a true and correct copy of *Lo Kok Jong v Eng Beng* [2024] 1 SLR 964 (see [14]).

(d)     Exhibit D is a true and correct copy of *Football Association Premier League Ltd v British Sky Broadcasting Ltd* [2013] EWHC 2058 (Ch*)* (see [30] to [31]).

(e)     Exhibit E is a true and correct copy of excerpts from *Halsbury's Laws of Singapore, Intellectual Property,* Vol. 13(3) (LexisNexis) (see [160.127] and [160.131]).

(f)     Exhibit F is a true and correct copy of excerpts from Ng-Loy Wee Loon, S.C., *Law of Intellectual Property of Singapore* (Sweet & Maxwell Asia, 3rd Ed., 2021) (see [10.1.9]).

(g)     Exhibit G is a true and correct copy of excerpts from *Singapore Parliamentary Debates, Official Report* (16 November 2004) vol 78 at cols 1041 to 1048 (Prof S Jayakumar, Minister for Law).

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on this 5th day of October 2025 (EDT) at Singapore.

_____

Leck Kwang Hwee Andy

# EXHIBIT A

# COPYRIGHT ACT 2021

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act to repeal and re-enact the Copyright Act (Chapter 63 of the 2006 Revised Edition) to provide for copyright, the protection of performances and related rights, and to make related and consequential amendments to certain other Acts.

[21 November 2021: Except Division 2 of Part 9 and sections 501(2) and (3) and 507(4)(*c*) and (10) ;

1 April 2022: Sections 501(2) and (3) and 507(10) ;

1 May 2024: Division 2 of Part 9 and section 507(4)(*c*) ]

**What is an artistic work**

**20.**—(1)  An "artistic work" —

(*a*)   is any of the following:

(i)    a painting, a sculpture, a drawing, an engraving or a photograph (whether the work is of artistic quality or not);

(ii)   a building or a model of a building (whether the building or model is of artistic quality or not);

(iii)  a work of artistic craftsmanship to which neither sub-paragraph (i) nor (ii) applies; but

(*b*)   does not include a layout-design or an integrated circuit as defined in section 2(1) of the Layout-Designs of Integrated Circuits Act 1999.

(2)  For the purposes of this Act —

"building" includes a structure of any kind;

"drawing" includes any diagram, map, chart or plan;

"engraving" includes an etching, a lithograph, a product of photogravure, a woodcut, a print or any other similar work, but not a photograph;

"photograph" —

(*a*)   is a product of —

     (i)   photography or a similar process; or

     (ii)   xerography; but

  (*b*)   does not include any article or thing in which the visual images of a film are embodied;

"sculpture" includes a cast or model made for purposes of sculpture.

## What does communicate mean

**61.**—(1)  "Communicate", in relation to a work or performance, means to transmit the work or performance by electronic means, and includes —

  (*a*)   broadcasting the work or performance;

  (*b*)   the inclusion of the work or performance in a cable programme; and

  (*c*)   making the work or performance available (on a network or otherwise) in a way that it may be accessed by any person on demand.

*[Act 32 of 2024 wef 25/11/2024]*

(2)  For the purposes of subsection (1), it does not matter —

  (*a*)   whether the transmission is over a path or a combination of paths;

  (*b*)   whether the path or paths are provided by a material substance or by wireless means or otherwise; and

  (*c*)   whether the work or performance is sent in response to a request.

(3)  "Communication" has a corresponding meaning.

## Who is the maker of a communication

**63.**  The maker of a communication (other than a broadcast) is the person responsible for deciding the content of the communication when the communication is made.

## Nature of copyright in artistic works

**113.**  For the purposes of this Act, unless the contrary intention appears, copyright in an artistic work is the exclusive right to do all or any of the following acts:

  (*a*)   to make a copy of the work;

  (*b*)   to publish the work if it is unpublished;

  (*c*)   to communicate the work to the public.

**Infringement by doing act comprised in copyright**

**146.**—(1)  Subject to the provisions of this Act, copyright is infringed if —

    (*a*)  a person does in Singapore, or authorises the doing in Singapore of, any act comprised in the copyright; and

    (*b*)  the person neither owns the copyright nor has the licence of the copyright owner.

(2)  For the purposes of subsection (1) —

    (*a*)  in the case of a sound recording — it does not matter whether an act is done by directly or indirectly making use of a copy of the recording; and

    (*b*)  in the case of a broadcast or a cable programme — it does not matter whether an act is done —

        (i)  by the reception of the broadcast or programme; or

        (ii)  by making use of any article or thing in which the visual images and sounds comprised in the broadcast or programme are embodied.

**Remedies**

**305.**—(1)  Subject to the provisions of this Act, the remedies that the Court may grant for a rights infringement include —

    (*a*)  an injunction (which may be subject to terms);

    (*b*)  damages, including additional damages under section 307;

    (*c*)  an account of profits;

    (*d*)  if the claimant so elects, statutory damages in accordance with section 308;

    (*e*)  a delivery up order; and

    (*f*)  a disposal order.

(2)  Subject to subsection (3), the remedies in subsection (1)(*b*), (*c*) and (*d*) are mutually exclusive.

(3)  Where the Court orders damages (with or without additional damages) under subsection (1)(*b*) in respect of a rights infringement, the Court may also order an account of profits attributable to the infringement, but only insofar as the profits have not been taken into account in computing those damages.

**No damages for innocent rights infringement**

**306.**—(1) Where a person does an act that constitutes a rights infringement, damages may not be ordered for the infringement if, when doing that act, the person does not know and could not reasonably have known that the act is a rights infringement.

(2) To avoid doubt, subsection (1) does not prevent the Court from ordering any other remedy (including an account of profits) for the infringement.

**Measure of damages**

**307.** The Court may order additional damages for a rights infringement if it is appropriate in the circumstances, having regard to all relevant matters, including —

> (*a*)   the flagrancy of the infringement; and

> (*b*)   any benefit gained by the defendant because of the infringement.

**Measure of statutory damages**

**308.**—(1) This section applies where a claimant in an infringement action elects for statutory damages.

(2) The amount of statutory damages must not exceed —

> (*a*)   $10,000 for each work or performance that is the subject of the action;

> (*b*)   $200,000 for all the works that are the subject of the action; and

> (*c*)   $200,000 for all the performances that are the subject of the action.

(3) However, subsection (2)(*b*) and (*c*) does not apply if the claimant proves that the claimant's actual loss for all the works or performances that are the subject of the action exceeds $200,000.

(4) If separate and independent works, or recordings of protected performances, are assembled into one whole, they are taken to be one work for the purposes of subsection (2).

(5) In deciding the amount of statutory damages to award, the Court must consider all relevant matters, including —

> (*a*)   the nature and purpose of the act constituting the rights infringement, including whether the act is of a commercial nature or otherwise;

> (*b*)   the flagrancy of the rights infringement;

> (*c*)   whether the defendant acted in bad faith;

> (*d*)   any loss that the claimant has suffered or is likely to suffer because of the

infringement;

(*e*)  any benefit gained by the defendant because of the infringement;

(*f*)  the conduct of the parties before and during the proceedings; and

(*g*)  the need to deter similar infringements.

# EXHIBIT B

# ADMINISTRATION OF JUSTICE
# (PROTECTION) ACT 2016

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act to state and consolidate the law of contempt of court for the protection of the administration of justice, to define the powers of certain courts in punishing contempt of court and to regulate their procedure in relation thereto.

[1 October 2017]

**Contempt by disobedience of court order or undertaking, etc.**

**4.**—(1)  Any person who —

　　(*a*)  intentionally disobeys or breaches any judgment, decree, direction, order, writ or other process of a court; or

　　(*b*)  intentionally breaches any undertaking given to a court,

commits a contempt of court.

(2)  For the purposes of subsection (1), intentional disposal by a person against whom an enforcement order for attachment of a debt has been made, otherwise than in accordance with law or with permission of the court, of any property subject to the order in his or her hands or under his or her control, is contempt of court.

*[Act 25 of 2021 wef 01/04/2022]*

(3)  Without limiting subsection (1), a person commits a contempt of court if the person —

　　(*a*)  being legally bound to produce or deliver any document to the court, intentionally omits to so produce or deliver up the document;

　　(*b*)  being legally bound to bind himself or herself by oath or affirmation to state the truth, refuses to so bind himself or herself;

　　(*c*)  being legally bound to state the truth on any subject to the court, refuses to answer any question demanded of him or her touching that subject by the court in the exercise of the lawful powers of the court; or

　　(*d*)  refuses to sign any statement made by him or her, when required to sign that statement by a court lawfully competent to require that he or she sign that statement.

(4) Subject to subsections (5), (6) and (7), any contempt of court referred to in subsection (1) or (2) may be waived by the aggrieved party and such waiver relieves from liability the person who commits the contempt.

(5) The court may, in its discretion, disallow the waiver of any contempt of court mentioned in subsection (1) or (2) in any of the following circumstances:

 (*a*) the Attorney-General has authorised investigations pursuant to section 22 for the contempt of court;

 (*b*) proceedings have been commenced in respect of the contempt of court;

 (*c*) the contempt of court is of such a nature that it interferes with, obstructs or poses a real risk of interference with or obstruction of the administration of justice;

 (*d*) it would be contrary to the public interest to allow the waiver.

(6) The court may, in granting any waiver of contempt of court under subsection (4), impose such conditions as it thinks fit.

(7) To avoid doubt, contempt of court referred to in subsection (3) may not be waived.

(8) A person who is not a party to an action commits contempt if he or she causes or abets the breach of any judgment, decree, direction, order, writ or other process of a court, with the intention of causing such breach or knowing that it would cause such breach.

(9) In this section —

 "aggrieved party" means a party to the relevant proceedings for whose benefit any judgment, decree, direction, order, writ or other process of a court is given, made or issued, or any undertaking to a court is given, in proceedings other than a proceeding against a person in respect of any offence;

 "undertaking given to a court" includes an implied undertaking given to a court.

# EXHIBIT C

# Lo Kok Jong
### v
# Eng Beng

## [2024] SGCA 28

Court of Appeal — Civil Appeal No 4 of 2024
Sundaresh Menon CJ, Tay Yong Kwang JCA and Steven Chong JCA
27 June 2024; 8 August 2024

*Damages* — *Measure of damages* — *Personal injuries*

*Damages* — *Rules in awarding* — *Rule against double recovery* — *Plaintiff's medical expenses paid for by government subsidies and grants* — *Whether such subsidies exempt from rule against double recovery*

*Damages* — *Special damages* — *Medical expenses*

**Facts**

On 9 January 2020, the respondent was crossing a road when she was hit by a vehicle driven by the appellant. The respondent suffered personal injuries, including a fracture of her right ankle. The respondent filed a negligence suit against the appellant, seeking general and special damages. By consent, interlocutory judgment was entered in the respondent's favour at 85% against the appellant with damages to be assessed.

The deputy registrar ("DR") awarded damages totalling $36,348.64, comprising: (a) general damages for pain and suffering caused to the respondent; and (b) special damages for medical and transport expenses paid for by the respondent. However, the DR refused to award the sum of $39,515.08 (the "Disputed Sum") claimed by the respondent in special damages for medical expenses which were paid for by certain government subsidies and grants (the "Subsidies and Grants"). On appeal, the district judge (the "DJ") affirmed the DR's decision.

The judge of the General Division of the High Court below (the "Judge") allowed the respondent's appeal against the DJ's decision and directed the respondent to return the Disputed Sum to the Ministry of Health (the "MOH") (the "Repayment Order") for the MOH to take any action it deemed fit, including whether to allow the respondent to retain the Subsidies and Grants. The appellant appealed.

**Held, allowing the appeal:**

(1) Damages were generally compensatory in nature and went towards compensating a plaintiff for the actual loss suffered. Thus, collateral benefits received by the plaintiff, which he or she would not have but for the injury, would *prima facie* be taken into account in calculating the damages to be awarded. This was one facet of the rule against double recovery: at [14] and [16].

(2) There were two established exceptions to the rule against double recovery. First, under the "Insurance Exception", where a plaintiff received an insurance

payout for which he or she had paid the premiums, such payouts were not deductible from the damages payable. Second, under the "Benevolence Exception", where a plaintiff received money from the benevolence of third parties, the money received was similarly not deductible from the damages payable. The list of exceptions remained open: at [17].

(3)     A rule of general application for deciding whether a payment should be exempt from the rule against double recovery remained elusive. Three types of reasoning were often relied on by courts in this area of law: (a) causation – the idea that certain payments were caused not by the tort, but by some other factor (such as insurance premiums or the benevolence of other parties), and should therefore be exempt from the rule against double recovery; (b) the argument that certain payments were "collateral", "*res inter alios acta*" (*ie*, matters between other parties), or "remote" matters which should not be considered in the assessment of damages; and (c) an intuitive sense of injustice if the tortfeasor were to pay a reduced amount in damages on account of the collateral benefit: at [20] to [25].

(4)     These types of reasoning were not helpful in assisting the court's analysis. First, the causation analysis said nothing about the reasons for attributing causal responsibility to a certain event. Second, the terms "collateral", "*res inter alios acta*", or "remote" were vague and did not provide a practical test of general application. Third, relying on an intuitive sense of injustice was plainly flawed: at [26] to [28].

(5)     A more principled test of general application for the deductibility of collateral benefits was developed in *National Insurance Co of New Zealand Ltd v Espagne* [1961] Qd R 277, which focused on the intended purpose of a payment: at [32].

(6)     The proper question was whether the plaintiff was intended to enjoy the relevant payment over and above the damages payable. In the absence of such intention, the default rule against double recovery should be reverted to. The corollary of this was that the question of intent was not concerned with whether it was intended that the tortfeasor should benefit from the payment – it would almost never be the case that such intention would be found. Hence, focusing on such intention would contradict the fundamental rule that damages for negligence were intended to be purely compensatory: at [34].

(7)     The appropriate test of general application was whether the intended purpose of the payment, objectively judged, was to provide the plaintiff with a sum to be enjoyed over and above the damages payable: at [36].

(8)     Several key indicia were helpful in applying this test: (a) whether the plaintiff contributed to the payment; (b) whether the payment was in the nature of an indemnity for the type of loss for which damages were sought; (c) the source of the payment; and (d) the group of persons to whom the payment was made available: at [56].

(9)     Excessive weight should not be placed on public policy considerations in deciding whether a payment should be exempt from the rule against double recovery: at [66].

(10)    Turning to the present case, the position at common law was that government subsidies and grants going towards a plaintiff's medical expenses were deductible from the damages payable by a tortfeasor: at [67].

(11)    This position accorded with principle. All four indicia indicated that there was no intention for the Subsidies and Grants to be enjoyed by the respondent on top of the damages payable. The respondent did not contribute to the Subsidies and Grants, which were targeted specifically at the loss for which she claimed the Disputed Sum in damages (and therefore were a substitute for the damages claimed) and were benefits made available by the government to the general public to cover any medical expenses they might incur. Thus, the default rule against double recovery applied such that the Subsidies and Grants were deductible from the damages payable: at [75], [80] and [81].

(12)    *Noor Azlin bte Abdul Rahman v Changi General Hospital Pte Ltd* [2021] SGHC 10 did not stand for the proposition that all government subsidies were not deductible from damages payable, regardless of their nature, type and the relevant application process. The test of objective intended purpose was a highly fact-centric exercise – in the context of government subsidies, this would naturally involve an inquiry into the specifics of the particular subsidy at hand. It was clear in the present case that the Subsidies and Grants were not targeted specifically at the respondent and were general subsidies available to all Singaporeans and Permanent Residents. Thus, no intention for the Subsidies and Grants to be enjoyed over and above the damages payable could be inferred: at [83] and [85].

(13)    The Repayment Order did not engage the rule against double recovery. The real issue here was whether the court had the power (and if so, whether the court should exercise this power) to order the proposed repayment: at [89].

(14)    Unlike in *Minichit Bunhom v Jazali bin Kastari* [2018] 1 SLR 1037, where there was a contractual mechanism in place for the victim to repay recovered sums from the tortfeasor to the victim's employer, there was no legal basis for making a repayment order in this case: at [96].

(15)    The institution of a recoupment mechanism was a legislative and executive matter which clearly lay outside the province of the courts. There were also logistical problems associated with the court making repayment orders. Ultimately, it was both unprincipled and impractical for the court to institute a recoupment mechanism on its own accord: at [97] to [100].

[Observation: The respondent's chief complaint was that the ordinary taxpayer should not be made to bear the appellant's liability. However, it was increasingly recognised that losses suffered by victims of motor accidents were a general social burden. Whether via the mechanism of insurance or government subsidies, society as a whole bore such losses. Thus, any notion of the "fairness" of making the tortfeasor instead of the government bear the victim's losses was illusory. Ultimately, true fairness in the present case lay in respecting the fundamental compensatory aim of damages as well as the court's role in this policy-laden area of law: at [101] to [104].]

**Case(s) referred to**

*ACB v Thomson Medical Pte Ltd* [2017] 1 SLR 918 (refd)

*ACES System Development Pte Ltd v Yenty Lily* [2013] 4 SLR 1317 (folld)

*Bradburn v Great Western Railway Co* [1874–80] All ER Rep 195 (folld)

*Eng Beng v Lo Kok Jong* [2022] SGDC 130 (refd)

*Eng Beng v Lo Kok Jong* [2023] SGHC 63 (overd)

*Gaca v Pirelli* [2004] 1 WLR 2683 (refd)

*Graham v Baker* [1961] HCA 48 (refd)

*Hodgson v Trapp* [1989] AC 807 (folld)

*Housecroft v Burnett* [1986] 1 All ER 332 (refd)

*Hussain v New Taplow Paper Mills Ltd* [1987] 1 WLR 336 (folld)

*Hussain v New Taplow Paper Mills* [1988] AC 514 (folld)

*IBM Canada Ltd v Waterman* [2013] 3 SCR 985 (folld)

*Leong Yock Mui v Lek Long Peow* [2023] SGDC 307 (refd)

*Lim Kiat Boon v Lim Seu Kong* [1980] 2 MLJ 39 (refd)

*Manser v Spry* [1994] HCA 50 (folld)

*Minichit Bunhom v Jazali bin Kastari* [2018] 1 SLR 1037 (distd)

*Mitchell v Mulholland (No 2)* [1972] 1 QB 65 (refd)

*National Insurance Co of New Zealand Ltd v Espagne* [1961] Qd R 277 (folld)

*Noor Azlin bte Abdul Rahman v Changi General Hospital Pte Ltd* [2021] SGHC 10 (distd)

*Noor Azlin bte Abdul Rahman v Changi General Hospital Pte Ltd* [2022] 1 SLR 689 (refd)

*Parry v Cleaver* [1970] AC 1 (folld)

*Payne v Railway Executive* [1952] 1 KB 26 (refd)

*Redding v Lee* [1983] HCA 16 (folld)

*Redpath v Belfast and County Down Railway* [1947] NI 167 (folld)

*Richard v Mills* (2003 27 WAR 200) (refd)

*Sylvester v British Columbia* [1997] 2 SCR 315 (folld)

*The MARA* [2000] 3 SLR(R) 31; [2000] 4 SLR 156 (folld)

*Turf Club Auto Emporium Pte Ltd v Yeo Boong Hua* [2018] 2 SLR 655 (folld)

*West v Shephard* [1964] AC 326 (refd)

*Westwood v Secretary of State for Employment* [1985] AC 20 (refd)

*Zheng v Cai* [2009] HCA 52 (folld)

**Legislation referred to**

Employment of Foreign Manpower Act (Cap 91A, 2009 Rev Ed)

Pioneer Generation and Merdeka Generation Funds Act 2014 (2020 Rev Ed) ss 12, 16(1)(*f*)

Pioneer Generation and Merdeka Generation Funds (Pioneer Generation and Merdeka Generation Benefits) Regulations 2015 reg 5

Health and Social Care (Community Health and Standards) Act 2003 (c 43) (UK) ss 150, 162

Law Reform (Personal Injuries) Act 1948 (c 41) (UK) s 2

Social Security Act 1989 (c 24) (UK)
Social Security (Recovery of Benefits) Act 1997 (c 27) (UK)

*Yeo Kim Hai Patrick, Lim Hui Ying and Ooi Jingyu (Legal Solutions LLC) for
the appellant;*
*VM Vidthiya (Victory Law Chambers LLC) for the respondent.*

[Editorial note: This was an appeal from the decision of the High Court (General
Division) in [2023] SGHC 63.]

8 August 2024

**Steven Chong JCA (delivering the grounds of decision of the court):**

**Introduction**

1      A claim arising from a road accident would typically comprise general
damages for pain and suffering and special damages for medical and other
expenses. In Singapore, various subsidies and grants are made available by
the government to its citizens to defray some medical expenses. However,
such subsidies and grants are payable, subject to certain criteria, upon the
incurrence of the medical expenses and *not* only in the context of injuries
occasioned by accidents.

2      Quite often, in suits brought by victims of road accidents against the
tortfeasors, the claims would include such subsidies and grants which were
not paid for by the victims. Given that damages in tort claims are
compensatory in nature, on its face, such claims would offend the rule
against double recovery. While the law has developed exceptions to that
rule, it appears from some decisions that there is a general tendency to
analogise the government payouts with the exceptions to the rule against
double recovery in the court's intuitive quest to ensure that the tortfeasor
does not benefit from such payouts. In our view, such efforts may obfuscate
the true factors that should properly guide the exercise in ascertaining the
intention behind the subsidies and grants.

3      We heard and allowed this appeal on 27 June 2024. It was clear to us
that the judge of the General Division of the High Court below (the
"Judge"), in holding that the government subsidies and grants totalling
$39,515.08 (the "Subsidies and Grants") should not be deducted from the
claim, failed to apply his mind to the relevant test as regards the
applicability of the exceptions, *ie*, whether the respondent was intended to
enjoy the Subsidies and Grants over and above what she might recover
against the appellant. In the absence of such intention, the default rule
against double recovery should apply.

4      In our grounds of decision, we take the opportunity to explain the test
and objective indicia which should guide the court in its determination as

to whether the disputed payouts fall within the exceptions to the rule against double recovery.

## Facts

5    On 9 January 2020, the respondent was crossing a road when she was hit by a vehicle driven by the appellant. The respondent sustained personal injuries as a result, including a closed trimalleolar fracture of her right ankle.

6    The respondent filed a negligence suit against the appellant, seeking general and special damages. By consent, interlocutory judgment was entered in the respondent's favour at 85% against the appellant with damages to be assessed.

## Procedural background

### *Proceedings in the State Courts*

7    The deputy registrar (the "DR") awarded damages totalling $36,348.64, comprising: (a) general damages for pain and suffering caused to the respondent; and (b) special damages for medical and transport expenses paid by the respondent in cash or through Medisave or MediShield. However, the DR declined to award the sum of $39,515.08 (the "Disputed Sum") claimed by the respondent in special damages for the medical expenses which were paid for by the Subsidies and Grants. The Subsidies and Grants comprised:

(a)    generic government subsidies of $19,211.57 (the "Generic Government Subsidies");

(b)    Pioneer Generation subsidies of $148.88 (the "PG Subsidies"); and

(c)    government grants for Community Hospital Services and medical drugs (the "Community Grants") of $20,155.16.

8    The DR held that the Subsidies and Grants did not fall under either of the established exceptions to the rule against double recovery: (a) the insurance exception (the "Insurance Exception"); and (b) the benevolence exception (the "Benevolence Exception"). First, unlike insurance payouts, government subsidies could hardly be considered the "fruits" of a citizen's "thrift and foresight", which was the underlying rationale for the Insurance Exception. Second, the DR considered that the key criterion for falling within the Benevolence Exception was that the moneys were "intended for [the plaintiff's] enjoyment, and not provided in relief of any liability in others fully to compensate him". In the absence of clear parliamentary indication that the Subsidies and Grants were intended as such, there was no material to suggest that Parliament intended to depart from the general

rule against double recovery. Hence, the DR declined to award the Disputed Sum. On appeal, the district judge (the "DJ") affirmed the DR's decision.

### Decision below

9    The respondent appealed to the General Division of the High Court. The Judge allowed the appeal, finding that the Subsidies and Grants fell within the Benevolence Exception as they were meant to assist the respondent with her medical bills in view of her financial needs, and were not designed to relieve any potential tortfeasor from his liability to fully compensate the victim for the injuries arising from any tortious wrong. The Judge therefore found that there was nothing wrong with the respondent effectively being allowed to "encash" the Subsidies and Grants. Nevertheless, in light of the respondent's willingness to return the Subsidies and Grants to the relevant authority, the Judge directed the respondent to return the Disputed Sum to the Ministry of Health (the "MOH") (the "Repayment Order") for the MOH to take any action it deemed fit, including whether to allow the respondent to retain the Subsidies and Grants. The Judge noted that the Repayment Order would address concerns that the respondent would enjoy double recovery if the Disputed Sum were to be paid directly to her.

### The parties' cases

10    The appellant appealed to the Appellate Division of the High Court. On this court's motion, the appeal was transferred to this court since it involved a novel point of law of significance to personal injury cases and the wider insurance industry in Singapore.

11    The appellant submitted that in the absence of clear parliamentary intent that the Subsidies and Grants were meant to be enjoyed by the respondent over and above the damages payable by the appellant, the rule against double recovery should apply. The appellant also submitted that the Judge erred in making the Repayment Order as it contradicted his finding that the Subsidies and Grants were exempt from the rule against double recovery. In any event, the MOH did not have the power to receive repayment of the Subsidies and Grants.

12    The respondent submitted that the Subsidies and Grants were specifically intended to benefit her and not to lessen a tortfeasor's liability towards a victim. Therefore, the Subsidies and Grants (and government subsidies in general) were exempt from the rule against double recovery. The respondent argued that the Repayment Order sufficiently addressed concerns over double recovery and noted that the MOH was agreeable to the respondent repaying the Subsidies and Grants via a donation to the Rare Diseases Fund.

**Issues to be determined**

13    There were two issues before this court: (a) whether the Subsidies and Grants should be exempt from the rule against double recovery; and (b) whether the court should order repayment of the Subsidies and Grants to the MOH.

**Our decision**

*The exceptions to the rule against double recovery*

14    Damages are generally *compensatory* in nature. Whether in contract or tort law, an award of damages generally goes toward compensating a plaintiff for the *actual loss* he or she has suffered, and no further: see *Turf Club Auto Emporium Pte Ltd and others v Yeo Boong Hua and others and another appeal* [2018] 2 SLR 655 ("*Turf Club*") at [1]. The logic underpinning this principle is self-evident – the aim of an award of damages is to place the plaintiff in the same position, as far as it is possible, as if the breach of contract or tort had not occurred: see *ACES System Development Pte Ltd v Yenty Lily (trading as Access International Services)* [2013] 4 SLR 1317 at [14].

15    There are, of course, other types of damages, such as punitive or restitutionary damages (the latter has yet to be decisively recognised in Singapore): see *ACB v Thomson Medical Pte Ltd and others* [2017] 1 SLR 918 ("*ACB*") at [153]–[206] and *Turf Club* at [250]–[255]. However, as the underlying rationale for these types of damages is different to that for compensatory damages, it is unsurprising that punitive or restitutionary damages may be available only in very limited circumstances: *ACB* at [176] and *Turf Club* at [254]. Importantly, these types of damages were *not* claimed in the present case.

16    One consequence of the general compensatory principle in damages is that any gain received by the plaintiff, which he or she would not have but for the injury, will *prima facie* be taken into account in calculating the damages to be awarded. In other words, such gains – commonly referred to as "collateral benefits" – will be *deductible* from the damages payable by the tortfeasor. This is one facet of the rule against double recovery, which stems from the principle that a plaintiff should be compensated only for his or her actual loss.

17    However, common sense comes in to ameliorate the rigid operation of the rule against double recovery in respect of certain collateral benefits. First, where a plaintiff receives an insurance payout for which he or she has paid the premiums, the law has long regarded such payouts *not* to be deductible from the damages payable: *Bradburn v Great Western Railway Co* [1874–80] All ER Rep 195 ("*Bradburn*"). This is known as the "Insurance Exception" to the rule against double recovery. Second, where a

plaintiff receives money from the benevolence of third parties prompted by sympathy for his or her misfortune, as in the case of a beneficiary from a disaster fund, the money received is similarly not deductible from the damages payable: *Redpath v Belfast and County Down Railway* [1947] NI 167 ("*Redpath*"). This is known as the "Benevolence Exception". For both these cases, there appears to be a clear rationale as to why the rule against double recovery should not operate – it would defeat the point of insurance payouts and benevolent donations if they were not provided over and above damages payable by a tortfeasor. Both the Insurance Exception and the Benevolence Exception are well-established in Singapore, although the list of exceptions remains open: see *The "MARA"* [2000] 3 SLR(R) 31 at [28]–[29].

### The search for a rule of general application

18     Outside of the Insurance Exception and the Benevolence Exception, there are many borderline situations for which it is not as self-evident whether a payment received by the plaintiff, which he or she would not have had but for the tort, should be deductible from the damages payable. A few examples include disability or unemployment benefits paid out by the plaintiff's employer or the government (see *Parry v Cleaver* [1970] AC 1 ("*Parry*") and *National Insurance Co of New Zealand Ltd v Espagne* [1961] Qd R 277 ("*Espagne*")); payouts from insurance plans taken out and paid for by the plaintiff's employer (*Hussain v New Taplow Paper Mills* [1988] AC 514 ("*Hussain (HL)*") and *Gaca v Pirelli* [2004] 1 WLR 2683 ("*Gaca*")); and indeed, medical subsidies provided by the government (*Hodgson v Trapp* [1989] AC 807 ("*Hodgson*")).

19     In these situations, a common analytical approach is to attempt to analogise the particular payment before the court to those under the Insurance Exception and the Benevolence Exception. For example, in *Parry*, the House of Lords held that following an accident in which the plaintiff policeman was severely injured, a disablement police pension which he had compulsorily contributed to during the course of his employment was not deductible from the damages payable by the tortfeasor. Lord Reid and Lord Pearce reasoned that a contributory pension was *akin* to a form of insurance, and therefore fell within the Insurance Exception to the rule against double recovery: *Parry* at 16 and 37–38. However, while the outcome in *Parry* was undoubtedly correct based on the equities of that case, reasoning by analogy only takes one so far. As Lord Wilberforce observed in his own speech in *Parry* (at 41–42):

> I regret that I cannot agree that it is easy to reason from one type of benefit to another. One cannot argue from non-deductibility of gifts to non-deductibility of the proceeds of insurance, nor from the non-deductibility of insurance to the non-deductibility of pensions. Accident insurances are not gifts or like gifts, they are essentially wagers: pensions, if insurance at all,

are not insurance in the same sense as accident insurance, and mere use of the common word is not enough to produce a common principle.

In his view, however, it was also "impossible to devise a principle so general as to be capable of covering the great variety of benefits from one source or another which may come to an injured man after, or because, he has met with an accident": *Parry* at 41.

20     Indeed, a rule of general application remains elusive. Lord Bridge observed in *Hussain (HL)* that "many eminent common law judges … have been baffled by the problem of how to articulate a single guiding rule to distinguish receipts by a plaintiff which are to be taken into account in mitigation of damage from those which are not": *Hussain (HL)* at 528. Similarly, Dixon CJ, sitting in the High Court of Australia, lamented in *Espagne* that while "[t]here is no lack of judicial authority upon [this] very difficult subject … the plain fact is that no legal rule exists, that can be applied to every case … it appears to be futile to look in the present state of the law for a rule of general application": *Espagne* at 284–286.

21     The inability to articulate a rule of general application is not for a lack of trying. Judicial attempts have been made to identify the reasons why certain collateral benefits should be exempt from the rule against double recovery. The first type of reasoning which often surfaces is that of causation – the argument that the relevant payment was caused *not* by the tort, but by some other factor, typically the plaintiff's employment, payment of insurance premiums, or the benevolence of other parties. For example, in *Bradburn* itself, recognised as the earliest articulation of the Insurance Exception, Pigott B reasoned that moneys received by the plaintiff under his accident insurance policy were not deductible from the damages payable by the tortfeasor because the plaintiff "does not receive that sum of money because of the accident, but *because he had made a contract providing for the contingency*; an accident must occur to entitle him to it, but it is not the accident, but his contract, which is the *cause* of his receiving it" [emphasis added]: *Bradburn* at 197. Similarly, in *Noor Azlin bte Abdul Rahman and another v Changi General Hospital Pte Ltd and others* [2021] SGHC 10 ("*Azlin (HC)*"), the court held that "insurance payouts would have been received by [the plaintiff] not merely due to [the tortfeasor's] negligence, but primarily because [the plaintiff] would have presumably duly paid her insurance premiums": *Azlin (HC)* at [212]. Lastly, in *Payne v Railway Executive* [1952] 1 KB 26 ("*Payne*"), Cohen LJ found that the disability pension received by the plaintiff (stemming from his service in the Royal Navy) following an accident was not deductible from the damages payable by the tortfeasor. He reasoned that the accident in that case was not the "*causa causans* [*ie*, the fundamental cause] of the receipt by the first plaintiff of the disability pension, but the *causa sine qua non* [*ie*, merely a factual cause]. The *causa causans* was his service in the Royal Navy": *Payne* at 36.

22    Reasoning based on causation has also been relied on in respect of the Benevolence Exception. In *Redpath* ([17] *supra*), Andrews CJ held that sums received by the victim of a railway accident from public donations were not deductible from the damages payable, explaining that "[i]n the present case the *causa causans* of the fund was *not* the accident, but the bounty or charitable motives of the subscribers" [emphasis added]: *Redpath* at 172.

23    The second type of reasoning often relied on is that "collateral" matters, "*res inter alios acta*" (*ie*, matters between other parties), or matters which are too "remote" should not be considered in the assessment of damages. The common thread of reasoning which runs through these various labels is that the relevant payment was *separate and distinct* from the tortious act and the relationship between the plaintiff and the tortfeasor in such a manner that it should not be taken into account.

24    For example, in *Parry*, Lord Pearson attempted to explain various cases on the ground that the relevant payment was "too remote" from the accident. In his view, the court in *Bradburn* was "saying, in effect, though the phrases were not used, that the item of insurance money was too remote and collateral to be properly deductible from the damages payable for the plaintiff's injuries …": *Parry* at 49–50. Similarly, in relation to the Benevolence Exception, Azmi J held in *Lim Kiat Boon & ors v Lim Seu Kong & anor* [1980] 2 MLJ 39 that "the proposition that there should be no reduction where the money is given gratuitously or advanced by a sympathetic employer is based on the principle that the generosity of others is *res inter alios acta* and not something from which the wrongdoer should reap the benefit".

25    The third type of reasoning which emerges is based on an intuitive sense of injustice if the tortfeasor were to pay a reduced amount in damages on account of the collateral benefit. This is best reflected in *Gaca* ([18] *supra*), where the court stated (citing *Parry* ([18] *supra*) at 14 and *Redpath* at 170) that "the rationale for the [Benevolence Exception] … is that 'it would be revolting to the ordinary man's sense of justice, and therefore contrary to public policy' … or 'startling' … that the victim should have his damages reduced so that he would gain nothing from the benevolence of third parties": *Gaca* at [30]. In a similar vein, the Judge in the present case observed that it would be unfair and unreasonable for the appellant's liability to the respondent to be reduced on account of the Subsidies and Grants: *Eng Beng v Lo Kok Jong* [2023] SGHC 63 (the "Judgment") at [97].

26    In our view, these three types of reasoning are not helpful in assisting the court's analysis. In respect of causation, both the source of the collateral benefit (whether the plaintiff's payment of premiums or the benevolence of others) and the tort itself are necessary causes of the plaintiff receiving the collateral benefit. Designating one event as the *causa causans*, or main cause, over the other says nothing about the reasons for attributing causal

responsibility to that event, and can often mask decisions based on policy considerations or an intuitive sense of justice: see *Espagne* at 285 and 306 and *IBM Canada Ltd v Waterman* [2013] 3 SCR 985 ("*IBM Canada*") at [31]. As Lord Pearce observed in *Parry*, "[s]trict causation seems to provide no satisfactory line of demarcation": *Parry* at 34.

27　　Reasoning based on the "collateral", "*inter alios acta*" or "remote" nature of a payment is also not illuminating. These terms are vague and do not provide a practical test for whether a specific payment should be exempt from the rule against double recovery: see *Espagne* at 284–285, 301 and 311, *IBM Canada* at [26] and *Parry* at 13. The term "*res inter alios acta*" has also been rejected because there are situations in which the tortfeasor may rightfully enjoy the benefit of a contract made between the plaintiff and a third party – for example, where the plaintiff has found alternative employment after an accident, the pay he or she receives under the employment contract is to be taken into account in the assessment of damages for loss of earnings: *Parry* at 48.

28　　Finally, relying on an intuitive sense of injustice is plainly flawed, particularly where not all share the same intuitions: *Espagne* at 285. Arguments based on an intuitive sense of injustice often invoke punitive reasoning – the idea that the tortfeasor does not deserve to enjoy a reduction in the damages payable and should in some sense be punished by being made to pay an unadjusted sum. However, such arguments are at odds with the main and *sole* concern of compensatory damages, which is to compensate the plaintiff for the actual loss suffered. In this context, notions based on the punitive or deterrent value of making the tortfeasor pay more damages are irrelevant.

### The test of objective intended purpose

29　　A more principled test of general application for the deductibility of collateral benefits may be found in the decision of the High Court of Australia in *Espagne*. In that case, after considering the flaws in the various modes of reasoning discussed above, Windeyer J observed as follows (*Espagne* at 311):

> What finally emerges? Phrases such as *causa causans*, collateral matter and so forth being discarded, how are we to ascertain what is remote? Is there a governing principle in all these cases? So far as any rules can be extracted, I think they may be stated, generally speaking, as follows: In assessing damages for personal injuries, benefits that a plaintiff has received or is to receive from any source other than the defendant are not to be regarded as mitigating his loss, if: (a) they were received or are to be received by him as a result of a contract he had made before the loss occurred and *by the express or implied terms of that contract they were to be provided notwithstanding any rights of action he might have*; or (b) they were given or promised to him by way of bounty, *to the intent that he should enjoy them in addition to and not in diminution of any claim for damages*. The first description covers accident

insurances and also many forms of pensions and similar benefits provided by employers … The second description covers a variety of public charitable aid and some forms of relief given by the State as well as the produce of private benevolence. In both cases the decisive consideration is, not whether the benefit was received in consequence of, or as a result of the injury, but *what was its character*: and that is determined, in the one case by what under his contract the plaintiff had paid for, and in the other by the intent of the person conferring the benefit. *The test is by purpose rather than cause.* [emphasis added]

30     In our view, the focus of Windeyer J's test on the *intended purpose* of the payment – in the case of a contractual payment, the intent as expressed by the express or implied terms of the contract, and in the case of payments "by way of bounty", the intent of the person conferring the benefit – is the correct approach.

31     Similarly, in his judgment in *Espagne*, Dixon CJ recognised (at 286) that the "distinguishing characteristic" of payments which should be exempt from the rule against double recovery is that they are *intended* for the plaintiff's enjoyment independently of any right of redress against others:

The reasoning begins with a distinction which I think is clear enough in general conception. There are certain special services, aids, benefits, subventions and the like which in most communities are available to injured people. Simple examples are hospital and pharmaceutical benefits which lighten the monetary burden of illness. If the injured plaintiff has availed himself of these, he cannot establish or calculate his damages on the footing that he did not do so. On the other hand there may be advantages which accrue to the injured plaintiff, whether as a result of legislation or of contract or of benevolence, which have *an additional characteristic*. It may be true that they are conferred because he is *intended to enjoy them* in the events which have happened. Yet they have *this distinguishing characteristic*, namely, they are *conferred on him not only independently of the existence in him of a right of redress against others, but so that they may be enjoyed by him although he may enforce that right*; they are the product of a disposition in his favour intended for his enjoyment, and not provided in relief of any liability in others fully to compensate him. This is readily seen in the case of benevolence … [and] in a contract of accident insurance … [emphasis added]

32     In the present case, the DR, DJ and the Judge all relied heavily on these passages from *Espagne*, recognising that the *intention* behind the Subsidies and Grants is key. We agree that the intended purpose of a payment is the appropriate criterion for ascertaining whether it should be exempt from the rule against double recovery. This criterion explains both the Insurance Exception and the Benevolence Exception. In the case of the Insurance Exception, it is obvious from the plaintiff's taking out of and payment for the insurance plan that any subsequent payout is intended to be enjoyed *over and above* any damages payable by a tortfeasor. In the case of the Benevolence Exception, it is equally clear from the charitable intent

of the donors that the donated funds are intended to be enjoyed over and above any damages payable. In a sense, a payment intended to be enjoyed by the plaintiff over and above the damages payable is *not* a doubly-recovered sum – it forms a separate pool of funds, accruing to the plaintiff, which is unrelated to and distinct from that which the tortfeasor must pay to cover the plaintiff's loss. That is why such payments are exempt from the rule against double recovery.

33　　Given the importance of the test of intention, we consider it appropriate to closely examine how the exercise in ascertaining intention should be conducted.

34　　First, the proper question is whether the plaintiff was intended to enjoy the relevant payment over and above the damages payable. In the absence of such intention, *the default rule against double recovery should be reverted to*, and the payment would be deductible from the damages payable: *Manser v Spry* [1994] HCA 50 at [10]. This is despite the fact that the tortfeasor may benefit from the payment by enjoying a reduction in the damages payable. The corollary of this is that the question of intent is *not* concerned with whether it was intended that *the tortfeasor should benefit* from the payment. It would almost never be the case that a *positive* intention for the tortfeasor to benefit will be found. Thus, if the focus were to be on finding such positive intention, then nearly *every* such payment would be exempt from the rule against double recovery. However, that would contradict the fundamental and axiomatic rule that damages for negligence are intended to be *purely compensatory* from the perspective of the plaintiff: see *Hodgson* ([18] *supra*) at 819. Indeed, as we have emphasised above, focusing on whether the tortfeasor should profit from a collateral benefit strays into punitive or deterrent reasoning, which is irrelevant in the context of compensatory damages.

35　　Second, the intention of the provider of the payment must be assessed in an *objective* manner. This avoids the difficulty associated with ascertaining the precise state of mind of the provider, since typically "the intent [is] never even thought out by the donor, certainly not expressed": see *Zheng v Cai* [2009] HCA 52 at [20].

36　　Thus, the question of intent may be phrased as follows: whether the intended purpose of the payment, objectively judged, was to provide the plaintiff with a sum to be enjoyed over and above the damages payable. This applies equally to explain the Insurance Exception and the Benevolence Exception, as well as to the question of whether a new exception should be found in any particular case.

37　　To aid the application of this test, we turn to examine several key indicia which shed light on the objective intended purpose of a payment.

**Indicia of the objective intended purpose**

*Contribution*

38     First, whether the plaintiff contributed to the relevant payment is an important factor. This is the basis for the Insurance Exception, under which "[the plaintiff] has paid for the accident insurance with his own moneys, and the fruits of this thrift and foresight should in fairness enure to his and not to the defendant's advantage": *Minichit Bunhom v Jazali bin Kastari and another* [2018] 1 SLR 1037 ("*Minichit Bunhom*") at [83]. This is also the factor underlying the extension of the Insurance Exception to include pensions or insurance policies taken out by an employer but which the plaintiff-employee contributed to: see *Parry* (([18] *supra*)) at 16 *per* Lord Reid and *Hussain (HL)* ([18] *supra*) at 532. In essence, the fact that the plaintiff contributed to the relevant payment shows that the intended purpose of the payment, objectively judged, was to provide him or her with a sum over and above the damages payable.

39     Ascertaining whether a plaintiff contributed to the payment is not a straightforward exercise. In England, the proceeds of insurance policies will only be held not deductible if the plaintiff *directly* paid for or contributed to the premiums: *Gaca* ([18] *supra*) at [56]. By contrast, it has been held in Australia that a payout from an insurance policy paid for *entirely* by the plaintiff's employer remains not deductible from the damages payable (since the employee indirectly pays for the benefit by working for the employer): see Trindade, Cane and Lunney, *The Law of Torts in Australia* (Oxford University Press, 4th Ed, 2006) at p 734, citing *Richard v Mills* (2003 27 WAR 200). Nevertheless, this is a disagreement over fact rather than principle: the courts in both jurisdictions agree that a plaintiff's contribution indicates non-deductibility, but disagree over when such contribution may be found.

*Indemnity for loss*

40     The second factor is whether the payment is in the nature of an indemnity for, or is targeted directly at, the type of loss for which damages were sought. The principle underlying this factor is simple – if the payment is targeted at the type of loss for which damages were sought, then it is more difficult to say that it is intended to be given to the plaintiff above and beyond the damages payable, since it appears to be a *substitute* for the damages. For example, in *Sylvester v British Columbia* [1997] 2 SCR 315 ("*Sylvester*"), the plaintiff was unable to work and was receiving disability payments under his employment contract when he was wrongfully dismissed. The Supreme Court of Canada found that under the contract, the disability benefits were intended to be a substitute for the plaintiff's regular salary, and therefore they were deductible from the damages payable by the employer: *Sylvester* at 321. The same court observed in its

decision in *IBM Canada* ([26] *supra*) that this was because the payment in *Sylvester* "was intended to be an indemnity for the loss of the regular salary, precisely the sort of loss that resulted from the defendant's breach of the employment contract": *IBM Canada* at [30].

41     Similarly, in *Hussain (HL)*, the House of Lords found that wage benefits paid under an employment plan after the plaintiff suffered injury were "a partial substitute for earnings and [were] the very antithesis of a pension": *Hussain (HL)* at 530. The court thus ruled that the benefits were deductible from the damages claimed for loss of earnings: see *Hussain (HL)* at 528–532. The same position has been taken in Australia, where in *Redding v Lee* [1983] HCA 16 ("*Redding*"), Mason and Dawson JJ observed that "the central question … is whether the unemployment benefits can be said to be a substitute or partial substitute for wages, justifying the same treatment as wages in terms of assessment of damages": *Redding* at [43]. On the facts in *Redding*, this question was answered in the affirmative and the benefit was held to be deductible: *Redding* at [46].

42     Conversely, if the payment is *not* targeted at the type of loss covered by the damages, then it is easier to say that it *is* intended to be a sum given to the plaintiff over and above the damages payable. In *IBM Canada* itself, the plaintiff was a member of his employer's pension plan, under which the employer contributed a percentage of the plaintiff's salary to the plan on his behalf and the plan in turn guaranteed specific benefits upon retirement. After wrongfully dismissing the plaintiff (the notice period given was too short), the employer argued that the plaintiff's pension benefits should be deducted from the salary and benefits otherwise payable during what should have been the correct notice period. The Supreme Court of Canada disagreed, finding that the pension benefits were *not* intended to be an indemnity for wage loss, and therefore could not be seen as compensating the plaintiff for the pecuniary loss he was claiming: *IBM Canada* at [4] and [62].

43     Similarly, in *Parry*, it will be recalled that the House of Lords held that the plaintiff policeman's disability pension was not deductible from the damages payable by the tortfeasor. Lord Pearce observed that the pension was "*not intended necessarily as any substitute for the capacity to earn …* a man may earn in a civilian employment when his service ends (whether prematurely or not) and thus enjoy both his pension and his civilian wages" [emphasis added]: *Parry* at 38. Thus, he held that the disability pension was not to be considered in assessing damages for loss of earnings, observing that "[the plaintiff's] pension is thus *a personal benefit additional to anything that he may be able to earn by way of wages*" [emphasis added]: *Parry* at 38.

*Source of the payment*

44    The third factor is the source of the payment. There are three possibilities: (a) the tortfeasor; (b) the government; or (c) some other third party. Where the tortfeasor is the source of the payment, that would be a *prima facie* indication that there is *no* intention for the plaintiff to enjoy the sum over and above the damages payable. Thus, in *Hussain v New Taplow Paper Mills Ltd* [1987] 1 WLR 336 ("*Hussain (CA)*"), Lloyd LJ observed that where "an employee is injured in the course of his employment, and his employers make him an immediate *ex gratia* payment … [there is] no reason why such a payment should not be taken into account in reduction of any damages for which the employer may ultimately be held liable": *Hussain (CA)* at 350. This proposition has more recently been upheld in *Gaca* at [30]–[31].

45    Where some other third party is the source of the payment, that would ordinarily indicate that the intended purpose of the payment was for the plaintiff to enjoy it over and above the damages payable. As the DR observed (*Eng Beng v Lo Kok Jong* [2022] SGDC 130 ("*Lo Kok Jong (DR)*") at [36]):

> For private benevolence … it is *possible to infer that the sums were intended purely for the sufferer's rather than the wrongdoer's benefit.* Why else would that gift have been made? The fact that the benefit was advanced at all therefore gives *credible basis to infer that the donor intended for the victim to benefit* from the benevolence independently of any damages from others compensating him. [emphasis added; emphasis in original omitted]

46    However, where the source of the payment is the government, the same inference is not necessarily drawn. We agree with the following observation made by the DR (*Lo Kok Jong (DR)* at [37]):

> … governmental benevolence is *quite different* [from private benevolence] … it is unsurprising to find governments providing benefits for their citizens … unremarkable to see governments setting up funds for the weak and vulnerable in the wider community … [and] commonplace to see governments implement national policies to subsidise the cost of important things like education and healthcare. The mere fact and existence of such benefits *should not ordinarily raise the same inference that they were intended to be enjoyed over and above any claims that a plaintiff-victim would have against his tortfeasor.* [emphasis added; emphasis in original omitted]

47    Similar sentiments were expressed by Lord Bridge in *Hodgson* ([18] *supra*), where he stated (at 822, citing himself in *Westwood v Secretary of State for Employment* [1985] AC 20 at 43):

> I *do not see any analogy at all* between the generosity of private subscribers to a fund for the victims of some disaster, who also have claims for damages against a tortfeasor, and the state providing subventions for the needy out of funds which, in one way or another, have been subscribed compulsorily by

various classes of citizens. *The concept of public benevolence by the state is one I find difficult to comprehend.* [emphasis added]

48    In other words, unlike private benevolence, for which the donor's intention to enrich the plaintiff above and beyond the damages payable may be easily discerned, it is difficult to find such intent underlying ordinary funds disbursed by the government to large segments of the citizenry (usually the weak and vulnerable). Thus, Dixon CJ drew a distinction in *Espagne* ([18] *supra*) between "ordinary charity dispensed by government" (including "certain special services, aids, benefits, subventions and the like which in most communities are available to injured people"), and those which have an "additional characteristic", namely that "they are the product of a disposition in his favour intended for his enjoyment, and not provided in relief of any liability in others fully to compensate him": *Espagne* at 286.

49    Thus, where the source of payment is the government, this would generally indicate that there is no intention for the payment to be enjoyed on top of the damages payable. Nevertheless, other factors or clear parliamentary intention may tip the scales in the other direction. For example, on the facts in *Espagne*, the government pension for permanently blind persons granted to the plaintiff following a serious accident was observed to have been specifically targeted at the plaintiff after consideration of his personal circumstances and granted as a sum for his enjoyment rather than an indemnity for loss. Thus, the court held that it was not deductible from the damages payable: see *Espagne* at 287 and 312. Likewise, Lord Bridge observed in *Hodgson* (at 822) that it is "always open to Parliament to provide expressly that particular statutory benefits shall be disregarded" – he cited s 2 of the Law Reform (Personal Injuries) Act 1948 (UK) (which lists specific statutory benefits as not deductible) as an example.

*Group of persons to whom payment is made available*

50    The fourth and final factor is the group of persons to whom the relevant payment is made available. This factor explains the distinction between private benevolence and government payments just discussed. In the case of private benevolence, the payment is often being made specifically to a group of tort victims, thus indicating that the payment is intended to be a "bounty" to be enjoyed by that group on top of the damages payable. In contrast, "ordinary" government payments typically target large segments of the public and are not limited to tort victims. There is therefore no corresponding indication that such payments are intended to be "bounties" to be enjoyed by a particular group of tort victims.

51    The more directed the payment and the more the plaintiff's individual circumstances are assessed before disbursement, the stronger the indication that the payment is intended to be enjoyed on top of the damages payable. Thus, in *Espagne*, the fact that the pension was only granted "after a

consideration of the position or situation in which the applicant stands" played an important part in Dixon CJ's decision that it was not deductible: *Espagne* at 287. Conversely, the further the group of potential recipients extends beyond tort victims to the general public, the weaker the indication that the payment is intended to be enjoyed on top of damages payable by a tortfeasor. This is the case for the "ordinary" government benefits referred to in *Espagne*.

52     We should make it clear that the above indicia are not necessarily exhaustive but they are the ones that have been shown in the case law to assist in the inquiry of the objective intended purpose.

### Summarising the applicable test

53     Having examined the indicia above, we turn to summarise the overall applicable test for whether a collateral benefit should be exempt from the rule against double recovery.

54     An important preliminary stage is to determine whether the rule against double recovery is even engaged. Before there is any question of deduction, the receipt of the benefit must constitute some form of *excess* recovery for the plaintiff's loss: *IBM Canada* ([26] *supra*) at [23]. There is no question of excess recovery if the plaintiff's rights are subrogated to the party supplying the benefit and the latter attempts to recover the value of the benefit – in this situation, there is no risk of overcompensation: *IBM Canada* at [24]. Equally, where the plaintiff is under a contractual obligation to repay the party supplying the benefit out of the damages recovered, the rule against double recovery is *not* engaged by the plaintiff's recovery of the full sum in damages: *Minichit Bunhom* ([38] *supra*) at [49] and [85].

55     If this preliminary threshold is overcome – *ie*, recovery of full damages from the tortfeasor does constitute excess recovery – we *then* examine the question of whether an exception to the rule against double recovery should apply. As set out above, the main inquiry is whether the intended purpose of the payment, objectively judged, was to provide the plaintiff with a sum over and above the damages payable. The following points are pertinent in this inquiry:

   (a)   For payments made pursuant to a contract, the focus should first be on interpreting the contract to ascertain if the contractual intention was for the payment to be provided over and above the damages payable. Thus, in cases such as *Sylvester* ([40] *supra*), *Hussain (HL)* ([18] *supra* at 525–527) and *Graham v Baker* [1961] HCA 48 (at [8]), the courts focused on the characterisation of the payment under the relevant employment contract.

   (b)   For payments made pursuant to legislation, the focus should first be on interpreting the relevant legislation to ascertain if

parliamentary intent was for the payment to be provided over and above the damages payable. For this reason, in cases such as *Redding* ([41] *supra* at [10]–[12]) and *Espagne* (at 287), the courts focused on the relevant statutory scheme under which the payment was made.

(c)    For all other payments, available evidence on the intention of the benefactors and/or the general circumstances in which the payment was made may be examined.

56    In summary, the following indicia would be helpful in ascertaining the objective intended purpose of the payment:

(a)    Whether the plaintiff contributed to the payment – if so, that would generally indicate that the payment was intended to be enjoyed on top of the damages payable.

(b)    Whether the payment was in the nature of an indemnity for the type of loss for which damages were sought – if so, that would indicate that there was no intention for the payment to be enjoyed on top of the damages payable.

(c)    The source of the payment – if it was the tortfeasor, that would ordinarily indicate that there was no intention for the payment to be enjoyed on top of the damages payable. If it was the government, that would in many cases indicate the same. If it was some other third party, that would typically indicate the opposite – *ie*, that the payment was intended to be enjoyed on top of the damages payable.

(d)    The group of persons to whom the payment was made available – the more the plaintiff's personal circumstances were considered, and the more the group of recipients was limited to tort victims, the stronger the indication that the payment was intended to be enjoyed on top of the damages payable.

57    If, after consideration of these indicia, there is an absence of any clear indication that the intended purpose of the payment was for the plaintiff to enjoy it on top of the damages payable, then the default rule against double recovery should apply, such that the payment is deductible from the damages payable.

58    We should caution that the application of the indicia should not be conducted in a mathematical or formulaic manner. Rather, the indicia should be considered holistically, in a manner which informs an overall judgment as to the intended purpose of the payment. In this regard, the weight to be accorded to each factor is heavily fact-centric. For instance, the fact that a payment is meant to be an indemnity for the loss suffered takes on less significance where the plaintiff contributed to it – such is the case for insurance payouts where the plaintiff paid the premiums.

59    For completeness, we observe that the test of objective intended purpose and the accompanying indicia serve to *rationalise*, not replace, the Insurance Exception and the Benevolence Exception. These exceptions are well-established in case law and provide helpful guidance. Nevertheless, as discussed above, reasoning primarily based on analogy to the existing exceptions may obfuscate the true factors that should guide the exercise in ascertaining intention. For example, despite the judicial tendency to analogise pensions or wage benefits to insurance payouts, the former group of payments *do not* in fact trigger the same considerations as insurance payouts. Whether a payment was in nature an indemnity for the type of loss suffered is an important consideration where courts are assessing the deductibility of pensions or wage benefits, but not so for insurance payouts, where the focus is largely on the contributory or non-contributory nature of the payment. In the context of the Benevolence Exception, government payouts are quite different in nature from private benevolence. Attempting to directly analogise the former to the latter may be an exercise in comparing apples to oranges. The test of objective intended purpose and the accompanying indicia serve to spell out the precise factors why a payment may truly be similar to the Insurance Exception and the Benevolence Exception, and if not, why certain payments should nevertheless be exempt from the rule against double recovery.

*The relevance of public policy considerations*

60    Public policy considerations often feature in cases addressing exceptions to the rule against double recovery, stemming from Lord Reid's observation in *Parry* ([18] *supra* at 13) that "[t]he common law has treated this matter as one depending on justice, reasonableness and public policy". In the present case, the DJ and the Judge also considered public policy factors at length in their respective judgments.

61    There are several common types of public policy reasoning relied on in the cases. The first and most common is that it would be unfair for the tortfeasor to benefit from the payment: see, for example, *Parry* at 14 and the Judgment ([25] *supra*) at [97]. However, as discussed above, relying on the notion of unfairness is unhelpful; further, it does not accord with the compensatory aim of damages in tort to uphold an increase in damages payable on a punitive or deterrent basis. It bears emphasis that allowing the plaintiff to recover more than his or her actual loss also constitutes a form of "unfairness". In our view, any applicable notion of "justice" or "fairness" in this area of law is sufficiently accommodated for under the test of the intended purpose of the payment – the true "fair" outcome is one in which such purpose is given effect to.

62    The second type of public policy reasoning commonly relied on is that of incentives. For example, in upholding the Benevolence Exception, Andrews CJ observed in *Redpath* (([17] *supra*) at 170) that if benevolent

payments were held to be deductible from damages payable, "the inevitable consequence in the case of future disasters of a similar character would be that the springs of private charity would be found to be largely if not entirely dried up". In the context of the Insurance Exception, courts have explained that deducting benefits which plaintiffs have provided for themselves might discourage people from acting prudently in obtaining insurance protection: see *IBM Canada* ([26] *supra*) at [73].

63     However, the evidential basis for the strength of such incentives is unclear. Deducting insurance benefits may not discourage people from buying insurance, since the coverage is not limited to situations where there is legal recourse against a defendant: see *IBM Canada* at [74]. Neither is it certain that private benevolence for tort victims would disappear if such moneys were to be deductible from a tortfeasor's damages.

64     In any event, reasoning based on such incentives appears unnecessary. The test of objective intended purpose suffices to explain the non-deductibility of these types of payments. In the case of private benevolence, the payment is given for the plaintiff's enjoyment on top of the damages payable, out of sympathy for the plaintiff's plight. In the case of insurance benefits, the plaintiff's contribution shows clear intent that he or she is to enjoy the payment on top of the damages payable. Further considerations of providing incentives for purportedly "desirable" behaviour are extraneous and unnecessary.

65     Finally, in the context of government payments, the underlying public policy for such payments often forms a key part of the court's decision on whether they should be exempt from the rule against double recovery. This consideration is in fact accommodated for under the test of objective intended purpose, since interpreting the relevant legislation is a crucial component of the test. However, the court should be limited to enforcing public policy that is ascertainable from the exercise in statutory interpretation rather than embarking on its own policy evaluation. To the extent that no clear public policy or parliamentary intent is ascertainable, the default rule against double recovery should apply.

66     Thus, the common public policy considerations contemplated in the authorities appear either irrelevant or sufficiently accommodated for under the test of objective intended purpose. Hence, we caution against placing excessive weight on public policy considerations in deciding whether a payment should be exempt from the rule against double recovery.

### *Application to the facts*

*Precedent – the position at common law*

67    As a matter of precedent, government subsidies and grants going towards a plaintiff's medical expenses have been held to be deductible from the damages payable by a tortfeasor.

68    There are two types of such government subsidies and grants in the UK: (a) monetary social security benefits for medical expenses ("Medical Social Security Benefits"); and (b) free medical treatment provided by the National Health Service (the "NHS").

69    In respect of Medical Social Security Benefits, there is presently legislation in place under the Social Security (Recovery of Benefits) Act 1997 (c 27) (UK) (the "SSRBA") which provides that the damages to be paid to the plaintiff for medical expenses are to be reduced by deducting the amount of the specified Medical Social Security Benefits paid or likely to be paid in the period following the injury: see *McGregor on Damages* (Sweet & Maxwell, 21st Ed, 2021) ("*McGregor on Damages*") at para 40-243. The specified benefits are listed out in Schedule 2 of the SSRBA and include, *inter alia*, attendance allowance (for payment of personal care) and the care component of the disability living allowance.

70    Notably, under the SSRBA, while the sum of Medical Social Security Benefits paid to the plaintiff will be deducted from the damages payable by a tortfeasor, the tortfeasor is obliged to *pay to the Secretary of State* an amount equal to the sum of the Medical Social Security Benefits paid to the plaintiff: see *McGregor on Damages* at para 40-166. As such, there is a statutory recoupment scheme in place. A government agency, the Compensation Recovery Unit ("CRU"), administers the recovery scheme: see *Tort Law and the Legislature: Common Law, Statute and the Dynamics of Legal Change* (T T Arvind & Jenny Steele gen eds) (Bloomsbury Publishing, 2012) ("*Tort Law and the Legislature*") at 286.

71    Notwithstanding the present statutory scheme in place in the UK, the common law position *prior* to statutory intervention provides valuable guidance. Similar to that under the SSRBA, the common law position was that Medical Social Security Benefits were deductible from the damages payable. In *Hodgson* ([18] *supra*), the House of Lords was faced with the question of whether statutory allowances for the plaintiff's medical expenses were deductible from the damages payable by the tortfeasor. The court held that these allowances (and statutory benefits payable as of right to tort victims in general) were deductible, with Lord Bridge observing that he could not see "any analogy at all" between payments which fell under the Benevolence Exception and such statutory benefits: *Hodgson* at 822–823. In doing so, the court expressly overruled previous decisions in which English courts had held government payments for medical expenses to be not

deductible: see *Hodgson* at 823. This decision was largely based on two reasons: (a) the statutory benefits were targeted directly at the medical expenses for which damages were claimed; and (b) no discernible intent could be found underlying these statutory benefits – hence, the default rule against double recovery applied: *Hodgson* at 822–823.

72    As for the second type of government subsidies and grants for medical expenses in the UK – free medical treatment provided by the NHS – courts also do not award plaintiffs damages in respect of such treatment: see *McGregor on Damages* at para 40-250, citing *West v Shephard* [1964] AC 326 at 357–358; *Mitchell v Mulholland (No 2)* [1972] 1 QB 65 at 88; and *Housecroft v Burnett* [1986] 1 All ER 332 at 342j. The UK Law Commission observed as settled law that (see *Damages for Personal Injury: Medical, Nursing and Other Expenses (1996) Consultation Paper No 144* at para 2.2):

> … if the plaintiff does not incur [medical] expenses, because he or she makes use of the NHS or services provided free of charge by a local authority, the plaintiff cannot recover what would have been paid if he or she had had private treatment or care.

73    Similar to Medical Social Security Benefits, there is presently a statutory recoupment scheme in place for medical expenses incurred by the NHS in caring for tort victims. Specifically, s 150 of the Health and Social Care (Community Health and Standards) Act 2003 (c 43) (UK) (the "HSCA") stipulates that the tortfeasor is obliged to pay to the Secretary of State the relevant charges incurred by the NHS in treating the victim (as calculated by the CRU). The Secretary of State is then obliged to pay the sum received to the NHS institutions which incurred the expenses: s 162 of the HSCA.

74    We observe that the nature of the Subsidies and Grants appears to fall midway between that of Medical Social Security Benefits and free healthcare under the NHS. However, it is not pertinent exactly which category the Subsidies and Grants fall under – the position at common law is that both categories are not exempt from the rule against double recovery.

*Principle – applying the exceptions and the test of objective intended purpose*

75    In our view, the voice of the authorities accords with principle. In this regard, it was undisputed that the Subsidies and Grants did not fall under the Insurance Exception. The factor of contribution towards the relevant payment (the signature characteristic under the Insurance Exception) was absent here.

76    As for the Benevolence Exception, much of the parties' submissions focused on whether the Subsidies and Grants possessed the "additional characteristic" referred to by Dixon CJ in *Espagne* ([18] *supra*) at 286 –

*ie*, whether they were the product of a disposition in the respondent's favour intended for her enjoyment, or whether they were part of "certain special services, aids, benefits, subventions and the like which in most communities are available to injured people" and which are deductible. The test of objective intended purpose which we have set out is in essence a modification of the "additional characteristic" test articulated by Dixon CJ. Hence, the questions of whether the Subsidies and Grants fall within the Benevolence Exception and whether a new exception should be found may be addressed simultaneously by applying the test of objective intended purpose.

77     As observed above, the first port of call for statutory payments should be parliamentary intention. However, it was undisputed in the present case that there was *no* clear expression of legislative intent in relation to whether the Subsidies and Grants were to be deductible from the damages payable. Therefore, the objective intended purpose of the Subsidies and Grants had to be inferred from the general information on their nature which was before the court.

78     The Subsidies and Grants comprise three categories: (a) the Generic Government Subsidies; (b) the PG Subsidies; and (c) the Community Grants. The Generic Government Subsidies apply automatically to *all* Singapore citizens and permanent residents seeking treatment at public healthcare institutions, with the percentage of medical expenses subsidised pegged to the monthly per capita household income of the patient (*ie*, a higher percentage subsidised for patients with lower household income). The Community Grants are also offered to *all* Singapore citizens and permanent residents who require intermediate and long-term care services, with the amount of subsidy also pegged to the monthly per capita household income of the patient.

79     The PG Subsidies are provided for under the Pioneer Generation and Merdeka Generation Funds Act 2014 (2020 Rev Ed) (the "Pioneer Act"). Section 12 of the Pioneer Act sets out the definition of a "Pioneer", which is based on age and the date on which an individual's Singapore citizenship was obtained. Under s 16(1)(*f*) of the Pioneer Act, financial assistance is provided in the form of a subsidy of the cost of any health service provided to a "Pioneer" by any prescribed healthcare provider, which includes "Specialist Outpatient Clinics" at public hospitals: see reg 5 of the Pioneer Generation and Merdeka Generation Funds (Pioneer Generation and Merdeka Generation Benefits) Regulations 2015.

80     Based on this information, the indicia may be applied as follows:

   (a)     Contribution – the respondent did not contribute to the Subsidies and Grants. Thus, this factor indicated that there was no intention for the respondent to enjoy the Subsidies and Grants on top of the damages payable.

(b)    Indemnity for loss – the Subsidies and Grants were targeted specifically at the medical expenses incurred by the respondent, which was exactly the loss for which she claimed the Disputed Sum in damages. Thus, this factor indicated that the payments were a *substitute* for the damages claimed, and there was therefore no intention for the respondent to enjoy the Subsidies and Grants on top of the damages payable.

(c)    Source of the payment and the group of persons to whom the payment was made available – the Subsidies and Grants were provided by the government and made available to *all* citizens in general (for the PG Subsidies, *all* "Pioneers"). Accordingly, the granting of the Subsidies and Grants: (a) did not involve a close assessment of the respondent's personal circumstances (in the manner that the payment of the blindness pension in *Espagne* entailed); and (b) extended to a group of persons far beyond only tort victims. This strongly indicated that there was no intention for the respondent to enjoy the Subsidies and Grants on top of the damages payable. In this regard, we respectfully disagreed with the Judge's finding that the tailoring of the Subsidies and Grants (on the basis of citizenship status, means and PG eligibility) indicated that they were intended to be not deductible: the Judgment ([25] *supra*) at [80]–[81]. The important aspect of "tailoring", which would indicate non-deductibility, is whether the payment was "tailored" specifically to either the *individual* or to *tort victims*, since that may indicate that the payment was meant to be enjoyed on top of any damages payable. No such element was present in respect of the Subsidies and Grants. In fact, the opposite was true – the Subsidies and Grants were available to the general public.

81    Thus, all four indicia indicated that there was no intention for the Subsidies and Grants to be enjoyed by the respondent on top of the damages payable. However, simply totalling up the indicia is not useful. What matters is how they inform a holistic assessment of the objective intended purpose behind the Subsidies and Grants. Considered collectively, the indicia showed that none of the types of reasoning relied on by courts in finding an "additional characteristic" applied to the Subsidies and Grants – there was no self-contribution to the moneys (like in *Bradburn* ([17] *supra*)); no characterisation of the payment as an additional sum unrelated to the damages (like in *Parry* ([18] *supra*) and *IBM Canada* ([26] *supra*)); and no close examination of the respondent's personal circumstances that could conceivably have considered her plight and accordingly awarded her a sum for her enjoyment (like in *Espagne*). Rather, the Subsidies and Grants were benefits made available by the government to the general public to cover any medical expenses they might incur. This strongly indicated that the Subsidies and Grants belonged to the group of "special services, aids,

benefits, subventions and the like which in most communities are available to injured people", and which are deductible from a tortfeasor's damages: *Espagne* at 286. Nothing indicated that the Subsidies and Grants were intended to be a separate "bounty"; a prize distinct from the respondent's medical expenses and given to her for her enjoyment. Thus, the default rule against double recovery applied such that the Subsidies and Grants were deductible from the damages payable. It is irrelevant that the tortfeasor may benefit from this; that is an incidental consequence of the rule against double recovery.

*Addressing* Azlin (HC)

82    Much of the discussion in the parties' submissions and the decisions below was on the extent to which the Subsidies and Grants might be analogised to the government subsidies received by the plaintiff in *Azlin (HC)* ([21] *supra*) (the "*Azlin* Subsidies"). In *Azlin (HC)*, the court was faced with issues relating to damages following the finding that the defendant hospital was negligent in its failure to diagnose the plaintiff with lung cancer at an earlier stage. The plaintiff claimed, *inter alia*, for medical expenses which were paid for by three sources of government financial assistance (the "*Azlin* Subsidies") – the Medication Assistance Fund Plus ("MAF Plus"), National Cancer Centre Medifund ("NCC Medifund") and the MOH's Medication Assistance Fund ("MAF"). The court held that the *Azlin* Subsidies were *not* deductible from the damages payable by the negligent hospital, analogising them to the insurance payouts received by the plaintiff (*Azlin (HC)* at [212]–[214]):

> 212    … [The] insurance payouts would have been received by Ms Azlin not merely due to [the hospital's] negligence, but primarily because Ms Azlin would have presumably duly paid her insurance premiums to the insurer. There is thus no 'double recovery' because, as clearly explained by Windeyer J in *Espagne*, the benefit from the insurance contract – the insurance payout – accrues to Ms Azlin as a result of a distinct contractual relationship between the insurer and Ms Azlin.
>
> 213    *The same reasoning applies to government subsidies*. Subsidies are provided by the government to its citizens or residents due to the government's relationship with its people. Such subsidies are awarded for a multitude of public policy reasons, such as the betterment of public health or access to affordable healthcare for citizens who qualify for assistance.
>
> 214    The Court of Appeal in *The 'MARA'* at [32] endorsed Windeyer J's dicta in *Espagne* that *relief given by the state should also be an exception to the rule against double recovery*. Therefore, the fact that Ms Azlin's medical expenses were paid by her insurance or government subsidies *does not* prevent her from claiming for compensation for these medical expenses from the tortfeasor.

[emphasis added]

These findings were not contested on appeal: see *Noor Azlin bte Abdul Rahman and another v Changi General Hospital Pte Ltd* [2022] 1 SLR 689 at [5].

83    The respondent submitted that this passage in *Azlin (HC)* stood for the proposition that *all* government subsidies were not deductible from damages payable, regardless of their nature, type and the relevant application process. We disagree. There are multiple forms of government subsidies available to the general public – it would not make sense for there to be a general rule that all are exempt from the rule against double recovery. The appropriate test centres on the objective intended purpose of a payment, which is a highly fact-centric exercise. In the context of government subsidies, this would naturally involve an inquiry into the *specifics* of the particular subsidy at hand, such as the relevant legislative framework under which it was paid out, the parliamentary intent behind it, and the group of persons to whom it was made available.

84    In fact, the very passage from *Espagne* referred to in *Azlin (HC)* (at [211] and [214]), states only that "*some* forms of relief given by the State" [emphasis added] may be exempt from the rule against double recovery: *Espagne* at 311. Dixon CJ even alluded to the fact that government subsidies would ordinarily be subject to the rule against double recovery, stating that "[t]here are certain special services, aids, benefits, subventions and the like which in most communities are available to injured people … [i]f the injured plaintiff has availed himself of these, he cannot establish or calculate his damages on the footing that he did not do so": *Espagne* at 286. There is, therefore, no blanket exemption of government subsidies from the rule against double recovery – the ultimate test is still whether the relevant benefits had the "additional characteristic" of being intended for the plaintiff's enjoyment: *Espagne* at 286.

85    The appellant attempted to distinguish the *Azlin* Subsidies from the Subsidies and Grants in the present case by arguing that the former were specific in nature and only granted following a tedious case-by-case assessment of the plaintiff's individual circumstances. The respondent disputed this, arguing that the MOH website did not state that a plaintiff is required to submit documents before subsidies are given under the MAF and MAF Plus (document submission is only applicable to the NCC MediFund application process). The respondent also contended that there was no evidence that the *Azlin* Subsidies required a case-by-case assessment by a medical social worker before being disbursed.

86    It was not necessary for the purposes of the present appeal to delve into a deep examination of the application process for the *Azlin* Subsidies. In any event, little information was provided in *Azlin (HC)* on this point. It suffices for us to say that to the extent that the *Azlin* Subsidies were not targeted and were simply general subsidies which did not require consideration of the plaintiff's personal circumstances, then the decision

that they were exempt from the rule against double recovery should not be followed. However, as far as the present case was concerned, it was clear that the Subsidies and Grants were *not* targeted and were general subsidies available to *all* Singaporeans and Permanent Residents (for the PG Subsidies, *all* "Pioneers"). Thus, no intention for the Subsidies and Grants to be enjoyed by the respondent over and above the damages payable could be inferred.

### *The Repayment Order*

87     The respondent first raised the proposal to repay the Subsidies and Grants to the government in her closing submissions before the DR. This proposal was first raised as an *alternative* submission, in the event the court found that the Subsidies and Grants were not exempt from the rule against double recovery. The respondent's primary submission before the DR (and indeed the DJ and the Judge) was that she should enjoy the Subsidies and Grants over and above the damages payable by the appellant.

88     It appeared that the Judge ultimately accepted both the respondent's primary and alternative submissions in a composite manner by making the Repayment Order. Under the Repayment Order, the respondent was to return the Disputed Sum to the MOH for it to decide what to do with the moneys, including whether to allow the respondent to retain them. Having addressed why the Subsidies and Grants were not exempt from the rule against double recovery (and hence the respondent could not retain them), we turn to address the second issue raised by the Repayment Order, which was whether the court should nevertheless order repayment of the Subsidies and Grants to the MOH.

89     Repayment of the Subsidies and Grants to the MOH did *not* engage the rule against double recovery. Where there is a condition for the plaintiff to repay the allegedly doubly-recovered sums to the provider of the payment or benefit, the rule against double recovery is not engaged, since the plaintiff does not recover more than his or her actual loss. Thus, the real issue here did not concern the rule against double recovery, and was simply whether the court had the power (and if so, whether the court should exercise this power) to order the proposed repayment.

90     Indeed, it was clear to us that the repayment proposal was raised precisely as a way to *circumvent* the rule against double recovery. That was why it first arose as an *alternative* submission in the respondent's case. As the DR observed, there was initially no mention at the hearing before him of any intention to return the Subsidies and Grants to the government: *Lo Kok Jong (DR)* ([45] *supra*) at [1]. The proposal was only raised later in the respondent's closing submissions before the DR, presumably in response to the difficulties with double recovery which counsel for the appellant as well as the DR noted at the hearing.

91    However, at the oral hearing for this appeal, Ms V M Vidthiya, counsel for the respondent adopted the position that a repayment order was her primary and *only* prayer. When it was pointed out to Ms Vidthiya that this would amount to conceding that the respondent was not entitled to enjoy the Subsidies and Grants on top of the damages payable, she accepted as much.

92    This concession was in line with our view that the Subsidies and Grants were not exempt from the rule against double recovery. However, it also meant that the respondent's case rested wholly on an attempt to invite this court to devise what was essentially an *ad hoc* solution, adrift of any statutory or legal framework, to prevent the appellant from benefiting from the Subsidies and Grants.

93    The respondent argued that there was precedent for making such an order. The respondent referred to the case of *Minichit Bunhom* ([38] *supra*), in which this court allowed the victim-employee to recover from the third-party tortfeasor damages for medical expenses which had already been paid for by the employer. These sums were then to be transferred to the employer on the basis of an agreement between the victim-employee and the employer (the "Non-Recourse Loan Agreement"), under which the victim-employee was to claim the sums from the tortfeasor and repay the employer.

94    However, the clear distinction between *Minichit Bunhom* and the present case was the existence of the Non-Recourse Loan Agreement in the former. There was a contractual mechanism for repayment in place. Therefore, in ordering the tortfeasor to pay damages for the victim's medical expenses, the court was simply recognising the contractual liability owed by the victim-employee, which meant that the rule against double recovery would *not* be engaged by the order.

95    The court in *Minichit Bunhom* did go on to say that even in the absence of a Non-Recourse Loan Agreement, "the court in granting the victim-foreign employee's claim for medical expenses against the tortfeasor would, and should as a matter of course, require an undertaking or make a direction that the victim-foreign employee was to return the recovered medical expenses to the employer": *Minichit Bunhom* at [85(a)]. We make three points in this regard. First, this observation was made *obiter* since on the facts, there was a Non-Recourse Loan Agreement in place. Second, in the context of the applicable legislation in *Minichit Bunhom* (*ie*, the Employment of Foreign Manpower Act (Cap 91A, 2009 Rev Ed) (the "EFMA"), which obliged the employer to bear the victim-employee's cost of medical treatment arising from the accident), the court there found that the EFMA was designed to modify only the relationship between an employer and his foreign employee, and not that between a tortfeasor and the victim: *Minichit Bunhom* at [41]–[42]. Hence, the *dictum* that an order for repayment to the employer should ordinarily be given was a consequence of

the court's interpretation of parliamentary intent specifically in relation to the EFMA. Third, in the general context of an employer's contractual agreement to pay the medical expenses of its employees, it is arguable that there is an *implied term* that the employer does not intend to make such payment on top of any damages that may be obtained from a third-party tortfeasor. Both these statutory and contractual analyses were inapplicable in the present case.

96      Thus, unlike in *Minichit Bunhom*, there was no legal basis for making a repayment order here. In fact, such an order would have involved the court taking steps beyond its judicial remit. The UK experience shows that setting up a mechanism for the recoupment of government benefits from tortfeasors is a complex undertaking. Academics have described the drawn-out political process, involving much debate over various policy considerations, leading up to the enactment of the Social Security Act 1989 (the "SSA") (the predecessor to the SSRBA) and the setting up of the CRU in the UK (*Tort Law and the Legislature* at 292–293):

> The Pearson Commission's view that the duplication of social security and tort payments should be brought to an end was accepted in principle by the Government in a White Paper in 1981. But before endorsing the Commission's proposal that benefits should be fully offset against damages, the Government wished to consider again whether it might also be possible for the state to recover those benefits. A recovery scheme would have the advantage, when compared to offsetting, of not reducing the liability of negligent defendants. In addition, for work injuries it was thought that the sums recovered might finance improved state provision for all injured workers whether or not they could claim in tort. Against this there continued to be concern that the state's intervention in tort claims would require an increase in staff numbers out of proportion to the benefit recovered. In addition it was thought difficult to set up an effective system to deal with cases settled out of court – the way in which almost all cases are determined in practice. Because of these fears the Government concluded that, on balance, recovery was still impractical. It therefore proposed to adopt the Pearson proposals for the offsetting of benefit, and to abandon the idea of state recoupment.

> However, further public comment was invited and this produced some responses suggesting that the recovery option should not be abandoned without more investigation. … By this time the political climate had also changed. The corporate welfarist philosophy of previous Labour Governments had given way to the monetary economics of Thatcherite conservatism to which state subsidies to employers and duplicated help for welfare recipients were anathema. The possibility of ending these subsidies – or at least recovering the public expenditure involved – was bound to receive enthusiastic political support.

> In spite of the increasingly favourable political climate the promised legislation did not materialise. As a result, in 1986 the National Audit Office criticised the Department of Health and Social Security for its failure to

investigate the feasibility of a cost-effective recovery scheme. It called for detailed research and for the necessary calculations to be made … the commissioned report found that such a scheme was feasible.

When the proposals for reform became known, these too met with widespread criticism. It is difficult to exaggerate the extent of this opposition. Only the National Audit Office and the Public Accounts Committee supported the proposals. Strong opposition came from the Law Society, the Association of British Insurers, and even certain judges who made public their view that the changes might make settlements harder to achieve. Both sides of industry – the Confederation of British Industry and the Trades Union Congress (TUC) – expressed their concern about the proposed scheme. The Industrial Injuries Advisory Council (IIAC) had previously been in favour of the Pearson Commission's proposal for offsetting benefits from damages. However, it was very critical of the new suggestions and was dismayed to note that any savings to be made were not to be earmarked for improvement to the industrial scheme. An editorial in Legal Action simply described the proposals as 'fiscal opportunism riding on the back of inadequate analysis'. However, such criticism made little difference to a Government who, at that time, were prepared to introduce legislation in the teeth of opposition from establishment groups. …

It was thus very much as a result of the prevailing political philosophy that the recovery scheme was first set up by the Social Security Act 1989.

97     All this to say that the issue of instituting a recoupment mechanism is a legislative and executive matter which clearly lies outside the province of the courts. Further, as a matter of practicality, the logistical problems associated with the court ordering repayment to the MOH or the government have already become apparent. In the present case, in an exchange where it seemed unsure as to how the Disputed Sum should be handled, the MOH eventually confirmed that it wished for the respondent to make a personal donation of the Subsidies and Grants to the Rare Disease Fund. This struck us as an unsatisfactory and *ad hoc* solution which did not address the concern of returning the moneys to the correct institution or department which had incurred the expense of treatment. In fact, it was not even certain if the Subsidies and Grants did in fact come out of the MOH's funds – there was simply no evidence before this court on the true source of the Subsidies and Grants.

98     We also note the recent case of *Leong Yock Mui v Lek Long Peow* [2023] SGDC 307 ("*Leong Yock Mui*"), in which the DR attempted to address the difficulties generated by the Repayment Order for subsequent cases. The DR's solution was to direct the tortfeasor in that case to pay the claimed subsidy sums to the plaintiff's solicitors, for them to hold until a suitable government body was identified to receive those sums: *Leong Yock Mui* at [34]. The DR noted that a "suitable" government body meant the precise government body that disbursed the sums, and which was "legally empowered" to receive repayment. This would involve obtaining the government body's input on whether it was indeed empowered as such:

*Leong Yock Mui* at [34]. In the event that multiple government bodies were involved, the DR directed that a proposal ought to be made as to how the government subsidy was to be distributed: *Leong Yock Mui* at [34].

99    This solution, while creative, requires the court to act as an administrative body co-ordinating the exchange of information and the distribution of the relevant sums across government bodies. In our judgment, it is wholly inappropriate for the court to play this role. *Leong Yock Mui* serves as a further example of the impracticality of the court ordering repayment of the Subsidies and Grants.

100    Ultimately, in our view, it was both unprincipled and impractical for the court to institute a recoupment mechanism on its own accord. Accordingly, we rejected the respondent's proposal that the Subsidies and Grants be repaid to the MOH.

**Conclusion**

101    For the aforementioned reasons, we allowed the appeal. It was clear to us that the respondent's case was largely based on the intuitive attraction of the idea that the tortfeasor should not benefit from the Subsidies and Grants, which were paid for by the government, and therefore stemmed from taxpayers' moneys. In a way, the respondent's chief complaint was that the ordinary taxpayer should not be made to bear the appellant's liability.

102    But that would be looking at this case through the wrong lens. In the context of damages for motor accidents, the law is hardly ever concerned with a moralistic view of the *wrong* committed by the tortfeasor. Accidents, while unfortunate, are an inherent risk of the use of roads and highways by motorists. As far as a driver's moment of inattention or indiscretion strays beyond that of tortious negligence into criminal negligence or rashness, the appropriate punishment to be meted out is a concern for criminal law. As far as civil claims go, however, punishment is *not* the focus. The main concern is simply to compensate the plaintiff for the loss suffered.

103    It is increasingly recognised that the losses suffered by victims of motor accidents are a general social burden. Insurance operates precisely to spread these losses among the subscribers to insurance as a whole. Given the ubiquity of insurance in modern society, these losses are effectively borne by society at large. In a way, medical subsidies and grants provided by the government work in the same manner, but for a larger type of general social burden. They work to spread the financial costs generated by medical problems – of which injuries suffered by motor accident victims are a subset – among taxpayers and hence society at large.

104    In the present case, as for almost all motor accident cases, the appellant's vehicle was covered by insurance and he had subrogated his rights to the insurance company. The court was essentially asked to choose

between two very similar options – either having subscribers to insurance or having taxpayers bear the respondent's medical expenses. In the modern context, the membership of these two groups overlap to such an extent that the difference is practically negligible. Any notion of the "fairness" of making the tortfeasor instead of the government bear the victim's losses is illusory – either way, society as a whole bears the loss. We should add that it is, in any event, a false comparison because taxpayers bear this loss for everyone; and there is nothing to suggest that the legislation contemplated that they would not bear it if there is an accident and another potential payer. If the government is of the view that society should bear these expenses via the mechanism of insurance premiums rather than taxes, then it is up to the legislature to devise a statutory mechanism for recoupment. Ultimately, true fairness in the present case lay in respecting the fundamental compensatory aim of damages as well as the court's role in this policy-laden area of law.

Reported by Darryl Ong Ming En.

# EXHIBIT D

# The Football Association Premier League Limited v British Sky Broadcasting Limited, British Telecommunications Plc, Everything Everywhere Limited, Talktalk Telecom Limited, TelefÓnica UK Limited, Virgin Media Limited

*Positive/Neutral Judicial Consideration*

**Court**
Chancery Division

**Judgment Date**
16 July 2013

Case No: HC13F02471

High Court of Justice Chancery Division

**[2013] EWHC 2058 (Ch), 2013 WL 3550408**

Before: The Hon Mr Justice Arnold

Date: 16 July 2013

**Representation**

Ian Mill QC and James Segan (instructed by DLA Piper UK LLP ) for the Claimant.
The Defendants did not appear and were not represented.

**Judgment**

Mr Justice Arnold:

**Introduction**

1. The Claimant ("FAPL") is the governing body of the football competition known as the Barclays Premier League ("the Premier League"). As explained in more detail below, FAPL owns the copyright in recordings of television footage of all Premier League matches, and in artistic works which appear within that footage. The Defendants are the six main retail internet service providers ("ISPs") in the United Kingdom. Between them they have a fixed line market share of some 94% of UK internet users. By this claim FAPL seeks an injunction against the Defendants pursuant to section 97A of the Copyright, Designs and Patents Act 1988 ("the 1988 Act"), which implements Article 8(3) of European Parliament and Council Directive 2001/29/EC of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society ("the Information Society Directive"), requiring the Defendants to take measures to block or at least impede access by their customers to a website known as FirstRow Sports ("FirstRow").

2. Although FAPL is formally the only applicant, the application is supported by the following other rightholders, a representative of each of which has made a witness statement in support of the application confirming that FirstRow is not licensed by that rightholder to exploit its content:

    i) The Football Association Ltd;
    ii) The Scottish Premier League Ltd;
    iii) The Football League Ltd;
    iv) Union des Associations Européennes de Football ("UEFA");

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 55 of 79

    v)  PGA European Tour;

    vi)  The Professional Darts Corporation Ltd;

    vii)  World Snooker Ltd; and

    viii)  Rugby Football Union.

**Previous case law**

3.  In Twentieth Century Fox Film Corp v British Telecommunications plc [2011] EWHC 1981 (Ch), [2012] Bus LR 1471 (" 20C Fox v BT ") I held that the Court had jurisdiction, and that it was appropriate to exercise my discretion, to make a blocking order against the Second Defendant ("BT") with respect to a website called Newzbin2. In Twentieth Century Fox Film Corp v British Telecommunications plc (No 2) [2011] EWHC 2714 (Ch), [2012] Bus LR 1525 (" 20C Fox v BT (No 2) ") I determined the terms of that order. Subsequently Vos J and I made similar orders against the other Defendants.

4.  In Dramatico Entertainment Ltd v British Sky Broadcasting Ltd [2012] EWHC 268 (Ch), [2012] 3 CMLR 14 (" Dramatico v Sky ") I held that both users and the operators of website called The Pirate Bay ("TPB") infringed the copyrights of the claimants (and those they represented) in the UK. Following that judgment, five of the Defendants indicated to the claimants that they did not oppose the making of orders under section 97A of the 1988 Act in terms which had been agreed between the parties. I acceded to the claimants' application that I should make those orders for the reasons I gave in Dramatico Entertainment Ltd v British Sky Broadcasting Ltd (No 2) [2012] EWHC 1152 (Ch), [2012] 3 CMLR 15 (" Dramatico v Sky (No 2) "). Subsequently I also made an order against the remaining Defendant in respect of TPB, again in terms agreed between the parties.

5.  In EMI Records Ltd v British Sky Broadcasting Ltd [2013] EWHC 379 (Ch), [2013] ECDR 8 (" EMI v Sky ") I held that both users and the operators of three websites called KAT, H33T and Fenopy infringed the copyrights of the claimants and that it was appropriate to grant blocking orders against the Defendants in respect of those websites in terms agreed between the parties.

**The present application**

6.  The present application differs from the applications considered in the judgments referred to above in a number of respects. First, the applicant and its supporters constitute a different class of rightholder. Secondly, unlike the websites the subject of the previous applications, FirstRow is not a peer-to-peer ("P2P") file-sharing website. Rather, it is a website which facilitates access to streams of television broadcasts of sporting events. Thirdly, as a result, the issues on infringement are somewhat different.

7.  As in the Dramatico v Sky and EMI v Sky cases, FAPL seeks orders in terms which have been agreed with the Defendants and the Defendants do not oppose the making of those orders. That does not absolve the Court of the responsibility of determining whether the orders sought are justified. I have considered the matter on paper.

**FAPL and its rights**

8.  FAPL is authorised by its member clubs to license broadcasters throughout the world to provide coverage of Premier League matches. A high proportion of the revenue generated by FAPL derives from the sale of such rights. The rights are offered to broadcasters by open competitive tender for a specified territory or groups of territories and term. The rights for the United Kingdom and the Republic of Ireland are sold separately from the rest of the world. The broadcast rights for the

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 56 of 79

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

UK alone were last auctioned for some £3.018 billion, which is by a very considerable margin the largest amount paid for sporting broadcast rights in the UK.

9.  The broadcasting of Premier League matches for viewing in the UK during the "Closed Period" is restricted by Article 48 of the Statutes of UEFA. This empowers each national football association to designate a period of two and half hours in each week during which the broadcasting of football matches in that territory is prohibited. The purpose of this is to encourage attendance at football matches, and in that way to support the sport of football. The Football Association has designated 2.45 pm to 5.15 pm on Saturdays as the Closed Period in England.

10.  Each Premier League match is filmed by one of three broadcasters (referred to as the "Host Broadcasters"), using between 8 and 25 cameras with built-in microphones. The live pictures and ambient sound from the stadium are referred as the "Clean Live Feed". The Clean Live Feed also includes action replays added by the Host Broadcaster's production team. These consist of recordings of pictures of incidents of particular interest ("the Action Replay Films"). The Clean Live Feed is transmitted directly to some broadcasters who have been licensed by FAPL, notably those in the UK, Republic of Ireland, United States of America and India.

11.  The Clean Live Feed is also transmitted to IMG Media Ltd, which incorporates certain onscreen graphics and logos into it to produce the "World Feed". Prior to the 2012/2013 season, the World Feed was transmitted live to broadcasters who had been licensed by FAPL other than those who receive the Clean Live Feed. Since the beginning of the 2012/2013 season, the World Feed has been recorded ("the Recorded World Feed") before it is transmitted to the broadcasters.

12.  For the purposes of the present application, FAPL claims copyright in the following works:

i)  the films comprising the Action Replay Films included in the Clean Live Feed (and hence the Recorded World Feed);
ii)  the films comprising the Recorded World Feed;
iii)  the artistic works comprising the Premier League and Barclays logos which are incorporated in the Recorded World Feed; and
iv)  the artistic works comprising two sets of on-screen graphics (referred to as the "AEL Onscreen Graphics" and the "IMG Onscreen Graphics") which are incorporated in the Recorded World Feed.

13.  I am satisfied by the evidence filed by FAPL that copyright subsists in these works and that FAPL owns those copyrights.

**FirstRow**

14.  FirstRow is a website which has been operating for some time as an indexing and aggregation portal to streamed broadcasts of sporting events. The site is currently located at www.firstrow1.eu, although a number of other domain names have been used, some of which have been seized by the US Department of Homeland Security. A visitor to the FirstRow website is presented with lists of links, organised by sport and time of the day, to streams containing live coverage of a wide range of sporting events, including in particular Premier League matches and events organised by the other supporting rightholders. Upon clicking on one of those links, the user is taken to a new page which features a "frame" or window in which that live coverage then appears, accompanied by advertising. As an alternative, the user can download a free app from the website to their computer which will enable them to access links.

15.  The streams that are indexed on FirstRow are provided by third party streamers using one of a number of User Generated Content ("UGC") websites. There are around six or seven such UGC sites which are commonly used for this purpose, one of

© 2025 Thomson Reuters.

the most popular of which is called 04stream.com. There are a number of stages to the process. First, the third party streamer digitally captures a broadcast of a live sports event on his or her computer. The captured broadcast may be one that the streamer is watching on his television or computer legally (e.g. via a legitimate subscription) or it may be an illegal stream. Secondly, the streamer sends the captured images in real time to the server of a UGC site. Thirdly, the streamer uses the UGC site to create an "embed code" which enables the stream player to be embedded into a website like FirstRow. Fourthly, the streamer submits the embed code to FirstRow. If it is accepted, it will be listed as a link on FirstRow. It appears that FirstRow has moderators who vet and index these submissions. It is common for multiple links to be listed for each event. These may comprise multiple versions of the same broadcast and/or different broadcasts. Fifthly, the user clicks on the link, thereby enabling the user to watch the stream.

16.  Three points should be noted about this process. First, whilst FirstRow gives the impression — by way of a "Submit your video" link — that it is open to the submission of streams by any member of the public, this does not in fact appear to be the case. FAPL's evidence is that it is likely that it works with a number of existing, trusted streamers (and, perhaps, new streamers introduced by existing streamers). Secondly, FAPL's evidence is that none of the streams links to which are provided by FirstRow comes directly from an official source (such as a broadcaster licensed by FAPL). Thirdly, FirstRow itself does not itself transmit any of the streams. Rather, the streams emanate from the UGC sites.

17.  The scale of FirstRow's activities is very large. There are a large number of links listed on the site at any one time. FirstRow was ranked by Alexa as the 268th most popular website in the UK in January 2013 and the 239th most popular in April 2013. To put that in perspective, FirstRow was on that basis more popular, in January 2013, than both www.lastminute.com and www.ft.com. In April 2013 alone, FirstRow received 9.98 million unique user hits worldwide.

18.  The generation of traffic at these levels enables FirstRow to make considerable sums in advertising and affiliation revenues. Using his expertise acquired from over twelve years of researching and analysing digital piracy, and on the basis of a detailed analysis of the website and the adverts which appear there, FAPL's expert witness Dr David Price estimates that FirstRow is likely to be generating between £5,360,680 and £9,505,564 in annual revenue. Many of the UGC streamers are also motivated by financial reward, since they are able to add their own adverts to the streams.

19.  FirstRow does not have permission from FAPL to engage in this activity. Nor, as the witnesses make clear, does FirstRow have permission from the other supporting rightholders, all of whose content has also been streamed via FirstRow.

20.  FirstRow is not merely used to watch coverage of sporting events in users' homes. On the contrary, FAPL's agents have discovered that FirstRow is being used by some public houses in the UK so as to show their customers broadcasts of Premier League matches, including during the Closed Period on a Saturday afternoon.

21.  FAPL has been unable to establish who the operators of FirstRow are and where they can be contacted. FirstRow has been registered under many different domain names, using a mixture of what appear to be false name and address details and registrations via proxy registration firms. The current host of the site is Portlane in Sweden, which FAPL's witness Tim Cooper, Chief Technology Officer of NetResult Solutions Ltd ("NetResult"), a company specialising in internet investigation, monitoring and enforcement, describes as "a well-known haven for pirate sites".

22.  NetResult has sent a number of cease and desist letters on behalf of FAPL to FirstRow, but these have not been responded to. Furthermore, although FirstRow states that it will accept takedown notices, the address given turns out to be fictitious.

© 2025 Thomson Reuters.

**The legal framework**

23.  I set this out in Dramatico v Sky at [30]-[38].

**Jurisdictional requirements**

24.  Section 97A of the 1988 Act empowers the High Court "to grant an injunction against a service provider, where that service provider has actual knowledge of another person using their service to infringe copyright". In order for this Court to have jurisdiction to make the orders sought by FAPL, four matters must be established. First, that the Defendants are service providers. Secondly, that users and/or the operators of FirstRow infringe FAPL's copyrights. Thirdly, that users and/or the operators of FirstRow use the Defendants' services to do that. Fourthly, that the Defendants have actual knowledge of this.

*Are the Defendants service providers?*

25.  As I stated in Dramatico v Sky (No 2) at [5], I am in no doubt that the Defendants are service providers within the meaning of regulation 2 of the Electronic Commerce (EC Directive) Regulations 2002 , SI 2002/2013, and hence within the meaning of section 97A of the 1988 Act. None of the Defendants has suggested otherwise.

*Do the operators and users of FirstRow infringe FAPL copyrights?*

26.  FAPL contends that the operators of FirstRow infringe their copyrights in two ways. First, by communicating the copyright works to the public within section 20 of the 1988 Act, alternatively by acting as joint tortfeasors with the operators of the UGC websites. Secondly, by authorising infringements by users. FAPL contends that some UK users of FirstRow, namely the publicans who use FirstRow to show Premier League matches in their public houses, infringe their copyrights by communicating the copyright works to the public.

27.  In view of the Supreme Court's decision and reference to the *Court of Justice of the European Union in Public Relations Consultants Association Ltd v The Newspaper Licensing Agency Ltd [2013] UKSC 18, [2013] ECDR 10* , FAPL does not advance any claim based on copying, whilst reserving its right to do so in later proceedings.

**Communication to the public**

28.  Section 20 of the 1988 Act provides:

"(1)  The communication to the public of the work is an act restricted by the copyright in—

(a)  a literary, dramatic, musical or artistic work,

(b)  a sound recording or film, or

(c)  a broadcast.

(2)  References in this part to communication to the public are to communications to the public by electronic transmission, and in relation to a work includes—

(a)  the broadcasting of the work;

(b)  the making available to the public of the work by electronic transmission in such a way that members of the public may access it from a place and at a time individually chosen by them."

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 59 of 79

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

29.  Section 20 implements Article 3 of the Information Society Directive , which provides as follows:

**"Right of communication to the public of works and right of making available to the public other subject-matter**

1.  Member States shall provide authors with the exclusive right to authorise or prohibit any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access them from a place and at a time individually chosen by them.

2.  Member States shall provide for the exclusive right to authorise or prohibit the making available to the public, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them:

(a)  for performers, of fixations of their performances;

(b)  for phonogram producers, of their phonograms;

(c)  for the producers of the first fixations of films, of the original and copies of their films;

(d)  for broadcasting organisations, of fixations of their broadcasts, whether these broadcasts are transmitted by wire or over the air, including by cable or satellite.

3.  The rights referred to in paragraphs 1 and 2 shall not be exhausted by any act of communication to the public or making available to the public as set out in this Article."

30.  I reviewed the law with regard to communication to the public under Article 3 of the Information Society Directive and section 20 of the 1988 Act in Dramatico v Sky at [45]-[70], where I considered the decisions of the *CJEU in Case C-306/05 Sociedad General de Autores y Editores de España (SGAE) v Rafael Hoteles SA [2006] ECR I-11519* , Case C-136/09 Organismos Sillogikis Diacheirisis Dimiourgon Theatrikon kai Optikoakoustikon Ergon v Divani Akropolis Anonimi Xenodocheiaki kai Touristiki Etaireia [2010] ECR I-37 , Case C-393/09 Bezpečnostní softwarová asociace – Svaz softwarové ochrany v Ministerstvo kultury [2010] ECR I-13971, Joined Cases C-403/08 and C-429/08 Football Association Premier League Ltd v QC Leisure [2011] ECR I-0000, [2012] Bus LR 1321 and Joined Cases C-431/09 and C-432/09 Airfield NV v Belgische Vereniging van Auteurs, Compositien en Uitgevers CVBA (SABAM) [2011] ECR I-0000, [2012] ECDR 3 . I reviewed the law again in EMI v Sky at [28]-[38], where I considered the decisions of the CJEU in Case C-135/10 Societá Consortile Fonografici v Del Corso [2012] ECR-0000, [2012] Bus LR 1870 and Case C-173/11 Football Dataco Ltd v Sportradar Gmbh [2012] ECR I-0000, [2013] FSR 4 .

31.  I concluded in EMI v Sky that whether there is a communication to the public depends on the answers to three questions:

i)  Is there a communication of copyright works by way of electronic transmission?
ii)  Is there a communication to a new public, that is to say, to a public which was not taken into account by the authors of the protected works when they authorised their communication to the original public?
iii)  Does the act of communication to the public take place in the UK? If the communication originates from outside the UK, that depends on whether it is targeted at the public in the UK.

32.  The CJEU has since given judgment in Case C-607/11 ITV Broadcasting Ltd v TVCatchup Ltd [2013] ECR-0000, [2013] ECDR 9 . That case concerned a website which re-transmitted live television broadcasts, via the internet, to persons who

© 2025 Thomson Reuters.

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 60 of 79

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

already held a licence to watch such broadcasts on a television. As to whether there was a "communication" under Article 3 , the Court of Justice held:

> "22. … Directive 2001/29 does not define the concept of 'communication' exhaustively. Thus, the meaning and scope of that concept must be defined in the light of the context in which it occurs and also in the light of the objective referred to in paragraph 20 above.
>
> 23. It follows, in particular, from recital 23 in the preamble to Directive 2001/29 that the author's right of communication to the public covers any transmission or retransmission of a work to the public not present at the place where the communication originates, by wire or wireless means, including broadcasting. In addition, it is apparent from Article 3(3) of that directive that authorising the inclusion of protected works in a communication to the public does not exhaust the right to authorise or prohibit other communications of those works to the public.
>
> 24. If follows that, by regulating the situations in which a given work is put to multiple use, the European Union legislature intended that each transmission or retransmission of a work which uses a specific technical means must, as a rule, be individually authorised by the author of the work in question.
>
> 25. Those findings are, moreover, supported by Articles 2 and 8 of Directive 93/83 , which require fresh authorisation for a simultaneous, unaltered and unabridged retransmission by satellite or cable of an initial transmission of television or radio programmes containing protected works, even though those programmes may already be received in their catchment area by other technical means, such as by wireless means or terrestrial networks.
>
> 26. Given that the making of works available through the retransmission of a terrestrial television broadcast over the internet uses a specific technical means different from that of the original communication, that retransmission must be considered to be a 'communication' within the meaning of Article 3(1) of Directive 2001/29 . Consequently, such a retransmission cannot be exempt from authorisation by the authors of the retransmitted works when these are communicated to the public.
>
> 27. That conclusion cannot be undermined by TVC's objection that the making of the works available over the internet, as was done in the case in the main proceedings, is merely a technical means to ensure or improve reception of the terrestrial television broadcast in its catchment area.
>
> 28. Admittedly, it follows from the case-law of the Court that a mere technical means to ensure or improve reception of the original transmission in its catchment area does not constitute a 'communication' within the meaning of Article 3(1) of Directive 2001/29 (see, to that effect, Football Association Premier League and Others , paragraph 194, and *Airfield and Canal Digitaal* , paragraphs 74 and 79).
>
> 29. Thus, the intervention of such a technical means must be limited to maintaining or improving the quality of the reception of a pre-existing transmission and cannot be used for any other transmission.
>
> 30. In the present case, however, the intervention by TVC consists in a transmission of the protected works at issue which is different from that of the broadcasting organisation concerned. TVC's intervention is in no way intended to maintain or improve the quality of the transmission by that other broadcasting organisation. In those circumstances, that intervention cannot be considered to be a mere technical means within the meaning specified in paragraph 28 above."

33. Thus the Court has confirmed that any retransmission of a terrestrial television broadcast via the internet will constitute a communication because it involves "…a specific technical means different from that of the original communication" and

© 2025 Thomson Reuters.

an "…intervention … which is different from that of the broadcasting organisation concerned". This reasoning is equally applicable to re-transmission of satellite and cable television broadcasts via the internet.

34. The Court then went on to consider the issue of whether there was communication to the "public":

> "32. In that connection, it follows from the case-law of the Court that the term 'public' in Article 3(1) of Directive 2001/29 refers to an indeterminate number of potential recipients and implies, moreover, a fairly large number of persons (see, to that effect, SGAE , paragraphs 37 and 38 and the case law cited).

> 33. As regards that last criterion specifically, the cumulative effect of making the works available to potential recipients should be taken into account. In that connection, it is in particular relevant to ascertain the number of persons who have access to the same work at the same time and successively ( SGAE , paragraph 39).

> 34. In that context, it is irrelevant whether the potential recipients access the communicated works through a one-to-one connection. That technique does not prevent a large number of persons having access to the same work at the same time.

> 35. In the present case, it should be noted that the retransmission of the works over the internet at issue in the main proceedings is aimed at all persons resident in the United Kingdom who have an internet connection and who claim to hold a television licence in that State. Those people may access the protected works at the same time, in the context of the 'live streaming' of television programmes on the internet.

> 36. Thus, the retransmission in question is aimed at an indeterminate number of potential recipients and implies a large number of persons. Consequently, it must be held that, by the retransmission in question, the protected works are indeed communicated to a 'public' within the meaning of Article 3(1) of Directive 2001/29 ."

35. Finally, the Court considered whether there was a "new public" in that particular case, because of the pre-existence of a television licence:

> "37 … TVC contends that the retransmission at issue in the main proceedings does not satisfy the requirement that there must be a new public, which is none the less necessary within the meaning of the judgments in SGAE (paragraph 40), Football Association Premier League and Others (paragraph 197), and *Airfield and Canal Digitaal* (paragraph 72). The recipients of the retransmission effected by TVC are, it submits, entitled to follow the televised broadcast, identical in content, using their own television sets.

> 38. In that connection, it should be noted that the situations examined in the cases which gave rise to the abovementioned judgments differ clearly from the situation at issue in the case in the main proceedings. In those cases, the Court examined situations in which an operator had made accessible, by its deliberate intervention, a broadcast containing protected works to a new public which was not considered by the authors concerned when they authorised the broadcast in question.

> 39. By contrast, the main proceedings in the present case concern the transmission of works included in a terrestrial broadcast and the making available of those works over the internet. As is apparent from paragraphs 24 to 26 above, each of those two transmissions must be authorised individually and separately by the authors concerned given that each is made under specific technical conditions, using a different means of transmission for the protected works, and each is intended for a public.

© 2025 Thomson Reuters.

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 62 of 79

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

> In those circumstances, it is no longer necessary to examine below the requirement that there must be a new public, which is relevant only in the situations on which the Court of Justice had to rule in the cases giving rise to the judgments in SGAE , Football Association Premier League and Others and *Airfield and Canal Digitaal* ."

36.  The Court thus held that, where a television broadcast is re-transmitted via the internet, there is no need to show that the "public" to which the re-transmission is communicated is any different from the public to which the original transmission was addressed. The fact that it is a separate communication to the public by a different technical means suffices.

**Communication to the public by the operators of FirstRow**

37.  Although some of the copyright works relied on by FAPL are "films" within the meaning of the 1988 Act and some are artistic works, it is not necessary to differentiate between them for the purposes of considering FAPL's claims of infringement by communication to the public for the reasons explained in Dramatico v Sky at [61]-[65].

38.  *Is there a communication by FirstRow?* FAPL contends that FirstRow communicates FAPL's copyright works by electronic transmission. In my judgment it is clear from the CJEU's reasoning in ITV v TVCatchup at [26] and [30] that there is a communication of the works. More specifically, the works are made available by electronic transmission in such a way that members of the public may access the recordings from a place and at a time individually chosen by them within section 20(2)(b) .

39.  The more difficult question is whether FirstRow is responsible for the communication. FAPL accepts that, in technical terms, the streams emanate from the UGC sites and not from FirstRow itself. FAPL nevertheless contends that both the UGC sites and FirstRow communicate the works.

40.  In support of this contention, FAPL relies upon the reasoning of Kitchin J (as he then was) in Twentieth Century Fox Film Corp v Newzbin Ltd [2010] EWHC 608 (Ch), [2010] FSR 21 at [125]:

> "The defendant has provided a service which, upon payment of a weekly subscription, enables its premium members to identify films of their choice using the Newzbin cataloguing and indexing system and then to download those films using the NZB facility, all in the way I have described in detail earlier in this judgment. This service is not remotely passive. Nor does it simply provide a link to a film of interest which is made available by a third party. To the contrary, the defendant has intervened in a highly material way to make the claimants' films available to a new audience, that is to say its premium members. Furthermore it has done so by providing a sophisticated technical and editorial system which allows its premium members to download all the component messages of the film of their choice upon pressing a button, and so avoid days of (potentially futile) effort in seeking to gather those messages together for themselves. As a result, I have no doubt that the defendant's premium members consider that Newzbin is making available to them the films in the Newzbin index. Moreover, the defendant has provided its service in full knowledge of the consequences of its actions."

41.  FAPL also relies on what I said in EMI v Sky at [46]:

> "I would add that I see nothing in Football Dataco v Sportradar to exclude the possibility that more than one person may be involved in an act of communication to the public. In the present situation, the communication to the public involves both the operators of Websites, who provide a mechanism specifically designed to achieve this, and the users, who provide the actual recordings. (Even if

© 2025 Thomson Reuters.

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 63 of 79

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

I am wrong about this, the operators may still be liable on the grounds of authorisation and joint tortfeasance.)"

42.  In the present case the operators of FirstRow have intervened in a manner which, although technically different, is analogous to that of the websites under consideration in those cases. FirstRow aggregates together a large number of streams from a variety of streamers, indexes them for the convenience of the user and provides a simple link for the user to click on in order to access a specific stream. It is true that the technical effect of clicking on the link is to direct the stream from the UCG site to the user's computer, but even so the stream is presented in a frame provided by FirstRow. In all the circumstances, I consider that FirstRow is responsible for the communication.

43.  Even if I am wrong about that, I consider that FirstRow is jointly liable for the communication by the UGC sites: compare EMI v Sky at [71]-[74].

44.  *Is the communication to the public?* FAPL contends that the communication is to the public, relying on the reasoning of the CJEU in ITV v TVCatchup at [35]-[36]. I agree that this reasoning is equally applicable to the present case. Furthermore, FAPL contends that it is not necessary for it to show that the communication is to a new public, relying on ITV v TVCatchup at [39]. I accept this. In any event, even if FAPL had to show that the communication was to a new public, I consider that it is clear that that requirement is satisfied, since the effect of FirstRow's activities is to make the broadcasts available to persons who are not legitimately entitled to view them either because those persons have not subscribed to the broadcaster's service or because the broadcaster has only been licensed by FAPL for a different territory.

45.  *Is the communication in the UK?* FAPL accepts that it must show an intention on the part of the operators of FirstRow to target the public in the UK. FAPL relies upon the following matters as evidencing such an intention:

i)  The website is an English language website.
ii)  The advertising on FirstRow includes adverts for companies located in the UK and products consumed in the UK.
iii)  FirstRow provides access to a large number of competitions which are extremely popular with UK audiences. In particular, the amount of Premier League content on the website is up to 11% whilst a Premier League match is being played.
iv)  As noted above, FirstRow is a very popular site in the UK.
v)  Between 12 and 13.7% of the worldwide traffic to the site comes from the UK.
vi)  FirstRow is discussed on internet blogs and forums, where a significant proportion of the internet traffic to those blogs and forums comes from the UK.

46.  I accept that these matters evidence an intention to target the public in the UK. Accordingly, there is communication to the public in the UK.

47.  *Conclusion.* I am satisfied that FirstRow communicates FAPL's copyright works to the public in the UK and thereby infringes FAPL's copyrights in those works.

**Communication to the public by users of FirstRow who are publicans**

48.  FAPL contends that publicans who use FirstRow to screen Premier League matches in their public houses are thereby communicating FAPL's copyright works to the public. In support of this, FAPL relies upon the decision of the CJEU in FAPL v QC , where the Court held at [207] that:

> "… 'communication to the public' within the meaning of Article 3(1) of the Copyright Directive must be interpreted as covering transmission of the broadcast works, via a television screen and speakers, to the customers present in a public house."

© 2025 Thomson Reuters.

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 64 of 79

49. Clearly, the same reasoning must apply where the technical means used is a computer rather than a television. Accordingly, I conclude that the publicans communicate FAPL's copyright works to the public.

**Authorisation by the operators of FirstRow**

50. FAPL contends that the operators of FirstRow authorise the infringements by the users and thus also infringe in that way. I have to say that I have doubts as to whether it can be said that the operators of FirstRow authorise the screening of Premier League matches using FirstRow in public houses. It is not necessary for me to reach a conclusion on this point, however, given that I have already concluded that the operators of FirstRow infringe FAPL's copyrights by communication to the public.

*Do the users and/or operators use the Defendants' services to infringe?*

51. I held in 20CFox v BT at [99]-[113], Dramatico v Sky (No 2) at [6] and EMI v Sky at [76]-[88] that both users and the operators of the websites in issue used the Defendants' services to infringe the claimants' copyrights. In my judgment that reasoning is equally applicable to the present case.

*Do the Defendants have actual knowledge?*

52. On 7 June 2013 FAPL's solicitors sent detailed letters before action to the Defendants which attached the evidence relied upon by FAPL in the present application. I am satisfied that, as a result, the Defendants do have actual knowledge that users and the operators of the Websites use the Defendants' services to infringe copyright. Indeed, I note that none of the Defendants denies this.

**Proportionality and discretion**

53. FAPL contends that I should exercise my discretion to make the orders sought. Unlike in 20C Fox v BT , the Defendants do not advance any reasons as to why I should exercise my discretion to refuse to make the orders sought. Even so, as FAPL rightly accepts, the onus remains on FAPL to satisfy the Court that it is appropriate to make such orders, and in particular that the orders are proportionate.

54. I reviewed the correct approach to the assessment of proportionality in EMI v Sky at [91]-[106]. I shall adopt the same approach here.

55. FAPL contends that the orders are proportionate for the following reasons:

i) As between FAPL and the Defendants, the Defendants do not oppose the making of the orders and the terms of the orders have been agreed between FAPL and the Defendants. The costs to the Defendants of implementation are modest and proportionate.

ii) The orders are necessary to protect the copyrights of FAPL and the supporting rightholders, which are being infringed on a large scale. Given the difficulty of identifying, let alone bringing proceedings against, the operators of FirstRow, no other effective remedy is open to FAPL in this jurisdiction.

iii) The orders are also necessary, or at least desirable, in order to protect the sporting objectives which lie behind the Closed Period, and in that sense are in the public interest. This is a legitimate factor to take into account: see *Rugby Football Union v Viagogo Ltd [2012] UKSC 55, [2012] 1 WLR 3333* at [45].

iv) While FirstRow features international content some of which may not be protected by copyright or may be licensed, the vast bulk of the content which is likely to be of interest to UK users infringes the rights of FAPL and the supporting rightholders.

v) The orders are narrow and targeted ones, and they contain safeguards in the event of any change of circumstances. While they are unlikely to be completely efficacious, since some users will be able to circumvent the technical measures which the orders require the Defendants to adopt, it is likely that they will be reasonably effective.

Case 7:13-cv-09239-CS-VR    Document 590    Filed 10/06/25    Page 65 of 79

Football Association Premier League Ltd v British Sky..., 2013 WL 3550408...

56.  So far as sub-paragraph (v) is concerned, two points should be noted. First, the orders require IP address blocking of the IP address for FirstRow's domain name firstrow1.eu. FAPL's evidence is that this will not result in over-blocking since that IP address is not shared. The orders also require IP address re-routing and URL blocking for URLs at any shared IP addresses.

57.  Secondly, on 25 June 2013 Mann J granted orders under section 97A concerning a website known as EZTV. He required the orders to contain an additional liberty to apply in the following terms:

> "The operator(s) of the Target Website (as defined in the Schedule to this order) and the operators of any other website who claim to be affected by this Order, are to have permission to apply to vary or discharge this Order insofar as it affects such an applicant, any such application to be on notice to all the parties and to be supported by materials setting out and justifying the grounds of the application. Any such application shall clearly indicate the status of the applicant and indicate clearly (supported by evidence) that it is the operator of the website which is the subject of the application."

58.  I agree that this is a beneficial provision to include in orders of this nature. In the present case, the parties have agreed to the inclusion of a similar provision.

59.  Having considered the proportionality of the orders sought by the present applications as between FAPL (and the supporting rightholders) and the Defendants and as between FAPL and the operators and users of FirstRow, I am satisfied that the orders sought are proportionate for the reasons advanced by FAPL. The interests of FAPL and the supporting rightholders in enforcing their copyrights clearly outweigh the Article 11 EU Charter rights of the users of the Websites, who can obtain the copyright works from lawful sources. They even more clearly outweigh the Article 11 rights of the operators of the Websites, who are profiting from infringement on a large scale. They also outweigh the Defendants' Article 11 rights to the extent that they are engaged.

**Conclusion**

60.  I will make the orders requested by FAPL.

Crown copyright

© 2025 Thomson Reuters.

# EXHIBIT E

## (2) Damages/Additional Damages/Statutory Damages

Halsbury's Laws of Singapore - Intellectual Property (Volume 13(3))

**Halsbury's Laws of Singapore - Intellectual Property (Volume 13(3))  >  160 – Intellectual Property > (I.) Copyright  >  (14.) Copyright: Particular Remedies**

# 160 –  Intellectual Property(I.) Copyright(14.) Copyright: Particular Remedies (2) Damages/Additional Damages/Statutory Damages

## [160.127] Damages generally

Damages are available in every action for copyright infringement.[1] If the claimant is in the business of licensing his copyright works, the damages would be an amount equivalent to a notional licence fee or royalty.[2]

In other cases, the amount would be based on the depreciation caused by the infringement to the value of the copyright or the actual harm or loss to the plaintiff's reputation.[3]

[1]
Except in cases of innocent infringement: see Copyright Act 2021 (2020 Rev Ed), s 306 and [160.128] below. The object of damages is to compensate for loss or injury. The general rule therefore is that the measure of damages is to be, so far as possible, the sum of money which will put the injured party in the same position as he would have been in if he had not sustained the wrong. The claimants have the burden of proving their loss. However, the defendants being wrongdoers, damages are to be liberally assessed, bearing in mind that the object is to compensate the plaintiffs and not punish the defendants: see *General Tire & Rubber Co v Firestone Tyre & Rubber Co Ltd* [1975] 1 WLR 819, [1975] 2 All ER 173, [1976] RPC 197, [1975] FSR 273 (HL). These principles, which were discussed by the House of Lords in the context of patent infringement, are generally applicable in cases of copyright infringement as well: see *Ong Seow Pheng v Lotus Development Corp* [1997] 3 SLR 137. For a recent case involving assessment of damages for copyright infringement, see *Cordlife Group Ltd v Cryoviva Singapore Pte Ltd* [2016] SGHCR 5.

[2] See *General Tire & Rubber Co v Firestone Tyre & Rubber Co Ltd* [1975] 1 WLR 819, [1975] 2 All ER 173, [1976] RPC 197, [1975] FSR 273 (HL); *PBI Publications (Hong Kong) Ltd v Marks Hundred Co Ltd* [1987] 2 HKC 157 (CA, HK); *Phonographic Performance (South East Asia) Ltd v Lost City Ltd* [1998] 1 HKC 357 (CFI, HK); [1998] 2 HKLRD 976, [1998] 4 HKC 131 (CFI, HK).

[3] See *Ong Seow Pheng v Lotus Development Corp* [1997] 3 SLR 137; *Sutherland Publishing Co Ltd v Caxton Publishing Co Ltd* [1936] Ch 323 at 336 per Lord Writ MR. Damages are usually assessed on an enquiry after the defendant's liability for infringement is established, but no enquiry will be ordered unless the plaintiff has shown he is likely to have suffered damage: see *Prince Plc v Prince Sports Group Inc* [1998] FSR 21. Note that, unlike in patent cases, there is no necessary assumption that every sale of the infringing product amounts to a lost sale by the plaintiff: see *Konstar Industries Ltd v Hung Sang Metal Plastic Factory Ltd* [2004] HKEC 1578 (CFI, HK). See also the Singapore High Court decision in *Dootson Investment Corp v Highway Video Pte Ltd and another action* [1998] 1 SLR 497, where damages were held to be 'at large'.

# (3) Account of Profits

Halsbury's Laws of Singapore - Intellectual Property (Volume 13(3))

**Halsbury's Laws of Singapore - Intellectual Property (Volume 13(3))  >  160 – Intellectual Property > (I.) Copyright  >  (14.) Copyright: Particular Remedies**

# 160 –  Intellectual Property(I.) Copyright(14.) Copyright: Particular Remedies (3) Account of Profits

## [160.131] Account of profits

The court may grant an account of profits for an infringement of copyright.[1] Further, when the court awards damages, the court may also make an order for an account of any profits attributable to the infringement that have not been taken into account in computing the damages.[2]

An account of profits is an equitable, and therefore, discretionary remedy. It may therefore be defeated by equitable defences such as acquiescence, unclean hands and laches. It is not clear whether the courts can take into account the 'innocence' of a defendant.[3]

The purpose of an account of profits is to prevent an infringer from being unjustly enriched by his acts of infringement.[4] The taking of an account of profits requires the infringer to pay to the claimant the portion of the profits that the infringer has made from the infringement.[5]

A claimant can claim for both damages and an account of profits in its pleadings,[6] and is only required to make an election as to which remedy he chooses after liability is established. The claimant is entitled to disclosure and inspection of documents and an order for the provision of information necessary for him to make an informed choice between damages and an account of profits.[7] A claimant who has chosen to sue more than one party in a chain of distribution may not elect for damages against one defendant and an account of profits against another.[8]

[1]

Copyright Act 2021 (2020 Rev Ed), s 305(1)(c).

[2] Copyright Act, s 305(3). Except in such a case, the remedies of damages (including additional damages), an account of profits and statutory damages are mutually exclusive: see s 305(2). It should also be noted that where, in an action for infringement of copyright, it is established that an infringement was committed but it is also established that, at the time of the infringement, the defendant was not aware, and had no reasonable grounds for suspecting, that the act constituting the infringement was an infringement of the copyright, the plaintiff shall not be entitled to any damages against the defendant in respect of the infringement, but shall be entitled to an account of profits instead: see s 306. See also *Redrow Homes Ltd v Betts Brothers plc*[1997] FSR 828 (Scottish Court of Session); [1998] FSR 345 (HL), overruling the decision in *Cala Homes (South) Ltd v Alfred McAlpine Homes East Ltd (No 2)* [1996] FSR 36 (HC, Eng).

[3] This is because the Copyright Act, s 306 provides that where it is established that an infringement was committed but it is also established that, at the time of the infringement, the defendant was not aware, and had no reasonable grounds for suspecting, that the act constituting the infringement was an infringement of the copyright, the plaintiff shall be entitled to an account of profits (but not to damages) in respect of the infringement. In *Real Electronics Industries Singapore (Pte) Ltd v Nimrod Engineering Pte Ltd* [1996] 1 SLR 336 at 352, the Singapore High Court held that since the defendant was unaware of the infringement, 'the plaintiffs shall only be entitled to an account of profits in respect of the infringement'. See also the English cases of *Sir Terence Orby Conran v Mean Fiddler Holdings Ltd* [1997] FSR 856 at 861 and *Wienerwolrd Ltd v Vision Video Ltd* [1998] FSR 832, and the discussion in George Wei *The Law of Copyright in Singapore* (2nd Edn, 2000) para 10.81A.

[4] *Colburn v Simms* (1843) 2 Ha 543 at 560; *Celanese International Corp v BP Chemicals Ltd* [1999] RPC 203 para 36 (a patent case).

[5] *Peter Pan Manufacturing Corp v Corsets Silhouette Ltd* [1963] 3 AER 402; *Colbeam Palmer Ltd v Stock Affiliates Pty Ltd* (1968) 42 ALJR 209; *Potton Ltd v Yorkclose Ltd* [1990] FSR 11; *Dart Industries Inc v Décor Corp Pty Ltd* (1993) 26 IPR 193.

(3) Account of Profits

[6] And presumably statutory damages as well. As to statutory damages, see [160.130].

[7] *Island Records Ltd v Tring International plc* [1995] FSR 560; *Brugge v Medicaid* [1996] FSR 362.

[8] *Spring Form Inc v Toy Brokers Ltd* [2002] FSR 276.

**End of Document**

# EXHIBIT F

# Law of Intellectual Property of Singapore, Revised Third Edition, 2022

## About this title

### FRONT MATTER

Law of Intellectual Property of Singapore

Revised Third Edition

*For Ian, Weng Sun and Weng Lin*

*The updates in this Revised 3rd Edition are primarily concerned with IP-related legislative changes that were brought into force between July 2021 (the printing of the 3rd Edition) and 1 April 2022.*

**S.C. (Hon.) Ng-Loy Wee Loon**

Originally published in 2021

Revised edition published in 2022 by

Thomson Reuters Corporation Pte Ltd

(trading as Sweet & Maxwell)

ISBN: 978-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-7

eISBN: 978-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-1

Thomson Reuters and the Thomson Reuters logo are trademarks of Thomson Reuters.

Sweet & Maxwell ® is a registered trademark of The Thomson Corporation Pte Ltd

© 2022 Ng-Loy Wee Loon

All rights reserved. No part of this publication may be reproduced or transmitt ed in any form or by any means, or stored in any retrieval system of any nature without the prior writt en permission of the publishers. Material is contained in this publication for which publishing permission has been sought, and for which copyright is acknowledged. Permission to reproduce such material cannot be granted by the publishers and application must be made to the copyright holder.

*"Important Disclaimer: No person should rely on the contents of this publication without first obtaining advice from a qualified professional person. This publication is distributed on the terms and understanding that (1) the authors, consultants and editors are not responsible for the results of any actions taken on the basis of information in this publication, nor for any error or omission from this publication; and (2) the publisher is not engaged in rendering legal, accounting, professional or other advice or services. The publisher, and the authors, consultants and editors, expressly disclaim all and any liability and responsibility to any person, in respect of anything, and of the consequences of anything, done or omitted to be done by any such person in reliance, whether wholly or partially, upon the whole or any part of the contents of this publication. Without limiting the generality of the above, no author, consultant or editor shall have any responsibility for any act or omission of any other author, consultant or editor."*

Printed in Singapore by Markono Print Media Pte Ltd



# Law of Intellectual Property of Singapore, Revised Third Edition, 2022

## PART 2 COPYRIGHT

## Chapter 10: INFRINGEMENT

## 10.1 PRIMARY INFRINGEMENT

## Territoriality in infringement actions

**[10.1.5]**

It is expressly provided in s 146(1) that the unauthorised act must have been done in Singapore. This requirement arises from the territorial nature of copyright. Copyright protection for a work is limited to the doing of any of the prohibited acts within the territory of the country that grants the copyright. For example, if a movie which enjoys protection in Singapore is pirated in Malaysia, making infringing copies of the movie in Malaysia does not constitute an infringement of the reproduction right under the Copyright Act 2021. (However, as we will see, if these infringing copies of the movie are imported into Singapore for commercial purposes, this may constitute secondary infringement.)

**[10.1.6]**

For some of the prohibited acts, the location of the unauthorised act may not be immediately obvious. For example, in satellite broadcasting, does the act of broadcasting occur in the country from which the signals are emitted to the satellite (the ʻup legʼ of the signals), or in the country or countries where the signals can be received (the ʻdown legʼ of the signals)? The effect of the ʻup legʼ option is that a broadcaster who emits the signals from a country pays licence fees in relation to the act of broadcasting taking place in that country only. In the ʻdown legʼ option, the broadcaster has to pay licence fees in relation to the act of broadcasting in all the countries where the signals can be received. The argument for the ʻdown legʼ option is that the harm suffered by the copyright owner is located in all these countries within the so-called ʻfootprintʼ of the broadcast because the public in these countries are enjoying the work.

**[10.1.7]**

In Singapore, this issue has been resolved as follows: a broadcast is made from the place from which the signals are transmitted to the satellite transponder.[5] This adopts the ʻup legʼ option. Therefore, a broadcaster who emits signals from the nearby Indonesian island of Batam is taken to be doing the act of broadcasting in Indonesia, and not in Singapore. This broadcast does not constitute primary infringement under s 146(1) of the Copyright Act 2021, even if the public in Singapore can receive this broadcast.

**[10.1.8]**

When works are disseminated via the Internet, the relevant exclusive right is the right of communication to the public. Where does the act of communicating the work to the public occur — in the country where the work is uploaded onto the Internet webpage, or where the server is located, or where the work is assessed (i.e. where the Internet surfer is located)? This question can be phrased in another way: what constitutes the act of communicating the work to the public?[6] The meaning of the word ʻcommunicateʼ, in relation to a work, is as follows:

to transmit the work by electronic means, and includes —

      (a) broadcasting the work;

(b) including the work in a cable programme service; and

(c) making the work available (on a network or otherwise) in way that it may be accessed by any person on demand.

## [10.1.9]

Paragraph (c) in this definition is targeted at dissemination of works on the Internet. The act of communication mentioned in this paragraph is the act of 'making available' the work. In the United Kingdom, the act of communication occurs in the United Kingdom when (i) the person making the work available (the uploader) is located in the United Kingdom; or (ii) if the uploader is outside the United Kingdom, his intention is to target the members of the public in the United Kingdom.[7] In this analysis, the location of the server is not a relevant factor. The rationale given for disregarding the location of the server is that it is sometimes difficult to localise the server with certainty.

---

5.  Section 32(b).

6.  Section 61(1).

7.  EMI Records Ltd v British Sky Broadcasting Ltd [2013] FSR 31 at [33]-[38]; Football Association Premier League Ltd v British Sky Broadcasting Ltd [2013] ECDR 14 at [30]-[31]; and Tunein Inc v Warner Music UK Ltd [2021] EWCA Civ 441 at [60]-[61].



# EXHIBIT G

| | |
|---|---|
| Parliament No: | 10 |
| Session No: | 1 |
| Volume No: | 78 |
| Sitting No: | 7 |
| Sitting Date: | 16-11-2004 |
| Section Name: | BILLS |
| Title: | COPYRIGHT (AMENDMENT) BILL |
| MPs Speaking: | Mr Ahmad Khalis Bin Abdul Ghani;Mr Abdullah Tarmugi (Mr Speaker);Mr Zainudin Nordin;Ms Indranee Rajah;The Deputy Prime Minister and Minister for Law (Prof. S Jayakumar) |

Column: 1041

# COPYRIGHT (AMENDMENT) BILL

Order for Second Reading read.

The Deputy Prime Minister and Minister for Law (Prof. S Jayakumar): Mr Speaker, Sir, I beg to move, "That the Bill be now read a Second time."

Mr Speaker, Sir, Members of the House may recall that in June this year, four Bills were enacted to strengthen our intellectual property regime.  At that time, I had informed the House that a further set of amendments to the Copyright Act would be proposed later in the year.

Sir, this Bill seeks to amend the Copyright Act to enhance and strengthen our copyright regime, particularly to ensure that our copyright laws remain relevant in an age of rapid technological development.  Major amendments to the Act were last made in 1999 to keep pace with the emerging popularity of the online environment and the growth of electronic commerce.  Even then, I had said that the amendments would by no means be the last word on the subject.

Today, we all are aware of the rapid pace of technological advancement, particularly in the realm of digital technology. Singapore's information communications technology (or ICT) environment has also correspondingly evolved.  In 1999, only 42% of Singapore households enjoyed home Internet access.  This has since increased to 65%, or almost two-thirds of all households.  More households also have high speed access to the Internet - 40% of households have broadband

Column: 1042

access now compared to only 3% in 1999.

The amendments in the Bill address the needs of both copyright owners and users in this new environment. These changes in the Bill will also further strengthen Singapore's position as an attractive location for copyright-based activities.  Several of the amendments in the Bill also relate to our obligations under the United States-Singapore Free Trade Agreement.

The proposed amendments, Sir, are a result of a two-year review of technological and international developments, and were finalised only after extensive consultations with the relevant stakeholders.  Since June 2003, the Intellectual Property Office of Singapore, or IPOS, has chaired an IP taskforce in order to obtain well-rounded feedback. The taskforce comprises members from business associations such as the Association of Small and Medium Enterprises and the Singapore International Chamber of Commerce, as well as Government statutory boards such as the Economic Development Board and the Media Development Authority.  To complement the IP taskforce, an inter-Ministry committee comprising the relevant Government agencies was also set up to review the proposed amendments.

In proposing these amendments, we have sought to strike a good balance between the interests of copyright owners and those of the copyright users.  We have taken into account legislation in other countries including that of the United States, the United Kingdom, Australia and Canada.

We made available a consultation draft version of the Bill on IPOS' website, and IPOS invited further feedback through a public seminar.  We received useful feedback from several IP rights organisations, user groups, the Law Society and experts

Column: 1043

in IP law.  All feedback was carefully considered and modifications incorporated where appropriate.  The Government is also committed to extensive public awareness initiatives.

Let me first deal with the amendments related to enhancing the copyright regime to meet the needs of copyright owners and users in the new digital environment.

The first group of amendments introduces several new rights, in recognition of changing business models in the digital realm.

First, new right of communication for works.  Sir, the Internet is becoming an increasingly important platform through which copyright owners promote and disseminate their copyrighted works.  Such digital dissemination of works has become the basis for businesses such as home-grown music distributor Soundbuzz.  Clause 8 of the Bill introduces a new right to enable the copyright owner to control the communication of his work to the public.  This new communication right encompasses both the existing broadcasting and cable programme rights, and also the right to

control the dissemination of works on the Internet. This right will enable copyright owners and entrepreneurs to fully leverage on the Internet platform as a means to disseminate copyrighted material.

Next, new rights for producers of sound recordings.  Likewise, Sir, clause 20 provides, for producers of sound recordings, a new right to publish a sound recording, and the right to make available to the public a sound recording by means of, or as part of, a digital audio transmission. These new rights will enable producers of sound recordings to control interactive transmissions of their recordings, and give them greater confidence in the protection of their IP in this medium.

Column: 1044

Next, let me speak about new rights for performers.  Clause 51 provides new rights to performers such as the right to control indirect recordings of their performances, the right to be attributed, the right to publish and the right to communicate a recording of their performance to the public.  These rights will enable the performer to control the way his performance is used and exploited in the commercial market.  We are confident these amendments will be welcomed by performing artistes in the music and media industry.

But let me say, Sir, that we have been mindful that the introduction of new rights does not lead to an undue restriction of the fair uses of copyrighted material.  Exceptions to these rights have therefore been provided, for example, for educational institutions and libraries.  These exceptions can be found in clauses 7, 14, 15, 16, 17 and 24.  We have also catered for exceptions in specific situations, such as an exception for the digital transmission of sound recordings within a business establishment, as long as such transmission is not the core business of such an establishment.  There are also necessary exceptions to cater for technical processes; for example, temporary, transient, incidental copies that could occur as part of making a lawful communication.  In the case of non-interactive transmissions such as webcasting, we have provided a limited right to equitable remuneration.  These exceptions can be found in clause 26 of the Bill which introduces new sections 107A to 107E.

Mr Speaker, these amendments will bring our copyright framework in line with international standards, embodied in international treaties such as the World Intellectual Property Organisation's Copyright Treaty, the WCT, and the Performances and Phonograms Treaty, the WPPT.  With these changes, Singapore will provide a similar copyright regime to

Column: 1045

the 48 other member states party to the WCT, and 45 others that are party to the WPPT.

Let me say something about the removal and alteration of rights management information.  The Copyright Act already provides civil remedies for copyright owners to prevent the unauthorised removal or alteration of rights management information, or RMI.  RMI refers to information which may identify the work, the author, or the terms and conditions of use of that work.  In the digital environment, an example of RMI could be a digital watermark, which incorporates information identifying the author of the work.

For example, RMI can assist copyright owners and such usage of the work, gives users confidence in the authenticity of the source of a work, and certainty as to the conditions of its use.  It is thus important to protect RMI and to prevent the distribution of copies where such information has been removed or manipulated in order to induce, enable, facilitate or conceal an infringement.

The Bill enhances protection by providing civil remedies against unauthorised distribution or importation for distribution of altered RMI.  It also provides civil remedies against the unauthorised distribution, importation for distribution or communication of works or other subject matter in respect of which RMI has been removed or altered.  In addition, the Bill also creates a new criminal offence in cases where any of the prohibited acts in relation to RMI are carried out wilfully and for the purpose of obtaining a commercial advantage.

Next, I turn to technological measures protecting copyrighted works.  Sir, the

Column: 1046

advent of digital technology has made it easy to make perfect copies of copyrighted works.  This new technology has made effective enforcement of copyright in the digital realm therefore a much more difficult undertaking than for conventional physical works of copyright.  So in order to protect their works from being infringed, copyright owners may employ technological measures to protect their works.  These technological measures include access control systems such as encryption and copy control systems.  These technological measures could also include a measure applied to a tangible copy of a copyrighted work, or used in connection with the exercise of copyright.  Copyright owners should reasonably expect their efforts in employing such measures to protect their works from infringement not to be thwarted and not to have those technological measures circumvented.

Accordingly, Mr Speaker, Sir, clause 59 introduces a new Part XIIIA providing civil remedies and criminal penalties for the circumvention of technological measures used by copyright owners in connection with the exercise of their copyright.  A copyright owner can bring suit against a person who manufactures or trades in circumvention measures, or offers services related to the circumvention of a technological measure.  If the person does these acts wilfully and for the purpose of obtaining a commercial advantage, he may also be guilty of an offence.

We have also built in review mechanisms that will allow our law to be responsive to technological changes. Where it has been determined that a dealing with a work or a class of works does not amount to an infringement, and that the legitimate use of these works has been adversely impaired or affected, the Minister has the discretion to exclude such works from the operation of these provisions which I have mentioned.

Column: 1047

As before, we have provided here exceptions such that legitimate forms of such acts would not be unduly impeded.  These are enumerated in new sections 261D and 261E.  Briefly, examples of such exempted acts include authorised encryption research and security testing, specific reverse engineering to ensure interoperability, law enforcement, intelligence and other Government activities such as defence and security, amongst others.

Case 7:13-cv-00239-CS-VR Document 590 Filed 10/06/25 Page 79 of 79

Sir, having consulted the relevant stakeholders, we will also exclude public non-profit organisations and institutions such as libraries, archives and educational institutions that routinely come into contact with large volumes of copyrighted works. These institutions have been exempted from criminal liability although they may remain subject to civil remedies for any violation.

Mr Speaker, Sir, these provisions will provide greater assurance to copyright owners and improve their ability to protect their copyrighted works from infringement. We will join the US, UK, Australia, the European Union and Japan in recognising the importance of such measures in protecting copyrighted works from infringement.

Let me turn now to stronger enforcement measures.

Sir, all the rights which I mentioned thus far, would be meaningful if they are backed up by a robust enforcement framework. We have proposed amendments to enhance both the civil and criminal remedies to infringement. Let me touch on some of these changes.

First, changes to civil procedures and remedies beginning with presumption of copyright.

Clause 35 of the Bill, Sir, refines the existing provision under our Copyright Act

Column: 1048

on the presumption of copyright in infringement actions. This refinement is intended to facilitate the process of copyright infringement actions, and to render such actions less onerous for the copyright owner. The presumption in favour of the copyright owner plaintiff, namely, that copyright subsists in the copyrighted work and that he is the owner of the copyright, will apply so long as the defendant does not satisfy the court that he puts these matters in issue in good faith. However, if the defendant, in good faith, puts these matters in issue, the plaintiff may now, by affidavit, assert relevant facts attesting to the ownership and subsistence of the copyright. Such affidavit will serve as *prima facie* proof of the matters asserted unless, of course, the defendant proves otherwise.

Turning to statutory damages regime, Members would recall that in June this year, when I moved amendments to the Trade Marks Act, we enacted a statutory damages regime as a complement to the current process of assessing damages in an infringement suit. In this Bill, we proposed to introduce a similar regime for the Copyright Act. This provides copyright owners, in an infringement action, the option to choose, in lieu of actual damages suffered, a new remedy of "statutory damages". This will be especially useful in situations where it is difficult for the copyright owner to prove the quantum of actual losses. Instead, the court will assess the quantum of statutory damages, based on compensatory principles, elaborated in new subsection 119(5). This remedy of statutory damages will also be available for the provisions relating to the circumvention of technological measures, rights management information and performances. This provision will serve as an additional deterrent against infringers.

Let me turn to criminal liability for wilful infringement of copyright.